## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| LUCASYS INC. | Case No. 1:20-CV-2987 |
| Plaintiff, | Judge Amy M. Totenberg |
| v. | |
| POWERPLAN, INC., | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

This case stems from a garden-variety dispute concerning Defendant PowerPlan, Inc.'s ("PowerPlan") lawful and legitimate attempts to protect its trade secrets from misappropriation by several former PowerPlan employees who recently formed the Plaintiff Lucasys Inc. ("Lucasys").  Expecting it would be sued, Lucasys has run to the Courthouse trying to recast itself as a victim in an attempt to dress up the dispute in the language of antitrust.  As shown below, however, Lucasys' vague and conclusory allegations are insufficient as a matter of law and there is no well-pled antitrust dispute in this case.

Among the many fatal issues here, Lucasys pleads injuries only to itself, and there are no well-pled, plausible injuries to *competition* in any market in which Lucasys actually participates.  For this and additional reasons, Lucasys also cannot

establish antitrust standing.   Accordingly, Lucasys' antitrust claims should be dismissed under Fed. R. Civ. Pro. 12(B)(6).

Lucasys' Georgia state law claims are equally flawed.  For example, Lucasys alleges that PowerPlan interfered with its contractual and business relations.  Under Georgia law, however, such claims can only be brought against defendants that are strangers to the contractual or business relationship.  Here, as the allegations of the Complaint show, PowerPlan is no stranger to these relationships.  Among other things, this dispute involves PowerPlan's former employees at Lucasys accessing and using PowerPlan's proprietary and confidential information at the same time that they are attempting to develop and sell competing software to PowerPlan's customers.  Accordingly, Lucasys' state law claims for tortious interference also fail as a matter of law, and should be dismissed.

## BACKGROUND

### Defendant, PowerPlan

PowerPlan is an Atlanta-based provider of management software for investor-owned rate-regulated utilities.  Cmplt. ¶ 6.  PowerPlan pioneered this software, after substantial investment of time and expense, in the 1990s.  PowerPlan's software provides a unique and comprehensive solution that allows investor-owned, rate-regulated utilities to efficiently process and analyze data for operational, accounting, regulatory, tax and other purposes.  *See id*. ¶¶ 8-9.  The software is licensed to

utilities.  *See id.* ¶ 8.  As is typical, the license agreement contains provisions to protect PowerPlan's confidential information.  *See id.* ¶ 46.  In addition to the core application, users can license certain add-on proprietary software modules for additional functionality.  *Id.* ¶¶ 7-9.  These add-on modules allow users to address specific issues relating to income tax, property tax, lease accounting, fixed assets, rate case management, asset investment optimization, capital planning and forecasting, and project portfolio cost management.  *Id.* ¶¶ 8-10.

**Plaintiff, Lucasys**

Lucasys describes itself as a "small, start-up tax consulting and software development company[.]"  Cmplt. ¶ 5.  Lucasys was founded in 2018, by a former PowerPlan employee.  *Id.* ¶ 27.  Lucasys subsequently added two additional "co-founders," who are also former PowerPlan employees.  *Id.*  Lucasys claims that it provides "subject-matter expertise to utility customers to help with their data issues, primarily for the purpose of facilitating the computation of deferred tax obligations and changes based on the new tax code."  *Id.*

**The Alleged Utility Management Software Market ("UMS Market")**

PowerPlan's proprietary, licensed software, referenced above, is the only full-suite utility management product in the market.  *Id.*  Lucasys' Complaint describes customers for such utility management software as the Utility Management Software Market ("UMS Market").  *Id.* ¶ 67.

Lucasys admits that it does <u>not</u> have a product that competes in the UMS Market, and that it has recently advised at least one of Lucasys' own customers that it "should implement PowerPlan's full income tax suite as the only solution available for their regulated requirements." *See id*. ¶¶ 31, 43, 50, 63.

**The Alleged Supplemental Management Services Market ("SMS Market")**

In addition to utility management software, rate-regulated utilities also purchase consulting services from a wide variety of providers. Lucasys claims that the "consulting services needed to perform critical processes that PowerPlan's Utility Management Software cannot perform" is a separate "aftermarket." Cmplt. ¶¶ 17, 18, 76, 77. Lucasys calls this alleged aftermarket the Supplemental Management Services Market ("SMS Market"). *Id*.

