# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF GEORGIA

# ATLANTA DIVISION

LUCASYS INC.,

        *Plaintiff*,

POWERPLAN, INC.,

        *Defendant.*

Civil Action No.: 1:20-CV-2987

## LUCASYS' OPPOSITION TO
## POWERPLAN'S MOTION TO DISMISS

PowerPlan moves to dismiss some—but not all—of Lucasys' claims. The Court should deny the motion.

PowerPlan prevents competition for its software by making baseless claims against rivals—including Lucasys—and threatening customers who do business with them. These anticompetitive acts deprive consumers of market alternatives, which means they pay higher prices for PowerPlan's subpar product that does not satisfy their utility management software needs. Federal antitrust law squarely forbids PowerPlan's conduct.

The complaint pleads facts showing PowerPlan protects its software monopoly from competition by coercing customers not to do business with consulting-firm rivals who also provide competing software products. PowerPlan

1

holds customers' data hostage, threatens to embroil them in baseless trade-secret litigation, and forces them to put their data projects on hold and unravel contracts they awarded based on merit. Yet PowerPlan wrongly argues this is not harm to competition.

The complaint also pleads facts showing Lucasys was excluded from the relevant markets because it won contracts to implement software that competes with PowerPlan's software. Yet PowerPlan wrongly argues Lucasys lacks antitrust standing because PowerPlan squashed Lucasys before it could develop a *complete* replacement for PowerPlan's product.

The complaint alleges PowerPlan interfered with Lucasys' contracts— including a contract Lucasys was awarded over PowerPlan's competing bid. Yet PowerPlan wrongly claims it is entitled to interfere with those contracts because it also has its own relationships with the same customers. Since PowerPlan has a monopoly giving it a relationship with 99% of the customers in the market, this argument would immunize PowerPlan's tortious interference with any competitor's contracts. This is not the law.

## FACTS

Defendant PowerPlan provides utility management software for investor-owned rate-regulated utilities. ¶6.[1] It is a monopolist, holding 99% share in the

---

1. All paragraph references are to the complaint (Dkt. 1) unless otherwise noted.

market, which it has dominated since launching its product in 1994. ¶¶6, 11. It has little meaningful competition, having acquired its only major competitor in 2008 and quelled every nascent competitive threat since. ¶¶11, 37, 44. It also serves a niche customer base locked in by extreme switching costs. ¶70. Since it has not had to compete on price, quality, innovation, or customer service, PowerPlan's legacy software is the same core product it launched in 1994—a time when a 56k dial-up modem was state-of-the-art computer technology. ¶14.

Customers in the market hold an overwhelmingly negative view of PowerPlan's product. Dkt. 1 at 2. It is so clunky and ineffective that it spawned its own service markets in which utility customers must regularly pay six- to seven-figure consulting costs to companies like Lucasys to develop software, write custom code extensions, provide data-consulting services, and integrate the utility's data with other applications. ¶15. These additional costly services are needed just to make customers' data from PowerPlan useable for the sorts of purposes they need data in the first place, and then they use that data outside PowerPlan to perform these basic but fundamentally important functions that PowerPlan's software is incapable of performing. ¶¶13–16, 23–24.

Like the classic monopoly scenario, others who start out competing on the margins to fulfill the market's unmet needs eventually start competing directly. PowerPlan's response to this competition is not to compete on the merits, but to quell these budding threats. ¶¶37, 44. When data consulting firms begin seeking

to provide longer-term technological solutions for their customers who also use PowerPlan, PowerPlan's *modus operandi* is to use its monopoly power to exclude them from the market, singling them out by selectively claiming the exclusive right to utilities' data, making sham legal threats, and ultimately coercing its locked-in utility customers not to do business with them. ¶¶37–41, 44, 46.

*The Relevant Markets*

PowerPlan holds a 99% market share in the Utility Management Software Market. ¶6. The customers in this market are investor-owned rate-regulated utilities who require purpose-built database software to store, access, analyze, and compute their data for various operational, accounting, regulatory, and tax purposes related to their fixed assets. ¶¶12, 65, 68. Lucasys is currently the only competitor willing and able to compete in the Utility Management Software Market: it developed and—until PowerPlan interfered—was performing a contract to implement a full deferred tax software suite to replace a major aspect of PowerPlan's utility management software. ¶¶52–54.

