## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| LUCASYS INC. | Case No. 1:20-CV-2987 |
| Plaintiff, | |
| | Judge Amy M. Totenberg |
| v. | |
| POWERPLAN, INC., | |
| Defendant. | |

## DEFENDANT POWERPLAN, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

In its Opposition, Lucasys engages in a shell game, scrambling the allegations of the Complaint and the law in the hopes of preserving its fatally flawed claims. (ECF 26.)  As explained below, Lucasys has not demonstrated preparedness to enter the UMS Market.  At most, it has undertaken initial steps in the hopes of someday entering the market.  As such, it lacks standing to assert claims premised on the UMS Market.  Similarly, Lucasys has not pled any coherent injury to competition in the SMS Market or the DTS Market.  As explained in PowerPlan's Motion to Dismiss (ECF 18) and below, Lucasys pleads only injuries to itself.  Nor has Lucasys pled a plausible definition of the DTS Market.  Indeed, the definition proffered by Lucasys makes it impossible for either the Court or the Defendant to determine where the SMS Market ends and the DTS Market begins.  Therefore, it is inadequate as a matter

of law.  Finally, Lucasys' tortious interference claims fail, as PowerPlan is not a stranger to those relationships.

## I.    Lucasys Lacks Standing To Assert Claims Based on the UMS Market.

Lucasys is *not* a participant in the UMS Market, and has not adequately pled facts that it is prepared to enter the UMS Market.  Markets are fundamentally "composed of products that have reasonable interchangeability." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337 (11th Cir. 2010).  Here, the market pled is for Utility Management Software ("UMS").  Cmplt. ¶¶ 65-72.  As pled by Lucasys, UMS is broad-based, and encompasses comprehensive software for income tax, property tax, fixed assets, rate case management, asset investment optimization, capital planning and forecasting, and project portfolio cost management.  *See* Cmplt ¶¶ 9, 10.  When viewed within the market Lucasys actually pled, its claims of preparedness are clearly insufficient to establish standing to assert claims in the UMS Market.

Lucasys frames its Opposition in terms of the factors set forth in *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir. 1966).  Opp. at 11-12.  However, none of these factors demonstrates that Lucasys is prepared to enter the UMS Market.  *First*, contrary to Lucasys' claims, it has *not* plausibly pled that it has the financial resources needed to develop Utility Management Software.  In its Complaint, Lucasys claims that entry to the UMS Market "require[s] substantial

resources," and would "require major capital investment."  *See* Cmplt. ¶¶ 69, 94, 106.  Lucasys claims that it hopes someday to be able to meet this substantial burden through revenue generated in its consulting engagements in the SMS market.  *See* Opp. at 11 (citing Cmplt. ¶¶ 32, 60).  Lucasys' pay-as-you-go financing model does not satisfy the standards required in this Circuit.

In the Eleventh Circuit, "[t]he mere possibility of financing being available in the abstract is not enough.  Showing that someone somehow could possibly obtain financing is not the same as showing that plaintiffs themselves were able and prepared to."  *See*, *e.g.*, *Gas Utils. Co. v. S. Nat. Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993) (citation omitted).  Here, Lucasys has done no more than plead its hope that eventually its business ventures will be sufficient to fund a hopelessly vague business plan.  *See, e.g.*, Cmplt. ¶ 32.  In short, Lucasys has not pled facts to support that it had or has the resources necessary to become a competitor in the comprehensive UMS Market.  Thus, regardless of PowerPlan's conduct, Lucasys was unprepared to enter the UMS Market, and therefore lacks standing in that market.

*Second*, Lucasys overstates the importance of its allegations concerning the AEP engagement.  Under some circumstances (not present here), the consummation of a contract may be some evidence of preparedness to enter a market.  *Martin, supra,* at 633.  In this case, however, the alleged "contract" contemplated (at most)

the development of a limited tool that would address only deferred taxes. Cmplt. ¶¶ 35, 53, 68.  If this contract had come to fruition, it would merely establish that Lucasys was engaged in initial steps that might someday lead to preparedness for market entry.  At most, it *may* have resulted in a limited product intended for a narrow segment of the UMS Market.  That does not demonstrate broad preparedness to enter the comprehensive UMS Market that was pled by Lucasys.[1]

*Third*, Lucasys has not taken "affirmative steps" to enter the UMS Market. Opp. at 12.   In its Opposition, Lucasys claims that it has built "two other technological solutions it has applied in the SMS Market: a 'business process automation tool' and a 'toolkit that contains several small applications.'"  *Id*.  But the fact that it has built small scale solutions in *other markets* has little bearing on whether it is ready, willing and able to enter the broad UMS Market.  Indeed, if that was a sufficient allegation of preparedness, many thousands of software developers around the world would likewise be "prepared" to enter the UMS Market.

