IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| LUCASYS INC., | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:20-cv-2987-AT |
| POWERPLAN, INC., | : | |
| Defendant. | : | |

## ORDER

The story alleged in this antitrust case is one of David and Goliath. Plaintiff Lucasys Inc. ("Lucasys"), an up-and-coming, eager-to-innovate competitor, alleges that Defendant PowerPlan, Inc. ("PowerPlan") violated antitrust laws when it used its monopoly power in a primary software market to harm potential competitors and competition in a secondary, dependent consulting market with the aim of precluding those competitors from entering the primary market and competing with PowerPlan. As alleged, when PowerPlan learns of competitors (like Lucasys) seeking to step out of the secondary market into the primary software one, it squashes that competition by *inter alia* reaching out to customers and leveraging its monopoly power to coerce customers to stop working with the competitor (such as Lucasys). According to Lucasys, these anticompetitive actions (1) ensure that no nascent competitor will ever be able to grow to compete with PowerPlan in the

primary software market and (2) harm consumers in all markets by stifling innovation, depriving consumers of their choice of product or service provider, reducing the output of current or prospective technology and software products, and increasing prices.

Defendant PowerPlan moves to dismiss Lucasys' antitrust claims and tortious interference claims under state law. [Doc. 18.]  Because the Complaint's allegations are sufficient at this stage to support the asserted antitrust violations and state law tortious interference claims, PowerPlan's Motion is **DENIED**.

## I.    Background

**The Parties, Industry, and Markets**

Defendant PowerPlan is the leading provider of utility management software for investor-owned rate-regulated utilities around the country. (Compl. ¶ 6.) Plaintiff Lucasys is a small start-up tax consulting and software development company that provides data consulting and deferred tax solutions to rate-regulated utilities. (*Id.* ¶ 5.)

In 1994, PowerPlan developed software specially built for the industry of rate-regulated utilities that allows utilities to store, access, analyze, and compute their data in connection with industry-specific operational, accounting, regulatory, and tax needs. (*Id.* ¶¶ 7, 11.) PowerPlan's software is a single centralized database with different "modules" and "suites" that perform different functions, for example, related to computing income tax or property tax, or assisting with lease accounting or "rate case management." (*Id.* ¶¶ 9, 10.) The software is industry-

2

specific in that much of these functions revolve around certain fixed assets unique to the industry of rate-regulated utilities. (*Id.* ¶ 7.)

After PowerPlan created this software in 1994, utility after utility bought in. By the late 2000s, PowerPlan had acquired its only competitor and was thus the only company offering a full suite of utility management software. (*Id.* ¶ 11.) Today, 99 percent of utilities use PowerPlan's software—indeed, large utilities *must* use PowerPlan's software because of the scale and complexity of their data. (*Id.* ¶ 12.)

According to the Complaint, PowerPlan, sitting atop this throne of monopoly power in the Utility Management Software Market ("Utility Software Market"), stopped innovating or updating its software to meet customers' needs. (*Id.* ¶ 13.) One alleged significant problem with PowerPlan's software is that it is built on an outdated coding language. (*Id.* ¶ 14.) For this reason, the customer utilities' data, housed in the PowerPlan software, cannot simply be exported to make calculations elsewhere. (*Id.* ¶ 23.) And because there are no alternative products, customers are forced to continue to purchase the PowerPlan software. (*Id.*) Moreover, the Utility Software Market has high barriers to entry in that it would require both significant capital and ongoing access to consumer data (which is housed in PowerPlan's software). (*Id.* ¶¶ 106, 69.) Customers also face extremely high switching costs because their data is locked into PowerPlan software and any change would involve significant implementation costs, disruptions/risks to business and accounting processes, employee retraining, audit concerns, and regulatory concerns and risks. (*Id.* ¶ 70.)

Over time, utility customers discovered that PowerPlan's software was not able to meet their needs and therefore began hiring consultants to fill the gaps by writing custom code extensions, providing data-consulting services, integrating their PowerPlan data with other applications to accomplish tasks the PowerPlan software could not, and other band-aid solutions. (*Id.* ¶ 15.) By the early 2010s, a market for these supplemental services existed; now, utilities typically pay hundreds of thousands or even millions of dollars every 3-5 years for these supplemental services. (*Id.* ¶¶ 16-17.) Currently, there are about ten companies competing in this Supplemental Management Service Market ("Supplemental Market"), including Lucasys and PowerPlan. (*Id.* ¶ 79.) As alleged, PowerPlan is largely content with the *status quo* of the Supplemental Market, even though it lacks a monopoly in this market, because (1) PowerPlan takes in additional revenue by providing services in this secondary market and (2) the availability of this market reduces pressure to invest substantial money into updating its obsolete utility management software. (*Id.* ¶ 18.)

Lucasys also alleges, in addition or in the alternative, a third "separate or sub-market" specifically related to "deferred tax solutions" for utilities (the "Deferred Tax Market"). (*Id.* ¶ 81.) Lucasys alleges that this is a market for consulting services and technology solutions to assist utility customers with cleansing and remediating their data to allow them to calculate tax positions associated with changes in the tax code at scale. (*Id.*) Only three firms compete in this sub-market—Lucasys, PowerPlan, and a firm called Regulated Capital

Consultants. (*Id.* ¶ 82.) This market/sub-market arose after the passage of a 2017 tax law that reduced the tax rate for utilities. (*Id.* ¶ 21.) Because rate-regulated utilities must share beneficial tax changes with the public ratepayers based on complicated state and federal regulations, often varying by jurisdiction, each utility requires services to evaluate its data in light of the tax changes and the relevant regulatory requirements to determine rates. (*Id.* ¶¶ 22-23.)

**Lucasys Enters the Scene**

Lucasys was founded in 2018 by three former PowerPlan employees — who left PowerPlan in 2013, 2014, and 2015 and worked elsewhere before founding Lucasys. (*Id.* ¶ 28.) The founders' goal in establishing Lucasys was to provide services and software related to deferred tax as well as long-term software and technology to replace consulting services. (*Id.*) Currently, Lucasys provides both consulting services and technological solutions, and expects to develop Software-As-A-Service ("SAAS") tools to automate certain processes and reduce the need for manual data assessment in both the Supplemental Services Market and the Deferred Tax Market. (*Id.* ¶ 29.) So far, Lucasys has created three technological products: (1) a cloud-based software for tax computations; (2) a business automation tool to automatically transmit data between sources; and (3) a toolkit with several applications for calculations and data-related tasks. (*Id.* ¶ 30.) Lucasys plans to build on these technological innovations to compete more broadly with PowerPlan in the Utility Software Market and ultimately provide an alternative full-suite product. (*Id.* ¶ 31.)

**PowerPlan's Anticompetitive Acts**

As alleged, after learning that Lucasys was not only offering consulting services but also software and technological products, PowerPlan sought to eliminate the threat posed by Lucasys' technological innovation. PowerPlan learned about Lucasys when both companies were bidding on a contract with American Electric Power Service Corporation ("AEP"). AEP offered a contract for a company to build a full software suite around taxes—one that would have replaced or expanded upon PowerPlan's existing tax suites. (*Id.* ¶ 35, 53.)  When PowerPlan discovered that AEP had awarded the contract to Lucasys, it sought to intimidate both Lucasys and AEP with threatened legal action related to trade secret violations. (*Id.* ¶ 38-42.)

First, PowerPlan sent a demand letter to Lucasys claiming that Lucasys had misappropriated unspecified trade secrets. (*Id.* ¶ 38.) PowerPlan also demanded that Lucasys not only cease-and-desist efforts to design, develop, market, and sell software but also cease-and-desist consulting for all PowerPlan customers *unless* it stopped creating new software. (*Id.* ¶ 41.) Lucasys alleges that these claims were made in bad faith and solely as an attempt to block Lucasys from offering or providing services to utility customers because Lucasys, in developing technological and software tools, is a competitive threat to PowerPlan's monopoly. (*Id.* ¶ 40.) Providing a carrot to accompany the stick, PowerPlan also proposed to Lucasys an allegedly unlawful market-allocation agreement under which

PowerPlan would "be open" to Lucasys competing with it for consulting services as long as it discontinued its software development. (*Id.* ¶ 42.)

