# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| LUCASYS INC., | Civil Action No.: |
| *Plaintiff,* | |
| POWERPLAN, INC., | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

## SECOND AMENDED COMPLAINT

Plaintiff Lucasys Inc. alleges as follows upon actual knowledge with respect to itself and its own acts and upon information and belief as to all other matters.[1]

## NATURE OF THE ACTION

Defendant PowerPlan is a monopolist with 80%+ share in the market for Tax Depreciation and Deferred Tax Software for investor-owned, rate-regulated utilities (the "Tax Software Market"). Substantially all such utilities require such software to track their costs, assets, taxes, and other data that is critical for their operations, accounting, compliance, taxes, and, ultimately, to

---

[1] This amendment to the complaint is being offered to correct certain allegations based on information learned in discovery and to conform the market definitions to the opinions offered by Lucasys' expert witness. It does not seek to update the complaint to include events that have transpired since the original filing of this case.

determine the rates the utility may charge to ratepayers. PowerPlan has dominated this market since launching its once-state-of-the-art software in 1994, and it has had no meaningful competition since it acquired its only competitor in 2008. Its legacy software framework is largely unchanged over many years, but it continues to dominate the market because the extreme switching costs, among other factors, effectively lock-in utility customers.

This is a classic monopoly case involving a company with clear monopoly power resting comfortably on its laurels, complacent from lack of competition on price, quality, innovation, or customer service. When the monopolist perceives a nascent competitor as a threat, the monopolist abuses its monopoly power to maintain its dominance rather than compete on the merits.

PowerPlan is that monopolist, still selling the same core legacy utility management software it built in 1994 to rate-regulated utilities today. Its software is expensive, inflexible, unnecessarily complicated, and because it does not adapt to the changing requirements of rate-regulated utilities, it can no longer perform some functions for which a rate-regulated utility needs software in the first place. Given a niche customer base that is locked in by extreme switching costs, PowerPlan has largely been insulated from competition even though its customers overwhelmingly hold a negative view of PowerPlan and its software.

Utilities regularly pay six- to seven-figure data consulting costs every three to five years just to make their data in PowerPlan useable, and then they use it outside of PowerPlan to perform these basic but fundamentally important functions. But when data consulting firms sought to provide longer-term technological solutions for their PowerPlan customers, PowerPlan saw them as budding threats. It then used its monopoly power to try to exclude them from the market, selectively claiming the exclusive right to utilities' data, making sham legal threats, and ultimately coercing its locked-in utility customers not to do business with those potential competitors.

Lucasys is one such nascent competitor. It is a tax consulting and software development company established in 2018 to provide deferred tax solutions for rate-regulated utilities. PowerPlan coerced multiple customers to terminate or reduce the scope of their contracts with Lucasys, which is crippling Lucasys' ability to develop modern and comprehensive solutions to its customers' PowerPlan-induced problems.

PowerPlan abused its monopoly power to exclude competitors from the market by a series of actions that amount to tying, sham assertions of trade secret misappropriation, exclusive dealing, and refusal to supply. This conduct violates Section 2 of the Sherman Act. In doing so, PowerPlan coerced the agreement of customers, so its conduct also violates Section 1 of the Sherman

Act. PowerPlan's anticompetitive campaign against Lucasys, among others, also violates various state laws.   To remedy PowerPlan's illegal conduct, Lucasys seeks trebled damages of at least $77.4 million  and other relief.

## JURISDICTION AND VENUE

1.      This Court has primary subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 because this action arises under the antitrust laws of the United States.

2.      This Court has supplemental jurisdiction over the state law claims of the complaint under 28 U.S.C. § 1367 because they arise from the same nucleus of operative facts as the federal claims such that they form part of the same case or controversy.

3.      PowerPlan, Inc. is a Delaware corporation with its principal place of business at 300 Galleria Parkway, Suite 2100, Atlanta, Georgia 30339. PowerPlan may be served via its registered agent, Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092. PowerPlan is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it resides in Georgia, transacts business in Georgia, and committed tortious acts in Georgia.

4.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) and 15 U.S.C. §§ 15, 22 because PowerPlan resides in this district and can be found in this district.

## PARTIES

5.     Plaintiff Lucasys Inc. is a small, start-up tax consulting and software development company that provides data consulting and deferred tax solutions to regulated utilities, including assisting those utilities with using the utilities' own data. Lucasys' principal place of business is in Cumming, Georgia.

6.     Defendant PowerPlan, Inc. is the leading provider of Tax Depreciation and Deferred Tax Software for investor-owned rate-regulated utilities ("IOU Tax Software"). PowerPlan's principal place of business is in Atlanta, Georgia. According to PowerPlan, 99% of investor-owned utilities in the United States use its software. PowerPlan is owned by Roper Technologies, a $42 billion publicly traded company.

## SUBSTANTIVE ALLEGATIONS

### PowerPlan Develops a Monopoly for IOU Tax Software

7.     To assist with management of their operations, nearly all investor-owned, rate-regulated utilities use software systems purpose-built for the industry, i.e. "IOU Tax Software." IOU Tax Software allows utilities to store,

access, analyze, and compute their data for various operational, accounting, regulatory, and tax purposes related to fixed assets—many of which are unique to the industry—vital to the utilities' regulatory compliance and, ultimately, their bottom lines.

8. PowerPlan's software is built as a single application and centralized database with different "modules" or "suites" available to customers for specific functions. Over time, PowerPlan has added modules to the software, which customers can separately license. When customers log in to the application, they can access their purchased modules from a horizontal toolbar at the top of the application window, allowing them to perform certain tasks related to their data.

9. For example, PowerPlan offers three income tax related modules: PowerTax, Provision, and Tax Repairs as part of its "Income Tax Suite." PowerTax is supposed to allow utility customers to compute tax depreciation and deferred income taxes from their underlying data.

10. Other PowerPlan suites comprise modules for property tax, lease accounting, fixed assets, rate case management, asset investment optimization, capital planning and forecasting, and project portfolio cost management.

11.    In 1994, PowerPlan's software had an early-mover advantage. PowerPlan quickly dominated the market as utility after utility began using its IOU Tax Software. By the late 2000s, after it acquired its only competitor, PowerPlan was the only company offering IOU Tax Software and became a true monopolist.

12.    Today, 80% of investor-owned, rate-regulated utilities use PowerPlan's IOU Tax Software, which remains the only full-suite product available in the market. The other 20% is comprised of small utilities that make do without IOU Tax Software, generally by using other accounting systems and professional services to perform manual calculations. Larger utilities—which make up almost the entire market—must use IOU Tax Software because of the scale and complexity of their data.

**PowerPlan Stops Innovating and Consultants Fill Gaps in PowerPlan's Software**

13.    Having achieved its monopoly, PowerPlan, like many monopolists, stopped innovating to meet its customers evolving needs. Accordingly, PowerPlan's IOU Tax Software cannot perform some core functions that utilities require.

14.    This is because (1) PowerPlan's legacy software is built on an outdated coding language, and (2) PowerPlan has had little incentive to update

its software because its customers have no other option for IOU Tax Software, which they must purchase.

15.   To perform core functions beyond the capabilities of PowerPlan's IOU Tax Software, utilities must hire consultants to write custom code extensions, provide data-consulting services, and integrate their PowerPlan data with other applications, among other tasks. Typically, utilities require these services every three to five years, costing them hundreds of thousands or even millions of dollars.

16.   Accordingly, by the early 2010s, the gaps in PowerPlan's IOU Tax Software had spawned a related market in which consultants provide these Tax Depreciation and Deferred Tax Services (the "Tax Services Market").

17.   Lucasys, several third parties, and PowerPlan itself offer Tax Depreciation and Deferred Tax Services ("Tax Services"). When these services are required, a utility will frequently issue a request for proposal seeking bids from multiple consultants and hire the consultant that submits the most competitive bid. Utilities judge bids based on various factors, including the expertise and track records of the consultants, the services offered, and the overall price or value.

