```
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3     LUCASYS INC.,

4              Plaintiff,          CIVIL ACTION NO.
      vs.                          1:20-CV-02987-AT
5
      POWERPLAN, INC.,
6
               Defendant.
7
         HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
8
                    PENDING DESIGNATIONS
9                        - - -

10            The videotaped deposition of BRETT BERTZ,

11     taken on behalf of the Plaintiff, pursuant to

12     Notice and agreement of counsel, in accordance

13     with the Federal Rules of Civil Procedure, before

14     Maureen S. Kreimer, CCR, CRR, Notary Public, at,

15     500 14th Street, N.W., Atlanta, Georgia on

16     December 2, 2021, between the hours of 9:12 a.m.

17     and 4:36 p.m.

17     _____

18

19                  REGENCY-BRENTANO, INC.
                   Certified Court Reporters
20                   13 Corporate Square
                          Suite 140
21               Brookhaven, Georgia  30329
                      (404) 321-3333
22

23

24

25
```

1                    INDEX OF EXAMINATION

2

    DEPOSITION OF BRETT BERTZ
3
    Examination by Mr. Alloy                          7
4

5                    DESCRIPTION OF EXHIBITS

6  PLAINTIFF'S
     EXHIBIT           DESCRIPTION                 PAGE
7
       P-1  Growing, Loyal Blue-Chip Customer       10
8            Base ROP007136

9      P-2  Our Domain Expertise Remains a          18
             Strength ROP006781
10
       P-3  Sales Observations - 60 Days            29
11           RPO006813

12     P-4  Product & Development Observations 60   31
             Days ROP006807
13
       P-5  Customer Dissatisfaction Clear          33
14           ROP006783

15     P-6  2H'20 Market Research Validates         35
             Energy Focus ROP006782
16
       P-7  No Direct, Multi-Product Competitor     38
17           Confidentiality Order ROP006867

18     P-8  LinkedIn printout for Brett Bertz       42
             profile
19
       P-9  Tier 1 Utilities Research Findings      66
20           ROP006844

21    P-10  Most competitors are more narrowly      69
             focused than ROP007039
22
      P-11  Q2 2019 Operating Package ROP006297     76
23
      P-12  Q3 2019 Operating Package ROP006315     78
24
      P-13  Q2 2020 Operating Package ROP006372     82
25

| | | |
|---|---|---|
| P-14 | Spreadsheet of IP Protection Wave information | 84 |
| P-15 | 6/11/2020 Email log | 92 |
| P-16 | 6/25/2020 Email log | 93 |
| P-17 | 6/11/20 email exemplar form Confidential | 99 |
| P-18 | 11/21/2019 Appointment calendar reminder with Hoersdig Accepted: [EXT] Discuss tax vendors with PowerPlan | 103 |
| P-19 | 7/17/20 letter RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights | 107 |
| P-20 | 10/19/19 Email May to Bertz [EXT] Re: License Agreement Section POWERPLAN00000058 | 110 |
| P-21 | 12/5/19 Email to group at AEP - Protecting PowerPlan Proprietary Software and Intellectual Property Rights | 113 |
| P-22 | 1/8/20 Email string Protecting PowerPlan Proprietary Software and Intellectual Property Rights- POWERPLAN00000134 | 144 |
| P-23 | Answer to a Complaint and Counterclaims | 156 |
| P-24 | 8/30/19 Email string PowerPlan brief follow up POWERPLAN00000038 | 161 |
| P-25 | 10/28/19 Email Bertz to May Connecting This Week POWERPLAN00000166 | 175 |
| P-26 | 10/30/19 Email string License Agreement Section POWERPLAN00000168 | 175 |
| P-27 | 11/4/19 Email Bertz to May.  Follow Up Time Slots POWERPLAN00000175 | 179 |

| | | |
|---|---|---|
| P-28 | 11/5/19 Skype invitation NextEra Energy and PowerPlan Follow Up | 181 |
| P-29 | 11/7/2019 Email Bertz to May. Subject: Follow up POWERPLAN00000179 | 182 |
| P-30 | 11/15/19 Email string PowerTax SOW Requirements POWERPLAN00000375 | 184 |
| P-31 | 12/11/19 Email string, RE: [EXT] Re: Outstanding issues with Lease Module POWERPLAN00000355 | 186 |
| P-32 | 1/28/2020 Email Williams to Bertz. Outstanding issues with Lease Module POWERPLAN00000061 | 189 |
| P-33 | 3/1/2021 Email, Bertz to May Subject: PowerPlan 2021 Executive Advisory Board Invitation | 190 |
| P-34 | 6/8/20 Letter, Salas to PowerPlan POWERPLAN00000866 | 192 |
| P-35 | 6/18/20 letter Bertz to Salas and Payson POWERPLAN00000004 | 196 |
| P-36 | 4/8/20 Email string Read to Duffy and others. Summary of our call this evening protection of Confidential information POWERPLAN00000009 | 202 |
| P-37 | 7/3/20 letter Salas to Bertz POWERPLAN00000751 | 200 |
| P-38 | PowerPlan EEI Survey- 2020 POWERPLAN00000144 | 206 |
| P-39 | 2021-2023 PowerPlan Strategic Plan ROP006667 | 214 |
| P-40 | 5/6/20 Email string Duffy to group POWERPLAN00000015 | 239 |
| P-41 | Increasing Software & SI Activities in Core Markets ROP006786 | 243 |

(End of index)

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the Plaintiff:

 3       JASON S. ALLOY, ESQ.
         JOSHUA MAYES, ESQ.
 4       Robbins Ross Alloy Belinfante Littlefield, LLC
         500 14th Street NW
 5       Atlanta, Georgia 30318
         678.701.9381
 6       Email: Jalloy@robbinsfirm.com
         Email: Jmayes@robbinsfirm.com
 7
         -and-
 8
         LUIS BLANQUEZ, ESQ. (By phone)
 9       BonaLaw PC
         4275 Executive Square
10       Suite 200
         La Jolla, California 92037
11       858-964-4589
         Email: Luis.blanquez@bonalawpc.com
12
     On behalf of the Defendant:
13
         STEPHEN M. FAZIO, ESQ.
14       Squire Patton Boggs (US) LLP
         127 Public Square
15       Cleveland, Ohio 44114
         216.479.8500
16       Email: Stephen.fazio@squirepb.com

17


18
     Videographer:
19
     Devin Walker
20   Legal Technology Services
     www.LTSAtlanta.com
21   770.554.1633

22

23

24

25
```

1              (Whereupon, disclosure as required by the

2         Georgia Board of Court Reporting is made by

3         the   court reporter, a written copy of which

4         is attached hereto.)

5              (Time noted 9:12 a.m.)

6         MR. ALLOY:  I want to note for the record

7         that our client representative Vadim Lantukh

8         was present initially before the deposition

9         started.

10             PowerPlan has articulated a position that

11        he should not attend because there is too much

12        attorney's eyes only information, and that the

13        process should be that we provide our client

14        with a transcript after AEO designations are

15        made.

16             We disagree and contend Mr. Lantukh should

17        be able to attend the deposition until

18        possible AEO material would arise in the

19        deposition.  But we have agreed for now for

20        Mr. Lantukh to not be present in the

21        deposition room.  We do not waive any argument

22        we have that our client should be permitted to

23        appear in the deposition and reserve our right

24        to take this issue up to the court.

25             MR. FAZIO:  And Steve Fazio on behalf of

1          PowerPlan.  Our position is that the

2          protective order contemplates a particular

3          process for the designation of testimony

4          during the deposition, and it's not reasonable

5          or appropriate to expect us to be able to do

6          that on the fly during the deposition without

7          the benefit of knowing where the questioning

8          is going, what particular documents are going

9          to be used, and so, of course, we also reserve

10          all of our rights.

11              MR. ALLOY:  Okay.  We're ready to proceed,

12          please.

13              (On video record 9:13 a.m.)

14              THE VIDEOGRAPHER:  We're now on video

15          record.  The date is December 2nd, 2021.  The

16          time is 9:13 a.m., and this is the beginning

17          of Media File No. 1.

18              Would the court reporter please swear in

19          the witness.

20                  BRETT M. BERTZ,

21      having been first duly sworn, was examined and

22      testified as follows:

23                  EXAMINATION

24      BY MR. ALLOY:

25          Q.   Good morning.  Would you please state your

1     full name.

2          A.    Brett Meyers Bertz.

3          Q.    Mr. Bertz, when did you start at PowerPlan?

4          A.    April 28th of 2019.

5          Q.    What is your title?

6          A.    Chief customer officer.

7          Q.    And that has that always been your title at

8     PowerPlan?

9          A.    It has.

10          Q.    What are your duties and responsibilities as

11     chief customer officer?

12          A.    So from a business perspective, I'm

13     responsible for our services business, which

14     includes our professional services, our support,

15     managed services organizations, and our customer

16     success team.

17                From a customer relationship perspective, I

18     was brought in to focus on creating an integrated

19     experience for our customers that was differentiated

20     and focused on ultimately their success.

21          Q.    Is there another officer or employee who's

22     in charge of and oversees the PowerPlan software?

23          A.    There is.

24          Q.    And who is that?

25          A.    So it would be -- it's not an officer, but

1    senior vice-president of Product Management would be

2    Suzanne Ward.

3       Q.    Do you know how long Ms. Ward has been with

4    PowerPlan?

5       A.    Approximately a year-and-a-half, I would

6    say.

7       Q.    And who preceded her in that position?

8       A.    That is a great question.   I would have to

9    refer back to my notes, actually, quite frankly,

10    because the position was vacant for a little while.

11       Q.    Okay.   It was vacant when you started at

12    PowerPlan?

13       A.    No, but -- so I remember the lady's name,

14    but we didn't work together very long, so.

15       Q.    Does PowerPlan have the top 20

16    investor-owned utilities as clients?

17       A.    My understanding is many of those would be

18    our customers, yes.   And I think -- can you clarify

19    your question?   Top 20 investor-owned utilities in

20    the United States, or North America?

21       Q.    Yes.   In the United States.

22       A.    Yeah, I would say many of those are our

23    customers.

24       Q.    Okay.   You don't know if all of them are?

25       A.    I do not know if all 20 are our customers,

 1      no.

 2           Q.   Do you have an understanding that at some

 3      point all 20 of them were PowerPlan customers?

 4           A.   I do not.

 5                (Plaintiff's Exhibit P-1 marked.)

 6           Q.   Handing you what I have marked as

 7      Plaintiff's Exhibit 1.

 8           A.   Thank you.

 9           Q.   This is a document produced by Roper

10      Technologies.  Have you seen this document before?

11           A.   That is a great question.  I don't -- I

12      can't guarantee that I have because I can only see

13      one page, and I don't know the full document.

14           Q.   Are you familiar, generally, with the

15      information on this page?

16           A.   To a degree, yes.

17           Q.   So top of this slide, or page, says:

18      Growing Loyal Blue-Chip Customer Base, 220-plus

19      total customers with 99% retention.

20                Do you understand that to accurately

21      describe PowerPlan's customer base?

22                MR. FAZIO:  Objection.

23      BY MR. ALLOY:

24           Q.   You can answer.

25           A.   I'd ask you to clarify your question.  Can

1   you tell me when this document was created?

2   BY MR. ALLOY:

3       Q.   No, I can't.

4       A.   Okay.  So I would say as of today in

5   general, yes.  But some of the details and data

6   points and what's called customer logos on here may

7   no longer be PowerPlan customers, or may not exist

8   because of merger and acquisition and other

9   scenarios.

10      Q.   Okay.  But my -- the previous question was

11  not about the lower parts of this document, but just

12  whether --

13      A.   Ah.

14      Q.   -- PowerPlan has 220-plus total customers

15  with 99% retention?

16      A.   We do have more than 220 customers.  And I

17  would say our retention rate is lower than 99%

18  today.

19      Q.   What do you understand the retention to be?

20      A.   In the high 90% range, so probably in the

21  97% arena.

22      Q.   And when you just say 97%, would that be

23  retention year over year, so approximately a loss of

24  3% a year?

25      A.   Yes.  And I'm talking about the not

1    necessarily customers, but customer spend when I'm

2    thinking and speaking to that term.

3         Q.   Next part on this page has -- is titled

4    "Core and Tier 1 Markets."

5              Do you have an understanding of what that

6    means?

7         A.   Yes, I do.

8         Q.   Okay.  What are the core and tier 1 markets?

9         A.   So in the core arena, as of today, we would

10   put our energy customers.  And in the tier 1 market,

11   it would be larger enterprise customers that may not

12   necessarily be in -- that may not necessarily be in

13   the energy industry.

14        Q.   Okay.  So in that section below Core and

15   Tier 1 markets that has Utilities, Oil & Gas, Public

16   Sector and Transportation, is that a mix of core 1

17   and tier 1 customers?

18        A.   It would be.  As I'm looking at this

19   document, the language that's being used and some of

20   the data points are a number of years old; and so

21   the tier 1 concept would have been something that we

22   used when I joined the company in 2019, but it's

23   really not language that we use today.

24        Q.   Okay.  So going back to when the language

25   was used, can you state whether -- you know, which

1    of these Utilities, Oil & Gas, Public Sector and

2    Transportation, are core and which are tier 1?

3         A.   So we would have put the utilities and the

4    oil and gas into the core.

5              And then you might have had public sector

6    and transportation, telecom, and then other types of

7    customers in tier 1 markets.

8         Q.   And what did that separation mean to you,

9    that some customers are core, and some are tier 1?

10        A.   So if this document is from 2017, the

11   strategy of PowerPlan in 2017 is different than it

12   is today.  So the core in 2017 would have been

13   similar, but it would have likely, you know, focused

14   on, as this document mentions, utilities and oil and

15   gas.

16             Tier 1 would have been growth markets with

17   enterprise customers on a global basis, and so

18   that's where the differentiation would have been set

19   at the time.

20        Q.   And how would differentiating these

21   customers into core and tier 1 effect how PowerPlan

22   does business with them?

23        A.   It could affect it in multiple ways.  I

24   think the first way it could affect it is how we

25   establish our sales and customer success account

1       coverage models, you know, both in how many

2       customers are supported and the way that they are

3       supported by those roles, and whether there is

4       support for those customers in the geographies in

5       which they are located; because at the time some of

6       the customers may have been outside of the North

7       America market.

8               It could also potentially affect the

9       investment approach that we take with where, you

10      know, we place our research and development dollars,

11      as well as how we structure our services.

12      Q.   And then you indicated previously that

13      that's an older way of -- let's call it designating

14      customers.  How does PowerPlan do it now versus the

15      core and tier 1?

16      A.   So at the beginning of 2020 we reset our

17      strategy.  And so as we talk about core today, core

18      would be focused on energy industry customers.

19      Q.   Out of the top 20 U.S. utilities that are

20      listed in that box towards the top left of

21      Plaintiff's Exhibit 1 do you see any of those

22      utilities that are no longer PowerPlan customers?

23      A.   Electranet I'm not familiar with.  But each

24      of the others I believe continue to be PowerPlan

25      customers.

1    Q.   And in the oil and gas box in Plaintiff's

2    Exhibit 1, are any of those companies no longer

3    PowerPlan customers?

4    A.   They are.  And my answer would be more of

5    what they have shared with us versus the timing of

6    their potential termination of contracts with us.

7         So Enbridge is a great example of a customer

8    who has notified us about a year-and-a-half ago of

9    their intention to transition away from PowerPlan.

10   They remain a customer today.  However, we are aware

11   that our relationship, you know, will not be

12   longstanding.

13   Q.   Any other of those oil and gas companies

14   indicate they would be transitioning to another

15   platform?

16   A.   Energy Transfer, Williams, and then I

17   believe Valero, as well.

18   Q.   And have any of those companies indicated

19   what software they would be using instead of

20   PowerPlan?

21   A.   They have.  I actually don't have the

22   details here and would have to go back and look at

23   it to be able to tell you.

24   Q.   And have you had communications with those

25   customers about them transitioning?

1          A.   Not me directly, no.

2          Q.   Who at PowerPlan would be having those

3     communications?

4          A.   So it depends.  Generally it would be their

5     sales executive, or their customer success manager

6     would be leading those conversations.

7          Q.   And are Energy Transfer, Valero and Williams

8     similar to Enbridge in that they've notified that

9     they'll be terminating, but they haven't terminated

10    yet?

11         A.   They are each in different steps.  So I

12    believe Valero is a -- was a lease customer, and I

13    believe they're no longer a customer of ours.  I

14    believe Energy Transfer is an example of one that's

15    in transition.

16         Q.   Do any of those customers who are leaving,

17    to your knowledge, use PowerTax?

18         A.   They may.

19         Q.   Okay.  What was --

20         A.   Directly, I do not know if they do or not.

21         Q.   Of the Public Sector box on Plaintiff's

22    Exhibit 1 are any of those companies -- or I

23    shouldn't say companies -- municipalities, entities,

24    potentially companies, any of those in that box for

25    Public Sector no longer PowerPlan customers, or have

1      indicated that they in the future would no longer be

2      a customer?

3           A.   The only one that stands out to me is the

4      DC.gov logo.  They have notified us and have

5      transitioned away from PowerPlan.

6           Q.   Do you know who they are transitioning to?

7           A.   I do not.

8           Q.   Do you know if they use PowerTax?

9           A.   They do not.

10          Q.   For Transportation and Telecom do you know

11     if any of those listed customers are no longer

12     customers, or have indicated they no longer would be

13     with PowerPlan?

14          A.   I do not.

15          Q.   Is there someone else at PowerPlan who

16     interfaces more with those types of customers than

17     you?

18          A.   Well, so, again, the direct interface with

19     our customers would be our sales executives, and our

20     customer success managers.

21               And to clarify my answer to the previous

22     questions, I'm not aware that any of those customers

23     has notified PowerPlan that they were no longer

24     going to be a customer.

25          Q.   Is it true that PowerPlan's technology is

1    outdated?

2         A.    No.

3         Q.    Is it true that PowerPlan's technology is

4    difficult to use?

5         A.    No.

6         Q.    Is it true that PowerPlan's technology is

7    difficult to implement?

8         A.    No.

9         Q.    Is it true that those are weaknesses of

10   PowerPlan's?

11        A.    I would say no.

12        Q.    Is PowerPlan's team knowledge a weakness of

13   the company?

14        A.    I would say no there as well.

15             (Plaintiff's Exhibit P-2 marked.)

16        Q.    I'm handing you what's been marked as

17   Plaintiff's Exhibit 2.  This is part of a document

18   that was produced by Roper Technologies.  Have you

19   seen this --

20        A.    I have.

21        Q.    -- page?  Did you draft it?

22        A.    No.

23        Q.    Do you know who did draft it?

24        A.    My understanding is this came out of an

25   Executive Advisory Board session that we held in

1    2019 over the summer.

2         Q.   Who leads those Executive Advisory Board

3    sessions?

4         A.   Our executive team.

5         Q.   And who would be included?

6         A.   I was a part of it, if that's what you're

7    asking.

8         Q.   And then?

9         A.   Our CEO would be there.  Our sales leader

10   would be there.  Most of our executive team would be

11   there.

12        Q.   Who is the sales leader?

13        A.   Today it's Marc Bortniker.

14        Q.   Marc Bortniker?

15        A.   Bortniker, yes.

16        Q.   How do you spell that?

17        A.   B-O-R-T-N-I-C-K-E-R [sic].

18        Q.   And does this take place at, like, a hotel,

19   or is at PowerPlan?

20        A.   This particular event took place in

21   Minneapolis, Minnesota.

22        Q.   And do you recall where?

23        A.   It was at a hotel in Minneapolis.  I do not

24   recall the name of the hotel.

25        Q.   Does PowerPlan pay for the customers to

1          attend?

2                    A.    Yes.

3                    Q.    Including airfare and hotel?

4                    A.    Yes.

5                    Q.    And how many people are on the customer

6          Executive Advisory Board?

7                    A.    So we generally have about 25 or so

8          invitees, and depending upon the timing of the

9          event, you know, we may have 20 or so attendees.

10                   Q.    Do you know what the purpose was for this

11         document?

12                   A.    Yes.  So during this particular event, we

13         asked the Executive Advisory Board to give us their

14         opinion on a SWOT analysis.

15                   Q.    And by SWOT analysis, what do you mean?

16                   A.    Strengths, weaknesses, opportunities and

17         threats, yes.

18                   Q.    Some of these categories, some of the

19         bullets are in black, and some are in a greenish or

20         tealish color?

21                   A.    Mm-hmm (affirmative).

22                   Q.    Do you know why that is?

23                   A.    I do not.

24                   Q.    Is it that the customer Executive Advisory

25         Board identifying similar themes are the items in

1    the greenish teal color versus the black color?

2         A.   It may be.

3         Q.   Did you have any input into the items on

4    this slide?

5         A.   I don't recall.

6         Q.   Now, under weakness, you know, one of the

7    points is:  Outdated technology and difficult to use

8    and implement.

9              Do you know why that's listed as a weakness?

10        A.   I do.  Because at the time the company had

11   been focusing the majority of its investment into a

12   new product platform.  And so the customer feedback

13   had -- was at that time that we needed to make more

14   investment into our -- I'll refer to it as our

15   classic technology platform.

16        Q.   Do you know approximately when, or in what

17   month the -- this Executive Advisory Board meeting

18   took place?

19        A.   It was in June of that year, I believe.

20        Q.   So approximately a month, or maybe less,

21   before Lucas filed suit against PowerPlan?

22        A.   No, because this was in 2019.

23        Q.   Oh, 2019?

24        A.   Yes.

25        Q.   Got it.

1          A.   It was about a month after I joined the

2     company.

3          Q.   Do you know why it has a 2020 copyright on

4     it?

5          A.   I do not.

6          Q.   Was there another Executive Advisory Board

7     meeting in 2020?

8          A.   There was.  But it would not have been in

9     person like this one because of the COVID situation.

10         Q.   So it was a Zoom meeting?

11         A.   It was.

12         Q.   Has there been one in 2021?

13         A.   There has.

14         Q.   Was that Zoom?

15         A.   Yes, it was.  Zoom, or -- it was -- it was

16    virtual.

17         Q.   Sure.  Would both the 2020 and 2021 meetings

18    have been around the June time frame?

19         A.   I don't recall on 2020.  2021 was September.

20         Q.   Okay.  Would you agree that PowerPlan's

21    technology was outdated, difficult to use, and

22    difficult to implement in 2019?

23         A.   I would agree that the customers gave us

24    that feedback as a part of this process.

25         Q.   Do you remember which customers in

 1    particular gave that feedback?

 2         A.   I do not.

 3         Q.   And would customers provide that feedback

 4    verbally, or in writing?

 5         A.   They would provide that feedback in this

 6    event verbally.

 7         Q.   And it's somebody's role to take notes of

 8    what the customers are indicating so that PowerPlan

 9    can consider what to do with the customer input?

10         A.   In this event we actually -- if you look at

11    the picture, you'll see sticky notes on the walls.

12    So the customers actually wrote their feedback down.

13    And we used that and categorized it across the

14    strengths, weaknesses, opportunities and threats.

15         Q.   Is the -- was that meeting recorded by video

16    or audio?

17         A.   I do not believe it was.

18         Q.   To your recollection, have any of the

19    meetings with the customer Executive Advisory Board

20    been recorded by video or audio?

21         A.   I don't recall.

22         Q.   Do you know if PowerPlan has kept the notes

23    from the meetings?

24         A.   I do not know.

25         Q.   Do you know who takes those notes and puts

1    the information into documents like Plaintiff's

2    Exhibit 2?

3         A.    I do not.

4         Q.    Did PowerPlan identify as an issue in 2019

5    its technology innovation and delivery?

6              MR. FAZIO:   Objection to form.

7    BY MR. ALLOY:

8         Q.    Under Weakness technology innovation and

9    delivery was listed.  And I was wondering if that

10   was something PowerPlan identified, or someone else?

11        A.    So going back to that time frame, the

12   innovation investment we were making was in a

13   different platform, and so we did acknowledge that

14   we needed to do more, and put more investment into

15   the classic platform, which was what many of our

16   customers were using at that time.

17        Q.    So if PowerPlan was spending money on a new

18   platform, was it just a cloud-based platform, or was

19   it something else?

20        A.    That's correct.  It was a cloud-based

21   platform.

22        Q.    So trying to paraphrase or summarize what

23   you're testifying to, it's that PowerPlan was trying

24   to develop now technology, and not investing in the

25   technology that its customers was -- were using at

1      the time sufficiently?

2          A.   It's -- we were needing to invest more in

3      the classic technology, and have more balance

4      between the investment and classic as well as the

5      new platform.

6          Q.   And PowerPlan also had an employee retention

7      and leadership issue in 2019; is that correct?

8          A.   Can you clarify your question?

9          Q.   Well, one of the weaknesses is innovation

10     technology and delivery.

11         A.   Mm-hmm (affirmative).

12         Q.   What information do you have about that

13     weakness from 2019?

14         A.   So the technology innovation weakness, I

15     think I just explained.

16         Q.   Right.

17         A.   The delivery would be around that new

18     technology, and bringing the new technology to

19     market.

20         Q.   Do you have any information about the

21     weakness listed that says no clear strategy?

22         A.   I do.

23         Q.   And what do you have about that?

24         A.   So at the time the strategy of the company

25     was based on rapid expansion into as many markets as

1    we could possibly capture with the efficacy of the

2    software platforms that we had.

3            And so for the customers that were present

4    at this event, and as we -- as we as an executive

5    team looked at where PowerPlan was, we felt that we

6    needed to do a better job of articulating the

7    strategy that would continue to differentiate us.

8        Q.   Do you have any information about the

9    weakness listed here for employee retention and

10   leadership?

11       A.   I do.

12       Q.   And what information do you have about that?

13       A.   So the employee retention situation in 2019

14   was a difficult one.  It's my understanding that

15   PowerPlan historically, the retention has been a

16   challenge, and it was in 2019 as well.  That's what

17   I know.

18       Q.   Were there any particular employees who left

19   the company that were notably valuable to customers

20   and the software?

21           MR. FAZIO:  Objection to form.

22   BY MR. ALLOY:

23       Q.   Yeah.  Let me ask that in a better way.

24       A.   Okay.

25       Q.   So employee retention is listed as a

1    weakness?

2         A.    Right.

3         Q.    Who around in 2018, or 2019, or even 2017

4    left PowerPlan that created an issue with employee

5    retention and leadership?

6         A.    I couldn't give you specific names given of

7    when I joined in 2019.  It was more of a general

8    theme for us, the percentage, if you will, of

9    attrition versus our employee base was higher than

10   where we would like it to be.

11        Q.    Under threats the final point says:

12   Competitive landscape.

13             Do you have any information as to why

14   competitive landscape was listed as a threat?

15        A.    Yes.

16        Q.    And what information do you have about that?

17        A.    So we consider the competitive landscape to

18   be pretty significant for us.  Probably the biggest

19   competitive threat that we face today is from ███

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████████████

1

2

3      Q.   Do you have -- do you know if PowerPlan has

4  any agreements with SAP or Oracle?

5      A.   My understanding is we have an agreement

6  with SAP surrounding an integration component with

7  SAP's ECC platform and S/4HANA.  I'm not aware of

8  any agreements we have with Oracle besides we're a

9  customer of Oracle's in using their software.

10     Q.   What is your understanding at a high level

11  as to what the agreement is with SAP to be able to

12  integrate?  What does that mean?

13     A.   So we -- my understanding is for the

14  integration component -- at one time we were

15  actually -- our integration component had us as a

16  reseller of some pieces of the SAP software.  But I

17  do not know if that's still the case today, or if

18  it's required for us to sell and implement that

19  component.

20     Q.   Do you have an understanding that PowerPlan,

21  to get data for its customers, would extract data

22  from SAP software?

23     A.   That's correct.  SAP would be an integration

24  into PowerPlan.

25     Q.   And is it your understanding that PowerPlan

1    has an agreement with SAP to be able to do that?

2           MR. FAZIO:  Objection to form, foundation.

3       A.   The -- yeah, can you clarify your question

4    for me, if you don't mind?

5    BY MR. ALLOY:

6       Q.   Sure.  Does PowerPlan have an agreement with

7    SAP to be able to obtain data out of the SAP

8    platform for any of its customers?

9       A.   I do not believe that we have an agreement

10   of that sort.

11      Q.   Does PowerPlan have any agreement with

12   Oracle to extract data out of the Oracle software

13   for its -- for PowerPlan's customers?

14      A.   I'm not aware of any agreement like that.

15      Q.   Is there a list at PowerPlan of who has

16   served on the customer advisory board each year?

17      A.   I believe we have one, yes.

18         (Plaintiff's Exhibit P-3 marked.)

19   BY MR. ALLOY:

20      Q.   I'm showing you what I have marked as

21   Plaintiff's Exhibit No. 3.  This is a document or

22   page produced by Roper Technologies.  You're

23   familiar with Plaintiff's Exhibit 3?

24      A.   I do not believe that I am.

25      Q.   In the top right it has this Customer-Sales.

1      And then the title of this page is Sales

2      Observations.

3            Do you know if PowerPlan, or Roper, or

4      anyone else was doing some review of PowerPlan in

5      which, you know, sales were being observed and the

6      strengths and challenges were being determined?

7            MR. FAZIO:  Objection to form, foundation.

8      A.    I would say that that type of review is

9      constantly underway as a part of the way we run our

10     business, not necessarily for Roper, but the way we

11     evaluate our business and the trajectory of it.

12           I can't say how this document was produced,

13     or if it was part of that.

14     BY MR. ALLOY:

15     Q.    The first challenge listed here is:  Lack of

16     product innovation and road map have been barriers

17     to performance and pipeline development.

18           Do you have information about that being a

19     challenge for sales?

20     A.    So I think it ties back to the other

21     question that we discussed where we were investing,

22     you know, was into a new platform, and back to the

23     delivery point we hadn't brought that new platform

24     to market.

25           And so our customers were, you know,

1    expecting that new platform.  And so and, you know,

2    as we went through the delivery process of bringing

3    it to market there was a period in which, you know,

4    the customers were awaiting that platform to invest

5    further with us.

6                (Plaintiff's Exhibit P-4 marked.)

7    BY MR. ALLOY:

8        Q.    I'm handing you what has been marked as

9    Plaintiff's Exhibit No. 4.

10               It's a similar document.  In the top right

11   it has Growth, Product & Development, and has a

12   title of Product & Development 60 Days.

13               Have you seen Plaintiff's Exhibit 4 prior to

14   today?

15       A.    This, I believe I have.

16       Q.    And is this something you would have worked

17   on?

18       A.    I would not have worked on this particular

19   section of the document.

20       Q.    So the Anti-Patterns with the trademark

21   indicator on the top right, do you have an

22   understanding as to whether that's a PowerPlan mark,

23   or somebody else?

24       A.    My understanding is it was done in jest.

25       Q.    Okay.  What do you understand an

1    anti-pattern to be?

2         A.   I really don't understand it, quite frankly.

3         Q.   Do you know who came up with that?

4         A.   I believe it was our chief technology

5    officer Neal Tisdale.

6         Q.   Do you believe that he would have been part

7    of, or that he would have helped list these items

8    under the Anti-Patterns?

9         A.   Yes.

10        Q.   Did he ever explain the second bullet:

11   Execution, Feature death march, lack of

12   maintenance and technical investment,

13   overscheduled sprints and releases.  Immature

14   agile practices, and superstitious behaviors?

15        A.   I am sure he did.

16        Q.   Do you remember anything he said about it?

17        A.   Not directly, no.

18        Q.   Do you have any understanding of what the

19   "feature death march" is?

20        A.   No, I don't.

21        Q.   Would it refresh your recollection if a

22   feature death march was:  Still pressing forward

23   with certain features that are failing?

24             MR. FAZIO:  Objection to form.

25        A.   I don't think -- no, that wouldn't -- that

1      wouldn't refresh my recollection.

2      BY MR. ALLOY:

3          Q.   In 2019 and 2020 were customers of

4      PowerPlan's clearly dissatisfied with PowerPlan?

5          A.   Can you clarify your question for me,

6      please?

7          Q.   Did you have an understanding that in 2019

8      and 2020 PowerPlan's customers were dissatisfied

9      with the PowerPlan product?

10         A.   No.

11              (Plaintiff's Exhibit P-5 marked.)

12     BY MR. ALLOY:

13         Q.   Handing you what's been marked as

14     Plaintiff's Exhibit 5, a document produced by Roper

15     Technologies titled:  Customer Dissatisfaction

16     Clear; Can Be Regained with Delivery of Product

17     Enhancements & Integration.

18              Have you seen this document before today?

19         A.   I have.

20         Q.   And do you know who drafted it?

21         A.   My understanding is, given the Stax logo on

22     the right-hand side, that this came from an external

23     market research firm.

24         Q.   Named Stax?

25         A.   I believe so, yes.

1           Q.    Is that a firm that PowerPlan hired to do
2      market research?
3           A.    That's correct.
4           Q.    When did PowerPlan hire Stax?
5           A.    That is a great question.  So I think this
6      started in 2019, and probably culminated in the
7      beginning of 2020.
8           Q.    Did you work with anybody from Stax?
9           A.    I was a part of the team that engaged with
10      Stax in the definition of their engagement for us,
11      and would have received readouts along the way.
12           Q.    Was there some type of final report provided
13      by Stax to PowerPlan?
14           A.    Yes, there would have been.
15           Q.    So do you disagree with the first part of
16      the title of the slide, that customer
17      dissatisfaction is clear?
18           A.    No.  I don't disagree with it, but I believe
19      there is nuances to it.
20           Q.    What do you think those nuances are?
21           A.    So I would say that the question you asked
22      around the dissatisfaction with the current product,
23      I believe that we've received significant positive
24      feedback as well.  And so we try to stay close to
25      our customers and in, you know, taking their

1      feedback apply it to continue to get better at what
2      we do.
3                  And so, you know, I wouldn't dispute that
4      the feedback that came from the Stax research would
5      be that we had displeased customers, but I also know
6      that we have customers that are very pleased with
7      the work that we do.
8          Q.   Did Stax provide any documents to PowerPlan
9      indicating that customers overall were pleased with
10     the product?
11         A.   I don't recall, actually.
12         Q.   Do you know who at Stax led that market
13     research assignment?
14         A.   I do not.
15         Q.   And who at PowerPlan primarily worked with
16     Stax, to your recollection?
17         A.   It would have been Drea Toretti, who is our
18     vice-president of marketing.
19                  (Plaintiff's Exhibit P-6 marked.)
20     BY MR. ALLOY:
21         Q.   I'm going to hand you what I have marked as
22     Plaintiff's Exhibit 6.
23                  Have you seen Plaintiff's Exhibit 6 prior to
24     today?
25         A.   Yes.

1          Q.   And do you have an understanding that this

2     is related to the Stax market research, or is this

3     something else?

4          A.   I do not believe that this was from -- well,

5     this would have, based on the logo on the left-hand

6     side, and the Stax research, I believe that this was

7     bringing together research from two different firms

8     as a part of the same process that we were following

9     in 2019.

10         Q.   OC&C is a strategy consulting firm engaged

11    by PowerPlan?

12         A.   That's my understanding, yes.

13         Q.   Did you work with them at all?

14         A.   I believe I did as a part of this effort in

15    2019.

16         Q.   Have any other consulting firms been hired

17    by PowerPlan since you've been employed by the

18    company?

19         A.   Yes.

20         Q.   What other firms?

21         A.   Well, I mean, I have an engagement going

22    right now with a firm by the name of Adonis

23    Partners, but it's not related to strategy.

24         Q.   What is it related to?

25         A.   It's related to process improvement within

1    our services business.

2         Q.   And do you have an understanding as to what

3    appears to be second half 2020 market research, this

4    is information from both OC&C and Stax?

5         A.   That's my understanding.

6         Q.   And then the first bullet under Observation

7    says:  Customer dissatisfaction highlighted.  Trust

8    can be rebuilt with enhancements and delivery of

9    core suites.

10             Do you have any other information that you

11   haven't testified to already about customer

12   dissatisfaction related to this first bullet point?

13        A.   No.

14        Q.   So, given what we've observed in the

15   documents, weaknesses of outdated technology and

16   difficult to use and implement, lack of product

17   innovation, customer dissatisfaction clear, how has

18   PowerPlan kept its customers?

19        A.   Well, we've focused ourselves on having an

20   intimate relationship with those customers, on

21   understanding their needs, and we have -- as I

22   mentioned to you in 2020, the beginning of 2020, we

23   have reset our strategy with a focus on the core

24   energy markets.

25             And we have directed our innovation towards

1      those core energy markets, and we've, you know, made

2      improvements in our services model as well, based on

3      their feedback, to focus on their success as part of

4      the process.

5          Q.    Isn't it true that the primary reason

6      PowerPlan has been able to keep its customers is

7      because it has no direct multi-product competitor?

8          A.    No.

9          Q.    Is it true that PowerPlan has no direct

10     multi-product competitor?

11         A.    I don't believe so.

12         Q.    Who do you understand to be a direct

13     multi-product competitor of PowerPlan?

14         A.    Can you define multi-product more clearly

15     for me, please?

16                (Plaintiff's Exhibit P-7 marked.)

17     BY MR. ALLOY:

18         Q.    Let me hand you what I have marked as

19     Plaintiff's Exhibit 7.

20                This is a document produced by Roper

21     Technologies titled No Direct, Multi-Product

22     Competitor.

23                Have you seen this page or printout before?

24         A.    I do not believe that I have.

25         Q.    In addition to indicating "No Direct

1     Multi-Product Competitor," this slide states:

2     "PowerPlan's comprehensive CPM platform is unmatched

3     in the market."

4          So, first, you would disagree that there is

5     no direct multi-product competitor; correct?

6       A.   I -- well, I think it depends on how you

7     define it.  That's why I asked for the clarification

8     of the question.

9       Q.   Well, this internal document from Roper,

10    and/or PowerPlan indicates there is no direct

11    multi-product competitor, so.

12         MR. FAZIO:  Objection to form, foundation.

13    BY MR. ALLOY:

14       Q.   Do you understand how the company defines

15    it?

16       A.   So the point that I would want to clarify is

17    CPM, in this document, as I understand it, because

18    I've seen that acronym before, refers to corporate

19    performance management.  And that was a pre new

20    strategy launch designation that PowerPlan was using

21    in the way its products would be applied to the

22    market.  And that is no longer a designation of

23    ours.  So I think we would need to think differently

24    about your question to that.

25       Q.   All right.  So back when the product was

1         referred to as a CPM platform, did PowerPlan have

2         any direct multi-product competitor?

3              A.    I don't know.

4              Q.    Is there any competitor, to your knowledge,

5         who has a product that includes lease accounting,

6         property tax, income tax, fixed asset compliance,

7         rate case and ROE management, asset investment

8         optimization, project portfolio management and

9         capital planning and forecasting modules?

10             A.    So there are elements of many of those

11        inside the ERP solutions that our customers use

12        today with Oracle and SAP.

13             Q.    Do either Oracle or SAP have all of those

14        modules, to your knowledge?

15             A.    So to clarify your question, and to clarify,

16        I guess, my response, these are very high-level

17        categories, and so I think to answer the question we

18        would need to go into more detail around them.  And

19        so I -- and, unfortunately, I'm not an expert in

20        this area, so I couldn't tell you exactly which

21        pieces that Oracle or SAP had versus did not.

22             Q.    Let's talk a little bit about your position

23        as chief customer officer.

24             A.    Sure.

25             Q.    Do you report to the CEO?

1      A.    Yes.

2      Q.    And who is the CEO?

3      A.    Joe Gomes.

4      Q.    Have you ever worked for a Roper

5   Technologies company prior to PowerPlan?

6      A.    No.

7      Q.    How did the opportunity arise for you to

8   work with PowerPlan?

9      A.    Joe and I had worked together in a previous

10   company, and when he became the CEO of PowerPlan, he

11   realized there was a need to drive more of a focus

12   or customer success as well as to, you know, help

13   improve the service delivery that PowerPlan had.

14   And so that was where the opportunity came from that

15   I pursued.

16      Q.    What was the company that you both worked

17   at?

18      A.    MedAssets.

19      Q.    What was your position there?

20      A.    I held multiple roles there.  My final role

21   there was senior vice-president of product support,

22   and at that time the name of the company was

23   nThrive.

24      Q.    What was Mr. Gomes' position?

25      A.    So we only worked together for a year, and

1        that was my first year at the company.  And he ran

2        ostensibly what was the services organization for

3        the technology business at MedAssets.

4             Q.    When Mr. Gomes told you about the

5        opportunity at PowerPlan, did he tell you that

6        PowerPlan was having certain issues that required

7        someone like you and a chief customer officer?

8             A.    He did.

9             Q.    And what did he describe those issues to be?

10            A.    The points that I mentioned to you earlier

11       on needing to put the customer at the center of

12       everything that we did, and, you know, at the time

13       as well, the elements of the services organization

14       were distributed across different teams within

15       PowerPlan.  And it was the intention to bring them

16       together under one umbrella so that we could focus

17       on improving the customer experience in the service

18       process.

19                  (Plaintiff's Exhibit P-8 marked.)

20       BY MR. ALLOY:

21            Q.    I'm handing you what I have marked as

22       Plaintiff's Exhibit 8.

23                  I'll represent to you this is a printout of

24       your LinkedIn profile.

25            A.    Okay.

1          Q.    Your picture doesn't appear, but --

2          A.    Right.

3          Q.    -- this is what it printed as.

4          A.    Sure.

5          Q.    Does this look like your LinkedIn profile?

6          A.    It does.

7          Q.    So on the second page, you've already

8     testified a little bit about what you did at

9     nThrive, and you were senior vice-president of both

10    technology support and implementation services.

11    Were those at all like software related?

12         A.    They were.

13         Q.    Okay.  But and did you actually work on

14    software?

15         A.    I did not.  I led the organizations that --

16    in the first role with MedAssets and ultimately

17    nThrive, the teams planned and designed and

18    implemented the SaaS-based software for the

19    healthcare industry.  And then in the second role I

20    was responsible for the teams that provided post

21    implementation support for the software.

22         Q.    Would you ever -- have you ever worked on

23    software code?

24         A.    I have.  But it was much, much earlier in my

25    career.

1      Q.   Do you have -- I mean, I see you graduated

2      from Georgia Tech with a BS in management, and then

3      Georgia State with an MBA.

4      A.   Mm-hmm (affirmative).

5      Q.   Did you ever get any education in computer

6      science or anything related?

7      A.   I did.   I did.   I actually have a minor in

8      computer science from Georgia Tech.   At the time it

9      was a certificate.   It's not listed here, of course,

10      but.

11      Q.   Have you ever worked on PowerPlan software

12      code?

13      A.   No.

14      Q.   Have you ever worked on actual

15      implementation of PowerPlan for a customer?

16      A.   No.

17      Q.   Have you ever used the PowerPlan product?

18      A.   I have never used the product, but I've seen

19      it used.

20      Q.   So you've never gone into the PowerPlan

21      product to, for example, try to execute some kind

22      of -- run something on the software to produce

23      information?

24      A.   No.

25      Q.   Have you ever seen a customer try to use the

1   product, or have a customer show you trying to use a

2   product and the product not working?

3       A.   No, I've not ever seen that.

4       Q.   Have you ever been on a call or a Zoom or

5   present with a customer observing a customer use the

6   PowerPlan product?

7       A.   I have seen them use it.

8       Q.   And what customer would that be?

9       A.   So my understanding is I have seen the FP&L

10  team use the software.  I have -- trying to think

11  back.  I don't want to misrepresent here.  I am sure

12  I've seen it.  I just can't recall --

13      Q.   All right.  FP&L --

14      A.   -- the exact customers.

15      Q.   I'm sorry.  I don't want to interrupt you.

16      A.   No, no, no, that's fine.

17      Q.   FP&L is also NextEra; correct?

18      A.   That's correct.

19      Q.   Was it your understanding that FP&L NextEra

20  was showing you the PowerPlan software because it

21  was having issues with the software?

22      A.   There was an instance of issues with our

23  property tax software, and they have shown -- I have

24  seen them, and I've seen the performance issue that

25  they were having with it.

 1          Q.    Was the issue like slow loading --

 2          A.    Yes.

 3          Q.    -- or was it --

 4          A.    That's it.

 5          Q.    Any other issues that you recall with FP&L

 6      and NextEra?

 7          A.    No.

 8          Q.    Or at least for that software?

 9          A.    For that specific, no.

10          Q.    I know there are other issues we'll get to

11      later.

12          A.    Yeah.

13          Q.    Is it your role as chief customer officer to

14      oversee implementation?

15          A.    It is.

16          Q.    Is it fair to say your role in overseeing it

17      is kind of overseeing the process but not getting

18      into the weeds of like how it actually works?

19          A.    Not necessarily.  I would say I do oversee

20      the process, but at times when a problem can't

21      necessarily be solved by the team that's

22      implementing it, if they require help, sometimes I

23      will be engaged in that process to help find the

24      right resources to help.

25          Q.    Sure.  And it would be more of your role as

1      chief customer officer to make sure that the client

2      gets the right technical resources at PowerPlan, and

3      most likely that's not you as the technical person?

4          A.   That's correct.

5          Q.   Have you ever testified before?

6          A.   First time.

7          Q.   You're not an economist; right?

8          A.   Not an economist.

9          Q.   Not an accountant?

10         A.   Well, so I have an MBA in finance from

11     Georgia State.  I'm not a certified accountant.

12         Q.   Do you have any certifications or licenses?

13         A.   I do not.

14         Q.   You're not a lawyer; right?

15         A.   I am not a lawyer.

16         Q.   You've never worked at an investor-owned

17     utility; correct?

18         A.   I have not.

19         Q.   Have you ever studied the tax laws related

20     to the investor-owned utilities?

21         A.   I have not.

22         Q.   Have you ever consulted outside of your role

23     at chief customer officer for an investor-owned

24     utility?

25         A.   I have not.

1      Q.   Have you ever been trained on PowerPlan
2  software?
3      A.   I have had demonstrations and very
4  high-level training of a number of the PowerPlan
5  modules.
6      Q.   Do you have access to PowerPlan software
7  such that you can go in and see how it works on your
8  own?
9      A.   No.
10     Q.   In your position do you have any specific
11 duties or responsibilities related to Lucasys?
12     A.   I do not.
13     Q.   Do you know if anyone at PowerPlan does?
14     A.   I do not.
15     Q.   Who led the effort to contact PowerPlan's
16 customers about Lucasys?
17          MR. FAZIO:   Objection to form.
18     Foundation.
19 BY MR. ALLOY:
20     Q.   That's what I'm trying to find out.
21     A.   Can you clarify your question for me?
22     Q.   Sure.   I mean, PowerPlan contacted its
23 customers about Lucasys; right?
24     A.   Mm-hmm (affirmative).
25     Q.   You have to answer yes or no for the court

1           reporter.

2                A.   Yes, yes.

3                Q.   Was there someone in charge of that effort?

4                A.   It was a joint effort that was conducted

5           with our legal counsel, and you know, I was the

6           primary contacter, if you will, and my name was on

7           the letter.  But the approach that we took in

8           contacting our customers -- and I would clarify,

9           too, it wasn't that Lucasys was a part of

10          communication to our customers, but the

11          communication was really around confidential

12          information and the protection of confidential

13          information, and reminding our customers of their,

14          you know, obligations based on our license agreement

15          on that front.

16               Q.   Has PowerPlan had any communications with

17          its customers about concerns with any other company

18          besides Lucasys specifically?

19               A.   Not that I'm aware of, no.

20                    MR. ALLOY:  I didn't know if you wanted a

21               break.

22                    MR. FAZIO:  No, I'm sorry.  I was just

23               getting a phone call.  Sorry.  Do you need a

24               break?

25                    THE WITNESS:  Maybe when we get to a

1          natural stopping point, that would be great.
2     BY MR. ALLOY:
3          Q.    Who reports to you?
4          A.    So the leader of our professional services
5     business reports to me.
6          Q.    Who is that?
7          A.    So that position is currently vacant.
8     However, we've just hired a new team member that
9     will be joining us at the end of December.
10          Q.    Who was the prior leader?
11          A.    His name was Skip Fowler.
12          Q.    Did he leave voluntarily?
13          A.    He did.
14          Q.    And where is he employed now?
15          A.    I believe the name of the company is PTC.
16          Q.    Is that located in Georgia?
17          A.    I believe it's located here in Atlanta.
18          Q.    And who else reports to you?
19          A.    Leader of our support organization, Aimee
20     Griffin, our customer success organization leader
21     Kim Pearch.  And then we have a portfolio management
22     leader in Matt O'Meara.
23               And with the vacant position of the
24     professional services leadership role I have the
25     professional services leadership team reporting

1      directly to me right now as well in the interim.

2           Q.   On the PowerPlan website, which I -- at

3      least I suspect you're generally familiar with, on

4      the leadership Mr. Gomes is listed first, and then

5      you're listed second.

6                Is that also the structure of the

7      organization in that you are second in charge?

8           A.   I wouldn't say that, no.  I don't believe

9      there is any particular reason in the order of the

10     leaders on our website.

11          Q.   And you've -- I think you've testified to

12     this before, but you only report to Mr. Gomes;

13     correct?

14          A.   That's correct.

15          Q.   When did Jamie Carr leave PowerPlan?

16          A.   I believe Jamie left late summer, early fall

17     of this year.

18          Q.   Do you know if that was voluntary?

19          A.   It was not voluntary.

20          Q.   What did you understand the issue to be with

21     Mr. Carr?

22          A.   I do not know the specifics of his

23     termination.

24          Q.   What do you generally know about it?

25          A.   I don't know anything specifically about the

1    termination in general.  I only know about my

2    relationship with Jamie and the work we had done

3    together.

4         Q.   Do you know if there were issues with

5    Mr. Carr's work?

6              MR. FAZIO:  Objection to form.

7         A.   It -- can you define "work?"

8    BY MR. ALLOY:

9         Q.   He was -- he left involuntarily, so I

10   presume there was some dissatisfaction with his

11   performance in his job.  Do you have any knowledge

12   about that?

13        A.   Like I said, I don't really know the

14   specifics of his termination.

15        Q.   Right.  And I know you're saying specifics.

16   I'm just asking if you have any knowledge at all,

17   have you had any interaction with anyone at

18   PowerPlan who indicated they were dissatisfied with

19   Mr. Carr?

20        A.   So I can tell you of my time in working with

21   Jamie.

22        Q.   Let's start there.

23        A.   Yeah.  So in my time with working with

24   Jamie, I'm not aware of any issues with quality of

25   work.  But from a relationship and interpersonal

1      perspective, sometimes there were difficulties

2      there.

3          Q.   Have you had communications with anyone else

4      at PowerPlan who were dissatisfied with Mr. Carr's

5      performance, or working with Mr. Carr?

6          A.   From a communication and relationship

7      perspective, there were others inside PowerPlan that

8      had the same experiences that I did.

9          Q.   Who do you understand that to be?

10         A.   So I mean, his direct manager was aware of

11     it.  I believe our CEO Joe was aware of it.  We had

12     others within my organization in the services

13     organization that were aware of it.  Skip would have

14     been one of those team members that would have had,

15     you know, interpersonal communication challenges.

16         Q.   Skip, what's his last name?

17         A.   Skip Fowler.

18         Q.   And who was Mr. Carr's direct manager?

19         A.   His direct manager would have been Jim

20     Dahlby.

21         Q.   Have you talked with Mr. Carr since he left

22     PowerPlan?

23         A.   I have not.

24         Q.   Do you know if he's employed somewhere else?

25         A.   I do not.

1          Q.    Lydia Olu-Harding.  Do you know if she goes

2     by Ms. Olu-Harding, or Ms. Harding?

3          A.    It's Olu-Harding.

4          Q.    Olu-Harding?

5          A.    That's right.

6          Q.    All right.  Did she leave PowerPlan in April

7     of 2021?

8          A.    She did.

9          Q.    Was that voluntarily?

10         A.    It was.

11         Q.    Did she communicate to you why she was

12    leaving PowerPlan?

13         A.    She moved on to an opportunity where she had

14    the chance to work directly for the CEO of a

15    smaller, generally, growing and startup company.

16         Q.    Have you talked with her since she left

17    PowerPlan?

18         A.    I have not.

19         Q.    Are you aware of any employee at PowerPlan

20    ever communicating that any PowerPlan product did

21    not have competition?

22         A.    Not that I can recall.

23         Q.    Are you aware of any communications from

24    anyone at PowerPlan referring to PowerPlan having a

25    monopoly?

1            A.   No.
2            Q.   Are you aware of any employee or anyone else
3       affiliated with PowerPlan who's reported anything
4       about PowerPlan to a government agency including the
5       Securities Exchange Commission, or the Federal Trade
6       Commission?
7            A.   Not that I'm aware of, no.
8                 MR. ALLOY:  Let's go ahead and take that
9            break.
10                THE WITNESS:  All right.
11                THE VIDEOGRAPHER:  Going off video record
12           at 10:14 a.m.
13                (Recess 10:14 a.m. - 10:31 a.m.)
14                THE VIDEOGRAPHER:  Now back on video
15           record at 10:31 a.m.  This is the beginning of
16           Video Media File No. 2.
17      BY MR. ALLOY:
18           Q.   All right.  Mr. Bertz, we're back from a
19      break.  A few followup questions from earlier.
20                First, you mentioned there is a consulting
21      firm that you're currently working with.  I think it
22      was Adonis?
23           A.   That's correct.
24           Q.   Is PowerPlan, to your knowledge, currently
25      working with any other consulting firms?

1          A.    Not that I'm aware of.

2          Q.    All right.  If you would turn to Exhibit 1,

3     which I think you have in front of you.  Is there

4     any information in Exhibit No. 1 that you would

5     consider to be a trade secret?

6          MR. FAZIO:  Objection to form, calls for a

7          legal conclusion.

8     BY MR. ALLOY:

9          Q.    Do you have an understanding -- go ahead.

10    You can answer.

11         A.    I would say no.

12         Q.    Is there any information on Exhibit No. 1

13    that is highly sensitive business or personal

14    information the disclosure of which is likely to

15    cause significant harm to PowerPlan?

16         A.    Yes.

17         Q.    And what type of information is that?

18         A.    The fact that some of the customers are our

19    customers.  If we don't have agreement from those

20    customers to share that they are our customers

21    externally, then that could cause significant harm

22    to us and the relationship.

23         Q.    Are PowerPlan's customers public

24    information, or I should say available to the

25    public?

1          A.   Not all of them are, no.  Our references

2     are, but those who haven't agreed to be references

3     would not normally be available to the public.

4          Q.   Let's turn to Exhibit 2.  Is there any

5     information, to your understanding, on Exhibit 2

6     that would be a trade secret?

7          A.   Can you define trade secret for me, please?

8          Q.   Well, what's your understanding of trade

9     secret?

10          A.   My definition of trade secret would be --

11     and it admittedly is not going to be a legal

12     definition, so I would say something that is --

13     could potentially be used by PowerPlan as a

14     competitive differentiator perhaps, or it, you know,

15     could be used by third parties to differentiate a

16     product or a service in their business.

17          Q.   All right.  Using that definition, is there

18     anything on Plaintiff's 2 that you would consider to

19     be a trade secret?

20          A.   Yes.

21          Q.   Okay.  What is that?

22          A.   So I think in the weaknesses area, you know,

23     if a third party were to have access to this, and,

24     you know, could potentially think about, all right,

25     well, you know, for technology innovation and

1    delivery, or employee retention and leadership how

2    might I take advantage of the fact that in 2019 when

3    this was produced PowerPlan has an employee

4    attrition challenge?

5         And then in the opportunities scenario where

6    we're talking about how we, you know, might

7    potentially capitalize on those opportunities, if

8    this document were to be provided to, you know,

9    another company they could potentially pursue those

10   opportunities.  And they may not have knowledge of

11   them.  They may choose to pursue them based on us

12   stating that our customers are telling us it's an

13   opportunity.

14        Q.   Now, it's your position from your earlier

15   testimony that currently none of these weaknesses

16   are weaknesses; correct?

17        MR. FAZIO:  Objection to form.  Go ahead.

18        A.   Yeah.  I don't think I testified that they

19   weren't weaknesses in totality.  I mean, we -- it

20   says here on the page, and I would agree, that these

21   are things that we need to continue to improve.

22        So, yeah, I mean, I believe that we have

23   opportunities for improvement across not clear

24   strategy, but certainly in some of these other areas

25   we have opportunities for improvement.

 1       BY MR. ALLOY:

 2             Q.    That includes the outdated technology and

 3       difficult to use and implement?

 4             A.    So we continue to improve in the innovation

 5       that we're delivering, and so the technology itself

 6       continues to improve and we will continue to

 7       innovate.

 8             Q.    And what is your concern if a competitor saw

 9       that you had a slide that said outdated technology

10       and difficult to use and implement?

11             A.    Again, I didn't point that out and say that

12       I would consider that to be a trade secret.

13             Q.    Okay.  Would you consider that something to

14       -- highly likely to cause significant harm to

15       PowerPlan if Lucasys was to see that bullet point?

16             A.    No.

17             Q.    Is there anything on Plaintiff's 2 that

18       would cause PowerPlan, in your view, significant

19       harm if Lucasys was to see it?

20             A.    So the mid-market and turn-key

21       implementation could potentially be harmful for us.

22                   You know, expansion into the strategic

23       systems integrator channel could be potentially

24       harmful for us.

25                   You know, thinking about the employee

1    retention area, that could be harmful for us as

2    well.  Those are just several examples.

3         Q.    Anything else you see on here that you

4    believe would be harmful if Lucasys saw it?

5         A.    Nothing that jumps out at me, no.

6               Well, perhaps the prepackage and best

7    practice, actually, thinking about that.

8         Q.    What does that mean?

9         A.    It means taking the best practices that we

10   have implemented for our customers and structuring

11   our service delivery, and, quite honestly, the way

12   we package our software to deliver those best

13   practices.

14        Q.    On the -- going back to Plaintiff's

15   Exhibit 1, outside of your testimony earlier that

16   customers may not want to be identified as using

17   PowerPlan, is there anything on Plaintiff's

18   Exhibit 1 that would be harmful to PowerPlan if it

19   were shown to Lucasys?

20        A.    Yes.

21        Q.    And what is that?

22        A.    Given that Lucasys is marketing itself as a

23   competitive software provider, for us to provide the

24   logos of our customers to a competitive software

25   provider would give them an opportunity to, you

1    know, target those specific customers for, you know,

2    potential competitive threats.

3         Q.   Doesn't PowerPlan market that it has the top

4    U.S. utilities as customers?

5         A.   We do.

6         Q.   So what harm would it be if Lucasys saw the

7    -- that PowerPlan had 20 of the top 20 U.S.

8    utilities?

9         A.   Well, so we're not at liberty to disclose

10   the fact that those customers are our customers,

11   unless they've given us the agreement to do so.

12        Q.   So is your point that PowerPlan just markets

13   that it has the top 20 U.S. utilities, but doesn't

14   name them?

15        A.   That's correct.  And the reason we don't

16   name them is because they don't allow us to name

17   them.

18        Q.   If you turn to Plaintiff's Exhibit 3.

19             Is there anything on Plaintiff's Exhibit 3

20   that you would consider a trade secret, using your

21   definition?

22        A.   No.

23        Q.   Is there anything on Plaintiff's 3 that

24   would be harmful to PowerPlan if Lucasys were to be

25   able to see it?

1      A.   Not that I can tell.

2      Q.   If you would, turn to Plaintiff's Exhibit 4.

3         Is there anything, to your knowledge, on

4 Plaintiff's Exhibit 4 that is a trade secret?

5      A.   No.

6      Q.   Is there anything on Plaintiff's 4 that you

7 believe would harm PowerPlan if it were shown to

8 Lucasys?

9      A.   No.

10     Q.   If you would turn to Plaintiff's Exhibit 5.

11 Is anything on Plaintiff's Exhibit 5 to your

12 understanding a trade secret of PowerPlan's?

13     A.   At a high level, the opportunity

14 internationally, as well as the needs or wants of

15 mid-market utilities, and the pricing level would

16 fall into that.

17     Q.   That it's a trade secret that PowerPlan

18 costs too much?

19        MR. FAZIO:  Objection to form.

20     A.   No.  They want PowerPlan.  But the pricing

21 of PowerPlan in that market historically has been

22 higher than what they were able to bear.

23 BY MR. ALLOY:

24     Q.   All right.  And just to be clear, you're

25 contending that's a trade secret, to your

1    understanding?

2    A.   So I'm contending that there was a desire on

3    the part of mid-market utilities to have PowerPlan's

4    capabilities as a trade secret.

5    Q.   Is there anything in Plaintiff's Exhibit 5

6    that you contend would be harmful to PowerPlan if it

7    were shown to Lucasys?

8    A.   You know, I do believe that the point that's

9    in the middle, and in the title, if you said

10    customer dissatisfaction is clear, that could be

11    harmful to PowerPlan if it were shown to a

12    competitor.

13    Q.   Would it be harmful if that were shown to

14    PowerPlan's customers?

15    A.   No.

16    Q.   And if you turn to Plaintiff's Exhibit 6.

17    Is there anything on Plaintiff's Exhibit 6

18    that you understand to be a trade secret of

19    PowerPlan?

20    A.   Forgive me, I'm going to read it here, if

21    you don't mind.

22    Q.   Mm-hmm (affirmative).

23    A.   Yes.

24    Q.   And what is that?

25    A.   That would be in the middle bottom where it

1    says:  Expand offering to business planning,

2    regulatory and FP&A.

3        Q.    Anything else?

4        A.    Yeah.  On the far left-hand side at the

5    bottom:  Focus on Large IOUs, U.S. Canada, retain

6    and acquire customers, improve core products,

7    accounting and tax.

8        Q.    Anything else on this slide?

9        A.    In the adjacency, the New Products

10   supporting:  AlO, Decision Support, Asset Management

11   could be harmful as well.

12       Q.    Okay.  I was asking about trade secrets, but

13   I guess your answer, just to be clear, is those are

14   the items that would be harmful to PowerPlan if they

15   were shown to Lucasys?

16       A.    Those are the items that would be harmful to

17   PowerPlan if they were shown to anyone that was a

18   competitor.

19       Q.    Anything else on this slide, just to make

20   sure we close the loop?

21       A.    "Oil & Gas has new product opportunities."

22   Companies adopting cloud solutions at different

23   paces."  The mid-market utility item again.

24   I think that's it.

25       Q.    If you would, turn to Plaintiff's 7.

1              Is there anything on Plaintiff's 7, to your

2      understanding, that would be a trade secret of

3      PowerPlan's?

4           A.   No.

5           Q.   Is there anything on Plaintiff's 7 that if

6      shown to Lucasys would be significantly harmful to

7      PowerPlan?

8           A.   No.

9           Q.   Plaintiff's Exhibit 8 is your LinkedIn

10      profile, and that's public; correct?

11           A.   That is public.

12              Can I go back to your question?  So just so

13      anywhere where there may be a customer statement if

14      that were shown to a third party, in particular if

15      the document where it was captured was intended to

16      be confidential, if that were shared with anyone

17      outside of PowerPlan, that could be harmful to

18      PowerPlan.

19           Q.   All right.  So that box at the bottom with

20      the VP of tax for Perkin Elmer, if that were shown

21      to Lucasys, that could be harmful to PowerPlan?

22           A.   Yes.

23           Q.   And Perkin Elmer is a customer of PowerPlan?

24           A.   I'm not familiar with that name, and so --

25      because I don't have all the history with the

1    document.  It's not a customer that I'm aware of.

2    But if their feedback was captured as part of the

3    production of the document, it could potentially be

4    harmful to PowerPlan.

5         Q.   How would it harm PowerPlan if they were to

6    see that?

7         A.   If they were -- if they were a customer at

8    the time.  I don't believe they're a customer today,

9    but if they were a customer at the time --

10        Q.   All right.

11        A.   -- it could be harmful.

12             (Plaintiff's Exhibit P-9 marked.)

13   BY MR. ALLOY:

14        Q.   All right.  I'm going to show you what I

15   have marked as Plaintiff's Exhibit 9 titled "Tier 1

16   Utilities Research Findings," which appears to be

17   from Stax.

18             MR. FAZIO:  I'm sorry.  Before you go on,

19        I just wanted to put on the record that

20        notwithstanding anything Mr. Bertz has to say

21        is his position as a fact witness.  We don't

22        waive any of the designations that we've made

23        this far, and we can deal with that

24        separately.

25             MR. ALLOY:  Okay.

1          BY MR. ALLOY:

2                Q.   Mr. Bertz, have you seen Plaintiff's

3          Exhibit 9 prior to today?

4                A.   I believe I have.

5                Q.   As part of the material that Stax has sent?

6                A.   I believe.

7                Q.   I know you know what I'm going to say, but

8          just for the record try to just let me finish, or

9          let me finish, please, and I'll try to do the same

10         because it gets difficult for the court reporter.

11               So just so the record is clear, you've seen

12         Plaintiff's Exhibit 9 prior to today; correct?

13               A.   Yes.

14               Q.   As part of the Stax material that was

15         provided to PowerPlan; right?

16               A.   Yes.

17               Q.   Is there anything on Plaintiff's Exhibit No.

18         9 that you understand to be a trade secret of

19         PowerPlan?

20               A.   I'll need to review it here.  So I think the

21         one area that I would say yes, it would be -- in the

22         trade secret area would be the integration, that

23         PowerPlan challenges to integrate across their own

24         products as well as some external data sources.  I

25         believe that could be a trade secret.

1       Q.   Anything in Plaintiff's Exhibit 9 that would

2   be significantly harmful to PowerPlan if shown to

3   Lucasys?

4       A.   I think all of it.

5       Q.   And is that primarily because the

6   information on Exhibit 9 shows weaknesses of

7   PowerPlan?

8       MR. FAZIO:  Objection to form.

9       A.   No, it's because it's actually the input

10   into how we were going to form our strategy to

11   improve, and I think that's it.

12   BY MR. ALLOY:

13       Q.   So outside of the strategy to improve, for

14   example, the leftmost column, "many customers are

15   dissatisfied with PowerPlan today," and stating

16   there is a need to address it, I'm paraphrasing --

17       A.   Mm-hmm (affirmative).

18       Q.   -- and then certain issues, would it be --

19   would it cause significant harm to PowerPlan if

20   Lucasys were to see the information in Column 1?

21       A.   Yes.

22       Q.   And why is that?

23       A.   Well, it would -- I mean, give an

24   implication basically that, you know, that were

25   opportunities to, you know, kind of leverage that

1        information in pursuing, you know, additional

2        competitive opportunities inside those customers.

3             Q.   There are no customers listed here; correct?

4             A.   That's true.

5             Q.   And PowerPlan doesn't list its customers;

6        correct?

7             A.   That's correct.

8             Q.   So how would Lucasys know how to go to any

9        PowerPlan customers with this knowledge that

10       customers are dissatisfied?

11            A.   Because Lucasys also provides services to

12       existing PowerPlan customers today, and so they

13       would know, in some instances, those customers that

14       are PowerPlan customers.

15            Q.   But they can't tell, looking at this

16       document, which customers are dissatisfied; right?

17            A.   That's true.

18            Q.   And it's your contention that customer

19       satisfaction is much higher today than it was back

20       in 2018 and 2019; correct?

21            A.   That is true.

22                 (Plaintiff's Exhibit P-10 marked.)

23       BY MR. ALLOY:

24            Q.   Handing you what I have marked as

25       Plaintiff's Exhibit 10.

1              Have you seen Plaintiff's Exhibit 10 prior

2      to today?

3          A.   I believe I have, yes.

4          Q.   And what do you understand it to be?

5          A.   So I understand it to be a map of the

6      competitive landscape that PowerPlan faced when this

7      document was produced.  And I don't see a date on

8      it, but my understanding is this LEK research was

9      done a number of years ago.

10         Q.   Prior to Roper's acquisition of PowerPlan?

11         A.   Alongside that.  I believe it predates me

12     joining the company.

13         Q.   Do you know if any of the products listed

14     here are Oracle or SAP products?

15         A.   Not that I'm aware of, no.

16         Q.   Now, there is a second page also.

17         A.   Okay.

18         Q.   Just so you're aware.

19              Are any of those products Oracle or SAP?

20         A.   No.

21         Q.   Now, based on Plaintiff's Exhibit 10 for the

22     competitive landscape listed here, none of the

23     companies, or company products listed here, have all

24     the modules that PowerPlan has at the time of this

25     document; correct?

1          A.    Based on this, yes.

2          Q.    Do you understand that -- if any of these

3     companies currently have all the modules that

4     PowerPlan has?

5          A.    I do not.

6          Q.    Is any of the information on Plaintiff's

7     Exhibit 10 a trade secret of PowerPlan's?

8          A.    I don't believe so, no.

9          Q.    And would providing Exhibit 10 to Lucasys

10    cause significant harm in any way to PowerPlan?

11         A.    I don't believe so unless there was a

12    confidentiality requirement with LEK.

13         Q.    Do you believe that Lucasys is a competitor

14    of PowerPlan?

15         A.    I do.

16         Q.    In what ways?

17         A.    I believe that they are a competitor seeking

18    to develop competitive software solutions to those

19    that we offer to our customers.

20         Q.    Do you believe that Lucasys is a competitor

21    in the services area?

22         A.    I believe that they offer services on top of

23    the PowerPlan products, and they compete with our

24    professional services organization.

25         Q.    What software, if any, do you understand

1          Lucasys has that currently competes with PowerPlan?

2          A.   I'm not sure that they actually have

3     software that is ready to implement for customers

4     today.

5          Q.   So, to your knowledge, Lucasys is currently

6     unable to compete with PowerPlan on providing a

7     software product because, to your knowledge, there

8     isn't one in existence yet; correct?

9          A.   It's my understanding that they are

10    marketing themselves as having the software

11    solutions, but I haven't seen them.

12         Q.   And where do you get your understanding that

13    they are marketing that they have software

14    solutions?

15         A.   From their website, as well as from feedback

16    they received from attendants at at least one Edison

17    Electric Institute meeting where they were

18    presenting software to customers -- potential

19    customers.

20         Q.   And which customer are you referring to from

21    the EEI?

22         A.   So it would have been a group setting at the

23    Edison Electric Institute where it's my

24    understanding that Lucasys had an opportunity to

25    present software.  I was not there in person.  I

1     only heard about it.

2          Q.   Who from PowerPlan, to your understanding,

3     was there?

4          A.   My understanding was Jim Dahlby was there,

5     and he's the only one that I'm pretty confident was

6     there.  I'm pretty sure there were other attendees,

7     but I don't recall who exactly it was.

8          Q.   Was this a 2021 meeting?

9          A.   No.  I believe it was earlier than that.  I

10    believe it was perhaps 2019.

11         Q.   Before COVID?

12         A.   Exactly.

13         Q.   Do you have an understanding as to whether

14    Lucasys showed software during its presentation?

15         A.   That's my understanding, yes.

16         Q.   Has PowerPlan ever showed its software at an

17    EEI meeting?

18         A.   Not that since I have been here, I'm not

19    aware of when we had done that.

20         Q.   Do you believe Lucasys is a threat to

21    PowerPlan's business?

22         A.   I believe they are a competitor.

23         Q.   Do you believe they are potential threat to

24    the business?

25              MR. FAZIO:  Objection.

1            A.   As a competitor, yes.

2       BY MR. ALLOY:

3            Q.   And when you testify to that, you believe if

4       Lucasys is able to compete with its own software

5       product that they might be able to get current

6       PowerPlan customers to use that product?

7                 MR. FAZIO:   Objection to form.

8            A.   There is the potential for that.

9       BY MR. ALLOY:

10           Q.   That's a concern of PowerPlan's; correct?

11                MR. FAZIO:   Objection to form.

12           A.   Yes.

13      BY MR. ALLOY:

14           Q.   Who at PowerPlan has communicated that

15      concern?

16                MR. FAZIO:   Objection to form.

17           A.   Yeah, I think it's a -- it is a general

18      competitive threat that we have discussed as an

19      executive team.

20      BY MR. ALLOY:

21           Q.   Have there been meetings at PowerPlan to

22      discuss Lucasys?

23           A.   There have.

24           Q.   And who would be present for those meetings?

25           A.   It would be our executive team or a subset

1    of the executive team, and given the current

2    situation, it would have involved our legal counsel

3    as well.

4         Q.   Prior to the litigation were there meetings

5    at PowerPlan about Lucasys?

6         A.   There were.

7         Q.   And who would attend those meetings?

8         A.   The same group.  And legal counsel as well.

9         Q.   And who is the legal counsel who would

10   attend?

11        A.   Jonathan Sucher.

12        Q.   Does PowerPlan have any other in-house legal

13   counsel?

14        A.   No.  Well, Jonathan's team, he has an

15   additional, George McDonnell, who's on his team.

16        Q.   George McDonnell?

17        A.   Yeah, Donnell.

18        Q.   D-O-N-N-E-L?

19        A.   Yeah.  Two Ls.

20        Q.   How long has Mr. Donnell, or Donnell, been

21   with the company?

22        A.   They -- both Jonathan and George predate me.

23   I don't know how long they have been at PowerPlan.

24        Q.   How did you first learn that Lucasys was

25   competing, or attempting to compete with PowerPlan?

1          A.   It would have been through the same

2     interactions that came post the EEI meeting that

3     took place in 2019.

4               (Plaintiff's Exhibit P-11 marked.)

5     BY MR. ALLOY:

6          Q.   Handing you what I have marked as

7     Plaintiff's 11.  This is part of PowerPlan's Q-2019

8     operating package.  Have you seen documents like

9     this before?

10         A.   I have.

11         Q.   And are these documents that PowerPlan

12    prepares to give to its parent company Roper

13    Technologies?

14         A.   Yes.

15         Q.   And it does it on a quarterly basis, to your

16    understanding, to update Roper on the PowerPlan

17    business; correct?

18         A.   That's correct.

19         Q.   The second page of Plaintiff's 11 at the

20    bottom has Competitor/Market Conditions box, and at

21    the bottom it has:  Lucasys emerges as a competitive

22    threat.  It says Lucasys is a company founded by a

23    former PowerPlan employee who exited 2012 who's

24    attempting to replicate PowerPlan's PowerTax

25    solution in a Cloud Environment.  The company

1    launched a high-level demo of its tax products in Q2

2    of 2019.

3         Is this section of Plaintiff's Exhibit 11 in

4    referring to the high-level demo what you're

5    referring to as the EEI meeting?

6      A.    That's my understanding. I can't say for

7    sure if those two scenarios are exactly the same,

8    but it -- yes, it would have been around the same

9    time frame.

10      Q.    So prior to the litigation, or let me say

11    prior to the cease and desist letter October 30th of

12    2019, what actions did PowerPlan take when it found

13    out that Lucasys emerged as a competitive threat?

14      A.    None.

15      Q.    When did PowerPlan first -- roughly, first

16    start communicating with customers about Lucasys?

17      A.    It would have been in the fall of 2019.

18      Q.    And who made the ultimate decision to

19    communicate to PowerPlan customers about Lucasys?

20      A.    So it would have been an executive team

21    decision that would have involved the consultation

22    of our legal team.

23      Q.    And who was the legal team at the time?

24      A.    It would have been Jonathan.

25      Q.    Did PowerPlan consult with its outside

1    counsel at the time?

2           A.    My understanding is we did have --

3                 MR. FAZIO:  Objection.

4           A.    Oh, sorry.

5    BY MR. ALLOY:

6           Q.    And let me phrase the question this way.  I

7    don't want to know what was discussed.  I just want

8    to know if outside -- when outside counsel first got

9    involved with the Lucasys issue.

10          A.    I don't know.

11          Q.    In any question that I ask you today, I

12   don't want to know the substance of any

13   communications with counsel.  If there's any doubt

14   about that, you consult with your lawyer.  But

15   that's not the intention of any question.

16          A.    Okay.

17          Q.    So if you can answer any question without

18   information from your lawyers, that's what I'm

19   trying to get at in this deposition.

20                MR. FAZIO:  Thank you for that

21          clarification.

22                (Plaintiff's Exhibit P-12 marked.)

23   BY MR. ALLOY:

24          Q.    I'm handing you what I have marked as

25   Plaintiff's Exhibit 12.  This is part of the Q3 2019

1    operating package to Roper.  And on the second page

2    it has an update on Lucasys being a competitor.  And

3    this update indicates, in part, that:  Lucasys has

4    approached several of our customers in Q3.

5              What customers do you understand Lucasys

6    approached in Q3?

7        A.    Actually, so I am aware of work that Lucasys

8    was doing in Q3 on behalf of some customers, but I

9    don't specifically know which ones that they might

10   have approached around the software that they were

11   developing.

12       Q.    All right.  Who did you know Lucasys was

13   working with in Q3 of 2019?

14       A.    So around about that same time, we became

15   aware that Lucasys was working, performing

16   engagements, with the PowerPlan software on behalf

17   of NextEra Energy, FP&L, as well as American

18   Electric Power.

19       Q.    Are you familiar at a high level with what

20   was called the agreed process between PowerPlan and

21   Lucasys?

22       A.    At a high level.

23       Q.    I'll represent to you that the agreed

24   process started in December of 2019.  As you may

25   recall, just refresh your memory, PowerPlan sent a

1    demand letter to Lucasys in October 30th, 2019, and

2    then the agreed process after some talks with

3    lawyers started in December 2019.

4           First, did you get any information from

5    anyone about what was exchanged in the agreed

6    process between Lucasys and PowerPlan?

7        A.   No.

8        Q.   Who at PowerPlan approved the law firm

9    Nelson Mullins sending the cease and desist letter

10   in October of 2019 to Lucasys?

11       A.   I don't know.

12       Q.   Were you involved in that process?

13       A.   I was involved in the discussion of the

14   potential to take an action like that.  But I was

15   not involved in the final decision.

16       Q.   And you don't know who was involved in the

17   final decision?

18       A.   No, not specifically.

19       Q.   Have you had discussions with Mr. Gomes

20   about Lucasys?

21       A.   I have.

22       Q.   And what have you discussed about Lucasys?

23       A.   The discussions that --

24           MR. FAZIO:  Again, just consistent with

25       his admonition, he's not asking for anything

1          that would have involved conversation that

2          would have also involved counsel.

3                  THE WITNESS:  Oh.

4                  MR. FAZIO:  So --

5                  THE WITNESS:  Okay.

6                  MR. FAZIO:  -- with that.

7          A.   Yeah.  With that, my discussions with Joe

8     and with any of our executive team members around

9     Lucasys would have involved support from our legal

10    counsel as well.

11    BY MR. ALLOY:

12         Q.   So you never had communications with

13    Mr. Gomes outside the presence of the PowerPlan

14    lawyers about Lucasys?

15         A.   Not that I can recall, no.

16         Q.   What evidence or facts were you aware of

17    through the time that the cease and desist letter

18    was sent in October 30th of 2019 that Lucasys

19    actually used any PowerPlan trade secret or

20    confidential proprietary information?

21         A.   I had no evidence.

22         Q.   Would you know if anyone at PowerPlan did?

23         A.   I do not.

24         Q.   When did PowerPlan first communicate with

25    AEP?  You know who AEP is; right?

1      A.   Yes.

2      Q.   One of your customers, right?

3      A.   Yes.

4      Q.   One of PowerPlan's customers.

5           When did PowerPlan first communicate with

6      AEP about Lucasys?

7      A.   So my understanding from the timeline around

8      it was that it was likely it started, the process

9      started in the fall of 2019.

10     Q.   Before I get to that, I want to jump a

11     little bit ahead in time just to get in one more of

12     these operating packages.  So I'll hand you

13     Plaintiff's 13.

14          (Plaintiff's Exhibit P-13 marked.)

15     BY MR. ALLOY:

16     Q.   Which is the Q2 2020 operating package from

17     PowerPlan to Roper.  And you've seen this.  It's

18     like the other ones, right, in terms of what it's

19     for?

20     A.   As far as what it's for, yes.

21     Q.   And the third page of Plaintiff's 13 has the

22     Competitors and Market Conditions Update.  And it

23     indicates in the second paragraph:  Five

24     terminations from non-utility clients moving to

25     large ERPs in last twelve months as limited product

1    investment has narrowed competitive differentiation

2    gap, and cost justification for non-regulated or

3    partially regulated businesses.

4             Are those the customers you were talking

5    about on that Exhibit 1?

6        A.   Some of them, yes.

7        Q.   Which ones do you understand the five to be

8    from this document?

9        A.   I probably can't name all five, but I would

10   say Enbridge would be one, and then we had

11   notification from a company by the name of NRG.  The

12   other three I can't tell you.

13       Q.   All right.  If you'd look at -- you have

14   Exhibit 1 showing.  Does that refresh your

15   recollection of who the other three may be?

16       A.   From Q2 of 2020, I don't see any other

17   customers from this list that would have fallen into

18   that category.

19       Q.   All right.  So the other ones that you named

20   like Valero and Williams?

21       A.   Those would have been more recent.

22       Q.   2021?

23       A.   Yeah.  Late, later in 2020 or 2021.

24       Q.   And then at the bottom of that box, going

25   back to Plaintiff's 13, it indicates:  A customer

1        awareness campaign was initiated to inform of the

2        situation, Lucasys' access restrictions and customer

3        obligations under software license agreements.

4                Who led the customer awareness campaign?

5        A.    So, again, it was an executive committee led

6        process.  I was a major part of that from a

7        communication perspective.  The communication

8        campaign, and the letters that initially were sent

9        to a group of our customers came from me.

10       Q.    All right.  Was the customer awareness

11       campaign, does it -- is it known internally as the

12       "2020 IP protection wave," or "IP protection"?

13       A.    I'm not familiar with that designation.

14               (Plaintiff's Exhibit P-14 marked.)

15       BY MR. ALLOY:

16       Q.    Let me hand you Plaintiff's Exhibit 14.  I

17       know it's hard to read, and I can help you with that

18       if it's an issue.  But this is --

19       A.    Okay.

20       Q.    -- last night's production.

21               MR. FAZIO:  I should have sent him with a

22           magnifying glass.

23       A.    Yes, those two things are the same thing.

24       BY MR. ALLOY:

25       Q.    I'm sorry?

1          A.    The question you asked about the customer

2    awareness campaign, and the IP protection item

3    listed here, my understanding is they're the same.

4          Q.    Okay.  Now, this document that I have marked

5    as 14, the leftmost column is the Name column, and

6    it says -- I'll just read it, if you can't read it,

7    just so it's clear for the record.

8                2020 IP protection Wave 1.  And then Wave 1

9    plus legal; Wave 2 hyphen no calls; Wave 2, after

10   call complete emails; Wave 3 emails.

11               Do you have any knowledge as to what this

12   process and what these waves mean?

13         A.    Yes.  So when we were looking at how we

14   wanted and needed to communicate with our customers

15   around this risk that we had, we were very aware

16   that it was going to be a sensitive situation, and

17   we wanted to ensure that we could respond

18   appropriately to customers if they had concerns

19   around the item.

20               And so we broke the -- we went through a

21   process of identifying the customers that we felt

22   like we had the highest risk potential with.  And so

23   in that we then built subcategories around it.  And

24   knew that if we had 100 customers, let's say, that

25   we needed to communicate to, attempting to do all

1           100 at a time, in a firm of our size, we would have

2           never been able to respond to those customers in a

3           meaningful way and have a dialogue with them

4           directly around the risks that we were facing, and

5           the communication itself.

6                Q.   All right.  I do have some followup, but

7           first on this document do you understand this to be

8           a Salesforce-related document?

9                A.   Yes.  I understand it to be a report or an

10          extract coming out of Salesforce.

11               Q.   Right.  An extract from Salesforce to Excel?

12               A.   That's correct, yes.

13               Q.   So somebody's inputting this information

14          into Salesforce; correct?

15               A.   Yes.

16               Q.   Do you know who that is?

17               A.   It was likely Drea Toretti, our VP of

18          marketing, and her team.

19               Q.   Was her team -- and she reports to you;

20          right?

21               A.   No, she does not.  She reports to Joe.

22               Q.   Would her team -- did her team take the lead

23          on the communications with the customers in 2020 by

24          Lucasys?

25               A.    No.  Her team would have executed the steps

1        in the campaign using the toolset.

2             Q.   I see.  So they managed the process and then

3        it's the personnel who have the relationships with

4        the customer --

5             A.   That's correct.

6             Q.   -- who would have sent the communication;

7        right?

8             A.   Yes.  Can I clarify?

9             Q.   Please do.

10            A.   This is a report coming out of Salesforce.

11       The letter communication was an automated

12       communication.

13            Q.   Right.  I understand.  I'm going to get to

14       that.

15            A.   Okay.  Yeah.

16            Q.   I saw that.  I'll get to that in a moment.

17            A.   Okay.

18            Q.   On this document, and I understand your

19       point that there may be waves in terms of if there

20       are 100 customers, and there -- you would agree

21       there were at least dozens of customers --

22            A.   Yes, there were.

23            Q.   -- who received these communications; right?

24            A.   Yes.  Between approximately 40 and 50, I

25       believe.

1           Q.   In addition to breaking it down and handling

2      customers and certain groups, was there a process

3      where there were steps in how the communications

4      were done?  For example, you know, first a phone

5      call, and then maybe an email, and then maybe a

6      followup, or -- were there certain steps?  Or was it

7      just the process was we need to send this email and

8      then followups followed?

9           A.   It was the former.

10          Q.   So can you outline the steps to your

11     knowledge?

12          A.   Yes.  So with the -- so could I clarify the

13     question?

14          Q.   Yeah.

15          A.   So is the question:  Can I explain what each

16     one of these segments would be, or?

17          Q.   Yeah.  It could be that way, if that

18     accurately describes the process.  Because I see

19     here, you know, there is legal, then no calls, and

20     after call, after the email?

21          A.   Right.

22          Q.   And I don't know if that fully explains it.

23     However you can fully explain the outreach process

24     to customers in 2020 by Lucasys.

25          A.   Sure.  So to the best of my knowledge, the

1          Wave 1 was a group of customers where, you know, we

2     felt like we had the highest potential risk with

3     those customers.  And so some of those customers

4     actually would have involved up front phone calls

5     from our team members to, you know, primary contacts

6     at those customers to let them know that the

7     communication was coming to explain more detail

8     around it.

9               I would have been involved in some of those

10    communications based on my relationships with

11    executives within those companies.

12              Wave 2, unfortunately, I don't recall

13    actually what the wave 2 plus legal means.

14         Q.   Well, it's Wave 1 plus legal.

15         A.   Oh, Wave 1.  I'm sorry.  I don't recall what

16    the Wave 1 plus legal indicated.

17              The Wave 2 --

18         Q.   Well, before you go to Wave 2 --

19         A.   Oh, sure.

20         Q.   -- I appreciate it --

21         A.   Sure.

22         Q.   -- just to followup, you recall there were

23    communications with customers and PowerPlan counsel

24    on the calls; correct?  Do you recall that?

25         A.   As a part of the Wave 1?  Yes, yes, there

1     were.

2         Q.   And does that refresh your recollection that

3     that could be what Wave 1 plus legal means?

4         A.   Potentially.

5         Q.   And you were on some of those calls; right?

6         A.   I was.

7         Q.   What lawyers would attend those calls?

8         A.   Jonathan Sucher from our team.

9         Q.   And outside counsel attended at least one of

10    them; correct?

11         A.   I don't recall that.

12         Q.   Okay.  Wasn't Mark VanderBroek from Nelson

13    Mullins on a call with one of the joint customers of

14    PowerPlan and Lucasys?

15         A.   That could potentially be the case, but I

16    don't know if it was a part of this process, or if

17    it was a followup, a customer-specific scenario that

18    we might have learned about later.

19         Q.   Right.  And I appreciate you letting me

20    interrupt and ask about that.  If you would continue

21    to go through the process.

22         A.   Absolutely.  So on the Wave 2, no calls, I

23    think that was a group of customers where we

24    designated that we probably didn't need to call them

25    first before we sent the letter.

1          And then, you know, there was a group of

2    customers where the after call complete emails, so,

3    you know, just exactly what it says.

4        Q.   Well, actually, enlighten me because I'm not

5    exactly sure what that means.  After call complete

6    emails.  What does that mean?

7        A.   So my understanding is from the time when we

8    were putting this together -- and I actually don't

9    think we made it to that wave in the process.  But

10   it was my understanding that we were placing the

11   call, and ensuring that we, you know, reached the

12   right team members within the customer's

13   organization, and then sent the email.  And there

14   may have been a post call after that as well that we

15   had designated.

16       Q.   All right.  And then there is the Wave 3

17   emails.  Any other information about that?

18       A.   No.

19       Q.   And do you understand or have knowledge of

20   any other actions taken by PowerPlan that aren't

21   listed here with regard to the 2020 IP protection?

22       A.   No.

23       Q.   Do you recall discussing or communicating

24   with any of these customers in the 2020 IP

25   protection plan, say, any other companies besides

1          Lucasys?

2              A.    Can you clarify your question for me,

3          please?

4              Q.    Sure.  Well, let me show --  maybe it would

5          be helpful if I show you an exhibit.

6                      (Plaintiff's Exhibit P-15 marked.)

7          BY MR. ALLOY:

8              Q.    So let me show you Exhibit 15.  This is part

9          of the production last night.  Are you familiar with

10         this document?

11             A.    I am.

12             Q.    And is this -- when you referred earlier to

13         sort of the automated email, this is an example of,

14         on the right, the email that would fill in the

15         relevant information in brackets that would be sent

16         to the account, and that's the first column.  Second

17         column, the date that it's sent.  And then who from

18         PowerPlan -- is it who -- the third contact -- who

19         from PowerPlan is sending it, or who the contact is,

20         or who from the customer?

21             A.    I believe it would have been additional

22         recipients of the customer.

23             Q.    And I know the email form on the right is

24         just the form that went to each customer; right?

25             A.    Correct.

1          Q.   Who would be shown as the sender of this

2     email to each customer?

3          A.   This would have been an email that it would

4     show me as the sender.

5               MR. FAZIO:  Jason, while we're on that

6          topic, the way that this is printed out, it's

7          actually -- it's not showing the full email

8          text.  It's printing out -- this is how it was

9          formatted.  There's additional text below.

10              MR. ALLOY:  You're right.  I see that.

11         That's annoying.  You're right.

12              Well --

13              (Plaintiff's Exhibit P-16 marked.)

14    BY MR. ALLOY:

15         Q.   I'll show you Plaintiff's Exhibit 16.

16         A.   Okay.

17         Q.   All right.  Now, Mr. Bertz, Plaintiff's

18    Exhibit 16 appears to be, again, similar to 15, but

19    it completes that third program.  Is it still not

20    complete?

21              MR. FAZIO:  It's still actually not

22         complete.  It goes down -- I mean, just to

23         simplify this, it goes down to traditional

24         signature and cc's and so forth.  So if you

25         open this all the way up, it will give you the

1          whole thing.

2                    MR. ALLOY:  All right.  Thank you.  At a

3          break we'll see if we can get a full copy so

4          that we can have an accurate exhibit.

5     BY MR. ALLOY:

6          Q.   But, in general, 16 would include the --

7     like 15 -- the customers who received the form

8     email; correct?

9          A.   Yes.

10         Q.   Now, you'll see in the form email, at least

11    the portions we can see right now, that the first

12    sentence, or first paragraph in part states:  I'm

13    writing to you to raise a concern that PowerPlan has

14    about access to our software and associated

15    intellectual property by a specific third party

16    Lucasys.

17                    And, you know, we'll pull the entire email,

18    but --

19         A.   Sure.

20         Q.   -- it would comport with your recollection

21    that only Lucasys is discussed in this type of

22    correspondence to the customer?

23         A.   That's correct.

24         Q.   Why did, to your knowledge, PowerPlan decide

25    to only name Lucasys in the correspondence?

1        A.    Because at the time of this, Lucasys was the

2    only company that we were aware of that was engaging

3    with our customers and delivering services on top of

4    the PowerPlan technology, which would give them

5    potential access to our confidential information,

6    and was marketing themselves as developing or

7    offering competitive products.

8        Q.    So the real differentiator between Lucasys

9    and other PowerPlan competitors, for purposes of

10   this communication, is that PowerPlan saw Lucasys as

11   a risk to develop competing software versus

12   competing in services; correct?

13           MR. FAZIO:   Objection to form.

14       A.    PowerPlan saw Lucasys as a risk of having

15   access to our confidential information to further

16   the development of competitive products.

17   BY MR. ALLOY:

18       Q.    Right.  Versus services that the other

19   competitor was engaged in?

20       A.    That's correct.

21       Q.    Isn't it true that consulting firms like

22   Regulated Capital Consultants do not have any formal

23   partner program or contractual agreement in place to

24   protect PowerPlan intellectual property?

25       A.    That is true.  They do not have an agreement

1    with PowerPlan.

2         Q.    And isn't it true there is a risk to

3    PowerPlan's business and customer relationships that

4    third parties could potentially use access to

5    PowerPlan's intellectual property and customers to

6    build competitive solutions targeted to displace

7    PowerPlan's current software offerings?

8              MR. FAZIO:  Objection to the form.

9         A.    It is true.

10   BY MR. ALLOY:

11        Q.    What has PowerPlan done to date about

12   ensuring that consulting firms like Regulated

13   Capital Consultants, RCC, do not access PowerPlan's

14   intellectual property and customers to build

15   competitive solutions targeted to displace

16   PowerPlan's current software offerings?

17        A.    We have created a communication with our

18   customers around the sensitivity of the protection

19   of our confidential information.  And at this time

20   we're not aware that any other third parties that

21   may have access to that confidential information are

22   developing competitive products.

23        Q.    So is it PowerPlan -- so what PowerPlan has

24   done is allowed these other companies to access

25   PowerPlan's intellectual property so long as

1      PowerPlan is not aware that they have started

2      developing competing software?

3            MR. FAZIO:   Objection of form and

4         foundation.

5         A.   Yes.

6      BY MR. ALLOY:

7         Q.   What has PowerPlan done to prevent any of

8      these firms that are accessing its software from

9      copying any of the software, taking pictures of any

10     of the software, and having PowerPlan's trade

11     secrets?

12            MR. FAZIO:   Objection to form, foundation.

13        A.   Nothing.

14     BY MR. ALLOY:

15        Q.   So this IP protection wave -- because it has

16     multiple waves, we'll call it wave.

17        A.   Mm-hmm (affirmative).

18        Q.   I know Ms. Toretti's group was in charge of

19     implementing it.  Do you know who first communicated

20     that PowerPlan needs to do something like that?

21        A.   It was a decision that we came to as an

22     executive team with the support of our legal

23     counsel.

24        Q.   Is PowerPlan concerned about other firms

25     besides Lucasys, like Regulated Capital Consultants

1    and other firms, having access to PowerPlan's

2    intellectual property?

3        A.   Not as long as they are not offering

4    competitive software solutions.

5        Q.   Have any consulting firms, or other firms

6    who access PowerPlan's product, to your knowledge,

7    have any agreement to not create competitive

8    software?

9            MR. FAZIO:  Objection to form.

10       A.   No.

11   BY MR. ALLOY:

12       Q.   Was there any kind of IP protection wave, to

13   your knowledge, done by PowerPlan prior to this one

14   in summer of 2020?

15       A.   Not that I'm aware of, no.

16       Q.   To your knowledge are there any PowerPlan

17   customers who did not receive a communication and

18   email like the ones in that Salesforce form in

19   Exhibits 14 through 16?

20       A.   Yes.

21       Q.   And what customers, generally speaking,

22   wouldn't receive that email?

23       A.   So we believed the highest risk existed with

24   our current PowerTax customers, and so we started

25   with that customer list.  And even in that list, we

1      didn't, I don't believe, make it through the

2      communication to every one of those customers prior

3      to the lawsuit being filed.  So there are some

4      customers in the -- in these waves, I don't believe

5      we completed all of those waves.

6              MR. ALLOY:  Let's take a short break,

7          please.

8              THE VIDEOGRAPHER:  Going off video record

9          at 11:28 a.m.

10             (Recess 11:28 a.m. - 11:44 a.m.)

11             THE VIDEOGRAPHER:  Now back on video

12         record at 11:44 a.m.  This is the beginning of

13         Media File No. 3.

14             (Plaintiff's Exhibit P-17 marked.)

15     BY MR. ALLOY:

16         Q.   Mr. Bertz, I'm handing you what I have

17     marked as Plaintiff's Exhibit 17, and I'll represent

18     to you that I printed one of the complete cells

19     from, you know, the earlier exhibits that we looked

20     at.

21             So my question to you is does this appear to

22     be the form of communication that was in Salesforce

23     that was sent to the PowerPlan customers?

24         A.   Yes.

25         Q.   Okay.  And, to your knowledge, when these

1   were sent to the PowerPlan customers in, roughly,

2   summer of 2020 the only thing that would change in

3   terms of the communication would be the names and

4   email addresses of the recipients, and not the

5   substance underneath the "Dear Recipient" and the

6   first name; is that right?

7          MR. FAZIO:  Objection.

8      A.   There are some scenarios where customers had

9   already received letters from us where we may have

10  changed the language and tailored it specifically

11  for them.  Beyond that, the only thing that would

12  change would be the recipient names at the top.

13     Q.   Just one moment.

14          Okay.  Then on the second page of

15  Plaintiff's Exhibit 17 above the final points, the

16  paragraph that starts Does this letter apply to

17  other third-party access, part of that paragraph

18  states:  In the future you will receive an

19  additional communication from a vendor that

20  PowerPlan has engaged to perform a generalized

21  customer audit of third party access to PowerPlan

22  software associated confidential information.  We

23  would appreciate your cooperation responding to that

24  communication.

25          Has PowerPlan engaged a vendor to conduct

1      that customer audit?

2           A.   We started the process, and the vendor

3      actually closed the division, and so we did not get

4      a chance to move forward with the full process.

5           Q.   Who did you understand was going to be that

6      vendor?

7           A.   It was a third party.  The name of the third

8      party escapes me at this point, and we -- it was a

9      contact through our chief financial officer.

10          Q.   And so PowerPlan sent this communication to

11     the customers in or around June of 2020, and through

12     November of 2021 PowerPlan has still not engaged a

13     vendor to perform this generalized customer audit of

14     third-party access to PowerPlan's software and

15     associated confidential information?

16          A.   That's correct.

17          Q.   Has PowerPlan itself conducted any kind of

18     customer audit of third-party access to PowerPlan's

19     software and associated confidential information?

20          A.   Not that I'm aware of.

21          Q.   Does PowerPlan know all third parties who

22     are accessing its software and associated

23     confidential information?

24          A.   Not that I know of at this time.

25          Q.   Does PowerPlan have plans to conduct that

1    audit, whether on its own, or through another

2    vendor?

3         A.    Not that I'm aware of.

4         Q.    Did PowerPlan ever sign any kind of

5    agreement or engagement letter with that vendor

6    before the vendor division closed?

7         A.    I do not believe we signed the engagement

8    letter, but I do believe we had one presented to us.

9         Q.    I think you already answered this, but you

10   don't remember the name of the vendor?

11        A.    I do not remember the name of the vendor.

12        Q.    Who at PowerPlan first communicated the idea

13   of engaging a vendor to do an audit like that?

14        A.    It was a joint decision we made as an

15   executive team.

16        Q.    And who was put in charge of carrying that

17   out?

18        A.    The process of identifying a vendor was

19   being handled by our CFO and our legal team.

20        Q.    The CFO is Mr.?

21        A.    Joost Ruten.

22        Q.    Ruten.  So, Mr. Ruten and the internal legal

23   team?

24        A.    That's correct.

25        Q.    Do you recall if the vendor provided

1    PowerPlan with a cost estimate to do the audit?

2         A.   Yes.

3         Q.   And what was the approximate cost estimate?

4         A.   I don't recall the exact dollar figures.

5         Q.   Was cost one of the reasons that PowerPlan

6    did not go forward with the audit?

7         A.   No.

8              MR. FAZIO:  Just slow down a little bit

9         and let him finish.

10             THE WITNESS:  Oh.  Sorry.

11   BY MR. ALLOY:

12        Q.   When did you learn that the vendor closed

13   the division that could do the audit?

14        A.   It would have been summer of 2020.  So right

15   about the same time as the letters being, you know,

16   sent, same, same situation.

17             (Plaintiff's Exhibit P-18 marked.)

18   BY MR. ALLOY:

19        Q.   Okay.  I'm going to show you Plaintiff's

20   Exhibit 18.

21             Exhibit 18 appears to show a calendar entry

22   for a discussion between you and AEP on

23   November 21st, 2019 about tax vendors; is that

24   right?

25        A.   That's right.

1      Q.    And did that discussion happen, to your

2   recollection?

3      A.    My understanding is that it did.

4      Q.    Do you know who was part of that discussion?

5      A.    I don't recall all the attendees.

6      Q.    Who do you recall attending?

7      A.    So I -- it would have been me for sure, and

8   Jeff Hoersdig from AEP.

9      Q.    And what do you recall from that call?

10      A.    If it's the call that I am thinking of, we

11   would have, or I would have, let Jeff know that it

12   was our understanding that they might have a current

13   engagement going with Lucasys, and that if that

14   engagement required access to our confidential

15   information that PowerPlan would no longer, you

16   know, supply consent for that confidential

17   information to be disclosed to Lucasys.

18          And I would have spoken to Jeff about the

19   license agreement that we had with IEP, or AEP,

20   rather, and the terms of that license agreement

21   requiring that AEP receive our consent in order to

22   disclose our confidential information to third

23   parties.

24      Q.    And what do you recall, if any, of how Jeff

25   responded?

1           A.   So Jeff's initial concern was that AEP had a

2     number of third parties that might have access to

3     PowerPlan's confidential information, and the

4     request to us was to clarify whether all third-party

5     access needed to have our consent.

6           Q.   And did you clarify that they all did not?

7           A.   No.  We actually said, yes, we desired to

8     have a list of any third parties that they were

9     using that would have access to our confidential

10    information.

11          Q.   Did AEP provide PowerPlan with that list?

12          A.   They did not.

13          Q.   Did AEP communicate that they would not

14    provide that list?

15          A.   They never said that they would not provide

16    the list.

17          Q.   Did they indicate they would, but just never

18    did it?

19          A.   They indicated that they would work on it,

20    and the list was never provided.

21          Q.   Did they communicate to you, and maybe

22    others who were on the same call, that they would

23    provide that list?

24          A.   It was my understanding from the call that

25    they intended to provide us with the list.

1      Q.   And is the call you're referring to this
2   initial call with Jeffrey?
3      A.   I don't recall if this call gave us that
4   indication, or if it was subsequent interactions
5   with them, but it was my belief from those
6   interactions that they were going to supply us with
7   a list of third parties that had that confidential
8   information access.
9      Q.   Now, as you may know, we don't have a lot of
10  emails yet.  Do you recall if there were email
11  communications with AEP about providing the list of
12  third-party access?
13     A.   Yes.
14     Q.   And was it you who was asking on these
15  emails?
16     A.   Most likely it would have been Jim Dahlby.
17     Q.   So your recollection is there is some
18  communications back and forth that AEP was willing
19  to provide the list.  They ultimately do not for
20  whatever reason.  What did PowerPlan do after that
21  to follow up?
22         MR. FAZIO:  Objection to form.  Go ahead.
23     A.   Well, so there were -- there were several
24  stages of interactions with AEP through the process,
25  and so there were several followups.  The last

1    followup was a letter to AEP surrounding, you know,

2    the third-party access and confidential information.

3              And I can't recall exactly if that letter

4    called out Lucasys specifically or not.  But I do

5    recall that was the last letter.

6                   (Plaintiff's Exhibit P-19 marked.)

7    BY MR. ALLOY:

8         Q.   Let me show you what I'll mark as

9    Plaintiff's Exhibit 19.

10             This is a letter that you sent; correct?

11        A.   Yes.

12        Q.   Is there any information in this letter that

13   you believe if disclosed to Lucasys would harm

14   PowerPlan?

15        A.   Let me review it, please.

16             So I don't see anything in this letter that

17   if disclosed to Lucasys would harm PowerPlan.

18        Q.   Okay.  Is there anything in Plaintiff's

19   Exhibit 17, which is the Salesforce form letter,

20   that if disclosed to Lucasys, would cause harm to

21   PowerPlan?

22        A.   If it was just the form letter, no, I do not

23   believe so.

24        Q.   Okay.

25        A.   And going back to Exhibit 19.

1          Q.   Yes, sir.

2          A.   I do not believe that AEP is an external

3     reference of ours today.  So if we were to share

4     this letter, you know, without AEP giving us the

5     ability to do so, that could be harmful to PowerPlan

6     and our relationship with AEP.

7          Q.   The disclosure of this letter to the public

8     could be harmful to AEP?

9          A.   Disclosure of the letter to the public

10    without AEP's consent could be harmful to PowerPlan

11    in our relationship with AEP.

12         Q.   How so?

13         A.   Because AEP, I don't believe, has given us

14    the ability to use their logo, or use them -- to

15    allow the market to know that they are a PowerPlan

16    customer.

17         Q.   And what harm would that disclosure actually

18    cause?

19         A.   Well, if their agreement -- if our agreement

20    with AEP requires that we get their consent in order

21    for the public to know that they're a customer of

22    ours, then we would not be following our license

23    agreement.

24         Q.   Do you know if PowerPlan has received

25    consent from AEP with regard to sharing that AEP is

1    a customer?

2        A.   I do not know.

3        Q.   Do you know that Plaintiff's Exhibit 19, the

4    July 17th, 2020 letter, has been filed with the

5    court, and is available to the public?

6        A.   I did not know that.

7        Q.   Now, when you indicated a bit earlier a

8    couple of minutes ago there was a final letter

9    communication with AEP, were you referring to this

10    July 17th, 2020 letter?

11        A.   So I believe this was the final letter, but

12    there may have been subsequent email surrounding it.

13        Q.   So where do things stand, to your

14    understanding, between -- or with AEP with regard to

15    AEP providing access to the PowerPlan system?

16        A.   So I do not believe that anything has

17    changed with respect to the access that AEP will --

18    does provide to, you know, the third parties that do

19    work on their behalf to the PowerPlan software and

20    our confidential information.

21        Q.   And do you understand that includes Lucasys?

22        A.   I don't know if that continues to include

23    Lucasys or not.

24        Q.   What have you done since July of 2020 to

25    learn whether Lucasys still has access to PowerPlan

1   through AEP?

2        A.   We have not done anything that I'm aware of

3   to do that.

4             (Plaintiff's Exhibit P-20 marked.)

5   BY MR. ALLOY:

6        Q.   I'm going to show you what's been marked

7   Plaintiff's Exhibit 20, which is an email string

8   between you and James May of NextEra.  So I'm

9   switching gears a little bit on the client.

10            Exhibit 20 is, in fact, an email string

11   between you and Mr. May; correct?

12        A.   That's correct.

13        Q.   And in Mr. May's email to you at the top

14   from October 29th, 2019 he sends a portion of the

15   PowerPlan perpetual licensing agreement to you.  And

16   towards the top of that section it says:  FPL

17   2001.04.20.

18            So my first question is do you have an

19   understanding that the relevant licensing agreement

20   between FPL and NextEra and PowerPlan is dated

21   April 20th of 2001?

22        A.   I can't say that for sure.

23        Q.   Are you aware of any other agreements

24   between FPL or NextEra and PowerPlan other than the

25   one indicated here by Mr. May?

1          A.    So this would be the licensing agreement.

2     There may be other specific orders that have been

3     placed, you know, in addition to the licensing

4     agreement, since, you know, 2001, if that's, in

5     fact, when this was put together.

6          Q.    Do you know if PowerPlan has a standard

7     licensing agreement with its customers that, you

8     know, all customers have at a certain period of

9     time, and then, you know, maybe there is an update

10     to it, and then all customers are governed by the

11     update?

12          MR. FAZIO:   Objection to form.  Go ahead.

13          A.    So the license agreement does get updated.

14     But the license agreement, if put into place with a

15     customer on a certain date, that is the license

16     agreement until they sign a new license agreement

17     with us.

18     BY MR. ALLOY:

19          Q.    Yeah, I understand.  But would it be typical

20     PowerPlan practice to have, you know, a standard

21     license agreement -- and I recognize -- let me start

22     with I know you started in 2019, okay?  So I'm just

23     trying to get the best of your knowledge as to what

24     the practice was.

25               Do you have an understanding that PowerPlan

1      would have a standard licensing agreement in place

2      that would have customers that on-board, sign that

3      licensing agreement, and then over time as there are

4      changes to the licensing agreement PowerPlan would

5      try to get the customer to sign it, and if they did

6      they'd be governed by the updated change?  Is that

7      your --

8          A.   Yes.

9          Q.   Now, for AEP, do you know if in its

10     licensing agreement with PowerPlan if it has a

11     different section for protection of proprietary

12     interests and confidentiality as the NextEra one?

13         A.   That's my understanding.

14         Q.   Are you aware of NextEra or AEP or SUEZ or

15     Liberty Utilities not agreeing to sign a new

16     agreement or amendment to any agreement with

17     PowerPlan?

18         A.   No.

19         Q.   Now, your initial email at the bottom cites

20     the licensing agreement section 14.2 covering

21     third-party access to PowerPlan software.

22              And if you look at Mr. May's email, he, you

23     know, copies that section.

24              Do you know if that was indeed the governing

25     14.2 for NextEra?

1           A.    That's my understanding, yes.

2           Q.    I'm going to go back to NextEra in a little

3      bit, but it is -- just to close the loop, it's your

4      understanding AEP's licensing agreement could have a

5      different provision with regard to protecting

6      proprietary information?

7           A.    That's possible, yes.

8           Q.    Who would sign the license agreements, to

9      your knowledge, on behalf of PowerPlan?

10          A.    Today it would be our chief financial

11     officer.  I don't know who would have signed the

12     NextEra Energy license agreement.

13          Q.    Or the AEP one?

14          A.    Or the AEP one.

15          Q.    Or SUEZ or Liberty Utilities?

16          A.    Liberty would have been our chief financial

17     officer because Liberty was done -- or the

18     overarching Liberty engagement that we had, was put

19     into place in the first part of 2020.

20                Prior to that I believe the other customers

21     had been longer-term customers of PowerPlan.

22          Q.    Do you know what law firm PowerPlan works

23     with with regard to licensing agreements?

24          A.    I do not.

25                (Plaintiff's Exhibit P-21 marked.)

1　　　BY MR. ALLOY:

2　　　　Q.　I'm handing you what I have marked as

3　　Plaintiff's 21.

4　　　　　　This is a December 5, 2019, email from you

5　　to certain personnel at AEP; correct?

6　　　　A.　That's correct.

7　　　　Q.　Is there any information in Plaintiff's 21

8　　that, if shared with Lucasys, would cause harm to

9　　PowerPlan?

10　　　　A.　Only the fact that American Electric Power

11　　is a customer of PowerPlan's.

12　　　　Q.　And are you aware that Plaintiff's 21 is

13　　available to the public because it was filed with

14　　the court?

15　　　　A.　I'm not.

16　　　　Q.　To your knowledge did anyone at PowerPlan

17　　communicate to AEP that the emails marked as

18　　Exhibit 19 and 21 have been filed in the public

19　　record?

20　　　　A.　I do not know.

21　　　　Q.　Did you draft Plaintiff's Exhibit 21?

22　　　　A.　I did, in conjunction with our internal

23　　legal counsel.

24　　　　Q.　And on Plaintiff's Exhibit 19, did you draft

25　　19?

1          A.    In conjunction with our legal counsel.

2          Q.    Who are the individuals at AEP who are

3     recipients of this email?

4               MR. FAZIO:  I'm sorry, 19 or 21?

5     BY MR. ALLOY:

6          Q.    I'm sorry.  On 21?

7          A.    On 21.  So Jeff Hoersdig is an assistant

8     controller within the accounting organization at

9     AEP.  Jimmy Llende, or James Llende, is the

10    vice-president of tax at AEP.  The other recipients,

11    I don't actually recall what their roles are within

12    the AEP organization.

13         Q.    Okay.  Do you believe when you signed this

14    letter in December of 2019 that you had a good

15    understanding of the contents?

16         A.    Yes.

17         Q.    Okay.  Did Mr. Dahlby assist in drafting

18    this letter?

19         A.    I believe Mr. Dahlby was a part of the

20    drafting of it, yes.

21         Q.    Did Mr. Gomes help draft or review this

22    letter?

23         A.    I don't know if Joe was a part of that

24    process.

25         Q.    Do you recall what AEP's response was to

1      this December 2019 letter?

2          A.    So my understanding, and my recollection of

3      the response, was in line with the feedback that I

4      provided on the conversation between Jeff Hoersdig

5      and me.

6              You know, the feedback was we have a number

7      of third parties that are, you know, doing work on

8      our behalf that may have access to PowerPlan's

9      confidential information, and do you -- are you

10     asking us to provide you with that entire list, and

11     do we require your consent for that to continue.

12         Q.    All right.    In the first paragraph of your

13     letter starting with that PowerPlan, you indicate

14     that PowerPlan's intellectual property, including

15     the confidential and proprietary information and

16     trade secrets in its software, includes -- and I'm

17     going to walk through these items.

18         A.    Sure.

19         Q.    First, source code.

20             What do you include, and what do you mean by

21     "source code" in this paragraph?

22         A.    So, the source code would be the software

23     that is written by our developers that ultimately is

24     then compiled in the final product.

25         Q.    Do you have any information or evidence that

1          Lucasys has accessed PowerPlan's source code?

2          A.   I do not.

3          Q.   And to your knowledge, when PowerPlan

4     customers, or outside vendors, access PowerPlan,

5     they can actually see PowerPlan's source code;

6     correct?

7          A.   It depends.  Some of our customers actually

8     have rights to the source code to not own the source

9     code, but to have access to it.  And those are -- in

10    those instances, they may actually have the source

11    code to be able to do that.

12         Q.   And is that in agreements with those

13    customers that permit them to have source codes?

14         A.   That's correct.

15         Q.   Separate agreements from the licensing

16    agreement?

17         A.   It would have been a part of the licensing

18    agreement, or perhaps an attachment to the licensing

19    agreement.

20         Q.   In that scenario where a customer has a

21    right to source code, does that right include

22    allowing third parties to see the source code?

23              MR. FAZIO:  Objection.

24         A.   I don't --

25              MR. FAZIO:  Objection to form.  Calls for

1          a legal conclusion, and foundation.
2     BY MR. ALLOY:
3          Q.   Do you know if any third parties have seen
4     PowerPlan's source code?  And let me be specific.
5     Not customers, but other third parties.  Have they
6     seen PowerPlan's source code, to your knowledge?
7          A.   Yes.
8          Q.   And what third parties would that be?
9          A.   So I believe I mentioned one earlier in
10    Regulated Capital Consultants.
11               I also believe a company by the name of
12    Arc-Two has seen PowerPlan source code.
13         Q.   Anybody else?
14         A.   My understanding -- not through the AEP
15    scenario, but my understanding is that Lucasys may
16    have seen it as well.
17         Q.   And what's your basis for Lucasys seeing the
18    source code?
19         A.   There are -- it comes from the interactions
20    around the United Water scenario.
21         Q.   What scenario is that?
22         A.   Well, with United Water in 2020 we had, you
23    know, learned from the customer, basically, that
24    they had an engagement going with Lucasys, and that
25    the customer was requesting access to source code

1    components.

2           I don't believe that they actually had the

3    full set of source code, but they may have had some

4    source code that was customization related that was

5    in their hands, and I believe that -- it's my

6    understanding that Lucasys may have had access to

7    that through the United Water Engagement.

8           Q.   And United Water is not AEP, FPL, Liberty,

9    or SUEZ?

10          A.   Correct.  Well, United Water is SUEZ.

11          Q.   Is SUEZ.  So it's your understanding that

12   PowerPlan has provided SUEZ with some access to

13   PowerPlan source code?

14          A.   So our practice historically has been if

15   we've built customizations on behalf of a customer,

16   that those customizations, and the source code

17   behind it, would be, you know, available to the

18   customer, and they would be responsible for

19   maintaining that.

20          And so it's my understanding that United

21   Water did have those.

22          Q.   All right.  And other than United Water

23   having those, and your understanding Lucasys was

24   doing work for United Water, what information do you

25   have that Lucasys actually used, or even viewed, the

1    source code?

2         A.   I don't have direct information that they

3    used or viewed.  We do have information that there

4    were other components that are later in this

5    paragraph that, you know, potentially were either

6    viewed or modified.

7         Q.   Okay.  And what are those?

8         A.   We would have to refer back to the United

9    Water communication to see that specifically.

10        Q.   Okay.  So you're not talking about source

11   code, but other things were modified related to --

12        A.   Correct.

13        Q.   Okay.  So on source code, when you wrote

14   source code, did you mean to include as part of it

15   custom objects, functions, or logic created by

16   PowerPlan to support customer requirements?

17        A.   If that was the -- the source code would

18   cover those elements, but it would be in the form in

19   which they were initially developed before they were

20   compiled.

21        Q.   Okay.  Does source code include those

22   elements, custom objects, functions, or logic, if

23   the customer created it, would it be PowerPlan's

24   source code?

25        A.   No.

1           MR. FAZIO:  Objection to form.
2     BY MR. ALLOY:
3           Q.   Did you mean source code in your letter to
4     include source code created by third parties?
5           A.   No.
6           Q.   If they supported PowerPlan software?
7                MR. FAZIO:  Objection to form.
8           A.   So to clarify the question, if the customer
9     -- or clarify my answer, if the customer has source
10    code that PowerPlan has provided, and the customer
11    is making updates to that source code, or third
12    parties are making updates to that source code, my
13    understanding is it would be covered under that.
14    BY MR. ALLOY:
15          Q.   And where do you get that understanding?
16          A.   From the way our license agreement is
17    structured with each customer.
18          Q.   Okay.  I'm just looking at the NextEra --
19    part of the NextEra agreement that was marked
20    Plaintiff's 20.  And 14.1 refers to rights and
21    software including, but not limited to, computer
22    programs, manuals and supporting material.
23               So it's your contention that if NextEra
24    creates its own code related to PowerPlan software
25    that it falls under one of those categories?

1              MR. FAZIO:  Objection of form.

2         A.    No.  It's my contention that if source code

3    associated with PowerPlan's custom work, or our core

4    product, has been provided to the customer, and if

5    that source code is changed or modified, that it

6    would fall under the agreement.

7    BY MR. ALLOY:

8         Q.    Have you seen the agreement with SUEZ or

9    United Water to use source code?

10        A.    Not recently, no.

11        Q.    How long has PowerPlan been aware that

12   Lucasys was working with SUEZ or United Water?

13        A.    I first became aware of it around about

14   the -- I thought it was probably end of Q1 of 2020.

15        Q.    From your letter when you listed source

16   code, does that include organization and management

17   of the source code?

18             MR. FAZIO:  Objection to form.

19        A.    Can you clarify your question?

20   BY MR. ALLOY:

21        Q.    No, I can't.

22        A.    No.

23        Q.    If you can't answer it, that's fine, you can

24   say you can't answer it, but that's the best I can

25   do.

1        A.   Yeah, I don't know -- I'm not -- I can't

2   answer it because I'm not sure how that applies.

3        Q.   Does source code include the -- an

4   application-building process?

5        A.   No.  The source code would be used in the

6   application-building process.

7        Q.   Does source code include application

8   screens?

9        A.   No.

10        Q.   Does source code include reports generated

11   by the application?

12        A.   Not unless it's the source of the report.

13        Q.   But not the report itself?

14        A.   Not the report itself.

15        Q.   All right.  Okay.  The next item in your

16   letter from December 5th is system and database

17   architecture.  What do you understand that to mean?

18        A.   So system and database architecture would be

19   the logical layout of the system flow, how the

20   software interacts between modules, as well as the

21   overall database architecture and its logical data

22   structures.

23        Q.   Okay.  So it would include PowerPlan's

24   software and modules, and how they related to each

25   other?

1           A.   That's correct; from an architectural

2     perspective, and from an integration standpoint.

3           Q.   Does it include data and process flows

4     within the application?

5           A.   It would.

6           Q.   Does it include application and

7     administration security?

8           A.   It would at that level, yes.

9           Q.   Does it include features related to audit

10     and logging?

11          A.   It would.

12          Q.   Does it include traffic of user names and

13     timestamps for who's accessed the software?

14          A.   It would.

15          Q.   Does it include any SQL statements

16     referencing table names and field names to be able

17     to retrieve data?

18          MR. FAZIO:  Objection to form.

19          A.   Not that specific component of the letter.

20     BY MR. ALLOY:

21          Q.   Okay.  What about taking out the SQL part

22     and just table name?  Would it include table names

23     and field names?

24          A.   Yes.

25          Q.   What evidence are you aware of that, if any,

1     that Power- -- I'm sorry -- that Lucasys has

2     misappropriated any of the PowerPlan system and

3     database architecture?

4          A.   I'm not aware of any direct evidence.

5          Q.   All right.  The next item in your

6     December 5th letter is databases.  What did you mean

7     by databases in your letter?

8          A.   So that would be the physical database

9     itself, which would be the physical implementation

10    of the logical database architecture that's referred

11    to in the prior part of the sentence.

12         Q.   Does PowerPlan license or deliver

13    proprietary databases to its customers?

14         A.   Not a proprietary database.  But the

15    information inside the database and the data model

16    itself, the data structures.  And then there is --

17    SQL packages, for example, are stored within the

18    database.

19         Q.   Do the databases include any databases that

20    a PowerPlan customer would be running in other

21    software; for example, Oracle or SAP?

22              MR. FAZIO:  Objection to form.

23         A.   Well, the PowerPlan database is an Oracle

24    database as a standard.

25    BY MR. ALLOY:

1        Q.    Okay.  And so let me break that down.

2              So what you're saying is the underlying

3        database that PowerPlan runs is based on an Oracle

4        platform?

5        A.    Correct.

6        Q.    Let's put that aside for a minute.  My

7        question is a little bit different.  Let's put that

8        aside.

9              Do databases in your letter include

10       databases that a PowerPlan customer would license

11       from Oracle where the customer has its information

12       in Oracle?

13       A.    No.

14       Q.    Are you aware of any facts or evidence that

15       Lucasys has misappropriated PowerPlan's databases?

16       A.    No.

17       Q.    Do you know who at PowerPlan may have those

18       facts or evidence?

19       A.    I do not.

20       Q.    The next item in your letter is database

21       models and structures.  What is included in that?

22       A.    Much of the same information that would be

23       covered under database architecture and databases is

24       incorporated in there as well.  So the data model

25       would be the physical representation of the logical

 1      data structures.

 2              And when we start to talk about structures

 3      as well, you would go beyond things like the

 4      database tables themselves.  You would get into

 5      business logic that could be SQL packages are stored

 6      in database triggers, and other elements of the

 7      database that would be proprietary in our view.

 8          Q.   Okay.  In addition to that, to maybe even

 9      ask about more simple aspects of the database models

10      and structures, would that include a defined list of

11      PowerPlan's tables?

12          A.   Yes.

13          Q.   Would that include the names of columns and

14      rows in the tables?

15          A.   Yes.

16          Q.   Would that include the types of information

17      in the columns and rows?

18          A.   Yes, in some instances.

19          Q.   Would database models and structures include

20      database administration and security?

21              MR. FAZIO:  Objection to form.

22          A.   I don't think it would include database

23      administration, but I think it would include

24      database security.

25      BY MR. ALLOY:

1           Q.   Okay.  Basically, between your inclusions

2      and my followup questions, do you think you've

3      covered everything that would be defined as part of

4      the database models and structures as you intended

5      in your December 5th letter?

6           A.   I think we covered much of it, yes.

7           Q.   So, I have never used the PowerPlan

8      software, so let me just guess.  Are these tables

9      for, like, PowerTax include information that might

10     be the name of an asset, like the asset name, like

11     building?

12          A.   Is that?

13          Q.   Yes.

14          A.   Yes, they would.

15          Q.   And would it include something like the cost

16     basis?

17          A.   Potentially.

18          Q.   Would it include something like number of

19     years of its useful life?

20          A.   Yes.

21          Q.   Would it include amount thus far

22     depreciated?

23          A.   Yes.

24          Q.   Is it your understanding that those kinds of

25     categories are PowerPlan's trade secrets, and

1      confidential and proprietary information?

2          A.    Yes.

3          Q.    Based on what?

4          A.    Based on how those data points in some

5      instances can be calculated and derived.

6          Q.    Well, let's break that down.  Cost basis.

7      That's just what a customer paid for an asset;

8      correct?

9          A.    It is.  However, it depends on the size and

10     complexity of the asset.  So an asset could be a

11     pen, or an asset could be a nuclear power plant.

12     And so how we help our customers differentiate in

13     the cost basis of the pen versus all the components

14     of the nuclear power plant is definitely a trade

15     secret of ours.

16         Q.    All right.  So how does PowerPlan go about

17     at a high level breaking down the cost for the

18     customer of a power plant?

19         A.    I'm not an engineer, so I'm not going to be

20     the best person to answer that question for you.

21         Q.    So and I'm just trying to understand at a

22     high level.  A customer buys a power plant, and they

23     open up the PowerPlan software, and they are, like,

24     I need to figure out how to depreciate this power

25     plant, and the PowerPlan has multiple parts?

1          A.    Right.

2          Q.    Like, generally what does a customer do, and

3     what does PowerPlan do?

4          A.    So the customer will have the ability on

5     their own to enter the assets into the PowerPlan

6     software.  And then based on their utilization of

7     the software and the parameters that they input, our

8     software will help them determine things like

9     deferred tax calculations, things like, you know,

10    full-cost basis as they define an asset.

11         Q.    Okay.  So using the U.S. tax code for how

12    depreciation might work, for example, if you're

13    depreciating a nuclear power plant, PowerPlan would

14    incorporate how the tax code would treat different

15    aspects --

16         A.    That's right.

17         Q.    -- of its asset and depreciate it

18    appropriately; correct?

19              MR. FAZIO:  Objection to form.

20              Let him finish before you answer.

21    BY MR. ALLOY:

22         Q.    Was that a fair characterization?

23         A.    Yes.

24         Q.    Okay.  So and the customer has to enter in

25    each asset, and then classify it a certain way so

1        that PowerPlan software would be able to use the

2        appropriate depreciation calculation to get the

3        customer a depreciation amount; right?

4            A.    That's correct.

5            Q.    Now, the treatment of those assets and how

6        they are depreciated is governed by the law;

7        correct?

8            A.    That's correct.

9            Q.    PowerPlan is not contending that how

10       depreciation is calculated for those as assets under

11       the law is PowerPlan's trade secret; correct?

12           A.    We're not contending that the law is

13       PowerPlan's trade secret.  But we're contending how

14       the law is translated into the way the software

15       operates is our trade secret.

16           Q.    Okay.  But under the law you need to know

17       what the asset is, what the depreciation life is,

18       and you need to know what the cost of the asset is?

19           A.    Yes.

20           Q.    And you can either run that calculation

21       through PowerPlan, and PowerPlan, I presume, says

22       this is the easiest way to do it, or you can get an

23       accountant to do it, or run it in Excel or some

24       other way yourself; right?

25                MR. FAZIO:  Objection to form.

1          A.    True.

2     BY MR. ALLOY:

3          Q.    And so what you're understanding PowerPlan

4     is trying to protect is not how that calculation

5     works, because that's part of the law in the tax

6     code, but just how the -- I'm not sure -- how the

7     table columns relate to each other?

8              MR. FAZIO:  Objection to form.  Go ahead.

9          A.    Okay.  So in the simple example that we were

10    just talking about of one asset and one set of tax

11    laws, then you probably could do that in a

12    spreadsheet.  But when you get into more complex

13    environments, and thousands or millions of assets,

14    and the need to have actually multiple sets of

15    books, and multiple depreciation models, and

16    multiple sets of potential tax liabilities in the

17    future, our software and the trade secrets

18    underneath that help our customers simplify for all

19    of that complexity.  So we believe those are trade

20    secrets.

21         Q.    You would agree there is certain information

22    needed to -- under the law to calculate depreciation

23    of an asset; right?

24         A.    Yes.

25         Q.    Does PowerPlan contend in any way that those

1    categories of information are PowerPlan's trade

2    secrets?

3         MR. FAZIO:  Objection to form.  He's not

4         here as a 30(b).

5    BY MR. ALLOY:

6    Q.   Okay.  Do you have an understanding that

7    PowerPlan contends that those are PowerPlan's trade

8    secrets as set forth in any of the items in your

9    December 5th letter?

10    A.   Can you restate your question for me?

11    Q.   Sure.  The general information, or

12    specific -- the information needed to perform a

13    depreciation calculation of an asset, the

14    categories, cost basis, years, whatever it is.

15    A.   Right.

16    Q.   Is it your understanding that PowerPlan is

17    contending that that information is a trade secret?

18         MR. FAZIO:  Objection to form.

19    A.   Not the information itself such as, you

20    know, the -- let's say the asset name, or the year

21    it was put into service.  But the derived

22    information that actually goes through and

23    calculates the depreciation schedule would be a

24    PowerPlan trade secret.

25    BY MR. ALLOY:

1    Q.   What about the column header where the asset

2    is a machine, and it says -- column header says

3    Asset.  Is that column header saying Asset, to your

4    understanding, a PowerPlan trade secret?

5              MR. FAZIO:  Objection to form.

6         A.   Not that one specifically.

7    BY MR. ALLOY:

8         Q.   Okay.  What about Useful Life Years as a

9    table header, is that a PowerPlan trade secret?

10             MR. FAZIO:  Objection to form.  Calls for

11        a legal conclusion.

12   BY MR. ALLOY:

13        Q.   All right.  Based on your understanding of

14   what is confidential and proprietary and trade

15   secrets, and your communications with customers, is

16   a table header like Number of Years of Useful Life a

17   PowerPlan trade secret, or it's confidential

18   proprietary information?

19        A.   So the way that that table header and the

20   information in it is used to provide business value

21   to the customer around it would be PowerPlan's

22   confidential information.

23        Q.   All right.  So is it like, somebody figuring

24   out the order of the columns, is that a trade

25   secret, or confidential proprietary information,

1      based on your December 5th letter?

2              MR. FAZIO:  Objection to form, calls for

3          legal conclusion.

4          A.   So the complex problems that we solve will

5      oftentimes require multiple steps of computation.

6      There will be multiple sets of derived data

7      throughout the database, and those will be stored in

8      the database for both reporting and for future

9      computational needs.  And so that information would

10     be considered proprietary.

11     BY MR. ALLOY:

12         Q.   Is there some way that PowerPlan calculates

13     something under the tax code that PowerPlan

14     calculates it differently than somebody else would

15     calculate it under the tax code?

16             MR. FAZIO:  Objection to form.  Go ahead.

17         A.   Not according to the tax code itself.  But

18     given the size and complexity and numbers of tax

19     codes, or numbers of compliance requirements, our

20     ability to blend that together on behalf of our

21     customers and simplify the complexity would be

22     confidential.

23     BY MR. ALLOY:

24         Q.   All right.  The next item in your

25     December 5th letter is:  Various unique and

1      integrated features and functions.

2                Let's start with Features.  What did you

3      mean when you wrote "various unique and integrated

4      features"?

5          A.    So the features would be the capabilities of

6      our software, and that would fall under the

7      functions as well.  Features and functions would be

8      any -- any capability that we, you know, provide to

9      our customers via the software itself, and then the

10     enabling architectural components of those.

11         Q.    Okay.  But can you give me a couple of

12     examples?

13         A.    Sure.  So from a -- you know, the deferred

14     tax calculation would be one example of a feature

15     that we provide to our customers.  Another example

16     would be, you know, in the lease world, you know,

17     helping them track their future minimum lease

18     payment requirements associated with the leases that

19     they have to carry on their balance sheet.  Those

20     would be two examples.

21         Q.    But you would agree doing a deferred tax

22     calculation in and of itself is not a PowerPlan

23     trade secret; correct?

24                MR. FAZIO:  Objection to form.  Asked and

25           answered.

1           A.    Deferred tax calculation, according to the

2     way the law states that it must be done, is not a

3     PowerPlan trade secret.  Our implementation of that

4     is a PowerPlan trade secret.

5     BY MR. ALLOY:

6           Q.    Do features and functions, as set forth in

7     your letter, include how PowerPlan modules integrate

8     with each other?

9           A.    That's actually covered earlier in the

10    section.  However, you know, to enable a feature, if

11    it requires integration between the products, it

12    would be covered.

13          Q.    Do those features and functions include how

14    PowerPlan integrates with other systems?

15          A.    Yes.

16          Q.    Has PowerPlan revealed how it integrates

17    with Oracle with Oracle?

18          A.    I'm not aware of whether we have worked with

19    Oracle in some sort of specific design process that

20    would have, you know, shared that information.

21          Q.    Okay.  So in the underlying PowerPlan

22    database, is an Oracle structured -- it's run off

23    Oracle software?

24          A.    That's right.

25          Q.    Has PowerPlan, to your knowledge, used any

1          of Oracle's trade secrets or confidential and

2          proprietary information?

3               A.    Not that I'm aware of, no.

4               Q.    Does Oracle's software have -- the databases

5          for the PowerPlan customers, have tables like the

6          PowerPlan software does?

7                    MR. FAZIO:   Objection to foundation, form.

8               A.    I don't know.

9          BY MR. ALLOY:

10              Q.    Have you not seen Oracle's databases that

11         PowerPlan uses?

12              A.    Well, I -- the Oracle database that I've

13         seen has the PowerPlan tables in it.  I don't know

14         what table structures may exist outside of the

15         PowerPlan tables.  I'm not a database administrator,

16         so I don't have that information.

17              Q.    So do you have any understanding whether

18         Oracle's database tables are Oracle's trade secrets

19         and confidential and proprietary information?

20              A.    I do not.

21              Q.    So the part of the trade secret information

22         that you're contending is PowerPlan's includes the

23         detailed level at which the computations are

24         performed?

25              A.    That's correct.

1          Q.   Does it include advanced case or scenario

2     capabilities?

3               MR. FAZIO:   Objection to form, foundation.

4          A.   If that feature set were licensed by the

5     customer, then, yes, it would be included in that.

6     BY MR. ALLOY:

7          Q.   Does it include tracking of cost basis by a

8     cost bucket, or basis bucket?

9               MR. FAZIO:   Same objections.

10         A.   Yes.

11    BY MR. ALLOY:

12         Q.   Are you aware of any facts or evidence that

13    Lucasys has misappropriated any of PowerPlan's

14    various unique and integrated features and

15    functions?

16         A.   I do not have direct evidence of that, no.

17         Q.   Are you aware of any facts or evidence that

18    Lucasys has any of PowerPlan's manuals or supporting

19    materials?

20         A.   I understand from my interactions with the

21    United Water team that some of that material may

22    have been supplied to Lucasys.

23         Q.   All right.  So I just want to make sure the

24    record is clear.  If you don't know, that's fine.

25         A.   Okay.

1          Q.    And you did say "may."

2          A.    Right.

3          Q.    So --

4          A.    I don't know for sure, no.  I don't have

5    direct evidence of that.

6          Q.    Okay.  Other than, you know, the letters

7    that we've kind of gone through, the AEP email of

8    December 5th that lists information, the form letter

9    that we marked as Exhibit 17, has PowerPlan listed

10   in detail to its customers what it believes are its

11   trade secrets and confidential and proprietary

12   information?

13         A.    Our license agreement with our customers is

14   what outlines for them what we consider to be our

15   confidential information.

16         Q.    So PowerPlan has had license agreements with

17   its customers for many years; is that correct?

18         A.    That's correct.

19         Q.    And it was not until 2019 and 2020 that

20   PowerPlan provided any more detail on what it

21   considers to be its trade secrets and proprietary

22   information above and beyond what's in the license

23   agreements; correct?

24              MR. FAZIO:  Objection to form and

25         foundation.

1      A.    I'm not aware of another time that it was

2    done.

3    BY MR. ALLOY:

4      Q.    Has PowerPlan updated its license agreements

5    to further detail what it considers to be its trade

6    secrets and confidential and proprietary information

7    in the past three years?

8      A.    I believe we have, yes.

9      Q.    And when did that start?

10      A.    I honestly believe it's an ongoing thing we

11    take a look at on an annual basis.

12      Q.    In this December 5th letter, Exhibit 21, end

13    of that middle paragraph, the one that starts with

14    "we understand," the last sentence says:  "This

15    creates an intolerable risk for us -- and you --

16    that Lucasys may continue or begin to misuse or

17    misappropriate our confidential information and

18    trade secrets and unfairly use them to develop,

19    market and sell its competing software."

20          My question about that sentence is that it

21    says:  Lucasys may continue or begin to misuse or

22    misappropriate our confidential information and

23    trade secrets and unfairly use them.

24          Did you at the time of this letter have any

25    facts or evidence that Lucasys had misused or

1    misappropriated PowerPlan's confidential information

2    and trade secrets and unfairly used them?

3        A.    No.

4        Q.    Let me just finish up with AEP, if that's

5    okay, and then we'll take a break.

6        A.    Okay.

7        Q.    It will maybe be a few minutes at most.

8              On Exhibit 19, which is the July 17, 2020,

9    letter -- end of that first paragraph, the AEP --

10   has a similar sentence.

11             It says:  This would create an intolerable

12   risk that Lucasys will misuse or misappropriate our

13   confidential information and unfairly use it to

14   develop, market, and sell its competing software.

15             My question is the same:  As of July 17th,

16   2020 when you sent this letter, were you aware of

17   any facts or evidence that Lucasys had misused or

18   misappropriated PowerPlan's confidential

19   information?

20             MR. FAZIO:  Objection.

21       A.    I was not.  I'm sorry.

22   BY MR. ALLOY:

23       Q.    In terms of PowerPlan's request to its

24   customers to obtain prior consent before using third

25   parties, have customers been doing that since the

1    correspondence?

2          A.   I have not received any direct

3    correspondence from customers where they have asked

4    us to provide consent for third-party access.

5    BY MR. ALLOY:

6          Q.   Are you aware of PowerPlan receiving any

7    request from any customer to provide third-party

8    access?

9          A.   There are some examples of where customers

10   have sought to engage third parties for services on

11   top of our products.  They have notified us.  And

12   we're aware of that one example is a project that's

13   underway with Dominion Energy.

14         Q.   But for all the other PowerPlan customers

15   who you are aware of who use and have used third

16   parties, you're not aware of any of those customers

17   responding to PowerPlan's communication and asking

18   PowerPlan for permission to use those third parties;

19   correct?

20         A.   That's correct.  I -- yeah, that is correct.

21         Q.   I'm almost done, I promise.  Before lunch I

22   figure it's just worth finishing this really

23   quickly.  Maybe your counsel is on Central time so

24   he can wait an hour later for lunch.

25              MR. FAZIO:  We are Eastern.

1              MR. ALLOY:  Oh, you are Eastern?

2              MR. FAZIO:  Yeah.

3              MR. ALLOY:  Well, sorry about that.

4              MR. FAZIO:  That's all right.

5              MR. ALLOY:  Yeah, what number are we on?

6         22.

7              (Plaintiff's Exhibit P-22 marked.)

8    BY MR. ALLOY:

9         Q.   Mr. Bertz, I have handed you Exhibit 22,

10   which is a January 8, 2020, email string -- and this

11   may be what you're referring to in terms of followup

12   on third parties.

13             So I guess my first question is this is an

14   email string between you and Mr. Hoersdig at AEP;

15   correct?

16        A.   That's right.

17        Q.   And basically paraphrasing it, if you look

18   at the second email, Mr. Hoersdig says he's been

19   working with IT folks to gather a comprehensive list

20   of everything that touches PowerPlan.  Then you

21   reply almost a month later in January and said you

22   wanted to follow up on this.

23             And so my question to you is what happened

24   after this January 8th, 2020 communication on

25   following up?

1          A.    I believe there were additional interactions

2     that took place that -- but I do not believe that

3     AEP ever provided us with the list of vendors that

4     needed access to the PowerPlan confidential

5     information.

6          Q.    And I understand Dominion recently made a

7     request, but, to your knowledge, has any PowerPlan

8     customer provided a complete list of all third

9     parties who are accessing PowerPlan software for

10    that customer?

11         A.    Not that I'm aware of, no.

12              MR. ALLOY:   Okay.   I think this is a good

13         spot to take a break.

14              MR. FAZIO:   Okay.

15              THE VIDEOGRAPHER:   Going off video record

16         at 12:46 p.m.

17                 (Lunch recess 12:46 p.m. - 1:44 p.m.)

18              THE VIDEOGRAPHER:   We're now back on video

19         record at 1:44 p.m.   This is the beginning of

20         Media File No. 4.

21    BY MR. ALLOY:

22         Q.    Okay.   We're back after a lunch break.

23              Mr. Bertz, does PowerPlan have any documents

24    or policies that identify its trade secrets?

25         A.    I'm not aware of that.

1          Q.   Does PowerPlan have an employee handbook of

2     any kind?

3          A.   Yes.

4          Q.   Do you know if that handbook covers anything

5     about trade secrets, or confidential and proprietary

6     information of PowerPlan?

7          A.   I do not know.

8          Q.   Do you know if the handbook is something

9     that employees are required to sign?

10         A.   Not the handbook necessarily, I don't

11    believe.

12         Q.   And some employees have employment

13    agreements; is that right?

14         A.   That's correct.

15         Q.   Do all employees have employment agreements?

16         A.   Not all employees, no.

17         Q.   Do all employees have some kind of agreement

18    with PowerPlan, all PowerPlan employees, that covers

19    their obligations to not reveal PowerPlan trade

20    secrets, or confidential and proprietary

21    information?

22         A.   It's my understanding there may be one or

23    two exceptions to that.

24         Q.   Do you know who the possible exceptions are?

25         A.   There's a gentleman by the name of Mike

1          Hamby in our team that I believe may not have that.

2               Q.   Is there anybody else?

3               A.   I don't know.

4               Q.   And how did you come to learn that

5     Mr. Handy --

6               A.   Hamby.

7               Q.   Hamby?

8               A.   H-A-M-B-Y.

9               Q.   I'm sorry.

10              A.   Because we have -- trying to think of the

11    circumstances around this -- so for Mike and his

12    career development within the company, there is a

13    limit to, you know, his career development within

14    the company, quite honestly, because he has chosen

15    not to sign one of these agreements with us.  So

16    that's why I'm aware of it.

17              Q.   Is he still employed by PowerPlan?

18              A.   Yes, he is.

19              Q.   And do you know how long he's been with

20    PowerPlan?

21              A.   I do not.

22              Q.   What's his role?

23              A.   He's an engineer within our Support

24    organization.

25              Q.   Does he have access to PowerPlan's source

1    code and the other materials we discussed that you

2    understand are trade secrets of PowerPlan?

3         A.   Yes, he does.

4         Q.   When was the last time, to your

5    understanding, that PowerPlan has asked Mr. Hamby to

6    sign an agreement related to trade secrets and

7    confidential --

8         A.   I don't know.

9         Q.   -- information?

10             MR. FAZIO:  Wait, let him finish.

11             THE WITNESS:  Wait, yeah.  Sorry.

12    BY MR. ALLOY:

13         Q.   To your knowledge, has PowerPlan done a

14    review in the last two to three years to ensure that

15    any employees who haven't signed such an agreement

16    will sign one?

17         A.   I understand and recall going through a

18    review of which team members had them in place and

19    which ones did not.  But I don't recall further

20    actions being taken from that.

21         Q.   Was that review done after the issues arose

22    with Lucasys?

23         A.   No.  It would have been prior to that, if I

24    recall.

25         Q.   Was it prior to your employment with the

1     company?

2          A.    No, there's been -- at least one of those

3     reviews, I believe, took place while I have been a

4     part of the company.

5          Q.    So I just want to make sure I understand

6     what was going on with these reviews.  Is it that

7     the company periodically reviews its agreements with

8     employees to see who has or has not signed this type

9     of agreement?

10         A.    That's the one time that we've done it that

11    I can recall.  I don't think I have gone back

12    through it --

13         Q.    And --

14         A.    -- with my team since.

15         Q.    I'm sorry.

16         A.    No, that's okay.

17         Q.    Was that a review that was companywide, or

18    just your team?

19         A.    No, it was companywide.

20         Q.    In approximately when did that review

21    happen?

22         A.    Summer of 2019, I believe.

23         Q.    Well, PowerPlan, according to its document,

24    operating document that it sends to Roper, knew of

25    the Lucasys's competitive threat by the second

1      quarter of 2019; correct?

2           A.    That's my understanding, yes.

3           Q.    Prior to that review that happened around

4      summer of 2019, are you aware of any other times

5      that PowerPlan has reviewed its agreements with its

6      employees to determine whether any had not signed an

7      agreement protecting PowerPlan trade secrets and

8      confidential information?

9           A.    I'm not, because I joined the company in

10     late April of that year.

11          Q.    Does PowerPlan train its employees on what

12     it considers to be its trade secrets and

13     confidential and proprietary information?

14          A.    Yes.

15          Q.    And what kind of training is given?

16          A.    So there is documents that team members are

17     asked to review.  And we also provide security,

18     confidential information, hacking type training as

19     part of our security and compliance process.

20          Q.    Okay.  Do those documents, to your

21     recollection, communicate to employees with any

22     specificity what PowerPlan contends are its trade

23     secrets and confidential information?

24          A.    The documents that we would have team

25     members review would -- the training would be more

1    general in nature.

2         Q.   Okay.  So when someone starts at PowerPlan,

3    is there any kind of general training that they get?

4         A.   Yes.

5         Q.   And can you just give us a brief overview of

6    what that is?

7         A.   So it would be an overview of the company.

8    There would be training on our policies and

9    procedures, as we've just talked about.  There would

10   be -- and those policies and procedures are

11   wide-ranging from HR policies and benefits to, you

12   know, there is an element of confidential

13   information associated with that.  There is training

14   on security policies, office policies, et cetera, in

15   general.

16        Q.   Okay.  Does the security -- well, let me

17   back up.

18             Are you aware of whether what is covered in

19   the training is documented, you know, that there is

20   some kind of training plan that is followed?

21        A.   I'm not aware of that, no.

22        Q.   Is that something that -- well, let me

23   withdraw.

24             Who handles training?

25        A.   Our HR function handles training.

1      Q.   Is that Ms. Park?

2      A.   Yes, it is.

3      Q.   Do you know if she actually does the

4  training, or if other people do the training?

5      A.   I do not.

6      Q.   Do you recall who trained you when you

7  started at PowerPlan?

8      A.   I do not.

9      Q.   Do you know if there is any training given

10  to customers with regard to what PowerPlan contends

11  are its trade secrets or confidential proprietary

12  information?

13      A.   I'm not aware of any training like that.

14      Q.   All right.  We've already kind of covered

15  the license agreements.  And so it would be your

16  understanding that the way PowerPlan attempts to

17  protect its trade secrets and confidential

18  information with customers is through its agreements

19  with customers; correct?

20      A.   Yes, that would be my understanding.

21      Q.   Any other way PowerPlan tries to protect

22  those secrets with customers?

23      A.   Not that I'm aware of, no.

24      Q.   What steps does PowerPlan take to ensure

25  that its customers are in compliance with its

1  agreement with PowerPlan on protecting PowerPlan's

2  proprietary interests and trade secrets?

3      A.   So the communication that we've made to

4  customers is the first step.  And so we try to keep

5  an open dialogue with customers about our

6  obligations to them, as well as theirs to us, and

7  that's the main mechanism that we use on that front.

8      Q.   And that started in summer of 2020; correct?

9      A.   Well --

10          MR. FAZIO:  Objection.  Go ahead.

11      A.   I was going to say, the formal program

12  around this started in the summer of 2020, yes.

13  BY MR. ALLOY:

14      Q.   So does PowerPlan still do user conferences,

15  even virtually?

16      A.   We do.

17      Q.   In advance of each of those conferences does

18  PowerPlan have the participant sign some kind of

19  agreement with regard to the information PowerPlan

20  is sharing at the conference?

21      A.   I do not know.

22      Q.   At these user conferences do you recall --

23  well, let me step back.

24          You attend the user conferences; correct?

25      A.   I do.

1          Q.   Do you recall any type of training or

2    communication to customers about PowerPlan's

3    information and trade secrets at the beginning of

4    the conference?

5          A.   Not at the beginning of the conference, but

6    in each presentation, there is a confidentiality

7    statement, as well as a safe harbor statement about

8    the statements that will be made as a part of it.

9          Q.   Okay.  Are those like put up on the screen,

10   those slides?

11         A.   They are.  They are.  And spoken, too, as

12   well by the presenter.

13         Q.   Okay.  So the presenter has slides that

14   starts with something about confidentiality and a

15   safe harbor before they get into substance; is that

16   typical?

17         A.   That's correct.

18         Q.   And it would be your understanding that the

19   slides that are being shown would be confidential

20   and trade secrets and should not be shared; is that

21   correct?

22         A.   Yes.

23         Q.   Are attendees provided with copies of the

24   slides?

25         A.   They are available to attendees, but they

1    are secured for access.

2         Q.   Okay.  And I understand how we're in a

3    virtual world for user conferences, so let's go back

4    to 2019.

5              How in 2019 were these slides -- I'll just

6    call them slides?

7         A.   Sure.  Yeah, yeah, the presentations.

8         Q.   Provided to users?

9         A.   So that we have a community that's -- we

10   call Social Power.  And so my understanding is we

11   would have made the content from our Elevate 2019

12   conference to customers available through Social

13   Power.

14        Q.   Is Social Power a website?

15        A.   Yeah, it's a website.

16        Q.   Password protected?

17        A.   Yes.

18        Q.   Do you recall in 2019 during the conference

19   if copies, physical copies, of these slides were

20   given to attendees?

21        A.   I do not recall.

22        Q.   And then for 2020 -- and then has 2021 user

23   conference happened yet?

24        A.   Not yet, but it's -- we do it every

25   18 months.  So we did a virtual one in 2020.

1          Q.    Oh.   Were slides from the 2020 conference

2    provided the same way, through the Social Power

3    website?

4          A.    We usually used another mechanism for 2020

5    during the conference, and then -- but the content

6    since that time is available to customers via the

7    Social Power website.

8          Q.    Okay.   And what was the method that it was

9    provided besides the website?

10         A.    Well, it was tied -- and to my -- my

11   understanding is the method was tied to the

12   registration process for the virtual conference.

13   And so that was made available to the customer

14   attendees for a period of time.   And then we took

15   that content and made it available to all of our

16   customers via the Social Power website.

17         Q.    Now, you're familiar with the allegation

18   PowerPlan is making in this case surrounding Daniel

19   Chang, one of the Lucasys employees, attending a

20   PowerPlan conference in 2019?   Is that --

21         A.    I'm not familiar with that.

22               (Plaintiff's Exhibit P-23 marked.)

23   BY MR. ALLOY:

24         Q.    I'll mark as Exhibit 23 PowerPlan's answer

25   to a Complaint and Counterclaims.

1              Mr. Bertz, have you seen Plaintiff's

2     Exhibit 23 prior to your deposition?

3          A.   I do not know.

4          Q.   If you turn to page 32 to Exhibit 23.  There

5     is -- you'll see an allegation that Mr. Chang

6     attended a PowerPlan user conference as an employee

7     of Deloitte where he was exposed to

8     PowerPlan-protected information.

9              Do you have any information or evidence

10    related to that?

11         A.   I do not.

12         Q.   Well, what types of PowerPlan-protected

13    information was exposed to the users at that

14    conference?

15         MR. FAZIO:   Objection to form.  Go ahead.

16         A.   It could be many different types of

17    information.  So that was literally I think week

18    three for me at PowerPlan in 2019, so I was brand

19    new.  I was not present, nor did I review the

20    content in every one of the sessions.  However, you

21    know, my knowledge of the conference would be most

22    of the content would be supplied around end user

23    utilization of the tools.

24              However, there are some specific topics

25    around supporting PowerPlan, and you know, adopting

1    the cloud with PowerPlan, that could go into, you

2    know, deeper levels that may be more technical.

3    BY MR. ALLOY:

4        Q.   Are you aware of any facts or evidence that

5    Mr. Chang has used or taken any of PowerPlan's

6    proprietary information from that user conference?

7        A.   I am not.

8        Q.   Do you know who at PowerPlan might have that

9    kind of information?

10       A.   I don't.

11       Q.   If you would turn back to Exhibit 19 for a

12   moment.  This is your July 17, 2020 email to AEP.

13           At the bottom of the page you see the

14   header:  What are examples of PowerPlan's

15   confidential information and trade secrets?

16           And this letter lists a few additional

17   things that haven't previously been listed.  At the

18   top of the second page it's User Guides and Other

19   Documentation.

20           What did you mean by "user guides and other

21   documentation"?

22       A.   It would be documentation that would have

23   been in support of our products, or our services,

24   for that matter, that would have been provided to

25   customers as a part of their purchase of the product

1           or the service.

2                Q.   Would those user guides and documentation

3           cover individual PowerPlan modules?

4                A.   They would.

5                Q.   Would it include release notes for the

6           software?

7                A.   It would.

8                Q.   Would it include self-assessment guides

9           created by PowerPlan for its customers?

10               A.   Yes.

11               Q.   And then the next item in your letter is:

12          Professional Services Deliverables.

13                    What does that include?

14               A.   That would include documents such as

15          statements of work, design documents that we provide

16          to customers, any documentation related to the build

17          work that we do for them around the application;

18          test scripts that we might provide; any, you know,

19          work that our project managers would deliver that

20          would be status-reporting-related to the customer.

21          So any of those deliverables.

22               Q.   And then:  Information relating to our

23          software design session and workshops.  What did you

24          mean by that?

25               A.   So specifically any work that we would have

1    done with a customer to help design software on

2    their behalf, or any design sessions that customers

3    may have participated in as a part of our advisory

4    board sessions at a product level.  Any of the

5    workshops on behalf of the customer, or on behalf of

6    the innovation work that PowerPlan is doing, would

7    be confidential.

8        Q.   And then the last part of that sentence

9    lists "training classes and materials."  What's

10   included in that?

11       A.   So that could include training documentation

12   that customers would receive when they attended our

13   training classes.

14       Q.   The training guide?

15       A.   Exactly.  It would also include

16   documentation when they were to participate in an

17   event like in Elevate, where they might be trained.

18       Q.   Slides?

19       A.   Exactly.

20       Q.   Would it include anything about PowerPlan's

21   enhanced support, or premier management services?

22       A.   It might.

23       Q.   Now, towards the end of your July 17th

24   letter you indicate that people, recipients, should

25   communicate to legal at PowerPlan.com.  Is that an

1      email address that is used for sorting purposes?

2          A.    That's correct.

3          Q.    And are these purposes only related to the

4      Lucasys issue?

5          A.    No, that's not.  It's an email address that

6      is used by our legal department.  This is the

7      situation that I have been involved in using it, but

8      it wasn't set up specifically for this.  It's been

9      available to customers for some time.

10         Q.    Who do you -- is it used internally?  Does

11     -- to your knowledge, would another PowerPlan plan

12     employee use it, or it's really for outsiders to

13     email into PowerPlan's legal department?

14         A.    It's really for outsiders to email in.

15         Q.    And do you know if PowerPlan responds to

16     outsiders through that email address, or would

17     individuals use it?

18         A.    I do not know that.

19             (Plaintiff's Exhibit P-24 marked.)

20     BY MR. ALLOY:

21         Q.    Handing you what's been marked as

22     Exhibit 24.

23             This is an email you were copied on from

24     Kevin Murphy at PowerPlan to individuals at FPL and

25     NextEra; correct?

1       A.   It looks to be, yes.

2       Q.   And it was sent on August 30th, 2019?

3       A.   That's right.

4       Q.   And this stems from FPL and NextEra raising

5   concerns with PowerPlan, and PowerPlan having a call

6   and other communications with FPL NextEra about

7   those concerns; right?

8       MR. FAZIO:  Objection to form and

9      foundation.

10      A.   Part of it stems from that.  This was more

11   of a relationship-building capture of the notes from

12   that, and what our next steps would be on the

13   relationship.

14   BY MR. ALLOY:

15       Q.   Well, the last page is an August 25th email

16   from Mr. Murphy, which indicates in part his

17   appreciation for the time for NextEra and FPL and

18   the candid feedback, and attached are slides shared

19   during the session.

20       Do you see that?

21       A.   Yes.

22       Q.   And then --

23       A.   I don't see slides, but I do see --

24       Q.   Right.  And that's an issue for another day.

25   We don't have a lot of attachments in the

1    production, but we'll deal with it later.

2         A.    Okay.

3         Q.    So this session that's described in this

4    email string, were you present during it?

5         A.    I recall being present during it, yes.

6         Q.    And Mr. Murphy, who's Mr. Murphy?

7         A.    Kevin Murphy is the strategic account

8    executive that supports NextEra and FP&L.

9         Q.    And he wrote in the email he wanted to be

10   thorough and transparent in what we took from the

11   session.  And you would believe that to be correct;

12   right?

13        A.    Yes.

14        Q.    Fair to say that NextEra and FPL had

15   numerous issues with the performance of the

16   PowerPlan product; correct?

17        A.    Yes.

18        Q.    And then in his bullets like halfway down on

19   the first page he has:  Review of NEE/FPL list,

20   system performance.

21             And is that load time and other performance?

22        A.    That's right.  The system performance is the

23   property tax scenario.  And then, unfortunately, it

24   looks like the bullets here, they are indented.

25   They are supposed to be indented, but they have been

1   pulled back over to the left.

2        Q.   I see that now, and I appreciate that.  So

3   under System Performance, for example, 1.5 minutes

4   to move between screens is one of the problems?

5        A.   Exactly, with that one application.

6        Q.   With just the property tax?

7        A.   Correct.

8        Q.   Now, I take it that 1,300 returns for 430

9   legal entities is FPL's and NextEra's communication

10  to PowerPlan that we have a lot of taxes to do for a

11  lot of different entities --

12       A.   That's right.

13       Q.   -- and it's taking way too long?

14       A.   That's right.

15       Q.   And then a little lower down:  FPL

16  Engineering feedback -- look at the code.

17            Are you aware of whether FPL and NextEra had

18  access to the code?

19       A.   I am not.

20       Q.   Now, next one is:  Performance needs to

21  improve.  Citrix is not the answer.

22            Do you have any information about that?

23       A.   I do.  So with property tax specifically,

24  NextEra at the time had a very unique deployment

25  model for it.  They actually, as I understand it,

1           had the software installed on a network share drive.

2                    And so then -- and we -- our belief was that

3           that was one of the reasons that it was suffering

4           performance challenges, and so which meant that each

5           time someone had to access is, they had to navigate

6           the share drive, and the entire application had to

7           be downloaded to their desktop before it could run,

8           which was not a best practice deployment model for

9           the property tax software.  And so that's my

10          understanding of that specific problem.

11               Q.   All right.  And what's your understanding

12          relating to Citrix not being the answer?

13               A.   I believe using Citrix as a presentation

14          layer, which would entail Citrix actually running on

15          a network shared device, and then Citrix basically

16          making it such that you don't have to download the

17          application across the network, would speed up the

18          situation.

19               Q.   All right.  And before I get to some of

20          these others, generally where do things stand with

21          NextEra in terms of resolving the issues they

22          brought up in 2019?

23               A.   So they have actually chosen to replace the

24          property tax software with another third-party

25          solution.

1    Q.   Do you know who they are going with?

2    A.   I do not.

3    Q.   Have they chosen to replace any other

4    aspects of the PowerPlan software, to your

5    knowledge?

6    A.   Not that I'm aware of, no.

7    Q.   So is it -- as you look through this, why

8    don't you just take a look and indicate to me the

9    rest of these bullets, at least on page 1.  Are

10   these property tax software issues, or do they get

11   to other modules?

12   A.   No, I believe that everything here is

13   specific to property tax.

14   Q.   And do you recall when NextEra moved to

15   different property tax software?

16   A.   I think they notified us this year of their

17   decision to move to a new property tax platform.

18   But I don't know that they have actually completed

19   the move.

20         Now, so to clarify, as you get down past the

21   Citrix point.

22   Q.   Yes.

23   A.   You're now starting to talk about other

24   software packages where it says:  Plant.  Work order

25   entry process slow and difficult.

1          Q.    Okay.

2          A.    Those, that's not property tax.

3          Q.    All right.  Well, that's -- I'm glad you

4     raised that because when I asked about the rest of

5     the page, I figured that might have been included.

6               So what are those other items?  What modules

7     do those relate to?

8          A.    That is probably the plant accounting module

9     would be my understanding.

10         Q.    And do you have an understanding as to

11    whether those issues with the plant accounting

12    module have been resolved?

13         A.    I do not know.

14         Q.    And there is a bullet point towards the top

15    of page 2:  Currently two people babysit PowerPlan

16    process overnight.

17              Do you know if that's been resolved?

18         A.    I do not know if that has been resolved.

19         Q.    Who at PowerPlan may have the most

20    information about the status of these issues with

21    FPL and NextEra?

22         A.    I would say Kevin Murphy might be closest to

23    it, and then Brian Moran, who's our customer success

24    manager.

25         Q.    And then lower down it indicates a six-month

1   development program related to NextEra and FPL for

2   PowerPlan new hires.

3          Is that essentially saying someone who's

4   working on the NextEra and FPL account, it takes

5   about six months for them to get up to speed?

6      A.   No, it's -- it was a proposal that the

7   NextEra team had brought forward to us where they

8   were offering at a reduced rate, if you will, which

9   we still needed to come to a consensus on, that they

10  would have some of our newer team members come in

11  and spend six months within their organization,

12  learn the processes that NextEra was using, gain --

13  provide them with some benefit around, you know,

14  having those resources and their expertise, and our

15  team members would also gain knowledge from that

16  approach.

17     Q.   But that has not come to fruition?

18     A.   We have not put that into place with them,

19  no.

20     Q.   Have they indicated they are not interested?

21     A.   No.  Actually, they are still very

22  interested.

23     Q.   It says:  Last two projects have been

24  deficient.  A little lower down.  Do you know what

25  two projects that refers to?

1          A.   Where is that?

2          Q.   That's about three lines below the six-month

3    development program.

4          A.   I do not.

5          Q.   Do you see it where I'm --

6          A.   Yeah, I do.  I see it there.  "Last two

7    projects have been deficient."  I do not know which

8    ones they were referring to there.

9          Q.   Do you have any specifics on the point of:

10   People would show up to meetings and be lost?

11         A.   No.

12         Q.   Do you have any specific information about:

13   Lack of consistency in resources?

14         A.   Not for this, no.

15         Q.   And then what is PMO right above that?

16         A.   The Project Management Organization.

17         Q.   And who leads that?

18         A.   Today that's led by a man by the name of Sam

19   Camacho.

20         Q.   Is he relatively new?

21         A.   He's new in that role, yes.

22         Q.   Who was the previous PMO?

23         A.   The previous PMO leader was Bobby Davis.

24         Q.   And is that a leader just for FPL, NextEra,

25   or overall PowerPlan?

1          A.   Overarching project management office within

2     professional services at PowerPlan.

3          Q.   Under Consulting Rates, about halfway down

4     the page, second point:  PowerPlan rate structure

5     has led NextEra and FPL to pursue insourcing and use

6     alternative niche resources for projects related to

7     PowerPlan.

8               Do you see that?

9          A.   I do.

10          Q.   Now, this is, again, I'll remind you an

11     August 2019 communication.  Is this around the time

12     that, to your knowledge, PowerPlan learned that

13     NextEra was using Lucasys?

14          A.   I believe this would have been before that,

15     actually.

16          Q.   And the next point says that FPL and NextEra

17     prefer to use a system vendor than one- and two-man

18     shops when valued delivered correlates to rates

19     charged.

20               Do you know what they are referring to in

21     the one- and two-man shops?

22          A.   I don't know for sure.

23          Q.   And then the next point on niche vendors

24     offering lower rates for more experienced personnel,

25     do you know which niche vendors they were referring

1      to?

2          A.   I do not.

3          Q.   Bottom of this page, last bullet:  Calendar

4      and forecasting is not complete.

5               Do you know what that refers to?

6          A.   That looks to be related back to the

7      property tax software again.

8          Q.   Who at PowerPlan, to your knowledge, was in

9      charge of the property tax software in August of

10     2019?

11         A.   Can you clarify your question for me?

12         Q.   Yeah.  I mean, was there -- PowerPlan had a

13     CTO; right?  At the time?

14         A.   Mm-hmm (affirmative).

15         Q.   And I was wondering was there somebody else

16     who would oversee as a general matter the

17     development of the property tax module for

18     PowerPlan?

19         A.   It would have been a project manager, but I

20     actually don't know who it would have been at the

21     time.

22         Q.   And the project product manager would report

23     to the CTO?

24         A.   It -- they would have reported to the leader

25     of our product management organization, who left the

1        company in the fall of that year.

2              Q.   Who was that?

3              A.   It's -- I think you asked me this question

4        early, actually; and I recall her first name.

5        Unfortunately, her last name has escaped me.

6              Q.   What was her first name?

7              A.   Elizabeth.

8              Q.   Okay.  And I don't mean to ask you the same

9        questions.  Sometimes I either forget, or don't

10       realize it's the same position.  There is a lot of

11       people.

12             A.   It's okay.

13             Q.   And then about ten points down there is:

14       PowerPlan canned reports are currently exported to

15       XL and manipulated in pivot tables.

16                  What does that refer to?

17             A.   What page are you on now?

18             Q.   Page 40, bottom right, so it's really the

19       second --

20             A.   Page 3 of the?

21             Q.   Yeah, page 3.  That's a better way of

22       putting it.

23             A.   And can you point to that for me?

24             Q.   Yeah.  So ten bullets down:  PowerPlan

25       canned reports are currently exported to XL and

1      manipulated in pivot tables.

2             Do you have any knowledge about what that

3      refers to?

4      A.    So that would be referring to reports in our

5      software that the customer would run and then export

6      the data into Excel, and use Excel to manipulate the

7      data.

8      Q.    Further down there is an action item for

9      inviting Keith to participate in the Executive

10     Advisory Board.

11            Is that that customer advisory board?

12     A.    Actually, it's the actual Executive Advisory

13     Board.

14     Q.    All right.  And so what is the Executive

15     Advisory Board?

16     A.    So the Executive Advisory Board is --

17     includes approximately 25 of our top customers, and

18     that is the session that you called out earlier when

19     we were talking when we talked about the SWOT

20     analysis.  That's the event that takes place on an

21     annual basis with those customers.  And it's senior

22     representatives from those customer organizations

23     that take part in that event.

24     Q.    I seem to recall an email with a very nice

25     hotel and resort --

1          A.    That's correct, yes, that's it.

2          Q.    -- golfing?

3          A.    (Nods head affirmatively.)

4          Q.    And do you recall where that was in 2019?

5          A.    I do not.  Well, I know the city it was in,

6     Minneapolis, Minnesota.  But I do not recall the

7     name of the hotel.

8          Q.    We're talking about the same --

9          A.    Exactly.

10         Q.    -- in Minneapolis?

11               And you might have answered this before, but

12    there was no in-person Executive Advisory Board in

13    '20 or '21; is that right?

14         A.    Correct.

15         Q.    So I'd asked if August 2019 was around when

16    PowerPlan Lucasys was working with NextEra, and you

17    indicated no.  Do you recall when PowerPlan learned

18    that Lucasys was working with NextEra?

19         A.    So I believe the meeting that we held was in

20    advance of when we learned that Lucasys was engaged

21    with NextEra.  I can't say exactly the timing

22    difference.  But my recollection is that we learned

23    of the Lucasys engagement in the fall.  And this, of

24    course, would have been late summer.

25         Q.    What do you recall learning about what

1        Lucasys was doing for NextEra?

2             A.   I recall learning that or hearing

3        anecdotally that Lucasys was engaged in a

4        tax-related project with NextEra.

5             Q.   Do you recall hearing that from NextEra?

6             A.   No.  That would have been internally within

7        PowerPlan.

8                  (Plaintiff's Exhibit P-25 marked.)

9        BY MR. ALLOY:

10            Q.   Hand you what I have marked as Exhibit 25.

11                 This is an email that you sent to James May

12       of NextEra on October 20th, 2019; correct?

13            A.   That's correct.

14            Q.   And the gist of it is that you wanted to

15       have a discussion with Mr. May about a sensitive

16       situation involving a third party engaged by NextEra

17       to provide services for NextEra; correct?

18            A.   That's correct.

19            Q.   And that third party was Lucasys; right?

20            A.   That's right.

21                 (Plaintiff's Exhibit P-26 marked.)

22       BY MR. ALLOY:

23            Q.   Handing you what I have marked as Exhibit

24       26, which looks a lot like a previous exhibit except

25       there is one more email more recent at the top.

1              And, again, this is a string, an email

2       string, in October of 2019 between you and Mr. May;

3       correct?

4              A.   That's correct.

5              Q.   And we had discussed previously Mr. May's

6       email that has this picture of part of the perpetual

7       licensing agreement, but this also -- this exhibit

8       also has your response to his email; right?

9              A.   That's right.

10             Q.   And you indicate:  Yes, all of section 14

11      handles the definition of trade secrets and section

12      14.2 addresses the consent requirements for access

13      to those trade secrets by a third party.

14             That's what you wrote; correct?

15             A.   Yes, it is.

16             Q.   So did you have an understanding when you

17      emailed Mr. May that the -- part of the agreement

18      that he was citing in this email string was the

19      operative agreement in October of 2019 between

20      PowerPlan and NextEra?

21             A.   Can you say that again, please?

22             Q.   That was really long, but it was very good,

23      though, the question.  But it was very long.  Steve

24      is like do I need to book a flight for tomorrow, the

25      question was so long.

1              MR. FAZIO:  I was actually thinking to

2          myself it's so much harder to ask the

3          questions than it is to answer them.

4     BY MR. ALLOY:

5          Q.   So the gist of my question is you answer

6     him, roughly, saying yes, that's the right language.

7     And so my question is, you know, did you look to see

8     whether this was the agreement in effect at that

9     time between NextEra and PowerPlan?

10         A.   I did.

11         Q.   And so you did confirm that this was the

12    operative language?

13         A.   I did.

14         Q.   And does that refresh your recollection that

15    the operative language came from a 2001 agreement

16    with NextEra?

17         A.   So, again, I don't know the specific date.

18    There is a date in the header here, but I can't tell

19    you that that's the date that this document was

20    signed.  It's just simply the name of the document

21    and whatever network they're pulling it from, so.

22         Q.   So when you go to check the agreements with

23    your customers, is there a place on the server, that

24    folder, that has the agreements with PowerPlan's

25    customers?

1          A.    There are multiple places where those

2     agreements might be stored.

3          Q.    And is there one place that you look that

4     you think is reliable?

5          A.    So generally for something like this I would

6     also need the assistance of our legal team to make

7     sure we had the right version.  And that's actually

8     what we did here is went and made sure that we had

9     the right version.

10         Q.    So did someone email you that version so you

11    can look at it?

12         A.    Yes, yeah.  If not, they would have directed

13    me to it on -- we have them placed on a network

14    share, but most of our agreements are also on -- in

15    Salesforce.

16              The master agreements may not be in

17    Salesforce, or the license agreements may not be

18    there, but others may.

19         Q.    When you would have these kinds of

20    conversations whether with AEP or NextEra, did you

21    have some notes or a script that you would use for

22    those calls?

23         A.    Not a written script, per se.  But we would

24    have discussed in-depth the talk track that we would

25    use, and we would have played that back to each

 1     other.  I would have done that with the advice of

 2     our internal legal counsel.

 3          Q.   All right.  And you might have bullets or

 4     something like that that you would have used on

 5     these phone calls so you'd make sure to cover the

 6     certain points with the customer?

 7          A.   I don't think so, no.

 8          Q.   Do you take notes from your phone calls with

 9     customers?

10          A.   Sometimes.

11          Q.   Do you recall if you took notes of your

12     phone calls, you know, in 2019 with AEP and NextEra

13     about what was going on with Lucasys?

14          A.   I don't.  Anything that I would have taken

15     down from those calls would have been documented in

16     the emails that we would have exchanged.

17          Q.   Do you document the substance of calls in

18     Salesforce or some other software?

19          A.   I do not, no.

20               (Plaintiff's Exhibit P-27 marked.)

21          Q.   Handing you what's been marked Exhibit 27.

22               This is an email you sent to Mr. May

23     November 4th, 2019; correct?

24          A.   Yes.

25          Q.   And you proposed certain times for a phone

1    call, and you indicate that there'll be

2    representation from the PowerPlan business,

3    including you and Mr. Dahlby and legal counsel;

4    right?

5         A.    That's right.

6         Q.    And do you recall if in that next

7    communication with Mr. May whether all of those

8    people participated, you Mr. Dahlby and legal

9    counsel?

10        A.    On our side, yes.  I don't recall who on the

11   NextEra side was present within the call.

12        Q.    Do you recall who the legal counsel was?

13        A.    On our side?

14        Q.    Yes.

15        A.    It would have been Jonathan Sucher.

16        Q.    Do you recall anything from that phone call?

17        A.    I do.

18        Q.    Okay.  What do you recall?

19        A.    So I recall outlining for the NextEra team

20   that we had become aware that there was a third

21   party that they were engaging with, and that that

22   third party had been marketing itself as having

23   competitive products to PowerPlan's.

24             And I would have let them know or reminded

25   them of the confidential information protection

1    clause within the license agreement, and that

2    because of that, and because of the third party

3    marketing itself as offering competitive products,

4    we were no longer allowing, you know, consent, or

5    providing consent, for the third party to access

6    that confidential information.

7         Q.   Do you recall anything legal counsel said to

8    Mr. May on the call?

9         A.   I do not.

10         Q.   Do you recall if they spoke at all?

11         A.   I do not.

12              (Plaintiff's Exhibit P-28 marked.)

13    BY MR. ALLOY:

14         Q.   Handing you what's been marked as

15    Exhibit 28.  This is an appointment, or Skype

16    meeting, invite that you sent on November 5, 2019;

17    right?

18         A.   Yes.

19         Q.   And among the recipients was Mark

20    VanderBroek at Nelson Mullins.  Do you see that?

21         A.   I do.

22         Q.   Does that refresh your memory that Mark

23    VanderBroek participated on at least one call with

24    PowerPlan customers?

25         A.   It definitely has him on the invitation, but

1          I can't say that he participated.

2                    Q.   You don't recall whether he participated?

3                    A.   I do not.

4                    Q.   Do you recall whether he participated in any

5     calls with PowerPlan customers?

6                    A.   With the customers themselves, I do not

7     recall.

8                    Q.   Has PowerPlan ever sent a cease and desist

9     or other type of demand to any other third-party

10    vendor to stop access of PowerPlan software?

11                   A.   I don't know if we have or not.

12                        (Plaintiff's Exhibit P-29 marked.)

13    BY MR. ALLOY:

14                   Q.   Handing you what's been marked as

15    Plaintiff's Exhibit 29.  This is a November 7th,

16    2019, email from you to Mr. May; correct?

17                   A.   That's right.

18                   Q.   And you're indicating, and I'll paraphrase:

19    That PowerPlan would be pleased to help with

20    completing remaining tax work, when NextEra's ready

21    to discuss bring in Jamie Carr, and we'll work with

22    NextEra to keep pricing in line with the remaining

23    budget.

24                        That was the purpose of your email; correct?

25                   A.   Correct.

1          Q.   At this point did you have an understanding

2     that NextEra was going to stop using Lucasys, and

3     that PowerPlan would replace Lucasys?

4          A.   So at this point my understanding was that

5     NextEra was no longer going to allow Lucasys to have

6     access to PowerPlan's confidential information.  And

7     they had requested that PowerPlan help in, you know,

8     finishing the project work that they had ongoing.

9          Q.   Do you know if Lucasys was working on any of

10    the property tax module or anything related to

11    property taxes?

12         A.   I don't know that, no.

13         Q.   Do you know what Lucasys was doing for

14    NextEra?

15         A.   I do not.  I believe it had to do with

16    actually a PowerTax-type activity.  But I don't know

17    the specifics of it.

18         Q.   And do you recall NextEra providing

19    PowerPlan with a budget to meet for the remaining

20    work?

21         A.   Yes.

22         Q.   And was that budget in line with what they

23    expected to pay Lucasys?

24         A.   I don't know.

25         Q.   Did NextEra communicate anything along the

1    lines of asking PowerPlan if it would meet, or get

2    close to, the price that Lucasys was going to charge

3    NextEra?

4          A.    Yes.

5          Q.    And I presume PowerPlan said we will?

6          A.    Yes.

7                (Plaintiff's Exhibit P-30 marked.)

8    BY MR. ALLOY:

9          Q.    Handing you what's been marked as

10   Plaintiff's Exhibit 30.

11               This is an email from Steven Williams to

12   Jamie Carr that you are copied on on November 15th,

13   2019; right?

14         A.    That's right.

15         Q.    And who is Mr. Williams?

16         A.    I believe Mr. Williams is a part of the

17   Supply Chain Procurement team at FP&L.

18         Q.    And do you have an understanding that he

19   would be involved in what NextEra or FPL would be

20   willing to pay for PowerPlan services?

21         A.    Yes.

22         Q.    And he wrote that he was highlighting a

23   recent discussion the FPL team had with you, Brett

24   Bertz, during which the team was advised of the

25   underlying potential IP infringement issue that

1      prompted the termination of our existing agreement

2      for the subject services.

3              First, do you have an understanding that

4      NextEra ceased doing work with Lucasys after

5      PowerPlan indicated that there was a potential IP

6      infringement issue?

7          A.   So it was my understanding that FP&L was no

8      longer going to provide Lucasys with access to

9      PowerPlan's confidential information.   That's all I

10     know.

11         Q.   And you know that PowerPlan was going to

12     step in and complete work that Lucasys was otherwise

13     doing previously; correct?

14         A.   That's correct, at the customer's request.

15         Q.   And he wrote, Mr. Williams wrote:   We were

16     assured that he would be no worse off from a

17     commercial standpoint by awarding the remainder of

18     the work to PowerPlan.

19              Is that sentence correct, that FPL was

20     assured they would be no worse off from a commercial

21     standpoint?

22         A.   That's right.

23         Q.   And is it true that FPL communicated a

24     budget to you as roughly ▇▇▇▇▇▇?

25         A.   That's -- yes, that's true.

1      Q.   And then it appears that PowerPlan responded

2   with a budget of around ███████ plus expenses; is

3   that correct?

4      A.   That is right.

5      Q.   What ended up happening in terms of what FPL

6   was charged?

7      A.   We agreed that we would actually do the work

8   that they asked us to do for, you know, within the

9   █████████ range.  It's my understanding and

10  recollection that actually the work they requested

11  from us was less than the original scope, and so it

12  ended up being much, much smaller than the original

13  request.

14     Q.   Do you know if FPL or NextEra used another

15  service provider to work on that project?

16     A.   I do not.

17          (Plaintiff's Exhibit P-31 marked.)

18  BY MR. ALLOY:

19     Q.   I'm handing you what I have marked as

20  Exhibit 31.  This is an email string between you and

21  Mr. May on December 11th, 2019; correct?

22     A.   That's right.

23     Q.   And at the bottom, the earliest email on

24  December 11th at 9:24 a.m., Mr. May writes to you

25  indicating that there were issues with the leased

1    software, that NextEra's been live for about a year,

2    and asking how we justify paying based on value

3    added.  We have several business and IT resources

4    fixing this software internally at the same time

5    being given an invoice for ████ plus dollars for

6    value added services.

7          Do you see that?

8       A.   I do.

9       Q.   Do you have the same understanding that

10   NextEra had its own internal resources fixing

11   PowerPlan software while NextEra was being charged

12   over ████ for services?

13      A.   When you say fixing PowerPlan software, what

14   exactly do you mean?

15      Q.   Well, he wrote:  We have several business

16   and IT resources fixing this software internally.

17   So I'm just using his language.

18      A.   Oh, I see what you mean.  Okay.  So can you

19   restate your question for me, if you don't mind?

20      Q.   Yes.  Do you have an understanding that

21   PowerPlan's client NextEra has resources fixing

22   PowerPlan software internally while they are being

23   charged over ████ for PowerPlan's value-added

24   services?

25      A.   That's what Jim indicates within his email.

1          But I didn't have knowledge of that at the time.

2              Q.   Now, you respond in part with the email at

3          the top that:  PowerPlan may not have cases on these

4          so we are not aware of them.

5                   Now, is there like a ticket system or a case

6          system when issues arise with customers?

7              A.   Yes.

8              Q.   And is that what you're referring to on the

9          cases?

10             A.   It is.

11             Q.   And did you learn whether those points were

12         defects, or potential enhancements?

13             A.   They were, I think, a bit of both.

14                  And I do recall that in most instances, if

15         not all of them, we did not actually have cases

16         related to the items.

17             Q.   To your knowledge did PowerPlan endeavor to

18         fix the defects?

19             A.   Yes.

20             Q.   Did PowerPlan fix the defects?

21             A.   My understanding is we have.

22             Q.   Was PowerPlan ever able to fix all of the

23         property tax defects before NextEra decided to

24         switch to a different property tax software?

25             A.   No.  It was the performance issue was the

1     main driver behind it.  And we were not able to fix

2     that.

3               (Plaintiff's Exhibit P-32 marked.)

4     BY MR. ALLOY:

5          Q.   I'm handing you Exhibit 32, an email from

6     Mr. Williams to you, January 28th, 2020, about

7     amendment to the existing licensing agreement.

8               Do you recall what FPL or NextEra wanted

9     amended in the licensing agreement?

10         A.   Yes.

11         Q.   And what is that?

12         A.   So the existing agreement was, as we noted

13    earlier, quite antiquated, and NextEra and FP&L have

14    a number of different modules from PowerPlan, and

15    they -- you know, those modules are all contracted

16    for differently today.  And so the goal from a

17    NextEra perspective was to bring all of the software

18    that they contract for from PowerPlan under one

19    agreement that was all subject to consistent terms

20    and conditions across the software.

21              There were some service elements to it as

22    well that we were seeking, and there were some

23    things from the PowerPlan perspective that we wanted

24    included that were not included in the existing

25    agreement as well.

1          Q.   Has the agreement been amended?

2          A.   It has not.

3               (Plaintiff's Exhibit P-33 marked.)

4     BY MR. ALLOY:

5          Q.   Handing you what's been marked as

6     Exhibit 33.

7               This is an email from you to Mr. May on

8     May 1st of this year; correct?

9          A.   March 1st.

10          Q.   You're correct.  March 1st of this year;

11     correct?

12          A.   That's correct.

13          Q.   And you extended an invite to Mr. May to the

14     2021 Executive Advisory Board event; correct?

15          A.   I did.

16          Q.   Again, that was not held in person; right?

17          A.   Correct, yeah.

18          Q.   Did Mr. May accept?

19          A.   He did not.

20          Q.   Did he say why not?

21          A.   So Jim and I had spoken.  We had actually

22     invited him in 2020 as well.  He had delegated to

23     Keith Ferguson, who is the controller at FP&L, and

24     so Keith and Leo Quintana have attended in '20 and

25     '21.  I sent him this note out of a courtesy, likely

1    anticipating that he was going to decline because

2    Keith was already a part of the event.

3         Q.   You previously testified that -- I'll

4    paraphrase or say something along the lines -- you

5    learned about Lucasys doing work for SUEZ or United

6    Water sometime in the first half of 2020; correct?

7         A.   Yes, that's right.

8         Q.   And to your recollection, was your first

9    communication to SUEZ about Lucasys working with

10   them one of the emails along the lines of what's in

11   Plaintiff's Exhibit 17?

12        A.   No.

13        Q.   Did you -- did PowerPlan first have a

14   telephone call with them?

15        A.   I did.

16        Q.   And who did you talk with?

17        A.   So I talked to Michael Salas at United

18   Water.

19        Q.   And did you have a similar conversation --

20        A.   I did.

21        Q.   -- about we're concerned about use of our

22   IP?

23        A.   Yes.

24        Q.   What was his response?

25        A.   His response was, you know, general concern

1    because they had a very large project that they had

2    running that was a large IT initiative.  The

3    PowerPlan piece of it was just one piece of it.  And

4    so I think he was concerned that there would be an

5    impact to that overall initiative.

6             And he was also concerned, you know, that

7    there could be, you know, some confidentiality issue

8    taking place that he needed to know more about.

9       Q.   And what do you recall, if anything, about

10   the next step in communicating with SUEZ?

11      A.   So that call with Michael was to inform them

12   that we were going to be sending them a letter.  And

13   so the next step in the communication was we sent

14   them the letter.

15      Q.   Okay.  And when you refer to the letter,

16   it's along the lines of Plaintiff's --

17      A.   Correct.

18      Q.   -- 17?

19      A.   Yes, that's right.

20      Q.   Steve is going to be very mad if you don't

21   let me finish my question, so if you can pause, that

22   would be great.  I know you know what I'm going to

23   say, but we still have to do it.

24      A.   I understand.

25             (Plaintiff's Exhibit P-34 marked.)

1      BY MR. ALLOY:

2            Q.   I'm presenting you with Plaintiff's

3      Exhibit 34.  Do you understand this to be SUEZ's and

4      Michael Salas's response to the May 21st letter from

5      you?

6            A.   I do.

7            Q.   And you address the letter not just to

8      Michael, but to also Andriana Payson; correct?

9            A.   That's correct.  I think it's Andrianne

10     Payson.

11           Q.   I'm sorry.  Andrianne Payson, that's right.

12     She's the general counsel; right?

13           A.   That's my understanding, yes, at the time.

14           Q.   Have you had any verbal communications with

15     her?

16           A.   No.  Now, she did, I believe, join one of

17     the followup meetings after the letter had been

18     sent.  She may have been present at one of those.

19           Q.   So and you're referring to some kind of

20     followup conference call?

21           A.   That's correct.

22           Q.   Do you recall if any other lawyers were

23     present on behalf of SUEZ on any of those calls?

24           A.   I do not, no.

25           Q.   And just to be clear, if we can, that letter

1       dated May 21st, May 21st seems to be pretty early

2       compared to when the other emails went out along the

3       lines of Plaintiff's Exhibit 17.  But it's, to your

4       recollection, it would be something similar to that

5       that was sent to them?

6           A.    I'm not sure I understand your question.

7       What do you mean by early?

8           Q.    Yeah.  So that was a bad question.

9                 Plaintiff's Exhibit 17 and the related

10      emails appear to have gone out in June.  And the

11      SUEZ letter cites a May 21st, 2021?

12          A.    Ah, yes.

13          Q.    And so my question and what I'm trying to

14      get at is you still understand what you sent to SUEZ

15      was along the lines still of what is Plaintiff's

16      Exhibit 17, even though it was a little earlier in

17      time?

18          A.    That's -- yes, that is true.  That's my

19      understanding.  The letter may have been slightly

20      different and, you know, tailored to the situation

21      at United Water SUEZ, less of the form letter.  But

22      I believe the contents would have been generally the

23      same.

24          Q.    And you had already sent a December 5th,

25      2019, letter to AEP, and it could have been somewhat

1    a combination of that?

2         A.    Yes, very similar.

3         Q.    Before I go to the next document, Exhibit 34

4    is marked "outside counsel eyes only."

5              Is there anything in Plaintiff's Exhibit 34

6    that you understand to contain PowerPlan's trade

7    secrets?

8         A.    I don't see anything in the letter that

9    would follow my understanding of a trade secret.

10        Q.    And is there anything in the letter from

11   SUEZ that you understand if it were revealed to

12   Lucasys would cause some kind of harm to PowerPlan?

13        A.    From a relationship perspective, there

14   again, with SUEZ, if it were to be revealed to a

15   third party, we would need to have, I believe,

16   SUEZ's agreement to do that.

17        Q.    Well, I mean Lucasys knows that --

18        A.    Yes.

19        Q.    -- SUEZ used PowerPlan; right?

20        A.    Yes.

21        Q.    So what else are you concerned about causing

22   harm to PowerPlan by Lucasys seeing this letter?

23        A.    I guess if they have already seen it, there

24   is not additional harm that can be caused.

25        Q.    Well, I'm not saying they have seen it.

1          A.   Oh.

2          Q.   I'm saying that I don't know what harm could

3     be caused to PowerPlan.  I'm asking do you have an

4     understanding of something in here that would cause

5     harm to PowerPlan, if this letter were shown to

6     Lucasys?

7               MR. FAZIO:  Objection to form.

8          A.   Given that they already are working, or had

9     been working, with SUEZ around the PowerPlan

10    software, and they were knowledgeable that they were

11    a PowerPlan customer, I don't see anything that

12    would cause harm.

13    BY MR. ALLOY:

14         Q.   And showing you what I have marked as

15    Plaintiff's Exhibit 36.

16               Oops, sorry.  Hang on.  Let me take that

17    back.  35.

18               (Plaintiff's Exhibit P-35 marked.)

19         Q.   So I have handed you Plaintiff's Exhibit 35,

20    which is a June 18th, 2020, email letter from you;

21    correct?

22         A.   That's correct.

23         Q.   Now, the second bullet point in the middle

24    of this letter you wrote -- well, before I even say

25    what you wrote, did you draft this letter?

1          A.   I did, in partnership with our legal

2     counsel.

3          Q.   Was anyone else besides legal counsel at

4     PowerPlan involved in drafting or reviewing this

5     letter?

6          A.   My recollection is that Lydia Olu-Harding,

7     and perhaps members of her team, may have been a

8     part of it.

9          Q.   Now, that second bullet -- and I'm just

10    skipping to the pertinent points.  You can read the

11    whole thing.

12         A.   Sure.

13         Q.   "It has become apparent to PowerPlan that

14    Lucasys has had access to the proprietary PowerPlan

15    software.  This is evident because we have observed

16    the resulting PowerBuilder code and scripts

17    developed by Lucasys, which would have required that

18    Lucasys have database access to the PowerPlan

19    proprietary software (including access to

20    PowerPlan's proprietary data model) to complete."

21              Do you see that?

22         A.   I do.

23         Q.   Is that knowledge knowledge you have, or do

24    you get that from somebody at PowerPlan?

25         A.   I would have gotten that from somebody else

1     at PowerPlan.

2          Q.   Who would that have been?

3          A.   That would have been in our Support

4     organization, or our Managed Service organization.

5          Q.   But do you know the particular person?

6          A.   So it would have been Ann Owulabi.  And that

7     would have been via Lydia Olu-Harding, however, to

8     me.

9          Q.   Let me make sure I got that.  Ann?

10         A.   Owulabi.  O-W-U-L-A-B-I.

11         Q.   So you got it from Ann, who you understood

12    got it from Lydia?

13         A.   Other way around.

14         Q.   You got it from Lydia, who you understood

15    got it from Ann?

16         A.   That is correct.

17         Q.   Is Ann still with PowerPlan?

18         A.   She is.

19         Q.   What's her position?

20         A.   She's a solution manager in our Managed

21    Services organization.

22         Q.   Now, this letter cites another MSLSA, which

23    has some other definitions for confidential

24    information, one of them being object code.

25              What is your understanding of object code?

1          A.    So object code would be the code that is

2     either partially compiled, or fully compiled, that

3     would be deployed in order to run the application.

4          Q.    Customers are able to download their data in

5     tables that have column definitions; correct?

6               MR. FAZIO:  Objection to form.

7     BY MR. ALLOY:

8          Q.    From PowerPlan?

9          A.    They are able to -- are you asking if they

10    are able to download data out of our reporting

11    tool --

12         Q.    Yes.

13         A.    -- with column headers on it?  Yes, they are

14    able to do that.

15         Q.    Is it your contention that when a customer

16    does that, the column headers are PowerPlan's trade

17    secrets and confidential information?

18         A.    Yes.

19              MR. FAZIO:  Object, objection to form.

20    BY MR. ALLOY:

21         Q.    Now, is it your understanding that

22    PowerPlan's position is that Lucasys can use

23    PowerPlan's customers' data?

24              MR. FAZIO:  Objection to form.

25         A.    That's my -- that's my understanding, yes.

1      BY MR. ALLOY:

2          Q.   How is Lucasys supposed to be able to use a

3      customer's data without understanding what each

4      column of data is?

5          A.   That's a great question.

6              (Plaintiff's Exhibit P-37 marked.)

7      BY MR. ALLOY:

8          Q.   I'm handing you Plaintiff's Exhibit 37.

9              MR. MAYES:  Did you skip 36?  You skipped

10         36.

11     BY MR. ALLOY:

12         Q.   You know what, I'm going to use 36 next.

13     Just stay on 37.

14              This is a July 3rd, 2020, response by SUEZ

15     to your June 18th, letter; correct?

16         A.   Yes.

17         Q.   And without going through everything, but

18     the gist of this letter is SUEZ believes it has the

19     right to let Lucasys access the PowerPlan software

20     because it's an authorized user versus a third

21     party; correct?

22         A.   That's my understanding of the response.

23         Q.   Is there a response from PowerPlan to this

24     July 3rd letter?

25         A.   My recollection is, yes, there is a

1    subsequent letter that we provided to them.

2         Q.   Do you know if that letter came from you?

3         A.   It did not.

4         Q.   Do you know who that letter came from?

5         A.   It came from Jonathan Sucher, our legal

6    representation.

7         Q.   And do you know if Mr. Sucher wrote

8    Ms. Payson or somebody else at SUEZ?

9         A.   I don't recall exactly who he directed the

10   letter to.

11        Q.   And so where, to your knowledge, did things

12   stand with regard to SUEZ and SUEZ allowing access

13   to authorized users or third parties like Lucasys?

14        A.   Well, at the time Michael Salas informed me

15   that because of their contention that Lucasys was an

16   authorized user, and the strategic nature of the

17   larger technology project that they had running, and

18   the fact that they had a non-disclosure agreement in

19   place with the third party, and a non-disclosure

20   agreement in place with PowerPlan, that they were

21   going to continue forward in the direction that they

22   were going.

23        Q.   All right.  And then did PowerPlan respond

24   further, to your knowledge?

25        A.   That letter that we just discussed was the

1   response.

2      MR. ALLOY: Let me wrap up this line and

3      then we can take a quick break.

4      (Plaintiff's Exhibit P-36 marked.)

5   BY MR. ALLOY:

6      Q. Now handing you Exhibit 36.

7      This is an email string that you're copied

8   on between Liberty Utilities and PowerPlan; correct?

9      A. That's correct.

10      Q. And if you'd go to the second page bottom

11   there is an email from Jim Duffy to Luisa Read at

12   Liberty Utilities copying you, April 21st, 2020.

13      First, who's Mr. Duffy?

14      A. Mr. Duffy at the time was the Strategic

15   Account executive responsible for the Liberty

16   Algonquin account.

17      Q. Is Mr. Duffy still with PowerPlan?

18      A. He is. He's now in a vice-president role

19   leading a sales team.

20      Q. So he writes this email to Ms. Read at

21   Liberty. Is this -- first before we get into the

22   substance of it, is this the first time, to your

23   knowledge, that PowerPlan has reached out to Liberty

24   Utilities with regard to Lucasys?

25      A. I don't recall if this is the first

1       interaction that took place, because there is

2       actually multiple threads on the email, so.

3           Q.   Correct.  But all the other threads are

4       after April 21st; right?

5           A.   Yes.

6           Q.   So --

7           A.   So, yeah, the April 21st, to my knowledge,

8       would have been approximately -- it would have been

9       the first time that I was involved in any

10      interaction with Liberty around the topic.

11          Q.   Okay.  So a similar communication to

12      Liberty, to Ms. Read, with the concern of Lucasys

13      accessing PowerPlan software; correct?

14          A.   Yes, that's correct.

15          Q.   And then Ms. Read responds 12 minutes later:

16      I just left you a voicemail.  I had a conversation

17      with Lucasys and they are willing to sign a

18      confidentiality agreement with PowerPlan.  Let me

19      know if this is something PowerPlan has and we can

20      get to Lucasys to sign in short order.

21              Mr. Duffy responds the next day:  We have an

22      internal call to discuss this.

23              I left at you -- Ms. Read, you know, just a

24      generic followup to that hoping to get it resolved.

25              And then some more followup on having a call

1      about this.

2              And my long lead-up to the question is what

3      ended up happening with Liberty Utilities with

4      regard to this matter and Lucasys?

5          A.    The whole matter?  Or is there a specific

6      item surrounding it that you'd like to go into in

7      more detail?

8          Q.    Well, that's a really good question.  I

9      mean, there is a call.  So, do you remember -- you

10     know, the communications we have in writing stop

11     here.

12         A.    Yes.

13         Q.    There is a subsequent call that might have

14     happened May 5th.  Do you recall what was discussed

15     at that point?

16         A.    So the -- I believe I participated in one

17     call that took place.  I don't know if there might

18     have been more than one.  In the call that I took

19     part in, we followed the same talk track that we've

20     been discussing around the confidential information,

21     the license agreement, and confidential, you know,

22     information protection.

23              In this instance, Lucasys was being engaged

24     and were participating, or had attempted to

25     participate, in some design sessions with PowerPlan,

1    and the customer.  And it was my understanding after

2    we notified Liberty that they could no longer

3    participate in those design sessions because of the

4    risk to our confidential information, they no longer

5    participated in those.

6         Q.   Do you have an understanding as to whether

7    Lucasys continued to do work with Liberty even

8    though they did not participate in design sessions?

9         A.   I don't know.

10         Q.   Have you had -- to your knowledge, you, or

11    anyone else at PowerPlan had -- followup with

12    Liberty with regard to Lucasys accessing PowerPlan's

13    software, design sessions aside?

14         A.   Not Lucasys, no.

15         Q.   Has that issue come up with another third

16    party?

17         A.   No.

18             MR. ALLOY:  Let's go ahead and take a

19         break.  It's been a while.

20             THE VIDEOGRAPHER:  Going off video record

21         at 3:02 p.m.

22             (Recess 3:02 p.m. - 3:20 p.m.)

23             THE VIDEOGRAPHER:  Now back on video

24         record at 2:18 p.m.  It's the beginning of

25         Media File No. 5.

1    BY MR. ALLOY:

2        Q.    With regard to Lucasys possibly

3    misappropriating or using PowerPlan trade secrets or

4    confidential information, do you have any

5    understanding or information as to how PowerPlan has

6    been damaged?

7        A.    I'm -- no.

8              (Plaintiff's Exhibit P-38 marked.)

9    BY MR. ALLOY:

10       Q.    Let me show you what I have marked as

11   Exhibit 38.

12             MR. FAZIO:  What is the Bates?

13             MR. ALLOY:  This is Bates 144.

14   BY MR. ALLOY:

15       Q.    Mr. Bertz, this is a document reflecting

16   results from a PowerPlan EEI survey in 2020;

17   correct?

18       A.    That's what the title of the document says.

19       Q.    Have you not seen this before today?

20       A.    I recall seeing it, but I wasn't present or

21   a part of the survey itself.

22       Q.    So for this kind of survey do you have an

23   understanding that at the EEI a survey is done with

24   regard to PowerPlan, and this is some of the

25   feedback?

1          A.    That would be the indication.  I actually

2    don't recall how we actually collected the feedback

3    in this instance.

4          Q.    Okay.  The second underlying category in

5    this document is External Interfaces, and the first

6    bullet is Interfacing Data with Oracle ERP.

7                Do you have an understanding that there was

8    some issue with interfacing data with Oracle in

9    PowerPoint?

10          A.    I don't know specifically what this would

11    be, referring to, no.

12          Q.    All right.  But putting this document aside,

13    do you have an understanding that there is some

14    issue with PowerPlan interfacing with Oracle data?

15          A.    Well, so this would be referring to the ERP

16    solution from Oracle --

17          Q.    Correct.

18          A.    -- not the Oracle database that's used as

19    the PowerPlan software stack.

20          Q.    No, no, no, I understand.

21          A.    Okay.  Well, no, I wouldn't say there is

22    necessarily an issue with it.  What I would say is

23    the interfaces between PowerPlan and Oracle, and

24    PowerPlan and SAP, or other third-party systems,

25    have a tendency to be some of the more complex

1　　　elements of, you know, of the software ecosystem.

2　　　　　　　And so, you know, what I have heard from

3　　　customers is, you know, if we had ways to simplify

4　　　that, that would be a benefit to them.

5　　　　　Q.　Is it your understanding that anything in

6　　　the Oracle ERP would constitute a PowerPlan trade

7　　　secret or confidential information?

8　　　　　A.　No, that I'm aware.

9　　　　　　　MR. FAZIO:　Objection to form.

10　　　　A.　Oh, I'm sorry.

11　　　　　　MR. FAZIO:　Objection to form.

12　　　　A.　Not that I'm aware of, no.

13　BY MR. ALLOY:

14　　　　Q.　And do you have an understanding as to

15　　whether once that information is taken from the

16　　Oracle ERP, and the data is moved into PowerPlan

17　　whether PowerPlan contends it becomes PowerPlan's

18　　trade secret, or confidential information?

19　　　　　　MR. FAZIO:　Objection to form, foundation.

20　　　　A.　I do not.

21　　　　　　MR. MAYES:　Let's go off the record for

22　　　one second.

23　　　　　　THE VIDEOGRAPHER:　Going off video record

24　　　at 3:22 p.m.

25　　　　　　　(Off-the-record discussion.)

1            THE VIDEOGRAPHER:  Back on video record at

2        3:23 p.m.

3   BY MR. ALLOY:

4        Q.   Mr. Bertz, if you would turn to Exhibit 34,

5   which is the SUEZ June 8th letter to PowerPlan.  And

6   this -- again, I think you answered this question,

7   but this is a letter you had seen around that time;

8   correct?

9        A.   Yes.

10        Q.   And in the second paragraph towards the end

11   SUEZ is discussing how it ensures confidentiality

12   obligations are included in its agreements with

13   vendors and contractors, and that it applies to

14   SUEZ's agreement with Lucasys.

15            Do you see that?

16        A.   I do.

17        Q.   And did you have an understanding, at least

18   based on SUEZ's representations, that any agreement

19   SUEZ had with Lucasys would include some kind of

20   confidentiality protection?

21        A.   That was what they had stated to us, yes.

22        Q.   Now, with regard to AEP, NextEra, and

23   Liberty Utilities, you understood after you gained

24   information that Lucasys was providing services to

25   those companies, that Lucasys had contracted to

1        provide those services; is that right?

2                MR. FAZIO:  Objection to form.

3           A.   So that I -- we really didn't -- other than

4        in the NextEra situation didn't get into, you know,

5        whether those services were being paid for,

6        contracted for, or any of those details.

7        BY MR. ALLOY:

8           Q.   Okay.  What about the NextEra situation?

9        Did NextEra communicate to you anything that was in

10       their agreements with Lucasys?

11          A.   Well, from a contracting perspective -- are

12       you talking about for confidentiality purposes, or?

13          Q.   Just in general?

14          A.   Just in general?  No.  It was more along the

15       lines of they needed work to be completed.  They

16       didn't feel that they would be able to have that

17       work completed if Lucasys no longer had access to

18       our confidential information, and so, therefore,

19       they asked us to assist.

20          Q.   Putting aside whether they provided any

21       details with their contract with Lucasys, did they

22       say we have a contract with Lucasys at any point?

23          A.   Not that I'm aware of, no.

24          Q.   What about AEP or Liberty Utilities?

25          A.   No, we didn't discuss that.

1        Q.   Okay.  And did any of those companies, to

2   your recollection, AEP, Liberty or NextEra, ever

3   discuss that they had a contract with Lucasys that

4   would protect confidential information?

5        A.   I don't recall that ever being discussed.

6        Q.   Did they ever refer, to your recollection,

7   to a contract with Lucasys with regard to anything

8   that could relate to PowerPlan?

9        A.   I don't recall any of that being discussed,

10  no.

11       Q.   Did anyone at PowerPlan, to your knowledge,

12  ever ask to review -- putting aside whether they got

13  it or not, any contract between Lucasys and any

14  PowerPlan customer?

15       A.   No, I don't recall that.

16       Q.   Who do you understand to be the competitors

17  for PowerTax?

18       A.   So there is a -- there's a solution offered

19  by Thomson Reuters.  Do you mind if I refer to one

20  of the exhibits --

21       Q.   Sure.

22       A.   -- because it actually has the --

23       Q.   No, that's fine.  Anything that will help

24  you answer the question is fine.

25       A.   Yeah.  I think here -- I thought we had

1     another one here.  Well, I don't see it at this

2     point, but the one -- yeah, here we go.

3                 So these two providers, Bloomberg BNA and

4     Thomson Reuters, the One Source software, are the

5     main competitors in the marketplace specific to the

6     tax software.

7          Q.    Okay.  Do either of those competitors focus

8     on the energy industry with regard to their

9     software?

10         A.    It's my understanding that they have

11    multiple industry verticals that they support.

12         Q.    How does PowerPlan differentiate itself from

13    those products with regard to PowerTax?

14         A.    So our differentiation comes in the focus on

15    the regulated and non-regulated energy industry.

16    And given that they are more of a general tax

17    software provider, have not specialized as much in

18    those industry segments.

19         Q.    So how does specializing in those industry

20    segments make your software any different than

21    theirs?

22         A.    There are -- earlier we talked about the tax

23    laws.  And so the tax laws, and then some of the

24    compliance requirements associated with being in the

25    energy industry, can be quite unique.  And because

1      I'm not an engineer and not really an expert in the

2      tax arena, I'm not going to be able to go too deep

3      for you on that front.

4           Q.   Is there somebody, or a few people, at

5      PowerPlan who you know have some tax expertise on

6      what the software needs to do?

7           A.   Yes.

8           Q.   Who heads that up?

9           A.   So Suzanne Ward leads our Product Management

10     organization.  She has product managers and an

11     organization, you know, around tax that reports in

12     to her.

13          Q.   But she herself doesn't come from a tax

14     background, she has people that work for her that

15     do?

16          A.   That's right.

17          Q.   Do you know who the lead is on the tax role?

18          A.   Yeah.  Rob Burns.

19          Q.   What do you understand are the things that

20     are most important to PowerPlan's customers in terms

21     of its software, whether it's price, or

22     functionality, or -- I don't know, you're the CCO.

23          A.   Right.

24          Q.   So what do you understand is important to

25     your customers in terms of the PowerPlan software?

1          A.    I think the most important thing is that we

2     help them solve these really complex and unique

3     challenges that they face within their business, and

4     we do it in a high quality way that they can count

5     on, that, you know, they've trusted for many years.

6     And they know we're here to support them if they

7     ever have a need, or ever have a challenge with

8     respect to some of their key processes that they

9     have to run.

10               (Plaintiff's Exhibit P-39 marked.)

11          Q.    Let me show you what I'll mark as

12     Exhibit 39.  This is the PowerPlan 2021 to 2023

13     Strategic Plan.

14               Are you familiar with this document?

15          A.    I am.

16          Q.    Is this something that PowerPlan does once a

17     year, to your knowledge?

18          A.    That's about right, yes.

19          Q.    And is this used just internally and within

20     Roper Technologies?

21          A.    That's right.

22          Q.    Okay.  On the second page of this strategic

23     plan under the Executive Summary, it says:  Within

24     our targeted niche we are the market leaders within

25     fixed asset accounting and tax.

1                Which market is that referring to?

2                MR. FAZIO:  Objection of form.

3     BY MR. ALLOY:

4        Q.   If you know?

5        A.   So it would be referring to the broader

6     market that our fixed accounting and tax software

7     would have, you know, efficacy and importance to.

8        Q.   Okay.  So is that, you know, looking at

9     the -- is that like the core market, as you referred

10     to it earlier?

11        A.   So in the current definition of the core

12     market, it would be companies within the energy

13     industry.

14        Q.   All right.  So just trying to understand

15     when the Executive Summary refers to market

16     leaders -- well, let me step back.

17                Did you have any input into this executive

18     summary?

19        A.   I do.  Well, not the executive summary, but

20     I have input into other parts of the document.

21        Q.   So other parts of the Strategic Plan.  And

22     are there specific parts you recall having input on?

23        A.   So on page 11 where we begin to talk about

24     PowerPlan services, I would have had input there.

25     Might have had -- I can't recall exactly, but I may

1      have provided some input into the Alliances and

2      Partner section as well.

3          Q.   Who are the primary people, to your

4      understanding, who worked on this strategic plan?

5          A.   This would have included our CEO Joe Gomes.

6      It would have included our VP of Marketing Drea

7      Toretti, our CFO Joost Ruten.  Suzanne Ward would

8      have been a part of this in Product Management.  I

9      would have been a part of it.  Jim Dahlby would have

10     been a part of it.

11         Q.   All right.  So just going back to that

12     executive summary, I can't remember exactly where we

13     left off, but I'll back up.  You were saying

14     something along the lines of the market leaders

15     point within fixed asset accounting and tax refer to

16     the broader market.

17             So when you say "broader market," are you

18     referring to more than the investor-owned utilities?

19         A.   I am.  I said -- yeah, specifically I think

20     I said the energy industry.

21         Q.   Okay.  Now, on PowerTax, which looks like

22     it's covered on page 6, at least the tax modules,

23     the commentary begins with:  Income tax is

24     PowerPlan's stickiest and most differentiated

25     product solution with currently 81% penetration for

1          the PowerTax module within our core IOU market.

2                    So just to be clear, that 81% is the subset

3          of the energy market that is investor-owned

4          utilities; correct?

5          A.    That's correct.

6          Q.    And do you know what that is 81% of?  Is

7          that like every investor-owned utility in the United

8          States?

9          A.    It would be investor-owned utilities in

10         North America, and it would be just for that

11         PowerTax module.

12         Q.    Do you know how many IOUs there are in North

13         America?

14         A.    About 110, I believe.

15         Q.    So PowerPlan would have close to 90?

16         A.    About 90 of them.

17         Q.    To your knowledge, has that been a

18         relatively stable number in terms of market

19         penetration in terms of tax?

20         A.    To my knowledge, yes.

21         Q.    On the next page there is a tax module

22         penetration rates, which has IOU, and then it's

23         MUNI, I presume that's municipalities.  They don't

24         have tax issues?

25         A.    Right, no taxes.

1      Q.   What are the remaining columns?

2      A.   So Cooperatives, such as, you know, electric

3 membership cooperatives, that's what that refers to.

4 MidStream, UpStream and DownStream. And then fully

5 integrated oil and gas.

6      Q.   So MidStream, UpStream and DownStream are

7 oil and gas?

8      A.   That's correct, yes.

9      Q.   Just depending where in the process?

10      A.   That's correct. And then integrated has

11 them all three together.

12      Q.   Do you know generally what the market

13 penetration is for One Source and Bloomberg on tax?

14      A.   I do not.

15      Q.   Do you know if any IOUs would use PowerPlan

16 and One Source or Bloomberg, or do they usually pick

17 one?

18      A.   I don't know.

19      Q.   You're not aware of any who use two?

20      A.   I'm not aware of any who use both, no.

21      Q.   Is that something that probably wouldn't

22 make sense for a customer to use both because they

23 overlap too much?

24      MR. FAZIO: Objection to form.

25 BY MR. ALLOY:

1          Q.   To your understanding?

2          A.   So I think it depends.  The main thing it

3     would depend on whether they made sort of

4     centralized technology decisions, or if they had

5     business unit level decisions where they were -- in

6     a scenario with a large corporation, business units

7     may have the autonomy to choose which software

8     packages they use to run.

9          Q.   Since you've been at PowerPlan do you know

10    of any PowerPlan customers who have switched from

11    PowerTax to another module, another service?

12         A.   I can't think of any, no.

13         Q.   All right.  There is a statement on page 3

14    that says:  All of our large enterprise customers

15    use PowerPlan in addition to their ERP and EAM

16    systems.

17              Is that correct, that your understanding is

18    there is always another system in place at a

19    PowerPlan customer besides the PowerPlan software?

20         A.   Yes.

21         Q.   On the next page, 4, just in the middle

22    there is a sentence that:  The 2020 roadmap

23    represents the first significant feature

24    improvements to the legacy products (with the

25    exception of Lease Accounting) in almost three

1    years.

2            Do you understand that to be correct?

3       A.   I do.

4       Q.   Now, on the next page, page 5 for fixed

5    asset accounting, the commentary indicates that it

6    has a 75% market penetration for investor-owned

7    utilities.

8            Do you understand that to be correct?

9       A.   I do.

10       Q.   And has that been relatively stable while

11    you've been at PowerPlan?

12       A.   It has.

13       Q.   And would that be investor-owned utilities

14    in North America for the 75%?

15       A.   Yes.

16       Q.   So out of the 110, we're talking like about

17    80?

18       A.   Approximately, yes.

19       Q.   Okay.  On page 9 of the Strategic Plan, this

20    is for regulatory, under Competition it indicates:

21    PowerPlan competes with in-house solutions and

22    utilities -- or Utilities International.  And

23    Utilities International reports that its clients

24    include 84% of the top 25 U.S. utilities and

25    leverages data which comes directly from PowerPlan.

1              Do you see that?

2      A.   I do.

3      Q.   Does PowerPlan have any agreements with

4  Utilities International?

5      A.   We do not.

6      Q.   And Utilities International is a competitor

7  in the software space?

8      A.   They are.

9      Q.   What is PowerPlan doing to protect its trade

10 secrets and confidential proprietary information

11 with regard to Utilities International?

12     A.   We're working with our customers to ensure

13 that, you know, the confidential information that is

14 governed by the license agreement is cared for

15 appropriately.

16     Q.   Have PowerPlan's customers responded to

17 PowerPlan's request to identify third-party vendors

18 like Utilities International such that PowerPlan

19 even knows which customers even use Utilities

20 International?

21     A.   So there is only a subset of the customers

22 that were in the program of communication around

23 confidential information.  So not all of the

24 customers were a part of that.

25     Q.   Do you know how many of PowerPlan's

1    customers use Utilities International?

2         A.   I do not.

3         Q.   Well, they indicate, as you can -- or the

4    strategic report for PowerPlan indicates 84% of the

5    top 25 utilities.  So, roughly, 20 of the top 25;

6    right?

7         A.   Yeah, approximately.

8         Q.   And do you know if PowerPlan has information

9    of which of those approximate 20 top U.S. utilities

10   use Utilities International?

11        A.   I do not.

12        Q.   The next page, page 10 of the Strategic

13   Plan, the platform which covers modules like Charge

14   Repository and the ERP/EAM adapters and integration

15   APIs, in the commentary it starts with:  "Charge

16   Repository is the main integration point between

17   PowerPlan and other ERP systems, providing a

18   flexible framework for data ingestion and extraction

19   to and from our software...also includes robust

20   engines to support derivations, allocations,

21   adjustments, and Journal entries with specific

22   requirements for utilities, such as Joint plant

23   allocations."

24             What ERP or EAM systems does Charge -- is

25   Charge Repository able to access?  Like Oracle is

1      one; right?

2           A.   That's correct, yes.

3           Q.   SAP?

4           A.   I would say those are the two most popular.

5           Q.   All right.  Are there others?

6           A.   I am sure there are.  You know, an example

7      would be PeopleSoft, which is actually owned by

8      Oracle.  We've integrated with PeopleSoft.  I can't

9      think of another third-party ERP system that's out

10     there today that we've integrated to.  Infor,

11     perhaps.

12          Q.   I'm sorry?  Infor?

13          A.   Yeah.  Infor is another example.

14          Q.   Like in, number 4?

15          A.   I-N-F-O-R.

16               MR. FAZIO:  Try not to talk over each other.

17               MR. ALLOY:  That was my bad.

18     BY MR. ALLOY:

19          Q.   Does PowerPlan have -- I think we've covered

20     this with Oracle, but just to be clear, PowerPlan

21     doesn't have an agreement with Oracle to acces

22     its -- Oracle's ERP database for data integration;

23     correct?

24          A.   I don't know if we have an agreement like

25     that or not.

1          Q.   And does PowerPlan, to your understanding,

2     have an agreement like that with SAP?

3          A.   I'm not aware of one, no.

4          Q.   Does PowerPlan have an agreement like that

5     with Infor?

6          A.   I'm not aware of one, no.

7          Q.   Do you know what PowerPlan can see inside of

8     these ERP systems when it accesses them?

9          A.   I do not.  In general, when we set up

10    interfaces, our customers' IT organizations are

11    actually building the extraction portion of the

12    interface from the ERP system.  And then we're

13    building the transformation and loading portion of

14    it to take the data, consume it, and get it into the

15    PowerPlan software.

16         Q.   Do you know when the data comes in, before

17    the PowerPlan software does anything with it, if it

18    takes the data and just -- for lack of a better way

19    to put it, just transcribes it as-is to get into the

20    PowerPlan system before PowerPlan does anything with

21    the data?

22              MR. FAZIO:  Objection to form.

23         A.   I'm not sure I understand your question.

24    BY MR. ALLOY:

25         Q.   Okay.  I haven't seen PowerPlan.  I haven't

1    seen Oracle.  Not a computer science guy,

2    unfortunately.  So you're going go be talking to a

3    lawyer/accounting educated person about software, so

4    bear with me.

5              Do you have an understanding when the Oracle

6    system -- someone accesses the Oracle system and

7    there's data, it's going to have columns or

8    whatever, some indication of what the data is;

9    right?

10   A.    Right.

11   Q.    Now, when PowerPlan accesses that system for

12   its customer that also uses Oracle, do you have an

13   understanding as to whether that data in Oracle is

14   first transferred to PowerPlan as-is, as it is in

15   Oracle, before PowerPlan software does anything to

16   that data?

17   A.    No, it's generally -- there is a data model

18   in PowerPlan, and there is a data model in Oracle,

19   and the data is extracted, and then it's transformed

20   to fit the PowerPlan data model, and that's how the

21   PowerPlan software consumes it.

22   Q.    Okay.  So, in other words, if one of the

23   items of information in both Oracle and PowerPlan is

24   asset name, and that is in Oracle's column D, but it

25   is in PowerPlan's column A, the data integration

1    will make sure it pulls that data from column D for

2    asset name into PowerPlan's column A so that you

3    have all the data in the right place at PowerPlan

4    keeps it; correct?

5         A.    Yes, that's my understanding.

6         Q.    And to be able to do that, you would agree

7    that PowerPlan has to be able to see what, you know,

8    the data is labeled, and what it's called, and how

9    the columns and rows are classified; correct?

10        A.    We would need that if we were performing

11   that function on behalf of our customers.  In many

12   instances, the customer's actually taking it to that

13   point and then ensuring that it fits the data model

14   template for consumption into the PowerPlan

15   software.

16        Q.    All right.  Page 11 of the Strategic Plan.

17   It's about PowerPlan services.  And this is the part

18   that you said you probably had some input in;

19   correct?

20        A.    Yes.

21        Q.    Now, this says ███ of PowerPlan revenue

22   comes from professional services, including

23   implementations, upgrades, et cetera.  You

24   understand that's accurate, to your knowledge?

25        A.    Yeah.  At the time that we built this

1    document that was the case.

2        Q.  Now, at the bottom of this page there is a

3    section Services Competition for PowerPlan.

4           Do you know what market share PowerPlan has

5    for these types of services, you know, PowerPlan

6    products, sort of PowerPlan's market share for its

7    own services?  Do you --

8        A.  Right.  We don't actually track that, no.  I

9    don't have that specific number.

10        Q.  Now, towards the bottom of this page, the --

11    like two-thirds of the way down the Services

12    Competition for PowerPlan, this document says in

13    addition to SI -- and what's an SI?

14        A.  A systems integrator.

15        Q.  Can you give an example of one?

16        A.  Deloitte, Accenture, IBM.

17        Q.  So:  In addition to SIs, there are a small

18    number of specialized consulting firms that compete

19    for services in the PowerPlan customer ecosystem

20    today.  The most notable of these firms is Regulated

21    Capital Consultants (RCC) which employs around 40

22    team members, many of whom are former PowerPlan

23    employees.

24           Do you have an understanding that that's

25    correct?

1          A.    Yes.

2          Q.    It says:  These specialized firms do little

3     to expand the PowerPlan business and often compete

4     directly with PowerPlan professional services,

5     offerings on expertise and price.

6                Is that true?

7          A.    Yes.

8          Q.    It says:  PowerPlan does not have a formal

9     partner program or any contractual agreements in

10    place to protect PowerPlan intellectual property or

11    customer experience when these specialized

12    consulting firms engage in the PowerPlan system.

13                Is that true?

14         A.    Yes, it is.

15         Q.    Finally, it says:  There is risk to

16    PowerPlan's business and customer relationships as

17    these third parties potentially use access to

18    PowerPlan intellectual property and customers to

19    build competitive solutions targeted to displace

20    PowerPlan's current software offerings.

21                Is that true?

22         A.    I believe it is, yes.

23         Q.    So if you turn to page 13, the Strategic

24    Plan covers market landscape, key risks, challenges

25    and opportunities.

1           And letter B indicates:  ERP cloud

2   transitions are driving terminations in

3   non-regulated customers.

4           Do you see that?

5       A.   I do.

6       Q.   And one of the competitive -- one area of

7   competition that PowerPlan is facing is from

8   Utegration; correct?

9       A.   It's Utegration.

10      Q.   Utegration?

11      A.   That's correct, yes.

12      Q.   And they're a PowerPlan competitor?

13      A.   They are.

14      Q.   Do you know if they access the PowerPlan

15  software?

16      A.   I do not know.

17      Q.   Do you know if anybody at PowerPlan is doing

18  anything to find out if they do?

19      A.   I do not.

20      Q.   Do you know if PowerPlan is doing anything

21  to find out if any third party who accesses the

22  PowerPlan system is building competitive software to

23  PowerPlan?

24      A.   We do market analysis and research on an

25  ongoing basis, and it's used as input into these

1      annual reports.  So that is generally what we use in

2      order to determine what does the competitive

3      landscape look like, and how is it evolving over

4      time.

5          Q.   Okay.  So I guess this market research is

6      from what, customers are using?

7          A.   Well, no.  I mean, it would be -- our

8      marketing team conducts research.  We have -- we

9      keep an eye on, you know, social media.  We keep an

10     eye on what's being communicated by other third

11     parties.  You know, we keep on eye on press releases

12     from our customers and what they are saying, and

13     general market information.

14             And we use that to understand, you know,

15     where is the market -- where are the markets that we

16     serve going from an investment prospective, and then

17     what does the competitive landscape look like inside

18     those.

19         Q.   So if there is a third party accessing the

20     PowerPlan software on behalf of a customer or

21     otherwise, PowerPlan would not know that they're

22     building a competing software product unless that

23     third party made some information public about that

24     software being built; correct?

25             MR. FAZIO:  Objection.

1          A.    That is correct.

2                MR. FAZIO:  Objection.

3          A.    Sorry.

4    BY MR. ALLOY:

5          Q.    You can answer.

6          A.    Yes, that is correct, that is my

7    understanding.

8          Q.    So what is PowerPlan doing to, if anything,

9    to try to find out if third-party vendors who access

10   PowerPlan software are building competitive software

11   to PowerPlan, besides what would be publicly

12   available information?

13         A.    I think at this time we're only relying on

14   the publicly available information.

15         Q.    Are you familiar with the deferred tax

16   solutions that are part of PowerPlan's software?

17         A.    To an extent.  I'm aware of them, but I'm

18   not an end user, and I didn't develop them.

19         Q.    Yeah, I wasn't going to ask you --

20         A.    Okay.

21         Q.    -- about that.  Do you know who the

22   competitors are for that product?

23         A.    I do not.  If they are not One Source and

24   Thomson Reuters, or rather Bloomberg and Thomson

25   Reuters.

 1         Q.   For PowerPlan software, how do customers
 2    access the results of anything generated by
 3    PowerPlan software?
 4         A.   Through the product's user interface.
 5         Q.   Would the customer ever be able to access
 6    the database directly for that?
 7         A.   In a situation where the software is
 8    deployed in an on-premise environment, the customer
 9    has access to the database in their on-premise
10    deployment.
11         Q.   Does PowerPlan ever provide scripts to
12    customers for them to be able to utilize?
13              MR. FAZIO:  Objection to form, foundation.
14         A.   We will provide scripts to customers for
15    them to utilize, yes.
16    BY MR. ALLOY:
17         Q.   And just, you know, again, I'm not a
18    software person, so -- and maybe you've already
19    answered this in the last minute.  But do customers
20    ever use direct access to the PowerPlan database to
21    update or alter their data?
22         A.   My understanding is yes, they will do that.
23         Q.   I thought that was the answer based on your
24    prior question --
25         A.   Okay.

1         Q.   -- but I want to make sure I worded it

2   correctly.

3            And in terms of the data generated by the

4   PowerPlan software itself, who do you understand to

5   own or have the right to that data?

6            MR. FAZIO:  Objection to the form.  It

7       calls for a legal conclusion.

8   BY MR. ALLOY:

9         Q.   I mean, do you have an understanding as the

10   CCO that that's the customer's data, or?

11         A.   So the ownership of the data, as I

12   understand it, is really governed and outlined in

13   our licensing agreement with the customer.

14         Q.   Getting closer to the end, which is the good

15   news.  A couple other topics, then I want to take a

16   quick break and see if I can wrap up.

17            First, without getting into attorney-client

18   communications, what did you do to prepare for this

19   deposition?

20         A.   I reviewed materials that many of which

21   we're looking at here surrounding the communications

22   that took place with the customers, and, you know,

23   followed basically -- we had several meetings, Steve

24   and Jonathan and I had, in preparation.

25         Q.   Did you review your emails?

1          A.    I did.

2          Q.    Do you have a Lucasys email folder?

3          A.    I do.

4          Q.    Do you know if anyone at PowerPlan reached

5     out to Deloitte with regard to Daniel Chang?

6          A.    I do not.

7          Q.    Do you know that Daniel Chang used to work

8     at Deloitte?

9          A.    Only from the information that's been shared

10    in this meeting.

11         Q.    Do you know if anyone at PowerPlan reached

12    out to Deloitte with regard to Daniel Chang?

13         A.    I do not.

14         Q.    Do you know who Doug Johnson is?

15         A.    I'm aware of Doug, yes.

16         Q.    And who do you understand him to be?

17         A.    I understand him to be a former PowerPlan

18    employee that left PowerPlan a few years ago, and

19    that's my knowledge of Doug.

20         Q.    Do you know what he's doing now?

21         A.    My understanding is now he's actually a part

22    of a company by the name of Arc-Two.

23         Q.    Do you know if anyone at PowerPlan, or on

24    behalf of PowerPlan, has corresponded with

25    Mr. Johnson about any issues related to trade

1    secrets or confidential, proprietary information of

2    PowerPlan?

3        A.   I have, actually.

4        Q.   Okay.  What kinds of communications did you

5    have with him?

6            MR. FAZIO:  Hold on.  You're not asking

7        for attorney-client communications; right?

8            MR. ALLOY:  Well, I'm asking just for his

9        communications with Mr. Johnson, so.

10           MR. FAZIO:  Oh, I'm sorry.  I misheard

11       you.  I'm sorry.

12           MR. ALLOY:  Yeah.  So I presume those

13       aren't attorney-client.

14           MR. FAZIO:  Sorry.

15   BY MR. ALLOY:

16       Q.   Yeah.  So what communications have you had

17   with Mr. Johnson?

18       A.   So Mr. Johnson and another principal from

19   Arc-Two were providing services to a company by the

20   name of National Grid.

21       Q.   I'm sorry, what?

22       A.   National Grid.  National Grid has rights to

23   the PowerPlan source code, or to -- right to modify,

24   basically.  And there was an instance in an

25   engagement that was taking place on the part of

1            Arc-Two where Arc-Two modified that source code.

2            And so I was on point along with one of our Customer

3            Success team members to do some followup, both with

4            the customer as well as with Arc-Two.

5                 Q.   Who was the other person at Arc-Two?

6                 A.   I'm so bad with names.  Ann.  And her last

7            name escapes me.  But she's the main principal at

8            Arc-Two.

9                 Q.   And approximately how long ago did you have

10           this communication?

11                A.   It was in 2021.  I believe it was in the

12           spring, perhaps.

13                Q.   And there was a concern -- well, what was

14           the -- I understand the background of Arc-Two's

15           modifying code, but what was the PowerPlan concern?

16                A.   That they had actually modified part of our

17           core product software, and billed it and deployed it

18           on behalf of the customer.

19                Q.   Okay.  So, again, so the layperson, lay

20           lawyer here understands, instead of a customization,

21           which is -- might be an extension --

22                A.   Exactly.

23                Q.   -- they went in and did something to the

24           underlying software, to your understanding?

25                A.   That's correct.

1     Q.   And that's a concern of PowerPlan because it
2   could create problems with the software?
3     A.   That's right.
4     Q.   And that would only create, just so we're
5   clear, that would just be that customer's software,
6   but it wouldn't -- it might not work correctly if
7   they do that?
8     A.   That's correct.
9     Q.   And so was there communication to cease
10   modifying the core software?
11     A.   Yes.
12     Q.   And how did they respond?
13     A.   They agreed that that was not their, you
14   know, primary approach, and it was a special
15   situation associated with the project, and that they
16   would endeavor not to do that in the future.
17     Q.   Do Arc-Two, Doug Johnson, and Ann, the main
18   principal --
19     A.   I'm sorry.
20     Q.   That's okay.  I get it.  Did any of them
21   have agreements with PowerPlan?
22     A.   No, they did not.
23     Q.   Do you know if they are building any kind of
24   competing software?
25     A.   I do not.

1          Q.   Do you know if they have any agreement with

2     National Grid to keep PowerPlan's trade secrets or

3     confidential information confidential?

4          A.   My understanding, through their

5     confirmation, is they have a non-disclosure

6     agreement in place with National Grid.

7          Q.   But you haven't actually seen --

8          A.   I have not seen it.

9          Q.   Has PowerPlan, anyone at PowerPlan to your

10     knowledge, had any communications with RCC,

11     Regulated Capital Consultants, I think, with regard

12     to any issues with PowerPlan?

13               MR. FAZIO:  Objection to form.

14     BY MR. ALLOY:

15          Q.   So, you know, any communications with RCC

16     about PowerPlan having concerns about RCC accessing

17     PowerPlan's trade secrets, or confidential and

18     proprietary information?

19          A.   So we are currently working with RCC, and

20     Dominion, as I mentioned earlier.  And in that

21     engagement, Dominion has taken great steps to ensure

22     that the proper protections were in place while, you

23     know, RCC has access to potential confidential

24     information as a part of that.

25          Q.   What do you understand those great

1          protections to be?

2               A.   So there are -- you know, there was quality

3          reviews that are taking place inside that where

4          Dominion has engaged our teams to help as a part of

5          that process, and ensuring that as a part of the

6          design process, that we were not encroaching on, you

7          know, PowerPlan confidential information in the same

8          way that that would have taken place with Arc-Two

9          and the changes that they made to the core product,

10         making sure nothing like that happened, and

11         ultimately, you know, preserving the customer

12         experience as a part of that process.

13              MR. ALLOY:  All right.  Let me -- let's

14              take a ten-minute break and see if we can't

15              wrap up.

16              THE VIDEOGRAPHER:  Going off video record

17              at 4:07 p.m.

18                   (Recess 4:07 p.m. - 4:18 p.m.)

19              THE VIDEOGRAPHER:  Now back on video

20              record at 4:18 p.m.  This is the beginning of

21              Media File No. 6.

22                   (Plaintiff's Exhibit P-40 marked.)

23         BY MR. ALLOY:

24              Q.   Mr. Bertz, just a few things I want to

25         follow up on from earlier today that I missed.

1          I'm handing you Exhibit 40.  And this is an

2    email string that you're copied on between PowerPlan

3    and Liberty Utilities.  Do you see that?

4          A.   I do.

5          Q.   And the email at the bottom of the first

6    page from Ms. Allison at Liberty Utilities

7    indicates -- I'm paraphrasing -- that Liberty had

8    secured resources to help our team.  It has limited

9    resources to work on the project related to

10   PowerPlan, and they were told that there was an

11   issue using the resource.

12         With regard to that part of her email, do

13   you have an understanding that Liberty was told by

14   PowerPlan that PowerPlan had concerns about Lucasys

15   accessing the PowerPlan software?

16         A.   What we told Liberty in the call that I was

17   in was that our license agreement required our

18   consent for them to provide our confidential

19   information to third parties, and that because

20   Lucasys was marketing itself as a competitive

21   software provider, we could no longer provide that

22   consent.

23         Q.   And then at the top of the first page of

24   Exhibit 40, point number 2 in Mr. Duffy's email

25   is -- indicates that that issue with the third party

1          could not be resolved.

2                    Is that your understanding?

3          A.    That is my understanding.

4          Q.    And that third party is Lucasys; right?

5          A.    That is my understanding, yes.

6          Q.    And No. 3 in Mr. Duffy's email indicates:

7     PowerPlan has been trying to help fill the void.

8     PowerPlan presented one option to Liberty last week,

9     but Liberty didn't feel that person was the right

10    fit for the role.

11                   Do you know what option was presented there?

12         A.    So my understanding is we actually presented

13    the customer with multiple options.  I think this

14    option that's being referenced was actually an

15    internal PowerPlan team member.  But we offered to

16    connect them with other third parties as well, RCC

17    being the primary vendor there, that we could have

18    potentially, you know, gotten them engaged with to

19    help.

20         Q.    So has PowerPlan -- let me withdraw.

21                   Do you know what happened with regard to

22    what option was selected?

23         A.    I do not, actually.

24         Q.    So based on your answer a moment ago there

25    have been times when PE has referred customers to

1    other service providers?

2         A.   We have made that offer.  I can't think of

3    any scenario in my tenure at PowerPlan when a

4    customer has actually taken us up on it, but we've

5    certainly made that offer.

6         Q.   In terms of making that offer, has PowerPlan

7    offered to make available any service providers

8    besides RCC, to your knowledge?

9         A.   That was the main one that we felt in the

10   instances that I can recall had the scale and scope

11   of expertise to help.

12        Q.   What is your view on the scale and scope of

13   expertise of RCC versus PowerPlan?

14        A.   Well, from a size perspective, RCC, when I

15   last saw it, had maybe 40 to 50 team members.  You

16   know, our professional services team alone has about

17   150 in it today, 145.  So, you know, from a size

18   perspective, we're much bigger.

19             I think inside, if you look at the numbers

20   of years of expertise that we have inside our team,

21   we probably have more.  I would say that, you know,

22   from a size and scale perspective, that pretty much

23   is my knowledge of the two teams.

24        Q.   Okay.  Well, all right.  So the PowerPlan

25   has more people.  And if you add up the years of the

1    more people, they have more years?

2        A.   No, that's not what I meant.  I mean, if you

3    look at -- if you look at the most senior people

4    that we have and this expertise that's there, I

5    would say it's on par with what we have at RCC.

6        And I would broaden the definition, too, out

7    into the rest of our Services business into our

8    Support organization, and to Managed Services as

9    well, and the expertise goes up in doing so there as

10    well.

11        (Plaintiff's Exhibit P-41 marked.)

12        Q.   Handing you Plaintiff's Exhibit 41.  This is

13    a document produced by Roper, I think the same

14    2019-type slides that has the 2020 copyright?

15        A.   Okay.

16        Q.   Have you seen this exhibit before?

17        A.   I believe I have.

18        Q.   So the title of the slide:  Increasing

19    Software and SI Activities in Core Markets, that

20    first row for Tax Suite, Software and Service has

21    Lucasys all the way on the left and RCC all the way

22    on the right in terms of software and service.

23        In terms of software, is it your

24    understanding that Lucasys -- well, let me withdraw

25    and ask a different way.

1          Why do you understand Lucasys is all the way

2     on the left on the -- on this scale when it also

3     provides service?

4          A.   It's a great question.  I did not actually

5     create this.  So from my understanding is that, you

6     know, they are predominantly marketing themselves as

7     a software provider, but that's only based on the

8     publicly information -- publicly available

9     information that I'm aware of.

10         Q.   Well, before PowerPlan found out that

11    Lucasys was marketing software, didn't -- PowerPlan

12    did know that Lucasys was providing services;

13    correct?

14         A.   That's my understanding, yes.

15         Q.   And it wasn't until PowerPlan believed that

16    Lucasys was going to provide potentially competing

17    software that PowerPlan communicated to the

18    customers that it did not approve of Lucasys's

19    accessing its software; correct?

20         A.   That is correct, yes.

21         Q.   Now, under the comments here in that first

22    row it says:  Lucasys's claims to have an Alpha

23    customer confirmed.

24              Do you know who that customer is?

25         A.   I do not.

1            Q.    The final line of that comment says:  Other

2       players offer weaker solutions for regulated

3       industries.

4                 Is that your understanding as well?

5            A.    It is.

6            Q.    All right.  And the other players besides

7       RCC there tend to be weaker in the regulated

8       industry market?

9            A.    That's correct.  It -- I -- to be -- to

10      clarify, that comment was largely focused on the

11      software side of this matrix because the big four

12      there in EY, PWC and Deloitte have practices in

13      utilities.

14           Q.    No KPMG?

15           A.    Not on this, no.

16           Q.    But are they a serious competitor?

17           A.    No, I would not say so.

18           Q.    I have a few PowerTax questions that might

19      be too much in the weeds of the software.  I don't

20      have many of them.  If you can't answer it, I get

21      it --

22           A.    Okay.

23           Q.    -- but I want to ask you a few questions

24      about PowerTax.

25                 So, again, just at a high level when someone

1          uses PowerTax, they have certain screens where they

2          view key information, and then the underlying data

3          is all behind that; correct?

4               A.    That's correct, yes.

5               Q.    So one of the things that Power -- excuse

6          me -- that PowerTax tracks is book tax differences;

7          is that right?

8               A.    That's my understanding, yes.

9               Q.    And is that accessible on the screen view,

10         or is that something that would only be seen in,

11         like, the underlying data?

12              A.    That's not a question I'd be able to answer.

13              Q.    Okay.  Has PowerPlan, to your knowledge,

14         ever told a customer it cannot use another product

15         or service provider besides Lucasys?

16              A.    Not that I'm aware of, no.

17              Q.    Has PowerPlan, to your knowledge, refused to

18         supply data to any of their customers if they used a

19         particular product or service provider?

20              A.    Refused to -- so can you clarify your

21         question for me?

22              Q.    Yeah.  I mean, PowerPlan is the software

23         that holds a lot of customer's data; right?

24              A.    (Nods head affirmatively.)

25              Q.    You have to answer yes or no.

1      A.    Yes, yes.

2      Q.    And my question is has PowerPlan ever

3 refused to provide customers with access to their

4 data if they used a certain other product, or

5 service provider?

6      A.    So the only instance that we would have a

7 discussion like that with a customer would be if

8 their software was hosted in our cloud environment,

9 and we would not tell a customer that you can't have

10 access to your data. But we would want to

11 understand what data they wanted to access and how

12 we would work together to get that to them.

13      Q.    Is it PowerPlan's position that it, to your

14 understanding --

15      A.    Mm-hmm (affirmative).

16      Q.    -- that it can limit who can access the

17 customer's data through the PowerPlan software?

18          MR. FAZIO:   Objection to form. Calls for

19      a legal conclusion.

20      A.    So, our license agreement really governs who

21 has access to our confidential information, and so

22 we rely on our customers to uphold the license

23 agreement.

24 BY MR. ALLOY:

25      Q.    Okay. But putting aside PowerPlan's

1          confidential information, I was just trying to get

2          to the customers' data.  Is it PowerPlan's position

3          it can limit who can access customer's data through

4          PowerPlan software?

5                    MR. FAZIO:  Objection, calls for a legal

6                    conclusion.  He's not a 30(b).

7                    Go ahead.  You can answer to your

8                    understanding.

9               A.   Yeah, I'm --

10         BY MR. ALLOY:

11              Q.   To your understanding.

12              A.   Yeah.  I'm not sure -- so in the customer's

13         on-premise deployment scenario, we have no mechanism

14         besides our license agreement, and the customer

15         upholding that to limit who accesses the customer's

16         data.

17              Q.   Now, I think you indicated earlier that

18         PowerPlan has communicated with approximately 40 to

19         50 of its customers with regard to Lucasys; correct?

20              A.   Yes.

21              Q.   Now, in the underlying basis for PowerPlan's

22         concern as articulated in these documents -- and you

23         can look at any of them -- is that PowerPlan is

24         concerned about Lucasys accessing PowerPlan software

25         to potentially view, or use, PowerPlan trade secrets

1      and confidential information; correct?

2          A.   That's correct.

3          Q.   Now, to your knowledge, have you or anyone

4      else at PowerPlan communicated to PowerPlan

5      customers that there is a lawsuit between Lucasys

6      and PowerPlan?

7          A.   I'm not aware of any communication like

8      that.

9          Q.   Do you have any understanding that any of

10     the customers of PowerPlan are aware that Lucasys

11     has sued PowerPlan?

12         A.   I'm not aware specifically of any customers

13     that have brought that to my attention.

14         Q.   To your knowledge have any of PowerPlan's

15     customers communicated any concerns -- excuse me --

16     that there aren't enough competitors with the

17     PowerPlan software?

18         A.   No, I have not heard that.

19         Q.   Have any customers, to your knowledge,

20     communicated any concerns that PowerPlan is engaging

21     in any anticompetitive activity?

22         A.   No.

23         Q.   Has anyone, whether a customer, an employee,

24     or anyone else, indicated any of those concerns to

25     PowerPlan, to your knowledge?

1          A.   Not to my knowledge, no.

2          Q.   Are there any plans for PowerPlan to update

3     its customers on the status of the litigation

4     between PowerPlan and Lucasys?

5          A.   Not that I'm aware of, no.

6          Q.   Are you aware of any communications to

7     PowerPlan customers that PowerPlan has filed a

8     motion to dismiss, or did file a motion to dismiss,

9     the antitrust claims against PowerPlan?

10          A.   No.  I'm not aware of any.

11          Q.   Do you know of any -- do you have an

12     understanding of any customers who are aware of the

13     order from the federal court denying PowerPlan's

14     motion to dismiss?

15          A.   I'm not aware, no.

16               MR. ALLOY:  Okay.  Let's go off the

17          record.  I may be done.

18               THE VIDEOGRAPHER:  Going off video record

19          at 4:32 p.m.

20              (Recess 4:32 p.m. - 4:36 p.m.)

21              (Off video record.)

22               MR. ALLOY:  We're done.

23               MR. FAZIO:  Reserve signature.

24          (Deposition concluded at 4:36 p.m.)

25                  (Signature reserved.)

1                        ERRATA PAGE

2       Civil Action No.   1:20-cv-02987-AT
        CASE CAPTION:      Lucasys vs. PowerPlan
3       DEPONENT:          BRETT M. BERTZ
        DATE:              December 2, 2021
4
        I, the undersigned, do hereby certify that I have
5       read, or have had read to me, the transcript of my
        testimony, and that:
6
                1)  There are no changes noted.
7               2)  The following changes are noted:

8        Pursuant to Rule 30(e) of the Federal Rules of
        Civil Procedure and/or the Official Code of
9       Georgia Annotated § 9-11-30(e), any changes in
        form or substance which you desire to make shall
10      be entered upon the deposition with a statement of
        the reasons given for making them.  To assist you
11      in making any such corrections, please use the
        form below.  If additional pages are necessary,
12      please furnish same and attach them to this sheet.

13
        PAGE       LINE       CHANGE
14

15      PAGE       LINE       CHANGE

16
        PAGE       LINE       CHANGE
17

18      PAGE       LINE       CHANGE

19
        PAGE       LINE       CHANGE
20

21      PAGE       LINE       CHANGE

22
        PAGE       LINE       CHANGE
23

24      PAGE       LINE       CHANGE

25

```
1        PAGE        LINE        CHANGE

2
         PAGE        LINE        CHANGE
3

4        PAGE        LINE        CHANGE

5
         PAGE        LINE        CHANGE
6

7        PAGE        LINE        CHANGE

8
         PAGE        LINE        CHANGE
9

10       PAGE        LINE        CHANGE

11
         PAGE        LINE        CHANGE
12

13       PAGE        LINE        CHANGE

14

15

16            BRETT M. BERTZ

17

18
         Sworn to and subscribed before me,
19
         This the     day of          , 20   .
20

21       Notary Public

22       My commission expires:

23

24

25
```

1                    C E R T I F I C A T E

2          STATE OF GEORGIA:

3          DEKALB COUNTY:

4                    I hereby certify that the foregoing

5          transcript was taken down, as stated in the

6          caption, and the questions and answers thereto

7          were reduced to the written page under my

8          direction; that the foregoing pages 1 through 242

9          represent a true and correct transcript of the

10         evidence given.  I further certify that I am not

11         of kin or counsel to the parties in the case; am

12         not in the regular employ of counsel for any of

13         said parties; nor am I anywise interested in the

14         result of said case.  The witness did reserve the

15         right to read and sign the transcript.

16                    This, the 7th day of December, 2021.

17

18

19

20

21

22

23         _____
           MAUREEN S. KREIMER, CCR-B-1379

24         Notary Public in and for the
           State of Georgia.  My Commission

25         Expires August 14, 2024.

1                          DISCLOSURE

2        STATE OF GEORGIA:
         COUNTY OF DEKALB:
3
                    Deposition of BRETT M. BERTZ
4
          Pursuant to Article 10.B of the Rules and
5     Regulations of the Board of Court Reporting of the
      Judicial Council of Georgia, I make the following
6     disclosure:

7          I am a Georgia Certified Court Reporter.  I am
      here as an employee and representative of Regency
8     Brentano, Inc.

9          I am not disqualified for a relationship of
      interest under the provisions of O.C.G.A. §9-11-28
10    ©.

11         Regency Brentano, Inc. was contacted by the
      offices of Robbins Ross Alloy Belinfante
12    Littlefield, LLC to provide court reporting
      services for this deposition.
13
           Regency Brentano, Inc. will not be taking this
14    deposition under any contract that is prohibited
      by O.C.G.A. §15-14-37 (a) and (b) and has no
15    exclusive contract to provide reporting services
      with any party to the case, any counsel in the
16    case, or any reporter or reporting agency from
      whom a referral might have been made to cover this
17    deposition.

18         Regency Brentano, Inc. will charge its usual and
      customary rates to all parties in the case, and a
19    financial discount will not be given to any party
      to this litigation.

20

21

22

23

24    _____
           MAUREEN S. KREIMER, CCR B-1379
25         Date:  December 2, 2021

# Growing, Loyal Blue-Chip Customer Base



*PLAINTIFF'S EXHIBIT*
*1*
*Bertz 12-2-21*

*220+ total customers with 99% retention*



## Core and Tier 1 Markets

| Utilities | Oil & Gas | | Public Sector | Transportation |
|---|---|---|---|---|
| **20** of the **20** Top U.S. Utilities | **5** of the **5** Top U.S. Natural Gas Utilities | **7** of the **10** Top North America Oil Companies | **3** of the **4** Largest Canadian Cities | **6** of the **6** Top U.S. Public Railroads |



## Key Customer Metrics – 2017

| 2017 Services Only Projects | 2017 Existing Customer Projects | Customer Success Manager Coverage | Active Advisory Board Customers |
|---|---|---|---|
| **197** SOWs | **108** Unique Customers | **118** Accounts (Includes All SaaS) | **78** Customers |

Note: The retention figure cited here represents a 6-year average.

OUTSIDE COUNSEL'S EYES ONLY
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

ROP007136
CONFIDENTIAL

# Our Domain Expertise Remains a Strength However Retention & Dated Technology Pose Risk

## Customer Executive Advisory Board Identified Similar Themes



### Strengths
- Existing customer base
- Deep utilities domain expertise
- Make it happen attitude
- *Staying ahead of regulatory changes*
- *New owner plans to hold & invest*
- *Expertise of People (Industry, Solution, Customer Focus)*

### Threats


### Weakness
- No clear strategy
- Lack of methodical & integrated sales and marketing approach
- Technology innovation and delivery
- Employee retention and leadership
- *Outdated technology & difficult to use & implement*
- *PowerPlan team knowledge*

### Opportunities
- Partner with strategic SI to expand channel
- Build relationship with compliance organization
- Pre-packaged best practice
- Mid-market, turn-key implementation
- *PowerPlan Related Services*
- *Software: Transparency and Removing Customizations*


Confidential & Proprietary – Copyright © 2020 PowerPlan, Inc.

POWERPLAN | 13

OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

ROP006781


PLAINTIFF'S EXHIBIT
2
Bertz 12-2-21



# Sales Observations – 60 Days

**Customer – Sales**

## Strengths

- Strategic role we play for our customers provides opportunity to leverage innovation and sell more

- Sales team has core of experienced SAEs and SCs with strong domain and account knowledge

- Added focus on Non-Users and Mid Market will be key to continued growth

## Challenges

- Lack of product innovation and road map have been barriers to performance and pipeline development

- Long sales cycle requires greater discipline in pipeline development
  - 80% of 2020 bookings expected from current pipeline

- Historical sales team structure didn't drive focus

- Investment in Lease and customers outside of energy impacted pipeline

- Inconsistent Process – Forecast, Pipeline, Pricing, Territories, Metrics

Confidential & Proprietary – Copyright © 2020 PowerPlan, Inc.

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER





PLAINTIFF'S EXHIBIT
3
Bertz 12-2-21



# Product & Development Observations – 60 Days

## Anti-Patterns™

- Many projects, wide scope

- Execution - "Feature death march", lack of maintenance and technical investment, overscheduled sprints and releases, Immature agile practices, superstitious behaviors

- Leadership lacking enterprise and agile instincts and experience – field implementation staff moved into development management

- Hiring based on paper and syntax

- Classic product lines investment

## Good to Great

- Direct reports – capable and taking change initiative

- Architecture team and lead – extremely capable, practical, and progressive

- Domain experience

- HR and recruiting

- Transition support from John Budala

Confidential & Proprietary – Copyright © 2020 PowerPlan, Inc.

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

POWERPLAN | 39

ROP006807



PLAINTIFF'S EXHIBIT
4
Bertz 12-2-21

# Customer Dissatisfaction Clear; Can Be Regained with Delivery of Product Enhancements & Integration

**Additionally, Opportunities Exist In the Mid-Market and International**





PowerPlan is the perceived leader in fixed asset data from the utility market

Customer dissatisfaction is higher than expected

Delivery of new product functionality and implementation best practices is required to grow whitespace

Mid-market utilities need & want PowerPlan but historically priced too high and too complex to implement

There's opportunity internationally but market priority is based on complexity of the books required

Confidential & Proprietary – Copyright © 2020 PowerPlan, Inc.

OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

 POWERPLAN | 15

ROP006783



PLAINTIFF'S EXHIBIT

5

Bertz 12-2-21

# 2H'20 Market Research Validates Energy Focus

## 310 Surveys/190 Interviews Conducted within Core and Expansion Markets



**New**

Expansion

*Target new markets / customers, with existing or amended products with new options, features.*

*(US Manufacturing, AUS, NZ, UK, CAN Public Sector)*

*Transformational Ideas*

**Markets / Customers**

Adjacent

**Adjacent**

*Expanding to new end markets and segments with our existing products*

*(US Regulated or Complex Asset Companies, O&G, Rail, Telco)*

*Expanding new products and offerings into adjacent markets.*

*(US Regulated or Complex Asset Companies, O&G, Rail, Telco)*

**Stax**

*New Products supporting: AIO, Decision Support, Asset Management*

Existing

**Core**

*Focus on Large IOUs, U.S. / CAN, retain and acquire customers, improve core products (Acct., Tax)*

*Expand product offering to Business Planning, Regulatory, FP&A*

*Bring new technology to market, New Product Suite Approach*

*Existing* — *Adjacent* — *Expansion*

## Observations

- Customer dissatisfaction highlighted – trust can be rebuilt with enhancements and delivery of core suites
- Mid-markets utilities want PowerPlan but require lighter solution and implementation
- Companies adopting cloud solutions at different paces
- Public sector is <u>not</u> attractive
- Oil & Gas has new product opportunities
- Clear path to enter new industries and international markets

Confidential & Proprietary – Copyright © 2020 PowerPlan, Inc.



14

ROP006782

**OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**



**PLAINTIFF'S EXHIBIT**

6

Bertz  12-2-21


PLAINTIFF'S EXHIBIT
7
Bertz 12-2-21

# No Direct, Multi-Product Competitor

*PowerPlan's comprehensive CPM platform is unmatched in the market*

| Fixed Asset Compliance | Capital Planning and Forecasting | Asset Investment Optimization | Rate Case and ROE Management | Tax | Lease |
|---|---|---|---|---|---|

 POWER**PLAN**™


ORACLE
SAP


UTILITIES International
# Hyperion


assetic
copperleaf


UTILITIES International
Boutique Consultants


Bloomberg BNA
THOMSON REUTERS


CoStar Group
NAKISA

*Many companies are currently using homegrown solutions (e.g., Excel) or custom code but feedback suggests that these solutions are either cumbersome and inefficient or are not fully meeting their needs*

*"… We're currently using a lot of homegrown solutions for tasks like asset management planning and capital planning, but there is definitely a need for a solution to put all of these different pieces together because our current solutions make it very challenging for us and just haven't really worked well …"*

*– VP of Tax, PerkinElmer*

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER
ROP006867

    
# Brett Bertz · 3rd

Chief Customer Officer

-  PowerPlan, Inc.
- Georgia State University - J. Mack Robinson College of Business

Atlanta Metropolitan Area · Contact info

500+ connections

Message   More

## About

Services executive with proven success at designing and executing strategy to grow revenue and profitability and improve customer satisfaction and success. Experienced change agent developing talent and leading organizations to deliver complex technology solutions across multiple industry verticals including the Healthcare, Financial Services, and Telecommunications/Media/Hi-tech sectors.

## Activity

880 followers

**Congrats**

Brett commented


PLAINTIFF'S EXHIBIT
8
Bertz 12-2-21



**Brett Bertz**
Chief Customer Officer

( More )      Message



### Chief Customer Officer
PowerPlan, Inc.
May 2019 – Present · 2 yrs 7 mos
Atlanta, Georgia



### nThrive
5 yrs 9 mos

**Senior Vice President -Technology Support**
Jun 2018 – Present · 3 yrs 6 mos
Alpharetta, Georgia

**Senior Vice President, Implementation Services**
Mar 2016 – Present · 5 yrs 9 mos
Greater Atlanta Area

Accountable for maximizing client success through the transition
and transformation of healthcare provider revenue cycle
operations to nThrive's Patient to Payment solutions including
technology, outsourcing services, advisory services, education



### Vice President, Implementation Services - Revenue Cycle Technology
MedAssets
Feb 2014 – Mar 2016 · 2 yrs 2 mos
Alpharetta, GA

Responsible for the planning, design, implementation, training
and optimization of MedAssets' cloud based revenue cycle
technology solutions delivering over $60M in net new total
contract value revenue annually. Defined and executed the



### Avaya
8 yrs

**Global Leader - Cloud Services and Support**
May 2013 – Jan 2014 · 9 mos

Accountable for defining and implementing the global service
strategy, structure, and execution model to grow Avaya's
recurring revenues via SaaS, PaaS, and IaaS offerings.

program management, field trial project management, and
solution engineering and support resources focused on
improving market adoption of Avaya's +$450M contact center

**Managing Director, Professional Services Business
Development**
Oct 2010 – Feb 2012 · 1 yr 5 mos
Atlanta, Georgia

Led the strategy and execution process for professional services
to develop new channels to market and grow via global mergers
and acquisitions(M&A).

**Managing Director - Avaya Professional Services, EMEA**
Oct 2009 – Oct 2010 · 1 yr 1 mo

Led +200 associates in the marketing, sales, and delivery of
consulting and systems integration for mission critical contact
centers and enterprise communications platforms throughout
Europe, the Middle East, and Africa (EMEA).

**Managing Director, Global Project Management**
Dec 2008 – Oct 2009 · 11 mos

Designed and developed a Global Project Management
organization responsible for the delivery of $200M in consulting
and systems integration annually.

**Director - Consulting and Systems Integration**
Feb 2006 – Dec 2008 · 2 yrs 11 mos

Led professional services practice responsible for over 90
consultants and managers in the U.S. and Canada with P&L
accountability for $32 million in annual revenue.

Show fewer roles ⌄



**Senior Manager**
Avaya
2004 – 2005 · 1 yr

Led contact center applications consulting practice consisting of
40 consultants and managers serving customers in the Eastern
U.S., delivering +$11M in revenue annually.



**Brett Bertz**
Chief Customer Officer

More     Message



**Business**
Masters, Business Administration
2002 – 2007

**Georgia Institute of Technology**
BS, Management
1989 – 1994

## Skills & endorsements

**Professional Services · 37**



Endorsed by **Terry Healy and 7 others who are highly skilled at this**



Endorsed by **3 of Brett's colleagues at nThrive**

**SaaS · 30**

**Juergen Kronawitter and 29 connections** have given endorsements for this skill

**Integration · 19**



Endorsed by **Tim Chapin, who is highly skilled at this**



Endorsed by **2 of Brett's colleagues at nThrive**

Show more ⌄

## Recommendations

Received (0)     Given (5)



**Dave Seaton, CCXP**

Dave's authentic leadership style elevates his ability to connect with colleagues across the

**Brett Bertz**
Chief Customer Officer

( More )    Message

Experience
Consultant |
Founder of
Seaton CX

differentiates his performance with his
commitment to... **See more**

August 29, 2020,
Brett managed Dave
directly



**Ajay Singh
Negi**
Senior Manager,
Services Program
Management -
Product
Introduction at
Avaya

Ajay and I worked together to increase field
readiness for early cloud solution offerings at
Avaya and to improve the new product
introduction process for future solutions. Ajay
consistently differentiated himself with his
ability to get underneath the true issues
inhibiting success and collaborate across
cross-f... **See more**

May 11, 2014, Brett
was senior to Ajay
Singh but didn't
manage directly

Show more ⌄



**Brett Bertz**
Chief Customer Officer

( More )    Message



Jason, explore jobs at **PowerPlan, Inc.**
that match your skills

( See jobs )

## People also viewed



**Joe Gomes** • 2nd 🔗
Chief Executive Officer at PowerPlan, Inc.

( Connect )



**David Rolling** • 3rd
Vice President of Customer Success at Journey

( Message )



**Aaron Smith** • 2nd
Principal Technical Product Manager at PowerPlan, Inc.

( Connect )



**John B.** • 3rd
Chief Information Officer

( Message )



**Suzanne Ward** • 3rd
Product Management and Strategy Leader

( Message )

Show more ⌄

## People you may know

**Sam B**
Dad

in  🔍

**Brett Bertz**
Chief Customer Officer

( More )    Message

( Connect )



**Ben Finley**
Managing Partner, The Finley Firm, P.C.

( Connect )



**Juan Martinez**
Attorney at Morgan & Morgan Complex Litigation Group

( Connect )



**Charlie Peeler**
White Collar and Government Investigations Partner at Troutman Pepper

( Connect )

Show more ⌄

in **LEARNING**

**Add new skills with these courses**

 Marketing Foundations: Analytics

 Learning YouTube Analytics

 Lessons from Data Scientists

**See more courses**

Promoted    •••

 M.S. in Accounting Online
Deadline approaching. Complete in 12
months from Syracuse University.  ❯


**Brett Bertz**
Chief Customer Officer

LegalMatch | Need More Legal Clients Immediately?
View Legal Cases In Your Area Today! ⟩

More     Message

# Tier 1 Utilities Research Findings



**Satisfaction Implications**                    **Product Implications**

**Stax Assessment**

| ① Many customers are dissatisfied with PowerPlan today | ② Customer dissatisfaction can also be attributed to PP's perception of its positioning being misaligned with customers | ③ PowerPlan will need to execute on product improvements to maintain revenue and protect future growth prospects | ④ Pillar 1 runway is constrained due to current satisfaction level | ⑤ By executing on product improvements, PowerPlan can gradually grow its entrenched customer base in Pillar 1 |

- Before considering next steps for growth opportunity, there is a need to address dissatisfaction with current customers, as some products and service / support considerations are creating customer churn risk.
- Issues with implementation, lack of focus on product improvements and lack of a clear product roadmap are creating the most issues with satisfaction.

- Customers note PowerPlan's challenges to integrate across their own products, as well as some external data sources (including ERPs, EAMS). It appears to be less capability issues, and more execution. i.e. PowerPlan can do it, but are they doing it in all customers?
- Implementation / ongoing service and support is an issue for customers with lower spend and products.
- While Department Heads are still decision makers in Accounting and Tax, CFOs are increasing involvement and will become more prominent over time, it will be critical to reach and message to them.

- PowerPlan will need to execute on specific short-term product improvements to mitigate risk of share loss and ensure continued alignment with market preferences and needs going forward.
- Over the next few years customers are increasingly demanding lower cost, easier implementation / maintenance and better integrations. A Cloud delivery model will enable PowerPlan to address these needs.
- Without action, PowerPlan will be at risk of losing existing accounts at an accelerating rate over the next several years.

- Due to lower than expected satisfaction with existing solutions and lack of delivery of solution enhancements, PowerPlan faces an uphill sell in the face of entrenched competitors
- Opportunity within existing accounts is further limited by the perception of PowerPlan as a pure niche player centered on FA data.
- Opportunity is also limited by prolonged solution lifecycles and low turnover.
- However, whitespace still remains if PowerPlan can create value added functionality that meets needs articulated by the market

- Existing product enhancements are needed both to ensure PowerPlan lowers the risk of customer churn and open-up new account opportunities.
- Stax estimates PowerPlan could compete for up to 30 accounts over a three year period, (both current and non-customers) but incremental revenue would be dependent on conversion rate and ASP of new products.

Confidential & Proprietary – Copyright © 2020 PowerPlan, Inc.

POWERPLAN | 76

ROP006844

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER



PLAINTIFF'S EXHIBIT
9
Bertz 12-2-21



# **A** Most competitors are more narrowly focused than PowerPlan, suggesting they may not be able to meet addressable organizations' full range of needs (1 of 2)

## Competitive landscape by module (not exhaustive)

| | Lease accounting | Property tax | Income tax | Fixed asset compliance | Rate case and ROE management | Asset investment optimization | Project portfolio management | Capital planning and forecasting |
|---|---|---|---|---|---|---|---|---|
| POWERPLAN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| CCH Tagetik | ✓ | ✗ | ✗ | ✓ | ✗ | ✓ | ✗ | ✓ |
| IBM | ✗ | ✗ | ✗ | ✓ | ✗ | ✓ | ✓ | ✓ |
| LeaseWave | ✓ | ✗ | ✗ | ✓ | ✗ | ✗ | ✗ | ✗ |
| LONGVIEW | ✗ | ✓ | ✓ | ✗ | ✗ | ✓ | ✗ | ✓ |
| SEAMS | ✗ | ✗ | ✗ | ✓ | ✗ | ✓ | ✓ | ✓ |
| assetic | ✗ | ✗ | ✗ | ✓ | ✗ | ✓ | ✗ | ✓ |
| copperleaf | ✗ | ✗ | ✗ | ✗ | ✗ | ✓ | ✓ | ✓ |
| Adaptive Insights | ✗ | ✗ | ✗ | ✓ | ✗ | ✗ | ✗ | ✓ |

Source: Grata data, Company websites, L.E.K. research and analysis



OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO DISCOVERY CONFIDENTIALITY

ROP0070391    L.E.K.



# Most competitors are more narrowly focused than PowerPlan, suggesting they may not be able to meet addressable organizations' full range of needs (2 of 2)

## Competitive landscape by module (not exhaustive)

| | Lease accounting | Property tax | Income tax | Fixed asset compliance | Rate case and ROE management | Asset investment optimization | Project portfolio management | Capital planning and forecasting |
|---|---|---|---|---|---|---|---|---|
| POWERPLAN | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Bloomberg BNA | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ |
| corptax | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ |
| EcoSys | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✓ | ✓ |
| ONESOURCE | ✗ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ |
| AIMS | ✗ | ✗ | ✗ | ✗ | ✗ | ✓ | ✗ | ✗ |
| lease accelerator | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| NAKISA | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| PTMS | ✗ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| UTILITIES International | ✗ | ✗ | ✗ | ✗ | ✓ | ✗ | ✗ | ✓ |

Source: Grata data, Company websites, L.E.K. research and analysis

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

ROP0070740





**ROPER TECHNOLOGIES, INC.**



Q2 2019 Operating Package

SIMPLE IDEAS. POWERFUL RESULTS.



OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

## Hot Issues

## Other Key Initiatives / Updates

**Market sizing/Growth strategy:** Initiated research project with Stax Consulting focused on continued growth within Utilities market. Primary goals of three-month project include: market sizing and segmenting opportunities within Utilities & MidStream O&G; map product whitespace within Tier 1 core-market office of the CFO (i.e. expansion into other areas of tax, FP&A user personas / needs where we don't play today, etc); analyzing current product set and value proposition vs. needs of Tier 2 U.S. Utilities; market attractiveness and dynamics of EU Utility market. Target completion scheduled for September.

## Competitors / Market Conditions

**Lease update:** 8 Lease Project go-lives in Q2 (vs. 17 planned) with another 16 planned for Q3, though customer challenges remain on certain projects. "Classic" development roadmap for the second half of 2019 exclusively dedicated to "table stakes" functionality with remaining lease customers (lessor, international requirements) that weren't included in earlier releases. "Classic" development team capacity, output, and quality remains a pain point as on-premise to cloud transition timelines have extended.

**Tax Fixed Assets (Cloud version of PowerTax):** TFA is the #1 priority product currently in development for a cloud-based version, however roadmap advancement has been slowed by offshore ramp time (high subject matter complexity and requirements translations), quality, and product architecture (database schema) challenges.

**Lucasys emerges as a competitive threat:** Lucasys is a company founded by a former PowerPlan employee (exited 2012) who is attempting to replicate PowerPlan's PowerTax solution in a Cloud Environment. The company launched a high-level demo of its tax product in Q2 of 2019.

## Big Wins

- Onboarding of two new Executive Team members: John Budala started at the beginning of Q2 as CIO and Brett Bertz started on May 1st as Chief Customer Officer

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

ROP006298



**ROPER TECHNOLOGIES, INC.**



Q3 2019 Operating Package

SIMPLE IDEAS. POWERFUL RESULTS.



PLAINTIFF'S EXHIBIT
tabbies
12
Bertz 12-2-21

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

## Hot Issues

## Big Wins & Notable Losses

Hiring of two new Executive Team members: Neal Teasdale (Chief Technology Officer) and Marc Bortniker (SVP Global Sales) will start October 14th.

Market sizing/Growth strategy: Completed research project with Stax Consulting and OC&C Strategy Consultants. 1) Stax focused on continued growth within Utilities market. Primary goals of three-month project include: market sizing and segmenting opportunities within Utilities & MidStream O&G; map product whitespace within Tier 1 core-market office of the CFO analyzing current product set and value proposition vs. needs of Tier 2 U.S. Utilities; market attractiveness and dynamics of EU Utility market. 2) OC&C Focused on market opportunity in adjacent markets (Manufacturing, Downstream O&G, Upstream O&G and Public Sector). Findings of both research engagements to be shared with the Executive Team in mid-October.

## Competitors / Market Conditions

## Other Key Initiatives / Updates

1) Lucasys (Update from Q2): Lucasys is a company founded by a former PowerPlan employee (exited 2012) who is attempting to replicate PowerPlan's PowerTax solution in a Cloud Environment. The company launched a high-level demo of its tax product in Q2 of 2019. Lucasys has approached several of our customers in Q3. We have engaged outside Counsel to address Trade Secret infringement issues.

2) Utegration (Update from Q1): Utegration is a SAP consulting firm focused on Utilities, Energy and Public Sector in North America. Although Utegration has been around for many years, the company has changed its messaging and is positioning itself as a PowerPlan alternative build within the SAP environment. In late Q3, we were informed by NRG their intention to move their Fixed Assets modules away from PowerPlan and partner with Utegration for an alternative solution in 2020.

People: TTM at 35%; attrition in both veteran and new hires (25 voluntary). No single driver for experienced hires, many started their career at PowerPlan. Reasons include Big 4 ERP recruitment, pursuing graduate education, etc. Training & "Success Enablement" consistently listed as reason to leave for new hires. Gallup Survey complete in August; action plans initiated in September.

Lease update: 10 Lease Project go-lives in Q3 (vs. 16 planned) with another 14 planned for Q4, though customer challenges remain on certain projects.

Tax Fixed Assets (Cloud version of PowerTax): Two early adopters cancelled engagements due to expectations & product readiness. Completed a 30-day project to assess and make recommendations on what changes need to be made to ensure the success of this critical program.

**OUTSIDE COUNSEL'S EYES ONLY -**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**

ROP006316



**ROPER TECHNOLOGIES, INC.**



Q2 2020 Operating Package

SIMPLE IDEAS. POWERFUL RESULTS.



PLAINTIFF'S
EXHIBIT
*13*
*Bertz 12-2-21*
tabbies



OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

ROP006373

## Hot Issues

## Operational Update

-Dev velocity remains steady at pre-Covid levels despite remote workforce; on track for major 2H milestones: 2nd "Classic" release, Mid-Market launch, & Workflow Automation tool

-Slow Dev backlog for next generation cloud tax product (Tax Fixed Asset) will delay launch to 2021; PM launched Agile training as fundamental gaps exist with current staff

## Competitors / Market Conditions

-Churn continues to be higher compared to historical figures; ▮▮▮ of ARR churn in Q2 with another ▮▮▮ of ARR churn identified in the remainder of the year, bringing total identified churn for the year to ▮▮▮▮▮▮

-Five terminations from non-utility clients moving to large ERP in last twelve months, as limited product investment has narrowed competitive differentiation gap and cost justification for non-regulated or partially regulated businesses

-EIA revised forecast: U.S. electricity consumption to decrease by 4% in 2020; Expect customers to push out timelines on software purchases & upgrades

-Lucasys - IP risk with competitive tax product (founded by a former PowerPlan employee). Pre-discovery complete with Roper & external counsel. Customer awareness campaign initiated to inform of situation, Lucasys access restrictions, and customer obligations under software license agreements.

## Org Update

-Q2 Pulse survey: 98% agree/strongly agree that PowerPlan has communicated a clear plan of action in response to COVID; 90% agree / strongly agree "My company cares about my overall well-being" (Gallup 79th percentile)

-Trailing twelve month voluntary turnover at 22.3% vs. 29.4% TTM on 6/30/19

-Dev hiring (Q2 approved investment) slower than anticipated; top candidates apprehensive about making change in current environment

**OUTSIDE COUNSEL'S EYES ONLY -**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**

ROP006374

| Name | Subject | Sent On | Sent On (UTC) | Sent From | Sent To | Suppressed From | Sent | Queued | Bounces | Soft Bounces | Hard Bounces | Delivered | Delivery Rate | Total Opens | Unique Opens | Open Rate | Total Clicks | Total Click-T | Unique Click | CTR | Click-To-Ope | Opt Outs | Opt-Out Rate | Spam Compl | SPAM Comp | Campaign Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2020 IP Protection Wave 1 | RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights | 5/28/2020 11:00 | 2020-05-28T15:00:00.000Z | Jay Schmidt: 22159793 <> | 2020 IP Protection Wave 1 | | 6 | 0 | 0 | 0 | 0 | 6 | 1 | | 41 | 1 | 0.1667 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | IP Protection |
| 2020 IP Protection Wave 1 + Legal | RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights | 6/9/2020 15:30 | 2020-06-09T19:30:00.000Z | Jay Schmidt: 22159793 <> | 2020 IP Protection Wave 1 + Legal | | 7 | 0 | 0 | 0 | 0 | 7 | 1 | | 32 | 1 | 0.1429 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | IP Protection |
| 2020 IP Protection Wave 2 – No Calls | RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights | 6/11/2020 10:45 | 2020-06-11T14:45:00.000Z | Jay Schmidt: 22159793 <> | 2020 IP Protection Wave 2 – No Calls | | 18 | 0 | 1 | 0 | 1 | 17 | 0.9444 | | 74 | 74 | 0.2353 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | IP Protection |
| 2020 IP Protection Wave 2 AFTER Call Complete Emails | RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights | 6/25/2020 11:45 | 2020-06-25T15:45:00.000Z | Jay Schmidt: 22159793 <> | 2020 IP Protection Wave 2 AFTER Call Complete Emails | | 13 | 0 | 1 | 0 | 1 | 12 | 0.9231 | | 66 | 3 | 0.25 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | IP Protection |
| 2020 IP Protection Wave 3 Emails | RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights | 6/25/2020 11:45 | 2020-06-25T15:45:00.000Z | Jay Schmidt: 22159793 <> | 2020 IP Protection Wave 3 Emails | | 23 | 0 | 2 | 0 | 2 | 21 | 0.913 | | 54 | 3 | 0.3429 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | IP Protection |

PLAINTIFF'S EXHIBIT
14
Bertz 12-2-21


| Account Name | Date Email Sent | Contact | Email Text |
|---|---|---|---|
| American Water Works Service Company, Inc. | 6/11/2020 | Michael Sgro | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| NorthWestern Corporation d/b/a NorthWestern Energy | 6/11/2020 | Gina Konen | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data


PLAINTIFF'S EXHIBIT
15
Bertz 12·2·21

| Pinnacle West Capital Corporation | 6/11/2020 | Robert Smith | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| American Transmission Company LLC | 6/11/2020 | Bill Marsan | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| New Jersey Resources Corporation | 6/11/2020 | Nancy Washington | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| American Transmission Company LLC | 6/11/2020 | Brian McGee | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

**PowerPlan - CONFIDENTIAL**

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

**PowerPlan - CONFIDENTIAL**

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| | | | |
|---|---|---|---|
| Arizona Public Service Company | 6/11/2020 | Gaylord Gagnon | PowerPlan - CONFIDENTIAL |

PowerPlan - CONFIDENTIAL

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| | | | |
|---|---|---|---|
| PPL Electric Utilities Corporation | 6/11/2020 | Natalie Hawk | PowerPlan - CONFIDENTIAL |

PowerPlan - CONFIDENTIAL

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| Eversource Energy Service Company | 6/11/2020 | Jay Buth | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| Alliant Energy Corporate Services, Inc. | 6/11/2020 | Jennifer Janecek | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| | | | |
|---|---|---|---|
| AT&T Services, Inc. | 6/11/2020 | Larry Rice | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| | | | |
|---|---|---|---|
| UNS Energy Corporation FKA Unisource Energy Corporation | 6/11/2020 | Frank Marino | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| Evergy Services, Inc. | 6/11/2020 | Heather Humphrey | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| NRG Energy, Inc. | 6/11/2020 | Brian Curci | PowerPlan - CONFIDENTIAL |

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data

| Account Name | Date Email Sent | Contact | Email Text |
|---|---|---|---|
| Colonial Pipeline Company | 6/25/2020 | Carolyn McCullion | PowerPlan - CONFIDENTIAL |

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

| Account Name | Date Email Sent | Contact | Email Text |
|---|---|---|---|
| WEC Energy Group | 6/25/2020 | | PowerPlan - CONFIDENTIAL |

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Brian Owens



PLAINTIFF'S EXHIBIT
16
Bertz 12-2-21

| | | |
|---|---|---|
| Upper Peninsula Power Company | 6/25/2020 | |

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Natasha Wonch

| | | |
|---|---|---|
| NiSource Corporate Services Company | 6/25/2020 | |

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Carrie Hightman

| San Jose Water Company | 6/25/2020 |
| --- | --- |

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Willie Brown

| Tampa Electric Company | 6/25/2020 |
| --- | --- |

PowerPlan - CONFIDENTIAL

June 25, 2020

.VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

David Nicholson

| Colonial Pipeline Company | 6/25/2020 |
| --- | --- |

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

David Gray

| NorthWestern Corporation d/b/a NorthWestern Energy | 6/25/2020 |
| --- | --- |

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Heather Grahame

| | | | |
|---|---|---|---|
| Southern California Edison Company | 6/25/2020 | | |

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Jennifer Hasbrouck

---

WEC Energy Group     6/25/2020

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Margaret Kelsey

San Jose Water Company         6/25/2020

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Linda Dresbach

---

NorthWestern Corporation d/b/a         6/25/2020
NorthWestern Energy

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Aaron Bjorkman

| | | |
|---|---|---|
| Southern Company Services, Inc | 6/25/2020 | |

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Veronica Hodges-Johnson

| | | |
|---|---|---|
| Southern California Edison Company | 6/25/2020 | |

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Mark Childs

PowerPlan - CONFIDENTIAL

June 25, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

Sandra Brummitt

PowerPlan - CONFIDENTIAL

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data models, or other confidential information. Additionally, PowerPlan consent is not required for customers to provide their data, in raw form, to Lucasys, provided it is being done in a way that does not involve third parties accessing PowerPlan's software or data models or schema, including the underlying database, to retrieve such data.

The remainder of this letter provides answers to certain questions that you may have relating to what your contract with PowerPlan says about confidential information, and the scope of PowerPlan's confidential and proprietary information.

What does my contract with PowerPlan say about confidential information?



PLAINTIFF'S EXHIBIT

17

Bertz 12.1.21

To protect and preserve our intellectual property, including trade secrets, we take reasonable steps to maintain the confidentiality of our software and associated information. One of the ways we do this is by including confidentiality provisions in our software license and subscription agreements in which we and our customers agree to protect each other's confidential information. As part of those provisions, our customers acknowledge our proprietary rights in our software and supporting materials and agree not to disclose our confidential information to any third-party without our consent and to protect such information as they would their own confidential information.

What are examples of PowerPlan's confidential information and trade secrets?
PowerPlan's intellectual property includes the confidential and proprietary information and trade secrets embodied within our unique and sophisticated software solutions. This includes our source code, system and database architecture, database models and structures, and various unique and integrated features and functions thereof. Our confidential information also includes user guides and other documentation, professional services deliverables, information relating to our software design sessions and workshops, and our training classes and materials. These examples fall within the definition of confidential information in our license and subscription agreements. They also meet the statutory definition of a trade secret, because they are: (i) not generally known by or available to the public; (ii) provide competitive economic value to PowerPlan; and (iii) are the subject of reasonable efforts to maintain their secrecy.

What actions amount to disclosure of or providing access to PowerPlan's confidential information?
Among the information and access that our customers should not provide to Lucasys are the following: (i) front-end user access to PowerPlan's software; (ii) access to your PowerPlan database (whether by a link or credentialed login access provided by you), or to PowerPlan's data model; (iii) user guides and other PowerPlan software documentation; (iv) access to Social Power and other PowerPlan user community sites; (v) professional services deliverables and other project work product; and (vi) invitations or participation in design sessions, software testing, user training, and other project meetings or workshops relating to PowerPlan software.

Does this letter apply to other third-party access to PowerPlan's confidential information?
PowerPlan software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. In the future, you will receive an additional communication from a vendor that PowerPlan has engaged to perform a generalized customer audit of third-party access to PowerPlan's software and associated confidential information. We would appreciate your cooperation in responding to that communication.

Final Points
If you are currently using Lucasys as a consultant to provide services that require access to PowerPlan software or confidential information, please contact PowerPlan by sending an email to Legal@pwrplan.com with the Subject: Protecting PowerPlan Proprietary Software and provide the relevant details. We will respond as soon as possible to discuss how to address the

situation without disrupting your operations or ongoing projects.

Once again, thank you for your investment with PowerPlan and for your partnership in protecting PowerPlan's confidential information.

Sincerely,
Brett Bertz
Chief Customer Officer

Cc: Jonathan Sucher, Senior Corporate Counsel
Copyright © {{Current_Year}}, PowerPlan, Inc. All rights reserved.
300 Galleria Parkway | Suite 2100 | Atlanta, GA | 30339
O: 1 678.223.2800 | F: +1 770.618.0507
https://info.powerplan.com/e/107062/2020-06-11/4n54y9/%%email_id%%?h=%%internal.tracker_url_hash%%

Update your email preferences here:
{{{EmailPreferenceCenter_36}}}

Appointment

| | |
|---|---|
| **From:** | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
| **Sent:** | 11/17/2019 6:12:12 PM |
| **To:** | Jeffrey W Hoersdig [jwhoersdig@aep.com] |
| **Subject:** | Accepted: [EXT] Discuss tax vendors with PowerPlan |
| **Location:** | Columbus 1RP 26A (18) |
| **Start:** | 11/21/2019 4:30:00 PM |
| **End:** | 11/21/2019 5:00:00 PM |
| **Show Time As:** | Busy |



PLAINTIFF'S
EXHIBIT

18

Bertz 12.2.21

**PLAINTIFF'S EXHIBIT**

19

Bertz 12-2-21

**CONFIDENTIAL**

 POWER**PLAN**™

July 17, 2020

**VIA EMAIL**

American Electric Power Service Corporation

ATTN: Jeffrey W Hoersdig <jwhoersdig@aep.com>; James Llende <jxllende@aep.com>; Kevin D Keller <kdkeller@aep.com>; Anthony J Swaneck <ajswaneck@aep.com>

RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights

Dear Messrs. Hoersdig, Llende, Keller, and Swaneck:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to again raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc. Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

PowerPlan is proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that AEP obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, **PowerPlan does <u>not</u> consent to Lucasys having access to our software or associated confidential information.**

PowerPlan consent is not required for AEP to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data models, or other confidential information. Additionally, PowerPlan consent is not required for AEP to provide their data, in raw form, to Lucasys, as long as it is done in a way that does not involve Lucasys accessing PowerPlan's software, data models or schema, including the underlying database, to retrieve such data.

The remainder of this letter provides answers to certain questions that you may have relating to what your contract with PowerPlan says about confidential information, and the scope of PowerPlan's confidential and proprietary information.

**What does my contract with PowerPlan say about confidential information?**

To protect and preserve our intellectual property, including trade secrets, we take reasonable steps to maintain the confidentiality of our software and associated information. The PowerPlant System Perpetual Licensing Agreement between our companies (the "License Agreement") includes provisions in Article 14 in which you acknowledge PowerPlan's proprietary rights in and to its software, including computer programs, manuals and supporting materials, and agree to maintain the confidentiality of this information by refraining from using, disclosing, publishing or divulging the information to any third-party without our consent, and by employing no less stringent procedures than the strictest procedures used to protect its own confidential information.

**What are examples of PowerPlan's confidential information and trade secrets?**

PowerPlan's intellectual property includes the confidential and proprietary information and trade secrets embodied within our unique and sophisticated software solutions. This includes our source code, system and database architecture, database models and structures, and various unique and integrated features and functions thereof. Our confidential



**CONFIDENTIAL**

information also includes user guides and other documentation, professional services deliverables, information relating to our software design sessions and workshops, and our training classes and materials.

These examples fall within the definition of confidential information in our license and subscription agreements. They also meet the statutory definition of a trade secret, because they are: (i) not generally known by or available to the public; (ii) provide competitive economic value to PowerPlan; and (iii) are the subject of reasonable efforts to maintain their secrecy.

**What actions amount to disclosure of or providing access to PowerPlan's confidential information?**

Among the information and access that our customers should not provide to Lucasys are the following: (i) front-end user access to PowerPlan's software; (ii) access to your PowerPlan database (whether by a link or credentialed login access provided by you), or to PowerPlan's data model; (iii) user guides and other PowerPlan software documentation; (iv) access to Social Power and other PowerPlan user community sites; (v) professional services deliverables and other project work product; and (vi) invitations or participation in design sessions, software testing, user training, and other project meetings or workshops relating to PowerPlan software.

**Does this letter apply to other third-party access to PowerPlan's confidential information?**

The License Agreement requires that you obtain our consent prior to disclosing our confidential information to third parties. In the future, you will receive an additional communication from a vendor that PowerPlan has engaged to perform a generalized customer audit of third-party access to PowerPlan's software and associated confidential information. We would appreciate your cooperation in responding to that communication.

**Final points**

PowerPlan requests that AEP and its affiliates confirm in writing that no access is currently being provided to Lucasys to PowerPlan's software, including the database architecture and data model, and other confidential information. PowerPlan also requests that AEP and its affiliates ensure that Lucasys is not provided with such access in the future. Please provide a response to confirm PowerPlan's requests or submit any questions regarding this matter via email to Legal@pwrplan.com with the **Subject: Protecting PowerPlan Proprietary Software**. PowerPlan will respond as soon as possible to assist in resolving this matter.

Once again, thank you for your investment with PowerPlan and for your partnership in protecting PowerPlan's confidential information.


Sincerely,

Brett Bertz
Brett Bertz
Chief Customer Officer


Cc:     Jonathan Sucher, Associate General Counsel

| | |
|---|---|
| **From:** | May, James [James.May@nexteraenergy.com] |
| **Sent:** | 10/29/2019 10:13:05 PM |
| **To:** | Brett Bertz [brett.bertz@powerplan.com] |
| **Subject:** | [EXT] Re: License Agreement Section |

**Exercise CAUTION when opening links or attachments.**

Section 14.2 below? I spoke with Leo when I hung up with you and we are circling back tomorrow after he determines whether we are still engaged with Lukasys.



10:10 PM  Tue Oct 29

FPL-2001.04.20-PowerPlant Perpetual Licensing Agreement

13.7  Licensor shall have no obligation under paragraph 13 if Licensee is delinquent in paying any sums of money owed to Licensor.

**14. PROTECTION OF PROPRIETARY INTERESTS / CONFIDENTIALITY**

14.1  Licensee acknowledges the proprietary rights of Licensor in and to the Software, including, but not limited to, computer programs, manuals, and supporting material and that such are properly considered to be trade secrets, in that they involve compilations of information which are secrets and which are the product of Licensor's own expenditures of time, effort, money, and creative skill. Licensee agrees that all tangible objects containing or relating to the PowerPlant programs are the sole and exclusive property of Licensor and upon termination of this agreement for any reason, Licensee will return to Licensor all programs, manuals and related materials provided under this Agreement, and will retain no copies whatsoever for its own use or for any purpose.

14.2  Each party agrees that it will not use, disclose, publish, or otherwise divulge to any third party either during or after the termination of this agreement or permit its officers or employees to so divulge any confidential information of the other party without prior written consent of such party. Each party shall employ no such less stringent procedures than the strictest procedures used to protect its own confidential data including procedures set forth in these paragraphs. If disclosure to a third party, such as an auditor, is required, the third party is required to first sign a confidentiality agreement with the owner of the confidential information. Licensee may use the standard reports of the Software in filings or proceedings before any governmental regulatory or judicial body to which it is subject.

14.3  In the event of a breach of this Section 14, the owner of the confidential information will not have an adequate remedy in money or in damages, and therefore shall be entitled to seek injunctive relief against such breach without any requirement to post bond as a condition thereof.

14.5  All of the above restrictions in Paragraph 14 shall survive any termination of this Agreement and/or the completion of work. Nothing contained herein shall be construed as to limit any rights of Licensor under copyright, patent, or other law.

**15. TITLE**

infringement of any patent, copyright, trademark, or trade secret by the Software or any part thereof.

**16. OWNERSHIP**

During the course of the term of this Agreement, Licensor and Licensee will be working together to install the Software. Improvements and modifications to the Software are expected to occur during the PowerPlant system implementation. Licensor will retain title to PowerPlant and to any and all modifications, improvements, and alterations made during or subsequent to the PowerPlant system installation.

**17. SYSTEM TRANSFER**

So long as Licensee is in compliance with the provisions of its Agreements with Licensor and is operating under current maintenance provisions with Licensor, Licensee shall have the right to make complete or partial copies of the software as needed solely for testing, archival, backup and disaster-recovery purposes. Licensee shall ensure that any proprietary, copyright, trademark, or trade secret notices contained in or placed upon the system shall appear on any such copies.

**18. PROGRAM ACCEPTANCE**

18.1  During the 90 (ninety) days following the delivery of the PowerPlant programs, the programs will be subject to test by Licensee to determine that the PowerPlant programs are in substantial conformance with the Licensee requirements. If, during the 90 day test period, Licensee discovers an error in the PowerPlant programs or a substantial non-conformance to Licensee's asset accounting requirements, Licensee will notify Licensor in writing accompanied by program listings or sample results evidencing such error or non-conformance.

18.2  If, within 60 days following receipt of Licensee's written error report in accordance with paragraph 18.1, Licensor fails to remedy the reported error or non-conformance, Licensee shall be entitled to terminate this Agreement by written notice to Licensor accompanied by return to Licensor all copies and materials relating to the Software delivered to Licensee under this Agreement.

18.3  If this Agreement is terminated by Licensee in accordance with paragraph 18.2, Licensee will receive a refund for all license fee amounts paid

Sent from my iPad

On Oct 29, 2019, at 9:32 PM, Brett Bertz <brett.bertz@powerplan.com> wrote:



**PLAINTIFF'S EXHIBIT**
20
Bertz 12.2.21

CAUTION - EXTERNAL EMAIL

Jim, Thank you for your time today. As a follow up, it's my understanding that our License agreement section §14.2 covers third party access to PowerPlan software. Please do speak with the NextEra team tomorrow and provide guidance on a follow up conversation between NextEra and PowerPlan surrounding the situation and request.

OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO DISCOVERY

Thank you

**Brett M. Bertz**
**Chief Customer Officer**

Office: +1 678.223.2762
Mobile: +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

 POWERPLAN

This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you.



December 5, 2019

**VIA EMAIL**

American Electric Power Service Corporation
ATTN: Jeffrey W Hoersdig <jwhoersdig@aep.com>; James X Llende <jxllende@aep.com>; Kevin D Keller
<kdkeller@aep.com>; Chris B Morris <cbmorris@aep.com>; Anthony J Swaneck <ajswaneck@aep.com>; Julie E Sanders
<jesanders2@aep.com>

RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights

Messrs. Hoersdig, Llende, Keller, Morris, Swaneck, and Ms. Sanders:

At PowerPlan, one of our most valuable assets is our intellectual property. This intellectual property includes the confidential and
proprietary information and trade secrets embodied within our unique and sophisticated software solutions, including the source
code, system and database architecture, databases, database models and structures, and various unique and integrated features and
functions thereof. To protect and preserve these rights, we take reasonable steps to maintain the confidentiality of our software
programs and solutions.

You may be aware that we include confidentiality provisions in our software license agreements with our customers. For example,
the PowerPlant System Perpetual Licensing Agreement (the "License Agreement") between our companies includes provisions
in Article 14 in which AEP acknowledges PowerPlan's proprietary rights in and to its software, including computer programs,
manuals and supporting materials, and agrees to maintain the confidentiality of this information by refraining from using,
disclosing, publishing or divulging the information to any third-party without our consent, and by employing no less stringent
procedures than the strictest procedures used to protect its own confidential data.

We understand that you utilize third-parties to perform services related to our software from time to time. Nevertheless, please be
advised that continued or future use of such third-parties will require our consent in compliance with the License Agreement. It
is our understanding that one such third-party used by you to perform this consulting work on the PowerPlan software is Lucasys
Inc. It is PowerPlan's understanding that Lucasys has been developing software that directly competes with our software, and
recently started marketing and seeking to sell that software to our customer base. As I am sure you can understand, to protect our
trade secrets and other intellectual property, we cannot permit Lucasys to have access to our confidential and proprietary software
through our customers while Lucasys simultaneously develops, markets, and sells the same kind of software to the same customer
base in direct competition with us. This creates an intolerable risk for us – and you – that Lucasys may continue or begin to misuse
or misappropriate our confidential information and trade secrets and unfairly use them to develop, market, and sell its competing
software.

Accordingly, this confirms our expectation that AEP and its affiliates will cease providing Lucasys with access to our software
and aforementioned intellectual property, including the database architecture and data model. Further, we ask that you notify us
of any other third parties that currently have access through AEP to the PowerPlan software and associated database, via database
link or otherwise, and (whether monitored, managed, or logged by you), and of the confidentiality arrangement you have in place
with such parties. This will allow us to determine whether our intellectual property is sufficiently protected, while continuing to
partner with you to minimize disruption to your strategic PowerPlan software-related initiatives.

If you have any questions regarding this matter, please do not hesitate to contact me.

Sincerely,

Brett Bertz
Brett Bertz
Chief Customer Officer



Cc:      Jim Dahlby, VP of Strategy
         Jonathan Sucher, Senior Corporate Counsel

Message
| | |
|---|---|
| **From:** | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
| **Sent:** | 1/8/2020 8:48:31 AM |
| **To:** | Jeffrey W Hoersdig [jwhoersdig@aep.com] |
| **CC:** | Jonathan Sucher [Jonathan.Sucher@powerplan.com]; John Ericson [jericson@pwrplan.com] |
| **Subject:** | RE: [EXT] RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights |

Jeff, good morning and happy New Year. I wanted to follow up on our communication from prior to the holiday. Can you please provide some guidance on your availability for a follow up meeting? Thank you

**From:** Jeffrey W Hoersdig <jwhoersdig@aep.com>
**Sent:** Tuesday, December 17, 2019 9:14 AM
**To:** Brett Bertz <brett.bertz@powerplan.com>
**Cc:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** [EXT] RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights

**Exercise CAUTION when opening links or attachments.**

Hi Brett,

Apologies for the delay in responding. I have been working with our IT folks and business folks to gather a comprehensive list of everything that touches PowerPlant – systems we feed, any vendors who touch the system, etc.

I thought this information would better inform our next conversation. I will let you know as soon as I have the information available.

As FYI, I am meeting with John Ericson this afternoon and will discuss our status further in gathering data.

Thanks,



**JEFFREY W HOERSDIG** | **ASST CONTROLLER GEN® ACCTG**
JWHOERSDIG@AEP.COM | D:614.716.2650
1 RIVERSIDE PLAZA, COLUMBUS, OH 43215

**From:** Brett Bertz <brett.bertz@powerplan.com>
**Sent:** Wednesday, December 11, 2019 2:36 PM
**To:** Jeffrey W Hoersdig <jwhoersdig@aep.com>
**Cc:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** [EXTERNAL] FW: Protecting PowerPlan Proprietary Software and Intellectual Property Rights

This is an **EXTERNAL** email. **STOP. THINK** before you CLICK links or OPEN attachments. If suspicious please click the '**Report to Incidents**' button in Outlook or forward to incidents@aep.com from a mobile device.

Jeff, Jimmy Llende and I exchanged vms yesterday and he directed me to you to discuss next steps. Can you please advise if the AEP team has availability early next week? Thank you

**From:** Brett Bertz
**Sent:** Friday, December 6, 2019 5:53 PM
**To:** Jeffrey W Hoersdig <jwhoersdig@aep.com>; James X Llende <jxllende@aep.com>; Kevin D Keller <kdkeller@aep.com>; Chris B Morris <cbmorris@aep.com>; Anthony J Swaneck <ajswaneck@aep.com>; Julie E Sanders



CONFIDENTIAL – SUBJECT TO
DISCOVERY CONFIDENTIALITY

<jesanders2@aep.com>
**Cc:** Jonathan Sucher <Jonathan.Sucher@powerplan.com>
**Subject:** Protecting PowerPlan Proprietary Software and Intellectual Property Rights

AEP team, for those that I have not had a chance to meet, my name is Brett Bertz and I'm PowerPlan's Chief Customer Officer. This note is a follow up to the call that took place between PowerPlan and AEP on November 21 and I've attached the formal letter that PowerPlan agreed to provide as an outcome of the call.

I would like to propose that the AEP team review the letter over the next week and that we schedule a time for PowerPlan and AEP to come back together to address any questions that may arise and ensure both teams are clear on next steps. I'm proposing two windows for a 30 minute follow up discussion:

- Monday 12/16, 10am – 12pm ET
- Tuesday 12/17, 3pm – 5pm ET

Please advise if there is a slot within these dates/times that will work best.

I want to thank you again for your investment with PowerPlan. We are committed to your success and will do everything we can to help ensure that success in balance with the protection of our unique intellectual property assets. We very much appreciate your partnership in this matter.

Thank you

**Brett M. Bertz**
**Chief Customer Officer**

Office: +1 678.223.2762
Mobile: +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

 POWERPLAN

This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| LUCASYS INC., | Civil Action No.: 1:20-CV-02987-AT |
| *Plaintiff and Counterclaim Defendant*, | Judge Amy Totenberg |
| v. | **JURY TRIAL DEMANDED** |
| POWERPLAN, INC., | |
| *Defendant and Counterclaim Plaintiff.* | |

## ANSWER TO A COMPLAINT AND COUNTERCLAIMS

Defendant and Counterclaim Plaintiff PowerPlan, Inc. ("PowerPlan") hereby answers Plaintiff and Counterclaim Defendant Lucasys Inc.'s ("Lucasys") Complaint (ECF No. 1).  Except as expressly admitted below, PowerPlan denies all allegations contained in the Complaint, and denies that Lucasys is entitled to any form of relief.  PowerPlan reserves all its rights to alter, amend, or supplement this answer, or to otherwise assert additional defenses and counterclaims, as discovery proceeds.  PowerPlan's Answer to the numbered paragraphs of Lucasys' Complaint are set forth below[1]:

1.   PowerPlan admits the allegations in paragraph 1 of the Complaint.

---

[1]   Lucasys' Complaint includes more than two pages of improper and argumentative narrative and mischaracterizations in a section entitled "Nature of the Action" appearing before its "Substantive Allegations."  To the extent that any response is required here to this improper narrative, PowerPlan denies the allegations and characterizations contained there.



2.      PowerPlan denies the allegations in paragraph 2 of the Complaint.

3.      PowerPlan admits only that personal jurisdiction over PowerPlan in Georgia is proper and that service *via* Corporation Service Company was proper. PowerPlan denies it committed any tortious acts in Georgia, and denies all remaining allegations in paragraph 3 of the Complaint.

4.      PowerPlan admits the allegations in paragraph 4 of the Complaint.

5.      PowerPlan admits that Lucasys' principal place of business is located in Cumming, Georgia. PowerPlan also admits that Lucasys represents itself as a tax consulting and software development company.   PowerPlan lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 5 of the Complaint, accordingly they are denied.

6.      PowerPlan admits only that: (*i*) it is a supplier of utility management software for investor-owned rate-regulated utilities and other customers, (*ii*) that its principal place of business is in Atlanta, Georgia, and (*iii*) that it is owned by Roper Technologies, a publicly traded company.    PowerPlan denies the remaining allegations in paragraph 6 of the Complaint.

7.      PowerPlan admits only that certain investor-owned, rate-regulated utilities use software to address various operational, accounting, regulatory, and tax issues. PowerPlan denies the remaining allegations in paragraph 7 of the Complaint.

8.     PowerPlan admits only that the allegations in paragraph 8 of the Complaint describe certain, but not all, products offered by PowerPlan. PowerPlan denies the remaining allegations in paragraph 8 of the Complaint.

9.     PowerPlan admits that PowerTax, Provision, and Tax Repairs are part of its Income Tax Suite. PowerPlan admits that its income tax related modules allow its customers to compute tax depreciation and deferred income taxes. PowerPlan denies the remaining allegations in paragraph 9 of the Complaint.

10.     PowerPlan admits the allegations in paragraph 10 of the Complaint.

11.     PowerPlan admits that some of its software was available in the market in 1994 and thereafter. PowerPlan denies the remaining allegations in paragraph 11 of the Complaint.

12.     PowerPlan lacks information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint, accordingly they are denied.

13.     PowerPlan denies the allegations in paragraph 13 of the Complaint.

14.     PowerPlan denies the allegations in paragraph 14 of the Complaint.

15.     PowerPlan admits only that customers wishing to perform functions that are outside of the capability of PowerPlan's software can use alternative service providers. PowerPlan denies the remaining allegations in paragraph 15 of the Complaint.

16.     PowerPlan denies the allegations in paragraph 16 of the Complaint.

17.     PowerPlan admits that there are numerous providers of services and custom code like those described, and that numerous utilities use competitive bidding to select consultants, and that different customers have different factors they use to evaluate consultants.   PowerPlan denies the remaining allegations in paragraph 17 of the Complaint.

18.     PowerPlan admits only that it earns revenue from consulting services to some customers that have licensed PowerPlan's products.  PowerPlan denies the remaining allegations in paragraph 18 of the Complaint.

19.     PowerPlan denies the allegations in paragraph 19 of the Complaint.

20.     PowerPlan admits only that paragraph 20 of the Complaint generally describes parts of the rate case process used in some states.  PowerPlan denies the remaining allegations in paragraph 20 of the Complaint.

21.     PowerPlan admits only that paragraph 21 of the Complaint describes generally part of The Tax Cuts and Jobs ·Act of 2017.   PowerPlan denies the remaining allegations in paragraph 21 of the Complaint.

22.     PowerPlan admits only that paragraph 22 of the Complaint describes generally some of the actions in some jurisdictions.  PowerPlan denies the remaining allegations in paragraph 22 of the Complaint.

23.     PowerPlan denies the allegations in paragraph 23 of the Complaint.

4

24.     PowerPlan admits only that certain of its clients have requested assistance with calculations associated with various tax law changes.  PowerPlan denies the remaining allegations in paragraph 24 of the Complaint.

25.     PowerPlan admits only that Lucasys and numerous others provide various tax related consulting.  PowerPlan denies the remaining allegations in paragraph 25 of the Complaint.

26.     PowerPlan admits that it competes with other providers of services concerning deferred taxes.  PowerPlan denies all remaining allegations in paragraph 26 of the Complaint.

27.     PowerPlan admits that Vadim Lantukh, Daniel Chang, and Stephen Strang are former PowerPlan employees whose employment with PowerPlan ended in 2013 (Lantukh), 2014 (Chang), and 2015 (Strang).  PowerPlan also admits that each held employment somewhere other than PowerPlan prior to joining Lucasys. PowerPlan denies the remaining allegations in paragraph 27 of the Complaint.

28.     PowerPlan lacks information sufficient to form a belief as to the reasons for Lucasys' founding and on that basis denies same.  PowerPlan denies the remaining allegations in paragraph 28 of the Complaint.

29.     PowerPlan is without information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint, accordingly they are denied.

30.     PowerPlan admits only that Lucasys has represented that it has developed three technological solutions.   PowerPlan is without information sufficient to form a belief as to the truth of any remaining allegations in paragraph 30 of the Complaint, accordingly they are denied.

   a. PowerPlan admits only that Lucasys has represented that is has developed software that makes certain deferred tax computations. PowerPlan is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 30(a) of the Complaint, accordingly they are denied.

   b. PowerPlan admits only that Lucasys has represented that is has developed software it refers to as "Copilot" which it claims is a business automation tool. PowerPlan is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 30(b) of the Complaint, accordingly they are denied.

   c. PowerPlan is without information sufficient to form a belief as to the truth of the allegations in paragraph 30(c) of the Complaint, accordingly they are denied.

31.     PowerPlan denies the allegations in paragraph 31 of the Complaint.

32.     PowerPlan lacks information sufficient to form a belief as to the truth of the allegations in paragraph 32 of the Complaint, accordingly they are denied.

33.    PowerPlan denies the allegations in paragraph 33 of the Complaint.

34.    PowerPlan denies the allegations in paragraph 34 of the Complaint.

35.    PowerPlan admits that it learned that Lucasys responded to a request for proposal issued by AEP.   PowerPlan denies the remaining allegations in paragraph 35 of the Complaint.

36.    PowerPlan admits that both PowerPlan and Lucasys submitted bids for at least a portion of the work requested by AEP.   PowerPlan also admits that it has had communications with AEP regarding PowerPlan's confidential information and the confidentiality obligations under its existing license agreement with PowerPlan. PowerPlan denies the remaining allegations in paragraph 36 of the Complaint.

37.    PowerPlan denies the allegations in paragraph 37 of the Complaint.

38.    PowerPlan admits only that it sent correspondence to Messrs. Lantukh, Chang and Strang on or about October 30, 2019, which speaks for itself.  PowerPlan denies the remaining allegations in paragraph 38 of the Complaint.

39.    PowerPlan admits only that it sent correspondence to Messrs. Lantukh, Chang and Strang on or about October 30, 2019, which speaks for itself.  PowerPlan denies the remaining allegations in paragraph 39 of the Complaint.

40.    PowerPlan denies the allegations in paragraph 40 of the Complaint.

41. PowerPlan admits only that it sent correspondence to Messrs. Lantukh, Chang and Strang on or about October 30, 2019, which speaks for itself. PowerPlan denies the remaining allegations in paragraph 41 of the Complaint.

42. PowerPlan denies the allegations in paragraph 42 of the Complaint.

43. PowerPlan admits only that Lucasys did not have a software product that could be fully substituted for PowerPlan's software. PowerPlan denies the remaining allegations in paragraph 43 of the Complaint.

44. PowerPlan denies the allegations in paragraph 44 of the Complaint.

45. PowerPlan admits only that Lucasys provided certain limited information to certain PowerPlan representatives under strict confidentiality and non-disclosure obligations. Further answering, to date Lucasys has refused to allow undersigned counsel access to the information provided. The remaining allegations in paragraph 45 of the Complaint are denied.

46. PowerPlan denies the allegations in paragraph 46 of the Complaint.

47. PowerPlan admits only that NextEra maintained certain information concerning its non-regulated entities outside the PowerPlan system. PowerPlan lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 47 of the Complaint, accordingly they are denied.

48. PowerPlan denies the allegations in paragraph 48 of the Complaint.

49.    PowerPlan admits only that it performed certain services for NextEra at various times and at the request of NextEra. PowerPlan is without information sufficient to form a belief as to the remaining allegations in paragraph 49 of the Complaint, accordingly they are denied.

50.    PowerPlan admits only that Lucasys proposed to provide certain services to Liberty Utilities and that Lucasys recommended Liberty Utilities implement PowerPlan's income tax suite.   PowerPlan denies the remaining allegations in paragraph 50 of the Complaint.

51.    PowerPlan denies the allegations in paragraph 51 of the Complaint.

52.    PowerPlan denies the allegations in paragraph 52 of the Complaint.

53.    PowerPlan admits that in 2019, AEP issued a request for proposals. PowerPlan also admits that both PowerPlan and Lucasys submitted bids for at least a portion of the work requested by AEP. PowerPlan lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 53 of the Complaint, accordingly they are denied.

54.    PowerPlan admits that it sent certain correspondence to its client AEP, which speaks for itself. PowerPlan lacks information sufficient to form a belief as to the allegations concerning Lucasys' communications with AEP and on that basis denies same. PowerPlan denies the remaining allegations in paragraph 54 of the Complaint.

55.     PowerPlan denies the allegations in paragraph 55 of the Complaint.

56.     PowerPlan denies the allegations in paragraph 56 of the Complaint.

57.     PowerPlan admits only that it has properly asserted its legitimate rights under its software license agreements with its customers. PowerPlan denies the remaining allegations in paragraph 57 of the Complaint.

58.     PowerPlan is without knowledge or information sufficient to form a belief as to the truth of what Lucasys allegedly learned, from whom, or when and on that basis denies same. PowerPlan also denies the remaining allegations in paragraph 58 of the Complaint.

59.     PowerPlan denies the allegations in paragraph 59 of the Complaint.

60.     PowerPlan denies the allegations in paragraph 60 of the Complaint.

61.     PowerPlan denies the allegations in paragraph 61 of the Complaint.

62.     PowerPlan denies the allegations in paragraph 62 of the Complaint.

63.     PowerPlan denies it has engaged in any improper anticompetitive conduct. PowerPlan is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 63 of the Complaint, accordingly they are denied.

64.     PowerPlan admits only that Lucasys' Complaint attempts to allege two or more markets. PowerPlan denies the remaining allegations in paragraph 64 of the Complaint.

65.     PowerPlan admits only that investor-owned rate-regulated utilities sometimes use software systems and that such systems can facilitate certain operational, accounting, regulatory, and tax functions.   PowerPlan denies the remaining allegations in paragraph 65 of the Complaint.

66.     PowerPlan admits only that rate-regulated utilities are regulated and asset intensive.   PowerPlan denies the remaining allegations in paragraph 66 of the Complaint.

67.     PowerPlan admits that there are certain investor-owned rate-regulated utilities that operate without the use of what the Complaint calls "Utility Management Software."   PowerPlan denies the remaining allegations in paragraph 67 of the Complaint.

68.     PowerPlan denies the allegations in paragraph 68 of the Complaint.

69.     PowerPlan denies the allegations in paragraph 69 of the Complaint.

70.     PowerPlan is without information sufficient to form a belief as to costs allegedly associated with switching to a system that Lucasys simultaneously alleges does not exist.   Accordingly, PowerPlan denies the allegations in paragraph 70 of the Complaint.

71.     PowerPlan denies the allegations in paragraph 71 of the Complaint.

72.     PowerPlan denies the allegations in paragraph 72 of the Complaint.

73.     PowerPlan denies the allegations in paragraph 73 of the Complaint.

74.    PowerPlan denies the allegations in paragraph 74 of the Complaint.

75.    PowerPlan denies the allegations in paragraph 75 of the Complaint.

76.    PowerPlan denies the allegations in paragraph 76 of the Complaint.

77.    PowerPlan denies the allegations in paragraph 77 of the Complaint.

78.  · PowerPlan denies the allegations in paragraph 78 of the Complaint.

79.    PowerPlan admits only that numerous firms provide various consulting

services to numerous customers that have deployed PowerPlan's software and that

there is competition among such providers.  PowerPlan lacks information sufficient

to form a belief as to the "capabilities and areas of focus" of these various

competitors, and denies any allegations regarding same.  The remaining allegations

in paragraph 79 of the Complaint also are denied.

80.    PowerPlan denies the allegations in paragraph 80 of the Complaint.

81.    PowerPlan denies the allegations in paragraph 81 of the Complaint.

82.    PowerPlan denies the allegations in paragraph 82 of the Complaint.

83.    PowerPlan admits only that utilities are located throughout the United

States and could source software and/or services from vendors within the United

States.   PowerPlan  denies  the  remaining  allegations  in  paragraph  83  of  the

Complaint.

84.    PowerPlan denies the allegations in paragraph 84 of the Complaint.

85.    PowerPlan denies the allegations in paragraph 85 of the Complaint

86.     PowerPlan denies the allegations in paragraph 86 of the Complaint.

87.     PowerPlan denies the allegations in paragraph 87 of the Complaint.

88.     PowerPlan denies the allegations in paragraph 88 of the Complaint.

89.     PowerPlan denies the allegations in paragraph 89 of the Complaint.

90.     PowerPlan denies it engaged in any improper anticompetitive conduct or that any alleged anticompetitive conduct affected interstate commerce. PowerPlan also denies that it has revenues in excess of $150 million annually. PowerPlan lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 90 of the Complaint, accordingly they are denied.

91.     PowerPlan admits that AEP operates in multiple states.  PowerPlan denies the remaining allegations in paragraph 91 of the Complaint.

92.     PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

93.     PowerPlan denies the allegations in paragraph 93 of the Complaint.

94.     PowerPlan admits only that development of a full suite software product of the scope of PowerPlan's software offering requires significant technological ability and any effort to organically develop such a software offering without access to PowerPlan's trade secrets would require a major capital investment and substantial time.  PowerPlan denies the remaining allegations in paragraph 94 of the Complaint.

13

95.   PowerPlan denies the allegations in paragraph 95 of the Complaint.

96.   PowerPlan admits only that there is existing choice available from different suppliers. PowerPlan denies the remaining allegations in paragraph 96 of the Complaint.

97.   PowerPlan denies the allegations in paragraph 97 of the Complaint

98.   PowerPlan denies the allegations in paragraph 98 of the Complaint.

99.   PowerPlan denies the allegations in paragraph 99 of the Complaint.

100.   PowerPlan denies the allegations in paragraph 100 of the Complaint.

101.   PowerPlan denies the allegations in paragraph 101 of the Complaint.

102.   PowerPlan denies the allegations in paragraph 102 of the Complaint.

103.   PowerPlan denies the allegations in paragraph 103 of the Complaint.

104.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

105.   PowerPlan denies the allegations in paragraph 105 of the Complaint.

106.   PowerPlan admits only that development of a full suite software product of the scope of PowerPlan's software offering requires significant technological ability and any effort to organically develop such a software offering without access to PowerPlan's trade secrets would require a major capital investment and substantial time. PowerPlan denies the remaining allegations in paragraph 106 of the Complaint.

107.   PowerPlan denies the allegations in paragraph 107 of the Complaint.

108.   PowerPlan denies the allegations in paragraph 108 of the Complaint.

109.   PowerPlan denies the allegations in paragraph 109 of the Complaint.

110.   PowerPlan denies the allegations in paragraph 110 of the Complaint.

111.   PowerPlan denies the allegations in paragraph 111 of the Complaint.

112.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

113.   PowerPlan admits only that there is existing choice available from different suppliers.  PowerPlan denies the remaining allegations in paragraph 113 of the Complaint.

114.   PowerPlan denies the allegations in paragraph 114 of the Complaint.

115.   PowerPlan denies the allegations in paragraph 115 of the Complaint.

116.   PowerPlan denies the allegations in paragraph 116 of the Complaint.

117.   PowerPlan denies the allegations in paragraph 117 of the Complaint.

118.   PowerPlan denies the allegations in paragraph 118 of the Complaint.

119.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

120.   PowerPlan denies the allegations in paragraph 120 of the Complaint.

121.   PowerPlan denies the allegations in paragraph 121 of the Complaint.

122.   PowerPlan denies the allegations in paragraph 122 of the Complaint.

123. PowerPlan denies the allegations in paragraph 123 of the Complaint.

124. PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

125. PowerPlan denies the allegations in paragraph 125 of the Complaint.

126. PowerPlan denies the allegations in paragraph 126 of the Complaint.

127. PowerPlan denies the allegations in paragraph 127 of the Complaint.

128. PowerPlan denies the allegations in paragraph 128 of the Complaint.

129. PowerPlan denies the allegations in paragraph 129 of the Complaint.

130. PowerPlan denies the allegations in paragraph 130 of the Complaint

131. PowerPlan denies the allegations in paragraph 131 of the Complaint.

132. PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

133. PowerPlan denies the allegations in paragraph 133 of the Complaint.

134. PowerPlan denies the allegations in paragraph 134 of the Complaint.

135. PowerPlan denies the allegations in paragraph 135 of the Complaint.

136. PowerPlan denies the allegations in paragraph 136 of the Complaint.

137. PowerPlan is without information sufficient to form a belief as to the truth of the allegations contained in paragraph 137 of the Complaint, accordingly they are denied.

138. PowerPlan denies the allegations in paragraph 138 of the Complaint.

139.   PowerPlan denies the allegations in paragraph 139 of the Complaint.

140.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

141.   PowerPlan denies the allegations in paragraph 141 of the Complaint.

142.   PowerPlan denies the allegations in paragraph 142 of the Complaint.

143.   PowerPlan denies the allegations in paragraph 143 of the Complaint.

144.   PowerPlan denies the allegations in paragraph 144 of the Complaint.

145.   PowerPlan denies the allegations in paragraph 145 of the Complaint.

146.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

147.   PowerPlan denies the allegations in paragraph 147 of the Complaint.

148.   PowerPlan denies the allegations in paragraph 148 of the Complaint.

149.   PowerPlan denies the allegations in paragraph 149 of the Complaint.

150.   PowerPlan denies the allegations in paragraph 150 of the Complaint.

151.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

152.   PowerPlan denies the allegations in paragraph 152 of the Complaint.

153.   PowerPlan denies the allegations in paragraph 153 of the Complaint

154.   PowerPlan denies the allegations in paragraph 154 of the Complaint.

155.   PowerPlan denies the allegations in paragraph 155 of the Complaint.

156. PowerPlan denies the allegations in paragraph 156 of the Complaint.

157. PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

158. PowerPlan denies the allegations in paragraph 158 of the Complaint.

159. PowerPlan denies the allegations in paragraph 159 of the Complaint.

160. PowerPlan denies the allegations in paragraph 160 of the Complaint.

To the extent PowerPlan has not responded above to any allegations of the Complaint, including the prayer for relief, PowerPlan hereby denies any such allegations.

## POWERPLAN'S ADDITIONAL DEFENSES

Pursuant to Federal Rule of Civil Procedure 8(c), PowerPlan asserts the following additional defenses. PowerPlan reserves the right to assert additional defenses and/or counterclaims as more information is discovered. PowerPlan does not assume the burden of proof for any defense asserted below, except to the extent the burden of proof already lies with PowerPlan as a matter of law.

## FIRST ADDITIONAL DEFENSE

1. Lucasys lacks standing to bring claims for antitrust violations because, among other reasons, there is no causal connection between the conduct attributed to PowerPlan and Lucasys' alleged injuries, and Lucasys has not suffered an antitrust injury.

## SECOND ADDITIONAL DEFENSE

2.     The Complaint and every claim for relief asserted therein fails to state a claim upon which relief can be granted against PowerPlan.

## THIRD ADDITIONAL DEFENSE

3.     Lucasys' claims are barred, in whole or in part, because there has been no injury to competition as a result of the conduct attributed to PowerPlan.

## FOURTH ADDITIONAL DEFENSE

4.     Lucasys' claims are barred, in whole or in part, because Lucasys has failed to define an appropriate relevant product market and/or geographic market under the antitrust laws.

## FIFTH ADDITIONAL DEFENSE

5.     PowerPlan's business practices were lawful, pro-competitive, increased efficiencies, and benefitted customers.

## SIXTH ADDITIONAL DEFENSE

6.     Lucasys' claims may be barred, in whole or in part, by the applicable statute of limitations and/or statute of repose.

## SEVENTH ADDITIONAL DEFENSE

7.     Lucasys' claims may be barred, in whole or in part, by the doctrines of laches, waiver and/or estoppel.

### EIGHTH ADDITIONAL DEFENSE

8.    Lucasys' claims may be barred, in whole or in part, by the doctrines of *in pari delicto* and/or unclean hands.

### NINTH ADDITIONAL DEFENSE

9.    Lucasys' claims are barred, in whole or in part, because Lucasys failed to reasonably mitigate its alleged damages.

### TENTH ADDITIONAL DEFENSE

10.    Lucasys' claim for equitable relief is barred because Lucasys has adequate remedies at law and/or equitable relief is neither necessary or proper.

### ELEVENTH ADDITIONAL DEFENSE

11.    Lucasys' Seventh and Eighth Causes of Action are barred because PowerPlan was not a stranger to the business relationships between Lucasys and its customers.

### TWELFTH ADDITIONAL DEFENSE

12.    Lucasys' Ninth and Tenth Causes of Action are barred because Lucasys fails to identify any defamatory statement made by PowerPlan with the requisite specificity.

## THIRTEENTH ADDITIONAL DEFENSE

13.   Lucasys' Ninth and Tenth Causes of Action are barred, in whole or in part, because all purported statements made by PowerPlan regarding Lucasys, if any, are privileged under O.C.G.A. § 51-5-7(2) and (3).

## FOURTEENTH ADDITIONAL DEFENSE

14.   Lucasys' Ninth and Tenth Causes of Action are barred, in whole or in part, because all purported fact statements made by PowerPlan regarding Lucasys, if any, were true.

## ADDITIONAL DEFENSES

By designating the aforementioned defenses, PowerPlan does not in any way waive or limit any defenses which are or may be raised by their denials, allegations, and averments.  These defenses also are without prejudice to PowerPlan's ability to raise other and further defenses.  PowerPlan expressly reserves all rights to re-evaluate its defenses and/or assert additional defenses upon any amendment of the underlying claims, and/or upon discovery and review of additional documents and information, and upon the development of other pertinent facts.

## POWERPLAN'S COUNTERCLAIMS

PowerPlan states the following counterclaims against Lucasys for violations of the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (the "DTSA"),

the Georgia Trade Secrets Act of 1990, O.C.G.A § 10-1-760 et seq. (the "GTSA"),

and unfair competition.

## PRELIMINARY STATEMENT

1. PowerPlan incorporates by reference the admissions, denials, and

defenses contained in its Answer to Lucasys' Complaint.

2. PowerPlan has, through a substantial investment of time, effort and

money over 25 years, developed valuable, unique, sophisticated, and proprietary

software and data systems solutions (the "PowerPlan Software"), which permits

utility companies, and other businesses operating in rate-regulated and asset-

intensive industries, to, among other things, effectively manage and integrate the

financial, operational, and regulatory compliance aspects of their assets.

PowerPlan's commercial success is due in large part to its proprietary PowerPlan

Software, which provides unique capabilities and functionality for customers who

license the PowerPlan Software.

3. Vadim Lantukh, Daniel Chang, and Stephen Strang each worked for

years as PowerPlan employees (with Lantukh and Chang also subsequently working

for years as consultants servicing the PowerPlan Software for PowerPlan

customers), where they had access to PowerPlan proprietary information and trade

secrets relating to the PowerPlan Software, customers, and pricing, subject to

confidentiality and non-disclosure obligations prohibiting them from using or

disclosing, or permitting the unauthorized use or disclosure of, this PowerPlan proprietary information.

4.     Lantukh, Chang, and Strang are the founders and main principals of Lucasys, which was formed to develop software, but which also has been providing consulting services to PowerPlan customers relating to their use of the PowerPlan Software, which has provided Lucasys with continued access to the proprietary elements of the PowerPlan Software—including but not limited to information embodied in PowerPlan's proprietary Software architecture, databases and database models, unique functions and features, processes, methods, algorithms, and (potentially) source code—under confidentiality obligations.

5.     Lucasys has attempted to market its own software products to the same customer base served by PowerPlan.  On information and belief, Lucasys has misappropriated PowerPlan's confidential and proprietary information and trade secrets—including but not limited to information embodied in PowerPlan's proprietary Software architecture, databases and database models, unique functions and features, processes, methods, algorithms, and (potentially) source code—and misused and is continuing to misuse that information to design and develop Lucasys' software. The details of such misappropriation is solely in the possession and control of Lucasys, and will be further elucidated by discovery.

6.     Lucasys' misconduct amounts to an intentional misappropriation of PowerPlan's trade secrets in violation of the DTSA and GTSA, and unfair competition.  In addition to causing monetary damages to PowerPlan and resulting in unjust enrichment to Lucasys, Lucasys' actions have caused and are causing PowerPlan irreparable harm, for which it seeks injunctive relief.

## PARTIES

7.     Defendant and Counterclaim Plaintiff PowerPlan is a Delaware corporation organized and existing under the laws of the State of Delaware and registered to do business in the State of Georgia as a foreign profit corporation with its principal place of business at 300 Galleria Parkway, Suite 2100, Atlanta, Cobb County, Georgia 30339. PowerPlan is a wholly-owned subsidiary of Roper Technologies, Inc. [NYSE: ROP].

8.     Plaintiff and Counterclaim Defendant Lucasys is a Delaware corporation organized and existing under the laws of the State of Delaware and registered to do business in the State of Georgia as a foreign profit corporation, which upon information and belief has its principal place of business at 1595 Peachtree Parkway, Suite 204-190, Cumming, Forsyth County, Georgia 30041.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because PowerPlan asserts a counterclaim under the federal

Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, for misappropriation of trade secrets. This Court has pendent or supplemental jurisdiction over PowerPlan's remaining counterclaims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Lucasys because its principal place of business is within the judicial district for the United States District Court for the Northern District of Georgia.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Lucasys resides in this judicial district and a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

12.     Through a substantial investment of time, effort, and money over the past 25 years, PowerPlan has developed valuable, unique, and sophisticated software and data systems solutions (i.e., the PowerPlan Software).

13.     PowerPlan has developed, and continues to develop, upgrade, refine, and add functions and features to, the PowerPlan Software with its own software engineers at great cost to the company. Over the past 25 years, PowerPlan estimates that it has invested more than $100 million in designing, developing, upgrading, and refining its PowerPlan Software.

14.     The PowerPlan Software permits utilities, and other businesses operating in rate-regulated and asset-intensive industries, among others, to

effectively manage and integrate financial, operational, and regulatory compliance aspects of their assets.

15.     Among other things, the integrated systems and solutions included in the PowerPlan Software enable companies to:

- combine and process granular financial and operational asset details from accounting, tax, finance, operations, and information technology departments into a unique view for each stakeholder that enables them to create optimal department strategies;

- mitigate compliance risk by applying complex tax and industry specific regulatory requirements to a company's consolidated, auditable set of financial books; and

- develop defensible, strategic financial asset scenarios that enable optimal planning.

16.     The PowerPlan Software includes architecture, databases, and database structures and models that are unique and proprietary and not provided by other software solutions, and also includes numerous features, functions, and capabilities (including but not limited to calculations, methods, processes, and algorithms), that are unique and proprietary and not provided by other software solutions.

17.     The PowerPlan Software, including source code, system and database architecture, databases, database models and structures, various unique and

integrated features and functions thereof, and the methods, processes, and algorithms used to carry them out are confidential and proprietary and embody trade secrets under federal and Georgia law.

18.    The PowerPlan Software, and the systems and components included in the Software, derive economic value from not being generally known, and PowerPlan has taken reasonable measures to maintain their secrecy.

19.    To maintain the secrecy of its confidential and proprietary information and trade secrets ("PowerPlan Protected Information"), PowerPlan takes a number of reasonable steps, which include but are not limited to the following:

- PowerPlan requires employees to sign employment agreements prohibiting use or disclosure of PowerPlan Protected Information outside of their employment with PowerPlan.

- PowerPlan has adopted employee handbooks with policies similarly prohibiting employees from using or disclosing PowerPlan Protected Information outside of their employment with PowerPlan.

- PowerPlan trains employees on protecting the confidential and proprietary nature of PowerPlan Protected Information.

- PowerPlan does not sell its PowerPlan Software to customers, but instead licenses the Software to customers pursuant to written license agreements in which the customer acknowledges PowerPlan's

proprietary rights in and to the PowerPlan Software programs, manuals and supporting materials; agrees to maintain the confidentiality of and refrain from disclosing PowerPlan Protected Information without the consent of PowerPlan; and agrees to maintain the confidentiality of the PowerPlan Protected Information using no less stringent procedures than the strictest procedures used to protect the customers' own confidential information.

- PowerPlan labels and marks Protected Information as confidential and proprietary.

- PowerPlan requires user logins and passwords for employees, customers, and other persons accessing the PowerPlan Software.

20. The PowerPlan Software has enjoyed success in the marketplace in which PowerPlan operates. The value of the PowerPlan Software and the success of PowerPlan in the marketplace depend in large part on the confidential and proprietary nature of the PowerPlan Software programs, solutions, and related materials, which prevents others from copying protected aspects thereof (including but not limited to proprietary architecture, databases, database models, features and functions, methods, processes, and algorithms) to unfairly compete with PowerPlan.

21. Lantukh, Chang, and Strang worked for years as PowerPlan employees, including in managerial positions.

28

22.     Lantukh was employed by PowerPlan from July 2007 through March 2013, as Manager of Software Implementation and later as Director of Professional Services.

23.     In his positions with PowerPlan, Lantukh was responsible for successful customer implementation of PowerPlan Software solutions, and had intimate access to and worked with all aspects of PowerPlan's confidential and proprietary Software systems (including but not limited to the system architecture, databases, database models, features, functions, and source code).  Lantukh worked closely with PowerPlan customers implementing and using the PowerPlan Software, including in connection with Software upgrades, restructurings, conversions, and interfacing with customer software solutions and data.  To accomplish these tasks, Lantukh worked with PowerPlan Software developers and engineers, and had direct access to, among other things, the PowerPlan Software database models and structure, source code, and confidential customer information.

24.     At all times, Lantukh's access to the PowerPlan Protected Information was subject to legal obligations to refrain from using or disclosing that information for any purpose other than PowerPlan business.

25.     On July 2, 2007, Lantukh signed an Employment Agreement in which he agreed, among other things, to refrain from using, disclosing, or permitting any unauthorized person from using, disclosing, or gaining access to, any trade secrets

of PowerPlan in perpetuity (for as long as they remained trade secrets), except to the limited extent necessary to satisfy his obligations to PowerPlan.

26.     Lantukh was and is also aware that PowerPlan requires its customers to sign license agreements acknowledging PowerPlan's proprietary rights in its Software programs, manuals and supporting materials, and agreeing to maintain the confidentiality of and refrain from disclosing such confidential information and trade secrets.

27.     After leaving employment with PowerPlan, from March 2013 through May 2018, Lantukh worked for Regulated Capital Consultants ("RCC") as a consultant providing services primarily to PowerPlan customers in connection with their implementation and use of the PowerPlan Software.

28.     As an RCC consultant serving PowerPlan customers, Lantukh continued to have access to the PowerPlan Software, including database model and structure, and to other PowerPlan Protected Information, subject to confidentiality obligations owed to the customers, PowerPlan, and on information and belief, RCC.

29.     Chang was employed by PowerPlan from June 2009 to December 2014, first as a consultant assisting customers in implementing and using the PowerPlan Software, and later in managerial positions.

30.     In each of his positions with PowerPlan, Chang was responsible for customer implementation of PowerPlan Software solutions, and had intimate access

to all aspects of PowerPlan's confidential and proprietary Software systems (including but not limited to the system architecture, databases, database models, features, functions, processes, methods, algorithms and source code). Chang worked closely with PowerPlan customers implementing and using the PowerPlan Software, including in connection with Software upgrades, restructurings, conversions, and interfacing with customer software solutions and data. To accomplish these tasks, Chang worked with PowerPlan Software developers and engineers, and had direct access to the PowerPlan Software database models and structure, source code, and other PowerPlan Protected Information.

31.    At all times, Chang's access to the PowerPlan Protected Information was subject to legal obligations to refrain from using or disclosing that information for any purpose other than PowerPlan business.

32.    On June 26, 2009, Chang signed a Handbook Acknowledgment agreeing to comply with PowerPlan's employee handbook policies, which prohibited the disclosure of PowerPlan Protected Information during or after his employment other than for the benefit of PowerPlan.

33.    On March 18, 2013, Chang executed an Employment Covenants Agreement agreeing that "both during and after Your employment with the Company," Chang would refrain from using, disclosing, or permitting any unauthorized person from using, disclosing, or gaining access to, any Protected

31

Information of PowerPlan, except to the limited extent necessary to satisfy Chang's obligations to PowerPlan.

34.    Chang was and is aware that PowerPlan requires its customers to sign license agreements acknowledging PowerPlan's proprietary rights in its Software programs, manuals and supporting materials, and agreeing to maintain the confidentiality of and refrain from disclosing its Protected Information.

35.    From 2015 until recently, Mr. Chang worked for Deloitte and, among other responsibilities, consulted with PowerPlan customers in connection with implementation and use of their PowerPlan Software.   In those capacities Chang continued to have access to PowerPlan's Software, and to other PowerPlan Protected Information, subject to confidentiality obligations owed to the customers, PowerPlan, and upon information and belief, Deloitte.

36.    Further, in May 2019, Chang attended a PowerPlan user conference as an employee of Deloitte, where he was exposed to additional PowerPlan Protected Information.   PowerPlan disclosed this Protected Information subject to and conditioned upon a non-disclosure agreement signed by Deloitte (the "Deloitte Non-Disclosure"), under which Chang is bound to maintain the confidentiality of PowerPlan's product and other Protected Information, and to refrain from disclosing or making such information available to a third party for any reason.

37.    Strang worked for PowerPlan from January 2011 to September 2015, first as a Senior Consultant assisting customers in implementing and using the PowerPlan Software, and later in a managerial position.

38.    In each of his positions with PowerPlan, Strang was responsible for customer implementation of PowerPlan Software solutions, and had intimate access to all aspects of PowerPlan's confidential and proprietary Software systems (including but not limited to the system architecture, databases, database models, features, functions, methods, processes, algorithms, and source code).   Strang worked closely with PowerPlan customers implementing and using the PowerPlan Software, including in connection with Software upgrades, restructurings, conversions, and interfacing with customer software solutions and data.   To accomplish these tasks, Strang worked with PowerPlan Software developers and engineers, and had direct access to the PowerPlan Software database model and structure, source code, and confidential customer information.

39.    At all times, Strang's access to the foregoing PowerPlan Protected Information was subject to his legal obligations to refrain from using or disclosing that information for any purpose other than PowerPlan business.

40.    On January 13, 2011, Strang signed a Handbook Acknowledgment agreeing to comply with PowerPlan's employee handbook policies, which

prohibited the disclosure of PowerPlan Protected Information during or after his employment other than for the benefit of PowerPlan.

41. On or about March 18, 2013, Strang executed an Employment Covenants Agreement agreeing that "both during and after Your employment with the Company," he would refrain from using, disclosing, or permitting any unauthorized person from using, disclosing, or gaining access to, any Protected Information of PowerPlan, except to the limited extent necessary to satisfy his obligations to PowerPlan.

42. Strang was and is aware that PowerPlan requires its customers to sign license agreements acknowledging PowerPlan's proprietary rights in its Software programs, manuals and supporting materials, and agreeing to maintain the confidentiality of and refrain from disclosing its Protected Information.

43. In or around May 2018, Lantukh founded and became Chief Executive Officer of Lucasys.

44. Lucasys was formed, in part, to develop software and programs (the "Lucasys Software") comparable to the PowerPlan Software, which it intends to market and sell to the same core customer base served by PowerPlan.

45. At the same time Lucasys has been developing its Software with the intent of selling to PowerPlan's customers, Lucasys has been providing consulting services to certain of PowerPlan's customers in connection with the customers'

implementation and use of the PowerPlan Software, during which they have access to nearly all aspects of PowerPlan's Software, under confidentiality obligations that prohibit the misappropriation of PowerPlan Protected Information.

46.     Because most of Lantukh's professional career has been spent accessing, modifying, implementing, and working with the PowerPlan Software, either as a PowerPlan employee or as a consultant servicing PowerPlan customers, it would be virtually impossible for him and Lucasys to design and develop the Lucasys Software without relying on confidential and proprietary aspects of the PowerPlan Software.

47.     PowerPlan's concerns about Lucasys' use of PowerPlan's Protected Information have been exacerbated by Lucasys' hiring of former PowerPlan employees Chang as Chief Operating Officer (started working with Lucasys in July 2019), and Strang as Chief Technology Officer (started in August 2019), and its announcement that Chang is also a co-founder, with Lantukh, of Lucasys.

48.     Lucasys has also contracted with yet another former PowerPlan employee—Vu Nguyen—to become a Lucasys Implementation Partner.  Nguyen was a PowerPlan employee who had access to and worked closely with PowerPlan's confidential and proprietary systems, including its database models and source code, and worked closely with PowerPlan customers in implementing the PowerPlan Software.

49.     Nguyen worked for PowerPlan from December 2007 to September 2015 in several managerial positions, including Manager of Professional Services, Principal Consultant, and Manager and Senior Manager of Delivery Center.

50.     As a PowerPlan employee, Nguyen executed an Employment Agreement agreeing that he would not use, disclose, or permit any unauthorized use of the PowerPlan's Protected Information, and a Handbook Acknowledgment agreeing to comply with PowerPlan's employee handbook policies, which prohibited the disclosure of PowerPlan Protected Information during or after his employment other than for the benefit of PowerPlan.

51.     Thus, at all times, Nguyen's access to the PowerPlan Protected Information was subject to his legal obligations to refrain from using or disclosing that information for any purpose other than PowerPlan business.

52.     In his position with Integrated Solutions Consulting, Nguyen has worked, or is working, as a consultant for one or more PowerPlan customers helping to implement the PowerPlan Software.

53.     On information and belief, Lucasys has been designing and developing the Lucasys Software for more than one year, and continues to do so.  Lucasys recently started to market, promote, and attempt to sell this Software to utilities and other regulated and asset intensive businesses, including to PowerPlan's customers.

54.     On information and belief, the Lucasys Software has been designed using and/or leveraging the confidential and trade secret information that Lucasys' principals and employees obtained by virtue of their prior PowerPlan employment and PowerPlan customer engagements, which were governed by confidentiality agreements requiring that PowerPlan's confidential and trade secret information be held in strict confidence.  On information and belief, Lucasys has used, and is using, that confidential and trade secret information for unauthorized purposes and without the consent or permission of PowerPlan.

55.     On information and belief, Lucasys is improperly, unlawfully, and unfairly using PowerPlan's Protected Information—including but not limited to information embodied in PowerPlan's proprietary architecture, software, databases, database schema, and unique functions and features to, on information and belief, design, develop, and implement Lucasys' Software products.

56.     On October 30, 2019, PowerPlan sent a letter to Lucasys demanding, among other things, that it:

- cease disclosing or using PowerPlan's Protected Information;

- return all Protected Information in its possession, and delete all such information from its systems; and

- cease designing, developing, selling, or marketing the Lucasys Software unless and until it can be independently verified that

Lucasys designed and developed the Software without use of PowerPlan's Protected Information.

57.    Lucasys responded through a letter dated November 8, 2019, in which it did not agree to comply with PowerPlan's demands. The November 8, 2019 letter includes a number of factual and legal assertions with which PowerPlan disagrees.

58.    The parties, through their lawyers, subsequently engaged in an expedited exchange of information under certain conditions, seeking to address their areas of disagreement. Lucasys, subject to a strict confidentiality and non-disclosure agreement, provided certain information regarding Lucasys' Software to certain persons at PowerPlan and PowerPlan's former outside counsel. However, to date, and despite its requests, Lucasys has refused to authorize undersigned counsel to review the information provided under this strict confidentiality agreement.

## CAUSES OF ACTION

### COUNT ONE
### Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1836

59.    PowerPlan alleges and incorporates the allegations contained in paragraphs 1–58 as if fully set forth here.

60.    The PowerPlan Software is licensed to business customers throughout the United States in interstate commerce.

61.    The customers to whom PowerPlan licenses PowerPlan Software are located throughout the United States and are engaged in interstate commerce.

62. PowerPlan's Protected Information, including information embodied in the PowerPlan Software (including but not limited to the Software architecture, databases, database models and structure, unique functions and features, methods, processes, algorithms, and source code) contain valuable trade secrets owned by PowerPlan.

63. PowerPlan's Protected Information contains trade secrets under the DTSA because it includes financial, business, technical, and engineering information, including formulas, designs, methods, techniques, processes, procedures, programs, and codes, that are not generally known to the public, for which PowerPlan takes measures that are reasonable under the circumstances to keep secret.

64. PowerPlan's Protected Information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons or entities who can obtain economic value from the disclosure or use of the information.

65. On information and belief, Lucasys acquired PowerPlan's trade secrets from one or more of Lantukh, Chang, and Strang by improper means, knowing that these individuals acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy and limit the use of the trade secrets and/or while consulting

for PowerPlan customers and under a duty to maintain the secrecy and limit the use of the information.

66.     On information and belief, Lucasys has improperly obtained and used, and is continuing to improperly use, PowerPlan's trade secrets in connection with designing, developing, implementing, marketing and selling Lucasys Software, without the consent of PowerPlan.

67.     Lucasys' acquisition, disclosure, and/or use of the PowerPlan trade secrets, including in connection with designing, developing, implementing, marketing and selling Lucasys software, amounts to a deliberate and improper misappropriation of PowerPlan's trade secrets in violation of the DTSA.

68.     As a result of Lucasys' actual and threatened misappropriation of PowerPlan's trade secrets, PowerPlan is suffering irreparable harm.   Without permanent injunctive relief awarded pursuant to 18 U.S.C. § 1836(b)(3)(A), PowerPlan will continue to sustain irreparable harm for which there is no adequate remedy at law.

69.     PowerPlan is likewise entitled to an award of damages sustained, and amounts by which Lucasys has been unjustly enriched, from Lucasys' misappropriation of PowerPlan's trade secrets, in an amount to be determined at trial, and to other appropriate monetary relief including a doubling of the actual loss

caused by the misappropriation and resulting unjust enrichment, pursuant to 18 U.S.C. § 1836(b)(3)(B) and (C).

70.     Lucasys' actions have been intentional and were meant to cause harm to PowerPlan, entitling PowerPlan to recover an award of costs and reasonable attorneys' fees incurred by PowerPlan in this action pursuant to 18 U.S.C. § 1836(b)(3)(D).

**COUNT TWO**
**Violation of the Georgia Trade Secrets Act – O.C.G.A. § 10-1-760**

71.     PowerPlan alleges and incorporates the allegations contained in paragraphs 1–70 as if fully set forth here.

72.     PowerPlan's Protected Information, including information embodied in the PowerPlan Software (including but not limited to the Software architecture, databases, database models and structure, unique functions and features, and source code) contains valuable trade secrets owned by PowerPlan.

73.     PowerPlan's Protected Information contains trade secrets under the GTSA because it includes financial, business, technical, and engineering information, including formulas, designs, methods, techniques, processes, procedures, programs, and codes that are not commonly known to the public, for which PowerPlan takes reasonable measures to keep secret.

74.     PowerPlan's Protected Information derives independent economic value from not being generally known to, and not being readily ascertainable through

proper means by, persons or entities who can obtain economic value from the disclosure or use of the information.

75. Upon information and belief, Lucasys acquired PowerPlan's trade secrets from one or more of Lantukh, Chang, and Strang by improper means, knowing that these individuals acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy and limit the use of the trade secrets and/or while consulting for PowerPlan customers and under a duty to maintain the secrecy and limit the use of the information.

76. Upon information and belief, Lucasys has improperly obtained and used, and is continuing to improperly use, PowerPlan's trade secrets in connection with designing, developing, and implementing Lucasys Software, without the consent of PowerPlan.

77. Upon information and belief, Lucasys has improperly acquired and/or used the trade secrets for the wrongful and deliberate purpose of unfairly competing against PowerPlan.

78. Lucasys' acquisition, disclosure, and/or use of the PowerPlan trade secrets, including in connection with designing, developing, and implementing Lucasys Software, amounts to a deliberate and improper misappropriation of PowerPlan's trade secrets in violation of the GTSA.

79. As a result of Lucasys' actual and threatened misappropriation of PowerPlan's trade secrets, PowerPlan is suffering irreparable harm. Without permanent injunctive relief awarded pursuant to O.C.G.A. § 10-1-762, PowerPlan will continue to sustain irreparable harm for which there is no adequate remedy at law.

80. PowerPlan is likewise entitled to an award of damages under O.C.G.A. § 10-1-763(a), including damages sustained from Lucasys' misappropriation of PowerPlan's trade secrets, or the actual loss to PowerPlan plus the unjust enrichment to Lucasys, for the misappropriation.

81. Lucasys' actions have been intentional and were meant to cause harm to PowerPlan, entitling PowerPlan under O.C.G.A. § 10-1-763(b) to recover exemplary damages in an amount not exceeding twice any award made under O.C.G.A. § 10-1-763(a), and to recover attorneys' fees under O.C.G.A. § 10-1-764.

## COUNT THREE
### Unfair Competition

82. PowerPlan alleges and incorporates the allegations contained in paragraphs 1–81 as if fully set forth here.

83. Lucasys' misconduct alleged herein, including but not limited to its misappropriation of PowerPlan trade secrets and breaches of obligations owed under confidentiality and non-disclosure agreements, amounts to unfair competition prohibited by Georgia common law.

43

84.     Lucasys' unfair competition has caused and will continue to cause damages to PowerPlan, for which it is entitled to recover in amounts that will be proved at trial.

85.     Lucasys' acts of unfair competition have been willful and intentional or reflect an entire want of care which raises the presumption of conscious disregard of the consequences, entitling PowerPlan to an award of punitive damages.

### COUNT FOUR
### Recovery of Expenses of Litigation – O.C.G.A. § 13-6-11

86.     PowerPlan alleges and incorporates the allegations contained in paragraphs 1–85 as if fully set forth here.

87.     Lucasys' actions as set forth in this Answer have been in bad faith and have caused PowerPlan unnecessary trouble and expense.

88.     As a result of Lucasys' actions, PowerPlan has incurred expenses of litigation, including attorneys' fees, which it is entitled to recover under O.C.G.A. § 13-6-11 in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, PowerPlan respectfully requests that judgment be made and entered in its favor and against Lucasys as follows:

a.      Entering judgment in favor of PowerPlan and against Lucasys on all counts alleged in this Counterclaim.

b.      Granting to PowerPlan permanent injunctive relief enjoining Lucasys, and all those acting directly or indirectly in concert or participation with it, as follows:

    i.      Enjoining all disclosure or use of PowerPlan's Protected Information, including but not limited to disclosure or use of the PowerPlan Software and PowerPlan's proprietary customer and pricing information;

    ii.     Requiring Lucasys and all those acting in concert or participation with Lucasys to return to PowerPlan all PowerPlan Protected Information in their possession, custody or control, and to destroy or delete all information from their computers, systems, and devices;

    iii.    Enjoining the further design, development, marketing, or sale or efforts to sell the Lucasys Software unless and until it can be independently verified that Lucasys designed, developed, and is able to market and sell the Software without use of PowerPlan's Protected Information;

c.      Award compensatory and actual damages against Lucasys, in an amount to be determined at trial, including all damages (including unjust enrichment damages) authorized under 18 U.S.C. § 1836(b)(3)(B) and O.C.G.A. § 10-1-763(a);

d.     Award punitive and exemplary damages, including damages up to twice the amount of actual and compensatory damages awarded, authorized under 18 U.S.C. § 1826(b)(3)(C) and O.C.G.A. § 10-1-763(b);

e.     Award PowerPlan its reasonable attorneys' fees and costs; and

f.     Grant PowerPlan such other and further relief in its favor as this Court may deem just and proper.

PowerPlan demands a trial by jury of every issue triable of right by a jury.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Answer to a Complaint and Counterclaims was served on October 14, 2021 by filing it using the Court's CM/ECF system, which will send electronic notification of such filing to all counsel of record.

*/s/ Damond R. Mace*
Damond R. Mace

*Attorney for Defendant and*
*Counterclaim Plaintiff PowerPlan, Inc.*

Message

| | |
|---|---|
| **From:** | Kevin Murphy [kmurphy@pwrplan.com] |
| **Sent:** | 8/30/2019 3:27:12 PM |
| **To:** | Leo Quintana - Florida Power & Light Company (leo.quintana@fpl.com) [leo.quintana@fpl.com]; 'Ana Leonard' [ana.leonard@fpl.com]; May, James [James.May@nexteraenergy.com]; Delucenay, Amber [Amber.Delucenay@fpl.com]; Hudson, Kenneth [Kenneth.Hudson@fpl.com]; Fenimore, Joseph [Joseph.Fenimore@fpl.com]; christopher.heaton@fpl.com; Hibbert, Marie [Marie.Hibbert@fpl.com]; Ferguson, Keith [Keith.Ferguson@fpl.com] |
| **CC:** | Skip Fowler [Skip.Fowler@powerplan.com]; Elizabeth Cowart [ecowart@pwrplan.com]; Jim Dahlby [jdahlby@pwrplan.com]; Brett Bertz [brett.bertz@powerplan.com] |
| **Subject:** | RE: PowerPlan brief follow up |
| **Attachments:** | 190822 Aug 22 2019 Executive Meeting email.docx |

First, let us say we hope you and your families all stay safe from the storm. As a Florida resident, thank you for the high level of preparedness.

While we expect the focus will be on storm duties for next while, we wanted to share the consolidated notes and action items from our session. These are below and wound up being a longer message than intended. (also attached as a word doc if that is easier to read) We wanted to be through and transparent in what we took from the session. If there are items not included, or you feel are misrepresented, please call that out to ensure alignment.

In a very open discussion, we covered:
- Brief Power plan update
- Discussion of the items on the list provided by NextEra / FPL
- Notes per area and action items noted below
- Review of PowerPlan Roadmap
- We did not cover the Finance Technology Roadmap, and would like to schedule a time to do so.

Goals, as articulated by Jim May, supported by the group"
- Avoid another lease project
- Strengthen relationship
- Find beneficial way to work together

Review of NEE / FPL List
- System Performance
- Property Tax

- Taking 1.5 minutes to move between screens
- Help buttons not working
- 1300 Returns / 430 legal entities
- FPL have looked at multiple options to improve performance - virtualization / different servers/ local machine – without success
  - FPL Engineering feedback – look at the code.
  - Performance needs to improve. Citrix not the answer

- Plant

- Work Order Entry Process is slow and difficult

  - Why does it take 15 clicks to get from X to Y – need to go watch client

- Screen refresh and reporting is a problem
- Why do all of the standard reports have to be exported and tweaked in XL?
- Can Company setup be improved – 30 minutes per company.

  - Too long with the number of companies being added



PLAINTIFF'S
EXHIBIT
24
Bertz 12.2.21

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

- Every module has a different process and set of data.
- Is "Copy Company" an option?
o Close Process
- NEE / FPL is driving toward a 1 day month end close process
- NEE / FPL Goal for PPlan is a 2-hour close
- Currently 2 people babysit PowerPlan close process over night. Seeking further automation opportunities
o *Action Item - PowerPlan to experience FPL user experience & engage engineering for architecture review.*
- *Jason Szelest (Dir PowerPlan Services) has been onsite this week working with Ana / Chris to understand performance issues and user experience. Feedback will drive further actions*

- Consulting Knowledge Level
o Brett Bertz acknowledged attrition has been / continues to be an issue / discussed changes in overall delivery strategy & staff development plans
o Jim May acknowledged that retention is also an issue for FPL / NextEra
o Collaboration opportunity and willingness to share what NEE / FPL are doing to keep people engaged. Potential for "Mini ignite program":
- 6 month development program with / at NEE / FPL for PowerPlan new hires
- Rotate through plant / tax / regulatory etc. to understand days to day activities / process and gain appreciation for Utility culture.
o PMO
- Last 2 projects have been deficient - Skip discussed reboot of PMO organization
- People would show up to meetings and be lost
- Lack of consistency in resources
- .Skip discussed reboot of professional services organization, and resource allocation and management processes to address these issues
o *Action Item – PowerPlan to follow up with Jim / Keith for further discussion on collaborative personnel development program.*

- Consulting Rates
o NEE / FPL has VMO meeting every 2 weeks. CIO reviews all proposed engagements were consulting rates are over $100/ hr.
- PowerPlan rate structure has led NEE / FPL to pursue insourcing and use alternative / niche resources for projects related to PowerPlan.
- NEE / FPL would prefer to use a system vendor than one- and two-man shops when valued delivered correlates to rates charged.
- Recently, niche vendors have offered lower rates for more experienced personnel.
- In one example requirements may have been misinterpreted leading to a significant difference in bids submitted. This appears to have been a one time occurrence, with subsequent bids being more comparable
- Rate cards are included in each PowerPlan SOW proposal.
o NESOP (NextEra Energy Strategic Operating Partner)
- Program under which discounts / credits are available based on level of work / number of hours consumed / delivered discussed as a potential approach with PowerPlan.
- GE / Siemens discussed as examples where NEE / FPL will have Serial No1 of a Turbine Model
o *Action Item - Further discussions on what a NEE / FPL / PowerPlan NESOP might look like*


- Last 2 Projects (Lease & Property Tax) did not meet NEE expectations
o Property Tax Project
- Number of items considered outstanding by the FPL project team
- Calendar / Forecasting not complete

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

**Kevin Murphy**
Customer Engagement Executive

PowerPlan, Inc.
300 Galleria Parkway
Atlanta, GA 30339

M: +1 770.310.4409
kmurphy@pwrplan.com

 POWERPLAN

---

**From:** Kevin Murphy
**Sent:** Sunday, August 25, 2019 11:50 PM
**To:** Leo Quintana - Florida Power & Light Company (leo.quintana@fpl.com) <leo.quintana@fpl.com>; 'Ana Leonard'
<ana.leonard@fpl.com>; May, James <James.May@nexteraenergy.com>; Delucenay, Amber
<Amber.Delucenay@fpl.com>; Hudson, Kenneth <Kenneth.Hudson@fpl.com>; Fenimore, Joseph
<Joseph.Fenimore@fpl.com>; christopher.heaton@fpl.com; Hibbert, Marie <Marie.Hibbert@fpl.com>; Ferguson, Keith
<Keith.Ferguson@fpl.com>
**Cc:** Skip Fowler <Skip.Fowler@powerplan.com>; Elizabeth Cowart <ecowart@pwrplan.com>; Jim Dahlby
<jdahlby@pwrplan.com>; Brett Bertz <brett.bertz@powerplan.com>
**Subject:** PowerPlan brief follow up

On behalf of the PowerPlan team, we appreciate you making the time to meet with us and providing candid feedback on
Nextera / FPL experience with PowerPlan along with potential paths forward. Attached are the slides shared during the
session. Jason Szelest will be reaching out early this week regarding Property Tax related topics. We will be following up
further after comprehensive review of our notes.

Thank you for your continued investment in PowerPlan

Kevin

**Kevin Murphy**
Customer Engagement Executive

PowerPlan, Inc.
300 Galleria Parkway
Atlanta, GA 30339

M: +1 770.310.4409
kmurphy@pwrplan.com

 POWERPLAN

| | |
|---|---|
| **From:** | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
| **Sent:** | 10/28/2019 9:35:58 AM |
| **To:** | May, James [James.May@nexteraenergy.com] |
| **Subject:** | Connecting This Week |

Jim, hope things are well for you. I was writing to see if I could get 15 minutes at some point this week to speak to you about a confidential topic involving the protection of PowerPlan's intellectual property and trade secrets. It's a sensitive situation that involves a third party that has been engaged by NextEra in the past to provide services on PowerPlan's software. I would appreciate it if you could keep my request private for now until I can get some direction from you on next steps. Please let me know if you can spare some time over the next few days.

Thanks

**Brett M. Bertz**
**Chief Customer Officer**

Office:   +1 678.223.2762
Mobile:  +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

 POWER**PLAN**



CONFIDENTIAL – SUBJECT TO
DISCOVERY CONFIDENTIALITY

| From: | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
|---|---|
| Sent: | 10/30/2019 7:52:49 AM |
| To: | May, James [James.May@nexteraenergy.com] |
| Subject: | RE: [EXT] Re: License Agreement Section |

Thank you Jim. Yes, all of section 14 handles the definition of trade secrets and section 14.2 addresses the consent requirements for access to those trade secrets by a third party.

**From:** May, James <James.May@nexteraenergy.com>
**Sent:** Tuesday, October 29, 2019 10:13 PM
**To:** Brett Bertz <brett.bertz@powerplan.com>
**Subject:** [EXT] Re: License Agreement Section

**Exercise CAUTION when opening links or attachments.**

Section 14.2 below? I spoke with Leo when I hung up with you and we are circling back tomorrow after he determines whether we are still engaged with Lukasys.

10:10 PM  Tue Oct 29                                                              ...II 🔋 86%

FPL-2001.04.20-PowerPlant Perpetual Licensing Agreement

13.7  Licensor shall have no obligation under paragraph 13 if Licensee is delinquent in paying any sums of money owed to Licensor.

**14. PROTECTION OF PROPRIETARY INTERESTS / CONFIDENTIALITY**

14.1  Licensee acknowledges the proprietary rights of Licensor in and to the Software, including, but not limited to, computer programs, manuals, and supporting material and that such are properly considered to be trade secrets, in that they involve compilations of information which are secrets and which are the product of Licensor's own expenditures of time, effort, money, and creative skill. Licensee agrees that all tangible objects containing or relating to the PowerPlant programs are the sole and exclusive property of Licensor and upon termination of this agreement for any reason, Licensee will return to Licensor all programs, manuals and related materials provided under this Agreement, and will retain no copies whatsoever for its own use or for any purpose.

14.2  Each party agrees that it will not use, disclose, publish, or otherwise divulge to any third party either during or after the termination of this agreement or permit its officers or employees to so divulge any confidential information of the other party without prior written consent of such party. Each party shall employ no such less stringent procedures than the strictest procedures used to protect its own confidential data including procedures set forth in these paragraphs. If disclosure to a third party, such as an auditor, is required, the third party is required to first sign a confidentiality agreement with the owner of the confidential information. Licensee may use the standard reports of the Software in filings or proceedings before any governmental regulatory or judicial body to which it is subject.

14.3  In the event of a breach of this Section 14, the owner of the confidential information will not have an adequate remedy in money or in damages, and therefore shall be entitled to seek injunctive relief against such breach without any requirement to post bond as a condition thereof.

14.5  All of the above restrictions in Paragraph 14 shall survive any termination of this Agreement and/or the completion of work. Nothing contained herein shall be construed as to limit any rights of Licensor under copyright, patent, or other law.

**15. TITLE**

infringement or any patent, copyright, trademark, or trade secret by the Software or any part thereof.

**16. OWNERSHIP**

During the course of the term of this Agreement, Licensor and Licensee will be working together to install the Software. Improvements and modifications to the Software are expected to occur during the PowerPlant system implementation. Licensor will retain title to PowerPlant and to any and all modifications, improvements, and alterations made during or subsequent to the PowerPlant system installation.

**17. SYSTEM TRANSFER**

So long as Licensee is in compliance with the provisions of its Agreements with Licensor and is operating under current maintenance provisions with Licensor, Licensee shall have the right to make complete or partial copies of the software as needed solely for testing, archival, backup and disaster-recovery purposes. Licensee shall ensure that any proprietary, copyright, trademark, or trade secret notices contained in or placed upon the system shall appear on any such copies.

**18. PROGRAM ACCEPTANCE**

18.1  During the 90 (ninety) days following the delivery of the PowerPlant programs, the programs will be subject to test by Licensee to determine that the PowerPlant programs are in substantial conformance with the Licensee requirements. If, during the 90 day test period, Licensee discovers an error in the PowerPlant programs or a substantial non-conformance to Licensee's asset accounting requirements, Licensee will notify Licensor in writing accompanied by program listings or sample results evidencing such error or non-conformance.

18.2  If, within 60 days following receipt of Licensee's written error report in accordance with paragraph 18.1, Licensor fails to remedy the reported error or non-conformance, Licensee shall be entitled to terminate this Agreement by written notice to Licensor accompanied by return to Licensor all copies and materials relating to the Software delivered to Licensee under this Agreement.

18.3  If this Agreement is terminated by Licensee in accordance with paragraph 18.2, Licensee will receive a refund for all license fee amounts paid

Sent from my iPad


PLAINTIFF'S
EXHIBIT
26
Bertz 12.2.21

OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO DISCOVERY

On Oct 29, 2019, at 9:32 PM, Brett Bertz <brett.bertz@powerplan.com> wrote:

CAUTION - EXTERNAL EMAIL

Jim, Thank you for your time today.  As a follow up, it's my understanding that our License agreement section §14.2 covers third party access to PowerPlan software.  Please do speak with the NextEra team tomorrow and provide guidance on a follow up conversation between NextEra and PowerPlan surrounding the situation and request.

Thank you

**Brett M. Bertz**
**Chief Customer Officer**

Office:  +1 678.223.2762
Mobile:  +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

 POWERPLAN˙

This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you.

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

Message

| | |
|---|---|
| **From:** | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
| **Sent:** | 11/4/2019 6:18:32 PM |
| **To:** | 'Jim May (james.may@nee.com)' [james.may@nee.com] |
| **Subject:** | Follow Up Time Slots |

Jim, I'd like to propose several options for the NextEra and PowerPlan teams to meet to follow up on the communication I provided last week:

- Wednesday, November 6  at 9:30a or 4p ET
- Thursday, November 7 at 2p ET

We'll have representation from the PowerPlan business, including me and Jim Dahlby, and our legal counsel represented.

Please let me know if any of these time slots will work for the NextEra team or if you have any questions.

Thanks

**Brett M. Bertz**
Chief Customer Officer

Office:   +1 678.223.2762
Mobile:  +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

 POWER**PLAN**



CONFIDENTIAL – SUBJECT TO
DISCOVERY CONFIDENTIALITY

Appointment

| | |
|---|---|
| **From:** | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
| **Sent:** | 11/5/2019 10:24:06 AM |
| **To:** | Mark VanderBroek [mark.vanderbroek@nelsonmullins.com]; Jim Dahlby [jdahlby@pwrplan.com]; Jonathan Sucher [Jonathan.Sucher@powerplan.com]; Jim May (james.may@nee.com) [james.may@nee.com]; Quintana, Leo [Leo.Quintana@fpl.com]; Goldstein, Bruce [Bruce.Goldstein@nexteraenergy.com] |

| | |
|---|---|
| **Subject:** | NextEra Energy and PowerPlan Follow Up |
| **Location:** | +1 (470) 440-6771,,614830975# (Dial-in Number) |

| | |
|---|---|
| **Start:** | 11/6/2019 4:00:00 PM |
| **End:** | 11/6/2019 4:30:00 PM |
| **Show Time As:** | Tentative |

| | |
|---|---|
| **Required Attendees:** | Mark VanderBroek; Jim Dahlby; Jonathan Sucher; Jim May; Quintana, Leo; Goldstein, Bruce |

......................................................................................

# Join Skype Meeting

Trouble Joining? Try Skype Web App

## Join by phone

Toll number:   +1 (470) 440-6771,,614830975# (Dial-in Number)      English (United States)

Find a local number

Conference ID: 614830975

Forgot your dial-in PIN? | Help

......................................................................................



PLAINTIFF'S
EXHIBIT
28
Bertz 12·2·21
tabbies

| From: | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
|---|---|
| Sent: | 11/7/2019 4:29:05 PM |
| To: | Jim May (james.may@nee.com) [james.may@nee.com] |
| Subject: | Follow Up |

Jim, just a follow up to our conversation from last night.  PowerPlan will be pleased to help with the completion of the remaining tax work.   When NextEra is ready to discuss next steps in more detail, I'd like to engage Jamie Carr who is a services strategist for our Tax platform to help with finalizing scope.  As discussed we will work with NextEra on the pricing approach to keep it  in line with remaining budget.  Please advise on next steps.  And, thanks for your partnership in the matter.

**Brett M. Bertz**
Chief Customer Officer

Office:   +1 678.223.2762
Mobile:  +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

 POWER**PLAN**



CONFIDENTIAL – SUBJECT TO
DISCOVERY CONFIDENTIALITY

Message

| | |
|---|---|
| **From:** | Williams, Steven [Steven.Williams2@fpl.com] |
| **Sent:** | 11/15/2019 11:16:25 AM |
| **To:** | Jamie Carr [jcarr@pwrplan.com] |
| **CC:** | Hibbert, Marie [Marie.Hibbert@fpl.com]; Kumar, Jitendra [Jitendra.Kumar@fpl.com]; Quintana, Leo [Leo.Quintana@fpl.com]; Brett Bertz [brett.bertz@powerplan.com] |
| **Subject:** | RE: [EXT] RE: PowerTax SOW Requirements |

Jamie,

Thanks for turning this around quickly. In response to the proposal, I want to highlight a recent discussion that the FPL team had with Brett Bertz, during which we were advised of the underlying potential IP infringement issue that prompted the termination of our existing agreement for the subject services. During this meeting, we were assured that we would be no worse off from a commercial standpoint by awarding the remainder of the work to PowerPlan. Our budgeted exposure for the remaining work was communicated to Brett as being roughly ▮▮▮▮ Your proposal misses that mark by ▮▮▮▮ plus the estimated expenses. From FPL's perspective, a substantial revision is required to meet our expectations and ability to move forward with these services.

Again, I appreciate the prompt response, as well as our continued partnership.

Best,

**Steven C. Williams**
Integrated Supply Chain
Florida Power & Light Company
Desk: 561-691-7044
Cell: 561-529-7361

-----Original Message-----
From: Jamie Carr <jcarr@pwrplan.com>
Sent: Friday, November 15, 2019 10:24 AM
To: Williams, Steven <Steven.Williams2@fpl.com>
Cc: Hibbert, Marie <Marie.Hibbert@fpl.com>; Kumar, Jitendra <Jitendra.Kumar@fpl.com>; Quintana, Leo <Leo.Quintana@fpl.com>
Subject: RE: [EXT] RE: PowerTax SOW Requirements

Steven-

Attached is the estimate. I'm about to board a flight and land at 12:36ET

Jamie Carr
Director, Professional Services

Mobile: 330.603.3556
jcarr@pwrplan.com
PowerPlan.com

-----Original Message-----
From: Williams, Steven <Steven.Williams2@fpl.com>
Sent: Thursday, November 14, 2019 2:52 PM



OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

To: Jamie Carr <jcarr@pwrplan.com>
Cc: Hibbert, Marie <Marie.Hibbert@fpl.com>; Kumar, Jitendra <Jitendra.Kumar@fpl.com>; Quintana, Leo <Leo.Quintana@fpl.com>
Subject: [EXT] RE: PowerTax SOW Requirements

Hi Jamie,

Do you have an ETA on the proposal being submitted? Ideally, we'd like to have that in hand by tomorrow morning.

Thanks,

Steve

-----Original Message-----
From: Williams, Steven
Sent: Wednesday, November 13, 2019 3:19 PM
To: 'Jamie Carr' <jcarr@pwrplan.com>
Cc: Hibbert, Marie <Marie.Hibbert@fpl.com>; Kumar, Jitendra <Jitendra.Kumar@fpl.com>; Quintana, Leo <Leo.Quintana@fpl.com>
Subject: PowerTax SOW Requirements
Importance: High

Jamie,

Please see the attached business requirements based upon which we will anticipate a proposal from PowerPlan.

Let me know of any questions.

Best,

Steven C. Williams
Integrated Supply Chain
Florida Power & Light Company
Desk: 561-691-7044
Cell: 561-529-7361


-----Original Message-----
From: Jamie Carr <jcarr@pwrplan.com>
Sent: Monday, November 11, 2019 1:44 PM
To: Williams, Steven <Steven.Williams2@fpl.com>
Subject: Re: [EXT] Discussion of PowerTax SOW Requirements

Hi Steve-

Yes, I understand.  Is there any way to get scope or any other information ahead of the call?  That way the call will be more productive.

Jamie

Sent from my iPhone

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

> On Nov 11, 2019, at 1:40 PM, Williams, Steven <Steven.Williams2@fpl.com> wrote:
>
> Exercise CAUTION when opening links or attachments.
> _____
>
> Hi Jamie,
>
> For this meeting, I want to confirm that the expectation is to work through this SOW and award expeditiously, and to potentially issue a purchase order by the end of the week.
>
> Thanks,
>
> Steve
>
> -----Original Appointment-----
> From: Jamie Carr <jcarr@pwrplan.com>
> Sent: Monday, November 11, 2019 9:09 AM
> To: Williams, Steven
> Subject: Accepted: [EXT] Discussion of PowerTax SOW Requirements
> When: Tuesday, November 12, 2019 10:30 AM-11:00 AM (UTC-05:00) Eastern Time (US & Canada).
> Where: WebEx - 305-552-3001; 4291 5415
>
> CAUTION - EXTERNAL EMAIL
>
>
>

This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you.
This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you.

Message

| From: | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
| Sent: | 12/11/2019 9:30:48 AM |
| To: | May, James [James.May@nexteraenergy.com] |
| Subject: | RE: [EXT] Re: Outstanding issues with Lease Module |

Jim, thank you for the note. I received it this morning as well from the PowerPlan team. There was an additional comment from Amber in the version I received that indicates PowerPlan may not have cases on these so we are likely not aware of them. I've asked my team to proactively open cases on behalf of NextEra so that we can get to the bottom of them as quickly as possible. We will triage and determine if these are defects or potentially enhancements. If they are defects you have our commitment to resolve them and ensure that NextEra is getting the maximum value out of your investment in our Lessee solution.

BB

**From:** May, James <James.May@nexteraenergy.com>
**Sent:** Wednesday, December 11, 2019 9:24 AM
**To:** Brett Bertz <brett.bertz@powerplan.com>
**Subject:** [EXT] Re: Outstanding issues with Lease Module

**Exercise CAUTION when opening links or attachments.**

Brett,

See below for issues we are still having with the lease software. We have been live for about a year now. Kevin and Jim have this information as well.

How do we justify paying based on value being added? We have several business and IT resources fixing this software internally at the same time being given an invoice for [ ] for value added services.

Please see below the issues we have with the PP lease module.

- For Regulated leases, FERC calculations are not working correctly. Instead of taking the Principal Paid column, PP is taking the Principal Accrued column (which is not a visible field in the ILR schedule), and is also taking the Interest Accrued column instead of the Interest Paid. This usually creates a difference for non-monthly leases.
- For leases that are prior to January 2016, they cannot be placed On-Balance Sheet using the Forecast Tool. PP gives an error message saying the Re-Statement Date and the Open Month Date are not the same.
- Approval errors. For leases in which we've had to make a revision and enter a Re-Measurement Date (all in the same month), the 2nd approver receives an error message regarding the JE being out of balance.
- Transfers. If we have leases that need to be transferred to other company codes, this feature does not work. In order to transfer a lease, we need to retire the old one and re-upload it again under the new company code.
- Un-Accrued Interest JE for ST/LT Reclass (monthly manual JE to fix)
- Future minimum lease payments report
- PP logic for allocation for interest & principal payments (always assumes interest to be fully paid. In certain instances when payment is less than interest accrued, creates negative principal payments)
- Hierarchy – no option to preserve historical hierarchy in the event of project acquisition by NEP from NEER



OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

- No flexibility for changing lease commencement date – (eg: executed agreement with future commencement date which is dependent on an event we do not know today). Currently ILR would need to be retired and re-loaded.
- Speed of software

POWERPLAN00000356

Message

| | |
|---|---|
| **From:** | Williams, Steven [Steven.Williams2@fpl.com] |
| **Sent:** | 1/28/2020 12:05:11 PM |
| **To:** | Brett Bertz [brett.bertz@powerplan.com] |
| **Subject:** | [EXT] PowerPlan/FPL Licensing Agreement Amendment |

**Exercise CAUTION when opening links or attachments.**

Hi Brett,

I hope this message finds you well. The purpose of this e-mail is to let you know that FPL will soon be proposing a draft amendment to the existing PowerPlan Perpetual Licensing Agreement to better serve the FPL-PowerPlan partnership. I know the FPL team is excited for the opportunity to improve the manner in which this partnership functions, with an amended agreement that memorializes our commitment to mutual growth and success.

You will be hearing from me in the coming weeks, but please don't hesitate to call me at any time to discuss the status of the amendment. Also, please share this communication with any PowerPlan stakeholders who should be involved as we work through the amendment.

Thank you,

**Steven C. Williams**
Integrated Supply Chain
Florida Power & Light Company
Desk: 561-691-7044
Cell: 561-529-7361



PLAINTIFF'S
EXHIBIT
32
Bertz 17.2.20

CONFIDENTIAL – SUBJECT TO
DISCOVERY CONFIDENTIALITY

| **From:** | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
| **Sent:** | 3/1/2021 10:04:37 AM |
| **To:** | Jim May (james.may@nee.com) [james.may@nee.com] |
| **Subject:** | PowerPlan 2021 Executive Advisory Board Invitation |

Jim, great to connect last week. Just a quick follow up to extend an invite to PowerPlan's 2021 Executive Advisory Board (EAB) event. We will continue to work with Keith and Leo as our prime contacts from NextEra for the EAB. We would always welcome your expertise and insights to help us better understand the challenges and opportunities facing the energy industry and shape PowerPlan's future direction.

While we typically meet in June, we have decided to push the meeting out a few months to mid-September. We are hopeful that as the year progresses and the vaccines roll-out it's possible to meet face-to-face.

If you can make the time for us, we'd be honored if you would hold September 13-15 on your calendar for our EAB event. We will continue to monitor the current pandemic situation and will make a formal decision in June as to if we will try to hold the meeting live at a wonderful destination.

I will continue to keep you posted as we get closer to the event time. In the interim, if there is anything I can do to help you or your team, please let me know.

**Brett M. Bertz**
Chief Customer Officer

Office: +1 678.223.2762
Mobile: +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

POWER**PLAN**


PLAINTIFF'S
EXHIBIT
33
Bertz 17.2.21

 SUEZ

SUEZ North America Inc.
461 From Road, Suite 400
Paramus, NJ 07652
Tel: +1 201 750 5755
michael.salas@suez.com

June 8, 2020

**VIA EMAIL**

PowerPlan, Inc.
300 Galleria Parkway, Suite 2100
Atlanta, GA 30339
Attn: Legal Department

Re: <u>Protecting PowerPlan Proprietary Software</u>

Dear Sirs:

We are in receipt of the letter dated May 21, 2020 from Brett Bertz, Chief Customer Officer of PowerPlan, addressed to Michael Salas and Andrianne Payson of SUEZ. Your letter indicates that you are of the understanding that consulting work being performed by Lucasys Inc. has resulted in disclosure of PowerPlan's confidential information to Lucasys. We write to request additional information from you regarding the nature of this statement, as we evaluate its basis.

We would first like to make clear that SUEZ always respects the intellectual property and confidential information of others. Whenever SUEZ engages vendors, contractors, agents and business partners, SUEZ takes measures to protect such parties' intellectual property and confidential information with the same or greater degree of care that it uses to protect its own intellectual property and confidential information, such degree of care exceeding a reasonable amount of care. As you should be aware, it is SUEZ's policy to ensure that confidentiality obligations are included in its agreements with vendors and contractors. This applies to SUEZ's agreement with PowerPlan. It also applies to SUEZ's agreement with Lucasys, which SUEZ has caused to be bound by strict confidentiality obligations during its performance of services.

In order to further evaluate the nature of the statements in your May 21st letter, we would appreciate if you could identify any PowerPlan proprietary software and associated confidential information to which you believe SUEZ has provided Lucasys access and explain why such access should be prohibited by the PowerPlan Master Software License and Services Agreement. Please also provide any other relevant facts or information of which you may be aware that would explain how you have reached the conclusions stated in your letter. We will need to receive this information before we can respond to any request for an audit.



PLAINTIFF'S
EXHIBIT
34
Bertz 12-7-21

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY



We value our relationship with PowerPlan, which is why we are disappointed that a collaboration meeting with Lucasys has been rejected. We are at a critical milestone of a strategic project and every day this issue goes unresolved affects our project budget and milestone schedule. We hope we can resolve this matter quickly and look forward to speaking with you soon.

Sincerely,

Michael Salas
Senior Vice President and
Chief Information & Digital Officer

cc: Andrianne Payson, Senior VP & General Counsel

2

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

POWERPLAN00000867

DocuSign Envelope ID: 506BAD06-E665-42B0-A336-6E271D3FFFCC



CONFIDENTIAL

June 18, 2020



**VIA EMAIL**

Suez Water Management and Services Inc.
ATTN: Michael Salas, Senior Vice President & Chief Information and Digital Officer <michael.salas@suez.com>;
Andrianne Payson, Senior Vice President & General Counsel <andrianne.payson@suez.com>

RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights

Dear Mr. Salas and Ms. Payson:

Thank you for taking the time to discuss the concerns raised in my initial letter during our June 8th conference call. We have also received and reviewed your letter of response from the same date. This letter is intended to respond to your requests for further information and provide feedback to information conveyed to me verbally by Mr. Salas during our follow-up phone conversation on June 10th.

In your letter, you asked that PowerPlan "identify any PowerPlan proprietary software and associated confidential information to which [we] believe SUEZ has provided Lucasys access and explain why such access should be prohibited by the PowerPlan Master Software License and Services Agreement". Specifically:

- PowerPlan believes that SUEZ has provided Lucasys access to the user interface, database, data model, user guides, and other software documentation for the following proprietary PowerPlan software modules: Charge Repository, Project Unitization, Project Accounting, Project Cost Management, Mobile Approvals, Asset Accounting, PowerTax US Tax Depreciation, and PowerTax Deferred Tax Accounting.
- During PowerPlan's provision of standard maintenance services and premier managed services, it has become apparent to PowerPlan that Lucasys has had access to the proprietary PowerPlan software. This is evident because we have observed the resulting PowerBuilder code and scripts developed by Lucasys, which would have required that Lucasys have database access to the PowerPlan proprietary software (including access to PowerPlan's proprietary data model) to complete.
- Additionally, based on what SUEZ has told PowerPlan about Lucasys' ongoing scope of work, the design of the project would have required access to the user interface, database, data model, user guides, and other software documentation for the PowerPlan proprietary software in order to perform the appropriate evaluation. Further, to complete the project build, Lucasys would need similar access to perform the integrations, conversions, configuration, training enablement and testing work.

The proprietary PowerPlan software (including the user interface, database, and data model) and related documentation and information are indisputably PowerPlan's Confidential Information, as that term is broadly defined in the Master Software License and Services Agreement effective September 8, 2014 (the "MSLSA"). Section 11.4 of the General Terms and Conditions of the MSLSA sets forth the definition of Confidential Information, which expressly includes: "any information that is of value to its owner, or is required to be kept confidential by contract or otherwise, and is treated as confidential," including but not limited to "the Licensed Products in Source Code, Object Code, and any other form". Per Section 11.14 of the General Terms and Conditions of the MSLSA, the term "Licensed Products" includes the proprietary PowerPlan software as well as the corresponding "Documentation". Section 11.6 of the General Terms and Conditions of the MSLSA defines Documentation as: "the user guide(s), installation instructions, user instructions, release notes, manuals, and on-line help files…regarding the use of the applicable" software modules. Importantly, PowerPlan only makes its proprietary software and Documentation available to its customers that have a valid license grant. PowerPlan does not make either the software (including the user interface, database, and data model) or the Documentation publicly available to non-customers.

OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO DISCOVERY

 **POWERPLAN**

Section 5.3 of the General Terms and Conditions of the MSLSA states that, "neither party will disclose to third parties the other's Confidential Information without prior written consent of the other party". Lucasys is not a party to the MSLSA, and thus SUEZ would require PowerPlan's consent prior to disclosure of any PowerPlan Confidential Information to Lucasys. It is PowerPlan's understanding that SUEZ believes that Lucasys has the right to use PowerPlan's proprietary software and Documentation on SUEZ's behalf without PowerPlan's consent because Lucasys and its employees are "Authorized Users" of SUEZ. While PowerPlan agrees that as a general matter, an Authorized User need not be an employee of SUEZ, this does not waive or supersede the clear requirement of Section 5.3 that PowerPlan must consent to any disclosure of PowerPlan's Confidential Information to a third-party, even if SUEZ has designated such third-party as an Authorized User.

For the reasons listed above, I must state again that PowerPlan does not consent to Lucasys having access to the proprietary PowerPlan software, Documentation, or other PowerPlan Confidential Information. Additionally, PowerPlan requests that SUEZ confirm in writing that it will cease providing Lucasys with access to PowerPlan's proprietary software, including the user interface, database architecture and data model, Documentation, and other Confidential Information. Moreover, PowerPlan requests that SUEZ describe in writing the measures it will take to protect PowerPlan's Confidential Information during the current SUEZ engagement with Lucasys. Please provide such confirmation and summary via email to legal@pwrplan.com by June 26, 2020.

Sincerely,

DocuSigned by:

*Brett Bertz*

3FAF2E92A3954A9...

Brett Bertz
Chief Customer Officer

Cc: Jonathan Sucher, Associate General Counsel

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

Message

| | |
|---|---|
| **From:** | Luisa Read [Luisa.Read@libertyutilities.com] |
| **Sent:** | 4/28/2020 6:56:41 PM |
| **To:** | Jim Duffy [jduffy@pwrplan.com] |
| **CC:** | Brett Bertz [brett.bertz@powerplan.com] |
| **Subject:** | RE: [EXT] RE: Summary of our call this evening re: PowerPlan protection of Confidential Information |

Hi Jim,

Tuesday May 5th at 9:30am works for us. I will send out an invite to both you and Brett with a call in number. Jody, Colin, and I will be joining from the Liberty side.

Jody Allison is Vice President, Transformation – leading the business side of the transformation program and Colin Penny is the Vice President, IT Transformation leading the technical IT delivery side of the transformation program.

**Luisa Read | Liberty Algonquin Business Services | Vice President**
P: 905-465-4505 | C: 416-988-0071 | E: Luisa.Read@libertyutilities.com

**From:** Jim Duffy [mailto:jduffy@pwrplan.com]
**Sent:** Tuesday, April 28, 2020 10:57 AM
**To:** Luisa Read <Luisa.Read@libertyutilities.com>
**Cc:** Brett Bertz <brett.bertz@powerplan.com>
**Subject:** RE: [EXT] RE: Summary of our call this evening re: PowerPlan protection of Confidential Information

Luisa,

I'm just now realizing that I dropped the ball on the senior leaders conversation... my apologies! Here are some dates and times we have available for a 30 minute call (all times ET):
- Tuesday May 5- 9:30-10:00, 11:30-12:00, 12:30-1:00
- Wednesday May 6- 9:30-10:00, 12:30-1:00
- Thursday May 7- 12:30-1:30

Any of those work on your end?

Thanks,
Jim

**Jim Duffy**
*Strategic Accounts Executive*

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com



**From:** Luisa Read <Luisa.Read@libertyutilities.com>
**Sent:** Wednesday, April 22, 2020 11:19 AM
**To:** Jim Duffy <jduffy@pwrplan.com>
**Cc:** Brett Bertz <brett.bertz@powerplan.com>
**Subject:** RE: [EXT] RE: Summary of our call this evening re: PowerPlan protection of Confidential Information

Thanks Jim. I really do hope that we can get this resolved.



OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

POWERPLAN00000009

Not necessarily related to this but I have been asked to set up a call to discuss the partnership between PowerPlan and Liberty and how important this is the success of our Customer First transformation initiative. This would include senior leaders from each of the organizations from Liberty it would be myself Jody Allison and Colin Penny.

Can you please let me know who from Powerplan should be invited and provide a couple of dates and times for a call.

Luisa

**Luisa Read | Liberty Algonquin Business Services | Vice President**
P: 905-465-4505 | C: 416-988-0071 | E: Luisa.Read@libertyutilities.com

**From:** Jim Duffy [mailto:jduffy@pwrplan.com]
**Sent:** Wednesday, April 22, 2020 9:00 AM
**To:** Luisa Read <Luisa.Read@libertyutilities.com>
**Cc:** Brett Bertz <brett.bertz@powerplan.com>
**Subject:** RE: [EXT] RE: Summary of our call this evening re: PowerPlan protection of Confidential Information

Luisa,

We have an internal call scheduled for 11 am to discuss this, I should have an update for you shortly thereafter.

Thanks,
Jim

**Jim Duffy**
*Strategic Accounts Executive*

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

 POWERPLAN

---

**From:** Luisa Read <Luisa.Read@libertyutilities.com>
**Sent:** Tuesday, April 21, 2020 6:51 PM
**To:** Jim Duffy <jduffy@pwrplan.com>
**Cc:** Brett Bertz <brett.bertz@powerplan.com>
**Subject:** [EXT] RE: Summary of our call this evening re: PowerPlan protection of Confidential Information

**Exercise CAUTION when opening links or attachments.**

---

Thanks Jim. I just left you a voicemail. I had a conversation with Lucasys and they are willing to sign an confidentiality agreement with PowerPlan. Let me know if this is something PowerPlan has and we can get Lucasys to sign in short order.

Luisa

**Luisa Read | Liberty Algonquin Business Services | Vice President**
P: 905-465-4505 | C: 416-988-0071 | E: Luisa.Read@libertyutilities.com

**From:** Jim Duffy [mailto:jduffy@pwrplan.com]
**Sent:** Tuesday, April 21, 2020 6:39 PM
**To:** Luisa Read <Luisa.Read@libertyutilities.com>

**Cc:** Brett Bertz <brett.bertz@powerplan.com>
**Subject:** Summary of our call this evening re: PowerPlan protection of Confidential Information
**Importance:** High

Luisa,

Thanks for your time on such short notice. Given the importance PowerPlan places on protecting its confidential and proprietary information, I wanted to provide you with a written recap of our discussion.

In Paragraph 5.1(a) of the Master Software License and Services Agreement (the "License Agreement") between Algonquin and PowerPlan, Algonquin acknowledges PowerPlan's proprietary rights in and to its Confidential Information and agrees not to take any action inconsistent with such title and ownership. In Paragraph 5.3, Algonquin also agrees to maintain the confidentiality of this information by refraining from disclosing the information to any third-party without our consent, and by employing no less stringent procedures than the strictest procedures used to protect its own confidential data. Examples of PowerPlan's Confidential Information include: our Software, database and data model, user guides and other documentation, PS Deliverables, design sessions and other project meetings/workshops, and training classes and materials.

You confirmed that you are using a third-party, Lucasys, to provide implementation or consulting services related to our software. As we discussed, Lucasys is developing software that directly competes with our software, and recently started marketing and seeking to sell that software to our customer base. As I am sure you can understand, to protect our Confidential Information, including trade secrets, we cannot permit Lucasys to have access to our proprietary software and associated Confidential Information through our customers while Lucasys simultaneously develops, markets, and sells the same kind of software to the same customer base in direct competition with us. This creates an intolerable risk for us – and you – that Lucasys will misuse or misappropriate our Confidential Information and unfairly use it to develop, market, and sell its competing software.

Accordingly, we must withhold our consent for Algonquin and its affiliates to provide Lucasys with access to our Confidential Information and from otherwise disclosing our Confidential Information to Lucasys, and we further request that Algonquin and its affiliates cease providing Lucasys with any such access to or disclosure of our Confidential Information (e.g., no longer invite them to design sessions or other project meetings where PowerPlan's Confidential Information may be shared). To be clear, we have no problem with Algonquin retaining Lucasys for projects that will not involve access to, disclosure of, or working with Confidential Information.

We appreciate your understanding of PowerPlan's intention to protect our confidential and proprietary information. We stand ready to continue to partner with you to minimize disruption to the PowerPlan implementation.

Thanks,
Jim

**Jim Duffy**
*Strategic Accounts Executive*

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

 POWERPLAN™

Please join us for PowerPlan's user conference, ELEVATE 2020 November 15-18, 2020, at the Marriott Marquis Marina in San Diego, CA. To register click here https://powerplan.com/about-us/elevate. This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient,

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you

Please join us for PowerPlan's user conference, ELEVATE 2020 November 15-18, 2020, at the Marriott Marquis Marina in San Diego, CA. To register click here https://powerplan.com/about-us/elevate. This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you

Please join us for PowerPlan's user conference, ELEVATE 2020 November 15-18, 2020, at the Marriott Marquis Marina in San Diego, CA. To register click here https://powerplan.com/about-us/elevate. This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY



SUEZ North America Inc.
461 From Road, Suite 400
Paramus, NJ 07652
Tel: +1 201 750 5755
michael.salas@suez.com

July 3, 2020

**VIA EMAIL**

PowerPlan, Inc.
300 Galleria Parkway, Suite 2100
Atlanta, GA 30339
Attn: Brett Bertz, Chief Customer Officer

Re: <u>Protecting PowerPlan Proprietary Software and Intellectual Property Rights</u>

Dear Mr. Bertz:

Thank you for agreeing to provide SUEZ with additional time to respond to your letter dated June 18, 2020. This letter is intended to address your concerns regarding the Master Software License and Services Agreement ("MSLSA") effective September 8, 2014. As stated in our previous correspondence, SUEZ respects the intellectual property rights of others. Further, we assure you that we and all of our business partners fully comply with the terms of our agreements. Our agreement with PowerPlan is no exception. SUEZ protects information considered to be confidential with the same degree of care that SUEZ uses to protect its own confidential information, such level of care being more than a reasonable amount of care. Our agreements include confidentiality obligations requiring each party to use any information to which they may have access thereunder solely for the purpose stated therein.

The June 18th letter states that you consider user interfaces, databases, data models, user guides and other software documentation for various PowerPlan software modules used by SUEZ to be PowerPlan's Confidential Information. While this material appears to be Confidential Information, the MSLSA specifically excludes from the definition of Confidential Information, *any information that is (i) generally known to the public through no act or omission of recipient; (ii) independently developed by recipient without use of or reference to the discloser's Confidential Information; and (iii) obtained by recipient from any third party not owing any confidentiality obligation to the discloser.* Any material that meets one or more of these criteria would not be considered Confidential Information in accordance with the MSLSA. To the best of SUEZ's knowledge after a reasonable inquiry, SUEZ has not provided Lucasys with access to Confidential Information as defined in the MSLSA.

Further, your June 18th letter suggests that any party that is not a signatory to the MSLSA is a third party which would require PowerPlan's prior written consent to have access to certain materials. We disagree with this overly narrow construction. There is no distinction set forth in the MSLSA between signatories and non-signatories, and there is nothing in the MSLSA that states that all non-signatories are third parties requiring such consent. A fair and appropriate reading of



PLAINTIFF'S
EXHIBIT
37
Bertz 12·7·21

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

POWERPLAN00000751



the MSLSA indicates otherwise. For example, Section 7.2 Limitation of Liability clearly identifies non-signatories to the MSLSA, such as Authorized Users, which are separate and distinct from third parties:

> Limitation of Liability. EXCEPT AS PROHIBITED BY LAW OR FOR CLAIMS ARISING UNDER SECTION 5., THE CUMULATIVE, AGGREGATE LIABILITY (INCLUDING ATTORNEYS FEES AWARDED UNDER THIS AGREEMENT) OF EITHER CLIENT TO POWERPLAN OR POWERPLAN, ITS LICENSORS, AND OTHER SUPPLIERS TO **CLIENT, CLIENT AFFILIATES, AUTHORIZED USERS, OR ANY THIRD PARTY** FOR ALL CLAIMS, LIABILITIES AND DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ALL EXHIBITS OR AMENDMENTS THERETO, WHETHER IN CONTRACT, TORT, OR OTHERWISE, SHALL NOT EXCEED TWO TIMES THE LICENSE FEES PAID BY CLIENT TO POWERPLAN FOR THE LICENSED PRODUCTS OR THE SERVICES FEES UNDER THE STATEMENT OF WORK GIVING RISE TO THE PARTICULAR CLAIM, WHICHEVER IS GREATER. *(emphasis added)*

Clearly, third parties are distinguished from the Client, Client Affiliates and Authorized Users. This interpretation of the MSLSA is consistent with the conduct of the parties during the term of the agreement. PowerPlan has been aware for some time that Lucasys was an Authorized User under the MSLSA and did not raise this issue previously. This conduct is consistent with our view that an Authorized User is not considered a third party under the MSLSA and does not require PowerPlan's prior written consent.

Notwithstanding the foregoing, we have carefully considered the allegations set forth in your letter. While we still continue to gather information, we can inform you that SUEZ has not provided Lucasys with access to any Source Code, Object Code, or Confidential Information as each term is defined in the MSLSA. We believe that the conclusory allegations set forth in your June 18th letter are incorrect.

If you have other information that you believe would be relevant and you are willing to provide this information to us, we would be happy to consider it. However, based on our due diligence to date, we have not provided Lucasys with PowerPlan's Confidential Information. Further, we do not believe that express written consent to do so would be required under the MSLSA since, among other reasons, Lucasys is an Authorized User. We value our relationship with PowerPlan and look forward to continue working with you.

Sincerely,

Michael Salas
Senior Vice President and
Chief Information & Digital Officer

cc: Andrianne Payson, Senior VP & General Counsel

2

POWERPLAN00000752

## PowerPlan EEI Survey – 2020

**Summary of specific issues and topics:**

Queries/Data Access:

- Query writing flexibility, ability to stage (transfer portions of a project to plant)
- Management of all asset records – unitization, retirements,
- Ability to connect directly to external data tables for Power BI queries, etc
- CR queries not intuitive; CR adjusting entries not intuitive for field; derivation capability for adjusting entries as part of base functionality would be helpful
- running NBV reports/queries

External interfaces:

- Interfacing data with Oracle ERP
- Interfaces with SAP
- Ability to easily integrate PowerPlan with externa robotic process automation and external reporting tools
- Interfaces and run times

Validations/Error handling:

- Currently there are no validations when retiring assets – when pending approval quantity to be retired isn't reflected. This makes it possible to over-retire the quantity of assets.
- Validation to prevent over amortization of software assets – an alert or similar

AFUDC Adjustments:

- AFUDC rate calculations and adjustments
- AFUDC rate – adjusting rate (related to change in short-term debt rate). How often do you do this? How do you do it logistically in PowerPlan?
- Applying adjustment to AFDUC rate (how to adjust rate retroactively)

Month end processing:

- Month end closing efficiency (processing/posting transactions), reopening of books
- Month-end close lacks reversal feature

Specialty topics:

- SOX and IT security compliance related to system administration
- Lookback functionality
- Undivided joint interest software projects requiring a half dozen work orders
- WIP Comps Maintenance



PLAINTIFF'S
EXHIBIT
38
Bertz 12-7-21

OUTSIDE COUNSEL'S EYES ONLY –
SUBJECT TO DISCOVERY

- EDIT – PT mapping interface changes to EDIT and discrete vs non-discrete PowerTax/PowerProvision
- ARO's – we use detailed rates and have multiple layers. Need ability to perform sensitivity analysis within PowerPlan would be nice.

<u>General Topics:</u>

- Leases
- Regulatory Module
- ARC's and Alerts

---

## Specific Responses:

**Question 2: What are the biggest pain points - "Other" option:**

- Applying adjustment to AFDUC rate (how to adjust rate retroactively)
- Query writing flexibility, ability to stage (transfer portions of a project to plant)
- Currently there are no validations when retiring assets – when pending approval quantity to be retired isn't reflected. This makes it possible to over-retire the quantity of assets.
- Validation to prevent over amortization of software assets – an alert or similar
- Interfaces and run times
- ARO's – we use detailed rates and have multiple layers. Need ability to perform sensitivity analysis within PowerPlan would be nice.
- Interfaces with SAP
- Management of all asset records – unitization, retirements, etc
- EDIT – PT mapping interface changes to EDIT and discrete vs non-discrete
    - Setup of EDIT amortization when not following ARAM & tracking layers of rate changes in PowerTax/PowerProvision
- Month-end close lacks reversal feature
- Leases
- Month end closing efficiency (processing/posting transactions), new company setup, running NBV reports/queries, conflicts/sharing within PowerPlan modules, reopening of books, AFUDC rate calculations and adjustments
- SOX and IT security compliance related to system administration
- Lookback functionality
- Undivided joint interest software projects requiring a half dozen work orders

**Question 4: Other topics for future discussion:**

- Interfacing data with Oracle ERP

- AFUDC rate – adjusting rate (related to change in short-term debt rate). How often do you do this? How do you do it logistically in PowerPlan?
- Ability to easily integrate PowerPlan with externa robotic process automation and external reporting tools
- Regulatory Module & Lease Module
- Ability to connect directly to external data tables for Power BI queries, etc
- ARC Rules and Alerts
- Various (emailed list to Amber)
- Leases, Property Unit/Retirement Unit Maintenance, WIP Comps Maintenance
- CR queries not intuitive; CR adjusting entries not intuitive for field; derivation capability for adjusting entries as part of base functionality would be helpful

# PowerPlan EEI Survey – 2020

**Summary of specific issues and topics:**

<u>Queries/Data Access:</u>

- Query writing flexibility, ability to stage (transfer portions of a project to plant)
- Management of all asset records – unitization, retirements,
- Ability to connect directly to external data tables for Power BI queries, etc
- CR queries not intuitive; CR adjusting entries not intuitive for field; derivation capability for adjusting entries as part of base functionality would be helpful
- running NBV reports/queries

<u>External interfaces:</u>

- Interfacing data with Oracle ERP
- Interfaces with SAP
- Ability to easily integrate PowerPlan with externa robotic process automation and external reporting tools
- Interfaces and run times

<u>Validations/Error handling:</u>

- Currently there are no validations when retiring assets – when pending approval quantity to be retired isn't reflected. This makes it possible to over-retire the quantity of assets.
- Validation to prevent over amortization of software assets – an alert or similar

<u>AFUDC Adjustments:</u>

- AFUDC rate calculations and adjustments
- AFUDC rate – adjusting rate (related to change in short-term debt rate). How often do you do this? How do you do it logistically in PowerPlan?
- Applying adjustment to AFDUC rate (how to adjust rate retroactively)

<u>Month end processing:</u>

- Month end closing efficiency (processing/posting transactions), reopening of books
- Month-end close lacks reversal feature

<u>Specialty topics:</u>

- SOX and IT security compliance related to system administration
- Lookback functionality
- Undivided joint interest software projects requiring a half dozen work orders
- WIP Comps Maintenance



# 2021 - 2023 PowerPlan Strategic Plan

OCTOBER 2020



PLAINTIFF'S EXHIBIT
39
Bertz 12-2-21

tabbies

POWER**PLAN**™

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

# Contents

Executive Summary.................................................................................................................2

I. Overview & Strategic Focus ...............................................................................................2

II. Product Solution Suite & Services ....................................................................................5
    Fixed Assets Accounting ..................................................................................................5
    Tax ...................................................................................................................................6
    Financial Planning & Analysis...........................................................................................7
    Regulatory.........................................................................................................................9
    Platform ..........................................................................................................................10
    PowerPlan Services .......................................................................................................11

III. Market Landscape / Key Risks & Opportunities............................................................13
    Covid-19..........................................................................................................................13
    ERP Cloud Transitions ...................................................................................................13
    2020 Strategy Shift ........................................................................................................15
    Market Trends & Opportunities .....................................................................................15

IV. Key Strategic Questions for the 2021-2023 Horizon.....................................................16

V. Strategy Execution.........................................................................................................18

VI. Capabilities & Talent Priorities......................................................................................20

VII. Financial Plan ..............................................................................................................21

OUTSIDE COUNSEL'S EYES ONLY -      ROP006668
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

**Executive Summary:**

PowerPlan's strategic intent: deliver best in class solutions that serve the unique and complex needs of Energy CFO's and their teams.

Within our targeted niche, we are the market leaders within Fixed Asset Accounting and Tax; significant opportunity remains in Financial Planning & Analysis and Regulatory solutions. Competition, ████████████

Our differentiation and competitive advantage come from our software's ability to manage highly complex financial requirements, track detail at a granular level, and provide the single source of truth for our customers *financial* fixed assets.

Following a strategic reset in 2020, PowerPlan remains in the early stages of rebuilding relationships and trust with our core customer base, after many years of a broad, multi-industry, multi-geography strategy. Additionally, our renewed focus is driving higher levels of engagement with our employees. In both key constituencies, the early returns are trending positive.

Operational execution, historically most problematic within software delivery, has improved in the last twelve months; however, process and capability gaps remain across the enterprise. Primary areas of future capability development include SaaS delivery, talent acquisition, and customer driven innovation.

Most of our installed software consists of on-premise legacy solutions; however, we have initiated our cloud journey via hosting services and active development of new products on our next-generation platform. Our intent is to deliver the next generation module by module, thus supporting our legacy software while our customers choose the pace of their conversion.

Revenue growth in the 2021-2023 horizon will come from the North America energy market, driven by expanding FP&A and Regulatory solutions into our core IOU customer base, expansion into the Municipal / Co-Operative utility market, and next-generation product launches replacing our legacy software footprint.

### I.    Overview & Strategic Focus

For over 25 years, PowerPlan has helped energy companies optimize financial decisions around their fixed asset infrastructure, investment, and modernization, while enabling financial and regulatory compliance. We deliver products and services exclusively focused on the North American Energy market: Utilities (Investor Owned, Municipal, and Cooperative), as well as Oil & Gas (Midstream, Upstream, Downstream, and Integrated). As of 2020, our solutions optimize and account for over $2.5 Trillion of our customers assets.

Energy companies are different - they face a more challenging regulatory environment and have unique financial requirements than other industries. Our customers have significant tracking and reporting requirements for multiple regulatory bodies (FERC, IRS, SEC, Public Utility Commissions), many which have different or even competing rules for the same capital assets.

While companies have multiple systems, such as their ERPs, EAMs, BI tools, and even workforce management solutions, none of these systems were built specifically for this market niche. These enterprise systems lack the ability to track and account for the level of detail for fixed assets, at times down to a sub-component level, that regulators require. Without that level of detail for every capital asset, companies can leave hundreds of millions

**OUTSIDE COUNSEL'S EYES ONLY -          ROP006669**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**

of dollars sub-optimized, making accounting for infrastructure assets extremely complex. A simple, yet powerful example is an individual power distribution line. This line may contain hundreds of physical components accumulated over 50 years of its life; the poles, wires, even cross arms, and bolts may be treated differently for accounting and income tax purposes - some are capitalized, others expensed. To complicate matters, depending on the city or county, there may be different rules that require tracking unique costs for each jurisdiction. These considerations are mission critical for energy CFO's and their teams, impacting everything from tax liability to financial reporting, to rate case development and revenue negotiations.

PowerPlan software was purpose built to support these complex financial requirements to provide <u>the single source of truth for the *financial* fixed assets and capital projects.</u> Our software provides unique complete visibility into every lifecycle phase of a capital asset - from initial planning stage through retirement - enabling end-to-end visibility, regulatory compliance and financial optimization. We enable our customers to strategically leverage the unique regulatory and accounting rules of our target market to improve their financial outcomes. With our customers spending billions in annual capex, it only takes a small change in how a company accounts for capital assets to produce millions in savings, enabling many of our customers to realize multiples on their software and implementation investment.

Additionally, PowerPlan seamlessly integrates into existing ERP and EAM systems. We do not aim to displace ERP systems — all of our large enterprise customers use PowerPlan in addition to their ERP and EAM systems, and our solutions are ERP/EAM agnostic. ERP's and EAM's are not structured to satisfy the granular and unique data demands of our target market without cost prohibitive customizations. Gartner has written extensively on utilizing a "layering" approach with best of breed and ERP solutions: *"instead of customizing their existing solutions, companies need "Layering" with systems of differentiation. Systems of differentiation have capabilities that deliver the most important business value …not always found in their system of record.".* However, while typically a fraction of the cost of ERP, PowerPlan will need to continue to justify the investment of "layered" systems as customers move to next generation cloud modules of ERP. PowerPlan will remain differentiated through our laser focus on our core market, delivering solutions tailored to the requirements our specific niche. We will compete on focus, customer intimacy, and innovation specific to energy, while leveraging our expertise and twenty-five-year track record of market leadership.

Our vision is to be ***the standard*** that enables Energy CFOs to solve their most complex financial challenges. This focus has recently narrowed as of 2020, as prior versions of corporate strategy included expansion into other industry verticals, new geographies, and non-CFO centric solutions. Our niche and competitive position is strongest within regulated energy companies, though we have customers with large amounts of fixed assets in other non-regulated industries (telecom, rail, etc.). As of 2020, these non-energy verticals are no longer target areas for commercial and / or product investment.

OUTSIDE COUNSEL'S EYES ONLY -                    ROP006670
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

**PowerPlan at-a-glance:**

- 323 Employees (88% U.S. / 12% Canada)
- 2020 Forecasted Revenue / EBITDA:



Our software product suites include four core areas of the Office of the CFO: Fixed Asset Accounting, Tax, Planning & Budgeting ("FP&A"), and Regulatory tools, with multiple sub-modules within each suite. Additionally, "Platform" is our fifth solution suite, as we classify products that span all functional modules within this suite (i.e. Reporting, Workflow & Process Automation, ERP adapters, etc.). The majority of our legacy software ("Classic") is deployed on-premise; however, we offer Classic hosting (via AWS), and are currently developing our "next-generation" modules on the Azure platform.

Our software development teams are structured into two main working groups: Classic platform and next generation products. After an increase in development investment in 2020, the Classic team delivered two major releases this year, and will continue to do so until the eventual sunset of the legacy platform. The 2020 roadmap represents the first significant feature improvements to the legacy products (with the exception of Lease Accounting) in almost three years. We fully expect to "live in two worlds", with active development for both Classic and next generation, for at least the next five years, as we build next generation replacement products, sold as SaaS, utilizing Azure as the cloud platform. Tax Fixed Assets (TFA) will be our first true next generation product, squarely aimed at replacing our legacy flagship product, PowerTax. Development for next generation Fixed Assets will initiate in 2021, and given the complexity of that product, expected to be a multi-year development project. While supporting these two worlds, product strategy aims to build out several cloud-based enabling technologies that work with customers on-prem solutions, such as integration and data API's, adapters, and workflow tools. Solutions such as these will pave the way for customers to maintain their Classic footprint while adopting new technologies that will stay with them as they move to the cloud.

As we look to transition customers to a SaaS-based model, we must understand our customers revenue levers and how to collaboratively transition them. A regulated utility is organized to earn recovery of its cost, and a return on equity for its shareholders, through a rate case process to determine the amount of revenue and allowed return on equity invested. The return on equity is tied to capital investments funded by equity investors – on premise software license, implementation, and upgrade costs are capitalized, and thus enable a return for Utilities. In some states, legislation or policies have been approved to allow for specific utilities to earn a return on SaaS contracts similar to perpetual, but in some jurisdictions, only a recovery of SaaS fees are allowed. Large players in the software industry (Oracle, IBM, etc.) are lobbying for legislative and local rule-making to enable utilities to recover and earn a return on subscription based software; however, we envision this regulatory transition to SaaS cost recovery to be a long road.

**OUTSIDE COUNSEL'S EYES ONLY -**          **ROP006671**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**

## II.     Product Solution Suite & Services Overview



Services begin and end with our software:
- Implementation & Solution Adoption
- Integration, Upgrade, & Expert Services
- Cloud and Managed Services
- **Out of scope:** non-software related services; outsourced services (i.e. running PP software on behalf of client)

**Fixed Asset Accounting:** Reduce errors, lower operating cost, mitigate risk, and ultimately manage and optimize fixed asset data for all accounting, tax, and regulatory bodies.

- TTM Product Revenue (License & Maintenance) / % of Total Product Revenue:
- Modules: Fixed Assets; Advanced Project Accounting; Depreciation Studies; Lessee & Lessor Accounting
- Persona: Controller; VP Accounting; Fixed Asset Manager
- Commentary: Fixed Assets is the flagship product within the suite, with 75% market penetration for Investor Owned Utilities (IOUs). Development for our next generation replacement for legacy Fixed Assets solutions will initiate development in 2021. Additionally, we are launching a cloud based Fixed Asset solution for the Municipal & Cooperative utility market, a segment where we have historically been cost prohibitive. This solution is a less complex / lighter installation footprint solution and will be launching in Q4 2020.
- Competition: The fixed asset accounting suite's primary competition comes from ERP vendors such as Oracle and SAP with customizations or spreadsheets augmenting basic capabilities. PowerPlan is at a significant disadvantage relative to sales and marketing spend, c-suite relationships, and brand equity. Although their modules may not be as robust as PowerPlan's, they still have an asset focus and may meet the needs of many organizations. Utegration, a services company that develops application add-ons within the SAP S4/HANA platform, is an emerging competitor who is specifically targeting utilities transitioning to the cloud with SAP. Full commentary on ERP competition is discussed in section III.B. "Market Landscape".

**OUTSIDE COUNSEL'S EYES ONLY -**          **ROP006672**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**

**Fixed Asset Accounting Module Penetration Rates\* By Market Segment (12 Month Market Share Movement) ↑↓**

| *customer count, not $* | IOU | Muni | Co-Op | MidStream | UpStream | DownStream | Integrated |
|---|---|---|---|---|---|---|---|
| Fixed Assets | ↑75% | 10% | 3% | ↓17% | 1% | 0% | 0% |
| Advanced Project Accounting | 75% | 10% | 3% | 17% | 1% | 0% | 0% |
| Depreciation Studies | 18% | 0 | 0% | 0% | 0% | 0% | 0% |
| Lease | ↓36% | 0 | 1% | ↑15% | 6% | 31% | 0% |



**Tax:** Mitigate compliance risk, improve tax department efficiency, support rigorous tax audits, and improve tax strategy with strategic scenario analysis.

- TTM Product Revenue (License & Maintenance) / % of Total Product Revenue: <span style="background:black">     </span>
- Modules: Income Tax – PowerTax; Tax Provision; Tax Repairs. Property Tax: Tax Bills & Returns
- Persona: VP of Tax
- Commentary: Income Tax is PowerPlan's stickiest and most differentiated product solution, with currently 81% penetration for the PowerTax module within our core IOU market. PowerPlan is currently developing "Tax Fixed Assets" (TFA), our next generation module, which will be a new cloud-based replacement for PowerTax. TFA general availability is expected for Q4 2021. The outcome of the 2020 election could trigger another round of tax reform, as a new administration and potential balance shift within Congress could modify or undo the prior administration's Tax Cuts & Jobs Act. We have already initiated research conversations with our customer base around "what-if" scenarios, and we envision a subsequent round of tax reform as a catalyst for TFA transitions.
- Competition: PowerPlan faces a variety of competitors in the area of income tax; direct competitors include Thomson Reuters ONESOURCE, Wolters Kluwer and Bloomberg. Similar to ERP competition in the Accounting market, these companies have large sales and marketing organizations, potential relationships across the organization, and considerable brand equity; however, none are focused on a specific target industry. Additional competition comes from the large System Integrators (SI) who have large Tax teams and offer services around BI tools and software. SI's currently do not

OUTSIDE COUNSEL'S EYES ONLY -                    ROP006673
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

implement PowerPlan products, and thus, at times, advocate for competitive solutions that would generate SI service dollars. Tax provisions and property tax have most competition from point solutions.

**Tax Module Penetration Rates\* By Market Segment (12 Month Market Share Movement)⬆⬇**

| | IOU | Muni | Co-Op | MidStream | UpStream | DownStream | Integrated |
|---|---|---|---|---|---|---|---|
| PowerTax | ⬆81% | | ⬆1% | ⬇22% | 4% | 0% | 0% |
| Tax Provision | 55% | | 0% | 5% | 0% | 0% | 0% |
| Tax Repairs | ⬇45% | | 0% | ⬇5% | 0% | 0% | 0% |
| Property Tax | ⬇50% | | ⬆2% | ⬇10% | 4% | 0% | 29% |

*customer count, not $



**Financial Planning & Analysis:** Deliver optimal investment strategy, improve efficiency and forecasting accuracy through automation and variance analysis, helping customers analyze and justify capital planning decisions to maximize their investments.

- TTM Product Revenue (License & Maintenance) / % of Total Product Revenue: ▮▮▮▮
- Modules: Capital Planning & Forecasting; Departmental Budgeting; Asset Investment Optimization (AIO); Project Cost Management (PCM)
- Persona: VP / Director of FP&A; corporate or business unit level
- Commentary: The FP&A space represents one of the two largest untapped opportunities within the IOU segment, with total addressable market estimated at ▮▮▮ of which, ▮▮ is currently penetrated by PowerPlan (primarily PCM). The AIO product was acquired in 2016, with the thesis of cross selling into our core IOU customer base. This thesis has not materialized, as only one IOU (Duke Energy) has implemented the product. Except for Project Cost Management, PowerPlan's FP&A solutions are currently not competitively differentiated enough to win within our core markets. Furthermore, we currently lack strong relationships within the FP&A persona within our

OUTSIDE COUNSEL'S EYES ONLY -          ROP006674
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

customer base. FP&A will be our primary focus of market research focus over the next six months, with the goal of clearly defining what are the unmet needs a utility-focused solution could deliver.

- <u>Competition:</u> PowerPlan faces a fragmented mix of competitors for budgeting and project management. Competitors span the continuum of mega-vendors like SAP and Oracle to Excel-based point solutions. Competitors are a mix of asset/capital investment planning (CIP), budgeting and forecasting, corporate performance management (CPM), project performance management, and project portfolio management solutions – none are industry focused. Many companies in the competitive set specialize in one area (e.g., asset investment planning) but do not provide a comprehensive budgeting and project management system. The mega-vendors (SAP, Oracle, Microsoft, etc.) all offer budgeting and project management capabilities, and are competitive threats due to the breadth and depth of their overall offerings, technical sophistication, sales and marketing expertise. Utilities International (UI), the only other utility pure-play focused competitor, is the market standard for long range forecasting and planning and is looking to expand into budgeting as well.

**FP&A Module Penetration Rates\* By Market Segment (12 Month Market Share Movement) ⬆⬇**

| | IOU | Muni | Co-Op | MidStream | UpStream | DownStream | Integrated |
|---|---|---|---|---|---|---|---|
| Project Cost Management | ⬆64% | 7% | ⬆3% | ⬇17% | 1% | 6% | 0% |
| Capital Planning & Forecasting | ⬇40% | 6% | ⬆1% | ⬇15% | 1% | 6% | 0% |
| Departmental Budgeting | 18% | 2% | 0% | 3% | 1% | 0% | 0% |
| AIO | 1% | ⬇5% | 0% | 0% | 0% | 0% | 0% |

*\*customer count, not $*



OUTSIDE COUNSEL'S EYES ONLY -          ROP006675
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

**Regulatory:** Ensure consistency and accuracy, reduce risk, improve data provided to regulatory department efficiency, and optimize rate-making process

- TTM Product Revenue (License & Maintenance) / % of Total Product Revenue: ▮▮▮▮▮▮
- Modules: Regulatory Ledger; Revenue Requirement Analysis; Revenue Monitoring; Collaboration Engine
- Persona: Accounting, Regulatory Affairs, FP&A
- Commentary: With mid-single digit penetration, the Regulatory suite is a $279M TAM growth opportunity within PowerPlan's IOU base. The rate making and approval process is one of the most mission critical activities of any utility. IOU's continue to face rising rate pressures from increased investment, evolving complexity from cost recovery mechanisms, higher frequency of rate reviews, and elevated scrutiny for cost and performance - all these trends are favorable for a purpose-built solution. In the near term, we will focus on FERC form automation and Regulatory Accounting use cases as beachhead. Our current solution lacks long term forecasting, which places it at a competitive disadvantage to competitors. Product investment and / or acquisition will be required to effectively compete in this space. Regulatory Accounting, a use case that is primarily targeted at Controllers, is the best near-term opportunity within the space.
- Competition: PowerPlan competes with either in-house solutions (excel spreadsheets layered with a document repository) or with Utilities International. UI reports that its clients include 84% of the top 25 U.S. utilities and leverages data which comes directly from PowerPlan. Whereas PowerPlan has a position of strength on actuals (historical and current data views), UI's strength is forward looking. UI Planner allows utilities to leverage their financial forecast while incorporating regulatory variables and provides regulatory personnel with a tool to perform detailed rate design and analysis (PowerPlan lacks this functionality).

**Regulatory Module Penetration Rates\* By Market Segment (12 Month Market Share Movement)** ⬆⬇

|  | IOU | Muni | Co-Op | MidStream | UpStream | DownStream | Integrated |
|---|---|---|---|---|---|---|---|
| Regulatory Ledger | 5% |  |  | 2% |  |  |  |
| Revenue Monitoring | 4% |  |  | 2% |  |  |  |
| Revenue Requirement Analysis | 4% |  |  | 2% |  |  |  |
| Collaboration Engine | 2% |  |  | 0% |  |  |  |

*customer count, not $

OUTSIDE COUNSEL'S EYES ONLY -          ROP006676
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

**Platform:** Augments, integrates and translates the data between ANY ERP and EAM solutions making these systems run more efficiently; automation of manual processes, increasing speed and accuracy

- <u>TTM Product Revenue (License & Maintenance) / % of Total Product Revenue:</u> ▓▓▓▓▓
- <u>Modules</u>: Charge Repository, ERP / EAM adapters, Integration APIs, Workflow & Process Automation; Reporting Data Layer & API
- <u>Persona:</u> CIO, CAO, FP&A
- <u>Commentary:</u> Charge Repository (CR) is the main integration point between PowerPlan and other ERP systems, providing a flexible framework for data ingestion and extraction to and from our software. The CR also includes robust engines to support derivations, allocations, adjustments, and journal entries with specific requirements for utilities, such as joint plant allocations.  Workflow & Process Automation is an easy-to-use workflow builder that automates manual process steps, adds decision-making criteria, generates reports, and improves the quality of their accounting processes, while freeing resources for analysis and exception resolution (2020 launch). Reporting Layer allows customers to leverage the PowerPlan data reporting layer to import and export data from PowerPlan into their existing BI solutions. It can also enable users to build their own reports based on drill downs within the entire PowerPlan Suite. We plan to launch our next generation reporting solution in 2021. The Reporting Data Layer & API (aka Data Hub), in its initial phase, will allow IT and end users of both Classic and cloud managed service solutions to more easily understand and utilize PowerPlan data by offering a simplified data model for end user consumption. Made specifically to help extract data, this solution will store data in an easy way to retrieve, analyze and aggregate, acting as a flexible data source "backend" for distribution into other systems. In future phases, this data layer foundation will serve as the backend for next-generation reports and ad-hoc reporting tools, offering new and differentiated dashboard solutions and data offerings as "next-gen" moves to the cloud.

**Platform Module Penetration Rates\* By Market Segment** ⬆⬇

|  | IOU | Muni | Co-Op | MidStream | UpStream | DownStream | Integrated |
|---|---|---|---|---|---|---|---|
| Charge Repository | ⬆75% | 10% | ⬆3% | 17% | 1% | 6% | 0% |
| ERP Adapters | ⬇16% | 1% | 0% | ⬇7% | 0% | 0% | 0% |
| EAM Adapters | ⬆10% | 1% | 0% | 2% | 0% | 0% | 0% |
| Workflow Automation (2020 launch) | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Reporting (2021 launch) | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

*customer count, not $

OUTSIDE COUNSEL'S EYES ONLY -          ROP006677
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER



**PowerPlan Services**

███ of PowerPlan revenue comes from Professional Services, which consists primarily of new software implementations, "Classic" software upgrades, integration services (most common with customer ERP upgrades), and expert service offerings (data efficiency, month end review, cloud managed services, etc.). All PowerPlan's service offerings are linked to software offerings – we do not compete with Big Four or boutique advisory firms for consulting or other functional specific engagements (i.e. advisory, attestation, etc.). Additionally, PowerPlan provides Managed Services, a high-touch level of additional proactive engagement and customer support, primarily within our IOU market.

**Services Competition for PowerPlan**

PowerPlan faces competition in the markets that we serve from "Big Four" accounting firms with global system integrator (SI) businesses and smaller consulting firms that have built their practices on PowerPlan expertise. In the case of SIs, such as Deloitte or EY, it is rare that they will compete directly with PowerPlan Professional Services or Managed Services for opportunities in the enterprise market. However, on a regular basis these consulting firms compete for mindshare and influence within the office of the enterprise energy industry CFO. The goal of the SI is often to direct customer investment toward solutions that will grow the SI consultancy business around other software applications, including cloud ERP vendors such as Oracle and SAP. This battle for mindshare and influence creates risk for PowerPlan's business, but the SI's also create opportunity for PowerPlan to extend its sales reach. Today, PowerPlan derives more than ███ of its new sales on an annual basis from projects that are led by SIs to help customers transform their financial operations. Consequently, PowerPlan is seeking to build broader mutually beneficial partnerships with these SIs to capture an even greater share of these customer investments in the future. In addition to SIs, there are a small number of specialized consulting firms that compete for services in the PowerPlan customer "ecosystem" today. The most notable of these firms is Regulated Capital Consultants (RCC) which employs around 40 team members, many of whom are former PowerPlan employees. These specialized firms do little to expand the PowerPlan business and often compete directly with PowerPlan professional services offerings on expertise and price. PowerPlan does not have a formal partner program or any contractual agreements in place to protect PowerPlan intellectual

**OUTSIDE COUNSEL'S EYES ONLY -**          **ROP006678**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**

property or customer experience when these specialized consulting firms engage in the PowerPlan "ecosystem." There is risk to PowerPlan's business and customer relationships as these third parties potentially use access to PowerPlan intellectual property and customers to build competitive solutions targeted to displace PowerPlan's current software offerings.

## Alliances and Partners

PowerPlan does not currently have any certified third-party implementers or commercial resellers. We often collaborate with third parties in the pursuit of new business or in execution of services. These third parties include large SI's, software vendors, and boutique consultants. The best way to describe our partner eco-system is "coop-etition", where we collaborate in some cases and compete in others. The situational requirements of each pursuit, and individual teams within larger firms, make the results from these relationships unpredictable. PowerPlan is a member of the SAP partner network (we resell a database component as part of our S/4 Adapter); however, this doesn't guarantee SAP will support all PowerPlan pursuits. We are currently working toward an alliance agreement with Deloitte. Additionally, to support the launch of Municipal & Cooperative utility market, we are pursuing relationships with Microsoft 365 resellers and other accounting/consulting firms targeting this market.

Competitive Landscape Summary:



OUTSIDE COUNSEL'S EYES ONLY -                              ROP006679
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

### III.    Market Landscape / Key Risks, Challenges & Opportunities

#### A.  Covid-19:

Covid-19 has greatly altered the landscape of our business. As both PowerPlan and our customers quickly adapted to virtual work, a vastly different engagement model than our historical in-person sales efforts and on-site delivery of service projects emerged. We don't expect for our clients to loosen their visitor restrictions until mid-2021 at earliest. Though the long-term impact of 100% virtual work remains unclear, many customers have suggested that the experience from this year will only accelerate their own cloud technology adoption timelines.

While Covid's impact to the core IOU market has not been as significant as compared to Oil & Gas, IOU's have faced economic headwinds in 2020 - via an initial decrease in demand, followed by increased bad debt due to a moratorium on service shutoffs. Furthermore, there has been pressure for Utilities to avoid rate cases (higher consumer costs), which has limited capital investments (utilities recoup their capital investments via rate increases). Decreased capital spending will ultimately lead to less PPE software uplift bookings in future years. Additionally, operating expenses have been cut across the board as well. As a result, we have found ourselves on the defensive, having more "justifying the technology" discussions than we've had previously. Municipal utilities have faced funding shortfalls, and an uneven economic recovery, paired with the rural nature of electric Cooperatives, will create headwinds as we launch our cloud based Fixed Asset solution into this market in 2021.

Covid's most material impact has manifest in our direct sales efforts, more specifically, new pipeline creation. While we have been able to advance existing deals in 2020, our core license pipeline (products excluding AIO & Regulatory) is down -3% year over year. Typical sales cycles and activities have been disrupted, impacting relationship building, depth of discovery, business case development and processes to gain customer internal alignment and sponsorship. We have addressed this new reality by shifting headcount to increase focus on new prospects, and created a new remote selling process that blends virtual selling best practices with a new approach to customer assessments.



**OUTSIDE COUNSEL'S EYES ONLY -          ROP006680**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**



**OUTSIDE COUNSEL'S EYES ONLY -** **ROP006681**

**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**



OUTSIDE COUNSEL'S EYES ONLY -            ROP006682
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER



**OUTSIDE COUNSEL'S EYES ONLY -**          **ROP006683**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**



**OUTSIDE COUNSEL'S EYES ONLY -**          **ROP006684**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**



OUTSIDE COUNSEL'S EYES ONLY -      ROP006685
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER



OUTSIDE COUNSEL'S EYES ONLY -

ROP006686

SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER



**OUTSIDE COUNSEL'S EYES ONLY -          ROP006687**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**



OUTSIDE COUNSEL'S EYES ONLY -              ROP006688
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER



**OUTSIDE COUNSEL'S EYES ONLY -** **ROP006689**
**SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER**





PLAINTIFF'S
EXHIBIT
40
Bertz 12.7.21

CONFIDENTIAL – SUBJECT TO
DISCOVERY CONFIDENTIALITY

Thanks for your support!

Jody

**Jody Allison | Liberty Algonquin Business Services |** (USA) | Vice President, Transformation
P: 905-287-2055 | C: 6032603819 | E: Jody.Allison@libertyutilities.com

**From:** Jim Duffy [mailto:jduffy@pwrplan.com]
**Sent:** Wednesday, May 6, 2020 12:29 PM
**To:** Luisa Read <Luisa.Read@libertyutilities.com>; Colin Penny <Colin.Penny@libertyutilities.com>; Jody Allison
<Jody.Allison@libertyutilities.com>; Brett Bertz <brett.bertz@powerplan.com>
**Cc:** Brett Bertz <brett.bertz@powerplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>; Lydia Olu-Harding
<lydia.olu-harding@powerplan.com>; Kim Pearch <kim.pearch@powerplan.com>; Maria Vaccaro
<maria.vaccaro@powerplan.com>; Cory Ching <cory.ching@powerplan.com>
**Subject:** RE: [EXT] PowerPlan/Liberty Call

Liberty team,

Thanks again for your time yesterday. Just to recap the team at PowerPlan and our roles for future reference:

-       Since I'm now a VP of Sales, I will no longer directly manage the Liberty Account at PowerPlan. Going forward,
the Strategic Account Executive (SAE) role at Liberty will now be in the capable hands of **Maria Vaccaro.** Maria will be
focused on bigger-picture, more strategic topics like new PowerPlan projects and larger or critical issue escalations.
Maria is also on my team, so I'll still be tracking and supporting Liberty through Maria and will remain as an escalation
point for you.
-       **Cory Ching** will be Liberty's Customer Success Manager (CSM), and Cory will be focused on your day-to-day
success and customer satisfaction. Cory will be in touch soon with more details about the processes we follow to make
this happen.

So between Maria and Cory, Liberty's short- and long-term needs will be thoroughly understood and prioritized by
PowerPlan. Given the size and complexity of your current implementation, I've asked both Maria and Cory to stay
engaged to track progress and assist the project team with issue escalation.

Other folks on the call:
-       **Brett Bertz** is our Chief Customer Officer and is ultimately responsible for all aspects of our customers' success
and happiness. On Brett's team are:
o       **Skip Fowler,** who runs our Professional Services organization,
o       **Lydia Olu-Harding,** who manages our Customer Support and Cloud Operations, and
o       **Kim Pearch,** who leads our Customer Success Management team (Cory Ching reports to Kim)

All of the PowerPlan people mentioned in this email are copied on this message for your reference.

We look forward to a long and successful partnership with Liberty!

Thanks,
Jim

**Jim Duffy**
*Vice President - Sales*

Mobile:  +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com



CONFIDENTIAL – SUBJECT TO
DISCOVERY CONFIDENTIALITY

-----Original Appointment-----
**From:** Luisa Read <Luisa.Read@libertyutilities.com>
**Sent:** Tuesday, April 28, 2020 6:57 PM
**To:** Luisa Read; Colin Penny; Jody Allison; Jim Duffy; Brett Bertz
**Subject:** [EXT] PowerPlan/Liberty Call
**When:** Tuesday, May 05, 2020 9:30 AM-10:00 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:**

**Exercise CAUTION when opening links or attachments.**

---

-- Do not delete or change any of the following text. --

## Join Webex meeting
Meeting number (access code): 474 973 442  Meeting password: fyU7bxMzr23

## Join from a Liberty video system
Dial **\*9 474 973 442**

**Join by phone**
Tap to call in from a mobile device (attendees only)
+1-415-655-0001 US Toll
+1-647-484-1598 Canada Toll (Toronto)
Global call-in numbers

**Join using Microsoft Lync or Microsoft Skype for Business**
Dial 474973442.libertyutilities@lync.webex.com
**Join from a video system or application**
Dial 474973442@libertyutilities.webex.com
You can also dial 173.243.2.68 and enter your meeting number.

Can't join the meeting?

If you are a host, go here to view host information. IMPORTANT NOTICE: Please note that this Webex service allows audio and other information sent during the session to be recorded, which may be discoverable in a legal matter. By joining this session, you automatically consent to such recordings. If you do not consent to being recorded, discuss your concerns with the host or do not join the session.

**Luisa Read | Liberty Algonquin Business Services** | Vice President, Transformation Enterprise System & Process Strategy
P: 905-465-4505 | C: 416-988-0071 | E: Luisa.Read@libertyutilities.com
354 Davis Road, Suite 100, Oakville, ON L6J 2X1

Please join us for PowerPlan's user conference, ELEVATE 2020 November 15-18, 2020, at the Marriott Marquis Marina in San Diego, CA. To register click here https://powerplan.com/about-us/elevate. This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you

# Increasing Software & SI Activities in Core Markets

## Point Solutions Building Functionality, SIs Land-grabbing for Service Revenue and ERPs Continue to Encroach



| Software ⟷ Service | Comments |
|---|---|
| **Tax Suite** — LUCASYS, THOMSON REUTERS, Bloomberg Industry Group, corptax, Wolters Kluwer / EY, pwc, Deloitte / RCC | Lucasys claims to have an Alpha customer confirmed, RCC continues to gain services dollars. Other players offer weaker solutions for regulated industries. |
| **Accounting Suite** — UTEGRATION, SAP S/4 HANA, LUCASYS, UTILITIES / EY, pwc, Deloitte / RCC | Utegration building solutions focused on S4 Hana only with former SAP team. Other entrants have failed building a solution. |
| **Rate Case & ROE Management Suite** — UTILITIES / EY / RCC | UI dominates the rate case software. RCC and EY are building services offerings to take services dollars. |
| **FP&A** — SAP, ORACLE, Anaplan, UTEGRATION, UTILITIES, workday / EY, pwc, Deloitte | ERPs and UI have the largest footprint but require integration to PowerPlan for granularity of data for full plan |

**Key:**
*Solid Box: Leader*
*Outline: Challenger*

Confidential & Proprietary – Copyright © 2020 PowerPlan, Inc.


POWERPLAN | 18

OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO DISCOVERY CONFIDENTIALITY ORDER

ROP006786



