

# Transcript of **Vadim Lantukh**

Thursday, July 14, 2022

*Lucasys Inc. v. Powerplan, Inc.*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 118713

1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE NORTHERN DISTRICT OF GEORGIA

3                            ATLANTA DIVISION

4    LUCASYS, INC.,

5         Plaintiff,

6    V.                          Civil Action File No.

7    POWERPLAN, INC.,            No. 1:20-cv-2987-AT

8         Defendant.

9    _____/

10

11                   DEPOSITION OF VADIM LANTUKH

12                   DATE:  Thursday, July 14, 2022

13                   TIME:  9:00 a.m. - 4:58 p.m.

14                   LOCATION:  500 14th Street, Northwest.

15                   Atlanta, Georgia  30318

16                   REPORTED BY:  Tamika Burnette, RPR, CSR

17                   No. 2870

18

19

20

21

22

23

24

25

```
 1                      APPEARANCES

 2

 3         For the Plaintiff:

 4         ROBBINS ALLOY BELINFANTE LITTLEFIELD, LLC

 5         BY:  Mr. Jason S. Alloy, Esquire
                500 14th Street, Northwest
 6              Atlanta, Georgia  30318
                Jalloy@robbinsfirm.com
 7              (678) 701-9381

 8
           For The Defendant:
 9
           SQUIRE PATTON BOGGS (US), LLP
10         BY:  Mr. Stephen M. Fazio, Esquire
           4900 Key Tower
11         127 Public Square
           Cleveland, Ohio  44114
12         Stephen.fazio@squirepb.com
           (216) 479-8403
13

14      Also Present:

15      Daniel Chang, Lucasys

16

17

18

19

20

21

22

23

24

25
```

```
 1                      ---oOo---

 2                     INDEX PAGE

 3   WITNESS:          EXAMINATION:              PAGE:

 4   VADIM LANTUKH     MS. FAZIO                    6

 5

 6                      EXHIBITS

 7             (Exhibits are attached hereto.)

 8   EXHIBIT:          DESCRIPTION:              PAGE:

 9   EXHIBIT NO. 1     MUTUAL NON-DISCLOSURE AGREEMENT   60

10   EXHIBIT NO. 2     E-MAIL CHAIN                 63

11   EXHIBIT NO. 3     E-MAIL CHAIN                 66

12   EXHIBIT NO. 4     MUTUAL NON-DISCLOSURE AGREEMENT   68

13   EXHIBIT NO. 5     E-MAIL CHAIN                 71

14   EXHIBIT NO. 6     E-MAIL CHAIN                 75

15   EXHIBIT NO. 7     INTERROGATORIES RESPONSES    82

16   EXHIBIT NO. 8     INCOME STATEMENT            148

17   EXHIBIT NO. 9     LUCASYS FORECAST            157

18   EXHIBIT NO. 10    LUCASYS FORECAST            162

19   EXHIBIT NO. 11    CONFIDENTIAL ROUTING SLIP   167

20   EXHIBIT NO. 12    RFP RESPONSE AND CONTRACT PRICING 180

21   EXHIBIT NO. 13    E-MAIL CHAIN                200

22   EXHIBIT NO. 14    E-MAIL CHAIN                205

23   EXHIBIT NO. 15    INITIAL CONTRACT ROUTING    206

24   EXHIBIT NO. 16    INITIAL CONTRACT ROUTING    207

25   EXHIBIT NO. 17    INITIAL CONTRACT ROUTING    208
```

1                        INDEX PAGE CONTINUED

2

3    EXHIBIT              DESCRIPTION                    PAGE

4    EXHIBIT NO. 18    STATEMENT OF WORK              210

5    EXHIBIT NO. 19    AEP TAX FIXED ASSET SYSTEM    212

6    EXHIBIT NO. 20    E-MAIL CHAIN                  218

7    EXHIBIT NO. 21    E-MAIL CHAIN                  224

8    EXHIBIT NO. 22    REVISED STATEMENT OF WORK     228

9    EXHIBIT NO. 23    STATEMENT OF WORK             233

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                         PROCEEDINGS

 2                         ---oOo---

 3

 4                 THE VIDEOGRAPHER:  All right.  Good

 5     morning.  This begins Media Unit No. 1 of the

 6     video-recorded deposition of a Vadim Lantukh, taken in

 7     the matter of Lucasys, Inc., versus PowerPlan, Inc.

 8                 Today is Thursday, July 14, 2022, and our

 9     time now is 9:33 a.m. Eastern Standard Time.  This

10     deposition is being conducted at Robbins Alloy

11     Belinfante Littlefield in Atlanta, Georgia 30318.

12                 My name is Duke Stephenson.  I'm the

13     videographer, and our court reporter today is Tamika

14     Burnette.  We both represent TrustPoint.One-Alderson.

15                 Will counsel please introduce themselves,

16     after which will the court reporter please swear in the

17     witness?

18                 MR. FAZIO:  Stephen Fazio of Squire Patton

19     Boggs US LLP on behalf of defendant, PowerPlan.

20                 MR. ALLOY:  Jason Alloy on behalf of the

21     plaintiff.

22                         (Witness sworn.)

23

24

25

```
 1                    VADIM LANTUKH,

 2              The witness herein, after having been first

 3              duly sworn to tell the truth, the whole

 4              truth, was examined and testified as

 5              follows:

 6

 7                    EXAMINATION

 8  BY MR. FAZIO:

 9       Q.  Good morning, sir.

10       A.  Good morning.

11       Q.  Could you state your name for the record,

12  please?

13       A.  Vadim Lantukh.

14       Q.  Lantukh.

15              Sir, good morning.  I'm Steve Fazio.  We've

16  met off the record.  We've met a couple times in the

17  past.

18              Have you ever had your deposition taken

19  before?

20       A.  I have not.

21       Q.  Okay.  We'll cover just a couple of ground

22  rules then, so we're on the same page.  As you can see,

23  we have a court reporter here.  The court reporter is

24  going to write down everything that we say; all the

25  questions I ask and all the answers you give.  Because
```

1    of that, and to keep her sane today, it's helpful if you

2    wait until I'm done asking a question before you start

3    answering, and I will do my best to wait until you're

4    done answering before I start asking the next question.

5                      Is that fair?

6         A.   Yes.

7         Q.   It's important that you answer all of my

8    questions fully and completely today.

9                      Do you understand that?

10        A.   Yes.

11        Q.   Okay.  And if you don't understand a question I

12   ask, please feel free to ask me to clarify it.  If you

13   answer a question that you don't understand, I and the

14   jury will assume that you did, in fact, understand it.

15                      Is that clear?

16        A.   It is.

17        Q.   Okay.  If you need a break at any time, just

18   let me know.  The only thing I ask is that we don't take

19   breaks while the question is pending.  And if possible,

20   if you can give me a few minutes warning so we can

21   finish up whatever we're working on.

22        A.   Okay.

23        Q.   Is that fair?

24        A.   Yes.

25        Q.   Did you do anything to prepare for today's

 1   deposition?

 2        A.  I did.

 3        Q.  Okay.  What did you do to prepare for today's

 4   deposition?

 5        A.  I met with Robbins firm.

 6        Q.  And when did you meet with the Robbins firm?

 7        A.  I met with Robbins firm on Monday and Tuesday

 8   of this week.

 9        Q.  Okay.  And approximately how long in each of

10   those meetings did you meet?

11        A.  Each one was a couple hours.

12        Q.  Okay.  Was there anybody else present at the

13   meetings besides you -- well let me ask -- strike that.

14            Who from the Robbins firm was present?

15        A.  Jason Alloy and Joshua Mayes.

16        Q.  Okay.  Was there anybody else present at the

17   meetings?

18        A.  At one of them, yes.

19        Q.  Okay.  Who was present at the other meeting?

20        A.  The other Lucasys employees.

21        Q.  Okay.  What employees -- what -- can you name

22   the individuals for me?

23        A.  Yes.  It's Daniel Chang, Stephen Strang, and

24   Gabriel St. James.

25        Q.  And what day did that meeting occur on?

```
 1        A.   Monday.

 2        Q.   And both meetings were approximately two hours?

 3        A.   About two hours, two or three hours.

 4        Q.   Okay.  And did you look at any documents in

 5   either of those meetings?

 6        A.   I believe we had documents before us, but I

 7   don't recall.  Yeah, we probably flipped through some

 8   documents.

 9        Q.   Okay.  Do you recall specifically what

10   documents you looked at?

11        A.   It was a whole binder full, so a lot of

12   documents.

13        Q.   Okay.  Are there any that you can identify for

14   me sitting here today?

15        A.   A lot of communications.

16        Q.   Okay.

17        A.   I don't know that -- e-mails, Slack messages.

18        Q.   Okay.  Between who and whom?

19        A.   I think primarily Lucasys employees, but I

20   think maybe there were some customer communications that

21   I recall, as well.

22        Q.   Okay.  What customers communications do you

23   recall?

24        A.   I don't recall specifically.  I just remember

25   that it was -- they were not all -- so, our internal
```

1    communications are Slack, and then external are e-mail,

2    and so I recall that they were both Slack and e-mail

3    messages.

4        Q.  Okay.

5        A.  Yeah.

6        Q.  But you recall looking at some customer

7    communications?

8        A.  E-mails.

9        Q.  E-mails?

10       A.  Yeah.

11       Q.  Okay.

12       A.  I recall looking at e-mails, which maybe would

13   have been with customers, that's correct.

14       Q.  Okay.  And so, which customers were those

15   e-mails related to?

16       A.  I don't remember specifically.  I know the

17   focus has been on the customers where we've either lost

18   contracts or our relationship has been diminished, so

19   the -- if the question is specifically regarding what

20   documents, I don't recall specifically, but I know which

21   customers are at issue.

22       Q.  Okay.  Well, my question was:  The documents

23   that you looked at, do you recall which customers they

24   related to?

25       A.  Generally, but not individually.  That's what

 1    I'm trying to describe.

 2        Q.   Okay.   Did you review any documents, PowerPlan

 3    documents?

 4        A.   I don't believe so.

 5        Q.   Okay.   Have you ever seen any PowerPlan

 6    documents that bear the label "attorneys' eyes only" or

 7    "outside counsel's eyes only"?

 8        A.   No.

 9        Q.   Aside from your counsel, have you spoken to

10    anybody else about your deposition?

11        A.   I spoke to -- I'm sorry, apart from who?

12        Q.   From your lawyers.

13        A.   From my lawyers --

14        Q.   Yes.

15        A.   -- okay.

16             So I spoke to other Lucasys employees.

17        Q.   Okay.   Who did you speak to?

18        A.   I mean, the employees that were in the room.

19        Q.   I'm not asking about the specific meeting you

20    had with your counsel.

21        A.   Okay.

22        Q.   I'm saying --

23        A.   I'm sorry.

24        Q.   -- aside from that meeting --

25        A.   Yeah.

 1       Q.  -- and aside from communications you had with

 2  your lawyers --

 3       A.  Yes.

 4       Q.  -- have you talked about the deposition with

 5  anybody else?

 6       A.  Yes, with my wife.

 7       Q.  Okay.

 8       A.  Yes.

 9       Q.  Anyone else?

10       A.  That's it.

11       Q.  Okay.

12       A.  Yeah.

13       Q.  Have you reviewed any deposition transcripts in

14  this case?

15       A.  I believe so.

16       Q.  Okay.

17       A.  Yes.

18       Q.  What deposition transcripts do you believe

19  you've seen?

20       A.  I believe I have seen -- I believe I've seen

21  the deposition transcript of Mr. Burts, or at least the

22  one that was redacted.  I believe I have seen the

23  deposition transcript of Mr. Cohen.  I'm trying to

24  think.  I believe I sat in on one deposition,

25  Mr. Yankovitch.  If there were more, they're not coming

 1   to me at the moment.

 2        Q.   Okay.

 3        A.   Yeah.

 4        Q.   And did you review any of those deposition

 5   transcripts in preparation for today?

 6        A.   No.  No, I did not.

 7        Q.   Did you do anything else to prepare for today's

 8   deposition, that we haven't talked about?

 9        A.   I just sat and tried to refresh my memory of

10   the last four years of Lucasys to the best that I could

11   recall.

12        Q.   Okay.  And how did you do that?

13        A.   Chronologically, I guess.  In my mind, I just

14   went over what I could recall from the founding of the

15   company to today.

16        Q.   And did you do that with anyone else, or was it

17   just you?

18        A.   No.  Just me.

19        Q.   Okay.  Did you look at any documents while you

20   were doing that?

21        A.   I did not, no.  I wanted to do that from

22   memory.

23        Q.   So this was strictly an exercise of your stroll

24   down Memory Lane, so to speak?

25        A.   That's correct.

 1        Q.   When did you do that?

 2        A.   I did that yesterday.

 3        Q.   How long did you spend doing that?

 4        A.   I think I sat down for about an hour to focus

 5   on that.

 6        Q.   Let's talk a little bit about your background.

 7             Where did you attend high school?

 8        A.   I went to Milton High School in Alpharetta

 9   Georgia.

10        Q.   Okay.  And is that where you grew up?

11        A.   Well --

12        Q.   Or did you attend all four years of high school

13   there?

14        A.   All four years of high school, yes, I did.

15        Q.   Okay.  And when did you graduate from high

16   school?

17        A.   2004.

18        Q.   And what did you do after high school?

19        A.   After high school, I went to Georgia Tech.

20        Q.   Okay.  And did you graduate from Georgia Tech?

21        A.   I did.

22        Q.   Okay.  And what year did you graduate?

23        A.   2007.

24        Q.   And you got a degree in industrial engineering;

25   is that correct?

 1        A.   That is correct.

 2        Q.   Can you tell me, what is industrial

 3   engineering?

 4        A.   Industrial engineering, in its basic form, is

 5   the study of systems and processes and the optimization

 6   of systems and processes.   So, a wide variety of

 7   applications.

 8        Q.   And did you have a particular focus in your

 9   studies?

10        A.   I did not.

11        Q.   Okay.   And so, describe for me a little bit of

12   sort of the curriculum that you went through?

13        A.   Certainly.   So, the core curriculum was heavy

14   engineering; math and science focused.   A lot of

15   statistics.   A lot of -- yeah, math and science;

16   statistics and technology, computer science, classes

17   that we took.

18        Q.   Did you have any accounting or tax training

19   while you were at Georgia Tech?

20        A.   No, I did not.

21        Q.   Okay.   And tell me a little bit about the

22   computer science training you got at Georgia Tech.   What

23   kind of courses did you take?

24        A.   I recall taking a course in Java.   Or really,

25   it was an object-oriented class, generally, but the

 1   course used the Java programming language during the

 2   instruction.  I recall taking a course focused on

 3   databases, so understanding databases; querying,

 4   building, manipulating databases.

 5              I do recall taking -- maybe this goes to

 6   your last question.  I took classes from the school of

 7   business, like elective classes, that were -- may have

 8   been accounting or finance focused.

 9       Q.  What did you do after graduation from Georgia

10   Tech?

11       A.  So throughout my time at Georgia Tech, I was

12   also working --

13       Q.  Okay.

14       A.  -- including full time.  So I continued working

15   full time after Georgia Tech.

16       Q.  Okay.  Where were you working full time?

17       A.  While I was at Georgia Tech, I worked full time

18   for Loreal, the cosmetics company.  I was doing -- I was

19   building an inventory database for their, kind of, R&D

20   center.

21              I also worked for a company called

22   Chartwell.  Chartwell's a research organization for

23   utilities, focussing on the utility industry generally,

24   but providing information for utilities and doing

25   conferences for utilities.

1        Q.  Tell me what -- the inventory database that you

2   were building, how -- what was the -- what was the

3   database that it was -- was it an Oracle database?  SQL

4   server?  What kind of database was it, if you recall?

5        A.  Yeah, this is a real -- this is a stroll down

6   Memory Lane, for sure.  I recall that the final product

7   was delivered in Access, so the users were using

8   Microsoft Access, but I don't recall the technologies

9   that were used to develop it.

10       Q.  Okay.  And tell me a little bit more about your

11  role at Chartwell.  What did you do at Chartwell

12  specifically?

13       A.  So, at Chartwell, I was their technology

14  person, right, so Chartwell was a small organization

15  while I was there, so I did all things technology

16  related.  So I maintained their website, maintained

17  their online document library, did technical functions

18  for their conferences.

19       Q.  Did you do any substantive work around the

20  utilities industry while you were at Chartwell, or was

21  it more support role?

22       A.  I'm not sure I understand the distinction.

23       Q.  Well, so did you -- tell me a little bit more

24  about what Chartwell actually does.  They throw -- they

25  put on conferences?

 1        A.   Conferences, research papers, things like that.

 2        Q.   Okay.  What kind of research do they do?

 3        A.   So, they're targeted for the utilities, so

 4   things like customer communications.  I don't recall,

 5   but focused on the industry and the way the industry is

 6   evolving and what utilities need to be aware of in terms

 7   of that evolution.

 8        Q.   And how long were you working at Chartwell?

 9        A.   A little over a year.

10        Q.   And in that year that you were there, did you

11   ever contribute to or draft a research paper?

12        A.   I believe I did some edits, too.  But no, I was

13   not the author of any research papers.

14        Q.   Did you present at any conferences?

15        A.   Not while I was at Chartwell.

16        Q.   Okay.

17        A.   Yes.

18        Q.   We're talking specifically about Chartwell.

19        A.   Yes.  Yes.

20        Q.   And the editing that you did on these research

21   papers, it was substantive in nature or no?

22        A.   Can you help me understand what --

23        Q.   So that when you edited -- you edited a paper,

24   were you correcting punctuation and grammar, word

25   choice, or were you making substantive recommendations?

1        A.  I think my exercises there were more learning

2   experiences about the industry --

3        Q.  Okay.

4        A.  -- more than anything else, so reading the

5   research papers, informing about the content, but no I

6   wasn't contributing to the subject matter, just doing

7   the grammar and word choice edits.

8        Q.  When you were at Loreal and Chartwell, did you

9   have any responsibility for any accounting issues?

10       A.  I don't believe so.

11       Q.  Okay.  How about tax issues?

12       A.  No, I don't think so.

13       Q.  Why did you stop working for Loreal?

14       A.  I stopped working for Loreal -- my course load

15   prevented me from continuing to work for Loreal at that

16   time.

17       Q.  And when did you leave Loreal?

18       A.  It would have been sometime while I was in

19   college.  I don't recall.

20       Q.  And did you take a job after you left Loreal?

21       A.  I may have done a part-time internship.  I do

22   recall working in a warehouse while I was in college --

23       Q.  Okay.

24       A.  -- so probably a part-time internship.

25       Q.  Did you work for Medtron -- a company called

1  Medtronic?

2     A.  Yes.  Yes, yes, yes.  It was not called that

3  when I worked there --

4     Q.  Okay.

5     A.  -- but yes, that was the warehouse job --

6     Q.  Okay.  And --

7     A.  -- I'm thinking of.

8     Q.  -- what did you do for them?

9     A.  I did time studies of throughput in a

10  warehouse.

11     Q.  Was that a full time, part time job?

12     A.  Part time.

13     Q.  And what's a time study?

14     A.  A time study is an analysis of how many

15  packages effectively go down one conveyor in a given

16  amount of time, how efficient that process is, yeah.

17     Q.  Did you do anything else for Medtronic other

18  than the time study, that you can recall?

19     A.  I may have had other minor duties.  It was an

20  internship.

21     Q.  No substantive responsibility for accounting

22  issues?

23     A.  No.

24     Q.  No substantive responsibility for tax issues?

25     A.  That is correct.

 1       Q.  Okay.  And didn't do any software development

 2   while you were there?

 3       A.  Not for the company.

 4       Q.  Explain to me what you mean by that?

 5       A.  Well, I mean that I was taking classes that may

 6   have included software development.

 7       Q.  Yeah, I'm asking you about your

 8   responsibilities at Medtronic exclusively, so --

 9       A.  That's correct.

10       Q.  Okay.

11       A.  Yes.

12       Q.  And you said it was an internship?

13       A.  It was.

14       Q.  Okay.  And so the internship ended?

15       A.  That's correct.

16       Q.  Did you have an opportunity to continue there?

17       A.  I did.

18       Q.  And did you elect to do that, or no?

19       A.  I elected not to do that.

20       Q.  And so what did you do after that?

21       A.  I believe that that internship was toward the

22   end of my college studies, and I believe that the

23   internship ended with my graduation, is the best of my

24   recollection -- or somewhere very close to my graduation

25   date.

 1       Q.   Okay.  And what did you do after you graduated?

 2       A.   I went to work for PowerPlan.

 3       Q.   And how is it -- well, tell me when -- so that

 4  would have been 2007 that you started with PowerPlan?

 5       A.   That is correct.

 6       Q.   Okay.  When you first started at PowerPlan,

 7  what position did you hold?

 8       A.   So, PowerPlan did not give out titles when I

 9  started.  I believe my business card said "consultant."

10  And I believe, outside of the founders of the company,

11  everybody in the company had a business card that said

12  "consultant."  That changed while I was at PowerPlan.

13       Q.   Okay.  Well, let's talk about your initial

14  position.

15            Who was your supervisor when you were there

16  initially?

17       A.   I worked primarily directly with Pat Pelling.

18       Q.   Okay.  And what were your responsibilities when

19  you first started with PowerPlan?

20       A.   So, the first few months, I recall kind of

21  getting a hodge podge of assignments from a lot of

22  different people.  I think they were just tasks that

23  needed to be done.  And so that was before I started

24  working with Pat directly.  And I don't recall

25  specifically.  I remember, for example, having to edit

1    the way, like, a report looked, right, where the columns

2    were and things like that.  So I remember doing that

3    very, very early.  But a couple of months in, I began to

4    work with Pat Pelling.

5        Q.  Okay.  And when you started working with Pat,

6    your responsibilities changed?

7        A.  They did.

8        Q.  And tell me what -- how did it change?

9        A.  Pat tapped me on the shoulder and said, I need

10   you to work in tax.

11              And that meant the side of the business

12   that provides tax products and services to the tax

13   organization of utilities, and so I spent a lot of time

14   converting utility data from Accufile to PowerTax that

15   first year.

16       Q.  Okay.  And approximately how long were you in

17   this role where you were working directly with Pat?

18       A.  So I was in the tax organization the rest of my

19   time at PowerPlan.  During that time, I think Pat --

20   Mark and Pat had sold the company and kind of

21   transitioned out slowly, and so there was a transition.

22   And at some point different lines of reporting were

23   established.

24       Q.  And so for this first year you were working

25   with the tax group --

 1     A.   Yes.

 2     Q.   -- you said you were primarily working with

 3  converting data from Accufile into -- is it -- it was --

 4  would be PowerTax?

 5     A.   Correct.

 6     Q.   Okay.  What other sorts of things were you

 7  doing during that first year?

 8     A.   So those -- I -- I believe I was almost solely

 9  focused on that for at least a years' time.  So there

10  were quite a few conversions that we were doing.

11     Q.   And at that -- some point, your role started to

12  change?

13     A.   Yes.  So -- well, I would say it started to

14  expand.

15     Q.   Okay.

16     A.   So, at some point, I also started to help with

17  deferred taxes.

18     Q.   And how did that come to pass?

19     A.   I don't recall specifically.  It must have been

20  a project where I was staffed on a project that had to

21  do with deferred taxes.

22     Q.   And were deferred taxes at that time handled

23  within the PowerTax module?

24     A.   So, the PowerTax module is kind of -- has some

25  modules, I would say, and so deferred taxes is a

1    sub-component of the PowerTax module.

2        Q.  And during this time you're working getting all

3    these data sets converted from Accufile to PowerTax, you

4    became very familiar with the data schema for PowerPlan

5    software; is that fair?

6        A.  For Accufile and PowerTax, yes.

7        Q.  Okay.  And did you become very familiar with

8    the operation of the PowerTax system?

9        A.  Certainly with my interactions with the end

10   users, I understood how the users were operating the

11   system.

12       Q.  Did you come to have an opportunity to

13   understand the logic that underlies the PowerTax

14   software system when you were working at -- when you

15   were first working at PowerPlan?

16                MR. ALLOY:  Object to form.

17                You can answer.

18                THE WITNESS:  I understood the work flow

19   within the application, the way that a user would go

20   through the application to form their business

21   functions.

22   BY MR. FAZIO:

23       Q.  Okay.  Was there a point in time where you --

24   so you described data conversion responsibilities, and

25   then you said you were asked to help with deferred

 1    taxes.

 2              What sort of help were you giving on the

 3    deferred tax side?

 4         A.   Yeah.

 5         Q.   Explain to me what you mean.

 6         A.   Sure.  So, deferred tax projects typically

 7    included data cleansing and data alignment.  The whole

 8    premise of deferred taxes is to align tax records with

 9    book or GAAP -- G-A-A-P -- records, strike a difference,

10    and compute a liability, a deferred tax liability on

11    that difference.

12         Q.   So you were helping with customers to be able

13    to do that?

14         A.   That's correct.

15         Q.   And is that something that was done inside the

16    PowerPlan system at that time, or outside, or a

17    combination of the two?

18         A.   Well, let's see.  The data alignment was

19    strictly working with the data, but then the results

20    would go somewhere into a database.  Yes, that's

21    correct.

22         Q.   And so you described this sort of data

23    conversion process.  You got involved in deferred tax

24    work.

25         A.   (Nodding yes.)

1        Q.  Did your role at PowerPlan change further from

2   that while you were employed there?

3        A.  It did.  So, I would say that with all of the

4   time that I had spent with the customers, I was

5   traveling weekly and performing services at the customer

6   site, so it's this opportunity to engage with the

7   customers directly.  I had a good understanding of their

8   business, their processes, and their requirements.  And

9   so, over time, I was doing less work, I would say, in

10  the software and more work consulting with their

11  customers -- with the customers about, kind of, what

12  decisions they ought to be making in their business, as

13  it regards their -- to their data.

14       Q.  What customers did you work with while you were

15  at PowerPlan?

16       A.  Oh, boy.  I think I was engaged in dozens of

17  different projects while I was at PowerPlan.

18       Q.  Did you have any that you were -- you

19  considered sort of your primary customers or your

20  primary clients, or you did larger projects for?

21       A.  The projects certainly differed in scope and

22  size.  That, I don't know if I would -- I'm not sure I

23  understand what you mean by "larger."

24       Q.  Well, tell me, what customers did you work

25  with, that you can recall, from PowerPlan.

 1        A.   Okay.   Certainly.

 2              So, I recall that I worked with Southern

 3   Company.   I recall that I worked with First Energy.   I

 4   recall that I worked with -- early on, I did a

 5   conversion for Louisville Gas and Electric.   While I was

 6   at PowerPlan, I worked for NextEra, at PowerPlan.   Tampa

 7   Electric.   Somehow, I worked with a lot of East Coast

 8   clients, now that I'm thinking about it now.   There were

 9   many.

10        Q.   Did you work with AEP while you were at

11   PowerPlan?

12        A.   I think I worked more with NiSource.   I worked

13   in Columbus a lot, but I worked with NiSource, so I

14   probably had been at AEP while I was at PowerPlan.

15        Q.   How about SUEZ?

16        A.   I had never worked with SUEZ at PowerPlan.

17        Q.   Liberty?

18        A.   No.

19        Q.   You mentioned that at some point, you got a

20   title.   When you finally got a business card with a

21   title on it, what did it say?

22        A.   It said director of professional services.

23        Q.   Okay.   And what were your responsibilities as a

24   director of professional services?

25        A.   I think it was maybe just formalizing the

1    things that I had been doing anyway, which -- helping to

2    coordinate not just my own projects, but projects of

3    other individuals.  There was a managerial component to

4    it.

5        Q.  So who were you managing?

6        A.  I think at one -- at the time that I had left

7    PowerPlan, I had -- I don't remember the exact work

8    structure, but I had responsibility for tax-fixed asset

9    and deferred tax services, so anybody in that umbrella

10   of an organization.

11       Q.  So at that time, was PowerPlan sort of broken

12   -- did it have a professional services organization at

13   the time you were there?

14       A.  Yeah, I believe they had just started

15   formalizing and calling it that --

16       Q.  Okay.

17       A.  -- at the end of my time there.

18       Q.  Okay.  And so your -- when you became -- were

19   you a director of professional services, or the director

20   of professional services?

21       A.  Oh, I was a director of professional services.

22       Q.  Okay.

23       A.  There were many.

24       Q.  Okay.  And your area was focused on tax

25   specifically?

 1          A.   That's correct.

 2          Q.   Okay.   In your time at PowerPlan, did you have

 3     any responsibility for product development?

 4          A.   I did not.

 5          Q.   Okay.   Did you participate at all in the

 6     development of any of the PowerTax products?

 7          A.   I did not.

 8          Q.   Did you have access to the source code for the

 9     PowerTax products or the PowerPlan software while you

10     were there, while you were employed at PowerPlan?

11          A.   Did I have access to it?   I believe the source

12     code was easily accessible to all employees, but I

13     didn't need it for my function.

14          Q.   Okay.   So you would not -- in your -- to

15     perform your tasks, you would not access the source code

16     on a regular basis?

17          A.   That is correct.

18          Q.   Do you recall any circumstances in which you

19     would have accessed the source code while you were at

20     PowerPlan?

21          A.   I don't recall, no.

22          Q.   So there was never a point in time when you had

23     responsibility for maintaining the PowerTax source code?

24          A.   That's correct.   I did not have responsibility

25     for maintaining the PowerTax source code.

1       Q.   Prior to being employed at PowerPlan, had you

2   ever been exposed to any of the PowerPlan software

3   products?

4       A.   I had not.

5       Q.   Aside from the -- your time at Chartwell, would

6   it be fair to say that prior to working at PowerPlan,

7   you had no professional experience working with

8   utilities?

9       A.   Outside of the time at Chartwell?

10      Q.   Yes.

11      A.   That's correct.

12      Q.   And it's fair to say that prior to working at

13  PowerPlan, you had no professional experience in

14  addressing tax issues for any type of customer?

15      A.   That's correct.

16      Q.   Would you agree that while you were at

17  PowerPlan, you learned the data schema that underlies

18  the PowerTax products?

19      A.   I became familiar with the database schema,

20  yes.

21      Q.   And were you also familiar with the front-end

22  interfaces used in the PowerTax software?

23      A.   Yes.

24      Q.   And having that familiarity was necessary for

25  you to perform your professional responsibilities while

1    you worked at PowerPlan, true?

2        A.   At times, yes.

3        Q.   At the conclusion of your time working at

4    PowerPlan, did you consider yourself to be an expert in

5    the PowerTax product?

6                MR. ALLOY:  Objection, but you can answer.

7                THE WITNESS:  No.  I would consider myself

8    to be an expert in utility tax fixed assets.

9    BY MR. FAZIO:

10       Q.   Okay.  And that was expertise that you gained

11   at PowerPlan, correct?

12       A.   Working with the customers, that's correct.

13       Q.   Is there any module of the PowerPlan software

14   that you considered yourself to be an expert in, as of

15   the time you left PowerPlan?

16                MR. ALLOY:  Same objection, but you can

17   answer.

18                THE WITNESS:  I don't think there was ever

19   a designation like that, no.  There's no module or -- I

20   would not provide an expert designation on a module at

21   PowerPlan.

22   BY MR. FAZIO:

23       Q.   So, I'm not asking you about a designation.

24   I'm asking what you considered yourself to be.

25                Did you consider yourself to be an expert

 1    in any of the PowerPlan software modules?

 2         A.   I would not use that word, no.

 3         Q.   What word would you have used to describe your

 4    level of expertise at the time you left PowerPlan?

 5         A.   I would say that I was familiar with some of

 6    the modules at PowerPlan.

 7         Q.   And just tell me again which of the modules

 8    that you would have -- you consider yourself to be

 9    familiar with?

10         A.   PowerTax, and I include tax depreciation,

11    deferred tax subcomponents there.  And I had some

12    familiarity with the asset accounting modules at

13    PowerPlan.

14         Q.   Which specific modules?

15         A.   I don't know what they're called now.  While I

16    was there, it was called the CPR, as I understood that

17    module.

18         Q.   And you -- when you were serving as a director

19    of professional services, who was your supervisor?

20         A.   I think it was Lee Watkins.

21         Q.   Is Lee a man or a woman?

22         A.   She's a woman.

23         Q.   Was Lee your supervisor throughout the time you

24    were director of personal services?

25         A.   I believe so.

Trustpoint.One    Alderson
www.trustpoint.one
www.aldersonreporting.com

800.FOR.DEPO
(800.367.3376)

1   Q. And you stayed with PowerPlan until 2013, true?

2   A. That is correct.

3   Q. Why did you leave PowerPlan?

4   A. I saw my focus kind of diverging from the

5 company's focus.

6   Q. In what sense?

7   A. So I had -- I had -- I was interested in doing

8 consulting work for utilities.  That was more business

9 consulting and strategic consulting, and PowerPlan was

10 shifting to be a pure play technology company.  And so I

11 felt like at PowerPlan I was limited in my toolset in

12 terms of how I could help customers, right, like I only

13 had a hammer, so to speak, and I knew that the problems

14 were bigger than a hammer could solve.

15   Q. And so you decided to leave in March 2013.

16     Did you leave PowerPlan on good terms?

17   A. I did.

18   Q. Did you consider your colleagues at PowerPlan

19 to be friends?

20   A. I had friends at PowerPlan, yes.

21   Q. Who were your friends at PowerPlan?

22   A. Well, at the time, I was close to a number of

23 employees.  I don't know that I -- that many of those

24 relationships have survived to today, but yeah, anybody

25 that I worked closely with at the time.

 1        Q.   Do you have anyone that you consider to be a
 2    personal friend today that still works at PowerPlan?
 3        A.   No.
 4        Q.   So, at the time you left PowerPlan, can we
 5    agree that everything that you knew about the tax issues
 6    facing utility customers, as of March 2013 when you left
 7    PowerPlan, you had learned that through your employment
 8    at PowerPlan; is that true?
 9        A.   I think there's a narrow scope of knowledge
10    that I had when I left PowerPlan that was focused on the
11    areas where PowerPlan was providing solutions.  I would
12    not say that that is the same scope of knowledge that I
13    have today, for example.
14        Q.   I'm asking you about March of 2013 when you
15    left.
16        A.   Could you repeat the question, then?
17        Q.   Yes.
18             The question was:  At the point you left
19    PowerPlan in 2013, everything that you knew about the
20    tax issues facing utility customers, up to that point,
21    you had learned as a PowerPlan employee?
22        A.   I would say I had learned while I was a
23    PowerPlan employee, so in the same time span.
24        Q.   So what made you decide to join -- so, in 2013,
25    you leave PowerPlan and you join Regulated Capital

 1   Consultants; is that correct?

 2        A.   That's correct.

 3        Q.   Okay.   What made you go to RCC?

 4        A.   I believed that RCC would give me the

 5   opportunity to provide those broader strategic

 6   consulting services to the industry.   So I was looking

 7   for a place that was still focused on the industry, was

 8   broader in its application of solutions to the industry,

 9   and I have a great deal of respect for

10   Jonathan Williams, the founder of RCC.

11        Q.   What was your first role at RCC?

12        A.   I believe I was the first non-founding employee

13   at RCC, so I had to wear a lot of hats.

14        Q.   How many people were employed at RCC with -- at

15   the time that you joined?

16        A.   So, it was the founders, Jonathan and Christie.

17   I believe they may have just started contracting with

18   some other individuals in the industry.   I believe if I

19   wasn't the first, I may have been the second.   So yeah,

20   three or four, max.

21        Q.   And did you have a title?

22        A.   I did not.

23        Q.   Okay.   What were your responsibilities when you

24   first started out?

25        A.   My first day, I got on a 6:00 a.m. flight to

1    New York City to have meetings at Consolidated Edison.

2        Q.   Let's take a step back from the specifics of --

3    when you were talking to the founders of RCC about what

4    your role would be, what did they tell you about what

5    you were going to be doing with them?

6        A.   They said, Vadim, here's an opportunity to help

7    utilities.

8        Q.   Okay.  And did they describe to you how you

9    were going to go about helping utilities?

10       A.   I don't recall specific conversations.  It was

11   identifying the utility business problems and provide

12   solutions.

13       Q.   So you think you were the third employee of

14   RCC?

15       A.   I think that's true.

16       Q.   Do you know how many employees, approximately,

17   RCC has today?

18       A.   I don't, no.

19       Q.   All right.  So you mentioned you went to see

20   Consolidated Edison?

21       A.   That's correct.

22       Q.   What other clients did you work with while you

23   were at RCC?

24       A.   I definitely worked with AEP.  I -- let's see.

25   I worked with First Energy.  I worked with a company

 1    called Pepco.  They were acquired by Exelon while I was

 2    working with them.  There are a lot.  Do you want me to

 3    keep going?

 4        Q.   Sure.

 5        A.   Okay.  I recall Tucson Electric Power, working

 6    with them.  Boy, I recall working with Dominion at RCC.

 7    I'm trying to differentiate.  There were more, but I

 8    can't recall, specifically, what other customers there

 9    were.

10        Q.   So tell me about the kinds of business problems

11    you were working on for these customers while you were

12    at RCC?

13        A.   Yeah.

14             So, at RCC, I developed a better

15    understanding and appreciation for the regulatory model,

16    the regulated nature of the business, and so that meant

17    working more on filings with individual rate

18    commissions, and maybe some, like, strategic decisions

19    that needed to be made around those filings and how to

20    collect revenue from customers.

21        Q.   What other sorts of business problems were you

22    working on when you were at RCC?

23        A.   So, we worked with customer data a lot, so

24    utilities are asset intensive, which means they're data

25    intensive.  Utilities have to, for regulatory purposes,

 1    track a lot of detailed data over a long period of time,

 2    and so there was a lot of data cleansing, data clean-up

 3    activities, as well.

 4         Q.   And so the -- the utilities that you worked

 5    with while you were at RCC, how did those utilities

 6    typically manage all of that data?

 7         A.   I think some combination of in-house and

 8    consultants.

 9         Q.   Did they have specific software programs that

10    they were using to manage the data?

11         A.   Oh, yes.  Utilities use a lot of software.

12         Q.   What kind of -- in the tax space in particular,

13    in the regulatory space that you were mentioning a

14    minute ago, what were the software programs that they

15    were using to manage that data?

16         A.   So, in the tax space, virtually every utility

17    uses PowerPlan tax products, or every U.S. utility, so

18    that's included.  Additionally, tax accounting

19    programs -- like, OneSource comes to mind -- on the

20    regulatory reporting side.  UI Planner comes to mind as

21    a solution that we help utilities with.  And then, of

22    course, the ERPs themselves, so like the accounting

23    suite for utilities.

24         Q.   The Oracle -- when you say ERP, you're

25    referring to companies like Oracle, SAP, and the like?

1      A.   Correct, yes.

2      Q.   What about B&A?  Does B&A have a product that

3   you ran across?

4      A.   Yes, I believe B&A has a tax depreciation

5   product.  I don't recall running into it at RCC, but I

6   know it was used by some subsidiary businesses and

7   utilities.

8      Q.   What percentage of the customers you worked

9   with at RCC, when you were doing data cleansing work,

10  were PowerPlan customers?

11     A.   What percentage -- I'm sorry can you --

12     Q.   So, what percentage -- you mentioned that you

13  were doing a lot of data cleansing work.

14     A.   Yes.

15     Q.   So, of the clients that you had that required

16  data cleansing work, what percentage would you say,

17  approximately, that were PowerPlan customers -- PowerTax

18  customers?

19     A.   Power -- I'm sorry.  PowerPlan generally?

20  PowerTax?

21     Q.   PowerTax.  Let's start with PowerTax.

22     A.   Well, I think like I said before, to my

23  knowledge, every or virtually every U.S. utility uses

24  PowerTax.  So at RCC, we worked with U.S. utilities, so

25  I would imagine each of them would have had PowerTax in

1    one way or another.

2        Q.   Did you do any software development work while

3    you were at RCC?

4        A.   I did not.

5        Q.   Did RCC as an organization do software

6    development at the time you were employed there?

7        A.   Not the RCC organization.  I don't believe so.

8        Q.   Okay.  And you were a partner at RCC; is that

9    true?

10       A.   Not from the beginning, but yes --

11       Q.   Okay.

12       A.   -- for some amount of time, I was a member,

13   yeah.

14       Q.   Okay.  So when did you become a member of RCC?

15       A.   I don't recall the exact date.  It would have

16   been toward the end of my time at RCC.

17       Q.   How many members were there at RCC at the time

18   you left the company?

19       A.   So -- three.  Three.

20       Q.   So you, Mr. Williams, and who would the third

21   be?

22       A.   Ms. Williams.

23       Q.   Ms. Williams?

24       A.   Yes.

25       Q.   So Mr. And Ms. Williams and --

 1        A.   And myself.

 2        Q.   Okay.

 3        A.   That is correct.

 4        Q.   Now, I've seen a description of your time there

 5   where you said you led the delivery of tax technology,

 6   forecasting, and regulatory services.  Does that

 7   accurately describe what you were doing at RCC?

 8        A.   Can you read that one more time?

 9        Q.   Led the delivery of tax technology,

10   forecasting, and regulatory services.

11        A.   I think that includes some things that I did at

12   RCC, that's correct.

13        Q.   What does it mean when you were saying, Led the

14   delivery of tax technology?

15        A.   Tax technology services, right?  Yeah.  So RCC

16   didn't deploy tax technology, but we provided services

17   around customer tax data and their use of technology on

18   that data.

19        Q.   And RCC actually accesses an implementer for

20   certain PowerPlan tax -- or PowerPlan software modules;

21   is that true -- or has?

22        A.   I would not -- so I don't know what they do

23   today.

24        Q.   I'm asking about when you were there.

25        A.   Yeah, while I was there, to my knowledge, they

 1   never implemented, like, brand new/new modules, but they

 2   certainly reconfigured data in existing modules.

 3        Q.   Okay.

 4        A.   Reset the data in the module.

 5        Q.   When you were there, were you ever personally

 6   involved in a PowerPlan module upgrade?

 7        A.   Not that I recall.

 8        Q.   While you were at RCC, did you ever work on

 9   any -- consult on any projects that were wholly

10   unrelated to PowerPlan software?

11        A.   Yes.

12        Q.   Okay.  Tell me about those.  What kind of

13   projects would those be?

14        A.   Okay.  So I recall specifically working with

15   Ameren, working with, I believe his name's Joe Power in

16   their regulatory group, regarding a recovery of a

17   regulatory asset that they had on their books and what

18   was the right way to support the reg access balance.  So

19   helping -- helping with the language around that filing.

20        Q.   Any other projects that you recall that were

21   unrelated to PowerPlan software?

22        A.   Yes.

23        Q.   Okay.  Tell me about them.

24        A.   I recall working with Consolidated Edison on a

25   public utility commission audit in New York, related to

 1   cost of removal and the way removal costs were being

 2   treated for income tax purposes.

 3        Q.   Other projects that you remember?

 4        A.   Just generally?

 5        Q.   That were unrelated to PowerPlan?

 6        A.   I'm sure there were more, yeah.  So, we would

 7   regularly get -- okay.  Here's another one.  During my

 8   time at RCC, a number of utilities had been electing

 9   method changes related to tax repairs.  There was some

10   IRS guidance around that.  So performing studies to try

11   to quantify the income tax benefit of electing that

12   election.  I think that was very common.  I recall a tax

13   basis balance sheet project, which is typically

14   something like a Big-Four company would do to help

15   validate the accounting positions that the company has

16   related to its tax accounts and its balance sheets.

17        Q.   Are you familiar with an entity called

18   ASI Singularity?

19        A.   I'm familiar with an entity called ASI.  I

20   believe it's Aggregate Singularity.

21        Q.   Okay.  Tell me about that company.  What did

22   you know about it?

23        A.   I believe that ASI develops reconciliation

24   software to help companies keep their data clean.

25        Q.   Did ASI -- now, ASI was founded by the

 1   Williams; is that accurate?

 2        A.  That's correct.

 3        Q.  Yeah.

 4             And did they found ASI while you were still

 5   employed at RCC?

 6        A.  I believe they did, yes.

 7        Q.  And were you ever a partner in ASI?

 8        A.  I was not.

 9        Q.  You were not a member of ASI?

10        A.  I was not.

11        Q.  Did you do any work with ASI, any kind?

12        A.  Did I do work with ASI?  I don't recall if this

13   was before for after the company was founded, but I

14   recall talking through kind of the -- the problem space,

15   right, like bad data, quality, and what solutions RCC

16   could deliver in that space.

17        Q.  Do you know why ASI was founded as a separate

18   company rather than developing software within RCC?

19        A.  I don't know.

20        Q.  Have you had an opportunity to become familiar

21   at all with ASI's product or products?

22        A.  I have seen demos of the ASI product, I

23   believe.

24        Q.  Would you have seen those while you were at

25   RCC, or after you left?

 1        A.   While I was at RCC.

 2        Q.   Explain to me, what is it that the product

 3   actually does, to the extent you know.

 4        A.   I mean, from my recollection, at least while I

 5   was there and during the demos, it was a tool to ingest

 6   data and perform reconciliations on that data.  So set

 7   up some rules of expected -- the way data was expected

 8   to look versus how it did look, I guess, and then

 9   provide some kind of alerts or indicators to the user

10   when the data conditions were not met.

11        Q.   Is the product designed to work with a

12   particular store of data, or is it source agnostic?

13        A.   Oh, I don't know.  I don't know how it's

14   architected.

15        Q.   Is it similar to Copilot?

16        A.   No, it's not.

17        Q.   Okay.  Tell me what's the difference between

18   Copilot and the ASI product?

19        A.   What's the difference?  So Copilot is a

20   business process automation software, so it's process

21   focused.  Now, certainly, data comes into and out of

22   processes, but my understanding is that ASI is

23   point-in-time reconciliation focused rather than kind of

24   a business process end-to-end.

25        Q.   Do you know if it's -- if ASI is used

 1   exclusively with PowerPlan?

 2        A.   I don't know.

 3        Q.   Do you know of any customers that have

 4   implemented ASI's products?

 5        A.   I don't know for certain.  I don't know with

 6   certainty, like, I haven't seen contracts or anything

 7   like that.

 8        Q.   Do RCC's consultants actually implement the

 9   Singularity products?  Do you know?

10        A.   I don't know.

11        Q.   Do you know if RCC employees are consulted on

12   product development issues?

13        A.   They -- they may have been while I was there.

14   I don't know if they are now.

15        Q.   And forgive me if I've already asked you this,

16   but were you personally involved in any software

17   development while you were at RCC?

18        A.   No, I wasn't.

19        Q.   Why did you decide to leave RCC?

20        A.   So, while I was at RCC, the utility industry

21   began to go through a number of pretty significant

22   changes, kind of macro changes to the industry, and it

23   became clear to me that utilities were lacking in the

24   right tools to address those, and not having the tools,

25   were just spending a lot of money on consultants.  So,

1    yeah.  I left RCC to try to help think about and address

2    some of those macro changes in the industry.

3         Q.  Prior to leaving RCC, did you ever propose to

4    the founders that you could develop software that would

5    address some of these challenges you've identified?

6         A.  So I -- my recollection is that RCC or at least

7    RCC's founders' focus in terms of software while I was

8    there was the ASI product, and there was not a capacity

9    or willingness to do more than that from a technology

10   standpoint.

11        Q.  Did you propose to them that you could build

12   other software products for them?

13        A.  No.  We had conversations around needs for

14   products, but didn't have any proposals related --

15        Q.  Were they surprised when you told them you were

16   leaving?

17              MR. ALLOY:  Objection.

18              You can answer.

19              THE WITNESS:  I don't know.  I don't know.

20   BY MR. FAZIO:

21        Q.  Did you leave on good terms?

22        A.  I did.

23        Q.  Do you consider the Williams to be personal

24   friends?

25        A.  I have a great deal of respect for them, but we

 1   haven't remained in contact.

 2        Q.   While you were employed at RCC, do you know of

 3   anybody at RCC who had access to the PowerPlan source

 4   code?

 5        A.   Not that I can recall.

 6        Q.   Do you have any financial interest in RCC

 7   today?

 8        A.   I do not.

 9        Q.   How about in ASI?

10        A.   I do not.

11        Q.   So you left RCC in 2018?

12        A.   That's correct.

13        Q.   Okay.  And you formed Lucasys immediately after

14   leaving RCC?

15        A.   In the same year, yeah.

16        Q.   What did you do from the time you left RCC

17   until Lucasys was formed?

18        A.   I think I sat down and thought about, What's

19   the right way to form a company; when and with who and

20   how, yeah.

21        Q.   So when did Lucasys sort of become an

22   operational entity?

23        A.   Well, I think it depends on what you mean by

24   operational.  The company formation documents, I

25   believe, is May 14th of 2018, but the first revenue came

 1    much later that year.

 2        Q.  And we're going to get to customers and

 3    revenues in a minute, but --

 4        A.  Okay.

 5        Q.  So you're the founder of the company, true?

 6        A.  That's correct.

 7        Q.  And you're currently the chief executive

 8    officer?

 9        A.  That is correct.

10        Q.  Okay.  Can you just briefly, for me, describe

11    your roles -- your role and responsibilities at Lucasys

12    as chief executive officer?

13        A.  Sure.

14            So, just as a small company, of course we

15    all wear a lot of hats, but as chief executive, I have

16    oversight for our business, so that means internally for

17    our employees; it means for our customer relationships;

18    it means for our product development and our consulting

19    services.

20

21

22

23

24

25



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Q. So aside from employees, is there anybody else

21 that has a financial interest in the performance of

22 Lucasys?

23  A. No.

24  Q. So we're going to talk a bunch about financial

25 issues later, but I wanted to just confirm at the

    1    outset, the funding for Lucasys operations comes

    2    entirely from its consulting revenues; is that true?

    3         A.   The funding for Lucasys operations comes

    4    entirely -- I mean, I contributed funding to begin, but

    5    yes, we have consulting revenues now.

    6         Q.   Okay.  You don't have any loans outstanding?  I

    7    understand you had a PPP loan in the past, but you don't

    8    have any loans outstanding today?

    9         A.   We have an SBA loan.

   10         Q.   Okay.  Any others?

   11         A.   No.

   12         Q.   When did you take on the SBA loan?

   13         A.   Sometime in 2020, I believe.

   14         Q.   Was that a loan for ███████████████████████?

   15         A.   No.  That would have been the PPP loan I think

   16    that you're referring to.

   17         Q.   Okay.  So this is a separate loan?

   18         A.   That's correct.

   19         Q.   How much was the loan for?

   20         A.   Oh, I think it's been increased a couple times.

   21    I don't know the exact number.  ████████████████████

   22    ████████

   23         Q.   And what has Lucasys been using those funds

   24    for?

   25         A.   Operating expenses, and that includes, of

 1    course, legal fees and expenses.

 2         Q.   So as of today, do you know what the

 3    outstanding balance on that loan is?

 4         A.   I don't know.

 5         Q.   And you said you think you took it out in 2020?

 6         A.   Initially, yes.  And I believe there were one

 7    or two options to increase that, the size of that loan.

 8         Q.   And is that loan how you're paying for the

 9    legal fees associated with this litigation?

10         A.   No.  We -- we look at that loan as reserves,

11    right?  So we hold that -- those loan proceeds in cash.

12         Q.   So have you drawn down the loan, or no?

13         A.   The loan is immediately funded, but we -- we

14    have not had to spend the loan proceeds.

15         Q.   I'm sorry, what was the last thing you said?

16         A.   We haven't had to spend the loan -- we've been

17    able to operate with a positive cash balance.

18         Q.   I see.

19         A.   Yeah.

20         Q.   So you're saying you have the loan, but you

21    haven't had to use the money from the loan; is that

22    fair?

23         A.   We have cash on-hand to cover the loans.

24              Does that help?  I mean, that --

25         Q.   I -- cash on-hand to cover the loans --

1    A.  Well, the question is a cash-flow question, so

2 I don't know that at any point in time we had cash to --

3 like, we may have used the loan for operating expenses,

4 but then subsequent revenue allows us to cover --

5    Q.  To pay it back down?

6    A.  Correct.

7    Q.  It operates like a line of credit, basically?

8    A.  Other than that we -- it's not a line of

9 credit, because we hold the loan proceeds.

10    Q.  Within Lucasys, are there employees that are --

11 of the five employees, are there any that are dedicated

12 exclusively to consulting activity?

13    A.  Yes, I think so.

14    Q.  Okay.

15    A.  Well, that spend a majority of their time in

16 consulting.

17    Q.  Okay.  And who would that be?

18    A.  So I think, like, Gabriel St. James spends most

19 of his time in the consulting space.

20    Q.  And what about the others?

21    A.  So, it's easier for me to answer the question

22 in the inverse.  We have one employee who is only

23 product focused.

24    Q.  Okay.  And who is that?

25    A.  Stephen Strang.

1      Q.   And the remaining employees do some combination

2   of product development work and consulting?

3      A.   They don't do product development, but they may

4   be, for example, consulted on the way a particular

5   screen may look or how a user might interface with a

6   particular product.

7      Q.   So for you personally, how would you break down

8   the time you spend in terms of consulting, operational,

9   you know, administrative-type things --

10      A.   Yeah.

11      Q.   -- and product development?  Just

12   approximately?

13      A.   I'd love for it to be equal, but I don't know.

14   Any given day could be different.  I try to spend enough

15   attention both on the consulting side, I understand

16   that's where our relationships are built and maintained,

17   as well as the product side, which is really the value

18   of the business.

19      Q.   How many customers does Lucasys currently

20   serve?

21      A.   We have, I believe, nine, perhaps ten,

22   customers that we've engaged with.

23      Q.   And are all of those customers consulting

24   customers?

25      A.   We haven't done consulting work for all of

1    those customers, no.

2        Q.  So tell me, if you're not doing consulting work

3    for -- which customers haven't you done consulting work

4    for?

16        Q.  And of the remaining Lucasys customers, are

17    they all consulting customers?

18        A.  Some of them are no longer customers.

19        Q.  Okay.

20        A.  Of the ones that are still customers, we

21    provide consulting or are available to do so at any

22    time.

23        Q.  Okay.

24        A.  Yeah.

25        Q.  Of the ▮▮▮▮▮▮▮▮▮▮▮▮ you mentioned a

 1    minute ago, how many are former customers?

 2         A.   At least two.

 3         Q.   And who is that?

 4         A.   NextEra and Liberty.

 5         Q.   And of the customers that you have, have you

 6    sold any software products to any of them, or licensed

 7    any software products to any of them?

 8         A.   We have mask -- we have negotiated master

 9    service agreements with a number of utilities related to

10    software subscriptions, yes.

11         Q.   Okay.  And what products have they -- so you

12    said -- I asked you if you had licensed it to any of

13    them, there are master service agreement -- you said

14    that there were master service agreements --

15         A.   Correct.

16

17

18

19

20

21

22

23

24

25         A.   We have at least one engagement where we are

1    working to deploy software during that engagement.

2        Q.   And what customer is that for?

3        A.   That is for AEP.

4        Q.   Are any of Lucasys' current customer

5    engagements wholly unrelated to PowerPlan software?

6        A.   Yes.

7        Q.   Okay.  Which ones?

8        A.   ███████████████████████████

9        Q.   Okay.  Others?  Any others?

10       A.   So -- yeah.  So, we have a number of

11   relationships where we're kind of industry consultants

12   on-call, right?  And so there are a few of those where

13   we take calls around the business issues.

14       Q.   Okay.

15       A.   Not related to --

16       Q.   And who would that be for?

17       A.   ██████████████████████████████

18   ████   ████████████████████   ████████

19   ██████████████████████████████████████

20   ████████

21       Q.   Okay.  We've been going for about an hour 15.

22   Why don't we take ten?  Ten-minute break?

23       A.   Sure.

24            THE VIDEOGRAPHER:  Off the record at

25   10:47 a.m.

 1                    (Off the record.)

 2                    THE VIDEOGRAPHER:  Back on the record at

 3  11:03 a.m.

 4  BY MR. FAZIO:

 5      Q.  Sir, at -- during the break, your counsel

 6  indicated that there was an answer that you wanted to

 7  clarify?

 8      A.  There is.

 9      Q.  Okay.  What clarification would you like to

10  give?

11      A.  I believe that you had asked me about my

12  expertise at the time that I had left PowerPlan.

13      Q.  Yes.

14      A.  As of that date.  And I wanted to -- I don't

15  recall my exact answer, but I wanted to clarify for the

16  record that I did not, at that time, nor do I now

17  consider myself an expert at that time.  I think I had

18  -- yeah, so to the extent that I -- if I had used that

19  word, "expert," I wanted to clarify that I don't -- I

20  don't consider myself -- or didn't -- to be an expert.

21      Q.  Okay.  I think you clarified at the time, but

22  --

23      A.  Yeah, okay.

24      Q.  -- let's --

25      A.  Thank you.

 1       Q.  -- get back to it.

 2              And sir, we were talking a little bit about

 3  Lucasys' business, and I wanted to just clarify one

 4  thing.

 5              Does anybody outside of Lucasys and its

 6  owners have a financial interest in the outcome of the

 7  litigation between PowerPlan and Lucasys?

 8       A.  No.

 9              (Exhibit 1 marked for identification.)

10  BY MR. FAZIO:

11       Q.  Sir, you're being handed what's been marked as

12  Exhibit 1 to your deposition.  Could you take a minute

13  to look at that document?

14       A.  (Witness examining document.)

15       Q.  Have you seen this document before, sir?

16       A.  I believe so.

17       Q.  Okay.  On the second-to-last page you will see

18  your name appears -- signature appears under,

19  "Counterparty."

20       A.  Yes, I do see that.

21       Q.  Okay.  And so, can you tell me what this

22  document is, sir?

23       A.  This appears to be a mutual non-disclosure

24  agreement between Lucasys and Legalist, Inc.

25       Q.  Sir, if you look at the purpose, it says that

 1    the purpose of the mutual non-disclosure agreement was,

 2    "The parties intend to explore a business opportunity of

 3    mutual interest concerning the company, potentially

 4    providing funding to the counterparty in relation to

 5    certain court and/or arbitration proceedings with the

 6    counterparty and to engage in discussions relating to a

 7    possible consensual negotiated transaction relating

 8    thereto," and then it's open paren, quote, "Purpose,"

 9    closed quote, closed paren, and the sentence goes on.

10              First of all, I just want to ask you:  Did

11    Lucasys ever enter into an agreement with Legalist?

12        A.   Outside of this --

13        Q.   Outside of the mutual agreement.

14        A.   No --

15        Q.   Okay.

16        A.   -- we did not.

17        Q.   Did you have conversations with Legalist

18    consisting of the description in the purpose that I just

19    read?

20        A.   I don't recall if we had those conversations

21    directly.  My recollection is that this was a firm that

22    may have been introduced to us by our counsel.

23        Q.   Okay.  And so today -- so there was never any

24    -- strike all of that.

25              Was this related to the PowerPlan/Lucasys

 1   litigation?

 2        A.  This was related to evaluating funding options

 3   for the PowerPlan/Lucasys litigation, that's correct.

 4        Q.  Okay.  And so today, has Lucasys entered into

 5   any agreements with any litigation funders related to

 6   this litigation?

 7        A.  No.

 8        Q.  Okay.  And are your lawyers working for you on

 9   a contingent fee?

10        A.  No.

11        Q.  How are you funding the litigation, sir?

12        A.  Lucasys' cash reserves.

13        Q.  Approximately how much out of cash reserves

14   have you paid on the litigation so far?

15        A.  I don't know the exact --

16             MR. ALLOY:  Just the use of "you."

17             MR. FAZIO:  Sorry.

18   BY MR. FAZIO:

19        Q.  I'm sorry.  Lucasys.

20        A.  Okay.

21        Q.  Yeah.

22        A.  Yeah.  I don't know the exact number, but

23   through June of this year, it is at least ████████ .

24        Q.  All right.  Sir, are you familiar with a person

25   named Kurt Zuch?

 1          A.   That name is familiar to me, yes.

 2                    (Exhibit 2 marked for identification.)

 3     BY MR. FAZIO:

 4          Q.   Sir, you've been handed what's been marked as

 5     Exhibit 2 to your deposition.

 6          A.   (Witness examining document.)

 7          Q.   Have you seen this document before?

 8          A.   Yes, I believe that I have.

 9          Q.   Okay.  So we look over the last page -- we'll

10     go through the chain from the bottom to the top.

11                    You see there's an introductory e-mail from

12     Vasily.  Is that your brother?  Is Vasily your brother?

13          A.   It is.

14          Q.   Okay.  Tell me why was it -- what was the

15     genesis of this introduction request to Mr. Zuch?

16          A.   I believe that, as I recall, Vasily had spoken

17     to me about his relationship with Kurt or maybe that

18     Kurt had reached out to him.  I think they knew each

19     other from church or a mutual acquaintance at church.

20     And I had asked him to pass along an introduction.

21          Q.   And Mr. Zuch is -- he's a member of the board

22     of directors of Utegration?

23          A.   I believe he was at that time.  I don't know if

24     he still is.

25          Q.   Okay.  In here, it says that Vasily reports

 1   that you would like to speak with him about Utegration.

 2                Do you see that?

 3       A.  Yes, I see that.

 4       Q.  Okay.  And so this is October 7, 2020.

 5                Do you see that?

 6       A.  I do see that.

 7       Q.  Okay.  In October of 2020, what was it that you

 8   wanted to discuss with Mr. Zuch about Utegration?

 9       A.  So, sometime before October 2020, I had seen a

10   press release from Utegration regarding its focus on the

11   utility industry, and specifically in the area of fixed

12   assets, and I wanted to explore more about the company.

13   Yeah, just what it was doing for utilities.

14       Q.  Okay.  So if you go up the chain to your e-mail

15   at 2:04 p.m. on October 7th --

16                Do you see that?

17       A.  2:04 p.m.

18       Q.  Yes.

19       A.  Yes, I see it.

20       Q.  Okay.  It's in the middle of the second

21   paragraph, it says, "I've been following" -- you're

22   saying, "I've been following Utegration closely over the

23   last 12 to 18 months and have been impressed with the

24   solutions the company has brought to the market," paren,

25   "Especially the new Finance4U solution, which I believe

1    can be revolutionary for the industry."

2              Do you see that?

3         A.  I do see that.

4         Q.  Okay.  Tell me, what was it about the Finance4U

5    solution that you thought would be revolutionary for the

6    industry?

7         A.  Based on the press release that I had seen, it

8    seemed to me that -- at least for that one customer, it

9    seemed that Finance4U had allowed that company to

10   leverage its SAP ERP solution and extend it into the

11   asset accounting space.

12        Q.  And what company was it that was listed in the

13   press release?

14        A.  That was NRG.

15        Q.  Now, do you agree that Utegration is a

16   competitor to PowerPlan in the fixed-asset accounting

17   space -- software space?

18        A.  I don't know that I would say that.

19        Q.  Okay.  How would you describe the competitive

20   position of Utegration?

21        A.  So I've -- the company that had the press

22   release was an energy company, but not a regulated

23   utility company, so it's unclear to me if Utegration is

24   a competitive -- competitive -- is competitive to

25   PowerPlan in the utility industry.  I just don't know,

1    one way or the other.

2         Q.  Well, in October of 2020, what specifically did

3    you want to talk to Mr. Zuch about regarding Utegration?

4         A.  So, I think in and around that time, we had

5    been marketing and reaching out to NRG in particular,

6    regarding our tax solutions, and just knowing that they

7    had gone through a transformational technology project,

8    it seemed like there may be something to learn about

9    what and how they had done that and whether they were,

10   you know, planning to do that at other energy companies

11   or potentially regulated utilities.

12        Q.  And eventually, Mr. Zuch introduced you to a

13   person by the name of Henry Bailey, correct?

14        A.  Yes, I believe that's true.

15             (Exhibit 3 marked for identification.)

16   BY MR. FAZIO:

17        Q.  Sir, you've been handed what's been marked as

18   Exhibit 3 to your deposition.  This is a chain -- an

19   e-mail chain in which Mr. Zuch is introducing you to

20   Mr. Bailey, correct?

21        A.  Yes.  I see that here at the end.

22        Q.  So I just want to direct your attention to the

23   March 10, 2021 , 3:05 p.m. e-mail from you to Kurt Zuch,

24   copying Mr. Bailey.

25             Do you see that?

 1        A.   (Witness examining document.)

 2                 March 10, 2021, 3:05 p.m.?

 3        Q.   Yep.

 4        A.   Yes, I see it.

 5        Q.   Okay.   So the first sentence of the second

 6   paragraph says -- you're saying, "Yes, I'd love the

 7   opportunity to connect and discuss potential synergies."

 8                 Do you see that?

 9        A.   I do see that.

10        Q.   What were the potential synergies that you saw

11   in March of 2021 with Utegration?

12        A.   I think my understanding, from my initial

13   conversation with Mr. Zuch, was that Utegration had not

14   been focused on tax space at utilities, and we had, of

15   course, been focused on that space, and so I think

16   Mr. Zuch had suggested that I be connected with somebody

17   in their executive team to discuss potential synergies,

18   I believe that's why that's there.

19        Q.   And who is Mr. Bailey?   What's his role at

20   Utegration?

21        A.   Well, I see his e-mail signature here, so I can

22   read that to you.   It says, "EVP and chief strategy

23   officer."

24        Q.   And you ultimately did get a chance to connect

25   with Mr. Bailey?

 1        A.   I did.

 2        Q.   It took a while for that to happen, true?

 3        A.   It did.   It feels like it was a year.

 4        Q.   Do you know why it took so long?

 5        A.   I don't know.

 6             (Exhibit 4 marked for identification.)

 7   BY MR. FAZIO:

 8        Q.   Sir, you're being handed what's been marked as

 9   Exhibit 4 to your deposition.

10             Do you recognize this document?

11        A.   Yes, I do.

12        Q.   Okay.   Tell me what this document is.

13        A.   This appears to be a mutual non-disclosure

14   agreement between Lucasys and Utegration.

15        Q.   And if you look down to the third paragraph, it

16   describes the -- there's a summary description of a

17   business transaction.

18             Do you see that?

19        A.   Third paragraph.   Yes, I see it.

20        Q.   Okay.   It says, "In order to evaluate and

21   possibly enter into a business transaction with one

22   another related to Utegration's Utility4UTM solution and

23   each of its modules," and it goes on to list them, you

24   agreed to this non-disclosure agreement?   When I say

25   "you," Lucasys agreed to it?

 1        A.  I see that, yes.

 2        Q.  What was the -- at the time that you entered

 3   into this, what was the nature of the business

 4   transaction that you were considering?

 5        A.  So, my recollection is that we needed a

 6   non-disclosure agreement to have any conversation of

 7   substance, so to -- other than the initial

 8   meet-and-greet, so my recollection is that this was

 9   needed to -- to have the conversation.

10        Q.  Okay.  And so there was no specific business

11   transaction contemplated at that time?

12        A.  There was not.

13        Q.  And did you consider the terms of the NDA to be

14   reasonable?

15        A.  (Witness examining document.)

16             I think I probably -- or I definitely

17   shared this with counsel and got their consensus, I

18   guess.  That seemed reasonable.

19        Q.  Okay.  Did you propose any changes that you

20   recall?

21        A.  I don't recall.

22        Q.  And eventually you did have a meeting, correct,

23   with Utegration?

24        A.  We had a call --

25        Q.  Okay.

1     A.   -- with Utegration.

2     Q.   Was there just one call, or was there more than

3  one call?

4     A.   I recall one call with Mr. Bailey and myself,

5  and I recall one call with a larger audience that

6  included other individuals from Utegration and perhaps

7  other individuals from Lucasys, as well.

8     Q.   The first conversation you had with Mr. Bailey,

9  was that before or after the NDA was entered into?

10     A.   I don't recall.

11     Q.   Can you tell me, what did you discuss on that

12  call?

13     A.   I believe it must have been before, because I

14  recall him requesting that we put an NDA in place --

15     Q.   Okay.

16     A.   -- to have a substantive conversation.

17     Q.   And what else do you recall from that

18  conversation?

19     A.   I recall him sharing his background and

20  professional work history.

21     Q.   Okay.  Anything else you recall from the

22  conversation?

23     A.   I think we -- I think it was a meet-and-greet.

24  I think he shared, maybe, where he was working from or

25  where he had been living at that time and commuting into

1    the office.  It was a meet-and-greet conversation.

2         Q.  And so then, subsequently there was a -- this

3    broader -- this broader discussion with the Utegration

4    team?

5         A.  That's correct.

6              (Exhibit 5 marked for identification.)

7    BY MR. FAZIO:

8         Q.  I'm handing you what's been marked as Exhibit 5

9    to your deposition.

10        A.  Yes.

11        Q.  Can you identify this document for me?

12        A.  (Witness examining document.)

13             Yes.  It's familiar to me.

14        Q.  So this was an exchange where you were --

15   between the Lucasys team and the Utegration team

16   concerning the agenda for the meeting you were going to

17   have?

18        A.  Yeah, I think it's -- it looks like it's the

19   administrative back and forth about -- including the NDA

20   and setting up the meeting, but yes, I see the proposed

21   agenda on there, as well.

22        Q.  Okay.  So if you go to the -- it's the second

23   page of the document, so it's the one that ends with

24   Bates stamp 15030.

25        A.  Yes.

1      Q.  Okay.  You'll see there's -- there's an

2   8:36 a.m. e-mail to the Lucasys team where he's saying,

3   "Henry asked me to forward the following proposed agenda

4   for our call on Tuesday."

5               Do you see that?

6      A.  I do see that.

7      Q.  Okay.  And then the one, two, three, four,

8   five, sixth bullet down, it says, "Competitor

9   positioning," comma, "PowerPlan risk," question mark.

10              Do you see that?

11     A.  I do see that.

12     Q.  Did you have an understanding as to what it was

13  -- what that topic of -- for the meeting was going to be

14  about?

15     A.  We did not.

16     Q.  I note that you say above -- you responded.

17  You say, "There is litigation pending," and you wouldn't

18  be able to discuss PowerPlan, its business or its

19  products.

20              At the meeting, was PowerPlan discussed at

21  all?

22     A.  No, we did not discuss PowerPlan.

23     Q.  And so when the -- was this a video call or

24  what was the -- how did the meeting actually take place?

25     A.  I don't recall.  It was probably some kind of

1    Zoom or Teams, but I don't recall if video was enabled

2    as part of that.

3        Q.   Okay.  And how long did the call last for?

4        A.   I don't recall.  I don't recall.  I don't

5    recall it being particularly long.

6        Q.   Okay.  Let's just run through.  If you look at

7    the first page, you'll see the third bullet down, it

8    says, "Value proposition for collaboration."

9        A.   Yes, I see that.

10       Q.   What was discussed around the value proposition

11   for collaboration between Lucasys and Utegration?

12       A.   Well, so, the call itself did not actually

13   follow this proposed agenda by Utegration.  So, for

14   example, regarding collaboration or even a potential for

15   collaboration, the only discussion on that call that I

16   can recall was just a confirmation that we are providing

17   products and services in auxiliary spaces, right.  So,

18   like I said before, they're not providing tax software,

19   and we're developing tax software.  So I recall

20   confirming those points with a wider audience.

21       Q.   Okay.  What else do you recall from the

22   meeting?  Regardless of whether it followed the agenda,

23   what were the rules of engagement?

24       A.   Yeah, so, most of the meeting was some slides

25   that Utegration showed us about their business.  So they

 1    were introducing us to the history of the company, the

 2    offerings that they have, the geographies that they work

 3    in, the key team members.  And I think there was an

 4    overview of their Finance4U solution.  That's my

 5    recollection, is that they presented slides.

 6         Q.  Okay.  And was there -- was there discussions

 7    around rules of engagement?

 8         A.  I don't know what that even means.

 9         Q.  So was there a discussion during the -- during

10    this call about low Lucasys and Utegration might

11    continue the conversations going forward?

12         A.  No.

13         Q.  All right.  Did you talk to Utegration during

14    that meeting about Lucasys' product roadmap?

15         A.  We did not present at the meeting.  I think we

16    confirmed, again, that our focus had been on tax

17    products.  I don't recall providing any insight into a

18    road map.

19         Q.  Okay.  Competitive position.  Did you discuss,

20    at all, Lucasys' competitive position within the market?

21         A.  No, we did not.

22         Q.  Was there any discussion around a tax

23    accounting finance for a joint proposition?

24         A.  Not -- no, not specifically a joint

25    proposition.  I recall a conversation -- or as part of

1    the conversation, Utegration highlighting that they

2    focus only on ASAP, and so they don't focus on the same

3    utilities, necessarily, that we focus on, since we would

4    focus on a broader set of utilities.  But there was no

5    proposition made at the meeting to us.

6        Q.  Okay.

7                (Exhibit 6 marked for identification.)

8    BY MR. FAZIO:

9        Q.  Sir, you're being handed what's been marked as

10   Exhibit 6 to your deposition.  It's an e-mail from

11   Mr. Bailey to you, dated 10/27/2021.

12               Do you see that?

13       A.  Yes, I do.

14       Q.  Okay.  I just want you to look down below, the

15   first paragraph.  There's a paragraph that begins, "From

16   the call, I noted the following highlights of Lucasys."

17   And it lists a number of issues.

18               Do you see that?

19       A.  I see that.

20       Q.  Okay.  And I want to ask you about a couple of

21   these, specifically.

22               First of all, does this refresh your

23   recollection at all about Lucasys' presentation

24   during -- or Lucasys -- positions Lucasys took during

25   the meeting?

1          A.   I'd have to read each one, but we did describe

2     what we were focused on at the meeting.

3          Q.   Okay.  You say in the middle there -- you see

4     there's not a bullet, but a dash.  It says, "You have a

5     dual-pronged approach to customer partnerships."

6                    What does that mean?

7          A.   I actually don't know what that means.  I can

8     tell you about how we work with our customers, but I

9     don't know what that meant in this e-mail in particular.

10         Q.   And the one down -- two down from there, "The

11    engagement model is to identify problems, generally,

12    with the customer."

13                    Do you see that line?

14         A.   I see it, yes.

15         Q.   Do you recall seeing that during the meeting?

16         A.   Let me read it, if you don't mind.

17                    (Witness examining document.)

18                    I don't recall saying that specifically,

19    but I think, in some ways, that's accurate.

20         Q.   Okay.

21         A.   Yeah.

22         Q.   And then the last bullet there, it says, "Due

23    to the litigation, Lucasys is operating in," quote,

24    "Half speed," closed quote, "Pending resolution."

25                    Do you see that?

 1        A.  I do see that.

 2        Q.  All right.  So was the litigation discussed

 3   during the meeting?

 4        A.  We were discussing our business and what we

 5   were doing in terms of marketing and sales, and so we

 6   had said that during this time period, we had a

 7   different sales and marketing approach.  I think that's

 8   what that's referring to.

 9        Q.  Okay.  Well, tell me, how did your -- how does

10   your -- how has your sales and marketing approach

11   changed since the litigation began?

12        A.  Well, we've been forced to be more conservative

13   in our resource deployment and allocation.

14        Q.  Why is that?

15        A.  We understood that the cost of litigation could

16   and would be substantial.

17        Q.  And so, when you say more conservative, what is

18   -- what do you mean you're more conservative?

19        A.  I mean we were spending less money on sales and

20   marketing activities.  I also mean that, for example, we

21   had rescinded a couple of offers for new employees, to

22   conserve capital, things like that.

23        Q.  Okay.  Whose offers did you rescind to conserve

24   capital?

25        A.  We had two -- we had two offers out to Georgia

 1   Tech graduates in -- sometime.  I'd have to recall, but

 2   it was summer of -- sometime.  It was in the summertime.

 3   I'm just trying to recall if it was last year or the

 4   prior year, but we had to rescind both of those offers.

 5       Q.  Okay.  So other than rescinding those two

 6   summer offers, how else have you been acting in a

 7   conservative fashion?

 8       A.  So in general, we have not pursued hiring to

 9   the pace that we would have otherwise pursued.  Yeah, we

10   have -- we've taken less risks as a business and wanted

11   to conserve the capital.

12       Q.  So what I'm asking you is:  What are the other

13   risks that you haven't taken?  What haven't you done

14   that you would have otherwise done as a result of the

15   litigation?

16       A.  Yeah, so, deployed more capital into, for

17   example, customer conferences, a website.  So kind of

18   all the marketing-facing items.  So we reduced our

19   operating expenses as much as possible during

20   litigation.

21       Q.  Other ways, other than reducing marketing

22   expenses, are there other ways that you've been more

23   conservative, if any?

24       A.  Yeah, absolutely.  We -- I mean, we -- we opted

25   not to, you know, pay certain benefits and compensation

 1    to our employees to conserve capital.

 2        Q.  What compensation and benefits did you forego

 3    to conserve capital?

 4        A.  Bonuses, retirement account contributions,

 5    things like that.

 6        Q.  And what year did that happen?

 7        A.  It happened, for sure, in 2021.  It may have

 8    happened in other years, as well.  I don't recall.

 9        Q.  Okay.  Anything else?

10        A.  Yeah, I think there were -- there were quite a

11    lot of decisions we were making in real time about what

12    to do and what not to do.  So, for example, yeah,

13    spending more on the technology, like the AWS

14    infrastructure, things like that.  We were trying to

15    keep our software development costs as lean as possible

16    during this time.  Reducing the spend on third-party

17    contractors during this time.  There are -- I think,

18    like I said, we were making almost daily decisions on

19    the business about how to really survive.

20        Q.  And Lucasys brought this lawsuit, true?

21        A.  Yes.  We got to a point in our business where

22    absent bringing this lawsuit, we would not have a

23    business.

24        Q.  Why do you say that, sir?

25        A.  Over a very short period of time, we had lost

1    very valuable customer contracts and entire customer

2    relationships based on PowerPlan's conduct in the

3    marketplace.

4         Q.   Okay.  And so you -- your judgment was that it

5    was better to invest in the litigation than invest in

6    the business?

7         A.   We understood that if there's no buyers of our

8    software, there's no business.  And so we understood

9    that until our target customers could understand that we

10   are -- that we are not a risky purchase, it didn't make

11   sense for us to go sell to someone who wouldn't buy.

12        Q.   Sir, if you look down at the list -- below the

13   list of bullets in Exhibit 6, Mr. Bailey says, "We felt

14   the discussion was very beneficial and would like to

15   take the next steps after a better understanding of the

16   litigation you mentioned, to avoid any issues as we

17   proceed."

18             What -- well, first of all, have there been

19   any further discussions with Utegration -- between

20   you -- Lucasys and Utegration?

21        A.   I believe, perhaps, our counsel may have had a

22   discussion with Utegration's counsel, and I think as a

23   result of that, Mr. Bailey informed us -- or informed me

24   that they were going to wait to have further

25   conversations with us.

 1          Q.  Wait until --

 2          A.  Wait until the dispute was resolved with

 3     PowerPlan.

 4          Q.  And so when was the conversation that you just

 5     mentioned?

 6          A.  With Mr. Bailey?

 7          Q.  Uh-huh.

 8          A.  I don't recall, exactly.  It would have been, I

 9     think, after a conversation with their counsel and our

10     counsel.

11          Q.  Okay.  So since that conversation with

12     Mr. Bailey, have you had any other -- has Lucasys had

13     any other contact with Utegration?

14          A.  We have not.

15          Q.  Do you know what documents were provided to

16     Utegration related to the litigation?

17          A.  I'm not aware that we provided any.  I don't

18     know about the conversations between counsel --

19          Q.  Okay.

20          A.  -- but we wouldn't have provided any.

21          Q.  I'm not asking you about anything you would

22     have learned from counsel.

23          A.  Okay.

24          Q.  So aside from what you've already told me, the

25     meeting with Mr. Bailey and the Utegration team, you

1    told me everything that you remember about the

2    litigation that was discussed in that call?

3        A.   Again, short of acknowledging that litigation

4    occurred, there was no conversation about the

5    litigation.

6        Q.   Actually, before we go on, was there anybody

7    present at the meeting that isn't listed on that e-mail?

8        A.   (Witness examining document.)

9             Not that I recall.

10       Q.   Let me switch gears a little bit.

11            (Exhibit 7 marked for identification.)

12   BY MR. FAZIO:

13       Q.   You're being handed what has been marked as

14   Exhibit 7 to your deposition.

15       A.   (Witness examining document.)

16       Q.   Do you have that in front of you, sir?

17       A.   I do.

18       Q.   Okay.  Are you familiar with this document?

19       A.   Yes, I am.

20       Q.   Okay.  If you'll just turn to the last page.

21       A.   Last page, yes.

22       Q.   So, you see your signature appears here?

23       A.   I do.

24       Q.   Okay.  And you say -- here you're verifying

25   under the pains and penalties of perjury that the

 1   answers contained in this document were true and correct

 2   to the best of your knowledge, information, and belief

 3   as of 16 November 2021?

 4        A.   I see that.

 5        Q.   So sir, we're going to get into the specifics

 6   of a bunch of these, but I just wanted to ask you before

 7   we begin:  Is there anything that you know of from these

 8   interrogatory responses as you're sitting here right now

 9   that you know needs to be updated?

10        A.   I don't know.

11        Q.   Okay.

12        A.   No.

13        Q.   That's fine.  Well, we'll go through them

14   individually, and we can talk through them.

15        A.   Yeah.

16        Q.   All right.  So let's go --

17             MR. ALLOY:  Just to be clear, you weren't

18   expecting him to go through all these right now --

19             MR. FAZIO:  No, I just was just asking him

20   if he knew off the top of his head.

21             MR. ALLOY:  Okay.

22             THE WITNESS:  Yeah.

23             MR. ALLOY:  I wanted to make sure that was

24   the question.

25             THE WITNESS:  Yeah.

```
 1    BY MR. FAZIO:

 2         Q.  All right.  Sir, can you go to -- let's go to

 3    Page 13.

 4         A.  (Witness complying.)

 5         Q.  I want to ask you specifically about Lucasys'

 6    response to the PowerPlan Interrogatory No. 12.

 7              You see there, it says that --

 8    Interrogatory 12, PowerPlan asked for Lucasys to

 9    "Identify each and every defamatory statement contained"

10    -- sorry.  Let me start again.

11              "Identify each and ever defamatory

12    statement alleged or referred to in counts 9 and 10 of

13    the Complaint, including the date of the statement, the

14    mode of transmittal of the statement, the specific

15    sender, and the receipt of the statement."

16              Do you see that?

17         A.  I see that.

18         Q.  Okay.  And then, below there is Lucasys'

19    response.  And you'll see that there are four bullet

20    points under 12.

21         A.  (Witness examining document.)

22         Q.  Now, we're going to go through each of these,

23    but I wanted to ask you before we did that:  Are you

24    aware -- as we sit here today, are you aware of any

25    other statements that you believe that PowerPlan made
```

 1    that were defamatory vis-à-vis Lucasys, other than the

 2    ones that are listed here?

 3        A.   Yes.

 4        Q.   Okay.  Tell me about those statements.

 5        A.   I'm aware of a campaign by and within PowerPlan

 6    to communicate to many utilities defamatory statements

 7    with regard to Lucasys.

 8        Q.   Okay.  And what -- are we talking about the

 9    letters that were sent out?

10        A.   Yes.

11        Q.   Tell me what you're talking about when you say

12    "campaign"?

13        A.   Yeah, so the letters come to mind, and sitting

14    here today, I think we've become aware through this

15    process, more than just letters, but maybe coordinated

16    talking points, if you will, to be used in

17    conversations.

18        Q.   Okay.

19        A.   Yeah.

20        Q.   Can you identify specifically for me any of

21    those conversations?

22        A.   I wasn't a party to those conversations, so

23    this was just what's kind of come through the discovery

24    process.

25        Q.   Okay.

1        A.   Yeah.

2        Q.   So this is something that you -- to the extent

3   you've learned of it, you've learned of it through the

4   litigation, not from any other source?

5        A.   I think that's generally the case.  I think

6   prior to the litigation, we had been told that -- that

7   there was a broad communication campaign from PowerPlan,

8   alleging the same types of things that had been alleged

9   to our existing customers.  So we had been aware that

10  there was a strategy in place to do that.

11       Q.   Let's go through these specifically, and then

12  we'll circle back to this.

13            So the first bullet point there, you'll see

14  there's an allegation about a conversation that

15  allegedly happened on or around November 7, 2019.

16            Do you see that?

17       A.   Yes, I see that.

18       Q.   Okay.  And it refers to PowerPlan employees,

19  Marc Botniker and John Budala and Jeff Hoersdig of AEP.

20            Do you see that?

21       A.   I do see that.

22       Q.   Okay.  First, I want to ask you:  How did you

23  become aware of this alleged conversation?

24       A.   My recollection is that the tax department at

25  AEP and, in particular, the management of the tax

 1   department had become aware of it.  Again, my

 2   recollection is that -- that -- that Jeff Hoersdig had

 3   informed the tax department of this conversation.

 4        Q.  Okay.  And so -- and who told Lucasys about the

 5   conversation?

 6        A.  I think it was one or all of the -- so

 7   Jimmy Llende, VP of tax, Kevin Keller was the director

 8   of -- in the tax department, and Kurt Mars was the

 9   managing director at the time.  One or all of them, I

10   think, referred to this conversation.

11        Q.  Okay.  And were any of them part of this

12   conversation?

13        A.  I don't know.

14        Q.  Did you ever talk to Mr. Hoersdig about the

15   conversation?

16        A.  I don't recall.

17        Q.  Did anybody from Lucasys ever try and confirm

18   this conversation with Mr. Hoersdig?

19        A.  We didn't see a need to confirm it with

20   Mr. Hoersdig.

21        Q.  So no, you -- no, no one from Lucasys ever

22   confirmed the conversation with Mr. Hoersdig?  Is that a

23   fair statement?

24        A.  Well, I did not, so I --

25        Q.  Well, there's only five people at Lucasys,

1  right --

2       A.  I understand.

3       Q.  So --

4       A.  I understand.  But I -- so I don't know if

5  anyone did.  I did not.  I'm not aware of anyone.

6       Q.  Would you expect if somebody from Lucasys was

7  inquiring of Mr. Hoersdig, that they would let you know

8  what they heard?

9       A.  I'm not aware of any conversations that

10  happened between Lucasys and Mr. Hoersdig after this

11  call.  Certainly we had conversations before that.

12       Q.  All right.  Now, what, specifically, were you

13  told about what PowerPlan allegedly said on this call?

14       A.  So, we were told that PowerPlan

15  representatives -- and I see the names here, but my

16  recollection is that it was the head of sales and the

17  CIO.  I don't know if those were the two individuals in

18  those roles, but that's my recollection now, is that it

19  was the head of sales and the CIO at PowerPlan who was

20  making statements to Mr. Hoersdig and, later, to the

21  individuals in the tax department that I named, stating

22  that Lucasys was stealing trade secrets, PowerPlan trade

23  secrets, presumably.

24       Q.  Okay.  Well let's go through this one sentence

25  at a time.

 1        A.   Sure.

 2        Q.   You say -- in the first sentence here, you're

 3   saying that during the phone call -- that there was a

 4   conversation that Lucasys potentially violated AEP's

 5   contractual obligations to PowerPlan, among other

 6   things.

 7             Do you see that?

 8        A.   (Witness examining document.)

 9             Yes, I see that.

10        Q.   Okay.  "Using PowerPlan potentially violated

11   AEP's contractual obligations to PowerPlan amongst other

12   things."

13        A.   Using Lucasys.

14        Q.   I'm sorry, yes.  Sorry.  Using Lucasys?

15        A.   Yes, I see that.

16        Q.   Okay.  So is that -- when that expressed that

17   to AEP, is there anything that is demonstratively false

18   about that?

19        A.   Well, so we understood that -- that PowerPlan

20   was seeking to exclude Lucasys from working with AEP

21   based on the contractual language that they purported to

22   have with AEP, and we understood that the reason was

23   because PowerPlan believed, or at least stated, that we

24   were stealing trade secrets.

25        Q.   Okay.  So let's -- the end of that sentence

1    there -- the sentence ends with, comma, "Among other

2    things."

3            Do you see that?

4        A.  I see that, yes.

5        Q.  Okay.  What were the "among other things" that

6    you were referring to there?

7        A.  Well, I think it's namely that, that -- that

8    the communication from PowerPlan to AEP was that Lucasys

9    was doing something illegal.

10       Q.  Okay.  So who -- who told you that PowerPlan

11   said that Lucasys was doing something illegal?

12       A.  Well, that Lucasys was stealing trade secrets,

13   which I presume may be illegal.  That's what I mean

14   by --

15       Q.  I'm just asking -- I want to know what the

16   words were that you heard.  I'm not asking for --

17       A.  No, I understand.

18       Q.  -- anything other than that.  So we're in the

19   conversation on or about November 7, 2019 --

20       A.  Yes.

21       Q.  -- with Mr. Budala, Botniker, and Hoersdig.

22       A.  Yes.

23       Q.  What have you been told about what,

24   specifically, PowerPlan said during that conversation?

25       A.  Again, we were told that the substance of the

 1  communication was that Lucasys was behaving

 2  improperly -- maybe I'll say it that way -- with

 3  PowerPlan's trade secrets, stealing those trade secrets

 4  or misappropriating them somehow, and that based on

 5  AEP's contract with PowerPlan, that that was somehow

 6  either a breach of contract or -- or that PowerPlan had

 7  a reason to exclude Lucasys from that relationship based

 8  on that contract.

 9       Q.  Okay.  Let's look at the next sentence.

10       A.  Okay.

11       Q.  It says, "Lucasys has reason to believe that

12  PowerPlan's employees told Mr. Hoersdig," comma, and

13  then it says, "And other AEP employees that Lucasys was

14  stealing trade secrets during that call and during a

15  subsequent meeting."

16       A.  Yes.

17       Q.  So let's break this the down.

18            So on the call, as far as you know, it was

19  just Mr. Hoersdig, Botniker, and Budala, correct?

20       A.  I don't know who else was on that call.

21       Q.  Okay.  Well, what was reported to you?  When it

22  was described -- the call was described to you, did they

23  describe anybody else being on the call?

24       A.  I don't think they gave me a list of everyone

25  on the call.  I think they indicated who was speaking

 1    and who was receiving that information.

 2        Q.   Okay.  And you personally were not part of the

 3    call, correct?

 4        A.   I was not personally part of that call.

 5        Q.   Okay.  And what you know about it comes from, I

 6    think you mentioned Mr. Llende, Mr. Mars, and there was

 7    one other person?

 8        A.   Mr. Keller.

 9        Q.   Okay.  You say, "In other -- so the last

10    sentence, "Lucasys has reason to believe that

11    PowerPlan's employees told Mr. Hoersdig and other

12    employees that Lucasys was stealing trade secrets during

13    the call and during the subsequent meeting."

14             Do you know when this subsequent meeting

15    occurred -- allegedly occurred?

16        A.   My understanding at the time was that it was in

17    close proximity to the initial conversation.

18        Q.   Do you know who participated in that meeting?

19        A.   My understanding was that it was a wider

20    audience and that, at least, Jimmy Llende was a

21    participant of that subsequent meeting.

22        Q.   Okay.  And how did you learn about the

23    subsequent meeting?

24        A.   From one or more of those individuals that I've

25    listed already.

     1          Q.  Okay.

     2          A.  Yes.

     3          Q.  And so what is it that you understand happened

     4     during that meeting?

     5          A.  My understanding is that during that subsequent

     6     meeting, that PowerPlan made the same or similar

     7     statements that they had done with the initial

     8     conversation.  And in that subsequent meeting, they had

     9     specifically identified Lucasys as the company that was

    10     causing AEP to be in some kind of violation of their

    11     agreement.

    12          Q.  Okay.  So -- and who told you that information

    13     specifically?

    14          A.  I think I heard it probably from more than one

    15     person.

    16          Q.  Okay.

    17          A.  Yeah.

    18          Q.  Which people told you that?

    19          A.  So again, Jimmy Llende, Kurt Mars, Kevin

    20     Keller.

    21          Q.  Okay.  And when did they tell you that?

    22          A.  In or around that same -- when the meeting

    23     happened.  We were actively engaged at AEP, and so we

    24     were interfacing with those individuals daily.  So it

    25     was in real time, not during the meeting, but certainly

 1   within days.

 2        Q.   And what did you do in response?

 3        A.   Well --

 4        Q.   If anything?

 5        A.   -- I think this was maybe a week after we had

 6   received a cease and desist letter from PowerPlan, and

 7   so we had already engaged counsel.  So we shared that

 8   information with counsel.

 9        Q.   Okay.  Did you do anything else?

10        A.   I recall -- I don't recall doing anything in

11   particular.  I just recall conversations with the

12   business, kind of confirming what we were and weren't

13   doing at AEP.

14        Q.   Okay.  And who did those conversations happen

15   with?

16        A.   The same individuals.  So it would have been

17   Kurt, Jimmy, Kevin.

18        Q.   Okay.  And how did they respond to you?

19        A.   How did they respond?  I think -- I think they

20   were shocked to have had those conversations with

21   PowerPlan, but in agreement with the scope and nature of

22   our services at AEP.  I mean, they were the ones we were

23   working with.

24        Q.   And did they express support for Lucasys?

25        A.   I think they expressed concern for AEP.

1        Q.   Okay.   Well, describe that for me.   In what way

2    did they express concern for AEP?

3        A.   Well, I recall them -- one or more of them

4    stating that AEP uses a number of third parties in its

5    accounting and tax functions and that the conversation

6    with PowerPlan created a risk for AEP that PowerPlan may

7    have -- may have that same allegation or conversation

8    with any one of their other third-party providers that

9    were critical to running their business.

10       Q.   Well, following that conversation, did AEP do

11   anything to -- you continued to work with -- strike

12   that.

13            Lucasys continued to work for AEP following

14   those conversations, true?

15       A.   We've had some type of working relationship

16   with AEP since that time, yes.

17       Q.   In fact, you've billed AEP almost ███████

18   since the beginning of your relationship with them?

19       A.   I don't know how much we've billed AEP since

20   the beginning of our relationship with them.

21       Q.   Is it something like -- in the ballpark?

22   ████████████████████████████?

23       A.   Again, I don't know how much.   We've certainly

24   had engagements in that size.

25       Q.   So after this -- after you spoke with the AEP

1    tax folks about this conversation that alledgedly

2    occurred between PowerPlan and AEP, was there any

3    discussion of the Lucasys/PowerPlan situation with AEP?

4        A.   Was there any discussion with AEP related to

5    the Lucasys/PowerPlan dispute?

6        Q.   Yeah.

7        A.   So, again, there was a conformation that the

8    scope of our services didn't create any risk to

9    PowerPlan's trade secrets.  I think there was a

10   conversation about that.  And there was a larger

11   conversation about a technology proposal that we had

12   provided to AEP and -- which they had selected for us to

13   move forward on.

14       Q.   Okay.  Well, we're going to talk about the

15   second thing in a minute --

16       A.   Okay.

17       Q.   -- but let's just circle back to this

18   confirmation that they -- so AEP -- I want to make sure

19   I heard what you said correctly.

20            So AEP confirmed to Lucasys that Lucasys'

21   work did not indicate any trade-secret issues?

22       A.   They confirmed that they were comfortable with

23   the services that we were providing, despite the dispute

24   or allegations.

25       Q.   Okay.  We're going to -- were going to circle

 1   back to AEP situation --

 2                    THE VIDEOGRAPHER:  I just need to change

 3   tapes very briefly.  It will take, like, ten seconds.

 4   Is that okay?

 5                    MR. FAZIO:  Yes.

 6                    THE VIDEOGRAPHER:  All right.  Off the

 7   record at 11:57 a.m.

 8                    (Off the record.)

 9                    THE VIDEOGRAPHER:  All right.  This begins

10   Media Unit No. 2.  We're back on the record at

11   11:57 a.m.

12   BY MR. FAZIO:

13        Q.  So other than -- just to close this situation

14   out, other than what we've already talked about, are you

15   aware of any other statements that you claim PowerPlan

16   made to AEP that were defamatory?

17        A.  We understood that the statements continued

18   periodically in the months that followed.

19        Q.  Okay.  Can you give me a specific example of

20   when such statements were made?

21        A.  I think at some point we were told that AEP had

22   received a letter -- well, if I take a step back.

23                    The meeting that we had talked about before

24   the break, the larger meeting, the feedback from that

25   was that Jimmy had told PowerPlan representatives to,

 1   essentially, put it in writing, right.  So, to not just

 2   state their allegations, but to put those in writing.

 3   And so then I think we heard sometime later that AEP had

 4   received some kind of written letter to that effect.

 5       Q.   Okay.  Anything else that you think was -- any

 6   other communications from PowerPlan, that you know of,

 7   that you think were defamatory?

 8       A.   Related to AEP, or just generally?

 9       Q.   Well, let's talk about AEP first.  We'll go

10   through everything, so --

11       A.   Okay.

12       Q.   -- let's focus on AEP.

13       A.   So, we understood that for a brief period of

14   time when we tried to work with PowerPlan to resolve the

15   dispute, and then subsequent to our initiating the

16   lawsuit, we -- that seemed to restrain PowerPlan's bad

17   conduct, so to speak.  So we heard less instances,

18   having filed a lawsuit, of defamatory statements being

19   made.

20       Q.   So what I'm asking, though, vis-à-vis AEP --

21       A.   Yeah.

22       Q.   -- specifically --

23       A.   Uh-huh.

24       Q.   -- are there any other statements that we

25   haven't already talked about?  You mentioned the letter.

1   We know about the letter.

2       A.   There may have been more than one letter.  We

3   understood that there was continuing dialog asserting

4   the same claims up until the time we had filed the

5   lawsuit.  And I think that included the week we filed a

6   lawsuit.  I think that was -- I recall, even, a sense of

7   urgency to file, because the false statements were

8   continuing even the week that we filed the lawsuit.

9       Q.   Now, sir -- but to be clear, AEP has continued

10  to engage Lucasys in various projects since then, right?

11      A.   In limited projects since then, that's correct.

12      Q.   Okay.  Well, we're going to get to whether they

13  were limited or not, but anything else about AEP

14  specifically, just about AEP?  Any other defamatory

15  statements that you're aware of -- specific statements

16  that you're aware of, related to AEP or that were made

17  to AEP?

18      A.   As I sit here at this moment, I don't recall,

19  but there may have been more.

20      Q.   All right.  So the next bullet down, you'll see

21  it says, "On around November 8th, 2019, during a

22  conversation, a representative of PowerPlan stated to

23  Leo Quintana, and possibly others of NextEra that

24  Lucasys was stealing trade secrets."

25                  Do you see that?

 1      A.  I do see that.

 2      Q.  Okay.  First of all, how did you come to learn

 3  of this alleged conversation?

 4      A.  We learned about this -- our -- our existing

 5  engagement and customer relationship was terminated

 6  suddenly on a Friday afternoon with a form letter from

 7  -- from NextEra, without warning.  That same afternoon,

 8  on a phone call with our business representative at

 9  NextEra, we were told that representatives of PowerPlan

10  had made these statements to Leo Quintana and others.

11      Q.  Okay.  And who is the business representative

12  that made this representation to you?

13      A.  So, that was Marie Hippert.

14      Q.  Okay.  And did Ms. Hippert represent that she

15  had been part of these conversations?

16      A.  I don't recall, but she represented that she

17  was very familiar with them.  So she was in charge of

18  tax technology at NextEra, so she would have been either

19  in or very familiar with those conversations.

20      Q.  All right.  I want you to tell me everything

21  that you can remember that Ms. Hippert told you about

22  this alleged conversation on November 8, 2019.

23      A.  Yeah, so I remember that -- I believe I had

24  texted Marie, maybe, or called her, but I didn't get a

25  -- I wasn't able to connect with her.  She had called me

 1  back.  But she called me later that Friday, because I

 2  had reached out to her, and she had said, Hey, I'm sorry

 3  that we had to cancel the contract like this.  It's out

 4  of my hands.  It's an IT decision.  PowerPlan said that

 5  you were -- with your access at NextEra, you were

 6  stealing trade secrets and using that --

 7  misappropriating those somehow to build software.

 8              I recall her saying that PowerPlan had

 9  stated that they had taken legal action against Lucasys.

10  I remember that in particular, because I had clarified

11  for Ms. Hippert that actually, we had -- there had been

12  no legal action taken.  We had received a letter from

13  PowerPlan.

14              And I recall Ms. Hippert just saying that,

15  We're sorry but there's nothing we could do,

16  essentially, that we had to cancel the contract based on

17  what PowerPlan told us.

18      Q.  So did she identify the person -- the, quote,

19  representative, unquote, of PowerPlan that allegedly

20  made these statements?

21      A.  My understanding was that there were multiple

22  representatives of PowerPlan, but I don't recall her

23  providing names.

24      Q.  So you can't tell me today who was -- from

25  PowerPlan was part of this conversation?

1        A.  If she told me, I don't recall.

2        Q.  Okay.  Was there anyone other than Mr. Quintana

3    involved in this alleged conversation?

4        A.  So Ms. Hippert may have been, I don't recall.

5    Again, she was giving me her firsthand account of those

6    conversations, but I don't know if she was in -- I don't

7    even know if there was only one conversation.  There may

8    have been more.  But she had specifically referenced a

9    conversation, and I recall her mentioning Leo's name.

10       Q.  And how did you know whether this conversation

11   happened on or around November 8th, 2019?

12       A.  Well, I don't know what day of the week that --

13   November 8th is.  We'd have to look it up, but the

14   Friday -- the first Friday in November was the day that

15   the contract was terminated.  Well, that first full week

16   in November, and so that would have been the day that I

17   spoke with Ms. Hibbert and my understanding was that the

18   conversation -- I think she must have given me the date;

19   that's why we have it here.  But the conversations were

20   happening during that week.

21                I recall, for example, that she had been

22   asked of her -- internally, the question regarding

23   whether Lucasys had informed her that PowerPlan had

24   taken legal action against Lucasys, and that her

25   response was that, no, Lucasys had not informed her, to

 1   that effect, and that that contributed to their

 2   termination of the contract.

 3        Q.  But she never identified who these people from

 4   PowerPlan were?

 5        A.  I don't recall.

 6        Q.  Okay.  Did you do anything -- or anyone from

 7   Lucasys ever do anything to reach out to Mr. Quintana

 8   and find out from someone who participated in the

 9   meeting what was said?

10        A.  Yes.  So we did follow up with a couple of

11   e-mails through the supply chain organization that was

12   managing the contract.  I believe the first went

13   un-responded to, and then at some point, they said, We

14   can't discuss, based on the dispute or something.  We

15   can't give you any details.

16        Q.  And so, would those -- so your recollection is

17   that somebody from NextEra sent you an e-mail that said

18   that they couldn't discuss it with you because of --

19   they couldn't give you any details?

20        A.  Yes.  So the individual from supply chain that

21   sent us the term -- contract termination letter, that it

22   was that individual who said that because of -- of the

23   legal issues or the dispute or something to that effect,

24   that they can't provide any -- they can't give us any

25   information.  We were trying to get context, because we

1    understood that this was at least the second Lucasys

2    customer that -- where these communications were had,

3    and we understood that our entire business was now at

4    risk, that it wasn't a one-off conversation with AEP,

5    that this was a pattern.  And so we were trying to

6    understand what led NextEra to make this decision

7    without having consulted with Lucasys.

8        Q.  Did you ever just pick up the phone and called

9    Mr. Quintana?

10       A.  I don't know if I had Mr. Quintana's contact

11   information.

12       Q.  Did you ever ask Ms. Hippert for it?

13       A.  Well, my understanding was that the

14   relationship was terminated.  So the supply chain e-mail

15   stated, in no uncertain terms, that there's no more

16   relationship between NextEra and Lucasys.

17       Q.  Okay.  And that was an e-mail that was sent to

18   you?

19       A.  Yes.

20       Q.  Let's talk about Liberty, the next bullet down.

21   "April 23, 2020, during a telephone conversation, a

22   PowerPlan agent stated to Luisa Reed of Liberty

23   Utilities that Lucasys was misappropriating confidential

24   information and stealing trade secrets."

25               First of all, how is it that you came to

 1    learn of this alleged conversation?

 2        A.   I was part of a conversation with Ms. Reed --

 3    with Luisa Reed when she described that telephone

 4    conversation.

 5        Q.   Okay.  And who was the PowerPlan agent?

 6        A.   I don't recall if she stated to us who that

 7    was.

 8        Q.   Was it a PowerPlan employee?

 9        A.   That's my understanding.

10        Q.   Okay.  So do you know why it says "agent" here?

11        A.   I don't know the difference between -- I don't

12    know why that says "agent."  My understanding is that it

13    was a representative of PowerPlan.

14        Q.   So you had a specific conversation with

15    Ms. Reed --

16        A.   Uh-huh.

17        Q.   -- about this conversation?

18        A.   Yes.

19        Q.   Okay.  And did she tell you during that

20    conversation that -- the identity of the person from

21    PowerPlan who had contacted her?  Whether or not you can

22    recall it today, I'm asking you if she told you?

23        A.   Yeah, so I recall that she told that there --

24    it was not a one-on-one conversation; it was a group.

25    So there were people from PowerPlan and from Liberty --

1      Q.  Okay.

2      A.  -- on a call, where PowerPlan made statements

3  to Liberty about Lucasys misappropriating trade secrets

4  and how it was improper for Liberty to contract with

5  Lucasys.

6      Q.  Okay.  What else did she tell you about it?

7  Did she tell you who else from Liberty was on that call?

8      A.  Did she?  The name escapes me, but I believe

9  there was another woman who was in charge of the project

10  as a whole, who was on that call.  I don't recall.  I

11  recall it was the project team.  So this was in the

12  context of next project, so it would have been the

13  project leadership team for that project.

14      Q.  Okay.  So you think it was -- as you understand

15  it, there was more than one Liberty person and more than

16  one PowerPlan employee involved in this conversation?

17      A.  That was my understanding.

18      Q.  Have you done anything to confirm the content

19  of this alleged communication?

20      A.  Have we done anything to confirm the content?

21  I mean, we spoke with Ms. Reed, who was part of that

22  conversation.

23      Q.  Okay.  So this was the one conversation -- you

24  had one conversation with Ms. Reed about this?

25      A.  I personally had one conversation, I believe.

 1    I believe other Lucasys employee had multiple

 2    conversations.

 3         Q.   Okay.   What other Lucasys employees would have

 4    had conversations with Ms. Reed?

 5         A.   I believe that Mr. Chang had more than the one

 6    conversation with either Ms. Reed or other members of

 7    that project team.

 8         Q.   Okay.   Based on your personal knowledge, beyond

 9    what we see here and what you've just told me, you don't

10    know anything about this alleged April 23, 2020,

11    conversation?

12         A.   No, that's not correct.

13         Q.   Okay.   What else did you know about it?

14         A.   So, Ms. Reed stated that she had asked the

15    PowerPlan representatives on the call whether Liberty

16    would be able to work with Lucasys on future engagements

17    outside of the project in question, and that the

18    response to Ms. Reed was that if Liberty chose to

19    contract with Lucasys, and if at any time in the future

20    Lucasys developed competing software, that that would

21    put Liberty at risk, because Lucasys may have

22    misappropriated or stolen trade secrets while they were

23    engaged with Liberty.

24         Q.   Okay.   Anything else you remember from that

25    conversation?

 1       A.  I remember her being apologetic, again, about

 2   having to terminate the contract.  I remember that --

 3   that after that conversation, or as part of that

 4   conversation, it was indicated that our involvement with

 5   the project would cease immediately.  And, again, this

 6   was -- this conversation with Ms. Reed happened

 7   immediately after a short time period when we tried to

 8   resolve the dispute with PowerPlan without litigation.

 9   So, immediately after that, this conversation occurred

10   and confirmed to us that there was a broad strategy to

11   make such statements to every Lucasys customer, this

12   being now the third one, at least.

13       Q.  All right.  So sir, last bullet point here, you

14   see down -- at the very last one, it says, "On or around

15   May 29, 2020, during a telephone conversation, Joe" --

16   it says Gomes here, "And Brett Burts on behalf of

17   PowerPlan stated to Mohamad Zarhuni -- did I say that

18   right?

19       A.  I believe that's right.

20       Q.  "And Michael Salas of SUEZ, that Lucasys was

21   misappropriating confidential information."

22       A.  (Nodding yes.)

23       Q.  First of all, can you tell me, how did you come

24   into this information, this alleged conversation?

25       A.  So, I believe we learned about this

 1    conversation from a couple of different avenues.  I

 2    believe that -- well, my personal knowledge of it came

 3    from a conversation with Mr. Salas, subsequent to this

 4    conversation, but I believe that Mr. Zarhuni had at

 5    least one conversation with Mr. Chang about this

 6    conversation, as well.

 7         Q.  Okay.  And Mr. Zarhuni, he goes by "Rali"?

 8         A.  He does.

 9         Q.  Okay.  So you had a direct conversation with

10    Mr. Salas, where you addressed this issue about the

11    telephone conversation on or about May 29, 2020?

12         A.  That's correct.  I think it was a wider -- it

13    was not just me and Mr. Salas, I believe there were

14    other SUEZ representatives and may have been other

15    Lucasys representatives.

16         Q.  Okay.  Let's focus on this conversation.  What

17    did he tell you about this alleged telephone

18    conversation with Mr. -- it says "Gomes."  I'm pretty

19    sure that it's supposed to refer to Gomes?

20         A.  Gomes.  Uh-huh.  Sorry.

21         Q.  -- and Mr. Burts.  What did he tell you about

22    that conversation?

23         A.  He described that conversation as being very

24    similar to the conversations we heard from the other

25    customers, but specifically that PowerPlan leadership,

 1  executive leadership, had connected with SUEZ leadership

 2  to make claims of misappropriation, trade secrets

 3  infringement by Lucasys related to the PowerPlan

 4  software, and that SUEZ's use of Lucasys was either

 5  improper or some -- or a breach of their agreement.

 6      Q.  Okay.  Anything else he told you about it?

 7  About this alleged conversation?

 8      A.  Well, I recall Mr. Salas describing the

 9  critical nature of the project that we were doing at the

10  time, and that he didn't want any disruption to that

11  project.  I recall confirmation, again, about scope of

12  what is Lucasys doing versus what is Lucasys not doing,

13  right, so -- and I understood that SUEZ would be

14  continuing conversations with PowerPlan on this matter

15  to try to maybe clarify what Lucasys was or wasn't

16  doing.

17      Q.  And following this conversation, Lucasys

18  remained engaged at SUEZ, true?

19      A.  I believe we continued that project, but we

20  don't currently have any relationship with SUEZ.

21      Q.  And did they -- has anybody from SUEZ told you

22  why you don't have a current relationship with them?

23      A.  Well, we understood during that conversation

24  that that project was too critical to cancel, and I

25  recall Mr. Zarhuni, at one point, making a statement to

 1    the effect of, If we knew this was an issue before this

 2    project, we may have gone with another vendor.

 3        Q.  But I want to -- I'm asking you a specific

 4    question now.  Has anybody from SUEZ told you that

 5    you're not engaged there currently because of anything

 6    that PowerPlan has done?

 7        A.  Again, I'm stating that SUEZ indicated that

 8    they would not have contracted with Lucasys had they

 9    known the dispute would arise.

10        Q.  All right.  And that was almost a year before,

11    true?  It took you about a year to do the SUEZ project?

12        A.  That's probably true, but I don't know how far

13    in we were in May of 2020.

14        Q.  Okay.  But the question I asked you was

15    specific.  Nobody from SUEZ has told you that they're

16    not engaging with you today because of the PowerPlan

17    situation.  Is that a true statement?

18        A.  We don't know why SUEZ is not engaging with us

19    today.  We only know that SUEZ indicated they would not

20    have engaged with us if they had known --

21        Q.  Have you asked them?

22        A.  -- that this would --

23        Q.  I'm sorry.

24        A.  Sorry?

25        Q.  I'm sorry I interrupted you.

1          Have you asked them why they're not engaged

2  with you right now?

3      A.  We've given them proposals for engagement, yes.

4  We don't typically ask our customers, you know, all the

5  reasons that they say no to proposals.

6      Q.  They've invited proposals from Lucasys since

7  the end of this -- the large project you were working

8  on?

9      A.  Well, I think there were some pending

10  proposals, as of this date, that we continued to try to

11  work through.

12      Q.  But I'm saying even -- even today, has Lucasys

13  been invited to bid on any SUEZ work?

14      A.  No.  I mean -- I mean that the proposals that

15  we had in place at the time of this conversation, that

16  we were not able to engage --

17      Q.  We'll get back -- we'll get into those in a

18  bit.

19      A.  Okay.  It's almost 12:30.  Do you want to take

20  a lunch break?

21          MR. ALLOY:  Yeah, it's up to you.  If you

22  want to go a little longer, maybe that works --

23          MR. FAZIO:  It's actually kind of a logical

24  spot to --

25          MR. ALLOY:  Okay.  Yeah, so let's break.

1              MR. FAZIO:  -- break.

2              MR. ALLOY:  Yes.

3              MR. FAZIO:  Can we do, like, 45?  Or is

4    that too tight?

5              MR. ALLOY:  It might be a little tight, but

6    we'll try.

7              MR. FAZIO:  Let's say an hour, but if we

8    can do it closer --

9              MR. ALLOY:  Yeah.  Yeah, yeah.

10             THE VIDEOGRAPHER:  Okay.  Off the record at

11   12:20 p.m.

12             (Off the record.)

13             THE VIDEOGRAPHER:  All right.  Back on the

14   record at 1:15 p.m.

15   BY MR. FAZIO:

16     Q.  All right.  Sir, let's switch gears just a

17   little bit.  I want to ask you:  Has Lucasys developed a

18   product roadmap for its software products?

19     A.  We have contemplated a number of products, so

20   what -- I'm not sure if I'm understanding your question.

21     Q.  Well, you said -- do you have a document, for

22   example, that outlines Lucasys plans in terms of

23   software development from this point going forward?

24     A.  I think we probably have documents based on

25   individual products.  I don't know that we have a -- I

1    don't know if we have a comprehensive product roadmap

2    document.

3         Q.   Okay.  And as we sit here today what, are the

4    software products that Lucasys has developed?

5         A.   We have at least four customer-facing products

6    and then a couple of other technology tools that we've

7    developed, so those exist.  Those -- those products are

8    the Copilot software.  They are what we call Nova --

9    which is N-O-V-A -- tax basis balance sheet automation.

10   A deferred tax solution, and currently in progress is a

11   depreciation solution.  And then outside of those

12   customer-facing products, we have some tool kits that

13   we've developed for customer acquisition, marketing

14   purposes, as well as a analytic solution that's intended

15   for our -- to enable our services.

16        Q.   And as we sit here today, has -- has any

17   software product that has been developed by Lucasys been

18   licensed by any client?

19

20

21

22

23

24

25        A.   (Nodding yes.)

1     Q.  So they're licensing that software from you?

2     A.  They have -- so, yes.  That's the goal, is that

3  with the completion of this project, that they would

4  begin their license of that software at the completion

5  of this project.

6

7

8

9

10

11     Q.  Okay.  And when the -- is this a project that

12  is currently underway?

13     A.  It is.

14

15

16

17

18

19

20

21     Q.  Okay.  I promise you, we're going to get to

22  those.

23     A.  Sure.

24     Q.  We're going to get to them.

25     A.  Yeah.

Trustpoint.One  Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

 1        Q.  So let me ask you about Copilot.  First of all,

 2   is Copilot -- at this point, is it fully developed and

 3   ready for deployment at customers?

 4        A.  It is.  So, Copilot has a configuration

 5   component, right, that depends on the customers's

 6   business processes data.  And so there's -- there is

 7   some amount of configuration and surrounding development

 8   that is project specific.

 9        Q.  Has Lucasys attempted -- so we're -- we've

10   talked about AEP.  We've talked about NextEra.  We've

11   talked about Liberty, the big four that we were dealing

12   with earlier, but aside -- setting those aside for a

13   moment, has Lucasys attempted to sell Copilot to any

14   other -- or licensed Copilot to any other customers?

15        A.  Yes.

16        Q.  Okay.  What other customers have you attempted

17   to license it to?

18        A.  So we performed demos of the Copilot product

19   and had conversations with a number of companies.  ███

20   ████████████████████████████████████████████████████

21   ██████████████████████   █████████████████████████████

22   ████████████████████████████   ███████████████████████

23   ██████████████████████████████████████████  I

24   know we demoed our other products, and I believe Copilot

25   was part of that demonstration there, as well.  There

1   may have been others.

2       Q.   In -- after these demos, has there been any

3   feedback given to you by any of these customers as to

4   why they were electing not to license it?

5       A.   We've had general feedback from customers about

6   why they were choosing not to pursue engagements with

7   Lucasys at this time.

8       Q.   Okay.  And tell me about those conversations.

9       A.   So, in -- so, we interact with our customers

10  through a couple different mediums; it's the demos that

11  we talked about, but we also engage with customers at

12  various industry conferences and the like, and so -- so,

13  in particular, ████████ comes to mind, where we had

14  performed a number of product demos.  The feedback that

15  we got was that they need to wait until the -- the

16  cloud, the legal cloud, had lifted.

17      Q.   Okay.  Did they give you any other explanations

18  as to why they weren't interested in Copilot?

19      A.   No, they did not.

20      Q.   And the implementation of Copilot at ████████

21  would that have been related to the PowerPlan product?

22      A.   I think at ████████ we had proposed or demoed a

23  number of solutions jointly.  I believe we had showed

24  them the deferred tax solution, as well.  So I don't

25  recall if we had identified the specific business

 1    processes that ███ may have used Copilot for.

 2        Q.  And are there products out there that compete

 3    with Copilot?

 4        A.  There are certainly products that help with

 5    automation.  Copilot is much more of a focused solution

 6    that seeks to take processes out of Excel and other

 7    manual processes and automate them.  So I would say the

 8    closest competitor to Copilot is Excel.

 9        Q.  So, I did want to circle back to our discussion

10    about NextEra.  There's a -- if you look at Page 6,

11    Lucasys' response to Interrogatory No. 6.

12        A.  I'm sorry, where are we -- are we on --

13        Q.  Page 6 --

14        A.  Of the same document --

15        Q.  Yeah, Exhibit 7.

16        A.  -- that we were on?

17             Exhibit 7, Page 6.  Okay.  I'm here.

18        Q.  Okay.  Do you see down at the first bullet

19    point, under where it says, "Copilot," the last sentence

20    says, "But for PowerPlan's actions, Lucasys would have

21    licensed Copilot at the completion of the NextEra

22    contract."

23             Do you see that?

24        A.  I see that.

25        Q.  So at the time that NextEra canceled its

 1    contract with Lucasys, did -- had NextEra already

 2    entered into a licensing agreement with you for the

 3    Copilot product -- or with Lucasys for the Copilot

 4    product?

 5        A.  So, this indicates that the licensing agreement

 6    would have come at the completion of the existing

 7    contract.

 8        Q.  So it did not exist as of the time the contract

 9    was terminated?

10        A.  So, during that contract we had completed a

11    design phase for Copilot, we had begun a build phase for

12    Copilot.  We had identified additional business

13    processes in scope, and I believe we were right at the

14    point where we had come to an agreement on a expansion

15    of the project or project change order related to those

16    additional -- so, in summary, NextEra had committed to

17    pursuing the Copilot solution, had begun to invest money

18    to that end, and the licensing occurs or starts once the

19    product is deployed to the end user.

20        Q.  Okay.  And had you reached an agreement with

21    NextEra as to how much it was going to cost?

22        A.  We had provided the pricing information to

23    them, yes.

24        Q.  Okay.  And had they agreed to the pricing?

25        A.  Yeah, they had continued the project to

1    implement the software, knowing the pricing information.

2         Q.  So, let's go down.  The next bullet point

3    there, it's a reference to the deferred tax product?

4         A.  Yes.

5         Q.  Okay.  And tell me, you mentioned ████ is one

6    that you've demoed this product to.

7              What other customers have you demoed the

8    deferred tax product to?

9         A.  ███████████████████████████████████████████

10   ████████████████████████████████████████████████

11   █████████████████████████    ██████████████████████

12   ████████████████████████████████    I think we

13   may have had an informal demo with NextEra.  I recall we

14   proposed the deferred tax solution for some of their

15   transition -- I'm sorry, transmission companies where

16   they were looking for a technology solution, so I recall

17   that occurring.  Like, there were a number.  We are --

18   again, our approach has always been to start our

19   customer relationships, provide good services, and then

20   provide options for the customer in terms of products in

21   the context of those relationships.

22        Q.  Is the deferred tax product, is it a complete

23   saleable product, as of today?

24        A.  Yes, it is.

25        Q.  And so are there features and functions of it

1  that you intend to include that don't currently exist

2  within the product?

3      A.  I think any software has -- I think you

4  mentioned a roadmap, so some kind of opportunity to

5  improve upon the existing features and functions.  So I

6  think there's -- I think we would contemplate, with any

7  of or solutions, that we would continue to invest into

8  them and make them better.

9      Q.  And this particular tax product, is it -- do

10  you consider it a replacement for any PowerPlan software

11  module?

12      A.  We believe that the deferred tax solution that

13  we offer would provide the technology solution for

14  deferred tax requirements.  Now, to the extent

15  PowerPlan's PowerTax software meets any of those

16  requirements, this certainly would be, or could be,

17  considered a replacement; however, the Lucasys deferred

18  tax solution, I believe, has much more functionality

19  than, let's say the equivalent PowerTax solution.

20      Q.  So when you market to potential customers, do

21  you say to them, If you adopt deferred tax, you can drop

22  -- you can drop PowerTax?

23      A.  So, we tell them that if you adopt Lucasys

24  deferred tax, you can use any tax depreciation software

25  that you choose.  That may be PowerTax.  It may be any

 1   of the other software vendors that create tax

 2   deprecation software.

 3       Q.   In Lucasys' deferred tax product, does it -- if

 4   you have an existing PowerTax customer, does the

 5   deferred tax product require information from the

 6   PowerTax module to operate?

 7       A.   The deferred tax product requires data from the

 8   customer related to its tax fixed assets, regardless of

 9   where that data is sourced.  It also, similarly,

10   requires the accounting data, again, regardless of where

11   that data source.

12       Q.   So if it needs to get the data from a PowerPlan

13   data table, how does it go about getting it?

14       A.   So, our general strategy for getting data into

15   and out of any Lucasys product is to allow the end users

16   to configure what that looks like.  So, I'm not involved

17   in the software development, so I'm going to try to

18   explain it in, like, layman's term, as I understand it,

19   but it's allowing the users of the application to

20   configure the connections that they need to their other

21   databases, or wherever the data is coming from; files,

22   locations, past, things like that.

23       Q.   And so that's something that the end user does?

24       A.   Either the end business user, or in conjunction

25   with the utilities' internal IT function.

1        Q.   Same -- is it the same process for getting

2   information from deferred tax back into, for example, a

3   PowerPlan data table?

4        A.   I don't think there's any use case that we've

5   identified where an output from the deferred tax system

6   would go back into a PowerPlan table.

7        Q.   You say at the last sentence there, "But for

8   PowerPlan's actions, Lucasys would have licensed

9   deferred tax to AEP as a result of winning the bid to

10   build a new tax fixed asset solution."

11              Do you see that?

12        A.   I do see that.

13        Q.   Okay.  And is that a reference to the -- to the

14   RFP that AEP put out in July of 2019 for tax fixed asset

15   support?

16        A.   So I don't know the exact date, but it would

17   have been in 2019, yes.

18        Q.   Okay.

19        A.   An RFP for a tax fixed asset solution, I

20   believe.

21        Q.   I keep promising, but eventually we're going to

22   get to that.

23        A.   Yeah, sure.

24        Q.   How much -- how much have you invested in

25   development of the deferred tax product?  And when I

1    say -- for the purposes of today, when I say "you," I'm

2    referring to Lucasys broadly.

3         A.   Yes, I understand.  Thank you.

4              So, our development efforts have been kind

5    of start and stop.  As we've lost contracts where a

6    particular solution was in focus, like Copilot and

7    NextEra, we've had to refocus our development efforts to

8    the next product that was most likely to be adopted by

9    utility.  So it's difficult for me to sit here and say

10   with certainly what we invested in any particular

11   product --

12        Q.   Uh-huh.

13        A.   -- as a result.  But I do know that -- that in

14   total, we've spent well over ███████ on developing

15   these four products.

16        Q.   Okay.

17             MR. ALLOY:  Can we pause for one second so

18   I can dial back in?  I'm really sorry, the connection

19   disappeared.

20             THE VIDEOGRAPHER:  Do you want to go off

21   the record?

22             MR. FAZIO:  Yes, please.

23             THE VIDEOGRAPHER:  Okay.  Off the record at

24   1:33 p.m.

25             (Off the record.)

 1                    THE VIDEOGRAPHER:  Okay.  Back on the

 2     record at 1:34 p.m.

 3     BY MR. FAZIO:

 4          Q.  Sir, just before our quick break, we were

 5     talking about the amount of money that's been invested

 6     in the development of the various software products, and

 7     you had mentioned that you believe it's in excess of

 8     ██████████, true?

 9          A.  That is correct.

10          Q.  Okay.  Tell me, how did you come up with the

11     ██████████ number?

12          A.  So, I believe that we had computed it at some

13     point during this dispute, maybe in response to a -- to

14     one of these interrogatories.  I don't recall for sure.

15     But that involved identifying which line items on our

16     profit and loss might -- or are either wholly related or

17     partially related to the development of software.  So

18     our -- one of our biggest costs is, of course, labor, so

19     we can identify the individuals that are either

20     employees or contractors helping with that effort and

21     segment those costs that way.

22                    We can identify the development support

23     cost, so the licensing of development software, fees for

24     hosting the software, things like that.

25          Q.  And you've used third-party developers to

 1  assist in the development of those software?

 2      A.  We have, at various stages.  So we primarily

 3  have used third-party developers to assist with the

 4  design phases and then taken the development of the

 5  software inhouse.

 6      Q.  Okay.  And who is -- who are those third

 7  parties?

 8      A.  So, we've primarily used a firm called

 9  AltexSoft for the design, layout, the way the software

10  looks like at the user interface.  Early on, we also

11  contracted with a firm, I think they're called

12  Pavans Group.  I think they helped with some of those

13  non-customer-facing technologies that are more marketing

14  focused.  I believe those are the only two.

15      Q.  And just to be clear, when we were talking

16  about the ███████ estimate -- well, first of all, the

17  third parties -- can you estimate for me how much you've

18  paid to the third parties in development costs?

19      A.  Not with certainty.  ████████████████████████

20  ████████████

21      Q.  And those would be costs that would be recorded

22  in the profit and loss statements?

23      A.  That's correct.

24      Q.  And to be clear on the internal costs, are you

25  -- when you're estimating those costs, are you applying

 1   a set rate to those people, or is it just the direct --

 2   you're allocating direct costs?

 3        A.   Clarify that question.

 4        Q.   So if you have somebody who is making $100,000

 5   a year and 80 percent of their time is on soft -- works

 6   on -- it's worked -- I'm sorry, dedicated to software

 7   development --

 8        A.   Uh-huh.

 9        Q.   Are you allocating $80,000 to the software

10   development costs or are you using a rate times the

11   number of hours they've committed?

12        A.   It would be their total compensation based on

13   their contribution to the software development.

14        Q.   Okay.

15        A.   So maybe the first example that you used.

16        Q.   Yeah.  So you're allocating expense, you're not

17   --

18        A.   Correct.

19        Q.   Okay.  So depreciation.  Tell me about the

20   depreciation tool.  What does that do?

21        A.   So, depreciation is cloud-based software that

22   computes depreciation for any jurisdiction, so tax or

23   accounting purposes, related to fixed assets.  It --

24   yeah.  I think that's a good explanation.

25        Q.   If you look at the last sentence of that blurb,

```
 1   as well, you say, "Lucasys would have licensed

 2   depreciation to AEP as a result of winning the bid to

 3   build a new tax fixed asset solution."

 4              Do you see that?

 5        A.  I do.
```

 6

 7

 8

 9

10

11

12

13

14

15

```
16        Q.  Okay.  Well -- so if you turn over to Page 8.

17        A.  Yeah.

18        Q.  Do you see the response to Interrogatory 7?

19   You see it says, "Depreciation."  It's the last bullet

20   point on that page?

21        A.  Yes, I see it.

22        Q.  And you say, "Depreciation design and

23   development began in 2021."

24        A.  Yes.

25        Q.  Do you see that?
```

 1      A.   Yes.

 2      Q.   So does that refresh your recollection as to

 3   whether or not it existed in 2019?

 4      A.   It helps.   So this date would have been tied to

 5   when we contracted with AltexSoft our formal design.

 6   Clearly, as part of the response to AEP, we had

 7   contemplated or that had been in our plans as a company,

 8   to move in that direction, back in 2019.

 9      Q.   Was there any -- had there been any development

10   towards a product in 2019?

11      A.   So again, our products share common elements,

12   so there's some amount of development that would have

13   already been shared across multiple products that would

14   have existed in 2019.   So -- I don't know if that

15   answers that question.

16      Q.   Well, I'm just trying to understand how it

17   could have exited in 2019, when Page 8 you say its

18   design and development began in 2021.   So in 2019,

19   you're -- explain to me, what existed in 2019 with

20   respect to the depreciation product?   Was it just an

21   idea?

22      A.   So I'd have to refresh my recollection, but I

23   believe back in 2019, we had already communicated, not

24   only internally, but to the market, that we were

25   interested in pursuing a depreciation solution.   I think

1    both through our website -- I think through our existing

2    technology we had already put in, like, the placeholder

3    and navigation items to navigate to a depreciation

4    solution.  So what I mean to say is that there's some

5    core architecture that is shared among all modules that

6    was in place, and we had not yet begun to build out the

7    tax depreciation solution within the Lucasys platform.

8         Q.  So this -- you mentioned marketing efforts.  I

9    mean, you were marketing the existence of deferred tax

10   and depreciation as products in 2019?

11        A.  We were marketing that these were problems that

12   we were interested in solving.

13        Q.  And when you were saying they were problems

14   that you were interested in solving, isn't it true that

15   on your website, you described having software built to

16   address those problems?

17        A.  I think we described our software, generally,

18   as having software in this area and space of tax fixed

19   assets.  I think to the extent we had developed, at any

20   point in time, any kind of mock-ups, right, or design,

21   that we were comfortable sharing with the market.  We

22   did that both through conversations and through the

23   website, as well.

24        Q.  So in your conversations or on the website, was

25   there any place that you made clear that, as of 2019,

1    for example, that these products were not necessarily

2    fully developed and ready for implementation?

3         A.  So are -- so we're talking about enterprise

4    software, right?  So nobody's purchasing a product from

5    our website.  So the website is a lead generation tool

6    to have a conversation with the customer, and then with

7    the conversation with the customer then we talk about

8    the timeline that we can create the needed solution for

9    that customer.

10        Q.  Right.  So basically, you were trying to get

11   customers interested in the product and then you were

12   going to build it after there was an expression of

13   interest?

14        A.  So I think in general, our strategy for

15   software development is to solve real problems that

16   exist and where value has been demonstrated, and we see

17   that best when there is a customer that will partner

18   with us to realize that value.

19        Q.  And so, if a third party was looking at your

20   website in 2019 and saw that -- the way that you had

21   presented these products, absent a follow-up

22   conversation with you about having to development and

23   implement them for specific problems, how would somebody

24   know that you didn't have saleable software ready to go

25   as of that moment in time?

 1        A.  I'm not -- I think you're asking me to infer

 2   how a third party --

 3        Q.  Well, I mean, you're representing -- your

 4   website -- in 2019, on your website, you were

 5   representing that Lucasys had developed certain software

 6   products, true?

 7        A.  We represented that we were focusing on these

 8   particular problem spaces and bringing solutions in

 9   these areas, that's correct.

10        Q.  And -- I'm sorry.  And on the website, you

11   described the way you were focusing on them was that you

12   had developed software to address those problems, true?

13        A.  Yes.  So -- so the website indicated that we

14   had begun developing or developed software in this

15   space.

16        Q.  Okay.

17        A.  That's correct.

18        Q.  And in 2019, did you also represent that you

19   had to -- that there a was a depreciation product that

20   Lucasys was developing -- or was -- that -- well,

21   Lucasys was developing?

22        A.  I think as early as 2019, we may already had

23   some early mock-ups for what that might look like.

24        Q.  Okay.

25        A.  Including, yeah, some views that we were -- I

1  want to clarify:  Our website is intended for the

2  market, for potential customers, not for third parties,

3  and so we would market to potential customers.

4       Q.  And so, if a competitor of yours was looking at

5  your website, do you think they would have known that

6  you did not have software that was saleable and ready to

7  go in the market?

8       A.  I --

9            MR. ALLOY:  Objection.  Go ahead.

10           THE WITNESS:  I don't know what a

11  competitor would have thought.

12  BY MR. FAZIO:

13      Q.  Let's talk about Nova quickly.  You mentioned

14  what it does, and you say -- on Page 7, Lucasys is

15  saying that -- "Lucasys has not sold or licensed Nova

16  because of PowerPlan's anticompetitive and tortious

17  actions."

18      A.  (Nodding yes.)

19      Q.  In what ways has PowerPlan interfered with your

20  ability to sell or license Nova?

21      A.  So, my recollection is that the development for

22  the Nova product began contemporaneously with our

23  relationship at SUEZ and that SUEZ was the primary

24  target customer for that development.  Having lost that

25  opportunity at SUEZ, as we've discussed already, based

1    on those -- the actions that PowerPlan took, we were not

2    able to sell the Nova product to SUEZ.

3         Q.   And --

4         A.   That's one example.

5         Q.   And did somebody from SUEZ tell you that they

6    weren't buying your Nova product because of PowerPlan?

7         A.   Did someone tell me they weren't -- so the

8    proposal to SUEZ was more comprehensive, so we included

9    proposals that were not just focused on Nova.  They were

10   on deploying broader technology solutions that I believe

11   included Nova, and those proposals were sidelined once

12   there was a -- once this dispute arose.

13        Q.   Okay.  My question to you, though, is:  Did

14   anybody tell you that they were not purchasing Nova from

15   you because of anything that PowerPlan did?  I'm just

16   asking yes or no.  Were you told that by somebody from

17   SUEZ?

18        A.   And again, I'm just stating that SUEZ indicated

19   that they would not have contracted with us if they knew

20   that the dispute would have arisen.  And so, as a

21   result, any proposal that we had at SUEZ did not come to

22   pass for the same reason.

23        Q.   Well, it's true, though, that they did keep you

24   on board for -- for a series of projects, true?

25        A.   I believe it was to finish the services related

 1   to the projects that were at hand at that time.

 2       Q.  Do you -- I think you touched on this earlier,

 3   but it wasn't clear to me from your response.

 4            Do you have any outstanding proposals with

 5   SUEZ today?  Lucasys?

 6       A.  Not current.  I mean, we have the same

 7   proposals that were outstanding, you know, two years

 8   ago, that are technically still outstanding, yeah.

 9       Q.  Aside from SUEZ, has Lucasys attempted to sell

10   or license Nova to any other clients?

11       A.  We have.

12       Q.  Okay.  What clients?

13       A.  So, off the top of my head, I recall ▇▇▇▇ as

14   being very interested in the Nova product.  A series of

15   conversations with their tax department, including demos

16   of the software.

17       Q.  When did those take place?

18       A.  I don't recall offhand.  It would have been

19   sometime after Nova was developed and sometime before

20   today.  In the last two years.

21       Q.  Any other customers you've attempted to sell it

22   to?

23       A.  So, we've certainly had conversations with

24   customers about tax space balance sheet automation.  So

25   another one is ▇▇▇▇ that comes to mind.  I'm sure

1    there were others. ███████████████████████

2    ████████████████████████████████████  But you

3    have to understand that once the litigation cloud

4    occurred and the dispute arose, the industry froze in

5    terms of our ability to have more than a casual

6    conversation about what we were working on.

7         Q.  So it's your view that the litigation is the

8    only thing that is preventing customers from adopting

9    your products?

10        A.  Well, I'd say it's the dispute at large.  So I

11   think it predates the litigation.  But the inference by

12   PowerPlan in the market, the communication to the

13   customer, and the uncertainty that that's created for

14   the customers is the impediment.

15        Q.  So sir, your belief is that uncertainty

16   surrounding the dispute between PowerPlan and Lucasys is

17   the driver that prevents these companies from adopting

18   your software?

19        A.  Yes.  I think it's an uncertainty for the

20   companies relating -- regarding the risk that they would

21   have to license software from Lucasys while there's a

22   dispute with PowerPlan.  These companies depend on the

23   PowerPlan software for mission-critical business

24   processes and operations, and the risk profile of

25   PowerPlan suddenly not supporting any particular

 1   customer is a risk that utilities aren't able to take.

 2        Q.   Are you aware of any customer where PowerPlan

 3   told its customer that it wouldn't support them if they

 4   used Lucasys?

 5        A.   So I -- so yes, actually.  Well, I believe that

 6   PowerPlan has communicated with a number of customers

 7   that by using Lucasys or any unauthorized third party,

 8   that they subject their maintenance agreements to,

 9   potentially, be void.

10        Q.   How did you learn that information?

11        A.   Well, I had actually heard that line back when

12   I was at RCC.  That was -- there were some -- there were

13   conversations to that effect, just in the services space

14   at one point.  But specifically, I believe, in the

15   context of the Liberty discussion, conversation with

16   Ms. Reed that we've already talked about, that that

17   would risk -- that use of Lucasys for services would

18   risk the contractual relationship that the utility has

19   with PowerPlan.

20        Q.   And your view is that that information has

21   proliferate throughout the entire industry?

22        A.   Oh, yes.  Yes.  That certainly -- I believe

23   that it's underscored even more in the context of the

24   communication campaign that we referenced before.

25        Q.   Sir, has it ever occurred to you that it's a --

```
 1   it's also possible that customers that rely on PowerPlan

 2   for this mission-critical task, they see risk in

 3   adopting new software to perform the same functions?

 4        A.  So, certainly any business decision takes risk,

 5   and my personal thought and my -- really I've heard this

 6   from -- from utility representatives, as well, but at

 7   some point the utility has to decide what's more risky;

 8   to continue to operate legacy software that's difficult

 9   to maintain and may blow up -- like, the data may just

10   blow up on them and they can't close the books or to

11   take a risk with a new software vendor.  I mean, that's

12   an evaluation of risk that every utility has to take.

13        Q.  And so did -- ██████ did -- they told you that

14   they were too -- well, I think I misheard what you said.

15   What did ████ tell you about why they weren't

16   interested in your product?

17        A.  I don't know if I recall specifically what

18   ████ communicated to us, other than at some point

19   after that conversation, we became aware that ██████ was

20   aware of this dispute, and so no subsequent follow-up

21   occurred from ████ at that time.

22        Q.  Did you ever follow up with ████ and ask them

23   for the status of it?

24        A.  We may have.  I don't recall specifically.

25        Q.  So other than ██████ any other -- what were
```

    1    the other customers that you mentioned that you were

    2    trying to sell Nova to?  Was it ███████████████?

    3        A.   Certainly with those two, we've had

    4    conversations around tax basis balance sheet automation.

    5        Q.   Okay.  And Lucasys is engaged with █████

    6    currently, true?

    7        A.   ████████████████████████████████████████

    8    █████████

    9        Q.   Okay.  And did they tell you why they weren't

   10    interested in your Nova product?

   11        A.   Again, because of the dispute and PowerPlan's

   12    actions from the beginning of this dispute, it's been

   13    not possible to have a formal presentation of -- of

   14    products.  So we've been limited to having informal

   15    conversations with utility representatives about what

   16    we're working on, and the feedback that we get is, We'd

   17    love to consider that once this is all over, meaning the

   18    litigation.

   19        Q.   What is it about the litigation that prevents

   20    you from demoing your product?

   21        A.   Well, I think the utility understands that it

   22    wouldn't be valuable for them to spend time -- that they

   23    wouldn't get the internal approvals to move forward

   24    pending the litigation.  Now, that's not to say that we

   25    haven't.  We certainly have had demos of the products

1    during the litigation, but those have been fewer and far

2    between.

3        Q.  Sir, I'm curious, because you keep talking

4    about the litigation being the thing that's holding back

5    -- holding back Lucasys, but when -- you're aware that

6    PowerPlan offered Lucasys the opportunity to enter into

7    an authorized vendor agreement with PowerPlan so that it

8    could do -- it could do work with mutual clients?

9    You're aware that that offer was made?

10       A.  I wouldn't characterize that offer that way at

11   all.  There was a document placed in front of us

12   labeled, Authorized vendor agreement, that had terms

13   that we couldn't agree to.

14       Q.  Okay.  What was it about the terms that you

15   couldn't -- that was so troubling to you?

16       A.  So in particular, that document sought to

17   extend the protections.  Let's say that PowerPlan would

18   have had, as a matter of -- not a legal opinion, but

19   that it would extend past just trade secrets, what they

20   sought to keep secret, and further that it would impose

21   or come with it an onerous and expensive audit procedure

22   that could be launched on a whim.  So we saw that as

23   just putting another tool in PowerPlan's belt to come

24   against competition and hammer Lucasys with another --

25   you know, because of this agreement, now you can't

1    compete, right, so we saw it as a bad faith measure from

2    PowerPlan to actually restrict our ability compete, and

3    not as anything that we would seriously consider.

4        Q.  Do you know if the confidentiality provisions

5    in the authorized vendor agreement -- do you know the

6    extent to which they track your Lucasys master services

7    agreement?  Have you ever compared the two?

8        A.  I haven't.  No, I have not.

9        Q.  Sir, does Lucasys have a fixed research and

10   development budget?

11       A.  We do not.

12       Q.  Any reason why not?

13       A.  Primarily because of the uncertainty that this

14   dispute has put on our business.  We've had to allocate

15   costs where they need to go in much more short-term

16   decision making.

17       Q.  Does Lucasys, in the ordinary course, maintain

18   an operating budget?

19       A.  We don't have a formal operating budget, no.

20       Q.  So with respect to deferred tax, tax

21   depreciation, Nova, in the absence of a customer

22   sponsoring an implementation of its projects, is there

23   any plan for Lucasys to invest further in the

24   development of those products?

25       A.  There is, and it's happening now.

 1        Q.  Okay.  And what -- tell me, what -- first of

 2   all, at what level is the investment being made?  I

 3   mean, what are you -- what resources are you

 4   contributing towards it?

 5        A.  So, we contribute our employee resources,

 6   including of course, our CTO's time, exclusively.  We

 7   continue to contract -- okay.  I think you had asked me

 8   about contracting with third parties for development.

 9   There's an individual that we contract with, that we've

10   continued to contract with, for development, as well.

11        Q.  Who is that?

12        A.  His name is Jonathan Porter.

13        Q.  Okay.

14        A.  I think we contract through his LLC.  So we

15   continued to contract with him.  We continue, of course,

16   to pay Stephen's salary.  We continue to invest in the

17   infrastructure required to host that software, as well

18   as all the software development tools that we need to

19   continue to perform the build-out.

20        Q.  Has Lucasys ever performed any form of market

21   study to determine the number or types of customers that

22   may want Lucasys' software products?

23        A.  So, yes.  So, early on, at the beginning of

24   Lucasys, we went almost six months, I think, with no

25   revenue coming in the door, and it was during that time

1  that Lucasys became a ATDC company.  I don't know if

2  you're familiar.  That's the Atlanta Technology

3  Development Center, I believe, affiliated with Georgia

4  Tech.  And they have a course for technology founders to

5  go through, and as part of that course, they have a -- a

6  customer feedback process that -- even for founders that

7  feel like they know what the customers need, they have

8  them go through a process to have the communications,

9  ask the questions, and confirm what customers need.

10      Q.  Okay.  Anything else that you've done to study

11  the market?

12      A.  Yeah, so in addition, we've spoken with the

13  market at large, right.  So we have relationships, long

14  standing relationships, with utilities, and that's not

15  just me, but actually, every employee at Lucasys has

16  longstanding relationships with utilities.  And so we're

17  in constant communication with utilities, and I believe

18  we collectively understand the utility market as well as

19  anybody out there.

20      Q.  Have you ever considered selling products or

21  services into any market other than the utility market?

22      A.  We've talked about it.  We haven't taken any

23  step in that direction.

24      Q.  Why not?

25      A.  So, the original goal of Lucasys when I founded

 1   it was to serve the utility market, so we've tried to

 2   stay focused to that.  It's where our collective

 3   expertise is as a target industry.  Really, we feel, to

 4   go into another vertical or industry, we would need to

 5   -- and this is how we talked about it -- we'd need to

 6   hire the equivalent team that we are for utilities to

 7   penetrate that market.  So it would be a significant

 8   capital investment to pursue another industry.

 9        Q.  Have you -- has Lucasys ever attempted to sell

10   any of its products or services to non-regulated utility

11   companies?

12        A.  So, I believe that some of our customers or

13   retail -- regulated utilities in general have

14   subsidiaries that are not regulated, and so -- so, for

15   example, the Copilot solution at NextEra would have been

16   focused on their non-regulated business.

17        Q.  Okay.  Any others that you perform services

18   for?

19        A.  So, I think I mentioned, at the time of the

20   Utegration press release, we had been reaching out to,

21   like, NRG to have conversations and penetrate that

22   space.  So we have -- we have, I would say, not pursued

23   standalone non-regulated energy businesses, only in the

24   context of providing a solution for a non-regulated

25   subsidiary of a regulated business.

1      Q.  Let me ask you, in the implementation of a

2  Lucasys software product would you -- would Lucasys

3  permit a third party to do the implementation of the

4  software?

5      A.  It's a good question.  I think -- I think it

6  depends on the software's maturity, right.  So

7  certainly, the first implementation would be difficult

8  for a third party to do.  There's a lot that goes on in

9  terms of product refinement in the first few

10  implementations, so I think broadly we've thought about

11  a long-term strategy to have third parties be part of

12  the Lucasys ecosystem.  In fact, architecturally, our

13  software supports that.  I think I talked about the

14  configuration that end users can do.  Of course, end

15  users can be third parties or contractors of the

16  utilities.  So -- so, we've -- we've given ourselves the

17  flexibility to do that in the future, if that makes

18  sense.

19      Q.  But as of today, you haven't made a decision

20  about exactly how that would work?

21      A.  It would be too premature to make that decision

22  today.

23      Q.  Would you allow PowerPlan to implement your

24  solutions?

25      A.  In the context of this dispute?  I mean, what

1    --

2         Q.   I mean eventually this dispute will end, right?

3         A.   I sure hope so, yes.

4         Q.   Well, let's imagine a world where this dispute

5    has ended.  Would you let PowerPlan implement your

6    solutions?

7         A.   I -- I don't see -- so yeah, I think we would.

8    I think we absolutely would.  It's hard for me to

9    imagine that world, because it's so separate from

10   reality, but I think that's possible.

11        Q.   All right.  Let's -- so, at Avista, ConEd, and

12   Dominion, you have access -- Lucasys has accessed

13   PowerPlan's software there as part of its consulting

14   work?

15        A.   At Avista, ConEd, and who else?  I'm sorry.

16        Q.   Dominion.

17        A.   Dominion?  I believe that's true.  I believe we

18   either have or had access to the PowerPlan

19   application --

20        Q.   And --

21        A.   -- at those utilities.

22        Q.   And did you have access to the back-end

23   database that supports the application?

24        A.   At those three utilities?  So, I don't believe

25   we ever had access to the back-end database at Avista.

 1  I don't believe we did at Dominion.  This is all -- I'm

 2  trying to recall to the best of my knowledge.  I believe

 3  that at ConEd we were engaged -- in addition to just our

 4  normal services work -- engaged in a project that

 5  required data to come from the PowerTax system to their

 6  forecasting solution, and so I believe that we had

 7  access to a project database, that back-end database

 8  that you're referring to, for that project.

 9      Q.  And aside from Avista, ConEd, Dominion, and

10  obviously AEP we've talked about --

11      A.  Uh-huh.

12      Q.  NextEra, SUEZ, we've talked about.  Are there

13  any other customers that you've had -- or Lucasys has

14  had access to PowerPlan software?

15      A.  Outside of the four that are in this --

16      Q.  Well there's -- AEP, Avista, ConEd, Dominion,

17  NextEra, and SUEZ are the list that appear on Pages 9

18  through 12, if you want to look at it again.

19      A.  I'm sorry.  Avista, ConEd, Dominion, NextEra,

20  SUEZ.

21              I believe that's accurate.

22      Q.  Now, sir, the -- since this dispute arose, has

23  Lucasys altered the way that it interacts with PowerPlan

24  systems in its consulting engagements?

25      A.  I don't believe so.

1        Q.   Have any of your customers placed restrictions

2   on the kinds of information Lucasys has access to in its

3   consulting work since the -- this dispute began?

4        A.   Outside of the customers that terminated the

5   relationship?

6        Q.   Yeah.

7        A.   They have not.

8        Q.   Okay.

9        A.   Not to my knowledge.

10        Q.   You can put that one away.

11             (Exhibit 8 marked for identification.)

12   BY MR. FAZIO:

13        Q.   Sir, you've been handed what's been marked as

14   Exhibit 8 to your deposition.

15        A.   Yes, I see that.

16        Q.   Can you tell me what this is?

17        A.   This looks like a profit and loss statement for

18   Lucasys.

19        Q.   Sir, I wanted to ask you, to your knowledge,

20   this -- it says for the year ending December 31, 2021.

21             Do you know if this reports full-year

22   figures for 2021?

23        A.   It does not appear to be a full-year 2021

24   picture.

25        Q.   Okay.  Can you tell me, for services in 2021 --

 1    and obviously you can't quote it to the penny, or maybe

 2    you can, but what was the approximate services revenue

 3    for Lucasys in 2021?

 4        A.    ████████████████████        ████████████████

 5    ██████████████████████

 6        Q.    ████████████████████████████████████████████

 7        A.    █████████████████████████████

 8        Q.    What kind of accounting system does Lucasys

 9    deploy?

10        A.    So, this comes from, I think it's called Xero,

11    with an X, X-E-R-O, which is a cloud-based accounting

12    solution.

13        Q.    Is that the system that Lucasys has always

14    used?

15        A.    Yes, I believe so.

16        Q.    Okay.  I want to just sort of -- let's go

17    through some of these that are high level.

18             So if you go down under "Operating

19    expenses," you'll see "Bonus compensation expense."

20        A.    Yes.

21        Q.    And tell, me how is -- first of all, who is

22    entitled to a bonus in Lucasys' system?

23        A.    We offer, or would like to offer, bonuses to

24    each employee at Lucasys.

25        Q.    Okay.  So in 2020, that was through the -- you

 1    gave out ███████  in bonuses?

 2         A.  That looks correct.

 3         Q.  All right.  And in 2019, it was ███████  in

 4    bonuses?

 5         A.  That's correct.

 6         Q.  And how is it the bonuses are calculated?

 7         A.  I think we were accruing numbers based on our

 8    profitability in any given month.  I'm trying to

 9    understand.  I think it depends on whether -- whether we

10    had the capacity to pay out bonuses.

11         Q.  And so they're discretionary bonuses?

12         A.  They are.

13         Q.  Okay.  In 2020, did you personally take a

14    bonus?

15         A.  I believe I did.

16         Q.  Okay.  And how -- in order of magnitude, what

17    was the size of your bonus?

18         A.  I don't recall.

19         Q.  The other founders took bonuses as well?  Well,

20    actually, let me withdraw that.

21              Did all employees get a bonus in 2020?

22         A.  Yes, all employees.

23         Q.  Okay.

24         A.  I think we also offered a bonus to our

25    long-term contractor, as well.

1    Q.  Okay.  And same in 2019?

2    A.  That's correct.

3    Q.  In 2021, were any bonuses given?

4    A.  They were not.

5    Q.  So, if you go down, you'll see "Consulting

6  expense."  It says "Dash ENG."

7          What does the ENG refer to?

8    A.  The ENG refers to engineering.

9    Q.  Okay.

10    A.  And so, for us, that would indicate a

11  development -- software development resource.

12    Q.  And what's "consulting GA"?

13    A.  That would indicate that the consulting

14  resource was not engaged in software development.  So

15  it's either supporting the businesses, Lucasys, or

16  potentially supporting services engagement at a

17  customer.

18    Q.  Okay.  If you look down, you'll see, "Legal

19  fees, GA," and you've got ██████████████████████

20  ████████████████████████

21    A.  I see that.

22    Q.  Okay.  So when you testified earlier that ███

23  ████████████████████████████████ had been spent

24  on the litigation, where would that be reflected in

25  these profit and loss statements?

1        A.   I think we'd want the full-year 2021 first, and

2   then, of course, we don't have the six months of 2022 in

3   here, either, so --

4        Q.   Okay.

5        A.   -- it's not a full picture.

6        Q.   So is the -- so is -- your understanding is

7   that as of whenever this was run in 2021, there was ███

8   ████████████████████████, approximately, of legal

9   fees that had been paid?

10       A.   My recollection is that the majority of 2021,

11  we were waiting for the court to rule on a motion to

12  dismiss.

13       Q.   Okay.  So approximately ███████████ in fees

14  from the time this was run until present?

15       A.   That's correct.

16       Q.   What was the -- what was the driver for the

17  decrease in services revenue from 2020 to 2021?

18       A.   Well, it was the lost opportunities in the

19  marketplace due to PowerPlan's inference.

20       Q.   Well, so -- but in 20 -- from 2019 to 2020, the

21  revenues nearly tripled.

22            Do you see that?

23       A.   I do see that.

24       Q.   Okay.  So how is it that -- did PowerPlan's

25  alleged inference impact your 2019 to 2020 numbers?

1       A.   It did.

2       Q.   Okay.  How so?

3       A.   I think what we see here in 2020 was largely

4    just the in-flight projects that we had contracted and

5    continued on into 2020.  So it's the relationships where

6    our customers did not cancel the relationship and,

7    instead, chose to continue to partner with us, at least

8    for the duration of the projects that had already begun.

9       Q.   Do you know, is there a full year 2021 P&L

10   that's been generated?

11      A.   I believe so.  I guess I don't know for sure.

12      Q.   And to be clear, this is something that's kept

13   in the ordinary -- this document, Exhibit A is something

14   that's just kept in the ordinary course of Lucasys'

15   business?

16      A.   It is, but I would say that we use it mostly at

17   the end of the year, for purposes of finalizing the

18   company's position and then, of course, for tax

19   reporting.

20      Q.   And just to be -- so my question is clear, I

21   mean, this was not something that was generated for

22   production in this litigation?

23      A.   No.  No, it was -- it's a report that can be

24   run on demand.

25      Q.   So if we wanted to see the customer breakdown

 1    for the services revenue that's reported here, you'd be

 2    able to find that information in your accounting system?

 3        A.  Yes, that's correct.

 4        Q.  So in 2020, you had operating income of about

 5    ████████████████████████████████████████████?

 6        A.  I'm sorry, can you repeat that question?  I was

 7    flipping back and forth.

 8        Q.  If you'll flip over to the second page, bottom

 9    of the -- or not quite the complete bottom --

10        A.  Uh-huh.

11        Q.  The column, 2020, you see ████████  is the total

12    operating income?

13        A.  I see that.

14        Q.  Okay.  And then in 2020, you had about ██████████

15    ████████████████  in revenue.

16        A.  Yes.

17        Q.  Do you see that?

18        A.  I see that.

19        Q.  So the net profit margin for Lucasys in that

20    year was about ██████████, somewhere in there?

21        A.  I'd probably need a calculator, but I'll take

22    your word for it.

23        Q.  In the course of your responsibilities as the

24    CEO, do you keep track of what the profit margin is,

25    Lucasys' profit margin is?

 1      A.   No.   We don't have an expectation to

 2   necessarily be profitable in any given year.

 3      Q.   When you say you don't have an expectation to

 4   be profitable in any given year, explain what you mean

 5   to me.

 6      A.   Well at its core, Lucasys is a software company

 7   building cloud software delivered under a SAS

 8   subscription model, so we recognize that in that model

 9   we -- we reinvest any profitability back into the

10   company to maximize growth.

11      Q.   Is it -- in your experience, for companies that

12   operate in that model, is it unusual to not have any

13   sort of outside financing or investment in the company?

14              MR. ALLOY:   Objection.

15              You can answer.

16              THE WITNESS:   So I -- I -- I don't know

17   what's typical or not.   I think my understanding is that

18   most startups are self-funded.   That's my understanding.

19   BY MR. FAZIO:

20      Q.   How did COVID impact Lucasys?

21      A.   I would say marginally, on a grand scale.

22   Certainly, there was some uncertainty in, maybe, March

23   of 2020 or whenever, kind of, everything closed, travel

24   closed, things like that.   But we had already been

25   operating on a -- kind of a distributed model, work from

 1    anywhere.  And so I think, like any other business, we

 2    evaluated and then were happy to see that the markets in

 3    general jumped back quickly.

 4         Q.  In terms of Lucasys' customer base, did you see

 5    a slowdown in activity amongst your customers?

 6         A.  I think we saw kind of a parallel there, that

 7    maybe for those couple of weeks, there was some

 8    uncertainty with customers about what the future would

 9    look like, and in particular related to their employees

10    and where they're working from, and then we saw that

11    quickly snap back in place once -- once folks became

12    accustomed to working from home.

13         Q.  So, on this -- on the profit and loss

14    statement, which would the categories be that I would be

15    looking in if I wanted to understand your software

16    investments.  You mentioned employee salary.

17         A.  Yes, that's certainly one of them.  Employee

18    salaries.  So some component of employees salaries would

19    be part of that.  Some component of each of the employee

20    benefits.  Those, of course, are benefits directly

21    attributable to those same employees.  Consulting

22    expense, engineering, as we've already described is

23    certainly an expense that's related to software

24    development.  Looking at this quickly, I see software,

25    kind of on the second page.  So the software we

 1    predominantly would use would be related to our

 2    development, and there may be components of these other

 3    costs that we'd need to look at in more granularity.

 4    For example, I'm not seeing the hosting fees just right

 5    offhand, but I'm sure they're here somewhere.

 6                    MR. FAZIO:  Are you reading or showing?

 7                    MR. ALLOY:  I'm just looking.

 8                    MR. FAZIO:  Okay.

 9                    THE WITNESS:  Oh, there it is.  So

10    Cloud-based hosting.  Do you see that there, in the

11    front?

12                    (Exhibit 9 marked for identification.)

13    BY MR. FAZIO:

14        Q.  Sir, you're being handed what's been marked as

15    Exhibit 9.

16        A.  (Witness examining document.)

17        Q.  Can you tell me what this is?

18        A.  This appears to be a forecast of revenues and

19    expenses for Lucasys for, maybe, the 18-month period

20    beginning June 2020.

21        Q.  Did you put this together?

22        A.  I believe that I played a role here, yes.

23        Q.  Okay.  And do you know what the purpose of this

24    document was?

25        A.  I don't know specifically.  I do know that in

1    this time frame, this may have been when we were

2    thinking about litigation funding.  Certainly this was

3    about the time frame that we were either evaluating or

4    taking the SBA loans that may be -- I don't recall

5    specifically.

6        Q.  Were you ever turned down for litigation

7    funding?

8        A.  I don't think we ever got to a point where we

9    would seriously consider it.  I think some of the

10   feedback that we had gotten just from the first

11   conversation indicated an interest, but we made a

12   business decision not to pursue.

13       Q.  And why was that?

14       A.  It seemed like a very expensive way to -- just

15   to -- it seemed like debt financing was a cheaper source

16   of capital.

17       Q.  And so this document, do you know, is this --

18   this is all based on -- these are all projections?  None

19   of this was based on actuals?

20       A.  I believe that's correct.

21       Q.  Okay.  So -- and this would have been created

22   around June of 2020?

23       A.  I think that's right.

24       Q.  So in June of 2020, can you tell me, what was

25   the -- what's the SUEZ -- so if you look down in the

```
 1    left-hand column there?

 2          A.  Yes.

 3

 4

 5

 6

 7

 8

 9    ████████████████████████████████, and this

10    looks like, maybe, the tail end of that project here in

11    June, beginning June 2020.

12          Q.  And then you have ██████████████████

13    ████████ of services.  And I think we've talked about two

14    of the three of them.

15                What were you doing for ████████████

16    Services?

17          A.  ████████████████████████████████████████████

18    ████████████████████████████

19          Q.  ████████████████████████████████████

20          A.  ████████████████████

21          Q.  ████████████████████████████████████████████

22    ████

23          A.  ████████████████████████████████████████████

24    ████████████████████████████████████████████████████

25    ████████████████████████████████
```

1      Q.  AEP financial transformation.  What's that?

2      A.  AEP financial transformation.  So, we had

3  understood from the RFP from the previous year that AEP

4  needed a lot of help in the areas of finance and

5  technology.  We didn't necessarily know what that would

6  look like, but we understood that there may be an

7  opportunity to help them.  So I think that's a generic

8  term for opportunities that we were hopeful might arise

9  at AEP.

10     Q.  And then you were forecasting two new Logo

11 Technology customers?

12     A.  Yes, I see that.

13     Q.  And did you obtain two new Logo technology

14 customers?

15     A.  We did not.

16     Q.  If you go down to the very last entry before

17 the totals, it says annual SEP IRA contributions?

18     A.  Yes.

19     Q.  Tell me, how does Lucasys -- does Lucasys have

20 a company-funded retirement plan?

21     A.  We do.

22     Q.  Okay.  And how does it work?

23     A.  So, I believe the rules of that S-E-P, SEP IRA,

24 the contribution and rules are governed by tax law, but

25 my understanding is that the company may contribute to

1    those accounts on behalf of the employees up to some

2    prescribed maximum, that it's an elective contribution.

3         Q.  So has the company been making ███████

4    contributions to these requirements accounts?

5         A.  So, my recollection is that we -- I don't

6    recall the exact amount, but we made a contribution in

7    2020, and did not make a contribution -- or let me

8    clarify.  We made a contribution for the tax year 2020

9    and did not make a contribution for the tax year 2021.

10        Q.  Well, actually, now that I've asked you this

11   question, just grab Exhibit 8 real quick.

12        A.  Eight.

13        Q.  Yes.

14        A.  Okay.

15        Q.  So if you look -- it's about a third of the way

16   up from the bottom, "Employee benefits, SEP IRA

17   expense."  So it was ███████ in 2020.  As of whenever

18   this was run in 2021, it was ███████?

19        A.  Yes.  So, during the year, we accrue that

20   expense just like other expenses, but we did not pay out

21   for the 2021 tax year --

22        Q.  Okay.

23        A.  -- of that expense.

24        Q.  As you look down the operating expense list,

25   are there any other categories of expenses where

 1  something was accrued, and is reflected on this income

 2  statement, that wasn't actually paid?

 3      A.  (Witness examining document.)

 4              Not to my knowledge.

 5              (Exhibit 10 marked for identification.)

 6  BY MR. FAZIO:

 7      Q.  Sir, you're being handed what's been marked

 8  Exhibit 10.

 9      A.  (Witness examining document.)

10      Q.  Can you tell me what this is?

11      A.  This looks similar in format to the previous

12  exhibit.  It looks like a Lucasys forecast, but for a

13  different period of time.

14      Q.  Okay.  And so this -- the last one we looked

15  at, Exhibit 9, was June 2020 to May 2022?

16      A.  Okay.  Yes.

17      Q.  Do you see that?

18      A.  Yes.

19      Q.  And then this one is October 2020 through

20  March 2022.

21      A.  Yes.

22      Q.  Do you know why this -- what the purpose was

23  for this updated forecast?

24      A.  I don't specifically know, but throughout 2020,

25  I think when we were pursuing the SBA loans, I think I

 1    mentioned there were some opportunities to -- to

 2    increase the value of the loans, and this may -- the

 3    update may have been related --

 4         Q.   Okay.  And so --

 5         A.   -- to that.

 6         Q.   I'm sorry.  Were you finished?

 7         A.   I was.

 8         Q.   Okay.  So in Exhibit 9, you'll see AEP services

 9    shows no revenue in 2022 at all.  And then in this

10    version, it shows ██████ a month in 2022.

11              Did something change between June and

12    October of 2020 that led you to believe there was going

13    to be rev -- additional revenue?

14         A.   There must have.  I don't recall anything in

15    particular, but I understand that our AEP services have

16    been continuous from the beginning of our relationship.

17         Q.   Okay.  And then also, this one has a -- this

18    version of the forecast has an entry for SUEZ services.

19              Do you see that?

20         A.   Yes, I see that.

21         Q.   Okay.  And then that shows revenue from 2020,

22    October 2020, all the way through March of 2022.

23              Do you know what changed that suggested

24    that adding SUEZ services was appropriate here?

25         A.   So, I think we had tried, or we -- throughout

1    the duration of our SUEZ engagement, we had tried to

2    build a long-lasting customer relationship, and so

3    whereas maybe the original forecast had just an

4    individual project or two, this one, I think, included

5    proposals that we would have made to continue an ongoing

6    relationship, much like we'd done with AEP.

7        Q.   As you move down, you'll see there's an entry

8    for SUEZ Nova.

9             Do you see that?

10       A.   Yes, I see that.

11       Q.   Okay.  And so what happened between June of

12   2020 and October of 2020 that led you to believe that

13   SUEZ was going to engage you on your Nova product such

14   that you'd be making ███████████████████ a month?

15       A.   Well, I think it's largely the same, maybe

16   labeled slightly differently, but I think it was labeled

17   SUEZ Technology in the original forecast.  And that

18   looks like largely the same opportunity.

19       Q.   Well, sir, if you look at SUEZ Technology, it

20   starts off -- you've got 12 months there, and you've got

21   14 months here, and there's multiple line items for SUEZ

22   in your October 2020 budget.

23             Do you see that?

24       A.   I do see that, yes.

25       Q.   So was there anything -- had anything changed

1    between June and October?

2         A.  So I think it's the same multiple line items,

3    they're just ordered a little bit differently than that

4    were in June.  So for example, I see in the June

5    forecast, I see the tax basis balance sheet project

6    running out.  I see the PPM project running out.  I see

7    those same two projects running out in the October

8    forecast.  And I see the technology project.  It looks

9    like it went from a 12-month to a 14-month duration, but

10   I also see that the amounts in any given month changed,

11   as well.  It may be the same total amount, just

12   distributed over a longer period.

13        Q.  And so you're -- do you know, other than these

14   two forecast documents that we've been talking about,

15   Exhibits 9 and 10, do you -- has -- does Lucasys, in its

16   -- the ordinary course of its business, maintain these

17   kinds of forecasts?

18        A.  We do not.

19        Q.  Why not?

20        A.  Well, we don't -- there was a brief period when

21   our litigation expenses were increasing, where we had to

22   really keep track of our cash flow, were more interested

23   in our cash position, but I think like I mentioned

24   before, for our shareholders, for the founders, the

25   profitability of any given year or month is not

1    important.

2        Q.   And so, sir, your recollection is that these

3    were used in connection with your SBA loan?

4        A.   I believe we -- yes.  So -- so, I believe we

5    used one or both of these in connection with the SBA

6    loan, that's correct.

7        Q.   And so, fair to say, sir, that when you

8    compiled these documents, they were your best effort at

9    understanding what the forecasted revenues and expenses

10   were going to be?

11       A.   I think it was a reasonable estimate at the

12   time.

13               MR. ALLOY:  You want to take a break?  You

14   okay?

15               THE WITNESS:  I would take a restroom

16   break, if now's a good time.

17               MR. FAZIO:  That's fine.  Off the record.

18               THE VIDEOGRAPHER:  Off the record at

19   2:38 p.m.

20               (Off the record.)

21               THE VIDEOGRAPHER:  This begins Media Unit

22   No. 3, and we're back on the record at 2:51 p.m.

23   BY MR. FAZIO:

24       Q.   All right.  Sir, we have been talking about AEP

25   all day, so let's get into AEP.

 1                    (Exhibit 11 marked for identification.)

 2    BY MR. FAZIO:

 3         Q.   You're being handed what the court reporter has

 4    marked as Exhibit 11.

 5                    Do you recognize this document?

 6         A.   (Witness examining document.)

 7                    I believe I do, yes.

 8         Q.   Okay.   You'll see on Page 1, it indicates that

 9    there was a contract that was signed on 5/3/2019.

10                    Do you see that?

11         A.   Yes, I see that.

12         Q.   Okay.   I want to flip to the back where there's

13    a statement of work on Lucasys letterhead.   So it's --

14         A.   (Witness examining document.)

15         Q.   Are you with me?

16         A.   I think so.   2184?

17         Q.   Uh-huh.   2184.

18         A.   Yes.

19         Q.   All right.   Sir, can you explain to me -- so,

20    in your contracting process, you contract through these

21    statements of work?   That's how Lucasys describes what

22    projects it's going to undertake with its customers?

23         A.   We sometimes do.   I think this is our default

24    way to contract.

25         Q.   Okay.   So this was a statement of work that was

 1   prepared for AEP, true?

 2        A.   Yes.

 3        Q.   Okay.  Was this the first statement of work

 4   that Lucasys was -- where Lucasys was engaged with AEP?

 5        A.   I believe it was.

 6        Q.   Okay.  So if you go back to the Statement of

 7   Work No. 1 on 2184, there's a scope there.  Can you

 8   explain to me, what was the -- what were you being

 9   retained to do here, or what was Lucasys being retained

10   to do?

11        A.   So, I see a two-part scope.  I see a -- I see

12   language that indicates that there would be an

13   assessment related to AEP's data and related processes

14   with some recommendations that may come from that.  I

15   also see that AEP or "client," here, will evaluate the

16   feasibility of Lucasys' software solutions as a

17   secondary item.

18        Q.   Now, sir, in May of 2019, were you the only

19   Lucasys employee?

20        A.   Well, actually, as of May 2019, there were -- I

21   had not been paying myself a salary, so there were

22   technically no employees, but I was the sole individual.

23        Q.   Uh-huh.  So it was going to be you individually

24   that was going to perform this statement of work?

25        A.   No.  So, up through that time, and after that

1  time, I had been in communications with and having

2  conversations with individuals who I thought might be

3  able to join Lucasys and help with services like these.

4      Q.  Okay.  And so in May of 2019, you entered into

5  this contract with AEP, and was that the thing that

6  allowed you to bring over the other founders?

7      A.  Well, I think -- I think the -- bringing on the

8  other founders was a comprehensive set of events that

9  came together.

10     Q.  Okay.

11     A.  I think that just signing a contract doesn't

12  necessarily mean there's revenue yet, so I think we

13  would have had to have some cash on hand to bring on

14  others as of that point in time, but certainly engaging

15  in contracts with utilities was the way that we intended

16  to grow the business.

17     Q.  So if you turn the page over, you'll see under,

18  "Fees," it says, "Fees will be billed out at a rate of

19  ██████████.  The total fees under the statement of

20  work shall not exceed ███████ without prior approval

21  from the client."

22             Do you see that?

23     A.  I do.

24     Q.  Okay.  Do you know how -- how much was charged

25  under this -- for this state of work --

 1        A.  I do --

 2        Q.  -- for this statement of work?

 3        A.  I don't know.

 4        Q.  Okay.  And do you recall these services

 5   actually being provided?

 6        A.  Yes.

 7        Q.  Okay.  And what were the recommendations that

 8   you -- was the result of your review of the data

 9   structures and what recommendations did you make?

10        A.  It's been a few years, but from what I recall,

11   from the very beginning of our relationship with AEP, we

12   learned, and I think largely AEP learned with our help,

13   that some of the data quality that they had, related to

14   tax fixed assets, created a risk to their organization

15   in terms of being able to support their stated financial

16   positions.  So there was certainly a data quality

17   component that came out of this.  I think we identified

18   some staffing issues, collectively, with AEP in terms of

19   having the right people in the right roles.  I recall

20   having those conversations.  I think we had

21   conversations around processes, as well, how to improve,

22   in particular, the controls, data controls, that would

23   have been performed in line with those processes.

24        Q.  Now, sir, at the beginning of this document,

25   you'll see there on -- if you go to 2147, you'll see it

 1    contains Lucasys Inc., master services agreement?

 2        A.   I see that, yes.

 3        Q.   And so -- I'm not going to ask you to read this

 4    in excruciating detail, but I wanted you to sort of skim

 5    through it and tell me, is this Lucasys' sort of form

 6    master services agreement?

 7        A.   I believe this would have been a negotiated

 8    agreement with AEP.

 9        Q.   Okay.

10        A.   But it may have started with Lucasys' form

11    agreement.

12        Q.   So this agreement is the -- the Lucasys master

13    services agreement that we see here, this is the

14    agreement, ultimately, that you reached with AEP

15    concerning the services that you were going to provide

16    to them?

17        A.   Yes, that's correct.

18        Q.   And the agreement contains license provisions

19    for future software that AEP might license, correct?

20        A.   That is correct.

21        Q.   And at the time that you entered into this

22    master services agreement with AEP, did you believe this

23    was a reasonable agreement?

24        A.   I -- probably.  Certainly, we entered into this

25    agreement.

1        Q.   And at the time you entered into the agreement,

2   did you believe that Lucasys' master service agreement

3   that's part of Exhibit 11 reasonably protected Lucasys

4   intellectual property rights and its software?

5        A.   So, yeah, the agreement was one of the things

6   that we would view as protecting our proprietary

7   software.

8        Q.   And do you think that this reasonably protects

9   Lucasys' commercial interests?

10       A.   Can you help me understand that question?

11       Q.   Well, so setting aside intellectual property

12   rights -- I mean, Lucasys also has commercial interests,

13   right?  Its price -- there are things like its pricing,

14   the way that you do things, things that may not -- they

15   may fall short of intellectual property in the legal

16   sense, but they're commercially valuable.

17            Do you follow what I'm saying?

18       A.   Perhaps.

19       Q.   Okay.

20       A.   I mean, I have an understanding that Lucasys

21   has confidential information, and to the extent that

22   that's included here, I hope that the appropriate

23   protections are there, as well.

24       Q.   Okay.  You didn't have any concerns about it

25   when you entered into it that it wasn't going to protect

1   your confidential information?

2       A.   No.  We understood that we carried -- we had to

3   take certain operational steps to protect that as well,

4   so we weren't solely focused on this as the only way to

5   protect that.

6       Q.   And there's nothing wrong with protecting the

7   company's intellectual property.

8               Can we agree about that?

9       A.   I would think that companies would want to

10  protect legitimate intellectual property, that's

11  correct.

12      Q.   And can we agree that it would be unfair if

13  Lucasys had invested resources into developing

14  intellectual property and someone else came along and

15  misappropriated it?

16      A.   Unfair?

17      Q.   Unfair.

18      A.   Well, I think we'd have to understand what that

19  means.  Certainly, if Lucasys provided the adequate

20  steps, as a matter of law, to protect its legitimate

21  intellectual property interests, and those were somehow

22  misappropriated anyway, I imagine that we'd, at least,

23  want to know more about what that was, yeah.

24      Q.   Well, it would be wrong if somebody did that,

25  right?

 1       A.  If someone misappropriated?

 2       Q.  Uh-huh.

 3       A.  Well, yeah.

 4       Q.  Did you have an understanding that if Lucasys

 5  didn't take reasonable steps to protect its intellectual

 6  property, it runs the risk of losing intellectual

 7  property protections?

 8       A.  We understood from the very founding of the

 9  business, that, day one, mattered, that from the very

10  beginning of the business, we had to take the right

11  steps to protect our intellectual property.

12       Q.  And can we agree that Lucasys has the right to

13  establish the terms and conditions under which it

14  licenses its software?

15       A.  I think Lucasys has the right to enter into

16  negotiations with its customers regarding those terms.

17       Q.  Well, and if those -- and if the customer asks

18  for a term that you don't agree with, you're not forced

19  to agree with them, are you?

20       A.  I don't believe so.

21       Q.  Do you think that there's anything in Lucasys'

22  master services agreement that negatively impacts

23  competition?

24           MR. ALLOY:  Object to form, but you can

25  answer.

 1              THE WITNESS:  I'm not sure how I would

 2     know.

 3     BY MR. FAZIO:

 4          Q.  Do you think AEP is a sophisticated company?

 5          A.  In some areas, yes; and in some areas, no.

 6          Q.  In what areas is AEP unsophisticated?

 7          A.  Maybe --

 8          Q.  In your experience?

 9          A.  Yeah, so sophisticated may be the wrong term,

10     but in -- largely, I would say utilities have not always

11     been the fastest adopters of technology, for example.

12     That doesn't necessarily make them unsophisticated.

13     That comes to mind.

14          Q.  Sir, would it be fair to say that all of

15     Lucasys' consulting engagements, the work that's being

16     performed is -- it's performed under some type of

17     confidentiality agreement with its customer?

18          A.  Yes, I think that's accurate.

19          Q.  And those agreements typically limit the

20     disclosure of confidential information, right?

21          A.  Certain to whatever exclusions might be in

22     those agreements, yes.

23          Q.  In the -- would you agree that the

24     confidentiality agreements, that Lucasys enters into

25     anyway, typically limit the use of confidential

 1   information only to the extent it's necessary for

 2   Lucasys to carry out its obligations to that customer?

 3        A.   I don't know.  Do you want me to look at

 4   something in particular?

 5        Q.   Well, I'm just asking you, like, your -- sort

 6   of the overarching -- do you have that understanding or

 7   not?  I mean, it's in here; we can find it if you want,

 8   but I'm asking more broadly than just this document.

 9        A.   I think there are -- any time there's an

10   exchange of confidential information, there may be terms

11   around how and when that confidential information is

12   utilized by that other party.

13        Q.   If you want to turn -- we'll just look at it

14   real quick, I mean -- 2157.  It's Section 10B.

15        A.   (Witness complying.)

16        Q.   And if you feel like you need to, you can read

17   from the beginning of Section 10.  It just starts on the

18   prior page.  I'm just going to ask you about 10B.

19        A.   (Witness examining documents.)

20        Q.   Do you see the first sentence there, it says,

21   "The receiving party will not use confidential

22   information for any purpose other than carrying out its

23   obligations as set forth in this agreement and shall not

24   disclose confidential information to any third party,"

25   comma, "Without prior written consent of the disclosing

 1   closing party and an agreement in writing from the third

 2   party that will adhere to the confidentiality

 3   obligations imposed herein."

 4              Do you see that?

 5       A.   I see that statement, and then I see, you know,

 6   the rest of the paragraph that provides exclusions --

 7       Q.   Right.

 8       A.   -- to this one.

 9       Q.   And in full disclosure, I mean, there's --

10   that's -- it's one sentence in this long provision there

11   --

12       A.   Right.

13       Q.   There are restrictors, there are expanders,

14   there's -- you've got to read it, but what I'm asking

15   you is, is that something that you commonly see in

16   consulting -- in the confidentiality agreements you

17   reach with your customers?

18       A.   So, our legal agreement negotiation with

19   customers goes through a third-party firm, and they help

20   us with coming to a consensus on mutually agreeable

21   terms, so I -- I just can't answer that with certainty

22   without looking at an agreement.

23       Q.   Okay.

24       A.   Yeah.

25       Q.   So you don't have a view one way or another if

 1   that's an industry-standard term in these kinds of

 2   services agreements?

 3        A.   If what is, specifically?

 4        Q.   The sentence I read to you from Section 10B?

 5        A.   I -- I don't know.  I see that that's a

 6   sentence that's part of a very large confidentiality

 7   section.

 8        Q.   Is Exhibit 11, the master services agreement

 9   between AEP and Lucasys, is that the master service

10   agreement that still controls your relationship with

11   AEP, even today?

12        A.   I -- I'm not 100 percent certain, but it may

13   be.

14        Q.   Now, sir, to the best of your knowledge, did

15   Lucasys complete the tasks that were set forth in the

16   Scope of Work 1 -- the Statement of Work 1?

17        A.   (Witness examining document.)

18              To the best of my knowledge, if we were

19   able to perform the scope in that duration, then we

20   would have -- would have tried to.

21        Q.   So do you know if you did it or not?

22        A.   I don't know.  It would be an assumption for me

23   to say one way or the other.

24        Q.   Do you have any reason to believe that you

25   weren't paid for any work that you did under Statement

 1    of Work 1?

 2         A.  Can you repeat the question?

 3         Q.  I said do you have any reason to believe that

 4    you weren't paid for the work that you would have

 5    completed under Statement of Work 1?

 6         A.  I'm trying to catch the -- That you were

 7    not paid?

 8         Q.  Were not paid.

 9         A.  I'm sorry --

10         Q.  Did you get paid for the work that you did

11    under Statement of Work 1?  How's that?

12         A.  I --

13         Q.  As far as you know?

14         A.  As far as I know, I believe we did.

15         Q.  Okay.  At some point in 2019, AEP issued an RFP

16    for a tax fixed asset system upgrade.  Were you aware of

17    that?

18         A.  I don't believe it was an upgrade.

19         Q.  Okay.  For a tax fixed asset system?

20         A.  Yes, that's correct.

21         Q.  Okay.  Did Lucasys have -- give input on the

22    scope and wording of the RFP for that project?

23         A.  I don't recall.

24         Q.  Okay.  Is that something that Lucasys would do

25    for customers like AEP?  Provide comments on RFPs before

 1   they were issued?

 2       A.  So, I think we would work with customers to

 3   identify their business needs, business requirements,

 4   and I would imagine that business requirements are a

 5   component of RFPs.  So we commonly work with customers

 6   to identify business requirements.

 7       Q.  But sitting here today, you don't recall

 8   whether Lucasys provided any input on that RFP or not?

 9       A.  I don't recall.

10       Q.  Do you recall whether Lucasys subsequently put

11   in a bid?

12       A.  I do recall that.

13       Q.  Okay.

14               (Exhibit 12 marked for identification.)

15   BY MR. FAZIO:

16       Q.  Sir, do you recognize this document?

17       A.  (Witness examining documents.)

18               Yes.  I think it's familiar.

19       Q.  Okay.  What is this document?

20       A.  This appears to be the RFP response that we

21   provided to AEP for the tax fixed asset software

22   project.

23       Q.  Okay.  Is this -- first of all, who is

24   Ms. Thal?  If you look at the first -- it's Page 2 of

25   28.  There's a letter addressed to Ms. Thal.

 1          A.  I don't know Ms. Thal.  She may have been,

 2     like, the procurement or supply chain person.

 3          Q.  Okay.

 4          A.  That's typically who those letters are

 5     addressed to.

 6          Q.  So, let's go to Page 5 of 28.  I just want to

 7     talk a little bit about the state of AEP systems as of

 8     July 2019.

 9          A.  (Witness complying.)

10          Q.  So you see the first two paragraphs here.  The

11     second sentence, Lucasys says, "Utilities typically

12     undertake" -- well, you're talking about clean-up and

13     reconstruction projects in the PowerTax depreciation and

14     deferred tax modules.

15                    Do you see that?

16          A.  I see that, yes.

17          Q.  All right.  And here you say, "Utilities

18     typically undertake these projects every five to seven

19     years as the underlying tax records become misaligned

20     with gap transactions and the carried deferred income

21     tax liabilities become more and more difficult to

22     reconcile, to the PowerTax deferred tax sub-ledger."

23                    Do you see that?

24          A.  I do see that.

25          Q.  So tell me, how is it -- why is that the

 1    records become misaligned over time?

 2         A.   I think it's deficiencies in the software that

 3    allow for bad data stakes to exist.

 4         Q.   Okay.  Can you give me a specific example of

 5    why you think that occurs?

 6         A.   I mean, I see, even in this sentence,

 7    highlighting the misalignment of tax records with the

 8    gap transactions, so there's one example.

 9         Q.   And here you say, "AEP's maintenance of the

10    PowerTax system has historically lagged its peers."

11              Do you see that?

12         A.   I do see that.

13         Q.   Okay.  And you say, "There was no meaningful

14    data cleansing or standardization activities related to

15    tax fixed assets having occurred since the initial

16    implementation of PowerTax in 1999."

17              And so, as of this point in time, they had

18    -- AEP had done nothing to clean or standardize its data

19    in 20 years?

20         A.   This was our understanding of AEP's state of

21    the records --

22         Q.   Okay.

23         A.   -- at this time.

24         Q.   And then you go on to talk about PowerTax

25    software, right?

 1                    Do you see that?

 2        A.   Where?  I'm sorry.

 3        Q.   The very next sentence.

 4        A.   Yes, I see that.

 5        Q.   All right.  And so you say, in part, here,

 6   "It's increasingly more difficult and risky to continue

 7   to utilize PowerTax software to support compliance

 8   accounting, forecasting, or inventory needs."

 9                    Do you see that?

10        A.   Not yet.

11        Q.   It's the last bit of the sentence.

12        A.   (Witness examining document.)

13                    Yes I see that.

14        Q.   And so here, I mean, you were directly

15   attacking power -- the PowerTax software, true?

16                    MR. ALLOY:  Object to form.

17                    You can answer.

18                    THE WITNESS:  That's not correct.  I was

19   commenting on the -- I think I even mentioned it earlier

20   today, the macro changes in the industry.

21   BY MR. FAZIO:

22        Q.   Okay.  And At the time, in 2019, is it correct

23   that AEP had not upgraded its PowerTax system since

24   2014, 2015?

25        A.   I don't know that.

 1      Q.  Okay.  Do you know, sitting here today, what

 2  version of PowerTax AEP was using at the time that you

 3  wrote this?

 4      A.  I don't know.

 5      Q.  Okay.  And sir, you recognize that there are

 6  multiple version of PowerTax available currently, right?

 7      A.  I understand that PowerPlan puts version labels

 8  on their software.

 9      Q.  Okay.  And functionality changes over time,

10  true?

11      A.  It is the expectation of customers that

12  functionality would change over time from person to

13  person.

14      Q.  And do you think it's not happened in the case

15  of PowerTax?

16      A.  I think it's been very minimal in the case of

17  PowerTax.

18      Q.  And what is it that you think PowerTax should

19  be doing that it hasn't done to upgrade its software?

20      A.  That's a great question.  You're putting me in

21  the shoes of the five of us running PowerTax.  It's hard

22  to say.  So the fact is that PowerTax was developed in a

23  regulatory and legislative climate that was static,

24  using technology and tools that were developed in the

25  80s and 90s.  And as the utility industry evolved, both

1   the legislative and the regulatory climates, the rules,

2   as well as the workforce, ever changing workforce, that

3   model became less and less effective.  So how could

4   PowerTax have -- I think it would have required

5   significant focus and attention for them to meet those

6   evolving needs.

7           Q.  So in Lucasys' proposal, you were proposing

8   both services and technology; is that correct?

9           A.  Certainly we were proposing technology.  I'd

10  have to refresh my recollection.

11          Q.  Feel free to peruse.  I'm want to ask you about

12  Page 13 in particular.

13          A.  Yes.  I see some services on that page in

14  particular.

15          Q.  So on 13, there's a pricing summary.  And just

16  to kind of cut to the quick here.  So you see there's a

17  table that shows -- first of all, your proposal was for

18  ██████████, true?  Or Lucasys' proposal was for

19  ██████████?

20          A.  I think that number represents a fixed-price

21  fee for the implementation or deployment of technology.

22  I think there are other components, as we can see here

23  on this page.

24          Q.  Okay.  So, data standardization and cleansing,

25  that was something that was going to need to happen

1   whether or not any technology was adopted, true?

2        A.  I think it -- I think the scope depends on what

3   technology was being adopted and where the data was

4   going to reside.

5        Q.  Okay.  And how does it depend on where the

6   technology was being adopted or where it was going to

7   reside?

8        A.  Well, I think any time we're dealing with data,

9   the final state of the data needs to, for lack of a

10  better word, fit in the target system.  And so I think

11  there's -- I think that cost can really depend on what

12  the target system -- what it takes to standardize,

13  cleanse, configure that data in a target system.

14       Q.  So if they were to maintain their PowerPlan

15  system, would -- is your view that the cost would have

16  gone up or down from the ███████ that you proposed

17  here?

18       A.  I'm not sure that I know at this moment.  It's

19  ban couple years.  It may have been -- I don't know.

20              MR. ALLOY:  You don't need to speculate if

21  you don't know.

22  BY MR. FAZIO:

23       Q.  Yeah, if you don't know, I'm not --

24       A.  Okay.

25       Q.  So sir, the other focus areas -- so there's

 1   automation, data reconciliation, interfaces, analytics,

 2   and forecasting.

 3        A.  Yes.

 4        Q.  So, explain to me, are those -- those are

 5   related to the implementation of the Lucasys technology?

 6        A.  I think the line items, if I recall, near or

 7   parallel areas of focus from the RFP itself, and so

 8   these are not -- so I guess what I'm saying is each

 9   individual line item may contain both costs related to

10   implementing Lucasys technology as well as any cost that

11   would have been needed anyway, I guess, if that makes

12   sense.

13        Q.  And this ▮▮▮▮▮▮▮▮, do you have any sense as

14   you sit here today -- and as Mr. Alloy correctly points

15   out, I'm not asking you to speculate, but as you sit

16   here today do you have any sense of how much of this

17   ▮▮▮▮▮▮▮▮ would have been devoted to development time

18   for the technology itself, as distinct from

19   implementation?

20        A.  So, this cost represents the implementation

21   cost only.  What -- what this does is gives us a

22   stability to the business to then invest our existing

23   cash resources into development.

24        Q.  And so, just to make sure I understand, this

25   proposal didn't include -- AEP was -- you were not

1    expecting AEP to fund directly the development of any

2    Lucasys technology?

3         A.   That's correct.

4         Q.   Okay.  And so, did you -- at this time, when

5    you put this proposal in -- I think we talked earlier

6    that the Lucasys tax depreciation product was in the --

7    was it -- we'll say a nascent stage.

8         A.   (Nodding yes.)

9         Q.   Did you put together any estimate or an

10   estimate of what resources were going to be required to

11   do the development that was going to be necessary to get

12   the software to a place where it could be implemented?

13        A.   I think we may have had internal conversations

14   around it.  Certainly we were talking about what it

15   would take to be ready to deliver on a project of this

16   scale and scope, and I think this was about the time

17   that Stephen had joined as our CTO, and so we were

18   activity talking about what it would take from a

19   resource standpoint.

20        Q.   And it was your belief, as of July 2019, that

21   you would have fully developed depreciation deferred --

22   and deferred tax software ready for implementation by

23   the conclusion of this project?

24        A.   Oh, certainly.  Yes.

25        Q.   Now, sir, the middle part of the page is

 1   another table, and it says, "Lucasys is offering AEP an

 2   early adopter discount of the annual software

 3   subscription pricing."

 4                     Do you see that?

 5        A.  I do see that.

 6        Q.  Okay.  How is it that you determined what the

 7   price would -- the subscription fee would be for either

 8   tax depreciation or deferred tax?

 9        A.  So, with any new product, there's some period

10   of time when -- I think it's called price discovery in

11   the software space -- and so we understood that -- that

12   we were in that phase, and so the pricing really was

13   tied to the value that AEP could expect to receive from

14   those solutions.

15        Q.  Now, sir, you said that the revenue that would

16   come from this project would have given Lucasys the

17   stability it needed to complete the development of tax

18   depreciation and deferred tax.

19                     Did you ever consider getting -- just going

20   out and getting financing so that you would have the

21   stability to develop the products absent this type of

22   product -- or project?

23        A.  So this is enterprise software, and so we

24   understand that our sales cycles are long and our

25   purchase prices are high.  And we, both based on the

 1   type of software we were creating as well as the

 2   industry we were pursuing did not feel like funding was

 3   the right fit.  So the alternative would have been

 4   consumer software for, you know, widgets or something

 5   that had a very wide market.  With a narrow market and a

 6   core niche, I should say, solution offering, we

 7   understood that we -- actually, like all of the other

 8   software built in the utility space, would need to work

 9   closely with utilities along the way to bring those

10   products to market.

11        Q.   Let's flip back to Page 11.

12        A.   (Witness complying.)

13        Q.   Do you see about a third of the way from the

14   bottom there, there's a paragraph that starts, "Lucasys

15   tax can interface with any upstream or downstream

16   system"?

17        A.   I'm sorry, I must be on the wrong page.

18        Q.   It's 11 of 28.

19        A.   Eleven?

20        Q.   Yes.

21        A.   (Witness examining document.)

22              Yes, I see that.

23        Q.   All right.  Do you see the numbered list there?

24        A.   Yes, I see that.

25        Q.   Okay.  And so just in the interest of

1    completion here.  It says "Lucasys tax can interface

2    with any upstream or downstream system that supports

3    flat file integration in relational databases or open

4    architecture.  For this focus area, Lucasys proposes to

5    deploy the following interfaces."

6                  When you say "interfaces," what do you mean

7    by "interface"?

8         A.  I think we mean the solution that's needed for

9    exchange of data.

10        Q.  Okay.  And under 1, it says, "PowerPlan assets

11   to Lucasys tax," and it says, "Lucasys tax fully

12   integrates to PowerPlan assets and pulls all relevant

13   book costs, transaction types and basis bucket

14   adjustments."

15                 Do you see that?

16        A.  I do see that.

17        Q.  Okay.  So how was it that Lucasys tax was

18   integrated into the PowerPlan assets?

19        A.  Well, I think the statement above it makes that

20   very clear, that because the solution that we had

21   already begun building at that time supports flat file

22   integration of any shape or form, that we could support

23   data inputs from any system.

24        Q.  And so you could create a system in which the

25   PowerPlan assets could export its information to a flat

 1   file, and then that flat file in turn could be uploaded

 2   into the Lucasys tax solution?

 3        A.   That's one option.

 4        Q.   What are the other options?  How else could you

 5   do it?

 6        A.   So, I see -- I see references to open

 7   architecture.  To the extent there's an open

 8   architecture and that's available to our customer, our

 9   customer's IT department could build whatever automated

10   data extract is needed for Lucasys to ingest.

11        Q.   And for that to work properly, they would need

12   to know -- understand the data schema in the PowerPlan

13   database, correct?

14        A.   What would the customer need to know?

15        Q.   Yeah.

16        A.   Is that what you're asking?

17        Q.   Or whoever was doing this work.  They'd need to

18   understand where in the PowerPlan database to go to get

19   the information, true?

20        A.   I assume whoever was getting data from a

21   database would need no know where to find that data.

22        Q.   All right.

23        A.   That's correct.

24        Q.   Do you know how many tables there are in the

25   database that supports the PowerPlan application?

 1          A.   I don't know.

 2          Q.   Do you know if it's in the thousands?

 3          A.   I have no idea.

 4          Q.   And so let's just kind of tick down the list

 5     here.   "PowerPlan depreciation to Lucasys tax," and

 6     again, it says, "Fully integrates PowerPlan

 7     depreciation -- reconciliation diagnostics of book

 8     revenue and Lucasys tax compared to PowerPlan."

 9               And so, again, the way the data would move,

10     it's the same as what we were just discussing a moment

11     ago?   It could be either a direct connection, it could

12     be flat file?

13          A.   Yeah, I just want to clarify that we would lean

14     on the utility's IT department to drive the integration

15     strategy.

16          Q.   So in the course of setting up these

17     interfaces, it was your view that it would be the -- the

18     customer's IT department that would set up the

19     integrations or the interfaces?   Or was that going to be

20     something Lucasys did?

21          A.   I think the customer's IT owns the access to

22     whatever database the data is in.   I don't think it

23     could have been done without -- I don't think it can be

24     done without the IT department.

25          Q.   Right.   Well, my question, though, is:   If they

1    gave Lucasys permission, did Lucasys intend to build

2    those interfaces?

3        A.  Again, typically, there's a design phase to a

4    project that starts after the, you know, signature and

5    those kind of questions are evaluated within the design

6    phase, so unfortunately with this project, we weren't

7    able to get to that point in the project.

8        Q.  And sir, I think you may have answered this

9    before, but with Lucasys tax and the depreciation

10   product -- or let's start with Lucasys tax.  There's

11   nothing -- I think you said earlier that there would be

12   nothing that would go -- no output from Lucasys tax that

13   would be required to go back into any PowerPlan product.

14            Did hear that correctly earlier?

15       A.  Nothing is required to go back in.  I think

16   that's a true statement.

17       Q.  Okay.  Are there things that the customer would

18   want to have pushed back into PowerPlan?

19            MR. ALLOY:  Objection, but you can answer.

20            THE WITNESS:  Yeah, I don't know.  I think

21   it depends on that particular customer's requests.

22   BY MR. FAZIO:

23       Q.  And if you were reversing the flow of data and

24   you were going from outside the PowerPlan system into

25   it, could you use these same interface types to make

 1   that happen?

 2        A.  So, I'm not sure.  So flat files would depends

 3   on the target system's ability to accept the flat files,

 4   and -- and anything more automated than that would

 5   depend on the IT department's rules and restrictions.

 6        Q.  Let's flip over to Page 9.

 7        A.  Page 9.

 8        Q.  Yes.

 9        A.  (Witness complying.)

10        Q.  You see there's a section there entitled, "Risk

11   mitigation"?

12        A.  Yes, I see that.

13        Q.  Okay.  In No. 2 there, it says, "Towards the

14   culmination of the project, Lucasys will discuss with

15   AEP its organizational readiness to adopt Lucasys tax

16   depreciation and Lucasys deferred tax."

17             Do you see that?

18        A.  I do see that.

19        Q.  And so at the end of this project, where the

20   customer was going to spend ████████████████

21   implementing the software, the risk mitigation that you

22   were proposing at the end was that, you know, they just

23   may not elect to use it?

24        A.  So, this statement is stating that -- it's

25   indicating that during the course of this project, we

 1   would keep an alternative option available for AEP to

 2   continue to use the PowerTax system of -- and you can

 3   see that with the addition of the Lucasys Copilot if AEP

 4   made that decision.

 5        Q.   So why is it that you thought it was important

 6   to include that as a risk mitigation point?

 7        A.   Well, AEP had an understanding that we were an

 8   early technology company and that they were taking a --

 9   making a -- or would be making a business decision to --

10   to adopt new technology, and so with that comes some

11   operational risk, and so we -- you know, a project of

12   this length, we wanted to make sure, like we do with any

13   of our projects, that we give the most flexibility back

14   to our customers that we can.

15        Q.   All right.  And this was something from July of

16   2019, true?  This was a document that was written in

17   July of 2019?  If you look at the cover, it --

18        A.   Yes, that looks correct.

19        Q.   Now, the interrogatory responses, there were a

20   number of references that Lucasys had quote/unquote won

21   work from AEP.

22             Is this the work you were talking about

23   having won?

24        A.   This would have been part of the work that we

25   would have won.

 1        Q.    Okay.

 2        A.    That's correct.

 3        Q.    Well, I'm specifically asking you about -- if

 4    you go back to Exhibit 7, on pages -- it really starts

 5    at 5, and it continues on to 6 and 7.  Do you see, you

 6    say with respect to deferred tax and depreciation, "But

 7    for PowerPlan's actions Lucasys would have licensed

 8    deferred tax to AEP as a result of winning the bid to

 9    build a new tax asset solution."

10              See that?

11        A.    I didn't catch the page, but I recall that

12    language.

13        Q.    It's 6.

14        A.    Six.

15        Q.    Second bullet point.

16        A.    Okay.  Yes, I see that.

17        Q.    All right.  And then you say it again in the

18    next bullet point.

19        A.    Yes.

20        Q.    Do you see that?

21        A.    Yes, I do.

22        Q.    And so, my question, sir -- I just want to make

23    sure I understand.  When you say you won the bid, was

24    this the bid that you were talking about when you were

25    responding to that interrogatory?  Or was there some

 1   other -- was there another bid?

 2        A.   No, this -- this is the bid that we won.   I

 3   believe we won it right around the time that PowerPlan

 4   reached out to AEP.

 5        Q.   Okay.  And how is it that you learned that you

 6   won the bid?

 7        A.   We got a communication from procurement.   It

 8   may have been the person referenced in that letter.   We

 9   got a communication that indicated that we were the

10   finalists for the RFP, and then contemporaneously, we

11   received communication from the tax department that we

12   were the only finalists for the RFP.

13        Q.   And how --

14        A.   And --

15        Q.   I'm sorry.

16        A.   That was how we knew that we had won.

17        Q.   Okay.  Who sent you that communication?

18        A.   So --

19        Q.   Or how did -- sorry.  First of all, what form

20   did that communication come in?

21        A.   I believe it was an e-mail from, was it

22   Ms. Thal that was on the -- I believe that may have been

23   the individual who sent us the e-mail.  And I believe we

24   got a -- I'm remembering a text message from one of the

25   leaders of the tax department.

 1        Q.   Okay.   And what did the text message say?

 2        A.   Something to the effect of, You guys are the

 3   only finalists.   And I believe -- whether it was in that

 4   text message or in a subsequent conversation that based

 5   on the communications with PowerPlan, that there may be

 6   some scope changes.   We may be requested to submit

 7   another response based on AEP's internal decisions.

 8        Q.   Okay.   And do you still have that text message

 9   today?

10        A.   I believe I shared it with the Lucasys team via

11   Slack.   So I think it's probably in a company Slack

12   message.

13        Q.   Okay.

14        A.   Yes.

15        Q.   And who sent you that message?

16        A.   My recollection is it was Kevin Keller.

17        Q.   So there was a text message from Kevin Keller

18   and then there was an e-mail, you believe, as well?

19        A.   And I believe it was from Ms. Thal, yes.

20   That's correct.

21        Q.   And your recollection of that e-mail is that

22   Ms. Thal told you that you were the only finalists?

23        A.   My recollection is that she told us that we

24   were a finalist, and that the text message from

25   Mr. Keller told us that we were the only finalists.

1       Q.  Who was responsible for wording the work under

2   that RFP?

3       A.  I don't know.

4               (Exhibit 13 marked for identification.)

5   BY MR. FAZIO:

6       Q.  All right, you've been handed what's been

7   marked as Exhibit 13.

8       A.  (Witness examining document.)

9       Q.  Do you recognize this document?

10      A.  This appears to be or may have been the e-mail

11  that I was recollecting from Ms. Thal.

12      Q.  Okay.  So let's start on the page marked 23130.

13  It's the last e-mail exchange.

14      A.  Yes, I see it.

15      Q.  The one that's the first e-mail in the chain?

16      A.  Yes.

17      Q.  And there, she says, "I'm reaching out because

18  the team is interested in moving forward with Lucasys as

19  a finalist in the tax fixed asset system RFP."

20              Do you see that?

21      A.  I do see that.

22      Q.  Okay.  And then it says, "Lucasys is

23  interested, I'll be working with you to narrow down the

24  scope of the project to accurately compare finalists in

25  making a final selection."

1      A.  I see that.

2      Q.  Okay.  So is this the e-mail that you were

3  referring to a minute ago?

4      A.  I think this is what I'm recalling, yes.

5      Q.  Okay.  And then she says, "I want to" -- at the

6  end, she says, "I want to thank you and the team for

7  being patient while the team took time to get internal

8  approvals and welcoming steps for this effort."

9           Let's flip over to the first page, and

10  she's responding as an intervening -- an intervening

11  note from you in which you express an interest in the

12  RFP and, of course, feel free to read all of this, if

13  you feel you need to.  But I want to direct your

14  attention to the January 6, 2020, 3:11 p.m. Thal e-mail.

15           Are you there?

16      A.  I am.

17      Q.  Okay.  So second paragraph, do you see that?

18  She says, "I understand Lucasys included software

19  subscription in the original proposal."  She says, "Due

20  to time and associated costs, the team is not interested

21  in purchasing the software license at this time, but

22  would like to better understand the costs associated

23  with the technical services required for this effort."

24           Do you see that?

25      A.  I see that.

1        Q.   Okay.   And then she goes on, "We have the

2    finalists selected for the tax specific components of

3    the project that are expected to take place after this

4    technical portion."

5        A.   I see that.

6        Q.   Okay.   So can you -- first of all, help me

7    understand, what was the difference between the tax

8    specific component of the project and the technical

9    portion of the project, if you recall.

10       A.   I don't know exactly what -- what -- how she's

11   delineating that in this e-mail.

12       Q.   Okay.   And then in the next paragraph, she

13   says, "To better understand the services required and

14   evaluate the finalists, we're asking each of the

15   finalists to draft a scope of work with the updated

16   scope and fees."

17                  Do you see that?

18       A.   I do.   I think I'm recalling that there may

19   have been parallel RFPs.

20       Q.   Okay.

21       A.   One set focused on technology and one focused

22   on tax accounting.   And I think -- maybe I'm going back

23   to your last question.   I apologize.   I think that's the

24   -- that may be the differentiation she's touching on;

25   tax specific versus technical.

1          Q.  Okay.

2          A.  Yeah.

3          Q.  And so the document we were looking at a moment

4     ago, Lucasys's July 26, 2019, proposal, RFP response and

5     contract pricing for the tax fixed asset system.  Which

6     of the components did that address?  Was it one, the

7     other, or both?

8          A.  That would is have been just the -- I think

9     what's labeled here as the technical portion.

10         Q.  Okay.  Okay.  And so, you see here, she says,

11    "Due to time and associated costs, the team is not

12    interested in purchasing the software license at this

13    time."

14              And so, has anyone from AEP ever told you

15    that the reason that this -- well, strike that.

16              So you got your -- a text from Mr. Keller?

17         A.  That's correct.

18         Q.  And said -- that said you were a finalist.

19    What -- after you received that, what -- did you get any

20    more communications from Mr. Keller or anybody else at

21    AEP's tax department about the July 2019 RFP submission

22    that you made?

23              MR. ALLOY:  I think you might have

24    misstated what the text said, right?

25              MR. FAZIO:  Oh.

 1                THE WITNESS:  Yeah, I can clarify.  Yeah,

 2  so Mr. Keller's text communicated to us that we were the

 3  only finalists.

 4                And, I'm sorry, can you ask the question

 5  again?

 6  BY MR. FAZIO:

 7       Q.   It's getting late in the day.

 8       A.   Yeah.

 9       Q.   The question is:  Did anyone from AEP's tax

10  department communicate with you about the state of the

11  July 2019, RFP response that you made, after you were

12  notified that you were the only finalists?

13       A.   Yeah, so, the communication that we received,

14  whether it was from the tax department or through the --

15  through the subsequent narrowing of scope, I think, as

16  this is talking about, was a request for a completely

17  different type of project, not implementing any new

18  technology, but only providing such services that could

19  be done with AEP's existing technology footprint.

20       Q.   Okay.  Do you have any reason to believe that

21  the reason they made the change was due to anything

22  other than the time and associated expense?

23       A.   Oh, definitely.  So the new proposal that we

24  gave them, my recollection was that it was at least the

25  same or similar cost, so I believe AEP ended up

 1   evaluating and pursuing a project of a similar or

 2   potentially greater cost than the original July RFP

 3   proposal.  Of course a different scope without the

 4   technology.

 5                    (Exhibit 14 marked for identification.)

 6   BY MR. FAZIO:

 7        Q.  Sir, you're being handed what's been marked as

 8   Exhibit 14.  I don't want to spend a ton of time on

 9   this, but I want to just confirm with you that this was

10   the updated scope that we've been talking about for the

11   last few minutes.

12        A.  Yeah, and again, it was characterized as a

13   scope reduction, but we can see that the final output of

14   this updated RFP calls for a completely different

15   technology solution.  So we at Lucasys evaluated this as

16   a services project and responded to this RFP as such.

17        Q.  Do you recall how much you bid in response to

18   the scope that was requested in Exhibit 14?

19        A.  I recall that it was at least ██████████.

20        Q.  And was Lucasys awarded that work?

21        A.  Not -- not at the time, or not -- not in the

22   scope of that RFP.

23        Q.  Okay.  Help me understand what you mean by

24   that.

25        A.  Subsequent to this time, AEP requested that

 1    Lucasys provide a statement of work.  I think they

 2    called it a refreshed version of our response to this

 3    RFP, that came, maybe, years later, I don't know.  At

 4    least a year or two later with some additional scope.

 5    And so -- saw that we were awarded a contract that

 6    wasn't the proposal that we gave to this updated

 7    January 2020 RFP.

 8        Q.  Okay.  And so the proposal that you provided in

 9    response to the January 2020 RFP, how much was that for,

10    if you recall?

11        A.  My recollection is that it was ███████████

12    ███

13                (Exhibit 15 marked for identification.)

14    BY MR. FAZIO:

15        Q.  All right.  Well, let's take a quick look at

16    Exhibit 15.

17        A.  Maybe we have that here.  15?

18        Q.  Yes.

19                And if you look at Exhibit A to the

20    contract --

21        A.  (Witness complying.)

22        Q.  -- this is a contract -- it's an initial

23    contract routing notification of risk that's signed off

24    by a series of folks from AEP, and then there's a -- it

25    looks like a purchase order and then there's a statement

 1   of work.  Statement of Work No. 2 for Lucasys.

 2        A.  (Witness examining document.)

 3        Q.  Take a look at the project scope on page 2130.

 4        A.  Yes, I see that.

 5        Q.  Okay.  Is this -- tell me, what was the work

 6   that you were going to be doing under Statement of Work

 7   No. 2?

 8        A.  So this is what we would call our standard

 9   services-type of work, where we help our customers keep

10   the lights on, so to speak.  So these services would

11   have included helping them navigate the tax department

12   processes.  It looks like for tax year ending

13   December 31, 2019, and year-end expiration for 2020.  So

14   this would have been kind of auxiliary resource

15   augmentation for the tax department.

16        Q.  Okay.  So this work was unrelated, essentially,

17   to the request for proposal for the tax fixed asset

18   system?

19        A.  That's correct.

20             (Exhibit 16 marked for identification.)

21   BY MR. FAZIO:

22        Q.  You've been handed what's been marked as

23   Exhibit 16.

24        A.  (Witness examining document.)

25        Q.  Can you identify that for the record for me,

 1   sir?

 2        A.   This appears to be another purchase order or

 3   purchase release from AEP for services from the

 4   business.

 5        Q.   Okay.  Can you describe for me what it is that

 6   you were going to be doing in Statement of Work 3 -- or

 7   Lucasys was going to be doing?

 8        A.   This looks very similar to the previous

 9   document that we looked at.  It looks like the tax years

10   may have incremented.  So this may be similar tax --

11   this looks like it's similar services, but for the

12   subsequent year.

13        Q.   Okay.  Was this in addition to Statement of

14   Work 2, or in place of?

15        A.   No.  This looks like it's in addition to, so it

16   governs the years following Statement of Work 2.

17        Q.   Okay.

18                 (Exhibit 17 marked for identification.)

19   BY MR. FAZIO:

20        Q.   Sir, you've been handed what's been marked as

21   Exhibit 17.

22        A.   (Witness examining document.)

23                 Okay.

24        Q.   Do you recognize this document?

25        A.   (Witness examining document.)

 1                    It appears to be another purchase order or

 2    purchase release from AEP for Lucasys.

 3         Q.  And I'll apologize in advance or the image

 4    quality on Statement of Work 4, but that's how we got

 5    it, so that's how I can give it to you.  Can you tell

 6    me, do you have a sense of what work it was that you

 7    were being asked to do by AEP, Statement of Work 4?

 8         A.  It's almost illegible, but let me do my best.

 9         Q.  If you look at the middle of the sheet, under

10    "Project scope," it appears to say, "Lucasys shall

11    provide advisory services with respect to increased

12    federal income tax rate as further detailed in Exhibit

13    A, the project plan."

14         A.  Oh, yes.  I see that.

15         Q.  Do you have understanding of what that was all

16    about?

17         A.  Yes.  That helps.  So, there was a point where

18    AEP wanted to model some proposed federal income tax

19    rate changes that had been proposed either formally or

20    informally, either in congress or from the executive

21    branch.

22         Q.  Okay.  Did you complete that work?

23         A.  My recollection is that we began that work and

24    shortly thereafter the -- I think we began it, maybe, in

25    December, and then January of that year, with the

 1  mid-term elections, the congressional makeup shifted and

 2  the likelihood of a rate increase was not there.

 3      Q.  Okay.  And so the project stalled, essentially?

 4      A.  I think it was paused, pending whenever AEP was

 5  ready to pick it up.

 6              (Exhibit 18 marked for identification.)

 7  BY MR. FAZIO:

 8      Q.  All right.  Sir, you've been handed what's been

 9  marked as Exhibit 18.

10      A.  Yes.

11      Q.  I think you referred to this -- you may have

12  referred to this a few minutes ago.  Can you explain to

13  me what we are looking at?

14      A.  Yes.  This is familiar.  So, this appears to be

15  the -- let me just confirm here.  This appears to be the

16  refreshed SOW requested by AEP that -- that began as

17  that January 2020 proposal.  I don't think that was in

18  the documents, but it was a refreshed version of the

19  January 2020 proposal with additional scope identified

20  by AEP.

21      Q.  Now, sir, you see under "Fees and expenses"

22  there?  It says, "Fixed fee cost for the scope of

23  services is ███████████  and is inclusive of any

24  out-of-pocket expenses."

25              Do you see that?

 1        A.   I do see that.

 2        Q.   So, sir, did this -- was this -- first of all,

 3   was this scope of work -- were you ever awarded this

 4   statement of work?

 5        A.   I believe there were revisions to the statement

 6   of work before it was awarded.

 7        Q.   Okay.  Well, tell me, has it been awarded to

 8   Lucasys at this point?

 9        A.   Again, not this exact one, but an iteration of

10   this has been awarded to Lucasys.

11        Q.   Okay.  And what was the value of that statement

12   work?

13        A.   I believe the revision that I recall was to

14   remove the estimates related to out-of-pocket expenses

15   and to instead invoices those as incurred outside of the

16   fixed fee.  And so, yeah, I believe it was in the

17   ballpark of ██████████, something to that effect.

18        Q.   And what tasks is Lucasys going to be

19   performing for that ██████████?

20        A.   Yeah, so -- quite a few.  Let's see, we don't

21   have the project detail here.

22        Q.   I can --

23        A.   Yeah.

24        Q.   I can help you out with that.

25        A.   Okay.

 1                    (Exhibit 19 marked for identification.)

 2      BY MR. FAZIO:

 3          Q.  Sir, you're being handed what's been marked as

 4      Exhibit 19.  And you'll see -- if you look at the last

 5      page of Exhibit 18 and the first page of Exhibit 19,

 6      you'll see they're consecutive Bates numbers.

 7          A.  Tell me again, I'm sorry, the last one of 18?

 8          Q.  Yeah, so just look at the back page.  You'll

 9      see that there's a number here?

10          A.  I see that.

11          Q.  And then --

12          A.  Yes, I see that.

13          Q.  -- they're sequential.

14          A.  Yes.

15          Q.  So tell me, what tasks was Lucasys going to be

16      doing for this ██████████?

17          A.  We have quite a bit of pages.  Would you like

18      me to read from the document?

19          Q.  Well, I'd like you to give me an overview.

20          A.  Okay.

21          Q.  So, first of all -- well, I'll ask you some

22      questions to make it easier.

23                  So, does this, the scope of this project,

24      include implementation of any Lucasys software product?

25          A.  In the project that was awarded, it does.  I

 1   don't know which version I'm looking at here.

 2        Q.   Okay.  And what products are going to be

 3   implemented?

 4        A.   ████████

 5        Q.   ███████

 6        A.   █████████

 7        Q.   ████████████████████████████████

 8   █████████████████████████████████████

 9        A.   ████████

10        Q.   Okay.  When did you learn that it was being

11   awarded to Lucasys?

12        A.   It would have been late 2021.

13        Q.   Okay.  And how did you learn?

14        A.   I think we received a -- one of these contract

15   routing slips from AEP.

16        Q.   Okay.  And so what's the timeline on which

17   Lucasys is expected to provide these services?

18        A.   My recollection is that AEP wasn't ready to

19   begin in January, as we -- as kind of this calendar

20   indicates, and so my recollection is that we started in

21   February of this year, 2022, and I believe -- I don't

22   know exactly what this proposal is, but our current

23   progress indicates that we would complete the services

24   around the first quarter of next year.

25        Q.   Okay.  And so you'll be invoicing AEP

1    approximately ████████████ a month from now -- from

2    the beginning of the project until its completion the

3    first quarter of next year?

4         A.  That's not correct.

5         Q.  Okay.

6         A.  So maybe I gave you the wrong number, but our

7    monthly invoice is around ████████

8         Q.  ████████?

9         A.  Yes.

10        Q.  Okay.  Do you know, did anybody else bid on

11   that work?

12        A.  I don't know.  I should say that I know that to

13   the extent this was a continuation of the work that was

14   done or the RFPs that came before there were other bids,

15   back to the July 2019 RFP, there were other bids that

16   would have, perhaps, been similar in nature to this one.

17   My understanding is that -- yeah, that there were

18   multiple bids at some point.  I just don't know if it

19   happened --

20        Q.  So, I asked you about --

21        A.  I am --

22        Q.  -- I'm sorry.

23             I asked you about software implementation.

24   In broad strokes, can you kind of give me the general

25   overview of what it is that you're doing on the services

 1   side for -- in the scope of this --

 2        A.   Yeah.

 3        Q.   -- RFP that you were recently awarded?

 4        A.   Yeah.  So in broad strokes, we are taking a

 5   holistic analysis of AEP's processes with regard to tax

 6   fixed assets, and that includes the compliance

 7   processes; tax depreciation as well as the tax

 8   accounting processes, including deferred taxes.  It

 9   includes the requirements for external reporting and

10   regulatory reporting.

11             As you may know, AEP has a lot of

12   subsidiary companies.  I think it's, like, 100-plus.

13   Most of those are regulated entities.  And so there's

14   quite a bit of data as well.  So in addition to kind of

15   the process, understanding, establishing processes for

16   AEP, there's a significant portion related to

17   remediating data for each of those subsidiary companies.

18             So, the project also, of course, includes

19   knowledge, transfer, and training for AEP on the newly

20   configured data.  It includes testing around the newly

21   configured data, and some kind of deployment back into

22   AEP's, kind of, live data set of the configured data.

23        Q.   Okay.  Other than the large RFP that we've been

24   talking about, do you have any other current projects

25   underway with AEP?

1      A.   We do.

2      Q.   Okay.   What are those projects?

3      A.   We have a project that's similar in nature to

4  some of the SOWs we looked at here today, but for the

5  current year, to provide resource augmentation for AEP.

6  We have another set of SOWs that -- for which we have

7  not begun services yet, but related to specific

8  transactions that AEP is entering into with its

9  subsidiary companies, so buying and selling assets,

10  things like that.

11      Q.   In total, do you have an estimate of how much

12  you expect that you're going to generate in revenue from

13  your AEP relationship in 2022?

14      A.   So, it would be the --   ███████████████

15  ███████████████████████████████, probably.

16      Q.   In terms of other work streams that you have

17  going at Lucasys right now, what are your other -- do

18  you have any other major products that are underway for

19  other customers?

20      A.   I don't believe that we do.   I think we have

21  some minor projects, but nothing major.

22      Q.   Do you anticipate hiring any new employees in

23  2022?

24      A.   So, since this dispute arose and there was

25  uncertainty to our business model, we primarily

 1   leveraged contractors to augment our ability to provide

 2   solutions, and so -- yeah.  So that's -- where and when

 3   we need additional resources, they're likely to come in

 4   that form.

 5       Q.  Sir, I want to switch gears a little bit and

 6   talk about SUEZ, the SUEZ situation.

 7             Were you -- have you -- were you personally

 8   involved in the delivery of services to SUEZ in the past

 9   couple years?

10       A.  Not in any major way.

11       Q.  Okay.

12       A.  I don't believe so.

13       Q.  How many hours, approximately, do you think

14   you've spent on SUEZ-related projects in the last two

15   years?

16       A.  I don't know even how to estimate that.

17       Q.  Would you say it's 5 percent of your time, 10

18   percent of your time?

19       A.  I think I've played a minor role in our SUEZ

20   engagements.

21       Q.  Okay.

22       A.  I don't know exactly.

23       Q.  Let me ask you, who is the person at Lucasys

24   who has responsibility, primary responsibility, for the

25   SUEZ engagement?  Or had primary responsibility?

 1          A.   So, we had a number of engagements with SUEZ.

 2   I think you'd have to be more specific.

 3          Q.   Okay.  Well we'll start filing through them.

 4          A.   Okay.

 5          Q.   Now, sir, we talked earlier about discussions

 6   that you had with Mr. Salas -- is it Salas or Salas?

 7          A.   I say Salas, but I don't know.  I could be

 8   wrong.

 9          Q.   Do you say it to him or --

10          A.   I don't say it to him.

11          Q.   All right.  Well, the transcript will -- it

12   will be pronounced correctly in the transcript, so.

13               You mentioned that he had recounted a

14   conversation that he alledgedly had with some

15   representatives of PowerPlan.

16               Do you recall that there was a point in

17   time when you had a meeting with outside counsel for

18   SUEZ?

19          A.   I remember a meeting with internal counsel of

20   SUEZ.

21          Q.   Okay.  Let me --

22               (Exhibit 20 marked for identification.)

23   BY MR. FAZIO:

24          Q.   We'll get to -- well, let's get to Exhibit 20

25   in just a second, but before we get there, tell me about

 1    this call that you had with internal counsel from SUEZ.

 2                   When did that occur?

 3          A.   I think it's the same conversation that I

 4    described before, where Mr. Salas had described the

 5    substance of his conversations with the PowerPlan

 6    representatives.

 7          Q.   Okay.   And so in-house counsel was on that

 8    call?

 9          A.   That's my recollection.

10          Q.   Okay.   Have you ever had any other

11    conversations with SUEZ representatives where in-house

12    counsel was on the call?

13          A.   I don't recall.   I don't recall.   I think I --

14    okay.   So, I think I made a courtesy call to Mr. Salas,

15    I believe, when we filed the litigation to let them know

16    that we had done that.

17          Q.   Okay and what did you tell him about that?

18          A.   Just that we had done that.

19          Q.   Okay.   Anything else?

20          A.   No.

21          Q.   Okay.   Did you direct him to the docket?

22          A.   I don't believe so.

23          Q.   Did you provide him a copy of the Complaint?

24          A.   I don't believe so.

25          Q.   Okay.   Have you provided anybody a copy of the

 1    Complaint?  Any third parties?

 2        A.  I believe there may have been customers who

 3    have asked me for those, and I've either -- I don't

 4    believe I've ever provided the Complaint, but I may have

 5    shared, like, a link, like a web link to the Complaint.

 6        Q.  So if a customer calls you and asks you about

 7    the litigation, what do you say to them?

 8        A.  I let them know that I can't talk about it and

 9    that they should look to whatever information's in the

10    public record.

11        Q.  Have you ever had any conversations with any

12    third party, meaning anyone outside -- not your counsel,

13    not your co-workers, not your wife -- any other kind of

14    third party about the litigation?

15        A.  I think as part of -- well, so, what I recall

16    is that as we were evaluating -- yeah, I recall having

17    conversations, for example, with -- with Mr. Jason Cohen

18    or a conversation asking him if he'd be comfortable to

19    speak to our lawyers.

20        Q.  Okay.  That was in advance of his deposition?

21        A.  It must have been.  I think it was -- yeah, I

22    don't know when, but it was a long time ago.

23        Q.  It was the purpose of making that introduction

24    to see if he would sit for a deposition, or was there a

25    different purpose?

 1         A.   I think the purpose was just to educate our

 2    counsel, and then I think any decisions that came from

 3    that were made by counsel.

 4         Q.   Okay.  All right.  So Jason Cohen.  Any others?

 5         A.   I think I had a similar conversation with

 6    Jonathan Williams and Josh Herschel of RCC.

 7         Q.   Uh-huh.  And that was concerning the

 8    deposition?

 9         A.   I think it was a courtesy conversation to let

10    them know that they would be deposed in this case.  I

11    think that's correct.

12         Q.   So what did you say to them?

13         A.   Just that, that unfortunately, you will be

14    deposed in this case.

15         Q.   Okay.  And did they react to that?

16         A.   I don't recall any reaction at all.

17         Q.   Has Mr. Williams ever expressed to you any

18    views about the litigation?

19         A.   He has not.

20         Q.   All right.  So let's look at Exhibit 20.

21         A.   (Witness examining document.)

22         Q.   Do you recognize this documents?

23         A.   I can see it's an e-mail that was forwarded to

24    me.

25         Q.   Okay.  Did you -- so it's a -- so this is --

 1   the bottom e-mail is from Brian Brockway.

 2        A.   Yes.

 3        Q.   Do you see that?

 4        A.   Yes.

 5        Q.   And it's addressed to your colleagues at

 6   Lucasys, Daniel and Lou.  It says -- he says, "Hi, I

 7   hope you're doing well" -- and it -- the bottom line in

 8   this is they were trying to set up a call with outside

 9   legal counsel.

10             Do you see that in the middle of the e-mail

11   exchange?

12        A.   (Witness examining document.)

13             I see that.  Including internal and

14   external legal counsel.

15        Q.   Yeah.

16        A.   Yeah, I see that.

17        Q.   First of all, did you participate in -- first

18   of all, did a call with outside counsel happen?

19        A.   I don't recall if outside counsel was on, like,

20   the conversation that I'm thinking or --

21        Q.   Okay.

22        A.   -- or if there was another conversation.  I

23   don't recall.

24        Q.   Well, down below, it says, "Would it be

25   possible to set up a call with Lucasys with me, on the

 1    call, to ask them some questions.  It would be helpful

 2    to find out more from them about how they may have used

 3    any PowerPlan information accessed through SUEZ."

 4         A.  Yes.

 5         Q.  Right?

 6         A.  I see that.

 7         Q.  So do you recall being on the call where that

 8    topic was discussed?

 9         A.  I think we got that question from Michael Salas

10    and internal counsel.  I think largely -- and really

11    every -- every company where PowerPlan made these

12    allegations to the extent that companies didn't

13    immediately terminate our contract, wanted to understand

14    what the risk profile was and what we're doing for that

15    company.

16         Q.  Okay.  So you don't recall ever being on a

17    conversation with outside counsel?

18         A.  It may have occurred, I just don't recall right

19    at this moment.

20         Q.  Did anyone from SUEZ ever explain to you or

21    provide to you an explanation as to what they were

22    saying to PowerPlan about the situation?

23         A.  I don't think anybody ever told us any

24    specifics.  We understood that SUEZ was in communication

25    with PowerPlan.  We knew that there was some kind of

1   back and forth, so we understood -- we understood that

2   there was communication back.  But at the time, we

3   didn't know what that was.  I think subsequent to that,

4   through the discovery, we maybe have seen more of that

5   or learned some more.

6         Q.  So you -- during while these conversations were

7   actually going on, you never actually saw any of the

8   letters that PowerPlan actually sent out to any of these

9   customers?

10        A.  I believe that's correct, yeah.

11        Q.  No customer ever just sent it on to you and

12  said, Hey, what's your response to this?

13        A.  I don't think so.  I think I would remember

14  something like that.

15              (Exhibit 21 marked for identification.)

16  BY MR. FAZIO:

17        Q.  I'm handing you what's been marked as

18  Exhibit 21.

19        A.  (Witness examining document.)

20        Q.  Just briefly -- I wanted you to take a look at

21  this.  It's a meeting invite that was forwarded to you.

22  The initial is -- was dated -- sent on June 25, 2020, at

23  7:20 a.m.  It's asking -- it says, "Daniel" -- it's from

24  Mr. Brockway -- "Daniel could you please forward to

25  Ladine."

1                    Do you see that?

2        A.   I see that, yes.

3        Q.   Okay.  Does this refresh your recollection

4   about being on a call with outside counsel June of 2020?

5        A.   I -- I -- I don't recall.  I see I marked it as

6   tentative.  I may have been, but I don't recall.

7        Q.   Okay.  Have you ever spoken with -- so there's

8   a Dennis Hopkins from Perkins Coie here.

9                    Do you see that?

10       A.   I see that.

11       Q.   Okay.  Have you ever spoken to Mr. Hopkins, to

12   your knowledge?

13       A.   I don't recall.  I do recall -- I think I

14   recall looking him up online.  Maybe it was when I got

15   this -- I recall looking up that name --

16       Q.   Uh-huh.

17       A.   -- but I don't recall having a conversation

18   with him, I don't believe.

19       Q.   And there's an Adrienne Payson?

20       A.   Yes.  Adrienne Payson is their internal --

21   chief legal, chief officer.

22       Q.   What's Mr. Brockway's position?

23       A.   I don't know for certain.  I understand he was

24   involved with one of the projects that we were

25   delivering for SUEZ.

1     Q.  Sir, we talked earlier about the conversation

2  that you had with Mr. Salas and Rali.  His actual name

3  escapes me right at the moment.

4     A.  Uh-huh.

5     Q.  We talked about that earlier.  Other than that

6  conversation, was there -- did you have any other

7  communications with anybody at SUEZ about the statements

8  that were allegedly made by PowerPlan concerning

9  Lucasys?

10          We talked about your -- and I'm excluding

11  the conversation you had with in-house counsel, and

12  obviously we talked a little bit about the

13  Brian Brockway communications, but I just want to know

14  from you:  Are there any other communications that

15  you've had with anybody from SUEZ concerning that topic?

16          MR. ALLOY:  Can you state the topic again?

17          MR. FAZIO:  The topic is the alleged

18  defamatory statements by PowerPlan.

19          THE WITNESS:  I may have been in

20  conversations with Rali.  I don't know if Rali was on

21  your list.

22  BY MR. FAZIO:

23     Q.  Uh-huh.

24     A.  I don't recall specifically.  I know I spoke

25  with Mr. Salas specifically, and with Ms. Payson, but I

 1  may have spoken with Rali or been part of a conversation

 2  with Rali.  I don't recall that.

 3       Q.  Okay.  And in broad strokes, can you describe

 4  for me the work that was being performed as part of this

 5  project that was ongoing at SUEZ?

 6       A.  I think we had multiple concurrent projects --

 7       Q.  Okay.

 8       A.  -- at this time.

 9       Q.  You're not going to make me go through all

10  these statements of work, are you?

11       A.  Well, I just don't recall.  I recall that there

12  was more than one.

13       Q.  Yeah.

14       A.  I recall -- yeah, I just -- I'm not sure if I

15  recall the -- we've had a number of engagements --

16       Q.  All right.

17       A.  -- with SUEZ.

18            MR. FAZIO:  Can we take ten minutes so I

19  can get organized?

20            MR. ALLOY:  Yeah.

21            MR. FAZIO:  Go off the record.

22            THE VIDEOGRAPHER:  Off the record at

23  4:19 p.m.

24            (Off the record.)

25            THE VIDEOGRAPHER:  Back on the record at

 1   4:36 p.m.

 2   BY MR. FAZIO:

 3       Q.  All right, sir.  So let's switch gears a little

 4   bit and talk a little bit about NextEra.

 5                   (Exhibit 22 marked for identification.)

 6   BY MR. FAZIO:

 7       Q.  Sir, I'm handing you what's been marked as

 8   Exhibit 22.

 9       A.  (Witness examining document.)

10       Q.  Can you identify this for me, sir?

11       A.  This appears to be a statement of work between

12   Lucasys and NextEra.

13       Q.  Okay.  So, sir, I just wanted -- in summary

14   fashion, I want to talk about the work streams that are

15   listed in the project scope to help me understand what

16   it was, specifically, that you'd been engaged to do and

17   what work was actually performed, okay?

18                   So on the first page here, you see

19   Work Stream 1.  It says, "Configuration of PowerTax

20   deferred tax module for NHT," comma, "Loan Star," comma,

21   "NER Pipelines."

22                   Do you see that?

23       A.  I do.

24       Q.  Okay.  So can you explain to me what was --

25   work was required in that stream?

1            And if it's helpful for you, just for

2    reference, on Page 2 there's a little more detailed

3    summary.

4        A.   Okay.  Was the question related to any

5    particular work stream?

6        Q.   Work Stream 1.

7        A.   Work Stream 1.  Okay.

8        Q.   We'll go in order.

9        A.   Okay.  Yeah, this appears to be a configuration

10   of NextEra's records on a couple of subsidiaries for the

11   computation of deferred taxes.

12       Q.   Okay.  Now, when you say "configuration of the

13   data," what, specifically, are you doing in that

14   process?

15       A.   So, typically, that would be applying

16   accounting rules or business rules to -- to the data.

17       Q.   Okay.  So can you give me a specific example of

18   what would be done in that process, just as an

19   illustration?

20       A.   Yeah, so an example of that may be -- so, I can

21   look at these companies and recognize that at least one

22   of them, New Hampshire Transmission, is a transmission

23   company.  I understand that transmission companies are

24   regulated by the FERC, and so that means that the tax

25   accounting treatment for fixed assets for that company

 1    needs to follow the FERC rules related to the way those

 2    tax costs are shared intergenerationally with rate

 3    payers.  And so it would have been applying those FERC

 4    rules, tax normalization rules, sometimes they're

 5    called, to that company's records.

 6         Q.  Okay.  Let's talk about Work Stream 2.

 7    "Assistance with PowerTax transfers interface."

 8              What was that?

 9         A.  So, my recollection is that this work stream

10    was really a problem brought to us by NextEra.  They

11    were struggling with a custom interface between, I

12    think, SAP and their tax depreciation records in

13    PowerTax.  And I believe -- my recollection is that

14    during, kind of, the discovery and scoping that we

15    proposed to -- rather than modify that custom interface,

16    to instead put that process in the Copilot software.

17         Q.  Okay.  And did you complete Work Stream 2?

18         A.  I'm sorry?

19         Q.  Did you complete Work Stream 2, do you recall?

20         A.  Yes, in that we proposed a solution, but not in

21    terms of the final proposed solution being deferred to a

22    later work stream.

23         Q.  Okay.

24         A.  Yeah.

25         Q.  Work Stream 3, "Federal and State tax books"?

 1        A.   Yes.   That would have been an exercise to align

 2   the records, tax fixed asset records or tax depreciation

 3   computations between two different taxing -- tax

 4   jurisdictions.   So the federal jurisdiction represents

 5   the IRS rules and State, of course, may represent any

 6   particular state's tax rules for fixed asset recovery.

 7        Q.   Okay.   Work Stream 4, "Configuration of excess

 8   ADIT, amortization for FPL"?

 9        A.   So, I don't recall in detail, and I'm kind of

10   flipping through to see if there's more.   Certainly I

11   understand the words there.   Excess ADIT would have been

12   accumulated deferred income taxes in excess of the

13   statutory requirement under the Tax Cuts and Jobs Act,

14   TCJA, and so that excess accumulated deferred income tax

15   position has some amortization life that is governed

16   both by IRS rules as well as Public Utility Commission

17   orders.   So, presumably, that would have been applying

18   those, either IRS rules, or if it was Florida Power &

19   Light, Florida PUC rules to those values.

20        Q.   Okay.   Then Work Stream 5, "B&A to PowerTax

21   migration," what was that all about?

22        A.   So, as I recall, at the time that we had been

23   engaged on this project, NextEra was utilizing both

24   PowerTax and B&A in its non-regulated business or

25   combination of those two systems.   They had certain

1   requirements, I believe, related to the way tax equity

2   partnerships are treated, that weren't able to be met

3   with the PowerTax solution, and so they were using kind

4   of this hybrid dual solution and tracking those assets

5   for the tax computation simultaneously in two solutions,

6   and as part of Work Stream 5, I believe we were

7   consolidating those computations back into the PowerTax

8   solution while also deploying the Copilot solution to

9   meet the additional unique requirements for which they

10  had needed to use B&A.

11       Q.  Sir, do you recall which of these work streams

12  were completed when NextEra terminated the agreement?

13       A.  I know for certain that Work Stream 5 was not

14  completed, because that was the work stream that

15  included the Copilot software.  I don't recall with

16  certainty regarding the other work streams.  I believe

17  that many of them were completed, or at least some of

18  them were completed at that time.

19       Q.  And sir, if you look on Page 3, you'll see --

20  0.5 -- well, let's start at 0.4.  It says, "The

21  following business requirements cannot be met with FDL's

22  existing software solutions.  Lucasys will provide

23  custom scripts to facilitate these processes.  Lucasys

24  will also configure these requirements within Lucasys

25  Copilot produce and offer it to NextEra as an optional

 1    subscription.  These requirements will be delivered as

 2    part of Work Stream 5, B&A to PowerTax conversion."

 3              Do you see that?

 4       A.  Yes.

 5       Q.  And then, 0.5 below says, "The use of Lucasys

 6    Copilot will be subject to the Lucasys software

 7    subscription agreement."  That's Point A.  Point B was

 8    that, "Lucasys Copilot subscription charge will be

 9    waived for all NextEra users until 12/31/2020."

10              Do you see that?

11       A.  I do.

12       Q.  Why were you waiving the subscription charge

13    for NextEra uses until 12/31/2020?

14       A.  I don't have the full project schedule, but my

15    recollection is that -- that the project -- we would

16    have been completing the project in 2020, and so we were

17    beginning, or proposed to begin, the subscription with a

18    full calendar year.

19       Q.  Okay.

20              (Exhibit 23 marked for identification.)

21    BY MR. FAZIO:

22       Q.  Sir, I'm handing you what has been marked as

23    Exhibit 23.

24       A.  (Witness examining document.)

25       Q.  Sir, this refers to Work Stream 6.

 1                      Do you see that?

 2        A.   I do.

 3        Q.   Well, first of all, just for the record, this

 4   is a statement of work.  It's unnumbered.  It's Lucasys

 5   RPD 0086581.

 6                      Can you tell me what this document is?

 7        A.   I believe I recall, concurrent with the

 8   existing project, there were a number of requests for

 9   additional kind of scope increases, if you will, and

10   some of those were incorporated with the change order to

11   the original statement of work, in particular, related

12   to Copilot, and others were contracted separately.  And

13   I believe this is what it represents, is that separate

14   contract.  And I believe that that was because it was

15   contracted through a separate subsidiary at NextEra, is

16   my recollection.

17        Q.   Was this work actually performed, do you

18   recall?

19        A.   I believe it was.

20        Q.   Sir, I want to ask you to take a step back for

21   a minute and tell me:  What is it that you want out of

22   this litigation?

23                      MR. ALLOY:  You?  That "you" issue.

24   BY MR. FAZIO:

25        Q.   Lucasys.  What does Lucasys's want --

1        A.  -- what does Lucasys want?

2        Q.  -- out of this litigation?

3        A.  Our goals have, from the very beginning, been

4   to preserve our business.  I think I had mentioned

5   before that we began this litigation because we really

6   had no other choice.  It was a binary choice for us;

7   either lose the last one or two customers that we had at

8   the time, or seek help from the courts to resolve.  Now,

9   since that time, we now know much more about PowerPlan's

10  actions and their impact on our ability to provide

11  technology solutions as well as services in this market,

12  and so we're still evaluating what that means for us as

13  a business.

14            We just know that as a business we can't

15  operate the same way that we did, you know, prior to

16  this litigation with the risk of PowerPlan's statements

17  being made into the market.

18       Q.  Sir, are you aware of any statement about

19  Lucasys that's been made, quote/unquote, to the market

20  since the beginning of 2020 -- or the beginning of 2021?

21       A.  We believe that this litigation has been an

22  effective deterrent to keep PowerPlan from making those

23  statements to the market.

24       Q.  Well, my question to you was not whether this

25  litigation was an effective deterrent.  My question to

1    you was:  Are you aware of any statements that have been

2    made since 2021?

3         A.  We have not been made aware of any statements,

4    to my knowledge or recollection, since 2021.

5         Q.  And are you aware of PowerPlan taking -- taking

6    the position that it would take action against a client

7    or one of their customers if it worked with Lucasys?

8    Are you aware of that, that happening any time since

9    mid-2020 or before?

10              MR. ALLOY:  I'm sorry, can you say that one

11   more time?

12   BY MR. FAZIO:

13        Q.  So, are you aware of PowerPlan saying to any

14   client that they would take action against the client?

15   I mean, you told us about, I think, one or two --

16        A.  Uh-huh.

17        Q.  -- conversations had.  Other than the ones that

18   you have already told us about, are you aware of any

19   other situation where PowerPlan said to a client,

20   allegedly said to a client, that it would take action

21   against the client if they used Lucasys?

22        A.  We haven't detected that PowerPlan's position

23   has changed.  Just because they haven't made that

24   statement to a client while this dispute is pending, we

25   have no indication that they wouldn't as soon as there

 1   was not litigation.

 2        Q.   Okay.   It's fair to say that you're speculating

 3   as to what PowerPlan would do?

 4        A.   Well, I would say that based on our experience

 5   when we tried to go through a voluntary process with

 6   PowerPlan during which time they agreed not to make

 7   statements for that brief period of time, as soon as

 8   that process ended, within days or perhaps hours, they

 9   were making statements, so, my statement was based on

10   the -- the actions that we've seen.

11        Q.   Sir, do you think that PowerPlan has the right

12   to protect its intellectual property?

13                  MR. ALLOY:   Objection.

14                  You can answer.

15                  THE WITNESS:   I believe that a technology

16   company generally should have the right to protect

17   legitimate intellectual property interests subject to

18   the requirements of law.

19   BY MR. FAZIO:

20        Q.   And can reasonable people disagree about what

21   those interests are?

22        A.   I believe that intellectual property is defined

23   by law.   I could be wrong about that, but certainly

24   trade secrets are.

25        Q.   So, sir, is there anything other than -- have

 1  you told me about all of the anti -- the allegedly

 2  anticompetitive acts that you think PowerPlan engaged

 3  vis-à-vis Lucasys in the course of our conversation

 4  today?

 5        A.  Could you repeat the question?  I'm sorry.

 6        Q.  I said, have you told me about all of the

 7  alledgedly anticompetitive acts that you believe

 8  PowerPlan engaged in against Lucasys during the course

 9  of our conversation today?

10        A.  I'm not sure you've specifically asked me about

11  anticompetitive acts.  I think we've been looking at

12  individual conversations and things like that.

13        Q.  Okay.  Are there anticompetitive acts that you

14  think PowerPlan has engaged in against Lucasys that we

15  haven't talked about today?

16        A.  So, I think broadly -- I think PowerPlan has

17  shown a willingness and eagerness to use the shield of

18  protecting purported trade secrets or confidential

19  information to restrict competition in the various

20  markets that it operates in.

21        Q.  And we talked about that today.  Is there

22  anything else that you view that -- you view as

23  anticompetitive that you think that PowerPlan has been

24  engaged in?  That we haven't talked about today already.

25                    I just want to make sure I know everything

1    that you're going to say down the road about what you

2    think PowerPlan has done to wrong Lucasys?

3        A.  Well, I think the substance of the

4    conversations we've had today is enough to put Lucasys

5    out of business, so I think I haven't even explored what

6    else PowerPlan may or may not have done.  I just

7    understand that the risk of just the fraction of items

8    that we've talked about risks our whole business.

9        Q.  Well, I'm asking about specific conduct of

10   PowerPlan.  We've talked about -- you've told me about

11   some of these sort of general issues.

12       A.  Uh-huh.

13       Q.  But I want to make sure that I know every

14   specific incidence of conduct that you will claim as

15   anticompetitive down the road so I know exactly what it

16   is.

17       A.  I don't know if I can give you every instance.

18   I know, for example, that during the discovery process,

19   we've learned of additional instances of anticompetitive

20   behavior.

21       Q.  Okay.

22       A.  But I don't know what other --

23       Q.  Well, tell me --

24       A.  -- instances might be.

25       Q.  -- about those.

 1         A.   Well, I think we touched on a couple of them.

 2    I think we touched on the AVA agreement, that we saw as

 3    a tool in PowerPlan's war chest, so to speak, to prevent

 4    competitors from emerging from the services market.

 5              I think we touched on, or at least alluded

 6    to, the communication campaign by PowerPlan as a

 7    company, and its executives, to preclude Lucasys

 8    specifically from the utility market in the U.S.

 9              So those are two things that come to mind

10    that were not known to us at the time we filed the

11    initial Complaint, but have come to light since.

12         Q.   Anything else?

13         A.   I -- there may be others, and I'd have to maybe

14    refresh.  I know we filed an amended complaint recently

15    in this dispute.  I might have to refresh my

16    recollection, but there may be others --

17         Q.   Okay.

18         A.   -- I'm not recalling at this moment.

19         Q.   But as you sit here today, you've told me about

20    everything that you know of?

21         A.   Like I said, I think we've -- we've -- what

22    we've known as of the amended Complaint, we've put in

23    the amended Complaint, and we understand that -- or I

24    understand that the discovery process is continuing.

25         Q.   All right.

1                    MR. FAZIO:  That's all I have for now.

2                    MR. ALLOY:  Thanks.  I don't have anything.

3                    THE VIDEOGRAPHER:  All right.  This

4      concludes the video-recorded deposition.  We're off the

5      record at 4:58 p.m.

6                    (Off the record.)

7                    (Whereupon, proceedings were concluded at

8      4:58 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF REPORTER

2

3         STATE OF GEORGIA)

4                          )

5         COUNTY OF DEKALB)

6

7              I, TAMIKA M. BURNETTE, hereby certify

8    that the foregoing proceedings were taken before me at

9    the time and place therein designated; that a review of

10   the transcript was not requested, and that the foregoing

11   pages numbered 1 through 241 are a true and correct

12   record of the aforesaid proceedings.

13                   I further certify that I am not a

14   relative, employee, attorney or counsel of any of the

15   parties, nor am I a relative or employee of any of the

16   parties' attorneys or counsel connected with the action,

17   nor am I financially interested in the action.

18

19              DATED this 22nd day of July, 2022.

20         _____

21              TAMIKA M. BURNETTE

22         CERTIFIED COURT REPORTER, RPR, CSR-2870

23

24

25

```
  1                   COURT REPORTER DISCLOSURE

  2

  3                   Pursuant to Article 10.B of the Rules and

  4    Regulations of the Board of Court Reporting of the

  5    Judicial Council of Georgia which states:  "Each court

  6    reporter shall tender a disclosure form at the time of

  7    the taking of the deposition stating the arrangements

  8    made for the reporting services of the certified court

  9    reporter, by the court reporter's employer, or the

 10    referral source for the deposition, with any party to

 11    the litigation, counsel to the parties or other entity.

 12    Such form shall be attached to the deposition

 13    transcript."  I make the following disclosure:

 14                   I am a Georgia Certified Court Reporter.

 15    I am here as a representative of TrustPoint.One.

 16    TrustPoint.One contacted to provide court reporting

 17    services for the deposition.  TrustPoint.One will not be

 18    taking this deposition under any contract that is

 19    prohibited by O.C.G.A. 91128 (c).

 20                   TrustPoint.One as no contract/agreement to

 21    provide court reporting services with any party to the

 22    case, any counsel in the case, or any reporter or

 23    reporting agency from whom a referral might have been

 24    made to cover this deposition.  TrustPoint.One will

 25    charge its usual and customary rates to all parties in
```

1    the case, and a financial discount will not be given to

2    any party to this litigation.

3

4

5

6                          Tamika M. Burnette, RPR, CCR2870.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Notice Date: 07/22/2022

Deposition Date: 7/14/2022

Deponent: Vadim Lantukh

Case Name: Lucasys Inc. v. Powerplan, Inc.

Page:Line                Now Reads                    Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

## WORD INDEX

**< $ >**
**$1**  149:*5*
**$1.2**  152:*13*  186:*16*
**$1.5**  62:*23*  151:*23*
**$100,000**  127:*4*  164:*14*
**$109-ish**  52:*14*
**$150,000**  150:*3*  161:*3*
**$179,000**  154:*11*
**$2**  124:*14*  125:*8, 11*
  126:*16*
**$2,900**  152:*8*
**$2.3**  154:*5*
**$200,000**  214:*7, 8*
**$270,000**  214:*1*
**$280,000**  169:*20*
**$3**  205:*19*  206:*11*
**$3,000**  152:*8*
**$3,529,120**  210:*23*
**$3.2**  211:*19*  212:*16*
**$3.4**  185:*18, 19*  187:*13, 17*
**$300,000**  150:*1*
**$350**  169:*19*
**$50,000**  163:*10*
**$700,000**  95:*17*
**$80,000**  127:*9*

**< 0 >**
**0.4**  232:*20*
**0.5**  232:*20*  233:*5*
**0086581**  234:*5*

**< 1 >**
**1**  3:*9*  5:*5*  60:*9, 12*
  149:*6, 7*  167:*8*  168:*7*
  178:*16*  179:*1, 5, 11*
  191:*10*  228:*19*  229:*6, 7*
  242:*11*
**1.1**  149:*7*
**1:15**  113:*14*
**1:20-cv-2987-AT**  1:*7*
**1:33**  124:*24*
**1:34**  125:*2*
**10**  3:*18*  66:*23*  67:*2*
  84:*12*  162:*5, 8*  165:*15*
  176:*17*  217:*17*
**10.B**  243:*3*
**10/27/2021**  75:*11*
**10:47**  58:*25*
**100**  178:*12*
**100-plus**  215:*12*
**10B**  176:*14, 18*  178:*4*
**11**  3:*19*  167:*1, 4*  172:*3*
  178:*8*  190:*11, 18*
**11:03**  59:*3*
**11:57**  97:*7, 11*
**12**  3:*20*  64:*23*  84:*6, 8, 20*  147:*18*  164:*20*

**180**:*14*
**12/31/2020**  233:*9, 13*
**12:20**  113:*11*
**12:30**  112:*19*
**127**  2:*11*
**12-month**  165:*9*
**13**  3:*21*  84:*3*  185:*12, 15*  200:*4, 7*
**14**  1:*12*  3:*22*  5:*8*
  164:*21*  205:*5, 8, 18*
**148**  3:*16*
**14-month**  165:*9*
**14th**  1:*14*  2:*5*  49:*25*
**15**  3:*23*  58:*21*  206:*13, 16, 17*
**15030**  71:*24*
**157**  3:*17*
**16**  3:*24*  83:*3*  207:*20, 23*
**162**  3:*18*
**167**  3:*19*
**169,000**  161:*18*
**17**  3:*25*  208:*18, 21*
**179,000**  154:*5*
**18**  4:*4*  64:*23*  210:*6, 9*  212:*5, 7*
**180**  3:*20*
**180,000**  161:*17*
**18-month**  157:*19*
**19**  4:*5*  212:*1, 4, 5*
**1999**  182:*16*

**< 2 >**
**2**  3:*10*  63:*2, 5*  97:*10*
  149:*6*  180:*24*  195:*13*
  207:*1, 7*  208:*14, 16*
  229:*2*  230:*6, 17, 19*
**2,900**  151:*20*
**2.26**  154:*14*
**2.276**  154:*15*
**2:04**  64:*15, 17*
**2:38**  166:*19*
**2:51**  166:*22*
**20**  4:*6*  152:*20*  182:*19*
  218:*22, 24*  221:*20*
**200**  3:*21*
**2004**  14:*17*
**2007**  14:*23*  22:*4*
**2013**  34:*1, 15*  35:*6, 14, 19, 24*
**2014**  183:*24*
**2015**  183:*24*
**2018**  49:*11, 25*
**2019**  86:*15*  90:*19*  99:*21*
  100:*22*  102:*11*  123:*14, 17*  128:*7, 12, 15*  129:*3, 8, 10, 14, 17, 18, 19, 23*
  130:*10, 25*  131:*20*  132:*4, 18, 22*  150:*3*  151:*1*
  152:*20, 25*  168:*18, 20*
  169:*4*  179:*15*  181:*8*
  183:*22*  188:*20*  196:*16,*

**17**  203:*4, 21*  204:*11*
  207:*13*  214:*15*
**2020**  52:*13*  53:*5*  64:*4, 7, 9*  66:*2*  104:*21*  107:*10*
  108:*15*  109:*11*  111:*13*
  149:*25*  150:*13, 21*
  151:*20*  152:*17, 20, 25*
  153:*3, 5*  154:*4, 11, 14*
  155:*23*  157:*20*  158:*22, 24*  159:*11, 24*  161:*7, 8, 17*  162:*15, 19, 24*  163:*12, 21, 22*  164:*12, 22*  201:*14*
  206:*7, 9*  207:*13*  210:*17, 19*  224:*22*  225:*4*  233:*16*  235:*20*
**2021**  66:*23*  67:*2, 11*
  79:*7*  83:*3*  128:*23*
  129:*18*  148:*20, 22, 23, 25*
  149:*3*  151:*3, 20*  152:*1, 7, 10, 17*  153:*9*  161:*9, 18, 21*  213:*12*  235:*20*  236:*2, 4*
**2022**  1:*12*  5:*8*  152:*2*
  162:*15, 20*  163:*9, 10, 22*
  213:*21*  216:*13, 23*
  242:*19*
**205**  3:*22*
**206**  3:*23*
**207**  3:*24*
**208**  3:*25*
**21**  4:*7*  224:*15, 18*
**210**  4:*4*
**212**  4:*5*
**2130**  207:*3*
**2147**  170:*25*
**2157**  176:*14*
**216**  2:*12*
**218**  4:*6*
**2184**  167:*16, 17*  168:*7*
**22**  4:*8*  228:*5, 8*
**224**  4:*7*
**228**  4:*8*
**22nd**  242:*19*
**23**  4:*9*  104:*21*  107:*10*
  233:*20, 23*
**23130**  200:*12*
**233**  4:*9*
**241**  242:*11*
**25**  224:*22*
**250**  214:*1*
**256,000**  151:*19*
**26**  203:*4*
**28**  180:*25*  181:*6*  190:*18*
**2870**  1:*17*
**29**  108:*15*  109:*11*

**< 3 >**
**3**  3:*11*  66:*15, 18*  166:*22*
  208:*6*  210:*23*  230:*25*
  232:*19*

**3.2**  211:*17*
**3:05**  66:*23*  67:*2*
**3:11**  201:*14*
**30318**  1:*15*  2:*6*  5:*11*
**31**  148:*20*  207:*13*

**< 4 >**
**4**  3:*12*  68:*6, 9*  209:*4, 7*
  231:*7*
**4:19**  227:*23*
**4:36**  228:*1*
**4:58**  1:*13*  241:*5, 8*
**44114**  2:*11*
**45**  113:*3*
**479-8403**  2:*12*
**4900**  2:*10*

**< 5 >**
**5**  3:*13*  71:*6, 8*  181:*6*
  197:*5*  217:*17*  231:*20*
  232:*6, 13*  233:*2*
**5/3/2019**  167:*9*
**50**  164:*14*
**500**  1:*14*  2:*5*

**< 6 >**
**6**  3:*4, 14*  75:*7, 10*  80:*13*
  118:*10, 11, 13, 17*  197:*5, 13*  201:*14*  233:*25*
**6:00**  36:*25*
**60**  3:*9*
**63**  3:*10*
**66**  3:*11*
**678**  2:*7*
**68**  3:*12*

**< 7 >**
**7**  3:*15*  64:*4*  82:*11, 14*
  86:*15*  90:*19*  118:*15, 17*
  128:*18*  133:*14*  197:*4, 5*
**7:20**  224:*23*
**701-9381**  2:*7*
**71**  3:*13*
**75**  3:*14*  50:*23*
**7th**  64:*15*

**< 8 >**
**8**  3:*16*  100:*22*  128:*16*
  129:*17*  148:*11, 14*
  154:*20*  161:*11*
**8:36**  72:*2*
**80**  127:*5*
**80s**  184:*25*
**82**  3:*15*
**8th**  99:*21*  102:*11, 13*

**< 9 >**
**9**  3:*17*  84:*12*  147:*17*
  157:*12, 15*  162:*15*  163:*8*
  165:*15*  195:*6, 7*

**9:00** 1:*13*
**9:33** 5:*9*
**90s** 184:*25*
**91128** 243:*19*

**< A >**
**a.m** 1:*13* 5:*9* 36:*25*
58:*25* 59:*3* 72:*2* 97:*7,*
*11* 224:*23*
**ability** 133:*20* 136:*5*
141:*2* 195:*3* 217:*1*
235:*10*
**able** 26:*12* 53:*17* 72:*18*
100:*25* 107:*16* 112:*16*
134:*2* 137:*1* 154:*2*
169:*3* 170:*15* 178:*19*
194:*7* 232:*2*
**absence** 141:*21*
**absent** 79:*22* 131:*21*
189:*21*
**absolutely** 78:*24* 146:*8*
**accept** 195:*3*
**Access** 17:*7, 8* 30:*8, 11,*
*15* 43:*18* 49:*3* 101:*5*
146:*12, 18, 22, 25* 147:*7,*
*14* 148:*2* 193:*21*
**accessed** 30:*19* 146:*12*
223:*3*
**accesses** 42:*19*
**accessible** 30:*12*
**account** 79:*4* 102:*5*
**accounting** 15:*18* 16:*8*
19:*9* 20:*21* 33:*12* 39:*18,*
*22* 44:*15* 65:*11, 16*
74:*23* 95:*5* 122:*10*
127:*23* 149:*8, 11* 154:*2*
159:*8* 183:*8* 202:*22*
215:*8* 229:*16, 25*
**accounts** 44:*16* 161:*1, 4*
**accrue** 161:*19*
**accrued** 162:*1*
**accruing** 150:*7*
**Accufile** 23:*14* 24:*3*
25:*3, 6*
**accumulated** 231:*12, 14*
**accurate** 45:*1* 76:*19*
147:*21* 175:*18*
**accurately** 42:*7* 200:*24*
**accustomed** 156:*12*
**acknowledging** 82:*3*
**acquaintance** 63:*19*
**acquired** 38:*1*
**acquisition** 114:*13*
**Act** 231:*13*
**acting** 78:*6*
**Action** 1:*6* 101:*9, 12*
102:*24* 236:*6, 14, 20*
242:*16, 17*
**actions** 118:*20* 123:*8*
133:*17* 134:*1* 139:*12*

**actively** 93:*23*
**activities** 39:*3* 77:*20*
182:*14*
**activity** 54:*12* 56:*13*
156:*5* 188:*18*
**acts** 238:*2, 7, 11, 13*
**actual** 226:*2*
**actuals** 158:*19*
**adding** 163:*24*
**addition** 120:*10* 143:*12*
147:*3* 196:*3* 208:*13, 15*
215:*14*
**additional** 119:*12, 16*
163:*13* 206:*4* 210:*19*
217:*3* 232:*9* 234:*9*
239:*19*
**Additionally** 39:*18*
**address** 47:*24* 48:*1, 5*
130:*16* 132:*12* 203:*6*
**addressed** 109:*10*
180:*25* 181:*5* 222:*5*
**addressing** 31:*14*
**adequate** 173:*19*
**adhere** 177:*2*
**ADIT** 231:*8, 11*
**adjustments** 191:*14*
**administrative** 71:*19*
**administrative-type** 55:*9*
**adopt** 121:*21, 23* 195:*15*
196:*10*
**adopted** 124:*8* 186:*1, 3,*
*6*
**adopter** 189:*2*
**adopters** 175:*11*
**adopting** 136:*8, 17* 138:*3*
**Adrienne** 225:*19, 20*
**advance** 209:*3* 220:*20*
**advisory** 209:*11*
**AEP** 4:*5* 28:*10, 14*
37:*24* 58:*3* 86:*19, 25*
89:*17, 20, 22* 90:*8* 91:*13*
93:*10, 23* 94:*13, 22, 25*
95:*2, 4, 6, 10, 13, 16, 17,*
*19, 25* 96:*2, 3, 4, 12, 18,*
*20* 97:*1, 16, 21* 98:*3, 8, 9,*
*12, 20* 99:*9, 13, 14, 16, 17*
104:*4* 114:*23, 24* 116:*10*
123:*9, 14* 128:*2, 9* 129:*6*
147:*10, 16* 160:*1, 2, 3, 9*
163:*8, 15* 164:*6* 166:*24,*
*25* 168:*1, 4, 15* 169:*5*
170:*11, 12, 18* 171:*8, 14,*
*19, 22* 175:*4, 6* 178:*9, 11*
179:*15, 25* 180:*21* 181:*7*
182:*18* 183:*23* 184:*2*
187:*25* 188:*1* 189:*1, 13*
195:*15* 196:*1, 3, 7, 21*
197:*8* 198:*4* 203:*14*
204:*25* 205:*25* 206:*24*
208:*3* 209:*2, 7, 18* 210:*4,*

*16, 20* 213:*15, 18, 25*
215:*11, 16, 19, 25* 216:*5,*
*8, 13*
**AEP's** 89:*4, 11* 91:*5*
168:*13* 182:*9, 20* 199:*7*
203:*21* 204:*9, 19* 215:*5,*
*22*
**affiliated** 143:*3*
**aforesaid** 242:*12*
**afternoon** 100:*6, 7*
**agency** 243:*23*
**agenda** 71:*16, 21* 72:*3*
73:*13, 22*
**agent** 104:*22* 105:*5, 10,*
*12*
**Aggregate** 44:*20*
**agnostic** 46:*12*
**ago** 39:*14* 57:*1* 135:*8*
193:*11* 201:*3* 203:*4*
210:*12* 220:*22*
**agree** 31:*16* 35:*5* 65:*15*
140:*13* 173:*8, 12* 174:*12,*
*18, 19* 175:*23*
**agreeable** 177:*20*
**agreed** 68:*24, 25* 119:*24*
237:*6*
**AGREEMENT** 3:*9, 12*
56:*9, 10, 14* 57:*13* 60:*24*
61:*1, 11, 13* 68:*14, 24*
69:*6* 93:*11* 94:*21* 110:*5*
119:*2, 5, 14, 20* 139:*7*
140:*7, 12, 25* 141:*5, 7*
171:*1, 6, 8, 11, 12, 13, 14,*
*18, 22, 23, 25* 172:*1, 2, 5*
174:*22* 175:*17* 176:*23*
177:*1, 18, 22* 178:*8, 10*
232:*12* 233:*7* 240:*2*
**agreements** 57:*9, 14*
62:*5* 137:*8* 175:*19, 22,*
*24* 177:*16* 178:*2*
**ahead** 133:*9*
**alerts** 46:*9*
**align** 26:*8* 231:*1*
**alignment** 26:*7, 18*
**alledgedly** 96:*1* 218:*14*
238:*7*
**allegation** 86:*14* 95:*7*
**allegations** 96:*24* 98:*2*
223:*12*
**alleged** 84:*12* 86:*8, 23*
100:*3, 22* 102:*3* 105:*1*
106:*19* 107:*10* 108:*24*
109:*17* 110:*7* 152:*25*
226:*17*
**allegedly** 86:*15* 88:*13*
92:*15* 101:*19* 226:*8*
236:*20* 238:*1*
**alleging** 86:*8*
**Alliant** 135:*25* 139:*2*
**allocate** 141:*14*

**allocating** 127:*2, 9, 16*
**allocation** 77:*13*
**allow** 122:*15* 145:*23*
182:*3*
**allowed** 65:*9* 169:*6*
**allowing** 122:*19*
**allows** 54:*4*
**ALLOY** 2:*4, 5* 5:*10, 20*
8:*15* 25:*16* 32:*6, 16*
48:*17* 62:*16* 83:*17, 21,*
*23* 112:*21, 25* 113:*2, 5, 9*
124:*17* 133:*9* 155:*14*
157:*7* 166:*13* 174:*24*
183:*16* 186:*20* 187:*14*
194:*19* 203:*23* 226:*16*
227:*20* 234:*23* 236:*10*
237:*13* 241:*2*
**alluded** 240:*5*
**Alpharetta** 14:*8*
**altered** 147:*23*
**alternative** 190:*3* 196:*1*
**AltexSoft** 126:*9* 129:*5*
**amended** 240:*14, 22, 23*
**Ameren** 43:*15* 116:*20*
117:*13, 20, 22* 118:*1*
120:*5*
**amortization** 231:*8, 15*
**amount** 20:*16* 41:*12*
116:*7* 125:*5* 129:*12*
161:*6* 165:*11*
**amounts** 165:*10*
**analysis** 20:*14* 215:*5*
**analytic** 114:*14*
**analytics** 187:*1*
**and/or** 61:*5*
**annual** 160:*17* 189:*2*
**answer** 7:*7, 13* 25:*17*
32:*6, 17* 48:*18* 54:*21*
59:*6, 15* 155:*15* 174:*25*
177:*21* 183:*17* 194:*19*
237:*14*
**answered** 194:*8*
**answering** 7:*3, 4*
**answers** 6:*25* 83:*1*
129:*15*
**anti** 238:*1*
**anticipate** 216:*22*
**anticompetitive** 133:*16*
238:*2, 7, 11, 13, 23*
239:*15, 19*
**anybody** 8:*12, 16* 11:*10*
12:*5* 29:*9* 34:*24* 49:*3*
51:*20* 60:*5* 82:*6* 87:*17*
91:*23* 110:*21* 111:*4*
134:*14* 143:*19* 203:*20*
214:*10* 219:*25* 223:*23*
226:*7, 15*
**anyway** 29:*1* 173:*22*
175:*25* 187:*11*
**apart** 11:*11*

**apologetic** 108:*1*
**apologize** 202:*23* 209:*3*
**appear** 147:*17* 148:*23*
**APPEARANCES** 2:*1*
**appears** 60:*18, 23* 68:*13*
82:22 157:*18* 180:*20*
200:*10* 208:*2* 209:*1, 10*
210:*14, 15* 228:*11* 229:*9*
**application** 25:*19, 20*
36:8 122:*19* 146:*19, 23*
192:25
**applications** 15:7
**applying** 126:*25* 229:*15*
230:*3* 231:*17*
**appreciation** 38:*15*
**approach** 76:5 77:7, *10*
120:*18*
**appropriate** 163:*24*
172:22
**approval** 169:*20*
**approvals** 139:*23* 201:8
**approximate** 51:*3* 149:2
**approximately** 8:9 9:2
23:*16* 37:*16* 40:*17*
55:*12* 62:*13* 151:*19*
152:8, *13* 214:*1* 217:*13*
**April** 104:2*1* 107:*10*
**arbitration** 61:5
**architected** 46:*14*
**architecturally** 145:*12*
**architecture** 130:5
191:*4* 192:7, 8
**area** 29:*24* 64:*11*
130:*18* 191:*4*
**areas** 35:*11* 132:9
160:*4* 175:5, *6* 186:*25*
187:7
**arisen** 134:*20*
**arose** 134:*12* 136:*4*
147:22 216:*24*
**arrangements** 243:7
**Article** 243:*3*
**ASAP** 75:*2*
**ASI** 44:*18, 19, 23, 25*
45:*4, 7, 9, 11, 12, 17, 22*
46:*18, 22, 25* 48:8 49:9
**Aside** 11:9, *24* 12:*1*
31:5 51:5, *12, 20* 81:*24*
115:*14* 116:*12* 135:9
147:9 172:*11*
**ASI's** 45:2*1* 47:*4*
**asked** 25:*25* 47:*15*
57:*12* 59:*11* 63:*20* 72:*3*
84:8 102:22 107:*14*
111:*14, 21* 112:*1* 142:7
161:*10* 209:7 214:*20, 23*
220:*3* 238:*10*
**asking** 7:2, *4* 11:*19*
21:7 32:*23, 24* 35:*14*
42:*24* 78:*12* 81:*21*
83:*19* 90:*15, 16* 98:*20*

105:22 111:*3* 132:*1*
134:*16* 176:5, 8 177:*14*
187:*15* 192:*16* 197:*3*
202:*14* 220:*18* 224:*23*
239:9
**asks** 174:*17* 220:6
**asserting** 99:*3*
**assessment** 168:*13*
**ASSET** 4:5 29:8 33:*12*
38:*24* 43:*17* 65:*11*
123:*10, 14, 19* 128:*3*
179:*16, 19* 180:2*1* 197:9
200:*19* 203:5 207:*17*
231:2, *6*
**assets** 32:8 64:*12* 122:*8*
127:*23* 130:*19* 170:*14*
182:*15* 191:*10, 12, 18, 25*
215:6 216:9 229:*25*
232:*4*
**assignments** 22:2*1*
**assist** 126:*1, 3*
**Assistance** 230:7
**associated** 53:9 201:2*0,
22* 203:*11* 204:22
**assume** 7:*14* 192:*20*
**assumption** 178:22
**ATDC** 143:*1*
**ATLANTA** 1:*3, 15* 2:6
5:*11* 143:2
**attached** 3:7 243:*12*
**attacking** 183:*15*
**attempted** 116:9, *13, 16*
135:9, 2*1* 144:9
**attend** 14:7, *12*
**attention** 55:*15* 66:22
185:5 201:*14*
**attorney** 242:*14*
**attorneys** 11:6 242:*16*
**attributable** 156:2*1*
**audience** 70:5 73:*20*
92:*20*
**audit** 43:*25* 140:2*1*
**augment** 217:*1*
**augmentation** 207:*15*
216:5
**author** 18:*13*
**authorized** 140:7, *12*
141:5
**automate** 118:7
**automated** 192:*9* 195:*4*
**automation** 46:*20* 114:9
118:5 135:*24* 139:*4*
187:*1*
**auxiliary** 73:*17* 207:*14*
**AVA** 240:*2*
**available** 56:2*1* 184:6
192:8 196:*1*
**Avangrid** 58:8
**avenues** 109:*1*
**Avista** 58:*18* 146:*11, 15,*

*25* 147:9, *16, 19*
**avoid** 80:*16*
**awarded** 205:*20* 206:5
211:*3, 6, 7, 10* 212:*25*
213:*11* 215:*3*
**aware** 18:6 81:*17* 84:*24*
85:5, *14* 86:9, *23* 87:*1*
88:5, *9* 97:*15* 99:*15, 16*
137:*2* 138:*19, 20* 140:5,
*9* 179:*16* 235:*18* 236:*1,
3, 5, 8, 13, 18*
**AWS** 79:*13*

**< B >**
**B&A** 40:2, *4* 231:*20, 24*
232:*10* 233:2
**back** 37:2 54:5 59:2
60:*1* 71:*19* 86:*12* 96:*17*
97:*1, 10, 22* 101:*1*
112:*17* 113:*13* 118:9
123:2, 6 124:*18* 125:*1*
128:9 129:8, *23* 137:*11*
140:*4, 5* 154:7 155:9
156:*3, 11* 166:22 167:*12*
168:6 190:*11* 194:*13, 15,*
*18* 196:*13* 197:*4* 202:22
212:8 214:*15* 215:2*1*
224:*1, 2* 227:*25* 232:7
234:*20*
**back-end** 146:22, *25*
147:7
**background** 14:6 70:*19*
**bad** 45:*15* 98:*16* 141:*1*
182:*3*
**Bailey** 66:*13, 20, 24*
67:*19, 25* 70:4, 8 75:*11*
80:*13, 23* 81:6, *12, 25*
**balance** 43:*18* 44:*13, 16*
53:*3, 17* 114:9 135:*24*
139:*4* 159:7, 9 165:5
**ballpark** 95:2*1* 211:*17*
**ban** 186:*19*
**base** 156:*4*
**Based** 65:7 80:2 89:2*1*
91:*4, 7* 101:*16* 103:*14*
107:*8* 113:*24* 127:*12*
133:*25* 150:7 158:*18, 19*
189:*25* 199:*4, 7* 237:*4, 9*
**basic** 15:*4*
**basically** 54:7 131:*10*
**basis** 30:*16* 44:*13* 114:9
139:*4* 159:7, 9 165:5
191:*13*
**Bates** 71:*24* 212:6
**bear** 11:6
**began** 23:*3* 47:2*1* 77:*11*
128:*23* 129:*18* 133:22
148:*3* 209:*23, 24* 210:*16*
235:5
**beginning** 41:*10* 95:*18,*
*20* 139:*12* 142:*23*

157:*20* 159:*11* 163:*16*
170:*11, 24* 174:*10*
176:*17* 214:2 233:*17*
235:3, *20*
**begins** 5:5 75:*15* 97:9
166:2*1*
**begun** 119:*11, 17* 128:7
130:6 132:*14* 153:8
191:2*1* 216:7
**behalf** 5:*19, 20* 108:*16*
161:*1*
**behaving** 91:*1*
**behavior** 239:*20*
**belief** 83:2 136:*15*
188:*20*
**believe** 9:6 11:*4* 12:*15,*
*18, 20, 22, 24* 18:*12*
19:*10* 21:2*1, 22* 22:9, *10*
24:8 29:*14* 30:*11* 33:*25*
36:*12, 17, 18* 40:*4* 41:7
43:*15* 44:*20, 23* 45:6, *23*
49:*25* 52:*13* 53:6 55:2*1*
59:*11* 60:*16* 63:8, *16, 23*
64:*25* 66:*14* 67:*18*
70:*13* 80:2*1* 84:*25*
91:*11* 92:*10* 100:*23*
103:*12* 106:8, *25* 107:*1,*
*5* 108:*19, 25* 109:2, *4, 13*
110:*19* 116:22, *24*
117:*23* 119:*13* 121:*12,*
*18* 123:*20* 125:7, *12*
126:*14* 129:*23* 134:*10,*
*25* 137:5, *14, 22* 143:*3,*
*17* 144:*12* 146:*17, 24*
147:*1, 2, 6, 21, 25* 149:*15*
150:*15* 153:*11* 157:22
158:*20* 160:*23* 163:*12*
164:*12* 166:*4* 167:7
168:5 171:7, 22 172:2
174:*20* 178:*24* 179:*3, 14,*
*18* 198:*3, 21, 22, 23*
199:*3, 10, 18, 19* 204:*20,*
*25* 211:5, *13, 16* 213:2*1*
216:*20* 217:*12* 219:*15,*
*22, 24* 220:2, *4* 224:*10*
225:*18* 230:*13* 232:*1, 6,*
*16* 234:7, *13, 14, 19*
235:2*1* 237:*15, 22* 238:7
**believed** 36:*4* 89:*23*
**BELINFANTE** 2:*4* 5:*11*
**belt** 140:*23*
**beneficial** 80:*14*
**benefit** 44:*11*
**benefits** 78:*25* 79:2
156:*20* 161:*16*
**best** 7:3 13:*10* 21:*23*
83:2 131:*17* 147:2
166:8 178:*14, 18* 209:8
**better** 38:*14* 80:5, *15*
121:8 186:*10* 201:22

202:*13*

**beyond** 107:*8*
**bid** 112:*13* 123:*9* 128:*2*
180:*11* 197:*8, 23, 24*
198:*1, 2, 6* 205:*17*
214:*10*
**bids** 214:*14, 15, 18*
**big** 116:*11*
**Big-Four** 44:*14*
**bigger** 34:*14*
**biggest** 125:*18*
**billed** 95:*17, 19* 169:*18*
**binary** 235:*6*
**binder** 9:*11*
**bit** 14:*6* 15:*11, 21*
17:*10, 23* 60:*2* 82:*10*
112:*18* 113:*17* 165:*3*
181:*7* 183:*11* 212:*17*
215:*14* 217:*5* 226:*12*
228:*4*
**Black** 116:*21*
**blow** 138:*9, 10*
**blurb** 127:*25*
**board** 63:*21* 134:*24*
243:*4*
**BOGGS** 2:*7* 5:*19*
**Bonus** 149:*19, 22*
150:*14, 17, 21, 24*
**Bonuses** 79:*4* 149:*23*
150:*1, 4, 6, 10, 11, 19*
151:*3*
**book** 26:*9* 191:*13* 193:*7*
**books** 43:*17* 138:*10*
230:*25*
**Botniker** 86:*19* 90:*21*
91:*19*
**bottom** 63:*10* 154:*8, 9*
161:*16* 190:*14* 222:*1, 7*
**boy** 27:*16* 38:*6*
**branch** 209:*21*
**brand** 43:*1*
**breach** 91:*6* 110:*5*
**break** 7:*17* 55:*7* 58:*22*
59:*5* 91:*17* 97:*24*
112:*20, 25* 113:*1* 125:*4*
166:*13, 16*
**breakdown** 153:*25*
**breaks** 7:*19*
**Brett** 108:*16*
**Brian** 222:*1* 226:*13*
**brief** 98:*13* 165:*20*
237:*7*
**briefly** 50:*10* 97:*3*
224:*20*
**bring** 169:*6, 13* 190:*9*
**bringing** 79:*22* 132:*8*
169:*7*
**broad** 86:*7* 108:*10*
214:*24* 215:*4* 227:*3*
**broader** 36:*5, 8* 71:*3*
75:*4* 134:*10*

**broadly** 124:*2* 145:*10*
176:*8* 238:*16*
**Brockway** 222:*1* 224:*24*
226:*13*
**Brockway's** 225:*22*
**broken** 29:*11*
**brother** 63:*12*
**brought** 64:*24* 79:*20*
230:*10*
**bucket** 191:*13*
**Budala** 86:*19* 90:*21*
91:*19*
**budget** 141:*10, 18, 19*
164:*22*
**build** 48:*11* 101:*7*
119:*11* 123:*10* 128:*3*
130:*6* 131:*12* 164:*2*
192:*9* 194:*1* 197:*9*
**building** 16:*4, 19* 17:*2*
155:*7* 191:*21*
**build-out** 142:*19*
**built** 55:*16* 130:*15*
190:*8*
**bullet** 72:*8* 73:*7* 76:*4,
22* 84:*19* 86:*13* 99:*20*
104:*20* 108:*13* 118:*18*
120:*2* 128:*19* 197:*15, 18*
**bullets** 80:*13*
**bunch** 51:*24* 83:*6*
**Burnette** 1:*16* 5:*14*
242:*7, 21* 244:*6*
**Burts** 12:*21* 108:*16*
109:*21*
**business** 16:*7* 22:*9, 11*
23:*11* 25:*20* 27:*8, 12*
28:*20* 34:*8* 37:*11* 38:*10,
16, 21* 46:*20, 24* 50:*16,
23* 51:*1* 55:*18* 58:*13*
60:*3* 61:*2* 68:*17, 21*
69:*3, 10* 72:*18* 73:*25*
77:*4* 78:*10* 79:*19, 21, 23*
80:*6, 8* 94:*12* 95:*9*
100:*8, 11* 104:*3* 116:*6*
117:*25* 119:*12* 122:*24*
136:*23* 138:*4* 141:*14*
144:*16, 25* 153:*15* 156:*1*
158:*12* 165:*16* 169:*16*
174:*9, 10* 180:*3, 4, 6*
187:*22* 196:*9* 208:*4*
216:*25* 229:*16* 231:*24*
232:*21* 235:*4, 13, 14*
239:*5, 8*
**businesses** 40:*6* 144:*23*
151:*15*
**buy** 80:*11*
**buyers** 80:*7*
**buying** 134:*6* 216:*9*


< C >
**calculated** 150:*6*

**calculator** 154:*21*
**calendar** 213:*19* 233:*18*
**call** 69:*24* 70:*2, 3, 4, 5,
12* 72:*4, 23* 73:*3, 12, 15*
74:*10* 75:*16* 82:*2* 88:*11,
13* 89:*3* 91:*14, 18, 20, 22,
23, 25* 92:*3, 4, 13* 100:*8*
106:*2, 7, 10* 107:*15*
114:*8* 207:*8* 219:*1, 8, 12,
14* 222:*8, 18, 25* 223:*1, 7*
225:*4*
**called** 16:*21* 19:*25* 20:*2*
33:*15, 16* 38:*1* 44:*17, 19*
100:*24, 25* 101:*1* 104:*8*
126:*8, 11* 149:*10* 189:*10*
206:*2* 230:*5*
**calling** 29:*15*
**calls** 58:*13* 205:*14*
220:*6*
**campaign** 85:*5, 12* 86:*7*
137:*24* 240:*6*
**cancel** 101:*3, 16* 110:*24*
153:*6*
**canceled** 57:*21* 115:*19*
118:*25*
**capacity** 48:*8* 150:*10*
**Capital** 35:*25* 77:*22, 24*
78:*11, 16* 79:*1, 3* 144:*8*
158:*16*
**card** 22:*9, 11* 28:*20*
**carried** 173:*2* 181:*20*
**carry** 176:*2*
**carrying** 176:*22*
**case** 12:*14* 86:*5* 123:*4*
184:*14, 16* 221:*10, 14*
243:*22* 244:*1*
**cash** 53:*11, 17, 23, 25*
54:*2* 62:*12, 13* 165:*22,
23* 169:*13* 187:*23*
**cash-flow** 54:*1*
**casual** 136:*5*
**catch** 179:*6* 197:*11*
**categories** 156:*14* 161:*25*
**causing** 93:*10*
**CCR2870** 244:*6*
**cease** 94:*6* 108:*5*
**center** 16:*20* 143:*3*
**CEO** 154:*24*
**certain** 42:*20* 47:*5* 61:*5*
78:*25* 132:*5* 173:*3*
175:*21* 178:*12* 225:*23*
231:*25* 232:*13*
**Certainly** 15:*13* 25:*9*
27:*21* 28:*1* 43:*2* 46:*21*
88:*11* 93:*25* 95:*23*
118:*4* 121:*16* 124:*10*
128:*14* 135:*23* 137:*22*
138:*4* 139:*3, 25* 145:*7*
155:*22* 156:*17, 23* 158:*2*
169:*14* 170:*16* 171:*24*

173:*19* 185:*9* 188:*14, 24*
231:*10* 237:*23*
**certainty** 47:*6* 126:*19*
149:*4* 177:*21* 232:*16*
**CERTIFICATE** 242:*1*
**CERTIFIED** 242:*22*
243:*8, 14*
**certify** 242:*7, 13*
**CHAIN** 3:*10, 11, 13, 14,
21, 22* 4:*6, 7* 63:*10*
64:*14* 66:*18, 19* 103:*11,
20* 104:*14* 181:*2* 200:*15*
**challenges** 48:*5*
**chance** 67:*24*
**Chang** 2:*15* 8:*23* 51:*2*
107:*5* 109:*5*
**change** 23:*8* 24:*12* 27:*1*
97:*2* 119:*15* 163:*11*
184:*12* 204:*21* 234:*10*
**changed** 22:*12* 23:*6*
77:*11* 163:*23* 164:*25*
165:*10* 236:*23*
**changes** 44:*9* 47:*22*
48:*2* 69:*19* 183:*20*
184:*9* 199:*6* 209:*19*
**changing** 185:*2*
**characterize** 140:*10*
**characterized** 205:*12*
**charge** 100:*17* 106:*9*
233:*8, 12* 243:*25*
**charged** 169:*24*
**Chartwell** 16:*22* 17:*11,
13, 14, 20, 24* 18:*8, 15, 18*
19:*8* 31:*5, 9*
**Chartwell's** 16:*22*
**cheaper** 158:*15*
**chest** 240:*3*
**chief** 50:*7, 12, 15* 67:*22*
225:*21*
**choice** 18:*25* 19:*7* 235:*6*
**choose** 121:*25*
**choosing** 117:*6*
**chose** 107:*18* 153:*7*
**Christie** 36:*16*
**Chronologically** 13:*13*
**church** 63:*19*
**CIO** 88:*17, 19*
**circle** 86:*12* 96:*17, 25*
118:*9*
**circumstances** 30:*18*
**City** 37:*1*
**Civil** 1:*6*
**claim** 97:*15* 239:*14*
**claims** 99:*4* 110:*2*
**clarification** 159:*9*
**clarified** 59:*21* 101:*10*
**clarify** 7:*12* 59:*7, 15, 19*
60:*3* 110:*15* 127:*3*
133:*1* 161:*8* 193:*13*
204:*1*
**class** 15:*25*

**classes** 15:*16* 16:6, *7*
21:*5*
**clean** 44:*24* 182:*18*
**cleanse** 186:*13*
**cleansing** 26:*7* 39:*2*
40:*9, 13, 16* 182:*14*
185:*24*
**clean-up** 39:*2* 181:*12*
**clear** 7:*15* 47:*23* 83:*17*
99:*9* 115:6 126:*15, 24*
130:*25* 135:*3* 153:*12, 20*
191:*20*
**Clearly** 129:6
**Cleveland** 2:*11*
**client** 114:*18* 168:*15*
169:*21* 236:6, *14, 19, 20,*
*21, 24*
**clients** 27:*20* 28:*8*
37:*22* 40:*15* 135:*10, 12*
140:*8*
**climate** 184:*23*
**climates** 185:*1*
**close** 21:*24* 34:*22* 92:*17*
97:*13* 138:*10*
**closed** 61:*9* 76:*24*
155:*23, 24*
**closely** 34:*25* 64:*22*
190:*9*
**closer** 113:*8*
**closest** 118:*8*
**closing** 177:*1*
**cloud** 117:*16* 136:*3*
155:*7*
**cloud-based** 127:*21*
149:*11* 157:*10*
**Coast** 28:*7*
**code** 30:*8, 12, 15, 19, 23,*
*25* 49:*4*
**co-develop** 128:*10*
**Cohen** 12:*23* 220:*17*
221:*4*
**Coie** 225:*8*
**collaboration** 73:*8, 11, 14,*
*15*
**colleagues** 34:*18* 222:*5*
**collect** 38:*20*
**collective** 144:*2*
**collectively** 143:*18*
170:*18*
**college** 19:*19, 22* 21:*22*
**Columbus** 28:*13*
**column** 154:*11* 159:*1*
**columns** 23:*1*
**combination** 26:*17* 39:*7*
55:*1* 231:*25*
**come** 24:*18* 25:*12*
85:*13, 23* 100:*2* 108:*23*
119:*6, 14* 125:*10* 134:*21*
140:*21, 23* 147:*5* 159:*6*
168:*14* 189:*16* 198:*20*
217:*3* 240:*9, 11*

**comes** 39:*19, 20* 46:*21*
52:*1, 3* 92:*5* 117:*13*
135:*25* 149:*10* 175:*13*
196:*10*
**comfortable** 96:*22*
130:*21* 220:*18*
**coming** 12:*25* 122:*21*
142:*25* 177:*20*
**comma** 72:*9* 90:*1* 91:*12*
176:*25* 228:*20*
**commenting** 183:*19*
**comments** 179:*25*
**commercial** 172:*9, 12*
**commercially** 172:*16*
**commission** 43:*25*
231:*16*
**commissions** 38:*18*
**committed** 119:*16*
127:*11*
**common** 44:*12* 129:*11*
**commonly** 177:*15* 180:*5*
**communicate** 85:*6*
204:*10*
**communicated** 129:*23*
137:*6* 138:*18* 204:*2*
**communication** 86:*7*
90:*8* 91:*1* 106:*19*
136:*12* 137:*24* 143:*17*
198:*7, 9, 11, 17, 20*
204:*13* 223:*24* 224:*2*
240:*6*
**communications** 9:*15, 20,*
*22* 10:*1, 7* 12:*1* 18:*4*
98:*6* 104:*2* 143:*8* 169:*1*
199:*5* 203:*20* 226:*7, 13,*
*14*
**commuting** 70:*25*
**companies** 39:*25* 44:*24*
66:*10* 116:*19, 21, 22*
120:*15* 136:*17, 20, 22*
144:*11* 155:*11* 173:*9*
215:*12, 17* 216:*9* 223:*12*
229:*21, 23*
**company** 13:*15* 16:*18,*
*21* 19:*25* 21:*3* 22:*10, 11*
23:*20* 28:*3* 34:*10* 37:*25*
41:*18* 44:*14, 15, 21*
45:*13, 18* 49:*19, 24* 50:*5,*
*14* 51:*9* 61:*3* 64:*12, 24*
65:*9, 12, 21, 22, 23* 74:*1*
93:*9* 129:*7* 143:*1* 155:*6,*
*10, 13* 160:*25* 161:*3*
175:*4* 196:*8* 199:*11*
223:*11, 15* 229:*23, 25*
237:*16* 240:*7*
**company-funded** 160:*20*
**company's** 34:*5* 153:*18*
173:*7* 230:*5*
**compare** 200:*24*
**compared** 141:*7* 193:*8*

**compensation** 78:*25*
79:*2* 127:*12* 149:*19*
**compete** 118:*2* 141:*1, 2*
**competing** 107:*20*
**competition** 140:*24*
174:*23* 238:*19*
**competitive** 65:*19, 24*
74:*19, 20*
**competitor** 65:*16* 72:*8*
118:*8* 133:*4, 11*
**competitors** 240:*4*
**compiled** 166:*8*
**Complaint** 84:*13* 219:*23*
220:*1, 4, 5* 240:*11, 14, 22,*
*23*
**complete** 120:*22* 154:*9*
178:*15* 189:*17* 209:*22*
213:*23* 230:*17, 19*
**completed** 119:*10*
128:*15* 179:*5* 232:*12, 14,*
*17, 18*
**completely** 7:*8* 204:*16*
205:*14*
**completing** 233:*16*
**completion** 115:*3, 4, 9*
118:*21* 119:*6* 191:*1*
214:*2*
**compliance** 183:*7* 215:*6*
**complying** 84:*4* 176:*15*
181:*9* 190:*12* 195:*9*
206:*21*
**component** 29:*3* 116:*5*
156:*18, 19* 170:*17* 180:*5*
202:*8*
**components** 157:*2*
185:*22* 202:*2* 203:*6*
**comprehensive** 114:*1*
134:*8* 169:*8*
**computation** 229:*11*
232:*5*
**computations** 231:*3*
232:*7*
**compute** 26:*10*
**computed** 125:*12*
**computer** 15:*16, 22*
**computes** 127:*22*
**concern** 94:*25* 95:*2*
**concerning** 61:*3* 71:*16*
171:*15* 221:*7* 226:*8, 15*
**concerns** 172:*24*
**concluded** 241:*7*
**concludes** 241:*4*
**conclusion** 32:*3* 188:*23*
**concurrent** 227:*6* 234:*7*
**conditions** 46:*10* 174:*13*
**conduct** 80:*2* 98:*17*
239:*9, 14*
**conducted** 5:*10*
**ConEd** 136:*2* 139:*2, 5, 8*
146:*11, 15* 147:*3, 9, 16,*
*19* 159:*12*

**conferences** 16:*25* 17:*18,*
*25* 18:*1, 14* 78:*17*
117:*12*
**CONFIDENTIAL** 3:*19*
104:*23* 108:*21* 172:*21*
173:*1* 175:*20, 25* 176:*10,*
*11, 21, 24* 238:*18*
**confidentiality** 141:*4*
175:*17, 24* 177:*2, 16*
178:*6*
**configuration** 116:*4, 7*
145:*14* 228:*19* 229:*9, 12*
231:*7*
**configure** 122:*16, 20*
186:*13* 232:*24*
**configured** 114:*20*
215:*20, 21, 22*
**confirm** 51:*25* 87:*17, 19*
106:*18, 20* 143:*9* 205:*9*
210:*15*
**confirmation** 73:*16*
96:*18* 110:*11*
**confirmed** 74:*16* 87:*22*
96:*20, 22* 108:*10*
**confirming** 73:*20* 94:*12*
**conformation** 96:*7*
**congress** 209:*20*
**congressional** 210:*1*
**conjunction** 122:*22*
**connect** 67:*7, 24* 100:*25*
**connected** 67:*16* 110:*1*
242:*16*
**connection** 124:*18* 166:*3,*
*5* 193:*11*
**connections** 122:*20*
**consecutive** 212:*6*
**consensual** 61:*7*
**consensus** 69:*17* 177:*20*
**consent** 176:*25*
**conservative** 77:*12, 17,*
*18* 78:*7, 23*
**conserve** 77:*22, 23*
78:*11* 79:*1, 3*
**consider** 32:*4, 7, 25* 33:*8*
34:*18* 35:*1* 48:*23* 59:*17,*
*20* 69:*13* 121:*10* 139:*17*
141:*3* 158:*9* 189:*19*
**considered** 27:*19* 32:*14,*
*24* 121:*17* 143:*20*
**considering** 69:*4*
**consisting** 61:*18*
**Consolidated** 37:*1, 20*
43:*24* 58:*17* 136:*2*
**consolidating** 232:*7*
**constant** 143:*17*
**consult** 43:*9*
**consultant** 22:*9, 12*
**Consultants** 36:*1* 39:*8*
47:*8, 25* 58:*11*
**consulted** 47:*11* 55:*4*
104:*7*

**consulting** 27:*10* 34:8, *9*
36:*6* 50:*18* 52:2, *5*
54:*12*, *16*, *19* 55:2, 8, *15*,
*23*, *25* 56:2, *3*, *6*, *17*, *21*
146:*13* 147:*24* 148:*3*
151:*5*, *12*, *13* 156:*21*
175:*15* 177:*16*
**consumer** 190:*4*
**contact** 49:*1* 81:*13*
104:*10*
**contacted** 105:*21* 243:*16*
**contain** 187:*9*
**contained** 83:*1* 84:*9*
**contains** 171:*1*, *18*
**contemplate** 121:*6*
**contemplated** 69:*11*
113:*19* 129:*7*
**contemporaneously**
133:22 198:*10*
**content** 19:*5* 106:*18*, *20*
**context** 103:*25* 106:*12*
120:*21* 137:*15*, *23*
144:*24* 145:*25*
**contingent** 62:*9*
**continuation** 214:*13*
**continue** 21:*16* 74:*11*
121:*7* 138:*8* 142:*7*, *15*,
*16*, *19* 153:*7* 164:*5*
183:*6* 196:*2*
**CONTINUED** 4:*1* 16:*14*
95:*11*, *13* 97:*17* 99:*9*
110:*19* 112:*10* 119:*25*
142:*10*, *15* 153:*5*
**continues** 197:*5*
**continuing** 19:*15* 99:*3*, *8*
110:*14* 240:*24*
**continuous** 163:*16*
**CONTRACT** 3:*20*, *23*,
*24*, *25* 56:*5*, *7* 91:*5*, *6*, *8*
101:*3*, *16* 102:*15* 103:*2*,
*12*, *21* 106:*4* 107:*19*
108:*2* 118:*22* 119:*1*, *7*, *8*,
*10* 142:*7*, *9*, *10*, *14*, *15*
167:*9*, *20*, *24* 169:*5*, *11*
203:*5* 206:*5*, *20*, *22*, *23*
213:*14* 223:*13* 234:*14*
243:*18*
**contract/agreement**
243:*20*
**contracted** 111:*8* 126:*11*
129:*5* 134:*19* 153:*4*
234:*12*, *15*
**contracting** 36:*17* 142:*8*
167:*20*
**contractor** 150:*25*
**contractors** 79:*17*
125:*20* 145:*15* 217:*1*
**contracts** 10:*18* 47:*6*
80:*1* 124:*5* 169:*15*
**contractual** 89:*5*, *11*, *21*
137:*18*

**contribute** 18:*11* 142:*5*
160:*25*
**contributed** 52:*4* 103:*1*
**contributing** 19:*6* 142:*4*
**contribution** 127:*13*
160:*24* 161:2, *6*, *7*, *8*, *9*
**contributions** 79:*4*
160:*17* 161:*4*
**control** 159:*9*
**controls** 170:22 178:*10*
**conversation** 67:*13* 69:*6*,
*9* 70:*8*, *16*, *18*, *22* 71:*1*
74:*25* 75:*1* 81:*4*, *9*, *11*
82:*4* 86:*14*, *23* 87:*3*, *5*,
*10*, *12*, *15*, *18*, *22* 89:*4*
90:*19*, *24* 92:*17* 93:*8*
95:*5*, *7*, *10* 96:*1*, *10*, *11*
99:22 100:*3*, *22* 101:*25*
102:*3*, *7*, *9*, *10*, *18* 104:*4*,
*21* 105:*1*, *2*, *4*, *14*, *17*, *20*,
*24* 106:*16*, *22*, *23*, *24*, *25*
107:*6*, *11*, *25* 108:*3*, *4*, *6*,
*9*, *15*, *24* 109:*1*, *3*, *4*, *5*, *6*,
*9*, *11*, *16*, *18*, *22*, *23* 110:*7*,
*17*, *23* 112:*15* 128:*14*
131:*6*, *7*, *22* 136:*1*, *6*
137:*15* 138:*19* 158:*11*
199:*4* 218:*14* 219:*3*
220:*18* 221:*5*, *9* 222:*20*,
*22* 223:*17* 225:*17* 226:*1*,
*6*, *11* 227:*1* 238:*3*, *9*
**conversations** 37:*10*
48:*13* 61:*17*, *20* 74:*11*
80:*25* 81:*18* 85:*17*, *21*,
*22* 88:*9*, *11* 94:*11*, *14*, *20*
95:*14* 100:*15*, *19* 102:*6*,
*19* 107:*2*, *4* 109:*24*
110:*14* 116:*19* 117:*8*
130:*22*, *24* 135:*15*, *23*
137:*13* 139:*4*, *15* 144:*21*
169:*2* 170:*20*, *21* 188:*13*
219:*5*, *11* 220:*11*, *17*
224:*6* 226:*20* 236:*17*
238:*12* 239:*4*
**conversion** 25:*24* 26:*23*
28:*5* 233:*2*
**conversions** 24:*10*
**converted** 25:*3*
**converting** 23:*14* 24:*3*
**conveyor** 20:*15*
**coordinate** 29:*2*
**coordinated** 85:*15*
**Copilot** 46:*15*, *18*, *19*
114:*8*, *19* 115:*7*, *8* 116:*1*,
*2*, *4*, *13*, *14*, *18*, *23*, *24*
117:*18*, *20* 118:*1*, *3*, *5*, *8*,
*19*, *21* 119:*3*, *11*, *12*, *17*
120:*10* 124:*6* 144:*15*
196:*3* 213:*4*, *5* 230:*16*
232:*8*, *15*, *25* 233:*6*, *8*

**234:*12*
**copy** 219:*23*, *25*
**copying** 66:*24*
**core** 15:*13* 130:*5* 155:*6*
190:*6*
**correct** 10:*13* 13:*25*
14:*25* 15:*1* 20:*25* 21:*9*,
*15* 22:*5* 24:*5* 26:*14*, *21*
30:*1*, *17*, *24* 31:*11*, *15*
32:*11*, *12* 34:*2* 36:*1*, *2*
37:*21* 40:*1* 42:*3*, *12*
45:*2* 49:*12* 50:*6*, *9*, *24*
52:*18* 54:*6* 56:*15* 57:*15*
62:*3* 66:*13*, *20* 69:22
71:*5* 83:*1* 91:*19* 92:*3*
99:*11* 107:*12* 109:*12*
115:*10* 125:*9* 126:*23*
127:*18* 132:*9*, *17* 150:*2*,
*5* 151:*2* 152:*15* 154:*3*
158:*20* 159:*20* 166:*6*
171:*17*, *19*, *20* 173:*11*
179:*20* 183:*18*, *22* 185:*8*
188:*3* 192:*13*, *23* 196:*18*
197:*2* 199:*20* 203:*17*
207:*19* 213:*9* 214:*4*
221:*11* 224:*10* 242:*11*
**correcting** 18:*24*
**correctly** 96:*19* 187:*14*
194:*14* 218:*12*
**cosmetics** 16:*18*
**cost** 44:*1* 77:*15* 119:*21*
125:*23* 186:*11*, *15*
187:*10*, *20*, *21* 204:*25*
205:*2* 210:*22*
**costs** 44:*1* 79:*15* 125:*18*,
*21* 126:*18*, *21*, *24*, *25*
127:*2*, *10* 141:*15* 157:*3*
187:*9* 191:*13* 201:*20*, *22*
203:*11* 230:*2*
**Council** 243:*5*
**counsel** 5:*15* 11:9, *20*
59:*5* 61:22 69:*17* 80:*21*,
*22* 81:*9*, *10*, *18*, *22* 94:*7*,
*8* 218:*17*, *19* 219:*1*, *7*, *12*
220:*12* 221:*2*, *3* 222:*9*,
*14*, *18*, *19* 223:*10*, *17*
225:*4* 226:*11* 242:*14*, *16*
243:*11*, *22*
**counsel's** 11:7
**Counterparty** 60:*19*
61:*4*, *6*
**counts** 84:*12*
**COUNTY** 242:*5*
**couple** 6:*16*, *21* 8:*11*
23:*3* 52:*20* 75:*20* 77:*21*
103:*10* 109:*1* 114:*6*
117:*10* 156:*7* 186:*19*
216:*15* 217:*9* 229:*10*
240:*1*
**course** 15:*24* 16:*1*, *2*
19:*14* 39:22 50:*14* 53:*1*

67:*15* 125:*18* 141:*17*
142:*6*, *15* 143:*4*, *5*
145:*14* 152:*2* 153:*14*, *18*
154:*23* 156:*20* 165:*16*
193:*16* 195:*25* 201:*12*
205:*3* 215:*18* 231:*5*
238:*3*, 8
**courses** 15:*23*
**COURT** 1:*1* 5:*13*, *16*
6:*23* 61:*5* 152:*11* 167:*3*
242:*22* 243:*1*, *4*, *5*, *8*, *9*,
*14*, *16*, *21*
**courtesy** 219:*14* 221:*9*
**courts** 235:*8*
**cover** 6:*21* 53:*23*, *25*
54:*4* 196:*17* 243:*24*
**COVID** 155:*20*
**co-workers** 220:*13*
**CPR** 33:*16*
**create** 96:*8* 122:*1* 131:*8*
191:*24*
**created** 95:*6* 136:*13*
158:*21* 170:*14*
**creating** 190:*1*
**credit** 54:*7*, *9*
**critical** 95:*9* 110:*9*, *24*
**CSR** 1:*16*
**CSR-2870** 242:*22*
**CTO** 188:*17*
**CTO's** 142:*6*
**culmination** 195:*14*
**curious** 140:*3*
**current** 51:*18* 58:*4*
110:22 135:*6* 213:*22*
215:*24* 216:*5*
**currently** 50:*7* 51:*15*
55:*19* 56:*12*, *13* 110:*20*
111:*5* 114:*10* 115:*12*
121:*1* 139:*6* 184:*6*
**curriculum** 15:*12*, *13*
**custom** 230:*11*, *15*
232:*23*
**customary** 243:*25*
**customer** 9:*20* 10:*6*
18:*4* 27:*5* 31:*14* 38:*23*
42:*17* 50:*17* 58:*2*, *4*
65:*8* 76:*5*, *12* 78:*17*
80:*1* 100:*5* 104:*2*
108:*11* 114:*13* 115:*15*
120:*19*, *20* 122:*4*, *8*
131:*6*, *7*, *9*, *17* 133:*24*
136:*13* 137:*1*, *2*, *3*
141:*21* 143:*6* 151:*17*
153:*25* 156:*4* 164:*2*
174:*17* 175:*17* 176:*2*
192:*8*, *14* 194:*17* 195:*20*
220:*6* 224:*11*
**customer-facing** 114:*5*, *12*
**customers** 9:22 10:*13*,
*14*, *17*, *21*, *23* 26:*12* 27:*4*,
*7*, *11*, *14*, *19*, *24* 32:*12*

34:*12* 35:6, *20* 38:8, *11*,
*20* 40:*8*, *10*, *17*, *18* 47:*3*
50:*2* 55:*19*, *22*, *23*, *24*
56:*1*, *3*, *16*, *17*, *18*, *20*, *25*
57:*1*, *5*, *17*, *22*, *24* 76:8
80:*9* 86:*9* 109:*25* 112:*4*
115:*18* 116:*3*, *14*, *16*
117:*3*, *5*, *9*, *11* 120:*7*
121:*20* 131:*11* 133:*2*, *3*
135:*21*, *24* 136:8, *14*
137:6 138:*1* 139:*1*
142:*21* 143:*7*, *9* 144:*12*
147:*13* 148:*1*, *4* 153:6
156:*5*, *8* 160:*11*, *14*
167:*22* 174:*16* 177:*17*,
*19* 179:*25* 180:*2*, *5*
184:*11* 196:*14* 207:*9*
216:*19* 220:*2* 224:*9*
235:*7* 236:7
**customer's** 192:*9* 193:*18*,
*21* 194:*21*
**customers's** 116:*5*
**cut** 185:*16*
**Cuts** 231:*13*
**cycles** 189:*24*

**< D >**
**daily** 79:*18* 93:*24*
**Daniel** 2:*15* 8:*23* 51:*2*
222:*6* 224:*23*, *24*
**dash** 76:*4* 151:*6*
**data** 23:*14* 24:*3* 25:*3*, *4*,
*24* 26:*7*, *18*, *19*, *22* 27:*13*
31:*17* 38:*23*, *24* 39:*1*, *2*,
*6*, *10*, *15* 40:*9*, *13*, *16*
42:*17*, *18* 43:*2*, *4* 44:*24*
45:*15* 46:*6*, *7*, *10*, *12*, *21*
116:*6* 122:*7*, *9*, *10*, *11*, *12*,
*13*, *14*, *21* 123:*3* 138:*9*
147:*5* 168:*13* 170:*8*, *13*,
*16*, *22* 182:*3*, *14*, *18*
185:*24* 186:*3*, *8*, *9*, *13*
187:*1* 191:*9*, *23* 192:*10*,
*12*, *20*, *21* 193:*9*, *22*
194:*23* 215:*14*, *17*, *20*, *21*,
*22* 229:*13*, *16*
**database** 16:*19* 17:*1*, *3*,
*4* 26:*20* 31:*19* 146:*23*,
*25* 147:*7* 192:*13*, *18*, *21*,
*25* 193:*22*
**databases** 16:*3*, *4*
122:*21* 191:*3*
**DATE** 1:*12* 21:*25*
41:*15* 59:*14* 84:*13*
102:*18* 112:*10* 123:*16*
129:*4*
**dated** 75:*11* 224:*22*
242:*19*
**day** 8:*25* 36:*25* 55:*14*
102:*12*, *14*, *16* 166:*25*

174:*9* 204:*7* 242:*19*
**days** 94:*1* 237:8
**deal** 36:*9* 48:*25*
**dealing** 116:*11* 186:8
**debt** 158:*15*
**December** 148:*20*
207:*13* 209:*25*
**decide** 35:*24* 47:*19*
138:*7*
**decided** 34:*15*
**decision** 10:*4* 104:6
138:*4* 141:*16* 145:*19*, *21*
158:*12* 196:*4*, *9*
**decisions** 27:*12* 38:*18*
79:*11*, *18* 199:*7* 221:*2*
**decrease** 152:*17*
**dedicated** 54:*11* 127:6
**defamatory** 84:*9*, *11*
85:*1*, *6* 97:*10* 98:*7*, *18*
99:*14* 226:*18*
**default** 167:*23*
**Defendant** 1:8 2:*7* 5:*19*
**deferred** 24:*17*, *21*, *22*, *25*
25:*25* 26:*3*, *6*, *8*, *10*, *23*
29:*9* 33:*11* 114:*10*
117:*24* 120:*3*, *8*, *11*, *12*,
*14*, *22* 121:*12*, *14*, *17*, *21*,
*24* 122:*3*, *5*, *7* 123:*2*, *5*, *9*,
*25* 130:*9* 141:*20* 181:*14*,
*20*, *22* 188:*21*, *22* 189:*8*,
*18* 195:*16* 197:*6*, *8*
213:*7* 215:*8* 228:*20*
229:*11* 230:*21* 231:*12*,
*14*
**deficiencies** 182:*2*
**defined** 237:*22*
**definitely** 37:*24* 69:*16*
204:*23*
**degree** 14:*24*
**DEKALB** 242:*5*
**delineating** 202:*11*
**deliver** 45:*16* 188:*15*
**delivered** 17:*7* 114:*20*
155:*7* 233:*1*
**delivering** 225:*25*
**delivery** 42:*5*, *9*, *14*
217:*8*
**demand** 153:*24*
**demo** 120:*10*, *13*
**demoed** 116:*24* 117:*22*
120:*6*, *7*
**demoing** 120:*11* 139:*20*
**demonstrated** 131:*16*
**demonstration** 116:*23*, *25*
**demonstratively** 89:*17*
**demos** 45:*22* 46:*5*
116:*18* 117:*2*, *10*, *14*
135:*15* 139:*25*
**Dennis** 225:*8*
**department** 86:*24* 87:*1*,
*3*, *8* 88:*21* 135:*15* 192:*9*

193:*14*, *18*, *24* 198:*11*, *25*
203:*21* 204:*10*, *14*
207:*11*, *15*
**department's** 195:*5*
**depend** 136:*22* 186:*5*, *11*
195:*5*
**depends** 49:*23* 116:*5*
145:6 150:*9* 186:*2*
194:*21* 195:*2*
**deploy** 42:*16* 58:*1*
149:*9* 159:*24* 191:*5*
**deployed** 78:*16* 119:*19*
**deploying** 57:*21* 134:*10*
232:*8*
**deployment** 77:*13* 116:*3*
185:*21* 215:*21*
**deployments** 115:*18*
**deposed** 221:*10*, *14*
**DEPOSITION** 1:*11* 5:6,
*10* 6:*18* 8:*1*, *4* 11:*10*
12:*4*, *13*, *18*, *21*, *23*, *24*
13:*4*, *8* 60:*12* 63:*5*
66:*18* 68:*9* 71:*9* 75:*10*
82:*14* 148:*14* 220:*20*, *24*
221:*8* 241:*4* 243:*7*, *10*,
*12*, *17*, *18*, *24*
**deprecation** 122:*2*
**depreciation** 33:*10* 40:*4*
114:*11* 121:*24* 127:*19*,
*20*, *21*, *22* 128:*2*, *8*, *19*, *22*
129:*20*, *25* 130:*3*, *7*, *10*
132:*19* 141:*21* 181:*13*
188:*6*, *21* 189:*8*, *18*
193:*5*, *7* 194:*9* 195:*16*
197:*6* 213:*7* 215:*7*
230:*12* 231:*2*
**describe** 11:*1* 15:*11*
33:*3* 37:*8* 42:*7* 50:*10*
65:*19* 76:*1* 91:*23* 95:*1*
208:*5* 227:*3*
**described** 25:*24* 26:*22*
91:*22* 105:*3* 109:*23*
130:*15*, *17* 132:*11*
156:*22* 219:*4*
**describes** 68:*16* 167:*21*
**describing** 110:*8*
**DESCRIPTION** 3:8 4:*3*
42:*4* 61:*18* 68:*16*
**design** 119:*11* 126:*4*, *9*
128:*13*, *22* 129:*5*, *18*
130:*20* 194:*3*, *5*
**designated** 242:*9*
**designation** 32:*19*, *20*, *23*
**designed** 46:*11*
**desist** 94:6
**despite** 96:*23*
**detail** 171:*4* 211:*21*
231:*9*
**detailed** 39:*1* 209:*12*
229:*2*

**details** 103:*15*, *19*
**detected** 236:*22*
**determine** 142:*21*
**determined** 189:*6*
**deterrent** 235:*22*, *25*
**develop** 17:*9* 48:*4*
189:*21*
**developed** 38:*14* 107:*20*
113:*17* 114:*4*, *7*, *13*, *17*
116:*2* 130:*19* 131:*2*
132:*5*, *12*, *14* 135:*19*
184:*22*, *24* 188:*21*
**developers** 125:*25* 126:*3*
**developing** 45:*18* 73:*19*
124:*14* 128:*7* 132:*14*, *20*,
*21* 173:*13*
**development** 21:*1*, *6*
30:*3*, *6* 41:*2*, *6* 47:*12*, *17*
50:*18* 55:*2*, *3*, *11* 79:*15*
113:*23* 116:*7* 122:*17*
123:*25* 124:*4*, *7* 125:*6*,
*17*, *22*, *23* 126:*1*, *4*, *18*
127:*7*, *10*, *13* 128:*23*
129:*9*, *12*, *18* 131:*15*, *22*
133:*21*, *24* 141:*10*, *24*
142:*8*, *10*, *18* 143:*3*
151:*11*, *14* 156:*24* 157:*2*
187:*17*, *23* 188:*1*, *11*
189:*17*
**develops** 44:*23*
**devoted** 187:*17*
**diagnostics** 193:*7*
**dial** 124:*18*
**dialog** 99:*3*
**differed** 27:*21*
**difference** 26:*9*, *11*
46:*17*, *19* 105:*11* 202:*7*
**different** 22:*22* 23:*22*
27:*17* 55:*14* 77:*7* 109:*1*
117:*10* 162:*13* 204:*17*
205:*3*, *14* 220:*25* 231:*3*
**differentiate** 38:*7*
**differentiation** 202:*24*
**differently** 164:*16* 165:*3*
**difficult** 124:*9* 138:*8*
145:*7* 181:*21* 183:6
**diminished** 10:*18*
**direct** 66:*22* 109:*9*
127:*1*, *2* 193:*11* 201:*13*
219:*21*
**direction** 129:*8* 143:*23*
**directly** 22:*17*, *24* 23:*17*
27:*7* 61:*21* 156:*20*
183:*14* 188:*1*
**director** 28:*22*, *24* 29:*19*,
*21* 33:*18*, *24* 87:*7*, *9*
**directors** 63:*22*
**disagree** 237:*20*
**disappeared** 124:*19*
**disclose** 176:*24*
**disclosing** 176:*25*

**disclosure** 175:20 177:9
243:1, 6, 13
**discount** 189:2 244:1
**discovery** 85:23 189:10
224:4 230:14 239:18
240:24
**discretionary** 150:11
**discuss** 64:8 67:7, 17
70:11 72:18, 22 74:19
103:14, 18 195:14
**discussed** 72:20 73:10
77:2 82:2 133:25 223:8
**discussing** 77:4 193:10
**discussion** 71:3 73:15
74:9, 22 80:14, 22 96:3,
4 118:9 137:15
**discussions** 61:6 74:6
80:19 218:5
**dismiss** 152:12
**dispute** 81:2 96:5, 23
98:15 103:14, 23 108:8
111:9 125:13 134:12, 20
136:4, 10, 16, 22 138:20
139:11, 12 141:14
145:25 146:2, 4 147:22
148:3 216:24 236:24
240:15
**disruption** 110:10
**distinct** 187:18
**distinction** 17:22
**distributed** 155:25
165:12
**DISTRICT** 1:1, 2
**diverging** 34:4
**DIVISION** 1:3
**docket** 219:21
**document** 17:17 60:13,
14, 15, 22 63:6, 7 67:1
68:10, 12 69:15 71:11,
12, 23 76:17 82:8, 15, 18
83:1 84:21 89:8 113:21
114:2 118:14 140:11, 16
153:13 157:16, 24
158:17 162:3, 9 167:5, 6,
14 170:24 176:8 178:17
180:16, 19 183:12
190:21 196:16 200:8, 9
203:3 207:2, 24 208:9,
22, 24, 25 212:18 221:21
222:12 224:19 228:9
233:24 234:6
**documents** 9:4, 6, 8, 10,
12 10:20, 22 11:2, 3, 6
13:19 49:24 81:15
113:24 165:14 166:8
176:19 180:17 210:18
221:22
**doing** 13:20 14:3 16:18,
24 19:6 23:2 24:7, 10
27:9 29:1 34:7 37:5
40:9, 13 42:7 56:2

64:13 77:5 90:9, 11
94:10, 13 110:9, 12, 16
159:15 184:19 192:17
207:6 208:6, 7 212:16
214:25 222:7 223:14
229:13
**dollars** 52:14, 22 95:22
126:20 159:19 195:20
216:15
**Dominion** 38:6 58:18
146:12, 16, 17 147:1, 9,
16, 19
**door** 142:25
**downstream** 190:15
191:2
**dozens** 27:16
**draft** 18:11 202:15
**drawn** 53:12
**drive** 193:14
**driver** 136:17 152:16
**drop** 121:21, 22
**dual** 232:4
**dual-pronged** 76:5
**Due** 76:22 152:19
201:19 203:11 204:21
**Duke** 5:12
**duly** 6:3
**duration** 153:8 164:1
165:9 178:19
**duties** 20:19

**< E >**
**eagerness** 238:17
**earlier** 116:12 135:2
151:22 159:7 183:19
188:5 194:11, 14 218:5
226:1, 5
**early** 23:3 28:4 126:10
132:22, 23 142:23 189:2
196:8
**easier** 54:21 212:22
**easily** 30:12
**East** 28:7
**Eastern** 5:9
**ecosystem** 145:12
**Edison** 37:1, 20 43:24
58:17 136:2
**edit** 22:25
**edited** 18:23
**editing** 18:20
**edits** 18:12 19:7
**educate** 221:1
**effect** 98:4 103:1, 23
111:1 136:2 137:13
199:2 211:17
**effective** 185:3 235:22,
25
**effectively** 20:15
**efficient** 20:16
**effort** 125:20 166:8

201:8, 23
**efforts** 124:4, 7 130:8
**Eight** 161:12
**either** 9:5 10:17 91:6
100:18 107:6 110:4
122:24 125:16, 19
146:18 151:15 152:3
158:3 189:7 193:11
209:19, 20 220:3 231:18
235:7
**elect** 21:18 195:23
**elected** 21:19
**electing** 44:8, 11 117:4
**election** 44:12
**elections** 210:1
**elective** 16:7 161:2
**Electric** 28:5, 7 38:5
**elements** 129:11
**Eleven** 190:19
**E-MAIL** 3:10, 11, 13, 14,
21, 22 4:6, 7 10:1, 2
63:11 64:14 66:19, 23
67:21 72:2 75:10 76:9
82:7 103:17 104:14, 17
198:21, 23 199:18, 21
200:10, 13, 15 201:2, 14
202:11 221:23 222:1, 10
**e-mails** 9:17 10:8, 9, 12,
15 103:11
**emerging** 240:4
**employed** 27:2 30:10
31:1 36:14 41:6 45:5
49:2
**employee** 35:21, 23
36:12 37:13 51:10
54:22 105:8 106:16
107:1 142:5 143:15
149:24 156:16, 17, 19
161:16 168:19 242:14,
15
**employees** 8:20, 21 9:19
11:16, 18 30:12 34:23
37:16 47:11 50:17, 20,
21 51:13, 15, 18, 20
54:10, 11 55:1 77:21
79:1 86:18 91:12, 13
92:11, 12 107:3 125:20
150:21, 22 156:9, 18, 21
161:1 168:22 216:22
**employer** 243:9
**employment** 35:7
**enable** 114:15
**enabled** 73:1
**ended** 21:14, 23 146:5
204:25 237:8
**ends** 71:23 90:1
**end-to-end** 46:24
**Energy** 28:3 37:25
65:22 66:10 144:23
159:13, 15, 17
**ENG** 151:6, 7, 8

**engage** 27:6 61:6 99:10
112:16 117:11 164:13
**engaged** 27:16 55:22
93:23 94:7 107:23
110:18 111:5, 20 112:1
139:5 147:3, 4 151:14
168:4 228:16 231:23
238:2, 8, 14, 24
**engagement** 57:25 58:1
73:23 74:7 76:11 100:5
112:3 151:16 164:1
217:25
**engagements** 56:10 58:5
95:24 107:16 117:6
147:24 175:15 217:20
218:1 227:15
**engaging** 111:16, 18
169:14
**engineering** 14:24 15:3,
4, 14 151:8 156:22
**enter** 61:11 68:21
140:6 174:15
**entered** 62:4 69:2 70:9
119:2 169:4 171:21, 24
172:1, 25
**entering** 216:8
**enterprise** 131:3 189:23
**enters** 175:24
**entire** 80:1 104:3
137:21
**entirely** 52:2, 4
**entities** 215:13
**entitled** 149:22 195:10
**entity** 44:17, 19 49:22
243:11
**entry** 160:16 163:18
164:7
**equal** 55:13
**equity** 232:1
**equivalent** 121:19 144:6
**ERP** 39:24 65:10
**ERPs** 39:22
**escapes** 106:8 226:3
**Especially** 64:25
**Esquire** 2:5, 10
**essentially** 98:1 101:16
207:16 210:3
**establish** 174:13
**established** 23:23
**establishing** 215:15
**estimate** 126:16, 17
166:11 188:9, 10 216:11
217:16
**estimates** 211:14
**estimating** 126:25
**evaluate** 68:20 168:15
202:14
**evaluated** 156:2 194:5
205:15
**evaluating** 62:2 158:3

205:*1* 220:*16* 235:*12*
**evaluation** 138:*12*
**events** 169:*8*
**eventually** 66:*12* 69:*22*
123:*21* 146:*2*
**everybody** 22:*11*
**evolution** 18:*7*
**evolved** 184:*25*
**evolving** 18:6 185:6
**EVP** 67:22
**exact** 29:7 41:*15* 52:*21*
59:*15* 62:*15, 22* 123:*16*
161:*6* 211:*9*
**exactly** 81:8 145:*20*
202:*10* 213:22 217:22
239:*15*
**EXAMINATION** 3:*3*
6:*7*
**examined** 6:*4*
**examining** 60:*14* 63:6
67:*1* 69:*15* 71:*12* 76:*17*
82:8, *15* 84:*21* 89:8
157:*16* 162:*3, 9* 167:6,
*14* 176:*19* 178:*17*
180:*17* 183:*12* 190:*21*
200:8 207:2, *24* 208:22,
*25* 221:*21* 222:*12*
224:*19* 228:9 233:24
**example** 22:*25* 35:*13*
55:*4* 73:*14* 77:20 78:*17*
79:*12* 97:*19* 102:*21*
113:22 123:2 127:*15*
131:*1* 134:*4* 144:*15*
157:*4* 165:*4* 175:*11*
182:*4, 8* 220:*17* 229:*17,
20* 239:*18*
**examples** 115:*17*
**exceed** 169:*20*
**Excel** 118:6, 8
**excess** 125:7 231:7, *11,
12, 14*
**exchange** 71:*14* 176:10
191:9 200:*13* 222:*11*
**exclude** 89:*20* 91:7
**excluding** 226:*10*
**exclusions** 175:*21* 177:6
**exclusively** 21:8 47:*1*
54:*12* 142:6
**excruciating** 171:*4*
**executive** 50:7, *12, 15*
67:*17* 110:*1* 209:*20*
**executives** 240:7
**Exelon** 38:*1* 135:*13*
138:*13, 15, 18, 19, 21, 22,
25*
**exercise** 13:*23* 231:*1*
**exercises** 19:*1*
**EXHIBIT** 3:8, 9, *10, 11,
12, 13, 14, 15, 16, 17, 18,
19, 20, 21, 22, 23, 24, 25*
4:3, *4, 5, 6, 7, 8, 9* 60:9,

*12* 63:2, 5 66:*15, 18*
68:6, 9 71:6, 8 75:7, *10*
80:*13* 82:*11, 14* 118:*15,
17* 148:*11, 14* 153:*13*
157:*12, 15* 161:*11* 162:*5,
8, 12, 15* 163:8 167:1, *4*
172:*3* 178:8 180:*14*
197:*4* 200:*4, 7* 205:5, 8,
*18* 206:*13, 16, 19* 207:*20,
23* 208:*18, 21* 209:*12*
210:6, 9 212:*1, 4, 5*
218:22, *24* 221:*20*
224:*15, 18* 228:5, 8
233:20, *23*
**EXHIBITS** 3:6, 7 165:*15*
**exist** 58:*18* 114:7 119:8
121:*1* 128:*12* 131:*16*
182:*3*
**existed** 129:*3, 14, 19*
**existence** 130:9
**existing** 43:2 86:9
100:*4* 119:6 121:5
122:*4* 130:*1* 187:22
204:*19* 232:22 234:8
**exists** 58:*17*
**exited** 129:*17*
**expand** 24:*14*
**expanders** 177:*13*
**expansion** 119:*14*
**expect** 88:6 189:*13*
216:*12*
**expectation** 155:*1, 3*
184:*11*
**expected** 46:7 202:*3*
213:*17*
**expecting** 83:*18* 188:*1*
**expense** 127:*16* 149:*19*
151:6 156:22, *23* 161:*17,
20, 23, 24* 204:22
**expenses** 52:*25* 53:*1*
54:*3* 78:*19, 22* 149:*19*
157:*19* 161:20, *25*
165:*21* 166:9 210:21, *24*
211:*14*
**expensive** 140:*21* 158:*14*
**experience** 31:7, *13*
155:*11* 175:8 237:*4*
**experiences** 19:2
**expert** 32:*4, 8, 14, 20, 25*
59:*17, 19, 20*
**expertise** 32:*10* 33:*4*
59:*12* 144:*3*
**expiration** 207:*13*
**Explain** 21:*4* 26:5 46:2
122:*18* 129:*19* 155:*4*
167:*19* 168:8 187:*4*
210:*12* 223:*20* 228:*24*
**explanation** 127:*24*
223:*21*
**explanations** 117:*17*

**explore** 61:2 64:*12*
**explored** 239:*5*
**export** 191:*25*
**exposed** 31:2
**express** 94:*24* 95:2
201:*11*
**expressed** 89:*16* 94:*25*
221:*17*
**expression** 131:*12*
**extend** 65:*10* 140:*17, 19*
**extent** 46:*3* 59:*18* 86:2
121:*14* 130:*19* 141:6
172:*21* 176:*1* 192:7
214:*13* 223:*12*
**external** 10:*1* 215:9
222:*14*
**extract** 192:*10*
**eyes** 11:6, 7

**< F >**
**facilitate** 232:*23*
**facing** 35:6, *20*
**fact** 7:*14* 95:*17* 145:*12*
184:22
**fair** 7:5, *23* 25:5 31:6,
*12* 53:22 87:*23* 128:6
166:7 175:*14* 237:2
**faith** 141:*1*
**fall** 172:*15*
**false** 89:*17* 99:7
**familiar** 25:*4, 7* 31:*19,
21* 33:5, 9 44:*17, 19*
45:*20* 62:*24* 81:*13*
82:*18* 100:*17, 19* 143:2
180:*18* 210:*14*
**familiarity** 31:*24* 33:*12*
**far** 62:*14* 91:*18* 111:*12*
140:*1* 179:*13, 14*
**fashion** 78:7 228:*14*
**fastest** 175:*11*
**Fazio** 2:*10* 3:*4* 5:*18*
6:8, *15* 25:22 32:9, 22
48:*20* 59:*4* 60:*10* 62:*17,
18* 63:*3* 66:*16* 68:7
71:7 75:8 82:*12* 83:*19*
84:*1* 97:5, *12* 112:*23*
113:*1, 3, 7, 15* 124:22
125:*3* 133:*12* 148:*12*
155:*19* 157:6, 8, *13*
162:6 166:*17, 23* 167:2
175:*3* 180:*15* 183:*21*
186:22 194:22 200:5
203:*25* 204:6 205:6
206:*14* 207:*21* 208:*19*
210:7 212:*2* 218:*23*
224:*16* 226:*17, 22*
227:*18, 21* 228:2, 6
233:*21* 234:24 236:*12*
237:*19* 241:*1*
**FDL's** 232:*21*

**feasibility** 168:*16*
**features** 120:*25* 121:5
**February** 213:*21*
**federal** 209:*12, 18*
230:*25* 231:*4*
**fee** 62:9 185:*21* 189:7
210:22 211:*16*
**feedback** 97:*24* 117:*3, 5,
14* 139:*16* 143:6 158:*10*
**feel** 7:*12* 143:7 144:*3*
176:*16* 185:*11* 190:2
201:*12, 13*
**feels** 68:*3*
**fees** 53:*1, 9* 125:*23*
151:*19* 152:9, *13* 157:*4*
169:*18, 19* 202:*16*
210:*21*
**felt** 34:*11* 80:*13*
**FERC** 229:*24* 230:*1, 3*
**fewer** 140:*1*
**figures** 148:22
**File** 1:6 99:7 191:*3, 21*
192:*1* 193:*12*
**filed** 98:*18* 99:*4, 5, 8*
219:*15* 240:*10, 14*
**files** 122:*21* 195:*2, 3*
**filing** 43:*19* 218:*3*
**filings** 38:*17, 19*
**final** 17:6 186:9 200:*25*
205:*13* 230:*21*
**finalist** 199:*24* 200:*19*
203:*18*
**finalists** 198:*10, 12*
199:*3, 22, 25* 200:*24*
202:2, *14, 15* 204:*3, 12*
**finalizing** 153:*17*
**finally** 28:*20*
**finance** 16:8 74:*23*
160:*4*
**Finance4U** 64:*25* 65:*4, 9*
74:*4*
**financial** 49:6 51:8, *21,
24* 60:6 160:*1, 2* 170:*15*
244:*1*
**financially** 242:*17*
**financing** 155:*13* 158:*15*
189:*20*
**find** 103:8 154:2 176:7
192:*21* 223:2
**fine** 83:*13* 166:*17*
**finish** 7:*21* 134:*25*
**finished** 163:6
**firm** 8:5, 6, 7, *14* 61:*21*
126:8, *11* 177:*19*
**first** 6:2 22:6, *19, 20*
23:*15, 24* 24:7 25:*15*
28:*3* 36:*11, 12, 19, 24, 25*
37:*25* 49:*25* 61:*10* 67:5
70:8 73:7 75:*15, 22*
80:*18* 86:*13, 22* 89:2
98:9 100:2 102:*14, 15*

103:*12* 104:*25* 108:*23*
116:*1* 118:*18* 126:*16*
127:*15* 142:*1* 145:7, *9*
149:*21* 152:*1* 158:*10*
159:*12, 15, 17, 24* 168:*3*
176:*20* 180:*23, 24*
181:*10* 185:*17* 198:*19*
200:*15* 201:*9* 202:*6*
211:2 212:5, *21* 213:*24*
214:*3* 222:*17* 228:*18*
234:*3*

**firsthand** 102:*5*

**fit** 186:*10* 190:*3*

**five** 50:*21* 51:*15* 54:*11*
72:8 87:*25* 181:*18*
184:*21*

**FIXED** 4:*5* 32:8 64:*11*
122:8 123:*10, 14, 19*
127:*23* 128:*3* 130:*18*
141:*9* 170:*14* 179:*16, 19*
180:*21* 182:*15* 200:*19*
203:*5* 207:*17* 210:*22*
211:*16* 215:6 229:*25*
231:2, *6*

**fixed-asset** 65:*16*

**fixed-price** 185:*20*

**flat** 191:*3, 21, 25* 192:*1*
193:*12* 195:2, *3*

**flexibility** 145:*17* 196:*13*

**flight** 36:*25*

**flip** 154:8 167:*12*
190:*11* 195:6 201:*9*

**flipped** 9:7

**flipping** 154:7 231:*10*

**Florida** 231:*18, 19*

**flow** 25:*18* 165:22
194:*23*

**focus** 10:*17* 14:*4* 15:8
34:4, *5* 48:7 64:*10*
74:*16* 75:2, *3, 4* 98:*12*
109:*16* 124:6 185:5
186:*25* 187:7 191:*4*

**focused** 15:*14* 16:2, 8
18:*5* 24:9 29:*24* 35:*10*
36:7 46:2*1, 23* 54:*23*
67:*14, 15* 76:2 118:5
126:*14* 134:*9* 144:2, *16*
173:*4* 202:2*1*

**focusing** 132:7, *11*

**focussing** 16:*23*

**folks** 51:5 96:*1* 156:*11*
206:*24*

**follow** 73:*13* 103:*10*
138:22 172:*17* 230:*1*

**followed** 73:22 97:*18*

**following** 64:2*1, 22* 72:*3*
75:*16* 95:*10, 13* 110:*17*
191:*5* 208:*16* 232:2*1*
243:*13*

**follows** 6:*5*

**follow-up** 131:*21* 138:*20*

**footprint** 204:*19*

**forced** 77:*12* 174:*18*

**FORECAST** 3:*17, 18*
157:*18* 162:*12, 23*
163:*18* 164:*3, 17* 165:*5,
8, 14*

**forecasted** 166:*9*

**forecasting** 42:6, *10*
147:*6* 160:*10* 183:8
187:*2*

**forecasts** 165:*17*

**forego** 79:*2*

**foregoing** 242:8, *10*

**forgive** 47:*15*

**form** 15:*4* 25:*16, 20*
49:*19* 100:6 142:*20*
171:5, *10* 174:*24* 183:*16*
191:*22* 198:*19* 217:*4*
243:6, *12*

**formal** 129:5 139:*13*
141:*19*

**formalizing** 28:*25* 29:*15*

**formally** 209:*19*

**format** 162:*11*

**formation** 49:*24*

**formed** 49:*13, 17*

**former** 57:*1*

**forth** 71:*19* 154:7
176:*23* 178:*15* 224:*1*

**forward** 72:*3* 74:*11*
96:*13* 113:*23* 139:*23*
200:*18* 224:*24*

**forwarded** 221:*23*
224:*21*

**found** 45:*4*

**founded** 44:*25* 45:*13, 17*
143:*25*

**founder** 36:*10* 50:*5*

**founders** 22:*10* 36:*16*
37:*3* 48:*4, 7* 143:*4, 6*
150:*19* 165:*24* 169:6, *8*

**founding** 13:*14* 51:*18*
174:*8*

**four** 13:*10* 14:*12, 14*
36:*20* 72:*7* 84:*19* 114:*5*
116:*11* 124:*15* 147:*15*

**FPL** 231:*8*

**fraction** 239:*7*

**frame** 158:*1, 3*

**free** 7:*12* 185:*11* 201:*12*
102:*14*

**friend** 35:*2*

**friends** 34:*19, 20, 21*
48:*24*

**front** 82:*16* 140:*11*
157:*11*

**front-end** 31:*21*

**froze** 136:*4*

**full** 9:*11* 16:*14, 15, 16,
17* 20:*11* 102:*15* 152:*5*
153:*9* 177:*9* 233:*14, 18*

**fully** 7:8 116:2 131:2
188:*21* 191:*11* 193:*6*

**full-year** 148:2*1, 23*
152:*1*

**function** 30:*13* 122:*25*

**functionality** 121:*18*
184:*9, 12*

**functions** 17:*17* 25:*21*
95:*5* 120:*25* 121:*5*
138:*3*

**fund** 188:*1*

**funded** 53:*13*

**funders** 62:*5*

**funding** 52:*1, 3, 4* 61:*4*
62:2, *11* 158:2, *7* 190:*2*

**funds** 52:*23*

**further** 27:*1* 80:*19, 24*
140:*20* 141:*23* 209:*12*
242:*13*

**future** 107:*16, 19*
145:*17* 156:8 171:*19*

**< G >**

**GA** 151:*12, 19*

**GAAP** 26:*9*

**G-A-A-P** 26:*9*

**Gabriel** 8:*24* 54:*18*

**gained** 32:*10*

**gap** 181:*20* 182:8

**Gas** 28:*5* 116:*23* 120:*10*

**gears** 82:*10* 113:*16*
217:*5* 228:*3*

**general** 78:8 117:*5*
122:*14* 131:*14* 144:*13*
156:*3* 214:*24* 239:*11*

**Generally** 10:*25* 15:*25*
16:*23* 40:*19* 44:*4* 76:*11*
86:*5* 98:*8* 130:*17*
237:*16*

**generate** 216:*12*

**generated** 153:*10, 21*

**generation** 131:*5*

**generic** 160:*7*

**genesis** 63:*15*

**geographies** 74:*2*

**GEORGIA** 1:2, *15* 2:*6*
5:*11* 14:*9, 19, 20* 15:*19,
22* 16:*9, 11, 15, 17* 77:*25*
143:*3* 242:*3* 243:*5, 14*

**getting** 22:2*1* 25:*2*
122:*13, 14* 123:*1* 189:*19,
20* 192:*20* 204:*7*

**give** 6:*25* 7:*20* 22:8
36:*4* 59:*10* 97:*19*
103:*15, 19, 24* 117:*17*
179:*21* 182:*4* 196:*13*
209:*5* 212:*19* 214:*24*
229:*17* 239:*17*

**given** 20:*15* 55:*14*
102:*18* 112:*3* 117:*3*
145:*16* 150:8 151:*3*
155:2, *4* 165:*10, 25*
189:*16* 244:*1*

**gives** 187:*21*

**giving** 26:2 102:*5*

**go** 20:*15* 25:*19* 26:*20*
36:*3* 37:*9* 47:*21* 63:*10*
64:*14* 71:*22* 80:*11* 82:*6*
83:*13, 16, 18* 84:*2, 22*
86:*11* 88:*24* 98:*9*
112:*22* 120:*2* 122:*13*
123:*6* 124:*20* 131:*24*
133:*7, 9* 141:*15* 143:*5, 8*
144:*4* 149:*16, 18* 151:*5*
160:*16* 168:6 170:*25*
181:*6* 182:*24* 192:*18*
194:*12, 13, 15* 197:*4*
227:*9, 21* 229:*8* 237:*5*

**goal** 115:2 143:*25*

**goals** 235:*3*

**goes** 16:*5* 61:*9* 68:*23*
109:*7* 145:8 177:*19*
202:*1*

**going** 6:*24* 37:*5, 9* 38:*3*
50:*2* 51:*24* 58:*21* 71:*16*
72:*13* 74:*11* 80:*24* 83:*5*
84:*22* 96:*14, 25* 99:*12*
113:*23* 115:2*1, 24*
119:2*1* 122:*17* 123:2*1*
131:*12* 163:*12* 164:*13*
166:*10* 167:*22* 168:*23,
24* 171:*3, 15* 172:*25*
176:*18* 185:*25* 186:*4, 6*
188:*10, 11* 189:*19*
193:*19* 194:*24* 195:*20*
202:*22* 207:6 208:6, *7*
211:*18* 212:*15* 213:*2*
216:*12, 17* 224:*7* 227:*9*
239:*1*

**Gomes** 108:*16* 109:*18,
19, 20*

**Good** 5:*4* 6:*9, 10, 15*
27:*7* 34:*16* 48:2*1*
120:*19* 127:*24* 145:*5*
166:*16*

**gotten** 158:*10*

**govern** 56:*10*

**governed** 160:*24* 231:*15*

**governs** 208:*16*

**grab** 161:*11*

**graduate** 14:*15, 20, 22*

**graduated** 22:*1*

**graduates** 78:*1*

**graduation** 16:*9* 21:*23,
24*

**grammar** 18:*24* 19:*7*

**grand** 155:2*1*

**grant** 51:*14*

**grants** 51:*13*
**granularity** 157:*3*
**great** 36:*9* 48:*25* 184:*20*
**greater** 205:2
**grew** 14:*10*
**ground** 6:*21*
**group** 23:*25* 43:*16*
 105:*24* 126:*12*
**grow** 169:*16*
**growth** 155:*10*
**guess** 13:*13* 46:8 69:*18*
 153:*11* 187:8, *11*
**guidance** 44:*10*
**guys** 199:*2*

**< H >**
**Half** 76:*24*
**hammer** 34:*13, 14*
 140:*24*
**Hampshire** 229:22
**hand** 135:*1* 169:*13*
**handed** 60:*11* 63:*4*
 66:*17* 68:8 75:*9* 82:*13*
 148:*13* 157:*14* 162:*7*
 167:*3* 200:*6* 205:*7*
 207:22 208:*20* 210:*8*
 212:*3*
**handing** 71:8 224:*17*
 228:*7* 233:22
**handled** 24:22
**hands** 101:*4*
**happen** 68:2 79:6
 94:*14* 185:*25* 195:*1*
 222:*18*
**happened** 79:*7, 8* 86:*15*
 88:*10* 93:*3, 23* 102:*11*
 108:6 164:*11* 184:*14*
 214:*19*
**happening** 102:*20*
 141:25 236:8
**happy** 156:*2*
**hard** 146:8 184:*21*
**hats** 36:*13* 50:*15*
**head** 83:*20* 88:*16, 19*
 116:*20* 120:*9* 135:*13*
**hear** 194:*14*
**heard** 88:8 90:*16* 93:*14*
 96:*19* 98:*3, 17* 109:*24*
 137:*11* 138:*5*
**heavy** 15:*13*
**he'd** 220:*18*
**help** 18:22 24:*16* 25:*25*
 26:2 34:*12* 37:6 39:*21*
 44:*14, 24* 48:*1* 53:*24*
 118:*4* 160:*4, 7* 169:*3*
 170:*12* 172:*10* 177:*19*
 202:6 205:*23* 207:*9*
 211:*24* 228:*15* 235:8
**helped** 126:*12*
**helpful** 7:*1* 223:*1* 229:*1*

**helping** 26:*12* 29:*1*
 37:*9* 43:*19* 125:*20*
 207:*11*
**helps** 129:*4* 209:*17*
**Henry** 66:*13* 72:*3*
**hereto** 3:*7*
**Herschel** 221:*6*
**Hey** 101:*2* 224:*12*
**Hi** 222:*6*
**Hibbert** 102:*17*
**high** 14:*7, 8, 12, 14, 15,
 18, 19* 149:*17* 189:*25*
**highlighting** 75:*1* 182:*7*
**highlights** 75:*16*
**Hills** 116:*21*
**Hippert** 100:*13, 14, 21*
 101:*11, 14* 102:*4* 104:*12*
**hire** 144:*6*
**hiring** 78:8 216:22
**historically** 182:*10*
**history** 70:*20* 74:*1*
**hodge** 22:*21*
**Hoersdig** 86:*19* 87:2, *14,
 18, 20, 22* 88:*7, 10, 20*
 90:*21* 91:*12, 19* 92:*11*
**hold** 22:*7* 53:*11* 54:*9*
**holding** 140:*4, 5*
**holdings** 51:*3*
**holistic** 215:*5*
**home** 156:*12*
**hope** 146:*3* 172:22
 222:*7*
**hopeful** 160:*8*
**Hopkins** 225:*8, 11*
**host** 142:*17*
**hosting** 125:*24* 157:*4, 10*
**hour** 14:*4* 58:*21* 113:*7*
 169:*19*
**hours** 8:*11* 9:2, *3*
 127:*11* 217:*13* 237:8
**How's** 179:*11*
**Hundreds** 95:22 126:*19*
**hybrid** 232:*4*

**< I >**
**idea** 129:*21* 193:*3*
**identification** 60:*9* 63:2
 66:*15* 68:6 71:6 75:*7*
 82:*11* 148:*11* 157:*12*
 162:*5* 167:*1* 180:*14*
 200:*4* 205:*5* 206:*13*
 207:*20* 208:*18* 210:6
 212:*1* 218:22 224:*15*
 228:*5* 233:*20*
**identified** 48:*5* 93:*9*
 103:*3* 117:*25* 119:*12*
 123:*5* 170:*17* 210:*19*
**identify** 9:*13* 71:*11*
 76:*11* 84:*9, 11* 85:*20*
 101:*18* 125:*19, 22* 180:*3,*

*6* 207:*25* 228:*10*
**identifying** 37:*11* 125:*15*
**identity** 105:*20*
**illegal** 90:*9, 11, 13*
**illegible** 209:*8*
**illustration** 229:*19*
**image** 209:*3*
**imagine** 40:*25* 146:*4, 9*
 173:22 180:*4*
**immediately** 49:*13*
 53:*13* 108:*5, 7, 9* 223:*13*
**impact** 152:*25* 155:*20*
 235:*10*
**impacts** 174:22
**impediment** 136:*14*
**implement** 47:8 120:*1*
 131:*23* 145:*23* 146:*5*
**implementation** 117:*20*
 131:*2* 141:22 145:*1, 3, 7*
 182:*16* 185:*21* 187:*5, 19,
 20* 188:22 212:*24*
 214:*23*
**implementations** 145:*10*
**implemented** 43:*1* 47:*4*
 188:*12* 213:*3, 8*
**implementer** 42:*19*
**implementing** 187:*10*
 195:*21* 204:*17*
**important** 7:*7* 166:*1*
 196:*5*
**impose** 140:*20*
**imposed** 177:*3*
**impressed** 64:*23*
**improper** 106:*4* 110:*5*
**improperly** 91:*2*
**improve** 121:*5* 170:*21*
**incidence** 239:*14*
**include** 33:*10* 121:*1*
 187:*25* 196:6 212:*24*
**included** 21:6 26:*7*
 39:*18* 70:6 99:*5* 120:*10*
 134:*8, 11* 164:*4* 172:22
 201:*18* 207:*11* 232:*15*
**includes** 42:*11* 52:*25*
 215:*6, 9, 18, 20*
**including** 16:*14* 71:*19*
 84:*13* 132:*25* 135:*15*
 142:*6* 215:8 222:*13*
**inclusive** 210:*23*
**INCOME** 3:*16* 44:*2, 11*
 154:*4, 12* 162:*1* 181:*20*
 209:*12, 18* 231:*12, 14*
**incorporated** 234:*10*
**increase** 53:*7* 163:*2*
 210:*2*
**increased** 52:*20* 209:*11*
**increases** 234:*9*
**increasing** 165:*21*
**increasingly** 183:*6*
**incremented** 208:*10*

**incurred** 211:*15*
**INDEX** 3:*2* 4:*1*
**indicate** 96:*21* 151:*10, 13*
**indicated** 59:*6* 91:*25*
 108:*4* 111:*7, 19* 128:*10*
 132:*13* 134:*18* 158:*11*
 198:*9*
**indicates** 119:*5* 167:8
 168:*12* 213:*20, 23*
**indicating** 195:*25*
**indication** 236:*25*
**indicators** 46:*9*
**individual** 38:*17* 103:*20,
 22* 113:*25* 142:*9* 164:*4*
 168:*22* 187:*9* 198:*23*
 238:*12*
**individually** 10:*25* 83:*14*
 168:*23*
**individuals** 8:22 29:*3*
 36:*18* 70:*6, 7* 88:*17, 21*
 92:*24* 93:*24* 94:*16*
 125:*19* 169:*2*
**industrial** 14:*24* 15:2, *4*
**industry** 16:*23* 17:*20*
 18:*5* 19:*2* 36:*6, 7, 8, 18*
 47:*20, 22* 48:*2* 58:*11*
 64:*11* 65:*1, 6, 25* 117:*12*
 136:*4* 137:*21* 144:*3, 4, 8*
 183:*20* 184:*25* 190:*2*
**industry-standard** 178:*1*
**infer** 132:*1*
**inference** 136:*11* 152:*19,
 25*
**in-flight** 153:*4*
**informal** 120:*13* 139:*14*
**informally** 209:*20*
**information** 16:24 83:*2*
 92:*1* 93:*12* 94:8 103:*25*
 104:*11, 24* 108:*21, 24*
 119:22 120:*1* 122:*5*
 123:*2* 137:*10, 20* 148:*2*
 154:*2* 172:*21* 173:*1*
 175:*20* 176:*1, 10, 11, 22,
 24* 191:*25* 192:*19* 223:*3*
 238:*19*
**information's** 220:*9*
**informed** 80:*23* 87:*3*
 102:*23, 25*
**informing** 19:*5*
**infrastructure** 79:*14*
 142:*17*
**infringement** 110:*3*
**ingest** 46:*5* 192:*10*
**inhouse** 126:*5*
**in-house** 39:*7* 219:*7, 11*
 226:*11*
**INITIAL** 3:*23, 24, 25*
 22:*13* 67:*12* 69:*7* 92:*17*
 93:*7* 182:*15* 206:22
 224:22 240:*11*

initially 22:*16* 53:6
initiating 98:*15*
input 179:*21* 180:8
inputs 191:*23*
inquiring 88:7
inside 26:15
insight 74:*17*
instance 239:*17*
instances 98:*17* 239:*19,
24*
instruction 16:2
integrated 191:*18*
integrates 191:*12* 193:6
integration 191:*3, 22*
193:*14*
integrations 193:*19*
intellectual 172:*4, 11, 15*
173:7, *10, 14, 21* 174:5, *6,
11* 237:*12, 17, 22*
intend 61:2 121:*1* 194:*1*
intended 114:*14* 133:*1*
169:*15*
intensive 38:*24, 25*
interact 117:9
interactions 25:9
interacts 147:*23*
interest 49:*6* 51:*1, 9, 21*
60:*6* 61:*3* 131:*13*
158:*11* 190:*25* 201:*11*
interested 34:7 117:*18*
129:*25* 130:*12, 14*
131:*11* 135:*14* 138:*16*
139:*10* 165:22 200:*18,
23* 201:20 203:*12*
242:*17*
interests 172:*9, 12*
173:*21* 237:*17, 21*
interface 55:5 126:*10*
190:*15* 191:*1, 7* 194:*25*
230:7, *11, 15*
interfaces 31:22 187:*1*
191:*5, 6* 193:*17, 19*
194:*2*
interfacing 93:*24*
interfered 133:*19*
interference 115:*20*
intergenerationally 230:2
internal 9:25 122:*25*
126:*24* 139:*23* 188:*13*
199:7 201:7 218:*19*
219:*1* 222:*13* 223:*10*
225:*20*
internally 50:*16* 102:22
129:*24*
internship 19:*21, 24*
20:*20* 21:*12, 14, 21, 23*
INTERROGATORIES
3:*15* 125:*14*
interrogatory 83:8 84:*6,
8* 118:*11* 128:*18* 196:*19*

197:*25*
interrupted 111:*25*
intervening 201:*10*
introduce 5:*15*
introduced 61:22 66:*12*
introducing 66:*19* 74:*1*
introduction 63:*15, 20*
220:*23*
introductory 63:*11*
inventory 16:*19* 17:*1*
183:8
inverse 54:22
invest 80:5 119:*17*
121:7 141:*23* 142:*16*
187:22
invested 123:*24* 124:*10*
125:5 173:*13*
investment 142:2 144:8
155:*13*
investments 156:*16*
investors 51:6
invite 224:*21*
invited 112:6, *13*
invoice 214:7
invoices 211:*15*
invoicing 213:*25*
involved 26:*23* 43:6
47:*16* 102:*3* 106:*16*
122:*16* 125:*15* 217:8
225:*24*
involvement 108:*4*
IRA 160:*17, 23* 161:*16*
IRS 44:*10* 231:5, *16, 18*
issue 10:*21* 109:*10*
111:*1* 234:*23*
issued 179:*15* 180:*1*
issues 19:9, *11* 20:22, *24*
31:*14* 35:5, *20* 47:*12*
51:25 58:*13* 75:*17*
80:*16* 96:*21* 103:*23*
170:*18* 239:*11*
item 168:*17* 187:9
items 78:*18* 125:*15*
130:*3* 164:*21* 165:2
187:6 239:7
iteration 211:9
its 15:*4* 36:8 44:*16*
52:2 60:5 64:*10* 65:*10*
68:*23* 72:*18* 95:*4*
113:*18* 118:*25* 122:8
129:*17* 137:*3* 141:22
144:*10* 146:*13* 147:*24*
148:2 155:6 165:*15, 16*
167:22 172:*4, 13* 173:*20*
174:5, *14, 16* 175:*17*
176:2, 22 182:*10, 18*
183:*23* 184:*19* 191:*25*
195:*15* 214:2 216:8
231:*24* 237:*12* 240:7
243:*25*

< J >
Jalloy@robbinsfirm.com
2:6
James 8:*24* 54:*18*
January 201:*14* 206:7, *9*
209:*25* 210:*17, 19*
213:*19*
Jason 2:5 5:*20* 8:*15*
220:*17* 221:*4*
Java 15:*24* 16:*1*
Jeff 86:*19* 87:2
Jimmy 87:7 92:*20*
93:*19* 94:*17* 97:25
job 19:*20* 20:5, *11*
Jobs 231:*13*
Joe 43:*15* 108:*15*
John 86:*19*
join 35:*24, 25* 169:*3*
joined 36:*15* 188:*17*
joint 74:*23, 24*
jointly 117:*23*
Jonathan 36:*10, 16*
142:*12* 221:6
Josh 221:6
Joshua 8:*15*
judgment 80:*4*
Judicial 243:5
July 1:*12* 5:*8* 123:*14*
181:8 188:*20* 196:*15, 17*
203:*4, 21* 204:*11* 205:2
214:*15* 242:*19*
jumped 156:*3*
June 62:*23* 157:*20*
158:22, *24* 159:*11*
162:*15* 163:*11* 164:*11*
165:*1, 4* 224:22 225:*4*
jurisdiction 127:22
231:*4*
jurisdictions 231:*4*
jury 7:*14*

< K >
keep 7:*1* 38:*3* 44:*24*
79:*15* 123:*21* 134:*23*
140:*3, 20* 154:*24* 165:22
196:*1* 207:9 235:22
Keller 87:7 92:8 93:20
199:*16, 17, 25* 203:*16, 20*
Keller's 204:2
kept 153:*12, 14*
Kevin 87:7 93:*19* 94:*17*
199:*16, 17*
Key 2:*10* 51:*13* 74:*3*
kind 15:*23* 16:*19* 17:*4*
18:2 22:20 23:20 24:24
27:*11* 34:*4* 39:*12* 43:*12*
45:*11, 14* 46:9, *23* 47:22
58:*1* 72:25 78:*17*
85:23 93:*10* 94:*12* 98:*4*
112:*23* 121:*4* 124:*4*

130:20 149:8 155:*23, 25*
156:6, *25* 185:*16* 193:*4*
194:5 207:*14* 213:*19*
214:*24* 215:*14, 21, 22*
220:*13* 223:25 230:*14*
231:9 232:*3* 234:9
kinds 38:*10* 148:2
165:*17* 178:*1*
kits 114:*12*
knew 34:*13* 35:5, *19*
63:*18* 83:20 111:*1*
134:*19* 198:*16* 223:25
know 7:*18* 9:*17* 10:*16,
20* 27:22 33:*15* 34:23
37:*16* 40:*6* 42:22 44:22
45:*17, 19* 46:*3, 13, 25*
47:2, *3, 5, 9, 10, 11, 14*
48:*19* 49:2 52:21 53:2,
*4* 54:2 55:9, *13* 62:*15,
22* 63:23 65:*18, 25*
66:*10* 68:*4, 5* 74:8 76:7,
*9* 78:25 81:*15, 18* 83:7,
*9, 10* 87:*13* 88:*4, 7, 17*
90:*15* 91:*18, 20* 92:5, *14,
18* 95:*19, 23* 98:6 99:*1*
102:6, 7, *10, 12* 104:*10*
105:*10, 11, 12* 107:*10, 13*
111:*12, 18, 19* 112:*4*
113:25 114:*1* 116:*24*
123:*16* 124:*13* 128:*13*
129:*14* 131:*24* 133:*10*
135:7 138:*17* 140:*25*
141:*4, 5* 143:*1, 7* 148:*21*
149:*4* 153:*9, 11* 155:*16*
157:*23, 25* 158:*17* 160:5
162:22, *24* 163:*23*
165:*13* 169:*24* 170:*3*
173:*23* 175:2 176:*3*
177:5 178:5, *21, 22*
179:*13, 14* 181:*1* 183:25
184:*1, 4* 186:*18, 19, 21,
23* 190:*4* 192:*12, 14, 21,
24* 193:*1, 2* 194:*4, 20*
195:22 196:*11* 200:*3*
202:*10* 206:*1* 213:*1, 22*
214:*10, 12, 18* 215:*11*
217:*16, 22* 218:7 219:*15*
220:8, *22* 221:*10* 224:*3*
225:23 226:*13, 20, 24*
232:*13* 235:9, *14, 15*
238:25 239:*13, 15, 17, 18,
22* 240:*14, 20*
knowing 66:6 120:*1*
knowledge 35:9, *12*
40:23 42:25 83:2 107:8
109:2 147:2 148:9, *19*
162:4 178:*14, 18* 215:*19*
225:*12* 236:4
known 111:9, *20* 133:5
240:*10, 22*

**Kurt** 62:*25* 63:*17, 18*
66:*23* 87:8 93:*19* 94:*17*

**< L >**
**label** 11:*6*
**labeled** 140:*12* 164:*16*
203:*9*
**labels** 184:*7*
**labor** 125:*18*
**lack** 186:*9*
**lacking** 47:*23*
**Ladine** 224:*25*
**lagged** 182:*10*
**Lane** 13:*24* 17:*6*
**language** 16:*1* 43:*19*
89:*21* 168:*12* 197:*12*
**LANTUKH** 1:*11* 3:*4*
5:*6* 6:*1, 13, 14*
**large** 112:*7* 136:*10*
143:*13* 178:*6* 215:*23*
**largely** 153:*3* 164:*15, 18*
170:*12* 175:*10* 223:*10*
**larger** 27:*20, 23* 70:*5*
96:*10* 97:*24*
**late** 204:*7* 213:*12*
**launched** 140:*22*
**law** 160:*24* 173:*20*
237:*18, 23*
**lawsuit** 79:*20, 22* 98:*16,
18* 99:*5, 6, 8*
**lawyers** 11:*12, 13* 12:*2*
62:*8* 220:*19*
**layman's** 122:*18*
**layout** 126:*9*
**lead** 131:*5*
**leaders** 198:*25*
**leadership** 106:*13*
109:*25* 110:*1*
**lean** 79:*15* 193:*13*
**learn** 66:*8* 92:*22* 100:*2*
105:*1* 137:*10* 213:*10, 13*
**learned** 31:*17* 35:*7, 21,
22* 81:*22* 86:*3* 100:*4*
108:*25* 170:*12* 198:*5*
224:*5* 239:*19*
**learning** 19:*1*
**leave** 19:*17* 34:*3, 15, 16*
35:*25* 47:*19* 48:*21*
**leaving** 48:*3, 16* 49:*14*
**led** 42:*5, 9, 13* 104:*6*
163:*12* 164:*12*
**Lee** 33:*20, 21, 23*
**left** 19:*20* 29:*6* 32:*15*
33:*4* 35:*4, 6, 10, 15, 18*
41:*18* 45:*25* 48:*1* 49:*11,
16* 59:*12*
**left-hand** 159:*1*
**legacy** 138:*8*
**legal** 53:*1, 9* 101:*9, 12*
102:*24* 103:*23* 117:*16*
140:*18* 151:*18* 152:*8*

**Legalist** 60:*24* 61:*11, 17*
**legislative** 184:*23* 185:*1*
**legitimate** 173:*10, 20*
237:*17*
**length** 196:*12*
**Leo** 99:*23* 100:*10*
**Leo's** 102:*9*
**letter** 94:*6* 97:*22* 98:*4,
25* 99:*1, 2* 100:*6* 101:*12*
103:*21* 180:*25* 198:*8*
**letterhead** 167:*13*
**letters** 85:*9, 13, 15*
181:*4* 224:*8*
**level** 33:*4* 142:*2* 149:*17*
**leverage** 65:*10*
**leveraged** 217:*1*
**liabilities** 181:*21*
**liability** 26:*10*
**Liberty** 28:*17* 57:*4*
104:*20, 22* 105:*25* 106:*3,
4, 7, 15* 107:*15, 18, 21, 23*
116:*11* 137:*15*
**library** 17:*17*
**license** 115:*4* 116:*17*
117:*4* 133:*20* 135:*10*
136:*21* 171:*18, 19*
201:*21* 203:*12*
**licensed** 57:*6, 12* 114:*18*
115:*7, 8* 116:*14* 118:*21*
123:*8* 128:*1* 133:*15*
197:*7*
**licenses** 115:*15* 174:*14*
**licensing** 57:*16* 115:*1*
119:*2, 5, 18* 125:*23*
**life** 231:*15*
**lifted** 117:*16*
**Light** 116:*23* 120:*10*
231:*19* 240:*11*
**lights** 207:*10*
**likelihood** 210:*2*
**limit** 175:*19, 25*
**limited** 34:*11* 51:*15*
99:*11, 13* 139:*14*
**line** 54:*7, 8* 76:*13*
125:*15* 137:*11* 164:*21*
165:*2* 170:*23* 187:*6, 9*
222:*7*
**lines** 23:*22*
**link** 220:*5*
**list** 68:*23* 80:*12, 13*
91:*24* 147:*17* 161:*24*
190:*23* 193:*4* 226:*21*
**listed** 65:*12* 82:*7* 85:*2*
92:*25* 228:*15*
**lists** 75:*17*
**litigation** 53:*9* 60:*7*
62:*1, 3, 5, 6, 11, 14* 72:*17*
76:*23* 77:*2, 11, 15* 78:*15,
20* 80:*5, 16* 81:*16* 82:*2,

*3, 5* 86:*4, 6* 108:*8* 136:*3,
7, 11* 139:*18, 19, 24*
140:*1, 4* 151:*24* 153:*22*
158:*2, 6* 165:*21* 219:*15*
220:*7, 14* 221:*18* 234:*22*
235:*2, 5, 16, 21, 25* 237:*1*
243:*11* 244:*2*
**little** 14:*6* 15:*11, 21*
17:*10, 23* 18:*9* 60:*2*
82:*10* 112:*22* 113:*5, 17*
165:*3* 181:*7* 217:*5*
226:*12* 228:*3, 4* 229:*2*
**LITTLEFIELD** 2:*4* 5:*11*
**live** 215:*22*
**living** 70:*25*
**LLC** 2:*4* 142:*14*
**Llende** 87:*7* 92:*6, 20*
93:*19*
**LLP** 2:*7* 5:*19*
**load** 19:*14*
**loan** 52:*7, 9, 12, 14, 15,
17, 19* 53:*3, 7, 8, 10, 11,
12, 13, 14, 16, 20, 21* 54:*3,
9* 166:*3, 6* 228:*20*
**loans** 52:*6, 8* 53:*23, 25*
158:*4* 162:*25* 163:*2*
**LOCATION** 1:*14*
**locations** 122:*22*
**logic** 25:*13*
**logical** 112:*23*
**Logo** 160:*10, 13*
**long** 8:*9* 14:*3* 18:*8*
23:*16* 39:*1* 68:*4* 73:*3, 5*
143:*13* 177:*10* 189:*24*
220:*22*
**longer** 56:*18* 112:*22*
165:*12*
**long-lasting** 164:*2*
**longstanding** 143:*16*
**long-term** 145:*11* 150:*25*
**look** 9:*4* 13:*19* 46:*8*
53:*10* 55:*5* 60:*13, 25*
63:*9* 68:*15* 73:*6* 75:*14*
80:*12* 91:*9* 102:*13*
118:*10* 127:*25* 132:*23*
147:*18* 151:*18* 156:*9*
157:*3* 158:*25* 160:*6*
161:*15, 24* 164:*19* 176:*3,
13* 180:*24* 196:*17*
206:*15, 19* 207:*3* 209:*9*
212:*4, 8* 220:*9* 221:*20*
224:*20* 229:*21* 232:*19*
**looked** 9:*10* 10:*23* 23:*1*
162:*14* 208:*9* 216:*4*
**looking** 10:*6, 12* 36:*6*
120:*16* 131:*19* 133:*4*
156:*15, 24* 157:*7* 177:*22*
203:*3* 210:*13* 231:*1*
225:*14, 15* 238:*11*
**looks** 71:*18* 122:*16*
126:*10* 148:*17* 150:*2*

159:*10* 162:*11, 12*
164:*18* 165:*8* 196:*18*
206:*25* 207:*12* 208:*8, 9,
11, 15*
**Loreal** 16:*18* 19:*8, 13,
14, 15, 17, 20*
**lose** 235:*7*
**losing** 174:*6*
**loss** 125:*16* 126:*22*
148:*17* 151:*25* 156:*13*
**lost** 10:*17* 79:*25* 124:*5*
133:*24* 152:*18*
**lot** 9:*11, 15* 15:*14, 15*
22:*21* 23:*13* 28:*7, 13*
36:*13* 38:*2, 23* 39:*1, 2,
11* 40:*13* 47:*25* 50:*15*
79:*11* 145:*8* 160:*4*
215:*11*
**Lou** 222:*6*
**Louisville** 28:*5*
**love** 55:*13* 67:*6* 139:*17*
**low** 74:*10*
**LUCASYS** 1:*4* 2:*15*
3:*17, 18* 5:*7* 8:*20* 9:*19*
11:*16* 13:*10* 49:*13, 17,
21* 50:*11, 20* 51:*6, 22*
52:*1, 3, 23* 54:*10* 55:*19*
56:*16* 57:*18, 23* 58:*4*
60:*3, 5, 7, 24* 61:*11* 62:*4,
12, 19* 68:*14, 25* 70:*7*
71:*15* 72:*2* 73:*11* 74:*10,
14, 20* 75:*16, 23, 24*
76:*23* 79:*20* 80:*20*
81:*12* 84:*5, 8, 18* 85:*1, 7*
87:*4, 17, 21, 25* 88:*6, 10,
22* 89:*4, 13, 14, 20* 90:*8,
11, 12* 91:*1, 7, 11, 13*
92:*10, 12* 93:*9* 94:*24*
95:*13* 96:*20* 99:*10, 24*
101:*9* 102:*23, 24, 25*
103:*7* 104:*1, 7, 16, 23*
106:*3, 5* 107:*1, 3, 16, 19,
20, 21* 108:*11, 20* 109:*15*
110:*3, 4, 12, 15, 17* 111:*8*
112:*6, 12* 113:*17, 22*
114:*4, 17* 115:*16* 116:*9,
13* 117:*18* 118:*11, 20*
119:*1, 3* 121:*17, 23*
122:*3, 15* 123:*8* 124:*2*
128:*1, 7* 130:*7* 132:*5, 20,
21* 133:*14, 15* 135:*5, 9*
136:*16, 21* 137:*4, 7, 17*
139:*5* 140:*5, 6, 24* 141:*6,
9, 17, 23* 142:*20, 22, 24*
143:*1, 15, 25* 144:*9*
145:*2, 12* 146:*12* 147:*13,
23* 148:*2, 18* 149:*3, 8, 13,
22, 24* 151:*15* 153:*14*
154:*19, 25* 155:*6, 20*
156:*4* 157:*19* 160:*19*
162:*12* 165:*15* 167:*13,

*21* 168:*4, 9, 16, 19* 169:*3*
171:*1, 5, 10, 12* 172:*2, 3,
9, 12, 20* 173:*13, 19*
174:*4, 12, 15, 21* 175:*15,
24* 176:*2* 178:*9, 15*
179:*21, 24* 180:*8, 10*
181:*11* 185:*7, 18* 187:*5,
10* 188:*2, 6* 189:*1, 16*
190:*14* 191:*1, 4, 11, 17*
192:*2, 10* 193:*5, 8, 20*
194:*1, 9, 10, 12* 195:*14,
15, 16* 196:*3, 20* 197:*7*
199:*10* 200:*18, 22*
201:*18* 205:*15, 20* 206:*1*
207:*1* 208:*7* 209:*2, 10*
211:*8, 10, 18* 212:*15, 24*
213:*11, 17* 216:*17*
217:*23* 222:*6, 25* 226:*9*
228:*12* 232:*22, 23, 24*
233:*5, 6, 8* 234:*4, 25*
235:*1, 19* 236:*7, 21*
238:*3, 8, 14* 239:*2, 4*
240:*7*
**Lucasys/PowerPlan** 96:*3,
5*
**Lucasys's** 203:*4* 234:*25*
**Luisa** 104:*22* 105:*3*
**lunch** 112:*20*

**< M >**
**macro** 47:*22* 48:*2*
183:*20*
**magnitude** 150:*16*
**maintain** 138:*9* 141:*17*
165:*16* 186:*14*
**maintained** 17:*16* 55:*16*
**maintaining** 30:*23, 25*
**maintenance** 137:*8*
182:*9*
**major** 216:*18, 21* 217:*10*
**majority** 54:*15* 152:*10*
**makeup** 210:*1*
**making** 18:*25* 27:*12*
79:*11, 18* 88:*20* 110:*25*
127:*4* 141:*16* 161:*3*
164:*14* 196:*9* 200:*25*
220:*23* 235:*22* 237:*9*
**man** 33:*21*
**manage** 39:*6, 10, 15*
**management** 86:*25*
**managerial** 29:*3*
**managing** 29:*5* 87:*9*
103:*12*
**manipulating** 16:*4*
**manual** 118:*7*
**map** 74:*18*
**Marc** 86:*19*
**March** 34:*15* 35:*6, 14*
66:*23* 67:*2, 11* 155:*22*
162:*20* 163:*22*

**margin** 154:*19, 24, 25*
**marginally** 155:*21*
**Marie** 100:*13, 24*
**Mark** 23:*20* 72:*9*
**marked** 60:*9, 11* 63:*2, 4*
66:*15, 17* 68:*6, 8* 71:*6, 8*
75:*7, 9* 82:*11, 13* 148:*11,
13* 157:*12, 14* 162:*5, 7*
167:*1, 4* 180:*14* 200:*4, 7,
12* 205:*5, 7* 206:*13*
207:*20, 22* 208:*18, 20*
210:*6, 9* 212:*1, 3* 218:*22*
224:*15, 17* 225:*5* 228:*5,
7* 233:*20, 22*
**market** 64:*24* 74:*20*
121:*20* 129:*24* 130:*21*
133:*2, 3, 7* 136:*12*
142:*20* 143:*11, 13, 18, 21*
144:*1, 7* 190:*5, 10*
235:*11, 17, 19, 23* 240:*4,
8*
**marketing** 66:*5* 77:*5, 7,
10, 20* 78:*21* 114:*13*
126:*13* 130:*8, 9, 11*
**marketing-facing** 78:*18*
**marketplace** 80:*3* 152:*19*
**markets** 156:*2* 238:*20*
**Mars** 87:*8* 92:*6* 93:*19*
**mask** 57:*8*
**master** 56:*9, 14* 57:*8, 13,
14* 141:*6* 171:*1, 6, 12, 22*
172:*2* 174:*22* 178:*8, 9*
**materialize** 159:*18*
**math** 15:*14, 15*
**matter** 5:*7* 19:*6* 110:*14*
140:*18* 173:*20*
**mattered** 174:*9*
**maturity** 145:*6*
**max** 36:*20*
**maximize** 155:*10*
**maximum** 161:*2*
**Mayes** 8:*15*
**mean** 11:*18* 21:*4, 5*
26:*5* 27:*23* 42:*13* 46:*4*
49:*23* 52:*4* 53:*24* 76:*6*
77:*18, 19, 20* 78:*24*
90:*13* 94:*22* 106:*21*
112:*14* 130:*4, 9* 132:*3*
135:*6* 138:*11* 142:*3*
145:*25* 146:*2* 153:*21*
155:*4* 169:*12* 172:*12, 20*
176:*7, 14* 177:*9* 182:*6*
183:*14* 191:*6, 8* 205:*23*
236:*15*
**meaning** 139:*17* 220:*12*
**meaningful** 182:*13*
**means** 38:*24* 50:*16, 17,
18* 74:*8* 76:*7* 173:*19*
229:*24* 235:*12*
**meant** 23:*11* 38:*16* 76:*9*

**measure** 141:*1*
**Media** 5:*5* 97:*10* 166:*21*
**mediums** 117:*10*
**Medtron** 19:*25*
**Medtronic** 20:*1, 17* 21:*8*
232:*9*
**meet-and-greet** 69:*8*
70:*23* 71:*1*
**meeting** 8:*19, 25* 11:*19,
24* 69:*22* 71:*16, 20*
72:*13, 20, 24* 73:*22, 24*
74:*14, 15* 75:*5, 25* 76:*2,
15* 77:*3* 81:*25* 82:*7*
91:*15* 92:*13, 14, 18, 21,
23* 93:*4, 6, 8, 22, 25*
97:*23, 24* 103:*9* 218:*17,
19* 224:*21*
**meetings** 8:*10, 13, 17*
9:*2, 5* 37:*1*
**meets** 121:*15*
**member** 41:*12, 14* 45:*9*
63:*21*
**members** 41:*17* 74:*3*
107:*6*
**memory** 13:*9, 22, 24*
17:*6*
**mentioned** 28:*19* 37:*19*
40:*12* 51:*6* 56:*25* 80:*16*
81:*5* 92:*6* 98:*25* 120:*5*
121:*4* 125:*7* 130:*8*
133:*13* 139:*1* 144:*19*
156:*16* 163:*1* 165:*23*
183:*19* 218:*13* 235:*4*
**mentioning** 39:*13* 102:*9*
**message** 198:*24* 199:*1, 4,
8, 12, 15, 17, 24*
**messages** 9:*17* 10:*3*
**met** 6:*16* 8:*5, 7* 46:*10*
232:*2, 21*
**method** 44:*9*
**Michael** 108:*20* 223:*9*
**Microsoft** 17:*8*
**mid-2020** 236:*9*
**middle** 64:*20* 76:*3*
188:*25* 209:*9* 222:*10*
**mid-term** 210:*1*
**migration** 231:*21*
**million** 52:*21* 62:*23*
124:*14* 125:*8, 11* 126:*16*
149:*5, 6* 151:*23* 152:*13*
154:*5, 15* 185:*18, 19*
186:*16* 187:*13, 17*
205:*19* 206:*11* 211:*17,
19* 212:*16* 216:*15*
**millions** 195:*20*
**Milton** 14:*8*
**mind** 13:*13* 39:*19, 20*
76:*16* 85:*13* 117:*13*
135:*25* 175:*13* 240:*9*
**minimal** 184:*16*

**minor** 20:*19* 216:*21*
217:*19*
**minute** 39:*14* 50:*3* 57:*1*
60:*12* 96:*15* 201:*3*
234:*21*
**minutes** 7:*20* 205:*11*
210:*12* 227:*18*
**misaligned** 181:*19* 182:*1*
**misalignment** 182:*7*
**misappropriated** 107:*22*
173:*15, 22* 174:*1*
**misappropriating** 91:*4*
101:*7* 104:*23* 106:*3*
108:*21*
**misappropriation** 110:*2*
**misheard** 138:*14*
**mission-critical** 136:*23*
138:*2*
**misstated** 203:*24*
**mitigation** 195:*11, 21*
196:*6*
**mock-ups** 130:*20* 132:*23*
**mode** 84:*14*
**model** 38:*15* 76:*11*
155:*8, 12, 25* 185:*3*
209:*18* 216:*25*
**modify** 230:*15*
**module** 24:*23, 24* 25:*1*
32:*13, 19, 20* 33:*17* 43:*4,
6* 121:*11* 122:*6* 228:*20*
**modules** 24:*25* 33:*1, 6, 7,
12, 14* 42:*20* 43:*1, 2*
68:*23* 130:*5* 181:*14*
**Mohamad** 108:*17*
**moment** 13:*1* 58:*20*
99:*18* 116:*13* 131:*25*
186:*18* 193:*10* 203:*3*
223:*19* 226:*3* 240:*18*
**Monday** 8:*7* 9:*1*
**money** 47:*25* 53:*21*
77:*19* 119:*17* 125:*5*
**month** 150:*8* 163:*10*
164:*14* 165:*10, 25* 214:*1*
**monthly** 214:*7*
**months** 22:*20* 23:*3*
64:*23* 97:*18* 142:*24*
152:*2* 164:*20, 21*
**morning** 5:*5* 6:*9, 10, 15*
**motion** 152:*11*
**move** 96:*13* 129:*8*
139:*23* 164:*7* 193:*9*
**moving** 200:*18*
**multiple** 56:*10* 101:*21*
107:*1* 129:*13* 164:*21*
165:*2* 184:*6* 214:*18*
227:*6*
**MUTUAL** 3:*9, 12* 60:*23*
61:*1, 3, 13* 63:*19* 68:*13*
140:*8*
**mutually** 177:*20*

**< N >**
**name** 5:*12* 6:*11* 8:*21*
60:*18* 63:*1* 66:*13* 102:*9*
106:*8* 142:*12* 225:*15*
226:*2*
**named** 62:*25* 88:*21*
**names** 88:*15* 101:*23*
**name's** 43:*15*
**narrow** 35:*9* 190:*5*
200:*23*
**narrowing** 204:*15*
**nascent** 188:*7*
**nature** 18:*21* 38:*16*
69:*3* 94:*21* 110:*9*
214:*16* 216:*3*
**navigate** 130:*3* 207:*11*
**navigation** 130:*3*
**NDA** 69:*13* 70:*9, 14*
71:*19*
**near** 187:*6*
**nearly** 152:*21*
**necessarily** 75:*3* 131:*1*
155:*2* 160:*5* 169:*12*
175:*12*
**necessary** 31:*24* 176:*1*
188:*11*
**need** 7:*17* 18:*6* 23:*9*
30:*13* 87:*19* 97:*2*
117:*15* 122:*20* 141:*15*
142:*18* 143:*7, 9* 144:*4, 5*
154:*21* 157:*3* 176:*16*
185:*25* 186:*20* 190:*8*
192:*11, 14, 17, 21* 201:*13*
217:*3*
**needed** 22:*23* 38:*19*
69:*5, 9* 131:*8* 160:*4*
187:*11* 189:*17* 191:*8*
192:*10* 232:*10*
**needs** 48:*13* 83:*9*
122:*12* 180:*3* 183:*8*
185:*6* 186:*9* 230:*1*
**negatively** 174:*22*
**negotiated** 57:*8* 61:*7*
171:*7*
**negotiation** 177:*18*
**negotiations** 174:*16*
**NER** 228:*21*
**net** 154:*19*
**never** 28:*16* 30:*22* 43:*1*
61:*23* 103:*3* 159:*19*
224:*7*
**New** 37:*1* 43:*25* 64:*25*
77:*21* 123:*10* 128:*3*
138:*3, 11* 160:*10, 13*
189:*9* 196:*10* 197:*9*
204:*17, 23* 216:*22*
229:*22*
**new/new** 43:*1*
**newly** 215:*19, 20*

**NextEra** 28:*6* 57:*4*
99:*23* 100:*7, 9, 18* 101:*5*
103:*17* 104:*6, 16* 116:*10*
118:*10, 21, 25* 119:*1, 16,*
*21* 120:*13* 124:*7* 144:*15*
147:*12, 17, 19* 228:*4, 12*
230:*10* 231:*23* 232:*12,*
*25* 233:*9, 13* 234:*15*
**NextEra's** 229:*10*
**NHT** 228:*20*
**niche** 190:*6*
**nine** 55:*21* 56:*25*
**NiSource** 28:*12, 13*
**nobody's** 131:*4*
**Nodding** 26:*25* 108:*22*
114:*25* 133:*18* 188:*8*
213:*6*
**non-customer-facing**
126:*13*
**NON-DISCLOSURE** 3:*9,*
*12* 60:*23* 61:*1* 68:*13, 24*
69:*6*
**non-equity** 51:*17*
**non-founding** 36:*12*
**non-regulated** 144:*10, 16,*
*23, 24* 231:*24*
**normal** 147:*4*
**normalization** 230:*4*
**NORTHERN** 1:*2*
**Northwest** 1:*14* 2:*5*
**note** 72:*16* 201:*11*
**noted** 75:*16*
**notification** 206:*23*
**notified** 204:*12*
**Nova** 114:*8* 133:*13, 15,*
*20, 22* 134:*2, 6, 9, 11, 14*
135:*10, 14, 19* 139:*2, 10*
141:*21* 164:*8, 13*
**N-O-V-A** 114:*9*
**November** 83:*3* 86:*15*
90:*19* 99:*21* 100:*22*
102:*11, 13, 14, 16*
**now's** 166:*16*
**NRG** 65:*14* 66:*5* 144:*21*
**number** 34:*22* 44:*8*
47:*21* 52:*21* 57:*9* 58:*10*
62:*22* 75:*17* 95:*4*
113:*19* 116:*19* 117:*14,*
*23* 120:*17* 125:*11*
127:*11* 137:*6* 142:*21*
185:*20* 196:*20* 212:*9*
214:*6* 218:*1* 227:*15*
234:*8*
**numbered** 190:*23* 242:*11*
**numbers** 150:*7* 152:*25*
212:*6*

**< O >**
**O.C.G.A** 243:*19*
**Object** 25:*16* 174:*24*
183:*16*

**Objection** 32:*6, 16*
48:*17* 133:*9* 155:*14*
194:*19* 237:*13*
**object-oriented** 15:*25*
**obligations** 89:*5, 11*
176:*2, 23* 177:*3*
**obtain** 160:*13*
**obviously** 147:*10* 149:*1*
226:*12*
**occur** 8:*25* 219:*2*
**occurred** 82:*4* 92:*15*
96:*2* 108:*9* 136:*4*
137:*25* 138:*21* 182:*15*
223:*18*
**occurring** 120:*17*
**occurs** 119:*18* 182:*5*
**October** 64:*4, 7, 9, 15*
66:*2* 162:*19* 163:*12, 22*
164:*12, 22* 165:*1, 7*
**offer** 121:*13* 140:*9, 10*
149:*23* 232:*25*
**offered** 140:*6* 150:*24*
**offering** 189:*1* 190:*6*
**offerings** 74:*2*
**offers** 77:*21, 23, 25* 78:*4,*
*6*
**offhand** 135:*18* 157:*5*
**office** 71:*1*
**officer** 50:*8, 12* 67:*23*
225:*21*
**Oh** 27:*16* 29:*21* 39:*11*
46:*13* 52:*20* 137:*22*
157:*9* 188:*24* 203:*25*
204:*23* 209:*14*
**Ohio** 2:*11*
**Okay** 6:*21* 7:*11, 17, 22*
8:*3, 9, 12, 16, 19, 21* 9:*4,*
*9, 13, 16, 18, 22* 10:*4, 11,*
*14, 22* 11:*2, 5, 15, 17, 21*
12:*7, 11, 16* 13:*2, 12, 19*
14:*10, 15, 20, 22* 15:*11,*
*21* 16:*13, 16, 17:10* 18:*2,*
*16* 19:*3, 11, 23* 20:*4, 6*
21:*1, 10, 14* 22:*1, 6, 13,*
*18* 23:*5, 16* 24:*6, 15*
25:*7, 23* 28:*1, 23* 29:*16,*
*18, 22, 24* 30:*2, 5, 14*
32:*10* 36:*3, 23* 37:*8*
38:*5* 41:*8, 11, 14* 42:*2*
43:*3, 12, 14, 23* 44:*7, 21*
46:*17* 49:*13* 50:*4, 10*
51:*11* 52:*6, 10, 17* 54:*14,*
*17, 24* 56:*19, 23* 57:*11,*
*23* 58:*7, 9, 14, 21* 59:*9,*
*21, 23* 60:*17, 21* 61:*15,*
*23* 62:*4, 8, 20* 63:*9, 14,*
*25* 64:*4, 7, 14, 20* 65:*4,*
*19* 67:*5* 68:*12, 20* 69:*10,*
*19, 25* 70:*15, 21* 71:*22*
72:*1, 7* 73:*3, 6, 21* 74:*6,*
*19* 75:*6, 14, 20* 76:*3, 20*

77:*9, 23* 78:*5* 79:*9* 80:*4*
81:*11, 19, 23* 82:*18, 20,*
*24* 83:*11, 21* 84:*18* 85:*4,*
*8, 18, 25* 86:*18, 22* 87:*4,*
*11* 88:*24* 89:*10, 16, 25*
90:*5, 10* 91:*9, 10, 21*
92:*2, 5, 9, 22* 93:*1, 12, 16,*
*21* 94:*9, 14, 18* 95:*1*
96:*14, 16, 25* 97:*4, 19*
98:*5, 11* 99:*12* 100:*2, 11,*
*14* 102:*2* 103:*6* 104:*17*
105:*5, 10, 19* 106:*1, 6, 14,*
*23* 107:*3, 8, 13, 24* 109:*7,*
*9, 16* 110:*6* 111:*14*
112:*19, 25* 113:*10* 114:*3,*
*22* 115:*6, 11, 14, 21*
116:*16* 117:*8, 17* 118:*17,*
*18* 119:*20, 24* 120:*5*
123:*13, 18* 124:*16, 23*
125:*1, 10* 126:*6* 127:*14,*
*19* 128:*6, 16* 132:*16, 24*
134:*13* 135:*12* 139:*5, 9*
140:*14* 142:*1, 7, 13*
143:*10* 144:*17* 148:*8, 25*
149:*16, 25* 150:*13, 16, 23*
151:*1, 9, 18, 22* 152:*4, 13,*
*24* 153:*2* 154:*14* 157:*8,*
*23* 158:*21* 160:*22*
161:*14, 22* 162:*14, 16*
163:*4, 8, 17, 21* 164:*11*
166:*14* 167:*8, 12, 25*
168:*3, 6* 169:*4, 10, 24*
170:*4, 7* 171:*9* 172:*19,*
*24* 177:*23* 179:*15, 19, 21,*
*24* 180:*13, 19, 23* 181:*3*
182:*4, 13, 22* 183:*22*
184:*1, 5, 9* 185:*24* 186:*5,*
*24* 188:*4* 189:*6* 190:*25*
191:*10, 17* 194:*17*
195:*13* 197:*1, 16* 198:*5,*
*17* 199:*1, 8, 13* 200:*12,*
*22* 201:*2, 5, 17* 202:*1, 6,*
*12, 20* 203:*1, 10* 204:*20*
205:*23* 206:*8* 207:*5, 16*
208:*5, 13, 17, 23* 209:*22*
210:*3* 211:*7, 11, 25*
212:*20* 213:*2, 10, 13, 16,*
*25* 214:*5, 10* 215:*23*
216:*2* 217:*11, 21* 218:*3,*
*4, 21* 219:*7, 10, 14, 17, 19,*
*21, 25* 220:*20* 221:*4, 15,*
*25* 222:*21* 223:*16* 225:*3,*
*7, 11* 227:*3, 7* 228:*13, 17,*
*24* 229:*4, 7, 9, 12, 17*
230:*6, 17, 23* 231:*7, 20*
233:*19* 237:*2* 238:*13*
239:*21* 240:*17*
**on-call** 58:*12*
**once** 119:*18* 134:*11, 12*
136:*3* 139:*17* 156:*11*

**one-off** 104:*4*
**one-on-one** 105:*24*
**onerous** 140:*21*
**ones** 56:*20* 58:*7* 85:2
94:*22* 236:*17*
**OneSource** 39:*19*
**ongoing** 164:5 227:5
**on-hand** 53:*23, 25*
**online** 17:*17* 225:*14*
**oOo** 3:*1* 5:2
**open** 61:*8* 191:*3* 192:*6,
7*
**operate** 53:*17* 122:6
138:*8* 155:*12* 235:*15*
**operates** 54:7 238:*20*
**operating** 25:*10* 52:*25*
54:*3* 76:*23* 78:*19*
141:*18, 19* 149:*18* 154:*4,
12* 155:*25* 161:*24*
**operation** 25:*8*
**operational** 49:*22, 24*
55:*8* 173:*3* 196:*11*
**operations** 52:*1, 3*
136:*24*
**opinion** 140:*18*
**opportunities** 152:*18*
160:*8* 163:*1*
**opportunity** 21:*16* 25:*12*
27:6 36:5 37:6 45:*20*
61:2 67:7 121:*4* 133:25
140:6 160:7 164:*18*
**opted** 78:*24*
**optimization** 15:*5*
**option** 192:*3* 196:*1*
**optional** 232:*25*
**options** 51:*10* 53:7 62:2
120:20 192:*4*
**Oracle** 17:*3* 39:*24, 25*
**order** 68:*20* 119:*15*
150:*16* 206:*25* 208:*2*
209:*1* 229:*8* 234:*10*
**ordered** 165:*3*
**orders** 231:*17*
**ordinary** 141:*17* 153:*13,
14* 165:*16*
**organization** 16:*22*
17:*14* 23:*13, 18* 29:*10,
12* 41:5, *7* 103:*11*
170:*14*
**organizational** 195:*15*
**organized** 227:*19*
**original** 143:*25* 164:*3,
17* 201:*19* 205:*2* 234:*11*
**ought** 27:*12*
**outcome** 60:*6*
**outlines** 113:*22*
**out-of-pocket** 210:*24*
211:*14*
**output** 123:*5* 194:*12*
205:*13*
**outset** 52:*1*

**outside** 11:7 22:*10*
26:*16* 31:*9* 60:5 61:*12,
13* 107:*17* 114:*11*
147:*15* 148:*4* 155:*13*
194:*24* 211:*15* 218:*17*
220:*12* 222:*8, 18, 19*
223:*17* 225:*4*
**outstanding** 52:6, *8* 53:*3*
135:*4, 7, 8*
**overarching** 176:*6*
**oversight** 50:*16*
**overview** 74:*4* 212:*19*
214:*25*
**owners** 50:*25* 60:*6*
**ownership** 50:*22* 51:*1*
**owns** 50:*25* 193:*21*

**< P >**
**P&L** 153:*9*
**p.m** 1:*13* 64:*15, 17*
66:*23* 67:2 113:*11, 14*
124:*24* 125:2 166:*19, 22*
201:*14* 227:*23* 228:*1*
241:5, *8*
**pace** 78:*9*
**packages** 20:*15*
**PAGE** 3:2, *3, 8* 4:1, *3*
6:*22* 60:*17* 63:*9* 71:*23*
73:7 82:*20, 21* 84:*3*
118:*10, 13, 17* 128:*16, 20*
129:*17* 133:*14* 154:*8*
156:*25* 167:*8* 169:*17*
176:*18* 180:*24* 181:6
185:*12, 13, 23* 188:*25*
190:*11, 17* 195:6, *7*
197:*11* 200:*12* 201:*9*
207:*3* 212:*5, 8* 228:*18*
229:2 232:*19*
**Pages** 147:*17* 197:*4*
212:*17* 242:*11*
**paid** 62:*14* 126:*18*
152:*9* 162:2 178:*25*
179:*4, 7, 8, 10*
**pains** 82:*25*
**paper** 18:*11, 23*
**papers** 18:*1, 13, 21* 19:5
**paragraph** 64:*21* 67:6
68:*15, 19* 75:*15* 177:6
190:*14* 201:*17* 202:*12*
**paragraphs** 181:*10*
**parallel** 156:6 187:7
202:*19*
**paren** 61:*8, 9* 64:*24*
**part** 20:*11, 12* 57:*21*
73:*2* 74:*25* 87:*11* 92:*2,
4* 100:*15* 101:*25* 105:2
106:*21* 108:*3* 114:*20*
116:*25* 129:*6* 143:*5*
145:*11* 146:*13* 156:*19*
159:*24* 172:*3* 178:6
183:*5* 188:*25* 196:*24*

213:*8* 220:*15* 227:*1, 4*
232:*6* 233:*2*
**partially** 125:*17*
**participant** 92:*21*
**participants** 51:*18*
**participate** 30:5 222:*17*
**participated** 92:*18* 103:*8*
**particular** 15:*8* 39:*12*
46:*12* 55:*4, 6* 66:5 76:*9*
86:*25* 94:*11* 101:*10*
117:*13* 121:*9* 124:6, *10*
132:*8* 136:*25* 140:*16*
156:*9* 163:*15* 170:*22*
176:*4* 185:*12, 14* 194:*21*
229:*5* 231:6 234:*11*
**particularly** 73:*5*
**parties** 61:2 95:*4* 126:*7,
17, 18* 133:2 142:*8*
145:*11, 15* 220:*1* 242:*15,
16* 243:*11, 25*
**partner** 41:*8* 45:7
131:*17* 153:*7*
**partnerships** 76:5 232:2
**part-time** 19:*21, 24*
**party** 85:*22* 131:*19*
132:2 137:7 145:*3, 8*
176:*12, 21, 24* 177:*1, 2*
220:*12, 14* 243:*10, 21*
244:*2*
**pass** 24:*18* 63:*20* 134:*22*
**Pat** 22:*17, 24* 23:*4, 5, 9,
17, 19, 20*
**patient** 201:*7*
**pattern** 104:*5*
**PATTON** 2:*7* 5:*18*
**pause** 124:*17*
**paused** 210:*4*
**Pavans** 126:*12*
**pay** 54:*5* 78:*25* 142:*16*
150:*10* 161:*20*
**payers** 230:*3*
**paying** 53:*8* 57:*18*
168:*21*
**Payson** 225:*19, 20*
226:*25*
**peers** 182:*10*
**Pelling** 22:*17* 23:*4*
**penalties** 82:*25*
**pending** 7:*19* 72:*17*
76:*24* 112:*9* 115:*9*
139:*24* 159:*23* 210:*4*
236:*24*
**penetrate** 144:*7, 21*
**penny** 149:*1*
**people** 22:*22* 36:*14*
87:*25* 93:*18* 103:*3*
105:*25* 127:*1* 170:*19*
237:*20*
**Pepco** 38:*1*

**percent** 50:*23* 51:*4*
127:5 154:*20* 178:*12*
217:*17, 18*
**percentage** 40:*8, 11, 12,
16*
**perform** 30:*15* 31:*25*
46:6 138:*3* 142:*19*
144:*17* 168:*24* 178:*19*
**performance** 51:*9, 21*
**performed** 116:*18*
117:*14* 142:*20* 170:*23*
175:*16* 227:*4* 228:*17*
234:*17*
**performing** 27:*5* 44:*10*
211:*19*
**period** 39:*1* 77:6 79:*25*
98:*13* 108:7 157:*19*
162:*13* 165:*12, 20* 189:*9*
237:*7*
**periodically** 97:*18*
**perjury** 82:*25*
**Perkins** 225:*8*
**permission** 194:*1*
**permit** 145:*3*
**person** 17:*14* 62:*24*
66:*13* 92:7 93:*15*
101:*18* 105:*20* 106:*15*
181:2 184:*12, 13* 198:*8*
217:*23*
**personal** 33:*24* 35:2
48:*23* 107:*8* 109:*2*
138:*5*
**personally** 43:*5* 47:*16*
55:7 92:*2, 4* 106:*25*
150:*13* 217:*7*
**peruse** 185:*11*
**phase** 119:*11* 189:*12*
194:*3, 6*
**phases** 126:*4* 128:*14*
**phone** 89:*3* 100:*8* 104:*8*
**pick** 104:*8* 210:*5*
**picture** 148:*24* 152:*5*
**Pipelines** 228:*21*
**place** 36:*7* 70:*14* 72:*24*
86:*10* 112:*15* 130:*6, 25*
135:*17* 156:*11* 188:*12*
202:*3* 208:*14* 242:*9*
**placed** 140:*11* 148:*1*
**placeholder** 130:*2*
**Plaintiff** 1:*5* 2:*3* 5:*21*
**plan** 141:*23* 160:*20*
209:*13*
**Planner** 39:*20*
**planning** 66:*10*
**plans** 113:*22* 129:7
**platform** 130:*7*
**play** 34:*10*
**played** 157:*22* 217:*19*
**please** 5:*15, 16* 6:*12*
7:*12* 124:*22* 224:*24*
**podge** 22:*21*

**point** 23:22 24:11, 16 25:23 28:19 30:22 35:18, 20 54:2 79:21 86:13 97:21 103:13 108:13 110:25 113:23 116:2 118:19 119:14 120:2, 12 125:13 128:20 130:20 137:14 138:7, 18 158:8 169:14 179:15 182:17 194:7 196:6 197:15, 18 209:17 211:8 214:18 218:16 233:7
**point-in-time** 46:23
**points** 73:20 84:20 85:16 187:14
**pool** 51:10
**Porter** 142:12
**portion** 202:4, 9 203:9 215:16
**position** 22:7, 14 65:20 74:19, 20 153:18 165:23 225:22 231:15 236:6, 22
**positioning** 72:9
**positions** 44:15 75:24 170:16
**positive** 53:17
**possible** 7:19 61:7 78:19 79:15 138:1 139:13 146:10 222:25
**possibly** 68:21 99:23
**potential** 67:7, 10, 17 73:14 121:20 133:2, 3
**potentially** 56:11 61:3 66:11 89:4, 10 137:9 151:16 205:2
**Power** 38:5 40:19 43:15 183:15 231:18
**POWERPLAN** 1:7 5:7, 19 11:2, 5 22:2, 4, 6, 8, 12, 19 23:19 25:4, 15 26:16 27:1, 15, 17, 25 28:6, 11, 14, 16 29:7, 11 30:2, 9, 10, 20 31:1, 2, 6, 13, 17 32:1, 4, 11, 13, 15, 21 33:1, 4, 6, 13 34:1, 3, 9, 11, 16, 18, 20, 21 35:2, 4, 7, 8, 10, 11, 19, 21, 23, 25 39:17 40:10, 17, 19 42:20 43:6, 10, 21 44:5 47:1 49:3 58:5 59:12 60:7 65:16, 25 72:9, 18, 20, 22 81:3 84:6, 8, 25 85:5 86:7, 18 88:13, 14, 19, 22 89:5, 10, 11, 19, 23 90:8, 10, 24 91:5, 6 93:6 94:6, 21 95:6 96:2 97:15, 25 98:6, 14 99:22 100:9 101:4, 8, 13, 17, 19, 22, 25 102:23 103:4 104:22 105:5, 8, 13, 21, 25 106:2, 16 107:15

**point** 108:8, 17 109:25 110:3, 14 111:6, 16 117:21 121:10 122:12 123:3, 6 133:19 134:1, 6, 15 136:12, 16, 22, 23, 25 137:2, 6, 19 138:1 140:6, 7, 17 141:2 145:23 146:5, 18 147:14, 23 184:7 186:14 191:10, 12, 18, 25 192:12, 18, 25 193:5, 6, 8 194:13, 18, 24 198:3 199:5 218:15 219:5 223:3, 11, 22, 25 224:8 226:8, 18 235:22 236:5, 13, 19 237:3, 6, 11 238:2, 8, 14, 16, 23 239:2, 6, 10 240:6
**PowerPlan/Lucasys** 61:25 62:3
**PowerPlan's** 80:2 91:3, 12 92:11 96:9 98:16 115:19 118:20 121:15 123:8 133:16 139:11 140:23 146:13 152:19, 24 197:7 235:9, 16 236:22 240:3
**PowerTax** 23:14 24:4, 23, 24 25:1, 3, 6, 8, 13 30:6, 9, 23, 25 31:18, 22 32:5 33:10 40:17, 20, 21, 24, 25 121:15, 19, 22, 25 122:4, 6 147:5 181:13, 22 182:10, 16, 24 183:7, 15, 23 184:2, 6, 15, 17, 18, 21, 22 185:4 196:2 228:19 230:7, 13 231:20, 24 232:3, 7 233:2
**PPM** 165:6
**PPP** 52:7, 15
**preclude** 240:7
**predates** 136:11
**predominantly** 157:1
**premature** 145:21
**premise** 26:8
**preparation** 13:5
**prepare** 7:25 8:3 13:7
**prepared** 168:1
**prescribed** 161:2
**Present** 2:14 8:12, 14, 16, 19 18:14 74:15 82:7 152:14
**presentation** 75:23 139:13
**presented** 74:5 131:21
**preserve** 235:4
**press** 64:10 65:7, 13, 21 144:20
**presumably** 88:23 231:17
**presume** 90:13

**pretty** 47:21 109:18
**prevent** 240:3
**prevented** 19:15
**preventing** 136:8
**prevents** 136:17 139:19
**previous** 160:3 162:11 208:8
**price** 172:13 189:7, 10
**prices** 189:25
**PRICING** 3:20 119:22, 24 120:1 172:13 185:15 189:3, 12 203:5
**primarily** 9:19 22:17 24:2 126:2, 8 141:13 216:25
**primary** 27:19, 20 133:23 217:24, 25
**Prior** 31:1, 6, 12 48:3 78:4 86:6 169:20 176:18, 25 235:15
**probably** 9:7 19:24 28:14 69:16 72:25 93:14 111:12 113:24 154:21 171:24 199:11 216:15
**problem** 45:14 132:8 230:10
**problems** 34:13 37:11 38:10, 21 76:11 130:11, 13, 16 131:15, 23 132:12
**procedure** 140:21
**proceed** 80:17
**PROCEEDINGS** 5:1 61:5 241:7 242:8, 12
**proceeds** 53:11, 14 54:9
**process** 20:16 26:23 46:20, 24 85:15, 24 123:1 143:6, 8 167:20 215:15 229:14, 18 230:16 237:5, 8 239:18 240:24
**processes** 15:5, 6 27:8 46:22 116:6 118:1, 6, 7 119:13 136:24 168:13 170:21, 23 207:12 215:5, 7, 8, 15 232:23
**procurement** 181:2 198:7
**produce** 232:25
**product** 17:6 30:3 32:5 40:2, 5 45:21, 22 46:2, 11, 18 47:12 48:8 50:18 54:23 55:2, 3, 6, 11, 17 57:19 74:14 113:18 114:1, 17 115:7, 14 116:18 117:14, 21 119:3, 4, 19 120:3, 6, 8, 11, 12, 22, 23 121:2, 9 122:3, 5, 7, 15 123:25 124:8, 11 128:8, 11, 15 129:10, 20 131:4, 11 132:19 133:22

**production** 134:2, 6 135:14 138:16 139:10, 20 145:2, 9 164:13 188:6 189:9, 22 194:10, 13 212:24
**production** 153:22
**products** 23:12 30:6, 9 31:3, 18 39:17 45:21 47:4, 9 48:12, 14 57:6, 7, 11 72:19 73:17 74:17 113:18, 19, 25 114:4, 5, 7, 12 116:24 118:2, 4 120:20 124:15 125:6 129:11, 13 130:10 131:1, 21 132:6 136:9 139:14, 25 141:24 142:22 143:20 144:10 189:21 190:10 213:2 216:18
**professional** 28:22, 24 29:12, 19, 20, 21 31:7, 13, 25 33:19 70:20
**profile** 136:24 223:14
**profit** 125:16 126:22 148:17 151:25 154:19, 24, 25 156:13
**profitability** 150:8 155:9 165:25
**profitable** 155:2, 4
**programming** 16:1
**programs** 39:9, 14, 19
**progress** 114:10 213:23
**prohibited** 243:19
**project** 24:20 44:13 66:7 106:9, 11, 12, 13 107:7, 17 108:5 110:9, 11, 19, 24 111:2, 11 112:7 114:19, 21, 22, 23 115:3, 5, 9, 11 116:8 119:15, 25 147:4, 7, 8 159:5, 8, 10 164:4 165:5, 6, 8 179:22 180:22 188:15, 23 189:16, 22 194:4, 6, 7 195:14, 19, 25 196:11 200:24 202:3, 8, 9 204:17 205:1, 16 207:3 209:10, 13 210:3 211:21 212:23, 25 213:8 214:2 215:18 216:3, 15 227:5 228:15 231:23 233:14, 15, 16 234:8
**projections** 158:18
**projects** 26:6 27:17, 20, 21 29:2 43:9, 13, 20 44:3 57:20 99:10, 11 115:18, 20 134:24 135:1 141:22 153:4, 8 165:7 167:22 181:13, 18 196:13 215:24 216:2, 21 217:14 225:24 227:6
**proliferate** 137:21
**promise** 115:21

**promising** 123:*21*
**pronounced** 218:*12*
**properly** 192:*11*
**property** 172:*4, 11, 15*
173:*7, 10, 14, 21* 174:*6, 7,*
*11* 237:*12, 17, 22*
**proposal** 96:*11* 134:*8,*
*21* 159:*24* 185:*7, 17, 18*
187:*25* 188:*5* 201:*19*
203:*4* 204:*23* 205:*3*
206:*6, 8* 207:*17* 210:*17,*
*19* 213:22
**proposals** 48:*14* 112:*3, 5,*
*6, 10, 14* 134:*9, 11* 135:*4,*
*7* 159:*17* 164:*5*
**propose** 48:*3, 11* 69:*19*
**proposed** 71:*20* 72:*3*
73:*13* 117:22 120:*14*
186:*16* 209:*18, 19*
230:*15, 20, 21* 233:*17*
**proposes** 191:*4*
**proposing** 185:*7, 9*
195:22
**proposition** 73:*8, 10*
74:*23, 25* 75:*5*
**proprietary** 172:*6*
**protect** 172:*25* 173:*3, 5,*
*10, 20* 174:*5, 11* 237:*12,*
*16*
**protected** 172:*3*
**protecting** 172:*6* 173:*6*
238:*18*
**protections** 140:*17*
172:*23* 174:*7*
**protects** 172:*8*
**provide** 32:*20* 36:*5*
37:*11* 46:*9* 56:*8, 21*
57:*16* 103:*24* 120:*19, 20*
121:*13* 171:*15* 179:*25*
206:*1* 209:*11* 213:*17*
216:*5* 217:*1* 219:*23*
223:*21* 232:22 235:*10*
243:*16, 21*
**provided** 42:*16* 81:*15,*
*17, 20* 96:*12* 119:22
170:*5* 173:*19* 180:*8, 21*
206:*8* 219:25 220:*4*
**providers** 95:*8*
**provides** 23:*12* 177:*6*
**providing** 16:*24* 35:*11*
61:*4* 73:*16, 18* 74:*17*
96:*23* 101:*23* 144:*24*
204:*18*
**provision** 177:*10*
**provisions** 141:*4* 171:*18*
**proximity** 92:*17*
**PSEG** 56:*5, 6, 8*
**Public** 2:*11* 43:*25*
220:*10* 231:*16*
**PUC** 231:*19*

**pulls** 191:*12*
**punctuation** 18:*24*
**purchase** 80:*10* 189:*25*
206:*25* 208:*2, 3* 209:*1, 2*
**purchasing** 131:*4*
134:*14* 201:*21* 203:*12*
**pure** 34:*10*
**purported** 89:*21* 238:*18*
**purpose** 60:*25* 61:*1, 8,*
*18* 157:*23* 162:22
176:22 220:*23, 25* 221:*1*
**purposes** 38:*25* 44:2
114:*14* 124:*1* 127:*23*
153:*17*
**Pursuant** 243:*3*
**pursue** 117:*6* 144:*8*
158:*12*
**pursued** 78:*8, 9* 144:22
**pursuing** 119:*17* 129:25
162:*25* 190:*2* 205:*1*
**pushed** 194:*18*
**put** 17:*25* 70:*14* 98:*1, 2*
107:*21* 123:*14* 130:*2*
141:*14* 148:*10* 157:*21*
159:*8* 180:*10* 188:*5, 9*
230:*16* 239:*4* 240:22
**puts** 184:*7*
**putting** 140:*23* 184:*20*

**< Q >**
**quality** 45:*15* 170:*13, 16*
209:*4*
**quantify** 44:*11*
**quarter** 213:*24* 214:*3*
**querying** 16:*3*
**question** 7:*2, 4, 11, 13, 19*
10:*19, 22* 16:*6* 35:*16, 18*
54:*1, 21* 72:*9* 83:*24*
102:22 107:*17* 111:*4, 14*
113:*20* 127:*3* 129:*15*
134:*13* 145:*5* 153:*20*
154:*6* 161:*11* 172:*10*
179:*2* 184:*20* 193:*25*
197:22 202:*23* 204:*4, 9*
223:*9* 229:*4* 235:*24, 25*
238:*5*
**questions** 6:*25* 7:*8*
143:*9* 194:*5* 212:22
223:*1*
**quick** 125:*4* 161:*11*
176:*14* 185:*16* 206:*15*
**quickly** 133:*13* 156:*3,*
*11, 24*
**Quintana** 99:*23* 100:*10*
102:*2* 103:*7* 104:*9*
**Quintana's** 104:*10*
**quite** 24:*10* 79:*10*
154:*9* 211:*20* 212:*17*
215:*14*
**quote** 61:*8, 9* 76:*23, 24*
101:*18* 149:*1*

**quote/unquote** 196:*20*
235:*19*

**< R >**
**R&D** 16:*19*
**Rali** 109:*7* 226:*2, 20*
227:*1, 2*
**ran** 40:*3*
**range** 149:*5*
**rate** 38:*17* 127:*1, 10*
169:*18* 209:*12, 19* 210:2
230:*2*
**rates** 243:*25*
**RCC** 36:*3, 4, 10, 11, 13,*
*14* 37:*3, 14, 17, 23* 38:*6,*
*12, 14, 22* 39:*5* 40:*5, 9,*
*24* 41:*3, 5, 7, 8, 14, 16, 17*
42:*7, 12, 15, 19* 43:*8*
44:*8* 45:*5, 15, 18, 25*
46:*1* 47:*11, 17, 19, 20*
48:*1, 3, 6* 49:*2, 3, 6, 11,*
*14, 16* 137:*12* 221:*6*
**RCC's** 47:*8* 48:*7*
**reach** 103:*7* 177:*17*
**reached** 63:*18* 101:2
119:*20* 171:*14* 198:*4*
**reaching** 66:*5* 144:*20*
200:*17*
**react** 221:*15*
**reaction** 221:*16*
**read** 42:*8* 61:*19* 67:22
76:*1, 16* 171:*3* 176:*16*
177:*14* 178:*4* 201:*12*
212:*18*
**readiness** 195:*15*
**reading** 19:*4* 157:*6*
**ready** 116:*3* 131:*2, 24*
133:*6* 188:*15, 22* 210:*5*
213:*18*
**real** 17:*5* 79:*11* 93:*25*
131:*15* 161:*11* 176:*14*
**reality** 146:*10*
**realize** 131:*18*
**realized** 159:*19*
**really** 15:*24* 51:*17*
55:*17* 79:*19* 124:*18*
138:*5* 144:*3* 165:22
186:*11* 189:*12* 197:*4*
223:*10* 230:*10* 235:*5*
**reason** 89:22 91:*7, 11*
92:*10* 134:22 141:*12*
178:*24* 179:*3* 203:*15*
204:*20, 21*
**reasonable** 69:*14, 18*
166:*11* 171:*23* 174:*5*
237:*20*
**reasonably** 172:*3, 8*
**reasons** 112:*5*
**recall** 9:*7, 9, 21, 23, 24*
10:*2, 6, 12, 20, 23* 13:*11,*
*14* 15:*24* 16:*2, 5* 17:*4, 6,*

*8* 18:*4* 19:*19, 22* 20:*18*
22:*20, 24* 24:*19* 27:*25*
28:*2, 3, 4* 30:*18, 21*
37:*10* 38:*5, 6, 8* 40:*5*
41:*15* 43:*7, 14, 20, 24*
44:*12* 45:*12, 14* 49:*5*
59:*15* 61:*20* 63:*16*
69:*20, 21* 70:*4, 5, 10, 14,*
*17, 19, 21* 72:*25* 73:*1, 4,*
*5, 16, 19, 21* 74:*17, 25*
76:*15, 18* 78:*1, 3* 79:*8*
81:*8* 82:*9* 87:*16* 94:*10,*
*11* 95:*3* 99:*6, 18* 100:*16*
101:*8, 14, 22* 102:*1, 4, 9,*
*21* 103:*5* 105:*6, 22, 23*
106:*10, 11* 110:*8, 11, 25*
116:*20, 21* 117:*25* 120:*9,*
*11, 13, 16* 125:*14* 135:*13,*
*18* 138:*17, 24* 147:2
150:*18* 158:*4* 161:*6*
163:*14* 170:*4, 10, 19*
179:*23* 180:*7, 9, 10, 12*
187:*6* 197:*11* 202:*9*
205:*17, 19* 206:*10*
211:*13* 218:*16* 219:*13*
220:*15, 16* 221:*16*
222:*19, 23* 223:*7, 16, 18*
225:*5, 6, 13, 14, 15, 17*
226:*24* 227:*2, 11, 14, 15*
230:*19* 231:*9, 22* 232:*11,*
*15* 234:*7, 18*
**recalling** 58:*19* 201:2
202:*18* 240:*18*
**receipt** 84:*15*
**receive** 189:*13*
**received** 94:*6* 97:*22*
98:*4* 101:*12* 198:*11*
203:*19* 204:*13* 213:*14*
**receiving** 92:*1* 176:*21*
**recognize** 68:*10* 155:*8*
167:*5* 180:*16* 184:*5*
200:*9* 208:*24* 221:22
229:*21*
**recollecting** 200:*11*
**recollection** 21:*24* 46:*4*
48:*6* 61:*21* 69:*5, 8* 74:*5*
75:*23* 86:*24* 87:*2* 88:*16,*
*18* 103:*16* 129:*2, 22*
133:*21* 152:*10* 161:*5*
166:*2* 185:*10* 199:*16, 21,*
*23* 204:*24* 206:*11*
209:*23* 213:*18, 20* 219:*9*
225:*3* 230:*9, 13* 233:*15*
234:*16* 236:*4* 240:*16*
**recommendations** 18:*25*
168:*14* 170:*7, 9*
**reconcile** 181:22
**reconciliation** 44:*23*
46:*23* 187:*1* 193:*7*
**reconciliations** 46:*6*

**reconfigured** 43:2
**reconstruction** 181:13
**record** 6:11, 16 58:24
59:1, 2, 16 97:7, 8, 10
113:10, 12, 14 124:21, 23,
25 125:2 166:17, 18, 20,
22 207:25 220:10
227:21, 22, 24, 25 234:3
241:5, 6 242:12
**recorded** 126:21
**records** 26:8, 9 181:19
182:1, 7, 21 229:10
230:5, 12 231:2
**recounted** 218:13
**recovery** 43:16 231:6
**redacted** 12:22
**reduced** 78:18
**reducing** 78:21 79:16
**reduction** 205:13
**Reed** 104:22 105:2, 3,
15 106:21, 24 107:4, 6,
14, 18 108:6 137:16
**refer** 109:19 151:7
159:21
**reference** 120:3 123:13
229:2
**referenced** 102:8 137:24
198:8
**references** 192:6 196:20
**referral** 243:10, 23
**referred** 84:12 87:10
210:11, 12
**referring** 39:25 52:16
77:8 90:6 124:2 147:8
201:3
**refers** 86:18 151:8
233:25
**refinement** 145:9
**reflected** 151:24 162:1
**refocus** 124:7
**refresh** 13:9 75:22
129:2, 22 185:10 225:3
240:14, 15
**refreshed** 206:2 210:16,
18
**reg** 43:18
**regard** 85:7 215:5
**regarding** 10:19 43:16
64:10 66:3, 6 73:14
102:22 136:20 174:16
232:16
**Regardless** 73:22 122:8,
10
**regards** 27:13
**regular** 30:16
**regularly** 44:7
**Regulated** 35:25 38:16
65:22 66:11 144:13, 14,
25 215:13 229:24
**Regulations** 243:4

**regulatory** 38:15, 25
39:13, 20 42:6, 10 43:16,
17 184:23 185:1 215:10
**reinvest** 155:9
**related** 10:15, 24 17:16
43:25 44:9, 16 48:14
57:9 58:15 61:25 62:2,
5 68:22 81:16 96:4
98:8 99:16 110:3
117:21 119:15 122:8
125:16, 17 127:23
134:25 156:9, 23 157:1
163:3 168:13 170:13
182:14 187:5, 9 211:14
215:16 216:7 229:4
230:1 232:1 234:11
**relating** 61:6, 7 136:20
**relation** 61:4
**relational** 191:3
**relationship** 10:18 63:17
91:7 95:15, 18, 20 100:5
104:14, 16 110:20, 22
133:23 137:18 148:5
153:6 163:16 164:2, 6
170:11 178:10 216:13
**relationships** 34:24
50:17 55:16 58:11 80:2
120:19, 21 143:13, 14, 16
153:5
**relative** 242:14, 15
**release** 64:10 65:7, 13,
22 144:20 208:3 209:2
**relevant** 191:12
**rely** 138:1
**remained** 49:1 110:18
**remaining** 55:1 56:16
**remediating** 215:17
**remember** 9:24 10:16
22:25 23:2 29:7 44:3
82:1 100:21, 23 101:10
107:24 108:1, 2 218:19
224:13
**remembering** 198:24
**removal** 44:1
**remove** 211:14
**repairs** 44:9
**repeat** 35:16 154:6
179:2 238:5
**replacement** 121:10, 17
**report** 23:1 153:23
**REPORTED** 1:16 91:21
154:1
**reporter** 5:13, 16 6:23
167:3 242:1, 22 243:1, 6,
9, 14, 22
**reporter's** 243:9
**reporting** 23:22 39:20
153:19 215:9, 10 243:4,
8, 16, 21, 23
**reports** 63:25 148:21

**represent** 5:14 100:14
132:18 231:5
**representation** 100:12
**representative** 99:22
100:8, 11 101:19 105:13
243:15
**representatives** 88:15
97:25 100:9 101:22
107:15 109:14, 15 138:6
139:15 218:15 219:6, 11
**represented** 100:16
132:7
**representing** 132:3, 5
**represents** 185:20
187:20 231:4 234:13
**request** 63:15 204:16
207:17
**requested** 199:6 205:18,
25 210:16 242:10
**requesting** 70:14
**requests** 194:21 234:8
**require** 56:7 122:5
**required** 40:15 142:17
147:5 185:4 188:10
194:13, 15 201:23
202:13 228:25
**requirement** 231:13
**requirements** 27:8
121:14, 16 161:4 180:3,
4, 6 215:9 232:1, 9, 21,
24 233:1 237:18
**requires** 122:7, 10
**rescind** 77:23 78:4
**rescinded** 77:21
**rescinding** 78:5
**research** 16:22 18:1, 2,
11, 13, 20 19:5 141:9
**reserves** 53:10 62:12, 13
**Reset** 43:4
**reside** 186:4, 7
**resolution** 76:24
**resolve** 98:14 108:8
235:8
**resolved** 81:2
**resource** 77:13 151:11,
14 188:19 207:14 216:5
**resources** 142:3, 5
173:13 187:23 188:10
217:3
**respect** 36:9 48:25
129:20 141:20 197:6
209:11
**respond** 94:18, 19
**responded** 72:16 205:16
**responding** 197:25
201:10
**RESPONSE** 3:20 84:6,
19 94:2 102:25 107:18
118:11 125:13 128:9, 18
129:6 135:3 180:20

199:7 203:4 204:11
205:17 206:2, 9 224:12
**RESPONSES** 3:15 83:8
196:19
**responsibilities** 21:8
22:18 23:6 25:24 28:23
31:25 36:23 50:11
154:23
**responsibility** 19:9
20:21, 24 29:8 30:3, 23,
24 217:24, 25
**responsible** 200:1
**rest** 23:18 177:6
**restrain** 98:16
**restrict** 141:2 238:19
**restrictions** 148:1 195:5
**restrictors** 177:13
**restroom** 166:15
**result** 78:14 80:23
123:9 124:13 128:2
134:21 170:8 197:8
**results** 26:19
**retail** 144:13
**retained** 168:9
**retirement** 79:4 160:20
**rev** 163:13
**revenue** 38:20 49:25
54:4 142:25 149:2
152:17 154:1, 15 163:9,
13, 21 169:12 189:15
193:8 216:12
**revenues** 50:3 52:2, 5
152:21 157:18 166:9
**reversing** 194:23
**review** 11:2 13:4 170:8
242:9
**reviewed** 12:13
**REVISED** 4:8
**revision** 211:13
**revisions** 211:5
**revolutionary** 65:1, 5
**RFP** 3:20 123:14, 19
160:3 179:15, 22 180:8,
20 187:7 198:10, 12
200:2, 19 201:12 203:4,
21 204:11 205:2, 14, 16,
22 206:3, 7, 9 214:15
215:3, 23
**RFPs** 179:25 180:5
202:19 214:14
**right** 5:4 17:14 23:1
34:12 37:19 42:15
43:18 45:15 47:24
49:19 53:11 58:12
62:24 73:17 74:13 77:2
83:8, 16, 18 84:2 88:1,
12 97:6, 9 98:1 99:10,
20 100:20 108:13, 18, 19
110:13 111:10 112:2
113:13, 16 116:5 119:13
130:20 131:4, 10 141:1

143:*13* 145:*6* 146:2, *11*
150:*3* 157:*4* 158:*23*
166:*24* 167:*19* 170:*19*
172:*13* 173:*25* 174:*10*,
*12*, *15* 175:20 177:*7*, *12*
181:*17* 182:*25* 183:*5*
184:*6* 190:*3*, *23* 192:22
193:*25* 196:*15* 197:*17*
198:*3* 200:*6* 203:*24*
206:*15* 210:*8* 216:*17*
218:*11* 221:*4*, *20* 223:*5*,
*18* 226:*3* 227:*16* 228:*3*
237:*11*, *16* 240:*25* 241:*3*
**rights** 172:*4*, *12*
**risk** 72:*9* 95:*6* 96:*8*
104:*4* 107:*21* 136:20, *24*
137:*1*, *17*, *18* 138:2, *4*, *11*,
*12* 170:*14* 174:*6* 195:*10*,
*21* 196:*6*, *11* 206:*23*
223:*14* 235:*16* 239:*7*
**risks** 78:*10*, *13* 239:*8*
**risky** 80:*10* 138:*7* 183:*6*
**road** 74:*18* 239:*1*, *15*
**roadmap** 74:*14* 113:*18*
114:*1* 121:*4*
**ROBBINS** 2:*4* 5:*10* 8:*5*,
*6*, *7*, *14*
**role** 17:*11*, *21* 23:*17*
24:*11* 27:*1* 36:*11* 37:*4*
50:*11* 67:*19* 157:22
217:*19*
**roles** 50:*11* 88:*18*
170:*19*
**room** 11:*18*
**ROUTING** 3:*19*, *23*, *24*,
*25* 206:*23* 213:*15*
**RPD** 234:*5*
**RPR** 1:*16* 242:22 244:*6*
**rule** 152:*11*
**rules** 6:22 46:*7* 73:*23*
74:*7* 160:*23*, *24* 185:*1*
195:*5* 229:*16* 230:*1*, *4*
231:*5*, *6*, *16*, *18*, *19* 243:*3*
**run** 73:*6* 152:*7*, *14*
153:*24* 161:*18*
**running** 40:*5* 95:*9*
165:*6*, *7* 184:*21*
**runs** 174:*6*

**< S >**
**salaries** 156:*18*
**salary** 142:*16* 156:*16*
168:*21*
**Salas** 108:20 109:*3*, *10*,
*13* 110:*8* 218:*6*, *7* 219:*4*,
*14* 223:*9* 226:*2*, *25*
**saleable** 120:*23* 131:*24*
133:*6*
**sales** 77:*5*, *7*, *10*, *19*
88:*16*, *19* 154:*5* 189:*24*
**sane** 7:*1*

**SAP** 39:*25* 65:*10*
230:*12*
**SAS** 155:*7*
**sat** 12:*24* 13:*9* 14:*4*
49:*18*
**saw** 34:*4* 67:*10* 131:20
140:22 141:*1* 156:*6*, *10*
206:*5* 224:*7* 240:2
**saying** 11:22 42:*13*
53:20 64:22 67:*6* 72:2
76:*18* 89:*3* 101:*8*, *14*
112:*12* 130:*13* 133:*15*
172:*17* 187:*8* 223:22
236:*13*
**says** 60:*25* 63:25 64:*21*
67:*6*, 22 68:20 72:*8*
73:*8* 76:*4*, 22 80:*13*
84:*7* 91:*11*, *13* 99:*21*
105:*10*, *12* 108:*14*, *16*
109:*18* 118:*19*, *20*
128:*19* 148:20 151:*6*
160:*17* 169:*18* 176:20
181:*11* 189:*1* 191:*1*, *10*,
*11* 193:*6* 195:*13* 200:*17*,
*22* 201:*5*, *6*, *18*, *19*
202:*13* 203:*10* 210:22
222:*6*, *24* 224:*23* 228:*19*
232:*20* 233:*5*
**SBA** 52:*9*, *12* 158:*4*
162:*25* 166:*3*, *5*
**scale** 155:*21* 188:*16*
**schedule** 233:*14*
**schema** 25:*4* 31:*17*, *19*
192:*12*
**school** 14:*7*, *8*, *12*, *14*, *16*,
*18*, *19* 16:*6*
**science** 15:*14*, *15*, *16*, *22*
**scope** 27:*21* 35:*9*, *12*
94:*21* 96:*8* 110:*11*
119:*13* 128:*9* 168:*7*, *11*
178:*16*, *19* 179:22 186:*2*
188:*16* 199:*6* 200:*24*
202:*15*, *16* 204:*15* 205:*3*,
*10*, *13*, *18*, 22 206:*4*
207:*3* 209:*10* 210:*19*, 22
211:*3* 212:*23* 215:*1*
228:*15* 234:*9*
**scoping** 230:*14*
**screen** 55:*5*
**scripts** 232:*23*
**second** 36:*19* 64:20
67:*5* 71:22 96:*15* 104:*1*
124:*17* 154:*8* 156:*25*
181:*11* 197:*15* 201:*17*
218:*25*
**secondary** 168:*17*
**seconds** 97:*3*
**second-to-last** 60:*17*
**secret** 140:*20*
**secrets** 88:22, *23* 89:*24*
90:*12* 91:*3*, *14* 92:*12*

96:*9* 99:*24* 101:*6*
104:*24* 106:*3* 107:22
110:*2* 140:*19* 237:*24*
238:*18*
**Section** 176:*14*, *17* 178:*4*,
*7* 195:*10*
**see** 6:22 26:*18* 37:*19*,
*24* 53:*18* 60:*17*, *20*
63:*11* 64:*2*, *3*, *5*, *6*, *16*, *19*
65:*2*, *3* 66:*21*, *25* 67:*4*, *8*,
*9*, *21* 68:*18*, *19* 69:*1*
71:*20* 72:*1*, *5*, *6*, *10*, *11*
73:*7*, *9* 75:*12*, *18*, *19*
76:*3*, *13*, *14*, *25* 77:*1*
82:22 83:*4* 84:*7*, *16*, *17*,
*19* 86:*13*, *16*, *17*, *20*, *21*
87:*19* 88:*15* 89:*7*, *9*, *15*
90:*3*, *4* 99:*20*, *25* 100:*1*
107:*9* 108:*14* 118:*18*, *23*,
*24* 123:*11*, *12* 128:*4*, *18*,
*19*, *21*, *25* 131:*16* 138:*2*
146:*7* 148:*15* 149:*19*
151:*5*, *18*, *21* 152:*22*, *23*
153:*3*, *25* 154:*11*, *13*, *17*,
*18* 156:*2*, *4*, *24* 157:*10*
160:*12* 162:*17* 163:*8*, *19*,
*20* 164:*7*, *9*, *10*, *23*, *24*
165:*4*, *5*, *6*, *8*, *10* 167:*8*,
*10*, *11* 168:*11*, *15* 169:*17*,
*22* 170:*25* 171:*2*, *13*
176:*20* 177:*4*, *5*, *15*
178:*5* 181:*10*, *15*, *16*, *23*,
*24* 182:*6*, *11*, *12* 183:*1*, *4*,
*9*, *13* 185:*13*, *16*, *22*
189:*4*, *5* 190:*13*, *22*, *23*,
*24* 191:*15*, *16* 192:*6*
195:*10*, *12*, *17*, *18* 196:*3*
197:*5*, *10*, *16*, *20* 200:*14*,
*20*, *21* 201:*1*, *17*, *24*, *25*
202:*5*, *17* 203:*10* 205:*13*
207:*4* 209:*14* 210:*21*, *25*
211:*1*, *20* 212:*4*, *6*, *9*, *10*,
*12* 220:*24* 221:*23* 222:*3*,
*10*, *13*, *16* 223:*6* 225:*1*, *2*,
*5*, *9*, *10* 228:*18*, *22*
231:*10* 232:*19* 233:*3*, *10*
234:*1*
**seeing** 76:*15* 157:*4*
**seek** 235:*8*
**seeking** 89:*20*
**seeks** 118:*6*
**seen** 11:*5* 12:*19*, *20*, *22*
42:*4* 45:22, *24* 47:*6*
60:*15* 63:*7* 64:*9* 65:*7*
224:*4* 237:*10*
**segment** 125:*21*
**selected** 96:*12* 202:*2*
**selection** 200:*25*
**self-funded** 155:*18*

**sell** 80:*11* 116:*13*
133:*20* 134:2 135:*9*, *21*
139:2 144:*9*
**selling** 143:*20* 216:*9*
**sender** 84:*15*
**sense** 34:*6* 80:*11* 99:*6*
145:*18* 172:*16* 187:*12*,
*13*, *16* 209:*6*
**sent** 85:*9* 103:*17*, *21*
104:*17* 198:*17*, *23*
199:*15* 224:*8*, *11*, *22*
**sentence** 61:*9* 67:*5*
88:*24* 89:*2*, *25* 90:*1*
91:*9* 92:*10* 118:*19*
123:*7* 127:*25* 176:*20*
177:*10* 178:*4*, *6* 181:*11*
182:*6* 183:*3*, *11*
**SEP** 160:*17*, *23* 161:*16*
**S-E-P** 160:*23*
**separate** 45:*17* 52:*17*
146:*9* 234:*13*, *15*
**separately** 234:*12*
**sequential** 212:*13*
**series** 134:*24* 135:*14*
206:*24*
**seriously** 141:*3* 158:*9*
**serve** 55:*20* 144:*1*
**server** 17:*4*
**service** 56:*9* 57:*9*, *13*, *14*
172:*2* 178:*9*
**services** 23:*12* 27:*5*
28:*22*, *24* 29:*9*, *12*, *19*, *20*,
*21* 33:*19*, *24* 36:*6* 42:*6*,
*10*, *15*, *16* 50:*19* 56:*9*, *14*
73:*17* 94:22 96:*8*, *23*
114:*15* 120:*19* 134:*25*
137:*13*, *17* 139:*7* 141:*6*
143:*21* 144:*10*, *17* 147:*4*
148:*25* 149:2 151:*16*
152:*17* 154:*1* 159:*13*, *16*,
*18* 163:*8*, *15*, *18*, *24*
169:*3* 170:*4* 171:*1*, *6*, *13*,
*15*, *22* 174:22 178:2, *8*
185:*8*, *13* 201:*23* 202:*13*
204:*18* 205:*16* 207:*10*
208:*3*, *11* 209:*11* 210:*23*
213:*17*, *23* 214:*25* 216:*7*
217:*8* 235:*11* 240:*4*
243:*8*, *17*, *21*
**services-type** 207:*9*
**serving** 33:*18*
**set** 46:*6* 51:*12* 75:*4*
127:*1* 169:*8* 176:*23*
178:*15* 193:*18* 202:*21*
215:22 216:*6* 222:*8*, *25*
**sets** 25:*3*
**setting** 71:*20* 116:*12*
172:*11* 193:*16*
**seven** 181:*18*
**shape** 191:22
**share** 51:*3* 129:*11*

shared 69:*17* 70:*24* 94:*7* 129:*13* 130:*5* 199:*10* 220:*5* 230:*2*
shareholders 165:*24*
shares 51:*12*
sharing 70:*19* 130:*21*
sheet 44:*13* 114:9 135:*24* 139:*4* 159:*7, 9* 165:*5* 209:*9*
sheets 44:*16*
shield 238:*17*
shifted 210:*1*
shifting 34:*10*
shocked 94:*20*
shoes 184:*21*
short 79:*25* 82:*3* 108:*7* 172:*15*
shortly 209:*24*
short-term 141:*15*
shoulder 23:*9*
showed 73:*25* 117:*23*
showing 157:*6*
shown 238:*17*
shows 163:*9, 10, 21* 185:*17*
side 23:*11* 26:*3* 39:*20* 55:*15, 17* 215:*1*
sidelined 134:*11*
signature 60:*18* 67:*21* 82:*22* 194:*4*
signed 167:*9* 206:*23*
significant 47:*21* 144:*7* 185:*5* 215:*16*
signing 169:*11*
similar 46:*15* 93:*6* 109:*24* 162:*11* 204:*25* 205:*1* 208:*8, 10, 11* 214:*16* 216:*3* 221:*5*
similarly 122:*9*
simultaneously 232:*5*
Singularity 44:*18, 20* 47:*9*
sir 6:*9, 15* 59:*5* 60:*2, 11, 15, 22, 25* 62:*11, 24* 63:*4* 66:*17* 68:*8* 75:*9* 79:*24* 80:*12* 82:*16* 83:*5* 84:*2* 99:*9* 108:*13* 113:*16* 125:*4* 128:*6* 136:*15* 137:*25* 140:*3* 141:*9* 147:*22* 148:*13, 19* 157:*14* 162:*7* 164:*19* 166:*2, 7, 24* 167:*19* 168:*18* 170:*24* 175:*14* 178:*14* 180:*16* 184:*5* 186:*25* 188:*25* 189:*15* 194:*8* 197:*22* 205:*7* 208:*1, 20* 210:*8, 21* 211:*2* 212:*3* 217:*5* 218:*5* 226:*1* 228:*3, 7, 10, 13* 232:*11, 19* 233:*22, 25*

234:*20* 235:*18* 237:*11, 25*
sit 84:*24* 99:*18* 114:*3, 16* 124:*9* 187:*14, 15* 220:*24* 240:*19*
site 27:*6*
sitting 9:*14* 83:*8* 85:*13* 180:*7* 184:*1*
situation 96:*3* 97:*1, 13* 111:*17* 217:*6* 223:*22* 236:*19*
six 142:*24* 152:*2* 197:*14*
sixth 72:*8*
size 27:*22* 53:*7* 95:*24* 150:*17*
skim 171:*4*
Slack 9:*17* 10:*1, 2* 199:*11*
slides 73:*24* 74:*5*
slightly 164:*16*
SLIP 3:*19*
slips 213:*15*
slowdown 156:*5*
slowly 23:*21*
small 17:*14* 50:*14*
snap 156:*11*
soft 127:*5*
software 21:*1, 6* 25:*5, 14* 27:*10* 30:*9* 31:*2, 22* 32:*13* 33:*1* 39:*9, 11, 14* 41:*2, 5* 42:*20* 43:*10, 21* 44:*24* 45:*18* 46:*20* 47:*16* 48:*4, 7, 12* 57:*6, 7, 10, 18, 19, 21, 24* 58:*1, 5* 65:*17* 73:*18, 19* 79:*15* 80:*8* 101:*7* 107:*20* 110:*4* 113:*18, 23* 114:*4, 8, 17* 115:*1, 4, 7, 9, 15, 17* 120:*1* 121:*3, 10, 15, 24* 122:*1, 2, 17* 125:*6, 17, 23, 24* 126:*1, 5, 9* 127:*6, 9, 13, 21* 130:*15, 17, 18* 131:*4, 15, 24* 132:*5, 12, 14* 133:*6* 135:*16* 136:*18, 21, 23* 138:*3, 8, 11* 142:*17, 18, 22* 145:*2, 4, 13* 146:*13* 147:*14* 151:*11, 14* 155:*6, 7* 156:*15, 23, 24, 25* 168:*13* 171:*19* 172:*4, 7* 174:*14* 180:*21* 182:*2, 25* 183:*7, 15* 184:*8, 19* 188:*12, 22* 189:*2, 11, 23* 190:*1, 4, 8* 195:*21* 201:*18, 21* 203:*12* 212:*24* 214:*23* 230:*16* 232:*15, 22* 233:*6*
software's 145:*6*
sold 23:*20* 57:*6* 115:*16* 133:*15*
sole 168:*22*
solely 24:*8* 173:*4*

solution 39:*21* 64:*25* 65:*5, 10* 68:*22* 74:*4* 114:*10, 11, 14* 117:*24* 118:*5* 119:*17* 120:*14, 16* 121:*12, 13, 18, 19* 123:*10, 19* 124:*6* 128:*3* 129:*25* 130:*4, 7* 131:*8* 144:*15, 24* 147:*6* 149:*12* 190:*6* 191:*8, 20* 192:*2* 197:*9* 205:*15* 230:*20, 21* 232:*3, 4, 8*
solutions 35:*11* 36:*8* 37:*12* 45:*15* 64:*24* 66:*6* 117:*23* 121:*7* 132:*8* 134:*10* 145:*24* 146:*6* 159:*25* 168:*16* 189:*14* 217:*2* 232:*5, 22* 235:*11*
solve 34:*14* 131:*15*
solving 130:*12, 14*
somebody 67:*16* 88:*6* 103:*17* 127:*4* 131:*23* 134:*5, 16* 173:*24*
soon 236:*25* 237:*7*
sophisticated 175:*4, 9*
sorry 11:*11, 23* 40:*11, 19* 53:*15* 62:*17, 19* 84:*10* 89:*14* 101:*2, 15* 109:*20* 111:*23, 24, 25* 118:*12* 120:*15* 124:*18* 127:*6* 132:*10* 146:*15* 147:*19* 154:*6* 163:*6* 179:*9* 183:*2* 190:*17* 198:*15, 19* 204:*4* 212:*7* 214:*22* 230:*18* 236:*10* 238:*5*
sort 15:*12* 26:*2, 22* 27:*19* 29:*11* 49:*21* 149:*16* 155:*13* 171:*4, 5* 176:*5* 239:*11*
sorts 24:*6* 38:*21*
sought 140:*16, 20*
source 30:*8, 11, 15, 19, 23, 25* 46:*12* 49:*3* 86:*4* 122:*11* 158:*15* 243:*10*
sourced 122:*9*
Southern 28:*2*
SOW 210:*16*
SOWs 216:*4, 6*
space 39:*12, 13, 16* 45:*14, 16* 54:*19* 65:*11, 17* 67:*14, 15* 130:*18* 132:*15* 135:*24* 137:*13* 144:*22* 189:*11* 190:*8*
spaces 73:*17* 132:*8*
span 35:*23*
speak 11:*17* 13:*24* 34:*13* 64:*1* 98:*17* 207:*10* 220:*19* 240:*3*
speaking 91:*25*
specific 11:*19* 33:*14* 37:*10* 39:*9* 69:*10* 84:*14*

97:*19* 99:*15* 105:*14* 111:*3, 15* 116:*8* 117:*25* 131:*23* 182:*4* 202:*2, 8, 25* 216:*7* 218:*2* 229:*17* 239:*9, 14*
specifically 9:*9, 24* 10:*16, 19, 20* 17:*12* 18:*18* 22:*25* 24:*19* 29:*25* 38:*8* 43:*14* 64:*11* 66:*2* 74:*24* 75:*21* 76:*18* 84:*5* 85:*20* 86:*11* 88:*12* 90:*24* 93:*9, 13* 98:*22* 99:*14* 102:*8* 109:*25* 137:*14* 138:*17, 24* 157:*25* 158:*5* 162:*24* 178:*3* 197:*3* 226:*24, 25* 228:*16* 229:*13* 238:*10* 240:*8*
specifics 37:*2* 83:*5* 223:*24*
speculate 186:*20* 187:*15*
speculating 237:*2*
speed 76:*24*
spend 14:*3* 53:*14, 16* 54:*15* 55:*8, 14* 79:*16* 139:*22* 195:*20* 205:*8*
spending 47:*25* 77:*19* 79:*13*
spends 54:*18*
spent 23:*13* 27:*4* 124:*14* 151:*23* 217:*14*
spoke 11:*11, 16* 95:*25* 102:*17* 106:*21* 226:*24*
spoken 11:*9* 63:*16* 143:*12* 225:*7, 11* 227:*1*
sponsoring 141:*22*
spot 112:*24*
SQL 17:*3*
Square 2:*11*
SQUIRE 2:*7* 5:*18*
St 8:*24* 54:*18*
stability 187:*22* 189:*17, 21*
staffed 24:*20*
staffing 170:*18*
stage 188:*7*
stages 126:*2*
stakes 182:*3*
stalled 210:*3*
stamp 71:*24*
standalone 144:*23*
Standard 5:*9* 207:*8*
standardization 182:*14* 185:*24*
standardize 182:*18* 186:*12*
standing 139:*7* 143:*14*
standpoint 48:*10* 188:*19*
Star 228:*20*

**start** 7:2, 4 40:21 84:10
120:18 124:5 194:10
200:12 218:3 232:20
**started** 22:4, 6, 9, 19, 23
23:5 24:11, 13, 16 29:14
36:17, 24 171:10 213:20
**starts** 119:18 164:20
176:17 190:14 194:4
197:4
**startups** 155:18
**state** 6:11 98:2 169:25
181:7 182:20 186:9
204:10 226:16 230:25
231:5 242:3
**stated** 89:23 99:22
101:9 104:15, 22 105:6
107:14 108:17 170:15
**STATEMENT** 3:16 4:4,
8, 9 84:9, 12, 13, 14, 15
87:23 110:25 111:17
148:17 156:14 162:2
167:13, 25 168:3, 6, 24
169:19 170:2 177:5
178:16, 25 179:5, 11
191:19 194:16 195:24
206:1, 25 207:1, 6 208:6,
13, 16 209:4, 7 211:4, 5,
11 228:11 234:4, 11
235:18 236:24 237:9
**statements** 84:25 85:4, 6
88:20 93:7 97:15, 17, 20
98:18, 24 99:7, 15
100:10 101:20 106:2
108:11 126:22 151:25
167:21 226:7, 18 227:10
235:16, 23 236:1, 3
237:7, 9
**STATES** 1:1 243:5
**state's** 231:6
**static** 184:23
**stating** 88:21 95:4
111:7 134:18 195:24
243:7
**statistics** 15:15, 16
**status** 138:23
**statutory** 231:13
**stay** 144:2
**stayed** 34:1
**stealing** 88:22 89:24
90:12 91:3, 14 92:12
99:24 101:6 104:24
**step** 73:2 97:22 143:23
234:20
**Stephen** 2:10 5:18 8:23
51:2 54:25 188:17
**Stephen.fazio@squirepb.c
om** 2:12
**Stephen's** 142:16
**Stephenson** 5:12
**steps** 80:15 173:3, 20

174:5, 11 201:8
**Steve** 6:15
**stock** 51:10, 13, 14
**stolen** 107:22
**stop** 19:13 124:5
**stopped** 19:14
**store** 46:12
**Strang** 8:23 51:2 54:25
**strategic** 34:9 36:5
38:18
**strategy** 67:22 86:10
108:10 122:14 131:14
145:11 193:15
**Stream** 228:19, 25 229:5,
6, 7 230:6, 9, 17, 19, 22,
25 231:7, 20 232:6, 13,
14 233:2, 25
**streams** 216:16 228:14
232:11, 16
**Street** 1:14 2:5
**strictly** 13:23 26:19
**strike** 8:13 26:9 61:24
95:11 203:15
**strokes** 214:24 215:4
227:3
**stroll** 13:23 17:5
**structure** 29:8 50:22
**structures** 170:9
**struggling** 230:11
**studies** 15:9 20:9 21:22
44:10
**study** 15:5 20:13, 14, 18
142:21 143:10
**sub-component** 25:1
**subcomponents** 33:11
**subject** 19:6 137:8
233:6 237:17
**sub-ledger** 181:22
**submission** 203:21
**submit** 199:6
**subscription** 155:8
189:3, 7 201:19 233:1, 7,
8, 12, 17
**subscriptions** 57:10
**subsequent** 54:4 91:15
92:13, 14, 21, 23 93:5, 8
98:15 109:3 138:20
199:4 204:15 205:25
208:12 224:3
**subsequently** 71:2
180:10
**subsidiaries** 144:14
229:10
**subsidiary** 40:6 144:25
215:12, 17 216:9 234:15
**substance** 69:7 90:25
219:5 239:3
**substantial** 77:16
**substantive** 17:19 18:21,
25 20:21, 24 70:16
**suddenly** 100:6 136:25

**SUEZ** 28:15, 16 108:20
109:14 110:1, 13, 18, 20,
21 111:4, 7, 11, 15, 18, 19
112:13 120:12 133:23,
25 134:2, 5, 8, 17, 18, 21
135:5, 9 147:12, 17, 20
158:25 159:3, 8, 21, 23,
25 163:18, 24 164:1, 8,
13, 17, 19, 21 217:6, 8, 19,
25 218:1, 18, 20 219:1,
11 223:3, 20, 24 225:25
226:7, 15 227:5, 17
**SUEZ-related** 217:14
**SUEZ's** 110:4
**suggested** 67:16 163:23
**suite** 39:23
**summary** 68:16 119:16
185:15 228:13 229:3
**summer** 78:2, 6
**summertime** 78:2
**supervisor** 22:15 33:19,
23
**supply** 103:11, 20
104:14 181:2
**support** 17:21 43:18
94:24 123:15 125:22
137:3 170:15 183:7
191:22
**supporting** 136:25
151:15, 16
**supports** 145:13 146:23
191:2, 21 192:25
**supposed** 109:19
**sure** 17:6, 22 26:6
27:22 38:4 44:6 50:13
58:23 79:7 83:23 89:1
96:18 109:19 113:20
115:23 123:23 125:14
135:25 146:3 153:11
157:5 175:1 186:18
187:24 195:2 196:12
197:23 227:14 238:10,
25 239:13
**surprised** 48:15
**surrounding** 116:7
136:16
**survive** 79:19
**survived** 34:24
**swear** 5:16
**switch** 82:10 113:16
217:5 228:3
**sworn** 5:22 6:3
**synergies** 67:7, 10, 17
**SYSTEM** 4:5 25:8, 11,
14 26:16 123:5 147:5
149:8, 13, 22 154:2
179:16, 19 182:10
183:23 186:10, 12, 13, 15
190:16 191:2, 23, 24
194:24 196:2 200:19
203:5 207:18

**systems** 15:5, 6 147:24
181:7 231:25
**system's** 195:3

**< T >**
**table** 122:13 123:3, 6
185:17 189:1
**tables** 192:24
**tail** 159:10
**take** 7:18 15:23 19:20
37:2 52:12 58:13, 22
60:12 72:24 80:15 97:3,
22 112:19 118:6 135:17
137:1 138:11, 12 150:13
154:21 166:13, 15 173:3
174:5, 10 188:15, 18
202:3 206:15 207:3
224:20 227:18 234:20
236:6, 14, 20
**taken** 5:6 6:18 78:10,
13 101:9, 12 102:24
126:4 143:22 242:8
**takes** 138:4 186:12
**talk** 14:6 22:13 51:24
66:3 74:13 83:14 87:14
96:14 98:9 104:20
131:7 133:13 181:7
182:24 217:6 220:8
228:4, 14 230:6
**talked** 12:4 13:8 97:14,
23 98:25 115:18 116:10,
11 117:11 137:16
143:22 144:5 145:13
147:10, 12 159:13 188:5
218:5 226:1, 5, 10, 12
238:15, 21, 24 239:8, 10
**talking** 18:18 37:3
45:14 60:2 85:8, 11, 16
125:5 126:15 131:3
140:3 165:14 166:24
181:12 188:14, 18
196:22 197:24 204:16
205:10 215:24
**Tamika** 1:16 5:13
242:7, 21 244:6
**Tampa** 28:6
**tapes** 97:3
**tapped** 23:9
**target** 80:9 133:24
144:3 186:10, 12, 13
195:3
**targeted** 18:3
**task** 138:2
**tasks** 22:22 30:15
178:15 211:18 212:15
**TAX** 4:5 15:18 19:11
20:24 23:10, 12, 18, 25
26:3, 6, 8, 10, 23 29:9, 24
31:14 32:8 33:10, 11
35:5, 20 39:12, 16, 17, 18
40:4 42:5, 9, 14, 15, 16,

*17, 20* 44:2, 9, 11, 12, 16
66:6 67:14 73:18, 19
74:16, 22 86:24, 25 87:3,
7, 8 88:21 95:5 96:1
100:18 114:9, 10 117:24
120:3, 8, 11, 12, 14, 22
121:9, 12, 14, 18, 21, 24
122:1, 3, 5, 7, 8 123:2, 5,
9, 10, 14, 19, 25 127:22
128:3, 7 130:7, 9, 18
135:15, 24 139:4 141:20
153:18 159:3, 7, 9
160:24 161:8, 9, 21
165:5 170:14 179:16, 19
180:21 181:14, 19, 21, 22
182:7, 15 188:6, 22
189:8, 17, 18 190:15
191:1, 11, 17 192:2
193:5, 8 194:9, 10, 12
195:15, 16 197:6, 8, 9
198:11, 25 200:19 202:2,
7, 22, 25 203:5, 21 204:9,
14 207:11, 12, 15, 17
208:9, 10 209:12, 18
213:7 215:5, 7 228:20
229:24 230:2, 4, 12, 25
231:2, 3, 6, 13, 14 232:1,
5

**taxes** 24:17, 21, 22, 25
26:1, 8 215:8 229:11
231:12
**tax-fixed** 29:8
**taxing** 231:3
**TBBS** 159:3
**TCJA** 231:14
**team** 67:17 71:4, 15
72:2 74:3 81:25 106:11,
13 107:7 144:6 199:10
200:18 201:6, 7, 20
203:11
**Teams** 73:1
**Tech** 14:19, 20 15:19, 22
16:10, 11, 15, 17 78:1
143:4
**technical** 17:17 201:23
202:4, 8, 25 203:9
**technically** 135:8 168:22
**technologies** 17:8 126:13
**technology** 15:16 17:13,
15 34:10 42:5, 9, 14, 15,
16, 17 48:9 66:7 79:13
96:11 100:18 114:6
120:16 121:13 130:2
134:10 143:2, 4 159:21,
23, 25 160:5, 11, 13
164:17, 19 165:8 175:11
184:24 185:8, 9, 21
186:1, 3, 6 187:5, 10, 18
188:2 196:8, 10 202:21
204:18, 19 205:4, 15
235:11 237:15

**telephone** 104:21 105:3
108:15 109:11, 17
**tell** 6:3 15:2, 21 17:1,
10, 23 22:3 23:8 27:24
33:7 37:4 38:10 43:12,
23 44:21 46:17 51:11
56:2 60:21 63:14 65:4
68:12 70:11 76:8 77:9
85:4, 11 93:21 100:20
101:24 105:19 106:6, 7
108:23 109:17, 21 117:8
120:5 121:23 125:10
127:19 134:5, 7, 14
138:15 139:9 142:1
148:16, 25 149:21
157:17 158:24 160:19
162:10 171:5 181:25
207:5 209:5 211:7
212:7, 15 218:25 219:17
234:6, 21 239:23
**ten** 55:21 56:25 58:22
97:3 227:18
**tender** 243:6
**Ten-minute** 58:22
**tentative** 225:6
**term** 103:21 122:18
160:8 174:18 175:9
178:1
**terminate** 108:2 223:13
**terminated** 100:5
102:15 104:14 119:9
148:4 232:12
**termination** 103:2, 21
**terms** 18:6 34:12, 16
48:7, 21 50:22 55:8
69:13 77:5 104:15
113:22 120:20 136:5
140:12, 14 145:9 156:4
170:15, 18 174:13, 16
176:10 177:21 216:16
230:21
**testified** 6:4 151:22
**testing** 215:20
**text** 198:24 199:1, 4, 8,
17, 24 203:16, 24 204:2
**texted** 100:24
**Thal** 180:24, 25 181:1
198:22 199:19, 22
200:11 201:14
**Thank** 59:25 124:3
201:6
**Thanks** 241:2
**thereto** 61:8
**thing** 7:18 53:15 60:4
96:15 136:8 140:4
169:5
**things** 17:15 18:1, 4
23:2 24:6 29:1 42:11
55:9 77:22 79:5, 14
86:8 89:6, 12 90:2, 5
122:22 125:24 155:24

172:5, 13, 14 194:17
216:10 238:12 240:9
**think** 9:19, 20 12:19
14:4 19:1, 12 22:22
23:19 27:16 28:12, 25
29:6 32:18 33:20 35:9
37:13, 15 39:7 40:22
42:11 44:12 48:1 49:18,
23 52:15, 20 53:5 54:13,
18 59:17, 21 63:18 66:4
67:12, 15 69:16 70:23,
24 71:18 74:3, 15 76:19
77:7 79:10, 17 80:22
81:9 85:14 86:5 87:6,
10 90:7 91:24, 25 92:6
93:14 94:5, 19, 25 96:9
97:21 98:3, 5, 7 99:5, 6
102:18 106:14 109:12
112:9 113:24 117:22
120:12 121:3, 6 123:4
126:11, 12 127:24 128:9
129:25 130:1, 17, 19
131:14 132:1, 22 133:5
135:2 136:1, 11, 19
138:14 139:21 142:7, 14,
24 144:19 145:5, 10, 13
146:7, 8, 10 149:10
150:7, 9, 24 152:1 153:3
155:17 156:1, 6 158:8, 9,
23 159:6, 13, 17 160:7
162:25 163:25 164:4, 15,
16 165:2, 23 166:11
167:16, 23 169:7, 11, 12
170:12, 17, 20 172:8
173:9, 18 174:15, 21
175:4, 18 176:9 180:2,
18 182:2, 5 183:19
184:14, 16, 18 185:4, 20,
22 186:2, 8, 10, 11 187:6
188:5, 13, 16 189:10
191:8, 19 193:21, 22, 23
194:8, 11, 15, 20 199:11
201:4 202:18, 22, 23
203:8, 23 204:15 206:1
209:24 210:4, 11, 17
213:14 215:12 216:20
217:13, 19 218:2 219:3,
13, 14 220:15, 21 221:1,
2, 5, 9, 11 223:9, 10, 23
224:3, 13 225:13 227:6
230:12 235:4 236:15
237:11 238:2, 11, 14, 16,
23 239:2, 3, 5 240:1, 2, 5,
21
**thinking** 20:7 28:8
158:2 222:20
**third** 37:13 41:20
68:15, 19 73:7 95:4
108:12 126:6, 17, 18
131:19 132:2 133:2
137:7 142:8 145:3, 8, 11,

15 161:15 176:24 177:1
190:13 220:1, 12, 14
**third-party** 79:16 95:8
125:25 126:3 177:19
**thought** 49:18 65:5
133:11 138:5 145:10
169:2 196:5
**thousand** 52:14 164:14
**thousands** 95:22 126:19
193:2
**three** 9:3 36:20 41:19
72:7 146:24 159:14
**throughput** 20:9
**throw** 17:24
**Thursday** 1:12 5:8
**tick** 193:4
**tied** 129:4 189:13
**tight** 113:4, 5
**TIME** 1:13 5:9 7:17
16:11, 14, 15, 16, 17
19:16 20:9, 11, 12, 13, 14,
16, 18 23:13, 19 24:9, 22
25:2, 23 26:16 27:4, 9
29:6, 11, 13, 17 30:2, 22
31:5, 9 32:3, 15 33:4, 23
34:22, 25 35:4, 23 36:15
39:1 41:6, 12, 16, 17
42:4, 8 44:8 49:16 54:2,
15, 19 55:8 56:22 58:18
59:12, 16, 17, 21 63:23
66:4 69:2, 11 70:25
77:6 79:11, 16, 17, 25
87:9 88:25 92:16 93:25
95:16 98:14 99:4
107:19 108:7 110:10
112:15 117:7 118:25
119:8 127:5 130:20
131:25 135:1 138:21
139:22 142:6, 25 144:19
152:14 158:1, 3 162:13
166:12, 16 168:25 169:1,
14 171:21 172:1 176:9
182:1, 17, 23 183:22
184:2, 9, 12 186:8
187:17 188:4, 16 189:10
191:21 198:3 201:7, 20,
21 203:11, 13 204:22
205:8, 21, 25 217:17, 18
218:17 220:22 224:2
227:8 231:22 232:18
235:8, 9 236:8, 11 237:6,
7 240:10 242:9 243:6
**timeline** 131:8 213:16
**times** 6:16 32:2 52:20
127:10
**title** 28:20, 21 36:21
**titles** 22:8
**Today** 5:8, 13 7:1, 8
9:14 13:5, 15 34:24
35:2, 13 37:17 42:23
49:7 50:20, 21 52:8

53:2 57:*18, 23* 61:*23*
62:*4* 84:*24* 85:*14*
101:*24* 105:*22* 111:*16,
19* 112:*12* 114:*3, 16, 19*
115:*19* 120:*23* 124:*1*
135:*5, 20* 145:*19, 22*
159:*7* 178:*11* 180:*7*
183:*20* 184:*1* 187:*14, 16*
199:*9* 216:*4* 238:*4, 9, 15,
21, 24* 239:*4* 240:*19*
**today's** 7:*25* 8:*3* 13:*7*
**told** 48:*15* 81:*24* 82:*1*
86:*6* 87:*4* 88:*13, 14*
90:*10, 23, 25* 91:*12*
92:*11* 93:*12, 18* 97:*21,
25* 100:*9, 21* 101:*17*
102:*1* 105:*22, 23* 107:*9*
110:*6, 21* 111:*4, 15*
134:*16* 137:*3* 138:*13*
199:*22, 23, 25* 203:*14*
223:*23* 236:*15, 18* 238:*1,
6* 239:*10* 240:*19*
**ton** 205:*8*
**tool** 46:*5* 114:*12* 127:*20*
131:*5* 140:*23* 240:*3*
**tools** 47:*24* 114:*6*
142:*18* 184:*24*
**toolset** 34:*11*
**top** 63:*10* 83:*20* 116:*20*
120:*9* 135:*13*
**topic** 72:*13* 223:*8*
226:*15, 16, 17*
**tortious** 133:*16*
**total** 124:*14* 127:*12*
154:*11* 165:*11* 169:*19*
216:*11*
**totals** 160:*17*
**touched** 135:*2* 240:*1, 2, 5*
**touching** 202:*24*
**Tower** 2:*10*
**track** 39:*1* 141:*6*
154:*24* 165:*22*
**tracking** 232:*4*
**trade** 88:*22* 89:*24*
90:*12* 91:*3, 14* 92:*12*
96:*9* 99:*24* 101:*6*
104:*24* 106:*3* 107:*22*
110:*2* 140:*19* 237:*24*
238:*18*
**trade-secret** 96:*21*
**training** 15:*18, 22*
215:*19*
**transaction** 61:*7* 68:*17,
21* 69:*4, 11* 191:*13*
**transactions** 181:*20*
182:*8* 216:*8*
**transcript** 12:*21, 23*
218:*11, 12* 242:*10*
243:*13*
**transcripts** 12:*13, 18*

13:*5*
**transfer** 215:*19*
**transfers** 230:*7*
**transformation** 160:*1, 2*
**transformational** 66:*7*
**transition** 23:*21* 120:*15*
**transitioned** 23:*21*
**transmission** 120:*15*
229:*22, 23*
**transmittal** 84:*14*
**travel** 155:*23*
**traveling** 27:*5*
**treated** 44:*2* 232:*2*
**treatment** 229:*25*
**tried** 13:*9* 98:*14* 108:*7*
144:*1* 163:*25* 164:*1*
178:*20* 237:*5*
**tripled** 152:*21*
**troubling** 140:*15*
**true** 32:*1* 34:*1* 35:*8*
37:*15* 41:*9* 42:*21* 50:*5*
52:*2* 66:*14* 68:*2* 79:*20*
83:*1* 95:*14* 110:*18*
111:*11, 12, 17* 125:*8*
130:*14* 132:*6, 12* 134:*23,
24* 139:*6* 146:*17* 168:*1*
183:*15* 184:*10* 185:*18*
186:*1* 192:*19* 194:*16*
196:*16* 242:*11*
**TrustPoint.One** 243:*15,
16, 17, 20, 24*
**TrustPoint.One-Alderson**
5:*14*
**truth** 6:*3, 4*
**try** 44:*10* 48:*1* 55:*14*
87:*17* 110:*15* 112:*10*
113:*6* 122:*17*
**trying** 11:*1* 12:*23* 38:*7*
78:*3* 79:*14* 103:*25*
104:*5* 129:*16* 131:*10*
139:*2* 147:*2* 150:*8*
179:*6* 222:*8*
**Tucson** 38:*5*
**Tuesday** 8:*7* 72:*4*
**turn** 82:*20* 128:*16*
169:*17* 176:*13* 192:*1*
**turned** 158:*6*
**Twelve-and-a-half** 51:*4*
**two** 9:*2, 3* 26:*17* 51:*17*
53:*7* 57:*2* 72:*7* 76:*10*
77:*25* 78:*5* 88:*17*
126:*14* 135:*7, 20* 139:*3*
141:*7* 159:*13* 160:*10, 13*
164:*4* 165:*7, 14* 181:*10*
206:*4* 217:*14* 231:*3, 25*
232:*5* 235:*7* 236:*15*
240:*9*
**two-part** 168:*11*
**type** 31:*14* 95:*15*
175:*16* 189:*21* 190:*1*
204:*17*

**types** 86:*8* 142:*21*
191:*13* 194:*25*
**typical** 155:*17*
**typically** 26:*6* 39:*6*
44:*13* 112:*4* 175:*19, 25*
181:*4, 11, 18* 194:*3*
229:*15*

**< U >**
**U.S** 39:*17* 40:*23, 24*
240:*8*
**Uh-huh** 81:*7* 98:*23*
105:*16* 109:*20* 124:*12*
127:*8* 147:*11* 154:*10*
167:*17* 168:*23* 174:*2*
221:*7* 225:*16* 226:*4, 23*
236:*16* 239:*12*
**UI** 39:*20*
**ultimately** 67:*24* 171:*14*
**umbrella** 29:*9*
**unauthorized** 137:*7*
**uncertain** 104:*15*
**uncertainty** 136:*13, 15,
19* 141:*13* 155:*22* 156:*8*
216:*25*
**unclear** 65:*23*
**underlies** 25:*13* 31:*17*
**underlying** 181:*19*
**underscored** 137:*23*
**understand** 7:*9, 11, 13,
14* 17:*22* 18:*22* 25:*13*
27:*23* 52:*7* 55:*15* 80:*9*
88:*2, 4* 90:*17* 93:*3*
104:*6* 106:*14* 122:*18*
124:*3* 129:*16* 136:*3*
143:*18* 150:*9* 156:*15*
163:*15* 172:*10* 173:*18*
184:*7* 187:*24* 189:*24*
192:*12, 18* 197:*23*
201:*18, 22* 202:*7, 13*
205:*23* 223:*13* 225:*23*
228:*15* 229:*23* 231:*11*
239:*7* 240:*23, 24*
**understanding** 16:*3*
27:*7* 38:*15* 46:*22* 67:*12*
72:*12* 80:*15* 92:*16, 19*
93:*5* 101:*21* 102:*17*
104:*13* 105:*9, 12* 106:*17*
113:*20* 152:*6* 155:*17, 18*
160:*25* 166:*9* 172:*20*
174:*4* 176:*6* 182:*20*
196:*7* 209:*15* 214:*17*
215:*15*
**understands** 139:*21*
**understood** 25:*10, 18*
33:*16* 77:*15* 80:*7, 8*
89:*19, 22* 97:*17* 98:*13*
99:*3* 104:*1, 3* 110:*13, 23*
160:*3, 6* 173:*2* 174:*8*
189:*11* 190:*7* 223:*24*
224:*1*

**undertake** 167:*22*
181:*12, 18*
**underway** 115:*12*
215:*25* 216:*18*
**unfair** 173:*12, 16, 17*
**Unfortunately** 57:*20*
194:*6* 221:*13*
**unique** 232:*9*
**Unit** 5:*5* 97:*10* 166:*21*
**UNITED** 1:*1*
**unnumbered** 234:*4*
**unquote** 101:*19*
**unrelated** 43:*10, 21* 44:*5*
58:*5* 207:*16*
**un-responded** 103:*13*
**unsophisticated** 175:*6, 12*
**unusual** 155:*12*
**update** 163:*3*
**updated** 83:*9* 162:*23*
202:*15* 205:*10, 14* 206:*6*
**upgrade** 43:*6* 179:*16, 18*
184:*19*
**upgraded** 183:*23*
**uploaded** 192:*1*
**upstream** 190:*15* 191:*2*
**urgency** 99:*7*
**use** 33:*2* 39:*11* 42:*17*
53:*21* 62:*16* 110:*4*
121:*24* 123:*4* 137:*17*
153:*16* 157:*1* 175:*25*
176:*21* 194:*25* 195:*23*
196:*2* 232:*10* 233:*5*
238:*17*
**user** 25:*19* 46:*9* 55:*5*
119:*19* 122:*23, 24*
126:*10*
**users** 17:*7* 25:*10*
122:*15, 19* 145:*14, 15*
233:*9*
**uses** 39:*17* 40:*23* 95:*4*
233:*13*
**usual** 243:*25*
**Utegration** 63:*22* 64:*1, 8,
10, 22* 65:*15, 20, 23* 66:*3*
67:*11, 13, 20* 68:*14*
69:*23* 70:*1, 6* 71:*3, 15*
73:*11, 13, 25* 74:*10, 13*
75:*1* 80:*19, 20* 81:*13, 16,
25* 144:*20*
**Utegration's** 68:*22* 80:*22*
**utilities** 16:*23, 24, 25*
17:*20* 18:*3, 6* 23:*13*
31:*8* 34:*8* 37:*7, 9* 38:*24,
25* 39:*4, 5, 11, 21, 23*
40:*7, 24* 44:*8* 47:*23*
57:*9* 64:*13* 66:*11* 67:*14*
75:*3, 4* 85:*6* 104:*23*
122:*25* 137:*1* 143:*14, 16,
17* 144:*6, 13* 145:*16*
146:*21, 24* 169:*15*
175:*10* 181:*11, 17* 190:*9*

**utility** 16:*23* 23:*14* 32:8 35:6, *20* 37:*11* 39:*16, 17* 40:*23* 43:25 47:*20* 64:*11* 65:*23, 25* 124:9 137:*18* 138:6, *7, 12* 139:*15, 21* 143:*18, 21* 144:*1, 10* 184:25 190:8 231:*16* 240:8

**Utility4UTM** 68:22

**utility's** 193:*14*

**utilize** 183:*7*

**utilized** 176:*12*

**utilizing** 231:*23*

**< V >**

**VADIM** 1:*11* 3:4 5:6 6:*1, 13* 37:6

**validate** 44:*15*

**valuable** 80:*1* 139:22 172:*16*

**value** 55:*17* 73:8, *10* 131:*16, 18* 163:2 189:*13* 211:*11* 216:*14*

**values** 231:*19*

**Vangrid** 159:*12*

**variety** 15:6

**various** 99:*10* 117:*12* 125:6 126:2 238:*19*

**Vasily** 63:*12, 16, 25*

**vendor** 111:2 138:*11* 140:7, *12* 141:5

**vendors** 122:*1*

**verifying** 82:*24*

**version** 163:*10, 18* 184:2, *6, 7* 206:2 210:*18* 213:*1*

**versus** 5:7 46:8 110:*12* 202:25

**vertical** 144:*4*

**video** 72:*23* 73:*1*

**VIDEOGRAPHER** 5:*4, 13* 58:24 59:2 97:2, 6, 9 113:*10, 13* 124:*20, 23* 125:*1* 166:*18, 21* 227:22, 25 241:*3*

**video-recorded** 5:6 241:*4*

**view** 136:7 137:*20* 172:6 177:25 186:*15* 193:*17* 238:22

**views** 132:25 221:*18*

**violated** 89:*4, 10*

**violation** 93:*10*

**virtually** 39:*16* 40:*23* 238:*3*

**void** 137:*9*

**voluntary** 237:*5*

**VP** 87:*7*

**< W >**

**wait** 7:2, *3* 80:24 81:*1, 2* 117:*15*

**waiting** 152:*11*

**waived** 233:*9*

**waiving** 233:*12*

**want** 38:2 61:*10* 66:*3, 22* 75:*14, 20* 84:5 86:22 90:*15* 96:*18* 100:*20* 110:*10* 111:*3* 112:*19, 22* 113:*17* 118:9 124:*20* 133:*1* 142:22 147:*18* 149:*4, 16* 152:*1* 166:*13* 167:*12* 173:9, *23* 176:*3, 7, 13* 181:6 185:*11* 193:*13* 194:*18* 197:22 201:*5, 6, 13* 205:8, 9 217:5 226:*13* 228:*14* 234:*20, 21, 25* 235:*1* 238:25 239:*13*

**wanted** 13:*21* 51:25 59:6, *14, 15, 19* 60:*3* 64:8, *12* 78:*10* 83:6, *23* 84:*23* 148:*19* 153:25 156:*15* 171:*4* 196:*12* 209:*18* 223:*13* 224:*20* 228:*13*

**war** 240:*3*

**warehouse** 19:22 20:*5, 10*

**warning** 7:*20* 100:7

**Washington** 116:*23* 120:9

**Watkins** 33:*20*

**way** 18:5 23:*1* 25:*19* 41:*1* 43:*18* 44:*1* 46:7 49:*19* 55:*4* 66:*1* 91:2 95:*1* 125:*21* 126:9 131:*20* 132:*11* 140:*10* 147:*23* 158:*14* 161:*15* 163:22 167:*24* 169:*15* 172:*14* 173:*4* 177:25 178:*23* 190:9, *13* 193:9 217:*10* 230:*1* 232:*1* 235:*15*

**ways** 76:*19* 78:2*1, 22* 133:*19*

**wear** 36:*13* 50:*15*

**web** 220:*5*

**website** 17:*16* 78:*17* 130:*1, 15, 23, 24* 131:*5, 20* 132:*4, 10, 13* 133:*1, 5*

**week** 8:8 94:5 99:5, 8 102:*12, 15, 20*

**weekly** 27:*5*

**weeks** 156:7

**welcoming** 201:*8*

**well** 8:*13* 9:*21* 10:22 14:*11* 17:23 21:5 22:*3, 13* 24:*13* 26:*18* 27:24 34:22 39:*3* 40:22 49:*23* 51:*17* 54:*1, 15* 55:*17*

66:2 67:*21* 70:7 71:*21* 73:*12* 77:9, *12* 79:8 80:*18* 83:*13* 87:*24, 25* 88:*24* 89:*19* 90:*7, 12* 91:*21* 94:*3* 95:*1, 3, 10* 96:*14* 97:22 98:9 99:*12* 102:*12, 15* 104:*13* 109:2, *6* 110:*8, 23* 112:9 113:*21* 114:*14* 116:25 117:*24* 124:*14* 126:*16* 128:*1, 16* 129:*16* 130:*23* 132:*3, 20* 134:*23* 136:*10* 137:*5, 11* 138:6, *14* 139:*21* 142:*10, 17* 143:*18* 146:*4* 147:*16* 150:*19, 25* 152:*18, 20* 155:6 161:*10* 164:*15, 19* 165:*11, 20* 168:*20* 169:7 170:*21* 172:*11, 23* 173:*3, 18, 24* 174:*3, 17* 176:*5* 181:*12* 185:2 186:8 187:*10* 190:*1* 191:*19* 193:25 196:7 197:*3* 199:*18* 203:*15* 206:*15* 211:7 212:*19, 21* 215:7, *14* 218:*3, 11, 24* 220:*15* 222:7, *24* 227:*11* 231:*16* 232:*20* 234:*3* 235:*11, 24* 237:*4* 239:*3, 9, 23* 240:*1*

**went** 13:*14* 14:8, *19* 15:*12* 22:2 37:*19* 103:*12* 142:*24* 165:9

**we're** 6:22 7:*21* 18:*18* 50:2 51:*24* 58:*11* 73:*19* 83:5 84:22 90:*18* 96:*14, 25* 97:*10* 99:*12* 101:*15* 115:2*1, 24* 116:9 123:2*1* 131:*3* 139:*16* 143:*16* 166:22 186:8 202:*14* 223:*14* 235:*12* 241:*4*

**We've** 6:*15, 16* 10:*17* 53:*16* 55:22 58:2*1* 77:*12* 78:*10* 85:*14* 95:*15, 19, 23* 97:*14* 112:*3* 114:6, *13* 116:9, *10* 117:5 123:*4* 124:5, *7, 14* 126:8 133:25 135:*23* 137:*16* 139:*3, 14* 141:*14* 142:9 143:*12, 22* 144:*1* 145:*10, 16* 147:*10, 12* 156:22 159:*13* 165:*14* 205:*10* 215:23 227:*15* 237:*10* 238:*11* 239:*4, 8, 10, 19* 240:2*1, 22*

**whim** 140:22

**wholly** 43:9 58:5 125:*16*

**wide** 15:6 190:5

**wider** 73:*20* 92:*19* 109:*12*

**widgets** 190:*4*

**wife** 12:6 220:*13*

**Williams** 36:*10* 41:*20, 22, 23, 25* 45:*1* 48:*23* 221:6, *17*

**willingness** 48:9 238:*17*

**winning** 123:9 128:2 197:8

**withdraw** 150:*20*

**WITNESS** 3:*3* 5:*17, 22* 6:2 25:*18* 32:7, *18* 48:*19* 60:*14* 63:6 67:*1* 69:*15* 71:*12* 76:*17* 82:8, *15* 83:22, *25* 84:*4, 21* 89:8 133:*10* 155:*16* 157:9, *16* 162:*3, 9* 166:*15* 167:6, *14* 175:*1* 176:*15, 19* 178:*17* 180:*17* 181:9 183:*12, 18* 190:*12, 21* 194:*20* 195:9 200:8 204:*1* 206:2*1* 207:2, *24* 208:22, *25* 221:2*1* 222:*12* 224:*19* 226:*19* 228:9 233:*24* 237:*15*

**woman** 33:2*1, 22* 106:9

**won** 196:*20, 23, 25* 197:*23* 198:2, *3, 6, 16*

**word** 18:24 19:7 33:2, *3* 59:*19* 154:22 186:*10*

**wording** 179:22 200:*1*

**words** 90:*16* 231:*11*

**WORK** 4:*4, 8, 9* 17:19 19:*15, 25* 22:2 23:*4, 10* 25:*18* 26:*24* 27:9, *10, 14, 24* 28:*10* 29:7 34:8 37:22 40:9, *13, 16* 41:2 43:8 45:*11, 12* 46:*11* 55:2, *25* 56:2, *3, 6* 70:*20* 74:2 76:8 95:*11, 13* 96:2*1* 98:*14* 107:*16* 112:*11, 13* 128:*10* 140:8 145:*20* 146:*14* 147:*4* 148:*3* 155:*25* 160:22 167:*13, 21, 25* 168:*3, 7, 24* 169:*20, 25* 170:2 175:*15* 178:*16, 25* 179:*1, 4, 5, 10, 11* 180:2, 5 190:8 192:*11, 17* 196:2*1, 22, 24* 200:*1* 202:*15* 205:*20* 206:*1* 207:*1, 5, 6, 9, 16* 208:6, *14, 16* 209:*4, 6, 7, 22, 23* 211:*3, 4, 6, 12* 214:*11, 13* 216:*16* 227:*4, 10* 228:*11, 14, 17, 19, 25* 229:*5, 6, 7* 230:6, *9, 17, 19, 22, 25* 231:*7, 20* 232:6, *11, 13, 14, 16* 233:2, *25* 234:*4, 11, 17*

**worked** 16:*17, 21* 20:*3* 22:*17* 28:2, *3, 4, 6, 7, 12, 13, 16* 32:*1* 34:25 37:24,

*25* 38:*23* 39:*4* 40:*8*, *24*
127:*6* 236:*7*
**workforce** 185:2
**working** 7:*21* 16:*12*, *14*,
*16* 18:8 19:*13*, *14*, 22
22:24 23:5, *17*, 24 24:2
25:2, *14*, *15* 26:*19* 31:*6*,
*7*, *12* 32:*3*, *12* 38:2, *5*, *6*,
*11*, *17*, 22 43:*14*, *15*, 24
56:*13* 58:*1* 62:8 70:24
89:*20* 94:*23* 95:*15*
112:7 136:6 139:*16*
156:*10*, *12* 200:*23*
**works** 35:2 112:22
127:*5*
**world** 146:*4*, *9*
**worth** 152:8
**write** 6:*24*
**writing** 98:*1*, 2 177:*1*
**written** 98:*4* 176:*25*
196:*16*
**wrong** 173:*6*, *24* 175:9
190:*17* 214:*6* 218:8
237:23 239:2
**wrote** 184:*3*

**< X >**
**Xero** 149:*10*
**X-E-R-O** 149:*11*

**< Y >**
**Yankovitch** 12:*25*
**Yeah** 9:7 10:*5*, *10*
11:*25* 12:*12* 13:*3* 15:*15*
17:*5* 20:*16* 21:7 26:*4*
29:*14* 34:*24* 36:*19*
38:*13* 41:*13* 42:*15*, *25*
44:*6* 45:*3* 48:*1* 49:*15*,
*20* 51:*13*, *18* 53:*19*
55:*10* 56:*12*, *24* 58:*10*
59:*18*, *23* 62:*21*, *22*
64:*13* 71:*18* 73:24
76:*21* 78:*9*, *16*, *24* 79:*10*,
*12* 83:*15*, *22*, *25* 85:*13*,
*19* 86:*1* 93:*17* 96:*6*
98:*21* 100:*23* 105:*23*
112:*21*, *25* 113:*9* 115:*25*
118:*15* 119:*25* 123:*23*
127:*16*, *24* 128:*17*
132:*25* 135:8 143:*12*
146:7 148:*6* 172:*5*
173:23 174:*3* 175:9
177:*24* 186:*23* 192:*15*
193:*13* 194:*20* 203:2
204:*1*, *8*, *13* 205:*12*
211:*16*, *20*, *23* 212:8
214:*17* 215:2, *4* 217:2
220:*16*, *21* 222:*15*, *16*
224:*10* 227:*13*, *14*, *20*
229:*9*, *20* 230:*24*

**year** 14:*22* 18:*9*, *10*
23:*15*, *24* 24:7 49:*15*
50:*1* 62:*23* 68:*3* 78:*3*, *4*
79:*6* 111:*10*, *11* 127:*5*
148:*20* 153:*9*, *17* 154:*20*
155:2, *4* 160:*3* 161:*8*, *9*,
*19*, *21* 165:*25* 206:*4*
207:*12* 208:*12* 209:*25*
213:*21*, *24* 214:*3* 216:*5*
233:*18*
**year-end** 207:*13*
**years** 13:*10* 14:*12*, *14*
24:9 79:8 135:7, *20*
170:*10* 181:*19* 182:*19*
186:*19* 206:*3* 208:*9*, *16*
217:*9*, *15*
**Yep** 67:*3*
**yesterday** 14:2
**York** 37:*1* 43:25

**< Z >**
**Zarhuni** 108:*17* 109:*4*, 7
110:*25*
**Zoom** 73:*1*
**Zuch** 62:*25* 63:*15*, *21*
64:*8* 66:*3*, *12*, *19*, *23*
67:*13*, *16*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

LUCASYS INC.,

    *Plaintiff,*

v.

POWERPLAN, INC.,

    *Defendant.*

Civil Action File

No.: 1:20-cv-2987-AT

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST CONTINUING INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Lucasys, Inc. ("Lucasys") hereby serves its Objections and Responses to Defendant PowerPlan, Inc.'s ("PowerPlan") First Continuing Interrogatories to Lucasys as follows.

### RESPONSES TO FIRST INTERROGATORIES

1.

Set forth and particularly describe the category and amount for each category of all damages you are claiming in this action, including any damage calculations. Your response should include, but not be limited to, your alleged damages stemming from alleged injury to your business, property, trade, reputation, and competitive positions, as alleged throughout the Complaint.



DEFENDANT'S
EXHIBIT

**RESPONSE:**

Lucasys objects to this Interrogatory to the extent it seeks information that is protected by the attorney-client privilege or the work-product doctrine. Subject to and without waiving the foregoing objection, Lucasys states that, as PowerPlan's monopolistic and anticompetitive behaviors are still ongoing, it continues to suffer damages—including, but not limited to, loss of software licensing revenue, loss of consulting services revenue, and loss of goodwill and market standing from current and future clients. Lucasys cannot precisely quantify the total amount of damages it has, or will, suffer as a result of PowerPlan's actions without the assistance of an expert, and the deadline for expert disclosures is not for many months. Accordingly, a precise quantification of Lucasys' damages, and the methods by which they are calculated, will be made in connection with Lucasys' expert disclosures at the time specified in the Court's scheduling order.

2.

Identify each person or entity by whom Lucasys was retained to perform consulting services that involved any PowerPlan software product, and for each such person or entity set forth the date(s) and scope of each retention.

**RESPONSE:**

Pursuant to Federal Rule of Civil Procedure 33(d), Lucasys will produce its Statements of Work ("SOWs"), which will identify such person or entity and the dates and scope of the retention.

3.

Identify each and every person or other entity you allege Lucasys attempted to provide consulting services, but was unable to do so because of the conduct of PowerPlan alleged in the Complaint. Your response should include the date(s) of each such attempt, any other bidder or entity also competing for such work, and the primary individuals involved from Lucasys and the other party.

**RESPONSE:**

Lucasys objects to this interrogatory as overly broad, unduly burdensome and not proportional to the needs of the case. Notwithstanding the foregoing objection Lucasys answers as set forth below. Given the scope and breadth of PowerPlan's anticompetitive behavior, including its ongoing threats of legal action, and the recent proposed changes to its master services agreement, Lucasys does not know each and every person or entity that has been dissuaded from engaging Lucasys for consulting services. In any event, Lucasys states that it attempted to provide consulting services, but was unable to do so because of PowerPlan's actions, to the following:

- **NextEra – October and November 2019.** PowerPlan also competed for this work.

- **AEP – ongoing since October 2019.** PowerPlan, Regulated Capital Consultants, LLC ("RCC"), Ernst & Young Global Limited ("EY"), and Deloitte also competed for this work.

- **Liberty Utilities – April 2020.** Despite there being no other bidders, Lucasys' consulting contract was terminated as a result of PowerPlan's threats and coercion, forcing Liberty to seek substitute services from PowerPlan or RCC.

4.

For each person or entity identified in response to Interrogatory no. 3, identify all documents and communications relating to Lucasys' attempt to provide consulting services.

**RESPONSE:**

Lucasys objects that identifying individual documents and communications is unduly burdensome and not proportional to the needs of the case. Pursuant to Federal Rule of Civil Procedure 33(d), Lucasys will produce nonprivileged, responsive documents and communications as specified in its response to PowerPlan's requests for the production of documents.

5.

Identify all communications or meetings between you and AEP, NextEra, Suez, or Liberty Utilities. For each communication or meeting, describe in detail the substance and result of the communication or meeting, date of the communication or meeting, and identify all persons involved in the communication or meeting.

**RESPONSE:**

Lucasys objects that identifying individual documents and communications is unduly burdensome and not proportional to the needs of the case. Pursuant to Federal Rule of Civil Procedure 33(d), Lucasys will produce nonprivileged, responsive documents and communications as specified in its response to PowerPlan's requests for the production of documents.

6.

Identify each software product that Lucasys has developed and for each describe its intended functionality, intended customer base, and cost; the actual number of units of each sold, licensed, or otherwise made available to any market; and who has purchased or licensed each such product, and what payments have been received by Lucasys from each person.

**RESPONSE:**

Lucasys' software products generally are not built for an intended customer base and are not industry specific. Lucasys primarily works with utility companies, however, and it has developed the following products:

- **Copilot:** This is a process automation and data transformation tool. Lucasys has not sold or licensed Copilot because of PowerPlan's anticompetitive and tortious actions. But for PowerPlan's actions, Lucasys would have licensed Copilot at the completion of the NextEra contract.

- **Deferred Tax:** This is a cloud-based software that computes and models timing differences and deferred taxes based on the 2018 federal tax changes as applied to customers' data. Lucasys has not sold or licensed Deferred Tax because of PowerPlan's anticompetitive and tortious actions. But for PowerPlan's actions, Lucasys would have licensed Deferred Tax to AEP, as a result of winning the bid to build a new tax fixed-asset solution.

- **Depreciation:** This is a tool that computes book and tax depreciation in accordance with GAAP and IRS requirements. Lucasys has not sold or licensed Depreciation because of PowerPlan's anticompetitive and

tortious actions. But for PowerPlan's actions, Lucasys would have licensed Depreciation to AEP, as a result of winning the bid to build a new tax fixed-asset solution.

- **Nova:** This is a tool that creates and maintains tax basis balance sheet controls. Lucasys has not sold or licensed Nova because of PowerPlan's anticompetitive and tortious actions.

- **Analytics:** This product provides business intelligence tools for consulting services.

- **Applications Toolkit:** This toolkit contains a suite of applications used in utility consulting services, including an ARAM Calculator, an audit tool for deferred tax computations, and a lease amortization calculator.

7.

For each software product identified in response to the prior interrogatory, state the time developing the product, the cost of development, the specific individuals involved in developing the product (in order, listing the persons most involved before the persons with less involvement), and any concerns, complaints or quality issues related to such products.

**RESPONSE:**

Lucasys states that, as a result of PowerPlan's ongoing attempts to disrupt and threaten its customer relationships, it has been forced to constantly shift focus between the aforementioned products, making it impossible to know definitively how much time or money was spent developing each individual product. Nevertheless, since its founding in 2018, Lucasys has been continuously designing and developing software products and spent no less than $2 million in that process. To date, Lucasys has not received any concerns, complaints, or quality issues related to its products. Notwithstanding the foregoing, Lucasys further states as follows:

- **Copilot:** Copilot was developed between 2018 and 2021 by Stephen Strang, Evan Blasy, and Jonathan Porter.

- **Deferred Tax:** Deferred Tax development began in 2018 and is ongoing by Stephen Strang and Jonathan Porter. The initial proof of concept was designed and developed by AltexSoft.

- **Nova:** Nova development began in 2020 and is ongoing by Stephen Strang and Jonathan Porter. AltexSoft designed the user interface and user experience.

- **Depreciation:** Depreciation design and development began in 2021. AltexSoft designed the user interface and user experience.

- **Analytics:** Analytics was developed between 2020 and 2021 by Stephen Strang and Chunhong Fei.

- **Applications Toolkit:** The Applications Toolkit was developed between 2018 and 2019. The Pavans Group and Julian Hamelberg developed the ARAM Calculator, and Julian, individually, developed the Lease Amortizer and ADIT Auditor.

In addition to the names listed above, Vadim Lantukh, Daniel Chang, Bryan Murphy, and Gabriel St James also provided industry subject matter expertise, which was considered by the developers during the development process.

8.

Identify each current or former sales agreement, contract arrangement, or other understanding, whether formal or informal, concerning consulting services to which Lucasys was a party. For each such agreement, contract, or other understanding, identify the person or entities involved, the dates the agreement or understanding was in effect, and the terms and conditions of the agreement or understanding.

**RESPONSE:**

Lucasys objects that identifying individual documents and communications is unduly burdensome and not proportional to the needs of the case. Pursuant to

Federal Rule of Civil Procedure 33(d), Lucasys will produce nonprivileged, responsive documents and communications as specified in its response to PowerPlan's requests for the production of documents.

<div align="center">9.</div>

Identify each and every occasion when Lucasys or anyone acting on its behalf has accessed PowerPlan's software (including, but not limited to, application, source, code, or data tables) and for each such occasion describe the circumstances under which Lucasys accessed the software, the date, and the purpose for which Lucasys accessed the PowerPlan software.

**RESPONSE:**

Lucasys objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of the case. Given the outdated nature of PowerPlan's code and the gaps in its software, there is an entire "Supplemental Management Services" market in which consultants, like Lucasys, must interact with PowerPlan's software on a regular basis. Accordingly, it is impossible to identify every distinct occasion when Lucasys or any of its agents have accessed PowerPlan's software.

Subject to and without waiving the foregoing objection, Lucasys has only had access to PowerPlan's software through its consulting work with customers in the Supplemental Management Services and Deferred Tax Solutions markets, and any

such access was limited to the duration of those projects. Lucasys has never requested access to nor accessed PowerPlan's source code. The specific consulting projects during which Lucasys had access to PowerPlan's software include:

- **AEP.** Through its consulting work with AEP, Lucasys has access to PowerPlan's software application and database. The purposes of this access are to support tax depreciation and deferred tax processing functions and to help with customer's data extraction for regulatory accounting needs.

- **Avista.** Through its consulting work with Avista, Lucasys has access to PowerPlan's software application. The purpose of this access is to help support their tax department processes.

- **ConEd.** Through its consulting work with ConEd, Lucasys has access to PowerPlan's software application. The purpose of this access is to help support their tax department processes.

- **Dominion.** Through its consulting work with Dominion, Lucasys has access to PowerPlan's software application. The purpose of this access is to help support its month-end close process.

- **NextEra.** Through its consulting work with NextEra, Lucasys had access to PowerPlan's software application and database. The purpose of this access was to assist with data cleansing and remediation.

- **SUEZ.** Through its consulting work with SUEZ, Lucasys has access to PowerPlan's application and database. The purposes of this access is for data cleansing, deferred tax data initialization, and other data configuration and integration activities.

10.

Identify each and every "source[]" referred to in paragraph 58 of the Complaint.

**RESPONSE:**

Lucasys identifies SUEZ, Liberty Utilities, and AEP.

11.

For each person or entity identified in response to Interrogatory no. 10, identify all communications between you and that person or entity relating to consulting services or software or PowerPlan.

**RESPONSE:**

Lucasys objects that identifying individual documents and communications is unduly burdensome and not proportional to the needs of the case. Pursuant to

Federal Rule of Civil Procedure 33(d), Lucasys will produce nonprivileged, responsive documents and communications as specified in its response to PowerPlan's requests for the production of documents.

12.

Identify each and every defamatory statement alleged or referred to in Counts IX and X of the Complaint, including the date of the statement, the mode of transmittal of the statement, and the specific sender and the recipient of the statement.

**RESPONSE:**

Lucasys is still investigating the scope and breadth of PowerPlan's campaign of misinformation and specifically reserves the right to supplement this Interrogatory should it learn of any additional defamatory statements. Subject to and without waiving the foregoing, Lucasys identifies the following defamatory statements:

- On or around November 7, 2019, PowerPlan employees Marc Botniker and/or John Budala told Jeff Hoersdig of AEP during a phone conversation that using Lucasys potentially violated AEP's contractual obligations to PowerPlan, among other things. Lucasys has reason to believe that PowerPlan's employees told Mr. Hoersdig, and other AEP

employees, that Lucasys was stealing trade secrets during that call and during a subsequent meeting.

- On or around November 8, 2019, during a conversation, a representative of PowerPlan stated to Leo Quintana and possibly others of NextEra that Lucasys was stealing trade secrets.

- On or around April 23, 2020, during a telephone conversation, a PowerPlan agent stated to Louisa Reid of Liberty Utilities that Lucasys was misappropriating confidential information and stealing trade secrets.

- On or around May 29, 2020, during a telephone conversation, Joe Gomez and Brett Bertz, on behalf of PowerPlan, stated to Mohammed Zerhouni and Michael Salas of SUEZ that Lucasys was misappropriating confidential information and stealing trade secrets.

13.

Identify all persons or entities that compete with Lucasys in the alleged Supplemental Management Services Market.

**RESPONSE:**

Lucasys identifies the following:

- Deloitte,

- PricewaterhouseCoopers ("PwC"),

- KPMG International Limited ("KPMG"),

- EY,

- PowerPlan,

- RCC, and

- Arc-Two Consulting.

14.

Describe with particularity what steps Lucasys takes to prevent its employees from using or disclosing trade secrets, confidential information, proprietary information or protected information of his or her previous employer in the course of his or her employment with Lucasys, including individual persons who implement or oversee such steps.

**RESPONSE:**

Lucasys states that it requires all employees to execute an Employee Agreement, which contains provisions expressly prohibiting the use or disclosure of protected information from the employee's former employer. Employees of Lucasys also must adhere to the Employee Handbook, which prohibits employees from using or disclosing protected information from their former employers. Both the Employee

Agreement and Employee Handbook are implemented and overseen by Lucasys'
CEO and COO.

15.

Describe with particularity what steps Lucasys takes to prevent its employees
from inappropriately using or disclosing Lucasys' trade secrets, confidential
information, or proprietary information or protected information.

**RESPONSE:**

Lucasys requires all employees to execute an Employee Agreement and abide
by an Employee Handbook, both of which contain provisions prohibiting the use or
disclosure of Lucasys' trade secrets, confidential information, proprietary
information, or protected information. Further, Lucasys maintains an Information
Security Policy limiting employees use or disclosure of such information. From an
operations standpoint, Lucasys requires secure IP Whitelisting to be able to access
cloud-hosted environments, requires secure Client VPN to access the internal
Lucasys Network, restricts source code and development access to developers only,
and requires pull requests to update the master branch, which includes both
automated and manual code reviews.

Furthermore, Lucasys uses separate credentials for database access and
application access, as well as separate credentials for each individual database.

Application users are unable to view the database connection profile information (e.g., hostname, IP address, etc.). Lucasys also does not provide SQL training for its database model to employees and/or customers or database query tools that expose table and column names from the database. Nor does it offer any tools for application users to review the SQL behind any of the core screens or elements in the application.

Lucasys builds custom serializers for web requests based on information needed to display on the front-end of the application. It also uses code splitting to bundle its front-end applications and only serves the bundle when a user is authorized and relevant. Lastly, Lucasys strictly limits its backend server and system log access to employees or consultants in developer roles.

16.

Describe with particularity all Lucasys products or services which "access PowerPlan's software . . . to obtain Lucasys' customers . . . data" as referred to in the April 29, 2020 letter from Jason S. Alloy to Mark S. VanderBroek and Peter Munk, including the specific method used to "access PowerPlan's software."

**RESPONSE:**

Lucasys objects to this Interrogatory as it misquotes the April 29, 2020 letter from Jason S. Alloy to Mark S. VanderBroek and Peter Munk, which is in writing

and speaks for itself. Subject to and without waiving the foregoing objection, Lucasys states that, out of the box, none of its software products directly access PowerPlan's software, or any others for that matter. However, Lucasys' software requires its customers to input their financial data into the software to be able to perform designated functions. Lucasys customers are responsible for providing this information either by uploading dataset files into Lucasys' software program or by configuring a direct database connection between Lucasys' software and the customers' financial data, which may be housed in PowerPlan's software program. With regard to its consulting services, Lucasys accesses customer's data through whichever technology it may be housed in, including if it is contained in PowerPlan's software program.

17.

Identify all persons who provided information used to respond to PowerPlan's discovery requests (including interrogatories and requests for production of documents or things), specifying for each person the specific discovery request on which they provided information.

**RESPONSE:**

Lucasys identifies the following persons: Vadim Lantukh, Daniel Chang and Stephen Strang reviewed and provided responsive information to each interrogatory response.

18.

Identify all third parties with whom Lucasys or anyone acting on its behalf have communicated concerning anything related to the subject matter of this action. For each such third party, set forth the date, method, substance, and result of any such communication, and the specific individuals involved in each communication.

**RESPONSE:**

Lucasys objects to this Interrogatory on the grounds it is overly broad, unduly burdensome, and not proportional to the needs of the case. Subject to and without waiving the foregoing, Lucasys states that, except for counsel, it generally does not discuss the instant litigation with third parties and, instead, refers any person making such an inquiry to the docket in this matter, which is publicly available. Further, pursuant to Federal Rule of Civil Procedure 33(d), Lucasys states that it will produce documents reflecting communications with third parties in response to PowerPlan's requests for production.

<center>19.</center>

Please describe every action Lucasys has taken to mitigate any claimed damages.

**RESPONSE:**

As PowerPlan's anticompetitive and tortious actions are still ongoing, Lucasys must continue to pursue various ways of mitigating damages. Lucasys states that, to date, it sent PowerPlan two cease-and-desist letters to stop PowerPlan's threatening and tortious acts against it and took various steps to resolve the issues without litigation. Lucasys further shifted its focus from software sales opportunities to consulting services, ensuring said customers could continue to be serviced and that Lucasys could continue to earn some revenue, although not nearly as much as it would have in the absence of PowerPlan's anticompetitive conduct.

This 17th day of November, 2021.

<div style="margin-left: 40%;">

*/s/ Jason S. Alloy*
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Jason S. Alloy
Georgia Bar No. 013188
jalloy@robbinsfirm.com
Joshua A. Mayes
Georgia Bar No. 143107
jmayes@robbinsfirm.com
Evan C. Dunn
Georgia Bar No. 535202

</div>

edunn@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, GA 30318
(678) 701-9381
(404) 856-3255 (fax)

Aaron Gott (admitted *pro hac vice*)
aaron.gott@bonalawpc.com
BONA LAW PC
331 2nd Avenue South #420
Minneapolis, MN 55401
(612) 284-5001

Jarod Bona (admitted *pro hac vice*)
jarod.bona@bonalawpc.com
Jon Cieslak (admitted *pro hac vice*)
jon.cieslak@bonalawpc.com
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
(858) 964-2301 (fax)

*Counsel for Plaintiff Lucasys Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served by U.S. Mail the foregoing

**PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST**

**CONTINUING INTERROGATORIES** to counsel of record as follows:

Petrina A. McDaniel
Petrina.mcdaniel@squirepb.com
Squire Patton Boggs (US) LLP
1230 Peachtree St., NE, Suite 1700
Atlanta, GA 30309

Damond R. Mace
Damond.mace@squirepb.com
Stephen M. Fazio
Stephen.fazio@squirepb.com
Squire Patton Boggs (US) LLP
4900 Key Tower
127 Public Square
Cleveland, OH 44114

This 17th day of November, 2021.

*/s/ Jason S. Alloy*
Jason S. Alloy

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the answers contained within the foregoing **PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST INTERROGATORIES** are true and correct to the best of my knowledge, information, and belief.

Vadim Lantukh
on behalf of Lucasys Inc.

This 16ᵗʰ day of November, 2021.