

# Transcript of **Jim Dahlby**

### Friday, August 5, 2022

### *Lucasys Inc. v. Powerplan, Inc.*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 117898

```
 1              IN THE COURT OF UNITED STATES DISTRICT COURT

 2                FOR THE NORTHERN DISTRICT OF GEORGIA

 3                        ATLANTA DIVISION

 4                        STATE OF GEORGIA

 5

 6   LUCASYS INC.,                )
                                  )
 7        PLAINTIFF,              )
     vs.                          )   CASE NO.  1:20-cv-2987-AT
 8                                )
     POWERPLAN, INC.,             )
 9                                )
          DEFENDANT.              )
10

11                        * * * * * * *

12       The following deposition of JIM DAHLBY, was taken pursuant

13   to stipulations contained herein, the reading and signing of

14   the deposition reserved before Collette Jackson, Certified

15   Court Reporter in the State of Georgia, on August 5, 2022, at

16   Robbins Alloy Belinfante Littlefield, LLC, 500 14th Street, NW,

17   Atlanta,Georgia 30318 at 9:30 a.m.

18

19

20

21

22

23

24

25
```

TP.One

```
 1                  A P P E A R A N C E S

 2

 3    ON B EHALF OF THE PLAINTIFF:

 4         JOSHUA A. MAYES, ESQ.
           ROBBINS ALLOY BELINFANTE LITTLEFIELD, LLC
 5              500 14TH STREET, NW
                ATLANTA, GEORGIA 30318
 6              678-701-9381
                jmayes@robbinsfirm.com
 7

 8

 9    ON BEHALF OF THE DEFENDANT:

10         STEPHEN M FAZIO, ESQ.
           SQUIRE PATTON BOGGS,LLP
11              4900 KEY TOWER
                127 PUBLIC SQUARE
12              CLEVELAND, OHIO 44114
                216-479-8403
13              stephen.fazio@squirepb.com

14

15

16         ALSO PRESENT:

17         SUMMER MENKEE, VIDEOGRAPHER

18

19

20

21

22

23

24

25
```

```
 1                     I N D E X

 2    DEPONENT

 3    JIM DAHLBY                                    PAGE

 4

 5    CROSS-EXAMINATION BY JOSHUA A. MAYES, ESQ........7-216

 6    DIRECT EXAMINATION BY STEPHEN FAZIO, ESQ.......216-231

 7    RECROSS-EXAMINATION BY JOSHUA A. MAYES, ESQ....231-238

 8    DISCLOSURE .......................................239

 9    CERTIFICATE ......................................240

10    ERRATA SHEET......................................241

11

12                      * * * * *

13                    E X H I B I T S

14

15    EXHIBIT IDENTIFIED      DESCRIPTION       PAGE MARKED

16    P-188                  DOCUMENT              15

17    P-189                  EMAIL                 19

18    P-190                  EMAIL FROM JAMIE CARR  38

19    P-191                  EMAIL                 40

20    P-192                  EMAIL                 45

21    p-193                  EMAIL                 47

22    P-194                  EMAIL FROM JOHN ERICKSON  48

23    P-195                  EMAIL                 52

24    P-196                  LETTER                58

25    P-197                  LETTER                64
```

| 1 | P-198 | EMAIL | 68 |
| 2 | P-199 | DOCUMENT | 73 |
| 3 | P-200 | DOCUMENT | 73 |
| 4 | P-201 | EMAIL | 76 |
| 5 | P-202 | PRINT OUT FROM THE | 92 |
| 6 | | WAYBACK MACHINE OF | |
| 7 | | POWERPLAN'S WEBSITE | |
| 8 | P-203 | LETTER | 94 |
| 9 | P-204 | EMAIL | 95 |
| 10 | P-205 | EMAIL | 97 |
| 11 | P-206 | DOCUMENT | 98 |
| 12 | P-207 | DOCUMENT | 100 |
| 13 | P-208 | IP PROTECTION LETTER | 101 |
| 14 | P-209 | EMAIL | 102 |
| 15 | P-210 | DOCUMENT | 105 |
| 16 | P-211 | EMAIL | 109 |
| 17 | P-212 | LETTER TO AEP | 110 |
| 18 | P-213 | DOCUMENT | 111 |
| 19 | P-214 | EXCERPT FROM PRIVILEGE | 118 |
| 20 | | LOG | |
| 21 | P-215 | INTERROGATORIES RESPONSE | 119 |
| 22 | P-216 | DOCUMENT | 119 |
| 23 | P-217 | DOCUMENT | 119 |
| 24 | P-218 | EMAIL | 120 |
| 25 | P-219 | DOCUMENT | 120 |

| 1 | P-220 | DOCUMENT | 129 |
| 2 | P-221 | EMAIL | 148 |
| 3 | P-222 | DOCUMENT | 152 |
| 4 | P-223 | DOCUMENT | 161 |
| 5 | P-224 | EMAIL | 166 |
| 6 | P-225 | EMAIL | 177 |
| 7 | P-226 | AGREEMENT FROM RCC | 181 |
| 8 | P-227 | EMAIL | 186 |
| 9 | P-228 | DOCUMENT | 189 |
| 10 | P-229 | DOCUMENT | 194 |
| 11 | P-230 | EMAIL | 198 |
| 12 | P-231 | EMAIL | 199 |
| 13 | P-232 | EMAIL | 232 |
| 14 | P-233 | EMAIL | 234 |

15

16

17

18

19

20

21

22

23

24

25

TP One

```
 1                 P R O C E E D I N G S

 2           VIDEOGRAPHER:  -- at 9:35 a.m. on August 5th, 2022.

 3      This begins the videotaped deposition of Dahlby taken in

 4      the matter of Lucasys, Incorporated versus PowerPlan,

 5      Incorporated, Case No. 1:20-CV-2987-AT.  This deposition

 6      is being taken at Robbins Alloy Belinfante Littlefield in

 7      Atlanta, Georgia, at the request of Robbins Alloy.

 8      Counsel, will all parties present please state their names

 9      and whom they represent?

10           MR. MAYES:  Joshua Mayes representing Lucasys, and

11      also here is Jason Alloy representing Lucasys.

12           MR. FAZIO:  Steve Fazio with Squire Patton Boggs US,

13      LLP, on behalf of PowerPlan.

14           COURT REPORTER:  Mr. Dahlby, will you raise your

15      right hand?

16           THE WITNESS:  (Witness complies.)

17           COURT REPORTER:  Do you solemnly swear or affirm that

18      the testimony that you're about to give will be the truth,

19      the whole truth, and nothing but the truth?  If so, say I

20      do.

21           THE WITNESS:  I do.

22  Whereupon,

23                         JIM DAHLBY

24       after being first duly sworn, testified as follows:

25                 C R O S S - E X A M I N A T I O N
```

BY MR. MAYES:

    Q.    Good morning, Mr. Dahlby.    Could you state your name
for the record?

    A.    Jim Dahlby.

    Q.    Mr. Dahlby, have you ever had your deposition taken
before?

    A.    Car accident over the phone only, so --

    Q.    Okay.    How long ago was that?

    A.    Probably at least 15 years ago.

    Q.    Okay.    I'm going to cover just the ground rules real
quick to remind you of the process.    We -- as you can tell,
we've got a court reporter here but no judge.    She is going to
be taking down a transcript of everything we say.    So in
natural conversation, it can be -- you can see where I'm going
with a question and just jump in to give an answer.    Please try
not to do that today.    So that she can take everything down,
let me finish my question, take a little breath, and then give
an answer.    Okay?

    A.    Okay.

    Q.    Thank you.    And along those lines, we need oral
responses.    You can't shake your head or say "uh-huh" and
"uh-uh" because that makes for a difficult transcript.    Okay?

    A.    Okay.

    Q.    Please don't guess or speculate unless I ask you to
do that or you tell me that's what you're doing.    Okay?

```
 1        A.    Okay.

 2        Q.    Otherwise, I'm just going to assume what you're

 3   telling me as an answer is something you actually remember and

 4   know from your firsthand experience.   Okay?

 5        A.    Okay.

 6        Q.    Is there any reason you couldn't give accurate

 7   answers today?

 8        A.    No.

 9        Q.    Are you on any drugs, alcohol, or medication that

10   would impair your ability to testify?

11        A.    No.

12        Q.    Do you have any health conditions that would impair

13   your ability to testify accurately?

14        A.    No.

15        Q.    What is your address?

16        A.    Business address or home address?

17        Q.    Both?

18        A.    Business address is 300 Parkwood -- or Galleria

19   Drive, Suite 2100, Atlanta, Georgia 30339.   And my home address

20   is 3291 Georgetown Bluff, Marietta, Georgia 30066.

21        Q.    Do you have a work phone number?

22        A.    (770)937-3002.

23        Q.    When did you graduate high school?

24        A.    1997.

25        Q.    And what did you do after high school?
```

1       A.   I attended Georgia Tech.

2       Q.   Did you get a degree?

3       A.   I did.

4       Q.   What was your degree in?

5       A.   Industrial engineering.

6       Q.   Do you have any further education after your

7   bachelor's degree?

8       A.   I received an MBA.  I graduated last year.

9       Q.   Where was that from?

10      A.   Northwestern University.

11      Q.   Do you have any professional certifications or

12   licenses?

13      A.   I do not.

14      Q.   After you graduated Georgia Tech, what was your first

15   job?

16      A.   PowerPlan.

17      Q.   Have you worked at PowerPlan continuously since that

18   time?

19      A.   I have.

20      Q.   Was that in June 2001 when you started at PowerPlan?

21      A.   That's correct.

22      Q.   Okay.  What was your first role at PowerPlan?

23      A.   I was a consultant.

24      Q.   Describe for me what your day-to-day activities were

25   in that job as a consultant.

TP.One

 1      A.    So I was assigned at customer project -- or on

 2   multiple customer projects, and I would assist the customer

 3   with implementing the PowerPlan software.  So that would

 4   involve working with them on their data, their business

 5   requirements, and then how -- how to best configure or set up

 6   and implement PowerPlan software.

 7      Q.    Did you ever work with Vadim Lantukh when you were at

 8   PowerPlan?

 9      A.    We did not directly work together, but we were

10   engaged in conversations from time to time.

11      Q.    Do you know what his role was when he was there?

12      A.    He was a tax consultant.

13      Q.    Did you do work similar to the work Mr. Lantukh did

14   in your role as a consultant for PowerPlan?

15      A.    I did.

16      Q.    Okay.  How did your responsibilities or roles evolve

17   over time at PowerPlan?

18      A.    So at -- over time I became responsible for some

19   product areas of the product, and then I moved into an industry

20   role within our sales organization, and then sales leader,

21   customer success leader, then a strategy -- growth strategy

22   role, and then most recently I'm now the SVP of customer

23   support and success.

24      Q.    Let's talk about the job you had immediately before

25   this when you were Vice President of Growth Strategy.  What did

1   you do when you were Vice President of Growth Strategy?

2        A.    So I was engaged in three teams on implementation

3   strategy, industry strategy, and alliances.

4        Q.    And what were your day-to-day tasks?  What kind of

5   day-to-day tasks would you do in that role?

6        A.    They varied from engaging with customers on a

7   particular implementation question or working with our industry

8   team on maybe an industry conference, or we have an alliances

9   group that would work with third parties (unintelligible).

10       Q.    Were you responsible for identifying competitive

11  threats in that role?

12       A.    I was not.

13       Q.    Was someone else responsible for that?

14       A.    I don't believe anyone had a direct responsibility

15  for that individually.

16       Q.    Okay.  What is your role now?

17       A.    So I lead the customer success, customer support,

18  (unintelligible) services, and services operations teams.

19       Q.    So what does your day-to-day job consist of now and

20  how did it change from your last role as, you know, Vice

21  President of Growth Strategy?

22       A.    I mean, so the teams provide different aspects for

23  the business, so -- but typically we'll have the leaders of my

24  teams and the individuals on the teams.  It may involve working

25  with customers.  It may involve, you know, working with our

1    executive team on various activities across the business and

2    how our team interacts -- or my four teams interact with other

3    teams inside the business.

4        Q.    Is one of your teams the services team -- the

5    professional services team?

6        A.    It is not.

7        Q.    Okay.  Have you ever had responsibility for leading

8    the customer services team?

9        A.    Well, so clarify.

10       Q.    Sorry.  The professional services team?  Yeah, I

11   misspoke.  Thank you.

12       A.    So I was -- prior to 2010, I would have had a

13   leadership role in professional services, but I haven't had a

14   professional services leadership role since then.

15       Q.    Okay.

16       A.    We didn't call it professional services at the time,

17   but --

18       Q.    What did you call it at the time?

19       A.    Consultants.

20       Q.    Okay.  Do you know Brett Burts (ph)?

21       A.    I do.

22       Q.    Do you know why he left PowerPlan?

23       A.    I do not.

24       Q.    Do you know what he is doing now?

25       A.    I do not.

1      Q.    Have you kept in touch with him since he left

2   PowerPlan?

3      A.    We spoke once briefly.  He asked for -- if I knew a

4   particular person he was looking to get an introduction to, and

5   I did not, so --

6      Q.    Okay.  Do you know Jamie Carr (ph)?

7      A.    I do.

8      Q.    ██████████████████████████████████████████████

9      A.    ████████████████████████████████████

10     Q.    ████████████████

11     A.    ████████████████████  ████████████████  ████████████

12   ██████████████████████████████████████████████████████████████

13   ████████████████████████████████████

14     Q.    Have you had kept in contact with him since he left

15   PowerPlan?

16     A.    The last contact I had, I was assisting him in

17   getting his last expense report paid through our accounts

18   payable process, but I have not spoken to him since then.

19     Q.    Okay.  Do you know Drea Terete (ph)?

20     A.    I do.

21     Q.    Do you know why she left PowerPlan?

22     A.    I do not.

23     Q.    Have you kept in touch with her since she left

24   PowerPlan?

25     A.    I have not.

```
 1        Q.    Do you know Jim Duffy (ph)?

 2        A.    I do.

 3        Q.    Do you know why he left PowerPlan?

 4        A.    I do not.

 5        Q.    Have you kept in touch with him since he left

 6   PowerPlan?

 7        A.    We've exchanged a couple of text messages.

 8        Q.    Have you had any discussions with him since he left

 9   PowerPlan about Lucasys?

10        A.    I have not.

11        Q.    How about about this case?

12        A.    I have not.

13        Q.    Do you know what Drea Terete is doing now?

14        A.    I believe she is leading marketing for a company out

15   of Alabama.  I don't know the company's name.

16        Q.    Okay.

17        A.    Or I don't remember it.

18        Q.    Do you know Yost Routon (ph)?

19        A.    I do.

20        Q.    Do you know why he left PowerPlan?

21        A.    I do not.

22        Q.    Do you know what he is doing now?

23        A.    He is leading finance for a software company in

24   Alpharetta.

25        Q.    Have you kept in touch with him since he left
```

 1  PowerPlan?

 2      A.   A couple of just casual text messages.

 3      Q.   Do any of those relate to this case?

 4      A.   No, nothing related to the case.

 5      Q.   How about to Lucasys?

 6      A.   No.

 7      Q.   Are you aware of anyone else who was in executive

 8  leadership at PowerPlan other than the people I just named who

 9  have left in recent years?

10      A.   No.

11    (Plaintiff's Exhibit No. 188 was marked and identified.)

12  BY MR. MAYES:   (Resuming)

13      Q.   Okay.  Mr. Dahlby, I'm handing you Exhibit 188.  Take

14  a look at that and tell me if you've seen that before.

15      A.   I have not.

16      Q.   Okay.  Do you know -- understand that you're

17  appearing here to testify pursuant to a notice of deposition

18  and that you were requested to appear to testify by Lucasys?

19      A.   Yes.  That was communicated by our legal counsel.

20      Q.   Okay.  Tell me what you did to prepare for today's

21  deposition.

22      A.   Steve and I met yesterday and he showed me a handful

23  of documents.  He kind of explained kind of what the process

24  was going to be like.

25          MR. FAZIO:  Don't get into any of our communications.

1                MR. MAYES:   Yeah, I was going to say the same.

2                MR. FAZIO:   He's not asking you about any

3        communications we've had.

4    BY MR. MAYES:   (Resuming)

5        Q.   So aside from your discussions with Mr. Fazio or any

6    other legal counsel for PowerPlan, have you discussed your

7    deposition with anyone else?

8        A.   No.

9        Q.   Have you read any deposition transcripts from this

10   case?

11       A.   I reviewed Mr. Burts' deposition just briefly to

12   understand kind of the types of questions and flow of the

13   conversation.  I didn't study or read the document.

14       Q.   Okay.  Any others?

15       A.   That's it.

16       Q.   Are you aware that Lucasys sent requests for the

17   production of documents to PowerPlan in this case?

18       A.   I'm aware, yes.

19       Q.   Were you involved in any way in the effort to collect

20   documents responsive to those?

21       A.   I believe that was requested on if I had a particular

22   pricing file, which I did not, so --

23       Q.   Okay.  And I guess you weren't -- you weren't one of

24   the people at PowerPlan who was tasked with, hey, go find where

25   these documents are located?

1        A.    I was not.

2        Q.    Okay.  Are you familiar with a company called

3   Accufile?

4        A.    I believe that was a product, but I'm not sure if

5   that was the company.  I believe --

6        Q.    Okay.  Were you familiar with the Accufile product?

7        A.    Not -- I mean, I knew it existed, but I was not

8   familiar with the product itself.

9        Q.    Okay.  In your role as a consultant, did you ever

10  convert PowerPlan customers from Accufile to PowerPlan?

11       A.    I did not.

12       Q.    Okay.  Did you have any involvement in the --

13  PowerPlan's purchase of Accufile from another company?

14       A.    I was not involved in that process.

15       Q.    Do you know anything at all about the acquisition of

16  Accufile?

17       A.    I mean, once it was completed, I mean, obviously we

18  had several team members join our team from -- I believe it was

19  -- Information Intellect was the company.  But -- but I wasn't

20  involved in the negotiations or don't have any information

21  about the process or anything like that of how that came to be.

22       Q.    Okay.  Do you know who was involved from PowerPlan?

23       A.    I believe it was primarily led by Pat Pelling (ph).

24  I don't know who else from PowerPlan was involved.

25       Q.    Have you ever heard the phrase plant follows tax used

1    at PowerPlan?

2          A.    Yes.

3          Q.    What does that mean?

4          A.    So it's the idea that a customer who has a tax

5    product from PowerPlan may be interested in also implementing

6    our plant product, which is -- refers to our fixed asset

7    project accounting kind of umbrella of products.

8          Q.    Is there a reason why customers would adopt a tax

9    product before a plant product?

10         A.    I mean, many customers have implemented both at the

11   same time, and some customers have implemented a tax product

12   first.   It kind of depends on their business needs or

13   requirements.   In some cases, the tax leader maybe has a more

14   urgent need and the project implement PowerTax was smaller than

15   implementing a larger number of products that we would call the

16   umbrella plant.

17         Q.    Did PowerPlan offer a lower price point for PowerTax

18   in order to get its foot in the door and have utilities?

19               MR. FAZIO:   Objection to form and foundation.

20               THE WITNESS:   I don't believe that the price point of

21         PowerTax was based on the -- trying to get the foot in the

22         door.   It was definitely based on the particular value

23         that the product would compel to customers.

24   BY MR. MAYES:   (Resuming)

25         Q.    Okay.   PowerTax was priced lower than the plant

```
 1   modules; is that true?

 2       A.   I mean, we have a large array of products and they're

 3   kind of each priced based on market -- market conditions and

 4   market value of those solutions.  So as a matter of fact, yes,

 5   the PowerTax product is priced at a lower price point than the

 6   -- all of the multiple products.  So typically a plant

 7   implementation would involve, you know, at least three or four

 8   products, maybe more, depending on the scope of the project.

 9       (Plaintiff's Exhibit No. 189 was marked and identified.)

10   BY MR. MAYES:   (Resuming)

11       Q.   Mr. Dahlby, I'm handing you Exhibit 189.  Take a look

12   at that and tell me if you've seen that before.

13       A.   The -- it's an e-mail that I sent, so I would have

14   been -- I have seen it.

15       Q.   So was it true at this time that historically tax was

16   usually at ███ and plant was ███?  I think that that's

17   ███████.

18       A.   Yes.  The ████ would be ████████, so -- yeah, so this

19   would have been, you know, legacy pricing from a historical.

20   Yes, that was the relative relationship and pricing.

21       Q.   Okay.  And then, the next paragraph says, "In

22   addition to tax value being less, there was a plant follows tax

23   approach where many customers would buy tax approved by tax VP,

24   and through the project we'd look for all the opportunities for

25   better data and use tax to help sell plant."  Is that true?
```

1      A.    Yes.

2      Q.    That was a strategy that PowerPlan used?

3      A.    That's correct.

4      Q.    And that was a successful strategy?

5      A.    It has been, yes.

6      Q.    It would be reasonable for Lucasys to use a similar

7  strategy to break into the market, wouldn't it?

8            MR. FAZIO:   Objection to form and foundation.

9            THE WITNESS:   I'm not sure what Lucasys' strategy is.

10      So I know from the website they have a lot of products

11      that they've marketed, so I don't know that that is their

12      strategy.

13  BY MR. MAYES:   (Resuming)

14      Q.    Are you aware that a trade secret owner must take

15  reasonable steps to protect it or they forfeit legal

16  protection?

17      A.    Yes.

18      Q.    Okay.  How long have you had that understanding?

19      A.    Since joining PowerPlan is my understanding.  I mean,

20  we've talked about intellectual property in a broader sense,

21  you know, generally over -- over the years.

22      Q.    So you were aware of that legal structure in 2010?

23      A.    Yes.

24      Q.    Okay.  Were you ever given any sort of formal

25  training documents about intellectual property during your time

1    at PowerPlan?

2         A.    Not that I recall.

3         Q.    Setting aside any communications you had with counsel

4    for PowerPlan, do you recall any sort of training module where

5    this -- the steps that were needed to be taken to protect trade

6    secrets were explained to PowerPlan employees?

7         A.    I'm not 100 percent affiliated with our current

8    on-boarding training, so I'm not sure they're -- what all is

9    included in that.  I know we have -- in many of our training

10   sessions, we have, you know, slides where we walk through that

11   this is confidential information and it's protected under

12   license agreements; for instance, like when we have customer

13   training and things like that.

14        Q.    Okay.  And when -- when were slides like that first

15   used at PowerPlan as far as you know?

16        A.    I don't remember the exact time that they were

17   introduced, but it wasn't just as of recent.  It's been many --

18   over the years we've had those in there as well as obviously

19   the proprietary and confidential type of footnotes have always

20   been a standard around our documentation that we would talk to

21   employees about making sure that the documents are

22   appropriately --

23        Q.    Okay.  And I'm asking specifically about formal

24   training modules or slide decks.  Do you recall ever having one

25   of those delivered to you personally?

1      A.    I do not.

2      Q.    At any point during your 20 years at PowerPlan; is

3  that correct?

4      A.    That's correct.

5      Q.    How many people report to you?

6      A.    Around 40.  Reporting to me is four.  The overall

7  team is around 40.

8      Q.    Okay.  Have you ever delivered any formal training to

9  the four people who directly report to you about what's

10  required to protect trade secrets?

11      A.    Not in the last six months.

12      Q.    Okay.  How about ever?

13      A.    I mean, I'd say trade secrets is -- or proprietary

14  confidential information is a conversation that comes up from

15  time to time, but it wasn't a formal training.

16      Q.    Okay.  So is the answer to my question no; you don't

17  recall ever delivering formal training on what's needed to

18  protect trade secrets to any of your direct reports while you

19  worked at PowerPlan?

20      A.    Like formal training as in a scheduled training

21  session, I have not done that.

22      Q.    Okay.  Have you required the people who report to you

23  to deliver any formal training to their direct reports about

24  what's required to keep a trade secret protected?

25      A.    I personally have not, but I know we have various

1  training sessions that all new employees go through and I'm not

2  familiar with the full on-boarding training and what's included

3  in that, so --

4      Q.   Okay.  But you have never instructed your direct

5  reports to deliver formal training to their -- the employees

6  they supervise about what is required to protect trade secrets;

7  is that true?

8      A.   I have not instructed my employees to -- to deliver

9  that training.  Now, all of our customers -- I mean, all of our

10  employees have that employee handbook that includes all of our

11  guidelines and all those things that -- when they're on-boarded

12  that they go through, and there's a frequent review process.  I

13  don't remember the timing of that review, but they do

14  acknowledge those things and review those documents on a -- I

15  believe it's an annual basis or it might be a biannual basis

16  that they review the employee handbook, and that's part of our

17  kind of annual training along with other trainings, like

18  security training and other things like that.

19      Q.   And those should be written documents you're talking

20  about right now, correct?

21      A.   Yes.

22      Q.   Okay.  So PowerPlan keeps copies of those sorts of

23  documents and should be able to produce them if it has them,

24  correct?

25      A.   The -- yeah, for the employee handbook, for instance,

1    yes, I would assume that that could be produced.

2        Q.    Okay.    Other formal training programs that PowerPlan

3    has, those are also delivered through, you know, some sort of

4    slide deck or written materials; is that correct?

5        A.    Other training and also it leverages third parties.

6    Like, I believe one of them is SI Global.    I don't know of all

7    of them, but that's one example where we -- we have annual

8    training requirements that, you know, you're tracked and

9    managed on those requirements.

10        Q.    Were third parties delivering training back in 2010

11    to PowerPlan?

12        A.    Not that I recall.

13        Q.    Are you aware of RCC?

14        A.    Yes.

15        Q.    What is RCC?

16        A.    Regulated Capital Consultants; is that -- I assume

17    that's the RCC that you're speaking about.

18        Q.    Yeah, that's correct.

19        A.    They're a consultancy.    I believe they're based here

20    in Atlanta; at least they were last I was aware.    And they

21    provide services to many PowerPlan customers as well as

22    non-PowerPlan customers is my understanding.

23        Q.    Do you have an understanding of what sorts of

24    services RCC offers to PowerPlan customers?

25        A.    What we've heard from customers is they provide

1    different types of consulting.  They provide both functional as

2    well as technical consulting.  They do -- they'll do user

3    training.  They'll do -- they'll even perform system operations

4    is our understanding.  They'll take a user activity and perform

5    user activities.

6        Q.    Are you aware that RCC has historically done data

7    cleansing and remediation projects for PowerPlan customers?

8        A.    I have heard that they've done that, yes.

9        Q.    Okay.  And that would involve RCC accessing PowerPlan

10   databases, extracting the data, modifying it, and putting it

11   back into the PowerPlan databases; isn't that true?

12       A.    Yes.  That process would involve those types of

13   activities.  Obviously we're not -- the environments, if

14   they're on an on-premise customer, are controlled by the

15   customer, so what access they're provided is based on the

16   customer's process.  So whether or not they had access to the

17   database, I don't know whether the customer gave them the data

18   or -- I believe they may have -- I believe they have done that

19   in the past, so --

20       Q.    Arc-2 has also done that same thing, isn't that true?

21       A.    I believe that to be true.

22       Q.    Do you know Mike Hamby (ph)?

23       A.    I do.

24       Q.    Do you know if Mike Hamby ever had a non-disclosure

25   agreement with PowerPlan?

```
 1       A.    I believe he had a non-disclosure agreement with

 2  PowerPlan.

 3       Q.    Okay.  So if Mr. Burts said Mike Hamby refused to

 4  sign a non-disclosure agreement with PowerPlan, he would have

 5  been mistaken?

 6           MR. FAZIO:  Objection to form and foundation.

 7           THE WITNESS:  So Mike Hamby had a -- there was an

 8       updated employment agreement that we asked new employees

 9       to sign, and then old employees were asked to sign that

10       new agreement and Mike did not sign that new agreement

11       that had -- may have had different terms in it than he had

12       signed previously, but I believe he -- I believe he had a

13       non-disclosure.  I don't -- I think that his concern may

14       have been around other areas of that, like whether or not

15       he could go work for a competitor.

16  BY MR. MAYES:  (Resuming)

17       Q.    Do you know if he ever signed that updated employment

18  agreement?

19       A.    He did not.

20       Q.    Was he still kept on as an employee?

21       A.    He was.

22       Q.    Okay.  Do you know Jason Cohn (ph)?

23       A.    I do.

24       Q.    Do you know if Jason Cohn ever signed a

25  non-disclosure agreement with PowerPlan?
```

```
 1        A.   I believe he did, but I don't have a -- I don't know

 2   for a fact.

 3        Q.   Have you ever seen one?

 4        A.   I have not seen employee records like that.

 5        Q.   Okay.  If he says that he never signed a

 6   non-disclosure agreement with PowerPlan, would you have any

 7   reason to dispute that?

 8        A.   So my understanding was he was given some more

 9   documents than I was given in 2010, and my recollection is

10   there were non-disclosure requirements inside of the -- those

11   documents as it related to stock and equity grants when

12   PowerPlan was sold to JMI and TPG.  So my understanding was he

13   was granted those.  I don't -- I assumed he signed them in

14   order to receive those and I believe there were those types of

15   clauses in there.  I have not looked at the document in ten

16   years, so --

17        Q.   Did you have any sort of non-disclosure agreement

18   before that agreement you referenced in 2010?

19        A.   I did.

20        Q.   Where did those come from?

21        A.   The employee on-boarding process.

22        Q.   Do you know if Mr. Cohn had any similar

23   non-disclosure agreement prior to 2010?

24        A.   I do not.  I wasn't involved in his hiring.  He was

25   an employee when I started.
```

1       Q.    Was it your understanding that he was the owner, for

2   lack of a better word, of the PowerTax source code at PowerPlan

3   for a period o time?

4           MR. FAZIO:    Objection to form and foundation.

5           THE WITNESS:    He would have been one of the

6       developers.    I don't know if I would call him the owner

7       necessarily.    But he would have been the role -- I think

8       we called it code owner, but -- meaning like the person

9       who collected all the code for a particular product.

10  BY MR. MAYES:    (Resuming)

11      Q.    Sure.    And I don't mean own in the legal sense.    I

12  mean the person with primary responsibility for that code was

13  him; is that true?

14      A.    I'm not exactly sure between him and Pat how they

15  managed that, but he was definitely involved.

16      Q.    Okay.    And through that, he would have known the

17  architecture of the PowerTax software; isn't that true?

18      A.    Yes.

19      Q.    If Mr. Cohn said he never was told that any

20  particular aspect of the PowerTax software was a trade secret,

21  would you have any reason to dispute that?

22          MR. FAZIO:    Objection to form and foundation.

23          THE WITNESS:    I don't have -- I don't know that --

24      why he would say that of if he would have said that.    I

25      don't have a reason -- nobody would have said it that way.

1    BY MR. MAYES:   (Resuming)

2        Q.    Okay.   Just my question is just if he said that,

3    would you believe -- would you have any reason to say that's

4    not true that he said that?

5            MR. FAZIO:   Same objections.

6            THE WITNESS:   What do you mean by not?

7    BY MR. MAYES:   (Resuming)

8        Q.    Okay.   So if Mr. Cohen said, "No one ever told me

9    that any particular aspect to the PowerTax software was a trade

10   secret," would you say that's not true?

11           MR. FAZIO:   Same objections.

12           THE WITNESS:   So in general, we've talked about

13       intellectual property and it would have definitely been a

14       part of our intellectual property.   Now, the word trade

15       secret was not something that we used internally to talk

16       about the product and the different components of the

17       product.

18   BY MR. MAYES:   (Resuming)

19       Q.    When you say we had discussions about intellectual

20   property, who is we?

21       A.    So, I mean, generally like all of our contracts have

22   -- with our customers talk about intellectual property.   Just I

23   guess a generalized comment -- I guess I don't have a specific

24   conversation in mind, but just it was definitely a -- when we

25   signed contracts or when we signed SOWs, any of those things,

1    there were always standard clauses with all of those that would

2    talk about our intellectual property.

3        Q.   So aside from the clauses in the customer contracts,

4    do you recall a specific discussion with any of the PowerPlan

5    executives where they said, "Here are what our -- here is what

6    our intellectual property consists of at PowerPlan?"

7        A.   Yeah.  We've definitely talked about how our

8    intellectual property incorporates our software, our database,

9    our user guides, our manuals, our project documentation.  All

10   of those things are part of our intellectual property.

11       Q.   Okay.  And not talking about, you know, since 201,9,

12   did you have those discussions at the time Jason Cohn was

13   employed by PowerPlan?

14       A.   Yes.

15       Q.   Okay.  Who was involved in those conversations that

16   you recall?

17       A.   I mean, we've had those conversations with the people

18   on my projects that I was working on.  We've had those

19   conversations with our customers, other PowerPlan executives.

20   So John Andrews or Ken Kelly at the time would have been the

21   CEO -- CFO.

22       Q.   Were these all oral conversations or did you have any

23   written documents that set forth here is what PowerPlan's

24   intellectual property is?

25       A.   I mean, the contract didn't really have specific ways

1   that those terms are defined with a customer, and I think, you

2   know, internally we would have talked about it in a more

3   general -- in a more general way.

4       Q.   Okay.  So aside from the customer contract, is there

5   any specific document you can point to that sets forth what

6   PowerPlan considered its intellectual property in 2010, for

7   instance?

8            MR. FAZIO:  Objection to form.

9            THE WITNESS:  I don't recall a specific document from

10      12 years ago.

11  BY MR. MAYES:   (Resuming)

12      Q.   Do you recall any specific documents prior to 2019

13  that set forth PowerPlan's purported intellectual property?

14      A.   I know our employee handbook has discussions and

15  definitions around, you know, kind of your employment

16  obligations around intellectual property.  I -- I can't recall

17  the specifics of that document right now.

18      Q.   Were you ever specifically told that the names that

19  were used for column headers in PowerPlan's databases were

20  trade secrets?

21      A.   So I'm not a legal expert to define trade secret,

22  but, I mean, I think the way our database is organized,

23  including the column names and how that all fits together,

24  would be, you know, an important part of our intellectual

25  property.  Is a specific column that's named description, you

1   know, that -- obviously that's not a unique way to describe a

2   column, but the way the tables are organized and the columns

3   and how they all fit together would definitely be critical to

4   our intellectual property.

5        Q.   You knew that when Jason Cohn and others worked at

6   Arc-2 they were accessing PowerPlan databases on behalf of

7   their customers; isn't that true?

8        A.   We had heard that, yes.

9        Q.   Okay.  And Arc-2 and its employees did not have

10  non-disclosure agreements with PowerPlan at the time; isn't

11  that true?

12       A.   They would have been accessing those within a

13  customer environment, and those customers would have had

14  contracts with us that governed how they manage the

15  intellectual property.

16       Q.   Are you aware of efforts by PowerPlan to get Arc-2 to

17  execute a non-disclosure agreement in connection with its --

18  with any of its projects for customers?

19       A.   I believe there was a project several years ago where

20  they were looking to get access to project documentation and

21  our project deliverables, and we had requested that they sign a

22  non-disclosure agreement around those.  I believe it was --

23  test scripts was one of the main topics of discussion.

24       Q.   And they refused to sign that non-disclosure

25  agreement; isn't that true?

1      A.    That's my understanding that they did not sign a

2   non-disclosure agreement.

3      Q.    And despite that, PowerPlan went ahead and released

4   those scripts; isn't that true?

5      A.    With understanding from the customer that they were,

6   you know, still required under their legal contract to maintain

7   the appropriate confidentiality and manage those test scripts

8   within the confines of our current contract, yes.

9      Q.    So that was a yes; you did still release the test

10  scripts despite Arc-2 refusing to sign a non-disclosure

11  agreement?

12          MR. FAZIO:  Objection to form.

13          THE WITNESS:  So they were released, but to the

14      customer, not to Arc-2 and under the agreement of the

15      customer that those were part of the -- covered under our

16      contract.

17  BY MR. MAYES:  (Resuming)

18     Q.    Do you know Rob Jankovic (ph)?

19     A.    I know -- yes, I know Rob.

20     Q.    Did you know him when he worked at PowerPlan?

21     A.    I did.

22     Q.    If Mr. Jankovic said that he was never told that

23  anything specific about the PowerTax software was a secret -- a

24  trade secret, would you have any reason to dispute that?

25          MR. FAZIO:  Objection to form and foundation.

1        THE WITNESS:  I guess I don't know how Rob would

2    decide what was secret to his -- from his perspective, but

3    Rob would have been told about our intellectual property.

4    He would have signed an employee handbook and those sorts

5    of things that includes those definitions.

6  BY MR. MAYES:  (Resuming)

7    Q.    So aside from the -- the fact that he would have

8  received an employee handbook, is there any specific

9  conversation you know that Rob Jankovic had where someone said,

10  hey, this is something that is secret and needs to be

11  protected?

12        MR. FAZIO:  Objection to form and foundation.

13        THE WITNESS:  I did not work with Rob directly and

14    would not be aware of if that conversation did or did not

15    happen.

16  BY MR. MAYES:  (Resuming)

17    Q.    You wouldn't have any reason to say he's lying if he

18  says that, right, or he's wrong?

19        MR. FAZIO:  Objection to form and foundation.

20        THE WITNESS:  I don't believe he would be lying.  I

21    think it may be a question of the definition of what was

22    asked and what he was being asked to discuss.

23  BY MR. MAYES:  (Resuming)

24    Q.    Are you aware of demand letters being sent to RCC in

25  2010?

1       A.   I am not.

2       Q.   Did you know John Williams when he worked at

3  PowerPlan?

4       A.   I did.

5       Q.   Did you work with him?

6       A.   Not for him or -- I was not -- I did not manage him,

7  but we worked on projects together at times.

8       Q.   You were not aware at the time in 2010 of any threats

9  being made to RCC or Mr. Williams?

10      A.   I was not.

11      Q.   Okay.  As far as you know, did PowerPlan ever file

12  any lawsuits to prevent RCC from accessing PowerPlan databases?

13      A.   I'm not aware.

14      Q.   Prior to 2020, are you aware of any agreements

15  between RCC and PowerPlan?

16      A.   No.

17      Q.   Aside from what's written in the customer contracts,

18  in your dealings with customers have you ever taken steps to

19  educate customers about what specifically constitutes

20  PowerPlan's intellectual property?

21      A.   Can you repeat the question?

22      Q.   Sure.  Aside from what's written in the customer

23  contracts, have you taken any efforts to educate PowerPlan

24  customers about what specifically PowerPlan considers its

25  intellectual property?

1      A.    I recall it coming up on customer conversations, but

2   not a formal training of any -- that I'm aware.

3      Q.    When is the first time you recall that coming up

4   during customer conversations?

5      A.    It was a long time ago.  I don't have a --

6      Q.    Can you name any specific customer with whom you've

7   had those conversations?

8      A.    I would have had those conversations with Duke

9   Energy.  It would have been in like 2006 to 2008.

10     Q.    What do you remember about those conversations?

11     A.    Just discussing the -- you know, the documents and

12  things we were producing for the project that were covered

13  under our license agreement.

14     Q.    What was that project?

15     A.    It was an implementation of PowerPlan.

16     Q.    So what specifically did you identify for Duke Energy

17  as intellectual property that was covered by the licensing

18  agreement?

19     A.    I don't recall the specifics of that.  I believe we

20  were talking about -- I remember talking about project

21  documents, but not -- that was the -- it was specific to the

22  project documents we were talking about.

23     Q.    Okay.  Do you recall any similar discussions with any

24  other customers?

25     A.    I do not.

1    Q.    Aside from the list of trade secrets that was

2    produced in this case or for this case in response to the

3    judge's order, are you aware of any similar document that sets

4    forth PowerPlan's trade secrets?

5    A.    That's the only document I'm aware of that was

6    produced for this case, but -- so --

7    Q.    Okay.  So prior to that, had you ever seen at

8    PowerPlan a list of what PowerPlan considered its trade

9    secrets?

10   A.    So in general, we talked about our intellectual

11   property which incorporates trade secrets, but we have not, I

12   would say, described what is a trade secret with legal advice

13   versus what is -- and put together an inventory.

14   Q.    Okay.  So that is a no; you do not.  You never saw a

15   document that was a list of trade secrets prior to the one that

16   was produced for this case; is that true?

17   A.    That is true.

18   Q.    It's true that PowerPlan historically would host some

19   of its source code on customer machines; is that true?

20        MR. FAZIO:  Objection to form.

21        THE WITNESS:  Can you repeat the question?

22   BY MR. MAYES:  (Resuming)

23   Q.    Sure.  Historically, it's true that PowerPlan would

24   allow customers to host the source code on their machines?

25   A.    Some of our customer agreements incorporate the

1    requirement for us to provide source code to those customers so

2    that our customers will have our source code.

3        Q.    And that was true -- like pursuant to their

4    contracts, they had the ability -- PowerPlan had to give them

5    copies of the source code; is that true?

6        A.    Correct.

7        Q.    Was that the base code, too, or just custom code?

8        A.    The base code as well.    It was required per the

9    contract.

10       Q.    When did you first become aware of Lucasys?

11       A.    When they posted a LinkedIn announcement that they

12   were formed as a business and that they were selling software.

13       Q.    Do you know what year that was?

14       A.    I believe it was 2018, but I don't recall the

15   specific time or date that that occurred.

16   (Plaintiff's Exhibit No. 190 was marked and identified.)

17   BY MR. MAYES:    (Resuming)

18       Q.    Mr. Dahlby, I'm handing you Exhibit 190.    Take a look

19   at that and tell me if you've seen that before.

20       A.    Yes, I've seen this.

21       Q.    Was this around the time when you first learned of

22   Lucasys?

23       A.    Yes.    It would have been in 2018.

24       Q.    If you look down at the bottom of the first page,

25   there's an e-mail from Jamie Carr to you and others; do you see

1    that?

2         A.    Yes.

3         Q.    That says this is from Vadim's new company.  The

4    final sentence of that says spelling is a bit of an issue, but

5    the tool would be competitive to us; do you see that?

6         A.    Yes.

7         Q.    Was it your understanding that the ARAM calc tool

8    that he was describing would have been competitive to PowerPlan

9    software?

10        A.    I guess from a contacts perspective, I don't know if

11   he was talking about this tool specifically or just in general

12   what Lucasys was promoting on their website.

13        Q.    Okay.  Well, the e-mail says, "Interesting tool.

14   Spelling is a bit of an issue, but the tool would be

15   competitive to us."  Isn't that true?

16        A.    That's what the e-mail states.

17        Q.    Okay.  And so my question is, do you agree with him

18   that that tool would have been competitive to PowerPlan?

19        A.    The -- that individual tool, I mean, it would

20   potentially be competitive to PowerPlan.

21        Q.    Okay.  As far as you know, did PowerPlan take any

22   steps at this time in 2018 to identify the seriousness of any

23   threat posed by Lucasys?

24             MR. FAZIO:  Objection to form.

25             THE WITNESS:  The only thing I'm aware of is looking

1        at what publicly available information was -- was

2        available on their website.

3    BY MR. MAYES:   (Resuming)

4        Q.   Okay.  Anything else?

5        A.   Not that I'm aware.

6        Q.   At some point, did you become aware that there was a

7    potential competitor to PowerPlan's planned tax -- sorry,

8    excuse me -- tax fixed asset product from Lucasys?

9        A.   Yes.  I mean, that was one of the products listed on

10    their website.

11        Q.   Okay.  When did you first become aware of that?

12        A.   I don't recall the specific dates.

13    (Plaintiff's Exhibit No. 191 was marked and identified.)

14    BY MR. MAYES:   (Resuming)

15        Q.   Okay.  Mr. Dahlby, I'm handing you Exhibit 191, and a

16    copy for your counsel.  Actually, can I have that back?  I

17    think I gave you the one I wrote on.  Thanks.

18             Now, I've handed you a clean copy of Exhibit 191.

19    Take a look at that and tell me if you've seen that before.

20    You're welcome to read as much or as little of it as you want,

21    but I'm only going to ask you questions about the first two

22    pages which are kind of a thread unto their own, but take your

23    time.

24        A.   Okay.  Yeah.  No, I'm just trying to understand where

25    the conversation was started.

1      Q.    Sure.

2      A.    Okay.  I've reviewed the document.

3      Q.    Okay.  You received this e-mail thread in 2019; is

4    that correct?

5      A.    I did.

6      Q.    Did you read it at the time?

7      A.    I would have, yes, read it.

8      Q.    Okay.  I want to start with the e-mail -- it's from

9    Michael Bradley on May 22nd at 10:29.

10     A.    Okay.

11     Q.    That includes a link to Lucasys' website; is that

12   correct?

13     A.    It does.

14     Q.    Would you have followed that link to see what Lucasys

15   was offering around this time?

16     A.    I would have.

17     Q.    Okay.  Was it your understanding -- he says, "It

18   certainly makes an intrusion on our space."  Do you see that?

19     A.    Yes, I see that.

20     Q.    Was that your assessment as well when you looked at

21   the Lucasys website?

22            MR. FAZIO:  Objection to form --

23            THE WITNESS:  I guess --

24            MR. FAZIO:  -- and foundation.  Go ahead.

25            THE WITNESS:  I mean, it was clear that there was --

1           they had a competitive product that they were looking to

2           compete with us with.  So I think the word intrusion is

3           maybe not how I would phrase it, but, I mean, definitely a

4           competitive product was -- was what it appeared from their

5           marketing materials.

6    BY MR. MAYES:  (Resuming)

7        Q.   Okay.  The next e-mail in this string is from Collin

8    Curier (ph) at 11:20; do you see that?

9        A.   Yes.

10       Q.   Was AEP -- it references AEP.  Do you know what AEP

11   is?

12       A.   That's an acronym for American Electric Power.

13       Q.   And this says, "Kevin Keller and Linda at AEP have a

14   meeting set up with Lucasys about an SOW."  Do you see that?

15       A.   Yes.

16       Q.   Was this the first you learned that Lucasys was

17   potentially going to be selling software to AEP?

18           MR. FAZIO:  Objection to form and foundation.

19           THE WITNESS:  I mean, I -- this isn't clear if they

20       were selling software or not, but that was -- you know,

21       being aware that they were discussing a statement of work

22       or SOW, yes.

23   BY MR. MAYES:  (Resuming)

24       Q.   Okay.  And so the next sentence says, "So the

25   competition is real."  Do you see that?

1        A.    Yes.

2        Q.    Did PowerPlan take this seriously when they learned

3   of potential competition at AEP?

4            MR. FAZIO:   Objection to form.

5            THE WITNESS:   I mean, in general PowerPlan looks to

6        compete when -- and, you know, we want to win, so yes, we

7        would have wanted to understand the competition to the

8        extent possible.

9   BY MR. MAYES:   (Resuming)

10       Q.    Mr. Bradley says here, "Vadim is formidable and we

11  shouldn't underestimate him."  Did you share that assessment of

12  Mr. Lantukh?

13       A.    Vadim definitely has a deep knowledge.  He had worked

14  exclusively in the PowerTax product for many, many years, so he

15  was definitely very knowledgeable.  I did not work with him

16  directly, so I don't have the same level of knowledge of Vadim

17  that Michael would have, but he definitely was a very

18  knowledgeable person in the area.

19       Q.    Did Mr. Bradley work directly with Mr. Lantukh?

20       A.    He would have.

21       Q.    If you look up to -- go back to the first page of

22  Exhibit 191, there is an e-mail from Matt Crye (ph) to Paul

23  Chris (ph) and John Erickson (ph).  Do you see that?

24       A.    Yes.

25       Q.    Is says, "Rumor is that Lucasys has a TFA solution

1    ready to go."  Do you see that?

2         A.    Yes.

3         Q.    What did you understand the TFA to refer to?

4         A.    Tax fixed assets is that -- what PowerPlan uses that

5    acronym to mean.

6         Q.    Okay.  The next sentence says, "We've known about

7    Lucasys for at least a year, so having TFA by now would make

8    sense."  Do you see that?

9         A.    Yes.

10        Q.    Do you -- did you agree with Mr. Crye's assessment

11   that having -- Lucasys having been around for at least a year

12   would have given them time to develop a tax fixed asset

13   solution?

14        A.    It was definitely possible.  I don't think we had a

15   -- we didn't know what resources he had and how he was going

16   about developing a product, but --

17        Q.    Did Mr. Crye work with Mr. Lantukh when he was at

18   PowerPlan?

19        A.    He would have had a similar relationship that I had

20   with Vadim.

21        Q.    Do you know what the basis is for his next statement

22   which is, "Vadim is extremely knowledgeable on the business

23   problem?"

24        A.    No.  I would have to make an assumption about that,

25   but --

1    Q.    What do you think he meant by -- or what was your

2    understanding at the time you read this of the business

3    problem?

4    A.    The tax fixed assets is how I would have interpreted

5    this when I read the e-mail.

6    Q.    Meaning like what the customers need from a tax fixed

7    asset software solution?

8    A.    Yes.

9    (Plaintiff's Exhibit No. 192 was marked and identified.)

10   BY MR. MAYES:   (Resuming)

11   Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 192.  Take

12   a look at that and tell me if you've seen that before.

13   A.    It's an e-mail that I would have received, yes.

14   Q.    Okay.  Did you read this e-mail when you received it?

15   A.    I did.

16   Q.    So the e-mail from Jamie Carr, do you know if this

17   was sent to more than just you?

18   A.    I believe it was sent to just me.

19   Q.    Okay.  "Brett asked me several months ago if he

20   should be concerned about Lucasys.  I said yes.  My answer

21   remains yes, and considering how many people he has added

22   recently, I'm even more concerned."  Do you see that?

23   A.    Yes.

24   Q.    Did you agree with Mr. Carr that PowerPlan should be

25   concerned about Lucasys?

1        A.    I did.

2        Q.    Okay.  Do you know -- this LinkedIn link above that

3    paragraph, do you know whose LinkedIn page that was?

4        A.    I mean, based on the link it appears to be a

5    gentleman name Vu Nguyen (ph).

6        Q.    Did you know Mr. Nguyen when he worked at PowerPlan?

7        A.    I did.

8        Q.    What was his role at PowerPlan?

9        A.    He was a consultant.

10       Q.    Did he work in the tax base?

11       A.    He did not.

12       Q.    Did this -- seeing that Mr. Lantukh had added

13   Mr. Nguyen to the team give you concern that Lucasys' strategy

14   was the plant follows tax strategy?

15            MR. FAZIO:   Objection to form and foundation.

16            THE WITNESS:  The -- not related to this e-mail, but

17       their website included -- at the time included solutions

18       for accounting as well as tax.

19   BY MR. MAYES:   (Resuming)

20       Q.    Do you recall if there was a competitive RFP put out

21   by AEP in the summer of 2019?

22       A.    I'm aware that there was an RFP, yes.

23       Q.    Did PowerPlan put in a bid for that RFP?

24       A.    We did.

25       Q.    Was PowerPlan concerned that Lucasys might compete

1  for that RFP?

2         MR. FAZIO:  Objection to form.

3         THE WITNESS:  Yes.  I believe that was one of the

4     potential competitors for that RFP that we assumed was --

5     would have received that RFP.

6  (Plaintiff's Exhibit No. 193 was marked and identified.)

7  BY MR. MAYES:  (Resuming)

8     Q.   Okay.  I'm handing you Exhibit 193.  Take a look at

9  that and tell me if you've seen that before.

10     A.   Yes, I've seen this before.

11     Q.   Okay.  Did you read this e-mail thread at the time

12  you received it in 2019?

13     A.   I did.

14     Q.   I want to focus on the e-mail on the first page --

15  bottom of the first page at 7:25 a.m. from Jamie Carr.  Do you

16  see that?

17     A.   Yes.

18     Q.   Okay.  It says, "Here is a draft of the AEP RFP.  The

19  official release is set for today.  You'll see it's worded very

20  generally and if Vadim actually has a product, we could be in

21  for a battle, especially if he partners with someone who has

22  tax accounting experience."  Do you see that?

23     A.   Yes.

24     Q.   Did you share Mr. Carr's concern that PowerPlan could

25  be in for a battle at AEP?

1          MR. FAZIO:  Objection to form and foundation.

2          THE WITNESS:  So my recollection of the RFP is it

3      included not only services but also software, and so that

4      was the difference than, you know, maybe prior -- prior

5      RFPs with AEP or other customers that included the

6      software and services.  So that definitely gave us a

7      reason to believe that they had built software.

8   BY MR. MAYES:  (Resuming)

9      Q.    And you thought it was particularly noteworthy that

10  the RFP did not specify PowerTax; isn't that true?

11     A.    Correct.

12     Q.    And did you interpret from that that AEP might be

13  looking to change software providers?

14     A.    Based on the RFP and the way it was worded, we

15  believe they were at least evaluating software providers.

16     Q.    In response to this AEP RFP, PowerPlan submitted a

17  deeply discounted bid; is that correct?

18         MR. FAZIO:  Objection to form and foundation.

19         THE WITNESS:  I don't recall the specifics of the

20     bid.

21     (Plaintiff's Exhibit No. 194 was marked and identified.)

22  BY MR. MAYES:  (Resuming)

23     Q.    Mr. Dahlby, I'm handing you Exhibit 194.  Take a look

24  at that and tell me if you've seen that before.

25     A.    I have.

1      Q.    This is related to the AEP bid we discussed; isn't

2   that true?

3      A.    Yes.

4      Q.    If you look at the e-mail from John Erickson at the

5   bottom of Page 1, there's a paragraph that says, "The details

6   are below, but we feel that keeping the competition out of AEP

7   is very important to our long-term success at AEP from a tax

8   perspective and have priced this services opportunity to

9   accomplish that goal." Do you see that?

10      A.    I do.

11      Q.    Okay.  The competition that this is referring to is

12   Lucasys; isn't that true?

13          MR. FAZIO:  Objection to form.

14          THE WITNESS:  I would not classify that as --

15      competition as Lucasys.

16   BY MR. MAYES:  (Resuming)

17      Q.    Okay.  You do not believe -- I mean, we just talked

18   about you believe that Lucasys was going to compete on this AEP

19   RFP; isn't that true?

20      A.    Lucasys among others were going to compete, yes.

21      Q.    Okay.

22      A.    They were not the only person that we assumed would

23   compete for this work.

24      Q.    Okay.  Take a look at the second page.  You'll see

25   that this quotes a ▮ percent discount for services; is that

1    correct?

2        A.    Yes.

3        Q.    That's a level of discount that has to -- had to be

4    approved at the time by the CEO of the company; isn't that

5    true?

6        A.    Based on the e-mail here, that's who it says the

7    approver is.

8        Q.    So in order to give a ■ percent discount, it had to

9    go all the way up to the CEO of the company; is that correct?

10       A.    I wasn't involved in the discounting process, but, I

11   mean, I -- I believe there are limits and this one appears to

12   have gone to Joe Gomes, so -- he is our CEO.

13       Q.    Okay.  Do you recall at any point prior to this

14   PowerPlan ever offering a discount on services that was so

15   large that it needed to go to the CEO for approval?

16       A.    I do.

17       Q.    Okay.  When was that?

18       A.    I don't recall.

19       Q.    Was it typical for PowerPlan to discount its services

20   by 36 percent?

21       A.    I would not describe it as typical.

22       Q.    Okay.  And when this e-mail from Mr. Erickson says

23   that they have priced this services opportunity to accomplish

24   that goal, that goal is keeping the competition out of AEP;

25   isn't that true?

1        A.   I would not say that that's -- that's the goal.  The

2   goal is to maintain our -- from a services business

3   perspective, maintaining a relationship with your customer is

4   always, you know, an important part of the services business,

5   and so that would be to maintain that services relationship

6   with the customer.

7        Q.   So when you read this sentence here that says, "The

8   details are below, but we feel that keeping the competition out

9   of AEP is very important to our long-term success at AEP from a

10  tax perspective and have priced this services opportunity to

11  accomplish that goal," you did not interpret that goal to be

12  keeping the competition out of AEP; is that true?

13       A.   I would interpret that goal to be to keep our

14  relationship and winning services with AEP.

15       Q.   Despite the 36 percent discount, PowerPlan lost this

16  RFP bid; isn't that true?

17       A.   That is accurate.

18       Q.   PowerPlan around this same time also lost a bid for

19  services work at NextEra/Florida Power & Light to Lucasys;

20  isn't that true?

21       A.   I don't recall the specifics of if it was a bid or

22  what the process was.  I'm aware that Lucasys was doing

23  services at NextEra.

24       Q.   Okay.  And there had been an RFP -- do you recall if

25  there was an RFP at Florida Power & Light for services?

1      A.    We've definitely done RFPs for Florida Power & Light.

2  I don't know if that set of specific work was an RFP or not.

3      (Plaintiff's Exhibit No. 195 was marked and identified.)

4  BY MR. MAYES:   (Resuming)

5      Q.    Okay.   Mr. Dahlby, I'm handing you Exhibit 195.   Take

6  a look at that and tell me if you've seen that before.

7      A.    I have seen this.

8      Q.    Okay.   Would you have read this e-mail at the time?

9      A.    Yes.

10      Q.    Okay.   This was around the same time as the e-mail on

11  the AEP RFP we just looked at; isn't that true, both In July of

12  2019?

13      A.    That -- yes, that appears to be the case.

14      Q.    Okay.   And this -- aside from the top e-mail, the

15  e-mails underneath are describing PowerPlan having lost an

16  opportunity at Florida Power & Light; isn't that true?

17      A.    Yes.   This is a communication from Florida Power &

18  Light indicating that they did not select PowerPlan for this

19  particular project.

20      Q.    Okay.   And their reason for doing that, at least

21  according to this e-mail from Roger Philip at 4:09 on

22  July 19th, is ultimately the team selected the lowest price

23  bidder.  Do you see that?

24      A.    Yes, I see that.

25      Q.    Okay.   You understood that Lucasys had actually won

1   that work; isn't that true?

2       A.   At this time, I don't know if I would have been aware

3   if Lucasys had won that work or not, but I believe we

4   understood Lucasys to be one of the competitors for that one.

5       Q.   Okay.  Well, can you explain to me why you said,

6   "Brett, this is the opportunity we think the Lucasys letter to

7   FPL could impact," if you did not understand Lucasys to have

8   won that work?

9           MR. FAZIO:  Objection to form.

10          THE WITNESS:  The reason I would have said that was

11      to make sure that Brett was aware that there was work that

12      potentially could have gone to Lucasys.  I don't know that

13      we were aware at the time that it had gone to Lucasys, but

14      we were aware that they were one of the --

15   BY MR. MAYES:  (Resuming)

16      Q.   What did you mean when you said the Lucasys letter to

17   FPL?

18      A.   My recollection is there was concern we had over

19   consulting work around Lucasys and our intellectual property

20   and making sure that someone who was building competing

21   software while also having access to our intellectual property

22   was -- was a concern.  I think -- I'd have to go back and look

23   at the history, but I believe we were talking about, you know,

24   how to inform our customers or how we look at making sure we're

25   protecting ourselves from that risk.

1        Q.    And so when you say, "This is the opportunity we

2   think the Lucasys letter to FPL could impact," what you were

3   telling Mr. Burts is we could win this work that we lost if we

4   can get Florida Power & Light to fire Lucasys; isn't that true?

5        A.    That is not --

6              MR. FAZIO:   Objection to form and foundation.

7              THE WITNESS:   That is not true.

8   BY MR. MAYES:   (Resuming)

9        Q.    Okay.   So that's not what you meant when you say

10   could impact this opportunity?

11              MR. FAZIO:   Objection to form.

12              THE WITNESS:   This could impact -- if Lucasys had won

13       that work, it would have impacted our customer, Florida

14       Power & Light.

15   BY MR. MAYES:   (Resuming)

16        Q.    So just so I'm clear, when you tell Mr. Burts, "This

17   is the opportunity we think the Lucasys letter to FPL could

18   impact," you were not suggesting to him that you could get this

19   work that you had lost from Florida Power & Light?

20              MR. FAZIO:   Objection to form and foundation.

21              THE WITNESS:   That was not what I was suggesting.

22   BY MR. MAYES:   (Resuming)

23        Q.    Okay.   You now know that Lucasys did, in fact, win

24   this work; isn't that true?

25        A.    I don't recall the specific work they did versus a

 1    specific proposal, but I do know they did work at FPL/NextEra,

 2    yes.

 3        Q.    Okay.  And PowerPlan reached out to Florida Power &

 4    Light to tell them that PowerPlan would not consent to them

 5    using Lucasys; isn't that true?

 6        A.    I guess we did not say they couldn't use Lucasys, but

 7    we communicated that we would not consent to Florida Power &

 8    Light providing access to our confidential intellectual

 9    property.

10        Q.    Well, you told them that they couldn't have any

11    access to PowerPlan's software at all; isn't that true?

12        A.    That would be incorporated in our confidential

13    intellectual property, yes.

14        Q.    And as a result of those communications, Florida

15    Power & Light terminated its relationship with Lucasys; isn't

16    that true?

17        A.    Yes.

18        Q.    At some point, did you become aware that Lucasys was

19    providing services to Suez?

20        A.    I was made aware of that, yes.

21        Q.    And Suez was a PowerPlan customer?

22        A.    Yes, and also would have referred to them as United

23    Water because that was the original name of the business when

24    they first became a customer.

25        Q.    And they're now known as something else, correct?

 1      A.   Yes.

 2      Q.   Veolia; is that it?

 3      A.   Something with a V.  I don't -- Veolia sounds right.

 4           MR. MAYES:  It's 10:45.  Why don't we take a

 5      ten-minute break?

 6           MR. FAZIO:  Sure.

 7           VIDEOGRAPHER:  Off the record.

 8                    (BREAK TAKEN)

 9           VIDEOGRAPHER:  Back on the record at 10:57 a.m.

10  BY MR. MAYES:  (Resuming)

11      Q.   Mr. Dahlby, can you please confirm for the record

12  that while we were on break we did not have any substantive

13  discussions about the case?

14      A.   Yes, I can confirm.

15      Q.   Thanks.  Before the break, we were talking about

16  Exhibit 195.  Do you still have that in front of you?

17      A.   I do.

18      Q.   I think -- I asked you some questions about how I

19  interpreted that first sentence.  Can you tell me what you did

20  mean by, "This is the opportunity we think the Lucasys letter

21  to FPL could impact?"

22      A.   The comment would have been around the project the

23  customer was undertaking, so, you know, we -- internally,

24  opportunity and project oftentimes are used in a, you know,

25  similar manner, so that would have been the -- what I was

1   communicating to Brett was that this would affect their

2   project.

3        Q.   Okay.  In what way did you think it could affect that

4   project?

5        A.   If they had signed with Lucasys for that work, they

6   would have potentially to find a new vendor for that work if

7   they couldn't perform that work without providing Lucasys

8   access to -- to the information we were not consenting to.

9        Q.   Okay.  I think you said before but you were not

10  hopeful that PowerPlan could be the replacement vendor in that

11  scenario; is that true?

12       A.   That was not.  The intent of communicating with the

13  customer around our intellectual property was for us to take

14  that work.

15       Q.   You mentioned that you had four people who reported

16  to you.  Who are those people?

17       A.   Amy Griffith -- Griffin, she runs our support

18  organization.  Kristin Wallace runs our managed services

19  organization.  Kim Pearch (ph) runs our customer success

20  organization.  And Sam Gowdy (ph) runs our services operations

21  group.

22       Q.   Sam Gaddy?

23       A.   Gowdy.

24       Q.   Gowdy?  Thank you.  You mentioned earlier that you

25  had discussions at PowerPlan about PowerPlan's intellectual

1    property and protecting it; do you recall that?

2        A.   Yes.

3        Q.   Have you had those discussions with those four people

4    you just mentioned?

5        A.   I don't recall any specific instance where we've

6    talked about a particular situation around that.

7        Q.   So as you sit here, you can't recall a specific

8    discussion with any one of those four people?

9        A.   Not as -- particularly with me, no.

10       Q.   Okay.  Were you aware that at some point in the fall

11   of 2019, PowerPlan sent a cease-and-desist letter to Lucasys?

12       A.   I'm aware of that, yes.

13       Q.   Did you see a copy of that letter at the time it was

14   sent?

15       A.   Yes.

16    (Plaintiff's Exhibit No. 196 was marked and identified.)

17   BY MR. MAYES:   (Resuming)

18       Q.   Mr. Dahlby, I'm handing you Exhibit 196.  Have you

19   seen this before?

20       A.   I have.

21       Q.   And is this the letter that you were referring to a

22   minute ago as having seen?

23       A.   I'm not following.

24       Q.   Sorry.  Did you see this letter around the time it

25   was sent in October of 2019?

1      A.    I did.

2      Q.    Okay.  Do you know if this pre-dated communications

3    to PowerPlan customers about Lucasys?

4      A.    I don't recall the specific dates we had different

5    customer conversations.

6      Q.    Okay.  But you are aware that at some point after

7    this -- or at some point in the fall of 2019, PowerPlan reached

8    out to several Lucasys customers?

9            MR. FAZIO:  Objection to form and foundation.

10           THE WITNESS:  I was involved with two conversations

11       with customers around that time, yes.

12   BY MR. MAYES:   (Resuming)

13     Q.    Okay.  Which customers were those?

14     A.    NextEra/FPL and AEP.

15     Q.    And tell me what you recall about those

16   conversations.

17     A.    That we communicated our concerns around having

18   access to our intellectual property while they were

19   simultaneously building competing products or similar products,

20   and the risk that they might use that intellectual property to

21   unfairly build their software.

22     Q.    Did you communicate to -- let's do them one at a time

23   -- to NextEra and FPL -- strike that.  I think you already said

24   this.

25           Did you -- did PowerPlan communicate during those

1    conversations to AEP that AEP should not permit Lucasys to

2    access PowerPlan's software?

3        A.    We would have said that they -- we did not consent

4    per our license agreement to them accessing our confidential

5    intellectual property.

6        Q.    And you said the same thing to Florida Power & Light?

7        A.    Yes.

8        Q.    Were you involved personally in the communications to

9    Florida Power & Light?

10       A.    I was in one of the calls led by Brett Burts when we

11   communicated with them.

12       Q.    Did you tell Florida Power & Light -- or did

13   Mr. Burts tell Florida Power & Light that PowerPlan believed

14   Lucasys was misappropriating PowerPlan trade secrets?

15       A.    My recollection was we communicated that it was the

16   risk of it.  We did not communicate that they -- they had.

17       Q.    Okay.  Let's talk about with AEP.  Were you on calls

18   with AEP personally?

19       A.    I was on at least one call with AEP.

20       Q.    Okay.

21       A.    I think it was two, actually.

22       Q.    Okay.  On those calls, did anyone at PowerPlan tell

23   anyone at AEP that PowerPlan believed Lucasys was

24   misappropriating PowerPlan trade secrets?

25       A.    I don't recall that being communicated.

1    Q.    Okay.  Who else was involved in the calls at Florida

2    Power & Light?

3    A.    I recall Brett Burts as well as Jonathan Suture (ph)

4    being in the call from PowerPlan.  On the customer side, I

5    recall Leo Quintana (ph).  I don't remember.  I believe Jim May

6    (ph) or Keith Ferguson.  I don't remember which of those was on

7    that call.

8    Q.    Okay.  Who was involved in the AEP calls?

9    A.    It would have been the same.  Jonathan, Brett, and

10   myself were on that call from PowerPlan.  We may have had

11   outside counsel at the time on those calls.  I don't recall.

12   Q.    Who was involved from the AEP side on those calls?

13   A.    I don't remember the entire attendee list.  I

14   remember Jimmy Lindy (ph) who was on the tax side and Jeff

15   Horsted (ph) who was on the controller's team.

16   Q.    What specifically do you recall being said to Florida

17   Power & Light about Lucasys on the call?

18   A.    That we had concerns around them accessing our

19   intellectual property while they were simultaneously building

20   software or had built software.  I -- and I think we had

21   thought they had built software at the time.  And so that was a

22   -- from a PowerPlan perspective, that was not something we were

23   going to consent to was them having access to our intellectual

24   property.  We would have communicated that they could do work

25   with Lucasys, they could -- you know, we weren't suggesting

1    they can't do work with Lucasys.  It was just we were not

2    consenting to their access to our intellectual property.

3        Q.    What specific intellectual property did you tell

4    Florida Power & Light Lucasys could not access?

5        A.    Some of the examples we would have provided would

6    have been the database schema, you know, user guides, or other

7    documentation.

8        Q.    At the time you made those calls, were you aware of

9    any facts or evidence that Lucasys had actually used any of

10   that intellectual property to build its software?

11       A.    I was not aware.

12       Q.    What was Florida Power & Light's response on that

13   call, if you -- to the extent you remember?

14       A.    I believe they said they were going to have to go

15   back and look at documents and discuss it.  At some point

16   later, I believe they communicated that they had stopped giving

17   access to Lucasys to our intellectual property.

18       Q.    Okay.  For the AEP call, what specifically do you

19   recall being said about Lucasys on those calls?

20       A.    It would have been the same communication around

21   concerns about access to our intellectual property and

22   confidential arrangement as they're building products.

23       Q.    And what do you recall AEP's response being?

24       A.    I believe their response was, "We're going to meet

25   internally and we'll get back to you."

1      Q.    Were you asked to put it in writing?

2      A.    I believe they did ask for that and we sent them a

3    letter.

4      Q.    What intellectual property, if any, did you tell AEP

5    that Lucasys should not be allowed to access?

6      A.    It would have been the same -- same types of

7    examples.  I don't know if we gave them an exhaustive list, but

8    we would have said the software, the source code, the database,

9    the documentation.

10     Q.    And at that point in time -- well, do you recall

11    which call came first, Florida Power & Light or AEP?

12     A.    My recollection is Florida Power & Light came first.

13     Q.    You had not learned any other facts or evidence that

14    led you to believe that Lucasys had actually used any

15    intellectual property from PowerPlan to build its software by

16    the time AEP called; isn't that true?

17            MR. FAZIO:  Objection to form and foundation.

18            THE WITNESS:  So my recollection is we did not have

19        any additional information at that time.

20    BY MR. MAYES:  (Resuming)

21     Q.    Okay.  Did Jonathan Suture say anything on those

22    calls?

23     A.    I -- I don't recall.

24     Q.    Were there -- was there any discussion on those calls

25    of potential liability to the customers if they permitted

1   Lucasys to access PowerPlan's software?

2      A.   I don't recall that specifically being discussed, but

3   it may have been.

4      Q.   Have you ever suggested that a customer might have

5   liability if they permit third parties to access PowerPlan

6   software?

7      A.   I don't recall having that direct conversation with a

8   customer.

9      Q.   Do you ever recall suggesting someone else have that

10  conversation with customers?

11     A.   I don't recall any specific situation where that has

12  happened, but I -- I mean, I know we've had internal

13  discussions, and that would -- that could be something that

14  could come up.

15     (Plaintiff's Exhibit No. 197 was marked and identified.)

16  BY MR. MAYES:   (Resuming)

17     Q.   I'm handing you Exhibit 197.   Lucasys -- I mean, I'm

18  sorry.   Strike that.

19          PowerPlan did, in fact, send a letter to AEP.   I

20  think you mentioned that a minute ago; is that true?

21     A.   To my understanding, yes.

22     Q.   Okay.   Is this the letter?   This being Exhibit 197?

23     A.   Yes, I believe this was.   I was copied on this letter

24  as it was sent to AEP.

25     Q.   This refers to, if you look at the last paragraph

1   here, the database architecture and data model as PowerPlan's

2   intellectual property; is that correct?

3          MR. FAZIO:  I'm sorry, Josh.  Where are we?

4          MR. MAYES:  The last paragraph, "Accordingly" --

5      second to last paragraph.  "Accordingly, this confirms our

6      expectation."

7   BY MR. MAYES:  (Resuming)

8      Q.   Do you see that sentence?

9      A.   Yes.

10     Q.   Okay.  When you said, you know, database schema, is

11  that the same thing as the database architecture or are those

12  different things?

13     A.   No, that would be synonymous.  Yes, database

14  architecture and schema.

15     Q.   Okay.  Is the data model different than the database

16  architecture?

17     A.   The database schema would incorporate both of those

18  items.

19     Q.   Okay.  Folks from RCC had been accessing PowerPlan's

20  database and was -- were familiar with PowerPlan's database

21  architecture and data model for years before this; isn't that

22  true?

23          MR. FAZIO:  Objection to form and foundation.

24          THE WITNESS:  That's our understanding.

25  BY MR. MAYES:  (Resuming)

1      Q.    And they were a competitor of PowerPlan; isn't that

2  true?

3             MR. FAZIO:   Objection to form.

4             THE WITNESS:   RCC was a competitor within our

5        professional services space, yes.

6  BY MR. MAYES:   (Resuming)

7      Q.    And RCC used its knowledge of PowerPlan's database

8  architecture and data model in connection with its provision of

9  competitor services; isn't that true?

10            MR. FAZIO:   Foundation.

11            THE WITNESS:   All of those would have been performed

12       under -- with the customer with a license agreement, and

13       our understanding is our customers would have

14       confidentiality provisions in place with any third parties

15       that they were giving access to -- to those resources.

16  BY MR. MAYES:   (Resuming)

17      Q.    Okay.  It is true, isn't it, that RCC employees were

18  using their knowledge of PowerPlan's database architecture and

19  data model to provide competitive services; isn't that true?

20      A.    That is accurate.

21      Q.    At this point in time in 2019, had PowerPlan ever

22  threatened any of RCC's customers, to your knowledge, that

23  providing access to RCC to PowerPlan software violated the

24  master services agreement?

25            MR. FAZIO:   Objection to form.

```
 1              THE WITNESS:  So we had not, to my knowledge,

 2       communicated that to customers.

 3  BY MR. MAYES:  (Resuming)

 4       Q.   To your knowledge, is this the first letter like this

 5   that was ever sent to a customer?

 6              MR. FAZIO:  Objection to form.

 7              THE WITNESS:  To my recollection, that -- that is

 8       accurate, but it -- the situation was definitely not the

 9       -- it wasn't the same situation because we're not talking

10       about services competitors.  I mean, it was -- you know,

11       providing services under our protection of our license

12       agreement is different than someone who could leverage

13       that to build a product that they have marketed actively

14       in the market.

15  BY MR. MAYES:  (Resuming)

16       Q.   But you didn't have any evidence that PowerPlan --

17   that Lucasys had actually done that; isn't that true?

18              MR. FAZIO:  Objection to form.

19              THE WITNESS:  It wasn't about the evidence.  It's

20       about the risk that they could use that information to --

21       to leverage that information to build products.

22  BY MR. MAYES:  (Resuming)

23       Q.   Did you know exactly what software offerings Lucasys

24   had aside from what was on its website at this point in time?

25       A.   Did not.
```

1      Q.    Did you have any knowledge or understanding of what

2   steps Lucasys had taken to develop its software offerings?

3      A.    I did not, no.

4      Q.    Do you know who developed Lucasys' software?

5      A.    I've learned some during the agreed process, but

6   prior to that I had no information.

7      (Plaintiff's Exhibit No. 198 was marked and identified.)

8   BY MR. MAYES:   (Resuming)

9      Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 198.  Take

10   a look at that and tell me if you've seen that before.

11     A.    Yes, I have.  I have seen this.

12     Q.    Okay.  And would you have read this e-mail chain at

13   the time you received it in February of 2020?

14     A.    I would have, yes.

15     Q.    The first two e-mails on the bottom of the first page

16   of Exhibit 198 appear to be follow-ups from the phone call you

17   mentioned; is that your understanding?

18              MR. FAZIO:  I'm sorry.  You're on what page?

19              MR. MAYES:  The first page.  Page 293, yeah.

20              THE WITNESS:  Okay.  Sorry, I missed --

21              MR. MAYES:  Sure.

22              THE WITNESS:  What was the question there?

23   BY MR. MAYES:   (Resuming)

24     Q.    The first two e-mails on the bottom of the first page

25   of Exhibit 198 appear to be follow-ups from Mr. Burts to the

1  phone conversations you mentioned earlier; is that correct?

2         MR. FAZIO:  Objection to form.

3         THE WITNESS:  I believe that was a follow-up to a

4     different phone conversation.

5         MR. MAYES:  Okay.

6         THE WITNESS:  Based on reading the initial e-mail.

7  BY MR. MAYES:  (Resuming)

8     Q.   Okay.  When you say the initial e-mail, are you

9  talking about the e-mail at the top of the second page of

10 Exhibit 198?

11    A.   The one that's dated 3/20 -- or February 6th at 3:23.

12    Q.   Okay.  Look at the e-mail that's dated

13 February 12th, 2020, from Mr. Burts.

14    A.   Okay.

15    Q.   What does the second bulletpoint there refer to?

16    A.   That is a follow-up on the conversation in the letter

17 from 2019.

18    Q.   Okay.  And so you understand that second bulletpoint

19 to be asking -- when it says the third party, you understand

20 that to mean Lucasys?

21    A.   Yes.

22    Q.   And so then, the two e-mails on the bottom of the

23 first page of Exhibit 198, to the extent they're talking about

24 -- let's just do them one at a time.  To the extent the bottom

25 e-mail says, "I'd like to confirm the intellectual property

1    access request," do you see that?

2        A.   Yes.

3        Q.   Do you understand that to be referring once again to

4    the request that Lucasys be cut off from accessing PowerPlan

5    software?

6            MR. FAZIO:  Objection to form.

7            THE WITNESS:  It was confirming what we had

8        communicated in the letter, yes.

9    BY MR. MAYES:  (Resuming)

10       Q.   Okay.  And then, the next e-mail is an e-mail to--

11   internally to you and Mr. Routon; is that correct?

12           MR. FAZIO:  Josh, can we just identify them by date

13       and time so he can keep them straight?

14           MR. MAYES:  Sure.  Yeah.

15   BY MR. MAYES:  (Resuming)

16       Q.   The next e-mail in this chain is Thursday,

17   February 20th, 2020, at 10:28 a.m.  Is that correct?

18       A.   Yes.

19       Q.   Okay.  And that is an internal PowerPlan e-mail only;

20   is that correct?

21       A.   That's correct.

22       Q.   Okay.  And Mr. Burts says, "I do not have

23   confirmation from him that the third party no longer has access

24   to our IP at AEP."  Did I read that correctly?

25       A.   You did.

1    Q.    And again, that's referring to Lucasys?

2    A.    Yes.

3    Q.    Okay.  And the next sentence says, "And we have

4    reason to be concerned as AEP's VP of tax was very vocal with

5    me at the AGA EEI tax leadership meeting in November about his

6    support of technology disruption in the markets we -- that we

7    serve."  Did I read that correctly?

8    A.    Yes.

9    Q.    What did you understand him to mean by support for

10   technology disruption in the markets that we serve?

11        MR. FAZIO:  Objection to form and foundation.

12        THE WITNESS:  Sorry.  It was -- Mr. Burts had

13        communicated a conversation he had had, and I believe

14        those were the words that were said to him.

15   BY MR. MAYES:  (Resuming)

16   Q.    Do you know what they mean?

17   A.    I mean, the -- I think -- I mean, I don't know

18   exactly how he meant to communicate that, but that was the

19   words that he shared with Brett was my understanding.

20   Q.    Okay.  And what was your understanding of those words

21   when you read this e-mail?

22   A.    The potential for other -- new players to develop new

23   software.

24   Q.    So by technology disruption, for someone to develop

25   software that competed with PowerPlan's tax software; is that

 1    correct?

 2              MR. FAZIO:   Objection to form and foundation.

 3              THE WITNESS:   I mean, we -- we have competition that

 4        existed prior to this.   So, I mean, I think the -- it

 5        wasn't competition existing.   It was potential for new

 6        competition, was I believe how it was communicated to

 7        Brett.

 8    BY MR. MAYES:   (Resuming)

 9        Q.   Do you know who AEP's VP of tax was that this refers

10    to?

11        A.   Jimmy Lindy.

12        Q.   Okay.   Were you involved in that discussion between

13    Mr. Lindy and Mr. Burts at the tax leadership meeting?

14        A.   I was not.

15        Q.   The next e-mail in the chain, the one at 10:31, is

16    from you and it says, "John Erickson has a conversation with

17    Jeff today.   Do we want John to bring it up?"   Is that correct?

18        A.   Yes.

19        Q.   And the follow-up e-mails are more or less yes; is

20    that correct?

21        A.   Yes.   Those are just e-mails that our -- that we

22    wanted John to bring it up.

23        Q.   Do you know if that happened?

24        A.   I don't recall.

25        Q.   Okay.   You mentioned earlier the agreed-upon process;

```
 1    do you recall that?

 2         A.    Yes.

 3         Q.    Do you recall when that started?

 4         A.    I believe that was either late '19 or early 2020.  I

 5    don't remember the exact dates.

 6         (Plaintiff's Exhibits No. 199 and 200 were marked and

 7                           identified.)

 8    BY MR. MAYES:   (Resuming)

 9         Q.    Mr. Burts, I'm handing you -- I mean, excuse me.

10    Mr. Dahlby, I'm handing you Exhibit 199, and a copy for your

11    counsel.  I'm also going to hand you Exhibit 200 here at the

12    same time.  Take a look at those and tell me if you've seen

13    them before.

14         A.    Yes, I've seen these.

15         Q.    Okay.  And did you see them around the time of the

16    dates on these documents?

17         A.    Yes.

18         Q.    Okay.  If you look at Exhibit 200 on the second page

19    number five, there is a DocuSign; do you see that?

20         A.    Yes.

21         Q.    Did you DocuSign a version of this Exhibit A?

22         A.    Yes.

23         Q.    Okay.  And this Exhibit 200 refers in the first

24    paragraph on the first page to Exhibit 199; is that correct?

25         A.    Yes.
```

TP.One

1      Q.    And at the time you DocuSigned, you had also already

2  seen Exhibit 199; is that true?

3      A.    Yes.

4      Q.    Okay.  If you go to Exhibit 199 and flip to the page

5  number three, look at paragraph two, little sub (b) at the

6  bottom -- very bottom of Page 3, and tell me when you're there.

7      A.    Yes.

8      Q.    This is an obligation for PowerPlan to refrain from

9  discussing concerns about Lucasys' software development efforts

10 with PowerPlan customers other than NextEra and AEP; is that

11 how you understood this?

12     A.    Yes.

13     Q.    Did PowerPlan abide by this restriction?

14     A.    I believe so.

15     Q.    Okay.  You participated in the process that's

16 described in Exhibit 199 for PowerPlan; is that true?

17     A.    Yes.

18     Q.    And Lucasys gave PowerPlan pursuant to this process a

19 copy of the software that it had developed; isn't that true?

20     A.    I believe that was part of the process.

21     Q.    Yeah.  And did you come to a meeting here at the

22 Robbins firm?

23     A.    I did attend the meeting.

24     Q.    And Vadim Lantukh was there as well; is that true?

25     A.    Yes.

1        Q.    And Vadim sat and demonstrated Lucasys' software for

2   you; is that true?

3        A.    That's my understanding.  He -- I mean, he did

4   demonstrate software.  I don't know.  It was purported to be

5   their software.

6        Q.    Okay.  As you sit here, do you have any reason to

7   believe that Vadim lied to you in any way during any of those

8   meetings?

9        A.    I do not.

10       Q.    Did Vadim answer the questions that he was asked at

11   that meeting?

12       A.    Yes.

13       Q.    PowerPlan received as part of that process source

14   code; isn't that true?

15       A.    I believe the lawyers did, yes.

16       Q.    Okay.  Did you ever see it?

17       A.    I don't recall seeing that source code.

18       Q.    Do you recall asking for anything as part of that

19   process that you were not provided?

20       A.    You're asking about from Lucasys or --

21       Q.    Yeah, from Lucasys.

22       A.    Can you repeat the question?

23       Q.    Sure.  Do you recall PowerPlan asking for anything

24   from Lucasys that Lucasys did not provide to PowerPlan?

25       A.    Not that I'm aware.

1        (Plaintiff's Exhibit No. 201 was marked and identified.)

2    BY MR. MAYES:   (Resuming)

3        Q.    Okay.   Mr. Dahlby, I'm handing you Exhibit 201.   Take

4    a look at that and tell me if you've seen that before.

5        A.    Yes, I've seen this.

6        Q.    Okay.   Did you receive a copy of this e-mail around

7    the time it was sent?

8        A.    I did.

9        Q.    I'm sorry.   Letter?   Strike that.   Let me start that

10   again.

11        Did you receive a copy of this letter around the time

12   it was sent?

13        A.    Yes.

14        Q.    I want to turn to Page 3 of the letter, and there's a

15   section called Lucasys' misappropriation of PowerPlan's trade

16   secrets and other proprietary information; do you see that?

17        A.    Yes, subheading (b).

18        Q.    Sorry?

19        A.    Heading (b), yeah.

20        Q.    Yeah.   Okay.   Did you read this letter at the time it

21   was sent -- around the time it was sent?

22        A.    I did.

23        Q.    Did you believe that the -- this Section (b), which

24   carries over all the way until Page 7, was accurate?

25        A.    Yes, I did believe that.

1      Q.    Okay.  And this section of the letter purported to

2  set forth summary findings about Lucasys' misappropriation of

3  PowerPlan's trade secrets; is that correct?

4      A.    Can you repeat that --

5          MR. FAZIO:  Objection to form.

6          THE WITNESS:  Can you repeat that question?

7  BY MR. MAYES:  (Resuming)

8      Q.    Yeah.  This section that begins on Page three and

9  carries over to Page 7 describes summary level findings about

10  Lucasys' purported misappropriation of PowerPlan's trade

11  secrets; is that your understanding?

12      A.    And other proprietary information.

13      Q.    Sure.  So the first section or first bulletpoint

14  number one, what is your understanding of what that -- what

15  that means in layman's terms?

16          MR. FAZIO:  Objection.  You can answer the question

17      only to the extent you can do so without revealing

18      anything you learned from or was communicated to you from

19      counsel, if you can answer that question with that

20      understanding.

21          THE WITNESS:  Okay.  So what was your question?

22  BY MR. MAYES:  (Resuming)

23      Q.    Yeah.  What's your understanding of what bulletpoint

24  number one means in layman's terms?  What was it that Lucasys

25  was purportedly doing that was improper?

1            MR. FAZIO:  Objection to form.  The letter speaks for

2       itself.  You can go ahead and answer if you can do so

3       without revealing communications you've had with counsel

4       or information you received from counsel.

5            THE WITNESS:  Okay.  I don't know that I could

6       communicate anything more than what was written in the

7       letter then.

8  BY MR. MAYES:  (Resuming)

9       Q.   Okay.  This bulletpoint section claims that Lucasys

10  was improperly using PowerPlan's proprietary database model by

11  having software that would access the database, retrieve and

12  export data from, and import data back to PowerPlan databases;

13  is that correct?

14            MR. FAZIO:  I'm sorry.  When you say bulletpoints,

15       we've got bulletpoints below and numbers above.

16            MR. MAYES:  Number one -- sorry.  Yeah.  Number one.

17            MR. FAZIO:  So we're on Page 4 still?

18            MR. MAYES:  Correct.

19            MR. FAZIO:  Okay.

20            THE WITNESS:  That -- that's what the heading states,

21       yes.

22  BY MR. MAYES:  (Resuming)

23       Q.   Yeah.  That's the same thing that RCC and other

24  third-party consultants do, just not using software; isn't that

25  true?

```
 1              MR. FAZIO:  Objection to form and foundation.

 2              THE WITNESS:  The -- I would define those as very --

 3         as different.  Consulting services are different than

 4         software developed.

 5    BY MR. MAYES:  (Resuming)

 6         Q.   Okay.  But RCC and other third-party consultants do

 7    access PowerPlan's databases; isn't that true?

 8         A.   That is true.

 9         Q.   They also retrieve and alter that data; isn't that

10    true?

11              MR. FAZIO:  Objection to foundation.

12              THE WITNESS:  They do.

13    BY MR. MAYES:  (Resuming)

14         Q.   Okay.  And they, they also import that data back into

15    PowerPlan databases; isn't that true?

16         A.   All under a license agreement with our customers.

17         Q.   So the answer is yes, they do all of those things;

18    isn't that true?

19              MR. FAZIO:  Objection to form.

20              THE WITNESS:  Their consulting services, yes.

21    BY MR. MAYES:  (Resuming)

22         Q.   So the only objection is that Lucasys had automated

23    that process; is that true?

24              MR. FAZIO:  Objection to form and foundation.  Are

25         you asking about his objection of what it said in the
```

1        letter or --

2    BY MR. MAYES:   (Resuming)

3        Q.    Do you understand my question?

4        A.    Can you repeat your question?

5        Q.    Sure.  My question is, so the only objection -- the

6    only difference between what RCC and other third-party

7    consultants were doing and what Lucasys was offering through

8    its software is that Lucasys had automated it; isn't that true?

9            MR. FAZIO:  Objection to form.

10           THE WITNESS:  I would not say that that would

11       describe the concerns, so --

12   BY MR. MAYES:   (Resuming)

13       Q.    Okay.  How would you describe it?

14       A.    I mean, I think the overall risk was how they were

15   leveraging their intellectual property to -- to build products.

16       Q.    The product that this is referring to is Lucasys'

17   copilot product; is that true, in part?

18       A.    I believe that was one of the products that's

19   mentioned here in the letter.

20       Q.    Okay.

21       A.    I believe there were other products that were also

22   mentioned.

23       Q.    Did Mr. Lantukh demonstrate the copilot product for

24   you at the meeting you attended?

25       A.    I believe he demonstrated -- or provided information

1   about copilot.  I believe it may have been some combination of

2   software and wireframes.  I don't remember what was software

3   and what was wireframes from that.

4        Q.   Okay.  Let's turn to Page 5 of Exhibit 201, and

5   there's a numbered heading, number two, which says, "Lucasys'

6   ARAM calc marketing tool has copied certain PowerPlan database

7   table headings and structures."  Do you see that?

8        A.   Yes.

9        Q.   What do you understand it to mean when it calls the

10   ARAM calc a marketing tool?

11        MR. FAZIO:  And again, with all of these questions,

12        to the extent you can answer without revealing

13        communications you've had with counsel or information

14        received from counsel.  With that admonition, go ahead.

15        THE WITNESS:  My recollection is that's how it was

16        positioned by the Lucasys team in the meeting we had here

17        in the office.

18   BY MR. MAYES:  (Resuming)

19        Q.   That it was not a functional software product.  It

20   was something they were using to generate leads; is that

21   accurate?

22        A.   I believe they classified it as a marketing tool,

23   yes.

24        Q.   Okay.  The second paragraph under that heading number

25   two says, "The attachment to this letter includes two tables

1   that map the virtually identical correlation between columns in

2   the Lucasys ARAM calc tables, ARAM calc tax depreciation, and

3   ARAM calc book depreciation rates and tables and columns in the

4   PowerPlan database," is that correct?

5       A.   Yes.

6       Q.   And if you flip further back in this letter past the

7   Page 9 signature page, the next page is an attachment.  Do you

8   see that?

9       A.   I do.

10      Q.   Do you believe this is one of the attachments that's

11  referred to in that paragraph we just looked at on Page 5?

12      A.   Yes.

13      Q.   Okay.  And then, the next page is another table.  Do

14  you believe this is also an attachment referenced in that

15  paragraph?

16      A.   Yeah.

17      Q.   So let's look at the first one of those two.  Did you

18  do any of the analysis that resulted in the generation of this

19  attachment yourself?

20          MR. FAZIO:  Objection.  You're -- you can answer that

21      to the extent you did anything that was not -- you were

22      not asked to do by counsel.  You can answer the question.

23      If it was all done at -- if it was all being done at the

24      request of counsel, I think that's privileged.

25  BY MR. MAYES:  (Resuming)

1        Q.    Can you answer without -- with following his

2    instruction?

3        A.    It was at the request of counsel.

4        Q.    Okay.  If you look at the items under the Lucasys

5    ARAM calc column, is it your understanding that those are the

6    items that were found in the Lucasys software?

7        A.    That's my understanding, yes.

8        Q.    Okay.  And it is, in fact, common for tables to have

9    column names that reflect what data is intended to be in that

10   column; isn't that true?

11            MR. FAZIO:  Objection to foundation.

12            THE WITNESS:  I guess, can you rephrase your question

13       or ask your question again?

14   BY MR. MAYES:  (Resuming)

15       Q.    Sure.  You've set up Excel spreadsheets or database

16   tables in the past, haven't you?

17       A.    Yes.

18       Q.    Okay.  And when you make a spreadsheet or a table,

19   it's common to name the columns something that's descriptive of

20   the data that's going to be in that column; isn't that true?

21       A.    Yes.

22       Q.    Okay.  So for example, to have a column named tax

23   year, would you assume that that reflected the tax year; the

24   data that's going to be reflected in that column?

25            MR. FAZIO:  Objection to form.

```
 1              THE WITNESS:  Yes.  I would assume that the tax year
 2      column heading would refer to the tax year.
 3  BY MR. MAYES:  (Resuming)
 4      Q.    Okay.  And there's nothing secret or valuable about
 5  naming columns something that describes the data that's in the
 6  column; isn't that true?
 7              MR. FAZIO:  Objection to form.
 8              THE WITNESS:  So, I mean, I think from a -- it's not
 9      the -- the combination of how you organize the data or
10      what a specific column name is, I would say maybe isn't as
11      important, but the -- the overall combination of all the
12      things is what -- is where we start to -- like, that's a
13      differentiation we feel is important to PowerPlan's
14      intellectual property.
15  BY MR. MAYES:  (Resuming)
16      Q.    Help me understand what you mean.  This letter lays
17  out on this first page these item that have similar names to
18  the PowerPlan -- to some PowerPlan column names; isn't that
19  true?
20      A.    That's true.
21      Q.    Okay.  If it's not the names that are problematic,
22  what is it about this information that's shown on this page
23  that is problematic?
24              MR. FAZIO:  Objection.  The letter speaks for itself
25      and if you can answer that question independent of
```

```
 1        information that you've received from counsel, you can go

 2        ahead and answer the question.  Otherwise, you should not

 3        answer it.

 4             THE WITNESS:  It was -- would have been conversation

 5        with counsel.

 6   BY MR. MAYES:  (Resuming)

 7        Q.   Okay.  And to be clear, for every one of my questions

 8   throughout I am never going to be asking you for communications

 9   with your counsel or things you only learned about through

10   communications with your counsel.  Okay?

11        A.   Okay.

12        Q.   And so if I ever ask you a question and you think the

13   answer calls for that, just you can say that or you can say,

14   hey, I need to talk to Mr. Fazio; is that fair?

15        A.   That's fair.

16        Q.   Okay.

17             MR. FAZIO:  Objection.  I think the challenge is

18        you're asking about the letter that was written by counsel

19        as part of due process.  So I'm not sure what he would

20        know that would not have come from counsel that would be

21        related to the letter is the challenge I'm having.

22             MR. MAYES:  Okay.  I mean --

23             MR. FAZIO:  You can keep asking him, but I understand

24        where you're -- that's --

25             MR. MAYES:  Yeah.
```

1             MR. FAZIO:  That's the challenge that I'm having.

2    BY MR. MAYES:  (Resuming)

3        Q.   You would agree with me, wouldn't you, Mr. Dahlby,

4    that the items that are shown here in this first column of

5    Lucasys ARAM calc column, tax year, company, tax book, tax

6    class, those are all items of data that would be necessary to

7    do an ARAM tax calculation, wouldn't you?

8             MR. FAZIO:  What page are you on?

9             MR. MAYES:  It's the first page after the signature

10       page.

11            MR. FAZIO:  Okay.

12            THE WITNESS:  Can you repeat the question?

13   BY MR. MAYES:  (Resuming)

14       Q.   Yeah.  These are all items of data that would be

15   necessary to do an ARAM tax calculation; isn't that true?

16       A.   I'm not familiar with the ARAM calculation details to

17   be able to answer if this would be the full extent of the data

18   required in that regard.

19       Q.   Well, maybe not the full extent of the data that's

20   required, but these items of data, you wouldn't have any reason

21   to think they're not items that are required to do an ARAM tax

22   calc; is that true?

23       A.   Not to my knowledge.

24       Q.   If you can go back to Page 5 of Exhibit 201, and look

25   at bulletpoint three.  Tell me when you're there.

1      A.    Okay.

2      Q.    The first part -- there are two clauses in that

3   sentence.   The first clause is similar to bulletpoint number

4   two, but instead of referring to the ARAM calc, it's referring

5   to the deferred tax module; is that correct?   Is that your

6   understanding?

7      A.    Yes.

8      Q.    Okay.   And if you flip back past the two pages that

9   we looked at after the signature page, there is a third page

10  which is the last page of Exhibit 201.   Do you see that?

11     A.    Yes.

12     Q.    Okay.   And do you believe that this attachment is

13  meant to show similar table headings and structures to

14  PowerPlan's for the Lucasys deferred tax module as identified

15  in that paragraph three we were just looking at?

16     A.    So can you repeat the question?

17     Q.    Yeah.

18     A.    I'm trying to --

19     Q.    Do you believe that this last page of Exhibit 201 is

20  an attachment that is supporting this third numbered

21  bulletpoint that begins on Page 5 of Exhibit 201?

22     A.    Yes.

23     Q.    If you turn to Page 6 of Exhibit 201, there is a

24  paragraph that begins with the word, "Second".   Let me know

25  when you get there.

1       A.    Okay.

2       Q.    This says, "Second, Lucasys appears to have developed

3   its data model for its deferred tax module without much, if

4   any, of the type of development processes and analyses that

5   would be expected if the model was being developed from

6   scratch, such as development of business requirements leading

7   to functional design specifications and statements of business

8   rules which then evolved into a data model."  Did I read that

9   correctly?

10      A.    You did read that correctly.

11      Q.    Okay.  This was written in 2020; is that right?

12      A.    Yes.

13      Q.    And the materials that led to this -- or sorry.  The

14  exchange of information that led to this letter took place

15  either at the end of 2019 or early 2020; is that correct?

16      A.    Yes.

17      Q.    And I think when we looked at earlier you agreed with

18  me that Vadim Lantukh had a good understanding of the business

19  requirements for deferred taxes; isn't that true?

20          MR. FAZIO:  Objection to form.

21          THE WITNESS:  He would have understood the functional

22      requirements for deferred taxes.

23  BY MR. MAYES:  (Resuming)

24      Q.    And he would have understood that before he ever even

25  started Lucasys; isn't that true?

 1            MR. FAZIO:  Objection to form.

 2            THE WITNESS:  From his experience -- he would have

 3       learned that through his experience with PowerPlan and

 4       PowerPlan's software.

 5  BY MR. MAYES:  (Resuming)

 6       Q.   And from RCC -- when he worked at RCC, correct?

 7       A.   Which would have been around PowerPlan software as

 8  well.

 9       Q.   Okay.  You're not saying that Vadim Lantukh's

10  understanding of the business requirements of PowerPlan's

11  customers is PowerPlan's confidential or proprietary

12  information, are you?

13            MR. FAZIO:  Objection to form.

14            THE WITNESS:  I did not say that, so --

15  BY MR. MAYES:  (Resuming)

16       Q.   Okay.  Do you believe that?

17       A.   The business requirements, I do not believe that

18  that's PowerPlan's intellectual property.

19       Q.   Okay.  And so if Vadim already knew those before he

20  started Lucasys, there wouldn't be any problem with him using

21  his knowledge of the business requirements to design software;

22  isn't that true?

23            MR. FAZIO:  Objection to form and foundation.

24            THE WITNESS:  Our concern has always been that the --

25       not the business requirements, but the method in which

 1          PowerPlan has combined our database and our code to manage

 2          those processes is the concern that we always had from an

 3          intellectual property perspective.

 4    BY MR. MAYES:   (Resuming)

 5       Q.    You would agree with me that someone who understands

 6    the business requirements around deferred tax calculations

 7    would be able to develop software faster than someone who did

 8    not previously understand those business requirements?

 9             MR. FAZIO:   Objection to form and foundation.

10             THE WITNESS:   That would be potentially a fact.   I

11          don't know -- I don't know if that's a definite statement,

12          but they would have an advantage if they knew.

13    BY MR. MAYES:   (Resuming)

14       Q.    Did PowerPlan always during the time you worked there

15    take the position that its database structure was proprietary

16    and confidential?

17       A.    Yes.

18       Q.    Did PowerPlan take the position that other software

19    could not interact and integrate with PowerPlan's database

20    model?

21             MR. FAZIO:   Objection to form.

22             THE WITNESS:   When you say other software, what do

23          you mean by that?

24    BY MR. MAYES:   (Resuming)

25       Q.    I mean, was it PowerPlan's position that it would be

1    a violation of PowerPlan's intellectual property for someone to

2    design software that could directly access PowerPlan's

3    database?

4              MR. FAZIO:  Objection to form.

5              THE WITNESS:  We have customers who would access our

6         database under their license agreement for various reasons

7         to publish data or other things to their other systems, so

8         PowerPlan is not a -- yeah, if there are other systems

9         that need to -- ERP systems, for instance, we would send

10        and receive data to those systems.

11   BY MR. MAYES:  (Resuming)

12        Q.   Okay.  Would those other systems or the people

13   operating those other systems have access to PowerPlan's

14   database architecture and data model in order to do that?

15             MR. FAZIO:  Objection to form and foundation.

16             THE WITNESS:  If our customers provided it to them

17        under our license agreement and other their agreements

18        with those -- those people.

19   BY MR. MAYES:  (Resuming)

20        Q.   Do you know if PowerPlan ever told its customers that

21   PowerPlan was an open system that they could use other software

22   with if they wanted to?

23        A.   How do you define open system?

24        Q.   I'm asking, do you know if that -- those exact words,

25   "PowerPlan is an open system," were ever told to PowerPlan's

1  customers?

2      A.   Not that I'm aware of, but --

3      (Plaintiff's Exhibit No. 202 was marked and identified.)

4  BY MR. MAYES:  (Resuming)

5      Q.   Mr. Dahlby, I'm handing you Exhibit 202.  Take a look

6  at that.  I'll represent to you this is a printout from the

7  Wayback Machine of PowerPlan's website from 2008.  First, are

8  you familiar with the Wayback Machine?

9      A.   I am not.

10     Q.   Okay.  I want you to turn to the second page of

11 Exhibit 202.  I want you to read the last sentence on that

12 second page.

13     A.   Which paragraph?

14     Q.   The last -- the last paragraph, last sentence.

15     A.   Okay.  "As an open system, other reporting tools such

16 InfoMaker or Crystal Reports can be used."

17     Q.   Do you know what InfoMaker and Crystal Reports are?

18     A.   They're software-to-produce reports.

19     Q.   Do you have any reason to dispute that this was

20 content on PowerPlan's website in 2008?

21         MR. FAZIO:  Objection to form and foundation.

22         THE WITNESS:  This appears to be PowerPlan's website.

23     It's our logo, so --

24 BY MR. MAYES:  (Resuming)

25     Q.   And InfoMaker and Crystal Reports are software

1    programs that could have been used -- or could be used to

2    directly access databases; is that correct?

3         A.   That's my understanding.

4         Q.   Okay.  And this at least appears to be saying that

5    PowerPlan was an open system and customers were permitted to

6    use other software to access the PowerPlan database; isn't that

7    true?

8              MR. FAZIO:  Objection to form and foundation.

9              THE WITNESS:  Again, this would have been all under

10        the license agreements in place with each customer.

11             MR. MAYES:  I saw Steve looking at his watch.  It's

12        about 12:00.  We've been going for another hour and

13        15 minutes.  This probably is a good time to break for

14        lunch, I think.

15             VIDEOGRAPHER:  Stand by.

16                   (BREAK TAKEN)

17             VIDEOGRAPHER:  Back on the record at 12:13 p.m.

18   BY MR. MAYES:  (Resuming)

19        Q.   All right.  Mr. Dahlby, can you confirm that while we

20   were on break we did not have any substantive discussions about

21   the case?

22        A.   No.

23        Q.   All right.  I'm handing you --

24        A.   I can confirm that there were no substantive

25   discussions.

 1      (Plaintiff's Exhibit No. 203 was marked and identified.)

 2   BY MR. MAYES:   (Resuming)

 3      Q.   All right.   Thank you.   I'm handing you Exhibit 203.

 4   Here's a copy for your counsel.   Take a look at this and tell

 5   me if you've seen this before.

 6      A.   I have seen this.

 7      Q.   Okay.   And you -- you received a copy of this letter

 8   around the time it was sent?

 9      A.   I did.

10      Q.   Okay.   I just want to ask you on the last page of

11   Exhibit 203, there's a paragraph -- the third full paragraph

12   begins, "We agree with you that there is no need to drag out

13   the agreed process unnecessarily."   Do you see that?

14      A.   Yes, I see that.

15      Q.   Okay.   In the next paragraph -- or the next sentence

16   says, "Accordingly, PowerPlan hereby terminates the agreed

17   process effective immediately."   Do you see that?

18      A.   I see that, yes.

19      Q.   Okay.   So your understanding is that April 17th,

20   2020, is the date that the agreed process formally ended?

21      A.   That's what I -- that's based on what this letter

22   says.

23      Q.   Okay.   At some point, did you learn shortly

24   thereafter that Lucasys was -- had been hired by

25   Algonquin/Liberty?

```
1       A.   I did become aware of that, yes.

2       Q.   Okay.  How did you become aware of that?

3       A.   I don't recall who shared that information, but it

4   was someone from the project team who shared that information.

5       Q.   Okay.  Was Jim Duffy on that project team?

6       A.   He was the strategic account executive.

7       Q.   Okay.  I've seen references and e-mails to SAE.  Is

8   that a reference to strategic account executive?

9       A.   It is.

10      (Plaintiff's Exhibit No. 204 was marked and identified.)

11  BY MR. MAYES:  (Resuming)

12      Q.   Just to get the dates, I'm handing you Exhibit 204,

13  Mr. Dahlby.  This appears to be an e-mail request from you to

14  Mr. Duffy.  Do you see that?

15      A.   Yes.

16      Q.   Was this around the time when you learned that

17  Lucasys was at Algonquin/Liberty?

18      A.   I believe that was the case, yes.

19      Q.   Okay.  What happened next with respect to Liberty?

20      A.   I guess, what do you mean by what happened next?

21  That's like --

22      Q.   Sure.  Did PowerPlan take any action with respect to

23  Liberty as a result of learning that Lucasys was there?

24      A.   My understanding was Jim Duffy did have a

25  conversation with Liberty around our intellectual property
```

1    concerns and the licensing obligations -- or the license

2    agreement that existed between PowerPlan and Algonquin/Liberty.

3        Q.    Okay.  Did he -- did he describe those discussions to

4    you?

5        A.    Not that I recall in detail.

6        Q.    Okay.

7        A.    He may have sent a summary e-mail or something, but I

8    don't recall anything.

9        Q.    Do you know if those -- the communication Mr. Duffy

10   had was shortly after this appointment?

11       A.    I believe it to be shortly after that.  I don't know

12   the --

13       Q.    Okay.

14       A.    -- specifics of when those happened.

15       Q.    Do you know what actions Liberty took as a result of

16   that phone call?

17            MR. FAZIO:  Objection to foundation.

18            THE WITNESS:  My understanding is they no longer had

19       Lucasys engaged with the PowerPlan project team.  I don't

20       know if they continued to employ Lucasys or not.

21   BY MR. MAYES:  (Resuming)

22       Q.    And did they ask PowerPlan to submit a scope of work

23   to replace what Lucasys had been doing?

24       A.    I don't -- I recall having conversations on that

25   question, but I don't recall what exactly was requested by

1    Liberty.

2      (Plaintiff's Exhibit No. 205 was marked and identified.)

3    BY MR. MAYES:   (Resuming)

4      Q.   Mr. Dahlby, I'm handing you Exhibit 205 with a

5    courtesy copy for counsel.   Take a look at that and tell me if

6    you've seen it before.

7      A.   Yes, I would have seen this at the time.

8      Q.   Okay.   And you read these e-mails at the time you

9    received them?

10     A.   I did.

11     Q.   The first e-mail, which is on PowerPlan 200787, the

12   very last page of Exhibit 205, is an e-mail from Mr. Duffy to

13   Luisa Reed.   Do you see that?

14     A.   Yes.

15     Q.   Do you believe that this e-mail was sent as a

16   follow-up to the conversation Mr. Duffy had with Ms. Reed?

17     A.   It appears that that is the case, yes.

18     Q.   Okay.   It says, "In trying to help you come up with a

19   plan B, would you be willing to share with me the scope of work

20   from the SOW you signed with Lucasys?"   Do you see that?

21     A.   I do.

22     Q.   When it says plan B, did you understand that to mean

23   a plan B to Lucasys?

24         MR. FAZIO:   Objection to form.

25         THE WITNESS:   Can you --

 1   BY MR. MAYES:   (Resuming)

 2       Q.   What did you understand this e-mail to mean when it

 3   says, "In helping you come up with a plan B?"

 4       A.   It would be an alternative to including Lucasys in

 5   meetings that would have had confidential information that we

 6   weren't comfortable with them having access to.

 7       Q.   The next sentence says, "Something you wouldn't mind

 8   me potentially forwarding to external third parties."  Do you

 9   see that?

10       A.   Yes.

11       Q.   Do you know, did anyone at PowerPlan forward this

12   opportunity to any external third parties?

13       A.   I don't know if the e-mail was forwarded, but I know

14   we discussed other alternatives with third parties.

15       Q.   Okay.  Which third parties?

16       A.   I believe we discussed it with Deloitte or we

17   discussed Deloitte as one option, and I believe we -- I don't

18   want to speculate something that I wasn't involved with.

19       Q.   Okay.  Did PowerPlan try to get this work?

20           MR. FAZIO:  Objection to form.

21           THE WITNESS:  I don't recall what happened after this

22       e-mail chain, if we ever provided a proposal or not.

23   (Plaintiff's Exhibit No. 206 was marked and identified.)

24   BY MR. MAYES:   (Resuming)

25       Q.   Mr. Dahlby, I'm handing you Exhibit 206 with a

1    courtesy copy for counsel.  Take a look at that and tell me if

2    you've seen this.

3         A.   I have seen this, yes.

4         Q.   Okay.  Does this refresh your recollection about

5    whether or not PowerPlan was going to attempt to provide the

6    tax resources that were no longer available from Lucasys?

7         A.   Yes.  It does appear we had proposed something to

8    them.

9         Q.   Okay.  And that was not successful; is that correct?

10        A.   Based on this e-mail chain, that's what it appears to

11   show.

12        Q.   Okay.  Were you consulted by the members of the

13   business team about whether or not PowerPlan should push back

14   against Liberty using RCC as a vendor?

15        A.   I don't recall a specific conversation like that.

16        Q.   Did you discuss the matter with Jim Duffy to your

17   recollection?

18        A.   I don't recall discussing specifically if we should

19   push back, as you phrased it, but --

20        Q.   Okay.  Ultimately, PowerPlan did not object to RCC

21   providing the services that Lucasys was previously going to

22   provide to Liberty; is that true?

23        A.   That is correct.

24        Q.   As far as you know, RCC did provide those services;

25   is that correct?

1       A.   As far as I know.

2    (Plaintiff's Exhibit No. 207 was marked and identified.)

3  BY MR. MAYES:   (Resuming)

4       Q.   Mr. Dahlby, I'm handing you Exhibit 207 with a

5  courtesy copy for your counsel.  Take a look at that and tell

6  me if you've seen that before.

7       A.   I don't recall seeing this specific document.

8       Q.   Okay.  You're aware that Lucasys sued PowerPlan in

9  this case in the summer of 2020, correct?

10      A.   Yes.

11      Q.   Setting aside any conversations you had with counsel,

12  did you have discussions prior to that lawsuit being filed

13  about the possibility that Lucasys was going to sue PowerPlan?

14      A.   Not -- not outside of discussions with counsel.

15      Q.   Okay.  Outside of conversations with counsel, did

16  anyone ever ask you to try and identify information that

17  PowerPlan contended was a trade secret that was already

18  publicly available?

19      A.   Not outside of counsel.

20      Q.   Okay.  As far as you know, did anyone on the

21  management team aside from counsel ever ask PowerPlan

22  employees, hey, go find out what's available on the Internet?

23          MR. FAZIO:  Objection to form.

24          THE WITNESS:  I'm not aware.

25  BY MR. MAYES:   (Resuming)

 1      Q.    Okay.  So does that mean no; you're not aware that

 2  anyone ever did that, correct?

 3      A.    I'm not aware that anyone did that.

 4      Q.    Okay.

 5      A.    Or I'm not aware of anyone requesting that action to

 6  take place.

 7            MR. MAYES:  Okay.  It's 12:30.  Is this a good time

 8      for lunch or do you want to keep going?  I'm good to keep

 9      going if you guys are.

10            THE WITNESS:  I'm good.

11            MR. FAZIO:  I'm good until 1:00.

12            MR. MAYES:  All right.  That's fine.

13  BY MR. MAYES:  (Resuming)

14      Q.    At some point, did PowerPlan commence what it called

15  an IP protection program with respect to Lucasys?

16      A.    PowerPlan did have an IP protection program.  I don't

17  recall what it was -- what it was called, but we did have that.

18      Q.    Describe for me what you remember about what the IP

19  protection program was.

20            MR. FAZIO:  Objection to form.

21            THE WITNESS:  The program was kind of reminding our

22      customers through sending them letters around what our

23      agreements in place have stated was my recollection of the

24      key objective of the -- of the program.

25  BY MR. MAYES:  (Resuming)

1      Q.    Okay.   Those communications specifically referenced

2  Lucasys; is that correct?

3      A.    I don't recall if it specifically referenced Lucasys

4  or not.

5      (Plaintiff's Exhibit No. 208 was marked and identified.)

6  BY MR. MAYES:   (Resuming)

7      Q.    Okay.   Mr. Dahlby, I'm handing you Exhibit 208 with a

8  courtesy copy for counsel.   Take a look at that and tell me if

9  you've seen that before.

10      A.    I have seen this.

11      Q.    Okay.   And this references in the subject line an IP

12  protection letter; is that correct?

13      A.    It does.

14      Q.    Do you believe that IP protection letter is -- are

15  the communications you were just referencing when you talked

16  about the IP protection program?

17      A.    Yes.

18      Q.    Okay.   And this says, "I was thinking we should bring

19  up the letter that's going out during the exec stand-up to make

20  sure the team is all aware."   Did I read that correctly?

21      A.    Yes.

22      Q.    What is the exec stand-up?

23      A.    It's a meeting on Monday mornings with our executive

24  leadership team.

25      Q.    Who are members of the executive leadership team who

1    participate in those meetings?

2        A.    So it would have been our CEO, Joe Gomes, CFO Yost

3    Routon, Brett Burts, Marc Bortniker, Neal Tisdale, Suzanne

4    Ward, Sarah Park, and I believe that maybe Drea Terete would

5    have been in that at the time.

6        Q.    Did you participate?

7        A.    Yes.

8        Q.    Okay.  All those people were aware that these letters

9    were going out?

10       A.    Yes.

11   (Plaintiff's Exhibit No. 209 was marked and identified.)

12   BY MR. MAYES:  (Resuming)

13       Q.    Mr. Dahlby, I'm handing you Exhibit 20 -- I'm sorry

14   -- 209.  Have you seen this before?

15       A.    I don't recall if I saw this one or not.

16       Q.    Okay.  This is the day after the e-mail we just

17   looked at in Exhibit 208; do you see that?

18       A.    Yes.

19       Q.    Do you believe that this is one of the letters that's

20   referred to in Exhibit 208?

21       A.    I believe that those would have been potentially

22   different circumstances.

23       Q.    So is that a -- that's a no; you don't believe this

24   is one of the letters?

25       A.    I do not believe this was one of the -- the letters.

1      Q.    Okay.  Was -- this one was specific to Suez?

2      A.    It was.

3      Q.    And why -- why was that?

4      A.    Based on specific information we had about Lucasys

5   being engaged and how they were being engaged was my

6   understanding.

7      Q.    Okay.  Because -- is that -- I just want to make sure

8   I'm not misunderstanding.  You're saying it's because you knew

9   that Lucasys was doing work for Suez?

10     A.    We were made aware of that, yes.

11     Q.    Okay.  Do you believe that the letters that went out

12   as part of the IP protection wave were significantly different

13   from this letter that went to Suez?

14     A.    I don't recall.  I have not reviewed those letters --

15     Q.    Okay.

16     A.    -- recently.

17     Q.    This letter is specific to Lucasys; is that correct?

18     A.    It does mention Lucasys in the letter, yes.

19     Q.    Okay.  Did PowerPlan -- was PowerPlan asked by Suez

20   to put together a statement of work for potentially replacing

21   Lucasys at Suez in response to this letter?

22          MR. FAZIO:  Objection to foundation.

23          THE WITNESS:  I know we prepared a proposal.  I do

24       not know if we were asked to prepare a statement of work

25       or just a proposal.

```
 1    BY MR. MAYES:   (Resuming)

 2         Q.   Okay.   Were you involved in that process?

 3         A.   I was made aware and I may have been included on some

 4    calls, but I --

 5         Q.   Was there a phone call to reach out to Suez in

 6    addition to this letter; do you know?

 7         A.   I was not involved in a phone call, but I understand

 8    what -- what happened.

 9         Q.   Okay.   You weren't on that call?

10         A.   I was not.

11      (Plaintiff's Exhibit No. 210 was marked and identified.)

12    BY MR. MAYES:   (Resuming)

13         Q.   Okay.   Mr. Dahlby, I'm handing you Exhibit 210.   Take

14    a look at that and tell me if you've seen that before.

15         A.   Yes, I've seen this.

16         Q.   Okay.   Does this refresh your recollection about

17    whether Suez requested a statement of work from PowerPlan in

18    response to the letter that we saw in Exhibit 209?

19         A.   Yes.   It references that an SOW was requested.

20         Q.   Okay.   And PowerPlan put one of those together; is

21    that correct?

22         A.   I believe that's the case.   Yes, we would have put an

23    SOW together in response to the customer requesting it.   Yes.

24         Q.   Your e-mail at the top of Page 1 of Exhibit 210 says,

25    "I'm expecting a lot smaller $ given scenario and politics."
```

1    Do you see that?

2         A.    Yes.

3         Q.    What did you mean by the scenario and politics?

4         A.    Just given the desire to maintain a positive

5    relationship with our customers.

6         Q.    Was -- the scenario was broader than that, correct?

7    You had just asked them to fire Lucasys; isn't that true?

8              MR. FAZIO:  Objection to form.

9              THE WITNESS:  I don't believe we asked them to fire

10        Lucasys.  I think we asked them to not provide them access

11        to our intellectual property.

12   BY MR. MAYES:  (Resuming)

13        Q.    You were aware at the time you made that ask that

14   Lucasys would not be able to do the kind of consulting work it

15   was doing any longer if that request was honored; isn't that

16   true, Mr. Dahlby?

17        A.    Based on our understanding, there would have been

18   things they would not have been able to complete.

19        Q.    Okay.

20        A.    I believe that to be true.

21        Q.    So you might not have expressly asked them to

22   terminate the relationship, but you understood at the time you

23   made this ask that if the request was honored, that would be

24   the end result; isn't that true?

25              MR. FAZIO:  Objection to form.

1                    THE WITNESS:  Not the exact -- like, it wasn't saying

2          that they had to fire Lucasys was my understanding of what

3          the letter states, so --

4    BY MR. MAYES:  (Resuming)

5          Q.   It didn't say that, but you understood that if they

6    honored the request that would be the end result; isn't that

7    correct?

8                    MR. FAZIO:  Objection; asked and answered.

9                    THE WITNESS:  That would not be necessarily the end

10         result.

11   BY MR. MAYES:  (Resuming)

12         Q.   Okay.  There would be at least some things that they

13   were doing that they would not -- no longer be able to do;

14   isn't that correct?

15         A.   That would be a true statement.

16         Q.   Okay.  Did that play into your expectation that the

17   dollar amount would be a lot smaller as it says at the top of

18   Exhibit 210?

19         A.   Did what play into the --

20         Q.   Your understanding of the fact that Lucasys would no

21   longer be able to do work that it had been previously doing for

22   Suez and you were asking them to have that happen; is that the

23   scenario and politics you were referring to here?

24                    MR. FAZIO:  Objection to form; asked and answered.

25                    MR. MAYES:  You can answer.

```
 1              THE WITNESS:  So the scenario and politics that I was

 2        referring to was the fact that we were telling the

 3        customer they could no longer have consent to share that

 4        information with Lucasys which would create a challenge

 5        for the customer.

 6   BY MR. MAYES:  (Resuming)

 7        Q.   The IP protection program wave -- excuse me.  Strike

 8   that.

 9              The IP protection program was carried out in waves;

10   is that true?

11        A.   That's my recollection, yes.

12        Q.   Okay.  Why was it done that way?

13        A.   Based on -- we like to do it based on waves in order

14   to -- from a resourcing perspective to make sure we were

15   aligning with the specific customers and the specific customer

16   -- what their contract says, for instance, and who would need

17   to be contacted and how they would be contacted.

18        Q.   Did you have input into which customers were in which

19   waves?

20        A.   I believe that, yes, I was involved in preparing

21   the --

22        Q.   Which customers were in the first wave?  What

23   criteria did you use to determine who was in the first wave?

24              MR. FAZIO:  Objection to form.

25              THE WITNESS:  I don't recall the exact criteria that
```

 1          was defined.  So I understand it was the -- the results

 2          were our larger utility customers primarily.

 3    BY MR. MAYES:  (Resuming)

 4       Q.   Was there a reason you focused on larger customers

 5    first?

 6               MR. FAZIO:  Objection to form.

 7               THE WITNESS:  The -- that's where we felt the IP

 8          protection risk was highest and that we needed to inform

 9          them first.

10    BY MR. MAYES:  (Resuming)

11       Q.   Did you at any point focus on customers that you knew

12    had had a previous relationship with Mr. Lantukh?

13               MR. FAZIO:  Objection to form.

14               THE WITNESS:  I don't recall if that was one of the

15          criteria or not.

16    BY MR. MAYES:  (Resuming)

17       Q.   As part of the IP protection program, did PowerPlan

18    reach back out to AEP?

19       A.   I do not recall if they were included in that

20    program.

21       (Plaintiff's Exhibit No. 211 was marked and identified.)

22    BY MR. MAYES:  (Resuming)

23       Q.   Mr. Dahlby, I'm handing you Exhibit 211 with a

24    courtesy copy for counsel.  Take a look at that and tell me if

25    you've seen this before.

1        A.    I have seen this.

2        Q.    Okay.  Did you read this e-mail around the time it

3   was sent in June of 2020?

4        A.    I did.

5        Q.    Does this refresh your recollection as to whether or

6   not AEP was added to one of the waves of the IP protection

7   program?

8        A.    The second e-mail here states that they were added to

9   a wave, yes.

10       (Plaintiff's Exhibit No. 212 was marked and identified.)

11  BY MR. MAYES:  (Resuming)

12       Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 212 with a

13  courtesy copy for your counsel.  Have you seen Exhibit 212

14  before?

15       A.    I have not.

16       Q.    Okay.  You did not see a second letter to AEP?

17       A.    I don't recall seeing that.

18       Q.    Okay.  Do you know if this is the form of the letters

19  that went out as part of the AEP protection wave?

20            MR. FAZIO:  Objection to form and foundation.

21            MR. MAYES:  I'm sorry.  I'm sorry.  Yes, I meant IP.

22       Thank you.

23  BY MR. MAYES:  (Resuming)

24       Q.    Do you know if this is the form of the letters that

25  went out as part of the IP protection wave?

1                MR. FAZIO:  Objection.

2                THE WITNESS:  I don't believe that this is the exact

3        form, but I --

4    BY MR. MAYES:  ()Resuming)

5        Q.   Okay.  Were some customers excluded from the IP

6    protection program because they had migrated to the cloud

7    version of PowerPlan's software?

8                MR. FAZIO:  Objection to form and foundation.

9                THE WITNESS:  I don't recall if they were excluded or

10       not, so I don't -- I don't recall.

11   BY MR. MAYES:  (Resuming)

12       Q.   Okay.  Were -- do you recall if customers who were on

13   the cloud version of PowerPlan's software were treated

14   differently for purposes of the IP protection program in any

15   way?

16       A.   I don't recall.

17      (Plaintiff's Exhibit No. 213 was marked and identified.)

18   BY MR. MAYES:  (Resuming)

19       Q.   Mr. Dahlby, I'm handing you Exhibit 213.  Take a look

20   at that and tell me if you've seen that before.

21       A.   I have seen this.

22       Q.   Okay.  And so first, who is Joel McManus (ph)?

23       A.   He was the senior manager of Manna (ph) Services.

24       Q.   What was he -- strike that.

25                Did he have a role in the IP protection program?

1    A.    My recollection is he was part of the team that was

2    executing the communications.

3    Q.    So he says in his e-mail to you, "I saw a note Kevin

4    had made on Seminole that they are on -- they are cloud

5    deployment and don't need the IP protection phone call."  Did I

6    read that correctly?

7    A.    You did read that correctly.

8    Q.    Why would a customer not need an IP protection phone

9    call if they were on the cloud deployment?

10   A.    Specifically, the reason that that reduces our risk

11   from an IP protection perspective is because they would not

12   have our database or our code on their premise.  I don't know

13   if we added them back to one of the waves or not, but the risk

14   would have been a different risk profile for those customers as

15   it relates to our IP.

16   Q.    Okay.  And the reason for that was because rather

17   than having the database hosted at the client site, the

18   database was hosted on PowerPlan-owned machines; is that

19   correct?

20   A.    I would describe it as PowerPlan-managed because

21   they're --

22   Q.    Sure.

23   A.    We don't own the machines, but we were in control of

24   the servers where their software and their database resided.

25   Q.    Did PowerPlan take the perspective -- the position --

1   excuse me.

2          Did PowerPlan take the position that third-party

3   consultants could not access the database for customers whose

4   data was stored on the cloud?

5          MR. FAZIO:  Objection to form.

6          THE WITNESS:  Can you repeat the question?

7   BY MR. MAYES:  (Resuming)

8      Q.   Yeah.  Sure.  Did PowerPlan take the position that

9   third-party consultants could not access customer databases

10  that were hosted in the cloud?

11     A.   So the -- so direct access to the database; is that

12  the question you're asking?

13     Q.   Yeah.

14     A.   So without a program or a way for us to enable them

15  to have that access, it was not possible for them to have

16  direct access to the database.

17     Q.   And that meant for customers who had historically

18  used third-party consultants to do things like data cleansing,

19  that was no longer possible for customers who had moved to the

20  cloud deployment; is that true?

21     A.   I would not classify that as -- as true.

22     Q.   Okay.

23     A.   They could still hire third parties to provide data

24  cleansing services.

25     Q.   They would need just an intermediary to extract the

1  data and give it to them before they could cleanse it?

2      A.   The customer could extract the data from their

3  system, yes.

4      Q.   Okay.  Did that become a problem for any customers?

5          MR. FAZIO:  Objection to form.

6          THE WITNESS:  I guess, what do you mean did that

7      become a problem?

8  BY MR. MAYES:  (Resuming)

9      Q.   Sure.  Did any customers object to not being able to

10  use third-party vendors as a result of their having deployed

11  the cloud version of PowerPlan's software?

12     A.   We have had that occur, yes.

13     Q.   Okay.  I guess we can talk about that more because

14  it's (unintelligible).

15          Did PowerPlan complete the IP protection program in

16  the manner that it planned to?

17          MR. FAZIO:  Objection to form and foundation.

18          THE WITNESS:  I don't believe we completed that

19      program.

20  BY MR. MAYES:  (Resuming)

21     Q.   Okay.  Why not?

22     A.   My understanding, that was, I guess, conversation

23  where legal counsel recommended that we --

24     Q.   Yeah, don't tell me what legal counsel recommended.

25  Was the program ceased once Lucasys sued PowerPlan?

1       A.    I don't recall the timing of those two events.

2       Q.    Do you know who Rob Kleczynski is?

3       A.    I believe he is the VP of tax for Exelon, one of our

4   customers.

5       Q.    Did you have any role ever supporting Exelon?

6       A.    I've worked with Exelon at different times in my

7   career, yes.

8       Q.    Did Mr. Burts ever consult you about potentially

9   reaching out to Exelon as part of the IP protection program?

10      A.    I don't recall if there was any specific conversation

11  around Exelon with Mr. Burts.

12      Q.    Okay.  I think we saw a minute ago that some of the

13  IP protection communications included phone calls; is that

14  correct?

15      A.    I believe that was part of the IP protection.

16      Q.    Did you participate in any of those phone calls?

17      A.    I don't recall participating in any of those phone

18  calls, no.

19      Q.    Who did participate in those phone calls as far as

20  you know?

21      A.    I don't recall.

22      Q.    Do you recall PowerPlan communicating to any of its

23  customers that it was going to be conducting a third-party

24  audit of access to intellectual property by outside vendors?

25      A.    I don't recall if that was ever communicated to

1    customers.

2         Q.   Do you know if PowerPlan ever actually hired anyone

3    to do an audit of access to PowerPlan databases by outside

4    vendors?

5         A.   I don't believe so.

6         Q.   You're aware that PowerPlan filed a motion -- do you

7    know what a motion to dismiss is in a lawsuit?

8         A.   I do.

9         Q.   Okay.  And you're aware that PowerPlan filed one of

10   those in this case?

11        A.   I believe I was told that from our legal counsel.

12        Q.   Did you ever see the judge's order on that motion to

13   dismiss?

14        A.   I have not.

15        Q.   Okay.  Do you know approximately when the judge's

16   order came down?

17        A.   I don't recall.

18        Q.   Do you believe you learned near in time to when it

19   was decided by the judge that it had been decided?

20        A.   I -- I don't recall.

21             MR. MAYES:  Okay.  Do you want to take a lunch break,

22        Steve?

23             MR. FAZIO:  Yeah, I wouldn't mind taking --

24             MR. MAYES:  All right.  Let's go off the record.

25             VIDEOGRAPHER:  Okay.  Going off the record.

```
 1                        (BREAK TAKEN)

 2              VIDEOGRAPHER:  Okay.  Go ahead.

 3   BY MR. MAYES:  (Resuming)

 4       Q.   All right.  We're back on the record after lunch.

 5   Mr. Dahlby, can you confirm that during the break we had no

 6   substantive discussion about the case?

 7       A.   I can confirm.

 8       Q.   Mr. Dahlby, before the break we talked some about the

 9   IP protection program that PowerPlan did in the summer of 2020;

10   do you recall that?

11       A.   Yes.

12       Q.   I'm handing you what was previously marked as

13   Exhibit 17.  Take a look at that.  Tell me if you've seen

14   something that looks like this before.

15       A.   Yes, I would have seen this.

16       Q.   Okay.  Are these -- is this the form of the

17   communications that were sent out as part of the intellectual

18   property protection program?

19       A.   Yeah.  This appears to be the form -- the generic

20   form.

21       Q.   So earlier, I asked you about a communication where

22   you were going to discuss the letter going out to customers in

23   the executive stand-up; do you recall that?

24       A.   Yes.

25       Q.   Is this the form of the letter you were referring to
```

1    in that -- in that exhibit?

2        A.    I believe that's the case, yeah.

3        (Plaintiff's Exhibit No. 214 was marked and identified.)

4    BY MR. MAYES:    (Resuming)

5        Q.    Okay.    Mr. Dahlby, I'm handing you Exhibit 214 with a

6    courtesy copy for counsel.    And I'll represent to you this is

7    an excerpt from the privilege log we were provided by

8    PowerPlan's counsel, and it's got a couple of e-mails from you

9    here identified.    Do you see that?

10        A.    Yes, I see that.

11        Q.    Okay.    And I'm not going to ask you about the

12    substance of your communications back and forth with

13    Mr. Suture, but the first e-mail that's listed there on 10/5/20

14    with a 1:10 timestamp says, "Re:    Trade secrets identification

15    kickoff."    Do you see that?

16        A.    Yes.

17        Q.    Do you recall having conversations that did involve

18    Mr. Suture or counsel for PowerPlan at this time involving a

19    trade secrets identification kickoff?

20        A.    I do not.

21        Q.    Okay.    Do you know what -- I did not see an e-mail

22    that didn't have the Re: on the privilege log.    Do you know,

23    was there an original e-mail that was with the subject line of

24    trade secrets identification kickoff?

25        A.    I don't recall.

1      Q.    Okay.  Were there meetings not involving counsel

2  around this time period where PowerPlan employees or executive

3  were trying to identify PowerPlan's trade secrets?

4      A.    Not that I'm aware.

5      (Plaintiff's Exhibit No. 215 was marked and identified.)

6  BY MR. MAYES:  (Resuming)

7      Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 215.  Take

8  a look at that and tell me if you've seen that before.

9      A.    I don't recall seeing this.

10      Q.    Okay.  Do you recall reviewing PowerPlan's responses

11  to Lucasys' interrogatories at any point?

12      A.    I do.

13      Q.    Do you recall if those interrogatories made reference

14  to the counterclaim filed by PowerPlan in the case?

15      A.    I don't recall if there was a specific reference to

16  that.

17      (Plaintiff's Exhibit No. 216 was marked and identified.)

18  BY MR. MAYES:  (Resuming)

19      Q.    Okay.  I'm handing you Exhibit 216.  Take a look at

20  Exhibit 216, and tell me if you have seen Exhibit 216 before.

21      A.    I have.

22      (Plaintiff's Exhibit No. 217 was marked and identified.)

23  BY MR. MAYES:  (Resuming)

24      Q.    And did you -- I'm handing you Exhibit 217 along with

25  a courtesy copy for counsel.  Is that your signature on the

1    bottom of 217?

2         A.   Yes, it is.

3         Q.   And that's verifying to the best of your knowledge

4    that the answers in Exhibit 216 are accurate, the factual

5    information; is that correct?

6         A.   Yes.

7         Q.   Okay.  And did you similarly verify the answers to a

8    second set of interrogatories; do you recall?  I might as well

9    just give them to you so you don't have to stress your memory.

10        A.   I do recall there being a second set of

11   interrogatories.

12        (Plaintiff's Exhibits No. 218 and 219 were marked and

13                        identified.)

14   BY MR. MAYES:  (Resuming)

15        Q.   Mr. Dahlby, I'm handing you Exhibit 218 along with a

16   courtesy copy for counsel, and 219 as well.

17             MR. FAZIO:  (Unintelligible response).

18             MR. MAYES:  Oh, does it?  Well, I had two files in

19        the e-mail (unintelligible), so I guess we can scrap --

20        well, it's already marked, so here's 219.

21   BY MR. MAYES:  (Resuming)

22        Q.   Mr. Dahlby, is that your signature on the last page

23   of Exhibit 218?

24        A.   Yes.  Yes, sir.

25        Q.   Okay.  Thank you.  All right.  So I know you've got a

1   lot of documents in front of you right now.  I want you to look

2   back at Exhibit 215 first.  And I'm going to ask you to turn

3   to the counterclaim portion of Exhibit 215, which begins on

4   Page 21.  And you'll see that numbering of the paragraphs

5   begins again on Page 21 with the counterclaims.  Are you with

6   me?

7       A.   Yep.

8            MR. FAZIO:  Page 22?

9            MR. MAYES:  Yeah.

10  BY MR. MAYES:   (Resuming)

11      Q.   I want you to look at paragraph number 19 of the

12  counterclaim, which is on Page 27 of Exhibit 215.  Are you with

13  me?

14      A.   Yes.

15      Q.   Okay.  Go ahead and read that to yourself and tell me

16  when you're done.

17      A.   Okay.

18      Q.   Are you aware of any other efforts that PowerPlan

19  takes to maintain the secrecy of its confidential or

20  proprietary information and trade secrets other than the things

21  that are listed here in paragraph 19?

22      A.   I'm sure there are others, but I can't think of

23  anything immediately that comes to mind.

24      Q.   Okay.  So as you sit here today, you cannot think of

25  any other efforts other than the ones that are set forth in

 1   paragraph 19?

 2       A.   Yes.

 3       Q.   Okay.  If you turn back to paragraph five, which is

 4   on Page 23 of Exhibit 215, go ahead and read that paragraph to

 5   yourself and let me know when you're done.

 6       A.   Okay.

 7       Q.   Okay.  As you sit here today, are you aware of any

 8   evidence that anyone at Lucasys misappropriated the items that

 9   are listed here beginning with, "Including but not limited to?"

10           MR. FAZIO:  Again, he's not asking you for anything

11       that you've learned through counsel.  With that, go ahead

12       and answer.

13           THE WITNESS:  Can you repeat the question to make

14       sure I heard it right?

15   BY MR. MAYES:  (Resuming)

16       Q.   Sure.  Yeah.  As you sit here today, are you aware of

17   any facts or evidence showing that Lucasys misappropriated any

18   of the items that are listed in paragraph five after,

19   "Including but not limited to?"

20       A.   I have not been presented that -- any direct

21   evidence.

22       Q.   If you look at Exhibit 216, which is the first set of

23   interrogatories, I want you to turn to interrogatory response

24   number eight, which is on Page 7 of Exhibit 216.  Go ahead and

25   read the response and let me know when you're finished.

1        A.    Okay.    I've read it.

2        Q.    Okay.    At the time you verified the accuracy of these

3    interrogatory responses, what facts or evidence supported the

4    response that Lucasys had misappropriated -- the things that

5    Lucasys had misappropriated included with the list that

6    follows?

7              MR. FAZIO:    Objection to form.

8              THE WITNESS:    Can you repeat the question, please?

9    BY MR. MAYES:    (Resuming)

10       Q.    Sure.    Yeah.    So the -- in the response here,

11   there's, "Without waiving its objections, PowerPlan states that

12   the trade secrets, confidential information, proprietary

13   information, and protected information set forth in the

14   October 30, 2019 letter that PowerPlan contends Lucasys has

15   misappropriated include," and then there is a list.    Do you see

16   that?

17       A.    I see that.

18       Q.    Okay.    And my question is, what facts or evidence

19   support this response that Lucasys had misappropriated the

20   things that are listed there at the time you verified these

21   interrogatory responses?

22       A.    I guess that would have been conversations I was

23   having with legal counsel around that.

24       Q.    I don't want you to tell me your conversations with

25   legal counsel.    But this is with respect to the facts that are

1   -- what facts or evidence were you aware of, setting aside

2   anything you had exclusively heard through counsel, that

3   supported this statement that Lucasys had misappropriated the

4   things listed after the word "include" in that interrogatory

5   response?

6       A.   What -- how would we classify the information learned

7   through the agreed process?

8       Q.   Was that the basis on which you verified this

9   response?

10          MR. FAZIO:   Objection to form and foundation.

11          THE WITNESS:   I guess that was a question I was

12      asking.  Is that --

13          MR. MAYES:   If you need to discuss with Mr. Fazio

14      whether you're permitted to -- to give an answer based on

15      things you learned during the agreed process, we can take

16      a short break.

17          THE WITNESS:   We can take a break.

18          VIDEOGRAPHER:   Okay.   Stand by.   Going off the

19      record.

20                      (BREAK TAKEN)

21          VIDEOGRAPHER:   Back on the record at 2:14 p.m.

22   BY MR. MAYES:   (Resuming)

23      Q.   Okay.  Mr. Dahlby, can you confirm that you and I did

24   not have any substantive discussions about the case during the

25   break?

1      A.    Yes.

2      Q.    So my question was, what facts or evidence did you

3   have at the time you verified this interrogatory response that

4   Lucasys had misappropriated the items after the word "include"

5   in response number eight?

6      A.    So those items would have been part of the agreed

7   process with legal counsel.

8      Q.    So specifically, was there -- so items you received

9   or reviewed during the agreed process were the basis for this

10  response; is that correct?

11          MR. FAZIO:   Objection.  I don't want to have a

12      speaking objection, but I think I need to clarify what

13      you're asking here.

14          MR. MAYES:   Okay.  Yeah.

15  BY MR. MAYES:  (Resuming)

16     Q.    My question is, the factual -- all of the factual

17  basis for this response number eight is information you learned

18  as part of the agreed process; is that true?

19          MR. FAZIO:   Objection.  Objection to form.

20          MR. MAYES:   You can answer if you understand the

21      question.

22          THE WITNESS:   Yeah, that -- to my knowledge, yes,

23      that's the only thing I can recall would have been that

24      information.

25  BY MR. MAYES:  (Resuming)

1      Q.   Okay.  If you could turn to interrogatory

2  response 11, which is on Page 12 of Exhibit 216, go ahead and

3  read the interrogatory and the response and let me know when

4  you're finished.

5      A.   Okay.  I've read it.

6      Q.   Okay.  At the time before you verified -- or before

7  you verified this response number 11, had you searched

8  PowerPlan's website to see what information was available on

9  PowerPlan's website?

10     A.   I have not done a -- I clicked through our website to

11  see what's available, but I have not done a search of our

12  website.

13     Q.   Did you do a Google search to see what was available

14  like through the Internet before verifying this response?

15     A.   I did not.

16     Q.   Did you ever go on any public source code

17  repositories to see what was available?

18     A.   I did not.

19     Q.   Do you now know that, in fact, information that

20  PowerPlan contended was a trade secret was available on

21  PowerPlan's website?

22          MR. FAZIO:  Objection to form and foundation.

23          THE WITNESS:  The -- I guess I'm not a legal expert

24      to decide what a trade secret is.  I do believe with the

25      second exhibit we're looking at, there was information

1        that we would consider confidential that was available.

2   BY MR. MAYES:   (Resuming)

3        Q.   Okay.  We can talk about that when we get to the

4   second set of interrogatory responses.  At some point, did you

5   become aware that the counterclaim that PowerPlan had filed in

6   this case was dismissed by the judge?

7        A.   I was provided updates from our legal counsel.

8        Q.   Did you understand why the counterclaim was

9   dismissed?

10       A.   I do not, no.

11       Q.   Okay.  If you can look back at Exhibit 215, which is

12   the counterclaim, and I want you to turn to paragraphs 53

13   through 55 of the counterclaim, which are on Pages 36 and 37 of

14   Exhibit 215.

15       A.   What paragraphs did you say?

16       Q.   Fifty-three through 55.

17       A.   Okay.  I've read those paragraphs.

18       Q.   Okay.  As you sit here today, are you aware of any

19   facts or evidence that Lucasys, in fact -- strike that.

20            Look at paragraph 55.

21       A.   Okay.

22       Q.   As you sit here today, are you aware of any

23   information -- facts or evidence that support the allegation

24   that Lucasys used PowerPlan's protected information including

25   but not limited to that list of things to design, develop, and

1  implement Lucasys' software?

2          MR. FAZIO:  You can answer that to the extent it does

3      not include information you learned from counsel.

4          THE WITNESS:  I'm not aware of any public information

5      that would pertain to that.

6  BY MR. MAYES:  (Resuming)

7      Q.  Okay.  My question is a little different, which is as

8  you sit here today, are you aware of any facts or evidence,

9  setting aside what you might have learned from counsel, that

10 shows Lucasys, in fact, used PowerPlan's protected information

11 to design, develop, and implement its software?

12     A.  I'm not aware.  I have not seen that information.

13     Q.  Okay.  Are you aware that the judge in the case gave

14 PowerPlan an opportunity to amend this counterclaim after it

15 was dismissed?

16     A.  I believe I may have heard that, but I don't --

17     Q.  Okay.  Are you aware that the judge at some point

18 ordered PowerPlan to identify the trade secrets at issue in the

19 case with particularity?

20     A.  I guess I was at the request of counsel involved in

21 answering those questions.  I don't know (unintelligible).

22     Q.  Okay.  And my question is just kind of simply, are

23 you aware that that was something that PowerPlan was ordered to

24 do?

25     A.  Yes.

 1      (Plaintiff's Exhibit No. 220 was marked and identified.)

 2   BY MR. MAYES:   (Resuming)

 3      Q.    Okay.  I'm handing you Exhibit 220.  Have you seen

 4   this document before?

 5      A.    I have not seen this document.

 6      Q.    Okay.  So I guess the answer is that you did not put

 7   this together; this is not your work product?

 8      A.    I have not seen this document.

 9      Q.    Okay.

10      A.    The -- yes, not this document.  I guess that's the

11   question, right?

12      Q.    Fair enough.  If you flip to Page 6, there is

13   something that begins Exhibit A.  Have you seen the document

14   starting at Page 6 going further back to Page 53?

15      A.    I have seen this -- some of this content.  I don't --

16   don't know if I've seen all of it.

17      Q.    Did you draft this?

18      A.    I did not draft this.

19      Q.    Prior to this document that we see here that begins

20   on Page 6 of Exhibit 220, are you aware of any similar list

21   that existed at PowerPlan at any point during your tenure

22   there?

23      A.    I'm not aware.

24      Q.    I want you to look at paragraph 174 on Page 25 of

25   this.  Strike that.

1          What's your understanding of what this document is?

2     What are these items that are listed in paragraphs one through

3     411?

4          A.   My understanding is these are key pieces of our

5     intellectual property documented at the request of legal -- a

6     legal request.

7          Q.   If you look at paragraph 174 on Page 25, do you

8     understand that PowerPlan was contending that storing any

9     number of income tax rates for federal and various state

10    jurisdictions was a piece of PowerPlan's intellectual property?

11          MR. FAZIO:  Objection to form.

12          THE WITNESS:  I guess, can you repeat the question to

13     make sure I understand what you're asking there?

14    BY MR. MAYES:  (Resuming)

15          Q.   Sure.  Yeah.  You just said, I think, that these

16    items in paragraphs one through 411 were key pieces of

17    PowerPlan's intellectual property.  Did I understand that

18    correctly?

19          A.   Yes.  You understood that correctly.

20          Q.   Okay.  And so I'm asking you about a specific one of

21    those, which is number 174, which says, "Storing any number of

22    income tax rates for federal and various state jurisdictions."

23    Is that a piece of PowerPlan's intellectual property?

24          A.   I mean, I think in the context of the various points

25    that all kind of fit together, it's not that we store rates.

1    It's how we store the rates is -- was the -- is what's being

2    described here.

3        Q.    Isn't it true that any tax software would need to

4    store tax rates?

5            MR. FAZIO:   Objection to form.

6            THE WITNESS:   Can you repeat the question to make

7        sure I understand?

8    BY MR. MAYES:   (Resuming)

9        Q.    Yeah.   Wouldn't any tax software -- any tax

10   calculation software need to store tax rates?

11       A.    Any tax software would have to decide how to

12   structure that information and how to organize that information

13   in a way that it efficiently works with the rest of -- in an

14   end piece of software.

15       Q.    Okay.   So if I understand right, each one of these

16   numbered bulletpoints is not by itself a piece of PowerPlan

17   intellectual property; is that correct?

18           MR. FAZIO:   Objection to form.

19           THE WITNESS:   I guess I don't believe I can -- I'm

20       not a legal expert on how you would define that.

21   BY MR. MAYES:   (Resuming)

22       Q.    Okay.   Has PowerPlan made any effort as far as you're

23   aware of to revise this list in light of the information that

24   Lucasys was able to find publicly through the Internet?

25           MR. FAZIO:   Objection to form.

```
1              THE WITNESS:  We have not.

2  BY MR. MAYES:  (Resuming)

3      Q.   Okay.  Have you made any communications to customers

4  letting them know that things that previously might have been

5  considered intellectual property were no longer considered

6  intellectual property?

7              MR. FAZIO:  Objection to form and foundation.

8              THE WITNESS:  I guess I'm not sure what you're

9      referring to.

10  BY MR. MAYES:  (Resuming)

11      Q.   Well, you understand that when something is publicly

12  available on the Internet, it can't be claimed as a trade

13  secret, correct?

14              MR. FAZIO:  Objection to form.

15              THE WITNESS:  I guess I'm not an expert to define

16      whether or not that's still our intellectual property,

17      so --

18  BY MR. MAYES:  (Resuming)

19      Q.   Okay.  And I guess as far as you know, has PowerPlan

20  in any way publicly changed its position about what constitutes

21  its intellectual property in response to the information that

22  Lucasys found to be publicly available on the Internet?

23      A.   No.

24      Q.   Okay.  I guess I've talked about it.  Why don't we

25  look at Exhibit 218?  This is the second set of interrogatory
```

1    responses, and I want you to look at interrogatory number 19 of

2    Exhibit 218, which doesn't have page numbers, but it's -- the

3    third page is where it starts.  Go ahead and read the

4    interrogatory and the response.  Let me know when you're done.

5         A.    You said 19?  Interrogatory 19, you said?

6         Q.    Yes.

7         A.    Okay.

8         Q.    Please let me know when you're finished reading the

9    response to interrogatory 19.  Are you ready?

10        A.    Yep.

11        Q.    Okay.  In response to -- or while you were preparing

12   to verify this response to interrogatory 19, did you review the

13   information Bates labeled Persons or Websites 001 through

14   002891?

15        A.    I did.

16        Q.    Okay.  And this interrogatory response refers to an

17   Exhibit A.  Tell me what steps you took to verify the

18   information presented in Exhibit A.

19        A.    Reviewing the documents and --

20        Q.    Okay.  So there's a column here on Exhibit A that

21   says, "Earliest possible date available on website or phone

22   application."  Do you see that?

23        A.    Yes.

24        Q.    Where did the information that was used to fill in

25   that column come from?

1       A.   I was told that that was based on our -- like the

2   timestamps on the files.

3       Q.   Okay.  So who told you that?

4       A.   The legal counsel.

5       Q.   Okay.  You didn't -- did you do anything

6   independently to verify that these dates that are shown here

7   were accurate?

8       A.   I did not.

9       Q.   Okay.  As far as you know, are they accurate?

10      A.   They -- I looked over them.  They all looked

11   reasonable, so I did not verify them individually.

12      Q.   Okay.  I want you to look at interrogatory number 18,

13   which is on -- it starts on the second page, and the answer to

14   that interrogatory.

15      A.   Okay.

16      Q.   Okay.  You understood this interrogatory number 18 to

17   be referring to the Exhibit A to Exhibit 220 that we looked at

18   a minute ago, correct, the -- the numbered list from one to

19   411?

20      A.   I did not understand those two things to be

21   connected.

22      Q.   Okay.  Did you think there was another list of trade

23   secrets provided by PowerPlan on April 29th, 2022, when you

24   read and verified the accuracy of the response to interrogatory

25   number 18?

1      A.   The -- well, let me ask -- clarify.  So I had not

2   seen the document that we talked about, so I guess I understood

3   that there was a list of trade secrets provided based on the

4   information from counsel.

5      Q.   Okay.  And I guess my question is, when you read this

6   interrogatory and then verified the accuracy of the response,

7   if you hadn't seen this, what did you think it was referring to

8   when it said the list of trade secrets provided by PowerPlan on

9   April 29th, 2022?

10          MR. FAZIO:  Objection to form.

11          THE WITNESS:  I was aware based on information from

12      counsel that we had provided a list.  I had not seen the

13      list, but based on the answer, we weren't specifying any

14      specific list based on the information provided from

15      counsel.

16   BY MR. MAYES:  (Resuming)

17      Q.   Okay.  So as of the date of -- that these were

18   verified, there was not a single one of the items from the list

19   of trade secrets that PowerPlan was contending that Lucasys had

20   misappropriated; is that correct?

21          MR. FAZIO:  Objection to form and foundation.

22          THE WITNESS:  That is not what the answer says.

23   BY MR. MAYES:  (Resuming)

24      Q.   Okay.  PowerPlan could not on this date identify any

25   specific item from that list; isn't that true?

1            MR. FAZIO:  Objection to form.

2            THE WITNESS:  Excuse me?

3  BY MR. MAYES:  (Resuming)

4      Q.   Okay.  As of the date you verified the response to

5  interrogatory number 18, isn't it true that PowerPlan could not

6  identify a specific item from the list of trade secrets that

7  Lucasys had misappropriated?

8            MR. FAZIO:  Objection to form.

9            THE WITNESS:  As the answer states, it's premature as

10       discovery in this case is ongoing.  So that was what I was

11       verifying; that -- the statement here that says it's

12       premature; discovery in the case is ongoing.

13  BY MR. MAYES:  (Resuming)

14      Q.   Okay.  And the answer does not, in fact, identify a

15  single item from the list, correct?

16      A.   The answer does not identify any item from the list.

17      Q.   As you sit here today, can you identify a specific

18  item from the list that you contend -- or PowerPlan contends

19  Lucasys misappropriated?

20            MR. FAZIO:  Objection to form and foundation.

21            THE WITNESS:  I have not been -- I have not seen any

22       of the production that would have allowed that analysis to

23       be done.

24  BY MR. MAYES:  (Resuming)

25      Q.   Okay.  So you personally as you sit here have not

1    received any new information since the time you verified this

2    interrogatory response that would allow you to give a different

3    more specific answer; is that true?

4         A.    That is true.

5         Q.    I want to look again at the response to interrogatory

6    number 19.  Let me know when you're -- when you're there.

7         A.    Okay.

8         Q.    The first sentence of the paragraph -- the second

9    paragraph, the response that begins, "With respect to Persons

10   or Websites 1 through 2891."  Do you see that sentence?

11        A.    Yes.

12        Q.    Okay.  This says, "The materials were uploaded to the

13   PowerPlan website and/or Cvent phone application by PowerPlan's

14   marketing department following approval by the respective

15   content owner."  Did I read that correctly?

16        A.    Yes.

17        Q.    Who are the respective content owners who approved

18   the posting of those materials?

19        A.    That would have been the head of the marketing

20   department.

21        Q.    And who was that at the time these items were posted?

22        A.    Drea Terete.

23        Q.    So it's your understanding that Ms. Terete approved

24   the posting of all of the information that Mr. Persinger (ph)

25   attached to his declaration with the Bates labels referred to

1    in that sentence?

2          A.    I was not involved to know the exact order, but

3    that's who would have been involved.

4          Q.    Okay.  Did you talk to Ms. Terete in connection with

5    your verification of this interrogatory answer?

6          A.    I did not.

7          Q.    Well, how do you know that that's true; that

8    sentence?

9          A.    Because that would be -- that's my understanding from

10   the people in the marketing department.

11         Q.    Okay.  So you talked to somebody else in the

12   marketing department when you were --

13         A.    Yes.

14         Q.    -- working on this response?

15         A.    Yes.

16         Q.    Who did you talk with?

17         A.    I believe it was Joyce Smith.

18         Q.    Was she the one who actually posted the material?

19         A.    I don't recall if she was or was not, so --

20         Q.    Okay.

21         A.    It could have been.  The department is a group of

22   people.  I don't know who actually posted it.

23         Q.    Skipping to the next sentence which talks about

24   Exhibit A, and going on to the sentence after that, it says,

25   "PowerPlan does not have any formal policies or training

1  specifically related to the upload of materials to the

2  PowerPlan website and/or Cvent phone application."  Did I read

3  that correctly?

4      A.   You did.

5      Q.   Has that changed since this interrogatory answer was

6  verified?

7      A.   So the -- yes, that has changed, so I guess so.  I

8  don't know if it's specific to the policies around where we

9  uploaded that content, so this content was uploaded into like a

10 hidden area of our website is my understanding.  I'm not

11 technical in how the -- the website works, but that's my

12 understanding is it was like a hidden area of the website that

13 wasn't accessible from the main homepage of the website.  And

14 so we've made sure that we're posting that content into a

15 customer portal that's password-protected or, you know,

16 specific to those registrations.

17     Q.   Have you taken steps to add additional security to

18 the app?

19          MR. FAZIO:   Objection to form.

20          THE WITNESS:   I'm not familiar with additional

21     security of the app.  I do know that the -- like, the most

22     recent events that the information was only available to

23     the registered attendees.

24 BY MR. MAYES:   (Resuming)

25     Q.   As far as you know prior to the posting of the

1   materials Bates labeled Persinger Website 1 through 2891 and

2   Persinger App 2892 through 871, had Ms. Terete received

3   specific training about what constituted PowerPlan's trade

4   secrets?

5        A.   I mean, she would have received similar training in

6   -- that we talked about in the earlier responses, and the

7   employee handbook and so forth.

8        Q.   So you looked through those materials.  Some of those

9   materials had confidential and proprietary legends across the

10  bottom; isn't that correct?

11       A.   They did.

12       Q.   Should those materials have been posted to the

13  PowerPlan website where they were accessible?

14       A.   They should not have been.  I think the fact that

15  they were in a hidden area was -- I believe that was a

16  technique to provide security on those -- a level of security

17  on those documents.

18       Q.   Okay.  Turn to the next page of Exhibit 218.  There

19  is a response about Persinger GitHub 9089 through 9423.  Do you

20  see that?

21       A.   Yes.

22       Q.   Okay.  The first sentence says PowerPlan did not

23  upload the information found at those Bates labels; is that

24  correct?

25       A.   Yes.

1      Q.    Is that accurate?

2      A.    Yes.

3      Q.    Okay.  Skip the next sentence and read the sentence

4  below that.  It says, "All folders within a PowerPlan-owned

5  GitHub account are private.  However, there was a brief period

6  where one or more folders in its GitHub account were made

7  accessible to the public."  Did I read that correctly?

8      A.    Yes.

9      Q.    Okay.  When was that brief period?

10     A.    In the last -- I don't know the exact dates of those

11  dates, but they are no longer public.

12     Q.    Okay.  How long were they public?

13     A.    I don't recall the specifics for each of those

14  different files, so --

15     Q.    Okay.  How about for just -- so only some folders in

16  PowerPlan's GitHub account were made accessible to the public;

17  is that correct?

18     A.    That's accurate.

19     Q.    Okay.

20     A.    A very limited amount of folders.

21     Q.    Where did you get that information from; the

22  information that some -- one or more folders were made

23  accessible to the public?

24     A.    After receiving those exhibits from the Persinger,

25  identify and speaking to the team that was involved with those

```
 1      -- those particular files.

 2          Q.   Is that Chris Shoon (ph) and Dan Modder (ph) as

 3      referred to in the next sentence?

 4          A.   Yes.

 5          Q.   So you spoke with Mr. Shoon and Mr. Modder?

 6          A.   I spoke with Mr. Tisdale who spoke with them.

 7          Q.   Okay.   And the next sentence says, "Chris Shoon,

 8      Daniel Modder, and/or other individuals may have edited,

 9      relocated, and/or duplicated information from a temporarily

10      public folder on a PowerPlan-owned GitHub account to

11      personally-owned GitHub accounts in approximately 2020 as

12      reflected in Persinger GitHub 009088."   Did I read that

13      correctly?

14          A.   You read that correctly.

15          Q.   Okay.   At the time they did that, Mr. Shoon and

16      Mr. Modder were PowerPlan employees; is that correct?

17          A.   They were.

18          Q.   Okay.   And at the time they did that, the folders

19      that they edited, relocated, and/or duplicated were publicly

20      available; is that true?

21          A.   That's my understanding, yes.

22          Q.   Okay.   And do you know at what point those folders

23      that they edited, relocated, and/or duplicated were changed

24      from being public to being private?

25          A.   After this, they were -- we were made aware of that.
```

1       Q.    So they were made private in 2022?

2       A.    Yes.

3       Q.    Okay.  So from 2020 until 2022, all of the

4   information in those folders was publicly available to people

5   on the Internet?

6       A.    That's -- yes.

7       Q.    Okay.  The next sentence says, "PowerPlan does not

8   have any formal policies or training related to the use of a

9   PowerPlan-owned GitHub account."  That's -- that was accurate

10  as of the time that this interrogatory response was verified,

11  correct?

12      A.    Yes.

13      Q.    And is that still true today?

14      A.    To my knowledge, yes.

15      Q.    Okay.  So by copying or -- strike that.

16            By editing, relocating, and/or duplicating

17  information from a public PowerPlan-owned GitHub to

18  personally-owned GitHub accounts, did Mr. Shoon or Mr. Modder

19  violate any policies of PowerPlan?

20            MR. FAZIO:  Objection to form.

21            THE WITNESS:  The -- can you repeat the question?

22  BY MR. MAYES:  (Resuming)

23      Q.    Yeah.  So in 2020 -- approximately 2020, Mr. Shoon

24  and Mr. Modder edited, relocated, and/or duplicated information

25  from a temporarily public folder to personally-owned GitHub

1   accounts, correct?

2        A.    Yes.

3        Q.    My question is, did that violate any PowerPlan

4   policies?

5        A.    Yes.

6        Q.    Okay.

7        A.    I mean, I guess I don't know about policies.  I would

8   say our standard operating process.

9        Q.    Is there something they could have looked at back in

10  2020 that would have said don't do this; don't make a copy of a

11  PowerPlan GitHub repository?

12       A.    It would have been in the standard training that's

13  mentioned where we talked about protecting, you know,

14  intellectual property.

15       Q.    Okay.  That -- if I understand the next sentence

16  correctly, that training doesn't actually refer to GitHub at

17  all, does it?

18       A.    Not specifically GitHub.

19       Q.    Okay.  So they would have had to read that and

20  interpret it to mean we can't copy this -- these GitHub

21  repositories; is that correct?

22       A.    I guess when they were made aware that these were

23  available, they were surprised because they knew that was not

24  what was supposed to happen.  So they were aware that that was

25  not copies -- that they should not be available, and that's

1    when they mentioned that they weren't sure how those were

2    duplicated and it was not done in an intentional manner.

3         Q.    Okay.  So was it -- your understanding, then, was

4    that they had just copied the PowerPlan ones which should have

5    been private but weren't, and they didn't realize it at the

6    time they did it?

7         A.    And it was a single small one.  I believe it was a

8    prototype.  It wasn't, you know, anything -- it wasn't the

9    entire library of PowerPlan source code.  It was a very

10   specific small piece of information.

11        Q.    It did, in fact, include almost all of the table

12   information for PowerTax, though; isn't that true?

13              MR. FAZIO:  Objection to form and foundation.

14              THE WITNESS:  I don't believe it had the list of

15        PowerTax tables, no.  I believe it had a list of tax

16        reporting elements is my understanding.  It did not

17        necessarily -- I don't know if it had a list of tables in

18        detail, but -- I didn't see that when I looked through the

19        information.

20   BY MR. MAYES:  (Resuming)

21        Q.    Okay.  Are you sure about that; that it did not

22   contain a list of PowerTax tables?

23              MR. FAZIO:  Objection to form.

24              THE WITNESS:  I'd have to go back and review it in

25        detail to see if there was.  I mean, I know it had

1          PowerTax information that did not have -- but I'm not

2          aware if it had the entire set of PowerTax tables.

3     BY MR. MAYES:   (Resuming)

4          Q.   Okay.  Most of the materials that were uploaded to

5     the website were uploaded prior to 2019, correct?

6          A.   Yes.

7          Q.   Okay.  So they were available from whenever they were

8     uploaded through at least 2022, correct?

9          A.   That is correct.

10         Q.   Was any -- were any employees disciplined as a result

11    of any of the materials that were publicly available as

12    referred to in interrogatory response number 19?

13         A.   How do you define disciplined?

14         Q.   How would you define disciplined?

15         A.   I think there was communication to the people that

16    were involved that this is not in line with our policies, so --

17         Q.   Were they like formal reprimands in their HR files?

18         A.   I do not have any idea.

19         Q.   Okay.  Were any of them fired as a result?

20         A.   Not that I'm aware.

21         Q.   Okay.  Or any -- was anyone demoted as a result of

22    this as far as you know?

23         A.   Not that I'm aware.

24         Q.   Since the time of the IP protection program, are you

25    aware of PowerPlan losing any services opportunities to

1    Lucasys?

2        A.   I'm -- yes.

3        Q.   Okay.   What ones?

4        A.   I don't know all of them, but I understand that

5    they've done work at Suez.

6        Q.   Any others?

7        A.   I'm not aware of any others.

8        Q.   Are you aware of any PowerPlan customers --

9        A.   Actually, I am aware that they've done work for Con

10   Edison.

11       Q.   Any others?

12       A.   Not that come to mind.

13       Q.   Okay.   Do you know if Lucasys had done work for Con

14   Ed and Suez before the IP protection program?

15       A.   I -- I don't know.

16       Q.   Okay.   I think you said before you knew Suez had

17   retained Lucasys and that's one of the reasons why they got a

18   different letter; is that correct?

19       A.   Yes.

20       Q.   And you're just not sure about Con Ed?

21       A.   Well, I understand Con Ed recently had told us they

22   were doing work with Lucasys.

23       Q.   Okay.

24       A.   So I don't know the timing specific to that.

25       Q.   Okay.   Are you aware of any -- aside from those two,

1  are you aware of any other PowerPlan services customers who

2  have done for work -- who have done work with Lucasys after the

3  IP protection program?

4      A.   I'm not aware personally.

5    (Plaintiff's Exhibit No. 221 was marked and identified.)

6  BY MR. MAYES:  (Resuming)

7      Q.   Mr. Dahlby, I'm handing you Exhibit 221.  Take a look

8  at that and tell me -- have you seen that before?

9      A.   I have seen that.  I wrote the e-mail, so --

10     Q.   Okay.  And the top e-mail doesn't appear to relate to

11  the rest of the chain; is that consistent with your

12  understanding?

13     A.   I don't recall how it's related or not related, so --

14     Q.   Okay.  On the first sentence of your e-mail on the

15  top of the first page of Exhibit 221, it says, "I was thinking

16  about the RCC discussion on meeting or not with John, and one

17  thing that comes to mind is comments from the EAB."  Did I read

18  that correctly?

19     A.   Yes.

20     Q.   What's the EAB?

21     A.   Executive advisory board.

22     Q.   And is that a board of your customers?

23     A.   It is.

24     Q.   And is the John here John Williams?

25     A.   I actually don't recall.

1    Q.   Okay.  What RCC discussion is this referring to?

2    A.   I don't -- I don't recall.

3    Q.   Okay.  Do you recall any discussions in early 2019

4    generally related to the treatment of RCC by PowerPlan?

5    A.   I don't recall.

6    Q.   Okay.  The next sentence is, "Our customers

7    historically complained that with our rates and no alternatives

8    in the market they felt we had them over the barrel."  Did I

9    read that correctly?

10   A.   You read that correctly.

11   Q.   And is that true that your customers historically

12   complained that with PowerPlan's rates and no alternatives in

13   the market they felt PowerPlan had them over the barrel?

14   A.   Customers have communicated something to that effect.

15   Q.   Was this -- was Mr. Gomes relatively new at this

16   point in time?

17   A.   I was trying to remember the timeline.  Yes, I

18   believe he was relatively new.

19   Q.   Was part of this communication for you to bring him

20   somewhat up to speed on potential problems with potentially

21   trying to squeeze RCC out of the market?

22        MR. FAZIO:  Objection to form.

23        THE WITNESS:  I -- I don't remember the context of

24        this conversation, so -- or the e-mail here.

25   BY MR. MAYES:  (Resuming)

1      Q.    Okay.   The next sentence says, "The SVP of tax from

2    Exelon said that people like the competition and it forces us

3    to provide a higher quality experience."   Did I read that

4    correctly?

5      A.    Yes.

6      Q.    Is that Rob Kleczynski you were referring to in that

7    sentence?

8      A.    I believe he was the -- at the time, yes.

9      Q.    Okay.   And that -- is that an accurate statement from

10   him that you reported to Mr. Gomes?

11     A.    Actually, I want to -- I'm not sure if that was Rob

12   at the time.   I'm trying to recall the -- when he took that

13   position.   It could have been his predecessor.

14     Q.    Okay.   But this statement was accurate?

15     A.    I don't know if it was the words that were used, but

16   I believe that was the -- a message that had been communicated,

17   yes.

18     Q.    Okay.   And then, the next sentence says, "So the

19   concerns from various people are what is perception from

20   utility market.   You are probably sensing hesitation from

21   people on being aggressive."   Did I read that correctly?

22     A.    You read that correctly.

23     Q.    So what are you referring to when you say the

24   concerns from various people?   Who are you referring to there?

25   Are those PowerPlan people or customers you're referring to?

```
 1              MR. FAZIO:  Objection to form.

 2              THE WITNESS:  Again, I'm not -- I don't recall the

 3         specific context of this conversation.

 4    BY MR. MAYES:  (Resuming)

 5         Q.   Okay.  Do you remember any specific customers who had

 6    historically complained in the manner described in the first

 7    sentence of that paragraph?

 8         A.   I don't remember a specific customer, no.

 9         Q.   Okay.  The next paragraph says, "I think a concern is

10    that if people get upset with our tactics, the industry could

11    side with John.  Then, they will not upgrade, stay on old

12    versions, and not look to expand to new modules or platform."

13    Did I read that correctly?

14         A.   Yes.  You read that correctly.

15         Q.   Okay.  And that's John Williams at RCC?

16              MR. FAZIO:  Objection.

17              THE WITNESS:  In the context of that sentence, I

18         would say yes; that refers to John Williams.

19    BY MR. MAYES:  (Resuming)

20         Q.   And so is the concern that you're identifying here

21    that customers could choose not to use PowerPlan if PowerPlan

22    excluded RCC from competing for service opportunities?

23         A.   Again, I don't recall the conversation that led to

24    this e-mail, so I'm trying not to speculate what that would

25    have been exactly.
```

1       Q.    Well, as you sit here today, how do you interpret

2    that sentence?  What's the concern?

3       A.    I think the concern would be if we took an action

4    that people could have -- be upset about a tactic if we were to

5    eliminate services competition.

6       Q.    And specifically with respect to RCC, correct?

7       A.    I mean, I think that was the specific reference to

8    John there.  I don't believe that that would have been the

9    holistic conversation.

10      Q.    Okay.  Was that something that was under

11   consideration at this time in February of 2019, excluding RCC

12   from competition in the services market?

13           MR. FAZIO:  Objection to form and foundation.

14           THE WITNESS:  I guess I don't recall the conversation

15       that led up to this, so --

16   (Plaintiff's Exhibit No. 222 was marked and identified.)

17   BY MR. MAYES:  (Resuming)

18      Q.    Mr. Dahlby, I'm handing you Exhibit 222.  Take a look

19   at that and tell me if you've seen that before.

20      A.    Okay.

21      Q.    Okay.  First, what is Aqua?

22      A.    They're a customer of PowerPlan.

23      Q.    And this is discussing a response to an RFP from

24   Aqua?

25      A.    Yes.

 1      Q.   I wanted to start with the e-mail that begins on the

 2   bottom of the first page from Jim Duffy.  Let me know when

 3   you're there.

 4      A.   Okay.

 5      Q.   This says, "My gut is just shaking us -- Ruth is just

 6   shaking us down for the best deal possible."  Did I read that

 7   correctly?

 8      A.   Yes.

 9      Q.   Who is Ruth?

10      A.   I recall her being a member of the Aqua team.

11      Q.   Okay.  This -- skip the next sentence, and it says,

12   "Eventide has a history there."  Did I read that correctly?

13      A.   Yes.

14      Q.   Who is Eventide?

15      A.   They're a consulting company.

16      Q.   Okay.  Do they provide services similar to those

17   provided by RCC and Lucasys?

18      A.   That's my understanding.

19      Q.   Okay.  Does Eventide, to your knowledge, do data

20   cleansing and remediation for utility customers?

21      A.   I'm not certain what -- what all they do.

22      Q.   Okay.  Do you know if they have a history of

23   accessing PowerPlan's databases?

24      A.   I believe they've had access to PowerPlan.  I don't

25   know if it was the database or the application with customers.

1    Q.   Does PowerPlan have any sort of non-disclosure

2  agreement or authorized vendor agreement with Eventide?

3    A.   We do not.  They would have been working with

4  customers that were under license agreements.

5    Q.   Okay.  The -- your e-mail at the top of the page --

6  the first page of Exhibit 222 says, "Makes sense.  Any thoughts

7  on bundling license discounts based on services purchases --

8  purchased, given it lowers our risk."  Did I read that

9  correctly?

10    A.   Yes.

11    Q.   In what way would bundling license discounts with a

12  service purchase lower your risk?

13    A.   So I believe this was in a sales context to lower the

14  risk of winning or losing -- you know, or losing an

15  opportunity.  So that was the -- did that answer the question?

16    Q.   Yeah, if that's what you meant when you wrote it.  Is

17  that what you meant when you wrote it?

18    A.   Sorry.  Can you repeat the question?

19    Q.   Yeah.  In what way would bundling license discounts

20  based on a services purchase lower PowerPlan's risk?  So what

21  did you mean when you wrote those words?

22    A.   Yeah.  So the risk in this case was risk of losing,

23  you know, the sales opportunity.

24    Q.   And the sales opportunity in this case was services

25  business for Aqua?

1      A.    And actually if I signed my licenses, it was the

2  combination.

3      Q.    Okay.  Were you concerned that Lucasys might put in a

4  bid to do both software and services in competition with

5  PowerPlan?

6      A.    I don't recall if that was a concern or not.

7      Q.    Okay.  Well, the e-mail from Mr. Duffy specifically

8  references RCC and Lucasys, correct?

9      A.    Yes.

10      Q.    And it also says Lucasys would probably be aggressive

11  in their bid, too, on the next page of 222 -- the second page

12  of 222, correct?

13      A.    Yes.

14      Q.    But that is not risk you were identifying in your

15  e-mail -- your e-mail on the top page -- the top of the first

16  page of Exhibit 222; the risk of Lucasys potentially making an

17  aggressive bid at Aqua?

18      A.    Yes.  That was not -- I guess I'm maybe confused on

19  the way you phrased that question.  Can you --

20      Q.    Sure.  I mean, by this point in time, Lucasys and

21  PowerPlan were already involved in a lawsuit, correct?

22      A.    Yes.

23      Q.    And PowerPlan had identified Lucasys a potential

24  software competitor, correct?

25      A.    Correct.

1      Q.    And PowerPlan had engaged in the IP protection wave

2   in order to prohibit Lucasys from accessing PowerPlan

3   databases, correct?

4      A.    Yes.

5      Q.    And the reason for that was because PowerPlan was

6   concerned about potential software competition, correct?

7      A.    No.   We were concerned about our IP being used in an

8   inappropriate manner.

9      Q.    Well, I mean, you knew it was already being used by

10  consultants to compete in the consulting space, right?

11          MR. FAZIO:   Objection to form and foundation.

12          THE WITNESS:   Under the license agreements with our

13      customers.

14  BY MR. MAYES:   (Resuming)

15      Q.    Okay.   And the only thing Lucasys was doing different

16  than the other consultants was also offering competitive

17  software; isn't that true?

18          MR. FAZIO:   Objection to form and foundation.

19          THE WITNESS:   That would be the most significant

20      difference, yes.

21  BY MR. MAYES:   (Resuming)

22      Q.    Okay.   So that was a risk that PowerPlan viewed as

23  being more significant than the risk posed by services

24  competitors, true?

25      A.    Yes.

1    Q.    Okay.  And my question on this specific document is,

2    was that the risk you were referring to when suggesting

3    bundling licenses and discounts based on services purchases?

4    A.    So I believe the RP was only for services, so this

5    would have been specifically around services is my -- what I

6    recall about the Aqua RP.

7    Q.    Okay.  Are you familiar with a company called UPCO?

8    A.    I am.

9    Q.    What does UPCO stand for?

10    A.    I believe it's Upper Peninsula something Power

11    Company.  I don't -- I actually don't know what it stands for.

12    I just know they're a customer in the upper peninsula of

13    Michigan.

14    Q.    At some point, did UPCO change from the on-premises

15    version of the PowerPlan software to the cloud-based version?

16    A.    I'm actually not sure that they were ever on-premise.

17    I don't recall if they were ever on-premise.

18    Q.    Okay.  Are you aware of a company name TECO?

19    A.    Yes.

20    Q.    Is that a PowerPlan customer?

21    A.    It is.

22    Q.    What does TECO stand for?

23    A.    It's an abbreviation for TECO Energy.

24    Q.    At some point, did TECO refuse to go to the

25    cloud-based version because they did not want to give PowerPlan

1    exclusivity over professional services?

2         A.   I don't recall if that was a specific conversation

3    with TECO.

4         Q.   Were you ever involved in any conversations with

5    TECO?

6         A.   I mean, I've had conversations with TECO many times

7    over my career.

8         Q.   Okay.  Did you have any about whether or not they

9    were going to move from the on-premises to the cloud version of

10   PowerPlan?

11        A.   I don't recall all of those conversations.  We've

12   talked at points in time about that.

13        Q.   Okay.  Did TECO switch from the on-premises to the

14   cloud version of PowerPlan?

15        A.   TECO has not.

16        Q.   Okay.  And I guess what you're saying then is you

17   don't know why they did not?

18        A.   I don't recall any specific conversation around that.

19        Q.   Okay.  If somebody else in PowerPlan reported that

20   they purposefully did not buy our cloud because they didn't

21   want to give us exclusivity over professional services, would

22   you disagree?

23        A.   What -- I don't know what timeframe you're talking

24   about in this communication.

25        Q.   In the summer of 2021?

1        A.    Okay.

2        Q.    Would you disagree if somebody reported that TECO

3    purposefully did not buy the cloud because they did not want to

4    give PowerPlan exclusivity over professional services?

5        A.    My understanding is TECO has used third parties for

6    consulting services at times, so -- and at the time in 2021,

7    depending on when that was, you know, we did not have within

8    our security protocols the ability for third parties to get

9    access to do consulting services for a customer

10   (unintelligible).

11       Q.    And at that point in time in the summer of 2021,

12   PowerPlan was taking the position that RCC could not access

13   databases stored in the cloud; isn't that true?

14            MR. FAZIO:  Objection to form and foundation.

15            THE WITNESS:  So our policies and procedures at the

16       time did not have a protocol that would allow external

17       parties to get access to our database.

18   BY MR. MAYES:  (Resuming)

19       Q.    And so that meant for a third-party consultant like

20   RCC, they could not do much of the work that they had

21   historically done; isn't that accurate?

22            MR. FAZIO:  Objection to form.

23            THE WITNESS:  It would depend on the work they were

24       completing, so --

25   BY MR. MAYES:  (Resuming)

1    Q.   But they did -- used to do work that they would no

2    longer be able to do, correct?

3    A.   My understanding is they did a lot of work for

4    companies like UPCO even though they were in our cloud.  So I

5    guess there are services if they were making -- you know, if

6    they needed access to the database to complete those services

7    that at the time there was not a protocol or procedure that

8    would enable that.

9    Q.   And is it true that UPCO switched from the cloud

10   version to the on-premises version?

11   A.   I'm not sure if that's been completed, but they are

12   in the process of switching.

13   Q.   And is the reason that they're doing that so that

14   they can use third-party vendors like RCC?

15   A.   I believe that was one reason they stated, but there

16   were other reasons, I believe, as well.

17   Q.   Okay.  What were the other reasons?

18   A.   My understanding was the IT department wanting to

19   have and maintain their own infrastructure was one of the items

20   communicated -- shared with me.

21   Q.   Did you personally view it as a risk that clients

22   might look to solutions other than PowerPlan if they could not

23   use consultants like RCC?

24       MR. FAZIO:  Objection to form.

25       THE WITNESS:  Can you repeat the question?  I want to

1        make sure I understand it.

2    BY MR. MAYES:   (Resuming)

3        Q.    Sure.  Did you view it as a risk that clients would

4    look at technology solutions other than PowerPlan if they could

5    not use RCC for consulting work?

6        A.    I believe that is a potential risk.

7        (Plaintiff's Exhibit No. 223 was marked and identified.)

8    BY MR. MAYES:   (Resuming)

9        Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 223 with a

10   courtesy copy for counsel.  Have you seen this before?

11       A.    I have seen this.

12       Q.    Okay.  Who is Nathaniel Huberick (ph)?

13       A.    He's a PowerPlan employee.

14       Q.    And what's his job at PowerPlan?

15       A.    At the time in 2021 he was part of our alliances

16   team.

17       Q.    And just what is that?  What does the alliances team

18   do?

19       A.    They work with third parties around PowerPlan.

20       Q.    What was going on that led him to send you this

21   e-mail in September of 2021?

22            MR. FAZIO:  Objection to form.

23            THE WITNESS:  My recollection is we were discussing

24       UPCO's -- some of UPCO's requests around a potential

25       upgrade and some of the work that they were asking RCC to

1        do.

2    BY MR. MAYES:   (Resuming)

3        Q.    Okay.  And it says, "Brett had a few comments on the

4    UPCO approach.  You may be aware of some of these already

5    through separate conversations with Brett."  Do you believe

6    that's referring to Mr. Burts?

7        A.    I do.

8        Q.    Okay.  The first bulletpoint underneath that sentence

9    says, "Only RCC work after passing through subcontracting is

10   the work that requires access within the timeframe of the

11   overall tech upgrade."  Did I read that correctly?

12       A.    Yes, you read that correctly.

13       Q.    What does that mean?

14       A.    So based on our current procedures and policies, that

15   was one of the methods we had talked to UPCO about as a way to

16   enable them to have RCC complete some work that they were

17   interested in within a specific timeframe.

18       Q.    So if I understand correctly, the proposal is that

19   perhaps RCC could be a subcontractor for PowerPlan; is that

20   correct?

21       A.    That was one of the options presented to UPCO.

22       Q.    Okay.  Did that work?  Was there ever a

23   subcontracting arrangement with RCC and PowerPlan?

24       A.    There was not.

25       Q.    Okay.  Do you know why?

1      A.    I don't know.   The customer did not pursue that is my

2  understanding.

3      Q.    Okay.   A few bulletpoints down, there is one that

4  says, "Fallback option:   Let RCC do the upgrade work as well.

5  Expand the pie for RCC."   Did I read that correctly?

6      A.    Yes.

7      Q.    And what is that fallback option that's being

8  described there?

9      A.    The formatting on this e-mail is making it difficult

10  to understand the -- okay.   So, I mean, in the context of this

11  discussion with UPCO, we were discussing different -- different

12  arrangements through which we would potentially work with RCC,

13  what the scope of what they would do is versus what our team

14  would potentially do.   We had -- prior to being communicated

15  about this, we were discussing with UPCO PowerPlan professional

16  services doing some work.   And so these were different options

17  around how the scope of work could be separated between

18  PowerPlan and RCC.

19      Q.    And UPCO wanted to use Power -- I'm sorry.   Excuse

20  me.   UPCO wanted to use RCC for its consulting work; is that

21  true?

22      A.    We were told there was specific work that PowerPlan

23  doesn't perform that they wanted RCC to do.

24      Q.    Did a simular issue with respect to a client using

25  RCC arise at PPL?

1      A.    So the -- PowerPlan and RCC had collaborated on the

2  most recent implementation at PPL, including implementing

3  PowerPlan in the cloud.  So I know there was additional work

4  they were interested in PPL completing -- or PPL was interested

5  in them completing.

6           MR. FAZIO:   Josh, do you want to take a break?

7           MR. MAYES:   Yeah.   Now is fine since we're switching

8      to a new topic.

9           VIDEOGRAPHER:   Okay.   All right.   Going off the

10     record.

11                        (BREAK TAKEN)

12           VIDEOGRAPHER:   Back on the record at 3:38 p.m.

13  BY MR. MAYES:   (Resuming)

14     Q.    Mr. Dahlby, back on the record.   Can you confirm that

15  we did not have any substantive discussions about the case

16  during the break?

17     A.    We did not.

18     Q.    Did there come a time in 2019 where there was an

19  issue regarding RCC and PPL?

20     A.    I don't recall any specific 2019 event, but -- is

21  there something specific you're asking about?

22     Q.    Sure.   Well, was there -- did there ever come a time

23  where there was an issue where RCC access at PPL was going to

24  be impacted by a PPL shift to the cloud?

25     A.    So can you repeat that again to make sure I

1   understand?

2       Q.   Sure.   At some point, was PPL considering switching

3   from the on-premises to the cloud version of PowerPlan's

4   software?

5       A.   Yes.

6       Q.   Did PPL express a concern that that might impact

7   their ability to use RCC?

8       A.   I don't recall if that was expressed at the time.

9       Q.   Okay.   Did it subsequently or at some point become an

10   issue?

11       A.   In more recent -- in the last 12 months, we've had

12   conversations with PPL where they were interested in using RCC

13   for consulting services and had previously moved into our

14   cloud.

15       Q.   And PPL had a history of using RCC for consulting

16   services; is that correct?

17       A.   Yes, that's accurate.

18       Q.   PowerPlan had considered potentially starting an

19   authorized vendor program back in 2019; is that true?

20       A.   So from an alliances perspective, we considered

21   different options for how to work with third parties, yes.

22       Q.   And one of those options was a certified partner

23   program; is that true?

24       A.   I believe we -- yes, we had discussed certified

25   partner programs in the past.

```
 1      (Plaintiff's Exhibit No. 224 was marked and identified.)

 2  BY MR. MAYES:   (Resuming)

 3      Q.    Okay.   Mr. Dahlby, I'm handing you Exhibit 224.   Have

 4  you seen this before?

 5      A.    Yes, I would have seen this before.

 6      Q.    Okay.   Let's start with the e-mail from Paul Chris at

 7  11:21.

 8      A.    What page are you on?

 9      Q.    It's the one that has the Bates label at the bottom,

10  PowerPlan 413007.   It's an e-mail at 11:21 from Paul Chris to

11  you and a number of other folks at PowerPlan.

12      A.    Okay.

13      Q.    So the first paragraph says, "Following our

14  discussion on RCC and PPL, Matt, Duffy, and I walked through

15  the contract for PPL, and a call is scheduled for the morning

16  of Tuesday, 2/19, to communicate our position with PPL."   Do

17  you see that?

18      A.    Yes, I see that.

19      Q.    What -- were you involved in the discussion that's

20  being referenced here in this sentence?

21      A.    I don't recall the specifics of that conversation, so

22  I --

23      Q.    Do you know what issue generally had arisen at this

24  point in time with respect to RCC and PPL?

25      A.    I don't recall the exact specifics as of
```

1    February 2019 or the exact details.

2         Q.   Okay.  This was a communication -- these are the --

3    this is the executive team that's copied on this including the

4    CEO; is that correct?

5         A.   Primarily, yes.

6         Q.   Okay.  And you just don't recall in February 2019

7    what issue with RCC and PPL was important enough to be

8    discussed at the executive committee level?

9         A.   I don't remember the exact specifics, no.

10        Q.   Okay.  The next sentence says, "During the meeting,

11   we discussed the potential ramifications of the communications

12   with our broader IOU customers."  Did I read that correctly?

13        A.   You read that correctly.

14        Q.   Okay.  I'm assuming from your last answer that you

15   don't know what the communications that are referenced in that

16   sentence are referred -- what communications that sentence is

17   referring to?

18        A.   Yeah.  I don't want to speculate what that would have

19   been.

20        Q.   Okay.  The last sentence in that paragraph says, "We

21   should anticipate that the communication of our position to PPL

22   will be quickly communicated to people involved in the AGA EEI

23   PowerPlan user group and other PowerPlan IOU customers."  Did I

24   read that correctly?

25        A.   You did.

1      Q.    What is the AGA EEI PowerPlan user group?

2      A.    It's a -- so AGA and EEI are organizations that have

3    member companies, primarily utilities.  And they have a

4    PowerPlan user group.

5      Q.    Okay.  So there was a fear that whatever PowerPlan --

6    whatever these communications were that you can't recall to PPL

7    might reach that broader group; is that a fair characterization

8    of that sentence?

9      A.    Yes.

10      Q.    Okay.  The next sentence says, "Potential impact

11    includes," and the first bulletpoint is, "Sole provider

12    backlash.  Our EAB has expressed dissatisfaction with not

13    having more viable services provider options and has described

14    it as, quote, the PowerPlan hostage crisis."  Did I read that

15    correctly?

16      A.    You did read that correctly.

17      Q.    Okay.  Was that, in fact, something you had heard

18    from your executive advisory board?

19      A.    Yes.

20      Q.    Okay.  The next sentence says, "The new AGA EEI

21    PowerPlan user group will likely -- likely perceive this as a

22    move towards a sole provider model."  Did I read that

23    correctly?

24      A.    You read that correctly.

25      Q.    Okay.  Does that refresh your recollection at all

1    about what this -- or the communications were about to PPL?

2         A.   It doesn't.

3         Q.   Okay.  You don't recall any options being discussed

4    with respect to RCC that that group could perceive as a move

5    towards a sole provider model?

6         A.   I don't recall the specifics.

7         Q.   Okay.  The next bulletpoint is recommendations, and I

8    want to talk about the one that says Certified Partner Program.

9    Do you see that?

10        A.   Yes.

11        Q.   And that recommendation is, "Quickly develop a

12   certified partner program that clearly describes what partners

13   can and cannot do in our cloud environment.  Whether or not RCC

14   is one of those partners isn't terribly important, but zero

15   certified partners will surely cause sales headwinds."  Did I

16   read that correctly?

17        A.   Yes.

18        Q.   Okay.  Does that refresh your recollection at all

19   about what this issue -- the communications and the issue being

20   communicated with PPL about involved?

21        A.   I guess I don't recall the specific communication

22   that's being discussed here, so --

23        Q.   Okay.  Did -- at this time in 2019, did PowerPlan, in

24   fact, develop a certified partner group?

25        A.   We did not.

1      Q.    Okay.   The next bulletpoint says, "Lift and shift

2   impact:   There are a number of customers, WEC, Talla (ph), PPL,

3   WGL, Amwater, AEP, Dominion Energy Tucson, that have used and

4   continue to use RCC for services which will cause some of them

5   to not lift and shift and sweat their current on-premise

6   classic install until final sunset."   Did I read that

7   correctly?

8      A.    You read that correctly.

9      Q.    Okay.   What does lift and shift mean in that context?

10     A.    Taking their perpetual license software and posting

11  it in PowerPlan's cloud -- with PowerPlan's cloud services.

12     Q.    So is this identifying that for customers that use

13  RCC for services, they may not want to change to the cloud

14  version of the software?

15     A.    That is what this point is stating.

16     Q.    Okay.   And then next bulletpoint says, "At that

17  point, it's logical to assume these customers will evaluate all

18  options including PowerPlan new platform, Utegration, or ERP."

19  Did I read that correctly?

20     A.    Yes, you read that correctly.

21     Q.    Okay.   What is Utegration?

22     A.    They're a software provider and a services provider.

23     Q.    Do they provide the same sort of services as RCC and

24  Lucasys?

25     A.    They do not.

1      Q.    Do they provide software that is competitive with

2   PowerTax?

3      A.    I'm not sure if they have a specific software or they

4   -- they are an SAP-based software and they utilize a

5   combination of their software and SAP.

6      Q.    Okay.  Do you know if the combination of their

7   software and SAP is competitive with PowerTax?

8      A.    It can be, yes.

9      Q.    Can it do, as far as you know, deferred tax

10  calculations for regulated utilities using the ARAM method?

11     A.    I don't know if it can or cannot.

12     Q.    The next sentence -- the next part of that sentence

13  says ERP.  What does ERP stand for?

14     A.    Enterprise resource planning.

15     Q.    Okay.  And that -- is that SAP and Oracle?

16     A.    That's a general term to refer to financial systems

17  such as SAP or Oracle.

18     Q.    Okay.  The next sentence says, "There are ten lift

19  and shift ops in the 2019 buckets of opportunity analysis

20  representing ███████████ in recurring revenue booking plans."

21  Did I read that correctly?

22     A.    Yes.

23     Q.    What are the -- how are those opportunities

24  identified?  Like, what makes one PowerPlan customer an

25  opportunity for a lift and shift versus another?

1    A.    I believe that lift and shift criteria is not

2    specifically opportunity-based.   It's more of a general

3    analysis.

4    Q.    Okay.   Well, it says there are ten.   Do you not read

5    that to be referring to ten specific customers?

6    A.    I believe that was suggesting that we are looking to

7    get ten customers to define ten opportunities for that, not

8    that there are ten specifically identified.

9    Q.    I see.   So this is -- your plan is we're going to get

10   ten of these in 2019?

11   A.    Yes.

12   Q.    Okay.   And not there are ten specific ones.   Just out

13   of the potential opportunities, we hope to land ten of them; is

14   that correct?

15   A.    Correct.

16   Q.    Okay.

17   A.    That's how I read that sentence.

18   Q.    Okay.   And then, the next sentence says, "Taking some

19   or all of our customers working with RCC out of the pool of

20   potential makes delivering on this plan very difficult."   Did I

21   read that correctly?

22   A.    Yes.

23   Q.    Okay.   So that's saying if RCC -- if the customers

24   who use RCC are not willing to lift and shift because of the

25   fact that they will no longer be able to use RCC, that will

```
 1    make achieving that goal of getting ten difficult; is that

 2    correct?

 3         A.    That's how I read that, yes.

 4         Q.    Okay.  And the recommendation there on the first one

 5    is the same as above with developing a certified partner

 6    program; is that correct?

 7         A.    Yes.

 8         Q.    Okay.  And the next bulletpoint says, "White space

 9    sales impact."  What do you understand that to mean; white

10    space sales impact?

11         A.    So white space refers to what we could call PowerPlan

12    products that are licensed by existing customers.  So if they

13    own one product but they own other products.

14         Q.    Okay.  And the sentence after that says, "RCC

15    actively influences customers to buy our software.  As an

16    example, PPL 429K and Amwater 313K.  They have an interest in

17    expanding the solution footprint and expanding their services

18    revenue."  Did I read that correctly?

19         A.    You read that correctly.

20         Q.    Okay.  So those sentences are saying that RCC helps

21    PowerPlan sell software; is that correct?

22         A.    There was, yes, the two examples listed there that

23    were involved, yes.

24         Q.    Okay.  The next sentence says, "If that changes, they

25    make wield their influence to deter customers or when possible
```

1   promote other software vendors and solutions to work with."

2   Did I read that correctly?

3       A.    That's correct.   You read that.

4       Q.    Okay.   So this is another potential risk is that RCC

5   may start supporting other software other than PowerPlan

6   software; is that correct?

7       A.    That's what that statement says, yes.

8       Q.    Okay.   And if you flip to the next page, you will see

9   the recommendation there is a certified partner program; is

10  that correct?

11      A.    That is correct.

12      Q.    And again, that was not done?

13      A.    We did not in 2019 create a certified partner

14  program.

15      Q.    Okay.   The next bulletpoint there says, "Stickiness

16  in competition."   The first sentence says, "We are facing

17  numerous competitive threats with Utegration as the most

18  formidable at our SAP IOU customers."   Did I read that

19  correctly?

20      A.    Yes.

21      Q.    Okay.   This was before you had identified Lucasys as

22  a competitive software threat; is that correct?

23      A.    I believe that's the case.

24      Q.    Okay.   It says, "Utegration is targeting NA IOUs to

25  sell services and potentially competitive software solutions."

1    Did I read that correctly?

2        A.    Yes.

3        Q.    And NA in that sense means North American?

4        A.    Yes.

5        Q.    Okay.  The last sentence of that says, "RCC helps

6    keep PowerPlan sticky."  Did I read that correctly?

7        A.    Yes, you read that correctly.

8        Q.    What does that mean?

9        A.    The way I interpret what's been written there is that

10   -- saying that if RCC is implementing our software, that makes

11   PowerPlan overall keep -- maintain longer relationships with

12   our customers.

13       Q.    Okay.  And the recommendation again under this

14   bulletpoint is a certified partner program; is that correct?

15       A.    Correct.

16       Q.    If you go down to the bulletpoint that says RCC

17   meeting, it says, "If Jonathan Williams, President of RCC, is

18   willing to meet, it is recommended that we take the meeting.

19   As discussed, there seems to be very little downside.  We might

20   learn valuable information and who knows; find a mutually

21   beneficial path -- mutually beneficial path forward."  Did I

22   read that correctly?

23       A.    Yes.

24       Q.    As far as you know, was there a meeting with Jonathan

25   Williams around this time in February of 2019?

1      A.   Not to my knowledge.

2      Q.   I want you to look back at Exhibit 221 that we looked

3   at before the last break.  That was roughly contemporaneous

4   with this e-mail that we just looked at; isn't that true, three

5   days before it?

6      A.   Yes.

7      Q.   Does that refresh your recollection at all as to what

8   RCC discussion you were referring to in your e-mail to

9   Mr. Gomes on February 14th of 2019?

10      A.   Again, I don't remember the specific discussion that

11   we're talking about here, so --

12      Q.   If you flip to the first page of Exhibit 224, your

13   e-mail at the top, the first sentence says, "Paul said he plans

14   to share with PPL on Tuesday."  Did I read that correctly?

15      A.   Yes.

16      Q.   Who -- first, who is Paul?

17      A.   Paul Chris.  He was in the e-mail chain.

18      Q.   Okay.  The one who wrote the e-mail we just went

19   through in detail, correct?

20      A.   Yes.

21      Q.   What was it he was going to share with PPL on

22   Tuesday?

23      A.   I don't recall what was shared with PPL on Tuesday.

24      Q.   Okay.  Was PowerPlan at this point in time, to your

25   knowledge, planning on trying to pursue a certified partner

1  program?

2      A.    It was something that was discussed.  I don't --

3  again, I don't remember the specific options or whatever was

4  being discussed here and what communication that was

5  specifically -- specifically talked about around this meeting

6  on Tuesday.

7      Q.    Okay.  And you don't know whether Paul communicated

8  to PPL that PowerPlan was going -- or willing to pursue a

9  certified partner program potentially with RCC or others at

10  this point in time?

11      A.    I do not know if that was communicated to PPL.

12      (Plaintiff's Exhibit No. 225 was marked and identified.)

13  BY MR. MAYES:  (Resuming)

14      Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 225.  Take

15  a look at that and tell me if you have seen that before.

16      A.    Okay.  Yes, I'm familiar with this.

17      Q.    Okay.  Did you -- do you believe you read this e-mail

18  chain around the time in September and October of 2021?

19      A.    Yes.

20      Q.    I want you to flip to the page at 408958 in the

21  bottom right-hand corner, and look at the e-mail from John

22  Erickson on Monday, September 27th, at 3:43 p.m.

23      A.    Okay.

24      Q.    This says, "Please see the note below.  PPL is

25  considering bringing PowerPlan back on-premise due to the

1   issues with RCC access."  Did I read that correctly?

2        A.   You read that correctly.

3        Q.   Okay.  What did you understand that to mean?

4        A.   So at the time, PPL had an on-premise database and

5   RCC was utilizing that in conjunction with PowerPlan to provide

6   services.  So -- and so because of the passage of time, that

7   database was no longer going to allow them to support the

8   specific services that they were discussing, and so they were

9   -- PPL was looking for options at that time to continue with

10  the services that they -- they needed to be performed.

11       Q.   Okay.  Let me make sure I understand the timeline.

12  Back in 2019, the e-mails we're looking at regarding PPL and

13  RCC, at that point in time PPL had on-premise software; is that

14  correct?

15       A.   Yes.

16       Q.   Okay.  At some point after that, PPL moved to the

17  cloud-based version; is that accurate?

18       A.   So there was a project.  RCC and PowerPlan worked

19  together, and then PPL moved their software into PowerPlan's

20  cloud is accurate.

21       Q.   Okay.  And that migration to the cloud caused issues

22  with RCC's access.  That's what is being reported here in this

23  e-mail; is that correct?

24       A.   Correct.  So at the time of this conversation, there

25  wasn't a policy or procedure that would allow third parties

1    access to cloud environments is accurate.

2         Q.   Okay.  And so as a result of that, PPL was

3    considering switching back from the cloud-based version to an

4    on-premise classic version; is that correct?

5         A.   That is the -- what they -- one of the options that

6    they told us they were considering, yes.

7         Q.   Okay.  And that's the same thing that happened with

8    UPCO, correct?

9         A.   That was -- yes.

10        Q.   Okay.  If you flip to the first page of Exhibit 225,

11   there is an e-mail from here from Nathaniel Huberick.  It says,

12   "Jim, welcome back.  I have formalized the next steps at PPL

13   largely in line with your PPTX sent to leadership but with

14   actual dates."  Did I read that correctly?

15        A.   Yes.

16        Q.   What were -- next steps at PPL for doing what?

17        A.   Providing a mechanism by which RCC would be able to

18   have access to our cloud environment.

19        Q.   Okay.  Underneath it, there are -- underneath that

20   paragraph, there is a statement that says, "PPL notes," with

21   some bulletpoints.  Do you see that?

22        A.   Yes.

23        Q.   Did you understand that to be Mr. Huberick relaying

24   to you information he had received from PPL?

25        A.   Or someone who had received it from PPL, yes.

1      Q.   Okay.  And so the first bulletpoint there says, "PPL

2   keen to make quick decisive decision on future of the cloud

3   ASAP, no later than mid-November."  Is that correct?

4      A.   Yes.

5      Q.   So if you look at your e-mail above that, the top

6   e-mail at the beginning of Exhibit 225, it says, "Is 11/19

7   decision date."  Is that correct?

8      A.   Yes.

9      Q.   Is that -- is that referring to the quick decisive

10  decision referred to in that first bulletpoint?

11     A.   I mean, it believe it is referred to further down in

12  No. 3(a) towards the bottom of the page.

13     Q.   Okay.  That one says, "Complete by 11/19 stated

14  deadline."  I guess I have the same question as you had.  What

15  is that deadline?  What was your understanding of that deadline

16  if you ever developed one?

17     A.   To complete steps one, two, and three.  Or to

18  complete steps one and two.

19     Q.   Okay.  Did you, in fact, have an agreement signed

20  with RCC by 11/19?

21     A.   I don't recall the specific date that we had the --

22     Q.   Okay.

23     A.   -- agreement signed with RCC.

24     Q.   The fourth bulletpoint under PPL notes says, "RCC

25  Joel Scheckler (ph) was not dismissive of the verbal cloud

1   access offer.  Proof is in the physical offer and legal

2   arrangement to support."  Did I read that correctly?

3       A.   Yes.

4       Q.   What did you understand that to mean?

5       A.   That Nathaniel had had a conversation with Joel

6   around PowerPlan providing a method by which they would be able

7   to get access to the cloud.

8       Q.   This series of communications with PPL ultimately

9   resulted in an authorized vendor agreement between RCC and

10  PowerPlan; is that correct?

11      A.   That's correct.

12      Q.   It's true that that had been brought up as early as

13  2019, but did not actually come to completion until after PPL

14  threatened to move back to an on-premise solution; is that

15  true?

16          MR. FAZIO:  Objection to form.

17          THE WITNESS:  I don't believe those two things are

18      the same, so --

19  BY MR. MAYES:  (Resuming)

20      Q.   Okay.  You don't believe that the authorized vendor

21  agreement is the same as a certified partner program; is that

22  what you mean?

23      A.   Yes.  Those are not the same.

24      (Plaintiff's Exhibit No. 226 was marked and identified.)

25  BY MR. MAYES:  (Resuming)

1      Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 226.  Have

2  you seen this before?

3      A.    Yes, I've seen this.

4      Q.    Okay.  Did you have any role in negotiating this

5  agreement with RCC?

6      A.    Yes.  I was involved in those conversations.

7      Q.    Okay.  Is it your understanding that under the terms

8  of this agreement there are still services that RCC used to

9  provide to PPL that it will no longer be allowed to provide to

10  PPL?

11      A.    I'm not aware of any.

12      Q.    Okay.  If you flip to Exhibit A, which is RCC 904, do

13  you see that?

14      A.    Yes.

15      Q.    Do you see the list of restrictions down there?

16      A.    Yes.

17      Q.    Okay.  What does it mean when it says, "PowerPlan

18  will not provide the following:  3) Developer access to the

19  PowerPlan integration hub to create or alter integrations

20  moving data to or from the PowerPlan cloud database?"

21      A.    So within the PowerPlan cloud infrastructure, the

22  integration hub component was something that we're not

23  permitted to give access to anyone other than PowerPlan.

24      Q.    So if RCC wanted to do a data cleansing project for

25  PPL under this agreement, how would it get the database out of

1   the PowerPlan cloud in order to do that?

2        A.    They would use the access as provided.

3        Q.    And just mechanically, how would that work?  You said

4   they would use the access.  They can't access it through the

5   PowerPlan integration hub, correct?

6        A.    Correct.  They would utilize the access as provided

7   in the database permissions and the tools provided under the

8   application integration access privileges.

9        Q.    Well, isn't use of the PowerPlan integration hub

10  necessary to move data to and from the PowerPlan cloud

11  databases?

12       A.    As it relates to a specific ongoing integration but

13  not for the project-related work that I understand RCC is

14  completing.

15       Q.    I see.  So your understanding of this restriction is

16  this is solely limited to what?

17       A.    Data that needs to move through the ongoing

18  integration hub, and we have tools within that framework for

19  things like secure file FTP.  So if RCC has a file that they

20  need to move, there is a method by which they can put that in

21  there, and the secure FTP would move that file from said

22  environment outside the PowerPlan cloud into the PowerPlan

23  cloud.

24       Q.    Okay.  So just so I'm clear, your understanding is

25  RCC under this agreement should be able to do all of the work

1    that it previously did for PPL?

2        A.   Yes.

3        Q.   Okay.  And isn't it true that the reason that

4    PowerPlan was willing to enter into these authorized vendor

5    agreements with RCC was that it was afraid its customers

6    wouldn't use its cloud product anymore?

7            MR. FAZIO:  Objection to form and foundation.

8            THE WITNESS:  Can you repeat the question or --

9    BY MR. MAYES:  (Resuming)

10       Q.   Yeah.  Sure.  The question is, was the motivation

11   behind PowerPlan entering into this authorized vendor agreement

12   fear that PowerPlan customers would not use the cloud-based

13   solution?

14       A.   I wouldn't call it -- I mean, I wouldn't say it was

15   fear.  I would say we -- we're always gathering feedback from

16   our customers and looking for ways to improve our software and

17   our other services offerings.

18       Q.   And one PowerPlan customer had already switched back

19   from the cloud to the on-premise solution, correct?

20       A.   That's accurate.  And had communicated that was their

21   plan.  That's accurate.

22       Q.   Okay.  And a second one had expressed the same desire

23   to do that, correct?

24       A.   I don't know if they expressed a desire to do that --

25   I could categorize that they expressed that they had a desire

1    to move it on-premise.  My understanding is they expressed that

2    was one of the options they were considering.

3        Q.   I gotcha.  Were you involved or did you see or review

4    the draft authorized vendor agreement that was provided to

5    Lucasys?

6        A.   So I understand that it was provided by a customer of

7    Lucasys is my understanding; is that accurate?

8        Q.   I'm just asking you what you know.  Did you see a

9    draft authorized vendor agreement between Lucasys and

10   PowerPlan?

11       A.   We did not see a draft of a specific authorized

12   vendor agreement between Lucasys and PowerPlan.

13       Q.   Okay.  You personally did not?

14       A.   Correct.

15       Q.   Okay.  And I take it from that that you also did not

16   see proposed revisions to any initial draft of an authorized

17   vendor agreement between Lucasys and PowerPlan?

18       A.   So I believe we provided a generic authorized vendor

19   agreement to a customer who was considering a cloud who I

20   believe provided it to Lucasys.  I was told by counsel they

21   provided redlines.  I did not see what comments or redlines

22   were provided.

23       Q.   Okay.  Did you have any input into the decision at

24   PowerPlan, setting aside communications with counsel, as to

25   whether or not the authorized vendor agreement as revised by

1    Lucasys would be acceptable to PowerPlan?

2         A.   I was not involved in the conversations around that.

3         (Plaintiff's Exhibit No. 227 was marked and identified.)

4    BY MR. MAYES:   (Resuming)

5         Q.   Okay.  Mr. Dahlby, I'm handing you Exhibit 227 with a

6    courtesy copy for your counsel.  Take a look at that and tell

7    me if you've seen this exchange before.

8         A.   Yes, I've seen this e-mail previously.

9         Q.   Okay.  My question is about -- actually, if you flip

10   to Page 2 of Exhibit 227, the first paragraph at the top from

11   Mr. Carr on which he CC'ed you says, "I also did an hour QA on

12   Liberty Yulu (ph) yesterday."  Did I read that correctly?

13        A.   Yes.

14        Q.   Is that someone's name, Liberty Yulu?

15        A.   Yulu is the name.

16        Q.   Okay.  So Yulu is the name.  Is Liberty the customer?

17        A.   That was my understanding, yes.

18        Q.   Okay.  The next sentence says, "It was bad to say the

19   least.  The one company that's being implemented in release one

20   is a tiny company that I could have converted in a week."  Did

21   I read that correctly?

22        A.   Yes.  You read that correctly.

23        Q.   Okay.  Do you know what it means when it says that's

24   being implemented in release one?

25        A.   So Liberty is implementing a project and they're

1  having multiple releases, so different entities are in each

2  release.

3      Q.   I see.  Is that sort of like they're putting whatever

4  software they're implementing in different Liberty

5  subsidiaries, for lack of a better word?

6      A.   Yes.

7      Q.   And they're doing that in a staged manner?

8      A.   That's correct.

9      Q.   Okay.  And what Mr. Carr is saying here is that the

10  first one is small and easy; is that correct?

11      A.   At least for him.  I think that's how he has implied

12  it, so this was his comment.

13      Q.   Okay.  And then, the next sentence says, "Yulu has

14  billed 241 hours."  Is that correct?

15      A.   That's what it says, yes.

16      Q.   Okay.  So that's more like six weeks worth of work

17  than one week worth of work, correct?

18      A.   Correct.

19      Q.   And the next sentence says, "She's also delivering

20  training to Liberty today," correct?

21      A.   Yes, it says that.

22      Q.   And then, it says, "Although she can explain the

23  basics, she can't answer questions.  Her and I discussed that

24  yesterday and she admitted she is going to be in trouble."  Is

25  that correct?

1        A.    That's what it says, yes.

2        Q.    Okay.   The next sentence says, "They have RCC engaged

3    at Empire and if they have RCC review our hours and completed

4    tasks, we're in big trouble."   Did I read that correctly?

5        A.    That's what he said, yes.

6        Q.    Okay.   What does it mean when it says, "They have RCC

7    engaged at Empire?"   Is that a different Liberty subsidiary?

8        A.    It is.

9        Q.    Okay.   And is the concern -- you understand the

10   concern here to be that RCC would share the same opinion as

11   Mr. Carr that this shouldn't have taken 241 hours?

12       A.    That's what he appears to be communicating.

13       Q.    Okay.   And it says -- the next sentence says, "I saw

14   the PowerTax hours billed as well; massive hours for a small

15   company, and Michael had to do and redo work."   Is that

16   correctly correct -- or did I read that correctly?

17       A.    That's what it says there, yes.

18       Q.    Okay.   Is that something separate, PowerTax hours

19   billed than this release one implementation; is that how you

20   understand that?

21       A.    I'm not sure what Yulu was responsible for in that

22   project, so --

23       Q.    Do you know if this is the sort of work that Lucasys

24   would have been doing for Liberty at the time that they were

25   terminated?

1      A.    I don't believe that is the work that -- like, my

2   understanding is this work was in the PowerPlan SOW that was

3   signed by Liberty prior to us having any knowledge of Liberty

4   -- or Lucasys being engaged.

5      Q.    Okay.  So this was -- so the communications from

6   PowerPlan to Liberty were in 2020; is that correct?  Right?  I

7   don't know if you recall that.  We looked at those documents

8   earlier.

9      A.    Yes, I believe that.

10      Q.    Okay.  So you believe that in February of 2021 this

11   work that was going on was related to some other PowerPlan

12   statement of work that was pre-existing that 2020 communication

13   to Liberty?

14      A.    Correct.

15      Q.    Okay.  If you look at the last paragraph here, the

16   second to last sentence of that paragraph says, "Maybe a

17   CHPK-like solution is needed in the short-term."  Do you know

18   what a CHP-like -- CHPK-like solution is?

19      A.    CHPK would have been referring to a particular

20   customer in Chesapeake.  I don't recall the specific solution

21   he was talking about.

22      (Plaintiff's Exhibit No. 228 was marked and identified.)

23   BY MR. MAYES:  (Resuming)

24      Q.    Mr. Dahlby, I'm handing you Exhibit 228 with a

25   courtesy copy for your counsel.  Take a look at that and tell

1   me if you've seen that before.

2        A.   Yes, I have seen this.

3        Q.   Do you know if this is the genesis of the Con Ed

4   communications you were referring to earlier?

5        A.   Can you rephrase the question genesis?  I'm not --

6        Q.   Sure.  You said earlier that there were some

7   communications with Lucasys about an authorized vendor

8   agreement that went through Con Ed; do you recall that?

9        A.   Yes.

10        Q.   Do you know if that's related to these -- this e-mail

11   chain in any way?

12        A.   That would have been very different timelines, right?

13   That was in the last three or four months, and this was an

14   e-mail back from 2021.

15        Q.   Okay.  And that -- that's really my question is, you

16   know, was this the start of whatever led to an authorized

17   vendor agreement being sent from Con Ed to Lucasys?

18        A.   It was not.

19        Q.   Okay.  The e-mail on the bottom says, "Jim, I

20   received a quick question Friday from Joel and Mark regarding

21   our stance on third-party access in PowerPlan's cloud in

22   reference to a future meeting with Con Ed."  Did I read that

23   correctly?

24        A.   Yes.

25        Q.   Who are Joel and Mark?

1      A.    This was Joel who we saw an e-mail from earlier who

2  was at Manna Services, and Mark was on his team.

3      Q.    Okay.  So this -- these are internal PowerPlan

4  employees, Joel and Mark?

5      A.    They are.

6      Q.    Is that Joel McManus?

7      A.    Yes.

8      Q.    Okay.  The next sentence says, "It is well known that

9  Vu Nguyen and another internal contractor utilized significant

10 access granted through the existing on-premise solution at Con

11 Ed."  Did I read that correctly?

12     A.    Yes.

13     Q.    Okay.  As far as you know, was that true?

14     A.    That's what I believe to be true, yes.

15     Q.    Okay.  And the next sentence is a question.  "Are you

16 okay with Joel and Mark utilizing the same framework presented

17 to UPCO, RCC, and Con Ed to afford that opportunity."  Did I

18 read that correctly?

19     A.    Yes.

20     Q.    What was the framework that was presented to UPCO and

21 RCC?

22     A.    I believe that was one of the exhibits that we had

23 discussed earlier, which was -- you know, we had shared a few

24 different options with UPCO around how they could work with

25 PowerPlan and RCC in the cloud.

1        Q.    Okay.  And you have an e-mail at the top.  Did --

2    it's a very short one-sentence e-mail.  "One challenge is Vu

3    has been associated with a software competitor."  Is that

4    referring to -- is that answering this question that I just

5    read?

6        A.    It is not.

7        Q.    Okay.  What sentence is -- what question is that in

8    response to or is it in response to the entire e-mail?

9        A.    It's just a general statement in response to the

10   e-mail.

11       Q.    Okay.  Did you ever provide an answer to the question

12   of whether or not you were okay with utilizing the same

13   framework presented to UPCO and RCC at Con Ed?

14       A.    My recollection is we agreed that we'd communicate a

15   more general conversation with Con Ed if it was asked.  I don't

16   believe the question was asked on that.

17       Q.    Okay.  What did you mean when you said, "One

18   challenge is Vu has been associated with a software

19   competitor?"

20       A.    So I was aware that Vu has a -- is connected to

21   Lucasys on LinkedIn and is referenced on LinkedIn.

22       Q.    Okay.  And the relationship with Lucasys or the

23   association with Lucasys was a potential impediment in your

24   view to offering the same sort of options that had been offered

25   to UPCO with respect to RCC; is that correct?

1              MR. FAZIO:  Objection to form.

2              THE WITNESS:  Can you restate your question?

3    BY MR. MAYES:  (Resuming)

4        Q.    Yeah.  The potential -- whatever association there

5    was between Vu Nguyen and Lucasys you viewed as a potential

6    impediment to offering the same framework that had been

7    presented to UPCO and RCC; is that correct?

8              MR. FAZIO:  Objection to form.

9              THE WITNESS:  The -- the question was we needed to

10       get further legal advice from our internal counsel is what

11       I was recommending -- or in a subsequent conversation, I

12       recommended that we have a conversation with legal

13       counsel.

14   BY MR. MAYES:  (Resuming)

15       Q.    Are you familiar with a company named via Barnabas?

16       A.    I am.

17       Q.    What is via Barnabas?

18       A.    They're a consulting company that worked on projects

19   related to PowerPlan in the past.  I don't know anything more

20   than -- specific recently.

21       Q.    Okay.  Do you know if they offered the same kind of

22   services that RCC and Lucasys offer?

23       A.    I don't believe that they have the same -- all the

24   same services.  I think they offer similar services.

25       Q.    Okay.  Did PowerPlan ever demand that via Barnabas

1    enter into a non-disclosure agreement?

2         A.   I don't recall if we did or not.

3              MR. MAYES:  We've been going for like another hour.

4         Why don't we take a break?  I've only got one pretty short

5         topic left.

6              VIDEOGRAPHER:  Okay.  Off the record at 4:28 p.m.

7                        (BREAK TAKEN)

8              VIDEOGRAPHER:  Back on the record at 4:41 p.m.

9    BY MR. MAYES:

10        Q.   Mr. Duffy -- I'm sorry.  Mr. --

11             MR. FAZIO:  I thought you said Duffy.

12   BY MR. MAYES:  (Resuming)

13        Q.   I did say Duffy.  I was going to correct it and say

14   Mr. Dahlby.  Can you confirm for me that we had no substantive

15   discussions while we were off the record?

16        A.   Yes.  We did not have any.

17        (Plaintiff's Exhibit No. 229 was marked and identified.)

18   BY MR. MAYES:  (Resuming)

19        Q.   Okay.  Thank you.  You're not copied on this, but I'm

20   going to show it to you anyway.  I'm handing you Exhibit 229.

21   I want to ask you about the reference in the first line, and

22   tell me when you've read that first sentence.

23        A.   Yes.

24        Q.   Are you aware of any audit by Roper Technologies

25   around the time of April 2019?

1      A.    I don't know what specifically that's referring to.

2      Q.    Okay.  Were you involved in any way -- let me just

3  read the sentence.  The second part of the sentence says, "I

4  would like to escalate a concern regarding -- a concern

5  regarding PowerPlan intellectual property and trade secrets and

6  a third party, via Barnabas Consulting."  Do you see that?

7      A.    Yes.

8      Q.    Were you involved at all with the escalation of a

9  concern regarding via Barnabas Consulting with Enbridge?

10      A.    I recall hearing about it.  I was not -- I don't

11  recall being directly involved.

12      Q.    Okay.  So did you have any communications with

13  Enbridge related to any concerns about PowerPlan intellectual

14  property or trade secrets?

15      A.    I don't recall having direct communication with

16  Enbridge on that.

17      Q.    Okay.  Did you have any communications with via

18  Barnabas Consulting about that topic?

19      A.    I don't recall having any direct conversations with

20  via Barnabas, no.

21      Q.    Okay.  And I think you said this, but were -- are you

22  aware of any audit by Roper Technologies regarding PowerPlan

23  intellectual property and trade secrets that took place around

24  the beginning of 2019?

25      A.    I don't recall what that might be referring to, no.

1        Q.    Okay.   Who else is currently on the leadership team

2    at PowerPlan?

3        A.    Are you talking about our executive leadership team?

4        Q.    Yes.

5        A.    Joe Gomes, Kevin Gianflone (ph), Neal Tisdale,

6    Suzanne Ward, Sarah Park.

7        Q.    Any others?

8        A.    The -- I'm trying to think if there are any others.

9    I guess Matt Crye reports to Suzanne Ward but is involved in

10   the -- some of the activities.

11       Q.    Okay.   Are any of those folks, do they have a longer

12   tenure at PowerPlan than you?

13       A.    Matt Crye.

14       Q.    Okay.   When -- do you know how long he's been working

15   for PowerPlan?

16       A.    More than 23 years.   I don't know if it's 24-ish.

17       Q.    Okay.   Aside from you and Mr. Crye, who is the next

18   most senior person on that executive leadership team?

19       A.    It would be Sarah Park.   And I may have forgotten

20   somebody, so --

21       Q.    Okay.

22       A.    I can't recall off the top of my head right now.

23       Q.    No problem.   It's not a memory test.   Do you know how

24   long Ms. Park has worked for PowerPlan?

25       A.    I don't.

```
 1        Q.    Do you know if it's more or less than ten years?

 2        A.    I believe it's less than ten years, but --

 3        Q.    Okay.

 4        A.    Or maybe approaching it.

 5        Q.    To whom do you report at PowerPlan?

 6        A.    Joe Gomes.

 7        Q.    And who did you report to -- have you always reported

 8   to him during his entire tenure as CEO?

 9        A.    Yes, I'd say that.

10        Q.    Okay.  To whom did you report before Mr. Gomes was

11   CEO?

12        A.    The chief operating officer.

13        Q.    And who was that?

14        A.    Brent Burns.

15        Q.    When did Mr. Burns leave PowerPlan?

16        A.    I don't recall the exact date.  I believe it was

17   2018, but it may have been 2019.

18        Q.    So Mr. Burns was chief operating officer, he left

19   around the time Mr. Gomes started, and then you began reporting

20   to Mr. Gomes?

21        A.    I don't remember if there was an interim stage in

22   there, but yeah, that --

23        Q.    Okay.  We talked before the break about a PowerPlan

24   employee named Yulu.  Is that Yulu Wong (ph)?

25        A.    I don't recall her last name.
```

1      Q.    Okay.  Do you know what her background is?

2      A.    She was a tax consultant.  I don't know what her

3   background was.

4      (Plaintiff's Exhibit No. 230 was marked and identified.)

5   BY MR. MAYES:  (Resuming)

6      Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 230.  Take

7   a look at that and tell me if you have seen that before.

8      A.    Yes, I have seen this.

9      Q.    Did you read this e-mail around the time you received

10   it in February of 2020?

11      A.    I did.

12      Q.    The first bulletpoint -- so looking at the e-mail

13   that Mr. Duffy sent at 2:34 that begins on the first page of

14   Exhibit 230, there are some bulletpoints that say, "Jason told

15   me."  Do you see that?

16      A.    Yes.

17      Q.    And that's referring to Jason Stevens at Deloitte?

18      A.    Yes, that's what the e-mail says.

19      Q.    Okay.  It said, "Utegration sponsored the meeting and

20   has a speaking slot, and they are bringing the CFO of NRG to

21   the meeting to talk about their success."  Did I read that

22   correctly?

23      A.    Yes.

24      Q.    Do you know what this is referring to about the

25   success of Utegration at NRG?

1        A.    They replaced some of the PowerPlan products with

2   Utegration software.

3        Q.    Do you know if they completely replaced PowerPlan's

4   software?

5        A.    My understanding is they're still using some of our

6   tax software.

7        Q.    Okay.  So as far as you know, NRG is still using

8   PowerTax; is that correct?

9        A.    That's my understanding, yes.

10       Q.    Okay.  If you go down to the third bulletpoint there,

11  or dash, it says, "Jason has been told explicitly by a senior

12  person at Utegration that their PowerPlan replacement solution

13  flat out does not work."  Did I read that correctly?

14       A.    You read that correctly.

15       Q.    Do you know if that's true?

16       A.    I do not know if that's true.

17       Q.    Okay.  Have you heard industry feedback about whether

18  or not NRG has been successful in using Utegration's product as

19  a replacement for PowerPlan's products?

20       A.    The only feedback I've personally seen was their --

21  one of their executives presented at an SAP conference.

22       Q.    Okay.  Do you personally have a relationship with

23  people at NRG?

24       A.    I do not.

25       (Plaintiff's Exhibit No. 231 was marked and identified.)

1    BY MR. MAYES:    (Resuming)

2        Q.    Okay.  Mr. Dahlby, I'm handing you Exhibit 231.  Have

3    you seen that before?

4        A.    I have seen this, yes.

5        Q.    Okay.  You forwarded this e-mail string to Kanav (ph)

6    Patel; is that correct?  Right there on the very top of the

7    first page of Exhibit 231.

8        A.    Yes.

9        Q.    Who is Kanav Patel?

10       A.    He's a strategic account executive for PowerPlan.

11       Q.    Do you know why you forwarded this e-mail string to

12   him?

13       A.    Because I thought there was information he might be

14   interested in.

15       Q.    Was it related to a specific customer of his?

16       A.    I don't recall.

17       Q.    Okay.  The e-mail below that from Alex Elkin (ph) --

18   who is Alex Elkin?

19       A.    He's a PowerPlan employee.

20       Q.    And what's his role?

21       A.    At the time he was a VP of product management.

22       Q.    Okay.  And it says accounting.  Does that delimit an

23   area of responsibility for him?

24       A.    Yes.

25       Q.    All right.  And how -- what area of responsibility is

1    that?

2         A.    Accounting.

3         Q.    Is that -- is another way of referring to that -- do

4    sometimes people refer to that as plant?

5         A.    In this context, accounting would be broader where

6    plant would be anything accounting-related.

7         Q.    Okay.  Would that include tax?

8         A.    No.

9         Q.    Okay.  So anything other than tax accounting-related?

10        A.    There are other areas within our product organization

11   for platform, FPNA, so -- that have different responsibilities.

12        Q.    I want you to look at the first two sentences -- or

13   really the second sentence of this e-mail.  It says, "I agree

14   that Utegration is the largest and most significant threat to

15   our core utility customer base."  Did I read that correctly?

16        A.    You read that correctly.

17        Q.    Okay.  When it says core utility customer base,

18   that's a phrase I've seen in several documents.  Do you have an

19   understanding of who PowerPlan's core customer base is?

20        A.    I would say generally speaking, that's talking about

21   investor-owned utilities in North America.

22        Q.    Okay.  The next sentence says, "We should expect

23   competition at every S/4HANA transition for fixed assets and

24   lease the NRG story, and even regulatory.  They are claim --

25   they claim some similar capabilities, but most customers use it

1  for real-time FERC translation, not our core regulatory case."

2  Did I read that correctly?

3      A.    I think technically it says, "not out core regulatory

4  case."

5      Q.    Oh, fair enough.  Do you think that he meant to say,

6  "not our core regulatory case?"

7      A.    I would probably make a similar assumption.

8      Q.    Okay.  What does S/4HANA mean?

9      A.    It's a version of SAP's ERP.

10     Q.    And it looks like when he says the NRG story that NRG

11 replaced PowerPlan for fixed assets and lease.  Am I reading

12 that correctly?

13     A.    Yes.

14     Q.    Okay.  Is that your understanding of what it is that

15 NRG switched from PowerPlan to Utegration for fixed assets and

16 lease?

17     A.    There would have been other products within the

18 PowerPlan suite that would be under that -- I'll call it an

19 umbrella.

20     Q.    Okay.  And the next sentence -- part of that sentence

21 says, "And even regulatory."  What does -- what is the

22 distinction there.  What is regulatory in that context?

23     A.    It would be referring to our regulatory software.

24     Q.    What is your regulatory software?

25     A.    Software for regulatory purposes.  It could be

1    re-cases or other --

2        Q.   Is there a particular PowerPlan module that you would

3    think of -- or modules that you would think of as being

4    encompassed by the descriptive word "regulatory" in this

5    sentence?

6        A.   I would.

7        Q.   What are those?

8        A.   There are essentially four products that make up our

9    regulatory suite of products.

10       Q.   Okay.  What are they?

11       A.   I don't recall the exact names of the four products,

12   but one of them is our regulatory ledger, one of them is our --

13   I don't remember the other two off the top of my head --

14       Q.   Okay.

15       A.   Sorry.  Go ahead.

16       Q.   I don't mean to interrupt you.

17       A.   I don't recall the other three off the top of my

18   head, the exact product names.

19       Q.   Would you include PowerTax in that?

20       A.   I would not.

21       Q.   Okay.  So this sentence, when it's talking about

22   where you should expect competition from Utegration, it's not

23   mentioning PowerPlan's tax -- PowerTax software; is that

24   correct?

25       A.   This doesn't mention that, no.

1       Q.    Okay.  Do you believe that Utegration with SAP is --

2  offers a solution that is competitive to PowerTax?

3       A.    I'm not sure.

4       Q.    Okay.  Are you aware of any PowerPlan customer who

5  has stopped using PowerTax and started using a solution from

6  Utegration instead?

7       A.    I'm not aware of that specific situation.

8       Q.    Are you aware of any software solution that could be

9  used as a replacement for PowerTax?

10      A.    Yes.

11      Q.    What -- what solution?

12      A.    So there's a -- ERP offers solution that could be a

13  potential replacement for PowerTax.  Bloomberg BNA offers a

14  product.  Sage offers a product.  And then, there are other

15  service providers like the big four who offer their own

16  products.  PWC has replaced our PowerTax product at two of our

17  customers that I'm aware of.

18      Q.    Okay.  Which two customers are those?

19      A.    Avangrid and UIL.

20      Q.    And are they -- is PWC selling a competitive software

21  product or are they just doing the work that PowerTax would

22  typically do in some other manner themselves?

23      A.    I'm not sure of the exact offering, so -- I just know

24  that that's how they're --

25      Q.    So your understanding is that those two customers

1   that you mentioned, Avangrid and ULI [sic], had stopped using

2   PowerTax and instead have hired PWC?

3        A.   That's accurate.

4        Q.   Are you aware of any PowerPlan investor-owned utility

5   customer who has stopped using PowerPlan and instead started

6   using some solution from one of the ERPs?

7        A.   Yes.

8        Q.   And which customers are those?

9        A.   Energy Transfer has done that.

10       Q.   I'm sorry?

11       A.   Energy Transfer.

12       Q.   Is that a rate-regulated utility?

13       A.   It's a rate-regulated pipeline company.

14       Q.   Do you know if they use the ARAM method for

15   calculating their deferred tax liability?

16       A.   I do not know that.

17       Q.   Okay.  And what software solution did they start

18   using instead of PowerTax?

19       A.   SAP.

20       Q.   And do you know if they're using SAP to calculate

21   deferred tax liability?

22       A.   I do not know.

23       Q.   Okay.  Has PWC signed any form of authorized vendor

24   agreement with PowerPlan?

25       A.   Are you referring to the ABA document that we --

1      Q.    Yeah, something like that.  Has PWC entered something

2  like that?

3      A.    Previously PowerPlan had a specific sort of alliance

4  agreement with PWC.  That was terminated when PowerPlan was

5  acquired by Roper.

6      Q.    Okay.  So since the Roper acquisition, has there been

7  any formal agreement in place between PWC and PowerPlan?

8      A.    There has not.

9      Q.    Do you know how PWC was able to get the data that it

10  needed to replace PowerTax for Avangrid and UIL?

11      A.    I do not know how they --

12      Q.    Do you know whether they had accessed the PowerTax

13  database in order to extract that data?

14      A.    I do not know.

15      Q.    As far as you know, has PowerPlan made any threats to

16  PWC related to PWC's unlawful -- unlawful access to PowerPlan

17  intellectual property or trade secrets?

18          MR. FAZIO:  Objection to form and foundation.

19          THE WITNESS:  Can you repeat the question?

20  BY MR. MAYES:  (Resuming)

21      Q.    Sure.  Has PowerPlan, to your knowledge, made any

22  communications to PWC regarding PWC's access to PowerPlan

23  proprietary information, trade secrets, or confidential

24  information?

25      A.    I'm not aware of anything being communicated with PWC

1    specific to that.

2         Q.    I may have already asked you this.  Do you know if

3    PWC is actually selling a competitive software solution?

4         A.    I do not know what their offering entails.

5         Q.    Are you aware of any investor-owned rate-regulated

6    utility that has canceled PowerTax to use Bloomberg instead?

7         A.    What were all of the qualifiers that you had on that?

8         Q.    A rate-regulated investor-owned utility.

9         A.    I don't recall that has ever happened before.

10        Q.    Okay.  What about Sage?  Are you aware of any

11   rate-regulated investor owned utilities who have stopped using

12   PowerTax and started using Sage instead?

13        A.    I am not aware of any.

14        Q.    Was Bloomberg and BNA the same thing?

15        A.    Yes.

16        Q.    Okay.  You mentioned ERPs, Bloomberg BNA, Sage, and

17   the big four accounting firms.  Are there any other software

18   solutions that you're aware of that you think could be used as

19   a substitute for PowerTax?

20        A.    I mean, Lucasys' marketing software in that space, so

21   I guess that was --

22        Q.    Sure.

23        A.    -- probably implied, but --

24        Q.    Yeah, and I wasn't asking about Lucasys on the

25   others, but yeah, thank you.  Are you aware of any of the other

1    big four accounting firms having done something similar to PWC

2    where they have been used as a substitute for PowerTax?

3        A.    I am aware Grant Thornton has done that in the past.

4        Q.    For who?

5        A.    Flint Hills Resources.

6        Q.    Any others?

7        A.    I don't recall another specific example with Grant

8    Thornton.

9        Q.    Okay.  Is Flint Hills an investor-owned utility?

10       A.    They are not.

11       Q.    Okay.  What is Flint Hills?

12       A.    It's an energy company with pipelines and refineries

13   and some other stuff.  I don't recall the details.

14       Q.    Okay.  Is it rate-regulated?

15       A.    I believe they are rate-regulated pipelines.

16       Q.    Are you aware of any of the other accounting firms

17   who have been used as a substitute for PowerTax by

18   rate-regulated investor-owned utilities?

19       A.    I believe that there is the case -- I know we have

20   prospective customers that don't use our software that have

21   used third parties to help them with their compliance with.

22       Q.    Do you know if they use software or do they just do

23   it manually?

24       A.    I -- I don't know if that distinction matters, I

25   guess.  I mean, from us, it's -- if they're not -- if they're

1   using any technology, whether it's a spreadsheet or other

2   things, that still is one of the competitors in the

3   marketplace.

4        Q.   Okay.  So is -- so the answer is you're not sure?

5        A.   I'm not sure what they use and how they do it.

6        Q.   As far as you know, have any of these -- the

7   accounting firms accessed PowerPlan's PowerTax databases?

8        A.   What do you mean by accessed?

9        Q.   Same way Lucasys would access when it was doing

10  consulting services PowerTax's database.  Do the accounting

11  firms do the same thing?

12       A.   I believe that the accounting firms would potentially

13  have access through customer agreements under our license

14  agreement in certain customer cases, so --

15       Q.   Okay.  As far as you know, have there been any

16  communications to any of those accounting firms asserting that

17  they had inappropriate access to PowerPlan trade secrets or

18  confidential information?

19       A.   I'm not aware of specific communications to those

20  accounting firms.

21       Q.   Are there any agreements in place -- any authorized

22  vendor agreements in place with respect to any of the big four

23  accounting firms?

24       A.   Not until we have an alliance agreement.  I don't

25  know if that would -- it's not in the same form as an

1   authorized vendor.

2       Q.   (Unintelligible response).

3       A.   Deloitte is the one that I can recall.  I -- there

4   may be others.

5       Q.   As you sit here, can you recall any others?

6       A.   Accenture is another, I guess.  I don't know if you

7   would qualify that in the accounting firm bucket, but --

8       Q.   As you sit here today -- and I believe you already

9   said this -- are you aware of any facts or evidence that lead

10  you to believe that Lucasys used any trade secrets or

11  proprietary information from PowerPlan development software

12  aside from anything you've heard from counsel?

13      A.   I have not been -- seen any specific evidence of

14  that.

15      Q.   As far as you know, is PowerPlan still taking the

16  position set forth in its IP protection plan communications

17  that it will not consent to Lucasys accessing the PowerPlan

18  databases?

19      A.   As far as I know, that's still our -- our position.

20  I believe based on ongoing litigation that our counsel may have

21  changed that, but I don't recall the exact specifics.  I don't

22  recall if we've had any customer conversations to that effect.

23      Q.   Okay.  As far as you know, there have been no

24  communications that say we've changed our mind and we will now

25  consent to Lucasys accessing PowerPlan software; is that

1   correct?

2        A.   I am not aware of any consent provided, no.

3             MR. MAYES:  Why don't we take a quick break?  I think

4        I may be finished.

5             VIDEOGRAPHER:  Okay.  At 5:09 p.m.

6                       (BREAK TAKEN)

7             VIDEOGRAPHER:  Back on the record at 4:20 -- or

8        excuse me -- 5:14 p.m.

9   BY MR. MAYES:  (Resuming)

10       Q.   Mr. Dahlby, can you confirm that during the break we

11  had no substantive discussions about the case?

12       A.   I can confirm that.

13       Q.   Okay.  You mentioned before the break that previously

14  PWC had an alliance agreement with PowerPlan; is that correct?

15       A.   Yes.

16       Q.   Did that alliance agreement contain a non-disclosure

17  provision, to your knowledge?

18       A.   It would have contained that.

19       Q.   Did -- through the course of that alliance, did PWC

20  have access to and learn the PowerTax and PowerPlan data models

21  and structures?

22       A.   I don't know what they would have learned.  We did

23  not provide them with data models or data structures.

24       Q.   Okay.  Did PWC pursuant to that alliance agreement,

25  to your knowledge, access PowerPlan's databases and data models

1    -- excuse me -- databases?

2        A.   To the extent they did, it would have been part of a

3    project with a customer with a license agreement.

4        Q.   Okay.  And PWC is now offering at least services that

5    compete with PowerTax; is that correct?

6        A.   That's my understanding, yes.

7        Q.   Okay.  And you're not sure if they're offering

8    software that competes with PowerTax?

9        A.   I do not know.

10       Q.   Okay.  Why hasn't PowerPlan taken the same sort of

11   actions that it took with respect to Lucasys to Price

12   Waterhouse Cooper?

13           MR. FAZIO:  Objection to form.

14           THE WITNESS:  Can you repeat the question?

15   BY MR. MAYES:  (Resuming)

16       Q.   Yeah.  Why is it that PowerPlan has not taken the

17   same sort of actions that it took with respect to Lucasys to

18   PWC?

19           MR. FAZIO:  Same objection.

20           THE WITNESS:  I'm not aware of any situation that

21       we've been made aware that they had access similar to what

22       Lucasys was accessing.

23   BY MR. MAYES:  (Resuming)

24       Q.   They had access as part of customer projects to the

25   PowerPlan databases, correct?

```
 1              MR. FAZIO:  Objection to form and foundation.

 2              THE WITNESS:  I guess I'm not sure I -- I'm not sure

 3       that that's happened in the same -- since they've had

 4       access or since that event has occurred that they --

 5  BY MR. MAYES:  (Resuming)

 6       Q.   Oh, I see.  So it's the fact that PWC had --

 7  previously had had the access to PowerPlan's database as

 8  opposed to having it currently; is that the distinguishing

 9  factor in your mind?

10              MR. FAZIO:  Objection to form.

11              THE WITNESS:  I guess I'm not sure.  Can you repeat

12       the question?

13  BY MR. MAYES:  (Resuming)

14       Q.   Sure.  Yeah.  So in the past, PWC through various

15  engagements had access to PowerPlan and PowerTax databases,

16  correct?

17              MR. FAZIO:  Objection to form and foundation.

18              THE WITNESS:  The -- they would have had access to

19       some PowerPlan through customer engagements, yes.

20  BY MR. MAYES:  (Resuming)

21       Q.   And those are items that PowerPlan has at least

22  contended in the past are trade secrets, intellectual property,

23  and proprietary information, correct?

24       A.   Yes.

25       Q.   Okay.  And PWC is now competing with PowerTax,
```

1  correct?

2       A.   I'm not sure how they're competing or if they are

3  competing with PowerTax, but they are providing a service to

4  customers.

5       Q.   And some of those customers have stopped using

6  PowerTax and started using PWC instead; is that correct?

7       A.   That's correct.

8       Q.   And so my question is why hasn't PowerPlan taken the

9  same aggressive steps that it took towards Lucasys to PWC?

10          MR. FAZIO:  Objection to form.

11          THE WITNESS:  I'm not aware of any evidence that

12      would lead us to believe that they are utilizing that

13      intellectual property to build competing solutions.

14  BY MR. MAYES:  (Resuming)

15       Q.   You told me when I asked you earlier you didn't have

16  that evidence at the time the initial demand letter was sent

17  either; isn't that true with respect to Lucasys?

18          MR. FAZIO:  Objection to form.

19          THE WITNESS:  We had belief to that fact.

20  BY MR. MAYES:  (Resuming)

21       Q.   Okay.  But at the time that the initial demand letter

22  was sent in October of 2019 to Lucasys, PowerPlan did not have

23  any knowledge of what PowerPlan even had aside from what was on

24  its website; isn't that true?

25       A.   I think you just -- yeah, you said --

1      Q.   I'm sorry.  That Lucasys had?  Let me start the

2   question again.  I'm sorry.

3           At the time the initial demand letter was sent in

4   October of 2019, PowerPlan did not have any information about

5   Lucasys' software offerings aside from what was on Lucasys'

6   website; isn't that true?

7      A.   Yes, that is correct.

8      Q.   Okay.  And you did not have any facts or evidence

9   about how that software had been developed; isn't that true?

10     A.   There were similarities in the videos and other

11  information put on the website to PowerPlan intellectual

12  property.

13     Q.   Okay.  What were those similarities?

14     A.   I believe some of those were described in the

15  original letter around data structures and such.

16     Q.   Okay.  But Power -- Lucasys' website didn't show its

17  data structures, did it?

18     A.   I mean, it showed screens -- screens of their

19  software and what was on their website to our knowledge.

20     Q.   Okay.  And you're not sure how it is that PWC is

21  replacing PowerTax.  You just know that they are in some way;

22  is that correct?

23     A.   Yeah, just the customers canceled their PowerTax

24  software maintenance.

25           MR. MAYES:  Okay.  I think I'm all done, so if you

1          want to go off the record?

2                    VIDEOGRAPHER:  Okay.  Yep.  Going off the video

3          record at 5:20 p.m.

4                              (BREAK TAKEN)

5                    VIDEOGRAPHER:  Back on the record at 5:21 p.m.

6                    D I R E C T - E X A M I N A T I O N

7     BY MR. FAZIO:

8          Q.    Good evening, Mr. Dahlby.  Just a couple of follow-up

9     questions and clarifications.  Can you pull up Exhibit 202?

10         A.    Okay.

11         Q.    Do you have that in front of you, sir?

12         A.    I do.  Yes, I do.

13         Q.    And, sir, I -- I want to make sure the record is

14    clear on this.  Prior to this deposition, do you have any

15    recollection of ever seeing this document previously?

16         A.    I don't recall seeing this document.

17         Q.    Okay.  And if you flip to Page 2 of 2, do you see at

18    the bottom there it indicates that it's copyrighted in 2007?

19         A.    Yes.

20         Q.    Okay.  Were you familiar with the products that were

21    available from PowerPlan in 2007?

22         A.    I was.

23         Q.    Okay.  And was there a reports and query product that

24    was being -- that was part of PowerPlan's offering at that

25    time?

1       A.    I would call it a feature of the overall platform,

2    yes.

3       Q.    Okay.  And so this was something that was -- it was a

4    feature that was built in which specific parts of the PowerPlan

5    platform?

6       A.    Within the -- I mean, kind of generally across the

7    product we have like a reporting, like, layer, I guess you'd

8    call it, or like a set of reports that were available that use

9    the same reporting framework.

10      Q.    Okay.  And you were asked the question about whether

11   PowerPlan referred to -- referred to its system in 2007 or

12   after as a, quote-unquote, open system; do you recall that?

13      A.    That was what this document referred -- one of the

14   ways it referred to it, yes.

15      Q.    Okay.  And other than this document, do you have any

16   recollection of PowerPlan referring to its product as an open

17   product?

18      A.    No.

19      Q.    Now, sir, you were asked some questions about a

20   couple of specific customer meetings and I want to make sure

21   the record is clear on it.  Now, sir, were you following --

22   there was a meeting with AEP at some point to discuss

23   PowerPlan's concerns around protecting its intellectual

24   property vis-à-vis Lucasys; do you recall that?

25      A.    Yes.

1        Q.    Okay.  And did you personally participate in that

2    meeting?

3        A.    I did.

4        Q.    Okay.  Who else from PowerPlan participated in that

5    meeting?

6        A.    Brett Burts and Jonathan Suture.

7        Q.    Okay.  And this was on a -- this was a telephone

8    call?

9        A.    Yes.

10       Q.    Okay.  And who from AEP was present at that meeting?

11       A.    I recall Jimmy Lindy and Jeff Horsted.  I don't

12    recall who the others were.  I believe there were others, but I

13    don't recall.

14       Q.    Okay.  And did you speak at that meeting?

15       A.    I believe I -- yes, I spoke.

16       Q.    Okay.  And what did you say at the meeting?

17       A.    I believe I might have given an example around other

18    software companies.  Like, Oracle wouldn't allow SAP or vice

19    versa, something to that effect.  Do consulting while they were

20    in their -- deep in their products.

21       Q.    And, sir, at that meeting, did you hear anybody from

22    Power -- well, first of all, did -- at that meeting, did you

23    personally say to AEP that Lucasys was affirmatively

24    misappropriating its intellectual property?  Did you make that

25    statement?

```
 1        A.    No.

 2        Q.    Okay.  Did you hear anybody from the PowerPlan side

 3   of that call make such a statement?

 4        A.    No.

 5        Q.    Okay.  With respect to AEP, are you aware of anybody

 6   from PowerPlan ever making such a statement?

 7        A.    I'm not aware.

 8        Q.    Okay.  NextEra, were you part of the conversations

 9   with NextEra around PowerPlan's concerns about protecting its

10   intellectual property vis-à-vis Lucasys?

11        A.    I was on a phone call with NextEra, yes.

12        Q.    Okay.  Do you know other than the phone call that you

13   were on, were there any other calls?

14        A.    I don't recall if there were other specific calls or

15   not.

16        Q.    Okay.  And who was on the NextEra call from on the

17   PowerPlan side of it?

18        A.    The one I participated in, it was Brett Burts and

19   Jonathan Suture.

20        Q.    And you?

21        A.    Yes.

22        Q.    Okay.  And -- and who participated on the NextEra

23   side?

24        A.    I believe it was Leo Quintana, and I believe Jim May

25   may have been on.  I can't recall if he was on or not, but he
```

1    was invited.

2        Q.   Okay.  Do you recall if anybody else participated in

3    that meeting --

4        A.   (Unintelligible) invited, I don't recall.

5        Q.   Okay.  Let's just --

6        A.   Sorry.

7        Q.   Let me finish asking before you start answering.  And

8    so on that -- in that call, did you say anything?

9        A.   I don't believe I said anything in that call.

10       Q.   Okay.  In that call, do you recall anybody from

11   PowerPlan ever saying to anybody from NextEra that Lucasys was

12   affirmatively misappropriating PowerPlan's intellectual

13   property?

14       A.   No.

15       Q.   Were you part of any of the discussions with the

16   folks at Liberty?

17       A.   I was not.

18       Q.   Okay.  And how about at Suez?  Were you -- did you

19   participate in any of those communications?

20       A.   I believe I was on a call when they were discussing

21   project timelines and scope, but not the discussion around

22   intellectual property.

23       Q.   Okay.  So with respect to Liberty and Suez, you

24   didn't have any -- you didn't participate in either of those

25   calls?

```
 1        A.    That's correct.

 2        Q.    Okay.   As you sit here today, are you aware -- so

 3   prior to -- setting aside what has been said in the litigation

 4   in terms of PowerPlan's communications with the market, are you

 5   aware of any communications in which somebody from PowerPlan

 6   made a statement to the PowerPlan customer that Lucasys was

 7   affirmatively misappropriating intellectual property?

 8        A.    No.

 9        Q.    Have you ever seen a document that indicates that?

10        A.    I have not.

11        Q.    Have you ever had a customer -- a PowerPlan customer

12   report to you that somebody from PowerPlan said that to you?

13        A.    I have not had that reported to me.

14        Q.    Now, sir, you were involved in what's been referred

15   to as the agreed process; do you recall that?

16        A.    Yes.

17        Q.    Okay.   And so you had some access to information

18   concerning Lucasys' software development activities as of the

19   time that the agreed process was ongoing?

20        A.    Yes.

21        Q.    Okay.   And you understood that you had

22   responsibilities to maintain the confidentiality of that

23   information?

24        A.    Yes.

25        Q.    Okay.   And you've discharged those obligations?
```

1        A.   Yes.

2        Q.   Okay.  And you -- do you have an understanding as to

3   whether Lucasys has provided further access to its software

4   solutions as part of the litigation that's ongoing?

5        A.   I was told that through legal counsel.

6        Q.   Okay.  And I want to get to the communications around

7   that, but I want to ask you as part of the litigation, have you

8   had access to or seen any information about Lucasys' software

9   development activities?  Have you seen their source code?

10       A.   No.

11       Q.   Okay.  Have you seen anything about their -- the data

12   structures they're implementing?

13       A.   No.

14       Q.   Okay.  Their development -- anything about their

15   development efforts at all?

16       A.   No.

17       Q.   Have you seen any Lucasys documents at all that have

18   been produced as part of the litigation?

19       A.   No.

20       Q.   Now, sir, when you -- so you were asked with respect

21   to Exhibits 217 and 219 when you had verified the

22   interrogatories -- the interrogatory responses that had been

23   served in this case?

24       A.   Yes.

25       Q.   Okay.  When you signed those interrogatory responses,

1    did you -- you didn't -- did you personally go about

2    investigating the answers to each and every response that was

3    included in the responses to the first and second set of

4    interrogatories?

5         A.   I did not investigate every one of those in detail.

6         Q.   Okay.  So you were comfortable at the time that you

7    signed those verifications that the statements that were made

8    were true and accurate as the information was available at the

9    time?

10        A.   Yes.

11        Q.   You were asked -- can you pull up Exhibit 227?

12        A.   Yeah.

13        Q.   Okay.  So you were -- you were asked some questions

14   about this communication from Jamie Carr concerning a PowerPlan

15   employee named Yulu; do you recall that?

16        A.   Yes.

17        Q.   So in -- this was sent in February -- on

18   February 16th, 2021; do you see that?

19        A.   Yes.

20        Q.   Okay.  And on February 16th, 2021, how many

21   consultants were in the professional services organization at

22   PowerPlan?

23        A.   Somewhere in the 150 range.

24        Q.   Okay.  And so this person, Yulu, what was her

25   position?

1       A.    She was a consultant within the tax group.

2       Q.    Okay.  And how long had she worked at PowerPlan as of

3  February 2021; do you know?

4       A.    I don't know the specifics.

5       Q.    Was she considered a relatively junior employee?

6       A.    She would have been.

7       Q.    Okay.  The situation, does she -- does Yulu still

8  work at PowerPlan?

9       A.    She does not.

10      Q.    Okay.  And when did she leave PowerPlan?

11      A.    I believe sometime last year.  I don't recall the

12  exact dates.

13      Q.    Do you -- I'm sorry.  Were you done answering?

14      A.    Yeah.  I don't recall the date when she left.

15      Q.    And do you know anything about the circumstances of

16  her departure?

17      A.    I just know it was voluntary.

18      Q.    The situation that is being reported by Mr. Carr in

19  the February 16th, 2021 e-mail with respect to Liberty, do you

20  have any understanding as to how the situation was resolved?

21      A.    I mean, so he was -- the person he was communicating

22  with is Jason Celeste (ph).  He would have been the practice

23  lead within the tax practice, so I think he was -- the way I

24  read this is Jamie was communicating concerns about one of the

25  employees and her performance.  I don't know how it was

1  resolved.

2      Q.   And to be clear, when I ask how it was resolved, is

3  it -- I'm asking about how it was resolved with respect to the

4  customer; do you have any understanding as to that?

5      A.   Oh, yeah.  I mean, my understanding is the customer

6  is satisfied with what the current implementation efforts that

7  are going on, so --

8      Q.   And are there ongoing implementation efforts at

9  Liberty right now?

10     A.   There are.

11     Q.   Okay.  And tell me about those.  What's going on at

12 Liberty currently?

13     A.   They're -- as was described earlier, they're in a

14 multi-release cycle and they're -- I believe they're working on

15 release three, maybe release two something, but I believe it's

16 release three they're kind of working on.  Probably four or

17 five releases, so --

18     Q.   Sir, you -- you were asked a couple of questions

19 about what was known to you at various points in time

20 concerning the potential for Lucasys having misappropriated the

21 intellectual property of PowerPlan.  Do you remember those

22 questions?

23     A.   Yes.

24     Q.   Now, with respect to what you personally knew at

25 various points in time, you were again part of the agreed

1    process, true?

2        A.   Yes.

3        Q.   So to the extent that you knew any specific facts,

4    those facts would have come to you through the agreed process

5    or through counsel, true?

6        A.   Yes.

7            MR. MAYES:  Object to the form of the question.

8    BY MR. FAZIO:  (Resuming)

9        Q.   Okay.  And to the extent that there were

10   communications that came out of the agreed process, those --

11   going back to Lucasys, those communications came from outside

12   counsel?

13       A.   Yes.

14           MR. MAYES:  Object to the form of question.

15   BY MR. FAZIO:  (Resuming)

16       Q.   So it was not -- and your understanding of your role

17   in that was not to -- you didn't have a role communicating what

18   you thought the -- what a potential misappropriation may have

19   been based on what you knew?

20           MR. MAYES:  Object to the form of the question.

21           THE WITNESS:  That's correct.

22   BY MR. FAZIO:  (Resuming)

23       Q.   Sir, the authorized vendor agreement that we were

24   talking about earlier, Exhibit 226 --

25       A.   Yes.

1      Q.    Okay.   This was -- this related to -- it was an

2   agreement between PowerPlan and RCC and it was related to work

3   you had done at PPL Services Corporation?

4      A.    That's correct.

5      Q.    Okay.   As far as you know, RCC has been performing

6   services for PPL pursuant to the ABA?

7      A.    Yes.

8      Q.    Has there been any -- to your knowledge, has

9   PowerPlan raised any concerns about how RCC has operated under

10  the authorized vendor agreement?

11     A.    No concerns that I'm aware of.

12     Q.    Okay.   And as far as you know, has RCC raised any

13  concerns with you about your ability to discharge -- to

14  discharge their consulting services to PPL under the ABA?

15     A.    No.

16     Q.    Okay.   Have they had come back to you and ask for

17  greater access?

18     A.    They have not.

19     Q.    Under this -- under the ABA for PPL?

20     A.    They have not.

21     Q.    Have they expressed any concerns at all with respect

22  to the ABA since you entered into it?

23     A.    Not with respect to the ABA.

24     Q.    Okay.   And I think you mentioned that PowerPlan is

25  also providing services to PPL simultaneously?

1   A.   Not currently.  I mean, I think there is a project

2   that's currently ongoing that PowerPlan and RCC are involved

3   with.  There's -- but there is also a project that is not

4   PowerPlan and professional services is not involved in.

5   Q.   Okay.  So the project that RCC and PowerPlan are

6   working on, are they working on it in collaboration?  Can you

7   explain to me what that project is?

8   A.   Yeah.  It's an ongoing project going on for several

9   months.  I don't know when it exactly started, but I believe

10  they were going live and cutting over as it relates to that

11  project here in the last few -- few weeks.  And so our team, we

12  have people involved and they have people involved, and the two

13  are collaborating based on our -- each of us has an individual

14  contract with the customer as to what our responsibilities are

15  within that project.

16  Q.   Okay.  And so when you say that you're working --

17  sort of working in parallel, you each have agreements with the

18  customer.  You're each doing your job (unintelligible) the

19  customer, and that requires some coordination between the two?

20  A.   That's correct.

21  Q.   So you were asked a question about PowerPlan's core

22  customer base.  I think that was the expression that was used.

23  Can you describe for me the customers that PowerPlan focuses on

24  just generally?

25  A.   Yes.  So our -- if we talked about our core markets,

1  we would talk about North American Energy, which would include,

2  you know, oil and gas, include municipals and coops, as well as

3  investor-owned utilities.

4      Q.   And, sir, the product mix that -- that PowerPlan

5  brings to those customers, can you put into context for us sort

6  of the role -- how much -- how many of those customers -- or

7  what's -- actually, strike all of that.

8          Sir, let's go back to the -- some of the Lucasys

9  questions for a second.  You -- I think you said this a couple

10  of times, but I want to make sure that it's clear on the

11  record.  From your perspective, was the concern -- what was the

12  concern about Lucasys having access to PowerPlan's -- what was

13  your concern about Lucasys having access to PowerPlan's systems

14  while they were developing the product?

15      A.   So the primary concern is around their ability to

16  take intellectual property and use it to develop their

17  products, and so whether that's the data structures or other --

18  other components.  Another concern I have personally is we

19  don't have a way to govern if they provide services in a manner

20  that always has our customer's best interest in mind.  So there

21  is a potential -- I am not saying that they have done this, but

22  there is a potential where they could set up their software, so

23  the PowerPlan software in a way that would, you know, create it

24  advantageous for Lucasys' software at some point in the future.

25      Q.   And, sir, were you -- so PowerPlan also has to

1    provide support services to its customers, true?

2         A.   That's correct.

3         Q.   Okay.  And so if Lucasys was doing work on

4    PowerPlan's software, how would that impact the provision of --

5    the support function by PowerPlan, or how could it?

6         A.   Can you repeat the first part of that?

7         Q.   Yeah.  So when Lucasys -- if Lucasys is doing work

8    for one of PowerPlan's customers, does it implicate PowerPlan's

9    support obligations to that customer?

10        A.   So under our support agreement, you know, our

11   customers will call us for maintenance fixes or they may call

12   us to ask support questions.  And so if Lucasys was doing

13   consulting, we would know what they did or how they did it, in

14   which case it could -- you know, and had they modified

15   something about the software or done something for our

16   customers that we don't know about.

17        Q.   And so how would that impact your support obligations

18   to your customers, or how could it?

19        A.   I mean, we'd have to investigate to determine that

20   maybe the software wasn't performing well, not because of the

21   software, but because of something that was done by Lucasys.

22        Q.   And, sir, when -- you were asked a series of question

23   about the letters that went out as part of -- that went out to

24   certain customers where PowerPlan was expressing its view that

25   it would -- it was not going to permit Lucasys access to our

1    software on a go-forward basis.   Do you remember those

2    questions?

3         A.   Yes.

4         Q.   And at the time that those letters were going out,

5    did you have any -- did you have a view as to whether -- did

6    you have any concern about whether those letters were

7    accurately expressing PowerPlan's position vis-à-vis Lucasys?

8         A.   I didn't have any concerns at the time.

9              MR. FAZIO:  All right.  That's all I have.

10             MR. MAYES:  Okay.  I've got a few more.

11             VIDEOGRAPHER:  Okay.  Do you want to go off the

12    record?

13             MR. MAYES:  Yeah.

14             VIDEOGRAPHER:  Okay.

15             MR. MAYES:  It's going to take a second.  I'm going

16    to have to dig out a couple documents.

17             VIDEOGRAPHER:  All right.  Off the record at

18    5:41 p.m.

19                        (BREAK TAKEN)

20             VIDEOGRAPHER:  Back on the record at 5:43 p.m.

21             R E C R O S S - E X A M I N A T I O N

22    BY MR. MAYES:

23         Q.   Mr. Dahlby, can you confirm that you and I did not

24    have any substantive discussions during the break?

25         A.   I can confirm.

1       Q.    Do you call Mr. Fazio just asked you whether or not

2   you had seen any documents in which PowerPlan affirmatively

3   represented that Lucasys had misappropriated trade secrets?

4       A.    Yes, sir.  I don't recall.

5       Q.    And you said you had not seen a document like that?

6       A.    I don't recall seeing that.

7    (Plaintiff's Exhibit No. 232 was marked and identified.)

8   BY MR. MAYES:   (Resuming)

9       Q.    I'm handing you Exhibit 232.  This is an e-mail from

10  Brett Burts to Rob Kleczynski on February 17th, 2020.  Take a

11  look at this and tell me if you've ever seen this before.

12      A.    I don't recall seeing this, no.

13      Q.    Okay.  I want you to look at the second paragraph.

14  The second sentence says, "Recently, we've identified that

15  there was a third party working with some of our customers

16  delivering services on the PowerPlan software that we have

17  strong reason to believe is using access to our intellectual

18  property to build competitive offerings."  Did I read that

19  correctly?

20      A.    You read that correctly.

21      Q.    Okay.  You understand that third party to be

22  referring to Lucasys, correct?

23      A.    I believe that's the case, yes.

24      Q.    And you would agree with me that this does not say

25  you have concerns; this says you have strong reason to believe

1    Lucasys is using access to the intellectual property to build

2    competitive offerings, correct?

3         A.    That's what it states.

4         Q.    Okay.  And rob Kleczynski is a PowerPlan customer,

5    correct?

6         A.    That is correct.

7         Q.    Okay.  And do you have any reason to think that Brett

8    Burts did not make similar statements during calls with other

9    customers at PowerPlan?

10              MR. FAZIO:  Objection to form and foundation.

11              THE WITNESS:  I don't have any --

12              MR. FAZIO:  Calls for speculation.

13              THE WITNESS:  I was going to say I don't have -- I

14        was not witness that I recall anything that would have

15        been in that form.

16   BY MR. MAYES:  (Resuming)

17        Q.    Did you ever discuss anything that you had learned as

18   part of the agreed-upon process with Mr. Burts?

19        A.    I did not.

20        Q.    Okay.  Mr. Burts was not part of the agreed-upon

21   process, correct?

22        A.    He was not.

23        Q.    Okay.  And if Mr. Burts testified that as of the same

24   exact date, July 17th, 2020, he did not have any facts or

25   evidence showing that Lucasys had misappropriated and used

1    trade secrets or confidential information of PowerPlan to build

2    competitive software, that would be true as far as you know,

3    correct?

4             MR. FAZIO:  Objection to the form and foundation.

5             THE WITNESS:  Can you repeat the --

6    BY MR. MAYES:  (Resuming)

7        Q.    Sure.  Yeah.  If Mr. Burts said that on the same

8    date, July 17th, 2020, he wasn't aware of any facts or evidence

9    that Lucasys had misappropriated trade secrets to build its

10   software, that would be true as far as you know, correct?

11            MR. FAZIO:  Objection to form and foundation.

12            THE WITNESS:  Yeah.  What I had seen at the time, I'm

13        not aware of that information.

14   BY MR. MAYES:  (Resuming)

15       Q.    Okay.  You were asked some questions about Yulu; do

16   you recall that by Mr. Fazio?

17       A.    Yes.

18     (Plaintiff's Exhibit No. 233 was marked and identified.)

19   BY MR. MAYES:  (Resuming)

20       Q.    I'm handing you Exhibit 233.  He asked you about

21   whether or not Yulu was just one of many PowerPlan consultants;

22   do you recall that?

23       A.    Yes.

24       Q.    This is an e-mail from Mr. Duffy sent to Mr. Burts

25   and some other folks in July of 2021, and I want you to look at

1    the paragraph -- the fourth paragraph down on Exhibit 233 of

2    Mr. Duffy's e-mail, which is on the first page.  It begins, "If

3    I was carrying an RCC business card."  Do you see that

4    paragraph?

5        A.   Yeah.

6        Q.   Do you see that?

7        A.   Yes.

8        Q.   Okay.  And Mr. Duffy says, "If I was carrying an RCC

9    business card, I would be screaming this UPCO story as loud as

10   I could to as many utilities as I could.  Don't you dare buy

11   PowerPlan cloud because you will be stuck with their

12   professional services going forward, and they will charge you

13   30 percent more for less experienced resources and lower value

14   services."  Did I read that correctly?

15       A.   You read that correctly.

16       Q.   Do you believe that PowerPlan charges 30 percent more

17   for less experienced resources and lower value services than

18   RCC?

19           MR. FAZIO:  Objection to form.

20           THE WITNESS:  I don't have any knowledge of what RCC

21       charges.

22   BY MR. MAYES:  (Resuming)

23       Q.   Okay.  Do you believe that RCC charges less than

24   PowerPlan for services?

25       A.   I don't necessarily believe that.

1      Q.   Okay.  Mr. Duffy is in sales, correct?

2      A.   He is, yes.

3      Q.   Or was at the time of this, correct?

4      A.   Yes.

5      Q.   Okay.  And he was a vice president?

6      A.   He was.

7      Q.   And do you think he would have reason to have found

8   out what RCC was charging for professional services?

9      A.   I don't believe that he would -- I've never been

10   aware that he had that information.

11      Q.   Mr. Fazio asked you about risks with Lucasys

12   providing services to PowerPlan customers; do you recall that?

13      A.   Yes.

14      Q.   And I want to make sure I fully understood your

15   answer.  You believed there was a risk that Lucasys might

16   sabotage the implementation so that they could sell software to

17   those customers in the future; did I understand that correctly?

18           MR. FAZIO:  Objection to the form; misstates.

19   BY MR. MAYES:   (Resuming)

20      Q.   That's what I'm trying to find out.  Is that what you

21   were saying?

22      A.   I did not say that they would sabotage.

23      Q.   Okay.  Was that the implication of your answer?

24           MR. FAZIO:  Objection to form.

25           THE WITNESS:  There is a risk that they could set it

1        up in a manner that's not as efficient for PowerPlan as it

2        might be for what their software building is.  That's a

3        risk we don't know.  I have not been made aware that that

4        has happened, but that is a risk that is possible.

5    BY MR. MAYES:  (Resuming)

6        Q.   Okay.  Would you not describe that as sabotage if

7    they're setting up less efficiently in order to be able to

8    later sell their own software?

9            MR. FAZIO:  Objection to form.

10           THE WITNESS:  I wouldn't describe that as sabotage.

11   BY MR. MAYES:  (Resuming)

12       Q.   Okay.  How would you describe it?  Would it be for

13   carelessness or mistake?

14       A.   Like I said, it's a risk that could happen, so I -- I

15   would describe it as a concern we had, so --

16       Q.   Okay.  Are you aware of that ever, in fact,

17   happening?

18       A.   I'm not aware of that.

19       Q.   Did you communicate that concern to any customers?

20       A.   I don't recall communicating that concern directly to

21   our customers.

22       Q.   Okay.  Do you know if anyone else at PowerPlan

23   communicated that concern to any PowerPlan customers?

24       A.   I do not know.

25           MR. MAYES:  That's all I have.  Thank you for your

1          time, Mr. Dahlby.

2                  MR. FAZIO:  Nothing further.  Thank you.

3                  MR. MAYES:  Off the record.

4                  VIDEOGRAPHER:  Okay.  Counsel, before we go off the

5          record, would you like to order your video synced or

6          unsynced with the transcript?

7                  MR. MAYES:  We wait until later to order video.

8                  VIDEOGRAPHER:  Oh, okay.  You have a standing order

9          probably.

10                 MR. MAYES:  We basically make the decision later on

11         if it looks like we're going to go to trial.

12                 VIDEOGRAPHER:  Got it.  Perfect.

13                 MR. MAYES:  And we will -- we would like a rush, like

14         a rough draft transcript.  Or yeah, not a rush.  Sorry,

15         just a rough draft.

16                 VIDEOGRAPHER:  Okay.

17                 MR. FAZIO:  Same for us, please.

18                 VIDEOGRAPHER:  And if there's -- if we're all in

19         agreement, then this concludes Mr. Dahlby's deposition on

20         August 5th, 2022.  Going off the record at 5:51 p.m.

21

22

23

24

25

```
 1
 2                    D I S C L O S U R E
 3
 4    STATE OF GEORGIA            DEPOSITION OF JIM DAHLBY
 5    COUNTY OF HENRY             AUGUST 5, 2022
 6
 7    Pursuant to Article 8.B of the rules and regulations of the
 8    Board of Court Reporting of the Judicial Council of Georgia, I
 9    make the following disclosure:
10
11    I, Collette Jackson, am a Georgia Certified Court Reporter.  I
12    am here as an independent contractor for Trustpoint.One.
13
14    Trustpoint.One, was contacted by Joshua A. Mayes, ESQ., to
15    provide court reporting services for this deposition.  The firm
16    will not be taking this deposition under any contract that is
17    prohibited by O.G.G.A. 15-14-37 (a) and (b).
18    AUGUST 5, 2022
19
20
21
22              COLLETTE JACKSON, CCR
23              No. 5741-5233-4639-1040
                CERTIFIED COURT REPORTER
24
25
```



```
 1                    C E R T I F I C A T E

 2

 3    STATE OF GEORGIA

 4    COUNTY OF HENRY

 5

 6         I COLLETTE JACKSON, Certified Court Reporter for the

 7    County of Henry and for the State of Georgia, do hereby

 8    certify:

 9         That the foregoing transcript is a true and accurate

10    account of evidence and testimony taken by me in the matter of

11    LUCASYS, INC. versus POWERPLAN, INC., to the best of my

12    ability.

13         I further certify that the foregoing pages 7 through 238

14    of testimony represent a true and correct record of the

15    evidence given upon said plea;

16         And I further certify that I am not a relative by blood or

17    marriage, or an employee of attorney or counsel of any of the

18    parties in the case, nor am I financially or in any way

19    interested in the outcome of the action.

20    This, AUGUST 18, 2022

21

22

23

24                         COLLETTE JACKSON, CCR
                           No. 5741-5233-4639-1040
25                         CERTIFIED COURT REPORTER
```



Notice Date: 08/19/2022

Deposition Date: 8/5/2022

Deponent: Jim Dahlby

Case Name: Lucasys Inc. v. Powerplan, Inc.

Page:Line          Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

~~WORD INDEX~~

**< $ >**
**$100,000** 19:*17*
**$125,000** 19:*18*

**< 0 >**
**001** 133:*13*
**002891** 133:*14*
**009088** 142:*12*

**< 1 >**
**1** 49:*5* 105:*24* 137:*10*
140:*1*
**1.25** 171:*20*
**1:00** 101:*11*
**1:10** 118:*14*
**1:20-cv-2987-AT** 1:*7* 6:*5*
**10/5/20** 118:*13*
**10:28** 70:*17*
**10:29** 41:*9*
**10:31** 72:*15*
**10:45** 56:*4*
**10:57** 56:*9*
**100** 4:*12* 21:*7*
**101** 4:*13*
**102** 4:*14*
**105** 4:*15*
**109** 4:*16*
**11** 126:2, *7*
**11/19** 180:*6, 13, 20*
**11:20** 42:*8*
**11:21** 166:*7, 10*
**110** 4:*17*
**111** 4:*18*
**118** 4:*19*
**119** 4:*21, 22, 23*
**12** 31:*10* 126:2 165:*11*
**12:00** 93:*12*
**12:13** 93:*17*
**12:30** 101:*7*
**120** 4:*24, 25*
**125** 19:*16, 18*
**127** 2:*11*
**129** 5:*1*
**12th** 69:*13*
**148** 5:*2*
**14th** 1:*16* 2:*5* 176:*9*
**15** 3:*16* 7:*9* 93:*13*
**150** 223:*23*
**15-14-37** 239:*17*
**152** 5:*3*
**161** 5:*4*
**166** 5:*5*
**16th** 223:*18, 20* 224:*19*
**17** 117:*13*
**174** 129:*24* 130:*7, 21*
**177** 5:*6*
**17th** 94:*19* 232:*10*
233:*24* 234:*8*

**18** 134:*12, 16, 25* 136:*5*
240:*20*
**181** 5:*7*
**186** 5:*8*
**188** 15:*11, 13*
**189** 5:*9* 19:*9, 11*
**19** 3:*17* 73:*4* 121:*11, 21*
122:*1* 133:*1, 5, 9, 12*
137:*6* 146:*12*
**190** 38:*16, 18*
**191** 40:*13, 15, 18* 43:*22*
**192** 45:*9, 11*
**193** 47:*6, 8*
**194** 5:*10* 48:*21, 23*
**195** 52:*3, 5* 56:*16*
**196** 58:*16, 18*
**197** 64:*15, 17, 22*
**198** 5:*11* 68:*7, 9, 16, 25*
69:*10, 23*
**199** 5:*12* 73:*6, 10, 24*
74:*2, 4, 16*
**1997** 8:*24*
**19th** 52:*22*

**< 2 >**
**2** 186:*10* 216:*17*
**2/19** 166:*16*
**2:14** 124:*21*
**2:34** 198:*13*
**20** 22:*2* 103:*13*
**200** 73:*6, 11, 18, 23*
**2001** 9:*20*
**2006** 36:*9*
**2007** 216:*18, 21* 217:*11*
**200787** 97:*11*
**2008** 36:*9* 92:*7, 20*
**201** 76:*1, 3* 81:*4* 86:*24*
87:*10, 19, 21, 23*
**201,9** 30:*11*
**2010** 12:*12* 20:22 24:*10*
27:*9, 18, 23* 31:*6* 34:*25*
35:*8*
**2018** 38:*14, 23* 39:*22*
197:*17*
**2019** 31:*12* 41:*3* 46:*21*
47:*12* 52:*12* 58:*11, 25*
59:*7* 66:*21* 69:*17* 88:*15*
123:*14* 146:*5* 149:*3*
152:*11* 164:*18, 20*
165:*19* 167:*1, 6* 169:*23*
171:*19* 172:*10* 174:*13*
175:*25* 176:*9* 178:*12*
181:*13* 194:*25* 195:*24*
197:*17* 214:*22* 215:*4*
**202** 92:*3, 5, 11* 216:*9*
**2020** 35:*14* 68:*13* 69:*13*
70:*17* 73:*4* 88:*11, 15*
94:*20* 100:*9* 110:*3*
117:*9* 142:*11* 143:*3, 23*
144:*10* 189:*6, 12* 198:*10*
232:*10* 233:*24* 234:*8*

**2021** 158:*25* 159:*6, 11*
161:*15, 21* 177:*18*
189:*10* 190:*14* 223:*18,*
*20* 224:*3, 19* 234:*25*
**2022** 1:*15* 6:*2* 134:*23*
135:*9* 143:*1, 3* 146:*8*
238:*20* 239:*5, 18* 240:*20*
**203** 94:*1, 3, 11*
**204** 95:*10, 12*
**205** 97:*2, 4, 12*
**206** 98:*23, 25*
**207** 100:*2, 4*
**208** 102:*5, 7* 103:*17, 20*
**209** 103:*11, 14* 105:*18*
**20th** 70:*17*
**21** 121:*4, 5*
**210** 105:*11, 13, 24*
107:*18*
**2100** 8:*19*
**211** 109:*21, 23*
**212** 110:*10, 12, 13*
**213** 111:*17, 19*
**214** 118:*3, 5*
**215** 119:*5, 7* 121:*2, 3, 12*
122:*4* 127:*11, 14*
**216** 119:*17, 19, 20* 120:*4*
122:22, *24* 126:2
**216-479-8403** 2:*12*
**217** 119:*22, 24* 120:*1*
222:*21*
**218** 120:*12, 15, 23*
132:*25* 133:2 140:*18*
**219** 120:*12, 16, 20*
222:*21*
**22** 121:*8*
**220** 129:*1, 3, 20* 134:*17*
**221** 148:*5, 7, 15* 176:*2*
**222** 152:*16, 18* 154:*6*
155:*11, 12, 16*
**223** 161:*7, 9*
**224** 166:*1, 3* 176:*12*
**225** 177:*12, 14* 179:*10*
180:*6*
**226** 181:*24* 182:*1*
226:*24*
**227** 186:*3, 5, 10* 223:*11*
**228** 189:*22, 24*
**229** 194:*17, 20*
**22nd** 41:*9*
**23** 122:*4* 196:*16*
**230** 198:*4, 6, 14*
**231** 199:*25* 200:*2, 7*
**232** 5:*13* 232:*7, 9*
**233** 234:*18, 20* 235:*1*
**234** 5:*14*
**238** 240:*13*
**239** 3:*8*
**240** 3:*9*
**241** 187:*14* 188:*11*
**24-ish** 196:*16*

**25** 129:*24* 130:*7*
**27** 121:*12*
**27th** 177:*22*
**2891** 137:*10* 140:*1*
**2892** 140:2
**293** 68:*19*
**29th** 134:*23* 135:*9*

**< 3 >**
**3** 74:*6* 76:*14* 182:*18*
**3(a** 180:*12*
**3/20** 69:*11*
**3:23** 69:*11*
**3:38** 164:*12*
**3:43** 177:22
**30** 123:*14* 235:*13, 16*
**300** 8:*18*
**30066** 8:*20*
**30318** 1:*17* 2:*5*
**30339** 8:*20*
**313K** 173:*16*
**3291** 8:*20*
**36** 49:*25* 50:8, *20* 51:*15*
127:*13*
**37** 127:*13*
**38** 3:*18*

**< 4 >**
**4** 78:*17*
**4:09** 52:*21*
**4:20** 211:*7*
**4:28** 194:*6*
**4:41** 194:*8*
**40** 3:*19* 22:6, *7*
**408958** 177:*20*
**411** 130:*3, 16* 134:*19*
**413007** 166:*10*
**429K** 173:*16*
**44114** 2:*12*
**45** 3:*20*
**47** 3:*21*
**48** 3:*22*
**4900** 2:*11*

**< 5 >**
**5** 1:*15* 81:*4* 82:*11*
86:*24* 87:*21* 239:*5, 18*
**5:09** 211:*5*
**5:14** 211:*8*
**5:20** 216:*3*
**5:21** 216:*5*
**5:41** 231:*18*
**5:43** 231:*20*
**5:51** 238:*20*
**500** 1:*16* 2:*5*
**52** 3:*23*
**53** 127:*12* 129:*14*
**55** 127:*13, 16, 20*
**5741-5233-4639-1040**
239:*21* 240:*24*

**58** 3:*24*
**5th** 6:2 238:*20*

**< 6 >**
**6** 87:*23* 129:*12, 14, 20*
**64** 3:*25*
**678-701-9381** 2:*6*
**68** 4:*1*
**6th** 69:*11*

**< 7 >**
**7** 76:*24* 77:9 122:*24*
240:*13*
**7:25** 47:*15*
**73** 4:2, *3*
**750** 19:*16*
**76** 4:*4*
**770)937-3002** 8:*22*

**< 8 >**
**8.B** 239:7
**871** 140:2

**< 9 >**
**9** 82:7
**9:30** 1:*17*
**9:35** 6:2
**904** 182:*12*
**9089** 140:*19*
**92** 4:*5*
**94** 4:*8*
**9423** 140:*19*
**95** 4:*9*
**97** 4:*10*
**98** 4:*11*

**< A >**
**a.m** 1:*17* 6:2 47:*15*
56:*9* 70:*17*
**ABA** 205:*25* 227:6, *14,*
*19, 22, 23*
**abbreviation** 157:*23*
**abide** 74:*13*
**ability** 8:*10, 13* 38:*4*
159:*8* 165:7 227:*13*
229:*15* 240:*12*
**able** 23:*23* 86:*17* 90:7
106:*14, 18* 107:*13, 21*
114:*9* 131:*24* 160:2
172:*25* 179:*17* 181:6
183:*25* 206:*9* 237:7
**Accenture** 210:6
**acceptable** 186:*1*
**access** 25:*15, 16* 32:*20*
53:*21* 55:*8, 11* 57:8
59:*18* 60:2 61:*23* 62:2,
*4, 17, 21* 63:5 64:*1, 5*
66:*15, 23* 70:*1, 23* 78:*11*
79:7 91:2, *5, 13* 93:2, 6
98:6 106:*10* 113:*3, 9, 11,*
*15, 16* 115:*24* 116:*3*

**153**:*24* 159:*9, 12, 17*
160:6 162:*10* 164:*23*
178:*1, 22* 179:*1, 18*
181:*1, 7* 182:*18, 23*
183:*2, 4, 6, 8* 190:*21*
191:*10* 206:*16, 22* 209:*9,*
*13, 17* 211:*20, 25* 212:*21,*
*24* 213:*4, 7, 15, 18*
221:*17* 222:*3, 8* 227:*17*
229:*12, 13* 230:*25*
232:*17* 233:*1*
**accessed** 206:*12* 209:7, 8
**accessible** 139:*17*
140:*13* 141:*7, 16, 23*
**accessing** 25:*9* 32:6, *12*
35:*12* 60:*4* 61:*18* 65:*19*
70:*4* 153:*23* 156:2
210:*17, 25* 212:22
**accident** 7:7
**accomplish** 49:*9* 50:*23*
51:*11*
**account** 95:*6, 8* 141:*5, 6,*
*16* 142:*10* 143:*9* 200:*10*
240:*10*
**accounting** 18:7 46:*18*
47:22 200:22 201:2, *5*
207:*17* 208:*1, 16* 209:7,
*10, 12, 16, 20, 23* 210:7
**accounting-related** 201:6,
*9*
**accounts** 13:*17* 142:*11*
143:*18* 144:*1*
**Accufile** 17:*3, 6, 10, 13,*
*16*
**accuracy** 123:2 134:*24*
135:6
**accurate** 8:6 51:*17*
66:20 67:8 76:*24* 81:*21*
120:*4* 134:7, *9* 141:*1, 18*
143:*9* 150:*9, 14* 159:*21*
165:*17* 178:*17, 20* 179:*1*
184:*20, 21* 185:7 205:*3*
223:8 240:*9*
**accurately** 8:*13* 231:7
**achieving** 173:*1*
**acknowledge** 23:*14*
**acquired** 206:5
**acquisition** 17:*15* 206:6
**acronym** 42:*12* 44:*5*
**action** 95:22 101:5
152:*3* 240:*19*
**actions** 96:*15* 212:*11, 17*
**actively** 67:*13* 173:*15*
**activities** 9:*24* 12:*1*
25:5, *13* 196:*10* 221:*18*
222:*9*
**activity** 25:*4*
**actual** 179:*14*
**add** 139:*17*
**added** 45:*21* 46:*12*

**110**:6, *8* 112:*13*
**addition** 19:22 105:6
**additional** 63:*19* 139:*17,*
*20* 164:*3*
**address** 8:*15, 16, 18, 19*
**admitted** 187:*24*
**admonition** 81:*14*
**adopt** 18:*8*
**advantage** 90:*12*
**advantageous** 229:*24*
**advice** 37:*12* 193:*10*
**advisory** 148:*21* 168:*18*
**AEP** 4:*17* 42:*10, 13, 17*
43:*3* 46:*21* 47:*18, 25*
48:5, *12, 16* 49:*1, 6, 7, 18*
50:*24* 51:*9, 12, 14* 52:*11*
59:*14* 60:*1, 17, 18, 19, 23*
61:8, *12* 62:*18* 63:*4, 11,*
*16* 64:*19, 24* 70:*24*
74:*10* 109:*18* 110:6, *16,*
*19* 170:*3* 217:22 218:*10,*
*23* 219:5
**AEP's** 62:*23* 71:*4* 72:9
**affect** 57:*1, 3*
**affiliated** 21:7
**affirm** 6:*17*
**affirmatively** 218:*23*
220:*12* 221:7 232:2
**afford** 191:*17*
**afraid** 184:5
**AGA** 71:5 167:22
168:*1, 2, 20*
**aggressive** 150:*21*
155:*10, 17* 214:*9*
**ago** 7:8, *9* 31:*10* 32:*19*
36:5 45:*19* 58:22 64:20
115:*12* 134:*18*
**agree** 39:*17* 44:*10*
45:*24* 86:*3* 90:5 94:*12*
201:*13* 232:*24*
**agreed** 68:5 88:*17*
94:*13, 16, 20* 124:7, *15*
125:6, *9, 18* 192:*14*
221:*15, 19* 225:*25* 226:*4,*
*10*
**agreed-upon** 72:*25*
233:*18, 20*
**AGREEMENT** 5:7
25:25 26:*1, 4, 8, 10, 18,*
*25* 27:6, *17, 18, 23* 32:*17,*
*22, 25* 33:2, *11, 14* 36:*13,*
*18* 60:4 66:*12, 24* 67:*12*
79:*16* 91:6, *17* 96:2
154:2 180:*19, 23* 181:*9,*
*21* 182:5, *8, 25* 183:*25*
184:*11* 185:*4, 9, 12, 17,*
*19, 25* 190:8, *17* 194:*1*
205:*24* 206:*4, 7* 209:*14,*
*24* 211:*14, 16, 24* 212:*3*
226:*23* 227:2, *10* 230:*10*
238:*19*

**agreements** 21:*12* 32:*10*
35:*14* 37:*25* 91:*17*
93:*10* 101:*23* 154:*4*
156:*12* 184:5 209:*13, 21,*
*22* 228:*17*
**ahead** 33:*3* 41:*24* 78:2
81:*14* 85:2 117:2
121:*15* 122:*4, 11, 24*
126:2 133:*3* 203:*15*
**Alabama** 14:*15*
**alcohol** 8:*9*
**Alex** 200:*17, 18*
**Algonquin/Liberty** 94:*25*
95:*17* 96:2
**aligning** 108:*15*
**allegation** 127:*23*
**alliance** 206:*3* 209:*24*
211:*14, 16, 19, 24*
**alliances** 11:*3, 8* 161:*15,*
*17* 165:*20*
**allow** 37:*24* 137:2
159:*16* 178:*7, 25* 218:*18*
**allowed** 63:5 136:22
182:*9*
**Alloy** 1:*16* 2:*4* 6:6, *7, 11*
**Alpharetta** 14:*24*
**alter** 79:*9* 182:*19*
**alternative** 98:*4*
**alternatives** 98:*14* 149:7,
*12*
**amend** 128:*14*
**America** 201:*21*
**American** 42:*12* 175:*3*
229:*1*
**amount** 107:*17* 141:*20*
**Amwater** 170:*3* 173:*16*
**Amy** 57:*17*
**analyses** 88:*4*
**analysis** 82:*18* 136:22
171:*19* 172:*3*
**and/or** 137:*13* 139:2
142:8, *9, 19, 23* 143:*16,*
*24*
**Andrews** 30:*20*
**announcement** 38:*11*
**annual** 23:*15, 17* 24:7
**answer** 7:*15, 18* 8:*3*
22:*16* 45:20 75:*10*
77:*16, 19* 78:2 79:*17*
81:*12* 82:*20, 22* 83:*1*
84:*25* 85:2, *3, 13* 86:*17*
107:*25* 122:*12* 124:*14*
125:*20* 128:2 129:6
134:*13* 135:*13, 22* 136:*9,*
*14, 16* 137:*3* 138:*5*
139:5 154:*15* 167:*14*
187:*23* 192:*11* 209:4
236:*15, 23*
**answered** 107:*8, 24*
**answering** 128:*21* 192:*4*
220:7 224:*13*

**answers** 8:7 120:*4, 7* 223:*2*
**anticipate** 167:*21*
**anybody** 218:*21* 219:*2, 5* 220:*2, 10, 11*
**anymore** 184:*6*
**anyway** 194:*20*
**app** 139:*18, 21* 140:*2*
**appear** 15:*18* 68:*16, 15* 99:*7* 148:*10*
**appeared** 42:*4*
**appearing** 15:*17*
**appears** 46:*4* 50:*11* 52:*13* 88:*2* 92:*22* 93:*4* 95:*13* 97:*17* 99:*10* 117:*19* 188:*12*
**application** 133:22 137:*13* 139:*2* 153:25 183:*8*
**appointment** 96:*10*
**approach** 19:*23* 162:*4*
**approaching** 197:*4*
**appropriate** 33:*7*
**appropriately** 21:22
**approval** 50:*15* 137:*14*
**approved** 19:*23* 50:*4* 137:*17, 23*
**approver** 50:*7*
**approximately** 116:*15* 142:*11* 143:*23*
**April** 94:*19* 134:*23* 135:*9* 194:*25*
**Aqua** 152:*21, 24* 153:*10* 154:25 155:*17* 157:6
**ARAM** 39:*7* 81:6, *10* 82:*2, 3* 83:*5* 86:*5, 7, 15, 16, 21* 87:*4* 171:*10* 205:*14*
**Arc-2** 25:*20* 32:6, *9, 16* 33:*10, 14*
**architecture** 28:*17* 65:*1, 11, 14, 16, 21* 66:8, *18* 91:*14*
**area** 43:*18* 139:*10, 12* 140:*15* 200:*23, 25*
**areas** 10:*19* 26:*14* 201:*10*
**arisen** 166:*23*
**arrangement** 62:22 162:*23* 181:*2*
**arrangements** 163:*12*
**array** 19:*2*
**Article** 239:*7*
**ASAP** 180:*3*
**aside** 16:*5* 21:*3* 30:*3* 31:*4* 34:*7* 35:*17, 22* 37:*1* 52:*14* 67:*24* 100:*11, 21* 124:*1* 128:*9* 147:25 185:*24* 196:*17* 210:*12* 214:*23* 215:*5* 221:*3*

**asked** 13:*3* 26:8, *9* 34:*22* 45:*19* 56:*18* 63:*1* 75:*10* 82:*22* 104:*19, 24* 106:*7, 9, 10, 21* 107:8, *24* 117:*21* 192:*15, 16* 207:*2* 214:*15* 217:*10, 19* 222:*20* 223:*11, 13* 225:*18* 228:*1* 230:22 232:*1* 234:*15, 20* 236:*11*
**asking** 16:*2* 21:*23* 69:*19* 75:*18, 20, 23* 79:25 85:8, *18, 23* 91:*24* 107:22 113:*12* 122:*10* 124:*12* 125:*13* 130:*13, 20* 161:25 164:*21* 185:8 207:*24* 220:*7* 225:*3*
**aspect** 28:*20* 29:9
**aspects** 11:22
**asserting** 209:*16*
**assessment** 41:20 43:*11* 44:*10*
**asset** 18:6 40:8 44:*12* 45:*7*
**assets** 44:*4* 45:*4* 201:*23* 202:*11, 15*
**assigned** 10:*1*
**assist** 10:2
**assisting** 13:*16*
**associated** 192:*3, 18*
**association** 192:*23* 193:*4*
**assume** 8:2 24:*1, 16* 83:*23* 84:*1* 170:*17*
**assumed** 27:*13* 47:*4* 49:22
**assuming** 167:*14*
**assumption** 44:*24* 202:*7*
**ATLANTA** 1:*3* 2:*5* 6:*7* 8:*19* 24:*20*
**Atlanta,Georgia** 1:*17*
**attached** 137:*25*
**attachment** 81:*25* 82:*7, 14, 19* 87:*12, 20*
**attachments** 82:*10*
**attempt** 99:*5*
**attend** 74:*23*
**attended** 9:*1* 80:*24*
**attendee** 61:*13*
**attendees** 139:*23*
**attorney** 240:*17*
**audit** 114:*24* 116:*3* 194:*24* 195:*22*
**August** 1:*15* 6:*2* 238:*20* 239:*5, 18* 240:*20*
**authorized** 154:*2* 165:*19* 181:*9, 20* 184:*4, 11* 185:*4, 9, 11, 16, 18, 25* 190:*7, 16* 205:*23* 209:*21* 210:*1* 226:*23* 227:*10*
**automated** 79:*22* 80:*8*
**available** 40:*1, 2* 99:6 100:*18, 22* 126:*8, 11, 13,*

*17, 20* 127:*1* 132:*12, 22* 133:*21* 139:*22* 142:*20* 143:*4* 144:*23, 25* 146:*7, 11* 216:*21* 217:*8* 223:*8*
**Avangrid** 204:*19* 205:*1* 206:*10*
**aware** 15:*7* 16:*16, 18* 20:*14, 22* 24:*13, 20* 25:6 32:*16* 34:*14, 24* 35:*8, 13, 14* 36:*2* 37:*3, 5* 38:*10* 39:*25* 40:*5, 6, 11* 42:*21* 46:*22* 51:*22* 53:*2, 11, 13, 14* 55:*18, 20* 58:*10, 12* 59:6 62:*8, 11* 75:*25* 92:*2* 95:*1, 2* 100:*8, 24* 101:*1, 3, 5* 102:*20* 103:*8* 104:*10* 105:*3* 106:*13* 116:*6, 9* 119:*4* 121:*18* 122:*7, 16* 124:*1* 127:*5, 18, 22* 128:*4, 8, 12, 13, 17, 23* 129:*20, 23* 131:*23* 135:*11* 142:*25* 144:*22, 24* 146:*2, 20, 23, 25* 147:*7, 8, 9, 25* 148:*1, 4* 157:*18* 162:*4* 182:*11* 192:*20* 194:*24* 195:*22* 204:*4, 7, 8, 17* 205:*4* 206:*25* 207:*5, 10, 13, 18, 25* 208:*3, 16* 209:*19* 210:*9* 211:*2* 212:*20, 21* 214:*11* 219:*5, 7* 221:*2, 5* 227:*11* 234:*8, 13* 236:*10* 237:*3, 16, 18*

**< B >**
**bachelor's** 9:*7*
**back** 24:*10* 25:*11* 40:*16* 43:*21* 53:*22* 56:*9* 62:*15, 25* 78:*12* 79:*14* 82:*6* 86:*24* 87:*8* 93:*17* 99:*13, 19* 109:*18* 112:*13* 117:*4* 118:*12* 121:*2* 122:*3* 124:*21* 127:*11* 129:*14* 144:*9* 145:*24* 164:*12, 14* 165:*19* 176:*2* 177:*25* 178:*12* 179:*3, 12* 181:*14* 184:*18* 190:*14* 194:*8* 211:*7* 216:*5* 226:*11* 227:*16* 229:*8* 231:*20*
**background** 198:*1, 3*
**backlash** 168:*12*
**bad** 186:*18*
**Barnabas** 193:*15, 17, 25* 195:6, *9, 18, 20*
**barrel** 149:*8, 13*
**base** 38:*7, 8* 46:*10* 201:*15, 17, 19* 228:*22*
**based** 18:*21, 22* 19:*3* 24:*19* 25:*15* 46:*4* 48:*14* 50:6 69:6 94:*21* 99:*10* 104:*4* 106:*17* 108:*13*

124:*14* 134:*1* 135:*3, 11, 13, 14* 154:*7, 20* 157:*3* 162:*14* 210:*20* 226:*19* 228:*13*
**basically** 238:*10*
**basics** 187:*23*
**basis** 23:*15* 44:*21* 124:*8* 125:*9, 17* 231:*1*
**Bates** 133:*13* 137:25 140:*1, 23* 166:*9*
**battle** 47:*21, 25*
**began** 197:*19*
**beginning** 122:*9* 180:6 195:*24*
**begins** 6:*3* 77:*8* 87:*21, 24* 94:*12* 121:*3, 5* 129:*13, 19* 137:*9* 153:*1* 198:*13* 235:*2*
**BEHALF** 2:*9* 6:*13* 32:6
**belief** 214:*19*
**believe** 11:*14* 14:*14* 16:*21* 17:*4, 5, 18, 23* 18:*20* 23:*15* 24:*6, 19* 25:*18, 21* 26:*1, 12* 27:*1, 14* 29:*3* 32:*19, 22* 34:*20* 36:*19* 38:*14* 45:*18* 47:*3* 48:*7, 15* 49:*17, 18* 50:*11* 53:*3, 23* 61:*5* 62:*14, 16, 24* 63:*2, 14* 64:*23* 69:*3* 71:*13* 72:6 73:*4* 74:*14, 20* 75:*7, 15* 76:*23, 25* 80:*18, 21, 25* 81:*1, 22* 82:*10, 14* 87:*12, 19* 89:*16, 17* 95:*18* 96:*11* 97:*15* 98:*16, 17* 102:*14* 103:*4, 19, 21, 23, 25* 104:*11* 105:22 106:*9, 20* 108:*20* 111:*2* 114:*18* 115:*3, 15* 116:*5, 11, 18* 118:*2* 126:*24* 128:*16* 131:*19* 138:*17* 140:*15* 145:*7, 14, 15* 149:*18* 150:*8, 16* 152:*8* 153:*24* 154:*13* 157:*4, 10* 160:*15, 16* 161:6 162:*5* 165:*24* 172:*1, 6* 174:*23* 177:*17* 180:*11* 181:*17, 20* 185:*18, 20* 189:*1, 9, 10* 191:*14, 22* 192:*16* 193:*23* 197:*2, 16* 204:*1* 208:*15, 19* 209:*12* 210:*8, 10, 20* 214:*12* 215:*14* 218:*12, 15, 17* 219:*24* 220:*9, 20* 224:*11* 225:*14, 15* 228:*9* 232:*17, 23, 25* 235:*16, 23, 25* 236:*9*
**believed** 60:*13, 23* 236:*15*
**Belinfante** 1:*16* 2:*4* 6:*6*
**beneficial** 175:*21*

best 10:5 120:3 153:6
229:20 240:11
better 19:25 28:2 187:5
biannual 23:15
bid 46:23 48:17, 20
49:1 51:16, 18, 21 155:4,
11, 17
bidder 52:23
big 188:4 204:15
207:17 208:1 209:22
billed 187:14 188:14, 19
bit 39:4, 14
blood 240:16
Bloomberg 204:13
207:6, 14, 16
Bluff 8:20
BNA 204:13 207:14, 16
board 148:21, 22 168:18
239:8
Boggs 6:12
BOGGS,LLP 2:10
book 82:3 86:5
booking 171:20
Bortniker 103:3
bottom 38:24 47:15
49:5 68:15, 24 69:22, 24
74:6 120:1 140:10
153:2 166:9 177:21
180:12 190:19 216:18
Bradley 41:9 43:10, 19
break 20:7 56:5, 8, 12,
15 93:13, 16, 20 116:21
117:1, 5, 8 124:16, 17, 20,
25 164:6, 11, 16 176:3
194:4, 7 197:23 211:3, 6,
10, 13 216:4 231:19, 24
breath 7:17
Brent 197:14
Brett 12:20 45:19 53:6,
11 57:1 60:10 61:3, 9
71:19 72:7 103:3 162:3,
5 218:6 219:18 232:10
233:7
brief 141:5, 9
briefly 13:3 16:11
bring 72:17, 22 102:18
149:19
bringing 177:25 198:20
brings 229:5
broader 20:20 106:6
167:12 168:7 201:5
brought 181:12
bucket 210:7
buckets 171:19
build 59:21 62:10
63:15 67:13, 21 80:15
214:13 232:18 233:1
234:1, 9
building 53:20 59:19
61:19 62:22 237:2

built 48:7 61:20, 21
217:4
bulletpoint 69:15, 18
77:13, 23 78:9 86:25
87:3, 21 162:8 168:11
169:7 170:1, 16 173:8
174:15 175:14, 16 180:1,
10, 24 198:12 199:10
bulletpoints 78:14, 15
131:16 163:3 179:21
198:14
bundling 154:7, 11, 19
157:3
Burns 197:14, 15, 18
Burts 12:20 16:11 26:3
54:3, 16 60:10, 13 61:3
68:25 69:13 70:22
71:12 72:13 73:9 103:3
115:8, 11 162:6 218:6
219:18 232:10 233:8, 18,
20, 23 234:7, 24
Business 8:16, 18 10:4
11:23 12:1, 3 18:12
38:12 44:22 45:2 51:2,
4 55:23 88:6, 7, 18
89:10, 17, 21, 25 90:6, 8
99:13 154:25 235:3, 9
buy 19:23 158:20 159:3
173:15 235:10

< C >
calc 39:7 81:6, 10 82:2,
3 83:5 86:5, 22 87:4
calculate 205:20
calculating 205:15
calculation 86:7, 15, 16
131:10
calculations 90:6 171:10
call 12:16, 18 18:15
28:6 60:19 61:4, 7, 10,
17 62:13, 18 63:11
68:16 96:16 105:5, 7, 9
112:5, 9 166:15 173:11
184:14 202:18 217:1, 8
218:8 219:3, 11, 12, 16
220:8, 9, 10, 20 230:11
232:1
called 17:2 28:8 63:16
76:15 101:14, 17 157:7
calls 60:10, 17, 22 61:1,
8, 11, 12 62:8, 19 63:22,
24 81:9 85:13 105:4
115:13, 16, 18, 19 219:13,
14 220:25 233:8, 12
canceled 207:6 215:23
capabilities 201:25
Capital 24:16
Car 17:2
card 235:3, 9
career 115:7 158:7
carelessness 237:13

CARR 3:18 13:6, 8
38:25 45:16, 24 47:15
186:11 187:9 188:11
223:14 224:18
carried 10:8
carries 76:24 77:9
Carr's 47:24
carrying 235:3, 8
CASE 1:7 6:5 14:11
15:3, 4 16:10, 17 37:2, 6,
16 52:13 56:13 93:21
95:18 97:17 100:9
105:22 116:10 117:6
118:2 119:14 124:24
127:6 128:13, 19 136:10,
12 154:22, 24 164:15
174:23 202:1, 4, 6
208:19 211:11 222:23
230:14 232:23 240:18
cases 18:13 209:14
casual 15:2
categorize 184:25
cause 169:15 170:4
caused 178:21
CC'ed 186:11
CCR 239:21 240:24
cease-and-desist 58:11
ceased 114:25
Celeste 224:22
CEO 30:21 50:4, 9, 12,
15 103:2 167:4 197:8,
11
certain 81:6 153:21
209:14 230:24
certainly 41:18
CERTIFICATE 3:9
certifications 9:11
Certified 1:14 165:22,
24 169:8, 12, 15, 24
173:5 174:9, 13 175:14
176:25 177:9 181:21
239:11, 22 240:6, 25
certify 240:8, 13, 16
CFO 30:21 103:2
198:20
chain 68:12 70:16
72:15 98:22 99:10
148:11 176:17 177:18
190:11
challenge 85:17, 21 86:1
108:4 192:2, 18
change 11:20 48:13
157:14 170:13
changed 132:20 139:5, 7
142:23 210:21, 24
changes 173:24
characterization 168:7
charge 235:12
charges 235:16, 21, 23
charging 236:8

Chesapeake 189:20
chief 197:12, 18
choose 151:21
CHPK 189:19
CHPK-like 189:17, 18
CHP-like 189:18
Chris 43:23 142:2, 7
166:6, 10 176:17
circumstances 103:22
224:15
claim 201:24, 25
claimed 132:12
claims 78:9
clarifications 216:9
clarify 12:9 125:12
135:1
class 86:6
classic 170:6 179:4
classified 81:22
classify 49:14 113:21
124:6
clause 87:3
clauses 27:15 30:1, 3
87:2
clean 40:18
cleanse 114:1
cleansing 25:7 113:18,
24 153:20 182:24
clear 41:25 42:19 54:16
85:7 183:24 216:14
217:21 225:2 229:10
clearly 169:12
CLEVELAND 2:12
clicked 126:10
client 112:17 163:24
clients 160:21 161:3
cloud 111:6, 13 112:4, 9
113:4, 10, 20 114:11
158:9, 14, 20 159:3, 13
160:4, 9 164:3, 24 165:3,
14 169:13 170:11, 13
178:20, 21 179:1, 18
180:2, 25 181:7 182:20,
21 183:1, 10, 22, 23
184:6, 19 185:19 190:21
191:25 235:11
cloud-based 157:15, 25
178:17 179:3 184:12
code 28:2, 8, 9, 12 37:19,
24 38:1, 2, 5, 7, 8 63:8
75:14, 17 90:1 112:12
126:16 145:9 222:9
Cohen 29:8
Cohn 26:22, 24 27:22
28:19 30:12 32:5
collaborated 164:1
collaborating 228:13
collaboration 228:6
collect 16:19
collected 28:9

**Collette** 1:*14* 239:*11, 21*
240:*6, 24*
**Collin** 42:*7*
**column** 31:*19, 23, 25*
32:*2* 83:*5, 9, 10, 20, 22,
24* 84:*2, 6, 10, 18* 86:*4, 5*
133:*20, 25*
**columns** 32:*2* 82:*1, 3*
83:*19* 84:*5*
**combination** 81:*1* 84:*9,
11* 155:*2* 171:*5, 6*
**combined** 90:*1*
**come** 27:*20* 64:*14*
74:*21* 85:*20* 97:*18* 98:*3*
133:*25* 147:*12* 164:*18,
22* 181:*13* 226:*4* 227:*16*
**comes** 22:*14* 121:*23*
148:*17*
**comfortable** 98:*6* 223:*6*
**coming** 36:*1, 3*
**commence** 101:*14*
**comment** 29:*23* 56:*22*
187:*12*
**comments** 148:*17* 162:*3*
185:*21*
**committee** 167:*8*
**common** 83:*8, 19*
**communicate** 59:*22, 25*
60:*16* 71:*18* 78:*6*
166:*16* 192:*14* 237:*19*
**communicated** 15:*19*
55:*7* 59:*17* 60:*11, 15, 25*
61:*24* 62:*16* 67:*2* 70:*8*
71:*13* 72:*6* 77:*18*
115:*25* 149:*14* 150:*16*
160:*20* 163:*14* 167:*23*
169:*20* 177:*7, 11* 184:*20*
206:*25* 237:*23*
**communicating** 57:*1, 12*
115:*22* 188:*12* 224:*21,
24* 226:*17* 237:*20*
**communication** 52:*17*
62:*20* 96:*9* 117:*21*
146:*15* 149:*19* 158:*24*
167:*2, 21* 169:*21* 177:*4*
189:*12* 195:*15* 223:*14*
**communications** 15:*25*
16:*3* 21:*3* 55:*14* 59:*2*
60:*8* 78:*3* 81:*13* 85:*8,
10* 102:*1, 15* 112:*2*
115:*13* 117:*17* 118:*12*
132:*3* 167:*11, 15, 16*
168:*6* 169:*1, 19* 181:*8*
185:*24* 189:*5* 190:*4, 7*
195:*12, 17* 206:*22*
209:*16, 19* 210:*16, 24*
220:*19* 221:*4, 5* 222:*6*
226:*10, 11*
**companies** 160:*4* 168:*3*
218:*18*

**company** 14:*14, 23* 17:*2,
5, 13, 19* 39:*3* 50:*4, 9*
86:*5* 153:*15* 157:*7, 11,
18* 186:*19, 20* 188:*15*
193:*15, 18* 205:*13*
208:*12*
**company's** 14:*15*
**compel** 18:*23*
**compete** 42:*2* 43:*6*
46:*25* 49:*18, 20, 23*
156:*10* 212:*5*
**competed** 71:*25*
**competes** 212:*8*
**competing** 53:*20* 59:*19*
151:*22* 213:*25* 214:*2, 3,
13*
**competition** 42:*25* 43:*3,
7* 49:*6, 11, 15* 50:*24*
51:*8, 12* 72:*3, 5, 6* 150:*2*
152:*5, 12* 155:*4* 156:*6*
174:*16* 201:*23* 203:*22*
**competitive** 11:*10* 39:*5,
8, 15, 18, 20* 42:*1, 4*
46:*20* 66:*19* 156:*16*
171:*1, 7* 174:*17, 22, 25*
204:*2, 20* 207:*3* 232:*18*
233:*2* 234:*2*
**competitor** 26:*15* 40:*7*
66:*1, 4, 9* 155:*24* 192:*3,
19*
**competitors** 47:*4* 53:*4*
67:*10* 156:*24* 209:*2*
**complained** 149:*7, 12*
151:*6*
**complete** 106:*18* 114:*15*
160:*6* 162:*16* 180:*13, 17,
18*
**completed** 17:*17* 114:*18*
160:*11* 188:*3*
**completely** 199:*3*
**completing** 159:*24*
164:*4, 5* 183:*14*
**completion** 181:*13*
**compliance** 208:*21*
**complies** 6:*16*
**component** 182:*22*
**components** 29:*16*
229:*18*
**Con** 147:*9, 13, 20, 21*
190:*3, 8, 17, 22* 191:*10,
17* 192:*13, 15*
**concern** 26:*13* 46:*13*
47:*24* 53:*18, 22* 89:*24*
90:*2* 151:*9, 20* 152:*2, 3*
155:*6* 165:*6* 188:*9, 10*
195:*4, 9* 229:*11, 12, 13,
15, 18* 231:*6* 237:*15, 19,
20, 23*
**concerned** 45:*20, 22, 25*
46:*25* 71:*4* 155:*3* 156:*6,
7*

**concerning** 221:*18*
223:*14* 225:*20*
**concerns** 59:*17* 61:*18*
62:*21* 74:*9* 80:*11* 96:*1*
150:*19, 24* 195:*13*
217:*23* 219:*9* 224:*24*
227:*9, 11, 13, 21* 231:*8*
232:*25*
**concludes** 238:*19*
**conditions** 8:*12* 19:*3*
**conduct** 13:*12*
**conducting** 115:*23*
**conference** 11:*8* 199:*21*
**confidential** 21:*11, 19*
22:*14* 55:*8, 12* 60:*4*
62:*22* 89:*11* 90:*16* 98:*5*
121:*19* 123:*12* 127:*1*
140:*9* 206:*23* 209:*18*
234:*1*
**confidentiality** 33:*7*
66:*14* 221:*22*
**configure** 10:*5*
**confines** 33:*8*
**confirm** 56:*11, 14* 69:*25*
93:*19, 24* 117:*5, 7*
124:*23* 164:*14* 194:*14*
211:*10, 12* 231:*23, 25*
**confirmation** 70:*23*
**confirming** 70:*7*
**confirms** 65:*5*
**confused** 155:*18*
**conjunction** 178:*5*
**connected** 134:*21* 192:*20*
**connection** 32:*17* 66:*8*
138:*4*
**consent** 55:*4, 7* 60:*3*
61:*23* 108:*3* 210:*17, 25*
211:*2*
**consenting** 57:*8* 62:*2*
**consider** 127:*1*
**consideration** 152:*11*
**considered** 31:*6* 37:*8*
132:*5* 165:*18, 20* 224:*5*
**considering** 45:*21* 165:*2*
177:*25* 179:*3, 6* 185:*2,
19*
**considers** 35:*24*
**consist** 11:*19*
**consistent** 148:*11*
**consists** 30:*6*
**constituted** 140:*3*
**constitutes** 35:*19* 132:*20*
**consult** 115:*8*
**consultancy** 24:*19*
**consultant** 9:*23, 25*
10:*12, 14* 17:*9* 46:*9*
159:*19* 198:*2* 224:*1*
**Consultants** 12:*19* 24:*16*
78:*24* 79:*6* 80:*7* 113:*3,
9, 18* 156:*10, 16* 160:*23*

**223:***21* 234:*21*
**consulted** 99:*12*
**consulting** 25:*1, 2* 53:*19*
79:*3, 20* 106:*14* 153:*15*
156:*10* 159:*6, 9* 161:*5*
163:*20* 165:*13, 15*
193:*18* 195:*6, 9, 18*
209:*10* 218:*19* 227:*14*
230:*13*
**contact** 13:*14, 16*
**contacted** 108:*17* 239:*14*
**contacts** 39:*10*
**contain** 145:*22* 211:*16*
**contained** 1:*13* 211:*18*
**contemporaneous** 176:*3*
**contend** 136:*18*
**contended** 100:*17*
126:*20* 213:*22*
**contending** 130:*8* 135:*19*
**contends** 123:*14* 136:*18*
**content** 92:*20* 129:*15*
137:*15, 17* 139:*9, 14*
**context** 130:*24* 149:*23*
151:*3, 17* 154:*13* 163:*10*
170:*9* 201:*5* 202:*22*
229:*5*
**continue** 170:*4* 178:*9*
**continued** 96:*20*
**continuously** 9:*17*
**contract** 30:*25* 31:*4*
33:*6, 8, 16* 38:*9* 108:*16*
166:*15* 228:*14* 239:*16*
**contractor** 191:*9* 239:*12*
**contracts** 29:*21, 25* 30:*3*
32:*14* 35:*17, 23* 38:*4*
**control** 112:*23*
**controlled** 25:*14*
**controller's** 61:*15*
**conversation** 7:*14* 16:*13*
22:*14* 29:*24* 34:*9, 14*
40:*25* 64:*7, 10* 69:*4, 16*
71:*13* 72:*16* 85:*4* 95:*25*
97:*16* 99:*15* 114:*22*
115:*10* 149:*24* 151:*3, 23*
152:*9, 14* 158:*2, 18*
166:*21* 178:*24* 181:*5*
192:*15* 193:*11, 12*
**conversations** 10:*10*
30:*15, 17, 19, 22* 36:*1, 4,
7, 8, 10* 59:*5, 10, 16* 60:*1*
69:*1* 96:*24* 100:*11, 15*
118:*17* 123:*22, 24* 158:*4,
6, 11* 162:*5* 165:*12*
182:*6* 186:*2* 195:*19*
210:*22* 219:*8*
**convert** 17:*10*
**converted** 186:*20*
**Cooper** 212:*12*
**coops** 229:*2*
**coordination** 228:*19*

**copied** 64:23 81:6
145:4 167:3 194:19
**copies** 23:22 38:5
144:25
**copilot** 80:17, 23 81:1
**copy** 40:16, 18 58:13
73:10 74:19 76:6, 11
94:4, 7 97:5 99:1 100:5
102:8 109:24 110:13
118:6 119:25 120:16
144:10, 20 161:10 186:6
189:25
**copying** 143:15
**copyrighted** 216:18
**core** 201:15, 17, 19
202:1, 3, 6 228:21, 25
**corner** 177:21
**Corporation** 227:3
**correct** 9:21 20:3 22:3,
4 23:20, 24 24:4, 18
38:6 41:4, 12 48:11, 17
50:1, 9 55:25 65:2 69:1
70:11, 17, 20, 21 72:1, 17,
20 73:24 77:3 78:13, 18
82:4 87:5 88:15 89:6
93:2 99:9, 23, 25 100:9
101:2 102:2, 12 104:17
105:21 106:6 107:7, 14
112:19 115:14 120:5
125:10 131:17 132:13
134:18 135:20 136:15
140:10, 24 141:17
142:16 143:11 144:1, 21
146:5, 8, 9 147:18 152:6
155:8, 12, 21, 24, 25
156:3, 6 160:2 162:20
165:16 167:4 172:14, 15
173:2, 6, 21 174:3, 6, 10,
11, 22 175:14, 15 176:19
178:14, 23, 24 179:4, 8
180:3, 7 181:10, 11
183:5, 6 184:19, 23
185:14 187:8, 10, 14, 17,
18, 20, 25 188:16 189:6,
14 192:25 193:7 194:13
199:8 200:6 203:24
211:1, 14 212:5, 25
213:16, 23 214:1, 6, 7
215:7, 22 221:1 226:21
227:4 228:20 230:2
232:22 233:2, 5, 6, 21
234:3, 10 236:1, 3
240:14
**correctly** 70:24 71:7
88:9, 10 102:20 112:6, 7
130:18, 19 137:15 139:3
141:7 142:13, 14 144:16
148:18 149:9, 10 150:4,
21, 22 151:13, 14 153:7,
12 154:9 162:11, 12, 18
163:5 167:12, 13, 24

168:15, 16, 23, 24 169:16
170:7, 8, 19, 20 171:21
172:21 173:18, 19 174:2,
19 175:1, 6, 7, 22 176:14
178:1, 2 179:14 181:2
186:12, 21, 22 188:4, 16
190:23 191:11, 18
198:22 199:13, 14
201:15, 16 202:2, 12
232:19, 20 235:14, 15
236:17
**correlation** 82:1
**Council** 239:8
**Counsel** 6:8 15:19 16:6
21:3 40:16 61:11 73:11
77:19 78:3, 4 81:13, 14
82:22, 24 83:3 85:1, 5, 9,
10, 18, 20 94:4 97:5
99:1 100:5, 11, 14, 15, 19,
21 102:8 109:24 110:13
114:23, 24 116:11 118:6,
8, 18 119:1, 25 120:16
122:11 123:23, 25 124:2
125:7 127:7 128:3, 9, 20
134:4 135:4, 12, 15
161:10 185:20, 24 186:6
189:25 193:10, 13
210:12, 20 222:5 226:5,
12 238:4 240:17
**counterclaim** 119:14
121:3, 12 127:5, 8, 12, 13
128:14
**counterclaims** 121:5
**COUNTY** 239:5 240:4, 7
**couple** 14:7 15:2 118:8
216:8 217:20 225:18
229:9 231:16
**course** 211:19
**COURT** 1:1, 15 6:14, 17
7:12 239:8, 11, 15, 22
240:6, 25
**courtesy** 97:5 99:1
100:5 102:8 109:24
110:13 118:6 119:25
120:16 161:10 186:6
189:25
**cover** 7:10
**covered** 33:15 36:12, 17
**create** 108:4 174:13
182:19 229:23
**crisis** 168:14
**criteria** 108:23, 25
109:15 172:1
**critical** 32:3
**CROSS-EXAMINATION**
3:5
**Crye** 43:22 44:17 196:9,
13, 17
**Crye's** 44:10
**Crystal** 92:16, 17, 25
**Curier** 42:8

**current** 21:7 33:8
162:14 170:5 225:6
**currently** 196:1 213:8
225:12 228:1, 2
**custom** 38:7
**customer** 10:1, 2, 21, 22
11:17 12:8 18:4 21:12
25:14, 15, 17 30:3 31:1,
4 32:13 33:5, 14, 15
35:17, 22 36:1, 4, 6
37:19, 25 51:3, 6 54:13
55:21, 24 56:23 57:13,
19 59:5 61:4 64:4, 8
66:12 67:5 93:10
105:23 108:3, 5, 15
112:8 113:9 114:2
139:15 151:8 152:22
157:12, 20 159:9 163:1
171:24 184:18 185:6, 19
186:16 189:20 200:15
201:15, 17, 19 204:4
205:5 209:13, 14 210:22
212:3, 24 213:19 217:20
221:6, 11 225:4, 5
228:14, 18, 19, 22 230:9
233:4
**customers** 11:6, 25
17:10 18:8, 10, 11, 23
19:23 23:9 24:21, 22, 24,
25 25:7 29:22 30:19
32:7, 13, 18 35:18, 19, 24
36:24 37:24 38:1, 2
45:6 48:5 53:24 59:3, 8,
11, 13 63:25 64:10
66:13, 22 67:2 74:10
79:16 89:11 91:5, 16, 20
92:1 93:5 101:22 106:5
108:15, 18, 22 109:2, 4,
11 111:5, 12 112:14
113:3, 17, 19 114:4, 9
115:4, 23 116:1 117:22
132:3 147:8 148:1, 22
149:6, 11, 14 150:25
151:5, 21 153:20, 25
154:4 156:13 167:12, 23
170:2, 12, 17 172:5, 7, 19,
23 173:12, 15, 25 174:18
175:12 184:5, 12, 16
201:25 204:17, 18, 25
205:8 208:20 214:4, 5
215:23 228:23 229:5, 6
230:1, 8, 11, 16, 18, 24
232:15 233:9 236:12, 17
237:19, 21, 23
**customer's** 25:16 229:20
**cut** 70:4
**cutting** 228:10
**Cvent** 137:13 139:2
**cycle** 225:14

**DAHLBY** 1:12 3:3 6:3,
14, 23 7:2, 4, 5 15:13
19:11 38:18 40:15
45:11 48:23 52:5 56:11
58:18 68:9 73:10 76:3
86:3 92:5 93:19 95:13
97:4 98:25 100:4 102:7
103:13 105:13 106:16
109:23 110:12 111:19
117:5, 8 118:5 119:7
120:15, 22 124:23 148:7
152:18 161:9 164:14
166:3 177:14 182:1
186:5 189:24 194:14
198:6 200:2 211:10
216:8 231:23 238:1
239:4
**Dahlby's** 238:19
**Dan** 142:2
**Daniel** 142:8
**dare** 235:10
**dash** 199:11
**data** 10:4 19:25 25:6,
10, 17 65:1, 15, 21 66:8,
19 78:12 79:9, 14 83:9,
20, 24 84:5, 9 86:6, 14,
17, 19, 20 88:3, 8 91:7,
10, 14 113:4, 18, 23
114:1, 2 153:19 182:20,
24 183:10, 17 206:9, 13
211:20, 23, 25 215:15, 17
222:11 229:17
**database** 25:17 30:8
31:22 62:6 63:8 65:1,
10, 11, 13, 15, 17, 20 66:7,
18 78:10, 11 81:6 82:4
83:15 90:1, 15, 19 91:3,
6, 14 93:6 112:12, 17, 18,
24 113:3, 11, 16 153:25
159:17 160:6 178:4, 7
182:20, 25 183:7 206:13
209:10 213:7
**databases** 25:10, 11
31:19 32:6 35:12 78:12
79:7, 15 93:2 113:9
116:3 153:23 156:3
159:13 183:11 209:7
210:18 211:25 212:1, 25
213:15
**date** 38:15 70:12 94:20
133:21 135:17, 24 136:4
187:21 197:16 224:14
233:24 234:8
**dated** 69:11, 12
**dates** 40:12 59:4 73:5,
16 95:12 134:6 141:10,
11 179:14 224:12
**day** 103:16
**days** 176:5
**day-to-day** 9:24 11:4, 5,

< D >

*19*
**deadline** 180:*14, 15*
**deal** 153:*6*
**dealings** 35:*18*
**decide** 34:2 126:*24*
131:*11*
**decided** 116:*19*
**decision** 180:2, *7, 10*
185:*23* 238:*10*
**decisive** 180:2, *9*
**deck** 24:*4*
**decks** 21:*24*
**declaration** 137:*25*
**deep** 43:*13* 218:*20*
**deeply** 48:*17*
**DEFENDANT** 1:*9* 2:*9*
**deferred** 87:*5, 14* 88:*3,*
*19, 22* 90:*6* 171:*9*
205:*15, 21*
**define** 31:*21* 79:2 91:*23*
131:*20* 132:*15* 146:*13,*
*14* 172:*7*
**defined** 31:*1* 109:*1*
**definite** 90:*11*
**definitely** 18:*22* 28:*15*
29:*13, 24* 30:*7* 32:*3*
42:*3* 43:*13, 15, 17* 44:*14*
48:*6* 52:*1* 67:*8*
**definition** 34:*21*
**definitions** 31:*15* 34:*5*
**degree** 9:*2, 4, 7*
**delimit** 200:*22*
**deliver** 22:*23* 23:*5, 8*
**deliverables** 32:*21*
**delivered** 21:*25* 22:*8*
24:*3*
**delivering** 22:*17* 24:*10*
172:*20* 187:*19* 232:*16*
**Deloitte** 98:*16, 17*
198:*17* 210:*3*
**demand** 34:*24* 193:*25*
214:*16, 21* 215:*3*
**demonstrate** 75:*4* 80:*23*
**demonstrated** 75:*1* 80:*25*
**demoted** 146:*21*
**department** 137:*14, 20*
138:*10, 12, 21* 160:*18*
**departure** 224:*16*
**depend** 159:*23*
**depending** 19:*8* 159:*7*
**depends** 18:*12*
**deployed** 114:*10*
**deployment** 112:*5, 9*
113:*20*
**DEPONENT** 3:*2*
**deposition** 1:*12, 14* 6:*3,*
*5* 7:*5* 15:*17, 21* 16:*7, 9,*
*11* 216:*14* 238:*19* 239:*4,*
*15, 16*
**depreciation** 82:*2, 3*

**Describe** 9:*24* 32:*1*
50:*21* 80:*11, 13* 96:*3*
101:*18* 112:*20* 228:*23*
237:*6, 10, 12, 15*
**described** 37:*12* 74:*16*
131:*2* 151:*6* 163:*8*
168:*13* 215:*14* 225:*13*
**describes** 77:*9* 84:*5*
169:*12*
**describing** 39:*8* 52:*15*
**DESCRIPTION** 3:*15*
31:*25*
**descriptive** 83:*19* 203:*4*
**design** 88:*7* 89:*21* 91:*2*
127:*25* 128:*11*
**desire** 106:*4* 184:*22, 24,*
*25*
**despite** 33:*3, 10* 51:*15*
**detail** 96:*5* 145:*18, 25*
176:*19* 223:*5*
**details** 49:*5* 51:*8* 86:*16*
167:*1* 208:*13*
**deter** 173:*25*
**determine** 108:*23* 230:*19*
**develop** 44:*12* 68:*2*
71:*22, 24* 90:*7* 127:*25*
128:*11* 169:*11, 24*
229:*16*
**developed** 68:*4* 74:*19*
79:*4* 88:*2, 5* 180:*16*
215:*9*
**Developer** 182:*18*
**developers** 28:*6*
**developing** 44:*16* 173:*5*
229:*14*
**development** 74:*9* 88:*4,*
*6* 210:*11* 221:*18* 222:*9,*
*14, 15*
**difference** 48:*4* 80:*6*
156:*20*
**different** 11:*22* 25:*1*
26:*11* 29:*16* 59:*4* 65:*12,*
*15* 67:*12* 69:*4* 79:*3*
103:*22* 104:*12* 112:*14*
115:*6* 128:*7* 137:*2*
141:*14* 147:*18* 156:*15*
163:*11, 16* 165:*21* 187:*1,*
*4* 188:*7* 190:*12* 191:*24*
201:*11*
**differentiation** 84:*13*
**differently** 111:*14*
**difficult** 7:*22* 163:*9*
172:*20* 173:*1*
**dig** 231:*16*
**DIRECT** 3:6 11:*14*
22:*18, 23* 23:*4* 64:*7*
113:*11, 16* 122:*20*
195:*15, 19*
**directly** 10:*9* 22:*9*
34:*13* 43:*16, 19* 91:*2*

93:*2* 195:*11* 237:*20*
**disagree** 158:*22* 159:*2*
**discharge** 227:*13, 14*
**discharged** 221:*25*
**disciplined** 146:*10, 13, 14*
**DISCLOSURE** 3:*8*
239:*9*
**discount** 49:*25* 50:*3, 8,*
*14, 19* 51:*15*
**discounted** 48:*17*
**discounting** 50:*10*
**discounts** 154:*7, 11, 19*
157:*3*
**discovery** 136:*10, 12*
**discuss** 34:*22* 62:*15*
99:*16* 117:*22* 124:*13*
217:*22* 233:*17*
**discussed** 16:*6* 49:*1*
64:*2* 98:*14, 16, 17*
165:*24* 167:*8, 11* 169:*3,*
*22* 175:*19* 177:*2, 4*
187:*23* 191:*23*
**discussing** 36:*11* 42:*21*
74:*9* 99:*18* 152:*23*
161:*23* 163:*11, 15* 178:*8*
220:*20*
**discussion** 30:*4* 32:*23*
58:*8* 63:*24* 72:*12* 117:*6*
148:*16* 149:*1* 163:*11*
166:*14, 19* 176:*8, 10*
220:*21*
**discussions** 14:*8* 16:*5*
29:*19* 30:*12* 31:*14*
36:*23* 56:*13* 57:*25* 58:*3*
64:*13* 93:*20, 25* 96:*3*
100:*12, 14* 124:*24* 149:*3*
164:*15* 194:*15* 211:*11*
220:*15* 231:*24*
**dismiss** 116:*7, 13*
**dismissed** 127:*6, 9*
128:*15*
**dismissive** 180:*25*
**dispute** 27:*7* 28:*21*
33:*24* 92:*19*
**disruption** 71:*6, 10, 24*
**dissatisfaction** 168:*12*
**distinction** 202:*22*
208:*24*
**distinguishing** 213:*8*
**DISTRICT** 1:*1, 2*
**DIVISION** 1:*3*
**DOCUMENT** 3:*16* 4:*2,*
*3, 11, 12, 15, 18, 22, 23, 25*
5:*1, 3, 4, 9, 10* 16:*13*
27:*15* 31:*5, 9, 17* 37:*3, 5,*
*15* 41:*2* 100:*7* 129:*4, 5,*
*8, 10, 13, 19* 130:*1* 135:*2*
157:*1* 205:*25* 216:*15, 16*
217:*13, 15* 221:*9* 232:*5*
**documentation** 21:*20*

30:*9* 32:*20* 62:*7* 63:*9*
**documented** 130:*5*
**documents** 15:*23* 16:*17,*
*20, 25* 20:*25* 21:*21*
23:*14, 19, 23* 27:*9, 11*
30:*23* 31:*12* 36:*11, 21,*
*22* 62:*15* 73:*16* 121:*1*
133:*19* 140:*17* 189:*7*
201:*18* 222:*17* 231:*16*
232:*2*
**DocuSign** 73:*19, 21*
**DocuSigned** 74:*1*
**doing** 7:*25* 12:*24* 14:*13,*
*22* 51:*22* 52:*20* 77:*25*
80:*7* 96:*23* 104:*9*
106:*15* 107:*13, 21*
147:*22* 156:*15* 160:*13*
163:*16* 179:*16* 187:*7*
188:*24* 204:*21* 209:*9*
228:*18* 230:*3, 7, 12*
**dollar** 107:*17*
**Dominion** 170:*3*
**door** 18:*18, 22*
**downside** 175:*19*
**draft** 47:*18* 129:*17, 18*
185:*4, 9, 11, 16* 238:*14,*
*15*
**drag** 94:*12*
**Drea** 13:*19* 14:*13* 103:*4*
137:*22*
**Drive** 8:*19*
**drugs** 8:*9*
**due** 85:*19* 177:*25*
**Duffy** 14:*1* 95:*5, 14, 24*
96:*9* 97:*12, 16* 99:*16*
153:*2* 155:*7* 166:*14*
194:*10, 11, 13* 198:*13*
234:*24* 235:*8* 236:*1*
**Duffy's** 235:*2*
**Duke** 36:*8, 16*
**duly** 6:*24*
**duplicated** 142:*9, 19, 23*
143:*24* 145:*2*
**duplicating** 143:*16*

**< E >**
**EAB** 148:*17, 20* 168:*12*
**earlier** 57:*24* 69:*1*
72:*25* 88:*17* 117:*21*
140:*6* 189:*8* 190:*4, 6*
191:*1, 23* 214:*15* 225:*13*
226:*24*
**Earliest** 133:*21*
**early** 73:*4* 88:*15* 149:*3*
181:*12*
**easy** 187:*10*
**Ed** 147:*14, 20, 21* 190:*3,*
*8, 17, 22* 191:*11, 17*
192:*13, 15*
**Edison** 147:*10*

edited 142:8, 19, 23
143:24
editing 143:16
educate 35:19, 23
education 9:6
EEI 71:5 167:22 168:1,
2, 20
effect 149:14 210:22
218:19
effective 94:17
efficient 237:1
efficiently 131:13 237:7
effort 16:19 131:22
efforts 32:16 35:23
74:9 121:18, 25 222:15
225:6, 8
EHALF 2:3
eight 122:24 125:5, 17
either 73:4 88:15
214:17 220:24
Electric 42:12
elements 145:16
eliminate 152:5
Elkin 200:17, 18
EMAIL 3:17, 18, 19, 20,
21, 22, 23 4:1, 4, 9, 10, 14,
16, 24 5:2, 5, 6, 8, 11, 12,
13, 14
e-mail 19:13 38:25
39:13, 16 41:3, 8 42:7
43:22 45:5, 13, 14, 16
46:16 47:11, 14 49:4
50:6, 22 52:8, 10, 14, 21
68:12 69:6, 8, 9, 12, 25
70:10, 16, 19 71:21
72:15 76:6 95:13 96:7
97:11, 12, 15 98:2, 13, 22
99:10 103:16 105:24
110:2, 8 112:3 118:13,
21, 23 120:19 148:9, 10,
14 149:24 151:24 153:1
154:5 155:7, 15 161:21
163:9 166:6, 10 176:4, 8,
13, 17, 18 177:17, 21
178:23 179:11 180:5, 6
186:8 190:10, 14, 19
191:1 192:1, 2, 8, 10
198:9, 12, 18 200:5, 11,
17 201:13 224:19 232:9
234:24 235:2
e-mails 52:15 68:15, 24
69:22 72:19, 21 95:7
97:8 118:8 178:12
Empire 188:3, 7
employ 96:20
employed 30:13
employee 13:12 23:10,
16, 25 26:20 27:4, 21, 25
31:14 34:4, 8 140:7
161:13 197:24 200:19
223:15 224:5 240:17

employees 21:6, 21 23:1,
5, 8, 10 26:8, 9 32:9
66:17 100:22 119:2
142:16 146:10 191:4
224:25
employment 13:13 26:8,
17 31:15
enable 113:14 160:8
162:16
Enbridge 195:9, 13, 16
encompassed 203:4
ended 94:20
Energy 36:9, 16 157:23
170:3 205:9, 11 208:12
229:1
engaged 10:10 11:2
96:19 104:5 156:1
188:2, 7 189:4
engagements 213:15, 19
engaging 11:6
engineering 9:5
entails 207:4
enter 184:4 194:1
entered 206:1 227:22
entering 184:11
Enterprise 171:14
entire 61:13 145:9
146:2 192:8 197:8
entities 187:1
environment 32:13
169:13 179:18 183:22
environments 25:13
179:1
equity 27:11
ERICKSON 3:22 43:23
49:4 50:22 72:16
177:22
ERP 91:9 170:18
171:13 202:9 204:12
ERPs 205:6 207:16
ERRATA 3:10
escalate 195:4
escalation 195:8
especially 47:21
ESQ 2:4, 10 239:14
ESQ........7-216 3:5
ESQ.......216-231 3:6
ESQ....231-238 3:7
essentially 203:8
evaluate 170:17
evaluating 48:15
evening 216:8
event 164:20 213:4
Eventide 153:12, 14, 19
154:2
events 115:1 139:22
evidence 62:9 63:13
67:16, 19 122:8, 17, 21
123:3, 18 124:1 125:2
127:19, 23 128:8 210:9,

13 214:11, 16 215:8
233:25 234:8 240:10, 15
evolve 10:16
evolved 88:8
exact 21:16 73:5 91:24
107:1 108:25 111:2
138:2 141:10 166:25
167:1, 9 197:16 203:11,
18 204:23 210:21
224:12 233:24
exactly 28:14 67:23
71:18 96:25 151:25
228:9
EXAMINATION 3:6
example 24:7 83:22
173:16 208:7 218:17
examples 62:5 63:7
173:22
Excel 83:15
EXCERPT 4:19 118:7
exchange 88:14 186:7
exchanged 14:7
excluded 111:5, 9 151:22
excluding 152:11
exclusively 43:14 124:2
exclusivity 158:1, 21
159:4
excuse 40:8 73:9 108:7
113:1 136:2 163:19
211:8 212:1
exec 102:19, 22
execute 32:17
executing 112:2
executive 12:1 15:7
95:6, 8 102:23, 25
117:23 119:2 148:21
167:3, 8 168:18 196:3,
18 200:10
executives 30:5, 19
199:21
Exelon 115:3, 5, 6, 9, 11
150:2
exhaustive 63:7
EXHIBIT 3:15 15:11,
13 19:9, 11 38:16, 18
40:13, 15, 18 43:22 45:9,
11 47:6, 8 48:21, 23
52:3, 5 56:16 58:16, 18
64:15, 17, 22 68:7, 9, 16,
25 69:10, 23 73:10, 11,
18, 21, 23, 24 74:2, 4, 16
76:1, 3 81:4 86:24
87:10, 19, 21, 23 92:3, 5,
11 94:1, 3, 11 95:10, 12
97:2, 4, 12 98:23, 25
100:2, 4 102:5, 7 103:11,
13, 17, 20 105:11, 13, 18,
24 107:18 109:21, 23
110:10, 12, 13 111:17, 19
117:13 118:1, 3, 5 119:5,
7, 17, 19, 20, 22, 24 120:4,

15, 23 121:2, 3, 12 122:4,
22, 24 126:2, 25 127:11,
14 129:1, 3, 13, 20
132:25 133:2, 17, 18, 20
134:17 138:24 140:18
148:5, 7, 15 152:16, 18
154:6 155:16 161:7, 9
166:1, 3 176:2, 12
177:12, 14 179:10 180:6
181:24 182:1, 12 186:3,
5, 10 189:22, 24 194:17,
20 198:4, 6, 14 199:25
200:2, 7 216:9 223:11
226:24 232:7, 9 234:18,
20 235:1
Exhibits 73:6 120:12
141:24 191:22 222:21
existed 17:7 72:4 96:2
129:21
existing 72:5 173:12
191:10
expand 151:12 163:5
expanding 173:17
expect 201:22 203:22
expectation 65:6 107:16
expected 88:5
expecting 105:25
expense 13:17
experience 8:4 47:22
89:2, 3 150:3
experienced 235:13, 17
expert 31:21 126:23
131:20 132:15
explain 53:5 187:22
228:7
explained 15:23 21:6
explicitly 199:11
export 78:12
express 165:6
expressed 165:8 168:12
184:22, 24, 25 185:1
227:21
expressing 230:24 231:7
expression 228:22
expressly 106:21
extent 43:8 62:13 69:23,
24 77:17 81:12 82:21
86:17, 19 128:2 212:2
226:3, 9
external 98:8, 12 159:16
extract 113:25 114:2
206:13
extracting 25:10
extremely 44:22

< F >
facing 174:16
fact 19:4 27:2 34:7
54:23 64:19 83:8 90:10
107:20 108:2 126:19
127:19 128:10 136:14

140:14 145:11 168:17
169:24 172:25 180:19
213:6 214:19 237:16
**factor** 213:9
**facts** 62:9 63:13 122:17
123:3, 18, 25 124:1
125:2 127:19, 23 128:8
210:9 215:8 226:3, 4
233:24 234:8
**factual** 120:4 125:16
**fair** 85:14, 15 129:12
168:7 202:5
**fall** 58:10 59:7
**Fallback** 163:4, 7
**familiar** 17:2, 6, 8 23:2
65:20 86:16 92:8
139:20 157:7 177:16
193:15 216:20
**far** 21:15 35:11 39:21
99:24 100:1, 20 115:19
131:22 132:19 134:9
139:25 146:22 171:9
175:24 191:13 199:7
206:15 209:6, 15 210:15,
19, 23 227:5, 12 234:2,
10
**faster** 90:7
**FAZIO** 2:10 3:6 6:12
15:25 16:2, 5 18:19
20:8 26:6 28:4, 22 29:5,
11 31:8 33:12, 25 34:12,
19 37:20 39:24 41:22,
24 42:18 43:4 46:15
47:2 48:1, 18 49:13
53:9 54:6, 11, 20 56:6
59:9 63:17 65:3, 23
66:3, 10, 25 67:6, 18
68:18 69:2 70:6, 12
71:11 72:2 77:5, 16
78:1, 14, 17, 19 79:1, 11,
19, 24 80:9 81:11 82:20
83:11, 25 84:7, 24 85:14,
17, 23 86:1, 8, 11 88:20
89:1, 13, 23 90:9, 21
91:4, 15 92:21 93:8
96:17 97:24 98:20
100:23 101:11, 20
104:22 106:8, 25 107:8,
24 108:24 109:6, 13
110:20 111:1, 8 113:5
114:5, 17 116:23 120:17
121:8 122:10 123:7
124:10, 13 125:11, 19
126:22 128:2 130:11
131:5, 18, 25 132:7, 14
135:10, 21 136:1, 8, 20
139:19 143:20 145:13,
23 149:22 151:1, 16
152:13 156:11, 18
159:14, 22 160:24
161:22 164:6 181:16

184:7 193:1, 8 194:11
206:18 212:13, 19 213:1,
10, 17 214:10, 18 216:7
226:8, 15, 22 231:9
232:1 233:10, 12 234:4,
11, 16 235:19 236:11, 18,
24 237:9 238:2, 17
**fear** 168:5 184:12, 15
**feature** 217:1, 4
**February** 68:13 69:11,
13 70:17 152:11 167:1,
6 175:25 176:9 189:10
198:10 223:17, 18, 20
224:3, 19 232:10
**federal** 130:9, 22
**feedback** 184:15 199:17,
20
**feel** 49:6 51:8 84:13
**felt** 109:7 149:8, 13
**FERC** 202:1
**Ferguson** 61:6
**Fifty-three** 127:16
**file** 16:22 35:11 183:19,
21
**filed** 100:12 116:6, 9
119:14 127:5
**files** 120:18 134:2
141:14 142:1 146:17
**fill** 133:24
**final** 39:4 170:6
**finance** 14:23
**financial** 171:16
**financially** 240:18
**find** 16:24 57:6 100:22
131:24 175:20 236:20
**findings** 77:2, 9
**fine** 101:12 164:7
**finish** 7:17 220:7
**finished** 122:25 126:4
133:8 211:4
**fire** 54:4 106:7, 9 107:2
**fired** 146:19
**firm** 74:22 210:7
239:15
**firms** 207:17 208:1, 16
209:7, 11, 12, 16, 20, 23
**first** 6:24 9:14, 22
18:12 21:14 36:3 38:10,
21, 24 40:11, 21 42:16
43:21 47:14, 15 55:24
56:19 63:11, 12 67:4
68:15, 19, 24 69:23
73:23, 24 77:13 82:17
84:17 86:4, 9 87:2, 3
92:7 97:11 108:22, 23
109:5, 9 111:22 118:13
121:2 122:22 137:8
140:22 148:14, 15 151:6
152:21 153:2 154:6
155:15 162:8 166:13
168:11 173:4 174:16

176:12, 13, 16 179:10
180:1, 10 186:10 187:10
194:21, 22 198:12, 13
200:7 201:12 218:22
223:3 230:6 235:2
**firsthand** 8:4
**fit** 32:3 130:25
**fits** 31:23
**five** 73:19 122:3, 18
225:17
**fixed** 18:6 40:8 44:4, 12
45:4, 6 201:23 202:11,
15
**fixes** 230:11
**flat** 199:13
**Flint** 208:5, 9, 11
**flip** 74:4 82:6 87:8
129:12 174:8 176:12
177:20 179:10 182:12
186:9 216:17
**Florida** 51:25 52:1, 16,
17 54:4, 13, 19 55:3, 7,
14 60:6, 9, 12, 13 61:1,
16 62:4, 12 63:11, 12
**flow** 16:12
**focus** 47:14 109:11
**focused** 109:4
**focuses** 228:23
**folder** 142:10 143:25
**folders** 141:4, 6, 15, 20,
22 142:18, 22 143:4
**Folks** 65:19 166:11
196:11 220:16 234:25
**followed** 41:14
**following** 1:12 58:23
83:1 137:14 166:13
182:18 217:21 239:9
**follows** 6:24 17:25
19:22 46:14 123:6
**follow-up** 69:3, 16 72:19
97:16 216:8
**follow-ups** 68:16, 25
**foot** 18:18, 21
**footnotes** 21:19
**footprint** 173:17
**forces** 150:2
**foregoing** 240:9, 13
**forfeit** 20:15
**forgotten** 196:19
**form** 18:19 20:8 26:6
28:4, 22 31:8 33:12, 25
34:12, 19 37:20 39:24
41:22 42:18 43:4 46:15
47:2 48:1, 18 49:13
53:9 54:6, 11, 20 59:9
63:17 65:23 66:3, 25
67:6, 18 69:2 70:6
71:11 72:2 77:5 78:1
79:1, 19, 24 80:9 83:25
84:7 88:20 89:1, 13, 23
90:9, 21 91:4, 15 92:21

93:8 97:24 98:20
100:23 101:20 106:8, 25
107:24 108:24 109:6, 13
110:18, 20, 24 111:3, 8
113:5 114:5, 17 117:16,
19, 20, 25 123:7 124:10
125:19 126:22 130:11
131:5, 18, 25 132:7, 14
135:10, 21 136:1, 8, 20
139:19 143:20 145:13,
23 149:22 151:1 152:13
156:11, 18 159:14, 22
160:24 161:22 181:16
184:7 193:1, 8 205:23
206:18 209:25 212:13
213:1, 10, 17 214:10, 18
226:7, 14, 20 233:10, 15
234:4, 11 235:19 236:18,
24 237:9
**formal** 20:24 21:23
22:8, 15, 17, 20, 23 23:5
24:2 36:2 138:25 143:8
146:17 206:7
**formalized** 179:12
**formally** 94:20
**formatting** 163:9
**formed** 38:12
**formidable** 43:10 174:18
**forth** 30:23 31:5, 13
37:4 77:2 118:12
121:25 123:13 140:7
210:16
**forward** 98:11 175:21
235:12
**forwarded** 98:13 200:5,
11
**forwarding** 98:8
**found** 83:6 132:22
140:23 236:7
**foundation** 18:19 20:8
26:6 28:4, 22 33:25
34:12, 19 41:24 42:18
46:15 48:1, 18 54:6, 20
59:9 63:17 65:23 66:10
71:11 72:2 79:1, 11, 24
83:11 89:23 90:9 91:15
92:21 93:8 96:17
104:22 110:20 111:8
114:17 124:10 126:22
132:7 135:21 136:20
145:13 152:13 156:11,
18 159:14 184:7 206:18
213:1, 17 233:10 234:4,
11
**four** 12:2 19:7 22:6, 9
57:15 58:3, 8 190:13
203:8, 11 204:15 207:17
208:1 209:22 225:16
**fourth** 180:24 235:1
**FPL** 53:7, 17 54:2, 17

56:21  59:23
FPL/NextEra  55:1
FPNA  201:11
framework  183:18
191:16, 20  192:13  193:6
217:9
frequent  23:12
Friday  190:20
front  56:16  121:1
216:11
FTP  183:19, 21
full  23:2  86:17, 19
94:11
fully  236:14
function  230:5
functional  25:1  81:19
88:7, 21
further  9:6  82:6  129:14
180:11  193:10  222:3
238:2  240:13, 16
future  180:2  190:22
229:24  236:17

< G >
Gaddy  57:22
Galleria  8:18
gas  229:2
gathering  184:15
general  29:12  31:3
37:10  39:11  43:5
171:16  172:2  192:9, 15
generalized  29:23
generally  20:21  29:21
47:20  149:4  166:23
201:20  217:6  228:24
generate  81:20
generation  82:18
generic  117:19  185:18
genesis  190:3, 5
gentleman  46:5
Georgetown  8:20
GEORGIA  1:2, 4, 15
2:5  6:7  8:19, 20  9:1, 14
239:4, 8, 11  240:3, 7
getting  13:17  173:1
Gianflone  196:5
GitHub  140:19  141:5, 6,
16  142:10, 11, 12  143:9,
17, 18, 25  144:11, 16, 18,
20
give  6:18  7:15, 17  8:6
38:4  46:13  50:8  114:1
120:9  124:14  137:2
157:25  158:21  159:4
182:23
given  20:24  27:8, 9
44:12  105:25  106:4
154:8  218:17  240:15
giving  62:16  66:15
Global  24:6

go  16:24  23:1, 12  26:15
41:24  43:21  44:1  50:9,
15  53:22  62:14  74:4
78:2  81:14  85:1  86:24
100:22  116:24  117:2
121:15  122:4, 11, 24
126:2, 16  133:3  145:24
157:24  175:16  199:10
203:15  216:1  223:1
229:8  231:11  238:4, 11
goal  49:9  50:24  51:1, 2,
11, 13  173:1
go-forward  231:1
going  7:10, 12, 14  8:2
15:24  16:1  40:21  42:17
44:15  49:18, 20  61:23
62:14, 24  73:11  83:20,
24  85:8  93:12  99:5, 21
100:13  101:8, 9  102:19
103:9  115:23  116:25
117:22  118:11  121:2
124:18  129:14  138:24
158:9  161:20  164:9, 23
172:9  176:21  177:8
178:7  187:24  189:11
194:3, 13, 20  216:2
225:7, 11  226:11  228:8,
10  230:25  231:4, 15
233:13  235:12  238:11,
17
Gomes  50:12  103:2
149:15  150:10  176:9
196:5  197:6, 10, 19, 20
Good  7:2  88:18  93:13
101:7, 8, 10, 11  216:8
Google  126:13
gotcha  185:3
govern  229:19
governed  32:14
Gowdy  57:20, 23, 24
graduate  8:23
graduated  9:8, 14
Grant  208:3, 7
granted  27:13  191:10
grants  27:11
greater  227:17
Griffin  57:17
Griffith  57:17
ground  7:10
group  11:9  57:21
138:21  167:23  168:1, 4,
7, 21  169:4, 24  224:1
growth  10:21, 25  11:1,
21
guess  7:24  16:23  29:23
34:1  39:10  41:23  55:6
83:12  95:20  114:6, 13,
22  121:20  123:22
124:11  126:23  128:20
129:6, 10  130:12  131:19
132:8, 15, 19, 24  135:2, 5

139:7  144:7, 22  152:14
155:18  158:16  160:5
169:21  180:14  196:9
207:21  208:25  210:6
213:2, 11  217:7
guidelines  23:11
guides  30:9  62:6
gut  153:5
guys  101:9

< H >
Hamby  25:22, 24  26:3, 7
hand  6:15  73:11
handbook  23:10, 16, 25
31:14  34:4, 8  140:7
handed  40:18
handful  15:22
handing  15:13  19:11
38:18  40:15  45:11  47:8
48:23  52:5  58:18  64:17
68:9  73:9, 10  76:3  92:5
93:23  94:3  95:12  97:4
98:25  100:4  102:7
103:13  105:13  109:23
110:12  111:19  117:12
118:5  119:7, 19, 24
120:15  129:3  148:7
152:18  161:9  166:3
177:14  182:1  186:5
189:24  194:20  198:6
200:2  232:9  234:20
happen  34:15  107:22
144:24  237:14
happened  64:12  72:23
95:19, 20  96:14  98:21
105:8  179:7  207:9
213:3  237:4
happening  237:17
head  7:21  137:19
196:22  203:13, 18
headers  31:7
Heading  76:19  78:20
81:5, 24  84:2
headings  81:7  87:13
headwinds  169:15
health  8:12
hear  218:21  219:2
heard  17:25  24:25  25:8
32:8  122:14  124:2
128:16  168:17  199:17
210:12
hearing  195:10
help  19:25  84:16  97:18
208:21
helping  98:3
helps  173:20  175:5
HENRY  239:5  240:4, 7
hesitation  150:20
hey  16:24  34:10  85:14
100:22

hidden  139:10, 12
140:15
high  8:23, 25
higher  150:3
highest  109:8
Hills  208:5, 9, 11
hire  113:23
hired  94:24  116:2  205:2
hiring  27:24
historical  19:19
historically  19:15  25:6
37:18, 23  113:17  149:7,
11  151:6  159:21
history  53:23  153:12, 22
165:15
holistic  152:9
home  8:16, 19
homepage  139:13
honored  106:15, 23
107:6
hope  172:13
hopeful  57:10
Horsted  61:15  218:11
host  37:18, 24
hostage  168:14
hosted  112:17, 18  113:10
hour  93:12  186:11
194:3
hours  187:14  188:3, 11,
14, 18
HR  13:11  146:17
hub  182:19, 22  183:5, 9,
18
Huberick  161:12  179:11,
23

< I >
idea  18:4  146:18
identical  82:1
identification  118:14, 19,
24
IDENTIFIED  3:15
15:11  19:9  38:16  40:13
45:9  47:6  48:21  52:3
58:16  64:15  68:7  73:7
76:1  87:14  92:3  94:1
95:10  97:2  98:23  100:2
102:5  103:11  105:11
109:21  110:10  111:17
118:3, 9  119:5, 17, 22
120:13  129:1  148:5
152:16  155:23  161:7
166:1  171:24  172:8
174:21  177:12  181:24
186:3  189:22  194:17
198:4  199:25  232:7, 14
234:18
identify  36:16  39:22
70:12  100:16  119:3
128:18  135:24  136:6, 14,
16, 17  141:25

**identifying** 11:*10* 151:*20* 155:*14* 170:*12*
**immediately** 10:*24* 94:*17* 121:*23*
**impact** 53:*7* 54:*2, 10, 12, 18* 56:*21* 165:*6* 168:*10* 170:*2* 173:*9, 10* 230:*4, 17*
**impacted** 54:*13* 164:*24*
**impair** 8:*10, 12*
**impediment** 192:*23* 193:*6*
**implement** 10:*6* 18:*14* 128:*1, 11*
**implementation** 11:*2, 7* 19:*7* 36:*15* 164:*2* 188:*19* 225:*6, 8* 236:*16*
**implemented** 18:*10, 11* 186:*19, 24*
**implementing** 10:*3* 18:*5, 15* 164:*2* 175:*10* 186:*25* 187:*4* 222:*12*
**implicate** 230:*8*
**implication** 236:*23*
**implied** 187:*11* 207:*23*
**import** 78:*12* 79:*14*
**important** 31:*24* 49:*7* 51:*4, 9* 84:*11, 13* 167:*7* 169:*14*
**improper** 77:*25*
**improperly** 78:*10*
**improve** 184:*16*
**inappropriate** 156:*8* 209:*17*
**include** 123:*15* 124:*4* 125:*4* 128:*3* 145:*11* 201:*7* 203:*19* 229:*1, 2*
**included** 21:*9* 23:*2* 46:*17* 48:*3, 5* 105:*3* 109:*19* 115:*13* 123:*5* 223:*3*
**includes** 23:*10* 34:*5* 41:*11* 81:*25* 168:*11*
**including** 31:*23* 98:*4* 122:*9, 19* 127:*24* 164:*2* 167:*3* 170:*18*
**income** 130:*9, 22*
**incorporate** 37:*25* 65:*17*
**Incorporated** 6:*4, 5* 55:*12*
**incorporates** 30:*8* 37:*11*
**independent** 84:*25* 239:*12*
**independently** 134:*6*
**indicates** 216:*18* 221:*9*
**indicating** 52:*18*
**individual** 39:*19* 228:*13*
**individually** 11:*15* 134:*11*
**individuals** 11:*24* 142:*8*
**Industrial** 9:*5*

**industry** 10:*19* 11:*3, 7, 8* 151:*10* 199:*17*
**influence** 173:*25*
**influences** 173:*15*
**InfoMaker** 92:*16, 17, 25*
**inform** 53:*24* 109:*8*
**Information** 17:*19, 20* 21:*11* 22:*14* 40:*1* 57:*8* 63:*19* 67:*20, 21* 68:*6* 76:*16* 77:*12* 78:*4* 80:*25* 81:*13* 84:*22* 85:*1* 88:*14* 89:*12* 95:*3, 4* 98:*5* 100:*16* 104:*4* 108:*4* 120:*5* 121:*20* 123:*12, 13* 124:*6* 125:*17, 24* 126:*8, 19, 25* 127:*23, 24* 128:*3, 4, 10, 12* 131:*12, 23* 132:*21* 133:*13, 18, 24* 135:*4, 11, 14* 137:*1, 24* 139:*22* 140:*23* 141:*21, 22* 142:*9* 143:*4, 17, 24* 145:*10, 12, 19* 146:*1* 175:*20* 179:*24* 200:*13* 206:*23, 24* 209:*18* 210:*11* 213:*23* 215:*4, 11* 221:*17, 23* 222:*8* 223:*8* 234:*1, 13* 236:*10*
**infrastructure** 160:*19* 182:*21*
**initial** 69:*6, 8* 185:*16* 214:*16, 21* 215:*3*
**input** 108:*18* 185:*23*
**inside** 12:*3* 27:*10*
**install** 170:*6*
**instance** 21:*12* 23:*25* 31:*7* 58:*5* 91:*19* 108:*16*
**instructed** 23:*4, 8*
**instruction** 83:*2*
**integrate** 90:*19*
**integration** 182:*19, 22* 183:*5, 8, 9, 12, 18*
**integrations** 182:*19*
**Intellect** 17:*19*
**intellectual** 20:*20, 25* 29:*13, 14, 19, 22* 30:*2, 6, 8, 10, 24* 31:*6, 13, 16, 24* 32:*4, 15* 34:*3* 35:*20, 25* 36:*17* 37:*10* 53:*19, 21* 55:*8, 13* 57:*13, 25* 59:*18, 20* 60:*5* 61:*19, 23* 62:*2, 3, 10, 17, 21* 63:*4, 15* 65:*2* 69:*25* 80:*15* 84:*14* 89:*18* 90:*3* 91:*1* 95:*25* 106:*11* 115:*24* 117:*17* 130:*5, 10, 17, 23* 131:*17* 132:*5, 6, 16, 21* 144:*14* 195:*5, 13, 23* 206:*17* 213:*22* 214:*13* 215:*11* 217:*23* 218:*24* 219:*10* 220:*12, 22* 221:*7* 225:*21*

**229**:*16* 232:*17* 233:*1*
**intended** 83:*9*
**intent** 57:*12*
**intentional** 145:*2*
**interact** 12:*2* 90:*19*
**interacts** 12:*2*
**interest** 173:*16* 229:*20*
**interested** 18:*5* 162:*17* 164:*4* 165:*12* 200:*14* 240:*19*
**Interesting** 39:*13*
**interim** 197:*21*
**intermediary** 113:*25*
**internal** 64:*12* 70:*19* 191:*3, 9* 193:*10*
**internally** 29:*15* 31:*2* 56:*23* 62:*25* 70:*11*
**Internet** 100:*22* 126:*14* 131:*24* 132:*12, 22* 143:*5*
**interpret** 48:*12* 51:*11, 13* 144:*20* 152:*1* 175:*9*
**interpreted** 45:*4* 56:*19*
**INTERROGATORIES** 4:*21* 119:*11, 13* 120:*8, 11* 122:*23* 222:*22* 223:*4*
**interrogatory** 122:*23* 123:*3, 21* 124:*4* 125:*3* 126:*1, 3* 127:*4* 132:*25* 133:*1, 4, 5, 9, 12, 16* 134:*12, 14, 16, 24* 135:*6* 136:*5* 137:*2, 5* 138:*5* 139:*5* 143:*10* 146:*12* 222:*22, 25*
**interrupt** 203:*16*
**introduced** 21:*17*
**introduction** 13:*4*
**intrusion** 41:*18* 42:*2*
**inventory** 37:*13*
**investigate** 223:*5* 230:*19*
**investigating** 223:*2*
**investigation** 13:*12*
**investor** 207:*11*
**investor-owned** 201:*21* 205:*4* 207:*5, 8* 208:*9, 18* 229:*3*
**invited** 220:*1, 4*
**involuntarily** 13:*9*
**involve** 10:*4* 11:*24, 25* 19:*7* 25:*9, 12* 118:*17*
**involved** 13:*11* 16:*19* 17:*14, 20, 22, 24* 27:*24* 28:*15* 30:*15* 50:*10* 59:*10* 60:*8* 61:*1, 8, 12* 72:*12* 98:*18* 105:*2, 7* 108:*20* 128:*20* 138:*2, 3* 141:*25* 146:*16* 155:*21* 158:*4* 166:*19* 167:*22* 169:*20* 173:*23* 182:*6* 185:*3* 186:*2* 195:*2, 8, 11* 196:*9* 221:*14* 228:*2, 4,*

**12**
**involvement** 17:*12*
**involving** 118:*18* 119:*1*
**IOU** 167:*12, 23* 174:*18*
**IOUs** 174:*24*
**IP** 4:*13* 70:*24* 101:*15, 16, 18* 102:*11, 14, 16* 104:*12* 108:*7, 9* 109:*7, 17* 110:*6, 21, 25* 111:*5, 14, 25* 112:*5, 8, 11, 15* 114:*15* 115:*9, 13, 15* 117:*9* 146:*24* 147:*14* 148:*3* 156:*1, 7* 210:*16*
**issue** 13:*11* 39:*4, 14* 128:*18* 163:*24* 164:*19, 23* 165:*10* 166:*23* 167:*7* 169:*19*
**issues** 178:*1, 21*
**item** 84:*17* 135:*25* 136:*6, 15, 16, 18*
**items** 65:*18* 83:*4, 6* 86:*4, 6, 14, 20, 21* 122:*8, 18* 125:*4, 6, 8* 130:*2, 16* 135:*18* 137:*21* 160:*19* 213:*21*
**its** 18:*18* 31:*6* 32:*9, 17, 18* 35:*24* 37:*8, 19* 50:*19* 55:*15* 62:*10* 63:*15* 66:*7, 8* 67:*24* 68:*2* 80:*8* 88:*3* 90:*15* 91:*20* 115:*22* 121:*19* 123:*11* 128:*11* 132:*20, 21* 141:*6* 163:*20* 184:*5, 6* 210:*16* 214:*24* 215:*16* 217:*11, 16, 23* 218:*24* 219:*9* 222:*3* 230:*1, 24* 234:*9*

**< J >**
**Jackson** 1:*14* 239:*11, 21* 240:*6, 24*
**JAMIE** 3:*18* 13:*6, 8* 38:*25* 45:*16* 47:*15* 223:*14* 224:*24*
**Jankovic** 33:*18, 22* 34:*9*
**Jason** 6:*11* 26:*22, 24* 30:*12* 32:*5* 198:*14, 17* 199:*11* 224:*22*
**Jeff** 61:*14* 72:*17* 218:*11*
**JIM** 1:*12* 3:*3* 6:*23* 7:*4* 14:*1* 61:*5* 95:*5, 24* 99:*16* 153:*2* 179:*12* 190:*19* 219:*24* 239:*4*
**Jimmy** 61:*14* 72:*11* 218:*11*
**jmayes@robbinsfirm.com** 2:*6*
**JMI** 27:*12*
**job** 9:*15, 25* 10:*24* 11:*19* 161:*14* 228:*18*
**Joe** 50:*12* 103:*2* 196:*5* 197:*6*

**Joel** 111:22 180:25
181:5 190:20, 25 191:1,
4, 6, 16
**JOHN** 3:22 30:20 35:2
43:23 49:4 72:16, 17, 22
148:16, 24 151:11, 15, 18
152:8 177:21
**join** 17:18
**joining** 20:19
**Jonathan** 61:3, 9 63:21
175:17, 24 218:6 219:19
**Josh** 65:3 70:12 164:6
**JOSHUA** 2:4 3:5, 7
6:10 239:14
**Joyce** 138:17
**judge** 7:12 116:19
127:6 128:13, 17
**judge's** 37:3 116:12, 15
**Judicial** 239:8
**July** 52:11, 22 233:24
234:8, 25
**jump** 7:15
**June** 9:20 110:3
**junior** 224:5
**jurisdictions** 130:10, 22

< K >
**Kanav** 200:5, 9
**keen** 180:2
**keep** 22:24 51:13 70:13
85:23 101:8 175:6, 11
**keeping** 49:6 50:24
51:8, 12
**keeps** 23:22
**Keith** 61:6
**Keller** 42:13
**Kelly** 30:20
**Ken** 30:20
**kept** 13:1, 14, 23 14:5,
25 26:20
**Kevin** 42:13 112:3
196:5
**KEY** 2:11 101:24
130:4, 16
**kickoff** 118:15, 19, 24
**Kim** 57:19
**kind** 11:4 15:23 16:12
18:7, 12 19:3 23:17
31:15 40:22 101:21
106:14 128:22 130:25
193:21 217:6 225:16
**Kleczynski** 115:2 150:6
232:10 233:4
**knew** 13:3 17:7 32:5
89:19 90:12 104:8
109:11 144:23 147:16
156:9 225:24 226:3, 19
**know** 8:4 10:11 11:20,
25 12:20, 22, 24 13:6, 8,
10, 19, 21 14:1, 3, 13, 15,
18, 20, 22 15:16 17:15,

22, 24 19:7, 19 20:10, 11,
21 21:9, 10, 15 22:25
24:3, 6, 8 25:17, 22, 24
26:17, 22, 24 27:1, 22
28:6, 23 30:11 31:2, 14,
15, 24 32:1 33:6, 18, 19,
20 34:1, 9 35:2, 11
36:11 38:13 39:10, 21
42:10, 20 43:6 44:15, 21
45:16 46:2, 3, 6 48:4
51:4 52:2 53:2, 12, 23
54:23 55:1 56:23, 24
59:2 61:25 62:6 63:7
64:12 65:10 67:10, 23
68:4 71:16, 17 72:9, 23
75:4 78:5 85:20 87:24
90:11 91:20, 24 92:17
96:9, 11, 15, 20 98:11, 13
99:24 100:1, 20 104:23,
24 105:6 110:18, 24
112:12 115:2, 20 116:2,
7, 15 118:21, 22 120:25
122:5, 25 126:3, 19
128:21 129:16 132:4, 19
133:4, 8 134:9 137:6
138:2, 7, 22 139:8, 15, 21,
25 141:10 142:22 144:7,
13 145:8, 17, 25 146:22
147:4, 13, 15, 24 150:15
153:2, 22, 25 154:14, 23
157:11, 12 158:17, 23
159:7 160:5 162:25
163:1 164:3 166:23
167:15 171:6, 9, 11
175:24 177:7, 11 184:24
185:8 186:23 188:23
189:7, 17 190:3, 10, 16
191:13, 23 193:19, 21
195:1 196:14, 16, 23
197:1 198:1, 2, 24 199:3,
7, 15, 16 200:11 204:23
205:14, 16, 20, 22 206:9,
11, 12, 14, 15 207:2, 4
208:19, 22, 24 209:6, 15,
25 210:6, 15, 19, 23
211:22 212:9 215:21
219:12 224:3, 4, 15, 17,
25 227:5, 12 228:9
229:2, 23 230:10, 13, 14,
16 234:2, 10 237:3, 22,
24
**knowledge** 43:13, 16
66:7, 18, 22 67:1, 4 68:1
86:23 89:21 120:3
125:22 143:14 153:19
176:1, 25 189:3 206:21
211:17, 25 214:23
215:19 227:8 235:20
**knowledgeable** 43:15, 18
44:22

**known** 28:16 44:6
55:25 191:8 225:19
**knows** 175:20
**Kristin** 57:18

< L >
**label** 166:9
**labeled** 133:13 140:1
**labels** 137:25 140:23
**lack** 28:2 187:5
**land** 172:13
**Lantukh** 10:7, 13 43:12,
19 44:17 46:12 74:24
80:23 88:18 109:12
**Lantukh's** 89:9
**large** 19:2 50:15
**largely** 179:13
**larger** 18:15 109:2, 4
**largest** 201:14
**late** 73:4
**lawsuit** 100:12 116:7
155:21
**lawsuits** 35:12
**lawyers** 75:15
**layer** 217:7
**layman's** 77:15, 24
**lays** 84:16
**lead** 11:17 210:9
214:12 224:23
**leader** 10:20, 21 18:13
**leaders** 11:23
**leadership** 12:13, 14
15:8 71:5 72:13 102:24,
25 179:13 196:1, 3, 18
**leading** 12:7 14:14, 23
88:6
**leads** 81:20
**learn** 94:23 175:20
211:20
**learned** 38:21 42:16
43:2 63:13 68:5 77:18
85:9 89:3 95:16 116:18
122:11 124:6, 15 125:17
128:3, 9 211:22 233:17
**learning** 95:23
**lease** 201:24 202:11, 16
**leave** 197:15 224:10
**led** 17:23 60:10 63:14
88:13, 14 151:23 152:15
161:20 190:16
**ledger** 203:12
**left** 12:22 13:1, 8, 14, 21,
23 14:3, 5, 8, 20, 25 15:9
194:5 197:18 224:14
**legacy** 19:19
**legal** 15:19 16:6 20:15,
22 28:11 31:21 33:6
37:12 114:23, 24 116:11
123:23, 25 125:7 126:23
127:7 130:5, 6 131:20

134:4 181:1 193:10, 12
222:5
**legends** 140:9
**Leo** 61:5 219:24
**LETTER** 3:24, 25 4:8,
13, 17 53:6, 16 54:2, 17
56:20 58:11, 13, 21, 24
63:3 64:19, 22, 23 67:4
69:16 70:8 76:9, 11, 14,
20 77:1 78:1, 7 80:1, 19
81:25 82:6 84:16, 24
85:18, 21 88:14 94:7, 21
102:12, 14, 19 104:13, 17,
18, 21 105:6, 18 107:3
110:16 117:22, 25
123:14 147:18 214:16,
21 215:3, 15
**letters** 34:24 101:22
103:8, 19, 24, 25 104:11,
14 110:18, 24 230:23
231:4, 6
**letting** 132:4
**level** 43:16 50:3 77:9
140:16 167:8
**leverage** 67:12, 21
**leverages** 24:5
**leveraging** 81:25
**liability** 63:25 64:5
205:15, 21
**Liberty** 95:19, 23, 25
96:15 97:1 99:14, 22
186:12, 14, 16, 25 187:4,
20 188:7, 24 189:3, 6, 13
220:16, 23 224:19 225:9,
12
**library** 145:9
**license** 21:12 36:13
60:4 66:12 67:11 79:16
91:6, 17 93:10 96:1
154:4, 7, 11, 19 156:12
170:10 209:13 212:3
**licensed** 173:12
**licenses** 9:12 155:1
157:3
**licensing** 36:17 96:1
**lied** 75:7
**Lift** 170:1, 5, 9 171:18,
25 172:1, 24
**Light** 51:19, 25 52:1, 16,
18 54:4, 14, 19 55:4, 8,
15 60:6, 9, 12, 13 61:2,
17 62:4 63:11, 12
131:23
**Light's** 62:12
**limited** 122:9, 19 127:25
141:20 183:16
**limits** 50:11
**Linda** 42:13
**Lindy** 61:14 72:11, 13
218:11

line  102:*11*  118:*23*
146:*16*  179:*13*  194:*21*
lines  7:*20*
link  41:*11, 14*  46:2, *4*
LinkedIn  38:*11*  46:2, *3*
192:*21*
list  37:*1, 8, 15*  61:*13*
63:*7*  123:*5, 15*  127:*25*
129:*20*  131:*23*  134:*18,*
22  135:*3, 8, 12, 13, 14, 18,*
25  136:*6, 15, 16, 18*
145:*14, 15, 17, 22*  182:*15*
listed  40:*9*  118:*13*
121:*21*  122:*9, 18*  123:*20*
124:*4*  130:*2*  173:*22*
litigation  210:*20*  221:*3*
222:*4, 7, 18*
little  7:*17*  40:*20*  74:*5*
128:*7*  175:*19*
Littlefield  1:*16*  2:*4*  6:*6*
live  228:*10*
LLC  1:*16*  2:*4*
LLP  6:*13*
located  16:*25*
LOG  4:*20*  118:*7, 22*
logical  170:*17*
logo  92:*23*
long  7:*8*  20:*18*  36:*5*
141:*12*  196:*14, 24*  224:*2*
longer  70:*23*  96:*18*
99:*6*  106:*15*  107:*13, 21*
108:*3*  113:*19*  132:*5*
141:*11*  160:*2*  172:*25*
175:*11*  178:*7*  182:*9*
196:*11*
long-term  49:*7*  51:*9*
look  15:*14*  19:*11, 24*
38:*18, 24*  40:*19*  43:*21*
45:*12*  47:*8*  48:*23*  49:*4,*
24  52:6  53:*22, 24*  62:*15*
64:*25*  68:*10*  69:*12*
73:*12, 18*  74:*5*  76:*4*
82:*17*  83:*4*  86:*24*  92:*5*
94:*4*  97:*5*  99:*1*  100:*5*
102:*8*  105:*14*  109:*24*
111:*19*  117:*13*  119:*8, 19*
121:*1, 11*  122:*22*  127:*11,*
20  129:*24*  130:*7*  132:*25*
133:*1*  134:*12*  137:*5*
148:*7*  151:*12*  152:*18*
160:*22*  161:*4*  176:*2*
177:*15, 21*  180:*5*  186:*6*
189:*15, 25*  198:*7*  201:*12*
232:*11, 13*  234:*25*
looked  27:*15*  41:*20*
52:*11*  82:*11*  87:*9*  88:*17*
103:*17*  134:*10, 17*  140:*8*
144:*9*  145:*18*  176:*2, 4*
189:*7*
looking  13:*4*  32:*20*
39:*25*  42:*1*  48:*13*  87:*15*

93:*11*  126:*25*  172:*6*
178:*9, 12*  184:*16*  198:*12*
looks  43:*5*  117:*14*
202:*10*  238:*11*
losing  146:*25*  154:*14, 22*
lost  51:*15, 18*  52:*15*
54:*3, 19*
lot  20:*10*  105:*25*  107:*17*
121:*1*  160:*3*
loud  235:*9*
lower  18:*17, 25*  19:*5*
154:*12, 13, 20*  235:*13, 17*
lowers  154:*8*
lowest  52:*22*
LUCASYS  1:6  6:*4, 10,*
11  14:*9*  15:*5, 18*  16:*16*
20:*6, 9*  38:*10, 22*  39:*12,*
23  40:*8*  41:*11, 14, 21*
42:*14, 16*  43:*25*  44:*7, 11*
45:*20, 25*  46:*13, 25*
49:*12, 15, 18, 20*  51:*19,*
22  52:*25*  53:*3, 4, 6, 7, 12,*
13, 16, 19  54:*2, 4, 12, 17,*
23  55:*5, 6, 15, 18*  56:*20*
57:*5, 7*  58:*11*  59:*3, 8*
60:*1, 14, 23*  61:*17, 25*
62:*1, 4, 9, 17, 19*  63:*5, 14*
64:*1, 17*  67:*17, 23*  68:*2,*
4  69:*20*  70:*4*  71:*1*  74:*9,*
18  75:*1, 20, 21, 24*  76:*15*
77:*2, 10, 24*  78:*9*  79:*22*
80:*7, 8, 16*  81:*5, 16*  82:*2*
83:*4, 6*  86:*5*  87:*14*  88:*2,*
25  89:*20*  94:*24*  95:*17,*
23  96:*19, 20, 23*  97:*20,*
23  98:*4*  99:*6, 21*  100:*8,*
13  101:*15*  102:*2, 3*
104:*4, 9, 17, 18, 21*  106:*7,*
10, 14  107:*2, 20*  108:*4*
114:*25*  119:*11*  122:*8, 17*
123:*4, 5, 14, 19*  124:*3*
125:*4*  127:*19, 24*  128:*1,*
10  131:*24*  132:*22*
135:*19*  136:*7, 19*  147:*1,*
13, 17, 22  148:*2*  153:*17*
155:*3, 8, 10, 16, 20, 23*
156:*2, 15*  170:*24*  174:*21*
185:*5, 7, 9, 12, 17, 20*
186:*1*  188:*23*  189:*4*
190:*7, 17*  192:*21, 22, 23*
193:*5, 22*  207:*20, 24*
209:*9*  210:*10, 17, 25*
212:*11, 17, 22*  214:*9, 17,*
22  215:*1, 5, 16*  217:*24*
218:*23*  219:*10*  220:*11*
221:*6, 18*  222:*3, 8, 17*
225:*20*  226:*11*  229:*8, 12,*
13, 24  230:*3, 7, 12, 21, 25*
231:*7*  232:*3, 22*  233:*1,*
25  234:*9*  236:*11, 15*

240:*11*
Luisa  97:*13*
lunch  93:*14*  101:*8*
116:*21*  117:*4*
lying  34:*17, 20*

< M >
MACHINE  4:6  92:*7, 8*
machines  37:*19, 24*
112:*18, 23*
main  32:*23*  139:*13*
maintain  33:6  51:*2, 5*
106:*4*  121:*19*  160:*19*
175:*11*  221:*22*
maintaining  51:*3*
maintenance  215:*24*
230:*11*
making  21:*21*  53:*20, 24*
155:*16*  160:*5*  163:*9*
219:*6*
manage  32:*14*  33:*7*
35:*6*  90:*1*
managed  24:*9*  28:*15*
57:*18*
management  100:*21*
200:*21*
manager  111:*23*
Manna  111:*23*  191:*2*
manner  56:*25*  114:*16*
145:*2*  151:*6*  156:*8*
187:*7*  204:*22*  229:*19*
237:*1*
manually  208:*23*
manuals  30:*9*
map  82:*1*
Marc  103:*3*
Marietta  8:*20*
Mark  190:*20, 25*  191:*2,*
4, 16
MARKED  3:*15*  15:*11*
19:*9*  38:*16*  40:*13*  45:*9*
47:*6*  48:*21*  52:*3*  58:*16*
64:*15*  68:*7*  73:*6*  76:*1*
92:*3*  94:*1*  95:*10*  97:*2*
98:*23*  100:*2*  102:*5*
103:*11*  105:*11*  109:*21*
110:*10*  111:*17*  117:*12*
118:*3*  119:*5, 17, 22*
152:*16*  161:*7*  166:*1*
177:*12*  181:*24*  186:*3*
189:*22*  194:*17*  198:*4*
199:*25*  232:*7*  234:*18*
market  19:*3, 4*  20:*7*
67:*14*  149:*8, 13, 21*
150:*20*  152:*12*  221:*4*
marketed  20:*11*  67:*13*
marketing  14:*14*  42:*5*
81:*6, 10, 12*  137:*14, 19*
138:*10, 12*  207:*20*

marketplace  209:*3*
markets  71:*6, 10*  228:*25*
marriage  240:*17*
massive  188:*14*
master  66:*24*
material  138:*18*
materials  24:*4*  42:*5*
88:*13*  137:*12, 18*  139:*1*
140:*1, 8, 9, 12*  146:*4, 11*
Matt  43:*22*  166:*14*
196:*9, 13*
matter  6:*4*  19:*4*  99:*16*
240:*10*
matters  208:*24*
MAYES  2:*4*  3:*5, 7*  6:*10*
7:*1*  15:*12*  16:*1, 4*  18:*24*
19:*10*  20:*13*  26:*16*
28:*10*  29:*1, 7, 18*  31:*11*
33:*17*  34:*6, 16, 23*  37:*22*
38:*17*  40:*3, 14*  42:*6, 23*
43:*9*  45:*10*  46:*19*  47:*7*
48:*8, 22*  49:*16, 22*  52:*4*
53:*15*  54:*8, 15, 22*  56:*4,*
10  58:*17*  59:*12*  63:*20*
64:*16*  65:*4, 7, 25*  66:*6,*
16  67:*3, 15, 22*  68:*8, 19,*
21, 23  69:*5, 7*  70:*9, 14,*
15  71:*15*  72:*8*  73:*8*
76:*2*  77:*7, 22*  78:*8, 16,*
18, 22  79:*5, 13, 21*  80:*2,*
12  81:*18*  82:*25*  83:*14*
84:*3, 15*  85:*6, 22, 25*
86:*2, 9, 13*  88:*23*  89:*5,*
15  90:*4, 13, 24*  91:*11, 19*
92:*4, 24*  93:*11, 18*  94:*2*
95:*11*  96:*21*  97:*3*  98:*1,*
24  100:*3, 25*  101:*7, 12,*
13, 25  102:*6*  103:*12*
105:*1, 12*  106:*12*  107:*4,*
11, 25  108:*6*  109:*3, 10,*
16, 22  110:*11, 21, 23*
111:*4, 11, 18*  113:*7*
114:*8, 20*  116:*21, 24*
117:*3*  118:*4*  119:*6, 18,*
23  120:*14, 18, 21*  121:*9,*
10  122:*15*  123:*9*  124:*13,*
22  125:*14, 15, 20, 25*
127:*2*  128:*6*  129:*2*
130:*14*  131:*8, 21*  132:*2,*
10, 18  135:*16, 23*  136:*3,*
13, 24  139:*24*  143:*22*
145:*20*  146:*3*  148:*6*
149:*25*  151:*4, 19*  152:*17*
156:*14, 21*  159:*18, 25*
161:*2, 8*  162:*2*  164:*7, 13*
166:*2*  177:*13*  181:*19, 25*
184:*9*  186:*4*  189:*23*
193:*3, 14*  194:*3, 9, 12, 18*
198:*5*  200:*1*  206:*20*
211:*3, 9*  212:*15, 23*
213:*5, 13, 20*  214:*14, 20*

215:25  226:7, *14, 20*
231:*10, 13, 15, 22*  232:8
233:*16*  234:6, *14, 19*
235:22  236:*19*  237:*5, 11,
25*  238:*3, 7, 10, 13*
239:*14*
**MBA**  9:*8*
**McManus**  111:22  191:6
**mean**  11:22  17:7, *17*
18:*3, 10*  19:2  20:*19*
22:*13*  23:9  28:*11, 12*
29:6, *21*  30:*17, 25*  31:22
39:*19*  40:9  41:25  42:*3,
19*  43:5  44:5  46:*4*
49:*17*  50:*11*  53:*16*
56:20  64:*12, 17*  67:*10*
69:20  71:9, *16, 17*  72:*3,
4*  73:9  75:*3*  80:*14*  81:9
84:8, *16*  85:22  90:*23, 25*
95:*20*  97:22  98:2  101:*1*
106:*3*  114:6  130:*24*
140:*5*  144:7, 20  145:*25*
152:7  154:*21*  155:*20*
156:9  158:6  162:*13*
163:*10*  170:9  173:9
175:8  178:*3*  180:*11*
181:*4, 22*  182:*17*  184:*14*
188:6  192:*17*  202:*8*
203:*16*  207:20  208:25
209:*8*  215:*18*  217:6
224:*21*  225:5  228:*1*
230:*19*
**meaning**  28:*8*  45:6
**means**  77:*15, 24*  175:*3*
186:*23*
**meant**  45:*1*  54:9  71:*18*
87:*13*  110:2*1*  113:*17*
154:*16, 17*  159:*19*  202:5
**mechanically**  183:*3*
**mechanism**  179:*17*
**medication**  8:*9*
**meet**  62:*24*  175:*18*
**meeting**  42:*14*  71:5
72:*13*  74:*21, 23*  75:*11*
80:*24*  81:*16*  102:*23*
148:*16*  167:*10*  175:*17,
18, 24*  177:5  190:*22*
198:*19, 21*  217:22  218:*2,
5, 10, 14, 16, 21, 22*  220:*3*
**meetings**  75:*8*  98:5
103:*1*  119:*1*  217:*20*
**member**  153:*10*  168:*3*
**members**  17:*18*  99:*12*
102:*25*
**memory**  120:*9*  196:*23*
**MENKEE**  2:*17*
**mention**  104:*18*  203:*25*
**mentioned**  57:*15, 24*
58:*4*  64:*20*  68:*17*  69:*1*
72:*25*  80:*19, 22*  144:*13*

145:*1*  205:*1*  207:*16*
211:*13*  227:*24*
**mentioning**  203:*23*
**message**  150:*16*
**messages**  14:7  15:2
**met**  15:22
**method**  89:*25*  171:*10*
181:6  183:*20*  205:*14*
**methods**  162:*15*
**Michael**  41:9  43:*17*
188:*15*
**Michigan**  157:*13*
**mid-November**  180:*3*
**migrated**  111:6
**migration**  178:*21*
**Mike**  25:22, *24*  26:3, 7,
*10*
**million**  171:*20*
**mind**  29:*24*  98:7
116:*23*  121:*23*  147:*12*
148:*17*  210:*24*  213:9
229:*20*
**minute**  58:22  64:*20*
115:*12*  134:*18*
**minutes**  93:*13*
**misappropriated**  122:*8,
17*  123:*4, 5, 15, 19*  124:*3*
125:*4*  135:20  136:7, *19*
225:*20*  232:*3*  233:*25*
234:*9*
**misappropriating**  60:*14,
24*  218:*24*  220:*12*  221:7
**misappropriation**  76:*15*
77:*2, 10*  226:*18*
**missed**  68:*20*
**misspoke**  12:*11*
**misstates**  236:*18*
**mistake**  237:*13*
**mistaken**  26:5
**misunderstanding**  104:*8*
**mix**  229:*4*
**Modder**  142:*2, 5, 8, 16*
143:*18, 24*
**model**  65:*1, 15, 21*  66:*8,
19*  78:*10*  88:*3, 5, 8*
90:20  91:*14*  168:22
169:5
**models**  211:*20, 23, 25*
**modified**  230:*14*
**modifying**  25:*10*
**module**  21:*4*  87:*5, 14*
88:*3*  203:2
**modules**  19:*1*  21:24
151:*12*  203:*3*
**Monday**  102:*23*  177:22
**months**  22:*11*  45:*19*
165:*11*  190:*13*  228:*9*
**morning**  7:2  166:*15*
**mornings**  102:*23*
**motion**  116:6, *7, 12*
**motivation**  184:*10*

**move**  158:9  168:22
169:*4*  181:*14*  183:*10, 17,
20, 21*  185:*1*
**moved**  10:*19*  113:*19*
165:*13*  178:*16, 19*
**moving**  182:*20*
**multiple**  10:2  19:6
187:*1*
**multi-release**  225:*14*
**municipals**  229:2
**mutually**  175:*20, 21*

< N >
**name**  7:2  14:*15*  36:6
46:5  55:*23*  83:*19*  84:*10*
157:*18*  186:*14, 15, 16*
197:*25*
**named**  15:8  31:*25*
83:22  193:*15*  197:*24*
223:*15*
**names**  6:8  31:*18, 23*
83:9  84:*17, 18, 21*
203:*11, 18*
**naming**  84:5
**Nathaniel**  161:*12*
179:*11*  181:5
**natural**  7:*14*
**Neal**  103:*3*  196:5
**near**  116:*18*
**necessarily**  28:7  107:9
145:*17*  235:*25*
**necessary**  86:6, *15*
183:*10*
**need**  7:*20*  18:*14*  45:6
85:*14*  91:9  94:*12*
108:*16*  112:*5, 8*  113:*25*
124:*13*  125:*12*  131:*3, 10*
183:*20*
**needed**  21:5  22:*17*
50:*15*  109:8  160:6
178:*10*  189:*17*  193:9
206:*10*
**needs**  18:*12*  34:*10*
183:*17*
**negotiating**  182:*4*
**negotiations**  17:*20*
**never**  23:*4*  27:5  28:*19*
33:22  37:*14*  85:8  236:9
**new**  23:*1*  26:8, *10*  39:*3*
57:6  71:22  72:5  137:*1*
149:*15, 18*  151:*12*  164:8
168:20  170:*18*
**NextEra**  51:23  59:*23*
74:*10*  219:8, 9, 11, 16, 22
220:*11*
**NextEra/Florida**  51:*19*
**NextEra/FPL**  59:*14*
**Nguyen**  46:5, 6, *13*
191:9  193:5
**non-disclosure**  25:*24*
26:*1, 4, 13, 25*  27:6, *10,*

*17, 23*  32:*10, 17, 22, 24*
33:2, *10*  154:*1*  194:*1*
211:*16*
**non-PowerPlan**  24:22
**North**  175:*3*  201:2*1*
229:*1*
**NORTHERN**  1:2
**Northwestern**  9:*10*
**note**  112:*3*  177:*24*
**notes**  179:*20*  180:*24*
**noteworthy**  48:*9*
**notice**  15:*17*
**November**  71:5
**NRG**  198:*20, 25*  199:7,
*18, 23*  201:*24*  202:*10, 15*
**number**  8:*21*  18:*15*
73:*19*  74:5  77:*14, 24*
78:*16*  81:5, *24*  87:*3*
121:*11*  122:*24*  125:5, *17*
126:7  130:9, *21*  133:*1*
134:*12, 16, 25*  136:5
137:6  146:*12*  166:*11*
170:2
**numbered**  81:5  87:*20*
131:*16*  134:*18*
**numbering**  121:*4*
**numbers**  78:*15*  133:2
**numerous**  174:*17*
**NW**  1:*16*  2:5

< O >
**O.G.G.A**  239:*17*
**object**  99:*20*  114:9
226:7, *14, 20*
**Objection**  18:*19*  20:8
26:6  28:*4, 22*  31:8
33:*12, 25*  34:*12, 19*
37:20  39:*24*  41:22
42:*18*  43:*4*  46:*15*  47:2
48:*1, 18*  49:*13*  53:9
54:6, *11, 20*  59:9  63:*17*
65:*23*  66:*3, 25*  67:6, *18*
69:*2*  70:6  71:*11*  72:*2*
77:5, *16*  78:*1*  79:*1, 11,
19, 22, 24, 25*  80:5, *9*
82:20  83:*11, 25*  84:7, *24*
85:*17*  88:20  89:*1, 13, 23*
90:9, *21*  91:*4, 15*  92:*21*
93:8  96:*17*  97:*24*  98:*20*
100:*23*  101:20  104:22
106:8, *25*  107:8, *24*
108:*24*  109:6, *13*  110:20
111:*1, 8*  113:5  114:5, *17*
123:7  124:*10*  125:*11, 12,
19*  126:22  130:*11*  131:5,
*18, 25*  132:7, *14*  135:*10,
21*  136:*1, 8, 20*  139:*19*
143:20  145:*13, 23*
149:22  151:*1, 16*  152:*13*
156:*11, 18*  159:*14, 22*
160:24  161:22  181:*16*

184:7 193:1, 8 206:18
212:13, 19 213:1, 10, 17
214:10, 18 233:10 234:4,
11 235:19 236:18, 24
237:9
**objections** 29:5, 11
123:11
**objective** 101:24
**obligation** 74:8
**obligations** 31:16 96:1
221:25 230:9, 17
**obviously** 17:17 21:18
25:13 32:1
**occur** 114:12
**occurred** 38:15 213:4
**October** 58:25 123:14
177:18 214:22 215:4
**offer** 18:17 181:1
193:22, 24 204:15
**offered** 192:24 193:21
**offering** 41:15 50:14
80:7 156:16 192:24
193:6 204:23 207:4
212:4, 7 216:24
**offerings** 67:23 68:2
184:17 215:5 232:18
233:2
**offers** 24:24 204:2, 12,
13, 14
**office** 81:17
**officer** 197:12, 18
**official** 47:19
**oftentimes** 56:24
**Oh** 120:18 202:5 213:6
225:5 238:8
**OHIO** 2:12
**oil** 229:2
**Okay** 7:8, 10, 18, 19, 22,
23, 25 8:1, 4, 5 9:22
10:16 11:16 12:7, 15, 20
13:6, 19 14:16 15:13, 16,
20 16:14, 23 17:2, 6, 9,
12, 22 18:25 19:21
20:18, 24 21:14, 23 22:8,
12, 16, 22 23:4, 22 24:2
25:9 26:3, 22 27:5
28:16 29:2, 8 30:11, 15
31:4 32:9 35:11 36:23
37:7, 14 39:13, 17, 21
40:4, 11, 15, 24 41:2, 3, 8,
10, 17 42:7, 24 44:6
45:11, 14, 19 46:2 47:8,
11, 18 49:11, 17, 21, 24
50:13, 17, 22 51:24 52:5,
8, 10, 14, 20, 25 53:5
54:9, 23 55:3 57:3, 9
58:10 59:2, 6, 13 60:17,
20, 22 61:1, 8 62:18
63:21 64:22 65:10, 15,
19 66:17 68:9, 12, 20
69:5, 8, 12, 14, 18 70:10,

19, 22 71:3, 20 72:12, 25
73:15, 18, 23 74:4, 15
75:6, 16 76:3, 6, 20 77:1,
21 78:5, 9, 19 79:6, 14
80:13, 20 81:4, 24 82:13
83:4, 8, 18, 22 84:4, 21
85:7, 10, 11, 16, 22 86:11
87:1, 8, 12 88:1, 11 89:9,
16, 19 91:12 92:10, 15
93:4 94:7, 10, 15, 19, 23
95:2, 5, 7, 19 96:3, 6, 13
97:8, 18 98:15, 19 99:4,
9, 12, 20 100:8, 15, 20
101:1, 4, 7 102:1, 7, 11,
18 103:8, 16 104:1, 7, 11,
15, 19 105:2, 9, 13, 16, 20
106:19 107:12, 16
108:12 110:2, 12, 16, 18
111:5, 12, 22 112:16
113:22 114:4, 13, 21
115:12 116:9, 15, 21, 25
117:2, 16 118:5, 11, 21
119:1, 7, 10, 19 120:7, 25
121:15, 17, 24 122:3, 6, 7
123:1, 2, 18 124:18, 23
125:14 126:1, 5, 6 127:3,
11, 17, 18, 21 128:7, 13,
17, 22 129:3, 6, 9 130:20
131:15, 22 132:3, 19, 24
133:7, 11, 16, 20 134:3, 5,
9, 12, 15, 16, 22 135:5, 17,
24 136:4, 14, 25 137:7,
12 138:4, 11, 20 140:18,
22 141:3, 9, 12, 15, 19
142:7, 15, 18, 22 143:3, 7,
15 144:6, 15, 19 145:3,
21 146:4, 7, 19, 21 147:3,
13, 16, 23, 25 148:10, 14
149:1, 3, 6 150:1, 9, 14,
18 151:5, 9, 15 152:10,
20, 21 153:4, 11, 16, 19,
22 154:5 155:3, 7
156:15, 22 157:1, 7, 18
158:8, 13, 16, 19 159:1
160:17 161:9, 12 162:3,
8, 22, 25 163:3, 10 164:9
165:9 166:3, 6, 12 167:2,
6, 10, 14, 20 168:5, 10, 17,
20, 25 169:3, 7, 18, 23
170:1, 9, 16, 21 171:6, 15,
18 172:4, 12, 16, 18, 23
173:4, 8, 14, 20, 24 174:4,
8, 15, 21, 24 175:5, 13
176:18, 24 177:7, 14, 16,
17, 23 178:3, 11, 16, 21
179:2, 7, 10, 19 180:1, 13,
19, 22 181:20 182:1, 4, 7,
12, 17 183:24 184:3, 22
185:13, 15, 23 186:5, 9,
16, 18, 23 187:9, 13, 16
188:2, 6, 9, 13, 18 189:5,

10, 15 190:15, 19 191:3,
8, 13, 15, 16 192:1, 7, 11,
12, 17, 22 193:21, 25
194:6, 19 195:2, 12, 17,
21 196:1, 11, 14, 17, 21
197:3, 10, 23 198:1, 6, 19
199:7, 10, 17, 22 200:2, 5,
17, 22 201:7, 9, 17, 22
202:8, 14, 20 203:10, 14,
21 204:1, 4, 18 205:17,
23 206:6 207:10, 16
208:9, 11, 14 209:4, 15
210:23 211:5, 13, 24
212:4, 7, 10 213:25
214:21 215:8, 13, 16, 20,
25 216:2, 10, 17, 20, 23
217:3, 10, 15 218:1, 4, 7,
10, 14, 16 219:2, 5, 8, 12,
16, 22 220:2, 5, 10, 18, 23
221:2, 17, 21, 25 222:2, 6,
11, 14, 25 223:6, 13, 20,
24 224:2, 7, 10 225:11
226:9 227:1, 5, 12, 16, 24
228:5, 16 230:3 231:10,
11, 14 232:13, 21 233:4,
7, 20, 23 234:15 235:8,
23 236:1, 5, 23 237:6, 12,
16, 22 238:4, 8, 16
**old** 26:9 151:11
**on-boarded** 23:11
**on-boarding** 21:8 23:2
27:21
**once** 13:3 17:17 70:3
114:25
**ones** 121:25 145:4
147:3 172:12
**one-sentence** 192:2
**ongoing** 136:10, 12
183:12, 17 210:20
221:19 222:4 225:8
228:2, 8
**on-premise** 25:14
157:16, 17 170:5 177:25
178:4, 13 179:4 181:14
184:19 185:1 191:10
**on-premises** 157:14
158:9, 13 160:10 165:3
**open** 91:21, 23, 25 92:15
93:5 217:12, 16
**operated** 227:9
**operating** 91:13 144:8
197:12, 18
**operations** 11:18 25:3
57:20
**opinion** 188:10
**opportunities** 19:24
146:25 151:22 171:23
172:7, 13
**opportunity** 49:8 50:23
51:10 52:16 53:6 54:1,
10, 17 56:20, 24 98:12

128:14 154:15, 23, 24
171:19, 25 191:17
**opportunity-based** 172:2
**opposed** 213:8
**ops** 171:19
**option** 98:17 163:4, 7
**options** 162:21 163:16
165:21, 22 168:13 169:3
170:18 177:3 178:9
179:5 185:2 191:24
192:24
**Oracle** 171:15, 17 218:18
**oral** 7:20 30:22
**order** 18:18 27:14 37:3
50:8 91:14 108:13
116:12, 16 138:2 156:2
183:1 206:13 237:7
238:5, 7, 8
**ordered** 128:18, 23
**organization** 10:20
57:18, 19, 20 201:10
223:21
**organizations** 168:2
**organize** 84:9 131:12
**organized** 31:22 32:2
**original** 55:23 118:23
215:15
**outcome** 240:19
**outside** 61:11 100:14, 15,
19 115:24 116:3 183:22
226:11
**overall** 22:6 80:14
84:11 162:11 175:11
217:1
**owned** 207:11
**owner** 20:14 28:1, 6, 8
137:15
**owners** 137:17

**< P >**
**p.m** 93:17 124:21
164:12 177:22 194:6, 8
211:5, 8 216:3, 5 231:18,
20 238:20
**P-188** 3:16
**P-189** 3:17
**P-190** 3:18
**P-191** 3:19
**P-192** 3:20
**p-193** 3:21
**P-194** 3:22
**P-195** 3:23
**P-196** 3:24
**P-197** 3:25
**P-198** 4:1
**P-199** 4:2
**P-200** 4:3
**P-201** 4:4
**P-202** 4:5
**P-203** 4:8

P-204 4:9
P-205 4:10
P-206 4:11
P-207 4:12
P-208 4:13
P-209 4:14
P-210 4:15
P-211 4:16
P-212 4:17
P-213 4:18
P-214 4:19
P-215 4:21
P-216 4:22
P-217 4:23
P-218 4:24
P-219 4:25
P-220 5:1
P-221 5:2
P-222 5:3
P-223 5:4
P-224 5:5
P-225 5:6
P-226 5:7
P-227 5:8
P-228 5:9
P-229 5:10
P-230 5:11
P-231 5:12
P-232 5:13
P-233 5:14
PAGE 3:3, 15 38:24
43:21 46:3 47:14, 15
49:5, 24 68:15, 18, 19, 24
69:9, 23 73:18, 24 74:4,
6 76:14, 24 77:8, 9
78:17 81:4 82:7, 11, 13
84:17, 22 86:8, 9, 10, 24
87:9, 10, 19, 21, 23 92:10,
12 94:10 97:12 105:24
120:22 121:4, 5, 8, 12
122:4, 24 126:2 129:12,
14, 20, 24 130:7 133:2, 3
134:13 140:18 148:15
153:2 154:5, 6 155:11,
15, 16 166:8 174:8
176:12 177:20 179:10
180:12 186:10 198:13
200:7 216:17 235:2
pages 40:22 87:8
127:13 240:13
paid 13:17
paragraph 19:21 46:3
49:5 64:25 65:4, 5
73:24 74:5 81:24 82:11,
15 87:15, 24 92:13, 14
94:11, 15 121:11, 21
122:1, 3, 4, 18 127:20
129:24 130:7 137:8, 9
151:7, 9 166:13 167:20
179:20 186:10 189:15,
16 232:13 235:1, 4

paragraphs 121:4
127:12, 15, 17 130:2, 16
parallel 228:17
Park 103:4 196:6, 19, 24
Parkwood 8:18
part 23:16 29:14 30:10
31:24 33:15 51:4 74:20
75:13, 18 80:17 85:19
87:2 104:12 109:17
110:19, 25 112:1 115:9,
15 117:17 125:6, 18
149:19 161:15 171:12
195:3 202:20 212:2, 24
216:24 219:8 220:15
222:4, 7, 18 225:25
230:6, 23 233:18, 20
participate 103:1, 6
115:16, 19 218:1 220:19,
24
participated 74:15
218:4 219:18, 22 220:2
participating 115:17
particular 11:7 13:4
16:21 18:22 28:9, 20
29:9 52:19 58:6 142:1
189:19 203:2
particularity 128:19
particularly 48:9 58:9
parties 6:8 11:9 24:5,
10 64:5 66:14 98:8, 12,
14, 15 113:23 159:5, 8,
17 161:19 165:21
178:25 208:21 240:18
partner 165:22, 25
169:8, 12, 24 173:5
174:9, 13 175:14 176:25
177:9 181:21
partners 47:21 169:12,
14, 15
parts 217:4
party 69:19 70:23
195:6 232:15, 21
passage 178:6
passing 162:9
password-protected
139:15
Pat 17:23 28:14
Patel 200:6, 9
path 175:21
PATTON 2:10 6:12
Paul 43:22 166:6, 10
176:13, 16, 17 177:7
payable 13:18
Pearch 57:19
Pelling 17:23
Peninsula 157:10, 12
people 15:8 16:24 22:5,
9, 22 30:17 45:21 57:15,
16 58:3, 8 91:12, 18
103:8 138:10, 22 143:4
146:15 150:2, 19, 21, 24,

25 151:10 152:4 167:22
199:23 201:4 228:12
perceive 168:21 169:4
percent 21:7 49:25
50:8, 20 51:15 235:13,
16
perception 150:19
Perfect 238:12
perform 25:3, 4 57:7
163:23
performance 224:25
performed 66:11 178:10
performing 227:5 230:20
period 28:3 119:2
141:5, 9
permissions 183:7
permit 60:1 64:5
230:25
permitted 63:25 93:5
124:14 182:23
perpetual 170:10
Persinger 137:24 140:1,
2, 19 141:24 142:12
person 13:4 28:8, 12
43:18 49:22 196:18
199:12 223:24 224:21
personally 21:25 22:25
60:8, 18 136:25 148:4
160:21 185:13 199:20,
22 218:1, 23 223:1
225:24 229:18
personally-owned 142:11
143:18, 25
Persons 133:13 137:9
perspective 34:2 39:10
49:8 51:3, 10 61:22
90:3 108:14 112:11, 25
165:20 229:11
pertain 128:5
ph 12:20 13:6, 19 14:1,
18 17:23 25:22 26:22
33:18 42:8 43:22, 23
46:5 57:19, 20 61:3, 5, 6,
14, 15 111:22, 23 137:24
142:2 161:12 170:2
180:25 186:12 196:5
197:24 200:5, 17 224:22
Philip 52:21
phone 7:7 8:21 68:16
69:1, 4 96:16 105:5, 7
112:5, 8 115:13, 16, 17,
19 133:21 137:13 139:2
219:11, 12
phrase 17:25 42:3
201:18
phrased 99:19 155:19
physical 181:1
pie 163:5
piece 130:10, 23 131:14,
16 145:10

pieces 130:4, 16
pipeline 205:13
pipelines 208:12, 15
place 66:14 88:14
93:10 101:6, 23 195:23
206:7 209:21, 22
PLAINTIFF 1:7 2:3
Plaintiff's 15:11 19:9
38:16 40:13 45:9 47:6
48:21 52:3 58:16 64:15
68:7 73:6 76:1 92:3
94:1 95:10 97:2 98:23
100:2 102:5 103:11
105:11 109:21 110:10
111:17 118:3 119:5, 17,
22 120:12 129:1 148:5
152:16 161:7 166:1
177:12 181:24 186:3
189:22 194:7 198:4
199:25 232:7 234:18
plan 97:19, 22, 23 98:3
172:9, 20 184:21 210:16
planned 40:7 114:16
planning 171:14 176:25
plans 171:20 176:13
plant 17:25 18:6, 9, 16,
25 19:6, 16, 22, 25 46:14
201:4, 6
platform 151:12 170:18
201:11 217:1, 5
play 107:16, 19
players 71:22
plea 240:15
please 6:8 7:15, 24
56:11 123:8 133:8
177:24 238:17
point 18:17, 20 19:5
22:2 31:5 40:6 50:13
55:18 58:10 59:6, 7
62:15 63:10 66:21
67:24 94:23 101:14
109:11 119:11 127:4
128:17 129:21 142:22
149:16 155:20 157:14,
24 159:11 165:2, 9
166:24 170:15, 17
176:24 177:10 178:13,
16 217:22 229:24
points 130:24 158:12
225:19, 25
policies 138:25 139:8
143:8, 19 144:4, 7
146:16 159:15 162:14
policy 178:25
politics 105:25 106:3
107:23 108:1
pool 172:19
portal 139:15
portion 121:3
posed 39:23 156:23

position  90:15, 18, 25
112:25  113:2, 8  132:20
150:13  159:12  166:16
167:21  210:16, 19
223:25  231:7
positioned  81:16
positive  106:4
possibility  100:13
possible  43:8  44:14
113:15, 19  133:21  153:6
173:25  237:4
posted  38:11  137:21
138:18, 22  140:12
posting  137:18, 24
139:14, 25  170:10
potential  40:7  43:3
47:4  63:25  71:22  72:5
149:20  155:23  156:6
161:6, 24  167:11  168:10
172:13, 20  174:4  192:23
193:4, 5  204:13  225:20
226:18  229:21, 22
potentially  39:20  42:17
53:12  57:6  90:10  98:8
103:21  104:20  115:8
149:20  155:16  163:12,
14  165:18  174:25  177:9
209:12
Power  42:12  51:19, 25
52:1, 16, 17  54:4, 14, 19
55:3, 7, 15  60:6, 9, 12, 13
61:2, 17  62:4, 12  63:11,
12  157:10  163:19
215:16  218:22
POWERPLAN  1:8  6:4,
13  9:16, 17, 20, 22  10:3,
6, 8, 14, 17  12:22  13:2, 8,
15, 21, 24  14:3, 6, 9, 20
15:1, 8  16:6, 17, 24
17:10, 22, 24  18:1, 5, 17
20:2, 19  21:1, 4, 6, 15
22:2, 19  23:22  24:2, 11,
21, 24  25:7, 9, 11, 25
26:2, 4, 25  27:6, 12  28:2
30:4, 6, 13, 19  31:6  32:6,
10, 16  33:3, 20  35:3, 11,
12, 15, 23, 24  36:15  37:8,
18, 23  38:4  39:8, 18, 20,
21  43:2, 5  44:4, 18
45:24  46:6, 8, 23, 25
47:24  48:16  50:14, 19
51:15, 18  52:15, 18  55:3,
4, 21  57:10, 25  58:11
59:3, 7, 25  60:13, 14, 22,
23, 24  61:4, 10, 22  63:15
64:5, 19  66:1, 21, 23
67:16  70:4, 19  74:8, 10,
13, 16, 18  75:13, 23, 24
78:12  79:15  81:6  82:4
84:18  89:3, 7  90:1, 14,
18  91:8, 20, 21, 25  93:5,

6  94:16  95:22  96:2, 19,
22  97:11  98:11, 19  99:5,
13, 20  100:8, 13, 17, 21
101:14, 16  104:19
105:17, 20  109:17
112:25  113:2, 8  114:15,
25  115:22  116:2, 3, 6, 9
117:9  118:18  119:2, 14
121:18  123:11, 14
126:20  127:5  128:14, 18,
23  129:21  130:8  131:16,
22  132:19  134:23  135:8,
19, 24  136:5, 18  137:13
138:25  139:2  140:13, 22
142:16  143:7, 19  144:3,
11  145:4, 9  146:25
147:8  148:1  149:4, 13
150:25  151:21  152:22
153:24  154:1  155:5, 21,
23  156:1, 2, 5, 22  157:15,
20, 25  158:10, 14, 19
159:4, 12  160:22  161:4,
13, 14, 19  162:19, 23
163:15, 18, 22  164:1, 3
165:18  166:10, 11
167:23  168:1, 4, 5, 14, 21
169:23  170:18  171:24
173:11, 21  174:5  175:6,
11  176:24  177:8, 25
178:5, 18  181:6, 10
182:17, 19, 20, 21, 23
183:1, 5, 9, 10, 22  184:4,
11, 12, 18  185:10, 12, 17,
24  186:1  189:2, 6, 11
191:3, 25  193:19, 25
195:5, 13, 22  196:2, 12,
15, 24  197:5, 15, 23
199:1, 12  200:10, 19
202:11, 15, 18  203:2
204:4  205:4, 5, 24  206:3,
4, 7, 15, 16, 21, 22  209:17
210:11, 15, 17, 25  211:14,
20  212:10, 16, 25  213:15,
19, 21  214:8, 22, 23
215:4, 11  216:21  217:4,
11, 16  218:4  219:2, 6, 17
220:11  221:5, 6, 11, 12
223:14, 22  224:2, 8, 10
225:21  227:2, 9, 24
228:2, 4, 5, 23  229:4, 23,
25  230:5, 24  232:2, 16
233:4, 9  234:1, 21
235:11, 16, 24  236:12
237:1, 22, 23  240:11
PowerPlan-managed
112:20
PowerPlan-owned
112:18  141:4  142:10
143:9, 17
POWERPLAN'S  4:7
17:13  30:23  31:13, 19

35:20  37:4  40:7  55:11
57:25  60:2  64:1  65:1,
19, 20  66:7, 18  71:25
76:15  77:3, 10  78:10
79:7  84:13  87:14  89:4,
10, 11, 18  90:19, 25  91:1,
2, 13, 25  92:7, 20, 22
111:7, 13  114:11  118:8
119:3, 10  126:8, 9, 21
127:24  128:10  130:10,
17, 23  137:13  140:3
141:16  149:12  153:23
154:20  165:3  170:11
178:19  190:21  199:3, 19
201:19  203:23  209:7
211:25  213:7  216:24
217:23  219:9  220:12
221:4  228:21  229:12, 13
230:4, 8  231:7
PowerTax  18:14, 17, 21,
25  19:5  28:2, 17, 20
29:9  33:23  43:14  48:10
145:12, 15, 22  146:1, 2
171:2, 7  188:14, 18
199:8  203:19, 23  204:2,
5, 9, 13, 16, 21  205:2, 18
206:10, 12  207:6, 12, 19
208:2, 17  209:7  211:20
212:5, 8  213:15, 25
214:3, 6  215:21, 23
PowerTax's  209:10
PPL  163:25  164:2, 4, 19,
23, 24  165:2, 6, 12, 15
166:14, 15, 16, 24  167:7,
21  168:6  169:1, 20
170:2  173:16  176:14, 21,
23  177:8, 11, 24  178:4, 9,
12, 13, 16, 19  179:2, 12,
16, 20, 24, 25  180:1, 24
181:8, 13  182:9, 10, 25
184:1  227:3, 6, 14, 19, 25
PPTX  179:13
practice  224:22, 23
pre-dated  59:2
predecessor  150:13
pre-existing  189:12
premature  136:9, 12
premise  112:12
prepare  15:20  104:24
prepared  104:23
preparing  108:20  133:11
PRESENT  2:16  6:8
218:10
presented  122:20
133:18  162:21  191:16,
20  192:13  193:7  199:21
President  10:25  11:1, 21
175:17  236:5
pretty  194:4
prevent  35:12
previous  109:12

previously  26:12  90:8
99:21  107:21  117:12
132:4  165:13  184:1
186:8  206:3  211:13
213:7  216:15
price  18:17, 20  19:5
52:22  212:11
priced  18:25  19:3, 5
49:8  50:23  51:10
pricing  16:22  19:19, 20
primarily  17:23  109:2
167:5  168:3
primary  28:12  229:15
PRINT  4:5
printout  92:6
prior  12:12  27:23
31:12  35:14  37:7, 15
48:4  50:13  68:6  72:4
100:12  129:19  139:25
146:5  163:14  189:3
216:14  221:3
private  141:5  142:24
143:1  145:5
PRIVILEGE  4:19  118:7,
22
privileged  82:24
privileges  183:8
Probably  7:9  93:13
150:20  155:10  202:7
207:23  225:16  236:9
problem  44:23  45:3
89:20  114:4, 7  196:23
problematic  84:21, 23
problems  149:20
procedure  160:7  178:25
procedures  159:15
162:14
process  7:11  13:18
15:23  17:14, 21  23:12
25:12, 16  27:21  50:10
51:22  68:5  72:25  74:15,
18, 20  75:13, 19  79:23
85:19  94:13, 17, 20
105:2  124:7, 15  125:7, 9,
18  144:8  160:12  221:15,
19  226:1, 4, 10  233:18,
21
processes  88:4  90:2
produce  23:23
produced  24:1  37:2, 6,
16  222:18
producing  36:12
product  10:19  17:4, 6, 8
18:5, 6, 9, 11, 23  19:5
28:9  29:16, 17  40:8
42:1, 4  43:14  44:16
47:20  67:13  80:16, 17,
23  81:19  129:7  173:13
184:6  199:18  200:21
201:10  203:18  204:14,

*16, 21* 216:*23* 217:*7, 16, 17* 229:*4, 14*
**production** 16:*17* 136:*22*
**products** 18:*7, 15* 19:*2, 6, 8* 20:*10* 40:*9* 59:*19* 62:*22* 67:*21* 80:*15, 18, 21* 173:*12, 13* 199:*1, 19* 202:*17* 203:*8, 9, 11* 204:*16* 216:*20* 218:*20* 229:*17*
**professional** 9:*11* 12:*5, 10, 13, 14, 16* 66:*5* 158:*1, 21* 159:*4* 163:*15* 223:*21* 228:*4* 235:*12* 236:*8*
**profile** 112:*14*
**program** 101:*15, 16, 19, 21, 24* 102:*16* 108:*7, 9* 109:*17, 20* 110:*7* 111:*6, 14, 25* 113:*14* 114:*15, 19, 25* 115:*9* 117:*9, 18* 146:*24* 147:*14* 148:*3* 165:*19, 23* 169:*8, 12* 173:*6* 174:*9, 14* 175:*14* 177:*1, 9* 181:*21*
**programs** 24:*2* 93:*1* 165:*25*
**prohibit** 156:*2*
**prohibited** 239:*17*
**project** 10:*1* 18:*7, 14* 19:*8, 24* 30:*9* 32:*19, 20, 21* 36:*12, 14, 20, 22* 52:*19* 56:*22, 24* 57:*2, 4* 95:*4, 5* 96:*19* 178:*18* 182:*24* 186:*25* 188:*22* 212:*3* 220:*21* 228:*1, 3, 5, 7, 8, 11, 15*
**project-related** 183:*13*
**projects** 10:*2* 25:*7* 30:*18* 32:*18* 35:*7* 193:*18* 212:*24*
**promote** 174:*1*
**promoting** 39:*12*
**Proof** 181:*1*
**property** 20:*20, 25* 29:*13, 14, 20, 22* 30:*2, 6, 8, 10, 24* 31:*6, 13, 16, 25* 32:*4, 15* 34:*3* 35:*20, 25* 36:*17* 37:*11* 53:*19, 21* 55:*9, 13* 57:*13* 58:*1* 59:*18, 20* 60:*5* 61:*19, 24* 62:*2, 3, 10, 17, 21* 63:*4, 15* 65:*2* 69:*25* 80:*15* 84:*14* 89:*18* 90:*3* 91:*1* 95:*25* 106:*11* 115:*24* 117:*18* 130:*5, 10, 17, 23* 131:*17* 132:*5, 6, 16, 21* 144:*14* 195:*5, 14, 23* 206:*17* 213:*22* 214:*13* 215:*12* 217:*24* 218:*24* 219:*10* 220:*13, 22* 221:*7*

225:*21* 229:*16* 232:*18* 233:*1*
**proposal** 55:*1* 98:*22* 104:*23, 25* 162:*18*
**proposed** 99:*7* 185:*16*
**proprietary** 21:*19* 22:*13* 76:*16* 77:*12* 78:*10* 89:*11* 90:*15* 121:*20* 123:*12* 140:*9* 206:*23* 210:*11* 213:*23*
**prospective** 208:*20*
**protect** 20:*15* 21:*5* 22:*10, 18* 23:*6*
**protected** 21:*11* 22:*24* 34:*11* 123:*13* 127:*24* 128:*10*
**protecting** 53:*25* 58:*1* 144:*13* 217:*23* 219:*9*
**PROTECTION** 4:*13* 20:*16* 67:*11* 101:*15, 16, 19* 102:*12, 14, 16* 104:*12* 108:*7, 9* 109:*8, 17* 110:*6, 19, 25* 111:*6, 14, 25* 112:*5, 8, 11* 114:*15* 115:*9, 13, 15* 117:*9, 18* 146:*24* 147:*14* 148:*3* 156:*1* 210:*16*
**protocol** 159:*16* 160:*7*
**protocols** 159:*8*
**prototype** 145:*8*
**provide** 11:*22* 24:*21, 25* 25:*1* 38:*1* 66:*19* 75:*24* 99:*5, 22, 24* 106:*10* 113:*23* 140:*16* 150:*3* 153:*16* 170:*23* 171:*1* 178:*5* 182:*9, 18* 192:*11* 211:*23* 229:*19* 230:*1* 239:*15*
**provided** 25:*15* 62:*5* 75:*19* 80:*25* 91:*16* 98:*22* 118:*7* 127:*7* 134:*23* 135:*3, 8, 12, 14* 153:*17* 183:*2, 6, 7* 185:*4, 6, 18, 20, 21, 22* 211:*2* 222:*3*
**provider** 168:*11, 13, 22* 169:*5* 170:*22*
**providers** 48:*13, 15* 204:*15*
**providing** 55:*8, 19* 57:*7* 66:*23* 67:*11* 99:*21* 179:*17* 181:*6* 214:*3* 227:*25* 236:*12*
**provision** 66:*8* 211:*17* 230:*4*
**provisions** 66:*14*
**PUBLIC** 2:*11* 126:*16* 128:*4* 141:*7, 11, 12, 16, 23* 142:*10, 24* 143:*17, 25*

**publicly** 40:*1* 100:*18* 131:*24* 132:*11, 20, 22* 142:*19* 143:*4* 146:*11*
**publish** 91:*7*
**pull** 216:*9* 223:*11*
**purchase** 17:*13* 154:*12, 20*
**purchased** 154:*8*
**purchases** 154:*7* 157:*3*
**purported** 31:*13* 75:*4* 77:*1, 10*
**purportedly** 77:*25*
**purposefully** 158:*20* 159:*3*
**purposes** 111:*14* 202:*25*
**pursuant** 1:*12* 15:*17* 38:*3* 74:*18* 211:*24* 227:*6* 239:*7*
**pursue** 163:*1* 176:*25* 177:*8*
**push** 99:*13, 19*
**put** 37:*13* 46:*20, 23* 63:*1* 104:*20* 105:*20, 22* 129:*6* 155:*3* 183:*20* 215:*11* 229:*5*
**putting** 25:*10* 187:*3*
**PWC** 204:*16, 20* 205:*2, 23* 206:*1, 4, 7, 9, 16, 22, 25* 207:*3* 208:*1* 211:*14, 19, 24* 212:*4, 18* 213:*6, 14, 25* 214:*6, 9* 215:*20*
**PWC's** 206:*16, 22*

**< Q >**
**QA** 186:*11*
**qualifiers** 207:*7*
**qualify** 210:*7*
**quality** 150:*3*
**query** 216:*23*
**question** 7:*15, 17* 11:*7* 22:*16* 29:*2* 34:*21* 35:*21* 37:*21* 39:*17* 68:*22* 75:*22* 77:*6, 16, 19, 21* 80:*3, 4, 5* 82:*22* 83:*12, 13* 84:*25* 85:*2, 12* 86:*12* 87:*16* 96:*25* 113:*6, 12* 122:*13* 123:*8, 18* 124:*11* 125:*2, 16, 21* 128:*7, 22* 129:*11* 130:*12* 131:*6* 135:*5* 143:*21* 144:*3* 154:*15, 18* 155:*19* 157:*1* 160:*25* 180:*14* 184:*8, 10* 186:*9* 190:*5, 15, 20* 191:*15* 192:*4, 7, 11, 16* 193:*2, 9* 206:*19* 212:*14* 213:*12* 214:*8* 215:*2* 217:*10* 226:*7, 14, 20* 228:*21* 230:*22*
**questions** 16:*12* 40:*21* 56:*18* 75:*10* 81:*11* 85:*7* 128:*21* 187:*23* 216:*9*

217:*19* 223:*13* 225:*18, 22* 229:*9* 230:*12* 231:*2* 234:*15*
**quick** 7:*11* 180:*2, 9* 190:*20* 211:*3*
**quickly** 167:*22* 169:*11*
**Quintana** 61:*5* 219:*24*
**quote** 168:*14*
**quotes** 49:*25*
**quote-unquote** 217:*12*

**< R >**
**raise** 6:*14*
**raised** 227:*9, 12*
**ramifications** 167:*11*
**range** 223:*23*
**rate-regulated** 205:*12, 13* 207:*5, 8, 11* 208:*14, 15, 18*
**rates** 82:*3* 130:*9, 22, 25* 131:*1, 4, 10* 149:*7, 12*
**RCC** 5:*7* 24:*13, 15, 17, 24* 25:*6, 9* 34:*24* 35:*9, 12, 15* 65:*19* 66:*4, 7, 17, 23* 78:*23* 79:*6* 80:*6* 89:*6* 99:*14, 20, 24* 148:*16* 149:*1, 4, 21* 151:*15, 22* 152:*6, 11* 153:*17* 155:*8* 159:*12, 20* 160:*14, 23* 161:*5, 25* 162:*9, 16, 19, 23* 163:*4, 5, 12, 18, 20, 23, 25* 164:*1, 19, 23* 165:*7, 12, 15* 166:*14, 24* 167:*7* 169:*4, 13* 170:*4, 13, 23* 172:*19, 23, 24, 25* 173:*14, 20* 174:*4* 175:*5, 10, 16, 17* 176:*8* 177:*9* 178:*1, 5, 13, 18* 179:*17* 180:*20, 23, 24* 181:*9* 182:*5, 8, 12, 24* 183:*13, 19, 25* 184:*5* 188:*2, 3, 6, 10* 191:*17, 21, 25* 192:*13, 25* 193:*7, 22* 227:*2, 5, 9, 12* 228:*2, 5* 235:*3, 8, 18, 20, 23* 236:*8*
**RCC's** 66:*22* 178:*22*
**reach** 105:*5* 109:*18* 168:*7*
**reached** 55:*3* 59:*7*
**reaching** 115:*9*
**read** 16:*9, 13* 40:*20* 41:*6, 7* 45:*2, 5, 14* 47:*11* 51:*7* 52:*8* 68:*12* 70:*24* 71:*7, 21* 76:*20* 88:*8, 10* 92:*11* 97:*8* 102:*20* 110:*2* 112:*6, 7* 121:*15* 122:*4, 25* 123:*1* 126:*3, 5* 127:*17* 133:*3* 134:*24* 135:*5* 137:*15* 139:*2* 141:*3, 7* 142:*12, 14* 144:*19* 148:*17* 149:*9, 10*

150:*3*, *21*, *22*   151:*13*, *14*
153:*6*, *12*   154:*8*   162:*11*,
*12*   163:*5*   167:*12*, *13*, *24*
168:*14*, *16*, *22*, *24*   169:*16*
170:*6*, *8*, *19*, *20*   171:*21*
172:*4*, *17*, *21*   173:*3*, *18*,
*19*   174:*2*, *3*, *18*   175:*1*, *6*,
*7*, *22*   176:*14*   177:*17*
178:*1*, *2*   179:*14*   181:*2*
186:*12*, *21*, *22*   188:*4*, *16*
190:*22*   191:*11*, *18*   192:*5*
194:*22*   195:*3*   198:*9*, *21*
199:*13*, *14*   201:*15*, *16*
202:*2*   224:*24*   232:*18*, *20*
235:*14*, *15*
**reading**   1:*13*   69:*6*
133:*8*   202:*11*
**ready**   44:*1*   133:*9*
**real**   7:*10*   42:*25*
**realize**   145:*5*
**really**   30:*25*   190:*15*
201:*13*
**real-time**   202:*1*
**reason**   8:*6*   18:*8*   27:*7*
28:*21*, *25*   29:*3*   33:*24*
34:*17*   48:*7*   52:*20*   53:*10*
71:*4*   75:*6*   86:*20*   92:*19*
109:*4*   112:*10*, *16*   156:*5*
160:*13*, *15*   184:*3*   232:*17*,
*25*   233:*7*   236:*7*
**reasonable**   20:*6*, *15*
134:*11*
**reasons**   91:*6*   147:*17*
160:*16*, *17*
**recall**   21:*2*, *4*, *24*   22:*17*
24:*12*   30:*4*, *16*   31:*9*, *12*,
*16*   36:*1*, *3*, *19*, *23*   38:*14*
40:*12*   46:*20*   48:*19*
50:*13*, *18*   51:*21*, *24*
54:*25*   58:*1*, *5*, *7*   59:*4*, *15*
60:*25*   61:*3*, *5*, *11*, *16*
62:*19*, *23*   63:*10*, *23*   64:*2*,
*7*, *9*, *11*   72:*24*   73:*1*, *3*
75:*17*, *18*, *23*   95:*3*   96:*5*,
*8*, *24*, *25*   98:*21*   99:*15*, *18*
100:*7*   101:*17*   102:*3*
103:*15*   104:*14*   108:*25*
109:*14*, *19*   110:*17*   111:*9*,
*10*, *12*, *16*   115:*1*, *10*, *17*,
*21*, *22*, *25*   116:*17*, *20*
117:*10*, *23*   118:*17*, *25*
119:*9*, *10*, *13*, *15*   120:*8*,
*10*   125:*23*   138:*19*
141:*13*   148:*13*, *25*   149:*2*,
*3*, *5*   150:*12*   151:*2*, *23*
152:*14*   153:*10*   155:*6*
157:*6*, *17*   158:*2*, *11*, *18*
164:*20*   165:*8*   166:*21*, *25*
167:*6*   168:*6*   169:*3*, *6*, *21*
176:*23*   180:*21*   189:*7*, *20*
190:*8*   194:*2*   195:*10*, *11*,

*15*, *19*, *25*   196:*22*   197:*16*,
*25*   200:*16*   203:*11*, *17*
207:*9*   208:*7*, *13*   210:*3*, *5*,
*21*, *22*   216:*16*   217:*12*, *24*
218:*11*, *12*, *13*   219:*14*, *25*
220:*2*, *4*, *10*   221:*15*
223:*15*   224:*11*, *14*   232:*4*,
*6*, *12*   233:*14*   234:*16*, *22*
236:*12*   237:*20*
**re-cases**   203:*1*
**receive**   27:*14*   76:*6*, *11*
91:*10*
**received**   9:*8*   34:*8*   41:*3*
45:*13*, *14*   47:*5*, *12*   68:*13*
75:*13*   78:*4*   81:*14*   85:*1*
94:*7*   97:*9*   125:*8*   137:*1*
140:*2*, *5*   179:*24*, *25*
190:*20*   198:*9*
**receiving**   141:*24*
**recollection**   27:*9*   48:*2*
53:*18*   60:*15*   63:*12*, *18*
67:*7*   81:*15*   99:*4*, *17*
101:*23*   105:*16*   108:*11*
110:*5*   112:*1*   161:*23*
168:*25*   169:*18*   176:*7*
192:*14*   216:*15*   217:*16*
**recommendation**   169:*11*
173:*4*   174:*9*   175:*13*
**recommendations**   169:*7*
**recommended**   114:*23*, *24*
175:*18*   193:*12*
**recommending**   193:*11*
**record**   7:*3*   56:*7*, *9*, *11*
93:*17*   116:*24*, *25*   117:*4*
124:*19*, *21*   164:*10*, *12*, *14*
194:*6*, *8*, *15*   211:*7*   216:*1*,
*3*, *5*, *13*   217:*21*   229:*11*
231:*12*, *17*, *20*   238:*3*, *5*,
*20*   240:*14*
**records**   27:*4*
**RECROSS-**
**EXAMINATION**   3:*7*
**recurring**   171:*20*
**redlines**   185:*21*
**redo**   188:*15*
**reduces**   112:*10*
**Reed**   97:*13*, *16*
**refer**   44:*3*   69:*15*   84:*2*
144:*16*   171:*16*   201:*4*
**reference**   95:*8*   119:*13*,
*15*   152:*7*   190:*22*   194:*21*
**referenced**   27:*18*   82:*14*
102:*1*, *3*   166:*20*   167:*15*
192:*21*
**references**   42:*10*   95:*7*
102:*11*   105:*19*   155:*8*
**referencing**   102:*15*
**referred**   55:*22*   82:*11*
103:*20*   137:*25*   142:*3*
146:*12*   167:*16*   180:*10*,
*11*   217:*11*, *13*, *14*   221:*14*

**referring**   49:*11*   58:*21*
70:*3*   71:*1*   80:*16*   87:*4*
107:*23*   108:*2*   117:*25*
132:*9*   134:*17*   135:*7*
149:*1*   150:*6*, *23*, *24*, *25*
157:*2*   162:*6*   167:*17*
172:*5*   176:*8*   180:*9*
189:*19*   190:*4*   192:*4*
195:*1*, *25*   198:*17*, *24*
201:*3*   202:*23*   205:*25*
217:*16*   232:*22*
**refers**   18:*6*   64:*25*   72:*9*
73:*23*   133:*16*   151:*18*
173:*11*
**refineries**   208:*12*
**reflect**   83:*9*
**reflected**   83:*23*, *24*
142:*12*
**refrain**   74:*8*
**refresh**   99:*4*   105:*16*
110:*5*   168:*25*   169:*18*
176:*7*
**refuse**   157:*24*
**refused**   26:*3*   32:*24*
**refusing**   33:*10*
**regard**   86:*18*
**regarding**   164:*19*
178:*12*   190:*20*   195:*4*, *5*,
*9*, *22*   206:*22*
**registered**   139:*23*
**registrations**   139:*16*
**Regulated**   24:*16*   171:*10*
**regulations**   239:*7*
**regulatory**   201:*24*   202:*1*,
*3*, *6*, *21*, *22*, *23*, *24*, *25*
203:*4*, *9*, *12*
**relate**   15:*3*   148:*10*
**related**   13:*12*   15:*4*
27:*11*   46:*16*   49:*1*   85:*21*
139:*1*   143:*8*   148:*13*
149:*4*   189:*11*   190:*10*
193:*19*   195:*13*   200:*15*
206:*16*   227:*1*, *2*
**relates**   112:*15*   183:*12*
228:*10*
**relationship**   19:*20*   44:*19*
51:*3*, *5*, *14*   55:*15*   106:*5*,
*22*   109:*12*   192:*22*
199:*22*
**relationships**   175:*11*
**relative**   19:*20*   240:*16*
**relatively**   149:*15*, *18*
224:*5*
**relaying**   179:*23*
**release**   33:*9*   47:*19*
186:*19*, *24*   187:*2*   188:*19*
225:*15*, *16*
**released**   33:*3*, *13*
**releases**   187:*1*   225:*17*
**relocated**   142:*9*, *19*, *23*

143:*24*
**relocating**   143:*16*
**remains**   45:*21*
**remediation**   25:*7*   153:*20*
**remember**   8:*3*   14:*17*
21:*16*   23:*13*   36:*10*, *20*
61:*5*, *6*, *13*, *14*   62:*13*
73:*5*   81:*2*   101:*18*
149:*17*, *23*   151:*5*, *8*
167:*9*   176:*10*   177:*3*
197:*21*   203:*13*   225:*21*
231:*1*
**remind**   7:*11*
**reminding**   101:*21*
**repeat**   35:*21*   37:*21*
75:*22*   77:*4*, *6*   80:*4*
86:*12*   87:*16*   113:*6*
122:*13*   123:*8*   130:*12*
131:*6*   143:*21*   154:*18*
160:*25*   164:*25*   184:*8*
206:*19*   212:*14*   213:*11*
230:*6*   234:*5*
**rephrase**   83:*12*   190:*5*
**replace**   96:*23*   206:*10*
**replaced**   199:*1*, *3*
202:*11*   204:*16*
**replacement**   57:*10*
199:*12*, *19*   204:*9*, *13*
**replacing**   104:*20*   215:*21*
**report**   13:*17*   22:*5*, *9*, *22*
197:*5*, *7*, *10*   221:*12*
**reported**   57:*15*   150:*10*
158:*19*   159:*2*   178:*22*
197:*7*   221:*13*   224:*18*
**Reporter**   1:*15*   6:*14*, *17*
7:*12*   239:*11*, *22*   240:*6*,
*25*
**Reporting**   22:*6*   92:*15*
145:*16*   197:*19*   217:*7*, *9*
239:*8*, *15*
**reports**   22:*18*, *23*   23:*5*
92:*16*, *17*, *18*, *25*   196:*9*
216:*23*   217:*8*
**repositories**   126:*17*
144:*21*
**repository**   144:*11*
**represent**   6:*9*   92:*6*
118:*6*   240:*14*
**represented**   232:*3*
**representing**   6:*10*, *11*
171:*20*
**reprimands**   146:*17*
**request**   6:*7*   70:*1*, *4*
82:*24*   83:*3*   95:*13*
106:*15*, *23*   107:*6*   128:*20*
130:*5*, *6*
**requested**   15:*18*   16:*21*
32:*21*   96:*25*   105:*17*, *19*
**requesting**   101:*5*   105:*23*
**requests**   16:*16*   161:*24*

**required** 22:*10*, 22, 24
  23:*6* 33:*6* 38:*8* 86:*18*,
  *20*, *21*
**requirement** 38:*1*
**requirements** 10:*5*
  18:*13* 24:*8*, 9 27:*10*
  88:*6*, *19*, 22 89:*10*, *17*, *21*,
  *25* 90:*6*, *8*
**requires** 162:*10* 228:*19*
**reserved** 1:*14*
**resided** 112:*24*
**resolved** 224:*20* 225:*1*, 2,
  *3*
**resource** 171:*14*
**resources** 44:*15* 66:*15*
  99:*6* 208:*5* 235:*13*, *17*
**resourcing** 108:*14*
**respect** 95:*19*, 22 101:*15*
  123:*25* 137:*9* 152:*6*
  163:*24* 166:*24* 169:*4*
  192:*25* 209:*22* 212:*11*,
  *17* 214:*17* 219:*5* 220:*23*
  222:*20* 224:*19* 225:*3*, *24*
  227:*21*, *23*
**respective** 137:*14*, *17*
**RESPONSE** 4:*21* 37:*2*
  48:*16* 62:*12*, *23*, *24*
  104:*21* 105:*18*, *23*
  120:*17* 122:*23*, 25 123:*4*,
  *10*, *19* 124:*5*, *9* 125:*3*, *5*,
  *10*, *17* 126:*2*, *3*, *7*, *14*
  132:*21* 133:*4*, *9*, *11*, *12*,
  *16* 134:*24* 135:*6* 136:*4*
  137:*2*, *5*, *9* 138:*14*
  140:*19* 143:*10* 146:*12*
  152:*23* 192:*8*, *9* 210:*2*
  223:*2*
**responses** 7:*21* 119:*10*
  123:*3*, *21* 127:*4* 133:*1*
  140:*6* 222:*22*, *25* 223:*3*
**responsibilities** 10:*16*
  201:*11* 221:*22* 228:*14*
**responsibility** 11:*14*
  12:*7* 28:*12* 200:*23*, *25*
**responsible** 10:*18* 11:*10*,
  *13* 188:*21*
**responsive** 16:*20*
**rest** 131:*13* 148:*11*
**restate** 193:*2*
**restriction** 74:*13* 183:*15*
**restrictions** 182:*15*
**result** 55:*14* 95:*23*
  96:*15* 106:*24* 107:*6*, *10*
  114:*10* 146:*10*, *19*, *21*
  179:*2*
**resulted** 82:*18* 181:*9*
**results** 109:*1*
**Resuming** 15:*12* 16:*4*
  18:*24* 19:*10* 20:*13*
  26:*16* 28:*10* 29:*1*, *7*, *18*
  31:*11* 33:*17* 34:*6*, *16*, *23*

37:*22* 38:*17* 40:*3*, *14*
  42:*6*, *23* 43:*9* 45:*10*
  46:*19* 47:*7* 48:*8*, *22*
  49:*16* 52:*4* 53:*15* 54:*8*,
  *15*, *22* 56:*10* 58:*17*
  59:*12* 63:*20* 64:*16* 65:*7*,
  *25* 66:*6*, *16* 67:*3*, *15*, *22*
  68:*8*, *23* 69:*7* 70:*9*, *15*
  71:*15* 72:*8* 73:*8* 76:*2*
  77:*7*, *22* 78:*8*, *22* 79:*5*,
  *13*, *21* 80:*2*, *12* 81:*18*
  82:*25* 83:*14* 84:*3*, *15*
  85:*6* 86:*2*, *13* 88:*23*
  89:*5*, *15* 90:*4*, *13*, *24*
  91:*11*, *19* 92:*4*, *24* 93:*18*
  94:*2* 95:*11* 96:*21* 97:*3*
  98:*1*, *24* 100:*3*, *25*
  101:*13*, *25* 102:*6* 103:*12*
  105:*1*, *12* 106:*12* 107:*4*,
  *11* 108:*6* 109:*3*, *10*, *16*,
  *22* 110:*11*, *23* 111:*4*, *11*,
  *18* 113:*7* 114:*8*, *20*
  117:*3* 118:*4* 119:*6*, *18*,
  *23* 120:*14*, *21* 121:*10*
  122:*15* 123:*9* 124:*22*
  125:*15*, *25* 127:*2* 128:*6*
  129:*2* 130:*14* 131:*8*, *21*
  132:*2*, *10*, *18* 135:*16*, *23*
  136:*3*, *13*, *24* 139:*24*
  143:*22* 145:*20* 146:*3*
  148:*6* 149:*25* 151:*4*, *19*
  152:*17* 156:*14*, *21*
  159:*18*, *25* 161:*2*, *8*
  162:*2* 164:*13* 166:*2*
  177:*13* 181:*19*, *25* 184:*9*
  186:*4* 189:*23* 193:*3*, *14*
  194:*12*, *18* 198:*5* 200:*1*
  206:*20* 211:*9* 212:*15*, *23*
  213:*5*, *13*, *20* 214:*14*, *20*
  226:*8*, *15*, *22* 232:*8*
  233:*16* 234:*6*, *14*, *19*
  235:*22* 236:*19* 237:*5*, *11*
**retained** 147:*17*
**retrieve** 78:*11* 79:*9*
**revealing** 77:*17* 78:*3*
  81:*12*
**revenue** 171:*20* 173:*18*
**review** 23:*12*, *13*, *14*, *16*
  133:*12* 145:*24* 185:*3*
  188:*3*
**reviewed** 16:*11* 41:*2*
  104:*14* 125:*9*
**reviewing** 119:*10* 133:*19*
**revise** 131:*23*
**revised** 185:*25*
**revisions** 185:*16*
**RFP** 46:*20*, 22, *23* 47:*1*,
  *4*, *5*, *18* 48:*12*, *10*, *14*, *16*
  49:*19* 51:*16*, *24*, *25* 52:*2*,
  *11* 152:*23*
**RFPs** 48:*5* 52:*1*

**right** 6:*15* 23:*20* 31:*17*
  34:*18* 56:*3* 88:*11* 93:*19*,
  *23* 94:*3* 101:*12* 116:*24*
  117:*4* 120:*25* 121:*1*
  122:*14* 129:*11* 131:*15*
  156:*10* 164:*9* 189:*6*
  190:*12* 196:*22* 200:*6*, *25*
  225:*9* 231:*9*, *17*
**right-hand** 177:*21*
**risk** 53:*25* 59:*20* 60:*16*
  67:*20* 80:*14* 109:*8*
  112:*10*, *13*, *14* 154:*8*, *12*,
  *14*, *20*, 22 155:*14*, *16*
  156:*22*, *23* 157:*2* 160:*21*
  161:*3*, *6* 174:*4* 236:*15*,
  *25* 237:*3*, *4*, *14*
**risks** 236:*11*
**Rob** 33:*18*, *19* 34:*1*, *3*, *9*,
  *13* 115:*2* 150:*6*, *11*
  232:*10* 233:*4*
**Robbins** 1:*16* 2:*4* 6:*6*, *7*
  74:*22*
**Roger** 52:*21*
**role** 9:*22* 10:*11*, *14*, *20*,
  22 11:*5*, *11*, *16*, *20* 12:*13*,
  *14* 17:*9* 28:*7* 46:*8*
  111:*25* 115:*5* 182:*4*
  200:*20* 226:*16*, *17* 229:*6*
**roles** 10:*16*
**Roper** 194:*24* 195:*22*
  206:*5*, *6*
**rough** 238:*14*, *15*
**roughly** 176:*3*
**Routon** 14:*18* 70:*11*
  103:*3*
**RP** 157:*4*, *6*
**rules** 7:*10* 88:*8* 239:*7*
**Rumor** 43:*9*
**runs** 57:*17*, *18*, *19*, *20*
**rush** 238:*13*, *14*
**Ruth** 153:*5*, *9*

**< S >**
**S/4HANA** 201:*23* 202:*8*
**sabotage** 236:*16*, 22
  237:*6*, *10*
**SAE** 95:*7*
**Sage** 204:*14* 207:*10*, *12*,
  *16*
**sales** 10:*20* 154:*13*, *23*,
  *24* 169:*15* 173:*9*, *10*
  236:*1*
**Sam** 57:*20*, 22
**SAP** 171:*5*, *7*, *15*, *17*
  174:*18* 199:*21* 204:*1*
  205:*19*, *20* 218:*18*
**SAP-based** 171:*4*
**SAP's** 202:*9*
**Sarah** 103:*4* 196:*6*, *19*
**sat** 75:*1*
**satisfied** 225:*6*

**saw** 37:*14* 93:*11* 103:*15*
  105:*18* 112:*3* 115:*12*
  188:*13* 191:*1*
**saying** 89:*9* 93:*4* 104:*8*
  107:*1* 158:*16* 172:*23*
  173:*20* 175:*10* 187:*9*
  220:*11* 229:*21* 236:*21*
**says** 19:*21* 27:*5* 34:*18*
  39:*3*, *4*, *13* 41:*17* 42:*13*,
  *24* 43:*10*, *25* 44:*6* 47:*18*
  49:*5* 50:*6*, 22 51:*7*
  69:*19*, *25* 70:*22* 71:*3*
  72:*16* 81:*5*, *25* 88:*2*
  94:*16*, 22 97:*18*, *22* 98:*3*,
  *7* 102:*18* 105:*24* 107:*17*
  108:*16* 112:*3* 118:*14*
  130:*21* 133:*21* 135:*22*
  136:*11* 137:*12* 138:*24*
  140:*22* 141:*4* 142:*7*
  143:*7* 148:*15* 150:*1*, *18*
  151:*9* 153:*5*, *11* 154:*6*
  155:*10* 162:*3*, *9* 163:*4*
  166:*13* 167:*10*, *20*
  168:*10*, *20* 169:*8* 170:*1*,
  *16* 171:*13*, *18* 172:*4*, *18*
  173:*8*, *14*, *24* 174:*7*, *15*,
  *16*, *24* 175:*5*, *16*, *17*
  176:*13* 177:*24* 179:*11*,
  *20* 180:*1*, *6*, *13*, *24*
  182:*17* 186:*11*, *18*, *23*
  187:*13*, *15*, *19*, *21*, 22
  188:*1*, *2*, *6*, *13*, *17* 189:*16*
  190:*19* 191:*8* 195:*3*
  198:*18* 199:*11* 200:*22*
  201:*13*, *17*, *22* 202:*3*, *10*,
  *21* 232:*14*, *25* 235:*8*
**scenario** 57:*11* 105:*25*
  106:*3*, *6* 107:*23* 108:*1*
**Scheckler** 180:*25*
**scheduled** 22:*20* 166:*15*
**schema** 62:*6* 65:*10*, *14*,
  *17*
**school** 8:*23*, *25*
**scope** 19:*8* 96:*22* 97:*19*
  163:*13*, *17* 220:*21*
**scrap** 120:*19*
**scratch** 88:*6*
**screaming** 235:*9*
**screens** 215:*18*
**scripts** 32:*23* 33:*4*, *7*, *10*
**search** 126:*11*, *13*
**searched** 126:*7*
**second** 49:*24* 65:*5* 69:*9*,
  *15*, *18* 73:*18* 81:*24*
  87:*24* 88:*2* 92:*10*, *12*
  110:*8*, *16* 120:*8*, *10*
  126:*25* 127:*4* 132:*25*
  134:*13* 137:*8* 155:*11*
  184:*22* 189:*16* 195:*3*
  201:*13* 223:*3* 229:*9*

231:15  232:13, 14
secrecy  121:19
secret  20:14  22:24
28:20  29:10, 15  31:21
33:23, 24  34:2, 10  37:12
84:4  100:17  126:20, 24
132:13
secrets  21:6  22:10, 13,
18  23:6  31:20  37:1, 4, 9,
11, 15  60:14, 24  76:16
77:3, 11  118:14, 19, 24
119:3  121:20  123:12
128:18  134:23  135:3, 8,
19  136:6  140:4  195:5,
14, 23  206:17, 23  209:17
210:10  213:22  232:3
234:1, 9
section  76:15, 23  77:1, 8,
13  78:9
secure  183:19, 21
security  23:18  139:17,
21  140:16  159:8
see  7:14  38:25  39:5
41:14, 18, 19  42:8, 14, 25
43:23  44:1, 8  45:22
47:16, 19, 22  49:9, 24
52:23, 24  58:13, 24  65:8
70:1  73:15, 19  75:16
76:16  81:7  82:8  87:10
94:13, 14, 17, 18  95:14
97:13, 20  98:9  103:17
106:1  110:16  116:12
118:9, 10, 15, 21  121:4
123:15, 17  126:8, 11, 13,
17  129:19  133:22
137:10  140:20  145:18,
25  166:17, 18  169:9
172:9  174:8  177:24
179:21  182:13, 15
183:15  185:3, 8, 11, 16,
21  187:3  195:6  198:15
213:6  216:17  223:18
235:3, 6
seeing  46:12  75:17
100:7  110:17  119:9
216:15, 16  232:6, 12
seen  15:14  19:12, 14
27:3, 4  37:7  38:19, 20
40:19  45:12  47:9, 10
48:24  52:6, 7  58:19, 22
68:10, 11  73:12, 14  74:2
76:4, 5  94:6  95:7
97:6, 7  99:2, 3  100:6
102:9, 10  103:14  105:14,
15  109:25  110:1, 13
111:20, 21  117:13, 15
119:8, 20  128:12  129:3,
5, 8, 13, 15, 16  135:2, 7,
12  136:21  148:8, 9
152:19  161:10, 11  166:4,
5  177:15  182:2, 3  186:7,

8  190:1, 2  198:7, 8
199:20  200:3, 4  201:18
210:13  221:9  222:8, 9,
11, 17  232:2, 5, 11
234:12
select  52:18
selected  52:22
sell  19:25  173:21
174:25  236:16  237:8
selling  38:12  42:17, 20
204:20  207:3
Seminole  112:4
send  64:19  91:9  161:20
sending  101:22
senior  111:23  196:18
199:11
sense  20:20  28:11  44:8
154:6  175:3
sensing  150:20
sent  16:16  19:13  34:24
45:17, 18  58:11, 14, 25
63:2  64:24  67:5  76:7,
12, 21  94:8  96:7  97:15
110:3  117:17  179:13
190:17  198:13  214:16,
22  215:3  223:17  234:24
sentence  39:4  42:24
44:6  51:7  56:19  65:8
71:3  87:3  92:11, 14
94:15  98:7  137:8, 10
138:1, 8, 23, 24  140:22
141:3  142:3, 7  143:7
144:15  148:14  149:6
150:1, 7, 18  151:7, 17
152:2  153:11  162:8
166:20  167:10, 16, 20
168:8, 10, 20  171:12, 18
172:17, 18  173:14, 24
174:16  175:5  176:13
186:18  187:13, 19  188:2,
13  189:16  191:8, 15
192:7  194:22  195:3
201:13, 22  202:20  203:5,
21  232:14
sentences  173:20  201:12
separate  162:5  188:18
separated  163:17
September  161:21
177:18, 22
series  181:8  230:22
seriously  43:2
seriousness  39:22
serve  71:7, 10
served  222:23
servers  112:24
service  151:22  154:12
204:15  214:3
services  11:18  12:4, 5, 8,
10, 13, 14, 16  24:21, 24
48:3, 6  49:8, 25  50:14,
19, 23  51:2, 4, 5, 10, 14,

19, 23, 25  55:19  57:18,
20  66:5, 9, 19, 24  67:10,
11  79:3, 20  99:21, 24
111:23  113:24  146:25
148:1  152:5, 12  153:16
154:7, 20, 24  155:4
156:23  157:3, 4, 5  158:1,
21  159:4, 6, 9  160:5, 6
163:16  165:13, 16
168:13  170:4, 11, 13, 22,
23  173:17  174:25  178:6,
8, 10  182:8  184:17
191:2  193:22, 24  209:10
212:4  223:21  227:3, 6,
14, 25  228:4  229:19
230:1  232:16  235:12, 14,
17, 24  236:8, 12  239:15
session  22:21
sessions  21:10  23:1
set  10:5  30:23  31:13
42:14  47:19  52:2  77:2
83:15  120:8, 10  121:25
122:22  123:13  127:4
132:25  146:2  210:16
217:8  223:3  229:22
236:25
sets  31:5  37:3
Setting  21:3  100:11
124:1  128:9  185:24
221:3  237:7
shake  7:21
shaking  153:5, 6
share  43:11  47:24
97:19  108:3  176:14, 21
188:10
shared  71:19  95:3, 4
160:20  176:23  191:23
SHEET................................
........241  3:10
shift  164:24  170:1, 5, 9
171:19, 25  172:1, 24
Shoon  142:2, 5, 7, 15
143:18, 23
short  124:16  192:2
194:4
shortly  94:23  96:10, 11
short-term  189:17
show  87:13  99:11
194:20  215:16
showed  15:22  215:18
showing  122:17  233:25
shown  84:22  86:4  134:6
shows  128:10
SI  24:6
sic  205:1
side  61:4, 12, 14  151:11
219:2, 17, 23
sign  26:4, 9, 10  32:21,
24  33:1, 10
signature  82:7  86:9
87:9  119:25  120:22

signed  26:12, 17, 24
27:5, 13  29:25  34:4
57:5  97:20  155:1
180:19, 23  189:3  205:23
222:25  223:7
significant  156:19, 23
191:9  201:14
significantly  104:12
signing  1:13
similar  10:13  20:6
27:22  36:23  37:3  44:19
56:25  59:19  84:17  87:3,
13  129:20  140:5  153:16
193:24  201:25  202:7
208:1  212:21  233:8
similarities  215:10, 13
similarly  120:7
simply  128:22
simular  163:24
simultaneously  59:19
61:19  227:25
single  135:18  136:15
145:7
sir  120:24  216:11, 13
217:19, 21  218:21
221:14  222:20  225:18
226:23  229:4, 8, 25
230:22  232:4
sit  58:7  75:6  121:24
122:7, 16  127:18, 22
128:8  136:17, 25  152:1
210:5, 8  221:2
site  112:17
situation  58:6  64:11
67:8, 9  204:7  212:20
224:7, 18, 20
six  22:11  187:16
Skip  141:3  153:11
Skipping  138:23
slide  21:24  24:4
slides  21:10, 14
slot  198:20
small  145:7, 10  187:10
188:14
smaller  18:14  105:25
107:17
Smith  138:17
software  10:3, 6  14:23
28:17, 20  29:9  30:8
33:23  38:12  39:9  42:17,
20  45:7  48:3, 6, 7, 13, 15
53:21  55:11  59:21  60:2
61:20, 21  62:10  63:8, 15
64:1, 6  66:23  67:23
68:2, 4  70:5  71:23, 25
74:9, 19  75:1, 4, 5  78:11,
24  79:4  80:8  81:2, 19
83:6  89:4, 7, 21  90:7, 18,
22  91:2, 21  92:25  93:6
111:7, 13  112:24  114:11
128:1, 11  131:3, 9, 10, 11,

*14* 155:*4, 24* 156:*6, 17*
157:*15* 165:*4* 170:*10, 14,*
*22* 171:*1, 3, 4, 5, 7*
173:*15, 21* 174:*1, 5, 6, 22,*
*25* 175:*10* 178:*13, 19*
184:*16* 187:*4* 192:*3, 18*
199:2, *4, 6* 202:23, *24, 25*
203:*23* 204:*8, 20* 205:*17*
207:*3, 17, 20* 208:*20, 22*
210:*11, 25* 212:8 215:5,
*9, 19, 24* 218:*18* 221:*18*
222:*3, 8* 229:22, *23, 24*
230:*4, 15, 20, 21* 231:*1*
232:*16* 234:2, *10* 236:*16*
237:*2, 8*
**software-to-produce**
92:*18*
**sold** 27:*12*
**Sole** 168:*11, 22* 169:*5*
**solely** 183:*16*
**solemnly** 6:*17*
**solution** 43:*25* 44:*13*
45:*7* 173:*17* 181:*14*
184:*13, 19* 189:*17, 18, 20*
191:*10* 199:*12* 204:2, *5,*
*8, 11, 12* 205:*6, 17* 207:*3*
**solutions** 19:*4* 46:*17*
160:22 161:*4* 174:*1, 25*
207:*18* 214:*13* 222:*4*
**somebody** 138:*11*
158:*19* 159:2 196:*20*
221:5, *12*
**someone's** 186:*14*
**somewhat** 149:*20*
**Sorry** 12:*10* 40:7 58:24
64:*18* 65:*3* 68:*18, 20*
71:*12* 76:*9, 18* 78:*14, 16*
88:*13* 103:*13* 110:*21*
154:*18* 163:*19* 194:*10*
203:*15* 205:*10* 215:*1, 2*
220:6 224:*13* 238:*14*
**sort** 20:*24* 21:*4* 24:*3*
27:*17* 154:*1* 170:*23*
187:*3* 188:*23* 192:*24*
206:*3* 212:*10, 17* 228:*17*
229:*5*
**sorts** 23:*22* 24:*23* 34:*4*
**sounds** 56:*3*
**source** 28:2 37:*19, 24*
38:*1, 2, 5* 63:*8* 75:*13, 17*
126:*16* 145:*9* 222:*9*
**SOW** 42:*14, 22* 97:*20*
105:*19, 23* 189:*2*
**SOWs** 29:*25*
**space** 41:*18* 66:*5*
156:*10* 173:*8, 10, 11*
207:*20*
**speak** 218:*14*
**speaking** 24:*17* 125:*12*
141:*25* 198:*20* 201:*20*
**speaks** 78:*1* 84:*24*

**specific** 29:*23* 30:*4, 25*
31:*5, 9, 12, 25* 33:*23*
34:*8* 36:*6, 21* 38:*15*
40:*12* 52:2 54:25 55:*1*
58:*5, 7* 59:*4, 22* 63:*1* 64:*11*
84:*10* 99:*15* 100:*7*
104:*1, 4, 17* 108:*15*
115:*10* 119:*15* 130:*20*
135:*14, 25* 136:*6, 17*
137:*3* 139:*8, 16* 140:*3*
145:*10* 147:*24* 151:*3, 5,*
*8* 152:*7* 157:*1* 158:*2, 18*
162:*17* 163:22 164:*20,*
*21* 169:*21* 171:*3* 172:*5,*
*12* 176:*10* 177:*3* 178:*8*
180:*21* 183:*12* 185:*11*
189:*20* 193:*20* 200:*15*
204:*7* 206:*3* 207:*1*
208:*7* 209:*19* 210:*13*
217:*4, 20* 219:*14* 226:*3*
**specifically** 21:*23* 31:*18*
35:*19, 24* 36:*16* 39:*11*
61:*16* 62:*18* 64:2 99:*18*
102:*1, 3* 112:*10* 125:*8*
139:*1* 144:*18* 152:*6*
155:*7* 157:*5* 172:*2, 8*
177:*5* 195:*1*
**specifications** 88:*7*
**specifics** 31:*17* 36:*19*
48:*19* 51:*21* 96:*14*
141:*13* 166:*21, 25* 167:*9*
169:*6* 210:*21* 224:*4*
**specify** 48:*10*
**specifying** 135:*13*
**speculate** 7:*24* 98:*18*
151:*24* 167:*18*
**speculation** 233:*12*
**speed** 149:*20*
**spelling** 39:*4, 14*
**spoke** 13:*3* 142:*5, 6*
218:*15*
**spoken** 13:*18*
**sponsored** 198:*19*
**spreadsheet** 83:*18* 209:*1*
**spreadsheets** 83:*15*
**SQUARE** 2:*11*
**squeeze** 149:*21*
**SQUIRE** 2:*10* 6:*12*
**stage** 197:*21*
**staged** 187:*7*
**stance** 190:*21*
**Stand** 93:*15* 124:*18*
157:*9, 22* 171:*13*
**standard** 21:*20* 30:*1*
144:*8, 12*
**standing** 238:*8*
**stands** 157:*11*
**stand-up** 102:*19, 22*
117:*23*
**start** 41:*8* 76:*9* 84:*12*
153:*1* 166:*6* 174:*5*

190:*16* 205:*17* 215:*1*
220:*7*
**started** 9:*20* 27:25
40:*25* 73:*3* 88:*25* 89:*20*
197:*19* 204:*5* 205:*5*
207:*12* 214:*6* 228:*9*
**starting** 129:*14* 165:*18*
**starts** 133:*3* 134:*13*
**STATE** 1:*4, 15* 6:*8* 7:2
130:*9, 22* 239:*4* 240:*3, 7*
**stated** 101:*23* 160:*15*
180:*13*
**statement** 42:*21* 44:*21*
90:*11* 104:*20, 24* 105:*17*
107:*15* 124:*3* 136:*11*
150:*9, 14* 174:*7* 179:*20*
189:*12* 192:*9* 218:*25*
219:*3, 6* 221:*6*
**statements** 88:*7* 223:*7*
233:*8*
**STATES** 1:*1* 39:*16*
78:*20* 107:*3* 110:*8*
123:*11* 136:*9* 233:*3*
**stating** 170:*15*
**stay** 151:*11*
**STEPHEN** 2:*10* 3:*6*
stephen.fazio@squirepb.c
om 2:*13*
**steps** 20:*15* 21:*5* 35:*18*
39:22 68:2 133:*17*
139:*17* 179:*12, 16*
180:*17, 18* 214:*9*
**Steve** 6:*12* 15:22 93:*11*
116:*22*
**Stevens** 198:*17*
**Stickiness** 174:*15*
**sticky** 175:*6*
**stipulations** 1:*13*
**stock** 27:*11*
**stopped** 62:*16* 204:*5*
205:*1, 5* 207:*11* 214:*5*
**store** 130:*25* 131:*1, 4, 10*
**stored** 113:*4* 159:*13*
**storing** 130:*8, 21*
**story** 201:*24* 202:*10*
235:*9*
**straight** 70:*13*
**strategic** 95:*6, 8* 200:*10*
**strategy** 10:*21, 25* 11:*1,*
*3, 21* 20:2, *4, 7, 9, 12*
46:*13, 14*
**Street** 1:*16* 2:*5*
**stress** 120:*9*
**strike** 59:*23* 64:*18* 76:*9*
108:*7* 111:*24* 127:*19*
129:*25* 143:*15* 229:*7*
**string** 42:*7* 200:*5, 11*
**strong** 232:*17, 25*
**structure** 20:22 90:*15*
131:*12*

**structures** 81:*7* 87:*13*
211:*21, 23* 215:*15, 17*
222:*12* 229:*17*
**stuck** 235:*11*
**study** 16:*13*
**stuff** 208:*13*
**sub** 74:*5*
**subcontracting** 162:*9, 23*
**subcontractor** 162:*19*
**subheading** 76:*17*
**subject** 102:*11* 118:*23*
**submit** 96:22
**submitted** 48:*16*
**subsequent** 193:*11*
**subsequently** 165:*9*
**subsidiaries** 187:*5*
**subsidiary** 188:*7*
**substance** 118:*12*
**substantive** 56:*12* 93:*20,*
*24* 117:*6* 124:*24* 164:*15*
194:*14* 211:*11* 231:*24*
**substitute** 207:*19* 208:*2,*
*17*
**success** 10:*21, 23* 11:*17*
49:*7* 51:*9* 57:*19* 198:*21,*
*25*
**successful** 20:*4* 99:*9*
199:*18*
**sue** 100:*13*
**sued** 100:*8* 114:*25*
**Suez** 55:*19, 21* 104:*1, 9,*
*13, 19, 21* 105:*5, 17*
107:22 147:*5, 14, 16*
220:*18, 23*
**suggested** 64:*4*
**suggesting** 54:*18, 21*
61:*25* 64:*9* 157:2 172:*6*
**Suite** 8:*19* 202:*18* 203:*9*
**summary** 77:2, *9* 96:*7*
**SUMMER** 2:*17* 46:*21*
100:*9* 117:*9* 158:*25*
159:*11*
**sunset** 170:*6*
**supervise** 23:*6*
**support** 10:*23* 11:*17*
57:*17* 71:*6, 9* 123:*19*
127:*23* 178:*7* 181:*2*
230:*1, 5, 9, 10, 12, 17*
**supported** 123:*3* 124:*3*
**supporting** 87:*20* 115:*5*
174:*5*
**supposed** 144:*24*
**sure** 17:*4* 20:*9* 21:*8, 21*
28:*11, 14* 35:22 37:*23*
41:*1* 53:*11, 20, 24* 56:*6*
68:*21* 70:*14* 75:*23*
77:*13* 80:*5* 83:*15* 85:*19*
95:22 102:*20* 104:*7*
108:*14* 112:22 113:*8*
114:*9* 121:22 122:*14, 16*
123:*10* 130:*13, 15* 131:*7*

132:8 139:14 145:1, 21
147:20 150:11 155:20
157:16 160:11 161:1, 3
164:22, 25 165:2 171:3
178:11 184:10 188:21
190:6 204:3, 23 206:21
207:22 209:4, 5 212:7
213:2, 11, 14 214:2
215:20 216:13 217:20
229:10 234:7 236:14
**surely** 169:15
**surprised** 144:23
**Suture** 61:3 63:21
118:13, 18 218:6 219:19
**Suzanne** 103:3 196:6, 9
**SVP** 10:22 150:1
**swear** 6:17
**sweat** 170:5
**switch** 158:13
**switched** 160:9 184:18
202:15
**switching** 160:12 164:7
165:2 179:3
**sworn** 6:24
**synced** 238:5
**synonymous** 65:13
**system** 25:3 91:21, 23,
25 92:15 93:5 114:3
217:11, 12
**systems** 91:7, 8, 9, 10, 12,
13 171:16 229:13

< T >
**table** 81:7 82:13 83:18
87:13 145:11
**tables** 32:2 81:25 82:2,
3 83:8, 16 145:15, 17, 22
146:2
**tactic** 152:4
**tactics** 151:10
**take** 7:16, 17 15:13
19:11 20:14 25:4 38:18
39:21 40:19, 22 43:2
45:11 47:8 48:23 49:24
52:5 56:4 57:13 68:9
73:12 76:3 90:15, 18
92:5 94:4 95:22 97:5
99:1 100:5 101:6 102:8
105:13 109:24 111:19
112:25 113:2, 8 116:21
117:13 119:7, 19 124:15,
17 148:7 152:18 164:6
175:18 177:14 185:15
186:6 189:25 194:4
198:6 211:3 229:16
231:15 232:10
**taken** 1:12 6:3, 6 7:5
21:5 35:18, 23 56:8
68:2 93:16 117:1
124:20 139:17 164:11
188:11 194:7 211:6

212:10, 16 214:8 216:4
231:19 240:10
**takes** 121:19
**talk** 10:24 21:20 29:15,
22 30:2 60:17 85:14
114:13 127:3 138:4, 16
169:8 198:21 229:1
**talked** 20:20 29:12
30:7 31:2 37:10 49:17
58:6 102:15 117:8
132:24 135:2 138:11
140:6 144:13 158:12
162:15 177:5 197:23
228:25
**talking** 23:19 30:11
36:20, 22 39:11 53:23
56:15 67:9 69:9, 23
158:23 176:11 189:21
196:3 201:20 203:21
226:24
**talks** 138:23
**Talla** 170:2
**targeting** 174:24
**tasked** 16:24
**tasks** 11:4, 5 188:4
**tax** 10:12 17:25 18:4, 8,
11, 13 19:15, 22, 23, 25
40:7, 8 44:4, 12 45:4, 6
46:10, 14, 18 47:22 49:7
51:10 61:14 71:4, 5, 25
72:9, 13 82:2 83:22, 23
84:1, 2 86:5, 7, 15, 21
87:5, 14 88:3 90:6 99:6
115:3 130:9, 22 131:3, 4,
9, 10, 11 145:15 150:1
171:9 198:2 199:6
201:7, 9 203:23 205:15,
21 224:1, 23
**taxes** 88:19, 22
**team** 11:8 12:1, 2, 4, 5, 8,
10 17:18 22:7 46:13
52:22 61:15 81:16 95:4,
5 96:19 99:13 100:21
102:20, 24, 25 112:1
141:25 153:10 161:16,
17 163:13 167:3 191:2
196:1, 3, 18 228:11
**teams** 11:2, 18, 22, 24
12:2, 3, 4
**Tech** 9:1, 14 162:11
**technical** 25:2 139:11
**technically** 202:3
**technique** 140:16
**Technologies** 194:24
195:22
**technology** 71:6, 10, 24
161:4 209:1
**TECO** 157:18, 22, 23, 24
158:3, 5, 6, 13, 15 159:2,
5
**telephone** 218:7

**tell** 7:11, 25 15:14, 20
19:12 38:19 40:19
45:12 47:9 48:24 52:6
54:16 55:4 56:19 59:15
60:12, 13, 22 62:3 63:4
68:10 73:12 74:6 76:4
86:25 94:4 97:5 99:1
100:5 102:8 105:14
109:24 111:20 114:24
117:13 119:8, 20 121:15
123:24 133:17 148:8
152:19 177:15 186:6
189:25 194:22 198:7
225:11 232:11
**telling** 8:3 54:3 108:2
**temporarily** 142:9
143:25
**ten** 27:15 171:18 172:4,
5, 7, 8, 10, 12, 13 173:1
197:1, 2
**ten-minute** 56:5
**tenure** 129:21 196:12
197:8
**Terete** 13:19 14:13
103:4 137:22, 23 138:4
140:2
**term** 171:16
**terminate** 106:22
**terminated** 13:9, 13
55:15 188:25 206:4
**terminates** 94:16
**terms** 26:11 31:1 77:15,
24 182:7 221:4
**terribly** 169:14
**test** 32:23 33:7, 9
196:23
**testified** 6:24 233:23
**testify** 8:10, 13 15:17, 18
**testimony** 6:18 240:10,
14
**text** 14:7 15:2
**TFA** 43:25 44:3, 7
**Thank** 7:20 12:11
57:24 94:3 110:22
120:25 194:19 207:25
237:25 238:2
**Thanks** 40:17 56:15
**thing** 25:20 39:25 60:6
65:11 78:23 125:23
148:17 156:15 179:7
207:14 209:11
**things** 21:13 23:11, 14,
18 29:25 30:10 34:5
36:12 65:12 79:17
84:12 85:9 91:7 106:18
107:12 113:18 121:20
123:4, 20 124:4, 15
127:25 132:4 134:20
181:17 183:19 209:2
**think** 19:16 26:13 28:7
31:1, 22 34:21 40:17

42:4 44:14 45:1 53:6,
22 54:2, 17 56:18, 20
57:3, 9 59:23 60:21
61:20 64:20 71:17 72:4
80:14 82:24 84:8 85:12,
17 86:21 88:17 93:14
106:10 115:12 121:22,
24 125:12 130:15, 24
134:22 135:7 140:14
146:15 147:16 151:9
152:3, 7 187:11 193:24
195:21 196:8 202:3, 5
203:3 207:18 211:3
214:25 215:25 224:23
227:24 228:1, 22 229:9
233:7 236:7
**thinking** 102:18 148:15
**third** 11:9 24:5, 10
64:5 66:14 69:19 70:23
87:9, 20 94:11 98:8, 12,
14, 15 113:23 133:3
159:5, 8 161:19 165:21
178:25 195:6 199:10
208:21 232:15, 21
**third-party** 78:24 79:6
80:6 113:2, 9, 18 114:10
115:23 159:19 160:14
190:21
**Thornton** 208:3, 8
**thought** 48:9 61:21
194:11 200:13 226:18
**thoughts** 154:6
**thread** 40:22 41:3 47:11
**threat** 39:23 174:22
201:14
**threatened** 66:22 181:14
**threats** 11:11 35:8
174:17 206:15
**three** 11:2 19:7 74:5
77:8 86:25 87:15 176:4
180:17 190:13 203:17
225:15, 16
**Thursday** 70:16
**time** 9:18 10:10, 17, 18
12:16, 18 18:11 19:15
20:25 21:16 22:15 28:3
30:12, 20 32:10 35:8
36:3, 5 38:15, 21 39:22
40:23 41:6, 15 44:12
45:2 46:17 47:11 50:4
51:18 52:8, 10 53:2, 13
58:13, 24 59:11, 22
61:11, 21 62:8 63:10, 16,
19 66:21 67:24 68:13
69:24 70:13 73:12, 15
74:1 76:7, 11, 20, 21
90:14 93:13 94:8 95:16
97:7, 8 101:7 103:5
106:13, 22 110:2 116:18
118:18 119:2 123:2, 20
125:3 126:6 137:1, 21

142:*15*, 18  143:*10*  145:6
146:24  149:*16*  150:*8, 12*
152:*11*  155:20  158:*12*
159:6, *11*, 16  160:7
161:*15*  164:*18, 22*  165:8
166:24  169:*23*  175:25
176:24  177:*10, 18*  178:*4,
6, 9, 13, 24*  188:24
194:25  197:*19*  198:9
200:*21*  214:*16, 21*  215:*3*
216:25  221:*19*  223:6, 9
225:*19, 25*  231:*4, 8*
234:*12*  236:*3*  238:*1*
**timeframe**  158:*23*
162:*10, 17*
**timeline**  149:*17*  178:*11*
**timelines**  190:*12*  220:*21*
**times**  35:7  115:6  158:6
159:6  229:*10*
**timestamp**  118:*14*
**timestamps**  134:2
**timing**  23:*13*  115:*1*
147:*24*
**tiny**  186:*20*
**Tisdale**  103:*3*  142:6
196:5
**today**  7:16  8:7  47:*19*
72:*17*  121:*24*  122:7, *16*
127:*18, 22*  128:8  136:*17*
143:*13*  152:*1*  187:*20*
210:8  221:2
**today's**  15:*20*
**told**  28:*19*  29:8  31:*18*
33:*22*  34:*3*  55:*10*  91:*20,
25*  116:*11*  134:*1, 3*
147:*21*  163:*22*  179:6
185:*20*  198:*14*  199:*11*
214:*15*  222:5
**tool**  39:*5, 7, 11, 13, 14, 18,
19*  81:6, *10, 22*
**tools**  92:*15*  183:7, *18*
**top**  52:*14*  69:9  105:*24*
107:*17*  148:*10, 15*  154:5
155:*15*  176:*13*  180:5
186:*10*  192:*1*  196:22
200:6  203:*13, 17*
**topic**  164:8  194:5
195:*18*
**topics**  32:*23*
**touch**  13:*1, 23*  14:5, *25*
**TOWER**  2:*11*
**TPG**  27:*12*
**tracked**  24:8
**trade**  20:*14*  21:5  22:*10,
13, 18, 24*  23:6  28:*20*
29:9, *14*  31:*20, 21*  33:*24*
37:*1, 4, 8, 11, 12, 15*
60:*14, 24*  76:*15*  77:*3, 10*
100:*17*  118:*14, 19, 24*
119:*3*  121:*20*  123:*12*
126:*20, 24*  128:*18*

132:*12*  134:*22*  135:*3, 8,
19*  136:6  140:*3*  195:*5,
14, 23*  206:*17, 23*  209:*17*
210:*10*  213:*22*  232:*3*
234:*1, 9*
**training**  20:*25*  21:*4, 8, 9,
13, 24*  22:*8, 15, 17, 20, 23*
23:*1, 2, 5, 9, 17, 18*  24:*2,
5, 8, 10*  25:*3*  36:2
138:*25*  140:*3, 5*  143:*8*
144:*12, 16*  187:*20*
**trainings**  23:*17*
**transcript**  7:*13, 22*
238:6, *14*  240:9
**transcripts**  16:9
**Transfer**  205:*9, 11*
**transition**  201:*23*
**translation**  202:*1*
**treated**  111:*13*
**treatment**  149:*4*
**trial**  238:*11*
**trouble**  187:*24*  188:*4*
**true**  19:*1, 15, 25*  23:7
25:*11, 20, 21*  28:*13, 17*
29:*4, 10*  32:*7, 11, 25*
33:*4*  37:*16, 17, 18, 19, 23*
38:*3, 5*  39:*15*  48:*10*
49:*2, 12, 19*  50:*5, 25*
51:*12, 16, 20*  52:*11, 16*
53:*1*  54:*4, 7, 24*  55:*5, 11,
16*  57:*11*  63:*16*  64:*20*
65:*22*  66:*2, 9, 17, 19*
67:*17*  74:*2, 16, 19, 24*
75:*2, 14*  78:*25*  79:*7, 8,
10, 15, 18, 23*  80:*8, 17*
83:*10, 20*  84:*6, 19, 20*
86:*15, 22*  88:*19, 25*
89:*22*  93:*7*  99:*22*  106:*7,
16, 20, 24*  107:*15*  108:*10*
113:*20, 21*  125:*18*  131:*3*
135:*25*  136:5  137:*3, 4*
138:*7*  142:*20*  143:*13*
145:*12*  149:*11*  156:*17,
24*  159:*13*  160:*9*  163:*21*
165:*19, 23*  176:*4*  181:*12,
15*  184:*3*  191:*13, 14*
199:*15, 16*  214:*17, 24*
215:*6, 9*  223:*8*  226:*1, 5*
230:*1*  234:*2, 10*  240:*9,
14*
**Trustpoint.One**  239:*12,
14*
**truth**  6:*18, 19*
**try**  7:*15*  98:*19*  100:*16*
**trying**  18:*21*  40:*24*
87:*18*  97:*18*  119:*3*
149:*17, 21*  150:*12*
151:*24*  176:*25*  196:8
236:*20*
**Tucson**  170:*3*

**Tuesday**  166:*16*  176:*14,
22, 23*  177:6
**turn**  76:*14*  81:*4*  87:*23*
92:*10*  121:2  122:*3, 23*
126:*1*  127:*12*  140:*18*
**two**  40:*21*  59:*10*  60:*21*
68:*15, 24*  69:*22*  74:*5*
81:*5, 25*  82:*17*  87:*2, 4, 8*
115:*1*  120:*18*  134:*20*
147:*25*  173:*22*  180:*17,
18*  181:*17*  201:*12*
203:*13*  204:*16, 18, 25*
225:*15*  228:*12, 19*
**type**  21:*19*  88:*4*
**types**  16:*12*  25:*1, 12*
27:*14*  63:6
**typical**  50:*19, 21*
**typically**  11:*23*  19:*6*
204:*22*

**< U >**
**uh-huh**  7:*21*
**uh-uh**  7:*22*
**UIL**  204:*19*  206:*10*
**ULI**  205:*1*
**ultimately**  52:*22*  99:*20*
181:*8*
**umbrella**  18:*7, 16*  202:*19*
**underestimate**  43:*11*
**underneath**  52:*15*  162:*8*
179:*19*
**understand**  15:*16*  16:*12*
40:*24*  43:*7*  44:*3*  53:*7*
69:*18, 19*  70:*3*  71:*9*
80:*3*  81:*9*  84:*16*  85:*23*
90:*8*  97:*22*  98:*2*  105:*7*
109:*1*  125:*20*  127:*8*
130:*8, 13, 17*  131:*7, 15*
132:*11*  134:*20*  144:*15*
147:*4, 21*  161:*1*  162:*18*
163:*10*  165:*1*  173:*9*
178:*3, 11*  179:*23*  181:*4*
183:*13*  185:6  188:*9, 20*
232:*21*  236:*17*
**understanding**  20:*18, 19*
24:*22, 23*  25:*4*  27:*8, 12*
28:*1*  33:*1, 5*  39:*7*  41:*17*
45:2  64:*21*  65:*24*  66:*13*
68:*1, 17*  71:*19, 20*  75:*3*
77:*11, 14, 20, 23*  83:*5, 7*
87:6  88:*18*  89:*10*  93:*3*
94:*19*  95:*24*  96:*18*
104:6  106:*17*  107:*2, 20*
114:*22*  130:*1, 4*  137:*23*
138:*9*  139:*10, 12*  142:*21*
145:*3, 16*  148:*12*  153:*18*
159:*5*  160:*3, 18*  163:*2*
180:*15*  182:*7*  183:*15, 24*
185:*1, 7*  186:*17*  189:*2*
199:*5, 9*  201:*19*  202:*14*

**204:**25  212:6  222:2
224:*20*  225:*4, 5*  226:*16*
**understands**  90:*5*
**understood**  52:*25*  53:*4*
74:*11*  88:*21, 24*  106:*22*
107:*5*  130:*19*  134:*16*
135:*2*  221:*21*  236:*14*
**undertaking**  56:*23*
**unfairly**  59:*21*
**unintelligible**  11:*9, 18*
114:*14*  120:*17, 19*
128:*21*  159:*10*  210:2
220:*4*  228:*18*
**unique**  32:*1*
**UNITED**  1:*1*  55:22
**University**  9:*10*
**unlawful**  206:*16*
**unnecessarily**  94:*13*
**unsynced**  238:6
**UPCO**  157:*7, 9, 14*
160:*4, 9*  162:*4, 15, 21*
163:*11, 15, 19, 20*  179:*8*
191:*17, 20, 24*  192:*13, 25*
193:*7*  235:9
**UPCO's**  161:*24*
**updated**  26:*8, 17*
**updates**  127:*7*
**upgrade**  151:*11*  161:*25*
162:*11*  163:*4*
**upload**  139:*1*  140:*23*
**uploaded**  137:*12*  139:*9*
146:*4, 5, 8*
**Upper**  157:*10, 12*
**upset**  151:*10*  152:*4*
**urgent**  18:*14*
**use**  19:*25*  20:6  55:6
59:*20*  67:*20*  91:*21*  93:6
108:*23*  114:*10*  143:*8*
151:*21*  160:*14, 23*  161:*5*
163:*19, 20*  165:*7*  170:*4,
12*  172:*24, 25*  183:*2, 4, 9*
184:*6, 12*  201:*25*  205:*14*
207:*6*  208:*20, 22*  209:*5*
217:*8*  229:*16*
**user**  25:*2, 4, 5*  30:*9*
62:6  167:*23*  168:*1, 4, 21*
**uses**  44:*4*
**usually**  19:*16*
**Utegration**  170:*18, 21*
174:*17, 24*  198:*19, 25*
199:*2, 12*  201:*14*  202:*15*
203:*22*  204:*1, 6*
**Utegration's**  199:*18*
**utilities**  18:*18*  168:*3*
171:*10*  201:*21*  207:*11*
208:*18*  229:*3*  235:*10*
**utility**  109:*2*  150:*20*
153:*20*  201:*15, 17*  205:*4,
12*  207:*6, 8*  208:*9*
**utilize**  171:*4*  183:*6*
**utilized**  191:*9*

utilizing 178:5 191:16
192:12 214:12

< V >
Vadim 10:7 43:10, 13,
16 44:20, 22 47:20
74:24 75:1, 7, 10 88:18
89:9, 19
Vadim's 39:3
valuable 84:4 175:20
value 18:22 19:4, 22
235:13, 17
varied 11:6
various 12:1 22:25
91:6 130:9, 22, 24
150:19, 24 213:14
225:19, 25
vendor 57:6, 10 99:14
154:2 165:19 181:9, 20
184:4, 11 185:4, 9, 12, 17,
18, 25 190:7, 17 205:23
209:22 210:1 226:23
227:10
vendors 114:10 115:24
116:4 160:14 174:1
Veolia 56:2, 3
verbal 180:25
verification 138:5
verifications 223:7
verified 123:2, 20 124:8
125:3 126:6, 7 134:24
135:6, 18 136:4 137:1
139:6 143:10 222:21
verify 120:7 133:12, 17
134:6, 11
verifying 120:3 126:14
136:11
versa 218:19
version 73:21 111:7, 13
114:11 157:15, 25 158:9,
14 160:10 165:3 170:14
178:17 179:3, 4 202:9
versions 151:12
versus 6:4 37:13 54:25
163:13 171:25 240:11
viable 168:13
Vice 10:25 11:1, 20
218:18 236:5
video 216:2 238:5, 7
VIDEOGRAPHER 2:17
6:2 56:7, 9 93:15, 17
116:25 117:2 124:18, 21
164:9, 12 194:6, 8 211:5,
7 216:2, 5 231:11, 14, 17,
20 238:4, 8, 12, 16, 18
videos 215:10
videotaped 6:3
view 160:21 161:3
192:24 230:24 231:5
viewed 156:22 193:5

violate 143:19 144:3
violated 66:23
violation 91:1
virtually 82:1
vis-à-vis 217:24 219:10
231:7
vocal 71:4
voluntary 224:17
VP 19:23 71:4 72:9
115:3 200:21
vs 1:7
Vu 46:5 191:9 192:2,
18, 20 193:5

< W >
wait 238:7
waiving 123:11
walk 21:10
walked 166:14
Wallace 57:18
want 40:20 41:8 43:6
47:14 72:17 76:14
92:10, 11 94:10 98:18
101:8 104:7 116:21
121:1, 11 122:23 123:24
125:11 127:12 129:24
133:1 134:12 137:5
150:11 157:25 158:21
159:3 160:25 164:6
167:18 169:8 170:13
176:2 177:20 194:21
201:12 216:1, 13 217:20
222:6, 7 229:10 231:11
232:13 234:25 236:14
wanted 43:7 72:22
91:22 153:1 163:19, 20,
23 182:24
wanting 160:18
Ward 103:4 196:6, 9
watch 93:11
Water 55:23
Waterhouse 212:12
wave 104:12 108:7, 22,
23 110:9, 19, 25 156:1
waves 108:9, 13, 19
110:6 112:13
way 16:19 28:25 31:3,
22 32:1, 2 48:14 50:9
57:3 75:7 76:24 108:12
111:15 113:14 131:13
132:20 154:11, 19
155:19 162:15 175:9
190:11 195:2 201:3
209:9 215:21 224:23
229:19, 23 240:8
WAYBACK 4:6 92:7, 8
ways 30:25 184:16
217:14
WEBSITE 4:7 20:10
39:12 40:2, 10 41:11, 21
46:17 67:24 92:7, 20, 22

126:8, 9, 10, 12, 21
133:21 137:13 139:2, 10,
11, 12, 13 140:1, 13
146:5 214:24 215:6, 11,
16, 19
Websites 133:13 137:10
WEC 170:2
week 186:20 187:17
weeks 187:16 228:11
welcome 40:20 179:12
Well 12:9 21:18 24:21
25:2 38:8 39:13 41:20
46:18 53:5 55:10 61:3
63:10 74:24 86:19 89:8
120:8, 16, 18, 20 132:11
135:1 138:7 147:21
152:1 155:7 156:9
160:16 163:4 164:22
172:4 183:9 188:14
191:8 218:22 229:2
230:20
went 33:3 104:11, 13
110:19, 25 176:18 190:8
230:23
we're 25:13 53:24
62:24 67:9 78:17 117:4
126:25 139:14 164:7
172:9 176:11 178:12
182:22 184:15 188:4
238:11, 18
we've 7:12 14:7 16:3
20:20 21:18 24:25
29:12 30:7, 17, 18 44:6
52:1 58:5 64:12 78:15
93:12 139:14 158:11
165:11 194:3 210:22, 24
212:21 232:14
WGL 170:3
White 173:8, 9, 11
wield 173:25
Williams 35:2, 9 148:24
151:15, 18 175:17, 25
willing 97:19 172:24
175:18 177:8 184:4
win 43:6 54:3, 23
winning 51:14 154:14
wireframes 81:2, 3
WITNESS 6:16, 21
18:20 20:9 26:7 28:5,
23 29:6, 12 31:9 33:13
34:1, 13, 20 37:21 39:25
41:23, 25 42:19 43:5
46:16 47:3 48:2, 19
49:14 53:10 54:7, 12, 21
59:10 63:18 65:24 66:4,
11 67:1, 7, 19 68:20, 22
69:3, 6 70:7 71:12 72:3
77:6, 21 78:5, 20 79:2,
12, 20 80:10 81:15
83:12 84:1, 8 85:4
86:12 88:21 89:2, 14, 24

90:10, 22 91:5, 16 92:22
93:9 96:18 97:25 98:21
100:24 101:10, 21
104:23 106:9 107:1, 9
108:1, 25 109:7, 14
111:2, 9 113:6 114:6, 18
122:13 123:8 124:11, 17
125:22 126:23 128:4
130:12 131:6, 19 132:1,
8, 15 135:11, 22 136:2, 9,
21 139:20 143:21
145:14, 24 149:23 151:2,
17 152:14 156:12, 19
159:15, 23 160:25
161:23 181:17 184:8
193:2, 9 206:19 212:14,
20 213:2, 11, 18 214:11,
19 226:21 233:11, 13, 14
234:5, 12 235:20 236:25
237:10
won 52:25 53:3, 8 54:12
Wong 197:24
word 28:2 29:14 42:2
87:24 124:4 125:4
187:5 203:4
worded 47:19 48:14
words 71:14, 19, 20
91:24 150:15 154:21
work 8:21 10:7, 9, 13
11:9 26:15 34:13 35:5
42:21 43:15, 19 44:17
46:10 49:23 51:19 52:2
53:1, 3, 8, 11, 19 54:3, 13,
19, 24, 25 55:1 57:5, 6, 7,
14 61:24 62:1 96:22
97:19 98:19 104:9, 20,
24 105:17 106:14
107:21 129:7 147:5, 9,
13, 22 148:2 159:20, 23
160:1, 3 161:5, 19, 25
162:9, 10, 16, 22 163:4,
12, 16, 17, 20, 22 164:3
165:21 174:1 183:3, 13,
25 187:16, 17 188:15, 23
189:1, 2, 11, 12 191:24
199:13 204:21 224:8
227:2 230:3, 7
worked 9:17 22:19
32:5 33:20 35:2, 7
43:13 46:6 89:6 90:14
115:6 178:18 193:18
196:24 224:2
working 10:4 11:7, 24,
25 30:18 138:14 154:3
172:19 196:14 225:14,
16 228:6, 16, 17 232:15
works 131:13 139:11
worth 187:16, 17
writing 63:1

**written** 23:*19* 24:*4*
30:*23* 35:*17, 22* 78:*6*
85:*18* 88:*11* 175:*9*
**wrong** 34:*18*
**wrote** 40:*17* 148:*9*
154:*16, 17, 21* 176:*18*

**< Y >**
**Yeah** 12:*10* 16:*1* 19:*18*
23:*25* 24:*18* 30:*7* 40:*24*
68:*19* 70:*14* 74:*21*
75:*21* 76:*19, 20* 77:*8, 23*
78:*16, 23* 82:*16* 85:*25*
86:*14* 87:*17* 91:*8* 113:*8,*
*13* 114:*24* 116:*23*
117:*19* 118:*2* 121:*9*
122:*16* 123:*10* 125:*14,*
*22* 130:*15* 131:*9* 143:*23*
154:*16, 19, 22* 164:*7*
167:*18* 184:*10* 193:*4*
197:*22* 206:*1* 207:*24, 25*
212:*16* 213:*14* 214:*25*
215:*23* 223:*12* 224:*14*
225:*5* 228:*8* 230:*7*
231:*13* 234:*7, 12* 235:*5*
238:*14*
**year** 9:*8* 38:*13* 44:*7, 11*
83:*23* 84:*1, 2* 86:*5*
224:*11*
**years** 7:*9* 15:*9* 20:*21*
21:*18* 22:*2* 27:*16* 31:*10*
32:*19* 43:*14* 65:*21*
196:*16* 197:*1, 2*
**Yep** 121:*7* 133:*10* 216:*2*
**yesterday** 15:*22* 186:*12*
187:*24*
**Yost** 14:*18* 103:*2*
**Yulu** 186:*12, 14, 15, 16*
187:*13* 188:*21* 197:*24*
223:*15, 24* 224:*7* 234:*15,*
*21*

**< Z >**
**zero** 169:*14*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LUCASYS INC.,

     *Plaintiff*,

v.

POWERPLAN, INC.,

     *Defendant*.

Civil Action File

No.: 1:20-cv-2987-AT

### AMENDED NOTICE OF DEPOSITION OF JIM DAHLBY

PLEASE TAKE NOTICE that, pursuant Federal Rule of Civil Procedure 30, counsel for Plaintiff Lucasys Inc. will take the oral deposition of **Jim Dahlby** at the office of **Robbins Alloy Belinfante Littlefield LLC, 500 14th Street, N.W., Atlanta, GA 30318**, unless the parties agree on another location, on **August 5, 2022**, beginning at **9:30 a.m.** and continuing thereafter until completed.

The deposition shall be taken before a Notary Public or some other officer authorized by law to administer oaths for use at trial. The deposition will be taken by oral examination with a written and/or sound and visual record made thereof (e.g., videotape, LiveNote, etc.). The deposition will be taken for the purposes of cross-examination, discovery, and for all other purposes permitted under the Federal Rules of Civil Procedure or other applicable law.



PLAINTIFF'S
EXHIBIT
188

This 23rd day of June, 2022.

/s/ Jason S. Alloy
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Jason S. Alloy
Georgia Bar No. 013188
jalloy@robbinsfirm.com
Joshua A. Mayes
Georgia Bar No. 143107
jmayes@robbinsfirm.com
Rachel F. Gage
Georgia Bar No. 547982
rgage@robbinsfirm.com
Evan C. Dunn
Georgia Bar No. 535202
edunn@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
(678) 701-9381
(404) 856-3255 (fax)

Aaron Gott (admitted *pro hac vice*)
aaron.gott@bonalawpc.com
BONA LAW PC
15 South 9th Street, Suite 239
Minneapolis, Minnesota 55402
(612) 284-5001
Jarod Bona (admitted *pro hac vice*)
jarod.bona@bonalawpc.com
Jon Cieslak (admitted *pro hac vice*)
jon.cieslak@bonalawpc.com
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, California 92037
(858) 964-4589

-2-

(858) 964-2301 (fax)

*Counsel for Plaintiff Lucasys Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the within and foregoing **AMENDED NOTICE OF DEPOSITION OF JIM DAHLBY** with the Clerk of Court using the CM/ECF electronic filing system which will automatically send counsel of record e-mail notification of such filing.

This 23rd day of June, 2022.

*/s/ Jason S. Alloy*
Jason S. Alloy

| Message | |
|---|---|
| From: | Jim Dahlby [jdahlby@pwrplan.com] |
| Sent: | 10/15/2020 6:50:19 PM |
| To: | Joe Gomes [Joe.Gomes@powerplan.com] |
| CC: | Henry Van de Sype [henry.vandesype@powerplan.com]; Drea Toretti [dtoretti@pwrplan.com]; Joost Rutten [Joost.Rutten@powerplan.com]; Suzanne Ward [suzanne.ward@powerplan.com]; Neal Tisdale [neal.tisdale@powerplan.com]; Mike Casella [mike.casella@powerplan.com] |
| Subject: | Re: Suite Sku's |

I would say pricing was based on a value where tax was a smaller compliance burden and priced relative to competitive environment. The value in tax Benefits was generally achieved from implementation of Plant system. Tax was usually ▇ and Plant was ▇

In addition to tax value being less, there was also a plant follows tax approach where many customers would buy tax (approved by Tax Vp) and through the project we'd look for all the opportunities for better data and use tax to help sell plant.

Tax Repairs we gave away as a free upgrade to project accounting for awhile as a defense against Erps, we later started charging for it.

Tax provisions and Prop tax have also always had competition from point solutions.

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.


On Oct 15, 2020, at 5:17 PM, Joe Gomes <Joe.Gomes@powerplan.com> wrote:


Henry – Thanks!

Suzanne / Neal – FYI... view of Trailing Twelve Month Revenue by Product

Jim – I've seen this data before, but always jumps out a me when I see it again. We must have been giving tax away in the early days. Footprint is on par with fixed asset accounting... but way lower price point. I would argue that value prop is same or greater? curious on your thoughts

**Joe Gomes**
Chief Executive Officer

Office  +1 678.223.2748
Mobile: +1 404.915.9827
jgomes@powerplan.com
PowerPlan.com

<image001.png>

**From:** Henry Van de Sype <henry.vandesype@powerplan.com>
**Sent:** Thursday, October 15, 2020 11:29 AM
**To:** Drea Toretti <dtoretti@pwrplan.com>; Joe Gomes <Joe.Gomes@powerplan.com>; Joost Rutten <Joost.Rutten@powerplan.com>



PLAINTIFF'S
EXHIBIT
189
PONGAO 800-631-6989

**Cc:** Mike Casella <mike.casella@powerplan.com>
**Subject:** RE: Suite Sku's

TTM Revenue for Suite of families ▆▆▆ of ▆▆▆ Total. Remaining revenue is made up by PS, managed and cloud services, reimbursable expenses, and term.

ACCTG - ▆▆▆
FP&A - ▆▆▆
Platform - ▆▆▆
Rate & ROE - ▆▆▆
Tax - ▆▆▆

First two tabs of attached file are pivots that show the data by quarter and show the breakdown between license, subscription and maintenancele different ways.

<image004.jpg>

<image006.jpg>

**Henry Van de Sype**
Vice President, Financial Planning & Analysis

Cell: +1 609 346 2153
Henry.VandeSype@PowerPlan.com
PowerPlan.com
<image008.png>

**From:** Drea Toretti <dtoretti@pwrplan.com>
**Sent:** Wednesday, October 14, 2020 8:16 PM
**To:** Joe Gomes <Joe.Gomes@powerplan.com>; Joost Rutten <Joost.Rutten@powerplan.com>; Henry Van de Sype <henry.vandesype@powerplan.com>
**Cc:** Mike Casella <mike.casella@powerplan.com>
**Subject:** RE: Suite Sku's

Evening everyone.

Henry in SF we have suites of families. To streamline the process we mapped them this way:

| AIO | FP&A |
|---|---|
| Capital P&F | FP&A |
| Fixed Asset | ACCTG |
| Income Tax | TAX |
| Lease Acctg | ACCTG |
| Platform | Platform |
| Project Cost Mgt | FP&A |

ATTORNEYS' EYES ONLY

| Property Tax | TAX |
|---|---|
| Rate Case and ROE | Rate & ROE |
| WPA | Platform |

If you want to chat about anything let us know.  Thanks.

**Drea Toretti**

Office:   +1 678.202.1680
Mobile:  +1 404.642.1116
www.PowerPlan.com

<image009.png>

**From:** Joe Gomes <Joe.Gomes@powerplan.com>
**Sent:** Wednesday, October 14, 2020 6:49 PM
**To:** Drea Toretti <dtoretti@pwrplan.com>; Joost Rutten <Joost.Rutten@powerplan.com>; Henry Van de Sype <henry.vandesype@powerplan.com>
**Subject:** Suite Sku's

Drea,

Can you send the solution suite groupings (Accouting, Tax, FP&A, Regulatory, and Platform) that we used to segment the TAM to Henry & Joost?

H&J: can you give me a breakdown of product revenue (license and maintenance) for the five suites?  2020 is fine, or if TTM is easier, that works too.

Will need this by mid-day on Friday...

Thanks

Joe

**Joe Gomes**
Chief Executive Officer

Office:   +1 678.223.2748
Mobile:  +1 404.915.9827
jgomes@powerplan.com
PowerPlan.com

<image001.png>

POWERPLAN01130126

Message

| | |
|---|---|
| **From:** | Jim Dahlby [jdanlby@pwrplan.com] |
| **Sent:** | 7/25/2018 11:59:33 AM |
| **To:** | Jamie Carr [jcarr@pwrplan.com]; Drea Toretti [dtoretti@pwrplan.com] |
| **CC:** | Nick Alexander [nalexander@pwrplan.com]; Phil Zegarelli [pzegarelli@pwrplan.com] |
| **Subject:** | RE: ARAM Calc - Calculation Process Finished |

What happens when you click?

Jim Dahlby

Mobile + 678.269 7950
jdahlby@pwrplan.com

PLAN

**From:** Jamie Carr
**Sent:** Wednesday, July 25, 2018 9:34 AM
**To:** Drea Toretti <dtoretti@pwrplan.com>
**Cc:** Jim Dahlby <jdahlby@pwrplan.com>; Nick Alexander <nalexander@pwrplan com>; Phil Zegarelli <pzegarelli@pwrplan.com>
**Subject:** Re: ARAM Calc - Calculation Process Finished

Not exactly. I got the email that said my calculation was done, as though I requested it. But of course I didn't. Maybe he just sent it so I'd see it Not sure.

Sent from my iPhone

On Jul 25, 2018, at 9:19 AM, Drea Toretti <dtoretti@pwrplan.com> wrote:

So he sent it to you.... And let you run it.

Drea Toretti

Office + 878.202 `680

<image003.png>

**From:** Jamie Carr
**Sent:** Wednesday, July 25, 2018 8:20 AM
**To:** Jim Dahlby <jdahlby@pwrplan.com>; Nick Alexander <nalexander@pwrplan.com>; Drea Toretti <dtoretti@pwrplan.com>
**Cc:** Phil Zegarelli <pzegarelli@pwrplan.com>
**Subject:** Fwd: ARAM Calc - Calculation Process Finished

This is from Vadim's new company. Interesting tool. Spelling is a bit of an issue, but the tool would be competitive to us.

Sent from my iPhone

Begin forwarded message:

**From:** "ARAM Calc Lite" <no-reply@lucasys.com>
**Date:** July 25, 2018 at 12:32:03 AM EDT



PLAINTIFF'S
EXHIBIT
190

**To:** jcarr@pwrplan.com
**Subject: ARAM Calc - Calculation Process Finished**
**Reply-To:** <no-reply@lucasys.com>

# Calculation Process Finished

Your caluclation has been processed successfully, click on below button for see your calculation result.

**Show Result**

Please ignore this email if you did not make this request.

POWERPLAN00112724

Message

| | |
|---|---|
| From: | Paul Crist [pcrist@pwrplan.com] |
| Sent: | 5/22/2019 7:28:26 PM |
| To: | Joe Gomes [Joe.Gomes@powerplan.com]; Joost Rutten [Joost.Rutten@powerplan.com]; Brett Bertz [brett.bertz@powerplan.com]; John Budala [John.Budala@powerplan.com]; Elizabeth Cowart [ecowart@pwrplan.com]; Drea Toretti [dtoretti@pwrplan.com]; Sarah Park [spark@pwrplan.com]; Neil Kimber [nkimber@pwrplan.com]; Jim Dahlby [jdahlby@pwrplan.com] |
| Subject: | Fwd: lucasys |

Looks like potential new TFA competition.

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Matt Crye <mcrye@pwrplan.com>
Date: 5/22/19 4:27 PM (GMT-05:00)
To: Paul Crist <pcrist@pwrplan.com>, John Ericson <jericson@pwrplan.com>
Subject: RE: lucasys

RCC was outwardly pitching Lucasys at AGA/EEI this week.

Rumor is that Lucasys has TFA solution ready to go. We've known about Lucasys for at least a year, so having TFA by now would make sense. Vadim is extremely knowledgeable on the business problem.

Matt Crye
VP Strategic Accounts

Mobile +1 678 576 4487
mcrye@pwrplan.com
PowerPlan com

 PLAN

From: Paul Crist <pcrist@pwrplan.com>
Sent: Wednesday, May 22, 2019 4:24 PM
To: Matt Crye <mcrye@pwrplan.com>; John Ericson <jericson@pwrplan.com>
Subject: FW: lucasys

Competition at AEP. Any feedback on the letter and invoice yet?

Paul Crist
VP Global Sales
pcrist@pwrplan.com
616.813.6150

 PLAN

From: Skip Fowler <Skip.Fowler@powerplan.com>
Sent: Wednesday, May 22, 2019 4:20 PM
To: Paul Crist <pcrist@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>
Subject: FW: lucasys



PLAINTIFF'S
EXHIBIT
191

FYI

**Skip Fowler**
Vice President Professional Services

**From:** Colin Currier
**Sent:** Wednesday, May 22, 2019 11:20 AM
**To:** Michael Bradley <mbradley@pwrplan.com>; Nick Alexander <nalexander@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Sebastian Cordoba <scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>; Elizabeth Cowart <ecowart@pwrplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>; Christine Bell <christine.bell@powerplan.com>; Phil Zegarelli <pzegarelli@pwrplan.com>; Rob Burns <rburns@pwrplan.com>; Scott Avery <Scott.Avery@powerplan.com>; Peyton Proctor <jpproctor@pwrplan.com>
**Subject:** RE: lucasys

I know I probably was not supposed to see this, but Kevin Keller and Linda at AEP have a meeting setup with Lucasys about a SOW. So the competition is real.

Best,

**Colin Currier**
Solution Architect, Professional Services

Mobile: +1 803.389.9158
ccurrier@pwrplan.com
Powerplan.com

 **PLAN**

**From:** Michael Bradley
**Sent:** Wednesday, May 22, 2019 10:29 AM
**To:** Nick Alexander <nalexander@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Sebastian Cordoba <scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>; Elizabeth Cowart <ecowart@pwrplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>; Christine Bell <christine.bell@powerplan.com>; Phil Zegarelli <pzegarelli@pwrplan.com>; Colin Currier <ccurrier@pwrplan.com>; Rob Burns <rburns@pwrplan.com>; Scott Avery <Scott.Avery@powerplan.com>; Peyton Proctor <jpproctor@pwrplan.com>
**Subject:** lucasys

And the fire beneath us grows...https://www.lucasys.com/tax-solutions

I didn't find that the solution specifically says it takes on tax depreciation functionality, it certainly makes an intrusion on our space. I suspect that this product is foundation for a larger competitive product. If you watch the video, it indicates functionality for analysis, forecasts, reconciliation, and ARAM/RSG calculations.

Vadim is formidable and we shouldn't underestimate him.

**Michael Bradley**
Sr. Manager

Office: +1 770.423.7674
Mobile: +1 770.712.8738

POWERPLAN00111103

michael.bradley@powerplan.com
PowerPlan.com

 PLAN

**From:** Michael Bradley
**Sent:** Monday, 20 May, 2019 7:59 AM
**To:** Nick Alexander <nalexander@pwrplan.com>; Phil Zegarelli <pzegarelli@pwrplan.com>; Jamie Carr
<jcarr@pwrplan.com>; Colin Currier <ccurrier@pwrplan.com>; Rob Burns <rburns@pwrplan.com>; Sebastian Cordoba
<scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>; Peyton Proctor <jpproctor@pwrplan.com>; Scott Avery
<Scott.Avery@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>; Christine Bell <christine.bell@powerplan.com>
**Subject:** RE: Big News: IRS notice regarding excess deferred taxes

The battle to not use aram was lost a long time ago?

**Michael Bradley**
Sr. Manager

Office: +1 770.423.7674
Mobile: +1 770.712.8738

michael.bradley@powerplan.com
PowerPlan.com

 PLAN

**From:** Nick Alexander
**Sent:** Monday, 20 May, 2019 7:56 AM
**To:** Michael Bradley <mbradley@pwrplan.com>; Phil Zegarelli <pzegarelli@pwrplan.com>; Jamie Carr
<jcarr@pwrplan.com>; Colin Currier <ccurrier@pwrplan.com>; Rob Burns <rburns@pwrplan.com>; Sebastian Cordoba
<scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>; Peyton Proctor <jpproctor@pwrplan.com>; Scott Avery
<Scott.Avery@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>; Christine Bell <christine.bell@powerplan.com>
**Subject:** RE: Big News: IRS notice regarding excess deferred taxes

Phil, Jarrett and I were in the room, not sure if Jamie was at that point.

John did a good job trying to fill in for Dave Yankee (who was out last minute) but didn't get much movement on that
question. Had 2 or 3 people raise their hands and people conceded it would be much easier but not likely because from
an executive front the purpose of having ARAM was to average and move costs out.

It was interesting that it was paralleled by an EY presentation from Mike Reno later in the day who said that battle was
lost a long time ago and has no chance.

**Nick Alexander**

Office: +1 770.423.7678
Mobile: +1 404.217.7379
Nick.Alexander@PowerPlan.com

**From:** Michael Bradley
**Sent:** Monday, May 20, 2019 7:50 AM
**To:** Nick Alexander <nalexander@pwrplan.com>; Phil Zegarelli <pzegarelli@pwrplan.com>; Jamie Carr

<jcarr@pwrplan.com>; Colin Currier <ccurrier@pwrplan.com>; Rob Burns <rburns@pwrplan.com>; Sebastian Cordoba <scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>; Peyton Proctor <jpproctor@pwrplan.com>; Scott Avery <Scott.Avery@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>; Christine Bell <christine.bell@powerplan.com>
**Subject:** RE: Big News: IRS notice regarding excess deferred taxes

Did anyone attend the presentation? I'm curious about the rooms reaction to slides 12. It looks like they were going to ask "Where are my anti-ARAM activists in the room?"

Do we know if there was momentum for ARAM or no ARAM?

**Michael Bradley**
Sr. Manager

Office: +1 770.423.7674
Mobile: +1 770.712.8738

michael.bradley@powerplan.com
PowerPlan.com

 **PLAN**

**From:** Nick Alexander
**Sent:** Monday, 20 May, 2019 7:36 AM
**To:** Michael Bradley <mbradley@pwrplan.com>; Phil Zegarelli <pzegarelli@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Colin Currier <ccurrier@pwrplan.com>; Rob Burns <rburns@pwrplan.com>; Sebastian Cordoba <scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>; Peyton Proctor <jpproctor@pwrplan.com>; Scott Avery <Scott.Avery@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>; Christine Bell <christine.bell@powerplan.com>
**Subject:** RE: Big News: IRS notice regarding excess deferred taxes

Replying with the latest updated slide deck that was presented at Elevate. They made some updated comments to 2019-33.

**Nick Alexander**

Office: +1 770.423.7678
Mobile: +1 404.217.7379
Nick.Alexander@PowerPlan.com

**From:** Michael Bradley
**Sent:** Wednesday, May 8, 2019 10:13 AM
**To:** Phil Zegarelli <pzegarelli@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Colin Currier <ccurrier@pwrplan.com>; Rob Burns <rburns@pwrplan.com>; Sebastian Cordoba <scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>; Peyton Proctor <jpproctor@pwrplan.com>; Scott Avery <Scott.Avery@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>; Nick Alexander <nalexander@pwrplan.com>; Christine Bell <christine.bell@powerplan.com>
**Subject:** RE: Big News: IRS notice regarding excess deferred taxes

One last thing for now because I just read through deloitte's slide changes and they could be useful.

Slides 11-14 are related

**Michael Bradley**
Sr. Manager

CONFIDENTIAL

Office +1 770.423.7674
Mobile: +1 770.712.8738

michael.bradley@powerplan.com
PowerPlan.com

 PLAN

**From:** Michael Bradley
**Sent:** Wednesday, 08 May, 2019 10:03 AM
**To:** Phil Zegarelli <pzegarelli@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Colin Currier <ccurrier@pwrplan.com>;
Rob Burns <rburns@pwrplan.com>; Sebastian Cordoba <scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>;
Peyton Proctor <jpproctor@pwrplan.com>; Scott Avery <Scott.Avery@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>, Nick Alexander (nalexander@pwrplan.com) <nalexander@pwrplan.com>;
Christine Bell <christine.bell@powerplan.com>
**Subject:** RE: Big News: IRS notice regarding excess deferred taxes

Also credit goes to Christine for mentioning it to me after Deloitte requested to change their conference slides on the
topic.

**Michael Bradley**
Sr. Manager

Office: +1 770.423.7674
Mobile: +1 770.712.8738

michael.bradley@powerplan.com
PowerPlan.com

 PLAN

**From:** Michael Bradley
**Sent:** Wednesday, 08 May, 2019 10:01 AM
**To:** Phil Zegarelli <pzegarelli@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Colin Currier <ccurrier@pwrplan.com>;
Rob Burns <rburns@pwrplan.com>; Sebastian Cordoba <scordoba@pwrplan.com>; Jarrett Skov <jskov@pwrplan.com>;
Peyton Proctor <jpproctor@pwrplan.com>; Scott Avery <Scott.Avery@powerplan.com>
**Cc:** Tim Price <tprice@pwrplan.com>; Nick Alexander (nalexander@pwrplan.com) <nalexander@pwrplan.com>;
Christine Bell <christine.bell@powerplan.com>
**Subject:** Big News: IRS notice regarding excess deferred taxes

Notice 2019-33, Request for Comments on Necessary Clarifications to Normalization Requirements for Excess
Tax Reserves Resulting from the Corporate Tax Rate Decrease (PDF)

I just did a read though and wanted to provide my interpretation and thoughts.

1.      Seems to clarify that reversing excess deferred taxes faster than ARAM is a normalization violation and that tax
is increased by the amount that they reversed faster than ARAM as a penalty if violated.
2.      Some sections seems to come word for word out of how we explain things...e.g. the paragraph starting on page
6 (which is good)
3.      Clarifies that reverse south georgia method is an alternative method and that it is not a normalization violation
4.      Requests for comments on how to handle

CONFIDENTIAL

a.        Situations where tax payers may have vintage account data but not in the form that the data is useful for ARAM without significant analysis and expense

        i.  They're wondering if there is a method that could be applied to determine what a reasonable amount of time/expense would be to get these records in order. (Percentage of rate base?)

b.        Situations where the tax payer already uses reverse south georgia

c.        Relationship between depreciation related NOLs and excess DIT

d.        Impacts of significant transactions

e.        Implementation of interim rates to reflect the TCJA's decrease in the corporate tax rate. **What could this mean?**

f.        Handling a rate case with a future test period

g.        Methodology of reversing protected vs unprotected ADIT after 2017 rate changes

5.    Request for comment until July 29th, 2019

b.    I wonder if Powerplan should formulate a comment?


Reactions

1.    If the ordering matters at all, I think it's obvious that the utility companies are concerned with the high costs of getting their record keeping into a place that can support an accurate ARAM calculation

a.        I think the argument has another side that some might not be considering. If you're saying that you can't calculate your excess deferred taxes under ARAM accurately, how can you say that you can calculate the reversal of any deferred taxes accurately?

        i.  We should be more clear that deferred tax reconstructions are all "TCJA" related and that it's getting all of their timing differences in order

        ii.  Utilities might win this argument if they can side step that

b.        I think we're directly involved in "the cost to the tax payer of assembling the data contained in the underlying books" between the provision and deferred tax projects.

        i.  What costs other than PowerPlan might go into the cost of setting up and using an ARAM method?

c.        This is probably a lot of what EEI wanted to talk about behind closed doors

d.        The service pack helps improve the visibility and ease of use regarding the rate change but I don't think it has a large impact the cost of getting their record keeping in order to justify.

2.    4g above kind of opens the door to all sorts of possibilities. Could they completely change how to handle deferred tax reversals? It's concerning because it doesn't specifically call out anything like AFUDC Equity or cost of removal.

3.    How long does it normally take the IRS to provide notice after comments are closed?

4.    This could definitely impact sales if the business case relies heavily on the need to configure for ARAM. Big deals like Exelon reconstructions might be put on hold.

5.    We need to figure out where the big players stand on this.

6.    How much information do we have on ARAM being better than RSGM for the utility?

c.        Even if the IRS makes a decision to allow more companies to use the RSGM, we should help form the business value in using ARAM

7.    Opportunity

.        This should provide more justification for the need to "basify" and improve the tool to move excess deferred taxes into a RSGM quickly and easily. If we don't do this, we'll start losing stuff to becoming "outside of the system adjustments"

a.    Conversation starter with customers.

**Michael Bradley**
Sr. Manager

Office: +1 770.423.7674
Mobile: +1 770 712.8738

michael.bradley@powerplan.com
PowerPlan.com

 PLAN

Message

| | |
|---|---|
| **From:** | Jim Dahlby [jdahlby@pwrplan.com] |
| **Sent:** | 10/27/2019 1:43:22 PM |
| **To:** | Jamie Carr [jcarr@pwrplan.com] |
| **Subject:** | Re: Lucasys |

Let's talk later or in the morning. Ultimately marketing isn't in a position to drive content without help.

Someone on marketing team manages social posting, but don't know who these days.

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.

On Oct 27, 2019, at 1:24 PM, Jamie Carr <jcarr@pwrplan.com> wrote:

Jim – I was going to send this to several execs, but don't want it tom come across as overly critical. But clearly, we need to step up our game.

Vadim continues to build his team.

https://www.linkedin.com/in/vu-nguyen-a3869947/

Brett asked me several months ago if he should be concerned about Lucasys. I said yes. My answer remains yes, and considering how many people he has added recently, I'm even more concerned.

I was scrolling through the Lucasys LinkedIn page just now. Vadim is seemingly everywhere, and posting pictures of him and his team at conferences, as well as good other content. I wanted to see what we are posting on our LinkedIn page as a comparison. We've got some Monday Motivation and Wednesday Wisdom posts, but it took quite a bit of scrolling to get to any meaty content. In terms of recent conferences, we have only posted about a conference in Liverpool, England. I didn't scroll for others.

We're going to see him at AGA/EEI in November.

As someone who attends many of the conferences, how I can get some content out there? Until I looked at Vadim's page, it never donned on me to check on our social media presence on LinkedIn. Do we post content somewhere else? One issue we have, at least with me, is that I'm needed to be so engrossed in projects that I don't have time to create content.

I'll get some pictures at TEI this week. Who can I send them for posting?

**Jamie Carr**
Director, Professional Services

Mobile: 330.603.3556
jcarr@pwrplan.com
PowerPlan.com

<image003.png>



CONFIDENTIAL

Message

| | |
|---|---|
| From: | jdahlby@pwrplan.com [jdahlby@pwrplan.com] |
| Sent: | 7/8/2019 8:47:09 AM |
| To: | Jamie Carr [jcarr@pwrplan.com] |
| Subject. | Re. [EXT] Draft RFP |

Don't see anything, I hadn't read it before I sent your email.

I thought I interpreted a comment that vadim would have a harder time because he doesn't have Provision. I do think its interesting that they didn't specify PowerTax.

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.

On Jul 8, 2019, at 7:56 AM, Jamie Carr <jcarr@pwrplan.com> wrote:

The RFP does not. It includes interfacing ptax to Provision, but not reconfiguration of Provision. Or did I miss something?

Sent from my iPhone

On Jul 8, 2019, at 7:26 AM, Jim Dahlby <jdahlby@pwrplan.com> wrote:

Does or does not have provision

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.

On Jul 8, 2019, at 7:25 AM, Jamie Carr <jcarr@pwrplan.com> wrote:

FYI - here's a draft of the AEP RFP. The official release is set for today. You'll see it's worded very generally and if Vadim actually has a product, we could be in for a battle, especially if he partners with someone who had tax accounting experience. However, the RFP doesn't include Provision reconfiguration.

I'll work with Eric. Colin, Rob and Justin on this.

Orals are the week of Aug 5th. Anyone have a conflict?

Sent from my iPhone

Begin forwarded message:

**From:** Kevin D Keller <kdkeller@aep.com>
**Date:** July 7, 2019 at 10:31:18 AM EDT
**To:** Jamie Carr <jcarr@pwrplan.com>
**Subject:** [EXT] Draft RFP

Exercise CAUTION when opening links or attachments.



PLAINTIFF'S
EXHIBIT
193

Jamie – Just got my hands on the Draft RFP. I do not anticipate any material changes to the doc. The final should be distributed to all vendors tomorrow through the formalized RFP process.

Thanks!

**KEVIN D KELLER | DIR TAX ACCTING & FORECASTING**
KDKELLER@AEP.COM | D:614.716.1994 | C:614.648.7640
1 RIVERSIDE PLAZA, COLUMBUS, OH 43215

<Tax Fixed Asset System RFP_DRAFT.docx>

CONFIDENTIAL

Message

| | |
|---|---|
| From: | Jim Dahlby [jdahlby@pwrplan.com] |
| Sent: | 7/25/2019 9:31.22 PM |
| To: | Jamie Carr [jcarr@pwrplan.com] |
| Subject | Re. Request for Pricing Approval - AEP Services |

Thanks for your leadership on this.

Jim

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.

On Jul 25, 2019, at 7:55 PM, Jamie Carr <jcarr@pwrplan.com> wrote:

Sent from my iPhone

Begin forwarded message:

**From:** John Ericson <jericson@pwrplan.com>
**Date:** July 25, 2019 at 5:49:39 PM EDT
**To:** Joe Gomes <Joe.Gomes@powerplan.com>, Joost Rutten <Joost.Rutten@powerplan com>, Brett Bertz <brett.bertz@powerplan.com>, Paul Crist <pcrist@pwrplan.com>
**Cc:** Matt Crye <mcrye@pwrplan.com>, Jamie Carr <jcarr@pwrplan.com>
**Subject: Request for Pricing Approval - AEP Services**

Joe, Joost, Brett, Paul,

Matt, Jamie, and me – with input from Jim Dahlby, Phil Zegarelli, and other tax experts have worked this week to review our options and put together a winning strategy for a Tax RFP at AEP.

The details are below, but we feel that keeping the competition out of AEP is very important to our longterm success at AEP from a tax perspective and have priced this services opportunity to accomplish that goal.

Please let us know if this is approved and we will complete the RFP for submission tomorrow.

Thanks,

John...

PLAINTIFF'S
EXHIBIT
114
PENGAD 800-621-6989

| | |
|---|---|
| **Account:** | AEP |
| **SAE:** | John Ericson, Jamie Carr on point for Services Sales |
| **Request Date:** | RFP Due July 26, 2019 |
| **SF Link:** | https://na01 salesforce.com/0060d00001tGO7s |
| **Oppy Description:** | AEP has issued an RFP for Tax Work related to Deferred Tax. They have requested a Fixed Fee bid It is highly |

competitive and we are looking to keep competition out of one of our largest customers.

**Close Date:** November 2019

**Stage 1-5:** Phase 3 – Vendor Analysis

**BC/E/C:** Best Case

**License/Cloud Discount Summary** (leave blank if not seeking a license discount)

**License / Cloud:**

| Term | Metric | List Price | Target Price | Discount % |
|------|--------|------------|--------------|------------|
|      |        |            |              |            |
|      |        |            |              |            |

No software discounts at this point

**License Approver:** None

**Prof. Services Discount Summary** (leave blank if not seeking a services discount)

**Services:**

| T&M Fixed Fee | |
|---------------|---|
| Fixed Fee | |

**Services Approver:** Joe Gomes

**Exec Justification:**
- <!--[if !supportLists]--><!--[endif]-->This is a highly competitive deal with RCC, Vadeem's company, Deloitte, and UI.
- <!--[if !supportLists]--><!--[endif]-->Vadeem potentially has a TFA product that they will pitch to displace PowerPlan
- <!--[if !supportLists]--><!--[endif]-->There is a lot of work after this project that will probably go to the selected vendor
- <! [if !supportLists] ><!- [endif]-->We recently lost a tax deal at FPL and believe it was on price due to competitive pricing tactics

**Supporting Docs Attached:** EAC from Deal Review

John Ericson
.

Office: +1 978-474-0640
Mobile: +1 617-513-3642
jericson@pwrplan.com
PowerPlan.com

<image003.png>

<PowerTax RFP EAC v2.xlsx>

ATTORNEYS' EYES ONLY

Message

| From: | Jim Dahlby [jdahlby@pwrplan.com] |
|-------|-----------------------------------|
| Sent: | 7/22/2019 1:27:38 PM |
| To: | Brett Bertz [brett.bertz@powerplan.com] |
| Subject: | FW: [EXT] NextEra Tax Depreciation and Deferred Tax Project |

Brett,

This is the opportunity we think the Lucasys letter to FPL could impact.

Jim

Jim Dahlby

Mobile: +1 678.269.7950
jdahlby@pwrplan.com

**From:** Jamie Carr <jcarr@pwrplan.com>
**Sent:** Friday, July 19, 2019 4:19 PM
**To:** Kevin Murphy <kmurphy@pwrplan.com>; Matt Crye <mcrye@pwrplan.com>; Phil Zegarelli
<pzegarelli@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Brett Bertz <brett.bertz@powerplan.com>; Skip
Fowler <Skip.Fowler@powerplan.com>; Michael Bradley <mbradley@pwrplan.com>
**Subject:** Fwd: [EXT] NextEra Tax Depreciation and Deferred Tax Project

FYI

Sent from my iPhone

Begin forwarded message:

**From:** "Rogers, Phillip" <Phillip.Rogers@fpl.com>
**Date:** July 19, 2019 at 4:09:03 PM EDT
**To:** Jamie Carr <jcarr@pwrplan.com>
**Subject: RE: [EXT] NextEra Tax Depreciation and Deferred Tax Project**

Ultimately, the team selected the lowest price bidder

Phillip

**From:** Jamie Carr <jcarr@pwrplan.com>
**Sent:** Friday, July 19, 2019 3:56 PM
**To:** Rogers, Phillip <Phillip.Rogers@fpl.com>
**Subject:** Re: [EXT] NextEra Tax Depreciation and Deferred Tax Project

---

### CAUTION - EXTERNAL EMAIL

Phillip-

Thanks for getting back to me. What was the deciding factor?

Jamie

Sent from my iPhone

PLAINTIFF'S
EXHIBIT
195
PENGAD 800-631-6964

CONFIDENTIAL

POWERPLAN00122473

On Jul 19, 2019, at 1:34 PM, Rogers, Phillip <Phillip.Rogers@fpl.com> wrote:

**Exercise CAUTION when opening links or attachments.**

Jaime:

I apologize for the long delay in getting the answer out, but the team will be moving forward with another company for this project.

Thank you for your professionalism throughout this process.

Phillip


Phillip Rogers
Integrated Supply Chain
Florida Power & Light
Desk: 561-694-3365
Cell: 561-563-2365
phillip.rogers@fpl.com

This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you.

POWERPLAN00122474

 **NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Atlantic Station
201 17th Street, NW | Suite 1700
Atlanta, GA 30363
T 404.322.6000  F 404.322.6050
nelsonmullins.com

Mark S. VanderBroek
T 404.322.6675
mark.vanderbroek@nelsonmullins.com

October 30, 2019

<u>Via FedEx and Email</u>

Mr. Vadim Lantukh
Co-Founder and CEO
Mr. Daniel Chang
Co-Founder and COO
Mr. Stephen Strang
Chief Technology Officer
Lucasys, Inc.
1595 Peachtree Parkway
Suite 204-190
Cumming, Georgia 30041

Mr. Vadim Lantukh
Co-Founder and CEO
Mr. Daniel Chang
Co-Founder and COO
Mr. Stephen Strang
Chief Technology Officer
Lucasys, Inc.
190 Bluegrass Valley Pkwy
Alpharetta, GA 30005

Mr. Vadim Lantukh
4460 Wykeshire Ct
Cumming, GA 30041-5836
<u>Vadim.lantukh@gmail.com</u>

Mr. Daniel Chang
2360 Someo Ct.
Atlanta, Georgia 30324
<u>changhdaniel@gmail.com</u>

Mr. Stephen Strang
600 Garson Dr. NE, Apt. 5103
Atlanta, Georgia 30324-3387
<u>sgstrang@gmail.com</u>



PLAINTIFF'S
EXHIBIT
196

Re:  Lucasys' Misappropriation of PowerPlan Intellectual Property

Dear Messrs. Lantukh, Chang and Strang:

I and this law firm represent PowerPlan, Inc. ("PowerPlan"), a wholly-owned subsidiary of Roper Technologies, Inc. [NYSE: ROP].  This letter addresses the misappropriation by Lucasys, Inc. ("Lucasys") and each of you of PowerPlan's confidential and proprietary information and trade secrets (collectively the "Protected Information"), including but not limited to those embodied by PowerPlan's unique and sophisticated software and data systems and solutions and its confidential customer information, through Lucasys' use of this information to design, develop, market and attempt to sell directly competing Lucasys software to the same group of customers and

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30. 2019
Page 2

potential customers served by PowerPlan. This letter also addresses the impropriety of Lucasys continuing to provide consulting services to PowerPlan customers for PowerPlan software, at the same time Lucasys is developing its own competing software to sell to these and other PowerPlan customers.

## A. PowerPlan and Its Proprietary Software and Other Trade Secrets and Confidential Information.

As you know, PowerPlan has, through a substantial expenditure of time, effort, and money over 25 years, developed valuable. unique, and sophisticated software and data systems and solutions. The PowerPlan software permits utilities, and other businesses operating in rate regulated and asset intensive industries. to effectively manage and integrate the financial, operational, and regulatory compliance aspects of their assets. PowerPlan's software platform integrates granular financial data with complex regulatory compliance rules and operational information, to allow decision makers to access meaningful data and make credible and supportable decisions to optimize corporate performance.

PowerPlan's unique and specialized software solutions include nine different software suites or modules, covering the areas of fixed assets, lease accounting. rate case and ROE management, income tax, property tax, capital planning and forecasting, project portfolio cost management, asset investment optimization, and insights analytics and reporting.

PowerPlan's software programs, including source code, system and data architecture, data bases, and various unique and integrated features and functions thereof, are confidential and proprietary and embody trade secrets under federal and Georgia law. These system components derive economic value from not being generally known, and PowerPlan has taken reasonable measures to maintain their secrecy. Similarly, PowerPlan has developed other valuable Protected Information that also amount to trade secrets, including but not limited to customer information relating to its customer base of utility companies and other regulated and asset intensive businesses, and pricing information for its software solutions.

As former employees of PowerPlan, you each know that the measures taken by PowerPlan to maintain the secrecy of its Protected Information include, but are not limited to: (1) requiring PowerPlan employees to sign employment agreements prohibiting use or disclosure of PowerPlan Protected Information outside their employment with PowerPlan; (2) adopting employee handbooks with policies similarly prohibiting use or disclosure of this information outside of employment with PowerPlan; (3) requiring customers to sign license agreements acknowledging PowerPlan's proprietary rights in its software programs, manuals and supporting materials, and

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30, 2019
Page 3

agreeing to maintain the confidentiality of and refrain from disclosing such PowerPlan Protected Information; and (4) requiring user log ins and passwords for employees, customers, and other persons accessing PowerPlan's software.

PowerPlan's unique and sophisticated software and data solutions have enjoyed tremendous success in the marketplace in which PowerPlan operates. The value of PowerPlan's system depends in large part on the confidential and proprietary nature of the software programs, solutions, and related materials, which prevents others from copying protected aspects thereof (including proprietary features and functions) to unfairly compete with PowerPlan.

B. **Your Backgrounds as Former PowerPlan Employees and as Consultants Servicing PowerPlan Software.**

You each worked for years as PowerPlan employees, including in managerial positions. Some of you have also worked as a consultant providing services to PowerPlan customers in implementing and using PowerPlan software. In those capacities, you have had, and still have, access to a wide spectrum of PowerPlan's Protected Information, under legal obligations to refrain from using or disclosing for purposes unrelated to servicing PowerPlan customers.

Mr. Lantukh was employed by PowerPlan from July 2007 through March 2013 first as Manager of Software Installation and later as Director of Professional Services. In both of those management positions, he had intimate access to all aspects of PowerPlan's confidential and proprietary systems (including but not limited to the system architecture, databases, features, functions, and source code), and worked closely with PowerPlan customers in connection with implementation and use of PowerPlan's software. He also had access to confidential and proprietary PowerPlan customer and pricing information.

Mr. Chang worked for PowerPlan from June 2009 to December 2014, as a consultant assisting customers in implementing and using their PowerPlan software, and later in managerial positions. Mr. Strang worked for PowerPlan from January 2011 to September 2015, as a Senior Consultant assisting customers in implementing and using their PowerPlan software, and later in a managerial position. In those capacities, Chang and Strang had access to a wide spectrum of PowerPlan's Protected Information – including but not limited to PowerPlan software system architecture, databases, features, functions, and source code, and customer and pricing information.

While working for PowerPlan, each of you signed Employment Agreements in which you agreed, among other things, to refrain in perpetuity from using, disclosing, or permitting any unauthorized person from using, disclosing, or gaining access to, any

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30, 2019
Page 4

Protected Information of PowerPlan, except to the limited extent necessary to satisfy your obligations to PowerPlan.  In addition, you were and are aware that PowerPlan requires its customers to sign license agreements acknowledging PowerPlan's proprietary rights in its software programs, manuals and supporting materials, and agreeing to maintain the confidentiality of and refrain from disclosing such Protected Information.

From March 2013 through May 2018, Mr. Lantukh worked for Regulated Capital Consultants ("RCC") as a consultant providing services exclusively or primarily to PowerPlan customers in connection with implementation and use of their PowerPlan software, subject to confidentiality obligations owed to the customers, to PowerPlan, and presumably to RCC as well.  From 2015 until earlier this year, Mr. Chang worked for Deloitte and consulted with PowerPlan customers in connection with implementation and use of their PowerPlan software, also subject to confidentiality obligations.  In those capacities you continued to have access to PowerPlan's proprietary software, and to other PowerPlan Protected Information.

Since Lucasys was formed in May 2018, PowerPlan understands that at least Mr. Lantukh has continued to provide consulting services to some of PowerPlan's customers in connection with their PowerPlan software.  Thus, Lucasys and you continue to have access to virtually all aspects of PowerPlan's proprietary software and data structures, subject to confidentiality and non-disclosure obligations, as discussed in more detail below.

## C. <u>Your Formation of Lucasys, and Your and Lucasys' Resulting Misappropriation of PowerPlan's Protected Information to Design and Develop Competing Software to Market and Sell to PowerPlan's Customer Base.</u>

In May 2018, Mr. Lantukh (and apparently Mr. Chang) founded and Mr. Lantukh became CEO of Lucasys.  Lucasys was formed to develop software solutions and programs comparable to PowerPlan's proprietary software, and to market and sell those solutions and programs to the same core customer base served by PowerPlan -- at the same time that Lucasys has continued to consult with PowerPlan customers about PowerPlan's software.  Lucasys has been designing and developing its software over the last year, and recently started to market, promote, and seek to sell this software to utilities and other regulated and asset intensive businesses, including to PowerPlan's customers.

Given that most of Mr. Lantukh's professional career has been spent accessing, modifying, implementing, and working with PowerPlan's proprietary software, either as a PowerPlan employee or a consultant servicing PowerPlan customers, PowerPlan was

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30, 2019
Page 5

concerned that it would be impossible for him and Lucasys to design and develop Lucasys' software without inevitably misappropriating confidential and proprietary aspects of PowerPlan's software.  This concern was exacerbated when PowerPlan learned that Lucasys recently hired former PowerPlan employees Mr. Chang as Lucasys' COO and Mr. Strang as its Chief Technology Officer, and that Mr. Chang is a co-founder of Lucasys.

PowerPlan just learned that Lucasys has hired a fourth former PowerPlan employee – Vu Nguyen – to become a Lucasys Implementation Partner.  Like each of you, while Mr. Nguyen was a PowerPlan employee he had access to and worked closely with PowerPlan's confidential and proprietary systems, including its source code, and worked closely with PowerPlan customers in implementing PowerPlan software.  Also like each of you, Nguyen signed employment agreements with PowerPlan prohibiting him from using or disclosing PowerPlan's Protected Information (including computer programs, codes, and documentation and customer information) outside of his employment with PowerPlan.  Furthermore, in his position with Integrated Solutions Consulting, Mr. Nguyen has worked as a consultant for one or more PowerPlan customers helping to implement the software.

In addition, earlier this year Mr. Chang attended a PowerPlan user conference while he was still an employee of Deloitte, at which he would have had been exposed to additional proprietary PowerPlan Protected Information.  This information was provided subject to and conditioned upon Deloitte's signed agreement, under which Chang is bound, to maintain the confidentiality of PowerPlan product and other Protected Information, and to refrain from disclosing or making such information available to a third party for any reason.

Based on a review of Lucasys' current and evolving website, marketing videos, and other information available to PowerPlan, it now has become apparent that PowerPlan's concerns were justified, and that Lucasys' software inappropriately mimics and imitates PowerPlan's proprietary software programs and solutions.  The Lucasys software purports to have many of the same software suites and modules as PowerPlan, and those modules appear to not only provide the same unique and proprietary functions and features as PowerPlan's software, but also to be built using similar proprietary software architecture and databases.

For example, the Lucasys software service modules listed on its website – fixed assets, tax solutions, regulatory solutions, planning and forecasting, intelligence as a service, and copilot finance automation – mirror many of the software service modules provided by PowerPlan.  Furthermore, the marketing video illustrating Lucasys' tax solutions software module reflects that the module has the same functions and features as PowerPlan's PowerTax module, and also reflects the same key architectural

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30, 2019
Page 6

components of the PowerTax solution – including methods for tracking book/tax differences, cases structure, allocating book depreciation, and tracking deferred taxes by book to tax differences with different treatments.

Furthermore, Lucasys' software products are being developed for, and are now being marketed and promoted for sale to, the same customer base served by PowerPlan – utilities and other businesses operating in rate regulated and asset intensive industries. Lucasys has a wide range of knowledge of PowerPlan Protected Information relating to these potential customers, as a result of each of your (and Nguyen's) past employment with PowerPlan and consulting engagements for PowerPlan customers who are now potential customers of Lucasys. Lucasys undoubtedly is using this PowerPlan Protected Information in connection with marketing and seeking to sell its competing software to these prospects.

In fact, Lucasys is continuing to provide consulting services to certain PowerPlan customers – including but not limited to Florida Power & Light and AEP – relating to those customers' implementation and use of PowerPlan software. In that capacity, Lucasys continues to have direct access to PowerPlan's confidential and proprietary systems (including source code), under obligations of confidentiality and non-disclosure. At the same time, Lucasys is developing software that competes with and mirrors the architecture, functions, and features of PowerPlan's software solutions and is marketing that software to PowerPlan customers in direct competition with PowerPlan. This creates an intolerable risk to PowerPlan that you and Lucasys will continue to misappropriate PowerPlan Protected Information. It also creates a conflict of interest for Lucasys, because Lucasys has financial incentive for its consulting customers to be dissatisfied with the very software (PowerPlan's) it was retained to help implement.

Finally, Lucasys has been able to develop and begin offering to sell its software solutions within one year of being formed. This is an unusually short development time for software with this level of sophistication and complexity – which further evidences that Lucasys took unfair and illegal shortcuts in development by copying PowerPlan's confidential and proprietary software programs and solutions, and, potentially, portions of PowerPlan's software source code.

These circumstances provide overwhelming proof that Lucasys and each of you individually are improperly, unlawfully, and unfairly using PowerPlan's Protected Information – including but not limited to information embodied in PowerPlan's proprietary architecture, software, data bases, and unique functions and features, and proprietary customer and pricing information – to design, develop, market and sell Lucasys' highly similar and competing software products and solutions to the same customer base. This misconduct amounts to an intentional misappropriation of PowerPlan's trade secrets in violation of the federal Defend Trade Secrets Act, 18

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30, 2019
Page 7

U.S.C. § 1831 *et seq.* and the Georgia Trade Secrets Act, O.C.G.A. § 10-1-760 *et. seq.*
It also amounts to a breach of each of your contractual obligations owed to PowerPlan
to refrain from disclosing or using PowerPlan's Protected Information to or on behalf of
third parties such as Lucasys.

To the extent that Lucasys has improperly copied or used portions of
PowerPlan's software source code in designing or developing its competing software,
then this also would amount to copyright infringement in violation of 17 U.S.C. § 501.

Your and Lucasys' misappropriation of PowerPlan's trade secrets, breaches of
confidentiality and non-disclosure agreements, and any copyright infringement, would
entitle PowerPlan to a variety of legal remedies. These include but are not limited to an
injunction against Lucasys, you, and others acting in concert with Lucasys: (1)
prohibiting actual or threatened misappropriation and infringement; (2) prohibiting
Lucasys' sale of software developed based on misappropriated trade secrets and/or
copied source code, and (3) requiring Lucasys, each of you, and Lucasys employees to
return to PowerPlan or destroy all PowerPlan Protected Information or data in their
possession, custody or control. 18 U.S.C § 1836(b)(3)(A); 17 U.S.C § 502; and
O.C.G.A. §§ 10-1-762.

PowerPlan's legal remedies also would include recovery of damages suffered by
PowerPlan (which could include but not be limited to lost profits from lost sales); a
disgorgement of Lucasys' profits or other unjust enrichment derived from its wrongful
conduct; payment of a royalty for Lucasys' unauthorized disclosure or use of
PowerPlan's trade secrets; exemplary damages of up to twice the amount of damages
or disgorged profits awarded, due to the willful and malicious nature of the
misappropriation; and a recovery of attorneys' fees and litigation expenses. *See, e.g.,*
18 U.S.C. § 1836(b)(3)(B)-(D); 17 U.S.C §§ 504, 505; and O.C.G.A. §§ 10-1-763, 10-1-
764.

In addition to Lucasys' wrongdoing mentioned above, Lucasys also has adopted
and is using in commerce: (1) a light bulb logo which is similar to a light bulb logo that
PowerPlan previously used for many years; and (2) the promotional tagline "complex
processes made simple," which is virtually identical to and copied from PowerPlan's
previously used taglines "we make the complex simple" and "simplifying the complex."
This is likely to cause confusion and deception of potential customers by suggesting
that Lucasys has an affiliation or connection with or sponsorship by PowerPlan that
does not exist. This amounts to infringement of PowerPlan's prior common law
trademark rights in its light bulb logo and tagline, in violation of the federal Trademark
Act, 15 U.S.C. § 1125(a) and Georgia common law, and also would entitle PowerPlan to
legal relief including an injunction, damages, and a disgorgement of Lucasys' profits.
*See* 15 U.S.C. §§ 1116, 1117. This conduct also serves as further evidence of Lucasys'

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30, 2019
Page 8

intent to copy PowerPlan's intellectual property so as to unfairly compete with
PowerPlan, and to freeride on PowerPlan's longstanding goodwill and reputation.

In conclusion, Lucasys and each of you are unfairly and wrongfully competing
with PowerPlan in numerous ways:  by misappropriating PowerPlan's Protected
Information that PowerPlan has spent decades and tens of millions of dollars
developing and protecting; misusing this information to develop competing software for
Lucasys containing the same or extremely similar proprietary functions, features,
architecture, and data bases as PowerPlan's software, wrongfully marketing and selling
that software to PowerPlan customers based on PowerPlan's confidential and
proprietary customer and pricing information; and using a logo and tagline copied from
PowerPlan's so as to further improperly suggest an affiliation with PowerPlan and
freeride on PowerPlan's goodwill.

### D. **PowerPlan's Demands**

PowerPlan's Protected Information and other intellectual property are extremely
important to it and to its business.  It will take all steps necessary to protect this
information.  PowerPlan cannot allow you and Lucasys to copy, misappropriate, and
freeride on this information and intellectual property, by using it to develop a completing
software platform to market and sell to the same customer base serviced by PowerPlan.
Nor can it permit you and Lucasys to continue to provide consulting services to
PowerPlan customers regarding PowerPlan software, with virtually unlimited access to
the PowerPlan software, at the same time Lucasys is developing competing software to
sell to the same customers in direct competition with PowerPlan.

Accordingly, on behalf of PowerPlan I hereby demand that Lucasys, each of you,
and all others acting in concert with Lucasys and/or you (including but not limited to Mr.
Nguyen, other Lucasys employees, and any and all persons or entities who own an
interest in or are working with Lucasys in relation to its development and sale of its
software), comply immediately with each of the following steps:

1. Cease and desist from all disclosure and use of any PowerPlan Protected
   Information, including but not limited to PowerPlan's software and data
   systems, solutions, and source code;

2. Make arrangements (coordinated through this law firm before taking any
   steps to implement) to (a) return to PowerPlan all non-public information and
   documents (including electronic files, software, and software source code) in
   your or Lucasys' possession, custody or control that relate to PowerPlan or to
   PowerPlan's software and customers, and (b) delete and destroy all such
   information and documents from your computers and other devices;

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30, 2019
Page 9

3. Cease and desist with further design, development, marketing, sales, or efforts to sell Lucasys software, including marketing and promoting at trade shows and industry events, unless and until Lucasys can prove to PowerPlan that its software has been and is being independently designed and developed without any use of PowerPlan's Protected Information, and can be sold to customers without use of PowerPlan's proprietary customer information;

4. Cease and desist from serving as a consultant to PowerPlan customers in any capacity which requires or permits Lucasys to have access to PowerPlan's software or data bases, for as long as Lucasys is developing and selling competing software, and cooperate with these customers in transitioning this consulting work to other persons or businesses. PowerPlan has no objection to Lucasys continuing to provide consulting services to PowerPlan customers that do not involve working with PowerPlan software; and

5. Cease and desist from using a light bulb logo and the slogan or tagline 'complex processes made simple,' and any confusingly similar slogans or taglines.

To preserve and prevent spoliation of information and documents relevant to PowerPlan's claims against you and Lucasys, I further demand that Lucasys, each of you, and all others acting in concert with Lucasys or you (including but not limited to Nguyen, other Lucasys employees, and others who own an interest with or are working with Lucasys in relation to its development and sale of its software) put a litigation hold in place and take all necessary steps to preserve and retain, and to avoid deleting, destroying, altering, or overwriting, all documents, records, and electronically stored information ("ESI") in their possession, custody or control which refer or relate to or evidence any of the practices and conduct referenced in this letter. This includes but is not limited to maintaining and preserving all documents and ESI, whether in the possession or control of Lucasys or any of you personally, consisting of or relating or referring in any manner to any of the following: (1) PowerPlan's software, or any portions of or source code for this software, and all manuals and other materials relating thereto; (2) PowerPlan's customers; (3) PowerPlan's pricing for its software; (4) Lucasys' design and development of its software; (5) Lucasys' promotion pricing, and sale of, and efforts to sell, its software, including but not limited to communications with customers and potential customers for the Lucasys software; and (6) Lucasys' consulting services provided for PowerPlan customers relating to PowerPlan software. Any destruction, deletion, or alteration of such materials, other than pursuant to an agreement with PowerPlan, will be considered spoliation of relevant evidence.

Vadim Lantukh
Daniel Chang
Stephen Strang
October 30, 2019
Page 10

Please contact me, or have your lawyer contact me, by no later than November 11, 2019, to advise whether and to what extent Lucasys and you have complied and will comply with the demands made herein.  If you do not timely comply with these demands, PowerPlan will take all appropriate steps to protect its rights.  This could include but not be limited to filing a lawsuit against Lucasys and each of you, which would seek all available equitable and legal remedies.

This letter is sent without waiver of any of PowerPlan's rights, claims and remedies against Lucasys and you, all of which are expressly reserved.

PLEASE BE GOVERNED ACCORDINGLY.

Very truly yours,

Mark S. VanderBroek

MSV:jh

Cc:   Mr. Joost Rutten, CFO
Jonathan Sucher, Esq., PowerPlan Senior Corporate Counsel

EXHIBIT 2

PLAINTIFF'S
EXHIBIT
197

DocuSign Envelope ID: FE6372A1-2133-4B00-B92B-7E2D05AC1327

POWERPLAN

December 5, 2019

**VIA EMAIL**

American Electric Power Service Corporation
ATTN: Jeffrey W Hoersdig <jwhoersdig@aep.com>; James X Llende <jxllende@aep.com>; Kevin D Keller
<kdkeller@aep.com>; Chris B Morris <cbmorris@aep.com>; Anthony J Swaneck <ajswaneck@aep.com>; Julie E Sanders
<jesanders2@aep.com>

RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights

Messrs. Hoersdig, Llende, Keller, Morris, Swaneck, and Ms. Sanders:

At PowerPlan, one of our most valuable assets is our intellectual property. This intellectual property includes the confidential and proprietary information and trade secrets embodied within our unique and sophisticated software solutions, including the source code, system and database architecture, databases, database models and structures, and various unique and integrated features and functions thereof. To protect and preserve these rights, we take reasonable steps to maintain the confidentiality of our software programs and solutions.

You may be aware that we include confidentiality provisions in our software license agreements with our customers. For example, the PowerPlant System Perpetual Licensing Agreement (the "License Agreement") between our companies includes provisions in Article 14 in which AEP acknowledges PowerPlan's proprietary rights in and to its software, including computer programs, manuals and supporting materials, and agrees to maintain the confidentiality of this information by refraining from using, disclosing, publishing or divulging the information to any third-party without our consent, and by employing no less stringent procedures than the strictest procedures used to protect its own confidential data.

We understand that you utilize third-parties to perform services related to our software from time to time. Nevertheless, please be advised that continued or future use of such third-parties will require our consent in compliance with the License Agreement. It is our understanding that one such third-party used by you to perform this consulting work on the PowerPlan software is Lucasys Inc. It is PowerPlan's understanding that Lucasys has been developing software that directly competes with our software, and recently started marketing and seeking to sell that software to our customer base. As I am sure you can understand, to protect our trade secrets and other intellectual property, we cannot permit Lucasys to have access to our confidential and proprietary software through our customers while Lucasys simultaneously develops, markets, and sells the same kind of software to the same customer base in direct competition with us. This creates an intolerable risk for us – and you – that Lucasys may continue or begin to misuse or misappropriate our confidential information and trade secrets and unfairly use them to develop, market, and sell its competing software.

Accordingly, this confirms our expectation that AEP and its affiliates will cease providing Lucasys with access to our software and aforementioned intellectual property, including the database architecture and data model. Further, we ask that you notify us of any other third parties that currently have access through AEP to the PowerPlan software and associated database, via database link or otherwise, and (whether monitored, managed, or logged by you), and of the confidentiality arrangement you have in place with such parties. This will allow us to determine whether our intellectual property is sufficiently protected, while continuing to partner with you to minimize disruption to your strategic PowerPlan software-related initiatives.

If you have any questions regarding this matter, please do not hesitate to contact me.

Sincerely,

Brett Bertz
Brett Bertz
Chief Customer Officer

Cc:    Jim Dahlby, VP of Strategy
       Jonathan Sucher, Senior Corporate Counsel

Message

| From: | Jim Dahlby [jdahlby@pwrplan.com] |
|---|---|
| Sent: | 2/26/2020 10:32:08 PM |
| To: | Joost Rutten [Joost.Rutten@powerplan.com] |
| Subject. | FW: AEP |

Do we want to discuss in tomorrow?

Jim Dahlby

Mobile:  +1 678.289 7950
jdahlby@pwrplan.com

**From:** Brett Bertz <brett.bertz@powerplan.com>
**Sent:** Thursday, February 20, 2020 10:34 AM
**To:** Jim Dahlby <jdahlby@pwrplan.com>; Joost Rutten <Joost.Rutten@powerplan.com>
**Subject:** RE: AEP

I do.  He's included on my previous note.  I'll ping him.

**From:** Jim Dahlby <jdahlby@pwrplan.com>
**Sent:** Thursday, February 20, 2020 10:31 AM
**To:** Brett Bertz <brett.bertz@powerplan.com>; Joost Rutten <Joost.Rutten@powerplan.com>
**Subject:** RE: AEP

John Ericson has a conversation with Jeff today, do we want John to bring it up.

Jim Dahlby

Mobile:  +1 678.269.7950
jdahlby@pwrplan.com

**From:** Brett Bertz <brett.bertz@powerplan.com>
**Sent:** Thursday, February 20, 2020 10:28 AM
**To:** Joost Rutten <Joost.Rutten@powerplan.com>; Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** AEP

FYI — Jeff is very difficult to get a response from.  I do not have confirmation from him that the third party no longer has access to our IP at AEP.  And, we have reason to be concerned as AEP's VP of Tax was very vocal with me at the AGA-EEI Tax Leadership meeting in November about his support of technology disruption in the markets that we serve.

**From:** Brett Bertz
**Sent:** Thursday, February 20, 2020 10:21 AM
**To:** 'Jeffrey W Hoersdig' <jwhoersdig@aep.com>
**Cc:** John Ericson <jericson@pwrplan.com>
**Subject:** RE: PowerPlan Executive Advisory Board - 2020

Jeff, following up on my previous note.  Do you have any feedback from Jimmy on our EAB? Also, I'd like to confirm the intellectual property access request.

Thanks for your assistance.

BB



PLAINTIFF'S
EXHIBIT
198

ATTORNEYS' EYES ONLY

**From:** Brett Bertz
**Sent:** Wednesday, February 12, 2020 8:14 AM
**To:** Jeffrey W Hoersdig <jwhoersdig@aep.com>
**Cc:** John Ericson <jericson@pwrplan.com>
**Subject:** RE: PowerPlan Executive Advisory Board - 2020

Jeff, just following up on my note from last week. Two items to confirm:

1.    Have you had feedback from Jimmy Llende on his ability to represent AEP at the June EAB meeting?

2.    Have you been able to confirm that we have removed the access of the third party we discussed to PowerPlan intellectual property?

Thanks and please let me know if you have any questions.

BB

**From:** Brett Bertz
**Sent:** Thursday, February 6, 2020 3:23 PM
**To:** Jeffrey W Hoersdig <jwhoersdig@aep.com>
**Cc:** John Ericson <jericson@pwrplan.com>
**Subject:** PowerPlan Executive Advisory Board - 2020

Jeff, good to catch up this afternoon. As discussed here is some additional detail on our 2020 Executive Advisory Board event:

- Location: Scottsdale, AZ
- Four Seasons Resort at Troon North
- Monday, June 22nd – Wednesday, June 24th

○        Kick off Monday with an activity of your choosing (Golf at Troon North Monument Course, Spa at Four Seasons or Jeep Tour to enjoy sights and sounds of desert area)

- Lake Wilson will follow up with you to confirm all details and get your preferred activity
○ Welcome reception on Monday evening
○ Meeting all day Tuesday followed by a dinner that evening
○ Breakfast and departure Wednesday morning

- Spouses or significant others are welcome and encouraged to attend. They are invited to join our activities on Monday as well as any meals or receptions and we will have a shopping outing for them on Tuesday while we are meeting.

I understand that you have another commitment during that week in June. We would welcome the participation of Jimmy Llende representing AEP if his schedule will support it.

I will synch back up with John on establishing a time that Joe Gomes and I can be in person at AEP to deliver a deeper review of PowerPlan's new strategy to become the standard for the way the office of the CFO within the energy industry solves the most complex problems their companies face.

Lastly, I'll look to hear from you over the next 2 weeks to establish a follow up on the 3rd party access to PowerPlan intellectual property at AEP.

Thanks again for your continued investment with PowerPlan. Let me know if I can ever help you.

**Brett M. Bertz**

ATTORNEYS' EYES ONLY

Office:   +' 678.223.2762
Mobile:   +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

     PLAN

ATTORNEYS' EYES ONLY

DEC. 4, 2019

## AGREED PROCESS FOR INFORMATION EXCHANGE AND DISPUTE RESOLUTION BETWEEN POWERPLAN, INC. AND LUCASYS, INC. AND ITS PRINCIPALS

### Introduction and Background

PowerPlan, Inc. ("PowerPlan") has sent a letter to Lucasys, Inc. ("Lucasys") and its principals, Vadim Lantukh ("Lantukh"), Daniel Chang ("Chang"), and Stephen Strang ("Strang") (collectively the "Lucasys Parties," and with Lantukh, Chang, and Strang collectively referred to as the "Lucasys Individuals"), accusing the Lucasys Parties of misappropriation of PowerPlan's confidential and proprietary information and trade secrets (the "Protected Information"), including Protected Information relating to PowerPlan's software products and solutions (the "PowerPlan Software"), customers, and pricing, in connection with Lucasys' development, marketing and sale of software (the "Lucasys Software" further defined herein). The Lucasys Parties have responded to that letter, and deny PowerPlan's contentions.

In an effort to resolve this dispute without litigation, PowerPlan and the Lucasys Parties (collectively the "Parties") have agreed upon the general parameters of a process and associated conditions, as set forth in this document (the "Agreed Process"), for permitting PowerPlan to inspect and review the Lucasys Software (including architecture, databases, and source code) and development documents, and to obtain additional information and documents from Lucasys, in an expeditious manner and for the purpose of analyzing and comparing the parties' respective software products and thereafter discussing and seeking to resolve disputed issues between the parties.

### The Agreed Process and Conditions

A.   **Process for permitting PowerPlan inspection of Lucasys Software and exchange and review of other information and documents.**

1.    PowerPlan representatives involved in inspection of Lucasys Software and review of related materials: The Parties agree that the following PowerPlan officers, employees and representatives will be permitted to have access to, review, inspect and discuss Lucasys Software (as defined below), including code and databases, and other confidential or highly confidential documents and information provided by Lucasys during this process, subject to the terms of a confidentiality and non-disclosure agreement ("Confidentiality Agreement") to be negotiated in good faith between the Parties: Jim Dahlby, PowerPlan Vice President; Jonathan Sucher, PowerPlan Senior Corporate Counsel, PowerPlan's outside counsel at Nelson Mullins Riley & Scarborough (Mark VanderBroek, Lloyd Farr, and Peter Munk), and PowerPlan's third party software experts Sylvan Advisory & Consulting, LLC (Paul Pinto, Lou Brink, and Scott Robinson).

a.    "Lucasys Software" shall mean any software that Lucasys has developed or is in the process of developing, and at a minimum shall include but not be limited to the software modules, suites, applications, or solutions identified on the "Solutions" page of Lucasys' website:

1



PLAINTIFF'S
EXHIBIT
199
PENGAD 800-631-6989

iii.     Access to the actual, or a copy of, the Product Development Life Cycle Management (PDLCM) tool used by Lucasys to manage the development of its applications.

d.     The Lucasys Software copies and other documents and information exchanged by and between the Parties will be subject to confidentiality/non-disclosure obligations set forth in the Confidentiality Agreement. The PowerPlan representatives listed in Section A.1 of this Agreed Process will have access to the Lucasys Software and Lucasys documents subject to the Confidentiality Agreement. In addition, PowerPlan may share with PowerPlan management and with Roper IP counsel high level general comments and summaries based on its representatives' review and analysis of the Lucasys Software and Lucasys documents, as long as the details of the Lucasys Completing Software, or other information or highly confidential materials are not shared beyond the persons permitted access to that. Any individual or entity with whom PowerPlan shares information that it obtained under this agreement (even if by general comments or summary) must execute the Confidentiality Agreement. Non-public Information shared by PowerPlan with Lucasys during this process, if any, shall also be treated as confidential by the Lucasys Parties under the Confidentiality Agreement.

B.     **Dispute Resolution Process.** After PowerPlan completes its review and inspection of Lucasys' Software, it is the current intention of the Parties to schedule a settlement meeting or mediation during January to seek to discuss and resolve disputes between the Parties.

C.     **Other Conditions to This Process.**

1.     The Parties agree that in order to encourage good faith participation in the processes set forth in this Agreed Process, all delays in any party's filing of a complaint or motion to seek expedited relief or discovery after November 11, 2019 will not be used by the opposing party(ies) to argue that the filing party has delayed or waited too long to seek a preliminary injunction or other form of expedited relief (including expedited discovery).

2.     While this process is underway and unless and until the process is terminated by either party:

a.     Lucasys will temporarily suspend its marketing of and efforts to sell Lucasys Software to any new customers who use PowerPlan's software, but will be permitted to follow up on existing opportunities to sell Lucasys Software (including ones for which a bid is already submitted), and will be permitted to continue to maintain the status quo of its website and the two currently existing promotional videos as long as it doesn't add more videos or actively market or try to sell competing software other than as permitted in this subparagraph; and

b.     PowerPlan will temporarily refrain from discussing concerns about Lucasys' development, marketing and sale of competing software or misappropriating PowerPlan proprietary information with PowerPlan customers that are using Lucasys as consultants for their PowerPlan software (with the exception of NextEra and AEP and their affiliates, with whom PowerPlan may continue to have such discussions).

DocuSign Envelope ID: BA7998FD-6C8A-4570-89B3-71CCF6FE8C20

## NONDISCLOSURE AND CONFIDENTIALITY AGREEMENT

This Nondisclosure and Confidentiality Agreement (this "**Agreement**"), effective December 11, 2019 (the "**Effective Date**"), is entered into by and between Lucasys Inc., a company having its principal office at 1595 Peachtree Parkway, Suite 204-190, Cumming, GA 30041 ("**Company**") and PowerPlan, Inc., a company having its principal office at 300 Galleria Parkway, Suite 2100, Atlanta, GA 30339 ("**PowerPlan**") (each herein referred to individually as a "**Party**," or collectively as the "**Parties**"). In consideration of the covenants and conditions contained herein, the Parties hereby agree to the following:

### 1. PURPOSE

Company and PowerPlan have agreed upon the general parameters of a process and associated conditions to share certain information, as set forth in the Agreed Process For Information Exchange And Dispute Resolution Between PowerPlan, Inc. and Lucasys, Inc. and Its Principals dated December 4, 2019 (the "**Agreed Process**"), including Company software code and databases, and other confidential or highly confidential documents and information provided by Company during this process, subject to the terms of this Agreement. In connection with the Agreed Process, the Company will share certain confidential information with certain PowerPlan officers, employees, and representatives (the following individuals are the only people that may review confidential information subject to this Agreement and the Agreed Process: Jim Dahlby, Jonathan Sucher, Mark VanderBroek, Lloyd Farr, Peter Munk, Paul Pinto, Lou Brink, and Scott Robinson). Any recipient of information pursuant to the Agreed Process shall be deemed a "**Recipient**" for purposes of this Agreement. The Parties agree that such information shall be maintained as confidential in accordance with the terms of this Agreement, and shall not be disclosed except as expressly permitted herein.

### 2. CONFIDENTIAL INFORMATION

A. *Definition.* "**Confidential Information**" means any non-public Company information disclosed to Recipient during the dispute resolution process provided for in the Agreed Process, including any such information disclosed prior to the Effective Date, either directly or indirectly in writing, orally or by inspection of tangible objects (including, without limitation, financial information, research, product plans, products, services, equipment, customers, markets, software, inventions, processes, designs, drawings, hardware configuration information, marketing and finance documents, prototypes, samples, and data sets), whether or not designated as "confidential" at the time of disclosure. Confidential Information may also include information of a third party that is in Company's possession and is disclosed to Recipient under this Agreement and as part of the Agreed Process.

B. *Exceptions.* Confidential Information shall not, however, include any information that PowerPlan or Recipient can establish (i) was publicly known or made generally available without a duty of confidentiality prior to the time of disclosure to Recipient; (ii) becomes publicly known or made generally available without a duty of confidentiality after disclosure to Recipient through no action or inaction of Recipient; (iii) is in the rightful possession of PowerPlan or Recipient without confidentiality obligations at the time of disclosure to Recipient as shown by PowerPlan's or Recipient's then-contemporaneous written files and records kept in the ord

**PLAINTIFF'S EXHIBIT** 200

PENDAO 604-631-0889

DocuSign Envelope ID: BA7998FD-6C8A-4570-89B3-71CCF6FEBC20

permitted by the Agreed Process. Nothing in this Agreement shall be construed to restrict Company's use or disclosure of its own Confidential Information.

6.     **RETURN OF MATERIALS**

All documents and other tangible objects containing or representing Confidential Information and all copies or extracts thereof or notes derived therefrom that are in the possession or control of Recipient shall be and remain the property of Company. Upon termination or expiration of the Agreed Process: (a) if the Parties have resolved all of their disputes, all Confidential Information provided to Recipients shall be returned to the Company or destroyed, at the option of the Company; and (b) if the Parties have not resolved all of their disputes, the Recipients may retain possession of all Confidential Information, including any Lucasys Software in the possession of PowerPlan's expert Recipients, for thirty (30) days, and, if a lawsuit between the Parties is filed within those 30 days, for as long as the lawsuit is pending; provided, that the obligations set forth in this Agreement shall continue to apply unless and until there is a Confidentiality or Protective Order entered as part of a lawsuit that supersedes this Agreement; and provided, further, that if a lawsuit is not filed within 30 days of termination or expiration of the Agreed Process all Confidential Information provided to Recipients shall be returned to the Company or destroyed, at the option of the Company.

7.     **NO LICENSE**

Nothing in this Agreement is intended to grant any rights to Recipient under any intellectual property right of Company, nor shall this Agreement grant Recipient any rights in or to the Confidential Information except as expressly set forth in this Agreement or in the Agreed Process.

8.     **REMEDIES**

Recipient agrees that any violation or threatened violation of this Agreement will cause irreparable injury to Company, entitling Company to seek injunctive relief in addition to all legal remedies without showing or proving any actual damage and without any bond required to be posted.

9.     **RECIPIENT INFORMATION**

Company does not wish to receive any confidential information belonging to PowerPlan, and Company assumes no obligation, either expressed or implied, with respect to any information disclosed by Recipient to Company.

10.     **MISCELLANEOUS**

This Agreement shall bind and inure to the benefit of the Parties and their respective successors and permitted assigns; except that Recipient may not assign or otherwise transfer this Agreement, by operation of law or otherwise, without written consent of Company. Any assignment or transfer of this Agreement in violation of the foregoing shall be null and void. This Agreement will be interpreted and construed in accordance with the laws of the State of Georgia.

DocuSign Envelope ID: BA7998FD-6C8A 4570-89B3-71CCF6FEBC20

## EXHIBIT A

## COMMITMENT OF RECIPIENT PURSUANT TO NONDISCLOSURE AND CONFIDENTIALITY AGREEMENT REGARDING CONFIDENTIAL INFORMATION

I hereby affirm my understanding (i) that Confidential Information is being provided to me pursuant to the terms and restrictions of the Nondisclosure and Confidentiality Agreement (the "Agreement") entered between Lucasys Inc and PowerPlan, Inc and (ii) that I have read the Agreement. I understand the terms of the Agreement. **I agree to be bound by the Agreement as though I am a party to the Agreement.**

Name: Jonathan Sucher

Job Title: Senior Corporate Counsel

Employer: PowerPlan, Inc.

Business Address:

300 Galleria Pkwy, Ste 2100

Atlanta, GA 30339

Date: December 12, 2019

DocuSigned by:

*Jonathan Sucher*

E02BEE50AC72478...

Signature

5

## EXHIBIT A

### COMMITMENT OF RECIPIENT PURSUANT TO NONDISCLOSURE AND CONFIDENTIALITY AGREEMENT REGARDING CONFIDENTIAL INFORMATION

I hereby affirm my understanding (i) that Confidential Information is being provided to me pursuant to the terms and restrictions of the Nondisclosure and Confidentiality Agreement (the "Agreement") entered between Lucasys Inc and PowerPlan, Inc and (ii) that I have read the Agreement. I understand the terms of the Agreement. **I agree to be bound by the Agreement as though I am a party to the Agreement,**

Name: *Mark VanderBroek*

Job Title: *Partner*

Employer: *Nelson Mullins*

Business Address:

*201 17th St. N.W.*
*Suite 1700*
*Atlanta, GA 30363*

Date: **Dec. 12, 2019**                          Signature

5

## EXHIBIT A

## COMMITMENT OF RECIPIENT PURSUANT TO NONDISCLOSURE AND CONFIDENTIALITY AGREEMENT REGARDING CONFIDENTIAL INFORMATION

I hereby affirm my understanding (i) that Confidential Information is being provided to me pursuant to the terms and restrictions of the Nondisclosure and Confidentiality Agreement (the "Agreement") entered between Lucasys Inc and PowerPlan, Inc and (ii) that I have read the Agreement. I understand the terms of the Agreement. **I agree to be bound by the Agreement as though I am a party to the Agreement,**

Name: PAUL PINTO

Job Title: MANAGING PARTNER

Employer: SYLVAN ADVISORY & CONSULTING LLC.

Business Address:

6240 AVALON BLVD.
ALPHARETTA, GA 30009

Date: 12/13/19

Signature

 **NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Atlantic Station
201 17th Street, NW | Suite 1700
Atlanta, GA 30363
T 404.322.6000  F 404.322.6050
nelsonmullins.com

Mark S. VanderBroek
T 404.322.6675
mark.vanderbroek@nelsonmullins.com

March 9, 2020

### Via Email and Overnight Courier

Jason S. Alloy, Esq.
Joseph Saul, Esq.
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, NW
Atlanta, Georgia 30318

> Re: PowerPlan, Inc. ("PowerPlan") v. Lucasys, Inc. ("Lucasys") *et al.*
> PowerPlan's Summary Findings from Investigation of Lucasys Software
> Development and Business Plans under Agreed Process

Dear Jason and Joseph:

To follow up on our phone call today, this letter provides summary level findings from PowerPlan's preliminary investigation and analysis of Lucasys software, documents and information produced pursuant to the December 4, 2019 Agreed Process for Information Exchange and Dispute Resolution between PowerPlan and Lucasys (the "Agreed Process"). These findings confirm that Lucasys and its principals are misappropriating and misusing certain PowerPlan trade secrets and proprietary information, including PowerPlan's proprietary database structure and model, in connection with its development of Lucasys software solutions for marketing and sale to PowerPlan customers.

This letter includes citations to various documents, code, and other information provided by Lucasys through the Agreed Process, as examples of evidence supporting PowerPlan's findings. The letter closes with a reiteration of demands that Lucasys cease and desist from all use of PowerPlan trade secrets and proprietary information in connection with its development, marketing and sale of software, and with a suggestion that the parties promptly explore options for voluntary resolution of claims and disputes between them.

### A. Lucasys' Business Model is to Develop Software Modules to Compete with PowerPlan and to Integrate Directly with PowerPlan's Proprietary Databases

It is undisputed that Lucasys has detailed knowledge of and access to PowerPlan's proprietary software. Through prior employment with PowerPlan and consulting for PowerPlan


**PLAINTIFF'S EXHIBIT**
201

Jason Alloy, Esq.
Joseph Saul, Esq.
March 9, 2020
Page 2

customers, Lucasys' principals have detailed knowledge about PowerPlan's confidential and
proprietary software, including the proprietary PowerPlan physical database, table layouts,
database schema, and data models. Further, Lucasys has continuing access to PowerPlan's
software, including source code, databases, and documentation, through its consulting
engagements with PowerPlan customers.

Lucasys' business model is to: (1) provide consulting services to help PowerPlan
customers' implement and use PowerPlan software; and (2) develop individual software
modules, one of which is complementary to PowerPlan's software (*e.g.*, CoPilot) and others of
which are competitive (*e.g.*, Deferred Tax module), to market and sell to PowerPlan's customers
and other potential customers.

> • L0299 · "we offer both *overlapping* and complementary products to PowerPlan in
> the areas of tax, fixed assets, budgeting and forecasting, and regulatory software
> solutions." (Emphasis added)
> •L0318   "Lucasys Tax (replacement for PowerTax)"

Lucasys is in the early stages of development of its CoPilot and Deferred Tax software
modules. It also plans to develop other software modules that will compete with PowerPlan's
software (*e.g.*, in the areas of tax, fixed assets, regulatory solutions, and planning and
forecasting, as identified on its website). Lucasys intends to use CoPilot to get its "toe in the
door" with PowerPlan customers, and then provide competing Lucasys modules to replace
PowerPlan modules.

> •L0240   "this is a way to come in with a 'light' footprint and take over
> calculations over time. Basically, getting a toe in the door without throwing up a bunch
> of alarm bells. Avoiding the upfront resistance to swapping out PowerTax altogether, but
> leaving that as an option over the long term."
> •L0285 – the Copilot software service would "automate the workflow in utility's
> existing systems rather than replace them. . . . This solution is supposed to help utilities
> which have been working with PowerPlan but still face some issues of its usage. Such
> add-on should help replace PowerPlan with our main solution in the future."
> •L0388-89   describing goals to develop deferred tax module in 6 months, and in
> 2 years develop a "full fixed-assed [sic] solution (would include cost tracking,
> accounting, tax, forecasting)"

To accomplish this plan, Lucasys' software development model is to develop software
modules that will integrate and work along with customers' existing PowerPlan software, by
accessing, retrieving, and exporting data from customers' PowerPlan databases, running various
calculations, studies and/or reports through the Lucasys software, and then importing data back
into the customers' PowerPlan databases as applicable. In other words, Lucasys is not
developing software intended to work independently from PowerPlan's software. Instead, it is
developing and marketing its software as modules that customers can use along with the

Jason Alloy, Esq.
Joseph Saul, Esq.
March 9, 2020
Page 3

customers' existing suite of PowerPlan software modules and proprietary PowerPlan databases,
either as a complement to PowerPlan's software (CoPilot) or as a replacement for a PowerPlan
module or component while the customer continues using other PowerPlan modules.

> •L0264 – Lantukh mentions that a customer is looking for a "system integration
> document showing Lucasys Deferred Tax and Lucasys Copilot would sit between their
> existing systems (PowerPlan, PowerTax, PeopleSoft, and ONESOURCE)."
> •L0268 – "Lucasys Tax: software that replaces PowerTax and plays nicely with
> other PowerPlan products."

Lucasys' software code is written in programming languages different from that of
PowerPlan's code. But Lucasys uses an Oracle database to align with the PowerPlan database
technology used by target customers. Furthermore, Lucasys is developing its software modules
and programs to integrate directly with PowerPlan's proprietary databases, to permit the Lucasys
modules to access, retrieve, and export particular data from such databases, manipulate the data,
and import back into the PowerPlan databases as applicable.

> •L0002 - Lucasys data "will reside in an Oracle database so as to align with the
> technologies in use at target customers" – which is predominantly PowerPlan. At our
> meeting with Lucasys, Lucasys admitted using Oracle as the database for its software for
> ease of integration with PowerPlan's Oracle databases because so many customers use
> PowerPlan.
> •L0815 – Lucasys Data Integration Strategy. Lucasys provides "innovative
> technology with the ability to integrate with other software providers and databases."
> Under the heading "Direct Database Connections (SQL)," Lucasys explains that a "direct
> connection can be established between Lucasys and a customer's target database to
> perform data retrievals or updates"
> •L0821 – Lucasys' "system architecture is built to optimize the processes and
> workflows of its customers by allowing direct integration with customer target databases
> from other products in the industry."

## B. **Lucasys' Misappropriation of PowerPlan's Trade Secrets and Other Proprietary Information**

PowerPlan's investigation and findings identified at least the following three areas in
which Lucasys is and/or will be misappropriating PowerPlan trade secrets, and/or otherwise
misusing PowerPlan's proprietary information, in connection with its development and planned
development of software.

Jason Alloy, Esq.
Joseph Saul, Esq.
March 9, 2020
Page 4

> 1. **Misappropriation of Trade Secrets in PowerPlan's Proprietary Database Model and Schema in connection with Lucasys' Development of Software Modules that Integrate with PowerPlan Databases to Access, Retrieve and Export Data From, and Import Data Back to, the PowerPlan Databases.**

Lucasys' business model is to develop software modules which will be integrated and used along with PowerPlan software, and which will access, export, and import data in, from and to customers' PowerPlan's databases. There is no available application programming interface to permit Lucasys to design its modules to integrate with PowerPlan's software and databases without using its knowledge of PowerPlan's proprietary database model. As a result, Lucasys is required to use its detailed knowledge of PowerPlan's proprietary database architecture, model, and schema to develop the integration between the Lucasys modules and PowerPlan databases, and to access, retrieve, and move data between the PowerPlan databases and the Lucasys software. Lucasys' knowledge of PowerPlan's proprietary database model and schema is necessary to: (1) know how and where to access the data from a PowerPlan database needed for the Lucasys software processes, (2) write SQL commands to retrieve that particular data from specified locations and tables in a PowerPlan database and export it to the Lucasys software, and (3) import data back into the PowerPlan database as applicable after Lucasys' calculations and processes are completed.

The documents and information produced by Lucasys to date confirm that Lucasys' CoPilot and Deferred Tax software modules both will require the accessing, retrieving, and exporting of extensive data from PowerPlan's proprietary database tables, and that the CoPilot module also will involve pushing data back into PowerPlan databases.

•L0020-28 CoPilot - PowerTax Business Process Automation summary, L0831-837 CoPilot wireframes, 0856-0937 CoPilot Process Library wireframes, and L0938-943 CoPilot videos, all depict data being retrieved from PowerTax databases and exported to the Lucasys program, manipulated to perform certain additional calculations, functions, or business processes, and then pushed back into PowerTax. These CoPilot processes would require accessing, retrieval, and exporting of substantial amounts of data from various locations in the proprietary PowerPlan database model.

•L0839, 0844   CoPilot process summaries include instructions to "Select the PowerTax case and load activity from PowerPlan," and queries to retrieve various data from PowerTax.

•L0225 – Deferred Tax Module Use Case Summary includes the requirement to "load source transactional data from PowerPlan software and/or template. There will be two separate loads: book data and tax data."

•Lucasys Deferred Tax Code   includes instructions to "Update 'tax base activity' from source system (PowerPlan). For POC, make these updates manually (if any)." This is from lines 1598-1604 from the procedure, calculate_basis summary, and from lines 3624-3630 from the procedure, update_data.

Jason Alloy, Esq.
Joseph Saul, Esq.
March 9, 2020
Page 5

Furthermore, this form of Lucasys misappropriation of PowerPlan's proprietary database model information will continue to occur as Lucasys develops additional software modules to be integrated and work along with PowerPlan's software and databases. Under Lucasys' current business model, each of these modules will need to integrate and work along with customers' PowerPlan databases by accessing, retrieving, exporting, and importing various data from and to the PowerPlan databases. Lucasys can only accomplish this integration through its knowledge and use of PowerPlan's trade secrets and proprietary information.

## 2.  Lucasys' ARAM Calc Marketing Tool Has Copied Certain PowerPlan Database Table Headings and Structures.

The database for Lucasys' ARAM Calc software marketing tool (accessible on Lucasys' website) includes at least two tables that strongly correlate with and derive from tables in PowerPlan's database structure. These tables include virtually identical column heading names and associated data. For each of these columns, the only difference in the column name is that, for the PowerPlan tables, the words or abbreviations that comprise the column names are separated by underscores, whereas for the ARAM Calc tables, the same words or abbreviations that comprise the column names are connected without any separating character. For example, the ARAM Calc column, AccumReserveEnd, corresponds to the PowerPlan column, ACCUM_RESERVE_END.

The attachment to this letter includes two tables that map the virtually identical correlation between columns in the Lucasys ARAM Calc tables aram_cal_tax_depreciation and aram_calc_book_depr_rates, and tables and columns in the PowerPlan database. This reflects that Lucasys directly copied these portions of the proprietary PowerPlan database model, amounting to both a misappropriation of trade secrets and copyright infringement.

## 3.  Lucasys' Deferred Tax Module Also Has Copied or Imitated PowerPlan Database Table Headings and Structures, and Misappropriates Unique and Proprietary Features and Components of PowerPlan's PowerTax Software.

Lucasys' Deferred Tax module is in an early stage of proof of concept development, which makes it difficult to compare with comparable portions of PowerPlan's PowerTax software with which Lucasys' module is intended to compete. However, this early version improperly imitates portions of PowerPlan's database table headings and structures and misappropriates certain unique and proprietary features and components of the PowerTax data models.

First, like the ARAM Calc tool, the database model for Lucasys' Deferred Tax module also includes at least three tables that correlate with and derive from analogous tables and columns within PowerPlan's database model. The attachment to this letter maps the correlation between columns in Lucasys Tax (DT_JURISDICTION_RATE, DT_RECORD_BASIS, and DT-RECORD) and analogous tables and columns from PowerPlan's database model. Although

Jason Alloy, Esq.
Joseph Saul, Esq.
March 9, 2020
Page 6

the correlation is not as close as with the ARAM Calc tables, this copying and imitation of portions of PowerPlan's proprietary database table headings and structures amounts to a misappropriation of trade secrets and copyright infringement.

Second, Lucasys appears to have developed its data model for its Deferred Tax Module without much, if any, of the type of development processes and analysis that would be expected if the model was being developed from scratch – such as development of business requirements, leading to functional design specifications and statements of business rules, which then evolve into a data model. Instead, based on its knowledge of PowerPlan's proprietary database model and its intent to market and sell its competing Deferred Tax module to PowerPlan customers, Lucasys appears to have simply adopted a database model that includes a number of unique and proprietary features and components of PowerPlan's PowerTax database model, without considering other ways that it could have developed its model without misappropriating these components. *(See, e.g.,* L0214-15.)

The unique PowerTax features and components (which, to PowerPlan's knowledge, are not available on other tax depreciation software) contained in Lucasys' data models include but may not be limited to the following:

(a) Advanced Case/Scenario Capabilities. PowerTax uniquely provides this capability to create and maintain multiple versions of data to enable forecasting, what-if scenarios, and provision cases while preparing a tax return version of the data. Lucasys' Study/Run concept and model is designed very similarly to PowerPlan's Version table, which is a key structure in PowerPlan's model for copying data for case scenarios.

(b) Line Item Tracking of Book to Tax Differences and Asset Level Deferred Tax Computations. This unique structure for computing deferred taxes at an asset level is a key differentiator for PowerPlan, especially with utility companies. Lucasys' architecture for computing its Record_id and Temp_diff id is at the same level of asset detail and structure as PowerPlan's Tax Record Id and Reconcile Item Id, although there are a number of other ways that Lucasys could have designed and structured this.

(c) Bonus Depreciation. PowerPlan uniquely architects this business requirement as a change in asset value instead of extra depreciation, which is not how it is architected by other tax depreciation solutions and which is contrary to applicable accounting principles. It is highly unlikely that Lucasys would have designed this requirement in this manner if it was not following PowerPlan's proprietary database structure.

These are examples of Lucasys' misappropriation of components of PowerPlan's proprietary database architecture and structures in its early development of its Deferred Tax module, which may not be inclusive. Given the findings to date, PowerPlan is concerned that Lucasys will misappropriate additional proprietary features and components of PowerTax as it continues to develop its competing Deferred Tax module.

Jason Alloy, Esq.
Joseph Saul, Esq.
March 9, 2020
Page 7

### 4. PowerPlan Has Not Been Provided with Information to Allow It to Evaluate Lucasys' Potential Misappropriation of Proprietary PowerPlan Customer or Pricing Information.

Lucasys software is being developed for, and now marketed and promoted to, the same target customer base served by PowerPlan's software solutions. Moreover, Lucasys is continuing to provide consulting services to some of PowerPlan customers – which provides it with continuing access not only to PowerPlan's proprietary software (including databases), but also to proprietary PowerPlan customer and pricing information.

PowerPlan's investigation pursuant to the Agreed Process has focused on Lucasys' development of software to date, and related business plans, and not on Lucasys' marketing or potential sale of software to PowerPlan's customers or other potential customers. In fact, to date Lucasys has declined to produce requested documents or information which would permit PowerPlan to evaluate whether Lucasys is misusing PowerPlan's proprietary customer or pricing information in connection with its efforts to market, price and sell its software solutions to the same customers.

### C. Addressing and Resolving Lucasys' Misappropriation of PowerPlan's Trade Secrets and Proprietary Information.

I reiterate that PowerPlan's trade secrets and other proprietary information and intellectual property are extremely important to it and to its business. PowerPlan will take all steps necessary to protect this information. It cannot allow Lucasys and its principals to continue to misappropriate or otherwise misuse this information to develop a software platform to market and sell to the same customer base serviced by PowerPlan.

Accordingly, if Lucasys chooses to continue to develop and market software that competes with PowerPlan software, then PowerPlan hereby demands that Lucasys, and all others acting in concert with it (including but not limited to Messrs. Lantukh, Chang, Strang, and Nguyen, and any and all persons or entities who own an interest in or are working with Lucasys in relation to its development and sale of its software), comply with each of the following steps:

1.     Cease and desist from all use of any PowerPlan trade secrets and confidential and proprietary information ("PowerPlan Protected Information") – including but not limited to knowledge or information regarding PowerPlan's proprietary database model, schema, structures, systems, and tables – in connection with the design, development, marketing and sale of Lucasys software;

2.     Remove the ARAM Calc tool from Lucasys' website, and cease and desist from otherwise using that tool as currently designed;

Jason Alloy, Esq.
Joseph Saul, Esq.
March 9, 2020
Page 8

3. Cease development of the current forms of the Lucasys CoPilot and Deferred Tax modules, and redevelop these software modules without making any use of PowerPlan's Protected Information, and in a manner that avoids having the Lucasys software integrate with and access, retrieve, and export data from PowerPlan databases; and

4. Cease and desist from any further design, development, marketing, sales, or efforts to sell Lucasys software, unless and until Lucasys can prove to PowerPlan that its software is and will continue to be independently designed and developed without any use of or reliance upon PowerPlan's Protected Information, and can be priced and sold to customers without use of PowerPlan's proprietary customer and pricing information.

In addition, there is an inherent conflict between Lucasys continuing to have access to PowerPlan's proprietary software through its consulting engagements with PowerPlan customers, and its development of competing software to be marketed and sold to those and other PowerPlan customers, especially considering the misappropriation shown in this letter. This creates an ongoing risk that Lucasys will continue to misappropriate PowerPlan Protected Information. It also creates a conflict of interest for Lucasys, because Lucasys has financial incentive for its consulting customers to be dissatisfied with the very software (PowerPlan's) it was retained to help implement. Thus, if Lucasys chooses to continue to develop software that competes with PowerPlan's, then PowerPlan will have no choice but to exercise its rights under its software license agreements to withhold consent from customers who seek to provide Lucasys with access to PowerPlan software in connection with consulting engagements.

Alternatively, should Lucasys choose to discontinue its software development, PowerPlan would be open to discussing how Lucasys' consulting business could coexist with PowerPlan's business without misappropriating PowerPlan Protected Information. This might include an arrangement for PowerPlan to consent to customers seeking to provide Lucasys with access to PowerPlan software in connection with consulting engagements, subject to appropriate non-disclosure and confidentiality obligations.

As we discussed on the phone, PowerPlan looks forward to receiving, in an expeditious manner, any responses that Lucasys has to the findings summarized in this letter. Please contact me to advise a reasonable time frame for your clients' response. I and PowerPlan also look forward to promptly discussing with you and Lucasys the manner through which Lucasys will comply with the demands made in this letter, and options for potential resolution of the claims, disputes, and open issues between the parties.

Jason Alloy, Esq.
Joseph Saul, Esq.
March 9, 2020
Page 9

      Nothing said in or omitted from this letter shall amount to a waiver of any of PowerPlan's rights, claims, and remedies regarding these matters, all of which are expressly reserved.

                    Very truly yours,

                    Mark S. VanderBroek

MSV:jh

Cc:   Mr. Jim Dahlby
       Jonathan Sucher, Esq.
       Lloyd Farr, Esq.
       Peter Munk, Esq.

## Attachment to March 9, 2020 Letter from Mark VanderBroek to Jason Alloy and Joseph Saul Re: PowerPlan, Inc. v. Lucasys, Inc.

### CONFIDENTIAL – Subject to December 4, 2019 Agreed Process for Information Exchange and Dispute Resolution Between PowerPlan and Lucasys

### Lucasys ARAM Calc Tool

The database for Lucasys' ARAM Calc tool has at least two tables that strongly correlate with and derive from tables in PowerPlan's database model. The table below shows the mapping between columns in the Lucasys ARAM Calc Table, aram_cal_tax_depreciation, and tables and columns in the PowerPlan database model.

| Lucasys ARAM Calc Column | PowerPlan Table | PowerPlan Column |
|---|---|---|
| Id | | primary key |
| CalculatorId | | primary key |
| TaxYear | TAX_DEPRECIATION | TAX_YEAR |
| Company | COMPANY_SETUP | DESCRIPTION |
| TaxBook | TAX_BOOK | DESCRIPTION |
| TaxClass | TAX_CLASS | DESCRIPTION |
| Vintage | VINTAGE | DESCRIPTION |
| InServiceMonth | TAX_RECORD_CONTROL | IN_SERVICE_MONTH |
| TaxRate | DEFERRED_RATES | DESCRIPTION |
| BookBalance | TAX_DEPRECIATION | BOOK_BALANCE |
| TaxBalance | TAX_DEPRECIATION | TAX_BALANCE |
| AccumReserve | TAX_DEPRECIATION | ACCUM_RESERVE |
| Depreciation | TAX_DEPRECIATION | DEPRECIATION |
| JobCreationAmount | TAX_DEPRECIATION | JOB_CREATION_AMOUNT |
| GainLoss | TAX_DEPRECIATION | GAIN_LOSS |
| BookBalanceEnd | TAX_DEPRECIATION | BOOK_BALANCE_END |
| TaxBalanceEnd | TAX_DEPRECIATION | TAX_BALANCE_END |
| AccumReserveEnd | TAX_DEPRECIATION | ACCUM_RESERVE_END |
| TaxRecordId | TAX_RECORD_CONTROL | TAX_RECORD_ID |

The table below shows the mapping between columns in the Lucasys ARAM Calc Table, aram_calc_book_depr_rates, and tables and columns in the PowerPlan's database model.

| Lucasys ARAM Calc Column | PowerPlan Table | PowerPlan Column |
|---|---|---|
| Calculator_id | | |
| DeprGroupId | DEPR_GROUP | DEPR_GROUP_ID |
| DeprSummary2Id | DEPR_GROUP | DEPR_SUMMARY2_ID |
| SubledgerTypeId | DEPR_GROUP | SUBLEDGER_TYPE_ID |
| DeprSummaryId | DEPR_GROUP | DEPR_SUMMARY_ID |
| CompanyId | DEPR_GROUP | COMPANY_ID |
| DeprMethodId | DEPR_GROUP | DEPR_METHOD_ID |
| ReserveAcctId | DEPR_GROUP | RESERVE_ACCOUNT_ID |
| ExpenseAcctId | DEPR_GROUP | EXPENSE_ACCOUNT_ID |
| DeprGroup | DEPR_GROUP | DESCRIPTION |
| FactorId | DEPR_GROUP | FACTOR_ID |
| | DEPR_GROUP | USER_ID |
| MidPeriodConv | DEPR_GROUP | MID_PERIOD_CONV |
| MidPeriodMethod | DEPR_GROUP | MID_PERIOD_METHOD |
| EstAnnNetAdds | DEPR_GROUP | EST_ANN_NET_ADDS |
| GainAcctId | DEPR_GROUP | GAIN_ACCT_ID |
| LossAcctId | DEPR_GROUP | LOSS_ACCT_ID |
| CorTreatment | DEPR_GROUP | COR_TREATMENT |
| SalvageTreatment | DEPR_GROUP | SALVAGE_TREATMENT |
| NetSalvageAmortLife | DEPR_GROUP | NET_SALVAGE_AMORT_LIFE |
| GainLossDefault | DEPR_GROUP | GAIN_LOSS_DEFAULT |
| DeprMethod | DEPRECIATION_METHOD | DESCRIPTION |
| EffectiveDate | DEPR_METHOD_RATES | EFFECTIVE_DATE |
| Rate | DEPR_METHOD_RATES | RATE |
| NetGross | DEPR_METHOD_RATES | NET_GROSS |
| OverDeprCheck | DEPR_METHOD_RATES | OVER_DEPR_CHECK |
| NetSalvagePct | DEPR_METHOD_RATES | NET_SALVAGE_PCT |
| EndOfLife | DEPR_METHOD_RATES | END_OF_LIFE |
| SetOfBooksId | DEPR_METHOD_RATES | SET_OF_BOOKS_ID |
| MortalityCurveId | DEPR_METHOD_RATES | MORTALITY_CURVE_ID |
| ExpectedAverageLife | DEPR_METHOD_RATES | EXPECTED_AVERAGE_LIFE |
| Company | COMPANY_SETUP | DESCRIPTION |
| CostOfRemovalRate | DEPR_METHOD_RATES | COST_OF_REMOVAL_RATE |
| | | |

## Lucasys Deferred Tax Software

The database for Lucasys' Deferred Tax module has at least three tables that display similarities that correlate with and derive from analogous tables and columns within PowerPlan's database model, as shown below:

| Lucasys Tax Table | Lucasys Tax Column | Powerplan Table | Powerplan Column |
|---|---|---|---|
| DT_JURISDICTION_RATE | DT_JURISDICTION_ID | NORMALIZATION_SCHEMA | JURISDICTION_ID |
| DT_JURISDICTION_RATE | USER_NAME | * | USER_ID |
| DT_JURISDICTION_RATE | TIME_STAMP | * | TIME_STAMP |
| DT_JURISDICTION_RATE | STATUTORY_RATE | DEFERRED_INCOME_TAX_RATES | STATUTORY_RATE |
| DT_JURISDICTION_RATE | GROSS_UP_RATE | DEFERRED_INCOME_TAX_RATES | GROSSUP_RATE |
|  |  |  |  |
| DT_RECORD_BASIS |  | TAX_BOOK_RECONCILE | TAX_INCLUDE_ID |
| DT_RECORD_BASIS | LS_PERIOD_ID | TAX_BOOK_RECONCILE | TAX_YEAR |
| DT_RECORD_BASIS |  | TAX_BOOK_RECONCILE | TAX_RECORD_ID |
| DT_RECORD_BASIS | DT_TEMP_DIFF_ID | TAX_BOOK_RECONCILE | RECONCILE_ITEM_ID |
| DT_RECORD_BASIS | TIME_STAMP | TAX_BOOK_RECONCILE | TIME_STAMP |
| DT_RECORD_BASIS | USER_NAME | TAX_BOOK_RECONCILE | USER_ID |
| DT_RECORD_BASIS | BOOK_BASIS_BEG | TAX_BOOK_RECONCILE | BASIS_AMOUNT_BEG |
| DT_RECORD_BASIS | BOOK_BASIS_END | TAX_BOOK_RECONCILE | BASIS_AMOUNT_END |
| DT_RECORD_BASIS | BOOK_BASIS_ACTIVITY | TAX_BOOK_RECONCILE | BASIS_AMOUNT_ACTIVITY |
| DT_RECORD_BASIS |  | TAX_BOOK_RECONCILE | BASIS_AMOUNT_INPUT_R ETIRE |
| DT_RECORD_BASIS |  | TAX_BOOK_RECONCILE | BASIS_AMOUNT_TRANSFE R |
| DT_RECORD_BASIS | TAX_BASIS_BEG | TAX_BOOK_RECONCILE | BASIS_AMOUNT_BEG |
| DT_RECORD_BASIS | TAX_BASIS_END | TAX_BOOK_RECONCILE | BASIS_AMOUNT_END |
| DT_RECORD_BASIS | TAX_BASIS_ACTIVITY | TAX_BOOK_RECONCILE | BASIS_AMOUNT_ACTIVITY |
| DT_RECORD_BASIS | TEMP_DIFF_BEG | TAX_BOOK_RECONCILE | BASIS_AMOUNT_BEG |
| DT_RECORD_BASIS | TEMP_DIFF_END | TAX_BOOK_RECONCILE | BASIS_AMOUNT_END |
| DT_RECORD_BASIS | TEMP_DIFF_ACTIVITY | TAX_BOOK_RECONCILE | BASIS_AMOUNT_ACTIVITY |
| DT_RECORD_BASIS | DT_RECORD_ID |  |  |
| DT_RECORD_BASIS | DT_RUN_ID | VERSION | VERSION_ID |
| DT_RECORD_BASIS | DT_JURISDICTION_ID | NORMALIZATION_SCHEMA | JURISDICTION_ID |
| DT_RECORD_BASIS | LS_BOOK_TAX_GROUP_I D | NORMALIZATION_SCHEMA | GL_ACCOUNT_ID |
| DT_RECORD | LS_COMPANY_ID | JURISDICTION | COMPANY_ID |
| DT_RECORD | LS_GL_ACCOUNT_ID | NORMALIZATION_SCHEMA | GL_ACCOUNT_ID |

The Wayback Machine - https://web.archive.org/web/20080320233710/http://www.powerplan.com:80/products/products_reports.php



**Home**

**Products**

Assets

Book Depreciation

Budgets

Charge Repository

Depreciation Studies

Leased Assets

PowerTax

Project Management

CWIP Accts & Unitization

Property Tax

Tax Provision

Reports & Query

Controls & Gen. Features

**Support**

**Training**

**Careers**

**About Us**

— SEARCH

**Search Tips | Site Index**

Quick Links

» **Events**
» **Careers**
» **Documents**

# Products

## Reports & Query

PowerPlant contains a wide variety of on-line reporting and ad-hoc querying. The base system comes delivered with over 700 standard reports. Wherever appropriate the reports provide the user the ability to specify at report time:

- the time period or time span to be reported (e.g., the last four months of 2004) and;
- filtering, i.e., restricting the reports to certain locations, companies, work orders, etc.

Reports are available online, to a printer, to a file (e.g. .pdf or text file formats), exported to MS Excel, or may be sent through e-mail. Special features including 'zoom', a word search facility and paging help in reviewing the report on the screen. Reports can be run from a batch, triggered by the user, or triggered from an event (e.g., the monthly close). Response time for reports is generally immediate due to a data model that includes tiers of summary variables. Hence, an account activity report does not need to loop through all the records on the CPR and so returns to the screen in a few seconds.

PowerPlant provides tab driven queries into projects, transactions, assets, depreciation, and tax records with selections and logical operators. Embedded within the windows are intuitive tabs and sorts that allow the user to drill down and easily find the required data elements. As users make tab selections, PowerPlant dynamically builds SQL behind the scenes. For example, assets can be queried based on any combination of the following characteristics: Company, Business Segment, General Ledger Account (e.g. In-Service Asset, Under Cons), Plant Account and Sub-Account, State, County, Property Tax District, Location (Major & Asset), Retirement Unit, Depreciation Group, Project Number, Asset ID or Description, Vintage, Status (e.g. Active or Retired), and Any number of additional, user defined identifiers.

These queries can be saved, named and modified for later use. The accountant has the option of running one of PowerPlant's standard reports against the queried data or exporting the queried data to a choice of several external file formats (e.g. Access, EXCEL, Lotus, DBASE, Text File, etc.).

Project related reports include: Summaries of balances and activities; Detail transactions; Trial balances; Calculation summaries for items like AFUDC, tax interest, overheads, and unitization; Monthly actual verses estimated expenditures; Audit reports; Various work order and project summaries; Overhead Allocation Detail; Unitization Detail; and Budget Comparisons.

Asset Management Reports include:

- Summaries of balances and activities;


PLAINTIFF'S
EXHIBIT
202
PENKAD BDX501-8692

- Detail transactions;
- Trial balances;
- Various analyses such as net value and replace costs;
- Depreciation and depreciation analysis reports;
- Various CPR activity and balance reports;
- FERC Form 1 reports, including pages 200, 204-207, 216, 217, 219, 221, 261 (some items), 274, 336, 337, 423, and 430;
- Unit catalogue, property/component unit and location reports;
- Audit reports;

PowerTax Reports include:

- Summaries of balances and activities;
- Support for federal tax forms - 4562, 4797, 4626, Schedule D, etc.;
- Tax depreciation detail for all books - Federal, States, AMT, ACE, E&P, Straight Line, etc.;
- APB11 deferred tax reports, tax recovery, book recovery, ARAM rate, excess DFIT analysis;
- FAS109 deferred tax reports, liability at statutory rates, Federal and state gross-ups, FAS109 liability;
- Forecast Reports;
- Over any number of future years as well as end-of-life analysis.

FERC reports are generated from two sources. Most are reported from a Summary Ledger which stores summarized asset values by month to ensure fast reporting performance. PowerPlant allows the user to determine which accounts are maintained and reported within the system. Generally, all asset related accounts (e.g., 101, 101 1, 102, 104, 105, 106, 107, 108, 109, 111, 118, 121, 122, etc.) are maintained and reported. Asset specific reports are generated directly from the CPR. Specific pages are produced correctly (e.g., 106 and 101 are combined).

PowerPlant has its own report management system. Reports can be added or changed dynamically with no compilaton or linking required. PowerPlant also provides on-line query wizards so that the user can create and save his own informal queries and reports.

All PowerPlant reports come generated in the PowerBuilder report painter, which is easy to use and intuitive. As an open system, other reporting tools such as InfoMaker or Crystal Reports can be used; However the completeness of available reporting alleviates the need for such 3rd party tools.

Home | Contact Us   Site Index | Training   Login

Copyright © 2007



**NELSON MULLINS**

NELSON MULLINS RILEY & SCARBOROUGH LLP
ATTORNEYS AND COUNSELORS AT LAW

Atlantic Station
201 17th Street, NW | Suite 1700
Atlanta, GA 30363
T 404.322.6000  F 404.322.6050
nelsonmullins.com

Mark S. VanderBroek
T 404.322.6675
mark.vanderbroek@nelsonmullins.com

April 17, 2020

**Via Email and Overnight Courier**

Jason S. Alloy, Esq.
Joseph Saul, Esq.
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, NW
Atlanta, Georgia 30318

> Re:  PowerPlan, Inc. ("PowerPlan") v. Lucasys, Inc. ("Lucasys") *et al.*
>      Reply to Lucasys' March 20 Letter under Pre-Litigation Agreed Process

Dear Jason and Joseph:

This letter responds to Jason's March 20, 2020 letter.

While the parties disagree on certain issues, your letter does not dispute at least one important fact: Lucasys and its principals are and/or will be making unauthorized use of their proprietary knowledge of PowerPlan's database model to design and develop competing Lucasys software modules that will directly integrate and work with PowerPlan databases. This alone amounts to both a misappropriation of PowerPlan trade secrets and a breach of Lucasys' and its principals' contractual confidentiality and non-disclosure obligations. Yet, your letter contains no suggestions whatsoever from Lucasys for resolving this and PowerPlan's other concerns.

## A. Lucasys' Unauthorized Use of Its Proprietary Knowledge about PowerPlan's Database Model to Develop Competing Software to Directly Integrate with PowerPlan Databases.

As mentioned, your letter does not dispute that Lucasys and its principals are and/or will be using their proprietary knowledge of PowerPlan's database model to design and develop an automated integration between Lucasys software modules and PowerPlan databases. This integration will allow Lucasys' software to access, retrieve, and export data from customers' PowerPlan databases, run various calculations, processes and reports through the Lucasys software, and then import data back into the PowerPlan databases as applicable. Nor does Lucasys dispute that its knowledge of PowerPlan's proprietary database model is necessary to: (1) know how and where to access the data from a PowerPlan database needed for the Lucasys software processes, (2) write SQL commands to retrieve that particular data from a PowerPlan database and



PLAINTIFF'S
EXHIBIT
203
PENGAD 800-631-6989

Jason Alloy, Esq.
Joseph Saul, Esq.
April 17, 2020
Page 3

Oracle Financial and SAP ERP. However, others, such as PowerPlan, do not. There is nothing improper with PowerPlan not providing an API or publishing its database model. This does not justify Lucasys using its proprietary knowledge of PowerPlan's database model for competitive advantage to design an automated integration of its competing software modules to work along with PowerPlan databases. Since PowerPlan neither supports an API nor publishes its data model, Lucasys' integration development strategy necessarily relies on its unauthorized and unlawful use of PowerPlan's proprietary information and trade secrets.

Finally, you say in your letter that "accessing a [database] system to obtain data does not amount to misappropriating a system." But Lucasys' unauthorized use of its proprietary knowledge of PowerPlan's database model to design/develop automated integrations between Lucasys software modules and PowerPlan databases for its own commercial advantage does amount to misappropriating PowerPlan proprietary information and trade secrets.

### B. Lucasys' ARAM Calc Marketing Tool

Your letter does not dispute that Lucsys' ARAM Calc tool copied substantial portions of PowerPlan's database table headings and structures, which are proprietary information and also protected by copyright. That Lucasys may use them only for integration to PowerTax's Fixed Assets system does not provide a defense to its misappropriation and copying of this proprietary information.

### C. Lucasys' Deferred Tax Module

With respect to the three unique PowerTax features described in my March 9, 2020 letter that Lucasys incorporated into its Deferred Tax data model, your letter states that many tax accounting and forecasting systems include similar functionality. But your letter does not respond to PowerPlan's points that these Lucasys features are designed to work in a similar manner to the unique ways that PowerPlan's similar features work. Nor does it address the lack of typical development processes and analysis that would be expected if Lucasys was developing its Deferred Tax database model from scratch as opposed to mimicking PowerPlan's design.

Lantukh, Chang, and Strang have spent most of their professional careers accessing, modifying, implementing, and working with PowerPlan software (primarily PowerTax) and PowerPlan customers, either as a PowerPlan employee or as a consultant servicing PowerPlan customers. Each of them have intimate knowledge of PowerPlan's software systems, including its database model. As a result, it would be virtually impossible for them and Lucasys to design, develop, market and sell competing software without disclosing and using confidential and proprietary aspects of PowerPlan's software and customer information. It is inevitable that they will continue to do so, based on the competing software modules they intend to develop and offer for sale and the manner in which they have been and apparently intend to continue developing software.

Appointment

| | |
|---|---|
| **From:** | Jim Dahlby [jdahlby@pwrplan.com] |
| **Sent:** | 4/21/2020 10:52:40 AM |
| **To:** | Jim Duffy [jduffy@pwrplan.com] |

**Subject:**      Accepted: URGENT follow up, Lucasys at Algonquin/Liberty

**Start:**        4/21/2020 2:30:00 PM
**End:**          4/21/2020 3:00:00 PM
**Show Time As:** Busy



PLAINTIFF'S
EXHIBIT
204
PENGAD 800-631-6989

Message

| | |
|---|---|
| From: | Jim Dahlby [jdahlby@pwrplan.com] |
| Sent: | 4/24/2020 3:39:32 PM |
| To: | Jamie Carr [jcarr@pwrplan.com] |
| Subject: | RE: Algonquin/Liberty scope of work |

Did a call get scheduled?

Jim Dahlby

Mobile: +1 678.269.7950
jdahlby@pwrplan.com

**From:** Jamie Carr <jcarr@pwrplan.com>
**Sent:** Friday, April 24, 2020 9:28 AM
**To:** Jim Dahlby <jdahlby@pwrplan.com>; Jim Duffy <jduffy@pwrplan.com>; Jay Marnell <jmarnell@pwrplan.com>; Jason Szelest <jszelest@pwrplan.com>
**Cc:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** RE: Algonquin/Liberty scope of work

Yes, we definitely need a call.

Jamie Carr
Senior Director, Implementation Strategy

Mobile: 330.803.3556
jcarr@pwrplan.com
PowerPlan.com

 PLAN

**From:** Jim Dahlby <jdahlby@pwrplan.com>
**Sent:** Thursday, April 23, 2020 6:29 PM
**To:** Jim Duffy <jduffy@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Jay Marnell <jmarnell@pwrplan.com>; Jason Szelest <jszelest@pwrplan.com>
**Cc:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** RE: Algonquin/Liberty scope of work

Jim,

I think a quick phone call with Jamie and Laura (maybe Luisa) make sense.  At a high level we cover some of those tasks as Jamie described.  But I think we need to understand more about the specific deliverables and activities they were going to be expected and perform to complete those tasks.

Was the expectation for going and gather requirements from all the different tax users?  Do they have common processes in place or is part of the work consolidating requirements from multiple parts of the acquired utilities?

Would they be actually populating design templates or just assisting in coordinating the effort for the Liberty tax group?  For instance, if they have 5 different sets of tax records at different gas utilities and they want to get common data structure would analyzing the data and completing the templates for a new "global" data set be part of the scope.

Jim Dahlby

Mobile: +1 678.269.7950

PLAINTIFF'S
EXHIBIT
265

PENGAD 800-631-6989

jdahlby@pwrplan.com

**From:** Jim Duffy <jduffy@pwrplan.com>
**Sent:** Thursday, April 23, 2020 3:45 PM
**To:** Jamie Carr <jcarr@pwrplan.com>; Jay Marnell <jmarnell@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>;
Jason Szelest <jszelest@pwrplan.com>
**Cc:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** RE: Algonquin/Liberty scope of work

"Represent **client's** tax department" is something we typically do?

Thanks,
Jim

**Jim Duffy**
Strategic Accounts Executive

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

 PLAN

**From:** Jamie Carr <jcarr@pwrplan.com>
**Sent:** Thursday, April 23, 2020 3:42 PM
**To:** Jim Duffy <jduffy@pwrplan.com>; Jay Marnell <jmarnell@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>;
Jason Szelest <jszelest@pwrplan.com>
**Cc:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** RE: Algonquin/Liberty scope of work

++Jason

**Jamie Carr**
Senior Director, Implementation Strategy

Mobile: 330.603.3556
jcarr@pwrplan.com
PowerPlan.com

 PLAN

**From:** Jamie Carr
**Sent:** Thursday, April 23, 2020 3:41 PM
**To:** Jim Duffy <jduffy@pwrplan.com>; Jay Marnell <jmarnell@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>
**Cc:** Jonathan Sucher <Jonathan.Sucher@powerplan.com>
**Subject:** RE: Algonquin/Liberty scope of work

This scope is essentially what we'd do in design workshops and throughout the project. Maybe this is a draft of the
response:

The scope below is part of what PowerPlan's Solution Architects and Subject Matter Experts focus on during design
sessions. As we work through an implementation, we will learn more about Algonquin and Algonquin will learn more
about the PowerPlan modules. Through this education process, PowerPlan will make additional recommendations, as

POWERPLAN00200785

necessary, to ensure the software is used to its capacity, and the functional requirements are met.  We also as a standard step in any implementation, collaboratively design the future state processes the client will follow.

**Jamie Carr**
Senior Director, Implementation Strategy

Mobile: 330.603.3556
jcarr@pwrplan.com
PowerPlan.com



**From:** Jim Duffy <jduffy@pwrplan.com>
**Sent:** Thursday, April 23, 2020 1:53 PM
**To:** Jamie Carr <jcarr@pwrplan.com>; Jay Marnell <jmarnell@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>
**Cc:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** Algonquin/Liberty scope of work

Guys,

Please see below and advise on how you'd like to proceed.

Thanks,
Jim

**Jim Duffy**
Strategic Accounts Executive

Mobile:  +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com



**From:** Luisa Read <Luisa.Read@libertyutilities.com>
**Sent:** Thursday, April 23, 2020 1:45 PM
**To:** Jim Duffy <jduffy@pwrplan.com>
**Cc:** Laura Naclerio <Laura.Naclerio@libertyutilities.com>
**Subject:** [EXT] RE: Scope of work?

**Exercise CAUTION when opening links or attachments.**

Hi Jim,

I have copied Laura to this email as she is the Senior Director of tax at Liberty and this resource will be working very closely with her and her team.

The scope of work is as follows:

Provide advisory services related to fixed assets and represent Client's tax department during the global design phase of Client's Customer First Project. Services will include assisting the tax department and the project team in determining the appropriate tax related software modules that should be deployed in subsequent releases and the design of data and configuration around its tax processes and systems.
• Participate in person in global design workshops related to PowerPlan fixed assets processes

and Power Tax (tax provision and deferred taxes). Design workshops may occur in the U.S. or in Oakville, Ontario, Canada. If a workshop is not expected to last a full day, participation may be by telephone or video conference

o Ensure functional requirement are addressed in the workshops

o Insure functional requirements are delivered in the standard process (fit gap analysis)

o Ensure the to-be process design fulfills Liberty Utilities requirements

• Development and review of the to-be-processes, report lists which will include all traceable information and project decisions

o Identification of reports required

o Identify change impacts of the process

o Security and job role segregation

o Review process design documents (PDDs)

• Weekly status reporting on the progress to date


**Luisa Read | Liberty Algonquin Business Services** | Vice President
P: 905-465-4505  |  C: 416-988-0071  |  E: Luisa.Read@libertyutilities.com

**From:** Jim Duffy [mailto:jduffy@pwrplan.com]
**Sent:** Thursday, April 23, 2020 1:00 PM
**To:** Luisa Read <Luisa.Read@libertyutilities.com>
**Subject:** Scope of work?

Hi Luisa,

In trying to help you come up with a "Plan B," would you be willing to share with me the scope of work from the SOW you signed with Lucasys? Something you wouldn't mind me potentially forwarding to external third parties. We've got a few options in mind (including our own) but obviously they need to know what they'd be signing up for...

Thanks,
Jim

**Jim Duffy**
*Strategic Accounts Executive*

Mobile:  +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

 PLAN


Please join us for PowerPlan's user conference, ELEVATE 2020 November 15-18, 2020, at the Marriott Marquis Marina in San Diego, CA. To register click here https://powerplan.com/about-us/elevate. This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you

Message

| | |
|---|---|
| From: | Jim Dahlby [jdahlby@pwrplan.com] |
| Sent: | 6/2/2020 11:04:18 AM |
| To: | Brett Bertz [brett.bertz@powerplan.com] |
| Subject: | RE: Liberty Resource |

The guidelines for the team engaging directly is probably something we need to work on, to address Jonathan's notes on

████

Jim

**Jim Dahlby**

Mobile:  +1 678.269.7950
jdahlby@pwrplan.com

**From:** Brett Bertz <brett.bertz@powerplan.com>
**Sent:** Tuesday, June 2, 2020 10:58 AM
**To:** Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** FW: Liberty Resource

████████████████████████

**From:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Sent:** Tuesday, May 19, 2020 3:21 PM
**To:** Brett Bertz <brett.bertz@powerplan.com>; Jim Duffy <jduffy@pwrplan.com>; Maria Vaccaro
<maria.vaccaro@powerplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>
**Subject:** RE: Liberty Resource

████████████████████████

Regards,

**Jonathan Sucher**
Senior Corporate Counsel

Office:   +1 678.223.2714
Mobile:  +1 706.218.8165

jonathan.sucher@powerplan.com
PowerPlan.com

PLAN

**From:** Brett Bertz <brett.bertz@powerplan.com>
**Sent:** Tuesday, May 19, 2020 3:12 PM
**To:** Jim Duffy <jduffy@pwrplan.com>; Maria Vaccaro <maria.vaccaro@powerplan.com>; Skip Fowler
<Skip.Fowler@powerplan.com>; Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** RE: Liberty Resource



PLAINTIFF'S
EXHIBIT
706
PENGAD 800-631-6989



BB

**From:** Jim Duffy <jduffy@pwrplan.com>
**Sent:** Tuesday, May 19, 2020 1:22 PM
**To:** Maria Vaccaro <maria.vaccaro@powerplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>; Brett Bertz <brett.bertz@powerplan.com>; Jonathan Sucher <jonathan.sucher@powerplan.com>
**Subject:** RE: Liberty Resource

+Brett +Jonathan.



Thoughts?

Thanks,
Jim

**Jim Duffy**
Vice President - Sales

Mobile:  +1.202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

PLAN

**From:** Maria Vaccaro <maria.vaccaro@powerplan.com>
**Sent:** Tuesday, May 19, 2020 1:07 PM
**To:** Jim Duffy <jduffy@pwrplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>
**Subject:** Liberty Resource

See below...they are using RCCI I still think we should try and push for them to use one of our resources.

**From:** Luisa Read <Luisa.Read@libertyutilities.com>
**Sent:** Tuesday, May 19, 2020 12:11 PM
**To:** Maria Vaccaro <maria.vaccaro@powerplan.com>
**Cc:** Cory Ching <cory.ching@powerplan.com>
**Subject:** RE: [EXT] RE: Contact Info & Tax Project Resource

Hi Maria,

CONFIDENTIAL

POWERPLAN01709484

Thank you for your email. It doesn't look like we will need PowerPlan's help in finding a resource. We are looking at engaging with an entity called Regulated Capital Consultants for their help. I hope this will not be an issue but would be happy to jump on a call to discuss.

Luisa
**Luisa Read | Liberty Algonquin Business Services** | Vice President
P: 905-465-4505 | C: 416-988-0071 | E: Luisa.Read@libertyutilities.com

**From:** Maria Vaccaro [mailto:maria.vaccaro@powerplan.com]
**Sent:** Monday, May 18, 2020 8:34 AM
**To:** Luisa Read <Luisa.Read@libertyutilities.com>
**Cc:** Cory Ching <cory.ching@powerplan.com>
**Subject:** RE: [EXT] RE: Contact Info & Tax Project Resource

Thanks Luisa and I hope you are enjoying your long weekend.

Do either of the following work for you?

Tuesday May 19th – 2:30 – 3:30
Thursday May 21st 12Pm – 1PM
Friday May 22nd 11AM – 11PM
Tuesday May 26th 12PM – 1:30PM

Thank you

**Maria Vaccaro**
Strategic Account Executive

Mobile: +1 416.566.8589
maria.vaccaro@powerplan.com
PowerPlan.com

 PLAN

**From:** Luisa Read <Luisa.Read@libertyutilities.com>
**Sent:** Friday, May 15, 2020 10:29 AM
**To:** Maria Vaccaro <maria.vaccaro@powerplan.com>
**Cc:** Cory Ching <cory.ching@powerplan.com>
**Subject:** [EXT] RE: Contact Info & Tax Project Resource

**Exercise CAUTION when opening links or attachments.**

Hi Maria,

Sorry for the delay in getting back to you. We are also looking for tax resources to help us as well. Let's touch base next week to discuss. Can you propose some dates and times next week?

Luisa
**Luisa Read | Liberty Algonquin Business Services** | Vice President
P: 905-465-4505 | C: 416-988-0071 | E: Luisa.Read@libertyutilities.com

**From:** Maria Vaccaro [mailto:maria.vaccaro@powerplan.com]
**Sent:** Wednesday, May 13, 2020 6:04 PM
**To:** Luisa Read <Luisa.Read@libertyutilities.com>

**Cc:** Cory Ching <cory.ching@powerplan.com>
**Subject:** RE: Contact Info & Tax Project Resource

Hi Luisa,

Just following up on the note below, are you available for 15 minutes tomorrow or on Friday to talk about a proposed solution on the tax resource?

Thank you

**Maria Vaccaro**
Strategic Account Executive

Mobile: +1 416.566.6589
maria.vaccaro@powerplan.com
PowerPlan.com

 PLAN

**From:** Maria Vaccaro
**Sent:** Monday, May 11, 2020 5:55 PM
**To:** Luisa Read <Luisa.Read@libertyutilities.com>
**Cc:** Cory Ching <cory.ching@powerplan.com>
**Subject:** Contact Info & Tax Project Resource

Hi Luisa,

Hope you had a great weekend.  It was great to virtually meet you last week.  I wanted to pass along my contact details (see below), feel free to reach out at anytime with questions, concerns, escalations.  Cory and I will setup some time with you and the team to discuss cadence moving forward.

Also, in reference to the **Tax Project Resource**, what is your availability this week to meet with Jim, and Skip to discuss a proposed option on how to move forward?

Thank you

**Maria Vaccaro**
Strategic Account Executive

Mobile: +1 416.566.6589
maria.vaccaro@powerplan.com
PowerPlan.com

 PLAN

Please join us for PowerPlan's user conference, ELEVATE 2020 November 15-18, 2020, at the Marriott Marquis Marina in San Diego, CA. To register click here https://powerplan.com/about-us/elevate. This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you
Please join us for PowerPlan's user conference, ELEVATE 2020 November 15-18, 2020, at the Marriott Marquis Marina in San Diego, CA. To register click here https://powerplan.com/about-us/elevate. This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally

privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you

CONFIDENTIAL

POWERPLAN01709487



# ROBBINS

LITIGATION AND REGULATORY LAW

Jason S. Alloy
DIRECT LINE: 678-701-9314
Email: jalloy@robbinsfirm.com

April 29, 2020

## VIA EMAIL AND U.S. MAIL

Mark S. VanderBroek, Esq.
Peter Munk, Esq.
Nelson Mullins Riley & Scarborough LLP
Atlantic Station
201 17th Street, NW - Suite 1700
Atlanta, Georgia 30363
mark.vanderbroek@nelsonmullins.com
peter.munk@nelsonmullins.com

      Re:    *PowerPlan, Inc. v. Lucasys, Inc.*

Dear Mark and Peter:

    We have received your letter dated April 17, 2020 terminating the Agreed Process. Following receipt of the letter, we have learned of very troubling actions by PowerPlan. Specifically, PowerPlan is now interfering with Lucasys' customer agreements and relationships and is attempting to lock Lucasys out from working with its customers that use PowerPlan's software, including most recently interfering with Lucasys' relationship with Liberty Utilities.

    PowerPlan's actions are anti-competitive and would likely raise the ire of various federal and state anti-trust authorities. PowerPlan's actions also violate multiple unfair competition statues and constitute tortious interference of Lucasys' customer relationships and contracts. PowerPlan is causing millions of dollars in damages to Lucasys.

    For the reasons set forth in more detail below, Lucasys demands that PowerPlan immediately cease and desist from its improper conduct, including interfering with Lucasys' relationship with its customers. In addition, if there is

PLAINTIFF'S
EXHIBIT
207
PENGAD 800-631-6989

Mark S. VanderBroek, Esq.
Peter Munk, Esq.
April 29, 2020
Page 3

is even more concerning because PowerPlan's customers are public utilities, and
PowerPlan's actions are preventing utilities from being able to use their own data
as they wish.

The most recent specific PowerPlan conduct that troubles us relates to
Liberty Utilities, which is a Lucasys client. Liberty Utilities engaged Lucasys to
advise on best practices through its design phase of a financial transformation
project. In this project, Lucasys has served as an extension of Liberty Utilities' tax
department to advocate for and provide advisory services related to Liberty's
business processes and requirements. To perform these services, Lucasys does not
require access to any PowerPlan confidential or proprietary information.

PowerPlan, however, notified Liberty Utilities that it cannot consult with
Lucasys on this process. We also understand that PowerPlan is threatening
Liberty Utilities that it may take legal action against Liberty Utilities if Liberty
Utilities continues to work with Lucasys or contracts with Lucasys in the future.
This is deeply concerning to say the least.

Finally, to preserve and prevent spoliation of information and documents
relevant to PowerPlan's improper actions, we demand that PowerPlan, and all
others acting in concert with it, put a litigation hold in place and take all necessary
steps to preserve and retain, and to avoid deleting, destroying, altering, or
overwriting, all documents, records, and electronically stored information ("ESI")
in its possession, custody, or control that refer, relate to, or evidence any of the
practices and conduct referenced in this letter. This includes but is not limited to
maintaining and preserving all documents and ESI in the possession or control of
PowerPlan, consisting of or relating or referring in any manner to any of the
following:

(1) PowerPlan's efforts to maintain the confidentiality of any of its alleged
proprietary, confidential, or trade secret information,

(2) PowerPlan's disclosure to the public or any person or entity of any of its
alleged proprietary, confidential, or trade secret information,

(3) All documents that refer or relate to how PowerPlan created/decided on
the labels and terminology for the column headers in its software,

Message

| | |
|---|---|
| **From:** | Jim Dahlby [jdahlby@pwrplan.com] |
| **Sent:** | 5/20/2020 1:04:21 PM |
| **To:** | Joost Rutten [Joost.Rutten@powerplan.com]; Brett Bertz [brett.bertz@powerplan.com]; Marc Bortniker [marc.bortniker@powerplan.com] |
| **Subject:** | RE: Customer contact list - IP Protection letter |

I was thinking we should bring up the letter that's going out during the an Exec stand up to make sure the team is all aware.

**Jim Dahlby**

Mobile +1 678 289 7950
jdahlby@pwrplan.com

**From:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Sent:** Wednesday, May 20, 2020 9:32 AM
**To:** Brett Bertz <brett.bertz@powerplan.com>; Marc Bortniker <marc.bortniker@powerplan.com>
**Cc:** Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** RE: Customer contact list - IP Protection letter



**Jonathan Sucher**
Senior Corporate Counsel

Office: +1 678.223.2714
Mobile: +1 706 218 8165

jonathan.sucher@powerplan.com
PowerPlan.com

 PLAN

**From:** Brett Bertz <brett.bertz@powerplan.com>
**Sent:** Wednesday, May 20, 2020 8:57 AM
**To:** Marc Bortniker <marc.bortniker@powerplan.com>; Jonathan Sucher <jonathan.sucher@powerplan.com>
**Cc:** Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** RE: Customer contact list - IP Protection letter

**From:** Marc Bortniker <marc.bortniker@powerplan.com>
**Sent:** Wednesday, May 20, 2020 8:45 AM
**To:** Jonathan Sucher <jonathan.sucher@powerplan.com>; Brett Bertz <brett.bertz@powerplan.com>
**Cc:** Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** RE: Customer contact list - IP Protection letter

PLAINTIFF'S
EXHIBIT
208
PENGAD 800-631-6989



**From:** Jonathan Sucher <jonathan.sucher@powerplan.com>
**Sent:** Tuesday, May 19, 2020 11:09 AM
**To:** Brett Bertz <brett.bertz@powerplan.com>; Marc Bortniker <marc.bortniker@powerplan.com>
**Cc:** Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** Customer contact list - IP Protection letter



Regards,

**Jonathan Sucher**
Senior Corporate Counsel

Office: +1 678.223.2714
Mobile: +1 706.218.8165

jonathan.sucher@powerplan.com
PowerPlan.com



DocuSign Envelope ID: D47781D0-46AB-4A22-A43C-20DDDCD9412C

 POWER**PLAN**

CONFIDENTIAL

May 21, 2020

**VIA EMAIL**

Suez Water Management and Services Inc.
ATTN: Michael Salas, Senior Vice President & Chief Information and Digital Officer <michael.salas@suez.com>,
Andrianne Payson, Senior Vice President & General Counsel <andrianne.payson@suez.com>

RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights

Dear Mr. Salas and Ms. Payson:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

It is our understanding that you are currently using Lucasys to perform consulting work on the PowerPlan software, and that such consulting work has resulted in disclosure of PowerPlan's confidential information to Lucasys. However, the Master Software License and Services Agreement between our companies ("License Agreement") requires that you obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, **PowerPlan does not consent to Lucasys having access to our software or associated confidential information.**

PowerPlan consent is not required for you to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data models, or other confidential information. Additionally, PowerPlan consent is not required for you to provide your data, in raw form, to Lucasys, provided it is being done in a way that does not involve third parties accessing PowerPlan's software or data models or schema, including the underlying database, to retrieve such data.

The remainder of this letter provides answers to certain questions that you may have relating to what the License Agreement says about confidential information, and the scope of PowerPlan's confidential and proprietary information.

**What does my contract with PowerPlan say about confidential information?**

To protect and preserve our intellectual property, including trade secrets, we take reasonable steps to maintain the confidentiality of our software and associated information. The License Agreement includes provisions in Sections 5.1(a) and 5.3 in which you acknowledge PowerPlan's proprietary rights in and to its software, including computer programs, manuals and supporting materials, and agree to maintain the confidentiality of this information by refraining from using, disclosing, publishing or divulging the information to any third-party without our consent, and by employing no less stringent procedures than the strictest procedures used to protect its own confidential information.

**What are examples of PowerPlan's confidential information and trade secrets?**

PLAINTIFF'S EXHIBIT 209
PENGAD 800-631-6989

300 Galleria Parkway | Suite 2100 | Atlanta, GA | 30339 | O: +1 678.223.2800 | F: +1 770.618.0507 | powerplan.com

DocuSign Envelope ID: D47781D0-46AB-4A22-A43C-20DDDCD9412C



CONFIDENTIAL

PowerPlan's intellectual property includes the confidential and proprietary information and trade secrets embodied within our unique and sophisticated software solutions. This includes our source code, system and database architecture, database models and structures, and various unique and integrated features and functions thereof. Our confidential information also includes user guides and other documentation, professional services deliverables, information relating to our software design sessions and workshops, and our training classes and materials.

These examples fall within the definition of confidential information in the License Agreement. They also meet the statutory definition of a trade secret, because they are: (i) not generally known by or available to the public; (ii) provide competitive economic value to PowerPlan; and (iii) are the subject of reasonable efforts to maintain their secrecy.

**What actions amount to disclosure of or providing access to PowerPlan's confidential information?**

Among the information and access that you should not provide to Lucasys are the following: (i) front-end user access to PowerPlan's software; (ii) access to your PowerPlan database (whether by a link or credentialed login access provided by you), or to PowerPlan's data model; (iii) user guides and other PowerPlan software documentation; (iv) access to Social Power and other PowerPlan user community sites; (v) professional services deliverables and other project work product; and (vi) invitations or participation in design sessions, software testing, user training, and other project meetings or workshops relating to PowerPlan software.

**Does this letter apply to other third-party access to PowerPlan's confidential information?**

The License Agreements requires that you obtain our consent prior to disclosing our confidential information to third parties. In the future, you will receive an additional communication from a vendor that PowerPlan has engaged to perform a generalized customer audit of third-party access to PowerPlan's software and associated confidential information. We would appreciate your cooperation in responding to that communication.

**Final points**

This confirms our expectation that Suez Water and its affiliates will cease providing Lucasys with access to our software, including the database architecture and data model, and other confidential information. If you have any questions regarding this matter, please contact PowerPlan by sending an email to Legal@pwrplan.com with the **Subject: Protecting PowerPlan Proprietary Software** and provide the relevant details. We will respond as soon as possible to discuss how to address the situation without disrupting your operations or ongoing projects.

Once again, thank you for your investment with PowerPlan and for your partnership in protecting PowerPlan's confidential information.

Sincerely,

Brett Bertz
Brett Bertz
Chief Customer Officer

Cc:    Jonathan Sucher, Senior Corporate Counsel

CONFIDENTIAL

POWERPLAN00119995

Message

| | |
|---|---|
| From: | jdahlby@pwrplan.com [jdahlby@pwrplan.com] |
| Sent: | 6/6/2020 9:20:35 AM |
| To: | Jon Joury [jjoury@pwrplan.com] |
| BCC: | Lydia Olu-Harding [lydia.olu-harding@powerplan.com] |
| Subject: | Re: Suez Update |

I was expecting a lot smaller $ given scenario and politics.

Is there alternative approaches to focus on work tasks and leverage the MS team to help with continuous support?


Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.


On Jun 5, 2020, at 7:56 PM, Jon Joury <jjoury@pwrplan.com> wrote:


All,

Attached is SOW and PS Estimate. Will need to review with some others in PS on Monday. I put an area for what I assumed managed services would do. It is probably a little high of an estimate but I would rather be conservative and pare down after we talk with Client and internally. Plus we have risk of not knowing their design documents. Please let me know your thoughts.

1.      **Lydia** – if you can make sure legal and finance is aware this is coming Monday/Tuesday and help them mark it as urgent. If you can also make sure legal is prepared to do whatever it needs to for ensuring the contract refers to this Client as SUEZ and not United Water as that will be a sticking point as well.

2.      They had a comment about Lucasys executing all testing for all phases which seems very odd. For now I assumed we make scripts and plan and they would execute testing for the three cycles. **Anthony/Lydia – can one of you reach out to them and confirm their request around the three cycles and ask how long they expect each cycle to last? I assumed 3-4 weeks each.**

3.      If they want a "not to exceed" in there, we will probably need to add 20% and say NTE the estimate + 20% or something along those lines.

4.      Once we align on managed services scope I can take it from there the rest of the way. Will need a deal review as well.


**Jon Joury**
Director, Professional Services

Mobile: +1 404 928 6687
Jon.Joury@powerplan.com

<image001.png>



**From:** Anthony Beckett <abeckett@powerplan.com>
**Sent:** Friday, June 5, 2020 6:16 PM
**To:** Lydia Olu-Harding <lydia.olu-harding@powerplan.com>; Manan Jani <Manan.Jani@powerplan.com>; Ann Owolabi

ATTORNEYS' EYES ONLY

<Ann.Owolabi@powerplan.com>; Jon Joury <jjoury@pwrplan.com>
**Cc:** Jim Dahlby <jdahlby@pwrplan.com>; Brett Bertz <brett.bertz@powerplan.com>; Skip Fowler
<Skip.Fowler@powerplan.com>; Joel McManness <jmcmanness@pwrplan.com>
**Subject:** RE: Suez Update

Hi Lydia,

Did my best to mimic the previous opportunity but I imagine I will need to edit based on the requirements from the
team. Here is the lync:

https://powerplan.my.salesforce.com/0060d00001w3Uf9

Happy to adjust as needed but wanted to get it entered ASAP given our timeline.

Thanks,

**Anthony Beckett**
Customer Success Manager

Mobile: (678) 736-1717

abeckett@powerplan.com
PowerPlan.com
<image005.png>

**From:** Lydia Olu-Harding <lydia.olu-harding@powerplan.com>
**Sent:** Friday, June 05, 2020 6:05 PM
**To:** Manan Jani <Manan.Jani@powerplan.com>; Ann Owolabi <Ann.Owolabi@powerplan.com>; Jon Joury
<jjoury@pwrplan.com>
**Cc:** Anthony Beckett <abeckett@powerplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Brett Bertz
<brett.bertz@powerplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>; Joel McManness
<jmcmanness@pwrplan.com>
**Subject:** Suez Update

Hey Team –

  Our call with Suez team this afternoon to further communicate our position went more positive than I imagined. Rally
appreciates the effort we are making and continues to emphasize the extreme risk position they are in as a company
with the project and their other contracted parties involved that are on hold (Oracle and Peoplesoft teams). They are at
risk of losing the assigned resources, etc that I know all of us can understand being in the consulting business. That said,
when asked what we can continue to do as a partner to alleviate the path forward- **Rally and team have asked for an
SOW by end of day Tuesday**. Rally did express that they own the rights to the design documents and will share those
with us when we are under agreement. He understands there will be risk to us in putting this proposal together and
expects to see some of that highlighted in assumptions. Here is my proposed path to getting to that:

End of Day Monday: PowerPlan internal check in point on evaluation of the information we have to date. (Meeting is
coming)
- Breakdown of the build requirements for the project:
o Detail of what is covered under Managed Services standard entitlement
o Detail of what we will cover under Managed Services for good faith that would typically be services
o Detail of what is additional services cost

By Noon on Tuesday: SOW drafted and in contracts hand to return a final copy to us
Tuesday 5PM: meeting with Suez team scheduled to hand over and review

Anthony is taking action to get the SF opportunity created.
Manan and Ann met this afternoon to connect to the system and do a deeper review to reach the above detail.

**Ask to all of you:** what do you need from me or any of the other leaders CC'd here to accomplish this ask? I will move what I need to move on my calendar to facilitate the need.

Details we heard on the call for record keeping:
- Go live plan is October 2020
- Their Oracle SI is owning getting the data in to the PowerPlan API format & taking the outbound format as standard from Post. No additional translation required
- If there are things we can highlight as "not critical" for go live but nice to haves, those would be good to highlight as levers we can pull that impact their timeline. (ie: clean up of reports.. not really necessary and could be done after under MS hours)
- Looking for a "not to exceed" limit in the agreement (I didn't commit to that, just what Rally asked)

Thanks,

**Lydia Olu-Harding**
*Vice President, Support and Shared Services*

Office:   +1 678.223.2744
Mobile:   +1 404.437.2541
lydia.olu-harding@powerplan.com
PowerPlan.com

<image006.png>

<Suez Project Portfolio Management Estimate.xlsx>
<SUEZ Project Portfolio Management SOW.docx>

ATTORNEYS' EYES ONLY

Message
<hr/>

| From: | jdahlby@pwrplan.com [jdahlby@pwrplan.com] |
| Sent: | 6/18/2020 10:26:43 PM |
| To: | Joel McManness [jmcmanness@pwrplan.com] |
| Subject: | Re: AEP and IP Protection |

Please check with Jonathan if we need a specific letter for them.

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.


On Jun 18, 2020, at 8:03 PM, Joel McManness <jmcmanness@pwrplan.com> wrote:


Brett –

Sure thing, I've add them to the next wave.  Do we need to talk to them prior to sending the protection letters or do they just need to be sent the letters to initiate a conversation?

Thanks,

**Joel McManness**
Sr Manager, Managed Services

Office:   +1 678.223.2820
Mobile:  +1 913.526.2108
Joel.McManness@PowerPlan.com
PowerPlan.com

<image001.png>
Link for Live Support


**From:** Brett Bertz <brett.bertz@powerplan.com>
**Sent:** Thursday, June 18, 2020 7:17 PM
**To:** Joel McManness <jmcmanness@pwrplan.com>; John Ericson <jericson@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>
**Cc:** Lydia Olu-Harding <lydia.olu-harding@powerplan.com>
**Subject:** AEP and IP Protection

Joel, I think we have AEP designated as complete from notification of IP protection requirements with third parties in late 2019.  We've yet to receive confirmation from AEP that they are following the requirements of our communication.  Therefore could you please make the adjustment to add them into our next letter communication wave.  Thanks

**Brett M. Bertz**
Chief Customer Officer

Office:   +1 678.223.2762
Mobile:  +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com



CONFIDENTIAL

&lt;image004.png&gt;

CONFIDENTIAL

EXHIBIT 1



Case 1:20-cv-02987-AT   Document 202   Filed 06/09/23   Page 353 of 487

DocuSign Envelope ID: 0CA29C36-7570-4A20-A900-D31C14C1782D
Case 1:20-cv-02987-AT   Document 18-2   Filed 09/11/20   Page 2 of 3



**CONFIDENTIAL**

July 17, 2020

**VIA EMAIL**

American Electric Power Service Corporation

ATTN: Jeffrey W Hoersdig <jwhoersdig@aep.com>; James Llende <jxllende@aep.com>; Kevin D Keller <kdkeller@aep.com>; Anthony J Swaneck <ajswaneck@aep.com>

RE: Protecting PowerPlan Proprietary Software and Intellectual Property Rights

Dear Messrs. Hoersdig, Llende, Keller, and Swaneck:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to again raise a concern that PowerPlan has about access to our software and associated intellectual property by a specific third-party: Lucasys Inc. Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

PowerPlan is proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that AEP obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, **PowerPlan does not consent to Lucasys having access to our software or associated confidential information.**

PowerPlan consent is not required for AEP to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data models, or other confidential information. Additionally, PowerPlan consent is not required for AEP to provide their data, in raw form, to Lucasys, as long as it is done in a way that does not involve Lucasys accessing PowerPlan's software, data models or schema, including the underlying database, to retrieve such data.

The remainder of this letter provides answers to certain questions that you may have relating to what your contract with PowerPlan says about confidential information, and the scope of PowerPlan's confidential and proprietary information.

**What does my contract with PowerPlan say about confidential information?**

To protect and preserve our intellectual property, including trade secrets, we take reasonable steps to maintain the confidentiality of our software and associated information. The PowerPlant System Perpetual Licensing Agreement between our companies (the "License Agreement") includes provisions in Article 14 in which you acknowledge PowerPlan's proprietary rights in and to its software, including computer programs, manuals and supporting materials, and agree to maintain the confidentiality of this information by refraining from using, disclosing, publishing or divulging the information to any third-party without our consent, and by employing no less stringent procedures than the strictest procedures used to protect its own confidential information.

**What are examples of PowerPlan's confidential information and trade secrets?**

PowerPlan's intellectual property includes the confidential and proprietary information and trade secrets embodied within our unique and sophisticated software solutions. This includes our source code, system and database architecture, database models and structures, and various unique and integrated features and functions thereof. Our confidential

Case 1:20-cv-02987-AT   Document 202   Filed 06/09/23   Page 354 of 487

DocuSign Envelope ID: 0CA29C36-7570-4A20-A900-D31C14017820
Case 1:20-cv-02987-AT   Document 18-2   Filed 09/11/20   Page 3 of 3



CONFIDENTIAL

information also includes user guides and other documentation, professional services deliverables, information relating to our software design sessions and workshops, and our training classes and materials.

These examples fall within the definition of confidential information in our license and subscription agreements. They also meet the statutory definition of a trade secret, because they are: (i) not generally known by or available to the public; (ii) provide competitive economic value to PowerPlan; and (iii) are the subject of reasonable efforts to maintain their secrecy.

### What actions amount to disclosure of or providing access to PowerPlan's confidential information?

Among the information and access that our customers should not provide to Lucasys are the following: (i) front-end user access to PowerPlan's software; (ii) access to your PowerPlan database (whether by a link or credentialed login access provided by you), or to PowerPlan's data model; (iii) user guides and other PowerPlan software documentation; (iv) access to Social Power and other PowerPlan user community sites; (v) professional services deliverables and other project work product; and (vi) invitations or participation in design sessions, software testing, user training, and other project meetings or workshops relating to PowerPlan software.

### Does this letter apply to other third-party access to PowerPlan's confidential information?

The License Agreement requires that you obtain our consent prior to disclosing our confidential information to third parties. In the future, you will receive an additional communication from a vendor that PowerPlan has engaged to perform a generalized customer audit of third-party access to PowerPlan's software and associated confidential information. We would appreciate your cooperation in responding to that communication.

### Final points

PowerPlan requests that AEP and its affiliates confirm in writing that no access is currently being provided to Lucasys to PowerPlan's software, including the database architecture and data model, and other confidential information. PowerPlan also requests that AEP and its affiliates ensure that Lucasys is not provided with such access in the future. Please provide a response to confirm PowerPlan's requests or submit any questions regarding this matter via email to Legal@pwrplan.com with the **Subject: Protecting PowerPlan Proprietary Software**. PowerPlan will respond as soon as possible to assist in resolving this matter.

Once again, thank you for your investment with PowerPlan and for your partnership in protecting PowerPlan's confidential information.

Sincerely,

*Brett Bertz*

Brett Bertz
Chief Customer Officer

Cc:     Jonathan Sucher, Associate General Counsel

Message

| From: | jdahlby@pwrplan.com [jdahlby@pwrplan.com] |
|---|---|
| Sent: | 6/22/2020 10:22:31 AM |
| To: | Joel McManness [jmcmanness@pwrplan.com] |
| CC: | Jonathan Sucher [jonathan.sucher@powerplan.com] |
| Subject: | Re: Seminole IP Protection Letter |

I forgot they are cloud , I'm good with Kevin's recommendation

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.


On Jun 22, 2020, at 8:44 AM, Joel McManness <jmcmanness@pwrplan.com> wrote:


Hey Jim —

I saw a note Kevin M made on Seminole that they are cloud deployment and don't need the IP protection phone call.  Is there a 3ʳᵈ party currently operating out there or another reason we need to be sensitive with this account?

Thanks,

**Joel McManness**
Sr Manager, Managed Services

Office:   +1 678 223 2620
Mobile   +1 913.526.2108
Joel.McManness@PowerPlan.com
PowerPlan.com

<image001.png>
Link for Live Support



ATTORNEYS' EYES ONLY

| | | | | | | |
|---|---|---|---|---|---|---|
| 4143 | RELOS387160 | 10/5/2021 21:10 | Jim Dahlby [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D216 F1B123C54B028D024E68DB71B750-JIM DAHLBY] | Jonathan Sucher [jonathan.sucher@powerplan.com] | | Re: Trade Secrets identification kick-off |
| 4144 | RELOS410490 | 10/6/2021 5:28 | Jonathan Sucher [jonathan.sucher@powerplan.com] | Jim Dahlby [jdahlby@pwrplan.com] | | Re: Trade Secrets identification kick-off |



**PLAINTIFF'S EXHIBIT**

714

PENGAD 800-631-6989

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LUCASYS INC.,

*Plaintiff and Counterclaim Defendant,*

v.

POWERPLAN, INC.,

*Defendant and Counterclaim Plaintiff.*

Civil Action No.: 1:20-CV-02987-AT

Judge Amy Totenberg

**JURY TRIAL DEMANDED**

## ANSWER TO A COMPLAINT AND COUNTERCLAIMS

Defendant and Counterclaim Plaintiff PowerPlan, Inc. ("PowerPlan") hereby

answers Plaintiff and Counterclaim Defendant Lucasys Inc.'s ("Lucasys")

Complaint (ECF No. 1). Except as expressly admitted below, PowerPlan denies all

allegations contained in the Complaint, and denies that Lucasys is entitled to any

form of relief. PowerPlan reserves all its rights to alter, amend, or supplement this

answer, or to otherwise assert additional defenses and counterclaims, as discovery

proceeds. PowerPlan's Answer to the numbered paragraphs of Lucasys' Complaint

are set forth below[1]:

1.    PowerPlan admits the allegations in paragraph 1 of the Complaint.

---

[1]    Lucasys' Complaint includes more than two pages of improper and
argumentative narrative and mischaracterizations in a section entitled "Nature of the
Action" appearing before its "Substantive Allegations." To the extent that any
response is required here to this improper narrative, PowerPlan denies the allegations
and characterizations contained there.

1

PLAINTIFF'S
EXHIBIT
2/5
PENKAD B9AG21-026

8.     PowerPlan admits only that the allegations in paragraph 8 of the Complaint describe certain, but not all, products offered by PowerPlan. PowerPlan denies the remaining allegations in paragraph 8 of the Complaint.

9.     PowerPlan admits that PowerTax, Provision, and Tax Repairs are part of its Income Tax Suite. PowerPlan admits that its income tax related modules allow its customers to compute tax depreciation and deferred income taxes. PowerPlan denies the remaining allegations in paragraph 9 of the Complaint.

10.    PowerPlan admits the allegations in paragraph 10 of the Complaint.

11.    PowerPlan admits that some of its software was available in the market in 1994 and thereafter. PowerPlan denies the remaining allegations in paragraph 11 of the Complaint.

12.    PowerPlan lacks information sufficient to form a belief as to the truth of the allegations in paragraph 12 of the Complaint, accordingly they are denied.

13.    PowerPlan denies the allegations in paragraph 13 of the Complaint.

14.    PowerPlan denies the allegations in paragraph 14 of the Complaint.

15.    PowerPlan admits only that customers wishing to perform functions that are outside of the capability of PowerPlan's software can use alternative service providers. PowerPlan denies the remaining allegations in paragraph 15 of the Complaint.

16.    PowerPlan denies the allegations in paragraph 16 of the Complaint.

3

24.     PowerPlan admits only that certain of its clients have requested assistance with calculations associated with various tax law changes. PowerPlan denies the remaining allegations in paragraph 24 of the Complaint.

25.     PowerPlan admits only that Lucasys and numerous others provide various tax related consulting. PowerPlan denies the remaining allegations in paragraph 25 of the Complaint.

26.     PowerPlan admits that it competes with other providers of services concerning deferred taxes. PowerPlan denies all remaining allegations in paragraph 26 of the Complaint.

27.     PowerPlan admits that Vadim Lantukh, Daniel Chang, and Stephen Strang are former PowerPlan employees whose employment with PowerPlan ended in 2013 (Lantukh), 2014 (Chang), and 2015 (Strang). PowerPlan also admits that each held employment somewhere other than PowerPlan prior to joining Lucasys. PowerPlan denies the remaining allegations in paragraph 27 of the Complaint.

28.     PowerPlan lacks information sufficient to form a belief as to the reasons for Lucasys' founding and on that basis denies same. PowerPlan denies the remaining allegations in paragraph 28 of the Complaint.

29.     PowerPlan is without information sufficient to form a belief as to the truth of the allegations in paragraph 29 of the Complaint, accordingly they are denied.

33.     PowerPlan denies the allegations in paragraph 33 of the Complaint.

34.     PowerPlan denies the allegations in paragraph 34 of the Complaint.

35.     PowerPlan admits that it learned that Lucasys responded to a request for proposal issued by AEP.   PowerPlan denies the remaining allegations in paragraph 35 of the Complaint.

36.     PowerPlan admits that both PowerPlan and Lucasys submitted bids for at least a portion of the work requested by AEP.   PowerPlan also admits that it has had communications with AEP regarding PowerPlan's confidential information and the confidentiality obligations under its existing license agreement with PowerPlan. PowerPlan denies the remaining allegations in paragraph 36 of the Complaint.

37.     PowerPlan denies the allegations in paragraph 37 of the Complaint.

38.     PowerPlan admits only that it sent correspondence to Messrs. Lantukh, Chang and Strang on or about October 30, 2019, which speaks for itself.   PowerPlan denies the remaining allegations in paragraph 38 of the Complaint.

39.     PowerPlan admits only that it sent correspondence to Messrs. Lantukh, Chang and Strang on or about October 30, 2019, which speaks for itself.   PowerPlan denies the remaining allegations in paragraph 39 of the Complaint.

40.     PowerPlan denies the allegations in paragraph 40 of the Complaint.

49.     PowerPlan admits only that it performed certain services for NextEra at various times and at the request of NextEra. PowerPlan is without information sufficient to form a belief as to the remaining allegations in paragraph 49 of the Complaint, accordingly they are denied.

50.     PowerPlan admits only that Lucasys proposed to provide certain services to Liberty Utilities and that Lucasys recommended Liberty Utilities implement PowerPlan's income tax suite.   PowerPlan denies the remaining allegations in paragraph 50 of the Complaint.

51.     PowerPlan denies the allegations in paragraph 51 of the Complaint.

52.     PowerPlan denies the allegations in paragraph 52 of the Complaint.

53.     PowerPlan admits that in 2019, AEP issued a request for proposals. PowerPlan also admits that both PowerPlan and Lucasys submitted bids for at least a portion of the work requested by AEP. PowerPlan lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 53 of the Complaint, accordingly they are denied.

54.     PowerPlan admits that it sent certain correspondence to its client AEP, which speaks for itself. PowerPlan lacks information sufficient to form a belief as to the allegations concerning Lucasys' communications with AEP and on that basis denies same. PowerPlan denies the remaining allegations in paragraph 54 of the Complaint.

65.     PowerPlan admits only that investor-owned rate-regulated utilities sometimes use software systems and that such systems can facilitate certain operational, accounting, regulatory, and tax functions.   PowerPlan denies the remaining allegations in paragraph 65 of the Complaint.

66.     PowerPlan admits only that rate-regulated utilities are regulated and asset intensive.   PowerPlan denies the remaining allegations in paragraph 66 of the Complaint.

67.     PowerPlan admits that there are certain investor-owned rate-regulated utilities that operate without the use of what the Complaint calls "Utility Management Software."   PowerPlan denies the remaining allegations in paragraph 67 of the Complaint.

68.     PowerPlan denies the allegations in paragraph 68 of the Complaint.

69.     PowerPlan denies the allegations in paragraph 69 of the Complaint.

70.     PowerPlan is without information sufficient to form a belief as to costs allegedly associated with switching to a system that Lucasys simultaneously alleges does not exist.   Accordingly, PowerPlan denies the allegations in paragraph 70 of the Complaint.

71.     PowerPlan denies the allegations in paragraph 71 of the Complaint.

72.     PowerPlan denies the allegations in paragraph 72 of the Complaint.

73.     PowerPlan denies the allegations in paragraph 73 of the Complaint.

86.    PowerPlan denies the allegations in paragraph 86 of the Complaint.

87.    PowerPlan denies the allegations in paragraph 87 of the Complaint.

88.    PowerPlan denies the allegations in paragraph 88 of the Complaint.

89.    PowerPlan denies the allegations in paragraph 89 of the Complaint.

90.    PowerPlan denies it engaged in any improper anticompetitive conduct
or that any alleged anticompetitive conduct affected interstate commerce.
PowerPlan also denies that it has revenues in excess of $150 million annually.
PowerPlan lacks information sufficient to form a belief as to the truth of the
remaining allegations in paragraph 90 of the Complaint, accordingly they are denied.

91.    PowerPlan admits that AEP operates in multiple states.  PowerPlan
denies the remaining allegations in paragraph 91 of the Complaint.

92.    PowerPlan incorporates by reference the preceding responses to
Lucasys' allegations.

93.    PowerPlan denies the allegations in paragraph 93 of the Complaint.

94.    PowerPlan admits only that development of a full suite software
product of the scope of PowerPlan's software offering requires significant
technological ability and any effort to organically develop such a software offering
without access to PowerPlan's trade secrets would require a major capital investment
and substantial time.  PowerPlan denies the remaining allegations in paragraph 94
of the Complaint.

13

107.   PowerPlan denies the allegations in paragraph 107 of the Complaint.

108.   PowerPlan denies the allegations in paragraph 108 of the Complaint.

109.   PowerPlan denies the allegations in paragraph 109 of the Complaint.

110.   PowerPlan denies the allegations in paragraph 110 of the Complaint.

111.   PowerPlan denies the allegations in paragraph 111 of the Complaint.

112.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

113.   PowerPlan admits only that there is existing choice available from different suppliers.  PowerPlan denies the remaining allegations in paragraph 113 of the Complaint.

114.   PowerPlan denies the allegations in paragraph 114 of the Complaint.

115.   PowerPlan denies the allegations in paragraph 115 of the Complaint.

116.   PowerPlan denies the allegations in paragraph 116 of the Complaint.

117.   PowerPlan denies the allegations in paragraph 117 of the Complaint.

118.   PowerPlan denies the allegations in paragraph 118 of the Complaint.

119.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

120.   PowerPlan denies the allegations in paragraph 120 of the Complaint.

121.   PowerPlan denies the allegations in paragraph 121 of the Complaint.

122.   PowerPlan denies the allegations in paragraph 122 of the Complaint.

139.   PowerPlan denies the allegations in paragraph 139 of the Complaint.

140.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

141.   PowerPlan denies the allegations in paragraph 141 of the Complaint.

142.   PowerPlan denies the allegations in paragraph 142 of the Complaint.

143.   PowerPlan denies the allegations in paragraph 143 of the Complaint.

144.   PowerPlan denies the allegations in paragraph 144 of the Complaint.

145.   PowerPlan denies the allegations in paragraph 145 of the Complaint.

146.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

147.   PowerPlan denies the allegations in paragraph 147 of the Complaint.

148.   PowerPlan denies the allegations in paragraph 148 of the Complaint.

149.   PowerPlan denies the allegations in paragraph 149 of the Complaint.

150.   PowerPlan denies the allegations in paragraph 150 of the Complaint.

151.   PowerPlan incorporates by reference the preceding responses to Lucasys' allegations.

152.   PowerPlan denies the allegations in paragraph 152 of the Complaint.

153.   PowerPlan denies the allegations in paragraph 153 of the Complaint

154.   PowerPlan denies the allegations in paragraph 154 of the Complaint.

155.   PowerPlan denies the allegations in paragraph 155 of the Complaint.

## SECOND ADDITIONAL DEFENSE

2.      The Complaint and every claim for relief asserted therein fails to state a claim upon which relief can be granted against PowerPlan.

## THIRD ADDITIONAL DEFENSE

3.      Lucasys' claims are barred, in whole or in part, because there has been no injury to competition as a result of the conduct attributed to PowerPlan.

## FOURTH ADDITIONAL DEFENSE

4.      Lucasys' claims are barred, in whole or in part, because Lucasys has failed to define an appropriate relevant product market and/or geographic market under the antitrust laws.

## FIFTH ADDITIONAL DEFENSE

5.      PowerPlan's business practices were lawful, pro-competitive, increased efficiencies, and benefitted customers.

## SIXTH ADDITIONAL DEFENSE

6.      Lucasys' claims may be barred, in whole or in part, by the applicable statute of limitations and/or statute of repose.

## SEVENTH ADDITIONAL DEFENSE

7.      Lucasys' claims may be barred, in whole or in part, by the doctrines of laches, waiver and/or estoppel.

## THIRTEENTH ADDITIONAL DEFENSE

13.    Lucasys' Ninth and Tenth Causes of Action are barred, in whole or in part, because all purported statements made by PowerPlan regarding Lucasys, if any, are privileged under O.C.G.A. § 51-5-7(2) and (3).

## FOURTEENTH ADDITIONAL DEFENSE

14.    Lucasys' Ninth and Tenth Causes of Action are barred, in whole or in part, because all purported fact statements made by PowerPlan regarding Lucasys, if any, were true.

## ADDITIONAL DEFENSES

By designating the aforementioned defenses, PowerPlan does not in any way waive or limit any defenses which are or may be raised by their denials, allegations, and averments.   These defenses also are without prejudice to PowerPlan's ability to raise other and further defenses.   PowerPlan expressly reserves all rights to re-evaluate its defenses and/or assert additional defenses upon any amendment of the underlying claims, and/or upon discovery and review of additional documents and information, and upon the development of other pertinent facts.

## POWERPLAN'S COUNTERCLAIMS

PowerPlan states the following counterclaims against Lucasys for violations of the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (the "DTSA"),

disclosing, or permitting the unauthorized use or disclosure of, this PowerPlan proprietary information.

4.    Lantukh, Chang, and Strang are the founders and main principals of Lucasys, which was formed to develop software, but which also has been providing consulting services to PowerPlan customers relating to their use of the PowerPlan Software, which has provided Lucasys with continued access to the proprietary elements of the PowerPlan Software—including but not limited to information embodied in PowerPlan's proprietary Software architecture, databases and database models, unique functions and features, processes, methods, algorithms, and (potentially) source code   under confidentiality obligations.

5.    Lucasys has attempted to market its own software products to the same customer base served by PowerPlan.   On information and belief, Lucasys has misappropriated PowerPlan's confidential and proprietary information and trade secrets  including but not limited to information embodied in PowerPlan's proprietary Software architecture, databases and database models, unique functions and features, processes, methods, algorithms, and (potentially) source code—and misused and is continuing to misuse that information to design and develop Lucasys' software. The details of such misappropriation is solely in the possession and control of Lucasys, and will be further elucidated by discovery.

Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, for misappropriation of trade secrets. This Court has pendent or supplemental jurisdiction over PowerPlan's remaining counterclaims pursuant to 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Lucasys because its principal place of business is within the judicial district for the United States District Court for the Northern District of Georgia.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Lucasys resides in this judicial district and a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

12.     Through a substantial investment of time, effort, and money over the past 25 years, PowerPlan has developed valuable, unique, and sophisticated software and data systems solutions (i.e., the PowerPlan Software).

13.     PowerPlan has developed, and continues to develop, upgrade, refine, and add functions and features to, the PowerPlan Software with its own software engineers at great cost to the company. Over the past 25 years, PowerPlan estimates that it has invested more than $100 million in designing, developing, upgrading, and refining its PowerPlan Software.

14.     The PowerPlan Software permits utilities, and other businesses operating in rate-regulated and asset-intensive industries, among others, to

integrated features and functions thereof, and the methods, processes, and algorithms used to carry them out are confidential and proprietary and embody trade secrets under federal and Georgia law.

18.     The PowerPlan Software, and the systems and components included in the Software, derive economic value from not being generally known, and PowerPlan has taken reasonable measures to maintain their secrecy.

19.     To maintain the secrecy of its confidential and proprietary information and trade secrets ("PowerPlan Protected Information"), PowerPlan takes a number of reasonable steps, which include but are not limited to the following:

- PowerPlan requires employees to sign employment agreements prohibiting use or disclosure of PowerPlan Protected Information outside of their employment with PowerPlan.

- PowerPlan has adopted employee handbooks with policies similarly prohibiting employees from using or disclosing PowerPlan Protected Information outside of their employment with PowerPlan.

- PowerPlan trains employees on protecting the confidential and proprietary nature of PowerPlan Protected Information.

- PowerPlan does not sell its PowerPlan Software to customers, but instead licenses the Software to customers pursuant to written license agreements in which the customer acknowledges PowerPlan's

22.    Lantukh was employed by PowerPlan from July 2007 through March 2013, as Manager of Software Implementation and later as Director of Professional Services.

23.    In his positions with PowerPlan, Lantukh was responsible for successful customer implementation of PowerPlan Software solutions, and had intimate access to and worked with all aspects of PowerPlan's confidential and proprietary Software systems (including but not limited to the system architecture, databases, database models, features, functions, and source code). Lantukh worked closely with PowerPlan customers implementing and using the PowerPlan Software, including in connection with Software upgrades, restructurings, conversions, and interfacing with customer software solutions and data. To accomplish these tasks, Lantukh worked with PowerPlan Software developers and engineers, and had direct access to, among other things, the PowerPlan Software database models and structure, source code, and confidential customer information.

24.    At all times, Lantukh's access to the PowerPlan Protected Information was subject to legal obligations to refrain from using or disclosing that information for any purpose other than PowerPlan business.

25.    On July 2, 2007, Lantukh signed an Employment Agreement in which he agreed, among other things, to refrain from using, disclosing, or permitting any unauthorized person from using, disclosing, or gaining access to, any trade secrets

to all aspects of PowerPlan's confidential and proprietary Software systems (including but not limited to the system architecture, databases, database models, features, functions, processes, methods, algorithms and source code). Chang worked closely with PowerPlan customers implementing and using the PowerPlan Software, including in connection with Software upgrades, restructurings, conversions, and interfacing with customer software solutions and data. To accomplish these tasks, Chang worked with PowerPlan Software developers and engineers, and had direct access to the PowerPlan Software database models and structure, source code, and other PowerPlan Protected Information.

31. At all times, Chang's access to the PowerPlan Protected Information was subject to legal obligations to refrain from using or disclosing that information for any purpose other than PowerPlan business.

32. On June 26, 2009, Chang signed a Handbook Acknowledgment agreeing to comply with PowerPlan's employee handbook policies, which prohibited the disclosure of PowerPlan Protected Information during or after his employment other than for the benefit of PowerPlan.

33. On March 18, 2013, Chang executed an Employment Covenants Agreement agreeing that "both during and after Your employment with the Company," Chang would refrain from using, disclosing, or permitting any unauthorized person from using, disclosing, or gaining access to, any Protected

31

37.    Strang worked for PowerPlan from January 2011 to September 2015, first as a Senior Consultant assisting customers in implementing and using the PowerPlan Software, and later in a managerial position.

38.    In each of his positions with PowerPlan, Strang was responsible for customer implementation of PowerPlan Software solutions, and had intimate access to all aspects of PowerPlan's confidential and proprietary Software systems (including but not limited to the system architecture, databases, database models, features, functions, methods, processes, algorithms, and source code). Strang worked closely with PowerPlan customers implementing and using the PowerPlan Software, including in connection with Software upgrades, restructurings, conversions, and interfacing with customer software solutions and data. To accomplish these tasks, Strang worked with PowerPlan Software developers and engineers, and had direct access to the PowerPlan Software database model and structure, source code, and confidential customer information.

39.    At all times, Strang's access to the foregoing PowerPlan Protected Information was subject to his legal obligations to refrain from using or disclosing that information for any purpose other than PowerPlan business.

40.    On January 13, 2011, Strang signed a Handbook Acknowledgment agreeing to comply with PowerPlan's employee handbook policies, which

implementation and use of the PowerPlan Software, during which they have access

to nearly all aspects of PowerPlan's Software, under confidentiality obligations that

prohibit the misappropriation of PowerPlan Protected Information.

46.     Because most of Lantukh's professional career has been spent

accessing, modifying, implementing, and working with the PowerPlan Software,

either as a PowerPlan employee or as a consultant servicing PowerPlan customers,

it would be virtually impossible for him and Lucasys to design and develop the

Lucasys Software without relying on confidential and proprietary aspects of the

PowerPlan Software.

47.     PowerPlan's concerns about Lucasys' use of PowerPlan's Protected

Information have been exacerbated by Lucasys' hiring of former PowerPlan

employees Chang as Chief Operating Officer (started working with Lucasys in July

2019), and Strang as Chief Technology Officer (started in August 2019), and its

announcement that Chang is also a co-founder, with Lantukh, of Lucasys.

48.     Lucasys has also contracted with yet another former PowerPlan

employee    Vu Nguyen—to become a Lucasys Implementation Partner.  Nguyen

was a PowerPlan employee who had access to and worked closely with PowerPlan's

confidential and proprietary systems, including its database models and source code,

and worked closely with PowerPlan customers in implementing the PowerPlan

Software.

54.     On information and belief, the Lucasys Software has been designed using and/or leveraging the confidential and trade secret information that Lucasys' principals and employees obtained by virtue of their prior PowerPlan employment and PowerPlan customer engagements, which were governed by confidentiality agreements requiring that PowerPlan's confidential and trade secret information be held in strict confidence.  On information and belief, Lucasys has used, and is using, that confidential and trade secret information for unauthorized purposes and without the consent or permission of PowerPlan.

55.     On information and belief, Lucasys is improperly, unlawfully, and unfairly using PowerPlan's Protected Information  including but not limited to information embodied in PowerPlan's proprietary architecture, software, databases, database schema, and unique functions and features to, on information and belief, design, develop, and implement Lucasys' Software products.

56.     On October 30, 2019, PowerPlan sent a letter to Lucasys demanding, among other things, that it:

- cease disclosing or using PowerPlan's Protected Information;

- return all Protected Information in its possession, and delete all such information from its systems; and

- cease designing, developing, selling, or marketing the Lucasys Software unless and until it can be independently verified that

62. PowerPlan's Protected Information, including information embodied in the PowerPlan Software (including but not limited to the Software architecture, databases, database models and structure, unique functions and features, methods, processes, algorithms, and source code) contain valuable trade secrets owned by PowerPlan.

63. PowerPlan's Protected Information contains trade secrets under the DTSA because it includes financial, business, technical, and engineering information, including formulas, designs, methods, techniques, processes, procedures, programs, and codes, that are not generally known to the public, for which PowerPlan takes measures that are reasonable under the circumstances to keep secret.

64. PowerPlan's Protected Information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, persons or entities who can obtain economic value from the disclosure or use of the information.

65. On information and belief, Lucasys acquired PowerPlan's trade secrets from one or more of Lantukh, Chang, and Strang by improper means, knowing that these individuals acquired the trade secrets under circumstances giving rise to a duty to maintain the secrecy and limit the use of the trade secrets and/or while consulting

caused by the misappropriation and resulting unjust enrichment, pursuant to 18 U.S.C. § 1836(b)(3)(B) and (C).

70. Lucasys' actions have been intentional and were meant to cause harm to PowerPlan, entitling PowerPlan to recover an award of costs and reasonable attorneys' fees incurred by PowerPlan in this action pursuant to 18 U.S.C. § 1836(b)(3)(D).

## COUNT TWO
## Violation of the Georgia Trade Secrets Act – O.C.G.A. § 10-1-760

71. PowerPlan alleges and incorporates the allegations contained in paragraphs 1–70 as if fully set forth here.

72. PowerPlan's Protected Information, including information embodied in the PowerPlan Software (including but not limited to the Software architecture, databases, database models and structure, unique functions and features, and source code) contains valuable trade secrets owned by PowerPlan.

73. PowerPlan's Protected Information contains trade secrets under the GTSA because it includes financial, business, technical, and engineering information, including formulas, designs, methods, techniques, processes, procedures, programs, and codes that are not commonly known to the public, for which PowerPlan takes reasonable measures to keep secret.

74. PowerPlan's Protected Information derives independent economic value from not being generally known to, and not being readily ascertainable through

41

79.     As a result of Lucasys' actual and threatened misappropriation of PowerPlan's trade secrets, PowerPlan is suffering irreparable harm. Without permanent injunctive relief awarded pursuant to O.C.G.A. § 10-1-762, PowerPlan will continue to sustain irreparable harm for which there is no adequate remedy at law.

80.     PowerPlan is likewise entitled to an award of damages under O.C.G.A. § 10-1-763(a), including damages sustained from Lucasys' misappropriation of PowerPlan's trade secrets, or the actual loss to PowerPlan plus the unjust enrichment to Lucasys, for the misappropriation.

81.     Lucasys' actions have been intentional and were meant to cause harm to PowerPlan, entitling PowerPlan under O.C.G.A. § 10-1-763(b) to recover exemplary damages in an amount not exceeding twice any award made under O.C.G.A. § 10-1-763(a), and to recover attorneys' fees under O.C.G.A. § 10-1-764.

## COUNT THREE
### Unfair Competition

82.     PowerPlan alleges and incorporates the allegations contained in paragraphs 1 81 as if fully set forth here.

83.     Lucasys' misconduct alleged herein, including but not limited to its misappropriation of PowerPlan trade secrets and breaches of obligations owed under confidentiality and non-disclosure agreements, amounts to unfair competition prohibited by Georgia common law.

b.      Granting to PowerPlan permanent injunctive relief enjoining Lucasys,
and all those acting directly or indirectly in concert or participation with it, as
follows:

i.      Enjoining all disclosure or use of PowerPlan's Protected
Information, including but not limited to disclosure or use
of the PowerPlan Software and PowerPlan's proprietary
customer and pricing information;

ii.     Requiring Lucasys and all those acting in concert or
participation with Lucasys to return to PowerPlan all
PowerPlan Protected Information in their possession,
custody or control, and to destroy or delete all information
from their computers, systems, and devices;

iii.    Enjoining the further design, development, marketing, or
sale or efforts to sell the Lucasys Software unless and until
it can be independently verified that Lucasys designed,
developed, and is able to market and sell the Software
without use of PowerPlan's Protected Information;

c.      Award compensatory and actual damages against Lucasys, in an
amount to be determined at trial, including all damages (including unjust enrichment
damages) authorized under 18 U.S.C. § 1836(h)(3)(B) and O.C.G.A. § 10-1-763(a);

Submitted this 14th day of October, 2021

Respectfully submitted,

/s/ Damond R. Mace

Damond R. Mace (admitted *pro hac vice*)
Damond.mace@squirepb.com
Stephen M. Fazio (admitted *pro hac vice*)
Stephen.Fazio@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
Telephone: (216) 479-8500
Facsimile: (216) 479-8780

Petrina A. McDaniel
Georgia Bar No. 141301
Petrina.mcdaniel@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
1230 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309
Telephone: (678) 272-3200
Facsimile: (678) 272-3211

*Attorneys for Defendant and Counterclaim
Plaintiff PowerPlan, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LUCASYS INC.,

        *Plaintiff and*
        *Counterclaim Defendant*,

    v.

POWERPLAN, INC.,

        *Defendant and*
        *Counterclaim Plaintiff.*

Civil Action No. 1:20-cv-2987-AT

Judge Amy Totenberg

## POWERPLAN, INC.'S RESPONSES TO LUCASYS INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, PowerPlan, Inc. ("PowerPlan") hereby responds and objects to Lucasys Inc.'s ("Lucasys") First Set of Interrogatories as follows:

### INTERROGATORY NO. 1:

Identify all persons associated with PowerPlan (including but not limited to current and former officers and employees) who have communicated about Lucasys, and provide the date, recipients, and substance of the communications.

### RESPONSE TO INTERROGATORY NO. 1:

PowerPlan objects to Interrogatory No. 1 (*i*) as it is vague and indefinite in its use of the phrase "communicated about Lucasys"; (*ii*) as it is unduly burdensome and not proportional to the needs of the case insofar as it demands that PowerPlan

1



PLAINTIFF'S
EXHIBIT
216
PENGAD 800-631-6989

summarize all communications over a nearly two year period; and (*iii*) to the extent it calls for disclosure of any privileged or protected communications. Without waiving its objections, PowerPlan states that the answer to Interrogatory No. 1 can be determined by examination of business records to be produced in response to Lucasys' Requests for the Production of Documents and that the burden of determining the answer to Interrogatory No. 1 will be substantially the same for either party. PowerPlan refers Lucasys to the documents being produced.

**INTERROGATORY NO. 2:**

Identify all persons associated with PowerPlan (including but not limited to current and former officers and employees) who have communicated about companies competing with, or potentially competing with, PowerPlan, and provide the date, recipients, and substance of the communications.

**RESPONSE TO INTERROGATORY NO. 2:**

PowerPlan objects to Interrogatory No. 2 (*i*) as it is vague and indefinite in its use of the phrase "communicated about companies competing with, or potentially competing with, PowerPlan"; (*ii*) as it is unduly burdensome and not proportional to the needs of the case insofar as it demands that PowerPlan summarize all communications over an indefinite period; and (*iii*) to the extent it calls for disclosure of any privileged or protected communications. Without waiving its objections,

2

PowerPlan states that the answer to Interrogatory No. 2 can be determined by examination of business records to be produced in response to Lucasys' Requests for the Production of Documents and that the burden of determining the answer to Interrogatory No. 2 will be substantially the same for either party.  PowerPlan refers Lucasys to the documents being produced.

## INTERROGATORY NO. 3:

Identify all communications that evidence concerns or complaints about PowerPlan's software, and provide the date, recipients, and substance of the communications.

## RESPONSE TO INTERROGATORY NO. 3:

PowerPlan objects to Interrogatory No. 3 as it is (*i*) vague and indefinite in its use of the phrase "concerns" and (*ii*) unduly burdensome and not proportional to the needs of the case insofar as it demands that PowerPlan summarize all communications over an indefinite period.   Without waiving its objections, PowerPlan states that the answer to Interrogatory No. 3 can be determined by examination of business records to be produced in response to Lucasys' Requests for the Production of Documents and that the burden of determining the answer to Interrogatory No. 3 will be substantially the same for either party.  PowerPlan refers Lucasys to the documents being produced.

3

## INTERROGATORY NO. 4:

Identify all communications that evidence compliments about PowerPlan's software, and provide the date, recipients, and substance of the communications.

## RESPONSE TO INTERROGATORY NO. 4:

PowerPlan objects to Interrogatory No. 4 as it is (*i*) vague and indefinite in its use of the phrase "compliments" and (*ii*) unduly burdensome and not proportional to the needs of the case insofar as it demands that PowerPlan summarize all communications over an indefinite period. Without waiving its objections, PowerPlan states that the answer to Interrogatory No. 4 can be determined by examination of business records to be produced in response to Lucasys' Requests for the Production of Documents and that the burden of determining the answer to Interrogatory No. 4 will be substantially the same for either party. PowerPlan refers Lucasys to the documents being produced.

## INTERROGATORY NO. 5:

Identify all persons who PowerPlan believes may have knowledge about quality issues with PowerPlan's software.

## RESPONSE TO INTERROGATORY NO. 5:

PowerPlan incorporates by reference its objections and responses to Interrogatory Nos. 3 and 4. PowerPlan further objects to Interrogatory No. 5 as the

reference to "quality issues" is vague, undefined, and subject to multiple reasonable interpretations. Without waiving its objections, concerns regarding PowerPlan Software may be communicated to PowerPlan in multiple ways. PowerPlan's Services, Sales, and Product Management groups may receive information concerning software quality. The Services function is currently led by Brett Bertz, Chief Customer Officer. Sales is currently led by Marc Bortniker, Senior Vice President of Global Sales. Product Management is currently led by Suzanne Ward, Senior Vice President, Product Management.

**INTERROGATORY NO. 6:**

Identify all communications related to PowerPlan or other companies potentially providing, or providing, Supplemental Management Services to PowerPlan's customers, and provide the date, recipients, and substance of the communications.

**RESPONSE TO INTERROGATORY NO. 6:**

PowerPlan objects to Interrogatory No. 6 as it is unduly burdensome and not proportional to the needs of the case insofar as it demands that PowerPlan summarize all communications over an indefinite period. PowerPlan further objects to Lucasys' definition of "Supplemental Management Services," which PowerPlan does not adopt for any purpose other than its response to Interrogatory No. 6. Without

5

waiving its objections, PowerPlan states that the answer to Interrogatory No. 6 can be determined by examination of business records to be produced in response to Lucasys' Requests for the Production of Documents and that the burden of determining the answer to Interrogatory No. 6 will be substantially the same for either party. PowerPlan refers Lucasys to the documents being produced.

### INTERROGATORY NO. 7:

Identify all communications related to PowerPlan withholding consent for a person or company to access PowerPlan's software and purported confidential information, as PowerPlan asserts it can do in the July 17, 2020 letter from PowerPlan to American Electric Power Service Corporation, and provide the date, recipients, and substance of the communications.

### RESPONSE TO INTERROGATORY NO. 7:

PowerPlan objects to Interrogatory No. 7 as it is ($i$) vague and indefinite in its use of the phrase "access PowerPlan's software and purported confidential information" and ($ii$) unduly burdensome and not proportional to the needs of the case insofar as it demands that PowerPlan summarize all communications over an indefinite period. Without waiving its objections, PowerPlan states that the answer to Interrogatory No. 7 can be determined by examination of business records to be produced in response to Lucasys' Requests for the Production of Documents and

that the burden of determining the answer to Interrogatory No. 7 will be substantially the same for either party.  PowerPlan refers Lucasys to the documents being produced.

## INTERROGATORY NO. 8:

Identify with specificity all trade secrets, confidential information, proprietary information, and protected information (as set forth in the October 30, 2019 letter from Mark S. VanderBroek (prior counsel for PowerPlan) to Lantukh, Chang and Strang ("2019 Letter")), that you contend Lucasys, Vadim Lantukh ("Lantukh"), Daniel Chang ("Chang"), or Stephen Strang ("Strang") have misappropriated from PowerPlan.

## RESPONSE TO INTERROGATORY NO. 8:

PowerPlan objects to Interrogatory No. 8 to the extent it seeks information that is protected by the attorney work product doctrine and/or attorney client privilege. Without waiving its objections, PowerPlan states that the trade secrets, confidential information, proprietary information and protected information set forth in the October 30, 2019 letter that PowerPlan contends Lucasys has misappropriated include PowerPlan's unique software solutions, including its source code, system and database architecture, database tables and their structure, database model and schema, algorithms, numerous unique and integrated features, functions, and

7

components thereof, the methods and processes for carrying out those features and functions, the relationship of the various components to one another, and its manuals, user guides and software documentation.  PowerPlan's investigation is continuing and it reserves the right to amend or supplement this response as Lucasys provides information relating to its activities.  In addition, this response may be supplemented by expert testimony at the appropriate time in the case.

## INTERROGATORY NO. 9:

Identify in detail the specifics of the "proprietary knowledge" that is referenced in a May 4, 2020 letter from its counsel Mark S. VanderBroek to Jason S. Alloy ("2020 Letter") that "Lucasys and its principals are making unauthorized use of their proprietary knowledge of PowerPlan's database model to design and develop competing Lucasys software modules to directly integrate and work with PowerPlan's software and databases."

## RESPONSE TO INTERROGATORY NO. 9:

PowerPlan objects to Interrogatory No. 9 to the extent it seeks information that is protected by the attorney work product doctrine and/or attorney client privilege.  Without waiving its objections, the proprietary knowledge referenced in the May 4, 2020 letter from Mark S. VanderBorek includes PowerPlan's unique software solutions, including its source code, system and database architecture, data

8

tables and their structure, database model and schema, algorithms, numerous unique and integrated features, functions, and components thereof, the methods and processes for carrying out those features and functions, the relationship of the various components to one another, and its manuals, user guides and software documentation. PowerPlan's investigation is continuing and it reserves the right to amend or supplement this response as Lucasys provides information relating to its activities. In addition, this response may be supplemented by expert testimony at the appropriate time in the case.

**INTERROGATORY NO. 10:**

Identify what steps PowerPlan takes to maintain the confidentiality of its trade secrets, confidential information, proprietary information, and protected information, and identify all persons associated with PowerPlan (including but not limited to officers and employees) who implement or oversee such steps.

**RESPONSE TO INTERROGATORY NO. 10:**

PowerPlan takes multiple steps to protect its trade secret, confidential, and protected information, including but not limited to, the following: PowerPlan requires employees to sign employment agreements prohibiting use or disclosure of PowerPlan's trade secret, confidential, and protected information outside of their employment with PowerPlan and which contain confidentiality obligations that

continue after the employee's employment with PowerPlan ends. PowerPlan has adopted employee handbooks with policies prohibiting employees from using or disclosing PowerPlan trade secret, confidential, and protected information outside of their employment with PowerPlan. PowerPlan also trains employees on protecting the confidential and proprietary nature of PowerPlan trade secret, confidential, and protected information. When employees leave employment with PowerPlan, departing employees are reminded of their ongoing obligations to protect PowerPlan trade secret, confidential, and protected information. These steps are primarily implemented by representatives of the Human Resources Department, which is currently led by Sarah Park, Vice President, Human Resources.

PowerPlan also licenses its software to customers pursuant to written license agreements in which the customer acknowledges PowerPlan's proprietary rights in and to the PowerPlan Software programs, manuals and supporting materials and requires the customer to protect the confidentiality of and not disclose PowerPlan's trade secret, confidential, and protected information without the consent of PowerPlan. These customer license agreements require the customer to maintain the confidentiality of the PowerPlan trade secret, confidential, and protected information using no less stringent procedures than the strictest procedures used to protect the customers' own confidential information. Licensing requirements, including the

requirement that confidentiality be maintained, are generally overseen by PowerPlan's legal team with oversight by the Chief Financial Officer, Joost Rutten.

PowerPlan also secures access to its software through various technical methods. The cloud-based version of PowerPlan's software operates in a secured information technology environment. Users are required to have appropriate security credentials and access is limited and subject to an acceptable use policy. Security of PowerPlan's cloud-based solution is overseen by Jennifer Butts, Director of Information Security and Compliance. For customers that deploy PowerPlan's software on their premises, software access is subject to the customer's internal security policies, subject always to the customer's obligation to protect the confidentiality of PowerPlan's confidential information.

PowerPlan also limits access to virtual and live PowerPlan user events in which confidential information may discussed. Access to such events is generally limited only to employees of PowerPlan licensees, which have confidentiality obligations under the software license between PowerPlan and their employers. If an individual is permitted to attend such an event that is not an employee of a PowerPlan licensee, it is subject to a non-disclosure agreement. Oversight of these events are generally overseen by Drea Toretti, Vice President Marketing.

**INTERROGATORY NO. 11:**

Identify all trade secrets, confidential information, proprietary information, and protected information from interrogatory number 8 above that have been disclosed publicly or shared with any entity or person without a nondisclosure agreement or confidentiality agreement, and identify the date the trade secret was disclosed or shared, with whom it was shared, and the form in which it was disclosed (i.e., email, verbal communication, or some other form).

**RESPONSE TO INTERROGATORY NO. 11:**

PowerPlan objects to Interrogatory No. 11 as vague and indefinite in its use of the undefined terms "confidential information," "proprietary information," and "protected information." Without waiving its objection and based upon its investigation to date, PowerPlan states that it is not aware of any of its trade secrets having been disclosed publicly or shared without a nondisclosure agreement or confidentiality agreement.

**INTERROGATORY NO. 12:**

Identify all non-employee agents of PowerPlan or its customers who have had access to PowerPlan's software without a confidentiality agreement or similar agreement.

## RESPONSE TO INTERROGATORY NO. 12:

PowerPlan objects to Interrogatory No. 12 as (*i*) vague in its use of the undefined terms "non-employee agents" and "access to PowerPlan's software"; (*ii*) overbroad; and (*iii*) unlimited to any reasonable time period. Without waiving its objections and based upon its investigation to date, PowerPlan states that there have been no non-employee agents of PowerPlan that have been granted access to PowerPlan's software without confidentiality or similar agreements. PowerPlan is aware that certain customers have retained firms to assist with certain consulting tasks related to the PowerPlan software. PowerPlan's standard license terms require that PowerPlan's licensees protect PowerPlan's confidential information in a manner no less stringent than the strictest procedures used to protect the licensee's confidential information. PowerPlan's investigation is continuing and it reserves the right to amend or supplement this response.

## INTERROGATORY NO. 13:

Identify each and every way in which PowerPlan claims that "Lucasys' software inappropriately mimics and imitates PowerPlan's proprietary software programs and solutions" and "competes with and mirrors the architecture, functions, and features of PowerPlan's software solutions" as described in the 2019 Letter.

13

## RESPONSE TO INTERROGATORY NO. 13:

PowerPlan objects to Interrogatory No. 13 to the extent it seeks information that is protected by the attorney work product doctrine and/or attorney client privilege. Without waiving its objections or any claim of privilege or protection, PowerPlan states that as explained in the 2019 letter, Lucasys software had many of the same unique and proprietary features and functions of PowerPlan's software and was built using the similar software architecture and databases. The 2019 letter also explained that it appeared that Lucasys tax module reflected the certain key architectural components of the PowerTax solution including methods for tracking book-tax differences, cases structure, allocation of book depreciation and tracking deferred taxes by book to tax differences. PowerPlan's investigation is continuing and it reserves the right to amend or supplement this response as Lucasys responds to PowerPlan's discovery and expert analysis is undertaken.

## INTERROGATORY NO. 14:

Identify all reasons for PowerPlan's assertion that Lucasys, Lantukh, Strang, or Chang "undoubtedly [are] using . . . PowerPlan Protected Information in connection with marketing and seeking to sell its competing software to" PowerPlan's customers as described in the 2019 Letter.

## RESPONSE TO INTERROGATORY NO. 14:

PowerPlan objects to Interrogatory No. 14 to the extent it seeks information that is protected by the attorney work product doctrine and/or attorney client privilege. Without waiving its objection or any claim of privilege or protection, PowerPlan states that as explained in the 2019 letter, Messrs. Lantukh, Strang, and Chang were all former PowerPlan employees who had exposure to PowerPlan's protected confidential and trade secret information while employees subject to confidentiality obligations.    In subsequent professional positions, Lucasys' principals also had access to PowerPlan protected information under confidentiality obligations in serving certain PowerPlan customers.  Also, as explained in the 2019 letter, Lucasys was providing services to Florida Power & Light in their implementation of PowerPlan's software.  In that capacity, Lucasys would have direct access to PowerPlan's confidential and proprietary systems under confidentiality obligations.  In addition, Lucasys claimed it had developed its software solutions within just a year of being formed, an unusually short period of time to develop software of the level of sophistication and complexity that Lucasys was claiming.  PowerPlan's investigation is continuing and it reserves the right to amend or supplement this response as Lucasys responds to PowerPlan's discovery and expert analysis is undertaken.

15

**INTERROGATORY NO. 15:**

Identify all bases for PowerPlan's assertion that Lucasys, Lantukh, Chang, and Strang are "improperly, unlawfully, and unfairly using PowerPlan's Protected Information—including but not limited to information embodied in PowerPlan's proprietary architecture, software, data bases and unique functions and features" as described in the 2019 Letter.

**RESPONSE TO INTERROGATORY NO. 15:**

*See* Response to Interrogatory No. 14.

**INTERROGATORY NO. 16:**

Identify all material facts relating to your development and deployment of your Workflow Process Automation product from conception to the present including a complete chronological history of material dates, all personnel involved, and resources used.

**RESPONSE TO INTERROGATORY NO. 16:**

PowerPlan objects to the Interrogatory No. 16 as (*i*) irrelevant to the parties' dispute and (*ii*) unduly burdensome and not proportional to the needs of the case insofar as it demands a "complete chronological history of material dates, all personnel involved, and resources used."

Without waiving these objections, PowerPlan states that it conceived of the Workflow Process Automation ("WPA") product in approximately late 2017 as a replacement for PowerPlan's already-existing Month End Automation product. Pre-development activity occurred throughout 2018. PowerPlan began development of WPA in or around December 2018 with contractors located in the Republic of Colombia. In or around March 2020, PowerPlan transitioned development of WPA to its contractors located in the Dominican Republic. PowerPlan began user testing in or around May 2020, recruitment for beta testing in or around June 2020, and beta testing in or around November 2020. PowerPlan concluded beta testing of WPA in or around February 2021 and released WPA to the public in or around March 2021. The following current and former PowerPlan employees were involved, to varying extents, in the design, development, and or marketing of WPA: (1) Aaron Smith, Principal Technology Product Manager, (2) Tiffany Smith, Senior Manager Marketing Communications, (3) Chris Schoon, Director of Architecture, and (4) Suzanne Ward, Senior Vice President, Product Management.

Dated: November 15, 2021

As to Objections:

s *Damond R. Mace*
Damond R. Mace
Damond.Mace@squirepb.com
Stephen M. Fazio
Stephen.Fazio@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
Tel.: +1 216 479 8500
Fax: −1 216 479 8780

Petrina A. McDaniel
Georgia Bar No. 141301
Petrina.Mcdaniel@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
1230 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309
Telephone: (678) 272-3200
Facsimile: (678) 272-3211

*Attorneys for Defendant and
Counterclaim Plaintiff PowerPlan, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing by email to counsel of record as follows:

Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Jason Alloy
Georgia Bar No. 013188
jalloy@robbinsfirm.com
Joshua A. Mayes
Georgia Bar No. 143107
jmayes@robbinsfirm.com
Evan C. Dunn
Georgia Bar No. 535202
edunn@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, GA 30318
(678) 701-9381
(404) 856-3255 (fax)

Aaron Gott (admitted *pro hac vice*)
aaron.gott@bonalawpc.com
BONA LAW PC
15 South 9th Street, Suite 239
Minneapolis, MN 55402
(612) 284-5001


Jarod Bona (admitted *pro hac vice*)
jarod.bona@bonalawpc.com
Jon Cieslak (admitted *pro hac vice*)
jon.cieslak@bonalawpc.com
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037

(858) 964-4589
(858) 964-2301 (fax)

/s/ *Damond R. Mace*

Damond R. Mace
Attorney for PowerPlan, Inc.

## VERIFICATION

I have read the foregoing **POWERPLAN, INC.'S RESPONSES TO LUCASYS INC.'S FIRST SET OF INTERROGATORIES** and am familiar with and know its contents.  I am the Vice President of Growth Strategy at PowerPlan, Inc., a defendant and counterclaim plaintiff in this action, and I make this verification in that capacity and for that reason.  Not all of the responses are within my personal knowledge because no single PowerPlan agent or employee has knowledge of all these matters.  Rather, the responses are based on information assembled by PowerPlan through its employees, and its attorneys, and I am informed and believe, and therefore declare, that responses based on such information are true and correct.  As for matters that are within my own personal knowledge, the responses are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 15, 2021.



Jim Dahlby



PLAINTIFF'S
EXHIBIT
21-7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LUCASYS INC.,

        *Plaintiff and*
        *Counterclaim Defendant,*

    v.

POWERPLAN, INC.,

        *Defendant and*
        *Counterclaim Plaintiff.*

Civil Action No. 1:20-cv-2987-AT

Judge Amy Totenberg

## POWERPLAN, INC.'S ANSWERS AND OBJECTIONS TO
## LUCASYS INC.'S SECOND CONTINUING INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure,

PowerPlan, Inc. ("PowerPlan") hereby answers and objects to Lucasys Inc.'s

("Lucasys") Second Continuing Interrogatories to PowerPlan as follows:

### INTERROGATORY NO. 17:

Identify documents produced by PowerPlan sufficient to show each trade

secret that PowerPlan listed in the trade secrets identified by PowerPlan on April 29,

2022 and for each document identified, list the corresponding bates label.

### ANSWER TO INTERROGATORY NO. 17:

PowerPlan objects to Interrogatory No. 17 as it is unduly burdensome and not

proportional to the needs of the case insofar as it demands that PowerPlan identify

documents sufficient to show each trade secret that PowerPlan listed in its April 29,

-1-



PLAINTIFF'S
EXHIBIT
218

2022 disclosure, even though the burden of determining the answer to Interrogatory No. 17 is substantially the same for either party. Without waiving its objection, PowerPlan states that the answer to Interrogatory No. 17 can be substantially determined by (i) examination of PowerPlan's PowerTax module which will be made available for inspection by Lucasys' experts upon entry of an appropriate protective order, and (ii) examination of business records produced by PowerPlan in response to Lucasys' Requests for Production, including but not limited to POWERPLAN01289004. PowerPlan's investigation is continuing and it reserves the right to amend or supplement this response. In addition, this response may be supplemented by expert testimony at the appropriate time in the case.

## INTERROGATORY NO. 18:

Identify all trade secrets from the list of trade secrets provided by PowerPlan on April 29, 2022 that PowerPlan contends that Lucasys misappropriated, and for each of those trade secrets, identify all bases for PowerPlan's contending that Lucasys misappropriated the trade secret.

## ANSWER TO INTERROGATORY NO. 18:

PowerPlan objects to Interrogatory No. 18 as it (i) is premature as discovery in the case is ongoing, and Lucasys only recently produced technical information needed to fully assess the scope of its misappropriation; (ii) is vague and indefinite in its use of the phrase "bases for PowerPlan's contending that Lucasys

misappropriated the trade secret", (iii) is unduly burdensome and not proportional to the needs of the case. and (iv) seeks information that is protected by the attorney work product doctrine and/or attorney client privilege.   Without waiving its objections, PowerPlan states that its investigation as to the trade secrets Lucasys misappropriated is ongoing and reserves the right to amend or supplement this response as Lucasys provides information relating to its activities.  In addition, this response may be supplemented by expert testimony at the appropriate time in the case.

## INTERROGATORY NO. 19:

Identify the person(s) who posted, uploaded, and/or made available the information identified in Persinger-Website000001 – Persinger-Website002891 on PowerPlan's website, Persinger-App002892 – Persinger-App008871 on PowerPlan's smartphone application, and Persinger-Github009088   Persinger-Github011001 on Github's platform. For each person identified, further identify:

a.   When the person posted the information;

b.   Who, if anyone, instructed and/or directed the person to post the information;

c.   Who, if anyone, approved the posting and/or uploading of the information; and

d.      What, if any, training the person who posted the information received relating to whether the posted information is confidential information and/or a trade secret.

## ANSWER TO INTERROGATORY NO. 19:

PowerPlan objects to Interrogatory No. 19 as it is (i) unduly burdensome and not proportional to the needs of the case insofar as it demands that PowerPlan summarize actions taken over an indefinite period, and (ii) improperly compound and containing multiple subparts. Without waiving its objections, PowerPlan states that the answer to Interrogatory No. 19 is the following:

With respect to Persinger-Website000001-002891 and Persinger-App002892-00871, the materials were uploaded to the PowerPlan website and/or Cvent phone application by PowerPlan's marketing department following approval by the respective content owner. The earliest possible dates on which PowerPlan's marketing department could have uploaded the materials to the PowerPlan website and/or Cvent phone application are included in the chart attached as Exhibit A. PowerPlan does not have any formal policies or training specifically related to the upload of materials to the PowerPlan website and/or Cvent phone application. PowerPlan, however, provides all employees with annual security awareness training to provide information on how to protect data and understand information classification levels. PowerPlan also has an Information Security policy that all

PowerPlan employees are made aware of through the PowerPlan Employee Handbook.

PowerPlan did not upload the information found in Persinger-Github009089-009423 and Persinger-Github009528-10982 and therefore cannot respond to Interrogatory No. 19 with respect to these materials. With respect to Persinger-Github009088, Persinger-Github009424-9527, and Persinger-Github010983-011001, any information derived from a PowerPlan-owned Github account was uploaded by Fernando Somoza and/or Willis Diebel. All folders within a PowerPlan-owned Github account are private, however, there was a brief period where one or more folders in its Github account were made accessible to the public. Chris Schoon, Daniel Motter, and/or other individuals may have edited, relocated, and/or duplicated information from a temporarily public folder on a PowerPlan-owned Github account to personally-owned Github accounts in approximately 2020, as reflected in Persinger-Github009088. PowerPlan does not have any formal policies or training related to use of the PowerPlan-owned Github account. PowerPlan, however, provides all employees with annual security awareness training to provide information on how to protect data and understand information classification levels. PowerPlan also has an Information Security policy that all PowerPlan employees are made aware of through the PowerPlan Employee Handbook.

Dated:  June 13, 2022

As to Objections:

/s/ *Damond R. Mace*          

Damond R. Mace
Damond.Mace@squirepb.com
Stephen M. Fazio
Stephen.Fazio@squirepb.com
Steven A. Friedman
Steven.friedman@squirepb.com
Janine C. Little
Janine.little@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio  44114
Tel.:  −1 216 479 8500
Fax:  +1 216 479 8780

Petrina A. McDaniel
Georgia Bar No. 141301
Petrina.Mcdaniel@squirepb.com
SQUIRE PATTON BOGGS (US) LLP
1230 Peachtree Street NE, Suite 1700
Atlanta, Georgia 30309
Telephone: (678) 272-3200
Facsimile: (678) 272-3211

*Attorneys for Defendant and
Counterclaim Plaintiff PowerPlan, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing by email to counsel of record as follows:

Richard L. Robbins
rrobbins@robbinsfirm.com
Jason Alloy
jalloy@robbinsfirm.com
Joshua A. Mayes
jmayes@robbinsfirm.com
Evan C. Dunn
edunn@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, GA 30318
(678) 701-9381
(404) 856-3255 (fax)

Aaron Gott (admitted *pro hac vice*)
aaron.gott@bonalawpc.com
BONA LAW PC
15 South 9th Street, Suite 239
Minneapolis, MN 55402
(612) 284-5001

Jarod Bona (admitted *pro hac vice*)
jarod.bona@bonalawpc.com
Jon Cieslak (admitted *pro hac vice*)
jon.cieslak@bonalawpc.com
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589
(858) 964-2301 (fax)

/s/ *Damond R. Mace*
Damond R. Mace

*Attorney for PowerPlan, Inc.*

# EXHIBIT A

| Begin Bates | File Name | Earliest Possible Date Available on Website or Phone Application |
|---|---|---|
| Persinger-Website000001 | Exhibit B.png | Unknown |
| Persinger-Website000002 | PowerPlan_Article_Strategy_2018.pdf | 7/11/2018 |
| Persinger-Website000004 | PowerPlan_Managed_Services_REV190501AP_2019.pdf | 9/14/2017 |
| Persinger-Website000012 | PowerPlan_WP_Security_Reliability_REV21_04A.pdf | 2/10/2017 |
| Persinger-Website000019 | PowerPlan_WP_Unleash_Hidden_Value_REV180815AD.pdf | 10/2/2018 |
| Persinger-Website000025 | PowerPlan_3_Mistakes_Avoid_Lease_Compliance_REV191028A.pdf | 2/20/2017 |
| Persinger-Website000027 | PowerPlan_8_Lease_Standard_Changes_REV191028A.pdf | 2/10/2017 |
| Persinger-Website000029 | PowerPlan_AIO_2019Utilities_Brochure_REV190724AD__5_.pdf | 8/19/2019 |
| Persinger-Website000035 | PowerPlan_AIP_A_Better_Approach_Multi_Year_Capital_Allocation_REV190724AD.pdf | 8/7/2019 |
| Persinger-Website000040 | PowerPlan_Article_Lease_Services_REV191028A.pdf | 6/22/2018 |
| Persinger-Website000042 | PowerPlan_Article_Reform_Isn_t_Over.pdf | 10/19/2018 |
| Persinger-Website000044 | PowerPlan_Lease_Accounting_ASC_IFRS_REV190530A__1_.pdf | Unknown |
| Persinger-Website000046 | PowerPlan_Readiness_Checklist_REV191028AD.pdf | 3/16/2018 |
| Persinger-Website000049 | FA1_01_CR_Querying__Reporting___Validations___FINAL.pdf | 5/15/2019 |
| Persinger-App003565 | FA1-01_CR-Querying__Reporting___Validations_-_FINAL.original.1557261319.pdf | 5/15/2019 |
| Persinger-Website000086 | FA1_02_Project_Management___Overall_Project_Flow___FINAL.pdf | 5/15/2019 |
| Persinger-App003596 | FA1-02_Project_Management_-_Overall_Project_Flow_-_FINAL.original.1557437845.pdf | 5/15/2019 |
| Persinger-Website000117 | FA1_03_Managing_CWIP_RWIP___FINAL.pdf | 5/15/2019 |
| Persinger-App003638 | FA1-03_Managing_CWIP_RWIP_-_FINAL.original.1557437720.pdf | 5/15/2019 |
| Persinger-Website000159 | FA1_04_Month_End_Close___FINAL.pdf | 5/15/2019 |
| Persinger-App003703 | FA1-04_Month_End_Close_-_FINAL.original.1557261393.pdf | 5/15/2019 |
| Persinger-Website000224 | FA1_05_Unitization_Best_Practices___FINAL.pdf | 5/15/2019 |
| Persinger-App003751 | FA1-05_Unitization_Best_Practices_-_FINAL.original.1557437642.pdf | 5/15/2019 |
| Persinger-Website000272 | FA1_06_Manage_Assets___FINAL.pdf | 5/15/2019 |
| Persinger-App003798 | FA1-06_Manage_Assets_-_FINAL.original.1557437578.pdf | 5/15/2019 |
| Persinger-Website000319 | FA1_08_Retirement_Best_Practices___FINAL.pdf | 5/15/2019 |
| Persinger-Website000354 | FA1_09_Depreciation_Concepts___FINAL.pdf | 5/15/2019 |
| Persinger-Website000398 | FA1_10_Depreciation_Forecasting___FINAL.pdf | 5/15/2019 |
| Persinger-Website000460 | FA1_11_CR_Allocations___Deep_Dive___FINAL.pdf | 5/15/2019 |
| Persinger-Website000485 | FA1_12_User_Reports_and_Queries___FINAL.pdf | 5/15/2019 |
| Persinger-App003876 | FA1-12_User_Reports_and_Queries_-_FINAL.original.1557437386(1).pdf | 5/15/2019 |
| Persinger-App003919 | FA1-12_User_Reports_and_Queries_-_FINAL.original.1557437386.pdf | 5/15/2019 |
| Persinger-Website000528 | FA2_01_ASU_2017_07_Pension_and_Other_Postemployment_Benefits___FINAL.pdf | 5/15/2019 |
| Persinger-App003940 | FA2-01_ASU_2017-07_Pension_and_Other_Postemployment_Benefits_-_FINAL.original.1557262180.pdf | 5/15/2019 |
| Persinger-Website000549 | FA2_02_AES_Journey_to_Cloud___FINAL.pdf | 5/15/2019 |
| Persinger-App003986 | FA2-02_AES_Journey_to_Cloud_-_FINAL.original.1557262976.pdf | 5/15/2019 |
| Persinger-Website000595 | FA2_04_Technology_Transformation_in_PSE_Finance_Dept___FINAL.pdf | 5/15/2019 |
| Persinger-App004005 | FA2-04_Technology_Transformation_in_PSE_Finance_Dept_-_FINAL.original.1557263185(1).pdf | 5/15/2019 |

| | | |
|---|---|---|
| Persinger-App004024 | FA2-04_Technology_Transformation_in_PSE_Finance_Dept_-_FINAL.original.1557263185.pdf | 5/15/2019 |
| Persinger-Website000614 | FA2_05_Implementing_the_PP_Adapter_for_SAP_S4___FINAL.pdf | 5/15/2019 |
| Persinger-Website000637 | FA2_06_Allocations_and_Concurrent_Processing___An_Eversource_Case_Study___FINAL.pdf | 5/15/2019 |
| Persinger-App004054 | FA2-06_Allocations_and_Concurrent_Processing_-_An_Eversource_Case_Study_-_FINAL.original.1557250017.pdf | 5/15/2019 |
| Persinger-Website000667 | FA2_07_Managing_assets_in_a_digital_world___FINAL.pdf | 5/15/2019 |
| Persinger-App004072 | FA2-07_Managing_assets_in_a_digital_world_-_FINAL.original.1557431501.pdf | 5/15/2019 |
| Persinger-Website000685 | FA2_08_Automating_Accounting_in_a_Digital_World___FINAL.pdf | 5/15/2019 |
| Persinger-App004095 | FA2-08_Automating_Accounting_in_a_Digital_World_-_FINAL.original.1557431914.pdf | 5/15/2019 |
| Persinger-Website000708 | FA2_10_Fixed_Assets_Analytics___A_Consolidated_Edison_o_NY_Case_Study___FINAL.pdf | 5/15/2019 |
| Persinger-Website000717 | Portfolio_Roadmap_Fixed_Assets.pdf | 5/15/2019 |
| Persinger-Website000739 | LEASE_01_Lease_Roadmap___FINAL.pdf | 5/15/2019 |
| Persinger-App004125 | LEASE-01_Lease_Roadmap_-_FINAL.original.1557260599.pdf | 5/15/2019 |
| Persinger-Website000769 | LEASE_02_Lessee_Journal_Entries___FINAL.pdf | 5/15/2019 |
| Persinger-App004165 | LEASE-02_Lessee_Journal_Entries_-_FINAL.original.1557430824.pdf | 5/15/2019 |
| Persinger-Website000809 | LEASE_03_Lessor_Accounting___FINAL.pdf | 5/15/2019 |
| Persinger-App004201 | LEASE-03_Lessor_Accounting_-_FINAL.original.1557431215.pdf | 5/15/2019 |
| Persinger-Website000845 | LEASE_05_Lease_Admin_and_MEC_Best_Practices___FINAL.pdf | 5/15/2019 |
| Persinger-App004284 | LEASE-05_Lease_Admin_and_MEC_Best_Practices_-_FINAL.original.1557430740.pdf | 5/15/2019 |
| Persinger-Website000893 | LEASE_06_AP_and_Payment_Invoice_Reconciliation___FINAL.pdf | 5/15/2019 |
| Persinger-App004325 | LEASE-06_AP_and_Payment-Invoice_Reconciliation_-_FINAL.original.1557260864.pdf | 5/15/2019 |
| Persinger-Website000934 | LEASE_07_New_Leasing_Company_and_JE_Maint_for_local_Sets_of_Books___FINAL.pdf | 5/15/2019 |
| Persinger-App004371 | LEASE-07_New_Leasing_Company_and_JE_Maint_for_local_Sets_of_Books___FINAL.original.1557260910.pdf | 5/15/2019 |
| Persinger-Website000980 | LEASE_10_Lease_Creating_a_Contract_-_FINAL.pdf | 5/15/2019 |
| Persinger-Website001017 | LEASE_11_Month_End_Close___NP___FINAL.pdf | 5/15/2019 |
| Persinger-Website001052 | LEASE_12_Reporting_and_Insights___FINAL.pdf | 5/15/2019 |
| Persinger-App004395 | LEASE_12_Reporting_and_Insights_-_FINAL.original.1557430618.pdf | 5/15/2019 |
| Persinger-Website001076 | Portfolio_Roadmap_Income_Tax.pdf | 5/15/2019 |
| Persinger-Website001098 | TAX1_01_Processing_in_PowerTax___FINAL.pdf | 5/15/2019 |
| Persinger-App005212 | TAX1-01_Processing_in_PowerTax_-_FINAL.original.1557256175.pdf | 5/15/2019 |
| Persinger-Website001175 | TAX1_02_Bonus_Depreciation_is_Gone__._Now_What___FINAL.pdf | 5/15/2019 |
| Persinger-App005212 | TAX1-02_Bonus_Depreciation_is_Gone__._Now_What_-_FINAL.original.1557257699.pdf | 5/15/2019 |
| Persinger-Website001233 | TAX1_03_Provision_and_Tax_Reform_2.0_Understanding_the_Impacts_of_Tax_Reform_FINAL.pdf | 5/15/2019 |
| Persinger-Website001286 | TAX1_04_Plant_Impacts_on_PowerTax_Depreciation_and_Deferred_Tax___FINAL.pdf | 5/15/2019 |
| Persinger-App005319 | TAX1-04_Plant_Impacts_on_PowerTax_Depreciation_and_Deferred_Tax_-_FINAL.original.1557257796.pdf | 5/15/2019 |
| Persinger-Website001335 | TAX1_05_Understanding_the_ARAM_Calculation___FINAL.pdf | 5/15/2019 |
| Persinger-App005348 | TAX1-05_Understanding_the_ARAM_Calculation_-_FINAL.original.1557258091.pdf | 5/15/2019 |
| Persinger-Website001364 | TAX1_06_Understanding_Deferred_Tax_Reports___FINAL.pdf | 5/15/2019 |
| Persinger-App005408 | TAX1-06_Understanding_Deferred_Tax_Reports_-_FINAL.original.1557258198.pdf | 5/15/2019 |
| Persinger-Website001424 | TAX1_07_Tax_Product_Enhancements___FINAL.pdf | 5/15/2019 |
| Persinger-App005448 | TAX1_07_Tax_Product_Enhancements_-_FINAL.original.1557258288.pdf | 5/15/2019 |
| Persinger-Website001464 | TAX1_08_Tax_Repairs_Expense_Testing___Processing___FINAL.pdf | 5/15/2019 |

| | | |
|---|---|---|
| Persinger-Website001521 | TAX1_09_Processing_PowerTax___Unique_Scenarios___FINAL.pdf | 5/15/2019 |
| Persinger-Website001575 | TAX1_10_Tax_Fixed_Assets____Advancements_in_the_Depreciation_Calculation___FINAL.pdf | 5/15/2019 |
| Persinger-Website001621 | TAX1_11_Preparing_for_Tax_Fixed_Assets___FINAL.pdf | 5/15/2019 |
| Persinger-Website001643 | TAX1_12_Tax_Fixed_Assets___A_New_Architecture___FINAL.pdf | 5/15/2019 |
| Persinger-App005485 | TAX1-12_Tax_Fixed_Assets_-_A_New_Architecture_-_FINAL.original.1557258888.pdf | 5/15/2019 |
| Persinger-Website001680 | TAX2_01_Resurgence_and_Reality_of_ARAM___FINAL.pdf | 5/15/2019 |
| Persinger-App005517 | TAX2-01_Resurgence_and_Reality_of_ARAM_-_FINAL.original.1557259090.pdf | 5/15/2019 |
| Persinger-Website001712 | TAX2_03_Power_and_Utilites___Tax_Reform_Panel_Discussion___FINAL.pdf | 5/15/2019 |
| Persinger-App005557 | TAX2-03_Power_and_Utilites_-_Tax_Reform_Panel_Discussion_-_FINAL.original.1557259235.pdf | 5/15/2019 |
| Persinger-Website001752 | TAX2_04_The_Future_of_Tax_Technology_Architecture___FINAL.pdf | 5/15/2019 |
| Persinger-App005581 | TAX2-04_The_Future_of_Tax_Technology_Architecture_-_FINAL.original.1557259535(1).pdf | 5/15/2019 |
| Persinger-App005605 | TAX2-04_The_Future_of_Tax_Technology_Architecture_-_FINAL.original.1557259535.pdf | 5/15/2019 |
| Persinger-Website001776 | TAX2_06_Validating_ARAM_Post_TJCA_amd_SQL_for_Prescribed_Reversals___FINAL.pdf | 5/15/2019 |
| Persinger-App005642 | TAX2-06_Validating_ARAM_Post_TJCA_amd_SQL_for_Prescribed_Reversals_-_FINAL.original.1557259722.pdf | 5/15/2019 |
| Persinger-Website001813 | TAX2_10_Advanced_Configuration_in_Provision___FINAL.pdf | 5/15/2019 |
| Persinger-Website001852 | TAX2_11_Advanced_Provision_Reporting___FINAL.pdf | 5/15/2019 |
| Persinger-Website001926 | TAX2_12_Operate_the_migration_of_tax_department_operating_models___FINAL.pdf | 5/15/2019 |
| Persinger-App005664 | TAX2-12_Operate_the_migration_of_tax_department_operating_models_-_FINAL.original.1557260040.pdf | 5/15/2019 |
| Persinger-Website001948 | LEASE_01_Lease_Roadmap___FINAL.pdf | 5/15/2019 |
| Persinger-Website001978 | LEASE_02_Lessee_Journal_Entries___FINAL.pdf | 5/15/2019 |
| Persinger-Website002018 | LEASE_03_Lessor_Accounting___FINAL.pdf | 5/15/2019 |
| Persinger-Website002054 | LEASE_05_Lease_Admin_and_MEC_Best_Practices___FINAL.pdf | 5/15/2019 |
| Persinger-Website002102 | LEASE_07_New_Leasing_Company_and_IE_Maint_for_local_Sets_of_Books___FINAL.pdf | 5/15/2019 |
| Persinger-Website002148 | LEASE_10_Lease_Creating_a_Contract___FINAL.pdf | 5/15/2019 |
| Persinger-Website002185 | LEASE_11_Month_End_Close   NP___FINAL.pdf | 5/15/2019 |
| Persinger-Website002220 | LEASE_12_Reporting_and_Insights___FINAL.pdf | 5/15/2019 |
| Persinger-Website002244 | AIO_01___Future_Proofing_Your_Asset_Management_Program___FINAL.pdf | 5/15/2019 |
| Persinger-App003035 | AIO-01__Future_Proofing_Your_Asset_Management_Program_-_FINAL.original.1557252574.pdf | 5/15/2019 |
| Persinger-Website002277 | AIO_02_AIO_Overview_Concepts___FINAL.pdf | 5/15/2019 |
| Persinger-App003065 | AIO-02_AIO_Overview_Concepts_-_FINAL.original.1557253489.pdf | 5/15/2019 |
| Persinger-Website002307 | AIO_03_AIO_Assets_and_Events___FINAL.pdf | 5/15/2019 |
| Persinger-App003090 | AIO-03_AIO_Assets_and_Events_-_FINAL.original.1557252852.pdf | 5/15/2019 |
| Persinger-App003104 | AIO_04_Cost_Estimator_-_FINAL.original.1557517084.pdf | Unknown |
| Persinger-Website002332 | AIO_05_AIO_Projects_and_Reporting___FINAL.pdf | 5/15/2019 |
| Persinger-App003131 | AIO-05_AIO_Projects_and_Reporting_-_FINAL.original.1557253578.pdf | 5/15/2019 |
| Persinger-App003156 | AIO-06_AIO_Training_GIS_VL_and_Analysis_-_FINAL.original.1557253276.pdf | Unknown |
| Persinger-Website002359 | AIO_07_Real_World_local_government___Tauranga_City_May_2019___FINAL.pdf | 5/15/2019 |
| Persinger-App003204 | AIO-07_Real_World_local_government_-_Tauranga_City_May_2019_-_FINAL.original.1557251297.pdf | 5/15/2019 |
| Persinger-Website002407 | AIO_08_AIO_Config___Asset_types_and_Attributes___FINAL.pdf | 5/15/2019 |
| Persinger-App003228 | AIO-08_AIO_Config_-_Asset_types_and_Attributes_-_FINAL.original.1557253013.pdf | 5/15/2019 |
| Persinger-Website002431 | AIO_09_AIO_Config   Measures_and_Strategies___FINAL.pdf | 5/15/2019 |

| Persinger-Website002451 | AIO_11_AIO_Implementation_in_a_Small_City___FINAL.pdf | 5/15/2019 |
| Persinger-Website002468 | AIO_12_AIO_Training_Integration___FINAL.pdf | 5/15/2019 |
| Persinger-App003255 | AIO-12_AIO_Training_Integration_-_FINAL.original.1557253366(1).pdf | 5/15/2019 |
| Persinger-App003282 | AIO-12_AIO_Training_integration_-_FINAL.original.1557253366.pdf | 5/15/2019 |
| Persinger-Website002495 | powerplan tax type pdf.png | Unknown |
| Persinger-Website002496 | PowerPlan_9_Lease_Accounting_Standards_REV191028A.pdf | 7/7/2016 |
| Persinger-Website002498 | PowerPlan_Article_Tax_Considerations_2018.pdf | 7/11/2018 |
| Persinger-Website002500 | PowerPlan_Property_Tax.pdf | 2/6/2017 |
| Persinger-Website002502 | PowerPlan_WP_esri_REV180815AD.pdf | 2/12/2017 |
| Persinger-Website002513 | powerplan training university screen capture.png | Unknown |
| Persinger-Website002514 | powerplan training.png | Unknown |
| Persinger-Website002515 | Insider_Magazine_Article_PowerPlan__Lease__Digital_Ready.pdf | 5/20/2017 |
| Persinger-Website002516 | PowerPlan_Article_5_Things_About_FERC_Accounting.pdf | 7/20/2021 |
| Persinger-Website002519 | PowerPlan_Article_American_Job_Plan_Cooperative.pdf | 7/6/2021 |
| Persinger-Website002522 | PowerPlan_Article_American_Job_Plan_Municipal.pdf | 7/6/2021 |
| Persinger-Website002525 | PowerPlan_Article_Cost_Recovery.pdf | 7/6/2021 |
| Persinger-Website002528 | PowerPlan_Article_Infrastructure_Recovery.pdf | 6/30/2021 |
| Persinger-Website002531 | PowerPlan_Article_Lease_Services_REV191028A.pdf | 6/22/2018 |
| Persinger-Website002533 | PowerPlan_Article_Optimizing_Retirements.pdf | 10/1/2021 |
| Persinger-Website002538 | PowerPlan_Article_Reset_Rate_Setting.pdf | 9/14/2021 |
| Persinger-Website002542 | PowerPlan_Article_Strategy_2018.pdf | 7/11/2018 |
| Persinger-Website002544 | PowerPlan_Article_Tax_Considerations_2018.pdf | 7/11/2018 |
| Persinger-Website002546 | PowerPlan_EAM_Clutter_Brochure_REV190418AD__002_.pdf | 6/24/2019 |
| Persinger-Website002553 | PowerPlan_Financial_Planning_Checklist_REV2108.pdf | 9/14/2021 |
| Persinger-Website002557 | PowerPlan_Maximo_Adapter.pdf | 2/10/2017 |
| Persinger-Website002559 | PowerPlan_Municipal_Cooperative_REV161120A.pdf | 11/18/2020 |
| Persinger-Website002561 | PowerPlan_Readiness_Checklist_REV191028AD.pdf | 3/16/2018 |
| Persinger-Website002564 | PowerPlan_Visual_Leveler_Utilities.pdf | 8/29/2017 |
| Persinger-Website002572 | PowerPlan_WP_Manager_Guide_Asset_Investment_Optimization_REV180607A.pdf | 2/12/2017 |
| Persinger-Website002580 | PowerPlan_WP_Muni_Co_Op_Industry_Survey.pdf | 12/3/2020 |
| Persinger-Website002587 | PowerPlan_WP_Oil_Gas_Tax_Scenario_REV200818AD.pdf | 9/25/2017 |
| Persinger-Website002592 | PowerPlan_WP_Realizing_Benefits_Asset_Management_REV180607A.pdf | 2/10/2017 |
| Persinger-Website002596 | PowerPlan_WP_Regulatory_REV180815AD.pdf | 2/10/2017 |
| Persinger-Website002602 | PowerPlan_WP_Security_Reliability_REV21_04A.pdf | 2/10/2017 |
| Persinger-Website002609 | PowerPlan_WP_Strategic_Financial_Planning_for_Cooperatives.pdf | 7/27/2021 |
| Persinger-Website002619 | PowerPlan_WP_Tax_Repairs_REV180815AD.pdf | 2/10/2017 |
| Persinger-Website002628 | powerplan.com pdf.png | Unknown |
| Persinger-Website002629 | PowerPlan_AIO_US_PS_Brochure.pdf | 3/28/2019 |
| Persinger-Website002635 | PowerPlan_WP_Stop_Large_Infrastructure_Disaster__REV180815A.pdf | 6/19/2018 |
| Persinger-Website002639 | Insider_Magazine_Article_PowerPlan__Lease__Digital_Ready.pdf | 5/20/2017 |
| Persinger-Website002640 | PowerPlan_Article_5_Things_About_FERC_Accounting.pdf | 7/20/2021 |

| | | |
|---|---|---|
| Persinger-Website002643 | PowerPlan_Article_American_Job_Plan_Cooperative.pdf | 7/6/2021 |
| Persinger-Website002646 | PowerPlan_Article_American_Job_Plan_Municipal.pdf | 7/6/2021 |
| Persinger-Website002649 | PowerPlan_Article_Cost_Recovery.pdf | 7/6/2021 |
| Persinger-Website002652 | PowerPlan_Article_Infrastructure_Recovery copy.pdf | 6/30/2021 |
| Persinger-Website002655 | PowerPlan_Article_Infrastructure_Recovery.pdf | 6/30/2021 |
| Persinger-Website002658 | PowerPlan_Article_Lease_Services_REV191028A.pdf | 6/22/2018 |
| Persinger-Website002660 | PowerPlan_Article_Optimizing_Retirements copy.pdf | 10/1/2021 |
| Persinger-Website002665 | PowerPlan_Article_Optimizing_Retirements.pdf | 10/1/2021 |
| Persinger-Website002670 | PowerPlan_Article_Reset_Rate_Setting copy.pdf | 9/14/2021 |
| Persinger-Website002674 | PowerPlan_Article_Reset_Rate_Setting.pdf | 9/14/2021 |
| Persinger-Website002678 | PowerPlan_Article_Strategy_2018.pdf | 7/11/2018 |
| Persinger-Website002680 | PowerPlan_Article_Tax_Considerations_2018.pdf | 7/11/2018 |
| Persinger-Website002682 | PowerPlan_Asset_Investment_Optimization_Suite.pdf | 2/6/2017 |
| Persinger-Website002684 | PowerPlan_CaseStudy_Austin.pdf | 10/25/2017 |
| Persinger-Website002688 | PowerPlan_CaseStudy_Large_Utility.pdf | 2/10/2017 |
| Persinger-Website002692 | PowerPlan_CaseStudy_SeminoleElectric.pdf | 9/14/2021 |
| Persinger-Website002695 | PowerPlan_CaseStudy_Southern_REV190211AD.pdf | 2/13/2017 |
| Persinger-Website002699 | PowerPlan_CaseStudy_TVA_REV190211AD.pdf | 2/6/2017 |
| Persinger-Website002703 | PowerPlan_CaseStudy_WSSC.pdf | 2/10/2017 |
| Persinger-Website002705 | PowerPlan_Financial_Planning_Checklist_REV2108 copy.pdf | 9/14/2021 |
| Persinger-Website002709 | PowerPlan_Financial_Planning_Checklist_REV2108.pdf | 9/14/2021 |
| Persinger-Website002713 | PowerPlan_Income_Tax_for_Parrtnerships.pdf | 2/10/2017 |
| Persinger-Website002715 | PowerPlan_Lease_Accounting_ASC_IFRS_REV190530A__1_.pdf | Unknown |
| Persinger-Website002717 | PowerPlan_Managed_Services_REV190501AP_2019.pdf | 9/14/2017 |
| Persinger-Website002725 | PowerPlan_Maximo_Adapter.pdf | 2/10/2017 |
| Persinger-Website002727 | PowerPlan_Municipal_Cooperative_REV161120A.pdf | 11/18/2020 |
| Persinger-Website002729 | PowerPlan_Overview_Brochure_1017.pdf | 9/25/2017 |
| Persinger-Website002737 | PowerPlan_Rate_Case_and_Roe_Management.pdf | 2/10/2017 |
| Persinger-Website002739 | PowerPlan_Rate_Case_Regulatory_Strategy.pdf | 7/23/2017 |
| Persinger-Website002741 | PowerPlan_Tax_Fixed_Assets.pdf | 9/15/2017 |
| Persinger-Website002743 | PowerPlan_Visual_Leveler_Utilities.pdf | 8/29/2017 |
| Persinger-Website002751 | PowerPlan_WPA_REV210416A.pdf | 11/3/2020 |
| Persinger-Website002753 | PowerPlan_WP_Muni_Co_Op_Industry_Survey.pdf | 12/3/2020 |
| Persinger-Website002760 | PowerPlan_WP_Stop_Large_Infrastructure_Disaster__REV180815A.pdf | 6/19/2018 |
| Persinger-Website002764 | PowerPlan_WP_Strategic_Financial_Planning_for_Cooperatives.pdf | 7/27/2021 |
| Persinger-Website002774 | PowerPlan_3_Mistakes_Avoid_Lease_Compliance_REV191028A.pdf | 2/20/2017 |
| Persinger-Website002776 | PowerPlan_8_Lease_Standard_Changes_REV191028A.pdf | 2/10/2017 |
| Persinger-Website002778 | PowerPlan_AIO_US_PS_Brochure.pdf | 9/13/2018 |
| Persinger-Website002784 | PowerPlan_Article_Lease_Services_REV191028A.pdf | 6/22/2018 |
| Persinger-Website002786 | PowerPlan_Asset_Investment_Optimization_Suite.pdf | 2/6/2018 |
| Persinger-Website002788 | PowerPlan_CaseStudy_Evoenergy_REV180911AD.PDF | 2/12/2017 |

| | | |
|---|---|---|
| Persinger-Website002792 | PowerPlan_CaseStudy_Southern_REV190211AD.pdf | 2/13/2017 |
| Persinger-Website002796 | PowerPlan_CaseStudy_TVA_REV190211AD.pdf | 2/6/2017 |
| Persinger-Website002800 | PowerPlan_CaseStudy_WSSC.pdf | 2/10/2017 |
| Persinger-Website002802 | PowerPlan_Lease_Accounting_ASC_IFRS_REV190530A__1_.pdf | Unknown |
| Persinger-Website002804 | PowerPlan_Readiness_Checklist_REV191028AD.pdf | 3/16/2018 |
| Persinger-Website002807 | PowerPlan_Tax_Fixed_Assets.pdf | 9/15/2017 |
| Persinger-Website002809 | PowerPlan_WP_Oil_Gas_REV180815AD.pdf | 2/6/2017 |
| Persinger-Website002815 | PowerPlan_WP_Security_Reliability_REV21_04A.pdf | 2/10/2017 |
| Persinger-Website002822 | PowerPlan_9_Lease_Accounting_Standards_REV191028A.pdf | 7/7/2016 |
| Persinger-Website002824 | PowerPlan_AIO_US_PS_Brochure.pdf | 9/13/2018 |
| Persinger-Website002830 | PowerPlan_Article_Tax_Considerations_2018.pdf | 7/11/2018 |
| Persinger-Website002832 | PowerPlan_Asset_Investment_Optimization_Suite.pdf | 2/6/2017 |
| Persinger-Website002834 | PowerPlan_CaseStudy_Southern_REV190211AD.pdf | 2/13/2017 |
| Persinger-Website002838 | PowerPlan_CaseStudy_TVA_REV190211AD.pdf | 2/6/2017 |
| Persinger-Website002842 | PowerPlan_CaseStudy_WSSC.pdf | 2/10/2017 |
| Persinger-Website002844 | PowerPlan_Property_Tax.pdf | 2/6/2017 |
| Persinger-Website002846 | PowerPlan_Rate_Case_and_Roe_Management.pdf | 2/10/2017 |
| Persinger-Website002848 | PowerPlan_Rate_Case_Regulatory_Strategy.pdf | 7/23/2017 |
| Persinger-Website002850 | PowerPlan_Tax_Fixed_Assets.pdf | 9/15/2017 |
| Persinger-Website002852 | PowerPlan_WP_esri_REV180815AD.pdf | 2/12/2017 |
| Persinger-Website002863 | PowerPlan_WP_Oil_Gas_REV180815AD.pdf | 2/6/2017 |
| Persinger-Website002869 | About Us PowerPlan.pdf | Unknown |
| Persinger-Website002873 | Clarity and confidence to businesses since 1994.pdf | Unknown |
| Persinger-Website002877 | Industries PowerPlan.pdf | Unknown |
| Persinger-Website002880 | Investor-Owned Utilities PowerPlan.pdf | Unknown |
| Persinger-Website002884 | Solutions PowerPlan.pdf | Unknown |
| Persinger-Website002888 | View Instructor-Led Course Catalog.pdf | Unknown |
| Persinger-App003799 | FA1-07_ARO_-_FINAL.original.1557261523.pdf | Unknown |
| Persinger-App004202 | LEASE-04_Lease_Accounting_Day_2_Optimization_-_FINAL.original.1557431307.pdf | Unknown |
| Persinger-App004396 | PROPTAX-01_Using_the_Data_Center_-_FINAL.original.1557260320.pdf | Unknown |
| Persinger-App004428 | PROPTAX-02_Returns_Processing_-_FINAL.original.1557428683.pdf | Unknown |
| Persinger-App004478 | PROPTAX-06_Property_Tax_Exemptions_-_FINAL.original.15574285 /8.pdf | Unknown |
| Persinger-App004496 | PROPTAX-07_Property_Tax_Cost_Savings_Through_Isolating_Cost_Compoentents_-_FINAL.original.1557428764.pdf | Unknown |
| Persinger-App004518 | REG-01_Regulatory_Journey_-_FINAL.original.1557434069.pdf | Unknown |
| Persinger-App004559 | REG-02_EY_Regulatory_Trends_panel__FINAL.original.1557435045.pdf | Unknown |
| Persinger-App004576 | REG-03_Base_Integration_for_Financial_Data_and_Reconciliation_-_FINAL.original.1557436042.pdf | Unknown |
| Persinger-App004613 | REG-04_FlexSource_Integration_and_Stat_Ledger_FINAL.original.1557436230.pdf | Unknown |
| Persinger-App004667 | REG-05_Overview_of_Regulatory_Trends_From_a_Regulator_Perspective_-_FINAL.original.1557436322(1).pdf | Unknown |
| Persinger-App004703 | REG-05_Overview_of_Regulatory_Trends_From_a_Regulator_Perspective_-_FINAL.original.1557436322.pdf | Unknown |
| Persinger-App004739 | REG-06_Electronic_Regulatory_Filings_-_A_Regulator_Perspective_-_FINAL.original.1557436427.pdf | Unknown |
| Persinger-App004782 | REG-07_Jur_Templates__Case_Creation__Adjustments__Allocations_-_FINAL.original.1557436539.pdf | Unknown |

| | | |
|---|---|---|
| Persinger-App004826 | SP-01_Becoming_your_Own_Support_System_-_FINAL.original.1557432361.pdf | Unknown |
| Persinger-App004868 | SP-02_Formulating_a_Test_Strategy_that_Drives_Successful_Projects_-_FINAL.original.1557432463.pdf | Unknown |
| Persinger-App004912 | SP-03_Best_Practices_in_Positioning_a_Value_Focused_PowerPlan_Upgrade_-_A_LKE_Case_Study_-FINAL.original.15574 | Unknown |
| Persinger-App004931 | SP-04_How_Can_I_Leverage_Dynamic_Validations__Alerts_and_ARCs_-_FINAL.original.1557517851(1).pdf | Unknown |
| Persinger-App005009 | SP-04_How_Can_I_Leverage_Dynamic_Validations__Alerts_and_ARCs_-_FINAL.original.1557517851.pdf | Unknown |
| Persinger-App005087 | SP-12_Managing_Integration_-_FINAL.original.1557432819.pdf | Unknown |
| Persinger-App005727 | AMP_01_-_AMP_Community_Orientation_-_Final.original.1509721239.pdf | Unknown |
| Persinger-App005755 | AMP_02_-_ElectraNet_-_Final.original.1509722536.pdf | Unknown |
| Persinger-App005787 | AMP_03_-_City_of_Burlington_-_Final.original.1509721860.pdf | Unknown |
| Persinger-App005807 | AMP_04_-_DC_Gov_-_Presentation_to_PLANET_-_Final.original.1509722718.pdf | Unknown |
| Persinger-App005830 | Budget_01_-_Consol_Fin_Fcst_and_Report_-_Final_.original.1509723860.pdf | Unknown |
| Persinger-App005868 | Budget_03_-_Using_Justifications_for_Project_Stage_Gates_-_Final.original.1509724586.pdf | Unknown |
| Persinger-App005915 | Budget_04_-_Budgeting_Best_Practices_-_Final.original.1509724180.pdf | Unknown |
| Persinger-App005940 | FAF_01_-_Introduction_to_PowerPlan_and_Data_Flow_Printable.original.1509740935(1).pdf | Unknown |
| Persinger-App005962 | FAF_01_-_Introduction_to_PowerPlan_and_Data_Flow_Printable.original.1509740935.pdf | Unknown |
| Persinger-App005984 | FAF_02_-_CR_-_Final.original.1510688728.pdf | Unknown |
| Persinger-App006026 | FAF_03-_Accounts__Unit_Catalog__and_Locations_-_Final.original.1510607881.pdf | Unknown |
| Persinger-App006065 | FAF_04_-_PM_-_Concepts_Lifecycle_-_Final.original.1510612922.pdf | Unknown |
| Persinger-App006130 | Fixed_Assets_01_-_Automating_Post_In-Service_Carrying_Charges-Final.original.1509725439.pdf | Unknown |
| Persinger-App006164 | Fixed_Assets_02_-_Aligning_Work_Management_Systems_with_Financial_Needs_-_FINAL.original.1509742171.pdf | Unknown |
| Persinger-App006207 | Fixed_Assets_02_-_Lease_Best_Practices.original.1510245959.pdf | Unknown |
| Persinger-App006239 | Fixed_Assets_03_-_WIP_Computations_-_Final.original.1509725488.pdf | Unknown |
| Persinger-App006276 | Fixed_Assets_04_-_ENMAX_-_Planet_Presentation_-_Final.original.1509725534.pdf | Unknown |
| Persinger-App006320 | IT_01_-_Platform_for_Today_and_Tomorrow_-_Final.original.1509726369.pdf | Unknown |
| Persinger-App006352 | IT_02_-_Cloud_Integration-_A_Look_at_the_PowerPlan_Integration_Hub_-_Final.original.1509726113.pdf | Unknown |
| Persinger-App006377 | IT_03_-_Transitioning_On-Prem_to_Cloud_-_Final.original.1509731154.pdf | Unknown |
| Persinger-App006408 | IT_04_-_SAP_S4Hana_and_PowerPlan_-_Final.original.1509731122.pdf | Unknown |
| Persinger-App006434 | PT_01_-_Tax_Reform_Impact_on_Property_Tax_-_Final.original.1509732104.pdf | Unknown |
| Persinger-App006450 | PT_02_-__An_Insgiht_into_Property_Tax.original.1509731492.pdf | Unknown |
| Persinger-App006485 | PT_03_-_Whats_new_in_Property_Tax_-_Final.original.1509732135.pdf | Unknown |
| Persinger-App006538 | PT_04_-_Tax_Owns_Tax_Foreasting_An_FPL_Case_Study_-_Final.original.1509732032.pdf | Unknown |
| Persinger-App006576 | Regulatory_01_-_Building_Your_Regulatory_Ledger_Integration_101_FINAL.original.1509737592.pdf | Unknown |
| Persinger-App006606 | Regulatory_02_-_Multi-Jurisdictional_Scenario_Analysis_-_Final.original.1509737690.pdf | Unknown |
| Persinger-App006639 | Regulatory_03_-_Stats_Ledger_-_Final.original.1509737860.pdf | Unknown |
| Persinger-App006673 | Regulatory_04_-_SDGE_-_Final.original.1509737627.pdf | Unknown |
| Persinger-App006700 | Tax_Accountant_03_-_Import_Tool_Strategies_FINAL_TM.original.1509985116.pdf | Unknown |
| Persinger-App006731 | Tax_Accountant_04_-_Tax_Book_Reconciliation_FINAL_TM.original.1509982417.pdf | Unknown |
| Persinger-App006764 | Tax_Manager_02_-_Preparing_for_Rate_Change_FINAL_TM.original.1509984895.pdf | Unknown |
| Persinger-App006817 | Tax_Manager_04_-_Budgeting_and_ETR_Forecasting_with_Provision_FINAL.original.1509984539.pdf | Unknown |
| Persinger-App006847 | Tax_Reform_Panel.original.1511191984.pdf | Unknown |
| Persinger-App006916 | AMP_05_-_Risk_Models-_Final.original.1509721956.pdf | Unknown |

| | | |
|---|---|---|
| Persinger-App006945 | Budget_05_-_PGE_2017_Presentation_Oct-Final__Read-Only_.original.1509740519.pdf | Unknown |
| Persinger-App006978 | Budget_06_-_VL_-_PLANET_2017_-_kpzw102617.original.1509742222.pdf | Unknown |
| Persinger-App007000 | Budget_07_-_Driver_Based_Budgeting_-_Final.original.1509724547.pdf | Unknown |
| Persinger-App007037 | Budget_08_-_Urgent_and_Emergent_-_Final.original.1509724802.pdf | Unknown |
| Persinger-App007065 | FAF_05_-_PM_Unit_Estimates_through_Completion_-_Final.original.1509741041.pdf | Unknown |
| Persinger-App007116 | FAF_06_-_PM_Selection_Reporting_and_Querying_-_Final.original.1509741002.pdf | Unknown |
| Persinger-App007158 | FAF_07_-_Assets_-_Concepts_and_Queries_-_Final.original.1509740864.pdf | Unknown |
| Persinger-App007210 | Fixed_Assets_05_-_Corporate_Accounting_use_of_the_CR_-_An_Eversource_Case_Study.original.1509725572.pdf | Unknown |
| Persinger-App007250 | Fixed_Assets_06_GTCOPC_Insights_-_FINAL.original.1509725617.pdf | Unknown |
| Persinger-App007264 | Fixed_Assets_07_-_Managing_a_Depreciation_Study_-_A_TECO_Energy_Case_Study_FINAL.original.1509743054.pdf | Unknown |
| Persinger-App007301 | Fixed_Assets_07_Overheads_Under_Control_-_Understanding_Your_Allocations_-_Printable.original.1509725695(1).pdf | Unknown |
| Persinger-App007387 | Fixed_Assets_08_-_El_Paso_-_Final.original.1509742126.pdf | Unknown |
| Persinger-App007425 | IT_05_-_Ready_Fire_Aim_-_Final.original.1509726438.pdf | Unknown |
| Persinger-App007441 | IT_06_-_SoCo_Power_Plan_Abstract_pp_-_Final.original.1509726237.pdf | Unknown |
| Persinger-App007469 | IT_07_-_Implementing_Multiple_IT_Projects_with_PowerPlan_-_An_Eversource_Case_Study_-_Final.original.1509726279 | Unknown |
| Persinger-App007506 | IT_08_-_Implementation_Power_Outage_-_Final.original.1509726183.pdf | Unknown |
| Persinger-App007533 | PT_05_-_Asset_Location_Implications_on_Property_Tax_-_Final.original.1509731538.pdf | Unknown |
| Persinger-App007569 | PT_06_-_Calculating_Cost_Basis_-_Final.original.1509731590.pdf | Unknown |
| Persinger-App007599 | PT_07_-_Reconciling_GIS_with_Fixed_Assets_-_Final.original.1509731997.pdf | Unknown |
| Persinger-App007630 | PT_08_-How_to-Starting_the_New_Year_Right_-_Final.original.1509731733.pdf | Unknown |
| Persinger-App007660 | Regulatory_06_-_Reporting_-_Final_10-31-2017.original.1509737977.pdf | Unknown |
| Persinger-App007696 | Tax_Accountant_06_-_Maximize_Income_Tax_Value_FINAL_wo_multi_SoB.original.1510154270.pdf | Unknown |
| Persinger-App007739 | Tax_Accountant_07_-_Best_Practices_for_Year-End_Processing_FINAL_TM.original.1509982181.pdf | Unknown |
| Persinger-App007779 | Tax_Accountant_08_-_Leveraging_Automation_and_Advanced_Features_in_Provision_FINAL_TM.original.1509984604.p | Unknown |
| Persinger-App007833 | Tax_Manager_05_-_Tax_Fixed_Assets_of_the_Future_FINAL_TM.original.1509985035.pdf | Unknown |
| Persinger-App007858 | Tax_Manager_06_-_Continually_Improving_Tax_Repairs_FINAL.original.1509982219.pdf | Unknown |
| Persinger-App007886 | Tax_Manager_07_-_Preparing_for_and_Executing_a_Successful_Merger_and_Acquisition_FINAL_TM.original.150998467 | Unknown |
| Persinger-App007919 | Tax_Manager_08_-_Understanding_Your_Tax_System_Part_2_FINAL_TM.original.1509982304.pdf | Unknown |

## VERIFICATION

I have read the foregoing **POWERPLAN, INC.'S ANSWERS AND OBJECTIONS TO LUCASYS INC.'S SECOND CONTINUING INTERROGATORIES** and am familiar with and know its contents. Not all of the responses are within my personal knowledge because no single PowerPlan agent or employee has knowledge of all these matters. Rather, the responses are based on information assembled by PowerPlan through its employees, and its attorneys, and I am informed and believe, and therefore declare, that responses based on such information are true and correct. As for matters that are within my own personal knowledge, the responses are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 2, 2022.

/s/ _____

## VERIFICATION

I have read the foregoing **POWERPLAN, INC.'S ANSWERS AND OBJECTIONS TO LUCASYS INC.'S SECOND CONTINUING INTERROGATORIES** and am familiar with and know its contents. Not all of the responses are within my personal knowledge because no single PowerPlan agent or employee has knowledge of all these matters. Rather, the responses are based on information assembled by PowerPlan through its employees, and its attorneys, and I am informed and believe, and therefore declare, that responses based on such information are true and correct. As for matters that are within my own personal knowledge, the responses are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 2, 2022.


/s/


PLAINTIFF'S
EXHIBIT
219

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

LUCASYS INC.,

*Plaintiff and Counterclaim Defendant,*

v.

POWERPLAN, INC.,

*Defendant and Counterclaim Plaintiff.*

Civil Action No.: 1:20-CV-02987-AT

Judge Amy Totenberg

## POWERPLAN, INC.'S IDENTIFICATION OF TRADE SECRETS

### OUTSIDE COUNSEL'S EYES ONLY
[Pursuant to Stipulated Protective Order (Doc. 44)]



PLAINTIFF'S
EXHIBIT
220

information potentially at issue in this dispute. PowerPlan reserves all of its rights

to supplement and amend this listing as a result of additional information resulting

from discovery.

Dated: April 29, 2022

*s/ Damond R. Mace*
Petrina A. McDaniel
Georgia Bar No. 141301
Petrina.mcdaniel@squirepb.com
**SQUIRE PATTON BOGGS (US) LLP**
1230 Peachtree Street NE, Suite 1700
Atlanta, GA 30309
Telephone: +1.678.272.3200
Facsimile: +1.678.272.3211

Damond R. Mace (admitted *pro hac vice*)
Damond.mace@squirepb.com
Stephen M. Fazio (admitted *pro hac vice*)
Stephen.fazio@squirepb.com
Steven A. Friedman (admitted *pro hac vice*)
Steven.friedman@squirepb.com
**SQUIRE PATTON BOGGS (US) LLP**
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304
Telephone: +1.216.479.8500
Facsimile: +1.216.479.8780

*Attorneys for Defendant*
*and Counterclaim Plaintiff*
*PowerPlan, Inc.*

Telephone:  +1.678.272.3200
Facsimile:  +1.678.272.3211

Damond R. Mace (admitted *pro hac vice*)
Damond.mace@squirepb.com
Stephen M. Fazio (admitted *pro hac vice*)
Stephen.fazio@squirepb.com
Steven A. Friedman (admitted *pro hac vice*)
Steven.friedman@squirepb.com
**SQUIRE PATTON BOGGS (US) LLP**
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304
Telephone:  +1.216.479.8500
Facsimile:  +1.216.479.8780

*Attorneys for Defendant
and Counterclaim Plaintiff
PowerPlan, Inc.*

PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets — PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets    PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER    15

PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   21

PowerPlan, Inc.'s Identification of Trade Secrets — PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets   PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   25

PowerPlan, Inc.'s Identification of Trade Secrets   PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   27

PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   29

PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   33

PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets   PowerTax

OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   37

PowerPlan, Inc.'s Identification of Trade Secrets  PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   43

PowerPlan, Inc.'s Identification of Trade Secrets    PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   45

PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   47

PowerPlan. Inc.'s Identification of Trade Secrets – PowerTax



PowerPlan. Inc.'s Identification of Trade Secrets – PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   51

PowerPlan, Inc.'s Identification of Trade Secrets – PowerTax



OUTSIDE COUNSEL'S EYES ONLY – SUBJECT TO PROTECTIVE ORDER   53

Message

| | |
|---|---|
| **From:** | Jim Dahlby [jdahlby@pwrplan.com] |
| **Sent:** | 2/14/2019 8:48:55 AM |
| **To:** | Joe Gomes [Joe Gomes@powerplan.com] |
| **Subject:** | Re: President's Club - Extra Spot |

I was thinking about the RCC discussion on meeting or not with Jon and one thing that comes to mind is comments from EAB.

Our customers historically complained that with our rates and no alternatives in the market they felt we had them over the barrel. The SVP of tax from Exelon said that people like the competition and it forces us to provide a higher quality experience. So the concerns from various people are what is perception from utility market, you are probably sensing hesitation from people on being aggressive.

I think a concern is that if people get upset with our tactics the industry could side with Jon, then they will not upgrade stay on old versions and not look to expand to new modules or platform.

I'm going to flush out a pro / con with a few more perspectives on short and long term and I can share that with the exec team. Matt, Brandon and Drea all would have some perspectives.

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.

On Feb 14, 2019, at 8:32 AM, Joe Gomes <Joe.Gomes@powerplan.com> wrote:

Drea will be joining this elite group (and raising the group average IQ / class score by at least 15% with her attendance).

Welcome Drea and Sully!

<and no.. I'm not on the meds yet...>

Joe Gomes

Office   +1 678 223 2748
Mobile  +1 404 9' 5 982'
jgomes@powerplan.com
PowerPlan.com

<image002.png>

**From:** Lake Wilson
**Sent:** Wednesday, February 13, 2019 3:03 PM
**To:** Joe Gomes <Joe Gomes@powerplan.com>
**Subject:** President's Club - Extra Spot

Joe,



PLAINTIFF'S
EXHIBIT
121

We still have 1 extra spot for President's Club. Paul mentioned that you might want to fill it, so I'm just following up. I realize we are just over 2 weeks out now and it might be hard at this point, but just let me know.

ATTORNEYS' EYES ONLY

POWERPLAN00395327

Thanks!

**Lake Wilson**

Office.    +1 678.202.1696

lwilson@powerplan.com
PowerPlan.com

<image001.png>

ATTORNEYS' EYES ONLY

Message

| From: | jdahlby@pwrplan.com [jdahlby@pwrplan.com] |
|---|---|
| Sent: | 2/19/2021 9:22:22 AM |
| To: | John Ericson [jericson@pwrplan.com] |
| Subject: | Re: Aqua RFP |

Makes sense, any thoughts on bundling license discounts based on services purchase given it lowers our risk?

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.


On Feb 19, 2021, at 9:07 AM, John Ericson <jericson@pwrplan.com> wrote:


During this final negotiation, I'd prefer not to expose her to someone that has ability to say a hard Yes or No over the phone until we finalize the pricing. Afterward, absolutely.

John...

**John Ericson**
PowerPlan, Inc.

Mobile  +1 817-513-3642
jericson@pwrplan.com
PowerPlan.com

**From:** Jim Dahlby <jdahlby@pwrplan.com>
**Sent:** Friday, February 19, 2021 8:55 AM
**To:** Jim Duffy <jduffy@pwrplan.com>
**Cc:** Jon Joury <jjoury@pwrplan.com>; John Ericson <jericson@pwrplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>
**Subject:** Re: Aqua RFP

Any value in giving Ruth an audience with an executive?

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.


On Feb 18, 2021, at 6:52 PM, Jim Duffy <jduffy@pwrplan.com> wrote:

I talked to John too...

My gut is that Ruth is just shaking us down for the best deal possible. Are there other vendors out there that could do some of this work? Sure. Eventide has a history there, and if RCC or Lucasys got the RFP I'm sure they would throw their



PLAINTIFF'S
EXHIBIT
172
PENGAD 800-631-6989

hat into the ring. Lucasys would probably be aggressive in their bid too. But based on how this sales cycle has been handled by John/Jon, I feel that we're absolutely the preferred vendor.

So is there a real threat to us losing this business? Maybe, but I would bet against it. So would we win if we dig our heels in and stand firm on price? Yes I think so. But if we can give them a little more, we give Ruth a win and make the rest of the sales cycle much easier. And I see real value in giving Ruth a win. She's fought us at every possible turn in the past, and our business supporters at Aqua had to successfully win the PowerPlan battle against her. If we can show her some love here, it could open a door to building a very important relationship that we can leverage for years to come.

Does anyone feel differently?

One additional out-of-the-box thought- is there any way to get them to agree to **evaluate Regulatory** during this project... even if they don't pay for it? In other words, we give them a discount, and they agree to let us try and sell Reg to them. Maybe a proof-of-concept for one of their important jurisdictions that could have a rate case coming up in the next 2-3 years?

Thanks,
Jim

**Jim Duffy**
*Vice President – Strategic Accounts*

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

<image002.png>

**From:** Jon Joury <jjoury@pwrplan.com>
**Sent:** Thursday, February 18, 2021 4:16 PM
**To:** John Ericson <jericson@pwrplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>
**Cc:** Jim Duffy <jduffy@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** RE: Aqua RFP

I synced with John,

He is going to circle back with Ruth based on what we discussed which is essentially recapped below. And then we will go from there.

**Jon Joury**
*Director, Professional Services*

Mobile: +1 404.926.6687
Jon.Joury@powerplan.com

<image003.png>

**From:** Jon Joury
**Sent:** Thursday, February 18, 2021 3:30 PM
**To:** John Ericson <jericson@pwrplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>
**Cc:** Jim Duffy <jduffy@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** RE: Aqua RFP

Thanks for the feedback John.

I met with Skip and Joost briefly and with some adjustments and moving to ▇▇ rate discount from ▇▇ we can take off ▇▇ to get to a ▇▇ total. That is about the best we can do price wise.

We think we need to challenge Ruth a bit around validating scope and making sure that we have apples t apples comparison. At a minimum they need to consolidate systems, convert in data and setup integrations. They also requested optional things such as adding on some tax modules for certain companies and enhancing capital budgeting. It could be the other responder is not incorporating any of the other items in outside of the minimum, even though the RFP does specifically call those points out.

I am pretty confident that no other vendor could do the full scope of work proposed on their own. It touches so many areas plus it has the HANA adapter. Furthermore, they are on an extremely tight timeline and we already have a leg up with ramp having done the assessments to accelerate design. Another vendor would need several additional weeks to ramp up putting the whole project at risk.

Jon Joury
*Director. Professional Services*

Mobile: +1 404.926.6687
Jon.Joury@powerplan.com

<image003.png>

**From:** John Ericson <jericson@pwrplan.com>
**Sent:** Thursday, February 18, 2021 1:40 PM
**To:** Jon Joury <jjoury@pwrplan.com>; Skip Fowler <Skip.Fowler@powerplan.com>
**Cc:** Jim Duffy <jduffy@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** Aqua RFP

I spoke to Ruth. She wants a further discount. Her reasoning was that she got responses from other vendors...she mentioned one with ex-PP employees and strong resumes (RCC?). She said their cost was almost half of ours. I told her that they must have severely underestimated the project and they would hit her up for big change orders. I also said that their rates are similar to ours, so it just didn't make sense if they wanted to be successful.

In the end, she said that "people are looking at those numbers and considering them". She also expressed that she wanted to go with PowerPlan but we needed to sharpen our pencil.

Let's set up some time to discuss.

John...

**John Ericson**
*Strategic Account Executive*

Mobile:   +1 617-513-3642
jericson@pwrplan.com
PowerPlan.com

<image003.png>

POWERPLAN00176202

Message
| | |
|---|---|
| From: | jdahlby@pwrplan.com [jdahlby@pwrplan.com] |
| Sent: | 9/1/2021 8:51:33 PM |
| To: | Nathaniel Gburek [ngburek@pwrplan.com] |
| Subject: | Re: Conversation with Brett on UPPCO |

Interesting...let's chat on how we might present this.

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.

On Sep 1, 2021, at 6:51 PM, Nathaniel Gburek <ngburek@pwrplan.com> wrote:

Jim

Brett had a few comments on the UPPCo approach, you may be aware of some of these already through separate conversation with Brett

•       Only RCC work effort passing through subcontracting is the work that requires access within the timeframe of the overall tech upgrade
•       Can we understand the RCC timelines for the tax and asset remediation work? Can we glean that tomorrow from RCC?
•            Ideally, to eliminate risk, the upgrade and RCC effort would not be mixed to allow for easy testing issue triage should they arise
•            If project timelines are mixed, there could finger pointing as to issue triage ownership

•       Fall Back Option: Let RCC do the upgrade work as well (Expand the Pie for RCC)
•       rate cut on the RCC side (20%) of original rates
•       helps alleviate PowerPlan resource challenges, PowerPlan gets a margin on the upgrade
•            Scope: all prof services minus PM where RCC has skills
•                Exclusions: integration redesign to eliminate VPN tunnel

Thanks,

**Nathaniel F. Gburek**
*Sr. Alliances Manager, Global Strategic Alliances*
Mobile:  +1 336.671.8948

ngburek@pwrplan.com
PowerPlan.com

<image001.png>



PLAINTIFF'S
EXHIBIT
223
PERGAD BY4531-989

| | |
|---|---|
| **Message** | |
| From: | jdahlby@pwrplan.com [jdahlby@pwrplan.com] |
| Sent: | 2/17/2019 10:06:31 PM |
| To: | Joe Gomes [Joe.Gomes@powerplan.com] |
| Subject: | Re: RCC/PPL Potential Impact & Recommendations |

Paul said he plans to share with PPL on Tuesday. I don't see any reason to stop that communication but wanted to confirm you say that comment.

Brandon and I spoke on Friday and he was collecting the notes and actions after getting back from PTO.

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.

On Feb 17, 2019, at 9:57 PM, Joe Gomes <Joe.Gomes@powerplan.com> wrote:

I have asked Brandon to coordinate efforts with the functional owners across all of the swim lanes (hr, legal, dev, etc). He has been briefed on our offsite meeting, and will be running point on this project for the exec team.

We need to discuss who should own building a partner program. If it is going to change alliance team focus, then it might need another owner.

We can add this topic for weds.

Thanks,
Joe

Get Outlook for iOS

**From:** Drea Toretti <dtoretti@pwrplan.com>
**Sent:** Sunday, February 17, 2019 7:16 PM
**To:** Paul Crist; Matt Crye; Brandon Tubandt; Brent Burns; Elizabeth Cowart; Jim Dahlby; Jim Ogilvie; Joe Gomes; Joost Rutten; Laurie Hawkins; Neil Kimber; Sarah Park; Skip Fowler
**Subject:** RE: RCC/PPL Potential Impact & Recommendations

Paul –

When are we re-grouping on this again? Ideally if we want some pro-active communications would like to meet with you, Matt, Dahlby and Skip to plan accordingly. Tomorrow will be out of pocket for a customer meeting – but please keep me posted.

Thanks.

Drea Toretti

Office   +1 678.202.1680

<image002.png>


PLAINTIFF'S
EXHIBIT
224

ATTORNEYS' EYES ONLY

**From:** Paul Crist
**Sent:** Saturday, February 16, 2019 11:21 AM
**To:** Matt Crye <mcrye@pwrplan.com>; Brandon Tubandt <btubandt@pwrplan.com>; Brent Burns <Brent.Burns@powerplan.com>; Drea Toretti <dtoretti@pwrplan.com>; Elizabeth Cowart <ecowart@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Jim Ogilvie <jogilvie@pwrplan.com>; Joe Gomes <Joe.Gomes@powerplan.com>; Joost Rutten <Joost.Rutten@powerplan.com>; Laurie Hawkins <lhawkins@pwrplan.com>; Neil Kimber <nkimber@pwrplan.com>; Sarah Park <spark@pwrplan.com>
**Cc:** Paul Crist <pcrist@pwrplan.com>
**Subject:** RCC/PPL Potential Impact & Recommendations

Following our discussion on RCC/PPL, Matt, Duffy and I worked through the talk-track for PPL and a call is scheduled for the morning of Tuesday, 2/19 to communicate our position with PPL.

During the meeting we discussed the potential ramifications of the communications with our broader IOU customers. As was discussed a new AGA/EEI PowerPlan user group has been formed. PowerPlan has benefited over the years of the tight collaboration and communication between our IOU customers, but as we know it is a double edged sword. We should anticipate that the communication of our position to PPL will be quickly communicated to people involved in the AGA/EEI PowerPlan user group and other PowerPlan IOU customers.

Potential impact includes.

• **Sole-provider Backlash:** Our EAB has expressed dissatisfaction with not having more viable services provider options and have described as 'The PowerPlan hostage crisis.' The new AGA/EEI PowerPlan user group will likely perceive this as a move towards sole provider model.

       **Recommendations**
•        Preemptive Communications - Consider a preemptive communication plan to the AGA/EEI PowerPlan user group and PowerPlan customers on what we are doing to protect our customers with our Cloud policy and SOX compliance restrictions relative to third party partners. I also think we should develop a talk-track for all PowerPlan employees, so that, as much as possible, everyone is communicating the same message any time a customer or third party of any kind asks about it.

•        Owner - Marketing
•        Certified Partner Program – Quickly develop a certified partner program that clearly describes what partners can and cannot do in our Cloud environment. (whether or not RCC is one of those partners isn't terribly important, but zero certified partners will surely cause sales headwinds).

•        Owner - Global Alliances

• **Lift & Shift Impact:** There are a number of our customers (WEC, Talen, PPL, WGL, AmWater, AEP, Dominion, Entergy, Tucson, …) that have used and continue to use RCC for services which will cause some of them to not Lift & Shift and sweat their current on-premise Classic install until final sunset. At that point, it's logical to assume these customers will evaluate all options, including PowerPlan New Platform, Utegration, or ERP. There are 10 Lift & Shift opps in the 2019 buckets of opportunity analysis representing ▇▇▇▇ in recurring revenue bookings plan. Taking some or all of our customers working with RCC out of the pool of potential makes delivering on this plan very difficult.

       **Recommendation**
•        Certified Partner Program – Quickly develop a certified partner program that clearly describes what partners can and cannot do in our Cloud environment. (whether or not RCC is one of those partners isn't terribly important, but zero certified partners will surely cause sales headwinds).

•        Owner - Global Alliances

• **Whitespace Sales Impact:** RCC actively influences customers to buy our software. As example, PPL $419k and AmWater $313k. They have an interest in expanding the solution footprint and expanding their services revenue. If that changes, they may wield their influence to deter customers or, when possible, promote other software vendors and solutions to work with. While they do not have a competing/replacement product, they can exert influence in a number of ways that will impact our software sales pursuits.

○ **Recommendation**
  ▪ <u>Certified Partner Program</u> – Quickly develop a certified partner program that clearly describes what partners can and cannot do in our Cloud environment. (whether or not RCC is one of those partners isn't terribly important, but zero certified partners will surely cause sales headwinds).
  ▪ <u>Owner</u> - Global Alliances

• **Stickiness & Competition:** We are facing numerous competitive threats with Utegration as the most formidable at our SAP IOU customers.  Utegration is targeting NA IOU's to sell services and potentially competitive software solutions.  AmWater would be a great candidate for the Utegration pitch, if not for the services provided by RCC (which led directly to a software sale for us).  RCC helps keep PowerPlan sticky.
○ **Recommendation**
  ▪ <u>Certified Partner Program</u> – Quickly develop a certified partner program that clearly describes what partners can and cannot do in our Cloud environment. (whether or not RCC is one of those partners isn't terribly important, but zero certified partners will surely cause sales headwinds).
  ▪ <u>Owner</u> – Global Alliances

• **Global Alliances Impact:** The development of a Certified Partner Program will require a significant change in priorities for the Global Alliances team – classic solution vs. new platform partner ecosystem development and with it opportunity costs of re-focusing priorities and resource allocation.
○ **Recommendation**
  ▪ Shift priorities and commence work asap.

• **RCC Meeting:** If Jonathan Williams, President, RCC is willing to meet, it is recommended that we take the meeting. As discussed, there seems to be very little downside and we might learn valuable information and who knows, find a mutually beneficial path forward.
○ **Recommendation**
  ▪ Schedule the meeting with Jonathan Williams

I welcome any feedback and additional thoughts on potential impact and recommendations to mitigate it.

Regards;

Paul Crist
VP Global Sales
pcrist@pwrplan.com
616.813.6150

PLAN

POWERPLAN00413008

Message
| | |
|---|---|
| From: | Jim Dahlby [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D216F1B123C546B280D24E68D8718750-JIM DAHLBY] |
| Sent: | 10/4/2021 12 19:52 AM |
| To: | Nathaniel Gburek [ngburek@pwrplan.com] |
| Subject: | Re: [EXT] Patch/DB Access |

is 11/19 decision date?  Meaning we need to have agreed to terms for RCC signed by then?

Jim Dahlby

(m) +1.678.269 7950

Sent from mobile device.


On Oct 3, 2021, at 9.21 PM, Nathaniel Gburek <ngburek@pwrplan.com> wrote


Jim

Welcome back! I have formalized the next steps at PPL, largely in line with your pptx sent to leadership but with actual dates  I spoke with Logan & John as well as back channeled with Jeff Brook @ RCC  I developed the plan below but I did not mobilize internally, specifically with John or Jonathan.

PPL Notes
• PPL keen to make quick decisive decision on future of the cloud ASAP, no later than mid Nov
• Customer looking to build confidence in PowerPlan offer, all talk right now
• ▮▮▮▮ EAM program ongoing – RCC/PowerPlan component small $ but if cloud issue risks overall timeline, customer will pull out of cloud to facilitate RCC work & larger project
• RCC (Joel Sechler) was not dismissive of the verbal cloud access offer, proof is in the physical offer and legal arrangement to support


Can you give feedback on the plan below? If good, would you like to communicate the urgency and timelines below to those responsible or can I do that with you on copy?

Here are the next steps I identified:


Identify next steps:
1)     Build out Access Package – 10/13 initial draft; John Budala responsible
a.     Spin up physical instance with toolsets to test and cost
b.     Think about the long term setup – environment up MoM
2)     3rd party access agreement preparation – 10/13 draft; Jonathan Sucher responsible
a.     Do we want to work on the request form for customer?
3)     Develop Timeline to Delivery for PPL – timeline socialized with PPL by 10/8
a.     Complete by 11/19 stated deadline, stretch goal: by end Oct
i.     <!--[if !supportLists]--><!--[endif]-->10/13 – initial drafts
ii.     <!--[if !supportLists]--><!--[endif] ->10/22 – final offer ready for 3rd party/customer visibility
iii.     <! [if !supportLists] ><!--[endif]-->Last week of Oct – scheduled session with customer

*** Nate's Opinion: PowerPlan must have executable contracts and access trail when presenting to customer ***

PLAINTIFF'S
EXHIBIT
225
PFN3A0 30401-G6R

Supporting items:

1) Project Landscape DB definition for 3rd party role
a. Reduced access from pwrplant
b. MAllen on PTo another week, maybe 1st draft with another resource
2) Formal policy and customer facing collateral
a. Utilize the PPL presentation to craft content with Joel
i. <!--[if !supportLists]--><!--[endif]-->Support policy -- procedures for interacting/triaging in cloud
ii. <!--[if !supportLists]--><!--[endif]-->What is allowed in each environment

Hope you had a good vacation -- we can chat in the 9:30 half hour but I plan to get a note our to the wider PPL pursuit team from the thread below. Key folks, John E, Logan M,etc are already on board.

Thanks,

**Nathaniel F. Gburek**
Sr. Alliances Manager, Global Strategic Alliances

Mobile +1 336.671.8949

ngburek@pwrplan.com
PowerPlan.com



**From:** John Ericson <jericson@pwrplan.com>
**Sent:** Monday, September 27, 2021 3:43 PM
**To:** Jim Dahlby <jdahlby@pwrplan.com>; Nathaniel Gburek <ngburek@pwrplan.com>
**Cc:** Anthony Beckett <abeckett@powerplan.com>; Jim Duffy <jduffy@pwrplan.com>; Kim Pearch <kim.pearch@powerplan.com>; Logan Morrison <lmorrison@pwrplan.com>; Ted Coulson <ted.coulson@powerplan.com>
**Subject:** FW: [EXT] Patch/DB Access

Nate, Jim, Jim, Kim,

Please see the note below. PPL is considering bringing PowerPlan back on-premise due to the issues with RCC access. I believe the renew date is 2/1/2023.

Can we discuss current status and our path forward on this?

Thanks,

John...

**John Ericson**

Mobile +1 617-513-3642
jericson@pwrplan.com

**From:** Alexander, Tracy <TAlexander@pplweb.com>
**Sent:** Monday, September 27, 2021 3:26 PM
**To:** Logan Morrison <lmorrison@pwrplan.com>
**Cc:** John Ericson <jericson@pwrplan.com>; Ted Coulson <ted.coulson@powerplan.com>; Joel Sechler

POWERPLAN00408958

<JSechler@regulatedconsultants.com>; Wisnoski, Bethany Ann <BAWisnoski@pplweb.com>
**Subject:** [EXT] Patch/DB Access

<div align="center">

**Exercise CAUTION when opening links or attachments.**

</div>

Hi Logan,

I wanted to reach back out on the information you provided to us on Friday regarding RCC losing access to the database. I appreciate you working with your internal teams to find a solution that will allow RCC to have access. What I'll ask is that we target 11/19/2021 as the date for agreed upon terms. While I understand the want to move forward with the patch sooner than later, we cannot sacrifice our current turnaround times.

We know we have a lot of work coming down the pipeline and there are identified risks with RCC losing their current testing capabilities. We just completed the cloud automation initiative and since the financial costs were nominal our executive team would consider bringing it back on prem so that we don't experience challenges with delivery timelines in the future.  We will be working in parallel to estimate the approach to bring the instance back on prem so we are ready to pick a path forward on 11/19/2021.


Please let me know if you have any questions.
Thank you,
Tracy

## Business Use
The information contained in this message is intended only for the personal and confidential use of the recipient(s) named above. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately, and delete the original message.



OUTSIDE COUNSEL'S EYES ONLY

DocuSign Envelope ID: 62B78710-037C-4F41-939F-024E2FB4F3C5





02275532-2 DMS:21911212.10

OUTSIDE COUNSEL'S EYES ONLY
RCC 00901

DocuSign Envelope ID: 62B78710-037C-4F41-958F-024E2FB4F3C5



**PLAN**



OUTSIDE COUNSEL'S EYES ONLY
RCC 00902

DocuSign Envelope ID: 62B7B71G-037C-4F41-938F-C24E2FB4F3C5

**PLAN**



OUTSIDE COUNSEL'S EYES ONLY
RCC 00903

DocuSign Envelope ID: 62B7B710-03/C-4F41-938F-C24E2FB4F3C5

**PLAN**

OUTSIDE COUNSEL'S EYES ONLY
RCC 00904

DocuSign Envelope ID: 62B78710-037C-4F41-938F-024E2FB4F3C5

   **PLAN**



OUTSIDE COUNSEL'S EYES ONLY
RCC 00905

DocuSign Envelope ID: 62B78710-037C-4F41-938F-C24E2FB4F3C5

 PLAN



OUTSIDE COUNSEL'S EYES ONLY
RCC 00906

Message
_____

| | |
|---|---|
| **From:** | Jim Dahlby [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D216F1B123C546B280D24E68D8718750-JIM DAHLBY] |
| **Sent:** | 2/16/2021 10:31:03 AM |
| **To:** | Jamie Carr [jcarr@pwrplan.com] |
| **Subject:** | RE: PS Estimation Process Update |

That was really me thinking about Outlook 365, I didn't know if meeting response got posted back to meeting attendees. I was worried about a couple things I've said in meeting replies recently.

Jim Dahlby

Mobile: +1 678.269.7950
jdahlby@pwrplan.com

**From:** Jamie Carr <jcarr@pwrplan.com>
**Sent:** Tuesday, February 16, 2021 10:27 AM
**To:** Jim Dahlby <jdahlby@pwrplan.com>
**Subject:** RE: PS Estimation Process Update

BCC'ed you, lol. Have faith!

Jamie Carr
Senior Director, Implementation Strategy

Mobile: 330.603.3556
jcarr@pwrplan.com
PowerPlan.com

 PLAN

**From:** Jim Dahlby <jdahlby@pwrplan.com>
**Sent:** Tuesday, February 16, 2021 10:23 AM
**To:** Jamie Carr <jcarr@pwrplan.com>
**Subject:** RE: PS Estimation Process Update

Did you BCC me or did it send to everyone on Friday's meeting?

Jim Dahlby

Mobile: +1 678.269.7950
jdahlby@pwrplan.com

——Original Appointment——
**From:** Jamie Carr <jcarr@pwrplan.com>
**Sent:** Tuesday, February 16, 2021 10:17 AM
**To:** Jason Szelest
**Subject:** Accepted: PS Estimation Process Update
**When:** Friday, February 19, 2021 11:00 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting



I don't know who did PowerTax, but I know Jeremy did Provision, and he has no idea how to estimate Provision projects. He expressed this to me while he was doing that. And after doing an all day session with him on Aqua yesterday, I see he hasn't absorbed nearly as much as I had thought over the last few projects we worked on together.

ATTORNEYS' EYES ONLY

I also did an hour QA on Liberty Yulu yesterday. It was bad to say the least. The one company that's being implemented in Release 1 is a tiny company that I could've converted in a week. Yulu has billed 241 hours. She's also delivering training to Liberty today. Although she can explain basics, she can't answer questions. Her and I discussed that yesterday and she admitted she's going to be in trouble. They have RCC engaged at Empire and if they have RCC review our hours and completed tasks, we're in big trouble. I saw the PowerTax hours billed as well. Massive hours for a small company and Michael had to do and re-do work.

Michael also told me that Southern TBBS is in trouble. I haven't heard anything from Yulu on that. He said that on both Liberty and Southern that on internal calls she describes everything as being on track and no issues. It's not.

Sorry for all the bad news, but this is the reality. "Tell it like it is", right? Lol. I don't have a resolution to this, but I think you need to be aware of the serious risks here. Maybe a CHPK-like solution is needed in the short term. All hands on deck to ensure all these projects get back on track.

I just can't be everywhere.

Happy belated Valentine's Day.

Message

| | |
|---|---|
| From: | Jim Dahlby [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D216F1B123C546B280D24E68D8718750-JIM DAHLBY] |
| Sent: | 9/11/2021 6:28:55 PM |
| To: | Nathaniel Gburek [ngburek@pwrplan.com] |
| Subject: | Re: ConEd Cloud Opportunity & Third Parties |

One challenge is Vu has been associated with a software competitor.

What time on Tuesday?

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.


On Sep 11, 2021, at 1:00 PM, Nathaniel Gburek <ngburek@pwrplan.com> wrote:


Jim

I received a quick question Friday from Joel and Mark regarding our stance on third party access in PowerPlan's cloud in reference to a future meeting with ConEd. It is well known that Vu Nguyen and another internal contractor utilize significant access granted through the existing on prem solution @ ConEd.

Are you ok Joel/Mark utilizing the same framework presented to UPPCO/RCC @ ConEd to forward that opportunity? The timing on this is relatively urgent, the PowerPlan opportunity team is meeting with ConEd Tuesday and I will be out on family leave by that time, so I wanted to get this on your radar.

From my limited knowledge of the ConEd oppty, subcontracting under a cloud upgrade should in line with the facts and circumstances at UPPCO. The nuance would come in when regarding steady state interaction with the cloud (punted at UPPCO), would we want to continually do subcontracting agreements (annually?) or solve the legal/access components more permanently through some longer-term agreement between the three parties (contractor, ConEd and PowerPlan)?

<image001.jpg>

Thanks,

**Nathaniel F. Gburek**
Sr. Alliances Manager, Global Strategic Alliances

Mobile: +1 336 871 8949

ngburek@pwrplan.com
PowerPlan.com

<image002.png>



Message

| | |
|---|---|
| From: | Jon Wolfe [jwolfe@pwrplan.com] |
| Sent: | 4/9/2019 1:27:58 PM |
| To: | Skip Fowler [Skip.Fowler@powerplan.com] |
| Subject: | RE: Questions for Enbridge |

See below: Let me know your thoughts.

Hi Kim

Based on a recent audit by Roper Technologies and after talking with our PowerPlan team regarding project status, I would like to escalate a concern regarding PowerPlan Intellectual Property and Trade Secrets and a third party, via Barnabus Consulting.

Per the agreement between PowerPlan and Enbridge (specifically, Section 14.2), a third party must first sign a confidentiality agreement with the owner of the Confidential Information prior to the other party making Confidential Information available to such third party. Please see below for the specific language.

14.2 Each party agrees that it will not use, disclose, publish, or otherwise divulge to any third party either during or after the termination of this Agreement or permit its officers or employees, subcontractors or consultants to so divulge any confidential information of the other party without prior written consent of such party, which consent may be withheld by either party in its sole discretion. Each party shall employ no such less stringent procedures than the strictest procedures used to protect its own confidential data including procedures set forth in those paragraphs. If disclosure to a third party, such as an auditor, is required, the third party is required to first sign a confidentiality agreement with the owner of the confidential information. Licensee may use the standard reports of the Software in filings or proceedings before any governmental regulatory or judicial body to which it is subject.



PLAINTIFF'S
EXHIBIT
229

Over the last 20 months PowerPlan has been working on good faith with via Barnabas with regards to our Intellectual Property and Trade Secrets. On three occasions, since the beginning of the PowerPlan Plan Project at Enbridge, PowerPlan or Roper Technologies has presented via Barnabas Consulting a Non-Disclosure Agreement based on via Barnabas being a competitor of PowerPlan, which has not been executed by via Barnabas Consulting.

The most recent was in March of this year, after Roper Technologies Intellectual Property Chief Legal Counsel completed a review of via Barnabas Consulting and sent via Barnabas Consulting a revised Non-Disclosure Agreement and a Cease and Desist Order regarding certain Marketing and Business practices of via Barnabas.

Going forward, until via Barnabas Consulting signs a Non-Disclosure Agreement, the PowerPlan Team has been directed not to share any Intellectual Property and Trade Secrets directly with via Barnabas Consulting Resources. Additionally, Roper Technologies Intellectual Property Chief Legal Counsel, also recommends that Enbridge and it's sub-contractors do not share or allow access to PowerPlan Intellectual Property and Trade Secrets. By doing so, Enbridge will avoid creating any joint liability for Enbridge, for any potential mis-uses of PowerPlan Intellectual Property, by via Barnabas Consulting.

Once an NDA is executed, PowerPlan still has the right to deny access to certain Intellectual Property and Trade Secrets, that PowerPlan is not willing to share with a known competitor in order to maintain a competitive advantage. The PowerPlan Project Manager is responsible for notifying Enbridge of any instances of such un-willingness to share certain Intellectual Property with via Barnabas Consulting.

Intellectual Property is considered any software, source code, databases, scripts, , solution designs, project plans, contracts and other documents and deliverables that are generated by PowerPlan and it's resources.

PowerPlan's software and all aspects of its Professional Services, relating to the software are Trade Secrets.

Could you please confirm your acknowledgement of these Enbridge requirements under the Agreement?

Please let me know if you have any questions or concerns.

Sincerely,

**Jon Wolfe, CMA®, PMP®**
Principal Project Manager
**Office:** +1 678.223.2724
**Mobile:** +1 864.915.0473
jon.wolfe@powerplan.com
PowerPlan.com

POWERPLAN

**From:** Skip Fowler
**Sent:** Tuesday, April 09, 2019 11:08 AM
**To:** Jon Wolfe <jwolfe@pwrplan.com>
**Subject:** Questions for Enbridge

John, please review the letter and specifically check on the highlighted yellow areas to where we should identify areas of concern around IP.  Can you please complete and verify the contract paragraph as well?

Hi Kim

After talking with our PowerPlan team regarding project status, I would like to escalate a concern with PowerPlan Intellectual Property and a third party, Barnabus Consulting.

Per the agreement between PowerPlan and Enbridge (specifically, Section 14.2), a third party must first sign a confidentiality agreement with the owner of the Confidential Information prior to the other party making Confidential Information available to such third party.  Please see below for the specific language:

> 14.2  Each party agrees that it will not use, disclose, publish, or otherwise divulge to any third party either during or after the termination of this agreement or permit its officers or employees to so divulge any confidential information of the other party without prior written consent of such party. Each party shall employ no such less stringent procedures than the strictest procedures used to protect its own confidential data including procedures set forth in these paragraphs.  If disclosure to a third party, such as an auditor, is required, the third party is required to first sign a confidentiality agreement with the owner of the confidential information.  Licensee may use the standard reports of the Software in filings or proceedings before any governmental regulatory or judicial body to which it is subject.

In good faith, we are considering release of the PowerPlan Test Scripts to National Grid.  Please note that PowerPlan's delivery of the PowerPlan Test Scripts to you would remain subject to the following assumptions:

POWERPLAN01392905

• PowerPlan's Software and Confidential Information are being made available in reliance of the representations National Grid has made to PowerPlan under the Agreement. Furthermore, PowerPlan's delivery of these test scripts to National Grid does not in any way waive, diminish or supersede National Grid's obligations to protect and limit disclosure of PowerPlan's Confidential Information, including but not limited to the obligations contained in Section 14.2 of the Agreement.

• National Grid acknowledges that per the Agreement, it is responsible and liable for any and all uses or misuses of the Software and PowerPlan Confidential Information (including the test scripts and other project deliverables) made available to National Grid, including any such use or misuse by any third parties.

• The rights and remedies available in Section 14.3 (injunctive release) and Section 14.5 (survival) also apply to these obligations.

Could you please confirm your acknowledgement of these Enbridge requirements under the Agreement?

Please let me know if you have any questions or concerns.

**Hoyt Skip Fowler**
Vice President Professional Services

Mobile:   +1 770 557 5527

skip.fowler@powerplan.com
PowerPlan.com

 POWERPLAN

POWERPLAN01392906

Message

| From: | Jim Dahlby [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D216F1B123C546B280D24E68D8718750-JIM DAHLBY] |
| Sent: | 2/18/2020 1:34:48 AM |
| To: | Jim Duffy [jduffy@pwrplan.com] |
| Subject: | RE: Important: SAP and Utegration update from Jason Stevens of Deloitte |

Any post meeting feedback?

Jim Dahlby

Mobile: +1 678.289.7950
jdahlby@pwrplan.com

**From:** Jim Duffy <jduffy@pwrplan.com>
**Sent:** Friday, February 7, 2020 2:34 PM
**To:** Matt Crye <mcrye@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Alex Elkin <aelkin@pwrplan.com>; Tod Bayne <Tod.Bayne@powerplan.com>; Jamie Carr <jcarr@pwrplan.com>; Jon Joury <jjoury@pwrplan.com>; Derrick Kemph <dkemph@pwrplan.com>
**Cc:** Marc Bortniker <marc.bortniker@powerplan.com>
**Subject:** Important: SAP and Utegration update from Jason Stevens of Deloitte

All,

I just got off the phone with Jason Stevens of Deloitte. As most of you know, he has been an incredibly valuable partner to us at UGI, and he would love to "copy and paste" our success to other utilities in North America.

I initially reached out to Jason to share some recent intelligence coming out of Aqua since that is one of his biggest target accounts (thanks Jamie for your consistent engagement and relationship building at Aqua). The purpose of this email isn't to get into Aqua per se, we'll continue to work that account regularly to insulate our position as they strategize how to merge with Peoples Gas.

The purpose of this email was to share some important information that Jason shared in return with me. Evidently next week SAP is getting their entire Utility industry practice (product, sales, pre-sales, consulting) together for a strategy meeting at the PGA facility in West Palm Beach.

Jason told me:

-        Utegration sponsored the meeting and has a speaking slot, and they are **bringing the CFO of NRG** to the meeting to talk about their success. It's logical to assume that Utegration will beg the SAP sales team to bring them into other accounts.

-        Jason doesn't know how SAP and SAP salespeople get paid if Utegration is successful. But there has to be some sort of agreement in place or else SAP's sales team won't care to advocate for Utegration. SAP gets paid when we sell our adapter, but it's not an earth-shattering amount of money and SAP's salespeople get no quota relief for it (to my knowledge).

-        Jason has been told explicitly by a senior person at Utegration that their "PowerPlan replacement" solution flat out **DOES NOT WORK.** This person used to be one of SAP's most notable utility industry experts for over 20 years.

-        Jason completely understands how non-regulated asset accounting (NRG) is much, MUCH less complicated than regulated utilities, so he's prepared to speak to that.

-        Jason also sponsored the meeting and has a speaking slot. **He's bringing Thomas Lord with him, and Thomas is going to talk about all the success we had at UGI.** They're going to talk about how it was the smoothest **PowerPlan-SAP project ever,** and a big reason for that was the **ease of integration** thanks to the S/4 HANA adapter.

-        Jason's speaking slot is **immediately following Utegration's.** So that's a good thing.

PLAINTIFF'S
EXHIBIT
230
PENGAD 800-631-6989

While it'll be great to have allies at the meeting, it's still very dangerous that Utegration will be speaking to SAP's entire utility practice. I'm sure Henry Bailey will speak in platitudes, brag about their success, and paint a product roadmap full of sunshine and rainbows. As a result, there could be some subsequent FUD in the marketplace that we'll have to battle.

If you have any questions or comments, or any advice/recommendations for prepping Jason in advance of this meeting, please let me know. Jason agreed to follow up with me after the meeting next Thursday to debrief, so I'll report back then.

Thanks,
Jim

**Jim Duffy**
*Strategic Accounts Executive*

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

 POWERPLAN

ATTORNEYS' EYES ONLY

Message

| | |
|---|---|
| **From:** | jdahlby@pwrplan.com [jdahlby@pwrplan.com] |
| **Sent:** | 2/21/2020 8:55:11 AM |
| **To:** | Kinav Patel [kpatel@pwrplan.com] |
| **Subject:** | Fwd: FOLLOW-UP: Important: SAP and Utegration update from Jason Stevens of Deloitte |

Jim Dahlby

(m) +1.678.269.7950

Sent from mobile device.

Begin forwarded message:

PLAINTIFF'S
EXHIBIT
23

**From:** Alex Eikin <aelkin@pwrplan.com>
**Date:** February 20, 2020 at 6:32:36 PM EST
**To:** Jim Duffy <jduffy@pwrplan.com>, Marc Bortniker <marc.bortniker@powerplan.com>, Tod Bayne
<Tod.Bayne@powerplan.com>, Matt Crye <mcrye@pwrplan.com>, Jim Dahlby <jdahlby@pwrplan.com>, Jamie Carr
<jcarr@pwrplan.com>, Jon Joury <jjoury@pwrplan.com>, Derrick Kemph <dkemph@pwrplan.com>, Drea Toretti
<dtoretti@pwrplan.com>, Suzanne Ward <suzanne.ward@powerplan.com>, Aaron Smith <asmith@pwrplan.com>
**Subject:** RE: FOLLOW-UP: Important: SAP and Utegration update from Jason Stevens of Deloitte

Duffy is correct. I agree that Utegration is the largest and most significant threat to our core utility customer base. We should expect competition at every S/4HANA transition for Fixed Assets and Lease (the NRG story) and even regulatory ( they claim some similar capabilities but most customers use it for real-time ferc translation, not out core regulatory case). We also know they are involved in most SI projects, and particularly seemed to be getting closer to PWC once PWC was off-limits to PP with the Roper acquisition. We also know they are partnering with Vesta specifically to pursue lower tier customers. We communicated this message last year prior to your arrival, Marc.

The new news in the below is the session they sponsored and the level of activity they are engaging in to promote their recent NRG win and the work they have done. I certainly understand Duffy's points, and SAP reps may indeed be compensated for Utegration. That said, we had confirmation late last year that was not the case, but I understand that can change quickly. He correctly states that the SAP sales rep gets no credit for PowerPlan or the S/4HANA adapter sales. There are additional arguments for why SAP might favor Utegration over PowerPlan.

Foremost, Utegration is an SAP-only shop; we are not. A Utegration solution arguably makes SAP stickier and in an open competition against other ERPs in the cloud transition war period we are entering, might be viewed more favorably than a PowerPlan that might say – happy to work with any ERP. Utegration is built on the SAP platform, it might require buying additional SAP tools or HANA direct which would credit the rep. SAP has struggled to build a business case for S/4HANA transition. They may look at a Utegration service solution that may be capitalizable ( and maybe even lower service number than our upgrade – I don't know, it could be more) as an opportunity to eliminate a large ongoing PowerPlan maintenance stream that is not capitalizable as a benefit to their business case. These reasons are all just reasonable speculation

Duffy is also correct that our relationship has eroded significantly with Henry Bailey's departure and other turnover and role changes at SAP. Henry was our primary supporter, and is now at Utegration which has adopted a competitive strategy. He led all aspects of utilities for SAP, and has relationships with customer executives, ecosystem partners, and across SAP at a level well beyond ours. That's an uphill battle. I am thankful that we were able to improve our relationship with Deloitte to the point they participated in the below as they did and shared this information; Duffy deserves a lot of credit for that as well.

I agree SIs will be very important, as is a stable and highly functional S/4HANA adapter. One additional idea we might want to consider would be to try to enter into some sort of mutually exclusive or preferred approach with Deloitte for Utilities running SAP. There would be pros and cons to that for sure, and it isn't a guarantee we could get there even if we wanted to, but there are a few data points out there that make me suggest it. Admittedly, this is likely not the right forum for debating them.

Thanks.

**Alex Elkin**
VP, Product Management - Accounting

Office:  +1 770.618.2276
Mobile:  +1 678.481.9358

alex.elkin@powerplan.com
Powerplan.com

 POWERPLAN

**From:** Jim Duffy <jduffy@pwrplan.com>
**Sent:** Thursday, February 20, 2020 4:56 PM
**To:** Marc Bortniker <marc.bortniker@powerplan.com>; Tod Bayne <Tod.Bayne@powerplan.com>; Matt Crye <mcrye@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Alex Elkin <aelkin@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Jon Joury <jjoury@pwrplan.com>; Derrick Kemph <dkemph@pwrplan.com>; Drea Toretti <dtoretti@pwrplan.com>; Suzanne Ward <suzanne.ward@powerplan.com>
**Subject:** RE: FOLLOW-UP: Important: SAP and Utegration update from Jason Stevens of Deloitte

Marc- my answers below inline in red.

**Jim Duffy**
Strategic Accounts Executive

Mobile:  +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

 POWERPLAN

**From:** Marc Bortniker <marc.bortniker@powerplan.com>
**Sent:** Thursday, February 20, 2020 2:14 PM
**To:** Tod Bayne <Tod.Bayne@powerplan.com>; Jim Duffy <jduffy@pwrplan.com>; Matt Crye <mcrye@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Alex Elkin <aelkin@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Jon Joury <jjoury@pwrplan.com>; Derrick Kemph <dkemph@pwrplan.com>; Drea Toretti <dtoretti@pwrplan.com>; Suzanne Ward <suzanne.ward@powerplan.com>
**Subject:** RE: FOLLOW-UP: Important: SAP and Utegration update from Jason Stevens of Deloitte

Adding Drea and Suzanne so they have visibility to the feedback below.

To the team –
Is this a threat? Yes In what way?

Utegration will do/say whatever they can in order to **replace us** at regulated utilities that are implementing SAP S/4 HANA. If SAP is assisting them in this effort, it could give them added legitimacy and become a huge distraction... **we'll**

**have to invest LOTS of time and energy into protecting our turf vs. selling.** Fortunately, Utegration tried this before (with SAP ECC... the product was called "Asset Lifecycle Accounting," or ALA) and failed miserably, so some utilities will be a little skeptical. But many IT departments are so loyal to SAP that they'll give them the benefit of the doubt.

One additional note- in late 2018, Utegration hired Henry Bailey (https://www.linkedin.com/in/henry-bailey/) to be their EVP and Chief Strategy Offer. Previously, Henry was the Global VP of Utilities Business Solutions at SAP. So he'll give them added legitimacy, and he'll probably make it easier for them to weave their way into our customer base.

How would we define our relationship with SAP, and is there a play we should pursue to get a more aligned relationship?

Right now I think it's pretty non-existent. Alex had done a WONDERFUL job of building a relationship with SAP through Henry Bailey, but that has mostly disappeared now that Henry has joined Utegation. It's my understanding that the new SAP leadership has given us the cold shoulder. But I welcome Alex's and Tod's feedback on this.

Marc

**From:** Tod Bayne <Tod.Bayne@powerplan.com>
**Sent:** Thursday, February 20, 2020 9:12 AM
**To:** Jim Duffy <jduffy@pwrplan.com>; Matt Crye <mcrye@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Alex Elkin <aelkin@pwrplan.com>; Jamie Carr <jcarr@pwrplan.com>; Jon Joury <jjoury@pwrplan.com>; Derrick Kemph <dkemph@pwrplan.com>
**Cc:** Marc Bortniker <marc.bortniker@powerplan.com>
**Subject:** RE: FOLLOW-UP: Important: SAP and Utegration update from Jason Stevens of Deloitte

If Utegration is adding their solution to the SAP App Center, then the SAP sales rep would get quota credit. We looked into adding AIO to the SAP App Center, but settled on putting an enterprise solution up there was not the right approach. On the SAP Adapter front, I had a brief conversation with Joost and he did not believe there was enough value for what we would be giving up in payments to SAP. I will circle back with Jim to see if we want to revisit this with Joost based on what was shared below.

On the SI front – Would we and the other parties (UGI and Deloitte) be open to creating a case study?

Thanks -

**Tod Bayne**
Mobile:  +1 239.4⁻0.9998

**From:** Jim Duffy <jduffy@pwrplan.com>
**Sent:** Wednesday, February 19, 2020 6:04 PM
**To:** Matt Crye <mcrye@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Alex Elkin <aelkin@pwrplan.com>; Tod Bayne <Tod.Bayne@powerplan.com>; Jamie Carr <jcarr@pwrplan.com>; Jon Joury <jjoury@pwrplan.com>; Derrick Kemph <dkemph@pwrplan.com>
**Cc:** Marc Bortniker <marc.bortniker@powerplan.com>
**Subject:** FOLLOW-UP: Important: SAP and Utegration update from Jason Stevens of Deloitte

Hi everyone,

I caught up with Jason Stevens and got his feedback on the SAP Utilities event last week that was mentioned in the email below.

POWERPLAN01232632

He said that the meetings went as expected. Utegration bragged about NRG and claimed that they were ready for regulated utilities. Then immediately thereafter, Deloitte and Thomas Lord gave their presentation and bragged about SAP and PowerPlan.

The one interesting piece of feedback Jason shared was that after the UGI presentation, Michael O'Donnell (National VP of Utilities for SAP- https://www.linkedin.com/in/michael-o-donnell-7854b24/), stood up in front of the room and said, "Obviously you guys just heard two completely different stories. Thomas made the right decision two years ago by implementing SAP with PowerPlan, but I'm not sure the rationale for that decision would hold true today based on what we're hearing from Utegration."

So in summary, Michael was very political... he didn't criticize UGI's decisions, and he stopped short of endorsing Utegration. But clearly SAP is trying hard to leave the door open for Utegration, so there's no doubt we're going to have to fight hard against them over the next few years. I can only guess that the reason why they're trying so hard is that they probably have a deal worked out with Utegration to get a kickback on every sale of their product, with their sales reps getting quota credit. That's pure conjecture, but it would easily explain this behavior. Yes SAP gets paid when we sell our adapter, but it isn't much, and I don't think the SAP sales reps get any credit for it.

Partnerships with SIs will be **critical** as more and more of these huge SAP transformation projects hit the market.

Thanks,
Jim

**Jim Duffy**
*Strategic Accounts Executive*

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

 POWERPLAN

**From:** Jim Duffy
**Sent:** Friday, February 07, 2020 2:34 PM
**To:** Matt Crye <mcrye@pwrplan.com>; Jim Dahlby <jdahlby@pwrplan.com>; Alex Elkin <aelkin@pwrplan.com>; Tod Bayne <Tod.Bayne@powerplan.com>; Jamie Carr <jcarr@pwrplan.com>; Jon Joury <jjoury@pwrplan.com>; Derrick Kemph <dkemph@pwrplan.com>
**Cc:** Marc Bortniker <marc.bortniker@powerplan.com>
**Subject:** Important: SAP and Utegration update from Jason Stevens of Deloitte

All,

I just got off the phone with Jason Stevens of Deloitte. As most of you know, he has been an incredibly valuable partner to us at UGI, and he would love to "copy and paste" our success to other utilities in North America.

I initially reached out to Jason to share some recent intelligence coming out of Aqua since that is one of his biggest target accounts (thanks Jamie for your consistent engagement and relationship building at Aqua). The purpose of this email isn't to get into Aqua per se, we'll continue to work that account regularly to insulate our position as they strategize how to merge with Peoples Gas.

The purpose of this email was to share some important information that Jason shared in return with me. Evidently next week SAP is getting their entire Utility industry practice (product, sales, pre-sales, consulting) together for a strategy meeting at the PGA facility in West Palm Beach.

POWERPLAN01232633

Jason told me:

-        Utegration sponsored the meeting and has a speaking slot, and they are **bringing the CFO of NRG** to the meeting to talk about their success. It's logical to assume that Utegration will beg the SAP sales team to bring them into other accounts.

-        Jason doesn't know how SAP and SAP salespeople get paid if Utegration is successful. But there has to be some sort of agreement in place or else SAP's sales team won't care to advocate for Utegration. SAP gets paid when we sell our adapter, but it's not an earth-shattering amount of money and SAP's salespeople get no quota relief for it (to my knowledge).

-        Jason has been told explicitly by a senior person at Utegration that their "PowerPlan replacement" solution flat out **DOES NOT WORK**. This person used to be one of SAP's most notable utility industry experts for over 20 years.

-        Jason completely understands how non-regulated asset accounting (NRG) is much, MUCH less complicated than regulated utilities, so he's prepared to speak to that.

-        Jason also sponsored the meeting and has a speaking slot. **He's bringing Thomas Lord with him, and Thomas is going to talk about all the success we had at UGI.** They're going to talk about how it was the **smoothest PowerPlan-SAP project ever**, and a big reason for that was the **ease of integration** thanks to the S/4 HANA adapter.

-        Jason's speaking slot is **immediately following Utegration's.** So that's a good thing.

While it'll be great to have allies at the meeting, it's still very dangerous that Utegration will be speaking to SAP's entire utility practice. I'm sure Henry Bailey will speak in platitudes, brag about their success, and paint a product roadmap full of sunshine and rainbows. As a result, there could be some subsequent FUD in the marketplace that we'll have to battle.

If you have any questions or comments, or any advice/recommendations for prepping Jason in advance of this meeting, please let me know. Jason agreed to follow up with me after the meeting next Thursday to debrief, so I'll report back then.

Thanks,
Jim

**Jim Duffy**
*Strategic Accounts Executive*

Mobile:  +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com

 **POWERPLAN**

ATTORNEYS' EYES ONLY

Message

| From: | Brett Bertz [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50C6D79EBEB74FFBB48F504EE2235E85-BRETT BERTZ] |
| Sent: | 7/17/2020 3:14:17 PM |
| To: | Kleczynski, Robert A:(BSC) [robert.kleczynski@exeloncorp.com] |
| Subject: | Connecting about PowerPlan and Tax |

Rob, I hope my note finds you and your family safe and healthy.

First, I wanted to let you know how much we appreciate the time you spent with the PowerPlan team in our recent EAB. I hope that you found the event valuable.

Second, I also wanted to see if you had a few minutes in the near term to talk about a topic that I don't think we've discussed before. Recently we've identified that there is a 3rd party working with some of our customers, delivering services on the PowerPlan software, that we have strong reason to believe is using access to our intellectual property to build competitive offerings. We've started a communication program with our customers and, given your role within the Tax community at EEI, I'd appreciate the opportunity to share with you what we're seeing and how we're responding to the situation. Your feedback would be very valuable in helping us make sure we continue to serve the needs of the EEI community and protect PowerPlan's intellectual property in tandem.

I have the following windows open:

- 7/23 after 4:30p ET
- 7/24 between 11a – 1p ET
- 7/27 after 4:00p ET

If there is a 30 minute slot that works for you, I'd be grateful for the time.

Thanks

**Brett M. Bertz**
Chief Customer Officer

Office   +1 678.223.2762
Mobile   +1 678.643.2242

brett.bertz@powerplan.com
PowerPlan.com

POWERPLAN

ATTORNEYS' EYES ONLY



PLAINTIFF'S
EXHIBIT
232

POWERPLAN00908118

Message

| | |
|---|---|
| From: | Brett Bertz [brett.bertz@powerplan.com] |
| Sent: | 7/27/2021 9:42:00 PM |
| To: | Jim Duffy [jduffy@pwrplan.com]; Marc Bortniker [marc.bortniker@powerplan.com]; Pat Petti [Pat.Petti@powerplan.com] |
| CC: | Matt Crye [mcrye@pwrplan.com] |
| Subject: | RE: IMPORTANT PLEASE READ: PowerPlan/UPPCO - Updated Technical Upgrade SOW & Order Form |

Thanks for the feedback Jim.

Marc, I think we should bring this example and others we are seeing with the competitive landscape and the desire of our customers to have choices and flexibility to our Exec Team to make sure we all have a clear view of the current state and what's ahead.

**From:** Jim Duffy <jduffy@pwrplan.com>
**Sent:** Tuesday, July 27, 2021 6:18 PM
**To:** Marc Bortniker <marc.bortniker@powerplan.com>; Brett Bertz <brett.bertz@powerplan.com>; Pat Petti <Pat.Petti@powerplan.com>
**Cc:** Matt Crye <mcrye@pwrplan.com>
**Subject:** RE: IMPORTANT PLEASE READ: PowerPlan/UPPCO - Updated Technical Upgrade SOW & Order Form

They're unable to go on-prem now because they're paid up on Cloud through Jan 2022. So they don't want to eat the 6 months of Cloud fees, and they probably can't rally on such short notice to stand up all the necessary infrastructure to host on-prem anyway. In other words, we dodged a bullet. If they knew these issues a few months ago, they would've cancelled Cloud and used RCC for the upgrade, costing us the PS bookings and the Cloud ARR.

Clearly we need to work with the customer between now and the end of January to protect our Cloud. Cory is the CSM on the Account, I'll make sure Maria pulls in him and Kim.

Bigger picture, we should discuss the broader (industry-wide) implications of this situation. I remember a story Matt shared recently about TECO... **they purposefully did NOT buy our Cloud because they didn't want to give us exclusivity over Professional Services.** They love PowerPlan, but they believe strongly in having a healthy ecosystem for PowerPlan professional services.

If I was carrying an RCC business card, I would be screaming this UPPCO story as loud as I could and to as many utilities as I could- *"Don't you dare buy PowerPlan Cloud because you will be stuck with their professional services going forward, and they'll charge you 30% more for less experienced resources and lower value services."*

I would also pick up the phone and call the heads of AGA/EEI, because they too are committed to making sure there is a healthy ecosystem of PowerPlan implementers. If somebody submits a question to the leadership group akin to *"How have other utilities managed the situation with the limitation of professional services options with PowerPlan Cloud?"* it could cause us BIG problems industry wide and kill our Cloud pipeline in the process.

Sorry if I'm taking sharp angles and being dramatic here, but I feel these are imminent risks (not "if" but "when"). Probably worth a conversation at the executive level.

Thanks,
Jim

**Jim Duffy**
*Vice President – Strategic Accounts*

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com


PLAINTIFF'S EXHIBIT 233 PENGAD 800-631-6989



**From:** Marc Bortniker <marc.bortniker@powerplan.com>
**Sent:** Tuesday, July 27, 2021 5:51 PM
**To:** Jim Duffy <jduffy@pwrplan.com>; Brett Bertz <brett.bertz@powerplan.com>; Pat Petti <Pat.Petti@powerplan.com>
**Cc:** Matt Crye <mcrye@pwrplan.com>
**Subject:** Re: IMPORTANT PLEASE READ: PowerPlan/UPPCO - Updated Technical Upgrade SOW & Order Form

Jim. I read this to say that they're unable to do that now (due to resources, licenses, skill sets, timelines) and they plan to move ahead with us as planned - and this is a future threat. Is that how you read it?

That said - even if that's correct this looks like a threat to this upgrade until we get a signed sow.

Thoughts on next steps or validation of current state?

I believe you have an exec relationship from the original discussion about IP protection when doing work in our cloud. Is there a move we should make there?

Get Outlook for iOS

---

**From:** Jim Duffy <jduffy@pwrplan.com>
**Sent:** Tuesday, July 27, 2021 5:24:05 PM
**To:** Brett Bertz <brett.bertz@powerplan.com>; Pat Petti <Pat.Petti@powerplan.com>
**Cc:** Marc Bortniker <marc.bortniker@powerplan.com>; Matt Crye <mcrye@pwrplan.com>
**Subject:** IMPORTANT PLEASE READ: PowerPlan/UPPCO - Updated Technical Upgrade SOW & Order Form

Brett and Pat,

As I've mentioned before, we're driving towards a successful outcome at UPPCO... an SOW for $505k, with about $25k in discounts getting us to that net number. However, Maria just unintentionally received some inside information about their conversations with RCC.

**UPPCO is considering moving off of our Cloud and hosting PowerPlan themselves so that RCC can do future upgrades.**

RCC was $135k cheaper than us for the upgrade, and that combined with the higher value services they provide UPPCO (accounting and tax staff augmentation and advice) is so compelling that UPPCO is going to do a cost/benefit analysis once they get through their current resource crunch.

We have time to fix this at UPPCO and protect our Cloud ARR, but I think this is pretty alarming.

Thanks,
Jim

**Jim Duffy**
*Vice President – Strategic Accounts*

Mobile: +1 202.340.4164
Jim.Duffy@PowerPlan.com
PowerPlan.com



ATTORNEYS' EYES ONLY

**From:** Maria Vaccaro <maria.vaccaro@powerplan.com>
**Sent:** Tuesday, July 27, 2021 4:38 PM
**To:** Jim Duffy <jduffy@pwrplan.com>
**Subject:** FW: [EXT] RE: PowerPlan/UPPCO - Updated Technical Upgrade SOW & Order Form

Greg - UPPCO IT sent me a note this morning requesting that one statement from the SOW be removed. But notice Natasha's note to her team – see paragraph below. They are considering moving back on prem so that RCC can help them with future work.

"Attached is the revised SOW for the PowerPlan Technical Upgrade. RCC has mentioned that if we wanted to move "On-Prem" in January 2022, that project would need to start in August. Due to our Cloud agreement, I am not sure if this is a possible route for us at this time. PowerPlan's quote came in at        (which doesn't include the testing environments for a cost of      . RCC's quote for the PowerPlan Technical upgrade and other fixed asset scope items was        so we may want to pursue other avenues other than PowerPlan Cloud in the future when we have resources and can complete the cost effectiveness analysis (Oracle license needed, IT support, administrative knowledge, etc.)."

**Maria Vaccaro**
Strategic Account Executive

Mobile +1 416.566.6589
maria.vaccaro@powerplan.com
PowerPlan.com

 **PLAN**

**From:** Gregory Gagnon <gsgagnon@uppco.com>
**Sent:** Tuesday, July 27, 2021 1:36 PM
**To:** Maria Vaccaro <maria.vaccaro@powerplan.com>
**Cc:** Joseph J. Gerry <JJGerry@uppco.com>; Wendy Rautio <wrautio@uppco.com>; Gradon Haehnel <GHaehnel@uppco.com>; Natasha L. Wonch <NLWonch@uppco.com>
**Subject:** [EXT] RE: PowerPlan/UPPCO - Updated Technical Upgrade SOW & Order Form

Maria, I have one question/issue with the SOW:

Note one concern in the SOW on page 6 under "Project Assumptions" Section 3:

3.      Client shall obtain all licenses or approvals necessary for PowerPlan or its subcontractors to perform the Services under this Statement of Work prior to making Client's facilities, software, hardware, networks or other similar resources available to PowerPlan. Client shall be responsible for the content of any database, system or server, and the control on its access, backup and recovery of the stored data (the "Security"). The Security will also include procedures necessary to safeguard the integrity of software and data from access by unauthorized personnel.

Does this paragraph even apply to use and we are upgrading a Cloud server controlled by PowerPlan and the have the licensing and the have full control of the database, systems, servers and backups, we did not. So I don't know why this is in our SOW? I do understand we are responsible for the content in the system.

Please advise. Thanks

**Greg Gagnon**
Director of Information Technology

ATTORNEYS' EYES ONLY

**Upper Peninsula Power Company**
**GSGagnon@uppco.com**
Office: 906 232-1444

**From:** Natasha L. Wonch <NLWonch@uppco.com>
**Sent:** Wednesday, July 21, 2021 6:50 AM
**To:** Gradon Haehnel <GHaehnel@uppco.com>; Gregory Gagnon <gsgagnon@uppco.com>
**Cc:** Joseph J. Gerry <JJGerry@uppco.com>; Wendy Rautio <wrautio@uppco.com>
**Subject:** FW: PowerPlan/UPPCO - Updated Technical Upgrade SOW & Order Form
**Importance:** High

Good Morning,

Attached is the revised SOW for the PowerPlan Technical Upgrade. RCC has mentioned that if we wanted to move "On-Prem" in January 2022, that project would need to start in August. Due to our Cloud agreement, I am not sure if this is a possible route for us at this time. PowerPlan's quote came in at [redacted] (which doesn't include the testing environments for a cost of [redacted] RCC's quote for the PowerPlan Technical upgrade and other fixed asset scope items was [redacted] so we may want to pursue other avenues other than PowerPlan Cloud in the future when we have resources and can complete the cost effectiveness analysis (Oracle license needed, IT support, administrative knowledge, etc.).

I am on vacation starting today until August 2nd, but could have a meeting anytime this week. I'll review this SOW sometime today and input my comments and share with the group.

Thank you,
Natasha

**From:** Maria Vaccaro <maria.vaccaro@powerplan.com>
**Sent:** Tuesday, July 20, 2021 5:18 PM
**To:** Natasha L. Wonch <NLWonch@uppco.com>
**Subject:** PowerPlan/UPPCO Updated Technical Upgrade SOW & Order Form
**Importance:** High

WARNING: This email was sent from an external address. Exercise caution when opening links or attachments.
Natasha,

Attached you will find word and .pdf copies of the:
1. Technical Upgrade SOW - which also includes testing services, and
2. Order Form (OF) – For additional environments required for the upgrade work to be performed in

Please Note:

• Both the SOW & OF will need to be reviewed and signed

• PowerPlan has honored a 5% discount for this upgrade and you will find language for this under Consulting Fees – 4$^\pm$ point

Please let me know if you have any questions or if the team would like to discuss any of the items on a call.

Thank you

**Maria Vaccaro**

ATTORNEYS' EYES ONLY

Mobile: +1 416.566.6589
maria.vaccaro@powerplan.com
PowerPlan.com

   PLAN

This email message is for the sole use of the intended recipient(s). It may contain confidential information, legally privileged information or other information subject to legal restrictions. If you are not the intended recipient, you may not read it, copy it, use it, or disclose it. Please notify the sender by replying to this message, and then delete or destroy all copies of this message in all media. Also, this email message is not an offer or acceptance, and it is not intended to be all or part of an agreement. Thank you.

This email, including any attachments, is confidential, may contain proprietary information and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, or if you have received this message in error, please notify the sender, delete this message and any attachments from your system and do not copy or otherwise disclose its contents to any other person. Any email or attachment sent to you in error does not amount to a waiver of privilege. Thank you.

This email, including any attachments, is confidential, may contain proprietary information and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, or if you have received this message in error, please notify the sender, delete this message and any attachments from your system and do not copy or otherwise disclose its contents to any other person. Any email or attachment sent to you in error does not amount to a waiver of privilege. Thank you.

POWERPLAN00207156

PowerPlan - CONFIDENTIAL

June 11, 2020

VIA EMAIL

{{Recipient.Company}}
ATTN:
{{Recipient.FirstName}} {{Recipient.LastName}}
{{Recipient.Email}}

Dear {{Recipient.FirstName}}:

Thank you for being a valued customer and partner of PowerPlan. In the spirit of this partnership, I am writing to you to raise a concern that PowerPlan has about access to our software and associated intellectua property by a specific third-party: Lucasys Inc.

Lucasys offers consulting services associated with PowerPlan software and software solutions that compete with PowerPlan software. To protect our intellectual property, including trade secrets, we cannot permit our customers to provide Lucasys with access to our proprietary software and associated confidential information while Lucasys is simultaneously developing, marketing, and selling competitive software to those same customers. This would create an intolerable risk that Lucasys will misuse and misappropriate our confidential information and unfairly use it to develop, market, and sell its competing software.

We are proactively alerting our customers about this intellectual property protection concern to help avoid a potentially compromising situation. Our software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. Please be advised that, pursuant to those provisions, PowerPlan will not consent to Lucasys having access to our software or associated confidential information.

PowerPlan consent is not required for our customers to retain Lucasys for projects that will not involve access to, disclosure of, or working with PowerPlan software, data models, or other confidential information. Additionally, PowerPlan consent is not required for customers to provide their data, in raw form, to Lucasys, provided it is being done in a way that does not involve third parties accessing PowerPlan's software or data models or schema, including the underlying database, to retrieve such data.

The remainder of this letter provides answers to certain questions that you may have relating to what your contract with PowerPlan says about confidential information, and the scope of PowerPlan's confidential and proprietary information.

What does my contract with PowerPlan say about confidential information?



To protect and preserve our intellectual property, including trade secrets, we take reasonable steps to maintain the confidentiality of our software and associated information. One of the ways we do this is by including confidentiality provisions in our software license and subscription agreements in which we and our customers agree to protect each other's confidential information. As part of those provisions, our customers acknowledge our proprietary rights in our software and supporting materials and agree not to disclose our confidential information to any third-party without our consent and to protect such information as they would their own confidential information.

What are examples of PowerPlan's confidential information and trade secrets?
PowerPlan's intellectual property includes the confidential and proprietary information and trade secrets embodied within our unique and sophisticated software solutions. This includes our source code, system and database architecture, database models and structures, and various unique and integrated features and functions thereof. Our confidential information also includes user guides and other documentation, professional services deliverables, information relating to our software design sessions and workshops, and our training classes and materials. These examples fall within the definition of confidential information in our license and subscription agreements. They also meet the statutory definition of a trade secret, because they are: (i) not generally known by or available to the public; (ii) provide competitive economic value to PowerPlan; and (iii) are the subject of reasonable efforts to maintain their secrecy.

What actions amount to disclosure of or providing access to PowerPlan's confidential information?
Among the information and access that our customers should not provide to Lucasys are the following: (i) front-end user access to PowerPlan's software; (ii) access to your PowerPlan database (whether by a link or credentialed login access provided by you), or to PowerPlan's data model; (iii) user guides and other PowerPlan software documentation; (iv) access to Social Power and other PowerPlan user community sites; (v) professional services deliverables and other project work product; and (vi) invitations or participation in design sessions, software testing, user training, and other project meetings or workshops relating to PowerPlan software.

Does this letter apply to other third-party access to PowerPlan's confidential information?
PowerPlan software license and subscription agreements require that customers obtain our consent prior to disclosing our confidential information to third parties. In the future, you will receive an additional communication from a vendor that PowerPlan has engaged to perform a generalized customer audit of third-party access to PowerPlan's software and associated confidential information. We would appreciate your cooperation in responding to that communication.

Final Points
If you are currently using Lucasys as a consultant to provide services that require access to PowerPlan software or confidential information, please contact PowerPlan by sending an email to Legal@pwrplan.com with the Subject: Protecting PowerPlan Proprietary Software and provide the relevant details. We will respond as soon as possible to discuss how to address the

situation without disrupting your operations or ongoing projects.

Once again, thank you for your investment with PowerPlan and for your partnership in protecting PowerPlan's confidential information.

Sincerely,
Brett Bertz
Chief Customer Officer

Cc: Jonathan Sucher, Senior Corporate Counsel
Copyright © {{Current_Year}}, PowerPlan, Inc. All rights reserved.
300 Galleria Parkway | Suite 2100 | Atlanta, GA | 30339
O: 1 678.223.2800 | F: +1 770.618.0507
https://info.powerplan.com/e/107062/2020-06-
11/4n54y9/%%email_id%%?h=%%internal.tracker_url_hash%%

Update your email preferences here:
{{{EmailPreferenceCenter_36}}}