Lucasys admits that there is active competition in the SMS Market, with at least ten different providers servicing the SMS Market, and that PowerPlan "allow[s] consulting competition . . . in the Supplemental Management Services Market[.]" Cmplt. ¶¶ 17, 18, 79, 88. Indeed, Lucasys acknowledges that utilities frequently issue requests for proposals (or "RFPs") to multiple providers of these services who compete for the work, and then the utilities select the most competitive bid. *Id*. ¶ 17. Lucasys also admits that PowerPlan has no monopoly in the alleged SMS Market. *Id*. ¶ 18.

**The Alleged Deferred Tax Solutions Market ("DTS Market")**

Lucasys also vaguely asserts the potential existence of an additional or alternative market it calls the Deferred Tax Solutions Market ("DTS Market"). Cmplt. ¶ 81.  It equivocally claims that this market is either a separate market or a submarket within the SMS Market.  *Id.*  This market allegedly "comprises consulting services to assist investor-owned rate-regulated utilities with cleansing and remediating their data and implementing systems that allow them to calculate tax positions associated with changes in the tax code[.]"  *Id*.

Once again, Lucasys admits that there is competition in the DTS Market, alleging that it, PowerPlan, and another provider are the primary competitors, and that there is also competition from "a few individuals."  *See id.* ¶¶ 25, 26.  There is no allegation that PowerPlan has monopoly power in the claimed DTS Market, and Lucasys admits that PowerPlan "has been content competing with other consultants to provide Deferred Tax Solutions."  *Id*. at ¶ 26.

**The Underlying Dispute**

The current dispute between the parties arose in October 2019.  Cmplt. ¶ 38. PowerPlan was concerned with the risk that PowerPlan's former employees at Lucasys could misappropriate PowerPlan's trade secrets and confidential information, including information obtained by the principals during their prior employment with PowerPlan.  As noted in the Complaint, PowerPlan sent a letter to

Lucasys on October 30, 2019 about PowerPlan's concerns with protecting PowerPlan's confidential information. *Id.* Lucasys then agreed to provide certain information over the following months, but ultimately attempts to resolve the dispute broke down. *See id.*

Although fundamentally mischaracterized in the Complaint, in response to Lucasys' conduct with PowerPlan's customers, PowerPlan took steps necessary to protect its trade secrets with certain of its customers. *See* Cmplt. ¶ 46. This included communications reminding certain customers of their obligations under their existing license agreements with PowerPlan to protect PowerPlan's trade secrets, and not to allow third parties to reverse engineer or otherwise misappropriate PowerPlan's confidential information to create competing software products.

For example, the Complaint refers to PowerPlan's letters sent to American Electric Power ("AEP"), a customer of both PowerPlan and Lucasys.[1] *Id.* ¶¶ 46, 54. As the Court can see, the letters are focused on PowerPlan's "concern" about the "risk that Lucasys will misuse and misappropriate [PowerPlan's] confidential information and unfairly use it to develop, market and sell its competing software." Ex. 1, 7-17-20 letter. PowerPlan stressed that AEP <u>could</u> "provide [AEP's own]

---

[1] On a Rule 12(b)(6) motion, the Court may consider evidence extrinsic to the pleadings if "(1) the documents are referred to in the complaint; (2) the evidence is central to the plaintiff's claim; and ([3]) the evidence's authenticity is not in question." *Pack v. Stanley*, No. 1:10-CV-2200-AT, 2011 U.S. Dist. LEXIS 169402, at *9-10 (N.D. Ga. Sept. 28, 2011) (J., Totenberg).

data, in raw form, to Lucasys," so long as it does not involve Lucasys accessing PowerPlan's proprietary software, data models or schema. *Id.*; *see also*, Ex. 2, 12-5-19 letter.

**Lucasys' Alleged Claims**

Lucasys claims to provide "both consulting services and technological solutions to its customers," and that it hopes and aspires someday to "largely replace consulting services with new Software-As-A-Service (SAAS) solutions[.]" Cmplt. ¶ 29; *see also id.* ¶ 28 (alleging it was founded in part to "provide long-term solutions to replace the need for consultants with software"). Lucasys also hopes someday, "with additional build-out and maturity," to "eventually" produce a replacement for PowerPlan's unique licensed software product in the UMS Market. *See* Cmplt. ¶¶ 31, 32. Lucasys admits, however, that several speculative events must occur before it could "offer an alternative product—which doesn't currently exist." *See id.* ¶¶ 60, 63.