PowerPlan's ineffective software also created its own market—the Supplemental Management Services Market—because it lacks necessary functionality to maintain utilities' data and to perform core accounting, tax, and regulatory functions required of rate-regulated utilities. ¶¶15–16. Utility customers seek out these services from PowerPlan, Lucasys, and several other competitors. ¶17. Lucasys is among the top competitors in this market because of

its unique offerings and ability to provide long-term solutions that ultimately reduce the need for such services, saving utilities time and money. ¶¶28, 79.

A third market, the Deferred Tax Solutions Market, is either a separate market or sub-market comprising consulting services and software for specialized deferred-tax problems that utility customers seek to solve. ¶81. Only PowerPlan, Lucasys, and one other firm provide services at scale in this market. ¶82.

*Lucasys*

Lucasys is a data consulting and software development company that uses its deep subject-matter expertise to help utility customers with their data issues, especially to facilitate computations of deferred tax obligations based on tax law changes in 2018. ¶28. During those engagements, Lucasys works to replace consulting with long-term software solutions and—contrary to PowerPlan's mischaracterization and selective omission of facts in the complaint—it has developed products that compete with PowerPlan's software. ¶¶29, 32. Indeed, in a letter PowerPlan attaches to its motion, PowerPlan asserts that "Lucasys offers consulting services . . . and software solutions that compete with PowerPlan software." Dkt. 18-2 at 2; *see also* Dkt. 18-3 at 2. One Lucasys product is a cloud-based software that makes deferred tax computations from customers' data based on the federal tax law changes in 2018 and can dynamically account for future tax law changes or their treatment by rate regulators. ¶30a. PowerPlan's product is incapable of making these computations or adapting to future changes because it

5

is static—frozen in the regulatory environment of 1994, the same year the world witnessed O.J. Simpson fleeing police in his white Ford Bronco. ¶30a.

PowerPlan and Lucasys do not work together. Rather, they each have their own contracts with customers. ¶¶36, 46, 51, 54, 55. PowerPlan is not a party or third-party beneficiary to Lucasys' contracts. *See* ¶¶34–35, 47–55.

*PowerPlan's Exclusionary Practices*

Whenever PowerPlan perceives a nascent competitive threat, it resorts to the same playbook: it selectively asserts baseless trade secret misappropriation claims against the competitor and complicit customers.[2] ¶44. Lucasys is such a threat—indeed, it is already competing with software. For example, Lucasys was awarded a contract by utility AEP—over PowerPlan's own bid—to both provide services and build a full software suite (incorporating its product described above) around taxes that would replace and expand upon PowerPlan's PowerTax module. ¶35.

When AEP awarded the contract to Lucasys, PowerPlan made baseless threats to Lucasys and its individual founders based on vague claims of trade

---

2. PowerPlan mischaracterizes this dispute as a race to the courthouse over PowerPlan's trade secrets, but the circumstances bely that: PowerPlan began making its baseless threats *a year ago* and took no legal action; instead, it coerced and threatened Lucasys' customers. ¶¶38–42, 45–55. PowerPlan is content with allowing competitors who only provide consulting services to access customer data through PowerPlan, which by definition defeats any arguable trade secret protection. ¶18.

secret misappropriation. ¶¶33–34. It said it would "be open" to allowing Lucasys to continue pure consulting work if Lucasys agreed not to compete, evidencing its anticompetitive intent with an invitation to a *per se* unlawful market allocation conspiracy. ¶42. After Lucasys provided substantial information to PowerPlan proving that its claims were baseless, PowerPlan nonetheless ascertained all of Lucasys' customers and contacted them. ¶¶45–46. PowerPlan asserted the exclusive right to those customers' data and threatened to embroil them in litigation if they did not stop working with Lucasys. ¶¶46–57. PowerPlan also intimated plans to send letters to *all* PowerPlan customers making the same baseless assertions and threats not to do business with Lucasys. ¶58.

### PowerPlan Harmed Competition and Lucasys

PowerPlan's exclusionary conduct reinforces and perpetuates its monopoly in the Utility Management Software Market by preventing emerging competitors from competing on the merits, resulting in higher prices, fewer choices, lower quality, and less innovation. ¶84. It also harmed competition in the Supplemental Management Services and Deferred Tax Solutions Markets by depriving utility customers of a choice—in some cases, their specific chosen service provider—and by reducing output and innovation while ultimately raising prices. ¶¶85–87.