In its Opposition, Lucasys also claims that it has "developed a deferred-tax product that can replace PowerPlan's PowerTax module" as evidence of its affirmative steps to enter the UMS Market.  *See* Opp. at 12 (citing Cmplt. at ¶ 30a). The Court will note that the cited paragraph of the Complaint says *nothing* about

---

[1]     The Complaint's paragraphs cited by Lucasys say nothing of a "consummated contract."  Cmplt. ¶¶ 35-36.  Rather, the Complaint speaks only of a "bid."

being a *replacement* for PowerTax.  *See* Cmplt ¶ 30a.  Indeed, elsewhere in the Complaint, Lucasys instead pleads that its contract with AEP would have required Lucasys to *build a software suite* to replace PowerTax.  *See* Cmplt ¶ 35.  On the face of the Complaint, it is apparent that the hoped for "replacement" for PowerTax does not yet exist.  *See, e.g.*, Cmplt. ¶ 43.  In any case, the development of limited software solutions in this context is no more than initial steps needed to someday be prepared for market entry and does not show current preparedness to enter the market.

*Fourth*, Lucasys' claims about its founders are so vague that it is impossible to determine from the face of the Complaint whether they have background necessary to enter the UMS Market.  To the limited extent it offers detail on this topic, Lucasys only pleads that their subject matter expertise is in "facilitating the computation of deferred tax obligations and changes based on the new tax code."  Cmplt. ¶ 27.  These allegations provide little insight into whether Lucasys' founders possess the technical or business acumen required to enter the broader UMS market.  Once again, the Complaint does not plead facts adequately supporting Lucasys' claim that it is currently prepared to enter the broader UMS Market.

*Finally*, the claim that PowerPlan's letters to AEP suggest that Lucasys has already entered the UMS Market is misguided.  At most, the letters express PowerPlan's understanding of (and concern about) Lucasys' intent to develop, market, and sell software to PowerPlan's customers by inappropriately utilizing

PowerPlan's confidential and proprietary information. *See* Motion, Ex. 1 and 2. In any case, any statement made by PowerPlan about its concerns to a PowerPlan customer is not dispositive on Lucasys' preparedness to enter the comprehensive UMS Market.

It is undisputed that absent well-pled facts demonstrating preparedness, Lucasys' UMS claims must be dismissed. *See* Opp. at 10. Accordingly, because the pled facts are insufficient, the UMS claims should be dismissed.

## II.   Lucasys Only Pleads Harm to Itself.

In addition, Lucasys' inability to identify any well-pled facts to support an injury to *competition*—as opposed to injuries to *itself*—is fatal to its claims. As the Eleventh Circuit has made clear, where (as here) a competitor claims that damage to it is also damage to competition, the plaintiff bears the burden of supporting that implication with specific factual allegations. *See, e.g., Spanish Broad. Sys. of Fla. v. Clear Channel Communs.,* 376 F.3d 1065, 1072-1073 (11th Cir. 2004). Conclusory statements (like those pled here) concerning theoretical harm are not enough. Indeed, "[w]ere theoretical effects stated only at the highest level of abstraction enough, a plaintiff could trot out these same basic principles any time conduct resulted in harm to a competitor. The Sherman Act requires more." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1085 (11th Cir. 2016). As explained

below, Lucasys has done no more than "trot out basic principles" in an attempt to recast injuries to *itself* as injuries to *competition*.

The crux of Lucasys' claim is that because it allegedly "offered the sole competing software product in each of the relevant markets . . . its exclusion *is* harm to competition." Opp. at 13-14. Lucasys attempts to cast this as a denial of "consumer choice," and therefore an antitrust injury. *Id*. at 14-15. But the issue is not merely whether there was *any* denial of choice. Rather, the issue is whether a denial of choice as pled could plausibly lead to *substantial market harm*. Indeed, the Court in *Procaps S.A. v. Patheon Inc.*—a case Lucasys cites to support its "choice" argument—makes this crystal clear. *See* 141 F. Supp. 3d 1246, 1277 (S.D. Fla. 2015) (holding that anticompetitive effects must be substantial, and rejecting *de minimis* effects).[2]

Against this backdrop, the deficiency of Lucasys' Complaint is clear. As explained above, Lucasys never pleads in concrete terms how this specific situation of its alleged exclusion from any market significantly impacts that *market as a whole*. Under the applicable law, there are no well-pled facts in the Complaint that support such an inference.