In addition to contacting Lucasys, PowerPlan also directly contacted AEP, the utility that had awarded the software development contract to Lucasys. In letters send to AEP, PowerPlan stated that

> It is PowerPlan's understanding that Lucasys has been developing software **that directly competes with our software**, and recently started marketing and **seeking to sell that software to our customer base**. As I am sure you can understand, to protect our trade secrets and other intellectual property, we cannot permit Lucasys to have access to our confidential and proprietary software through our customers **while Lucasys simultaneously develops, markets, and sells the same kind of software to the same customer base in direct competition with us**. This creates an intolerable risk for us—and you—that Lucasys may continue or begin to misuse or misappropriate our confidential information and trade secrets and unfairly use them to develop, market, and sell its competing software.

(Doc. 18-3, December 2019 Letter; *see also*, Compl. ¶ 54) (emphasis added.) Later, PowerPlan sent a second letter to AEP, reiterating that

> Lucasys offers ... **software solutions that compete with PowerPlan software**. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers...

(Doc. 18-2, July 2020 Letter; Compl. ¶ 54) (emphasis added.) In the Complaint, Lucasys asserts that, not only are these allegations of trade secret violations entirely unfounded, but that neither Lucasys nor any other third party *can* obtain proprietary information simply by accessing customer data through PowerPlan's

software (where the data is housed). (Compl. ¶ 54.)[1] As a result of PowerPlan's letters, AEP narrowed the scope of its contract with Lucasys to services only, rather than the development of software products. (*Id.*)

Lucasys alleges that PowerPlan similarly coerced other customers, including Liberty Utilities and NextEra, to terminate its contracts with Lucasys, including one contract that involved the implementation of Lucasys Copilot product, discussed *supra*. (*Id.* ¶¶ 47-51.) Lucasys also asserts that PowerPlan has engaged in similar tactics — asserting baseless trade secrets claims to squelch nascent competition — with other competitors in the past that have threatened its monopoly on software. For example, PowerPlan also sought to restrain Regulated Capital Consultants ("RCC") because PowerPlan saw RCC's custom code editing as a threat. (*Id.* ¶¶ 44, 61.) In addition, the Complaint alleges that PowerPlan directly and/or implicitly threatens to cancel software license agreements or withhold software support from customers who work with Lucasys or other technology-providing competitors. (*Id.* ¶ 56.) According to Plaintiff, PowerPlan intends to send letters to all of its customers telling them not to do business with Lucasys. (*Id.* ¶ 58.)

As alleged, not only has Lucasys lost out on contracts, but it has been blocked from building business relationships with other utilities because of PowerPlan's actions. This foreclosure has inhibited Lucasys' ability to obtain important data

---

[1] As noted above, the Complaint alleges that some data cannot simply be extracted from the PowerPlan software because the software is so obsolete and uses an old coding language. (Compl. ¶ 23.)

reflecting customer's needs, develop that data to accomplish business objectives, and raise revenue—all of which will allow it to create new software to better compete with PowerPlan's. (*Id.* ¶ 60.)  Because of the high barriers to entry and high switching costs, the most likely avenue for competition with PowerPlan's software is through the Supplemental Market; however, if any potential software competitor is squashed before it can grow, no company will ever be able to compete with PowerPlan's software monopoly. (*Id.* ¶ 62.)

**Resultant Harm**

According to Lucasys, PowerPlan's anticompetitive action — aimed at perpetuating its monopoly — has harmed competition in the Utility Software Market by (1) precluding any company from entering that market and competing with it and (2) quelling innovation, thereby keeping utility customers "in the technology of the dark ages of the 1990s for their utility management needs." (*Id.* ¶¶ 84, 88, 89.) PowerPlan's conduct has also harmed competition in the Supplemental and Deferred Tax Markets by allegedly (1) reducing choices available to utility customers by blocking any software component in the aftermarket; (2) raising prices in the markets because software components would allow for automation, which is cheaper than continuing to use manual labor; (3) decreasing the quality of products in the markets; and (4) generally reducing outputs in these markets. (*Id.* ¶ 85, 88.)

**Asserted Claims**

Based on the above allegations, Plaintiff alleges five counts of antitrust violations under Sections 1 and 2 of the Sherman Act, 15 U.S.C §§ 1-2. Counts I and II are brought under Section 2 for unlawfully maintaining a monopoly through negative tying and refusal to supply customers with their own data if they work with Lucasys. Counts III, IV, and V are brought under Section 1 for unlawful agreements to restrain trade via negative tying, a concerted refusal to deal with Lucasys, and *de facto* exclusive dealing provisions in contracts with utilities. Count VI alleges a violation of the Georgia Fair Business Practices Act. Counts VII and VIII allege claims for tortious interference with contract and business, respectively. Finally, Counts IX and X allege claims of defamation *per se* and defamation.

Lucasys seeks treble damages as to the antitrust claims, actual damages for the state law claims, and permanent injunctive relief.

## II.    **Legal Standard**

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-556 (2007); Fed. R. Civ. P. 12(b)(6). The plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)); Fed. R. Civ. P. 8(a). In ruling on a motion to dismiss, the court must accept the facts alleged in the complaint as true

and construe them in the light most favorable to the plaintiff. *See Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff is not required to provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim.  *Id.* at 556.  A complaint may survive a motion to dismiss for failure to state a claim even if it is "improbable" that a plaintiff would be able to prove those facts and even if the possibility of recovery is extremely "remote and unlikely." *Id.*

## III.   Discussion

### A.   Antitrust Standing Regarding the Utility Software Market

PowerPlan first argues that Lucasys cannot maintain any antitrust claims related to the Utility Software Market because it lacks standing to bring claims based on conduct in this market. (Motion to Dismiss Brief ("Mot."), Doc. 18-1 at 10-13.)

 "A private plaintiff seeking damages under the antitrust laws must establish standing to sue." *Sunbeam Tel. Corp. v. Nielsen Media Research, Inc.*, 711 F.3d

1264, 170 (11th Cir. 2013) (quoting *Fla. Seed. Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997)). "Antitrust standing requires more than the 'injury in fact' and the 'case or controversy' required by Article III of the Constitution." *Fla. Seed Co.*, 105 F.3d at 1374 (citing *Todorov v. DHC Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991)). "The doctrine of antitrust standing reflects prudential concerns and is designed to avoid burdening the courts with speculative or remote claims." *Sunbeam*, 711 F.3d at 1270 (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983)). "Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Todorov*, 921 F.2d at 1448.

A private plaintiff may bring a federal antitrust action through Section Four of the Clayton Act, 15 U.S.C. § 15(a), which creates a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ..., and shall recover threefold the damages by him sustained." *Sunbeam*, 711 F.3d at 1270 (citing 15 U.S.C. § 15(a)); *see also, Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*, 604 F.3d 1291, 1298 (11th Cir. 2010). To recover treble damages under § 4 of the Clayton Act, a plaintiff must establish both that it has antitrust standing and that the defendant violated the antitrust laws. *Sunbeam*, 711 F.3d at 1271 (citing *Levine v. Cen. Fl. Med. Affiliates*, 72 F.3d 1538, 1545 (11th Cir. 1996)).

To determine whether a plaintiff has antitrust standing, courts in the Eleventh Circuit employ a two-prong test. *Sunbeam*, 711 F.3d at 1271; *Palmyra*

*Park Hosp.,* 604 F.3d at 1299. Under this test, a plaintiff must establish that (1) it has suffered an antitrust injury and (2) it is an "efficient enforcer" of the antitrust laws. *Sunbeam*, 711 F.3d at 1271; *Palmyra Park Hosp.*, 604 F.3d at 1299 ("We employ a two-prong test for antitrust standing under § 4 of the Clayton Act: first, the plaintiff must have alleged an antitrust injury; and second, the plaintiff must be an efficient enforcer of the antitrust laws."); *Florida Seed Co.*, 105 F.3d at 1374. Under the second prong to determine whether the plaintiff is an "efficient enforcer," courts consider the following factors:

> (1) the directness or indirectness of the asserted injury; (2) the remoteness of the injury; (3) whether other potential plaintiffs were better suited to vindicate the harm; (4) whether the damages were highly speculative; (5) the extent which the apportionment of damages was highly complex and would risk duplicative recoveries; and (6) whether the plaintiff would be able to efficiently and effectively enforce the judgment.