18.   PowerPlan is largely content with the existence of the Supplemental Management Service market even though PowerPlan lacks a

monopoly in it, for at least two reasons.  First, PowerPlan derives additional revenue by providing Tax Services over and above the fees it charges customers for use of its IOU Tax Software.  Second, the availability of  Tax Services reduces pressure on PowerPlan to invest substantial money into updating its IOU Tax Software to meet all its customers' needs. And the band-aid that is the Tax Services Market reduces the urgency for customers to demand either improvements from PowerPlan or entry of a new competitor into the Tax Software Market.

### Tax Code Changes Require  Tax Services

19.    As utilities' needs evolve—but PowerPlan's software remains mostly static—new Tax Services are needed. One crucial area where PowerPlan's IOU Tax Software fails to meet utilities' needs is related to tax fixed assets and deferred taxes, which in turn affect the utilities' rates.

20.    Under traditional rate regulation, utilities are permitted to charge rates to recover their costs of providing service plus a reasonable rate of return. To gain approval of their rates, utilities submit rate cases to the regulators of their jurisdictions, which are determined by a formula that calculates a revenue requirement based on data points including investor-supplied capital, the authorized rate of return, and operating costs. Rates for different types of ratepayers are then derived from the revenue requirement.

21.    The Tax Cuts and Jobs Act of 2017—the first major federal tax reform legislation since 1986—made changes to the tax code with significant tax and rate-case implications for investor-owned utilities. The tax code changes that became effective in 2018 decreased the tax rate for utilities from a maximum of 35% to a flat 21% and resulted in a reduction of "Accumulated Deferred Income Tax Liabilities and Assets" on their books. Because utilities are typically rate-regulated on a cost-plus-reasonable-rate-of-return basis as described above, they must share beneficial income tax changes with ratepayers based on complicated state and federal rules unique to rate-regulated utilities which, in many cases, vary by jurisdiction and are constantly subject to change.

22.    In fact, many jurisdictions issued orders directing utilities to calculate the effects of the 2018 tax reforms on existing rates or tariffs, including differences caused by the income tax rate reduction and the effect of deferred taxes. Jurisdictions have required individual utilities to return previously accumulated excess deferred tax benefits back to ratepayers using a variety of amortization methodologies. The required amortization methodologies are applied to various components of deferred taxes based on utilities' and commissions' interpretations of the tax law, and the subsequent facts, circumstances, and negotiations relevant to each utility. The evolving

interpretations and jurisdictional application of legislative requirements have created a complex and dynamic regulatory and compliance environment.

23.     PowerPlan's legacy software does not provide an adequate solution to this tax and ratemaking problem. Indeed, it does not afford utilities the ability to configure and implement the new amortization requirements because it was built for a static, pre-2017 version of the tax code that predated PowerPlan. And because it is based on an archaic coding language, PowerPlan's IOU Tax Software does not even manage the utilities' data such that it can simply be exported to make the calculations elsewhere.

24.     Instead, to even use their PowerPlan-based data for the types of calculations that must be done to account for the new tax code changes, utilities must obtain Tax Services to assess data quality, completeness, and accuracy, and then cleanse and remediate the data to make it usable, i.e. "Deferred Tax Solutions."

25.     Lucasys, along with one other firm, Regulated Capital Consultants, are PowerPlan's primary competitors providing these Deferred Tax Solutions, though there are also a few individuals who are former PowerPlan employees that provide such consulting services on some limited basis.

26.    As in the Tax Services Market in general, PowerPlan has been content competing with other consultants to provide Deferred Tax Solutions.

**Lucasys Disrupts the Status Quo by Offering New Software**

27.    Lucasys was founded in 2018 by Vadim Lantukh, who was previously employed by PowerPlan but left in 2013. Daniel Chang and Stephen Strang joined Lucasys as co-founders in 2019 and were also previously employed by PowerPlan but left in 2014 and 2015, respectively. Before working at Lucasys, each worked for employers other than PowerPlan where they obtained additional experience in software development, business consulting, and tax advising. Lucasys provides subject-matter expertise to utility customers to help with their data issues, primarily for the purpose of facilitating the computation of deferred tax obligations and changes based on the new tax code.

28.    Lucasys was founded not only to provide Deferred Tax Solutions, but also to provide long-term solutions to replace the need for consultants with software. No other existing software accounts for the changes required by the tax code amendments, so Lucasys has identified an underserved market and a unique solution.

29.    Accordingly, Lucasys provides both consulting services and technological solutions to its customers. Lucasys ultimately expects to largely

replace consulting services with new Software-As-A-Service (SAAS) solutions that negate the need for manual data assessment, cleansing, and remediation.

30.    Lucasys has thus far developed three technological solutions.

a.    First, it has developed cloud-based software that makes deferred tax computations based on the 2018 federal tax changes as applied to a customer's data. The software works directly with the customer's data (not through PowerPlan's system) and is rules-driven, which means that it can be used dynamically to account for future tax changes or the treatment of tax changes by rate regulators. Existing tools in the market, including PowerPlan's PowerTax, are static and do not account for these changes.

b.    Second, Lucasys developed Copilot, which is a business process automation tool. Copilot allows customers to configure steps to processes between different data sources (including PowerPlan and utilities' other financial systems) that can be automated, saving the hundreds of thousands of dollars a year it would cost to continue performing those tasks manually.

c.    Third, Lucasys developed a toolkit that contains several small applications, including an ARAM calculator, an audit tool for computations, a lease payment calculator, and an application that automates

a variety of data-related tasks regularly performed by consultants. These tools work directly with the customer's data, not through PowerPlan's system.

31.   Absent PowerPlan's anticompetitive conduct, Lucasys is positioned to begin competing more broadly with PowerPlan in the  Tax Software Market by identifying customers' unmet needs relating to their data and then building solutions that permit customers to use their data more efficiently and effectively. Eventually, if able to compete without illegal obstruction, Lucasys would be able to provide utility customers with a replacement IOU Tax Software suite. This would be an alternative to PowerPlan's product in the Tax Software Market.

32.   Rather than take the traditional software development approach, Lucasys seeks to identify its clients' challenges and needs and then create solutions in the context of its existing engagements, which it can then deploy more broadly in the market. The power of the engine that underlies Lucasys' deferred tax tool will, with additional build-out and maturity, eventually allow it to compete with more PowerPlan modules and ultimately allow utilities to replace PowerPlan altogether.

33.   The information, knowledge, and technical skill of Lucasys' founders and employees is general knowledge about software as well as tax and accounting regulations and their effects on the rate-regulated utility

industry; they are not confidential nor subject to any confidentiality agreement. None of Lucasys' work entails the use of PowerPlan trade secrets, and none of its software uses PowerPlan source code, trade secrets, or other proprietary information.

34.     When performing work for a customer, Lucasys accesses a customer's data using the only available methods, and in the same manner as its customers, agents, and other service providers, including data accessed through the PowerPlan software. When accessing the data, Lucasys acts as an agent of its customer and does so with the customer's prior and express authorization. It does not access any source code, trade secrets, or other proprietary information in doing so.

**PowerPlan Punishes Nascent Competitors**

35.     PowerPlan learned about Lucasys during a competitive bidding process for a mutual utility customer, AEP, who uses PowerPlan software and had been using Lucasys for data consulting services. AEP issued a request for proposals to Lucasys, PowerPlan, and others to provide a wide scope of consulting services and technology development, including a major deferred tax software component. The solution that AEP sought—because PowerPlan's software was inadequate and of poor quality—involved building a full software suite around taxes and, more specifically, deferred taxes. The software suite

would have replaced and expanded upon an existing PowerPlan module called PowerTax.

36.    Both PowerPlan and Lucasys submitted bids, and Lucasys' bid was selected for the contract. When PowerPlan discovered that Lucasys had submitted a competing bid, it sought information from AEP about the consulting work that it had originally hired Lucasys to perform.

37.    After learning that Lucasys is developing software in addition to providing  Tax Services, PowerPlan took steps to quash the nascent threat to its monopoly in the  Tax Software Market.