Tellingly, Lucasys offers few details on its business plan to achieve its lofty business aspirations. It alleges that "[r]ather than take the traditional software development approach, Lucasys seeks to identify its clients' challenges and needs and then create solutions in the context of its existing engagements, which it can then deploy more broadly in the market." Cmplt. ¶ 32. Using this admittedly novel approach (rather than the typical investment of time and money into independent

research and development to create its own competitive software), Lucasys hopes it will "eventually . . . compete with more PowerPlan modules and ultimately allow utilities to replace PowerPlan altogether." *See id*.

Moreover, Lucasys admits that it has developed very few solutions to date. Lucasys pleads facts concerning only three software solutions it has allegedly developed. Cmplt. ¶ 30. Lucasys does <u>not</u> claim that any of these software products even begin to approach the hypothetical SAAS solution to eliminate consulting in the SMS Market. Lucasys also does <u>not</u> claim that PowerPlan's attempts to protect PowerPlan's proprietary and confidential information regarding PowerPlan's software has prevented Lucasys from developing any of these three products.

On July 17, 2020, Lucasys filed its Complaint. Lucasys asserts five causes of action under the Sherman Act. In Counts I and II, Lucasys alleges that PowerPlan is maintaining a monopoly in the UMS Market *via* "negative tying arrangements" and by refusing "to supply customers with access to their own data if those customers purchase Supplemental Management Services (and/or Deferred Tax solutions) from Lucasys." Cmplt. ¶¶ 97, 107. Lucasys also alleges that: PowerPlan's customer agreements operate as *de facto* negative tying arrangements (Count III); PowerPlan "coerced" customers to refuse to deal with Lucasys (Count IV); and that PowerPlan's license agreements are *de facto* "exclusive dealing" arrangements (Count V). It asserts these are all violations of 15 U.S.C. § 1.

Finally, Plaintiff alleges various business torts under Georgia law including: engaging in deceptive trade practices (Count VI); tortious interference with contract (Count VII); malicious interference with business relations (Count VIII); defamation per se (Count IX); and, defamation (Count X).

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausibility is the key as the 'well-pled allegations must nudge the claim "across the line from conceivable to plausible."'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010) (citations omitted). To cross this line, the Complaint must contain more than labels and conclusions, and a formulaic recitation of the elements of a cause of action. *Id.*

Stated differently, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Instead, Plaintiff must offer "sufficient factual matter, accepted as true, to 'raise a right to relief above the speculative level.'" *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1262 (11th Cir. 2015) (quoting *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 708 (11th Cir. 2014)). The Eleventh Circuit has repeatedly affirmed the dismissal of antitrust claims under Fed. R. Civ. Pro. 12(b)(6). *See, e.g.,*

*Spanish Broad. Sys. of Fla. v. Clear Channel Communs.*, 376 F.3d 1065 (11th Cir. 2004); *Duty Free Ams., Inc., supra*, 797 F.3d at 1282; *Jacobs, supra*, 626 F.3d at 1345.

## ARGUMENT

### A.   Lucasys' Sherman Act Claims Fail as a Matter of Law.

Lucasys' Sherman Act claims are (at most) garden-variety business tort allegations dressed in the language of antitrust.  The antitrust laws, however, protect competition, not competitors.  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993).  Here, PowerPlan has taken reasonable, legitimate steps to protect its proprietary, trade secret and confidential information from misappropriation.  These steps have not plausibly injured competition in any of the alleged markets.  Unable to plead a plausible injury to competition, Lucasys has simply attempted to recast injuries that Lucasys alone allegedly suffered as injuries to market competition.  As explained below, this is insufficient as a matter of law, and Lucasys' antitrust claims should all be dismissed.

### 1.   Lucasys Lacks Standing to Assert Claims Concerning Alleged Monopolization of the UMS Market.

Lucasys does <u>not</u> plead that it was willing and able to enter the UMS Market, and therefore lacks standing to assert monopolization claims relating to that market.  In Counts I, II, IV and V, Lucasys alleges that PowerPlan is unlawfully maintaining a monopoly in the UMS Market or otherwise injuring competition in this market

through "exclusionary tactics."  Cmplt. ¶¶ 93-95, 105-107, 122, 128-129.  It seeks treble damages for these alleged violations pursuant to Section Four of the Clayton Act (15 U.S.C. § 15).  Cmplt. ¶¶ 97, 107, 123. 125.