PowerPlan's exclusionary conduct is not limited to Lucasys (¶44), but its most recent actions directly harmed Lucasys: PowerPlan successfully coerced two of four major Lucasys utility customers to terminate their contracts with Lucasys;

7

a third reduced the scope of Lucasys' contract to exclude the portion competing with PowerPlan's software; a fourth contract remains at risk; and countless other potential customers may not hire Lucasys in the future because of PowerPlan's threats and false statements. ¶¶36–37, 46–59, 141, 143, 147–50. Lucasys lost and continues to lose revenue from current and future opportunities and its ability to develop its competing software solutions has been hampered. ¶¶59–60. PowerPlan successfully blocked Lucasys, a competitor who was not just standing prepared in the wings but was actually developing and implementing unique new software solutions in the relevant markets. ¶¶30a–c, 35, 37, 43, 52–53.

## LEGAL STANDARD

A complaint need only contain "enough facts to state a claim to relief that is *plausible* on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (emphasis added); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations.' "). It must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333 (11th Cir. 2010). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully," but is not akin to a "probability requirement." *Iqbal*, 556 U.S. at 678.

The complaint must be "liberally" construed, *Harrigan v. Metro Dade Police Dep't Station # 4*, 636 F. App'x 470, 473 (11th Cir. 2015); *Smith v. Israel*, 619 F.

App'x 839, 842 (11th Cir. 2015), drawing all inferences in favor of the plaintiff. *Iqbal*, 556 U.S. at 679. Finally, it "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013); *see also Tellabs, Inc. v. Makor Issue & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007); *Arar v. Ashcroft*, 585 F.3d 559, 619 (2nd Cir. 2009).

## ARGUMENT

The Court should deny PowerPlan's partial motion to dismiss because the complaint pleads facts plausibly suggesting Lucasys and competition have been harmed in each of the relevant markets. This satisfies the antitrust standing and injury requirements. Lucasys also meets its minimal burden to adequately define the Deferred Tax Solutions Market. At any rate, Lucasys' antitrust claims do not depend on and would survive regardless of the existence of that market. Finally, PowerPlan cannot invoke the stranger doctrine to immunize it from liability for interfering with Lucasys' contracts and relationships just because it has its own separate relationships with those customers.

### I.   LUCASYS HAS ANTITRUST STANDING TO CHALLENGE POWERPLAN'S ANTICOMPETITIVE CONDUCT IN THE UTILITY MANAGEMENT SOFTWARE MARKET

PowerPlan argues that Lucasys does not have antitrust standing because the complaint lacks allegations that Lucasys "was willing and able to enter the UMS Market." Mot. at 10. This argument is built on two faulty premises. First,

PowerPlan overstates what is required to participate in, or be prepared to enter, a market. Second, PowerPlan ignores the complaint's well-pleaded facts—and PowerPlan's own admission—that Lucasys already participates in the UMS Market and is prepared to expand its offerings but for PowerPlan's anticompetitive acts.

The parties do not disagree that "an attempt to enter a market coupled with a showing of preparedness is sufficient to establish an injury in fact" granting antitrust standing. *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991); *see also* Mot. at 11 ("Where (as here) a plaintiff alleges that it was prevented from entering a market, a plaintiff must plead that it not only had the intent to enter the market, but also was prepared to do so."). PowerPlan argues further, however, that Lucasys must have a product that is a complete substitute for PowerPlan's software to participate in the UMS Market. Mot. at 12. But PowerPlan does not cite any case law that a complete substitute is needed, and indeed, this position is inconsistent with both the law and how markets and competition work in practice.

In fact, "[a]s long as the plaintiff made a reasonable attempt to enter the market, our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations which create barriers to that market." *Thompson*, 934 F.2d at 1572. Moreover, "[t]here are numerous decisions stating that one need not have an actual going business to obtain standing, but an attempt to enter a business is

sufficient." *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir. 1966) (citations omitted). This makes sense because, otherwise, a monopolist could illegally maintain its monopoly by destroying any potential competitors while they are still small or before they progress their competitive offerings to a certain point—indeed, it would have an incentive to do so if that were the law.