_____

[2]    The Court in *ProCaps* also made clear the skepticism with which courts view loss of consumer choice arguments. *See* 141 F.Supp. 3d 1246, 1276-77 (citations omitted) ("while the loss of consumer choice is not normally a prevailing argument, it does not appear to be *per se* barred as an actual anticompetitive effect for the Court to consider . . . .").

This is well-illustrated by Lucasys' nebulous claims surrounding the SMS Market.  Lucasys pled that the SMS Market "comprises the consulting services needed to perform the critical processes that PowerPlan's Utility Management Software cannot perform" and "encompasses the companies that provide these solutions, in the form of *consulting <u>and</u> software*."  Cmplt. ¶¶ 77, 80 (emphasis supplied).  Thus, as alleged, competition in this alleged market exists between traditional consulting services and software, which are interchangeable according to Lucasys.  Lucasys also pled that (*i*) at least ten different providers actively compete in the SMS Market, (*ii*) there is competitive bidding, (*iii*) there is consulting competition in this market, and (*iv*) PowerPlan has no monopoly in this market.  *See* Cmplt. ¶¶ 17, 18, 79, 88.

Neither Lucasys' Complaint nor its Opposition make the required showing (nor even offer any clear explanation) of injury to competition in this robust, admittedly competitive market.  Instead, Lucasys pleads the opposite—that competition is vibrant, despite any conduct by PowerPlan.  At most, Lucasys vaguely argues that PowerPlan's conduct impacts "consumer choice."  Opp. at 14.  Although PowerPlan acknowledges that, in some situations, a reduction in consumer choice *can* impact market competition, Lucasys fails to plead facts sufficient to *show* a plausible substantial injury to competition in the market as a whole *in this case*.  Indeed, as explained above, for a reduction in choice to be relevant, there must be

sufficiently pled facts that show a substantial impact to the market as a whole—not merely one single competitor, as Lucasys does here.

Lucasys' other attempts to recast its individual injuries as injuries to competition are also deficient. For example, Lucasys alleges that PowerPlan interfered with Lucasys' consulting relationship with Liberty Utilities resulting in Liberty Utilities "los[ing] its preferred vendor and pay[ing] higher effective prices—a classic example of harm to competition." Opp. at 14 (citing Cmplt. ¶ 51). In the Complaint, however, Lucasys actually pleads that it was recommending Liberty Utilities to implement *PowerPlan's full income tax suite*—a product it decries throughout the Complaint as inadequate and dissatisfactory. *See* Cmplt. ¶ 50. The Complaint does not plead *software competition* by Lucasys on this project. *Id*. at ¶¶ 50, 51. Thus, any of the other SMS Market participants could have easily undertaken this work, and it is not plausible that the alleged exclusion of Lucasys impacted prices in this market—which is a competitive market according to the Complaint.

Lucasys' claim that the NextEra contract illustrates a competitive injury is also wrong. *See* Opp. at 14. Lucasys pleads that it was engaged to "consolidate [NextEra's] *non-regulated entities into the PowerPlan software*." Cmplt. ¶ 47 (emphasis supplied). It claims "on information and belief" that the consolidation of these non-regulated entities did not occur. *Id*. at ¶ 49. In its Opposition, it claims that this is an example of a "decrease in output—a classic example of harm to

competition." Opp. at 14.  But standing alone, this anecdote offers no insight into whether output or prices in the SMS Market were impacted.  In both the case of Liberty Utilities and NextEra, Lucasys has done nothing more that "trot out basic principles," and declared its individual injuries to be injuries to competition.

Nor can Lucasys rely on its similar conclusory allegations of "decreased quality" as a competitive injury.  Lucasys decries the quality of PowerPlan's software at every opportunity in its Complaint and its Opposition.  *See, e.g.,* Cmplt. ¶¶ 13, 14, 15, 16, 19, 23, 24.  But, as noted above, in two of the three examples offered by Lucasys in the Complaint, Lucasys actually was proposing that the client *deploy PowerPlan's software*.  This speaks directly to the credibility of Lucasys' quality claims, and is antithetical to the claims that the market as a whole was substantially injured.  More importantly, Lucasys offers no well-pled facts—only conclusory allegations—of this alleged impact on quality in the SMS Market as a whole.