*Sunbeam*, 711 F.3d at 1271 (citing *Associated Gen. Contractors*, 103 S.Ct. at 908-912; *Todorov*, 921 F.2d at 1451-52.)

Whether a plaintiff has antitrust standing under the two-prong test also involves consideration of causation, *i.e.*, the nexus between the antitrust violation and the plaintiff's harm, as well as an assessment of whether the harm alleged is of the type for which Congress provides a remedy. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."). "[P]lainly relevant to a

13

determination of whether" a plaintiff suffered antitrust injury is the issue of preparedness to enter the market. *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1651 (11th Cir. 1987) ("Thus, if [plaintiff] is deemed unprepared it has failed to establish one of the prerequisites of a private cause of action under the antitrust law—a causal relationship between the antitrust violation alleged and the injury sustained") (cleaned up); *see also*, *Sunbeam*, 711 F.3d at 1272-73 (discussing preparedness requirement and explaining that "in order to meet the second prong, the plaintiff must prove the existence of a competitor willing and able to enter the relevant market, but for the exclusionary conduct of the incumbent monopolist").

On this issue of preparedness, the Eleventh Circuit has explained that, in cases where a plaintiff "seeks to recover for an antitrust injury that allegedly arises from the frustrated expansion of one's business into a new market, there are significant requirements for establishing an entitlement to recovery," *Cable Holdings*, 825 F.2d at 1562. Specifically, a plaintiff must demonstrate "(1) an intention to enter the business and (2) a showing of preparedness to enter the business." *Id.* (citing *Hayes v. Solomon*, 597 F.2d 958, 973 (5th Cir. 1979), *cert. denied*, 444 U.S. 1078 (1980)[2]; *Heatransfer Copr. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 988 n.20 (5th Cir. 1977), *cert. denied*, 434 U.S. 1087 (1978); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 723 (11th Cir. 1984)); *see also*,

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Sanger Ins. Agency v. HUB Intern., Ltd.*, 802 F.3d 732, 738 (5th Cir. 2013). Absent a showing of both intention and preparedness to enter the business, "it cannot fairly be concluded that the antitrust violation was the cause of the failure to expand." *Cable Holdings*, 825 F.2d at 1562; *see also, Gas Utilities Co. of Ala. v. S. Nat. Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993) ("The law clearly requires a showing of an intention and preparedness to enter the business to give a plaintiff a cause of action for being foreclosed from the market.").

While an antitrust plaintiff must establish intention and preparedness, it "need not have an actual going business to establish private antitrust injury." *Hayes*, 597 F.2d at 973. ("Recovery can be had for a wrongfully frustrated attempt to enter a business."); *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991) ("Our circuit has recognized, in a related context, that an attempt to enter a market coupled with a showing of preparedness is sufficient to establish an injury in fact, which is one of the bases of standing.") Indeed,

> a defendant cannot benefit by the application of the standing doctrine from the fact that it is able to prevent the plaintiff from becoming a consumer of its product. As long as the plaintiff made a reasonable attempt to enter the market, our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations which create barriers to that market.

*Thompson*, 934 F.2d at 1572 (assessing preparedness where plaintiff sought to become consumer, rather than competitor, in monopolized market). In the case of "nascent competitors," the preparedness requirement allows courts to balance important concerns:

> [o]n the one hand, a plaintiff who never entered a particular market but would have if not for an antitrust violation can undoubtedly challenge an antitrust violation in court. In fact, such firms may become prime targets for antitrust violations, because "early exclusion may be far cheaper than ruining or disciplining a recent entrant who has become established." Areeda & Hovencamp, ANTITRUST LAW, ¶ 349a, at 258 (4th ed. 2014). Too restrictive a view of standing would immunize incumbents from antitrust scrutiny when they only aim their efforts at new entrants (who may pose the primary threat to monopolists). On the other hand, an overly permissive standing doctrine would allow mere bystanders who lack particularized injury to benefit from another party's antitrust violation.

*Sanger*, *supra*, 802 F.3d at 737.

In evaluating whether an antitrust plaintiff has shown that it is prepared to enter the business, courts have considered: (1) the ability of the plaintiff to finance the business and to purchase the necessary facilities and equipment; (2) the consummation of contracts by the plaintiff; (3) affirmative action by the plaintiff to enter the business; and (4) the background and experience of the plaintiff in the prospective business. *Hayes,* 597 F.2d at 973 (citing *Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633-34 (5th Cir. 1966)).

In the present case, PowerPlan argues that Lucasys fails to plead that it was prepared to enter the Utility Management Software Market, primarily because Lucasys does not allege that it has a substitute software product to sell in this market. (Mot. at 12) ("In the absence of a concrete product to sell in the alleged UMS Market, Lucasys is fundamentally unprepared to enter the market, and lacks standing to assert its monopolization claims in the UMS Market.")

Countering, Plaintiff Lucasys points out that PlowerPlan cites no authority holding, *or even suggesting*, that an antitrust plaintiff must have a complete substitute product to have antitrust standing. (Pl. Resp. at 10) (also citing *Thompson*, 934 F.2d at 1572) ("As long as the plaintiff made a reasonable attempt to enter the market, our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations which create barriers to that market); *Martin*, 365 F.2d at 633 ("There are numerous decisions stating that one need not have an actual going business to obtain standing, but an attempt to enter a business is sufficient.")). Further, Plaintiff Lucasys relies on the antitrust principle that "[i]mperfect substitutes create competitive pressures within markets," and that Lucasys' nascent software substitutes inspired PowerPlan's attempts to squish the threat of any entity seeking to compete in the software arena. (Pl. Resp. at 12-13) (citing Phillip E. Areeda (late) & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 756b6 (4th ed. 2020 Cum. Supp. 2013-2019) ("[T]he availability of the imperfect substitute tends to put a ceiling on the monopolist's price.")

In its Complaint, Lucasys acknowledges that it has "not yet developed a software product that could be fully substituted for PowerPlan's Utility Management Software." (Compl. ¶ 43.) However, Lucasys has taken affirmative action in developing various types of software and technology that "fills in gaps" where PowerPlan's software is deficient (*id*.). For example, Lucasys has developed cloud-based software that "makes deferred tax computations based on the 2018

federal tax changes as applied to a customer's data"—a task that PowerPlan's PowerTax software cannot accomplish. (*Id.* ¶ 30a.)  Lucasys has also developed a business process automation tool called Copilot that allows customers to configure steps between different data sources which, because it is automated, will save hundreds of thousands of dollars a year since it does not rely on the performance of manual tasks. (*Id.* ¶ 30b.) Further, Lucasys has developed a toolkit that contains applications that allow a customer utility to calculate lease payments, conduct audit computations, and complete other data-related tasks in an automated way. (*Id.* ¶ 30c.)

Lucasys alleges that, absent PowerPlan's anticompetitive conduct, it will be able to begin competing more broadly with PowerPlan in the Utility Software Market, build more software solutions, and eventually create a replacement for PowerPlan's overall utility management software suite. (*Id.* ¶ 31.) As a plan for expansion, Lucasys asserts that it has and will continue to create new software in the context of specific contracts with individual customers (utilities), earn revenue from those contracts, use that revenue to further develop the software solutions, and then deploy those solutions more broadly in the Utility Software Market. (*Id.* ¶¶ 32, 60.)[3]

---

[3] Lucasys further alleges that software competition "in the Supplemental Management Services Market is the most likely route for a potential competitor in the Utility Management Software market to achieve sufficient scale to threaten PowerPlan's monopoly. Thus, Powerplan's *modus operandi* of allowing consulting competition in the Supplemental Management Services market but thwarting through anticompetitive conduct all software competition in that market, effectively protects its monopoly" in the Utility Software Market. (Compl. ¶ 62.)