38.    On October 30, 2019, PowerPlan sent a demand letter to Lucasys and its co-founders, Mr. Lantukh, Mr. Chang, and Mr. Strang. The letter asserted—falsely—that they had misappropriated trade secrets obtained during their employment with PowerPlan several years before. PowerPlan did not describe those asserted trade secrets with any particularity.

39.    PowerPlan further asserted that Lucasys was developing a competing software solution using these vaguely referenced trade secrets.

40.    PowerPlan's assertions were, in fact, made in bad faith and solely as an attempt to block Lucasys from offering or providing its services to utility customers because PowerPlan views Lucasys as a competitive threat, as Lucasys does not limit itself to consulting services; it is building a technology

solution that will—if it is not stopped—threaten PowerPlan's cozy monopoly profits.

41.    PowerPlan demanded that Lucasys and its members cease-and-desist the alleged use and disclosure of these falsely asserted trade secrets, return all such information, cease-and-desist efforts to design, develop, market, and sell Lucasys software unless it could prove it was independently developed, cease-and-desist consulting for all PowerPlan customers unless it agreed to cease-and-desist developing competing software, and even to change its logo and slogan.

42.    Moreover, PowerPlan, evidencing its anticompetitive intentions and mode of doing business, proposed an unlawful market-allocation agreement under which PowerPlan would "be open" to Lucasys competing with consulting services only if Lucasys agreed to discontinue its software development.

43.    In fact, while Lucasys has not misappropriated trade secrets, it has also not yet developed a software product that could be fully substituted for PowerPlan's IOU Tax Software. Rather, Lucasys was developing software that filled gaps in what PowerPlan's software does: tools focused on automating processes and creating better integration and reach from existing PowerPlan software. Lucasys developed these tools because PowerPlan fails to provide its

customers with a software solution that can address the challenges of data management, including effects on data presented by the Tax Cuts & Jobs Act.

44.    This is not the first time PowerPlan has attempted to prevent perceived competition by asserting baseless trade secret misappropriation claims. It made similar threats regarding Regulated Capital Consultants (RCC), which employs numerous former PowerPlan employees, because it perceived RCC's custom code editing and extension coding services as a threat. It also recently threatened an individual consultant, Doug Johnson.

45.    Nevertheless, in an act of good faith, Lucasys sought to reassure PowerPlan that it was not, in fact, developing software based on any PowerPlan trade secrets. Lucasys provided substantial information to PowerPlan showing exactly what it was doing and how. Lucasys has neither used nor misappropriated any PowerPlan trade secrets. Nor does Lucasys need to utilize any PowerPlan trade secrets to compete in the Tax Services Market or the Tax Software Market.

46.    Without any good-faith basis to embroil Lucasys in trade secret misappropriation litigation, PowerPlan chose another path: it sought to ascertain which customers aside from AEP had hired Lucasys. PowerPlan then threatened those utility customers not to do business with Lucasys, baselessly citing contractual confidentiality obligations, asserting the exclusive right to

restrict access to the utilities' own data, and falsely claiming that Lucasys misappropriated PowerPlan's nondescript trade secrets, implicitly threatening to entangle these customers in litigation. PowerPlan wields a large stick in its threats because its software performs critical accounting functions for its customers and, lacking an alternative, the utilities must purchase PowerPlan's software. So utilities must take even baseless claims from PowerPlan seriously, or risk losing their software.

47. **NextEra.** NextEra engaged Lucasys for tax fixed-asset related services including data remediation, cleansing, and transformation and for the development and deployment of technology, Lucasys Copilot, which would allow NextEra to consolidate its non-regulated entities into the PowerPlan software. Non-regulated entities have different requirements than rate-regulated utilities, and the PowerPlan software was not capable of meeting the unique requirements of partnership depreciation and acquisitions of new assets and entities. As a result, NextEra had maintained its non-regulated entities in a different system.

48. PowerPlan successfully coerced NextEra to terminate its contract with Lucasys by falsely claiming that Lucasys misappropriated PowerPlan's trade secrets in the course and scope of its work for NextEra and that PowerPlan had taken legal action against Lucasys (it had not).

49.    At the time of termination, Lucasys was still completing the service phase of the contract and had just begun the design phase for the Copilot implementation. On information and belief, PowerPlan performed the remaining service work and NextEra was required to forego consolidating its non-regulated entities into the PowerPlan system as it had desired.

50.    **Liberty Utilities.** Liberty Utilities engaged Lucasys to provide advisory services related to tax-fixed assets and assistance with consolidating and standardizing tax processes with respect to the global design phase of a transformation initiative. Lucasys advised Liberty Utilities that it should implement PowerPlan's full income tax suite as the only solution available for their regulated requirements.

51.    Nonetheless, PowerPlan successfully coerced Liberty Utilities to terminate its contract with Lucasys even though, before termination, Liberty Utilities expressed concerns to Lucasys that PowerPlan's tactics deprived it of the most efficient and cost-effective provider in the market capable of completing the project. When Liberty Utilities asked PowerPlan whether Liberty Utilities could utilize Lucasys for other tax fixed-asset services in the future, PowerPlan stated that Liberty Utilities would face legal risk if Lucasys were to develop a software product that competes with PowerPlan's products.

52. **AEP.** After PowerPlan initially failed to provide adequate services for AEP in support of its tax data and processes, AEP engaged Lucasys to perform data consulting services and support its overall tax return and year-end provision calculations. These services were an interim solution to the myriad problems with PowerPlan's software until such time as AEP could execute an RFP to replace PowerPlan's PowerTax module, which could not meet AEP's needs.

53. In 2019, AEP issued a request for proposals for a project with a large scope of work for services and technology, including a major tax software development component: the project involved building a full suite around taxes, with a specific focus on deferred taxes. Both PowerPlan and Lucasys submitted bids. AEP selected Lucasys' bid.

54. PowerPlan first threatened AEP regarding its contract with Lucasys in phone discussions, and AEP asked PowerPlan to make its vague statements about impropriety by Lucasys in writing and with specificity. PowerPlan instead sent a letter demanding AEP restrict access to AEP's systems and data based on its view that Lucasys *might* appropriate proprietary information and develop competitive solutions. As explained in Paragraphs 33–34, this is baseless because neither Lucasys nor any other customer or third party can obtain proprietary information simply by accessing

customer data through PowerPlan's software. Nevertheless, AEP ultimately delayed execution of the contract, stating that it would need to resolve its legal discussion with PowerPlan before starting work with Lucasys. Although AEP did not terminate its relationship with Lucasys, PowerPlan successfully coerced AEP to delay the technology component of the project by at least 12 months and narrow the scope of Lucasys' contract to services only.

55.     PowerPlan has attempted, thus far without success, to coerce another customer to terminate its contract with Lucasys, which covers project management and services relating to upstream asset accounting and processes, with some work involving deferred tax processes. The customer has shared its position that: (1) it owns its data and can hire whoever it wants to access it; (2) it would suffer substantial harm if it could not provide Lucasys with access to the data to perform the contracted work; and (3) PowerPlan's vague claims about confidential information lacked veracity and were insufficient. Nevertheless, PowerPlan responded with more direct threats and, thus, Lucasys' contract remains at risk.

56.     With each of these customers, PowerPlan asserted a reading of its agreements with the utilities under which it has the exclusive right to restrict who can access utilities' data and threatened the customers with litigation if they were to allow Lucasys access to the data. PowerPlan also directly or

implicitly threatened that it will cancel the software license agreements or withhold support for customers who work with Lucasys.

57.    As a result of PowerPlan's unlawful interference with Lucasys' contracts and business relationships, two of four of Lucasys' major utility customers terminated their relationships with Lucasys for fear of litigation and other punitive measures; one of four reduced the scope of Lucasys' contract to exclude a substantial technology component (more substantial than all the other contracts) such that Lucasys is impeded from developing technology that competes with PowerPlan's software; and one contract remains at risk.