As the Eleventh Circuit has recognized, standing to assert such antitrust claims requires a private plaintiff to plead facts demonstrating: (1) that it suffered an "antitrust injury," and (2) that it is an "efficient enforcer" of the antitrust laws.  *See Sunbeam TV Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013) (citations omitted).  The antitrust standing doctrine reflects prudential concerns and is intended to avoid burdening courts with claims that are speculative or remote.  *Id*. at 1270 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)).

Where (as here) a plaintiff alleges that it was prevented from entering a market, a plaintiff must plead that it not only had the intent to enter the market, but also was prepared to do so.  *See id*. at 1273 (citations omitted).  "The law clearly requires a showing of an intention and preparedness to enter the business to give a plaintiff a cause of action for being foreclosed from the market."  *Gas Utils. Co. v. S. Nat. Gas Co.,* 996 F.2d 282, 283 (11th Cir. 1993) (citing *Cable Holdings of Ga., Inc. v. Home Video, Inc.,* 825 F.2d 1559, 1562 (11th Cir. 1987)).  "The preparedness requirement is particularly important for 'capital intensive' industries."  *Sunbeam TV Corp, supra,* at 1273 (citations omitted).  If a plaintiff would be unable to enter

the market even without the alleged exclusionary conduct of the defendant, it lacks standing and its claims fail as a matter of law.  *Id* at 1271.

Here, Lucasys has not pled even the most basic requirement for preparedness to enter the UMS Market —*i.e., the existence of a product.*  To the contrary, Lucasys admits repeatedly in the Complaint that it does <u>not</u> have a product to sell in the UMS Market.  *See* Cmplt.¶ 43 (Lucasys "has also not yet developed a software product that could be fully substituted for PowerPlan's Utility Management Software"); *see also id.* ¶ 63 (pleading that no other alternative Utility Management Software product currently exists).  In the absence of a concrete product to sell in the alleged UMS Market, Lucasys is fundamentally unprepared to enter the market, and lacks standing to assert its monopolization claims in the UMS Market.

Lucasys' Complaint is also clear that Lucasys' business plan does not contemplate entry into the UMS market for the foreseeable future, and is contingent on a number of speculative future events.  Lucasys alleges it prefers a non-traditional software development model in which it would develop limited scope software solutions in the context of its work in the SMS Market, and eventually hopes to develop a product to compete in the alleged UMS Market.  *See* Cmplt. ¶ 32.  To do so, it plans to "identif[y] customers' unmet needs relating to their data and then build[] solutions that permit their customers to use their data more efficiently and effectively."  Cmplt. ¶ 31.

Lucasys claims that, at some unspecified time in the future, it intends to aggregate these incrementally-developed and unidentified "solutions" in some unspecified fashion to ultimately create a product competitive in the UMS Market. *See* Cmplt. ¶ 32.  Accordingly, Lucasys not only admits it has no existing product in the UMS Market, it admits that it has not even identified the "unmet needs" that would be the genesis of the (as yet) undeveloped solutions that would then need to be integrated.

Moreover, the Complaint does <u>not</u> allege that Lucasys has the other business or technical resources needed to bring a product to the UMS Market.  For example, although Lucasys alleges that entry to the UMS Market requires "major capital investment," it does not allege that it has the resources needed to enter the UMS market.  *See* Cmplt. ¶¶ 94, 106.  In short, the Complaint itself reveals that Lucasys is simply unprepared to enter the UMS Market.  It has no product to sell, and no non-speculative or plausible plan to achieve one in the foreseeable future.

Remote and speculative claims like these are precisely the type of claims that the antitrust standing doctrine is intended to prevent.  In short, Lucasys lacks standing to assert claims based on the UMS Market, and those claims should be dismissed.

2.    <u>The Complaint Does Not Allege Plausible Injury to Competition in the SMS Market.</u>

Lucasys' remaining antitrust causes of action all fail for the same central reason: Lucasys fails to plead a plausible injury to competition. In an antitrust case, "to survive a motion to dismiss, the Plaintiff must adequately allege 'actual or potential harm to competition.'" *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1263 (11th Cir. 2015) (quoting *Jacobs, supra,* at 1339). Such "anticompetitive effects are measured by their impact on the market rather than by their impact on competitors." *Spanish Broad Sys. of Fla.*, *supra*, at 1071 (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) (quotations omitted)).