To determine whether a party made a reasonable attempt to enter a market, the Court can consider many factors including "the ability of plaintiff to finance the business and to purchase the necessary facilities and equipment, the consummation of contracts by the plaintiff, affirmative action by plaintiff to enter the business, and the background and experience of plaintiff in the prospective business." *Id.* (citations omitted). As alleged in the complaint, these factors show that Lucasys has made a reasonable attempt to enter the market:

- Lucasys has an ***ability to finance*** its development of utility management software. Lucasys creates solutions in the context of its existing engagements, earns revenue from those engagements, invests in research and development efforts, and then deploys them more broadly in the market. ¶¶32, 60.

- Lucasys ***consummated a contract*** with AEP—one it was awarded over PowerPlan's bid—to develop a module that would completely replace one of PowerPlan's modules in the UMS market. ¶¶35–36.

11

- Lucasys took ***affirmative steps*** to enter the market: in addition to the AEP contract, it developed a deferred-tax product that can replace PowerPlan's PowerTax module. ¶30a. It also demonstrated its preparedness to enter the UMS market by building two other technological solutions it has applied in the SMS market: a "business process automation tool" and a "toolkit that contains several small applications." ¶30b–c.

- Lucasys' founders have the ***background and experience*** "in software development, business consulting, and tax advising" for "utility customers" to enter the UMS Market. ¶27.[3]

These facts demonstrate Lucasys did not merely attempt to enter the UMS Market; it actually entered it. ¶¶35–36, 54. In fact, PowerPlan's letters to customers—attached to its own motion—bely its argument: "Lucasys has been developing software that directly competes with [PowerPlan's] software, and recently started marketing and seeking to sell that software to our customer base." Dkt. 18-3 at 2; *see also* Dkt. 18-2 at 2 ("Lucasys offers . . . software solutions that compete with PowerPlan software.").

Lucasys' current offerings need not be a complete replacement for PowerPlan's utility management software. Imperfect substitutes create

---

3.     PowerPlan insinuates something improper from the fact that Lucasys' founders all previously worked at PowerPlan, but Lucasys' founders left PowerPlan in 2013, 2014, and 2015, and each worked elsewhere before founding Lucasys. ¶27.

competitive pressures within markets. Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶756b6 (4th ed. 2020 Cum. Supp. 2013-2019) ("[T]he availability of the imperfect substitute tends to put a ceiling on the monopolist's price."). Avoiding these competitive pressures—which will force PowerPlan to improve its product, lower prices, or both—is precisely why PowerPlan sought to cripple Lucasys as it entered the UMS Market. ¶40. Accordingly, the complaint's factual allegations are sufficient to establish Lucasys' antitrust standing at the pleading stage.[4]

## II.   POWERPLAN'S   UNLAWFUL   CONDUCT   HARMS COMPETITION IN THE RELEVANT MARKETS

PowerPlan argues that Lucasys' antitrust claims fail because there has been no harm to competition, just harm to a single competitor. Mot. at 14. Again, PowerPlan is wrong. The complaint alleges PowerPlan's *modus operandi* is to quell competition in the early stages of any technological offerings before they can become a serious threat to PowerPlan's failing product. Lucasys is PowerPlan's latest victim, but it also offered the sole competing software product in each of the relevant markets at the time of its exclusion, so its exclusion *is* harm to

---

4.  Notably, PowerPlan relies *exclusively* on cases decided at the summary judgment stage, which is not the standard that applies on a motion to dismiss. *See* Mot. at 11–12 (citing *Sunbeam TV Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013) and *Gas Utils. Co. v. S. Nat. Gas Co.,* 996 F.2d 282, 283 (11th Cir. 1993)).

competition. ¶28–31. Moreover, the complaint alleges in detail how competition—and the consumers who benefit from it—have been harmed beyond injury to Lucasys.

Contrary to PowerPlan's assertion that the allegation that its exclusionary conduct "raises prices" or "decreases the quality" is "pure speculation," (Mot. at 16) the complaint alleges detailed facts demonstrating competitive harm. For example, it alleges anticompetitive outcomes related to specific customers in the SMS and DTS markets: PowerPlan coerced NextEra into terminating its contract with Lucasys, leading NextEra to forego the work entirely. This is a decrease in output—a classic example of harm to competition. ¶¶48–49; *Ohio v. AMEX Co.*, 138 S. Ct. 2274, 2284 (2018) (reduced output is harm to competition). PowerPlan also coerced Liberty Utilities into terminating its contract with Lucasys, causing it to lose its preferred vendor and pay higher effective prices—another classic example of harm to competition. ¶51; *AMEX*, 138 S. Ct. at 2284 (higher prices is harm to competition). PowerPlan's actions have also put at risk at least two other contracts, where both the customers and Lucasys will suffer similar anticompetitive harm should PowerPlan's unlawful conduct succeed. ¶¶52–55.