In short, without the required well-pled facts, Lucasys asks the Court to accept as an article of faith that its software (whatever that may be) is capable of impacting quality, efficiency, output, and ultimately prices in three different markets.  Yet it offers no *well-pled facts* from which such a conclusion can plausibly be inferred.  Instead, it simply restates its legal conclusions on these points as thinly-disguised factual allegations.  The Court is under no obligation to accept such legal conclusions

as true.  *See Jacobs, supra* at 1338-40 (allegation that defendant harmed competition "by eliminating price competition" is a "bare legal conclusion" insufficient to establish harm to competition).  To survive a motion to dismiss, Plaintiff must have pled plausible injuries to competition.  Here, Lucasys has failed to do so and its claims should be dismissed.

## III.    Lucasys has not properly pled the DTS Market.

In its Opposition, Lucasys struggles to explain whether the DTS Market is a separate market or submarket, and whether this market is alleged in "addition to" or as an "alternative to" some other market.  Opp. at 16.  Lucasys' inability to explain what this market is, or how it relates to its claims underscores the deficiency of its Complaint.  Indeed, as explained below, as it relates to the DTS Market, Lucasys' Opposition is more an attempt at distraction than substantive opposition to PowerPlan's Motion.

*First*, Lucasys devotes significant effort attempting to ignore or minimize its pleading requirements by claiming market definition is "fact-intensive" and that courts are reluctant to dismiss cases on the basis of market definition.  Opp. at 16.  But courts do dismiss cases where—*as here*—plaintiffs fail to adequately plead a plausible market definition.  In fact, Lucasys cites such a case.  *Id.* (citing *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 55 (2d Cir. 2016)) (affirming 12(b)(6) dismissal for failure to define a plausible relevant geographic or product market).

- 11 -

Similarly, in the Eleventh Circuit, courts dismiss cases for failure to plead a plausible market definition. *See Jacobs*, *supra*, at 1331. Lucasys strangely attacks PowerPlan's "reliance" on *Jacobs* for the standard for pleading market definition. *See* Opp. at 17. But Lucasys does not appear to dispute the articulation of the law in *Jacobs*, which largely mirrors the law stated in cases cited in the Opposition. *Compare Jacobs*, *supra*, at 1337, *with Polypore Int'l, Inc. v. FTC*, 686 F.3d 1208, 1217 (11th Cir. 2012).

*Second*, Lucasys' Opposition does virtually nothing to substantively defend its deficient DTS Market definition. Instead of pointing to well-pled facts that would allow one to determine where the SMS Market ends and the DTS Market begins, it simply repeats its claim that there are "three primary competitors" in this alleged market (or submarket)[3] and recounts the history of tax legislation in the United States. *See* Opp. at 18, 19. It offers *no* explanation as to why other current market participants in the SMS Market cannot participate in the DTS Market, or why other software or tax professionals cannot enter or compete in the market. The Complaint also is silent as to how consumers see this market (if at all), and whether there are distinct customers, prices, or sensitivity to price changes. *See Jacobs*, *supra* at 1217. In short, Lucasys pleads no facts to establish a plausible submarket or alternative market.

---

[3]     Lucasys notes that there are others that provide such services. Cmplt. ¶ 25.

Nor does Lucasys offer any plausible explanation of competitive harm in this alleged market. Lucasys merely cryptically claims that its "exclusion from the DTS Market *is* harm to competition as explained in the previous section." Opp. at 19. But the Opposition's "previous section" does not adequately detail *any* alleged competitive injury in the DTS Market. *Id*. at 13-16. Neither of the two specific customer examples cited in that section relate to the DTS Market. *Id*. at 14. And, as explained above, there has been no plausible injury to competition in the DTS Market, or in any other market.