As an example, Lucasys cites a situation in which a utility, American Electric Power Service Corporation ("AEP"), sought proposals for technological development and consulting services for a full software suite around deferred taxes that would have replaced and expanded upon PowerTax, one of PowerPlan's existing software suites. (*Id.* ¶¶ 35, 36.) Both PowerPlan and Lucasys submitted bids and AEP ultimately awarded the contract to Lucasys. (*Id.* ¶¶ 36, 53.) After learning that Lucasys was developing its own software and thus entering the software development market, PowerPlan coerced AEP to cancel its contract with Lucasys, citing trade secrets concerns. Specifically, as discussed above, PowerPlan sent AEP a demand letter, stating *inter alia* that

> To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information **while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers**.

(July 17, 2020 Letter to AEP, Doc. 18-2) (emphasis added.) Of note, Lucasys alleges that it cannot obtain any proprietary information simply by accessing customer data through PowerPlan software. (Compl. ¶ 54.)[4] Ultimately, AEP, citing legal concerns, narrowed the scope of its contract with Lucasys so that the agreement was for the provision of *services only*, not the development of new tax software, which would have competed with PowerPlan's tax suites. (*Id.*)

---

[4] Also relevant, as noted in the above Factual Background, Lucasys alleges that PowerPlan's software that houses customers' data is based on an outdated coding language and therefore customer data cannot simply be exported to make calculations elsewhere. (Compl. ¶ 23.) Lucasys alleges that it needs access to its customers' data in order to design and develop solutions to meet customers' needs and also to provide consulting services. (*Id.* ¶ 60.)

The Complaint also alleges that Lucasys' founders have backgrounds and experience in the relevant market, specifically stating that: Lucasys was founded in 2018 by three employees who previously worked for PowerPlan but left in 2013, 2014 and 2015; each founder worked for other employers (after PowerPlan) where they obtained additional experience in software development, business consulting, and tax advising; and Lucasys provides subject matter expertise to utility customers to help with data issues. (Compl. ¶ 27.) Currently, Lucasys is actively competing in the Supplemental Services Market, providing consulting services to utilities in need of services to supplement the alleged deficiencies of PowerPlan's software. (*Id.* ¶¶ 79, 47, 50.) Lucasys is also one of three companies currently competing in the Deferred Tax Market. (*Id.* ¶ 82.)

Accordingly, the allegations in the Complaint establish that: Lucasys' founders had the background and experience necessary to compete in the Utility Software Market; Lucasys had already taken affirmative steps to enter the market by developing relevant software and tools; Lucasys had consummated at least one contract with AEP for the development of additional software to compete with or replace PowerPlan's current tax suites and another contract with Liberty Utilities to implement its Copilot technology; and Lucasys had a plan to finance its continued development of new technology and expansion—therefore meeting all of the preparedness factors. *Hayes,* 597 F.2d at 973; *Martin*, 365 F.2d at 633-34.

In *Sanger, supra*, 802 F.3d 732 (5th Cir. 2013), the plaintiff company (Sanger) was attempting to enter the market of selling/brokering veterinary

professional liability insurance but was blocked by the defendant company, which had a near monopoly in the market. *Id.* at 734-35. In particular, Sanger argued that, upon learning of its plans to enter the market, the defendant monopoly reached out to underwriters (The Hartford, Travelers, Zurich) and to veterinary associations considering endorsing Sanger, and sought to influence those actors not to work with Sanger. *Id.* at 736. There, the defendant company made the same argument that PowerPlan makes here—that the plaintiff was not prepared to enter the market. In finding that Sanger had standing (at the summary judgment stage), the Fifth Circuit explained that Sanger had taken affirmative steps, including marketing its services to members of the Texas Equine Veterinary Association; setting up an office and staff; conducting discussions internally with veterinarians, insurance companies, brokers, and consultants; and even making some minor sales before it was blocked. *Id.* at 739-40.

The Fifth Circuit further explained that "*[t]he degree to which a business must take affirmative steps is mitigated by the impact of the antitrust violation*, which we assume to have occurred when analyzing standing. Thus, nascent competitors need not 'pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture.'" *Id.* (citing *Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F.Supp. 176, 180 (E.D. Pa. 1976) (emphasis added)). Thus, the *Sanger* Court found it "critical" that the obstacles to full entry flowed from the alleged anticompetitive conduct itself rather than unrelated

reasons. *Id.* at 740. ("Without access to insurers, and to the rates and coverage options offered by those insurers, it would have been futile to take those steps.")

Here, the same reasoning applies. Lucasys took affirmative steps to enter the software market by creating three technological products (including cloud-based software), marketing and selling their products to consumers, and winning contract bids to develop more software. More than in *Sanger*, even, Lucasys' founders had significant experience in the business. Critically, like in *Sanger*, Lucasys' inability to grow was a direct result of PowerPlan's anticompetitive actions, which the Court assumes to be true for purposes of a standing analysis. *See Sanger*, 802 F.3d at 738 (citing *Gas Util. Co. of Ala.*, 996 F.2d at 283 (11th Cir. 1993)).  Absent PowerPlan's actions, Lucasys would have retained the contract with AEP to develop new software, would have implemented its Copilot technology into NextEra's systems, and would have had access to the customers, their data, and additional revenue, all necessary to expand their technological operations. *Sanger*, 802 F.3d at 740 ("Absent the exclusive dealing arrangement that Sanger contends prevented it from brokering policies, a factfinder could conclude that Sanger was prepared to enter at least the Texas market").

Considering the allegations in the Complaint and in light of the authority above, the Court concludes that Lucasys has sufficiently pled that it was prepared to enter the Utility Software Market absent PowerPlan's anticompetitive conduct. *Sanger*, 802 F.3d at 740; *Hayes,* 597 F.2d at 973; *Martin*, 365 F.2d at 633-34;

*Thompson*, 934 F.2d at 1572.[5] Accordingly, the portion of PowerPlan's motion to dismiss for lack of preparedness and standing is **DENIED**.

## B. Injury to Competition in the Supplemental Market and Deferred Tax Market

In its second argument for dismissal, PowerPlan contends that Lucasys fails to allege plausible injury *to competition* in the Supplemental and Deferred Tax Markets, as opposed to just injury *to Lucasys*. (Mot. at 14-19.) As a result, PowerPlan seeks dismissal of Counts III, IV, and V for failure to allege harm to competition in these markets. (*Id*. at 19.)[6]

Counts III, IV, V assert claims under Section One of the Sherman Act. In particular, Count III alleges that PowerPlan engaged in "negative tying," when it conditioned customers' purchases of its main utility management software on an agreement not to purchase/use products in the Supplemental and Deferred Tax Markets that are provided by PowerPlan's perceived competitors. (Compl. ¶ 114.) In Count IV, Lucasys alleges a "refusal to deal" claim, asserting that PowerPlan coerced customers — such as AEP, NextEra, and Liberty Utilities — into agreeing not to do business with Lucasys. (*Id*. ¶ 120.) In Count V, Lucasys alleges that PowerPlan engaged in *de facto* exclusive dealing by preventing customers from

---

[5] The Court notes that all of PowerPlan's cited cases, in which courts found a lack of preparedness, were before the court on summary judgment. PowerPlan's dearth of authority arising at the motion to dismiss stage only reinforces the Court's finding at this juncture.