58.    Moreover, Lucasys learned from multiple sources in June and July 2020 that PowerPlan intends to send letters to *all* of its customers asserting, falsely, that Lucasys is misappropriating PowerPlan's trade secrets. Notably, by telling certain Utility customers that PowerPlan is going to inform all utility customers not to do business with Lucasys, PowerPlan is coordinating a boycott of Lucasys among utilities. Regardless of whether PowerPlan sent the letters or ends up sending the letters, by sharing with customers that it plans to do so, it is connecting the hubs in a hub-and-spoke conspiracy to boycott Lucasys. Each can feel comfortable in not doing business with Lucasys, knowing that other utilities are doing the same.

59.    These actions have harmed Lucasys in multiple ways. Not only has Lucasys lost revenue from the cancelled contracts and from future opportunities with other customers, the cancelled contracts and foreclosed future opportunities have also harmed Lucasys' ability to develop innovative software that can compete with PowerPlan's legacy system. And PowerPlan's actions have threatened Lucasys' ability to gain other utility customers.

60.    Lucasys' customer contracts help it develop that software in several ways. They provide revenue that allow Lucasys to invest in research and development efforts. They also provide Lucasys with information about their customers' needs and real-time data about what solutions are most effective. Lucasys needs access to its customers' data to develop software that can effectively use the data to accomplish its customers' business objectives. Indeed, customers' data is an important and powerful medium for customers to communicate their complex business requirements to Lucasys, and access to that data is required for Lucasys to design and develop solutions to meet those requirements.

61.    PowerPlan, through its unlawful anticompetitive conduct, has successfully blocked Lucasys' ability to obtain sufficient scale to be able to (1) implement a software solution in the Tax Services Market; and (2) enter the Tax Software Market with a competing software product. Indeed, through

the same tactics, PowerPlan has successfully stopped all similar software threats to its monopoly.

62.     Software competition in the Tax Services Market is the most likely route for a potential competitor in the Tax Software Market to achieve sufficient scale to threaten PowerPlan's monopoly. Thus, PowerPlan's modus operandi of allowing consulting competition in the Tax Services Market but thwarting through anticompetitive conduct all software competition in that market, effectively protects its monopoly in the Tax Software Market from competition or potential competition.

63.     Lucasys' existing customers were not the only ones to whom PowerPlan communicated its sham concerns that Lucasys was misappropriating PowerPlan's intellectual property.  PowerPlan reached out directly to dozens of potential Lucasys customers to claim it had concerns about Lucasys misappropriating PowerPlan's trade secrets. In that effort, PowerPlan targeted the customers with whom PowerPlan believed Lucasys had the highest chance of making inroads.

64.     Absent PowerPlan's anticompetitive conduct, Lucasys will fully implement a software solution throughout the Tax Services Market, and then offer an alternative product—which doesn't currently exist—to customers in the Tax Software Market. Absent PowerPlan's anticompetitive conduct,

customers would ultimately pay less for higher quality products in both markets.

### PowerPlan's Asserted Trade Secret Claims Were a Sham

65.    The purported basis for PowerPlan's anti-competitive interference with Lucasys' existing and potential customers is that it wanted to protect its "intellectual property," which consists exclusively of purported trade secrets.

66.    PowerPlan's claimed concern about trade secrets was, and continues to be, an anti-competitive sham. *See CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 850–51 (1st Cir. 1985) ("[T]he assertion of a trade secret claim in bad faith, in an attempt to monopolize, can be a violation of the antitrust laws.").

67.    Before its dispute with Lucasys, PowerPlan did no formal training on the contents of its purported trade secrets, and it did not instruct employees with access to the purported trade secrets to communicate with clients about appropriate safeguards.

68.    Before its dispute with Lucasys, PowerPlan did not have formal policies or other documents setting forth the contents of its purported trade secrets in any kind of detail.  In other words, there was no way for its employees or customers to know what supposed trade secrets needed protecting, aside from a generic description in PowerPlan's form agreements.

69.    PowerPlan knew for years that consultants other than Lucasys, such as Regulated Capital Consultants and Arc-Two Consulting, were accessing PowerPlan's software and client databases in the same manner as Lucasys without a non-disclosure agreement.   PowerPlan did not actively prevent such access, and in fact, expressly permitted it in some instances.

70.    In other words, prior to a perceived threat to its monopoly, PowerPlan did not act as if it had trade secrets.

71.    Even worse, PowerPlan made the majority (if not all) of PowerPlan's purported "trade secrets" available in the public domain.

72.    After PowerPlan asserted a counterclaim accusing Lucasys of misappropriation, Lucasys hired a private investigator, Jim Persinger, to search for and collect publicly available information containing PowerPlan's purported trade secrets.

73.    A declaration from Mr. Persinger, which attaches a large sampling of the publicly available documents and files, has been filed in this case.

74.    The Persinger declaration attaches thousands of pages of publicly available information containing the purported "trade secrets."   Most of the documents attached to the Persinger declaration are from PowerPlan's own website, smart-phone app and YouTube channel.   Others were posted on publicly available open-source software code repositories, apparently by

PowerPlan employees, such as its director of architecture and one of its software engineers.

75.   Even more information not included with the Persinger declaration is available from public sources, such as filings by power companies with public utility commissions, which contain PowerPlan related information.

76.   A very clear example of the sham nature of PowerPlan's trade secrets claims can be found in Paragraph 36 of Powerplan's Counterclaim [Dkt. 36 at 32, ¶ 36.]

77.   In that paragraph, PowerPlan alleges that Lucasys employee Daniel Chang had access to "PowerPlan Protected Information" at a "PowerPlan user conference in May 2019."

78.   But PowerPlan has not treated the materials from that conference as a secret.  In fact, the PowerPoint presentations from the May 2019 user conference are freely available for download from both PowerPlan's own website and its free smartphone app.  *See*, *e.g.*, *Persinger Dec.* at ¶ 25, Ex. C.

79.   Similarly, PowerPlan's "database structures and models" are readily discernible from the publicly available documents collected by Persinger.  They are not a secret.

80.   At the time that it first interfered with Lucasys' customers and attempted to coerce Lucasys into refraining from developing software,

PowerPlan *knew* that it had no basis for claiming that Lucasys misappropriated its trade secrets because (i) PowerPlan did not have any trade secrets, and (ii) PowerPlan had no evidence that Lucasys misappropriated any of PowerPlan's purported trade secrets.

81.   Strong evidence that PowerPlan had no basis for claiming that Lucasys misappropriated its trade secrets can be found in the deposition testimony of Brett Bertz, PowerPlan's Chief Customer Officer at the time.

82.   Mr. Bertz signed most of the communications directed to Lucasys' customers and potential customers, including the letter to AEP that PowerPlan attached as an exhibit to PowerPlan's motion to dismiss [Dkt. 18-3].

83.   Mr. Bertz was deposed in this case on December 2, 2021.

84.   At that deposition, Mr. Bertz testified as follows about the state of his knowledge when PowerPlan first contacted Lucasys:

> Q. What evidence or facts were you aware of through the time that the cease and desist letter was sent in October 30th of 2019 that Lucasys actually used any PowerPlan trade secret or confidential proprietary information?
>
> A. **I had no evidence.**

85.   Mr. Bertz testified as follows about his December 2019 letter to AEP [Dkt. 18-3]:

Q.: [D]id you, at the time of this letter, have any facts or evidence that Lucasys had misused or misappropriated PowerPlan's confidential information and trade secrets and unfairly used them?

A: **No.**

86.    Mr. Bertz further testified as follows with regard to a second letter that he sent to AEP in July 2020 [Dkt. 18-2]:

Q. As of July 17th, 2020 when you sent this letter, were you aware of any facts or evidence that Lucasys had misused or misappropriated PowerPlan's confidential information?

[OBJECTION]

A. **I was not.**

87.    In short, from its inception, PowerPlan's alleged concerns regarding purported trade secret misappropriation were an anti-competitive sham.  The sham was aimed at preserving PowerPlan's monopoly, and it continues to this day.