Harm to competition can be demonstrated through reduction in output, increases in price, or deterioration in quality in the market. *See id*. Merely reciting these words, however, is insufficient to survive a motion to dismiss. Plaintiff must plead facts connecting the alleged harmful conduct and its impact (or likely impact) on competition in the market. *Id*.; *see also Jacobs*, 626 F.3d at 1339 ("The plaintiff has the burden of demonstrating damage to competition with 'specific factual allegations.'").

Here, the Complaint alleges injuries claimed to have been suffered by Lucasys—*not injuries to competition*. *See*, *e.g.*, Cmplt. ¶¶ 47-60, 86 (describing *Lucasys*' alleged lost contracts); ¶ 87 (alleging that absent the alleged wrongdoing, *Lucasys* (in unspecified ways) would have reduced *its* prices and improved *its*

product); ¶ 100 (alleging that PowerPlan wants to cripple *Lucasys* before it can enter the UMS Market); ¶ 108 (same); ¶ 58 (claiming that PowerPlan is coordinating a boycott of *Lucasys*).  These allegations, at most, state injuries to *Lucasys*, and do <u>not</u> state a claim for the actual or potential injury to *competition,* as required in the Eleventh Circuit.

The Eleventh Circuit views such single-competitor claims with skepticism.  It has held that "damage to individual competitors is rarely sufficient to establish [competitive harm]."  *Duty Free, supra*, 797 F.3d at 1263 (citing *Spanish Broad. Sys. of Fla. v. Clear Channel Communs.*, 376 F.3d 1065, 1072-73 (11th Cir. 2004) ("Although damage to a critical competitor *may* also damage competition in general, [the plaintiff] bears the burden of drawing that implication with specific factual allegations.") (emphasis in original).

Here, the Complaint is devoid of well-pled factual allegations that PowerPlan has plausibly caused actual or potential harm to competition in the SMS Market. The gravamen of Lucasys' Complaint is that PowerPlan allegedly "block[s] *software competition* in the [SMS] market." Cmplt. ¶ 88 (emphasis supplied).  Specifically it alleges:

> PowerPlan's anticompetitive conduct against Lucasys and other similar competitors . . . affects the [SMS] Market in the following ways: (1) it reduces choices available to utility customers by blocking and precluding a software component to this aftermarket; (2) it raises prices in this market because a software solution creates automation and efficiency and is a lower-priced solution for utilities; and (3) it

decreases the quality of products and services for utility customers in this market because a software solution—with or without consulting services —improves performance and capabilities in this market through automation and customization.

*Id*. As explained below, however, Lucasys' conclusory rhetoric on general economic theory is not sufficient to survive a motion to dismiss.

*First*, Lucasys pleads no *facts* that SMS Market competition has been injured by a lack of choice. Lucasys admits that at least ten different providers actively compete in the SMS Market, there is competitive bidding where the utility hires "the consultant that submits the most competitive bid," and that "PowerPlan allow[s] consulting competition . . . in the Supplemental Management Services Market." Cmplt. ¶¶ 17, 18, 79, 88. Moreover, Lucasys never alleges that any firm—*other than itself*—was blocked from competing in the SMS market for any reason, let alone because it offered a software solution in the SMS market.[2] *See generally*, Cmplt.

*Second*, Lucasys' conclusory claim that PowerPlan's alleged exclusionary conduct "raises prices" or "decreases the quality" is pure speculation, untethered to any well-pled factual allegations in the Complaint. *See* Cmplt. ¶ 88. This position is premised on conclusory allegations that assume software solutions are inherently

---

[2] Lucasys cryptically alleges (in a single paragraph) that at some unspecific point in the past, PowerPlan asserted "baseless trade secret misappropriation claims" against two other firms. Cmplt. ¶ 44. But Lucasys fails to allege any facts plausibly linking this gratuitous (and false) claim to harm to competition in any market.

superior to other forms of consulting services available in the SMS Market.  *See* Cmplt. ¶ 88.  Moreover, Lucasys never identifies the specific "software solutions" to which it refers, whether these are products in existence or to be built, what they would do, who would produce them, when they would be available in the market, how much they would cost, or the extent to which they would displace existing consulting services.  *See generally*, Cmplt.  In short, Lucasys offers only speculation—and no *facts*—from which the Court could determine whether a reduction of price or increase in quality capable of impacting competition in the SMS Market is even possible, much less plausible.