The complaint also alleges another type of harm to competition: loss of consumer choice. "Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions." *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459

14

U.S. 519, 528 (1983). PowerPlan coerced its customers not to work with Lucasys. And since Lucasys is the sole competitor of PowerPlan that currently offers software solutions in the relevant markets, this reduction in consumer choice is commensurate with a reduction in competition. *See, e.g., Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1275–77 (S.D. Fla., 2015) (acknowledging that reduction in consumer choice can constitute harm to competition). That, of course, also goes to decreased quality: the complaint is replete with details about the inadequacy of and customer dissatisfaction with PowerPlan's product. By excluding firms like Lucasys, PowerPlan not only reduces choice, it relieves itself of the competitive pressure to put resources into improving its own inadequate product.

*Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999), is instructive. There, the organizer of an archery trade show organized a group boycott of its sole competitor. *Id.* at 748. As PowerPlan does here, the defendant argued that competition wasn't harmed, just the one competitor. *Id.* at 755. The court rejected this argument, observing it was "hard to imagine a closer connection between anticompetitive effect and injury" than where a party destroys its only competitor. *Id.* at 754. Similarly, Lucasys is the only competitor other than PowerPlan offering software solutions in both the UMS Market and the SMS Market/DTS Market. Its loss therefore " 'stems from a competition-reducing aspect or effect of defendant's behavior,' and accordingly is antitrust

injury." *Id.* This case, just as in *Full Draw*, "is not one in which it is alleged that a competitor fell prey to competition; it is one in which it is alleged that competition fell prey to a competitor." *Id.*

### III.   THE   COMPLAINT   SUFFICIENTLY   DETAILS   THE DEFERRED TAX SOLUTIONS MARKET

Besides the Utility Management Software Market and the Supplemental Management Solutions Market, the complaint details a third separate or sub-market, either in addition to or in the alternative: the Deferred Tax Solutions Market. PowerPlan attacks this proposed market definition. But the complaint adequately pleads details about the Deferred Tax Solutions Market to meet the minimal burden required at this stage while also demonstrating injury to competition and to Lucasys.

Market definition is a "deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage" except "where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way." *Concord Assocs. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016); *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1264 (11th Cir. 2015) ("Defining the relevant product market is a fact-intensive endeavor."); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.").

A complaint need only "explain why the market it alleges is the relevant, economically significant product market" if it is not too narrow or economically implausible. *Concord Assocs.*, 817 F.3d at 54; *Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1217 (11th Cir. 2012) ("Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other."); *see also Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (geographic market measured by where sellers operate and where consumers can turn for the services). Market definition is a means, not an end; it merely aids in the search for competitive injury. Actual detrimental effects—such as a reduction of output—obviates the need for a more elaborate inquiry even at later stages of the case. *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986).

PowerPlan relies on *Jacobs*, which involved a plaintiff that tried to plead an artificially narrow market for visco-elastic foam mattresses separately from the much broader market for mattresses generally. It was an obviously transparent effort to overcome the significant rule-of-reason hurdles—showing anticompetitive effects in the relevant market—for a claim concerning Tempur-Pedic's vertical resale price maintenance practices right on the heels of the Supreme Court's decision in *Leegin*. *Jacobs*, 626 F.3d at 1334–36; *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) (holding that vertical resale

price maintenance claims are judged under rule of reason). *Leegin* stressed that vertical resale price restraints have myriad procompetitive benefits and that without market power, the anticompetitive effects "may not be a serious concern" because they restrain only intrabrand competition. *Leegin*, 551 U.S. at 898. The complaint alleged Tempur-Pedic sold 80–90% of all visco-elastic mattresses, but its share in the much broader market for mattresses generally would obviously be much smaller—not enough to establish market power. *Jacobs*, 626 F.3d at 1340. And, of course, a visco-elastic mattress has obvious substitutes.

Lucasys' complaint, by contrast, does not attempt to artificially define a narrow, separate submarket to give the illusion of market power (here, monopoly power) where it does not exist. For Lucasys' claims to proceed, the only market in which it needs to allege facts showing market (or monopoly) power is the Utility Management Software Market.