## IV. Lucasys' Tortious Interference Claims are Barred Under Georgia's Stanger Doctrine.

The stranger doctrine precludes Lucasys' tortious interference claims because Lucasys' alleged injured relations with its customers are inextricably a part of, or dependent upon, PowerPlan's business relations with those same customers.[4] Motion at 23-25. Lucasys attempts to side-step the fatal flaw to its claims, contending that, "[o]ther than providing customers with software that stores those customers' data, PowerPlan has nothing to do with what Lucasys is doing for its

---

[4] This Court recognizes four independent circumstances in which a defendant is *not* a stranger to a plaintiff's alleged injured business relations. *Sis, LLC v. Stoneridge Holdings*, No. 1:17-CV-01816-ELR, 2019 U.S. Dist. LEXIS 229882, at *18 (N.D. Ga. Feb. 5, 2019). In its Motion, PowerPlan argued that the instant facts align with the second circumstance, which provides that a defendant is not a stranger where the alleged injured relations are inextricably a part of or dependent upon the defendant's business relations. Motion at 23-25. Accordingly, PowerPlan responds here to Lucasys' arguments with respect to that particular circumstance.

customers." Opp. at 20. Lucasys' allegations in the Complaint, however, belie this position. Lucasys actually pleads that it was developing "software that filled gaps in what PowerPlan's software does: tools focused on automating processes and creating better integration and reach from existing PowerPlan software." Cmplt. ¶ 43. Lucasys also pleads that it was engaged to deploy its product, Copilot, which would allow a customer "to consolidate its non-regulated entities into the PowerPlan software." Cmplt. ¶ 47. Lucasys is therefore reliant on PowerPlan for more than just access to its customers' data, as Lucasys pleads that it seeks to develop products that integrate with PowerPlan's comprehensive Utility Management Software.

In any event, Lucasys ignores the inexorably interwoven relationships between PowerPlan, Lucasys, and their mutual customers. The terms of access to the PowerPlan software is set forth in a license agreement between PowerPlan and each of its respective customers. *See* Cmplt. ¶ 8. Under the terms of the license agreement, PowerPlan has the right to limit access to third parties to protect its interests in its confidential information, and those customers have an obligation to protect PowerPlan's confidential information. *See* Motion, Ex. 1 and 2. To serve its clients, Lucasys alleges that it must have access to PowerPlan's software, and therefore it must contract with PowerPlan's customers. *See, e.g.,* Cmplt. ¶ 34. PowerPlan is entitled to the benefit of the bargain it struck under the license

agreements with its customers to protect its confidential information.  Accordingly, the relationships are intertwined, and PowerPlan is no stranger to the relationship.[5] *See, e.g.*, *CAE Inc. v. Gulfstream Aero. Corp.*, No. 15-924-LPS, 2017 U.S. Dist. LEXIS 124573, at *22-23 (D. Del. July 28, 2017) (under Georgia law, defendant was not a stranger to the relationship between plaintiff and third party, where the technology that the third party provided to the plaintiff was subject to restrictions imposed by the defendant).

## **CONCLUSION**

For the foregoing reasons, and those stated in PowerPlan's Motion to Dismiss, this Court should dismiss Counts I, II, III, IV, V, VII, and VIII of the Complaint for failure to state a claim.  In the alternative, the Court should dismiss these counts with leave to attempt to replead.

---

[5]    The foregoing readily demonstrates the fallacy in Lucasys' argument that "Microsoft would be immune from virtually all tortious interference claims relating to software because most software is run through Windows operating systems licensed to customers by Microsoft." Opp. at 20.  Microsoft would only be immune from tortious interference claims where it exercises its rights under its license agreements, and therefore acts as a non-stranger.

Respectfully submitted this 9th day of November, 2020.

Respectfully submitted,

/s/ Petrina A. McDaniel

Petrina A. McDaniel
Georgia Bar No. 141301
Petrina.mcdaniel@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
1230 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309
Telephone: (678) 272-3200
Facsimile: (678) 272-3211

Damond R. Mace (admitted *pro hac vice*)
Damond.mace@squirepb.com
Stephen M. Fazio (admitted *pro hac vice*)
Stephen.fazio@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8780

*Attorneys for Defendant PowerPlan, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing Reply in Support of PowerPlan's Motion to Dismiss has been prepared using Times New Roman, 14 point font.

*/s/ Petrina A. McDaniel*
Petrina A. McDaniel

*Attorney for Defendant PowerPlan, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Reply in Support of PowerPlan's Motion to Dismiss was served on November 9, 2020 by filing it using the Court's CM/ECF system, which will send electronic notification of such filing to all counsel of record.

/s/ Petrina A. McDaniel
Petrina A. McDaniel

*Attorney for Defendant PowerPlan, Inc.*