[6] In its Motion to Dismiss, PowerPlan argues that Lucasys fails to allege injury to competition in the Deferred Tax Market in Section 3 of its brief. (Mot. at 22.) As reasoned *infra*, however, the Court finds that Plaintiff has adequately pled the contours of the Deferred Tax Market and therefore addresses issues of whether Plaintiff has sufficiently pled harm to competition in both markets together.

releasing their own data to third-party vendors, like Lucasys, without PowerPlan's permission. (*Id.* ¶ 126.)[7]

"Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states." *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2283 (2018) (citing 15 U.S.C. § 1).  The phrase "restraint of trade" is best read to mean "undue restraint." *Id.* Accordingly, § 1 is understood to outlaw only unreasonable restraints. *Id.*

Under § 1, "[a] small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Id.* at 2283 (cleaned up); *see also*, *Spanish Broadcasting Sys. of Fla., Inc. v. Clean Channel Communications, Inc.*, 376 F.3d 1065, 1069 (11th Cir. 2004) (noting that "some restraints on trade remain illegal *per se*, such as certain agreements to fix prices . . ."). "Restraints that are not unreasonable *per se* are judged under the 'rule of reason.'" *American Express Co.*, 138 S.Ct. at 2284. "The rule of reason requires courts to conduct a *fact-specific* assessment of 'market power and market structure ... to assess the [restraint]'s actual effect' on competition." *Id.* (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)) (emphasis added); *see also*, *Spanish Broadcasting*, 376 F.3d at 1071 (explaining that most Section

---

[7] PowerPlan does not argue that Lucasys fails to allege harm to competition in the Utility Software Market or argue for dismissal of Counts I and II on that basis. Counts I and II assert § 2 violations for unlawful maintenance of a monopoly.  Accordingly, the Court does not assess those claims here or the issue of harm to competition in the Utility Software Market.

One claims that assert a prohibited contract that unlawfully restrains trade require the factfinder to "decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its conditions before and after the restraint was imposed, and the restraint's history, nature, and effect.") (citing *State Oil v. Khan*, 522 U.S. 3, 10 (1997)).

In making this fact-specific assessment, "[t]he goal is to 'distinguis[h] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" *American Express Co.*, 138 S.Ct. at 2284 (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)).

To determine whether a restraint violates the rule of reason under § 1, courts conduct a three-step, burden-shifting analysis. *Id.* The plaintiff "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* If a plaintiff makes this showing, the burden shifts to the defendant to establish a procompetitive rationale for the restraint. *Id.* If the defendant makes this showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

On the first step, "[i]n alleging the anticompetitive effect of the defendant's conduct, an antitrust plaintiff must show harm to competition rather than to competitors." *Spanish Broadcasting*, 376 F.3d at 1071 (citation omitted). In other

words, the anticompetitive effects "are measured by their impact on the market rather than by their impact on competitors." *Id*; *see also*, *Nat'l Collegiate Athletic Assoc. v. Alston*, 141 S.Ct. 2141, 2159 (2021) ("The 'statutory policy' of the Act is one of competition and it 'precludes inquiry into the question of whether competition is good or bad.'"). It is well-recognized that

> The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

*Spanish Broadcasting*, 376 F.3d at 1069.

To show this anticompetitive effect on the market, a plaintiff "may either prove that the defendants' behavior had an actual detrimental effect on competition, or that the behavior *had the potential* for genuine adverse effects on competition." *Id*. at 1072. (citing *Levine*, 72 F.3d at 1551) (emphasis added).

A plaintiff can show anticompetitive effects on the market by direct evidence, "such as reduced output, increased prices, or decreased quality in the relevant market," *American Express Co*., 138 S.Ct. at 2284, or through indirect evidence, for example, "proof of market power plus some evidence that the challenged restraint harms competition." *Id*.; *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 827, 835 (11th Cir. 2015) (explaining that exclusive dealing arrangements can harm competition by allowing a defendant to "increase prices, restrict output, reduce quality, slow innovation, or otherwise harm consumers" and also noting

examples of "indirect evidence" including "the degree of rivals' exclusion, the duration of the exclusive deals, and the existence of alternative channels of distribution"); *Impax Laboratories, Inc. v. F.T.C.*, 994 F.3d 484, 492 (5th Cir. 2021) ("Anticompetitive effects are those that harm consumers. Think increased prices, decreased output, or lower quality goods. Eliminating potential competition is, by definition, anticompetitive."); *1-800 Contacts, Inc. v. F.T.C.*, 1 F.4th 102, 118 (2d Cir. 2021) (noting that anticompetitive harm may include "evidence of retarded innovation, or other manifestations of harm to consumer welfare") (internal citation omitted).

In the present case, PowerPlan argues that the Complaint does not allege plausible injury to competition in the Supplemental Market because it only alleges injury to Lucasys and any other allegations of harm to the Supplemental Market are "pure speculation." (Mot. at 14-19.)

In connection with harm to competition in the Supplemental and Deferred Tax Markets, the Complaint alleges that PowerPlan's anticompetitive conduct harms competition in these markets by:

- depriving utility customers of a choice in obtaining necessary services (*id.* ¶ 85);
- motivating customers to hire PowerPlan for supplemental services to avoid the risk that the customer's chosen service provider will be denied access to the customer's data (*id.*);
- imposing a Hobson's Choice on customers that excludes competitors and reduces output of new products and services, which in turn raises prices for customers (*id.*);
- coercing customers to terminate or reduce the scope of contracts with their chosen providers and are thus forcing them to accept lower quality services (*id.* ¶ 86);

- threatening customers to obtain fewer solutions from Lucasys and others, which decreases output (*id.* ¶ 87);
- reducing choices available to customers because it blocks Lucasys or others from establishing a software/technological component to that Supplemental Market (*id.* ¶ 88);
- raising prices because allowing a technological or software component in the Supplemental Market (like Lucasys' Copilot program) would be cheaper than consulting labor (*id.*);
- decreasing the quality of products and services in the Supplemental Market because innovative software or automation tools would improve performance (*id.*);
- generally reducing quality by keeping "utility customers in the technological dark ages" by squelching competitive innovation (*id.*);
- raising operating costs and reducing efficiency in the Supplemental and Deferred Tax Markets, which gets passed on to end-consumer ratepayers (*id.* ¶ 89).

In addition, Lucasys has supported these allegations with specific incidents. For example, Lucasys alleges that PowerPlan's actions limited output when PowerPlan coerced AEP into cancelling its contract with Lucasys to create new software and again when PowerPlan blocked NextEra's implementation of Lucasys' innovative Copilot product. (Compl. ¶¶ 47, 54.) Without PowerPlan's intervention, new technology would have been available to customers seeking supplemental services. Relatedly, Lucasys alleges that Liberty Utilities has expressed concerns that, because of PowerPlan's interference, it was deprived of its choice of the most efficient, cost-effective provider in the market. (*Id.* ¶ 51.) On top of this, Lucasys alleges that PowerPlan engaged in similar tactics with other competitors, for example by similarly threatening Regulated Capital Consultants ("RCC") with "baseless trade secret misappropriation claims" because it perceived RCC's custom code editing and extension coding service as a threat. (*Id.* ¶ 44.)

Further, Lucasys alleges that PowerPlan similarly threatened another individual consultant named Doug Johnson. (*Id*.)

At this early stage, Lucasys' allegations of harm to competition in the Supplemental and Deferred Tax Markets in the form of reduced output, decreased product quality, stymied innovation, and raised prices — which are supported by specific examples — sufficiently allege anticompetitive effects in these markets. *American Express Co*., 138 S.Ct. at 2284; *See also*, *Lifewatch Servs. Inc. v. Highmark Inc.,* 902 F.3d 323, 341 (3d Cir. 2018) (finding allegations adequate to allege harm to competition where defendant denied coverage for specific cardiac monitor supplied by plaintiff company where denial of coverage allegedly resulted in reduced quality of cardiac monitors, reduced output of more effective devices, and hindered research, development, and innovation in the market).[8]

Additionally, Lucasys' allegations that PowerPlan's anticompetitive conduct harmed competition by depriving customers of choice, and thereby prevented them from accessing lower-cost, higher-quality options, sufficiently assert harm to

---

[8] *See also Restore Robotics, LLC v. Intuitive Surgical, Inc*., 2019 WL 8063989, at *4 (N.D. Fla. Sept. 16, 2019) (finding that plaintiff adequately alleged injury to competition where it alleged that tying and exclusive dealing arrangements harmed competition in the aftermarkets in general even though plaintiff was still able to "compete some" with defendant's anticompetitive conduct); *CollegeNet, Inc. v. Common Application, Inc.,* 355 F. Supp. 3d 926, 950 (D. Or. 2018) (finding that plaintiff had adequately plead anticompetitive effect where, as a result of allegedly unlawful tying of products, members were coerced into agreeing not to purchase higher-quality, more innovative, or lower-priced college application processing services from rival); *Epic Games, Inc. v. Apple Inc.,* 2021 WL 4128925, at *101 (N.D. Cal. Sept. 10, 2021) (finding that plaintiff had shown anticompetitive harm to competition by showing that Apple precluded developers from opening competing game stores, which would have increased competition and reduced prices and even improved innovation) .