## PowerPlan Forces Potential Competitors Into Licensing Agreements Based on the Sham Trade Secret Assertion

88.    Another tactic that is sometimes used by monopolists seeking to prevent competition dovetails with the sham assertion of trade secrets—forcing potential competitors to enter into licensing or access agreements under the threat of litigation.  *See*, *e.g.*, CVD, Inc. v. Raytheon Co., 769 F.2d 842, 850–51 (1st Cir. 1985) ("[I]t is well established that an agreement which

purports to license trade secrets, but in reality, is no more than a sham, or device designed to restrict competition, may violate the antitrust laws.")

89.    After Lucasys filed this case, PowerPlan began seeking to require consultants in the deferred tax consulting market to enter into "Authorized Vendor Agreements" ("AVAs") by which they would be permitted to access PowerPlan software.

90.    The purported reason for the AVAs is to permit the consultants and PowerPlan to protect their trade secrets and intellectual property while permitting PowerPlan customers to use consultants other than PowerPlan.

91.    PowerPlan proposed to Lucasys that it enter into an AVA with PowerPlan.

92.    PowerPlan proposed the AVA to Lucasys only after one of Lucasys' customers indicated that it wanted to continue using Lucasys for services.

93.     The customer was concerned that language in PowerPlan's licensing agreement would prevent it from using Lucasys and other consultants.

94.    On information and belief, PowerPlan has entered into AVAs with other deferred tax consulting competitors in recent months.

95.    The proposed AVA PowerPlan sent to Lucasys extended to far more than PowerPlan's intellectual property and trade secrets.

96.   Instead, it purports to prohibit the use of any "confidential information" belonging to PowerPlan for use in developing competing software.

97.   The draft AVA also gave PowerPlan the right to require a draconian audit process whenever it had a "belief" that the undefined "confidential information" had been or was being used to develop competing software.

98.   Lucasys indicated that it would agree to enter into an AVA, but only if the AVA was limited to protecting each party's "source code and trade secrets."   PowerPlan declined the counteroffer—insisting that the AVA's restrictions extend beyond legally protected trade secrets, presumably including what PowerPlan contends is confidential information that is actually publicly available.

99.   In other words, the AVA is a sham.   It was designed to give PowerPlan an even greater ability to thwart software competition than it has under trade secret law.

100.   Lucasys cannot enter into an AVA that essentially forecloses it from developing software that competes with PowerPlan based on the false premise that PowerPlan is protecting intellectual property.

101.   Such an agreement would be illegal. *See CVD, Inc.*, <u>769 F.2d at 850</u>–51.

## RELEVANT MARKETS

102.   This case involves two distinct but related markets: (1) the Tax Software Market; and (2) the Tax Services Market.

### The Tax Software Market

103.   To assist with management of their operations, including tracking and reporting related to fixed assets for tax purposes, nearly all investor-owned rate-regulated utilities use software systems purpose-built for calculating fixed asset depreciation and deferred income taxes, i.e. IOU Tax Software. IOU Tax Software allows utilities to store, access, analyze, and compute their data for various tax purposes related to fixed assets—many of which are unique to the industry—along with supplemental solutions necessary to perform these functions.

104.   The rate-regulated utility industry is unique in that there are specific data inputs, processes, and data outputs that relate to the asset-intensive nature and highly regulated landscape of the industry.

105.   For most investor-owned rate-regulated utilities, there is no economically viable substitute for IOU Tax Software. Other processes, including industry-agnostic tax software, enterprise resource planning ("ERP") and enterprise asset management ("EAM") systems, in-house manual solutions such as Microsoft Excel, and third-party service providers, are unable

to replicate the functionality of IOU Tax Software needed by the majority of investor-owned utilities. While a few small-scale utilities can manage their operations without IOU Tax Software—generally through use of one of these other systems or manual professional services—these processes would be overly cumbersome and expensive for all but the smallest utilities, who lack the data scale and complexities of larger utilities. Accordingly, there is a cognizable market for IOU Tax Software, i.e. the Tax Software Market.

106.   PowerPlan has monopoly power in the  Tax Software Market because, according to PowerPlan, the vast majority of investor-owned, rate-regulated utilities use PowerPlan's IOU Tax  Software, which is called PowerTax.  PowerTax is the only comprehensive, full-suite product currently available in the Tax  Software Market.   Lucasys expects that, but for PowerPlan's anticompetitive conduct, it would have deployed its own competitive solutions that would allow utilities the choice to replace their current PowerTax system. Indeed, before PowerPlan interfered, Lucasys' contract with AEP included the development of software that would potentially replace PowerTax. Lucasys has also demonstrated its own tax depreciation and deferred tax software for other utilities as a replacement for PowerTax. Potential customers have expressed a reluctance, however, to engage with Lucasys because of PowerPlan's threats and the existence of this lawsuit.

107.   There are high barriers to entry in the Tax Software market. Not only will a new purpose-built IOU Tax Software product require substantial resources to develop, it requires deep, specialized knowledge of the industry and understanding of utilities' needs based on experience and access to utilities' real-time data to build and test the software. Thus, any competitor is likely to come from the Tax Services market.

108.   PowerPlan's monopoly power is reinforced because utility customers cannot freely switch to another IOU Tax Software provider—even if one were available—as it is extremely expensive and disruptive for a utility to switch to a different system. These switching costs include substantial implementation costs, information technology commitments and risks, disruptions and risks to business and accounting processes, employee retraining, audit concerns and risks, regulatory concerns and risks, all of which can have material consequences that substantially affect the utilities' financial position and business operations.

109.   PowerPlan's antiquated software system, which does not and cannot interact with modern software systems without customized interfaces requiring substantial time and effort to develop and manual modifications to the data structure is a further obstacle to switching. To switch to a different IOU Tax Software provider and transfer its existing data, a customer would

need to develop or obtain these customized interfaces. Accordingly, while PowerPlan's offering in 1994 was a first-of-its-kind digital IOU Tax Software that enjoyed widespread adoption among utility customers, it is now handcuffing those same customers, who are effectively locked-into an antiquated system.

110.   Indeed, PowerPlan still has an inordinately large market share over 25 years after launching its product despite widespread customer dissatisfaction. The fact that PowerPlan prioritizes maximizing profits over maintaining a high product quality  further demonstrates the extremely high switching costs and its monopoly power, as it has little to no incentive to invest in research and development or product updates since investor-owned utilities have virtually no alternative Tax Depreciation and Deferred Tax Software solution.

### The Tax  Services Market

111.   The conditions that have locked in and handcuffed utility customers has long allowed PowerPlan to enjoy a monopoly in the Tax Software Market, resting on its laurels without significant price competition and other market forces that would require it to innovate and improve the quality and functionality of its product to meet its customers' evolving needs.

When competition does arise, PowerPlan engages in anticompetitive conduct to stop it, rather than providing a better product or better prices. As a result, PowerPlan still provides fundamentally the same legacy system as it introduced in 1994, which is host to significant data management issues and which lacks necessary functionality to (1) maintain utility data with the required accuracy, cleanliness, and integrity to meet modern standards for various accounting, tax, and regulatory purposes, and (2) to perform core accounting, tax, and regulatory functions that are now routinely required of rate-regulated utilities.

112. Thus, PowerPlan's software alone cannot meet the data management requirements for rate-regulated utilities. Just to make their data useable for core processes, utilities must hire consultants every three to five years, typically costing them hundreds of thousands or even millions of dollars, and then use other software or services to perform certain core processes with their data.

113. PowerPlan's inadequacy was compounded by the 2017 Tax Cuts and Jobs Act, which changed tax rates for rate-regulated utilities and, ultimately, had significant rate case implications. Because rate-regulated utilities' rates are set through state and/or federal ratemaking processes that utilize a cost-plus-reasonable-rate-of-return formula, rate calculations

necessarily take tax costs including asset depreciation and deferred taxes into account. State public utility commissions and the Federal Energy Regulatory Commission each have developed their own set of rules, which means that utilities require a dynamic solution based on operational, accounting, and rate-making decisions that are being made in real time.