It is well-established that these types of threadbare, conclusory allegations are insufficient as a matter of law.  The Eleventh Circuit's opinion in *Spanish Broad. Sys. of Fla. v. Clear Channel Communs.*, 376 F.3d 1065 (11th Cir. 2004), is particularly instructive.  *Spanish Broadcasting* involved Sherman Act claims regarding the Spanish language advertising market.  The district court granted the defendant's motion to dismiss with prejudice.  *Id.* at 1070.  The Eleventh Circuit affirmed, holding that the plaintiff had failed to adequately plead actual or potential harm to competition.  *Id.* at 1074.  It also held that the plaintiff's proposed amended complaint did not sufficiently allege harm to competition.  *Id.*

In *Spanish Broadcasting*, the plaintiff's proposed amended complaint alleged that the defendant "caused injury to competition by limiting alternatives available to

advertisers, performers and the listening audience." *Id.* at 1078-79.  It also alleged

"[defendants'] conduct has and will continue to affect prices for advertisements, the

quality of programming, and the prices for advertisers' products." *Id.* at 1079.  The

Eleventh Circuit held that neither statement alleged actual harm to competition,

noting that the statements did not plead that prices had *actually* risen or that quality

had *actually* decreased.  *Id.* (emphasis supplied).

 The Court also rejected the plaintiff's allegations concerning potential harm

to competition, observing:

> [T]he complaint contains several vague statements about the potential
> general consequences of hypothetical monopolization of the Spanish-
> language radio market: it "ultimately results in supra-competitive prices
> for advertisements and reduces the number of Spanish stations
> available." A reduction in the number of stations, in turn, "reduces the
> inventory of available advertisements and hinders the advertisers'
> ability to target Hispanics of different origins." Finally, this situation
> "ultimately results in higher prices for the advertisers' products," "will
> likely deteriorate programming quality," and "affect the viability of
> artists in the marketplace."

*Id.* (quotations in original).  The Court held that the plaintiff merely:

> …assumes, conclusorily, a pernicious monopoly capable of limiting
> output and raising prices and then proceeds to describe the other evils
> that might flow from this monopoly. We hold that these conclusory
> allegations, unsupported by specific factual allegations, do not state a
> claim for relief under the antitrust laws.

*Id*.  Like the plaintiff in *Spanish Broadcasting*, Lucasys has simply assumed the

existence of pernicious conduct and then speculates about the alleged evils that may

someday flow from it.  It offers no facts supporting its claims that the claimed partial

exclusion of a single competitor could or did impact prices, quality, or output in a market that Lucasys concedes is competitive.

In sum, Lucasys only pleads injuries to itself.  It offers no well-pled facts from which it is plausible that competition in the SMS Market was injured by any conduct of PowerPlan.  Accordingly, it fails to state a viable antitrust claim as a matter of law, and its remaining antitrust causes of action (Counts III, IV and V) premised on the SMS Market should be dismissed.

      3.     <u>Lucasys has not pled a viable cause of action based on the alleged Deferred Tax Solutions Market.</u>

Lucasys itself seems unsure about the role that the alleged Deferred Tax Solutions ("DTS") Market plays in this case.  It states that "[t]his case involves two distinct but related markets: (1) the [UMS] Market and; (2) the [SMS] Market." Cmplt. ¶ 64.  Later, Lucasys claims, "[i]n addition, or alternatively, it also involves a Deferred Tax Solutions Market." *Id*.  Indeed, the Complaint treats the alleged DTS Market largely as an after-thought, providing little detail that would permit the Court or PowerPlan to decipher where (if at all) the alleged SMS Market ends and the alleged DTS Market begins.  As explained below, this failure is fatal to Lucasys' claims premised on the DTS Market.

*First*, Lucasys' purported market definition is insufficient as a matter of law. Lucasys claims the DTS Market is a "separate or sub-market within the [SMS]

Market for deferred tax solutions for utilities." Cmplt. ¶ 81. It defines the market as follows:

> This market comprises consulting services to assist investor-owned rate-regulated utilities with cleansing and remediating their data and implementing systems that allow them to calculate tax positions associated with changes in the tax code at scale.

*Id.* It alleges that there are three primary competitors and several individuals that provide these services. Cmplt. ¶ 25. It also admits that competition is active in this alleged submarket. *See id.* ¶ 26 ("PowerPlan has been content competing with other consultants to provide Deferred Tax Solutions.").