Moreover, Lucasys **does** plead the sorts of economically significant detail that PowerPlan suggests the complaint lacks including, for example, "the product's peculiar characteristics and uses" and "specialized vendors." Deferred Tax Solutions concern data and calculations for the Tax Cuts and Jobs Act of 2017, which created significant tax and rate-case implications for utilities that vary from jurisdiction to jurisdiction. ¶¶21–24. There are only three primary competitors with the subject-matter expertise to provide these solutions at a scale (¶¶25, 27) such that they could "take significant amounts of business away from

each other." *Polypore Int'l*, 686 F.3d at 1217. Unlike visco-elastic mattresses, there are no apparent substitutes for these niche, highly specialized deferred tax solutions. And Lucasys' exclusion from the DTS Market *is* harm to competition as explained in the previous section.

## IV.   POWERPLAN IS A STRANGER TO LUCASYS' CONTRACTS WHO CANNOT AVOID LIABILITY FOR ITS TORTIOUS INTERFERENCE

PowerPlan seeks to avoid liability for tortious interference by invoking the stranger doctrine, arguing that the existence of its own, separate contractual relationships with Lucasys' customers give it the right to interfere with Lucasys' contracts. But PowerPlan conflates having its own relationships with Lucasys' customers with being a party to Lucasys' contracts. It is not a party (or even a third-party beneficiary) to those contracts, so it does not have a free pass to interfere with them. If relationships with mutual customers were sufficient for the stranger doctrine to preclude liability as PowerPlan suggests, a monopolist who does business with all the customers in an industry would simply be immune from any tortious interference claim. That, of course, is not the law. ¶141.

PowerPlan attempts to invoke the four factors from *Sis, LLC v. Stoneridge Holdings, Inc.* to suggest it is not a stranger to Lucasys' *relationships*. 1:17-CV-01816-ELR, 2019 WL 8277244, at *7 (N.D. Ga. Feb. 5, 2019). But it does not meet *any* of those four factors:

19

**First**, PowerPlan is not an essential entity to the contracts or relations at issue. *See Renden, Inc. v. Liberty Real Est. Ltd. P'ship III*, 213 Ga. App. 333, 336 (1994) (finding that a lessor was "an essential entity" to subletting part of its property by a tenant because tenant's right to sublease was stated in the *lessor's* lease). In fact, Lucasys seeks to replace PowerPlan as a consultant and software provider and does not work with PowerPlan. ¶¶35, 39, 40, 43.

**Second**, along those same lines, the injured relations are not inextricably a part of or dependent upon PowerPlan's business relations. Lucasys must access its customers' data through PowerPlan's software to the extent that data is stored through PowerPlan's software. Other than providing customers with software that stores those customers' data, PowerPlan has nothing to do with what Lucasys is doing for its customers. If PowerPlan's theory were correct, then Microsoft would be immune from virtually all tortious interference claims relating to software because most software is run through Windows operating systems licensed to customers by Microsoft. Indeed, PowerPlan's connection is even more tenuous than Microsoft's since it is the customers' data that Lucasys interfaces with.

**Third**, PowerPlan **does not** benefit from Lucasys' contracts and relationships with the customers PowerPlan tortiously interfered with. Quite the opposite: those contracts and relationships are directly adverse to PowerPlan's interest—they take business away from PowerPlan. ¶¶35, 37, 40–41, 142.

*Last*, the complaint contains no allegations suggesting Lucasys and PowerPlan are parties to a comprehensive interwoven set of contracts or relations. *See Howerton v. Harbin Clinic, LLC*, 333 Ga. App. 191, 198 (2015) (finding that a comprehensive interwoven set of contracts occurs when "each of the parties to any individual contract involved in the transaction is a third-party beneficiary of the other contracts necessary to complete the project."); *see also Jefferson-Pilot Commc'ns Co. v. Phoenix City Broad., Ltd.*, 205 Ga. App. 57, 60 (1992) (finding parties were part of an interwoven set of contracts for the sale of a business when the set of contracts were for financing the sale, construction, and transfer of ownership of the business). PowerPlan is not a third party-beneficiary to Lucasys' contracts or relationships—it is a stranger to them. ¶144.