competition. *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("Coercive activity that prevents its victims from making free choices between market alternatives is inherently destructive of competitive conditions . . ."); *Ross v. Bank of America*, 524 F.3d 217, 223 (2d Cir. 2008) (recognizing that one form of antitrust injury is coercive activity that prevents its victims from making free choices between market alternatives); *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F.2d 1000, 1011 (9th Cir. 2003) (same); *Procaps S.A. v. Patheon Inc.*, 141 F.Supp.3d 1246, 1275-76 (S.D. Fla. 2015) (addressing relevant authority and acknowledging that "loss of choice can be evidence of actual adverse effects of the challenged restraint if the necessary impact on the market is demonstrated"); *In the Matter of McWane, Inc., A Corp., & Star Pipe Prod., Ltd. A. Ltd. P'ship.*, 2014-1 Trade Cas. (CCH) ¶ 78670 (MSNET Jan. 30, 2014) ("McWane's exclusive dealing policy also had another adverse impact on competition: it denied its customers the ability to make meaningful choice regarding domestic fittings suppliers that the evidence shows many of them sought"), *aff'd sub. nom. McWane, Inc. v. F.T.C.*, 783 F.3d 814, 838 (11th Cir. 2015).

Most troubling, perhaps, are the allegations of anticompetitive effects of stymied innovation of software products and technological tools, such as Copilot, to be used in the Supplemental Market. "[A] dominant firm's restraints on the innovations of others goes to the heart of antitrust policy . . ." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and*

*Their Application* ¶ 704d (4th ed. 2015) at 234. In the context of monopolistic

restraints on innovation,

> The rationales for the monopolist's position are clear enough. Innovation is capable of producing significant, unexpected, market-shifting social gains. Many monopolists enjoy their positions as a result of dramatic innovations. However, once a monopolist has acquired its position, its attitude towards innovation can become quite different. Its investment in its own technology has been made, and just as it may have dislodged older rivals from their position by innovating, so too it fears dislodgement by the nascent technology of newer or potential rivals . . . .

> Restraints on innovation are very likely even more harmful than traditional price cartels, which we usually consider to be the most harmful anticompetitive practice. Innovation restraints are almost certainly more harmful than a great many of the exclusionary practices that antitrust has condemned . . .

(*Id.* at 234-35.). *See also, United States v. Microsoft Corp.*, 253 F.3d 34, 77-78

(D.C. Cir. 2001) *cert. denied,* 534 U.S. 952 (2001) (finding that Microsoft engaged

in anticompetitive behavior, albeit under § 2, when it *inter alia* threatened to stop

distributing Intel products bundled with Windows products unless Intel stopped

aiding other firms (Sun and Netscape) from developing Java technology that would

threaten Microsoft's monopoly in operating system market).

In light of these allegations, PowerPlan's heavy reliance on *Spanish

Broadcasting* is misplaced. In that case, the plaintiff did not describe how

defendant's conduct could harm competition, admitted that consumer prices were

*lower* than they might be absent the defendant's activities, and even alleged that it

had considerably expanded its share of the market over the past few years. 376

F.3d at 1074. Moreover, unlike the plaintiffs in *Spanish Broadcasting* who alleged

only the *possibility* of limited output, Lucasys has alleged that PowerPlan's actions did in fact limit output, for example, when it coerced AEP into cancelling a contract to create new software and blocked NextEra's implementation of Lucasys' existing Copilot product. (Compl. ¶¶ 47, 54.)

PowerPlan also cites *Spanish Broadcasting* for the proposition that damage to a single competitor is rarely sufficient to establish competitive harm. But what the *Spanish Broadcasting* Court said is that "damage to a critical competitor may also damage competition in general" where the plaintiff "draw[s] that implication with specific factual allegations." 376 F.3d at 1072-73 (citing *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745 (10th Cir. 1999) (discussing reduction in exhibition space at archery trade shows following elimination of sole competitor); *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C. Cir. 1998) (discussing allegations that defendants' monopoly on radio advertising caused consumers to pay higher prices)).

At this juncture, Lucasys has argued that damage to it — PowerPlan's only competitor that offered software solutions in the Supplemental Market — was damage to competition in general because the blocking of new products hampered innovation, reduced output, deprived consumers of the choice of a software component in the aftermarket, and ultimately raised prices. Thus, Lucasys has supported its contention that harm to it was harm to the Supplemental and Deferred Tax Market "with specific factual allegations." *Spanish Broadcasting,* 376 F.3d at 1072-73. *See In the Matter of McWane, supra*, 2014-1 Trade Cas.

(CCH) ¶ 78670 ("[T]he evidence that McWane's exclusive dealing policy significantly impaired the access of McWane's only rival, Star, to the main channel of distribution, thereby increasing its costs and keeping it below the critical level necessary to pose a real competitive threat, is plainly sufficient to meet the standard of harm to competition set forth in the prevailing case law"). Further, the Court notes that Lucasys alleges that PowerPlan engaged in similar anticompetitive conduct against at least one other firm (RCC), whose custom code editing PowerPlan perceived as a threat.

Under the circumstances here, Lucasys has adequately alleged anticompetitive effect and harm to competition in the Supplemental and Deferred Tax Markets.

### C.    The Deferred Tax Market

PowerPlan argues that Lucasys cannot state any claims based on the Deferred Tax Market because Lucasys' market definition is insufficient as a matter of law. (Mot. at 19.) Specifically, PowerPlan asserts that Lucasys has not pled facts concerning how the public views the submarket, the extent to which there are distinct customers, distinct prices, sensitivity to price change, or the number of customers in the submarket. (*Id*. at 21.)

Lucasys contends that it has adequately alleged the contours of the Deferred Tax Market and explained why the market it alleges is relevant and economically significant, in light of the "minimal burden required" to define markets at the motion to dismiss stage. (Pl. Resp. at 16-17.)

33

In bringing claims under Section One, a plaintiff must define both (1) a geographic market and (2) a production market. *Jacobs v. Tempur-Pedic Intern., Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). "Although the parameters of a given market are questions of fact . . . antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Id.*

Here, Lucasys has alleged that the relevant geographic market is the United States. (Compl. ¶ 83.) In pleading the relevant product market for the Deferred Tax Market, Lucasys alleges

> 81. In addition, or alternatively, there is a separate or sub-market within the Supplemental Management Services Market for deferred tax solutions for utilities (the "Deferred Tax Solutions Market"). This market comprises consulting services to assist investor-owned rate-regulated utilities with cleansing and remediating their data and implementing systems that allow them to calculate tax positions associated with changes in the tax code at scale.

> 82. Only three firms are capable of providing these specialized services: PowerPlan, Regulated Capital Consultants, and Lucasys.

(Compl. ¶¶ 81-82)

"Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *Duty Free Americas, Inc. v. Estee Lauder Co., Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015) (*Polypore Int'l, Inc. v. F.T.C.*, 686 F.3d 1208, 1217 (11th Cir.

2012)); *American Express*, 138 S.Ct. at 2285 ("[T]he relevant market is defined as 'the area of effective competition.'").

"A product market consists of products that have reasonable interchangeability for the purposes for which they are produced." *Estee Lauder,* 97 F.3d at 1263 (citing *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 828 (11th Cir. 2015) (cleaned up)). "A relevant product market can exist as a distinct subset of a larger product market." *Jacobs,* 626 F.3d at 1337. However, "if customers view the products as substitutes, the products are part of the same market." *Id.* (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995)).

"Defining the relevant submarket is a fact-intensive endeavor," and courts consider a variety of factors, including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Estee Lauder Co., Inc.*, 797 F.3d at 1263 (citing *Polypore Int'l,* 686 F.3d at 1217). In light of this "fact-intensive" endeavor, a "dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (citing *Todd v. Exxon Corp.*, 275 F.3d 19, 199-200 (2d Cir. 2001) (Sotomayor, J.)).