114.   Thus, PowerPlan's failure to evolve combined with its monopoly power to exclude competition have spawned a second related market: the Tax Services Market for aftermarket performance management and data solutions.

115.   This market comprises the consulting services needed to perform critical processes that PowerTax cannot perform.

116.   For example, PowerTax cannot track excess or deficient accumulated deferred taxes and the corresponding regulated liability or asset by tax event. It cannot track monthly amortizations and balances or simultaneously compute ARAM and Reverse South Georgia ("RSGM") amortizations on the same vintage assets at the same time, and it lacks reporting flexibility.

117.   The Tax Software Market is distinct from the Tax  Services Market. Tax  Services cannot replace Tax  Software and, at least for the time being, no available IOU Tax Software eliminates the need for Tax Services. Utility customers must purchase products and services from both markets.

118. At least four firms provide Tax Services, including PowerPlan itself, Regulated Capital Consultants, and Lucasys. However, the capabilities and areas of focus for the firms vary. Thus, competition has naturally developed to solve these utility needs arising from tax and other developments that have occurred since the 1980s.

119. In a response to a significant and non-temporary change of pricing in the Tax Services Market, utilities would not have any alternatives outside this market. There are no current products or options in the Tax Software Market, for example, that would satisfy the business and regulatory requirements for the utilities. And the Tax Services Market encompasses the companies that provide these solutions, in the form of consulting and software. By the nature of their businesses, these customers have no choice but to engage providers of these supplemental products or services because they must follow extensive regulations.

**Relevant Geographic Market**

120. Demand in the relevant markets is national, as substantially all investor-owned, rate-regulated utilities in the United States require performance management and data systems and supplemental solutions to effectively meet their operational, accounting, tax, and regulatory obligations. These customers can turn to companies anywhere in the United States to meet

their needs. For regulatory reasons, these customers cannot practically turn to companies outside of the United States to fulfill their requirements. Thus, the geographic scope of the relevant markets is the United States.

## HARM TO PLAINTIFF AND COMPETITION

121.   PowerPlan's actions were intended to perpetuate its monopoly by preventing its perceived emerging competitors from providing solutions to utility customers in the marketplace. This has harmed competition in the Tax Software Market because, as described above, PowerPlan has 80%+ share in this market, and its conduct has severely curtailed Lucasys' ability to develop a competing product and deprived utility customers of the ability to use and access their data as they see fit.

122.   PowerPlan's actions also harmed competition in the Tax Services Market by depriving utility customers of a choice in obtaining services necessary to perform core regulatory, tax, and accounting functions. By impeding competition of Lucasys and others, PowerPlan creates confusion about what service providers are available to utility customers and motivates the customers to hire PowerPlan for Tax Services and thus avoid the risk of their services providers being denied access to necessary data. The exclusion of such competitors also reduces output in these markets, which in turn raises prices for utility customers.

123.   In addition, as described above, PowerPlan has made threats that have coerced three of four Lucasys customers to terminate or reduce the scope of their contracts with Lucasys as their chosen provider, and the fourth remains subject to coercive pressure from PowerPlan. But for these threats, rate-regulated utilities would have a legitimate choice among suppliers of Tax Services—including choices, like Lucasys, who provide higher quality services and greater value to customers.

124.   PowerPlan's threats and other anticompetitive conduct has caused rate-regulated utilities to obtain substantially fewer solutions from Lucasys than they otherwise would have, including those services that were terminated after PowerPlan's threats as detailed above. Without PowerPlan's actions, Lucasys would have achieved sufficient economies of scale in developing its technological solutions that would allow it to further reduce its prices and improve its product and service offerings to rate-regulated utilities so it could effectively compete in both the supplemental markets and, ultimately, the Tax Software Market itself.

125.   PowerPlan's approach and strategy of allowing consulting competition but blocking software competition in the Tax Services Market directly harms competition and consumers in that market. That is, PowerPlan's anticompetitive conduct against Lucasys and other similar

competitors that seek to offer a software solution directly affects the Tax Services Market in the following ways: (1) it reduces the choices available to utility customers by blocking and precluding a software component to this aftermarket; (2) it raises prices in this market because a software solution creates automation and efficiency and is a lower-priced solution for utilities; and (3) it decreases the quality of products and services for utility customers in this market because a software solution—with or without consulting services—improves performance and capabilities in this market through automation and customization. PowerPlan's tactics threaten to keep utility customers in the technology dark ages of the 1990s for their utility-management needs. PowerPlan is using its monopoly power to effectively stop innovation, so it can continue to collect supracompetitive profits without investing into improving its product.

126.   By using these illegal actions to maintain its monopoly in the Tax Software Market and reduce competition in the Tax Services Market, PowerPlan deprived customers of (1) a nascent competitor in a market where it is the sole competitor, and (2) a competitive choice and the benefits of a lower-priced, higher-quality product in the Tax Services Market. These illegal actions ultimately raise operating costs and reduce efficiency for investor-owned rate-regulated utilities, which they pass on to end-consumer ratepayers.

## INTERSTATE COMMERCE

127.   PowerPlan's anticompetitive conduct and monopolization affected interstate commerce because PowerPlan offers and distributes its products and services to customers throughout the United States, and because Lucasys offers and distributes its products and services to customers throughout the United States. PowerPlan's revenue is more than $150 million annually.

128.   AEP, for example, is a major investor-owned utility in the United States and has operations delivering electricity to more than five million customers in 11 U.S. states. PowerPlan's conduct has increased operating costs and reduced its efficiency, which in turn will necessarily be passed on to customers in those 11 U.S. states who pay rates based on AEP's costs.

## COUNT I

### Monopolization (Negative Tying)
### <u>15 U.S.C. § 2</u>

129.   Plaintiff incorporates by reference the preceding allegations.

130.   PowerPlan has an approximately 80% share of the Tax Software Market, giving it monopoly power in that market. PowerPlan enjoys the power to raise prices or exclude competition.

131.   The Tax Software Market has high barriers to entry. Not only would entry require major capital investment, it would require real-time and

ongoing access to customer data. Moreover, utility customers face extremely high switching costs that effectively lock them in.

132. PowerPlan is maintaining its monopoly power through exclusionary tactics, including a negative tying arrangement involving IOU Tax Software and Tax Services.

133. IOU Tax Software and Tax Services are separate products and customers want the freedom to buy those separate products from different suppliers.

134. PowerPlan entered into contracts with its customers that contain *de facto* provisions that operate as negative tying arrangements by conditioning the purchase and use of PowerPlan's IOU Tax Software to an agreement not to purchase or use products in the Tax Services Market that are provided by PowerPlan's perceived competitors. More specifically, PowerPlan has told customers that they cannot purchase products or services of Lucasys and others because of the fact that they are perceived rivals in the Tax Software Market. These provisions unreasonably restrict trade or commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

135. PowerPlan can impose these negative tying arrangements on customers because of its monopoly power in the Tax Software Market.

44

136.   The negative tie affects a substantial volume of commerce—at least $50 million of a total $100 million—in the Tax Services Market (and/or the Deferred Tax Solutions Market) by restricting Lucasys and other rivals from competing in the market.

137.   PowerPlan is using exclusionary tactics because Lucasys is a potential competitor in the Tax Software Market and PowerPlan wants to cripple Lucasys before it can enter that market. This demonstrates PowerPlan's willful intent to maintain its monopoly through means other than a superior product, business acumen, or historic accident.

138.   There are no legitimate or procompetitive business reasons for these acts other than to eliminate a potential competitor. PowerPlan's actions are intended to perpetuate its monopoly and destroy potential or emerging competition in the Tax Software Market.

139.   Through its negative tying arrangements, PowerPlan has injured competition in the Tax Services Market , as further described in Paragraphs 122–126.