For a Sherman Act claim to survive dismissal, plaintiffs "must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336. To determine the contours of the relevant sub-market the Court is to look to "practical indicia" including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* at 1337 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)). In making this evaluation, the Eleventh Circuit cautions, "a court should pay particular attention to evidence of the cross-elasticity of demand and reasonable substitutability of the products, because '[i]f consumers view the products as

substitutes, the products are part of the same market.'" *Id.* at 1337-38 (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995)).

Here, Lucasys has <u>not</u> pled facts plausibly suggesting the composition of its alleged submarket.  Indeed, the Complaint admits that either consulting services or software can be used for deferred tax issues, Cmplt. ¶¶ 30, 81, and offers no facts concerning how the public views this alleged sub-market, or the extent to which there are distinct customers, distinct prices, or sensitivity to price changes.  Nor does Lucasys allege the number of customers purportedly in this alleged sub-market or its overall size.  Indeed, the only fact that Lucasys offers in support of its proposed sub-market definition is that this alleged sub-market is primarily served by three firms.  Cmplt. ¶¶ 25, 82.  Lucasys' vague market definition leaves both the Court and PowerPlan to wonder where (if at all) the alleged SMS Market ends and the DTS Market begins.  Accordingly, it is inadequate as a matter of law.

*Second*, even if Lucasys had adequately alleged a cognizable sub-market (it has not), its Sherman Act claims still fail because Lucasys has failed to plead a plausible injury to competition in the DTS Market.  As explained above, to survive a motion to dismiss, a plaintiff must plead facts supporting a plausible injury to actual or potential injury to *market competition*—not just an injury to an individual competitor.  *Supra,* Section A(2).

As noted above, Lucasys treats its substantive claims concerning the DTS Market as an afterthought to its claims concerning the SMS Market.  *See* Cmplt. ¶¶ 85, 99, 102, 107, 110, 116, 122.  Indeed, the only specific allegation concerning harm to competition in the DTS Market concerns the alleged elimination of consumer choice.  *See* Cmplt. ¶ 85 ("PowerPlan's actions also harmed competition in the . . . [DTS] Market by depriving utility customers of a choice in obtaining services[.]").[3]  It also makes the conclusory allegation that elimination of choice "reduces output . . . which in turn raises prices for utility customers."  *Id*.

Notably, Lucasys offers no *facts* to support that the alleged exclusion of Lucasys *actually* raised prices or reduced output.  Nor does Lucasys allege any non-speculative potential harm to competition.  As it did with the SMS Market, Lucasys simply assumes the existence of pernicious conduct, and then speculates about the alleged evils that could theoretically, someday flow from that conduct.  This is insufficient to survive dismissal in the Eleventh Circuit.  *See Spanish Broadcasting*, *supra,* at 1078-79.  Accordingly, Lucasys' claims, premised on the alleged DTS Market, should be dismissed.

---

[3] The vague allegation of a reduction in choice is also contradicted by the allegation in ¶ 68 of the Complaint that "Lucasys has also demonstrated its deferred tax software for other utilities as a replacement for a PowerPlan module."  By Lucasys' own admission, it has <u>not</u> been excluded from offering consumers in the claimed DTS Market an additional choice.

**B.    Lucasys' Tortious Interference Claims Are Precluded By Georgia's "Stranger Doctrine."**

Lucasys also fails to state a claim for tortious interference with contract (Count VII) and malicious interference with business (Count VIII), because Lucasys' complaint makes clear that PowerPlan was <u>not</u> a stranger to the business relationships between Lucasys and its customers.  Under Georgia law, to be liable for tortious interference the defendant must be a "stranger" to the contract or business relationship at issue.[4]  *Atlanta Market Center Management Co. v. McLane*, 503 S.E.2d 278 (Ga. 1998).  A defendant is not a stranger to a contract or business relationship when: "(1) the defendant is an essential entity to the purported injured relations; (2) the alleged injured relations are inextricably a part of or dependent upon the defendant's business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations." *Sis, LLC v. Stoneridge Holdings*, No. 1:17-CV-01816-ELR, 2019 U.S. Dist. LEXIS 229882, at *18 (N.D. Ga. Feb. 5, 2019).