Even if PowerPlan could point to facts in the complaint showing Lucasys' and PowerPlan's business relationships are interwoven (it cannot), it would only be because PowerPlan created a "wall" around its customers that requires any third party to interact with PowerPlan's software to access a customer's data. At best, PowerPlan happens to have relationships with some of the same businesses as Lucasys—but it is still a stranger to Lucasys' contracts and Lucasys' relationship with its customers through those contracts.[5] *All Star, Inc. v. Fellows*,

_____

5.      PowerPlan also argues that it has "a legitimate economic interest . . . in the Lucasys principals" that immunizes it from a tortious interference claim. Dkt. 18-1 at 25 n.5. But the complaint provides no support for PowerPlan's

297 Ga. App. 142, 143 (2009). The complaint does *not* allege Lucasys contracted with PowerPlan or that any of Lucasys' contracts relate to PowerPlan. It just happens that customers' data is stored *somewhere* and the customer and Lucasys need to access the data to perform work related to the data. ¶¶35, 39–40, 43, 50, 55, 142. PowerPlan is strictly a competitor to Lucasys, and that makes it a stranger. *Tidikis v. Network for Med. Communc'ns & Rsch. LLC*, 274 Ga. App. 807, 812 (2005) ("[T]o be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract.").

The cases PowerPlan relies on to claim otherwise are inapposite. *Atlanta Fiberglass USA, LLC v. KPI, Co.*, 911 F. Supp. 2d 1247 (N.D. Ga. 2012), concerned a plaintiff and defendant *who were in business together* and even contracted with one another. Lucasys and PowerPlan are *competitors* with no contracts to which they are both a party. ¶¶35–63. In *Ashford International, Inc. v. World Bank Group*, No. 1:04-CV-3822-JOF, 2006 WL 783357 (N.D. Ga. 2006), the defendants were "intrinsically involved" in the bidding process in which plaintiff took part because the defendants controlled the bidding process. *Id.* at \*1, \*6. PowerPlan has no control or involvement—other than as a potential competing bidder (and thus, literally, a stranger)—in the bidding processes Lucasys took part in. In *Bond*

---

purported economic interest in former employees who left the company 5–7 years ago.

*Safeguard Insurance Co. v. Wells Fargo Bank, N.A.*, No. 1:13-CV-3874-AT, 2014 WL 12629942 (N.D. Ga. July 30, 2014), the defendant lent funds for the purchase of lots at issue and thus had a direct economic interest in the contracts concerning those lots, more akin to a third-party beneficiary. *Id.* at *5. PowerPlan did not provide any funding related to Lucasys' contracts with its customers.

Ultimately, it would be an absurd result contrary to the underlying rationale for tortious interference liability if PowerPlan were immune simply because it has its own separate contractual relationships with some of the same customers that Lucasys has contractual relationships with and is competing for their business.

## CONCLUSION

For the foregoing reasons, the Court should deny PowerPlan's motion to dismiss. If the Court grants the motion, Lucasys requests leave to file an amended complaint.

Respectfully submitted this 16th day of October, 2020.

By: */s/ Richard L. Robbins*
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Jason Alloy
Georgia Bar No. 013188
jalloy@robbinsfirm.com
Joseph Saul
Georgia Bar No. 432592
jsaul@robbinsfirm.com

23

ROBBINS ROSS ALLOY
BELINFANTE LITTLEFIELD
LLC
500 14th St. NW
Atlanta, GA 30318
(678) 701-9381
(404) 856-3250 (fax)

By: */s/ Jon F. Cieslak*
Jon F. Cieslak

Jarod Bona (admitted *pro hac vice*)
jarod.bona@bonalawpc.com
Jon F. Cieslak (admitted *pro hac vice*)
jon.cieslak@bonalawpc.com
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
(858) 964-2301 (fax)

—

Aaron Gott (admitted *pro hac vice*)
aaron.gott@bonalawpc.com
BONA LAW PC
15 South 9th Street, Suite 239
Minneapolis, MN 55402
(612) 284-5001

—

*Counsel for Plaintiff Lucasys Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of October, 2020, Plaintiff Lucasys Inc.'s Opposition to Powerplan, Inc.'s Motion to Dismiss Pursuant to Rule 12(b)(6) was filed electronically with the Clerk of the Court using the CM/ECF system which will send a notification of such filing to all counsel of record in this matter.

By: */s/ Jon F. Cieslak*
Jon F. Cieslak
(*admitted phv*)
Bona Law PC
4275 Executive Square
Suite 200
La Jolla, CA 92037
(858) 964-4589