In *Jacobs, supra*, the Eleventh Circuit affirmed the district court's dismissal of the plaintiff's antitrust suit because "the complaint's allegations of the relevant product market [were] legally insufficient." 626 F.3d 1327, 1338 (11th Cir. 2010). In that case, the plaintiff alleged that the relevant product market was for "visco-elastic foam mattresses" which he alleged was a separate and distinct market from mattresses generally. *Id.* In explaining why the allegation was insufficient, the Eleventh Circuit noted that

> The complaint provides no factual allegations of the cross-elasticity of demand or other indications of price sensitivity that would indicate whether consumers treat visco-elastic foam mattresses differently than they do mattresses in general. Consumer preferences for visco-elastic foam mattresses versus traditional innerspring mattresses, and the costs associated with their sale, may vary widely, may vary little, or may not vary at all. Jacobs's complaint, however, gives no indication of which of these is the case. The allegations that visco-elastic foam mattresses are more expensive than traditional innerspring mattresses and that visco-elastic foam mattresses have "unique attributes" are similarly of little help. They do not indicate the degree to which consumers prefer visco-elastic foam mattresses to traditional mattresses because of these unique attributes and differences in price . . . . Are visco-elastic foam mattresses put to different uses (as luxury goods, such as in fine hotels and within higher income brackets) than are traditional mattresses? These types of questions, which our precedent makes clear are crucial to understanding whether a separate market exists, go unanswered in the complaint.

*Id.* at 1338. (further acknowledging that the plaintiff did not have a chance to undertake discovery but nevertheless had an obligation under *Twombly* to indicate that he *could* provide evidence plausibly suggesting the definition of the alleged submarket).

PowerPlan relies heavily on *Jacobs* and Lucasys distinguishes it. As Lucasys points out, the plaintiff in *Jacobs* attempted to plead an artificially narrow market — visco-elastic mattresses instead of all mattresses — because, with a broader market, he likely could not establish that Tempur-Pedic had sufficient "market power." *Id*. at 1340. In addition, the visco-elastic mattresses, a product rather than a service, had obvious substitutes—other mattresses.

Here, Lucasys' Complaint alleges that the Deferred Tax Market includes services and products that are separate and distinct from the Supplemental Market, specifically services/products that allow utilities to configure their data to implement and assess new regulatory requirements resulting from 2017 and 2018 changes in the tax code. (Compl. ¶¶ 21-23.) Most importantly, Lucasys alleges that only three firms are capable of providing these specialized services at scale. (*Id*. ¶ 82.) Taking as true this allegation that only three potential suppliers are "capable of providing" deferred tax services, and making all reasonable inferences in Plaintiff's favor, it follows that the other seven consulting firms that provide services in the Supplemental Market are *not* capable of providing these services and therefore *do not* have the ability "to take significant amounts of [deferred tax consulting] business away from" the three providers of deferred tax services— Lucasys, PowerPlan, and RCC. *Estee Lauder Co., Inc*., 797 F.3d at 1263. Based on these allegations, it is plausible that the "peculiar characteristics," distinct services, and "specialized vendors" of the Deferred Tax Market support that it could be a "separate economic entity" from the Supplemental Market. *Id*., 797 F.3d at 1263.

In so finding, the Court places significant emphasis on the posture in which this issue arises. As the above authority demonstrates, defining the relevant market is a highly "fact-intensive endeavor," *Estee Lauder Co., Inc.*, 797 F.3d at 1263, and the proper market definition can sometimes "be determined only after a factual inquiry into the 'commercial realities' faced by consumers." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482 (1992). The Court is also mindful that the Federal Rules allow a plaintiff to plead alternative theories of recovery, Fed. R. Civ. P. 8(a)(3), which Plaintiff appears to have intentionally done with respect to its market definition. For these reasons, Plaintiff has adequately alleged a separate Deferred Tax Market. Of course, any challenge to Plaintiff's market definitions will be subject to significantly more stringent review as the case proceeds and Plaintiff will be required to provide evidence demonstrating *why* the seven other consulting firms that operate in the Supplemental Market are not capable of providing deferred tax services, that consumers see the Deferred Tax Market as separate from the Supplemental Market, and/or that it is priced differently, *etc.*[9]

### D.   Tortious Interference Claims

In addition to federal antitrust claims, Lucasys asserts a host of state law claims against PowerPlan. PowerPlan moves to dismiss only the tortious

---

[9] PowerPlan also argued that Lucasys failed to adequately allege harm to the Deferred Tax Market. (Mot. at 21-22.) But, as detailed in Section B., *supra*, Plaintiff has adequately pled injury to competition in this market based on allegations similar to the ones related to the Supplemental Market.

interference with contract and business claims (Counts VII and VIII) as precluded by the "stranger doctrine." (Mot. at 23-25.) Responding, Lucasys argues that PowerPlan is not an essential party or third-party beneficiary to any of Lucasys' contracts with the utilities; rather, PowerPlan is a stranger to these agreements, and thus the "stranger doctrine" is no bar to Plaintiff's claims. (Pl. Resp. at 19-23.)

To state a claim for tortious interference with contract or business relations, a plaintiff must show: (1) improper action or wrongful conduct by the defendant without privilege; (2) that the defendant acted purposely and with malice with the intent to injure; (3) that the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff. *Tribeca Homes, LLC v. Marathon Inv. Corp.*, 745 S.E.2d 806, 808-09 (Ga. Ct. App. 2013).

Under the first element, acting "without privilege" means that "the defendant was an intermeddler or 'stranger' to the business relationship at issue." *ASC Constr. Equip. USA, Inc. v. City Commercial Real Estate, Inc.*, 693 S.E.2d 559, 564 (Ga. Ct. App. 2010); *see also, Cox v. City of Atlanta*, 596 S.E.2d 785 (Ga. Ct. App. 2004). In *Atlanta Market Center Mgmt., Co. v. McLane*, 503 S.E.2d 278, 282 (Ga. 1998), the Georgia Supreme Court outlined the contours of who falls into the "stranger" category (*i.e.*, those who can be sued for tortious interference) and detailed how that category of individuals or entities has narrowed over time.

A defendant "is not a stranger to the contract just because [it] is not a party to the contract . . ." *McLane*, 503 S.E.2d at 282. For example, where the alleged intermeddler is the agent for one of the parties and the meddling acts were done within the scope of agency duties, the agent is not a stranger to the contract. *Id.* (citing *Jet Air v. Nat. Union Fire Ins. Co.*, 375 S.E.2d 873 (Ga. Ct. App. 1988) (where intermeddler was the underwriter for party insurance company); *Hyre v. Denise*, 449 S.E.2d 120 (Ga. Ct. App. 1994) (where intermeddler was attorney acting on behalf of party client); *Nexus Services v. Manning Tronics*, 410 S.E.2d 810 (Ga. Ct. App. 1991) (where intermeddler was corporate president of one of contracting parties)). Third-party beneficiaries, whether intended or not, are not strangers to the contract. *Id.*

The "shadow of liability was further diminished" when the Georgia Court of Appeals "reasoned that 'all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership' were not strangers." *Id.* (quoting *Jefferson-Pilot Comm. Co. v. Phoenix City Broadcasting*, 421 S.E.2d 295 (Ga. Ct. App. 1992) (where purchaser of radio station was not stranger to contractual relations between radio station's seller and seller's lenders)). Further, where a defendant is an "essential entity" to another contract, he cannot be liable for tortious interference. *Id.* (citing *Renden v. Liberty Real Estate*, 444 S.E.2d 814 (Ga. Ct. App. 1994) (where the lessor was an "essential entity" to the subletting space by its tenants since the tenant's right to sublease was set forth in the lessor's lease)). The *McLane* Court embraced this over-time

reduction of the "number of entities against which a claim of tortious interference can be maintained." *Id.*

Even so, strangers still exist. To qualify as an unintended third-party beneficiary, who cannot be sued for tortious interference, an individual or entity must have a *legitimate* and *direct* economic interest in the contract at issue. *Howerton v. Harbin Clinic, LLC*, 776 S.E.2d 288, 295 (Ga. Ct. App. 2015); *Mabra v. SF, Inc.*, 728 S.E.2d 737 (Ga. Ct. App. 2012). Put another way, if an entity does not have a legitimate and direct economic interest, it can be sued, absent other barriers. Further, a defendant does not become an unintended third-party beneficiary of a contract simply because he might receive some incidental benefit from performance of the agreement. *Howerton*, 776 S.E.2d at 295.