140.   As a proximate result of PowerPlan's unlawful conduct, Lucasys has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## COUNT II

### Monopolization (Refusal to Supply)
### 15 U.S.C. § 2

141.   Plaintiff incorporates by reference the preceding allegations.

142.   PowerPlan has an approximately 80% share of the Tax Software Market, giving it monopoly power in that market.

143.   The Tax Software Market has high barriers to entry. Not only would entry require major capital investment, it would require real-time and ongoing access to customer data. Moreover, utility customers face extremely high switching costs that effectively lock them in.

144.   PowerPlan is maintaining its monopoly power through exclusionary tactics, including refusals to supply customers with access to their own data if those customers purchase Tax Services from Lucasys. These tactics unreasonably restrict trade or commerce in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

145.   PowerPlan is using exclusionary tactics because Lucasys is a potential competitor in the Tax Software Market and PowerPlan wants to cripple Lucasys before it can enter that market. This demonstrates PowerPlan's willful intent to maintain its monopoly through means other than a superior product, business acumen, or historic accident.

146.   There are no legitimate or procompetitive business reasons for these acts other than to eliminate a potential competitor. PowerPlan's action are intended to perpetuate its monopoly and destroy potential or emerging competition in the Tax Software Market.

147.   By refusing to supply customers with access to their own data if those customers purchase Tax Services from Lucasys, PowerPlan has injured competition in both the Tax Software Market and the Deferred Tax Services Market (and/or the Deferred Tax Solutions Market) as further described in Paragraphs 121–126.

148.   As a proximate result of PowerPlan's unlawful conduct, Lucasys has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## COUNT III

### Agreement to Restrain Trade (Negative Tying)
### 15 U.S.C. § 1

149.   Plaintiff incorporates by reference the preceding allegations.

150.   IOU Tax Software and Tax Services are separate products and customers want the freedom to buy those separate products from different suppliers.

151.   PowerPlan entered into contracts with rate-regulated utility customers that contain *de facto* provisions that operate as negative tying arrangements by conditioning the purchase and use of PowerPlan's  Tax Software system to an agreement not to purchase or use products in the Tax Services Market that are provided by PowerPlan's perceived competitors. These provisions unreasonably restrict trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

152.   PowerPlan can only impose these negative tying arrangements on customers because it has appreciable market power in the Tax Software Market.

153.   The negative tie affects a substantial volume of commerce—at least $50 million of a total $100 million—in the Tax Services Market and/or the Deferred Tax Solutions Market by restricting Lucasys and other rivals from competing in the market.

154.   Through its negative tying arrangements, PowerPlan has injured competition in the Tax Services Market, as further described in Paragraphs 122–126.

155.  As a proximate result of PowerPlan's unlawful conduct, Lucasys has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## COUNT IV

### Agreement to Restrain Trade (Concerted Refusal to Deal)
### 15 U.S.C. § 1

156.  Plaintiff incorporates by reference the preceding allegations.

157.  PowerPlan entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act by coercing the agreement of PowerPlan customers, including NextEra, AEP, and Liberty Utilities, not to do business with Lucasys.

158.  PowerPlan's parallel agreements with the utility customers substantially foreclosed competition in the relevant markets. The market has been harmed by depriving customers seeking alternatives to PowerPlan's offerings and necessary Tax Services of meaningful competition, which in turn has forced them to pay supracompetitive prices while receiving lower quality solutions. PowerPlan has operated as the hub, in a series of hub-and-spoke agreements, requiring the parties not to do business with Lucasys.

159.   By entering into these agreements, PowerPlan has injured competition in both the Tax Software Market and the Tax Services Market as further described in Paragraphs 121–126.

160.   As a proximate result of these agreements, Lucasys has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## COUNT V

### Agreement to Restrain Trade (Exclusive Dealing)
### 15 U.S.C. § 1

161.   Plaintiff incorporates by reference the preceding allegations.

162.   PowerPlan entered into contracts with its customers that contain *de facto* exclusive dealing provisions that unreasonably restrict trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

163.   PowerPlan interprets its customer contracts to prevent customers from permitting third-party vendors like Lucasys to access the customers' data without PowerPlan's express or implied permission.

164.   PowerPlan can impose this restriction on customers because of its market power in the Tax Software Market.

165.   PowerPlan's vertical restraints are unlawful because they have led to increased prices and reduced output in both the Tax Software Market and the Tax Services Market .

166.   Through its exclusive dealing provisions, PowerPlan has injured competition in both the Tax Software Market and the Tax Services Market (and/or the Deferred Tax Solutions Market), as further described in Paragraphs 121–126.

167.   PowerPlan's exclusive dealing provisions do not enhance efficiency or competition in any market. On the contrary, the agreements have produced only anticompetitive effects.

168.   As a proximate result of these agreements, Lucasys has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## COUNT VI

### Deceptive Trade Practices
### O.C.G.A. § 10-1-373

169.   Plaintiff incorporates by reference the preceding allegations.

170.   PowerPlan has engaged in deceptive trade practices by disparaging Lucasys' services and business by false or misleading

representations of fact, and causing confusion and/or misunderstanding of Lucasys' services.

171.   PowerPlan is causing confusion to Lucasys' customers by falsely representing that (1) PowerPlan has protectable trade secrets in its software, services, and processes; and (2) that Lucasys is or will misappropriate those trade secrets if Lucasys' customers continue doing business with Lucasys or that Lucasys has already misappropriated PowerPlan's trade secrets and included those trade secrets in Lucasys' product and services.

172.   These deceptive trade practices have caused current and potential Lucasys customers to cease doing business with Lucasys and to be diverted to PowerPlan or provide more business to PowerPlan with Lucasys no longer a competitor.

173.   Customers in the utilities marketplace are confused and misunderstand whether PowerPlan has protectable trade secrets that Lucasys is improperly using and whether they can or should do business with Lucasys.

174.   Many customers believe that they may be subject to litigation if they work with Lucasys while also using PowerPlan's services or that Lucasys has already misappropriated PowerPlan's trade secrets.

175.   Lucasys is entitled to injunctive relief against PowerPlan pursuant to O.C.G.A. § 10-1-373.

176.   Additionally, since PowerPlan has willingly engaged in a trade practice that it knows to be deceptive, Lucasys is allowed to recover its attorneys' fees and costs for pursuing its claim and punitive damages under O.C.G.A. § 10-1-373.

## Count VII

### Tortious Interference with Contract
### Georgia Common Law

177.   Plaintiff incorporates by reference the preceding allegations.

178.   PowerPlan acted improperly and without privilege when it contacted Lucasys' customers or potential customers, that PowerPlan knew Lucasys had contracted or planned to contract with to provide services, to (1) threaten   Lucasys' customers or potential customers if they continued business with Lucasys in any capacity by aiding and abetting Lucasys' alleged misappropriation of trade secrets, and (2) incorrectly stating or implying that Lucasys misappropriated PowerPlan's confidential trade secrets.

179.   PowerPlan acted purposely and with malice to injure Lucasys in PowerPlan's effort to curtail competition with PowerPlan and have Lucasys' customers cease doing business with Lucasys based on the false information PowerPlan disseminated.

180.  PowerPlan's actions caused Lucasys' customers that Lucasys already had a contractual relationship with to cease doing business with Lucasys and caused potential customers to not enter into anticipated contracts for Lucasys' services.

181.  PowerPlan is a stranger to all of the actual or potential Lucasys contracts that it interfered with as PowerPlan is not a party to the contract, is a stranger to the business relationship between Lucasys and its customer, and PowerPlan is not a beneficiary to any such contract that it interfered with.

182.  Lucasys was injured financially by losing revenue from each customer or potential customer that ceased doing business with Lucasys because of PowerPlan's improper conduct.  Lucasys is entitled to recover damages in an amount to be determined at trial.

### Count VIII

### Malicious Interference with Business
### Georgia Common Law

183.  Plaintiff incorporates by reference the preceding allegations.

184.  PowerPlan has intentionally interfered with Lucasys' business to cause injury to Lucasys, specifically to put Lucasys out of business.