The Complaint makes clear that PowerPlan is not a stranger—it is inextricably interwoven in the business relationships with the mutual customers of PowerPlan

---

[4] The applicability of Georgia's "stranger doctrine" is the same for tortious interference with contract claims and malicious interference with business claims. *Atlanta Market Center Management Co., supra*, 503 S.E.2d at 283 n. 2 (Ga. 1998).

and Lucasys.  The gravamen of Lucasys' complaint is that PowerPlan is preventing Lucasys from fully realizing its aspirations in the UMS and SMS Markets by depriving Lucasys' access to PowerPlan's software and customers.  Cmplt. ¶¶ 46, 54, 56, 59, 61.  Lucasys claims its business is substantially dependent on its ability to access customers' data after it has been processed by PowerPlan's proprietary, licensed software.  *See, e.g.,* Cmplt. ¶ 34

Where one's relationship with a customer is dependent upon another's relationship with the same customer (as alleged here), the parties are not "strangers." For instance, in *Atlanta Fiberglass USA, LLC v. KPI, Co.*, the plaintiff and defendant were parties to an agreement where the defendant agreed to manufacture goods that the plaintiff would sell to its customers.  911 F. Supp. 2d 1247, 1251 (N.D. Ga. 2012).  The defendant manufacturer approached plaintiff's customers—without plaintiff's consent—and informed them that it would sell the products directly to them.  *Id.* at 1252.  The plaintiff brought claims for tortious interference with contract and business relations, alleging that it was unable to fulfill its contracts in place with its customers because of defendant's conduct.  *Id.* at 1257.

The court dismissed the tortious interference claims because the defendant manufacturer was not a "stranger" to the plaintiff's business relationships with its customers, holding that "[t]he interwovenness of these contractual relationships is further demonstrated by AFG's allegation that KPI's breach . . . prevent[ed] AFG

from fulfilling the contracts it currently has in place with its customers[.]"  *Id.* Similarly here, Lucasys alleges that its relationships with its customers are interwoven with PowerPlan's relationships with those same customers.  *See, e.g.,* Cmplt. ¶¶ 43, 34 ("Lucasys was developing software that filled gaps in what PowerPlan software does"; Lucasys uses "data accessed through the PowerPlan software[.]").[5]  When the complaint's allegations make clear that the defendant is not a "stranger" as defined by Georgia law, federal courts routinely dismiss tortious interference claims at the pleadings stage.  *See, e.g., Ashford Int'l, Inc. v. World Bank Group*, No. 1:04-CV-3822, 2006 U.S. Dist. LEXIS 17286, at *20 (N.D. Ga. Mar. 24, 2006) (granting motion to dismiss because defendant was not a stranger to the contractual relations at issue).  Accordingly, this Court should dismiss Plaintiff's tortious interference with contract and malicious interference with business claims with prejudice.

---

[5] As this Court has recognized: "[I]f a defendant has a legitimate economic interest in either the contract or a party to the contract, then the defendant is not a stranger to the contract and acts with privilege." *Bond Safeguard Ins. Co. v. Wells Fargo Bank, N.A.*, No. 1:13-cv-3874-AT, 2014 U.S. Dist. LEXIS 198697, at *11 (N.D. Ga. July 30, 2014) (J., Totenberg) (quoting *Dalton Diversified, Inc. v. AmSouth Bank*, 270 Ga. App. 203 (Ga. Ct. App. 2004)).  Here, PowerPlan has a legitimate economic interest in its customers (who are licensing PowerPlan's software with obligations to protect PowerPlan's confidential information), and in the Lucasys principals (who are former PowerPlan employees, with contractual obligations to PowerPlan).

## **CONCLUSION**

For the foregoing reasons, this Court should dismiss Counts I, II, III, IV, V, VII, and VIII of the Complaint for failure to state a claim.


Respectfully submitted this 11th day of September, 2020,

/s/ Petrina A. McDaniel

Petrina A. McDaniel
Georgia Bar No. 141301
Petrina.mcdaniel@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
1230 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309
Telephone: (678) 272-3200
Facsimile: (678) 272-3211

Damond R. Mace (admitted *pro hac vice*)
Damond.mace@squirepb.com
Stephen M. Fazio (admitted *pro hac vice*)
Stephen.fazio@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8780

*Attorneys for Defendant PowerPlan, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing Memorandum in Support of Motion to Dismiss has been prepared using Times New Roman, 14 point font.

*/s/ Petrina A. McDaniel*

Petrina A. McDaniel

*Attorney for Defendant PowerPlan, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing Memorandum in Support of Motion to Dismiss was served on September 11, 2020 by filing it using the Court's CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Petrina A. McDaniel*

Petrina A. McDaniel

*Attorney for Defendant PowerPlan, Inc.*