Likewise, a fact pattern involving multiple contracts with related entities does not necessarily mean that those contracts are "interwoven" such that any involved party is immune from liability for tortious interference. *See id.* at 296 (where plaintiff had contract with hospital, hospital had contract with clinic, and clinic had contract with defendant, the three agreements were not "a comprehensive interwoven set of contracts" because they involved separate subject matter and each addressed issues that were separate and independent of the subjects of the other two). In assessing the relatedness of the contracts, the *Howerton* Court emphasized that the defendant failed to show that he had a "direct economic interest" in the plaintiff's contract that was the subject of the tortious interference allegations. *Id.*

41

Here, Lucasys alleges that PowerPlan acted with malice to sabotage Lucasys'
contracts with various customers including NexEra, Liberty Utilities, AEP, and
another unnamed customer. (Compl. ¶¶ 47-55.) As alleged, PowerPlan threatened
these customers with litigation and also directly or implicitly threatened to cancel
software licensing agreements if the customers continued to work with Lucasys.
(*Id.* ¶ 56.) As a result, two of four of Lucasys' major utilities customers terminated
their relationships with Lucasys, one reduced the scope of Lucasys contract, and
one "remains at risk." (*Id.* ¶ 57.)  Besides cancelled contracts, Lucasys has also lost
out on future opportunities with other customers, which harms its ability to
innovate new technology and to grow. (*Id.* ¶¶ 59-62.) The Complaint does not
allege that PowerPlan was a party to any of Lucasys contracts or any facts to
support that PowerPlan was an unintended beneficiary of Lucasys' contracts.

Like in *Howerton*, PowerPlan has identified no *direct* interest in Lucasys'
contracts or business relationships with the utility customers. 776 S.E.2d at 296.
That PowerPlan also has a contract with AEP to provide utility management
software does not mean it had an interest in a wholly *separate* agreement between
AEP and Lucasys for separate services. *Howerton*, 776 S.E.2d at 296. Indeed,
based on the allegations in the Complaint, PowerPlan's primary interest in
Lucasys' contracts or prospective business agreements with utilities was that of a
competitor.[10] Georgia Courts have acknowledged that tortious interference claims

---

[10] Without using this explicit language, PowerPlan argues that it had an interest in Lucasys'
relationships because, under its separate contracts with customers, it has the power to protect its

can be brought against competitors who are not otherwise deprived of stranger status for some other reason. *See Parks v. Multimedia Techs., Inc.,* 520 S.E.2d 517, 526–27 (Ga. Ct. App. 1999) (holding that competitor was indisputably a stranger to the contracts and business relationship); *Tom's Amusement Co. v. Total Vending Servs.*, 533 S.E.2d 413, 417 (Ga. Ct. App. 2000) (physical precedent only) (noting that, even though employee, acting as agent for employer, was not stranger and thus "cannot be held liable" under a claim of tortious interference, "the competitor and its agents who assist in the interference can").

In light of PowerPlan's failure to identify a direct interest in Lucasys' contract with AEP (or other utilities), its cited authority is inapposite. In *Atlanta Fiberglass USA, LLC v. KPI, Co.*, 911 F. Supp. 2d 1247 (N.D. Ga. 2012), the plaintiff (Atlanta Fiberglass) and defendant (KPI) were part of a single supply chain agreement in which KPI agreed to manufacture products exclusively for the Atlanta Fiberglass, and Atlanta Fiberglass agreed to assist its customers in developing products to be exclusively manufactured by KPI. *Id.* at 1256-57. KPI

---

interest in PowerPlan confidential information. (Reply at 14-15.) But, taking the allegations in the Complaint as true at this stage, "neither Lucasys not any other customer or third party can obtain proprietary information simply by accessing customer data through PowerPlan's software." (Compl. ¶ 54.) PowerPlan's assertions of trade secret concerns were, according to the Complaint, baseless and concocted, (*id.*), and thus not *direct* or *legitimate*. For this reason, PowerPlan's reliance on *CAE Inc. v. Gulfstream Aero. Corp.*, 2017 U.S. Dist. LEXIS 124573, at *20-23 (D. Del. Aug. 2, 2017), an unreported case cited in its reply brief, is misplaced. There, the contract at issue involved a third party's *agreement to provide* plaintiff with defendant's data. *Id.* at *3-6. Here, Lucasys' contract with AEP (or others) was not for the provision of PowerPlan's data, *i.e.*, PowerPlan's data was not the direct subject of any agreement. Instead, Lucasys' agreement with AEP was for separate services that involved accessing customer data which *indirectly* involved access to PowerPlan software (but not in a manner that would allow a third party to obtain proprietary information, *see* Compl. ¶ 54).

allegedly reached out to customers, attempting to cut out the middleman (Atlanta Fiberglass). *Id.* Atlanta Fiberglass alleged that, in reaching out directly to customers, KPI (the manufacturer) both violated its contract with Atlanta Fiberglass and also tortiously interfered with the Atlanta Fiberglass's contracts with its customers. *Id.* The court found that KPI was not a stranger to the plaintiff's contracts with its customers because the contracts were interwoven, as evidenced by the allegation that KPI's breach of its contract with plaintiff prevented the plaintiff from fulfilling its contracts with customers. *Id.* at 1257. In that scenario, the contracts were multiple links in single supply chains, and the agreements were dependent on one another. KPI, as the exclusive manufacturer of the customers' products had a *legitimate* and *direct* interest in Atlanta Fiberglass's contracts with the customers—indeed, it was a *direct third-party beneficiary* to these contracts.

That is not the situation presently before the Court. As noted, PowerPlan has provided no direct and legitimate interest in Lucasys' contracts with AEP and other customers. Rather, Lucasys' contracts were for independent and separate services that required nothing of PowerPlan. Most importantly, PowerPlan was not a direct third-party beneficiary of Lucasys's contracts, unlike in *Atlanta Fiberglass*. Moreover, as Plaintiff points out, if PowerPlan's theory were correct — that because PowerPlan has contracts with customers for utility management software it therefore has an interest in *any* contract that its customers enter into that involves the monopoly software product — then PowerPlan would *never* be a stranger to the contracts its customers had with any supplemental service provider. The Court

44

rejects this invitation to grant PowerPlan immunity to tortiously interfere with any potential competitors in a market in which it has an alleged monopoly.

Under the circumstances and based on the allegations in the Complaint, PowerPlan has not identified any facts or authority to support the conclusion that it had a direct and legitimate interest in Lucasys' contracts and business relationships with the various utilities/customers. PowerPlan's request for dismissal of the tortious interference claims is therefore **DENIED**.

## IV.  Conclusion

At this stage, Lucasys has adequately alleged facts to support that: it was prepared to enter the Utility Software Market; PowerPlan's actions harmed competition in all three markets; and the Deferred Tax Market is separate and distinct from the Supplemental Market. The Complaint also supports that PowerPlan was a stranger to the contracts/business relationships with which it allegedly interfered.

Accordingly, Defendant's Motion to Dismiss [Doc. 18] is **DENIED**. It appears that the Parties have already exchanged initial disclosures and completed the joint preliminary conference. (*See* Docs. 23, 24, 25, 27.) The Court **ORDERS** that PowerPlan's Answer to the Complaint shall be due within 14 days of the date of this Order and discovery shall commence on that same date. The Parties are **DIRECTED** to submit a proposed joint case management scheduling order within 20 days of the date of this Order.

**IT IS SO ORDERED** this 30th day of September 2021.

**Honorable Amy Totenberg**
**United States District Judge**