185.  PowerPlan's actions have caused harm to Lucasys' business, including the loss of customers and its reputation.

186.   PowerPlan knows that Lucasys has the right to lawfully conduct its business in competition with PowerPlan, yet PowerPlan has intentionally and maliciously interfered with Lucasys' rights.

187.   Lucasys was injured financially by losing revenue from each customer or potential customer that ceased doing business with Lucasys because of PowerPlan's improper conduct.   Lucasys is entitled to recover damages in an amount to be determined at trial.

## Count IX

### Defamation Per Se
### Georgia Common Law

188.   Plaintiff incorporates by reference the preceding allegations.

189.   PowerPlan published and disseminated false and defamatory statements to third parties with the purpose of damaging Lucasys.

190.   These false and defamatory statements include false assertions that Lucasys misappropriated or intended to misappropriate PowerPlan's confidential trade secrets, which could cause Lucasys' customers to be held liable for misappropriation of PowerPlan's trade secrets if they continued to do business with Lucasys.

191.   Such statements were made with the intent to injure Lucasys. These statements constitute defamation per se under Georgia law.

192.   PowerPlan's statement were intended to and did cause injury to Lucasys' business reputation.

193.   As a direct and proximate result of PowerPlan's false and defamatory statements, Lucasys has been damaged.

## Count X

### Defamation
### Georgia Common Law

194.   Plaintiff incorporates by reference the preceding allegations.

195.   PowerPlan has made false, defamatory statements about Lucasys to third parties by asserting that Lucasys misappropriated or intended to misappropriate PowerPlan's confidential trade secrets, which could also cause Lucasys' customers to be held liable for misappropriation of PowerPlan's trade secrets if they continued to do business with Lucasys.  Such statements were made with the intent to injure Lucasys.

196.   PowerPlan made the false and defamatory statements with malicious intent to harm Lucasys.

197.   As a proximate result of PowerPlan's conduct, Lucasys has suffered substantial and irreparable damage to its reputation and is entitled to recover from PowerPlan.

## Count XI

## Monopolization (Sham Trade Secret Assertions)
## 15 U.S.C. § 2

198.     Plaintiff incorporates by reference the preceding allegations.

199.     PowerPlan has an approximately 80%+ share of the Tax Software Market, giving it monopoly power in that market. PowerPlan enjoys the power to raise prices or exclude competition.

200.     The Tax Software Market has high barriers to entry. Not only would entry require major capital investment, it would require real-time and ongoing access to customer data. Moreover, utility customers face extremely high switching costs that effectively lock them in.

201.     PowerPlan is maintaining its monopoly power through exclusionary tactics, including by asserting that Lucasys misappropriated PowerPlan's trade secrets with knowledge that (i) no trade secrets existed and (ii) Lucasys had not misappropriated any trade secrets.

202.     The sham trade secret misappropriation assertions affect a substantial volume of commerce—at least $50 million of a total $100 million— in the Tax Services Market  by restricting Lucasys and other rivals from competing in the market.

203.     PowerPlan is using exclusionary tactics because Lucasys is a potential competitor in the Tax Software Market and PowerPlan wants to cripple Lucasys before it can enter that market. This demonstrates PowerPlan's willful intent to maintain its monopoly through means other than a superior product, business acumen, or historic accident.

204.     There are no legitimate or procompetitive business reasons for these acts other than to eliminate a potential competitor. PowerPlan's actions are intended to perpetuate its monopoly and destroy potential or emerging competition in the Tax Software Market.

205.     Through its sham trade secret misappropriation assertions, PowerPlan has injured competition in the Tax Services Market (and/or Deferred Tax Solutions Market).

206.     As a proximate result of PowerPlan's unlawful conduct, Lucasys has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## Count XII

## Monopolization (Sham Trade Secret Licensing)
## 15 U.S.C. § 2

207.     Plaintiff incorporates by reference the preceding allegations.

208.    PowerPlan has an approximately 80% share of the Tax Software Market, giving it monopoly power in that market. PowerPlan enjoys the power to raise prices or exclude competition.

209.    The Tax Software Market has high barriers to entry. Not only would entry require major capital investment, it would require real-time and ongoing access to customer data. Moreover, utility customers face extremely high switching costs that effectively lock them in.

210.    PowerPlan is maintaining its monopoly power through exclusionary tactics, including by purporting to license trade secrets or other intellectual property in the AVA with knowledge that no trade secrets existed and the AVA would limit the use of information that is not protected by law.

211.    The sham licensing arrangements affect a substantial volume of commerce—at least $50 million of a total $100 million—in the  Tax Services Market by restricting Lucasys and other rivals from competing in the market.

212.    PowerPlan is using exclusionary tactics because Lucasys is a potential competitor in the Tax Software Market and PowerPlan wants to cripple Lucasys before it can enter that market. This demonstrates PowerPlan's willful intent to maintain its monopoly through means other than a superior product, business acumen, or historic accident.

213.     There are no legitimate or procompetitive business reasons for these acts other than to eliminate a potential competitor. PowerPlan's actions are intended to perpetuate its monopoly and destroy potential or emerging competition in the Tax Software Market.

214.     Through its sham trade secret misappropriation assertions, PowerPlan has injured competition in the Tax Services Market.

215.     As a proximate result of PowerPlan's unlawful conduct, Lucasys has suffered injury to its business or property in an amount to be proven at trial and automatically trebled.

## Count XIII

## Punitive Damages

216.     Plaintiff incorporates by reference the preceding allegations.

217.     PowerPlan's tortious acts, as particularized above, show willful misconduct, malice, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences.

218.     For example, even though it had no evidence, PowerPlan willfully and intentionally represented to Lucasys' customers that it had a protectable trade secret in its software, services, and processes and that it had strong reason to believe that Lucasys was using improper access to those trade secrets to develop its competing software.

219.    PowerPlan made those false representations knowing that they were baseless and with the specific intent to harm Lucasys and its current and prospective customer relationships.

220.    As a result of the foregoing misconduct and as particularized above, Lucasys is entitled to recover punitive damages in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Lucasys requests that this Court:

A.    Declare that PowerPlan's conduct violates 15 U.S.C. §§ 1 and 2;

B.    Declare that PowerPlan's conduct violates applicable state law;

C.    Enter judgment against PowerPlan;

D.    Award Lucasys treble antitrust damages, as provided in 15 U.S.C. § 15, in an amount to be determined at trial, but not less than $77.4 million ;

E.    Award Lucasys actual damages for its state law claims;

F.    Award Lucasys punitive damages;

G.    Award Lucasys pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and applicable state law;

H.      Award Lucasys its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. §§ 15 and 26;

I.      Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in this complaint; and

J.      Order any other such relief as the Court deems appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff Lucasys hereby demands a trial by jury on all claims.

Respectfully submitted this ___day of ____, 2023

By: */s/ Jason S. Alloy*
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Jason Alloy
Georgia Bar No. 013188
jalloy@robbinsfirm.com
Joshua A. Mayes
Georgia Bar No. 143107
jmayes@robbinsfirm.com
Rachel F. Gage
Georgia Bar No. 547982
rgage@robbinsfirm.com
Evan C. Dunn
Georgia Bar No. 535202
edunn@robbinsfirm.com
ROBBINS ALLOY BELINFANTE
   LITTLEFIELD LLC
500 14th Streeet, NW
Atlanta, GA 30318

Telephone:  (678) 701-9381
Facsimile:   (404) 856-3255

By: */s/ Aaron R. Gott*
Aaron Gott *(pro hac vice)*
aaron.gott@bonalawpc.com
BONA LAW PC
15 South 9th Street, Suite 239
Minneapolis, MN 55402
Telephone:  (612) 284-5001

—

Jarod Bona *(pro hac vice)*
jarod.bona@bonalawpc.com
Jon Cieslak *(pro hac vice)*
jon.cieslak@bonalawpc.com
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
Telephone:  (858) 964-4589
Facsimile:   (858) 964-2301

—

*Counsel for Plaintiff Lucasys Inc.*