

Transcript of **Christine S. Meyer, Ph.D.**

Wednesday, March 15, 2023

*Lucasys Inc. v. Powerplan, Inc.*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 126477

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE NORTHERN DISTRICT OF GEORGIA

 3                           ATLANTA DIVISION

 4

 5   LUCASYS INC.,

 6        Plaintiff,                   Civil Action No.

 7   v.                                1:20-CV-02987-AT

 8   POWERPLAN, INC.,

 9        Defendant.

10   _____/

11

12                   DEPOSITION OF CHRISTINE S. MEYER, Ph.D

13                   DATE:  Wednesday, March 15, 2023

14                   LOCATION:  3100 Cumberland Boulevard

15                          Suite 1470

16                          Atlanta, Georgia  30339

17                   TIME:   9:00 a.m. - 3:51 p.m.

18

19

20

21   REPORTED BY:  TAMIKA M. BURNETTE, RPR, CSR-2870

22

23

24

25
```

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFFS:

 3   BONALAW, PC

 4   BY:  Mr. Jon Cieslak, Esquire

 5        4275 Executive Square

 6        Suite 200

 7        La Jolla, California  92037

 8        (858) 964-4589

 9        Jon.cieslak@bonalawpc.com

10   ROBBINS ALLOY BELINFANTE LITTLEFIELD, LLC

11   BY:  Mr. Joshua Mayes, Esquire

12        Mr. Jason Alloy, Esquire

13        500 14th Street

14        Atlanta, Georgia  30318

15        (404) 856-3255

16        Jalloy@robbinsfirm.com

17   FOR THE DEFENDANT:

18   SQUIRE PATTON BOGGS, LLP

19   BY:  Mr. Stephen M. Fazio, Esquire

20        Mt. Steven A. Friedman, Esquire

21        1000 Key Tower

22        127 Public Square

23        Cleveland, Ohio  44114

24        (216) 479-8403

25        Stephen.fazio@squirepb.com
```

```
 1                        INDEX

 2

 3   WITNESS:                            PAGE:

 4   CHRISTINE MEYER, Ph.D

 5

 6         EXAMINATION BY MR. FAZIO            5

 7

 8                     EXHIBITS

 9           (Exhibits are attached hereto.)

10

11   EXHIBIT          DESCRIPTION              PAGE

12   EXHIBIT NO. 1    EXPERT REPORT              5

13   EXHIBIT NO. 2    E-MAIL CHAIN             151

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      Monday, March 13, 2023

 2                      9:00 a.m.

 3

 4              *            *            *

 5              THE VIDEOGRAPHER:  Stand by.  Good

 6  morning, everybody.  We are now on the record for the

 7  video recorded deposition of Christine S. Meyer, PhD,

 8  taken in the matter of Lucasys, Inc. Versus PowerPlan,

 9  Inc.

10              Today is March 15, 2023, and the time on

11  the record is now 9:07 a.m. Eastern Standard Time.

12  This deposition is being conducted at Robin, Alloy,

13  Belinfante, Littlefield, LLC in Atlanta, Georgia.

14              My name is Duke Stephens.  I'm the

15  videographer.  Our court reporter today is Tamika

16  Burnette.  We both represent Trustpointe.

17              Will counsel please introduce themselves

18  for the record.

19              MR. FAZIO:  Stephen Fazio on behalf of

20  PowerPlan.

21              MR. FRIEDMAN:  And Steven Friedman.

22              MR. CIESLAK:  Jon Cieslak on behalf of

23  Lucasys.

24              MR. MAYES:  Josh Mayes on behalf of

25  Lucasys.
```

1              MR. ALLOY:  Jason Alloy on behalf of

2     Lucasys.

3                     (Witness sworn.)

4                     CHRISTINE MEYER, Ph.D,

5              After having been first duly sworn to tell

6              the truth, was examined and testified as

7              follows:

8                     EXAMINATION

9     BY MR. FAZIO:

10         Q.  Good morning, Dr. Meyer.

11         A.  Good morning.

12         Q.  My name is Steve Fazio.  We met off the record

13    a minute ago.

14              Dr. Meyer, I'm going to hand to you what

15    we'll mark as Exhibit 1.

16              (Exhibit 1 marked for identification.)

17              MR. FAZIO:  Do you want a copy of the

18    report or are you good?

19         Q.  (By Mr. Fazio)  Dr. Meyer, can you identify

20    that for the record for us?

21         A.  (Witness examining document.)

22              This appears to be the expert report that I

23    filed in this case.

24         Q.  And is that a complete copy of the report?

25         A.  As best I can tell, as I sit here today, it

1    appears to be.  I'd have to, obviously, go back and tie

2    every page, but it appears to be.

3         Q.  And the report that you served in this case,

4    that was served, that you authored in this case, does it

5    taken contain all the opinions you intend to give at

6    trial in this matter?

7         A.  Certainly it contains all of the opinions that

8    I have at this point in time.  I can't predict the

9    future to know when I might be asked to form other

10   opinions that would be relevant at trial.

11        Q.  In terms of the report itself, with respect to

12   the opinions you've given, have you identified the basis

13   for your opinions in your report?

14        A.  Yes.

15        Q.  And have you identified all of the materials

16   that you've relied on in forming the opinions in your

17   report?

18        A.  Yes.

19        Q.  Now, I -- a couple of preliminary things before

20   we dive too far into it.  I understand, in your report,

21   you're relying on an interview you conducted with Mr.

22   Lantukh?

23        A.  Yes.

24        Q.  Is that correct?

25        A.  Yes.



1      Q.   You had just one interview with Mr. Lantukh?

2      A.   I spoke with Mr. Lantukh on another occasion,

3   early in the case.  But in terms of materials relied

4   upon for this report, yes.

5      Q.   Okay.  In terms of your earlier conversations

6   with him, approximately, when did that happen?

7      A.   To the best of my recollection, shortly after I

8   was retained by -- to the best of my recollection,

9   somewhere in early 2022, but I don't have an exact date.

10      Q.   So early 2022, that was approximately when you

11   were retained in this case?

12      A.   To the best of my recollections.

13      Q.   And do you know -- were you replacing another

14   expert, as far as you know?

15      A.   I do not know.

16      Q.   So the memo that was produced with your report,

17   is that -- was there any communications that you had

18   within that interview that are not reflected in your

19   memorandum?

20      A.   I'm sorry, I don't understand what you mean by

21   that conversation.

22      Q.   So the conversation that you rely on in your

23   report, your interview in your report with Mr. Lantukh,

24   correct?

25      A.   Correct.



1    Q.   That interview, there was a set of notes or a

2    memorandum that you served along with your report --

3    A.   (Nodding yes.)

4    Q.   To the best of your knowledge, sitting here

5    today, is that memorandum a complete recollection that

6    you took with Mr. Lantukh that you're relying on in this

7    case?

8    A.   Insofar as what I'm relying on.  So, I mean, I

9    didn't intend for that to be a word for word transcript.

10   Q.   Yes.

11   A.   But in terms of the interview, insofar as I

12   relied on it, yes.

13   Q.   In forming your opinions in this case, are you

14   relying on any personal communications you had with

15   anyone?

16   A.   No.

17   Q.   Have you had any communications with Mr. Chang,

18   Mr. Strang or Mr. Saint James or any other Lucasys'

19   employees?

20   A.   Not to the best of my recollection.  If they

21   were on a phone call that I wasn't aware of the person

22   being on -- obviously, these days, with Zoom and such,

23   but no, not to the best of my recollection.

24   Q.   And just to be clear, what I'm asking -- what

25   I'm asking you -- I'm asking you in your role as the

1    leader of the team at NERA, okay -- so was there someone

2    else at your team that may have interviewed those folks?

3        A.  Not that I recall, as I sit here today.

4        Q.  All right.  Do you know if you or anyone on

5    your team has had any communications with any PowerPlan

6    employees?

7        A.  Not that I'm aware of.  No.

8        Q.  Have you or anyone on your team have any

9    communications with any PowerPlan customers?

10       A.  Not that I'm aware of, as I sit here today.

11       Q.  Have you or anyone on your team had any

12   communications with any Lucasys' customers?

13       A.  Not that I'm aware of, as I sit here today.

14       Q.  Have you or any one of your team had any

15   communications with any other providers of Tax

16   Consulting Services, RCC, Double A, R2, folks like that?

17       A.  Not to the best of my knowledge.  No.

18       Q.  Okay.  With your work on this case, have you

19   had any type of communication with any type of software

20   provider?

21       A.  I'm not sure what you mean.  Not that is

22   relevant to this case.  No.

23       Q.  And when you say "not that you're aware of," is

24   there anybody -- is there any reason you would be

25   unaware of those kinds of communications occurring?



1       A.  No.  But I mean, you're asking me about

2  somebody else.  You know, I don't keep tabs of

3  everybody, 24 hours of the day.  So I just want it to be

4  clear that it's to the best of my knowledge, as leader

5  of the team, as you said.  But that's all I can testify

6  to.

7       Q.  In you forming your opinions you're going to be

8  giving at the trial in this case, you're not going to be

9  relying on those kinds of communications?

10       A.  When you say "those kinds of communications," I

11  take it that you mean communications that I am --

12       Q.  The --

13       A.  Anything other than the interview that I cited

14  in my report?

15       Q.  Correct.

16       A.  That's correct.

17       Q.  In forming your opinions in this case, have you

18  relied on any information that you learned exclusively

19  from counsel?

20       A.  Not that I'm aware of, as I sit here today.

21  I'd have to go through -- I certainly have developed

22  certain understandings from counsel.  I would have to

23  think, for each one, whether there was an additional

24  source or not.  For example, legal understandings, those

25  would likely have come just from counsel.



1        Q.   In any case, if -- to the extent you were

2    relying on that, would you have referred to it in your

3    report?  You would have cited it if that had been the

4    case?

5        A.   Generally speaking, in my reports, when I have

6    received, for example, by way of example, legal

7    understandings from counsel, I would -- I would denote

8    that as I understand something.

9        Q.   Okay.

10       A.   I wouldn't necessarily -- when I say "cite," I

11    take that to mean a footnote.  I wouldn't necessarily

12    drop/add footnotes, but I would have indicated it.

13       Q.   Now your charges are 850 an hour for your time?

14       A.   Correct.

15       Q.   How many hours have you personally spent

16    working on this case to this point?

17       A.   I don't know as I sit here today.

18       Q.   Can you estimate for me?

19       A.   I cannot.

20       Q.   Do you know how much you have billed in this

21    case so far?

22       A.   I do not.

23       Q.   You're responsible for sending out the bills?

24       A.   I am.

25       Q.   All right.



1          A.   Well, my accounting department does.  I have --

2          Q.   And you've been reviewing the bills?

3          A.   I have.

4          Q.   Well, can you give me an estimate how much it

5     is?

6          A.   No.

7

8

9

10

11

12

13          Q.   Okay.  I think you said earlier that you were

14     retained in 2022; is that correct?

15          A.   To the best of my recollection, I would call it

16     being around the time of the change of the year.  So

17     whether it was late in 2021 or early in 2022, I don't

18     remember exactly.  It was during that time frame, to the

19     best of my recollection, as I sit here today.

20          Q.   Now if you look towards the back of your --

21     your report, there's an Exhibit 2 --

22          A.   (Witness complying.)

23          Q.   -- right immediately following your CV.  Do you

24     have that in front of you?

25          A.   Yes.

1      Q.  And so this says materials relied upon by

2  Christine S. Myer, PhD.  So I just want to understand

3  the materials that you list here.  These are things that

4  you're relying on in your opinions.

5              Did you have access -- what other materials

6  did you have access to in this case?

7      A.  My team had access to a database of materials

8  that I understand -- a database of materials produced in

9  this case.

10     Q.  And your understanding is it was all the

11  materials that were produced in this case?

12     A.  That's my understanding.

13     Q.  How many people were on your team working on

14  this case at NERA?

15     A.  The primary team, in addition to myself, was

16  four individuals.  There may have been other individuals

17  that worked on -- there were other individuals who

18  worked on some footnotes or smaller parts of the case,

19  but the core team was four individuals.

20     Q.  And who were those individuals?

21     A.  Those were Dr. Scalf, Dr. Lantukh, Dr. Camonie

22  and Ms. Wonvel.

23     Q.  I'm sorry who was the first, Dr. --

24     A.  Scalf.

25     Q.  S-C-A-L-F?



1        A.   Yes.

2        Q.   And what was Dr. Scalf's role on the team?

3        A.   Dr. Scalf's role was to assist me on primarily

4   -- with the writing of the report, and -- yes, to assist

5   me into formulating the arguments and writing the report

6   itself.

7        Q.   And the other two you mentioned, what were

8   their roles?

9        A.   I believe I had mentioned three others.

10       Q.   Okay.   Three others?

11       A.   Mr. Lantukh discovery was primarily responsible

12   for the interface with counsel in terms of documents and

13   setting up various -- with setting up, for example, the

14   interview that we will talk about or any other

15   communications with counsel.   He was primarily

16   responsible for overseeing the work of the researchers

17   of the other two individuals that I was talking about,

18   and also assisted me with the writing of the report.

19             The other two individuals, I would call

20   reservers, as narrative.   They were responsible for

21   actually going through, for example, the first sweep of

22   documents that we received, bringing those to my

23   attention, to Dr. O'Cotection, to Dr. Scalf's attention.

24   They were responsible for actually writing the footnotes

25   in the report and checking the report, putting it



1    together, for example, Exhibit 2 that we mentioned, and

2    things of that nature.

3         Q.  To your knowledge, did you -- did your team

4    have access to any Lucasys documents that were not

5    produced in this case?

6         A.  Not to the best of my knowledge.  No.

7         Q.  Have you reviewed any additional documents

8    since issuing your report in this case?

9         A.  Yes.

10        Q.  What documents have you reviewed?

11        A.  I've reviewed the expert report of Mr. Tyler.

12   That's what comes to mind as I sit here today.

13        Q.  What did you do to prepare for today's

14   deposition?

15        A.  I met with counsel.  I reviewed my report and

16   that of Mr. Tyler.  I reviewed -- well, I should say I

17   spoke with members of my team.  That's what comes to

18   mind as I sit here today.

19        Q.  How -- when did you meet with counsel?

20        A.  I met with counsel yesterday and a few -- maybe

21   about two weeks ago.  I don't remember the exact date.

22        Q.  And when you met two weeks ago, about how long

23   did you spend preparing for your depo?

24        A.  My recollection is I spent a better part of

25   that day preparing for my deposition, reviewing



1  materials.  I don't recall exactly how long I was with

2  counsel and how much was on my own.

3       Q.  And yesterday, how long did you meet?

4       A.  For approximately an hour, an hour and a half.

5       Q.  And your meeting yesterday, did you look at any

6  documents?

7       A.  Not -- I believe I had looked at my report, but

8  other than that, not that I can recall.

9       Q.  Dr. Meyer, you, in your report, define two

10 separate markets in this case, true?

11      A.  Correct.

12      Q.  Okay.  And you define a tax depreciation and

13 deferred tax software market?

14      A.  Correct.

15      Q.  And a tax depreciation and deferred tax

16 services market, correct?

17      A.  Correct.

18      Q.  Just to be consistent with your reporting,

19 we'll refer to those today, in shorthand, as the tax

20 market and the tax services market, do you understand?

21      A.  Yes.

22      Q.  And you identified PowerTax as a software; is

23 that true?

24      A.  Correct.

25      Q.  When you say "PowerTax," what specifically are

1   you referring to?

2       A.  As I mentioned in my report, I'm specifically

3   referring to the tax depreciation knowledge and the

4   deferred tax module tax.

5       Q.  You understand that PowerPlan sold many, many

6   different software modules, correct?

7       A.  Yes.

8       Q.  Did you do anything to analyze that as part of

9   your work in this case?

10              MR. CIESLAK:  Objection.  Vague.

11              THE WITNESS:  I'm not sure what you mean by

12  analyze.  I certainly was aware of them.  But in terms

13  of the specific relevant tax market that I have

14  determined, they were not part of that particular

15  relevant interest market.

16      Q.  (By Mr. Fazio)  Okay.  But explain to me, then,

17  how -- when you were determining -- well, actually,

18  strike that.  We'll come back to it.

19              So other than PowerPlan/PowerTax deferred

20  accounting and PowerTax U.S. tax depreciation, those are

21  the only tax software markets, correct?

22      A.  Insofar as products sold by PowerPlan, those

23  are the -- those are the modules that provides

24  functionality.  Yes.  That's all within my interest

25  market.



1       Q.  Okay.  And have you -- and are you aware of

2   PowerPlan tax asset products?

3       A.  I can't recall that particular name, but I

4   understand that the depreciation at issue is

5   depreciation of fixed assets.

6       Q.  So in your work in this case, you didn't

7   consider whether PowerPlan's tax asset products should

8   also be in your tax software market?

9       A.  I certainly considered which products were

10  necessary for the functionality that allows a company to

11  -- to -- an IOU in particular, investor-owned utility,

12  to be able to do the tax -- to be able to get the tax

13  deferred, functionally that it requires, and my

14  understanding is that it's the two modules that I refer

15  to.

16      Q.  Okay.  Do you know what tax PowerPlan's

17  tax-fixed -- sorry.  Strike that.

18              Do you know what functionality PowerPlan's

19  tax-fixed assets modules provides?

20      A.  I don't have a specific understanding of that,

21  no.

22      Q.  So sitting here today, you don't know if it

23  would be in your tax software market or out of your tax

24  software?

25              MR. CIESLAK:  Objection.  Misstates

1    testimony.

2              THE WITNESS:  As I said in an answer to one

3    of your previous questions, my understanding is that the

4    functionality required by investor-owned utilities for

5    the deferred tax requirements, that that functionality

6    resides within PowerPlan's products in the two modules

7    that I'd mentioned.

8        Q.  (By Mr. Fazio)  Is any Lucasys software product

9    included in your proposed tax software market?

10       A.  My understanding is that Lucasys was attempting

11   to develop and was developing products in that -- in

12   that space, but has was been reported by PowerPlan.  I

13   don't have a particular specific product offering that's

14   in that space.

15       Q.  Do you know if today, as we sit here today,

16   Lucasys has a product that would be capable of replacing

17   PowerTax at an industrial-owned utility?

18       A.  When you say, "replacing PowerTax," my

19   understanding that Lucasys was looking first to enter

20   the space of the deferred tax functionality.  I'm not

21   aware that they have -- that Lucasys has a products

22   that's currently on the market to replace all of

23   PowerTax.

24       Q.  And again , just so we're clear, when you're

25   talking about PowerTax, you're talking about the U.S.



1  tax depreciation module and the deferred accounting

2  module?  That's specifically what you're talking about?

3      A.  In my answer to your last question, I was --

4  you had used to term PowerTax generally.

5      Q.  Okay.

6      A.  So I was using the term "PowerTax" in a general

7  sense in my answer to your previous question.

8      Q.  I guess my question to you is:  When I use that

9  term, what does that term mean to you?

10      A.  I think it depends on exactly what the context

11  is that you use that term.  If you'd like me to use it

12  to refer to the tax depreciation and tax deferred

13  software, I certainly can do that.

14      Q.  Let please assume for the purposes of our

15  deposition today that if I use the term "PowerTax," I'm

16  preferring to those two specific modules; is that fair?

17      A.  Yes.

18      Q.  So going back to the question about Lucasys.

19  So there is -- as you sit here today, you don't know --

20  well, strike that.

21          As you sit here today, does Lucasys have a

22  product that's capable of replacing PowerTax in

23  investor-owned utility?

24      A.  And again , my understanding is that Lucasys is

25  -- that that's a -- first of all, an area that Lucasys



1    is looking to get into.  It's -- it has offerings that

2    are -- can address some of that functionality.  Whether

3    or not that that rises to the level of having a product

4    available, I don't have an understanding, as I sit here

5    today, but my understanding is that that's the

6    development that they're looking to and have been

7    looking to undertake.

8         Q.  So in your analysis of the market, you did not

9    consider any Lucasys products to be a close substitute

10   for PowerTax; is that fair?

11        A.  My understanding is that the development

12   process in this space is one of -- and then I mentioned

13   this in any report -- of development with a customer,

14   and so that is a space that Lucasys has been looking to

15   get into, has begun to develop into, but was thwarted

16   from being able to fully enter that market, you know, in

17   such a way that I would characterize them as having a

18   product in that market.

19        Q.  So my question to you was whether you

20   considered any Lucasys software product a close

21   substitute for the purposes of your market analysis.  So

22   can you answer that question for me?

23        A.  And I think I have answered that question.  My

24   understanding is that there -- that Lucasys has been

25   developing products in that space and that the



1   development process is an ongoing process and is a

2   process that, as I said, they've been thwarted.  I don't

3   have a specific understanding of -- a marketed product

4   in the same way that a PowerTax product is marketed, but

5   rather that it's an ongoing development.

6       Q.  So -- we'll come back to this.  So in your

7   analysis in this case, do you consider the tax software

8   market to currently be a one-product market?

9       A.  My understanding is that PowerTax has, as I had

10  mentioned in my report, somewhere between 85 percent or

11  higher market share in that market indicating other

12  products as well.

13      Q.  And what are those other products?

14      A.  As I have indicated in my report, they're -- my

15  understanding is that there are investor-owned utilities

16  that can use other software products, whether those be

17  homegrown products or whether those be products from,

18  for example, an SAP to provide some of that

19  functionality, but that for most of the -- the IOUs,

20  PowerTax is the preferred option for them.

21      Q.  Setting aside whether there is a preference for

22  PowerTax for not, are there this software products --

23  and it's your opinion that -- do you have an opinion as

24  to whether or not there are any other software products

25  that are close substitutes to PowerTax that are



1    available on the market today?

2               MR. CIESLAK:  Objection.  Vague.

3               THE WITNESS:  In terms of -- in terms of

4    providing the functionality that most investor-owned

5    utilities require, my understanding is that there are

6    not other close substitutes to PowerTax.

7        Q.  (By Mr. Fazio)  And so this 15 percent of the

8    market that isn't serviced by PowerPlan -- well, strike

9    that.

10              Dr. Meyer, do you agree that PowerPlan's

11   tax depreciation and deferred tax modules perform

12   different functions?

13       A.  My understanding is that that's correct.

14       Q.  And can we agree that the deferred tax module

15   and the tax depreciation module, PowerPlan's, are not

16   substitutes for one another, true?

17       A.  I don't understand -- I understand them not to

18   be substitute, rather to be working in compliment for

19   these functionalities.

20       Q.  And the two modules we're talking about, you

21   understand that they can be separately licensed?

22       A.  That's my understanding, yes.

23       Q.  Did you investigate any of the differences in

24   pricing between the modules?

25       A.  Not that I can recall, no.



1     Q.   Did you investigate if there were any

2   differences in the customer base for these modules?

3     A.   Yes.

4     Q.   And what did you do to investigate them?

5     A.   I understand that there are customers who only

6   need the tax depreciation functionality and not the

7   deferred tax functionality.

8     Q.   And who are those -- what type of customer

9   would that be?

10     A.   I -- sitting here today, I can't recall

11   specifically what type of customer that would be, but I

12   recall that being an attribute of those particular

13   products.

14     Q.   And why -- why was it that you thought it was

15   worthy of investigating whether there were differences

16   in the customer basis between the two modules?

17     A.   My focus was on starting from the deferred tax

18   software module, and my understanding was -- that I

19   developed was that the full functionality, in order to

20   be able to provide the deferred tax calculations, that

21   it was also necessary to -- to have the depreciation

22   module, that -- that there was an interconnectedness

23   between those two modules for IOUs that required the

24   deferred tax functionality, and so I wanted to

25   understand generally about those two modules.



1        Q.   And we touched on this earlier, but I wanted to

2    see if we can clear it up.   When you were investigating

3    the interdependencies between those modules, did you

4    look at any other PowerPlan modules to see if they were

5    also necessary in your performance of the tax

6    depreciation and deferred tax functionality?

7        A.   Not to the best of my recollection, no.

8        Q.   In your work in this case, did you consider any

9    other potential software market definitions than the one

10   you landed on?

11       A.   I recall -- not that I can recall, no.

12       Q.   You've read the complaint in this case?

13       A.   Yes.

14       Q.   And you've seen the first amended complaint in

15   the case?

16       A.   Yes.

17       Q.   Okay.   And do you have an understanding as to

18   whether there are market definitions included in the

19   complaint itself?

20       A.   To the best of my recollection, there were,

21   yes.

22       Q.   Okay.   And do you have an understanding as to

23   how those definitions and the definitions you use in

24   your report are different?

25       A.   I don't recall that language with enough



1   specificity to be able to answer that.

2       Q.  Did you -- do you recall rejecting the

3   definitions that were used in the complaint, in the

4   first amended complaint, in your work?

5              MR. CIESLAK:  Objection.  Lacks foundation.

6              THE WITNESS:  Again, I've done my own

7   analysis of the relevant markets.  I just don't have

8   enough recollection of the specificity of what was

9   mentioned in the complaint.  As I sit here today, I

10  certainly reviewed it.  I don't have that at my

11  fingertips to be able to answer.

12      Q.  (By Mr. Fazio)  Dr. Meyer, in your tax software

13  market definition, is it limited to investor-owned

14  utilities?

15      A.  My understanding is that the deferred tax

16  functionality is specific to investor-owned utilities,

17  yes.

18      Q.  So your market definition is limited to

19  investor-owned utilities?

20      A.  (Witness examining document.)

21      Q.  Feel free to look at your --

22      A.  Yes.

23      Q.  And do you include all types of investor-owned

24  utilities in your market definition, including -- so

25  electric, water, gas?



1          A.   In terms of types of investor-owned utilities,

2    yes, it includes, as you said, water, electric, gas,

3    yes.

4          Q.   So if we have a non-investor-owned utility that

5    is a PowerTax customer, are they in your market or out

6    of your market?

7          A.   The product market definition refers to the

8    specific product.  My understanding is -- and as I said,

9    specifically that deferred tax functionality.  To the

10   extent that there might be a customer that falls outside

11   of the space of investor-owned utilities, that's not the

12   -- the space that I'm looking at from -- for purposes of

13   relevant market in this particular matter.

14         Q.   Well, if you have a customer that's purchasing

15   the PowerTax products, I mean both modules, what would

16   -- what's the economic rational for excluding them from

17   your market definition?

18         A.   The relevant market exercise is -- is a demand

19   side exercise specifically for the questions at issues

20   here, and the questions at issue in this case is the

21   exclusion or potential exclusion or thwarting or

22   hindering of the competition, specifically as alleged by

23   Lucasys.  Lucasys was looking to get into the deferred

24   tax base specifically as related to investor-owned

25   utilities.  So that's the -- that's the particular space



1    that's relevant to analysis here.

2        Q.  So in your -- as an economist, you're defining

3    the market based on the allegations in the complaint.

4    Is that's what happening?

5                MR. CIESLAK:  Objection.  Misstates

6    testimony.

7                THE WITNESS:  I wouldn't characterize it in

8    that way.  The relevant market is the one relevant to

9    understanding competition in the market relevant to the

10   analysis.  The relevant analysis here certainly is the

11   allegations in the complaint, but then the question is

12   around that, what are -- from a demand side perspective,

13   what are the relevant customers demanding.

14       Q.  (By Mr. Fazio)  And if a non-IOU was demanding

15   PowerTax, they would be able -- they're a potential

16   customer in that market, true?

17       A.  I agree that they're certainly a potential

18   customer for the tax deferred and tax depreciation

19   software modules.  I understand that to the extent that

20   non-IOU customers purchase those products, that would be

21   a relatively small number of customers.

22       Q.  But in your work in this case, you haven't

23   analyzed that question whether there are the -- the

24   extent to which there are non-IOUs that are either

25   customers or potential customers of PowerTax?



1       A.  That was not my focus in this case.  That was

2   not my focus.

3       Q.  So you didn't do it or you did do it?

4       A.  I generally recall learning that there might

5   public a small number of customers on the deferred tax

6   side that are non-IOUs, but that the -- the majority of

7   the customers both from the standpoint of PowerPlan for

8   those modules and also if Lucasys is looking to get into

9   that is IOUs.

10      Q.  So your work on this case, did you

11  independently evaluate or attempt to quantify

12  PowerPlan's market share in the IOU space for PowerTax?

13      A.  I did not -- I looked at all the information

14  available and numerous characterizations in that market.

15  I did not do a separate assessment of market share,

16  other than those.

17      Q.  Let's turn to paragraph 27 of your -- let me

18  orient you a little bit here.  So this is your -- your

19  discussion -- this is section B of your report, which

20  starts at Page 11, which talks about the product

21  markets, and you have section one here that talks about

22  the tax software market, and then you go through a

23  number of other potential substitutes, and you reach

24  conclusions on them.  Do you see that?  It starts on

25  Page 11 and then goes through Page 20 and the top of 21.



1      A.   Yes.   I see what you're look at.

2      Q.   Okay.   So I just want to orient you to

3   paragraph 27 where you say -- the heading here is

4   "Industry-Agnostic Tax Systems Are Not Close Substitutes

5   to Tax Software."   Do you see that?

6      A.   Yes.

7      Q.   And then you went through and you identified a

8   number of software providers, and you talk about whether

9   they are close substitutes or not, various bullet

10   points.   Do you see that?

11      A.   Yes.

12      Q.   First of all, I wanted to ask you, how did you

13   come up with this list of other potential substitutes

14   for PowerTax software?

15      A.   As I note in footnote 52, I believe it is,

16   these are some potential customers that were mentioned

17   by a consulting company for PowerPlan, and I mention the

18   specific Bates numbers down below.

19      Q.   You're referring to -- footnote -- you said

20   footnote 52?

21      A.   Correct.

22      Q.   Did you do anything to independently determine

23   what software may be a close substitute for PowerTax in

24   your work on this case?

25      A.   I'm not sure by what you mean "independently."

1   Certainly I looked at any potential substitutes that

2   were mentioned by PowerTax.  I discussed how I -- how I

3   do that or how PowerPlan, I should say, including

4   various profiles of companies that were -- were

5   mentioned.  I discuss all of what I did.  Other than

6   what I mention in my report, I don't have anything else,

7   bit did a comprehensive analysis based on all of the

8   potential competitive products that I saw and mentioned

9   in various documents and in various other sources.

10      Q.  I --

11      A.  Including depositions, for example.

12      Q.  Excuse me, I didn't mean to interrupt you.  So

13   these products, as I look at the footnotes, you're

14   referring to a number of profiles that were prepared by

15   a marketing research and consulting group from

16   PowerPlan.  If you look at footnote 53 and 56.  We can

17   go through all of them if you like.  And I note that

18   they're all dated December 2017.  Do you see that?

19      A.  I see a number of dates of December 2017, yes.

20      Q.  Footnote 53, 56, 58, 60, 61, those all refer to

21   the same December 2017 date, right?

22      A.  (Witness examining document.)  Certainly some

23   of them do, yes.  Some of them I don't see a date on.

24      Q.  Okay.

25      A.  Some of them do, yes.



1      Q.  Well, with respect to the ones where you're

2  citing to these competitive profiles that are dated

3  December 2017, do you go and do anything to actually

4  verify whether or not those competitive summaries or

5  competitive profiles were still accurate as of today or

6  as of the time you're doing your report?

7      A.  (Witness examining document.)  As I note, you

8  know, some of the sources have a date of December 2017,

9  but I have additional sources as well.  I'd have to go

10  back, and I don't have all of the dates at my

11  fingertips.

12      Q.  Well, let me make the question a little easier

13  for you.  Did you ever -- with respect to any of the

14  companies that are listed here, did you or anyone on

15  your team ever go back and determine whether or not the

16  descriptions from the materials that you're citing were

17  still accurate as of the time you were preparing your

18  report?

19      A.  I don't recall going back specifically with

20  regards to checking specific language in competitive

21  profiles.  I note, for example, however, that there's

22  other information.  For example, going further in that

23  same section in my report, deposition testimony, for

24  example, by several customers that corroborate the lack

25  of close substitutes.  So if you're asking me



1    specifically did I, you know, check a particular wording

2    in a document, that document speaks for itself, but I

3    did corroborate the overall conclusion with deposition

4    testimony by customers and the other information that's

5    in my report.

6        Q.  So you didn't go out or no one on your team

7    went out and actually looked at these particular

8    software offerings and determined whether they had the

9    features or functions of the PowerTax products as of

10   2022 when you issued your report?

11       A.  Again, if you're asking me, you know, for

12   ticking and time a certain wording in a -- in a

13   document, I took that document on its face for what it

14   was.  However -- and to the extent that it was in 2017,

15   I note that I have other sources that are after that

16   date.  However, several industry participants,

17   particularly customers, were asked at a much later point

18   in time for their assessment of the market and the

19   competitors, and that is consistent with the same basic

20   conclusion of no close substitutes for PowerTax.

21       Q.  Okay.  So the question -- or the answer to the

22   question that I asked you is no, you didn't go out and

23   check to see if any of those pieces of software had the

24   features or functions such that they could be a close

25   substitute for PowerTax; is that accurate?



1        A.   Again, and you're asking me about doing a

2   particular analysis in one way, and I agree that I

3   didn't do a particular piece of analysis in a particular

4   way, but that doesn't mean that the analysis wasn't done

5   in a different way, and that's what I just wanted to

6   clarify.  I -- in looking at what industry different

7   participants are saying at much later points in time,

8   that's a -- a corroboration of the general point of lack

9   of close substitutes.

10       Q.   Switch gears for a minute and talk about your

11  proposed services market.  So just for a second to

12  orient you, your -- this is paragraph 39.  You say that

13  the tax services market includes services designed and

14  used to overcome the limitation of PowerTax.  Do you see

15  that?

16       A.   Yes.

17       Q.   Okay.  And then you go on to identify specific

18  limitations in paragraphs 40 and 41?

19       A.   (Witness examining document.)  That's correct.

20       Q.   Is it fair to say that these are the alleged

21  limitations that define the scope of your services

22  market?

23              MR. CIESLAK:  Objection.  Vague.

24              THE WITNESS:  I would not characterize

25  these as limitations of my tax services market.  I would

1   -- I would view these as examples of the types of

2   limitations that the tax services providers provide to

3   customers.

4        Q.   (By Mr. Fazio)   Okay.   Doctor, so help me you

5   were circumstantial then.   In your own words, tell me

6   what is the -- what is the tax services market.   How do

7   I -- how do I define the tax services market?

8        A.   So as I stated in my report, my understanding

9   is that PowerTax has some limitations.   Some of them are

10  enumerated here, but they could -- my understanding is

11  that they could also be specific for a particular

12  customer, that each customer may need a custom set of

13  services in order to overcome the limitations that they,

14  you know, require assistance with, and that's one of the

15  things that Lucasys and some of the other providers

16  provide.   These are -- these are examples that I

17  mentioned in this section.

18       Q.   Well, give me some more examples.   Help me

19  understand what the limitations are of PowerTax are that

20  you're referring to here.

21       A.   Again, I've laid out some limitations as I

22  understand stand them.   For example, the TCJA.   The way

23  that PowerTax was not able to account for those

24  particular limitations, and the others that I -- I don't

25  have anything to add besides what I have written in this



1    section.

2        Q.   Okay.   You mentioned that a particular customer

3    may need some custom development.   Did you say that a

4    minute ago?

5        A.   While I don't disagree that that may be the

6    case, my statement a minute ago was about the

7    limitations and the limitations that are important to

8    particular customers may also be specific to that

9    customer.

10        Q.   And when you -- you keep using the term

11    "limitation."   I think that's where I'm struggling.   I'm

12    trying to understand how I know whether something is a

13    limit -- how would a court or the factfinder know that

14    something is a limitation of software versus some other

15    thing that requires outside services that implicated

16    PowerTax?

17        A.   I'm not sure I understand your question.

18        Q.   So if I -- if a -- for example, if Lucasys is

19    hired to do an upgrade of PowerTax module, is that a

20    limitation of the PowerTax module or is that something

21    different, in your view?

22        A.   If there is a -- improvements needed to the

23    PowerTax module to -- in order to fulfill the

24    requirements of the customer with regard to its deferred

25    tax and requirements, then at least as I sit here today,

1    I'd have to think about that question some more and then

2    have a particular example in mind to think about, but I

3    believe that would fall within the category of the tax

4    services, as health as I'm sitting here today, but that

5    would be something I would want to think some more about

6    in exactly the way you described it.

7         Q.  Well, let goes back to back paragraphs 40 and

8    41 for a second.  Have you done anything to

9    independently confirm whether the alleged limitations

10   that you list here actually exist in the PowerTax

11   software?

12        A.  I'm not sure what you mean by independent

13   verification.  I don't, myself -- I'm not an

14   investor-owned utility, so I don't use the PowerTax

15   software myself as an investor-owned utility.  So I have

16   relied here on industry participants to -- to describe

17   what the limitations of the software -- what some of the

18   limitations of the software are.

19        Q.  Well, you're talking in paragraph 40 about --

20   you cite to three things:  an IRS private letter ruling,

21   and then you cite to two Lucasys documents and your

22   interview with Mr. Lantukh.  So it's fair to say that at

23   least with respect to the two sentences in paragraph 40,

24   you were taking -- you were relying on Lucasys for that

25   information?



1      A.  I agree that I was relying on Lucasys document

2  in the interview for these particular sentences, yes.

3      Q.  And you haven't done anything aside from that

4  to determine whether those statements are factually

5  accurate?

6      A.  With regards to those two particular sentences,

7  I relied on what I relied on.  I agree.

8      Q.  And that was Lucasys, correct?

9      A.  Again, I'd have to go back and look at the

10  document that was cited in 89 -- sorry, footnotes 89 and

11  90 that certainly comes from Lucasys file.  I don't have

12  a photographic memory of what those are.

13      Q.  And let's talk about the issues in

14  paragraph 41.  I mean, the same issue there, right?  If

15  you look at the footnotes, for each of those footnotes,

16  for three of the four -- four of the four of them, you

17  refer to a Lucasys document, the same document.  In one

18  of them, you also cite to Lucasys's website.  Do you

19  know that?

20      A.  (Witness examining document.)  I'm sorry, which

21  footnotes are you referring to again?

22      Q.  The -- each of the footnotes that relate to

23  paragraph 41, so it's footnote 91 through 94 on Page 22,

24  Exhibit 1.

25      A.  Again, I don't have a photographic memory of



1    that document.  I would have to go back and look at what

2    document that is.  It certainly comes from Lucasys's

3    files.  I agree with that.

4         Q.  And aside from the this document that you got

5    from Lucasys's files, neither you or anyone on here

6    actually confirmed that any of the items that are listed

7    in bullet point form in paragraph 44 are actual

8    limitations of the software?

9         A.  Again, as I said before, I'm not an

10    investor-owned utility.  I rely, as I usually do, on

11    participants in that market.

12        Q.  Okay.  And so if it turns out that the document

13    that's cited there is actually just a Lucasys marketing

14    document, is it going to change your opinion about

15    whether any of these things are actual limitations or

16    not with the PowerTax software?

17                  MR. CIESLAK:  Objection.  Incomplete

18    hypothetical.

19                  THE WITNESS:  I don't understand.  I'm

20    sorry.  Can you repeat your question?  Maybe I didn't

21    hear.

22        Q.  (By Mr. Fazio)  Assume for a second that the

23    document that's being cited, so footnotes 91 through 94

24    where each one of them refers to Lucasys RPD

25    O1177753-755.  Do you see that?



1      A.   Yes.

2      Q.   Okay.  If that turns out to be an internal

3   marketing document or an internal document that's

4   authored by Lucasys, would that change your opinion as

5   to whether any of the items you've identified in

6   paragraph 41 are actually limitations of the PowerTax

7   software?

8                MR. CIESLAK:  Same objection.

9                THE WITNESS:  I don't see how that would

10   change my -- my understanding that according to market

11   participants, including Lucasys, that is -- that is

12   retained -- that is hired by firms to -- to actually

13   provide these services, they would be there the position

14   to know what adjustments customers are asking them to

15   perform with regards to services to -- to address

16   limitations of the PowerTax product.

17      Q.   (By Mr. Fazio)  Well, Dr. Meyer, I'm trying to

18   understand.  You keep saying it's a limitation.  I'm

19   asking you to tell me whether your opinion would change

20   as to whether these are actual limitations if the only

21   source for this information was Lucasys?

22                MR. CIESLAK:  Same objection.

23                THE WITNESS:  And again, my answer is no

24   for the reason that I stated before.

25      Q.   (By Mr. Fazio)  When you were forming your

1  opinions in this case, did you do -- when you were

2  getting information from Lucasys, did you do anything to

3  additionally verify that information?

4      A.  I looked at, as is indicated by the footnotes

5  to my report and Exhibit 2, a great deal of other work

6  and analysis, other than what I -- any information that

7  I received, for example, from an interview from a

8  Lucasys individual.

9      Q.  And with respect to criticisms of PowerPlan,

10 could we agree that Lucasys as a competitor or potential

11 competitor to PowerPlan as an incentive to suggest

12 infirmities in the PowerTax products?

13     A.  I don't have a particular opinion on that one

14 way or the other.

15     Q.  In -- when you were considering this additional

16 market definition of tax services, have you considered

17 how the PowerTax software has changed over time?

18     A.  I'm certainly aware, in general, of -- of dates

19 to the PowerTax product, yes.

20     Q.  Can you tell me about what some of them have

21 been?

22     A.  I don't have a specific listing of those in my

23 mind, as I sit here today.

24     Q.  You understand that different customers use

25 different versions of PowerTax, correct?



1       A.  I don't understand what you mean by "versions."

2   If you're talking about sort of upgrades over time, by

3   versions, I understand that to be the case, yes.

4       Q.  Do you have any idea of how many different

5   versions of the PowerTax software are in use at a

6   customer today?

7       A.  Not off the top of my head, no.

8       Q.  Is that something that you looked at when you

9   were forming your opinions in this case?

10      A.  It certainly may have been in some of the

11  documents that I've reviewed, but nothing comes to mind,

12  as I sit here today.

13      Q.  So is the scope of the tax services market

14  different for different customers?

15      A.  I don't understand what you mean by that

16  question.

17      Q.  So for example, if a customer -- if you have

18  customers with older versions of the software and some

19  customers with the newest version of the software, where

20  their need for services be different?

21      A.  As I stated in an answer to your earlier

22  question, my understanding is that the particular

23  services required by a particular customers would be

24  specific to that customer, which could include the

25  version of the software, but also the particular needs



1   of that customer.

2       Q.  So if there was an upgraded -- an upgrade to

3   the software that was available that addressed the

4   concern or the need that the customer -- the customer

5   had, the customer could choose to either deploy services

6   or implement an upgrade; is that true?

7       A.  I don't know the answer to that question for

8   any -- for any particular possible limitations and/or

9   upgrade.

10      Q.  Okay.  Well, let's please assume for a second

11  that the specific problem for the specific issue that

12  the customer wants address is if they upgrade to the

13  newer version of the software, it would take care of

14  that issue for them.  Are you with me?

15      A.  Yes.

16      Q.  And so in that scenario, the customer could

17  choose either to deploy resources to the services or

18  they could deploy resources to an upgrade, true?

19              MR. CIESLAK:  Objection.  Incomplete

20  hypothetical.

21              THE WITNESS:  Again, you seem to be asking

22  me sort of a totality, if that upgrade completely

23  fulfills the customer's wishes at a -- and of course,

24  pricing and other things are also important and, you

25  know, taking into account all the other capabilities of



1  the customer, including hardware that they have and et

2  cetera.  If, in fact, that's possible, then, you know, I

3  don't have a technical reason, as I sit here today, to

4  know one way or the other whether that would be possible

5  for a particular customer or not.

6      Q.  (By Mr. Fazio)  Well, from an economic

7  perspective, in that scenario, a software upgrade would

8  be a substitute for services in the services market,

9  wouldn't it?

10          MR. CIESLAK:  Objection.  Incomplete

11  hypothetical.

12          THE WITNESS:  Again, as I just stated, my

13  understanding is that there would be a lot that you

14  would have to know about the customer, the customer's

15  needs, the -- the hardware and other software that the

16  customer might have, the pricing of the services versus

17  an upgrade, what else that upgrade might imply.  I can't

18  say one way or the other, as I sit here today, without

19  having a specific scenario in front of me.

20      Q.  So all the things, the factors that you just

21  mentioned, those are all things that you think bear on

22  the decision as to whether someone would -- a particular

23  customer might upgrade for your software?

24      A.  Certainly those could be some of the

25  considerations, yes.



1        Q.  We've been going for about an hour.  Why don't

2   we take a ten-minute break.

3        A.  Sure.

4             MR. CIESLAK:  Okay.

5             THE VIDEOGRAPHER:  Off the record at

6   10:12 a.m.

7             (Off the record.)

8             THE VIDEOGRAPHER:  Back on the record at

9   10:27 a.m.

10       Q.  (By Mr. Fazio)  Dr. Meyer, I want to take you

11  back to paragraph 9 of your report.  I want to make sure

12  I have a clear understanding here.  So you'll see that

13  the second sentence of paragraph 39 says, "This market,

14  the tax depreciation and deferred tax services market,

15  is defined in reference to limitations of PowerTax,

16  which is the dominant tax offer in the IOU space."  Do

17  you see that?

18       A.  I do.

19       Q.  I'm trying to understand the definition of your

20  market.  So we talked about these limitations that were

21  -- or alleged limitations in paragraphs 40 and 41.  Can

22  you help me -- can you define for me, when you are

23  talking about this market, what is included in the

24  market?

25       A.  As I stated here in exactly in that sentence

 1   that you're reading, what's included is our services --

 2   well, the last sentence, actually, I think it sort of

 3   says it most specifically to the question that you

 4   asked.  It includes services design and used to overcome

 5   the limitations of PowerTax.

 6        Q.  Okay.

 7        A.  So it's the services, as it's stated there.

 8        Q.  So -- and can you help me understand what those

 9   services consist of?

10        A.  My understanding is that those services consist

11   of consulting services, writing code, you know,

12   sometimes called solutions, if you will, for overcoming

13   those limitations.

14        Q.  And so is there any service that can be

15   provided by a consultant that implicates use of PowerTax

16   that is excluded from your definition of the tax

17   services market?

18        A.  Again, I don't understand -- I think this is

19   similar to a question that you asked before, and I don't

20   understand the distinction that you seem to be trying to

21   make.

22        Q.  Well, what I'm trying to understand is what is

23   the outer boundary of your market definition?  You

24   listed off some -- in 40 and 41, you talked about some

25   alleged limitations.  You told us about some tasks.

1   What I'm trying to understand is, is there any service

2   that can be provided that implicates PowerTax that would

3   not fall within your tax services market, your proposed

4   tax services market?

5        A.   There may or may not be.  I'd have to think

6   more about that specific question.  I don't have an

7   answer, as I sit here today.

8        Q.   Okay.  So if the judge or a factfinder in this

9   case is trying to understand whether a particular

10  service falls inside the tax services market or outside

11  the tax services market, is there a test that they can

12  apply?

13       A.   I'm not sure what you mean by a test in that

14  circumstance.  As I said before, the -- a relevant

15  market definition exercise is by its very nature demand

16  side exercise.  So it's a question of whether the

17  customer is demanding a particular service and whether

18  or not it falls into this category.

19       Q.   Right.  And with what I'm trying to understand

20  from you, Dr. Meyer, is what is this category?  You said

21  this category.  What is this category?

22       A.   And as I stated here in any report, the

23  category is services designed and used to overcome the

24  limitations of PowerTax.

25       Q.   And how do we determine if something is or is

1    not a limitation of PowerTax?

2        A.   Again, the -- the relevant market is a demand

3    side exercise.   So it's a question of whether or not

4    customers view something to be a limitation of PowerTax.

5        Q.   Okay.   And what did you do to define or to

6    ascertain what customers perceive as a limitation of

7    PowerTax such that we can define this market?

8        A.   So as I stated in this particular section,

9    there are some specific limitations that Lucasys has

10   described in a number of different locations regarding

11   specific limitations.   I note as well that there are

12   other sections of the report in which I discuss issues

13   that customers have with PowerTax.   So the totality of

14   the report speaks to various types of limitations that

15   both Lucasys sees as a provider of such services and

16   that customers have described.

17       Q.   And so it's any -- is it anything that a

18   customer says it is?   Is that -- does that summarize

19   your view?

20       A.   From the standpoint of a limitation of the

21   software, my understanding that is -- it's a limitation

22   -- it's a functionality that the customer demands that

23   PowerTax does not have.   So by -- by it's sort of very

24   essence, it is -- comes from needs and demands that the

25   customer has.



1     Q.  And so is it your view that any time a customer

2  expects more out of a piece of software than it is then

3  capable of providing, that the software is deficient in

4  some way?

5            MR. CIESLAK:  Objection.  Incomplete

6  hypothetical.

7            THE WITNESS:  I don't have an opinion as to

8  that general question.

9     Q.  (By Mr. Fazio)  Okay.  Well, in this particular

10  case -- let's go down to paragraph 42 and talk a little

11  bit more about this.  Now, we can agree that there are a

12  number of service providers that would fall into your

13  proposed deferred tax services market, true?

14     A.  Yes.

15     Q.  And you lists -- you list here RCC, Regulated

16  Capital Consultants, true?

17     A.  Correct.

18     Q.  And just run -- I'm going to run through a list

19  of them, and if I -- if I hit one that you don't think

20  should be included, stop me and we'll talk about it.  So

21  Deloitte, Price Waterhouse Coopers, KPMG, Ernst & Young,

22  R2 Consulting, and PowerPlan are all service providers

23  in your proposed deferred tax services market, true?

24     A.  I certainly mention some of those.  The two

25  that I don't mention, I would have to just go back.

1    Those names are familiar to me, but as I'm looking

2    specifically at -- at one particular paragraph, to be

3    able to answer that question, I would have to go back to

4    my report.

5         Q.  And which are the ones that you're concerned

6    about?

7         A.  I believe there were two that were not on the

8    list that I included in paragraph 42, but I note that my

9    list says including.

10        Q.  Yes.

11        A.  So I certainly can't rule those out, as I sit

12   here today, but again, I haven't committed either all of

13   the documents that I reviewed in reliance for my

14   opinions or on my entire report to memory.

15        Q.  So, Dr. Meyer, can we agree that there are also

16   customers that have internal resources that can provide

17   the services that would otherwise be provided in this

18   deferred tax services market?

19        A.  For some customers, that may be the case.

20        Q.  Okay.  When you're analyzing the deferred tax

21   services market, did you take that into consideration?

22        A.  As a general matter, I -- I've spoken about

23   customers providing functionality on their own.  Here in

24   this particular paragraph, I'm specifically talking

25   about other firms competing.



1       Q.   Yes.  But you agree that there are situations

2   in which customers can provide those services

3   themselves?

4       A.   Again, I can't rule that out, as I sit here

5   today, but my understanding is that particular -- that

6   there are a number of situations in which customers have

7   choose to engage outside firms, including Lucasys,

8   including RCC, for example, and therefore, at the prices

9   and for the services provided, they have determined that

10  that is their best option.

11      Q.   Dr. Meyer, is it fair to say that you've not

12  analyzed the relative market shares of any of the

13  participants in the tax services market?

14      A.   I agree.

15      Q.   And it's -- is it fair to say that you've not

16  analyzed any of the prices that are charged within this

17  alleged tax services market?

18      A.   I would agree as to the use of the term

19  "analyzed," yes.

20      Q.   Okay.

21      A.   I certainly have seen information from Lucasys,

22  generally, about -- about its -- its supply of services

23  to this market.

24      Q.   Okay.  Aside from the information that you --

25  you've seen from Lucasys though, you've not looked at



1    what other consulting firms charge for these services?

2         A.   Specifically on pricing from other consulting

3    firms, no.

4         Q.   And you've not done any kind of empirical

5    analysis of pricing, is that fair, in the tax services

6    market?

7         A.   I'm not sure what you mean by "empirical

8    analysis."  As I said, I've certainly seen financial

9    documents from Lucasys, but in terms of other consulting

10   firms, I agree, I haven't done an empirical analysis.

11        Q.   Have you done an empirical analysis of Lucasys'

12   prices in the tax services market?

13        A.   I wasn't characterize what I have done as an

14   empirical analysis in the tax services market.

15        Q.   What did you do in your analysis or your review

16   of Lucasys' pricing in tax services market?

17             MR. CIESLAK:  Objection.  Vague.

18             THE WITNESS:  My recollection is that there

19   was discussion about the provision of services for

20   various customers of Lucasys.  As I sit here today, I

21   can't specifically parse out the degree to which that

22   separately enumerated pricing or overall cost.  I would

23   have to go back and look at those documents to refresh

24   my recollection.

25        Q.   (By Mr. Fazio)  And as I sit here today, do you

1  have an understanding as to whether or not Lucasys'

2  services pricing is higher or lower than any other

3  market participant?

4      A.  I don't have that particular -- I'm not sure

5  exactly what you -- in what context you're referring to

6  that, but I don't have a specific analysis of that one

7  way or the other.

8      Q.  It's fair to say, isn't it, that you've not

9  analyzed the relative quality service provided in the

10  tax software market by these different providers?

11      A.  I disagree.

12      Q.  Okay.  In what way have you analyzed the

13  quality of the services provided in the tax services

14  market?

15      A.  I believe your previous question talked about

16  the tax software market, and I have analyzed extensively

17  discussions of quality in the tax software market.

18      Q.  I may have misspoken.  I meant to ask you --

19  the question I meant to ask was:  Is it fair to say that

20  you've not analyzed the relative quality of services

21  provided in the tax services market?

22      A.  I certainly have, as I state throughout my

23  report, reviewed information about Lucasys' supply of

24  services into the tax services market, but in terms of a

25  -- a specific a analysis of relative quality, I would



 1    agree.

 2         Q.  And is it fair to say that you're not

 3    formulating an opinion about whether any individual

 4    participant in the tax services market has market power?

 5         A.  I agree.

 6         Q.  And so then it's fair to say that you don't

 7    claim that PowerPlan has market power in tax services

 8    market?

 9         A.  I haven't come to a conclusion one way or

10    another on that.

11         Q.  Can we agree that Lucasys is providing

12    consulting services today that are related to PowerTax?

13         A.  I agree.

14         Q.  And they're currently engaged by AEP to provide

15    PowerTax-related consulting; is that fair?

16         A.  If I can just -- if by today you mean generally

17    speaking today, I don't know about literally today, but

18    if you mean sort of around this time, I agree.

19         Q.  They are -- they are engaged by AEP currently.

20    They're doing work for AEP right now, are they not?  And

21    by "right now" I don't mean right this second.

22         A.  At this very instant, I can't say with

23    certainly, but I do understand that they're, generally

24    speaking, retained by AEP.

25         Q.  And do you have a sense of what other customers

1    Lucasys is providing tax services to?

2       A.   As I sit here today, I cannot recall the names

3    of the other Lucasys customers.  I can -- I can recall

4    seeing information on that.  It's just not coming to

5    mind, as I sit here today.

6       Q.   Okay.  On Page 6, the summary of opinions, last

7    bullet point on Page 6, second sentence, you say, "In

8    the tax services market, consumers have been harmed

9    because they face increase cost in risk of using

10   Lucasys, which for some consumers is a preferred service

11   provider."  Do you see that?

12      A.   Yes.

13      Q.   Can you tell me first for which consumers of

14   Lucasys is a preferred provider?

15      A.   (Witness examining document.)  So my

16   understanding is that, for example, for Liberty, Lucasys

17   was a preferred provider, but that -- that contract was

18   terminated.

19      Q.   So let me ask you about the Liberty situation.

20   Well, first of all, before we do that, tell me what are

21   the other ones that are preferred -- where Lucasys --

22   what are the other customers where Lucasys is a

23   preferred provider of tax services?

24      A.   My recollection was that for NextEra, likewise,

25   Lucasys was a preferred provider, and the project was



1    terminated and not -- and that a -- an ongoing or a

2    continuation project was not -- Lucasys was not engaged

3    in a continuation project.  My understanding was that

4    for Suez as well, there was a -- Suez did -- decided to

5    -- I take that back.  I understand that they're still

6    consulting or they were continuing to consult for Suez.

7    I apologize.

8         Q.  I was asking a broader question.  Who are the

9    -- for which customers is Lucasys a preferred provider,

10   regardless of whether they stopped or continued?  So you

11   mentioned Liberty, NextEra.  You began to mention Suez.

12   With that clarification, I don't know if you want them

13   on the list or not.

14        A.  I do understand that for Suez, Lucasys was a

15   preferred provider for those services, yes.

16        Q.  Okay.  Anyone --

17        A.  And I understand for AEP as well, Lucasys was a

18   preferred provider for certain services.  As I said,

19   again, my recollection is that there were and are other

20   customers as well, and I'm just not bringing them to

21   mind, as I sit here today.

22        Q.  Okay.  So help me understand.  How is it that

23   for customers that we just talked about, for example,

24   they faced -- you say they faced increased cost and

25   risk.  What were the increased costs that those



1    customers faced?

2        A.  So the cost -- so first of all, as a matter of

3    economics, risk is a cost is a way of thinking of --

4    risk is a cost, and as a result of letters that were

5    sent and a lawsuit that was filed, those would represent

6    increased risk, and therefore, cost to -- to the

7    customers.

8        Q.  Using Lucasys?

9        A.  Increased cost of -- yes, of using Lucasys.

10       Q.  Okay.

11       A.  Yes.

12       Q.  And have you done anything to quantify this

13   alleged increase in cost?

14       A.  Not specifically in terms of dollars and cents,

15   no.

16       Q.  Have you done anything to determine whether

17   competition broadly in your deferred or your tax

18   services market was impacted by any of this?

19       A.  Yes.

20       Q.  Okay.  What have you done?

21       A.  As I've laid out in my report, and you

22   mentioned one particular place in my report in the

23   summary of conclusions, but then the remainder of my

24   report, in particular, mention of the instances in

25   which, for example, customers were -- had Lucasys as a



1    -- as a provider of choice and then had to go to a --a

2    second best solution or felt they needed to go to a

3    second best solution as a result of the exclusionary

4    conduct would be one of the ways in which competition

5    was specifically effected.

6         Q.  Well -- so let me ask you, I mean, you're --

7    have you done any analysis of how they impacted the

8    market overall as opposed to just Lucasys?

9         A.  Yes.

10        Q.  Okay.  Well, tell me how have you done it and

11   what --

12        A.  Well, when you say the market overall as

13   opposed to Lucasys, I take the distinction that you're

14   making to be one of effect on customers, not just

15   Lucasys, and so what I described to you earlier was an

16   effect on a particular customer.

17        Q.  Okay.

18        A.  So that to me would be market -- the market

19   overall, not just Lucasys.

20        Q.  So the impact on these customers, I mean, have

21   you done anything to quantity, for example, how it

22   impacted cost in the broad deferred tax services market?

23        A.  I'm not sure what you mean by cost in the broad

24   deferred tax services market.  I looked at specific

25   customers that were effected.



1    Q.   Let me can you about a couple of these.   For

2  one, with respect to Suez, is it your understanding that

3  the work that was being done by Suez falls within your

4  tax services market?

5    A.   That's my understanding, yes.

6    Q.   Okay.   Describe for me what it is you

7  understand that Lucasys was doing at Suez.

8    A.   I can't recall with any specificity the

9  specific nature of the work that it was doing at Suez.

10   Q.   And we -- we can agree that the work continued

11 at Suez, true?

12   A.   I agree, yes.   That's my understanding.

13   Q.   If it turns out that either all or a

14 substantial majority of the services that were being

15 provided to Suez were not PowerTax related, how would

16 that change your opinion in this case?

17            MR. CIESLAK:   Objection.   Incomplete

18 hypothetical.

19            THE WITNESS:   Could you repeat the

20 question?   I just want to make sure I hear it.

21            MR. FAZIO:   Could you read it back?

22            (Whereupon, the question was read back on

23 the record.)

24            THE WITNESS:   I would have to -- I can't

25 fully answer that, as I sit here today.   My



1   understanding was that at least part of that was, in

2   fact, PowerTax related.  So to the extent that that

3   understanding is different, I would have to have a

4   better understanding of the completeness of the

5   hypothetical before I could answer that question.

6       Q.  (By Mr. Fazio)  Well, you've concluded in your

7   report though -- I mean, correct me if I'm wrong, but I

8   understand your prior testimony in your report to be

9   that Suez is amongst this group of people who were

10  harmed because of PowerPlan's alleged exclusionary

11  conduct.  Do I have that right?

12      A.  Certainly from the standpoint of risk, Suez was

13  harmed in terms of the letters that it received.  I

14  agree.

15      Q.  Okay.  And has any of that risk materialized

16  with respect to Suez, as far as you know?

17              MR. CIESLAK:  Objection.  Vague.

18      Q.  (By Mr. Fazio)  Well, actually, strike that.

19  I'll ask a better question then and probably a worse one

20  after that.

21              What was -- what is your understanding of

22  the risk that Suez was facing as a result of the letters

23  that PowerPlan sent?

24      A.  My recollection was that Suez itself was -- had

25  ascertained that it was facing legal risk as a result of



1    engaging with Lucasys.

2        Q.   And what -- what it was, that legal risk?

3        A.   I would have to go back to the documents to get

4    a -- to refresh my recollection completely, but my

5    understanding is that it was concerned with the -- the

6    legal risk of engaging Lucasys that was where PowerPlan

7    had made certain statements with regards to -- to

8    alleged intellectual property.

9        Q.   And you know that Suez elected to continue

10   using Lucasys, true?

11       A.   That's my understanding.   Yes.

12       Q.   And do you know if there's been any of these

13   legal consequences that you've described ever

14   materialized for Suez?

15            MR. CIESLAK:   Objection.   Vague.

16            THE WITNESS:   I'm not sure what you mean by

17   "materialized" in that particular -- the risk -- my

18   understanding is that Suez itself perceived there to be

19   such risk.

20       Q.   (By Mr. Fazio)   And then Suez moved forward

21   with Lucasys, true?

22       A.   My understanding is that Suez moved forward

23   with Lucasys, yes.

24       Q.   And they completed scopes of work that they

25   were hired for, true?



1      A.   In general, I understand that they continued

2  the scope of work.  Whether that's completely finished

3  or not, I just -- I'd have to go back.  I don't have

4  that fully.

5      Q.   And are you aware of any legal action that was

6  taken against Suez by PowerPlan?

7      A.   Not to the best of my knowledge, no.

8      Q.   Do you know of any customers that's been

9  subjected to legal action by PowerPlan relating to

10  Lucasys?

11      A.   I certainly understand that Lucasys itself was

12  subject to I believe it was counterclaims with regards

13  to intellectual property, but in terms of a particular

14  customer -- and which could then obviously have an

15  effect on a customer as well, but I can't recall, as I

16  sit here today, any legal action on a customer, per se.

17      Q.   Do you know for what percentage of the overall

18  market Lucasys is a preferred provider?

19          MR. CIESLAK:   Objection.   Vague.

20      Q.   (By Mr. Fazio)  Let me clarify.  Do you know

21  what percentage of your alleged tax services market

22  Lucasys is a preferred provider?

23      A.   No.

24      Q.   Since this dispute arose between Lucasys and

25  PowerPlan in late 2019 to the current, have you done



1   anything to quantify the change in pricing for tax

2   services to IOUs in the United States?

3        A.  No.

4        Q.  Have you done anything to quantify the risk

5   that you describe for any IOU that consumes tax services

6   as a result of the dispute between PowerPlan and

7   Lucasys?

8        A.  I have certainly seen the effect of such risk

9   on certain customers, yes.

10       Q.  Okay.  Well, let's -- we talked about Suez,

11  okay?

12       A.  (Nodding yes.)

13       Q.  What else are you referring to?

14       A.  So by way of example, Liberty was another

15  customer that I understand was effected by -- by

16  PowerPlan's actions.

17       Q.  And do you know if they were providing services

18  and they were -- strike that.

19            Do you know if they we were going to be

20  consulting in the tax services space or some other space

21  or a combination of the two?

22       A.  My understanding was that would be in the tax

23  services space.

24       Q.  So you told us about Liberty.  You told us

25  about Suez.  Are there this others?



1      A.   As I had mentioned, NextEra was another

2  customer that I understand was effected by PowerPlan's

3  actions.

4      Q.   Okay.  Any others?

5      A.   AEP, as I understand, was also effected by

6  PowerPlan's actions.

7      Q.   Any others?

8      A.   Those are the specific customers that come to

9  mind, as I sit here today, in which Lucasys had a

10  specific ongoing relationship in which that relationship

11  was and/or that customer was effected, but I understand

12  also that PowerPlan sent letters to a large number of

13  customers, and as we stated -- as I stated before, also

14  filed a lawsuit against Lucasys, which could have

15  certainly effected potential dealings with other

16  customers as well.  So it's -- it's not possible to

17  fully ascertain the complete number of potential

18  customers that were effected because some may just not

19  have come to Lucasys at all because of the risk, but

20  there are the particular customers that I can

21  specifically observe.

22      Q.   And so the ones you mentioned are the four

23  specific customers you can identify, correct?

24      A.   Yes.

25      Q.   So let's go back to paragraph 42.  So back on

1    Page 22.

2         A.   (Witness complying.)

3         Q.   You'll see mid-paragraph you say, "Lucasys is

4    differentiated by these other competitors by its

5    division of both services and software so address the

6    limitations of PowerTax."  Do you see that?

7         A.   Yes.

8         Q.   Okay.  What are the software solutions that

9    Lucasys offers in the deferred tax services market?

10        A.   My understanding is that the software involves

11   the writing of code to overcome certain limitations of

12   PowerTax, as discussed before.

13        Q.   Okay.  But what are the specific software

14   solutions?  They have -- can you name any of them?

15        A.   As I think I discussed earlier, my

16   understanding is that the specific software solutions,

17   whether one puts it in the software bucket or services

18   bucket, involved, in part, coding, computer coding, to

19   overcome those limitations, and that is specific to the

20   customers -- each individual customer with regards to

21   the specific needs of that customer.

22        Q.   So you've seen Lucasys' website, haven't you?

23        A.   I have.

24        Q.   And you refer to it where you say, "Solutions

25   consist of a number of software products, including

1   Lucasys' copilot software."  So is copilot, is that a

2   piece of software that relates to provisions of tax

3   services?

4        A.  My understanding is that could be used to -- to

5   address certain limitations as -- in the overall

6   category of tax services, yes.

7        Q.  Limitations and in the overall tax services.

8   Well, tell me how it does that.  Tell me what -- can you

9   tell me what copilot does?

10       A.  (Witness examining document.)  I don't have a

11  detailed understanding of copilot, but my understanding

12  -- my general understanding is that it's software

13  developed by Lucasys to assist companies with certain

14  deferred tax needs.

15       Q.  What sorts of -- what sort of functionality

16  does copilot have?

17       A.  I don't have a detailed understanding of the

18  functionality.

19       Q.  Do you have any understanding of the

20  functionality?

21       A.  I certainly looked at the description of

22  copilot.  I just don't have an understanding, as I sit

23  here now.

24       Q.  Well, you said in your report that Lucasys is

25  differentiated because it provides services in software,



1    and then you say, "The solutions consist of a number of

2    software products, including Lucasys' copilot software."

3    So I'm trying to understand which of the products you,

4    having offered an opinion in this case, believe are part

5    of the tax services market.  So can you tell me what are

6    the other products -- or the other software products

7    that differentiates Lucasys in the tax services market?

8        A.  And as I indicated here and as I -- my previous

9    answer also indicates, my understanding is that the

10   copilot software, for example, is part of what I would

11   call -- the way I that would use it and I understand

12   it's used as a larger solution, which could be used for

13   -- which would be specific to a particular customer.

14       Q.  Okay.  In what type of larger solution would it

15   be used?

16       A.  My understanding is that the larger solution is

17   whatever the customer needed in terms of consulting

18   services to include the overcoming of limitations with

19   regards to the PowerTax product.

20       Q.  Okay.  Do you know if PowerPlan offers a

21   products that is comparable to copilot with respect to

22   PowerTax?

23       A.  I don't have a specific understanding of that.

24       Q.  Okay.  You didn't look into that while you were

25   working on your opinion in this case?



1          A.  I very well may have, but I'm not a computer

2     software technical expert, so I wouldn't be comfortable

3     sort of -- and I can't recall specifically making that

4     one-to-one comparison.

5          Q.  You understand that Lucasys advertises a

6     product that it refers to as deferred tax.  Do you have

7     that understanding?

8          A.  My understanding that generally it -- it

9     advertises a deferred tax, yes.

10         Q.  Okay.  And is the defer tax product something

11    that is used in the tax services market?

12         A.  Again, I would have to go back to -- you're

13    asking me about particular products.  I would have to go

14    back to the -- to the use of that particular term in the

15    way that you're using it to be able to determine whether

16    or not that would be the case.

17         Q.  Okay.  Well, I'm just trying to understand when

18    you said in your report that solutions consist of a

19    number of software products, and you're making that

20    point with respect to services, the services market.

21    I'm trying to understand what those software products

22    are so I can understand what's in the market and what's

23    not in the market.  So we'll just take through the rest,

24    and you can just tell me if you know or don't know.  Is

25    Lucasys' tax depreciation product something that is



1   offered as part of their services in the tax services

2   market?

3        A.   And again, as I stated in an answer in your

4   previous question, in general, the services, including

5   solutions, which can include software, that a address

6   the limitations of PowerTax certainly would be part of

7   that market.  I would have to look at exactly what list

8   you're looking at to determine whether on that

9   particular list -- certainly deferred tax is key to that

10  functionality, and my understanding is that depreciation

11  of the fixed assets is a key input to that calculation

12  as well, but you're asking me about a certain -- it's

13  sounds like you're asking about a certain enumeration or

14  depreciation, and I would just need to look back at that

15  to be able to answer your question --

16       Q.   Okay.

17       A.   -- specifically.

18       Q.   So as we sit here today, you can't tell me when

19  you wrote the sentence, "Solutions consist of a number

20  of software products," you can't tell me what the

21  software products are that you were referring to; is

22  that fair?

23       A.   Again, I would have to go back to the

24  underlying source to be able to give you a complete

25  answer to that.



1          Q.   Okay.  And so let me ask you -- we'll go back

2     to another question.  Let's assume for a second that

3     PowerPlan has a software product that could replicate

4     the functionality of copilot with respect to PowerTax.

5     Accept that as a representation to your -- as a

6     hypothetical.  Let's assume that's hypothetically that's

7     true.  PowerPlan's consulting business would also be

8     differentiated in that it was capable of offering

9     software solutions along with its services or to

10    facilitate its services?

11               MR. CIESLAK:  Objection.  Incomplete

12    hypothetical and vague.

13               THE WITNESS:  As a general matter, I

14    certainly have, as I indicated earlier in that

15    paragraph, understand that PowerPlan participates in the

16    tax services market.  With respect to that particular

17    example, I would have to consider that further before

18    indicating whether that particular example would be the

19    example, but in general, I understand that PowerPlan

20    itself participates in that market as well.

21         Q.   (By Mr. Fazio)  And so did you do anything to

22    determine whether any of the other service providers

23    that we've talked about, RCC and so on, whether any of

24    them also have software offerings that would facilitate

25    their provision of services in your tax services market?



1                     MR. CIESLAK:  Objection.  Vague as to time.

2          Q.  (By Mr. Fazio)  Ever?

3          A.  As I stated earlier, my understanding is that

4    those other products -- sorry, those other firms

5    certainly do compete, as a general matter, with Lucasys

6    and PowerPlan in that tax services market.

7          Q.  Right.  My question to you was:  Have you ever

8    -- did you or anyone on your team ever gone out to

9    determine whether any of these other competitors also

10   have software offerings that facilitate your provision

11   services in the tax services market?

12                    MR. CIESLAK:  Same objection.

13                    THE WITNESS:  And again, there was mention

14   of sort of the time period, but also whether or not that

15   would be characterized as a software product versus

16   simply providing code within a services environment.  I

17   can't recall specifically without looking at that

18   differentiation.

19         Q.  (By Mr. Fazio)  So when you talk about writing

20   code as part of the services that were provided, what

21   kind of code are you talking about?

22         A.  What I'm talking about is -- is implementing

23   solutions, computer solutions, to be able to facilitate

24   and overcome some of the limitations.

25         Q.  Yes.  And so I'm asking you specifically, where

1    is this code deployed?  Is it added to the PowerPlan

2    software or does it exist somewhere else?  What is it

3    that you're -- what are you talking about?

4         A.  I don't have a technical computer understanding

5    of how that would be described from a technical

6    perspective.

7         Q.  And so if the judge or a factfinder wants to

8    understand whether a particular piece of software is

9    something that's used in aid of the tax services market

10   or is actually in the tax software market, how do they

11   differentiate between those two things?

12        A.  Again, the differentiation here that's relevant

13   to the questions at issue in this matter are tax

14   services insofar as they are used to overcome

15   limitations of PowerTax so insofar as a customer has a

16   PowerTax application and is running that PowerTax

17   application or using that PowerTax application and

18   requires additional services to improve the

19   functionality.

20              THE VIDEOGRAPHER:  Do you mind if I change

21   tapes?

22              MR. FAZIO:  Go off the record for a second.

23              THE VIDEOGRAPHER:  Off the record at

24   11:26 a.m.

25              (Off the record.)



1            THE VIDEOGRAPHER:  This begins media unit

2    number two, and we're back on the record at 11:17 a.m.

3        Q.   (By Mr. Fazio)  Dr. Meyer, you say -- let's

4    jump over to paragraph 87 of your report.  You say in

5    paragraph 87 -- it's the middle of the paragraph.  "In

6    particular, I understand from my conversation with Mr.

7    Lantukh that Lucasys sought direct relationships with

8    customers as opportunities to understand their business

9    needs and directly to optimize development of software

10   solutions."  Do you see that?

11       A.   Yes.

12       Q.   Now, you go on to say -- you talk about this

13   Nova product.  You say, "I understand that Lucasys

14   developed -- for example, I understand that Lucasys

15   developed its Nova product (which does tax-based balance

16   sheet automation) by leveraging an existing relationship

17   with cooperation from a customer, Suez North America

18   Inc."  So first of all, I wanted to ask you, do you have

19   an understanding as to whether or not the Nova product

20   addresses any limitation in PowerTax?

21       A.   I don't have a specific understanding one way

22   or the other on that -- on that particular question, no.

23       Q.   Do you --

24       A.   But I don't assume that it does for purposes of

25   this discussion.



1        Q.  You say -- can we agree that -- strike that.

2             Can we agree that Mr. Lantukh and Mr. Chang

3    in particular have been in the industry for many years?

4        A.  That's my understanding, yes.

5        Q.  Okay.  And can we agree they both claim to have

6    relationships with potential customers in the industry?

7        A.  That's my understanding, yes.

8        Q.  And do you -- I thought this was

9    uncontroversial, but maybe we have a different

10   understanding.  So do you have an understanding as to

11   whether or not Lucasys has claims it has developed

12   software products for the tax software market?

13       A.  Yes, I understand it has, yes.

14       Q.  Okay.  So when we were speaking earlier about

15   your analysis of close substitutes in the tax software

16   market, you defined you didn't include any of Lucasys'

17   products, correct?

18       A.  In terms of being able to -- to recall -- if I

19   can just, for a moment.

20       Q.  Yes.

21       A.  Specifically with regard to -- I was just

22   refreshing my recollection.  Thank you.  Specifically

23   with regards to a deferred tax solution, I can't recall,

24   as I sit here today, the specific -- I recall that there

25   was development of tax depreciation and deferred tax



1    application.  Is I indicated here -- as I'm sitting here

2    today, I'm just not recall the specification to brand

3    names and their relationship to particular applications,

4    and I just don't want to misspeak as I'm being careful

5    since I'm not a technical expert.

6        Q.  Okay.  Well, let me ask you a broader question.

7    Maybe that will help.  Is it your understanding today

8    that Lucasys has -- they have products that they could

9    take to an investor-owned utility and license them such

10   that the utility could replace PowerTax?

11       A.  Specifically with -- I don't recall a specific

12   understanding about whether or not -- I don't have a

13   specific answer to your question.

14       Q.  Well, they would need those products to enter

15   the tax software market, true?

16       A.  Again, as I stated before, I understand -- and

17   this section refreshes my recollection as well with

18   regards to that understanding of the relationship

19   between the development of such software as an

20   ongoing -- as an ongoing development vis-a-vis the

21   customers.

22       Q.  So from your perspective as an economist, is

23   Lucasys able to enter the tax software market today?

24       A.  And again, as I've stated in this section and

25   in the other places in my report, my understanding is



1    that Lucasys has -- as I state in the next paragraph and

2    is -- and is explained in other places in this section

3    and other sections, that it has the necessary elements

4    to be able to enter that market, yes.

5        Q.  Okay.  And is -- is Lucasys in the tax software

6    market today?

7        A.  I would not consider Lucasys to be in the tax

8    software market today.  My understanding is that they've

9    been thwarted from effectively entering that market.

10       Q.  Okay.  And how long -- assuming -- let's assume

11   that none of the -- none of the alleged interference

12   ever occurred.  Do you ever consider when they would

13   have entered the tax software market?  Do you do that

14   analysis as part of your forming your opinions in this

15   case?

16       A.  In -- in terms of a specific date and a but-for

17   world, I would not consider that part of my analyst.

18       Q.  You didn't do that analyst?

19              MR. CIESLAK:  Objection.  Asked and

20   answered.

21              THE WITNESS:  As I said, in terms of a

22   particular but-for date, I wouldn't consider that as

23   part of my analysis, no.

24       Q.  (By Mr. Fazio)  Okay.  And did you consider

25   what additional resources Lucasys would have had to



1    invest into its business to enter the tax software

2    business?

3         A.   Again, as part of my analysis, no, I would not

4    consider that to be part of my analysis.

5         Q.   Okay.  So Lucasys was founded in 2018; is that

6    correct?  You say that on page --

7         A.   That's my understanding, yes.

8         Q.   And so it's now 20 -- early 2023, so say, a

9    little over four years Lucasys has been in business?

10        A.   I agree.

11

12

13

14        A.   I don't have that number committed to memory,

15   if that's true or not.

16        Q.   Was that not something that was important to

17   you when you were forming your opinions in this case,

18   the resources that would be required for a potential

19   market entrant to bring product to the tax software

20   market?

21        A.   My understanding is that Lucasys was developing

22   the software to enter the tax software market and had

23   the resources at hand.  Specifically in terms of the

24   amount that it had spent in terms of dollars, that

25   wasn't particularly important, no.

1     Q.  In terms of your analysis in this case, if you

2  go back to October of 2019, so before all of the --

3  before the dispute arose between Lucasys and PowerPlan,

4  do you have any understanding of how long it would have

5  taken from that point in the but-for world to get

6  product into the market?  That's question one, and then

7  I'll give you question two after that.

8     A.  Again, this is similar to a question that you

9  asked me just a few minutes ago.  In terms of a

10  particular but-for world, that was not part of my

11  analysis.

12     Q.  You state in your report that entry into the

13  market requires or would require significant capital

14  investment to design, test, and implement tax software.

15  You say that in paragraph 52.

16     A.  (Witness examining document.)

17     Q.  Did you do anything to determine -- set Lucasys

18  aside for a moment.  Did you do anything to determine

19  what kind of capital investment would be required to

20  design, test, and implement tax software?

21     A.  As I note in the remainder of that paragraph,

22  it was a discussion about PowerTax's entry, and there

23  may have been other places in any report as well that I

24  speak to some of those issues.

25     Q.  Do you know how much investment was required to



1   bring the first version of PowerTax to the market?

2       A.  I can't recall whether I've seen a dollar

3   figure, as I sit here today.

4       Q.  It's not something that you specifically

5   analyzed?

6       A.  Again, I've reviewed many, many documents in

7   this case.  It's just not something -- and deposition

8   testimony.  It's not something that comes to mind, as I

9   sit here today.

10      Q.  Well, in terms of evaluating the possibility

11  that other firms could enter the tax software market,

12  right.  You've said that there are capital requirements,

13  and you talk about specialized knowledge.  I'm just

14  curious what you've done so -- what you've done to

15  determine what other firms may have this specialized

16  knowledge, capital, and other requirements that would be

17  necessary to enter the market, if they choose to do it.

18      A.  My understanding, as I've discussed in the

19  report, is that Lucasys in particular has the

20  specialized knowledge to enter into that market and is

21  in the process of developing the particular software

22  solutions and was looking to those customers

23  relationships to further that development.

24      Q.  Okay.  My question was:  Did you look at it --

25  did you look at it generally so that you would know how



1    much was required -- how much capital could be required,

2    what kind of relationships were required?  Do you do

3    that just generally, not with respect to what Lucasys

4    says it wanted to do or whether Lucasys was going -- I'm

5    asking, generally, have you looked at any other -- have

6    you looked at the issue, generally, first?

7         A.  Well, I don't understand the distinction you're

8    trying the make between generally and specifically.

9         Q.  Okay.

10        A.  My understanding is that Lucasys was looking to

11   enter that market, and so that would be at some level

12   both the general and the specific in terms of particular

13   entrance into the market.  More generally, yes, I mean,

14   I talk about in this section on barriers to entry, for

15   example, and other places sort of more generally the

16   requirements for getting into the market.

17        Q.  And did you consider what other software

18   providers or other firms that are out there may have all

19   of these prerequisites that you've identified to enter

20   the market?

21        A.  In terms of what I observed in the market is

22   that PowerTax has that high market share, and I haven't

23   seen evidence that I can recall of another company

24   coming in and entering that market specifically.

25        Q.  Have you heard of a company called Utegration?



1      A.   Not to the best of my recollection.

2      Q.   Okay.  So you don't know what Utegration does?

3      A.   Again, I seen a lot of documents.  I would have

4  to go back and refresh my recollection to say with

5  certainly whether I've seen that or not, but it doesn't

6  sound familiar, as I sit here today.

7      Q.   Okay.  Have you done -- have you considered at

8  all whether any of the ERP providers could enter into

9  the market?

10      A.   I haven't specifically with regards to any

11  particular ERP provider, but I note that based on my

12  understanding in terms of actually becoming a new

13  entrant, that I haven't seen a new entrant into this

14  market.

15      Q.   Well, so can we agree that any ERP prior -- and

16  we're talking about -- I just want to make sure the

17  record is clear.  We're talking about enterprise

18  resource planning software providers?

19      A.   That's what I understand ERP to -- and that's

20  how I used it in my report.  Yes, I agree.

21      Q.   And can we agree the leading ERP providers

22  include firms like Oracle, SAP?  I know there's others.

23  Those are the two that immediately comes to mind.  Do

24  you believe that those are the large providers of the

25  ERP software?



1      A.   Those are names that come no to my mind, and I

2   believe I discussed them as well, yes.

3      Q.   And do you know of the PowerTax customers what

4   percentage of them use either SAP or Oracle?

5      A.   If you're asking me whether they use SAP or

6   Oracle for other applications, other than PowerTax --

7      Q.   Yes.

8      A.   -- because you are specifically talking about

9   PowerTax customers.  I don't recall, but I wouldn't be

10   surprised if a number of them used Oracle or SAP for

11   other applications.

12      Q.   Okay.  And can we agree that firms like Oracle

13   and SAP have significant software development experience

14   and resources?

15      A.   I haven't -- I would not, as a general matter,

16   disagree with the notation that an SAP or an Oracle as,

17   in general, resources, but specific to PowerTax or a tax

18   deferred accounting or for that matter what resources

19   they had available at any particular point in time, I

20   haven't studied that in depth.

21      Q.   Have you studied it at all?

22      A.   Again, I certainly note the -- those companies

23   in my analysis, and I -- and I also have -- as I noted,

24   they have not specifically come out with a -- as I

25   understand it, with a tax deferred product for these



1    purposes.

2         Q.  All right.  And so can we agree that companies

3    like Oracle and SAP have significant capital resources

4    available to them?

5              MR. CIESLAK:  Objection.  Lacks foundation.

6              THE WITNESS:  Again, that's not something

7    that I have studied.  As I general matter, I understand

8    them to be large companies, but specifically as to

9    capital availability for any particular project, I

10   haven't done an exhaustive analysis of that.

11        Q.  (By Mr. Fazio)  Okay.  Well, I'm assuming we

12   can agree that oral or SAP have greater capital

13   resources than Lucasys.  Can we agree to that?

14             MR. CIESLAK:  Objection.  Lacks foundation.

15             THE WITNESS:  I have not done an analysis

16   of that.

17        Q.  (By Mr. Fazio)  And you understand that to the

18   extent you have an ERP provider that has software that

19   exists at an investor-owned utility currently, they

20   would have knowledge of how the system operates within

21   that particular investor-owned utility; is that true?

22             MR. CIESLAK:  Objection.  Lacks foundation.

23             THE WITNESS:  In terms of whether or not

24   they have knowledge that's relevant to tax deferred

25   calculations, I don't have knowledge of that one way or



1    the other.

2        Q.  (By Mr. Fazio)  And so I guess what I'm -- do

3    you see any structural reason why any ERP provider would

4    not be able to enter the tax software market it if

5    choose to do so?

6        A.  As a matter of economics, what I observe is

7    that they haven't chosen to do so.  I don't have a

8    detailed understanding of why they have not chosen to do

9    so.  That's not something that I've seen as publicly

10   available in terms of documents -- public documents from

11   SAP or Oracle, but what I can see as an economist is the

12   fact that they have not chosen to do so, indicating that

13   it's not in their economic interest to do so.

14       Q.  And why is it that you -- why it not be in

15   their economic interest to do so if PowerTax, as you

16   indicate in your report, demands high prices?

17       A.  I have not done a study of why SAP for Oracle

18   have -- wouldn't be in their economic interest.  What I

19   can observe is their economic reality that they have not

20   entered this market.

21       Q.  Paragraph 88, you say that Lucasys is

22   especially positioned with customer relationships,

23   industry experience, software development experience

24   necessary to enter the tax software market.  Do you see?

25       A.  (Witness examining document.)  I'm sorry, I --



1      Q.   It's paragraph 88.

2      A.   I was turning pages.

3      Q.   Sorry.

4      A.   (Witness examining document.)  Yes, I see that.

5      Q.   Okay.  And so I'm -- I'm just questioning --

6  I'd like to know what's the test that you would apply to

7  any given firm to determine whether it was prepared to

8  enter the tax software market?

9      A.   I'm not understanding -- I don't understand

10  what you mean.

11      Q.   So if you were to evaluate a -- not PowerPlan,

12  not Lucasys, but a third -- you were going to do a

13  evaluation of a third firm and make a determination as

14  to whether or not they were prepared to enter the tax

15  software market, what test would you apply to determine

16  whether they were taken prepared or not?

17      A.   I don't understand the use of your word "test"

18  in that question.  I would evaluate the evidence to

19  determine whether it appeared as though they were

20  looking to enter that market and able to enter that

21  market.  I don't understand what you mean by "test."

22      Q.   Well, how would you determine whether they're

23  able to enter the market?

24      A.   Again , I would look at the evidence with

25  regards to some of the important aspects that I



1   understand to be important in entering this market.

2      Q.  And so what I'm asking you is I'd like to know

3   what are the important aspects and what is the evidence

4   you would be looking at?

5      A.  And again, as I -- this feels a little bit

6   circular.  I'm trying to answer your question the best I

7   can.  I would look at the types of things that I looked

8   at when I looked at Lucasys, for example, looking at

9   whether or not -- I mean, it would be a case-by-case

10  basis, and so Lucasys provides an example of what I

11  would look at.

12     Q.  Okay.

13     A.  In their case having a product in development,

14  having the customer relationships, having the industry

15  experience.

16     Q.  And what about your point on capital, how much

17  capital is required?

18            MR. CIESLAK:  Objection.  Asked and

19  answered.

20     Q.  (By Mr. Fazio)  Well, let me ask it a different

21  way.  Did you evaluate whether Lucasys has sufficient

22  capital or has ever had sufficient capital to enter the

23  market?

24     A.  My understanding is that an important part of

25  that capital is the services revenue that it's -- that



1    it is obtaining and that it -- and that to the extent

2    that it was precluded from getting such services

3    revenue, that that would certainly impede its ability to

4    -- to have funds on hand, but it was still -- even in

5    that impeded state, was developing the deferred tax

6    software.

7        Q.  So my question to you is simpler.  I'm just

8    asking you how much capital is required.  How much

9    capital would be required for Lucasys to come into the

10   tax software?  Have you done that analysis?  That's all

11   I'm asking.  If you don't know, just tell me you don't

12   know.

13       A.  If you're asking me for a specific dollar

14   amount, no, I don't know that.

15       Q.  Have you ever done an analysis where you've

16   came up with a range of capital requirements?

17       A.  No.

18       Q.  And you've mentioned that Lucasys' preferred

19   business model is to generate revenue through its

20   services offerings.  You said that a moment ago, true?

21       A.  Yes, I did.

22       Q.  And there are other ways for Lucasys to obtain

23   capital to develop software, true?

24       A.  As a general matter , certainly there are a

25   number of ways of raising capital, yes.



1      Q.  Right.  So they could sell equity in the

2  company, for example.  Is that a way they could raise

3  capital?

4      A.  I can have a specific knowledge of that level

5  down to details for Lucasys in terms of feasibility of

6  raising capital.

7      Q.  Well, let's just talk generally about how

8  people raise capital in startup situations.  One way any

9  firm could do it would be to sell equity in the company;

10  is that fair?

11      A.  Again, as a very general matter, some companies

12  chose to raise capital in that way.

13      Q.  Okay.  Some companies choose to get a loan from

14  a bank, true?

15      A.  Again, as a very general matter, I'm aware that

16  in some companies choose to get bank loans, yes.

17      Q.  Okay.  And are you aware of any reason why

18  Lucasys could fund its capital requirements through a

19  means, other than providing services?

20              MR. CIESLAK:  Objection.  Outside the

21  scope.

22              THE WITNESS:  Again, I have not done a --

23  an analysis of that particular question.  If we can at

24  some point take a quick break, that would be great,

25  but --



1          Q.   (By Mr. Fazio)   So we're at -- well, let's go

2     off the record.

3                    THE VIDEOGRAPHER:   Off the record.

4     11:45 a.m.

5                    (Off the record.)

6                    THE VIDEOGRAPHER:   Back on the record at

7     12:02 p.m.

8                    THE WITNESS:   Actually, can I just -- I

9     took the wrong glasses.   Can we --

10         Q.   (By Mr. Fazio)   Yes.   Just be careful with your

11    mic.

12         A.   Yes.   Thank you.

13         Q.   Ready to go?

14         A.   Yes.

15         Q.   Okay.   All right, doctor, I'd like to direct

16    your attention to paragraph 65 of your report.

17         A.   (Witness complying.)

18         Q.   And just so that we're oriented, this is in

19    your section where you say PowerPlant has market power

20    in the market for tax software, and I'm taking to you

21    the section -- section E, which is PowerPlan's PowerTax

22    is lower quality than if there were competition in the

23    market.   Are you with me?

24         A.   Yes.

25         Q.   Okay.   Now, doctor, I want to -- you're an

```
 1    economist, true?

 2         A.   I agree.

 3         Q.   You don't consider yourself to be an expert in

 4    software, true?

 5         A.   Insofar as the technical aspects of software,

 6    yes, I agree.

 7         Q.   And you're not offering opinions about the

 8    quality of -- you haven't personally tested the quality

 9    of PowerTax -- the PowerTax software, have you?

10         A.   As I stated earlier, I am not an IOU.  I have

11    not personally utilized the PowerTax software.

12         Q.   Okay.

13         A.   Yes.

14         Q.   Do you consider yourself an expert in the tax

15    depreciation and deferred tax accounting practices of

16    investor-owned utilities?

17         A.   No, I would not consider myself an expert on

18    that.

19         Q.   Do you --

20         A.   Although I have studied that as part of my work

21    in this case, but in terms of specific expertise, no.

22         Q.   Well, we're going to dive into each of these.

23    Don't -- do you consider yourself an expert in how

24    investor-owned utilities make software purchasing

25    decisions?
```



1    A.   Again, some of that was part of my analysis, as

2    I've indicated in any report, but specifically an expert

3    in that area, no.

4        Q.   Where in your report do you indicate that?

5        A.   So there are places, for example, when I talk

6    about alternatives to PowerTax that touch on these sorts

7    of issues.   That's one place that comes the mind, as I

8    sit here today.

9        Q.   Okay.   Any others?

10       A.   I'd have to look through -- for example, in

11   this quality section, my recollection is there's

12   discussion of customer needs and customer reactions to

13   software.   There may be other places as well.

14       Q.   Have you ever been involved in the purchasing

15   decision of deferred tax or pretax depreciation software

16   for an industrial-owned utility?

17       A.   No.

18       Q.   I'm assuming you've never actually used any

19   version of the PowerTax software; is that correct?

20       A.   Correct.

21       Q.   I assume you've never used PowerPlan's tax

22   fixed assets software?

23       A.   Correct.

24       Q.   Have you ever seen live demonstration of

25   PowerTax software?



1        A.   Not to the best of my recollection, no.

2        Q.   What about tax-fixed assets, have you ever seen

3   a live demonstration of tax-fixed assets?

4        A.   Not to my recollection, no.

5        Q.   In your work on this case, you and your team,

6   you haven't undertaken any independent analysis of the

7   functionality of the PowerTax software, have you?

8        A.   Again, I don't know what you mean by

9   "independent analysis."  I've certainly independent of

10  what -- I've certainly -- whatever I've looked at is

11  noted in my report.

12       Q.   Okay.  Have you ever used or seen the Lucasys

13  software products being used, any of them?

14       A.   Not to the best of my recollection.

15       Q.   Have you ever done a comparison between the

16  features or functionality of the PowerTax software and

17  Lucasys' deferred tax or tax depreciation products?

18       A.   No.

19       Q.   Have you ever done a comparison of the features

20  and functionality of PowerTax in any other software?

21       A.   There's a discussion of PowerTax and other

22  potential or other products that were -- or I should say

23  providers that PowerPlan had mentioned in various

24  documents in that section of my report, which talk about

25  some functionality issues.



1      Q.  But you and your team never sat down, for

2  example, and charted out the features and functions of

3  PowerTax and then created a similar list for any other

4  piece of software?

5      A.  I agree.

6      Q.  And I assume that the answer is the same with

7  respect to tax-fixed assets, you've never gone through a

8  kind of exercise with respect to tax-fixed assets?

9      A.  That exercise being sort of in numeration of --

10  what you said in your last --

11     Q.  Correct.

12     A.  I didn't want to paraphrase what you said.

13  What you said in your last question.

14     Q.  Correct.

15     A.  I agree.

16     Q.  Have you done anything to determine the

17  perception of the quality of Lucasys' software among

18  potential customers and your alleged tax software

19  market?

20     A.  My understanding is that Lucasys was thwarted

21  from really entering into that market.  So, no, I have

22  not.

23     Q.  But you understand that Lucasys has

24  demonstrated its products to various customers, correct?

25     A.  My understanding is that there's been

1  development and that there's been some working with

2  customers, yes, in that regard.  Whether that would be

3  properly characterized as demonstration, I just can't

4  recall, as I sit here today.

5      Q.  And you've never reached out to any of the

6  customers that have seen Lucasys' software products to

7  get feedback from them on their perception of the

8  product?

9      A.  Correct.

10      Q.  Is there a test that a practicing economist

11  uses to measure whether a product's quality has been

12  impacted by an exercise in market power?

13      A.  I don't understand what you mean by "test" in

14  that context.  One looks at the evidence, as I've done

15  in this case.

16      Q.  Well, you've looked at the evidence, and how do

17  you analyze the evidence?  What's the process that you

18  go through to determine whether quality of a product has

19  been impacted -- has been impacted by market power or

20  participants?

21      A.  What I've done in this case and -- is to look

22  at what market participants say about the quality of the

23  product.

24      Q.  Okay.  Have you done anything else beyond that?

25      A.  I would characterize my work with regards to



1    product qualities specifically in those regards

2    understanding that either the market participants

3    include both PowerPlan itself and its own statements

4    about quality, Lucasys and its understanding and

5    development of services and other companies provision of

6    services to overcome some of those limitations, as we

7    talked about before, and then customers willingness to

8    pay for services to overcome those limitations.  That's

9    -- those are in general.  I mean, there may be other

10   things as well that I cite to, including statements by

11   customers.  Those are the general categories that comes

12   to mind, as I sit here today, but of course, the

13   totality of my analysis is in my report.

14        Q.  Is there -- so I take it there is no analytical

15   test that an economist would -- there's no analytical

16   test that you deployed in this circumstance to reach a

17   conclusion as to whether or not the PowerTax software is

18   -- its quality has been affected by PowerPlan's alleged

19   market power?

20             MR. CIESLAK:  Objection.  Vague and

21   misstates testimony.

22             THE WITNESS:  Again, I analyzed the

23   evidence with regards to the various market

24   participants.  I would consider that to be an analytical

25   exercise.



1        Q.   (By Mr. Fazio)  Okay.  Is it your opinion in

2   this case that any customer criticism of the PowerTax

3   software is indicative of low quality?

4        A.   In terms of customer criticism, what I have

5   looked at is the totality of the evidence with regards

6   to not only customer criticisms, but also the reaction

7   of customers in terms of paying money to overcome

8   certain limitations and PowerPlan's own statements about

9   the -- the lack of quality and the limitations.  So what

10  I looked at goes beyond a few mere customer criticisms.

11       Q.   Well, what did you do -- how does your analysis

12  account for positive of neutral customer comments about

13  PowerTax software?

14       A.   I certainly have -- have looked at the -- for

15  example, there are some surveys that are discussed, and

16  there were a variety of comments within those surveys,

17  and I've looked at the totality of those documents, but

18  together with those documents, I've also looked at what

19  PowerPlan said about the import of those documents and

20  specifically -- and also what customers have done in

21  terms of paying for tax services to overcome some of

22  those limitations.  So it's a combination of looking at

23  all of that evidence together.

24       Q.   Okay.  My -- how -- so how was it that you

25  incorporated positive or neutral customer comments in



1    your analysis?  Did you do anything specifically to

2    address those?

3         A.  I looked at the totality of the documents that

4    are cited in my report, which some of them include a

5    variety of different types of comments about the --

6    about the quality of the product and about the product

7    itself, but as I stated, I then went on to look at these

8    other aspects.

9         Q.  Is it your opinion in this case that any

10   employee criticism of the PowerTax software is

11   indicative of low quality?

12        A.  Again, my answer is that I don't look at one

13   particular piece of criticism, whether it be from an

14   employee of any particular company in isolation.  What

15   I've done is I have looked at all of the evidence with

16   regards to quality in its totality.

17        Q.  So your position in this case is you have

18   looked at all of the -- all of the evidence concerning

19   quality of the PowerTax system?

20        A.  I certainly have looked at what I have

21   indicated in my -- in the footnotes to my report and my

22   Exhibit 2 in terms of materials relied upon.  That's

23   what I can recall, as I sit here today.

24        Q.  So with respect to the employee and customer

25   criticisms we've been talking about, we'll get to them



1   specifically in a second, but I'm curious, what did you

2   do to ensure that the antidotes that were counted in

3   your report were actually representative of the broad

4   perception amongst customers?

5        A.   And again, as I -- I think I've stated now a

6   number of times, I looked at -- in addition to certain

7   comments and surveys that were done, I looked at what

8   PowerPlan itself stated about those surveys in their

9   totality and its reaction to them and then also the fact

10  that customers were paying services providers to

11  overcome some of the quality and other limitation --

12  quality issues and other limitations of PowerTax.

13       Q.   So I hate to circle back to this, but I'm

14  afraid I have to.  So explain to me what -- what are the

15  quality limitations in PowerTax that these customers

16  were allegedly paying money for?

17       A.   So there's a section in my report that I talk

18  about specific limitations of PowerTax, and in this

19  particular section, I talk about other quality issues

20  that -- that customers and others have had commented on,

21  including PowerPlan itself, recognizing some of these

22  limitations.

23       Q.   So when you're reviewing these comments, how do

24  you know which comments are direct to PowerTax and what

25  are -- I'm sorry, which ones are directed to PowerTax



1   alleged limitations?  How do you know that?  Is any

2   reference to PowerTax in a criticism a reference to

3   limitations?

4       A.  I wouldn't -- I'd have to think more about this

5   question about limitations and quality, but I don't see

6   them as being one in the same.  Certainly some of the

7   limitations also relate to quality issues, and quality

8   issues can become limitations, but I haven't used them

9   as synonyms in this report, at least that's not how I

10  would think about them, as I'm sitting here today.

11      Q.  Well, I guess help me understand then, because

12  you said a moment ago that one of the reasons why you

13  think it's of low quality -- the software is of lower

14  quality than it would otherwise be is the dollars that

15  are spend in the tax service market are to address

16  limitations.  Do I have that right?

17      A.  I agree, yes.

18      Q.  So can you differentiate for me, what is a

19  limitation of the software that requires service dollars

20  and what's a quality issue that requires service dollars

21  to address?

22      A.  In terms of the limitations -- in terms of the

23  -- and again, I would want to think about this some more

24  because I think there's a -- there's a line that I

25  haven't -- and a usage of terms that I would want to be



1   careful about, but I -- I think about the tax services

2   market as I've defined it, specifically as addressing

3   limitations of the software, as I've indicated before,

4   but quality issues of things being just in general, as

5   it sort of talks about, a clunky or an aging platform

6   may or may not rise then to the level of limitations.

7       Q.  Okay.  Well, I appreciate you want to think it

8   through more, but unfortunately, it's the only chance I

9   get to ask you questions.  So I'm struggling to

10  understand the distinction you're making.  If I'm trying

11  to identify whether a service is related to quality or

12  related to limitation, how do I -- where does -- how

13  does the line get drawn between these two things?

14              MR. CIESLAK:  Objection.  Incomplete

15  hypothetical.

16              THE WITNESS:  I don't know what you mean by

17  drawing the line between those two things.

18      Q.  (By Mr. Fazio)  All right.  You talked about

19  limitations as one category of issues with PowerTax

20  software, and you just started telling us about quality

21  issues as a different group of issues associated with

22  the PowerTax software.  I'm trying to figure out how I

23  make a decision about whether a particular -- a

24  particular issue for a particular client, whether it

25  goes into Dr. Meyer's limitation bucket or Dr. Meyer's



1   quality bucket.

2        A.  And as I think I explained just a few minutes

3   ago, that's not a question that makes sense to me.  As I

4   said, some of the limitations may be things that

5   customers view as quality issues, and some of the

6   quality issues may be also limitations.  I don't see a

7   line as you're describing it in that way.

8        Q.  Okay.  So is it anything that a customer

9   perceives as you can either be -- it can be a limitation

10  or it can be a quality issue, but any time is a customer

11  is unhappy, that's an issue with the PowerTax software.

12  Is that what you're saying?

13       A.  Well, I'm not sure what you mean by "an issue."

14  If a customer is unhappy, that's an issue -- with the

15  PowerTax system, then it seems to me that's an issue

16  that the customer has with the PowerTax system, but that

17  seems to be a totality, so I'm not sure what the

18  distinction is that you're trying to draw.

19       Q.  Well, let's take it in a different direction

20  then.  Have you made any determination as to how the

21  PowerTax system's quality would be different in a more

22  competitive environment or more competitive market?

23             MR. CIESLAK:  Sorry, can you repeat the

24  question?

25             (Whereupon, the question was read back on

1    the record.)

2              THE WITNESS:   And as a -- as a general

3    matter in this particular case, with a -- I've come to

4    the conclusion that had there been more competition,

5    there would be higher quality in this market.

6         Q.   (By Mr. Fazio)   And how did you reach that

7    conclusion?

8         A.   Well, the totally of the evidence is -- as I

9    said, it's in my reports.   Specifically as I talk about

10   in this particular -- well, as I talk about in other

11   situation -- in other parts of this report, there's a --

12   this market -- in terms of tax software is characterized

13   by one dominant player, and there hasn't been entry or

14   effective competition to that player for many years.

15   Lucasys has tried to come into that market and was

16   thwarted in that, at least today in fully participating

17   in that market, and we see indicators of low quality in

18   that -- in that same market, and customers who state

19   that they have feel as though they have no other place

20   to turn.

21        Q.   Okay.   My question though is:   How is it that

22   the PowerTax software equality would be different in a

23   more competitive market?   Can you answer that question?

24   Can you tell me what the difference would be in the

25   product?



1      A.   In you're -- again, as I've just laid out, the

2  time between the competition and the quality, if you're

3  asking me specifically, you know, from a technical

4  standpoint, whether it would be PowerTax's software or

5  maybe -- or PowerPlan's software, sorry, or perhaps

6  Lucasys' software, that would bring me improved quality

7  from a technical standpoint.  I don't have a specific

8  but-for world in mind.

9      Q.   So you have not done the but-for analysis with

10  respect to quality in this case?

11      A.   I would not characterize what I've done as a

12  but-for analysis, no.

13      Q.   In your work on this case, have you made any

14  determination as to when you think the quality of the

15  PowerTax software began to decline as a result of

16  PowerPlan's market -- allege market power?

17      A.   No.

18      Q.   Do we agree that over the years, PowerPlant has

19  improved the PowerTax software?

20              MR. CIESLAK:   Objection.   Lacks foundation.

21              THE WITNESS:   I certainly understand that

22  PowerPlan has -- has come out with updates, but in terms

23  of improvement relative to customers expectation of

24  software products, no, I would not agree on that.

25      Q.   (By Mr. Fazio)   So again, you're basing this



1    around customer expectation.  That's your touchtone and

2    your analysis?

3        A.  Again, as I've said before, customers reactions

4    are certainly a portion of that.  It's also PowerPlan's

5    own assessment of those reactions, and Lucasys

6    certainly, in speaking with customers and working the

7    tax services market, has an assessment of that as well.

8        Q.  And to be clear, you haven't -- we've been

9    talking about PowerTax, but you actually -- you're not

10   familiar with tax-fixed assets, true?

11       A.  Again, I -- the products that I've been focused

12   on were -- as I mentioned before, I would have to go

13   back and refresh my recollection on exactly how

14   PowerPlan's fixed assets fits into that.

15       Q.  Well, PowerPlan represents to PowerTax.  Were

16   you aware of that?

17       A.  Not as I sit here today.

18       Q.  So it's not something you considered in forming

19   your opinions in this case?

20       A.  Not that I can recall.

21       Q.  So when you say that PowerTax's quality is law,

22   if PowerPlan is replacing it with a new next-gen

23   product, how does that impact your quality analysis of

24   the PowerTax product?

25                  MR. CIESLAK:  Objection.  Incomplete



1   hypothetical.

2              THE WITNESS:  Well, I would obviously have

3   to look at the time periods at issue, but certainly

4   insofar as the time period in which Lucasys was thwarted

5   in its ability to enter, you know, to the extent that

6   there's a future product coming out, that certainly is

7   something that would not necessarily -- that wouldn't,

8   as I would see it, effect, you know, the time period and

9   the specific customers to which Lucasys was attempting

10  to -- to enter this market and was thwarted from doing

11  so.

12      Q.  (By Mr. Fazio)  So, doctor, though, in forming

13  your opinions about whether PowerPlan was appropriately

14  investing into the development of the PowerTax product,

15  wouldn't it be relevant to consider whether they were

16  simultaneously working on a next-gen replacement forming

17  your opinions in this case?

18      A.  In terms of the quality during the period of

19  time that I've been discussing, if that product is not

20  -- was not available to customers at the time, then that

21  wouldn't be relevant to competition at that

22  particular -- or quality at that particular point in

23  time.

24      Q.  Okay.  And if it's available today, is it

25  relevant to your analysis?



1        A.  Again, it may or may not be.  I would have to

2   look at that.

3        Q.  So let me just offer this up as a hypothetical.

4   Assume with me with that tax-fixed assets is capable of

5   fully replacing PowerTax for customers or substantial

6   portion of customers.  Is that -- would that be relevant

7   to your quality analysis vis-a-vis PowerTax?

8        A.  In terms of the quality during the time period

9   in the past at issue, no, that wouldn't be relevant.

10       Q.  But going forward, it would be relevant?

11       A.  Again, I -- I can't tell, as I sit here today.

12       Q.  Well, assume that it is -- well, let me --

13   strike that.

14            Help me understand why it is that you can't

15   -- you can't answer that question from today going

16   forward.  What is it -- what is it that you would need

17   to know to be able to answer that question?

18       A.  And I apologize, but I've lost track of what

19   that question is.

20       Q.  I have too, to be totally honest with you.  All

21   right.  Let's go back.  In terms of tax-fixed assets,

22   it's a -- assume with me that it is a replacement for

23   either PowerTax -- either or all or substantial portions

24   of current PowerTax customers.  Are you with me on that

25   is assumption, my assumption I'm asking to you a accept?



1          A.   I can accept that as an assumption, yes.

2          Q.   Okay.  You had said to me earlier that in terms

3     of the time period when TFA was not in the market, it

4     would not be relevant to the quality analysis, true?

5          A.   Correct.

6          Q.   And then I asked you if going forward it would

7     be relevant to the quality analysis, and I think you --

8     I was -- what's your -- let me re-ask you the question

9     so you can re-answer and we can get oriented.  So going

10    forward, is the existence of that TFA products that I've

11    asked you to assume exist, is that relevant to your

12    quality analysis on a go-forward basis?

13                    MR. CIESLAK:   Objection.   In complete

14    hypothetical.

15                    THE WITNESS:   So I -- I -- I'm struggling

16    because it's -- I really -- there's a number of

17    different aspects of your question that aren't relevant

18    to my analysis.   Number one, I'm looking at what

19    happened in the past.   Mine is not an analysis of --

20    specifically of the future.   It really is of an analysis

21    of the effect of allegedly anticompetitive behaviors in

22    the past.   So the -- and -- so in terms of analyzing

23    quality going forward, that's not what is inherent in my

24    analysis, and furthermore, that would not be a part of

25    my analysis -- well, that's not part of my analysis.   I



1  guess I would just leave it there.

2      Q.  (By Mr. Fazio)  So you raise -- but you're

3  raising the quality issue with respect to PowerTax in

4  your report because you're saying that it's an

5  indication of market power, true?

6      A.  Correct.

7      Q.  Okay.  And so would it be inconsistent with

8  your conclusion concerning market power, if fact,

9  PowerPlan had been investing in and now has put out a

10  new next-gen product that addresses your quality

11  issues -- assume that it addresses your quality issues?

12              MR. CIESLAK:  Objection.  Vague.

13              THE WITNESS:  Again, that in and of itself

14  does not -- does not address the lack of quality in the

15  past, even if -- no matter what will happen in the

16  future, and there obviously, you know, questions that

17  would need to be addressed, but no, it would not effect

18  the quality issues that customers had.

19      Q.  (By Mr. Fazio)  Let me ask you, you referred to

20  some net promoter score surveys in your report?

21      A.  Yes.

22      Q.  I wanted to ask you some specific questions

23  about those.  This is subsection two.  It starts on

24  Page 34.

25      A.  Yes.



1      Q.  Can we agree that the net promoter score

2  surveys are intended to measure overall customer

3  experience with PowerPlan?

4      A.  I don't know if that's the exact language

5  that's used.  I can't recall with that specificity, but

6  as a general matter, that sounds -- that's consistent

7  with my recollection.

8      Q.  Yes.

9      A.  But I would want to go back to the documents to

10  see exactly how they characterized it.

11     Q.  And so do you know what specific question was

12  posed to the customers in the net promoter score surveys

13  that you're relying on in your report?

14     A.  I don't recall with specificity, as I sit here

15  today.  I can go back to the documents, but I just don't

16  have that committed to memory.

17     Q.  Do you have an understanding as to whether or

18  not any of the surveys, net promoter score surveys, that

19  you rely on in your report were focused specifically on

20  PowerTax?

21     A.  I certainly recall that there was a specific

22  mention of PowerTax.

23     Q.  Okay.  My question's a little different.  In

24  terms of the question that was being posed to the

25  customer, were any of the surveys as a whole directed to

1    PowerTax specifically, if you know?

2        A.   Again, as I sit here today, I don't have the

3    survey questions committed to memory.  I recall that

4    there was mention of PowerTax.

5        Q.   And --

6        A.   That's what I recall.

7        Q.   And when you say there's mention of PowerTax,

8    you're talking about in the survey responses or in the

9    question posed in the survey?

10       A.   Again, as I -- as I stated earlier, I don't

11   have committed to memory the questions that were posed.

12   I recall in the responses that there was mention of

13   PowerTax specifically.

14       Q.   I'm sorry.  Can you repeat your answer?

15            (Whereupon, the question was read back on

16   the record.)

17       Q.   (By Mr. Fazio)  Is it your understanding that

18   the same question was asked in each of the surveys that

19   were conducted?

20       A.   Again, I don't have committed to memory the --

21   the exact survey instrument.  I would have to go back

22   and refresh my recollection.

23       Q.   Would it be -- is it important to you when you

24   were determining whether the comments that you were

25   extracting from your report were representative or not



```
 1   to know whether or not it was the same question that was

 2   posed each time?

 3        A.   No.

 4        Q.   It's not?

 5        A.   No.

 6        Q.   So any customer comment, regardless of what

 7   prompted it, you were considering, any PowerTax-related

 8   comment?

 9        A.   Again, the -- the comments and the -- the

10   quotes that I have extracted are in the context of then

11   PowerPlan's reaction to those.  So it's specifically the

12   survey question is not the relevant piece.

13        Q.   So is it fair to say -- I think we understand

14   this from your prior discussion.  In your -- you are

15   have not done anything to determine, from a quantitative

16   perspective, whether the specific anecdotes that you

17   were reporting in paragraph 74 are representative of the

18   broader surveys from which they come at any quantitative

19   sense.  Is that fair?

20        A.   In terms of -- I'm not sure what you mean by --

21   by quantitative, but certainly the -- the totality of

22   those surveys was then commented on by PowerPlan.  So I

23   would consider that to be sort of a holistic look at

24   those surveys and the implications that PowerPlan

25   specifically recognized as a result of those is surveys.
```

1    If you're asking for something else, then I'm not sure

2    exactly what you're asking about.

3         Q.  So, for example, in your first bullet point,

4    paragraph 74, you were referring to the net promoter

5    survey -- score survey from 2020, first half.  Do you

6    see that?

7         A.  Are you talk about the first bullet point on

8    page --

9         Q.  Yes, first bullet point.

10        A.  -- paragraph 74?

11        Q.  Seventy-four.

12        A.  Yes, I see that.

13        Q.  And you are quoting someone from Florida Power

14   & Light Company?

15        A.  Yes.

16        Q.  Now, my question to you is:  When this person

17   entered in this comment, they also entered into a score,

18   correct?

19        A.  I believe in were scores associated within of

20   the comments, yes.

21        Q.  And did you calculate out -- did you compare

22   the score that was associated with this particular

23   comment, first bullet in paragraph 74, with, for

24   example, the average or all of the responses?

25        A.  I did not.



1      Q.  Okay.  And did you do any kind of calculations

2  on the scores of any kind?

3      A.  Specific calculations, no.

4      Q.  Okay.  And so you don't know if the score that

5  Mr. Geiser, who you were counting the first bullet, you

6  don't know if the score that he gave was substantially

7  above or substantially below the average of all

8  responses, fair?

9      A.  Correct.

10      Q.  All right.  And you also don't know whether his

11  response is substantially above for below the average of

12  all of the responses from Florida Power & Light Company

13  in this survey, true?

14      A.  Yes, I agree.

15      Q.  So in terms of identifying whether this comment

16  is actually representative of customer sentiment, how

17  did you go about -- how did you go about doing it?

18      A.  As I stated earlier, the import of these

19  comments is not solely the comments themselves, but then

20  also the reaction of PowerPlan to those comments, what

21  PowerPlan then took away from these surveys, this one

22  and then there was another survey that I believe goes by

23  the name of Stacks, and the -- and the implications that

24  PowerPlan itself took away from those surveys.  So the

25  surveys are not insolation.  It's the surveys and then



1    PowerPlan's takeaways from those surveys.

2        Q.   Okay.  For each of the folks that you've

3    identified in these comments that you've identified in

4    paragraph 74, the various bullet points, did you do

5    anything to determine which version of PowerTax the

6    particular customer was using?

7        A.   I did not.

8        Q.   Did you do anything to determine what other

9    PowerPlan product these particular customers -- sorry.

10   Did you do anything to identify the particular PowerPlan

11   software products that each of the IOUs that you have

12   listed in paragraph 74 were using at the time the

13   comments were made?

14       A.   As I stated earlier, a number of them mentioned

15   specific products.  Aside from that, no, I did not.

16       Q.   And I take it no one ever communicated with any

17   of the folks you have listed here?

18       A.   That's correct.

19            MR. FAZIO:  It's 12:45.  Why don't we take

20   a lunch break?

21            MR. CIESLAK:  Okay.

22            THE VIDEOGRAPHER:  Off the record at

23   12:45 p.m.

24            (Off the record.)

25            THE VIDEOGRAPHER:  Back on the record at

1    1:40 p.m.

2         Q.   (By Mr. Fazio)   All right.   Dr. Meyer, let's

3    get back into.   So paragraph 81, Page 31 -- or 39 of

4    your report.   Again, we're on the section on market

5    power, and here you're talking about PowerPlan's

6    pricing.   Do you see that?

7         A.   Yes.

8         Q.   The last sentence of 81, you say, "PowerPlan's

9    pricing and margins are consistent with PowerPlan having

10   market power in the tax software market."   I'll take

11   these one at a time.   We'll talk about pricing first.

12   When you refer to pricing this in this section, you're

13   talking about PowerTax pricing specifically, true?

14        A.   The -- the -- the -- the product that I'm

15   talking about when I'm talking about the market power in

16   the product is the PowerTax, yes.

17        Q.   You conclude here that pricing is "high"; is

18   that accurate?

19        A.   Yes.

20        Q.   Okay.   Have you done any quantitative analysis

21   to determine what the competitive price level should be

22   in the tax software market?

23        A.   I have not, and that's -- not possible to do

24   here given PowerPlan's dominance in that market.

25        Q.   Okay.   And so when you say the PowerPlan's

1    pricing is high, it's high relative to what?

2        A.   High relative to the competitive level

3    certainly is the -- is the -- is the -- is the -- I'm

4    sorry, I'm losing the word that I'm looking for -- is

5    the framing of it in the context of the way that

6    customers have described the pricing.

7        Q.   Okay.  But you told me a minute ago that you

8    haven't determined what the competitive price level

9    should be in this market, true?

10       A.   I agree that I -- it's not possible.

11       Q.   Okay.

12       A.   -- given the extended duration and the market

13   power that PowerPlan has to determine a competitive

14   price level.

15       Q.   And so there's no quantitative elements to your

16   exclusion in this section concerning pricing?

17       A.   In terms of specifically what you were asking

18   about, determining exactly what the competitive price

19   level would be, I agree there's no quantitative

20   assessment of that particular element.  It's not

21   possible to do.

22       Q.   Have you done any analysis of PowerPlan's

23   pricing over time -- I'm sorry, PowerTax pricing over

24   time?

25       A.   Certainly some of the quotes that I use are --

1    reflect pricing at different points in time.  So to that

2    extent, there's analysis that occurs over time.

3         Q.  You had access to the prices that were actually

4    paid by PowerTax customers to PowerPlan, true?

5         A.  I remember seeing financial data of that

6    nature, yes.

7         Q.  Okay.

8         A.  To the best of my recollection.

9         Q.  So in your work on the case, did you do

10   anything to analyze any trends that were in that data?

11        A.  Not to the best of my recollection, no.

12        Q.  And if you had done that, would you have

13   reported it in your report that was served in this case?

14        A.  I don't recall doing such an analysis.

15        Q.  So you don't know whether or not over the years

16   PowerPlan's pricing has gone up, down, or stayed stable

17   over, say, the last decade?

18        A.  Not -- not as I sit here today, no.

19        Q.  Can you tell me, what's your understanding of

20   how PowerPlan prices its PowerTax products?

21        A.  I understand that there are license agreements

22   with pricing for various -- a set of products and

23   modules that a particular customer needs or demands.

24        Q.  So when you're referring to PowerTax prices,

25   what are you -- what specifically are you referring to?

1          A.   I'm referring to exactly the kinds of things

2     that the customers are talking about in terms of license

3     -- as one says, license pricing.  Different terms might

4     be used by different customers.

5          Q.   Well, so when you're reading these customer

6     comments, you know, explain to me how it is that you're

7     -- you're evaluating these comments to determine whether

8     they are fair or accurate, reasonable observations about

9     PowerTax pricing.

10         A.   I'm evaluating these as comments provided by

11    customers who are in -- in this industry and who are

12    evaluating their own opinions as to the pricing in this

13    particular case.  There's other times when I talk about

14    other aspects of the survey, but particularly here with

15    regards to pricing.

16         Q.   And so when you -- when you talk about pricing

17    or prices in your report, are you talking about the

18    license fee itself?

19         A.   Certainly the license fees are -- are what I

20    have in mind in terms of pricing, but it really is, as I

21    say, consistency of the customer comments with high

22    pricing, which is indicative of market power.  So it's

23    those three things together.

24         Q.   And so what about -- are there any other

25    elements to the cost of PowerTax that you consider while



1   -- when you're putting your report together?

2        A.  Well, certainly for some customers, as I've

3   indicated, they require additional services in what are

4   to remedy certain limitations of the functionality that

5   they require with PowerTax.  So to the extent that that

6   is an additional cost that customers incur in order to

7   get the complete functionality that they need or that

8   they're demanding from PowerTax, that would be an

9   additional cost.

10       Q.  Do you know how it is that PowerPlan generates

11  revenue, if at all, after it licenses a -- licenses

12  PowerTax to a customer?

13       A.  In addition to the licensing revenue, my

14  understanding is that PowerPlan sometimes provides

15  additional services as well that I -- that I mentioned,

16  I believe, elsewhere in the report.

17       Q.  Is there anything else?

18       A.  My understanding is that some PowerTax

19  customers also paid for other sorts of PowerPlan

20  products and services outside of PowerTax.

21       Q.  In your considering the pricing of PowerTax,

22  did you consider at all whether there were differences

23  between non-premise or cloud-based implementation of

24  PowerTax?

25       A.  When I was looking at pricing in this section,

1    I was looking at, most generally, the perception of

2    pricing by customers, regardless of the particular

3    platform.

4         Q.  So would you agree with me that a perpetual

5    license is a one-time licensing event in terms of the

6    fees that are being paid?

7         A.  I understand that a license could be structured

8    in that way.

9         Q.  Do you know how PowerPlan structures its

10   licenses -- its customers for PowerTax?

11        A.  I -- as I stated earlier -- I was just looking

12   to refresh my recollection on their software sales and

13   the services side.  As I indicated earlier, revenue

14   amounting from both of those, but specifically as to

15   more specifics of the licensing for PowerTax, I just

16   can't recall, as I sit here today.

17        Q.  Have you reviewed any of the license agreements

18   that PowerPlan has with its customers concerning

19   PowerTax?

20        A.  I can't recall one way or another, as I sit

21   here today.

22        Q.  Do you have a sense of how many of Power -- of

23   PowerPlan's PowerTax customers have on-premise

24   appointments versus cloud-based appointments?

25        A.  I do not.



1      Q.  Have you looked at how PowerPlan prices any of

2  its other software modules?

3      A.  Not specifically.

4      Q.  So have you done something generally?

5      A.  Not that I can recall, no.

6      Q.  Have you done anything to compare PowerTax

7  pricing to any of the other PowerPlan software modules?

8      A.  Not that I can recall.

9      Q.  Would it be relevant to your analysis in this

10  case if PowerPlan's structure to its PowerTax pricing

11  was the same as it is for all of its other software

12  modules?

13          MR. CIESLAK:  Objection.  Incomplete

14  hypothetical.

15          THE WITNESS:  Not one way or the other, no.

16      Q.  (By Mr. Fazio)  Now, you -- again, you're

17  citing a number of net promoter score result or

18  responses paragraph 82.  Do you see that?

19      A.  I do.

20      Q.  In the document that you cite for all of these

21  is indicated in the footnote PowerPlan 01595157.  Do you

22  see that and it kind of continues on?

23      A.  Yes.

24      Q.  So you have three --

25      A.  I see that.



1    Q.   Okay.  Do you have a sense of how many survey

2   responses there were reflected in PowerPlan 0159157?

3    A.   Not off the top of my head, no.

4    Q.   Basis to dispute that it's more than 1,000?

5               MR. CIESLAK:  Objection.  Lacks foundation.

6               THE WITNESS:  Again, I -- I don't have

7   these documents for this particular document committed

8   to memory.

9    Q.   (By Mr. Fazio)  Let me ask you a different way.

10  You have -- you've identified three specific comments,

11  and we can go through these in a minute, but do you

12  think that it's reflective of the overall sentiment of

13  the net promoter score survey to cite to three out of

14  700 responses amongst folks that had the income tax

15  suite?

16              MR. CIESLAK:  Objection.  Lacks foundation.

17              THE WITNESS:  Again, what I'm going here,

18  as I'd mentioned in some earlier questions as well, is

19  in this particular case, it's just looking at customer

20  comments in this case that are consistent with the

21  market power based on their discussions of pricing.

22   Q.   (By Mr. Fazio)  Okay.  And have you picked

23  three comments out of 700 responses, do you think that

24  that's reflective of the overall sentiment of customers?

25              MR. CIESLAK:  Objection.  Lacks foundation.

1    Incomplete hypothetical.

2                    THE WITNESS:  Again, I would have to go

3    back to the underlying document to refresh my

4    recollection on the specifics, but the -- the point is

5    simply the -- the consistency of these customers

6    comments with regards to the market power.  It's in the

7    context of how I looked at pricing here.

8         Q.  (By Mr. Fazio)  When you say, "consistency," if

9    you reported antidote from three out of four respondents

10   that talk about price, is that consistent with the

11   broader survey response?

12        A.  As I said, it's talks here in this section of

13   my report about specific customers whose perception of

14   pricing is consistent with the market power.

15        Q.  So as a practicing economist, do you think that

16   it's reasonable to take three antidotes from a net

17   promoter score survey and rely on those to reach the

18   conclusion that pricing in the market of a particular

19   product is high?

20                    MR. CIESLAK:  Objection.  Misstates

21   testimony.

22                    THE WITNESS:  Again, I -- just to be clear,

23   I've been very particular in terms of what this

24   particular section is showing, and it's providing

25   evidence that it's consistent with high pricing and



 1    market power.

 2         Q.   (By Mr. Fazio)   My question to you though is:

 3    Why didn't include any commentary about other -- other

 4    survey responses that did not indicate concern of

 5    pricing?

 6         A.   I can't recall, as I sit here today -- again, I

 7    haven't committed the -- these documents to memory.

 8    What I recall is when pricing was mentioned, that --

 9    that expensive pricing was what the survey respondents

10    mentioned, and I -- I indicate some of those responses

11    here.

12         Q.   Okay.  Well, let's look at these bullet points.

13    So paragraph 82, first bullet point.  Can we agree that

14    the comment that you report is not specific to PowerTax?

15    Is that fair?

16         A.   I agree that PowerTax is not specifically

17    mentioned in this -- in this quote.

18         Q.   Okay.  And you never reached out to Mr. Donahue

19    or anyone at National Grid to find out if others at

20    National Grid believed that pricing model was extremely

21    high?

22         A.   I did not.

23         Q.   And you didn't determine what other products

24    National Grid licenses in forming your opinions in this

25    case?

1      A.  Again, I don't have this document committed to

2   memory to the extent there's additional relevant

3   information in the document on that question.

4      Q.  Well, did you go and look to see what other

5   products National Grid licenses from PowerPlan in the

6   first half of 2020 when the survey was conducted?

7      A.  Again, as I said, I don't have the document

8   committed memory, but I can't recall specifically doing

9   that analysis.

10      Q.  And did you look to see what prices National

11   Grid is paying for the products that they licensed?

12      A.  No.

13      Q.  So look at the second bullet point.  Can we

14   agree that the second bullet point doesn't refer

15   specifically to PowerTax?

16      A.  I agree that the term "PowerTax" is not -- is

17   not used.

18      Q.  Okay.  In what way do you think -- are you

19   under the impression that this is a reference

20   specifically to PowerTax?

21      A.  I have an understanding that this refers

22   certainly to PowerPlan products, and it's talking about

23   asset, which I take to be fixed asset management, but

24   again, I don't have these -- this documents memorized,

25   so I'd have to go back to give you a more complete



1    answer.

2        Q.  Well, let's just talk about the words that are

3    in your report that you've quoted here.  Second -- the

4    second sentence, right, "Consultant hour rates are much

5    higher than market with no room for negotiation."  Is

6    that a reference to the tax -- the PowerTax market or to

7    the services market?

8        A.  My sense is that that would be to consulting,

9    be it in the services market as is relevant to PowerTax

10   or other consulting.

11       Q.  And it says, "Overall" -- the comment includes

12   "Overall quality of services delivered is average at

13   best."  Is that services or software?

14       A.  Again, I would have to go back to the document

15   to specifically answer that question that you posed.  My

16   understanding -- my recollection is that it's a general

17   statement, but again, I don't have these documents

18   memorized, so in order to give you a complete answer, I

19   would need to go back to the document.

20       Q.  Do you recall in the spreadsheet that you've

21   cited here -- it's a spreadsheet, and the only

22   commentary that really appears from the survey is the

23   comments that you're quoting.  Do you have a

24   recollection if there's something else in there that

25   would be relevant to the questions I'm asking you?



1        A.   Again, I have not memorized these documents.   I

2   don't -- I would have to go back and look to see what

3   else might be on that document.   I just haven't

4   memorized these documents.

5        Q.   And like with National Grid, you didn't go and

6   try to determine what specific products industries have

7   licensed as of the second half of 2020 when this

8   response was given or the prices they were paying for

9   those products?

10        A.   Correct.

11        Q.   Last bullet.   So, tell me, do you see a

12   specific reference to PowerTax in the last bullet?

13        A.   (Witness examining document.)   Again, I note

14   that here they're specifically talking with the tax

15   planning manager and asset-intensive organizations, both

16   are which are consistent with PowerTax, but I agree that

17   PowerTax, that phrase is not specifically used.

18        Q.   And like the others, you didn't do anything to

19   determine what PowerPlan products and services had

20   licensed as of the first half of 2021 or the prices they

21   paid for those products?

22        A.   Correct.

23        Q.   In paragraph 83, you talk about margins, and

24   you say that financial documents PowerPlan provided --

25   sorry.   "In financial documents that PowerPlan provided



1   to its parent company, Roper Technologies, PowerPlan

2   reported a gross profit margin of over ████████ on its

3   tax products."  Do you see that?

4        A.  Yes.

5        Q.  At what level of margin is an exercise of

6   market power implicated to have?

7        A.  I don't understand.

8        Q.  Okay.  So when you say that it's consistent

9   with your -- you're saying here that an ███████

10  margin on tax products is consistent with having market

11  power.  How did you make that determination?

12       A.  As is indicated in this paragraph, I did not

13  have -- the information that I had available to me on

14  margin was limited, but the margin -- profit margin

15  information that I had, limited though it was, was

16  certainly consistent with market power.

17       Q.  In what way?

18       A.  In that a profit margin is between zero and

19  100 percent, and ██████████ is a relatively high profit

20  margin in the realm of overall profit margins, and so I

21  looked at what I had available to me simply to see

22  whether there was consistency with market power.

23       Q.  Is there a test that you as a practicing

24  economist apply to determine whether a specific profit

25  margin indicates market power or not?



 1        A.  There's not a specific test.  And again, I had

 2   very limited visibility as to margins in the relevant

 3   set of products, so I'm simply, you know, reporting here

 4   what I was able to observe and the limited implications

 5   that I could draw from that.

 6        Q.  Well, the implication that you draw from it is

 7   that PowerPlan had market power.  I'm trying to see how

 8   you went from ███ margin to conclusion.  So did you

 9   compare the gross profit, as reported in paragraph 83,

10   with any other products that PowerPlan reports in its

11   financials?

12               MR. CIESLAK:  Objection.  Misstates

13   testimony.

14               THE WITNESS:  Again, I disagree with the

15   premise of the question.

16        Q.  (By Mr. Fazio)  Okay.  Well, did you compare

17   ████████  profit margin that you're reporting in

18   paragraph 83 with any other product line that PowerPlan

19   -- any other line of software that PowerPlan produces?

20        A.  Specific to that question, no, that's not a

21   comparison that I did.

22        Q.  Okay.  And did you compare the 85 percent to

23   any other software company?

24        A.  I did not.

25        Q.  Can we agree that high margins can exist even

1    in competitive markets?

2        A.  I don't disagree.  As a very general matter,

3    high profit margins can exist, yes, in competitive

4    markets, yes.

5        Q.  In market participants without market powers

6    can earn high margins, true?

7        A.  If you're asking me in a very general way sort

8    of in general if that can be true, yes, that can be

9    true.

10        Q.  Do you know what specific products are included

11    in the ███████████ figure that you're report in

12    paragraph 83?

13        A.  I would have to go back to the -- to the source

14    document to -- I don't have -- I don't recall, as I sit

15    here today.

16        Q.  So if it excluded things, other than PowerTax

17    as we defined them today, would that affect your

18    exclusions concerning profit margins?

19        A.  Again, as I have stated now several times, I

20    had very limited information available from PowerPlan

21    regarding the question of margin, so I simply looked at

22    the information that I had to determine whether or not

23    there was consistently or not.  That's as much as I was

24    to do based on the information that PowerPlan -- that I

25    saw from PowerPlan.



1    Q.  Did you do anything to investigate economic

2    literature, the use of profit margin as a metric for

3    market power?

4    A.  I'm certainly aware of -- of an economic

5    literature that talks about profit margins and market

6    power, yes.

7    Q.  And is it your view that market power -- that

8    it's generally accepted amongst economists, that market

9    power is a fair indicator of -- strike all of that.  I

10   went backwards.

11           Is it your understanding or your view that

12   amongst economists, it's generally accepted that profit

13   margins are a reliable indicator of whether a market

14   participant has market power?

15   A.  Again, I would say in a general matter -- as a

16   general matter, that's a question that's specific to the

17   situation and, you know, due to the limited visibility

18   that I had about profit margins, I was very careful in

19   terms of how much information I could glean from the

20   limited information that I had in light of -- in light

21   of literature and -- and the limited information that I

22   had.

23   Q.  In terms of -- you said the limited information

24   you had.  What additional information did you feel like

25   you needed to investigate whether this margin was



1    indicative of market power or not?

2        A.  To the best of my recollection, I looked

3    through the -- the documents -- to the best of my

4    recollection, this is the only place where I saw a

5    profit margin that was related specifically to tax

6    products and as it's indicated in sort of this

7    particular document.  So -- and I don't recall the level

8    of specificity, as I sit here today -- again, I haven't

9    committed these documents to memory, but I don't recall

10   a lot of additional specificity in terms of all of the

11   inputs into the -- into the ██████████, and I could be

12   wrong on that, as I sit here today.  I just can't recall

13   that document.  So I was able to use what I had, which

14   was the information to -- to indicate consistency with

15   market power.

16       Q.  Let's switch gears again.  Page 44 of your

17   report, section C where you indicate PowerPlan's

18   conducted has impeded Lucasys' ability compete.  It's at

19   paragraph 90.  Are you there?

20       A.  (Nodding yes.)

21       Q.  Sorry.

22       A.  Yes, I am there.

23       Q.  Now, in this section, we talked a little bit

24   about this earlier, so we'll try and not belabor it.  So

25   these four -- you identified four customers, specific

1    customers, where you say PowerPlan interfered with

2    Lucasys' relationship with its customers.  Do you see

3    that, starting at 92, paragraph 92?

4          A.   Yes.

5          Q.   Okay.  And I think you told me earlier that

6    these are the -- these are the four specific customers

7    that you can identify.  There's specific examples where

8    PowerPlan was interfering directly with a customer

9    relationship?

10         A.   Yes, I agree.

11         Q.   Okay.  Can --

12         A.   I would say specifically where it also -- where

13   Lucasys was either currently working with or had the

14   least a contract to work with the customer.  There's

15   evidence of letters being sent to many, many customers,

16   which could indicate interference, but this is

17   specifically with regards to specific customers that had

18   either engaged Lucasys or were, you know, planning to

19   use Lucasys specifically.

20         Q.   Okay.  And so with that -- with that, these are

21   -- that clarification, these are the only four that fall

22   into that category for you?

23         A.   Yes, to the best of my recollection, yes.

24         Q.   Okay.  Let me ask you :  Did you -- you've seen

25   the depositions of the various customers that were

1    deposed in this case?

2        A.  I've seen customer depositions, yes.

3        Q.  Did you ever ask counsel for Lucasys to seek

4    depositions from any other customers?

5            MR. CIESLAK:  Objection.

6            THE WITNESS:  Not to the best of my

7    recollect.

8            MR. CIESLAK:  That's fine.  Go on.

9            MR. FAZIO:  I agree.  That was close.

10       Q.  (By Mr. Fazio)  So not to the best of your

11   recollection.  Okay.  Would it have been helpful to you

12   to have testimony from other customers beyond the four

13   that are listed here in paragraph 92 in forming your

14   opinions about whether or not PowerPlan interfered with

15   Lucasys in the market?

16       A.  I'm not sure what you mean by "helpful."  This

17   certainly -- the evidence I reviewed certainly was

18   sufficient to reach my conclusions.

19       Q.  Now, in -- of the examples that are set forth

20   in paragraph 92, with respect to each of these, are

21   there any other specific examples of interference that

22   you intend to testify about through each trial with

23   respect to each of these four customers?  Do you follow

24   my question?

25       A.  No.



1       Q.  Okay.

2       A.  I don't.

3       Q.  Your description of the alleged interference

4   with each of them, this is -- you described the

5   interference that you think caused the alleged harm in

6   paragraph 92?

7       A.  (Witness examining document.)  I described the

8   specifics of the -- as I said, the examples of such

9   interference here.  I agree with that.

10      Q.  So let's just -- we'll go through these

11  quickly.  The first bullet point relates to NextEra.

12  You say in your last sentence -- last sentence, "Even

13  though the terminated project only involved services,

14  Mr. Lantukh testified that the project would have led to

15  NextEra licensing the copilot product after the

16  completion of the existing contract."  Do you see that?

17      A.  Yes.

18      Q.  So, first of all, is copilot is in the services

19  market or in the software market or do we not know?

20      A.  And I think you are asking me about these

21  earlier, and I just -- let me just refresh my

22  recollection.

23              (Witness examining document.)

24              I would have to go back and remind myself.

25  I just don't want to testify incorrectly as to those

1   particular markets.  My recollection is that it's part

2   of the solutions that would be today considered part of

3   the services market, but I would have to go back and

4   just double-check.

5        Q.  So the NextEra product, as you understand it,

6   involved only services?

7        A.  To the best of my recollection, as I sit here

8   today, I would want to go back and double-check on that.

9   That's my recollection, as I sit here today, but I could

10  be -- I could be mistaken on that.

11       Q.  What, if anything, did you do to verify Mr.

12  Lantukh's statement that the project would have led to

13  NextEra licensing the copilot project -- product at the

14  completion of the contract?

15       A.  As I stated, my understanding is that that is

16  -- that's his opinion based on his interaction with

17  NextEra.

18       Q.  So setting aside Mr. Lantukh's opinion, did you

19  look at this documents or do anything else to verify

20  whether his opinion was accurate or inaccurate?

21       A.  Not that I can recall.

22       Q.  Tell me how -- in what way was NextEra harmed

23  by PowerPlan's conduct in this situation.

24       A.  My recollection from talking to Mr. Lantukh or

25  reading his deposition was that NextEra wanted to



1   continue to work with Lucasys, and as a result of the

2   interference, did not do so.

3       Q.   And so how does that harm NextEra?

4       A.   That harms NextEra because NextEra wants to --

5   or demands a certain product or service that as a result

6   of the interference is unable to acquire from Lucasys.

7       Q.   So it's -- aside from customer preference, can

8   you point to any other harm that has fallen on NextEra

9   as a result of the alleged conduct in October of 2000 --

10  October or November of 2019?

11      A.   I'm not sure what the -- other than customer

12  preference refers to -- I mean, the -- the ability or

13  the lack of in ability of a customer to -- to purchase a

14  product or service as a result of the interference that

15  it wants to purchase, that in and of itself is a

16  competitive harm.

17      Q.   Did you consider --

18      A.   Both to the competition as a whole and to that

19  customer.

20      Q.   Did you do anything to determine whether

21  NextEra was agnostic as to whether they used Lucasys or

22  another provider?

23      A.   My understanding is that they were using

24  Lucasys for certain services and wanted to use Lucasys

25  for additional services, indicating a preference for



1   Lucasys.

2        Q.  Do you know if the corporate representative of

3   NextEra who testified in this case was ever asked id

4   they were perceived that they were harmed as a result of

5   this?

6        A.  I have not committed the depositions to memory.

7        Q.  AEP, the next bullet point down, you say -- and

8   I'm jumping down the last sentence.  You say, "I

9   understand that AEP paused using Lucasys' consulting

10  services in response to PowerPlan's demand that would

11  have eventually resumed using Lucasys' services."  Do

12  you see that?

13       A.  Yes.

14       Q.  Can we agree that the alleged pause was only a

15  couple of months?

16       A.  I don't recall, as I sit here today, exactly

17  what the duration of the pause was.

18       Q.  Was the duration of the pause relevant to your

19  determination as to whether or not AEP was harmed as a

20  result of the communication it received from PowerPlan?

21       A.  The specific duration of the pause was not

22  specifically relevant.  I mean, the fact that it was not

23  able to have access to Lucasys' consulting services as

24  it wanted to and on a schedule that it wanted to

25  indicates that there was a harm to competition and a



1    harm to AEP.

2         Q.  Do you know roughly when the pause occurred?

3         A.  Again, I noted on footnote 226 that I -- that

4    the deposition of -- of an individual, Mr. Yende from

5    AEP, speaks to that issue.  I don't have that memorized,

6    as I sit here today.

7         Q.  You're aware that Lucasys is currently engaged

8    providing tax services to AEP?

9         A.  That's my understanding.



20        A.  I don't understand your question.  I certainly

21   looked at AEP and recall seeing information about the

22   revenue that -- that Lucasys has received from AEP, but

23   there was -- there was still a pause, which indicates

24   harm to AEP.

25        Q.  And how did you quantify the harm from a pause?

1          A.   I haven't specifically calculated a dollar

2     amount, if that's what you mean by quantification of

3     harm, but just because there's no dollar amount

4     associated with a particular harm does not mean that

5     it's not a harm.

6          Q.   So Liberty, third bullet point down.  You say,

7     "Lucasys was engaged by Liberty to provide tax and fixed

8     asset advisory services."  Can we agree that the project

9     that Liberty was actually -- the specific engagement of

10    Liberty was actually provide internal support to Liberty

11    in implementing PowerPlan products?

12         A.   I'm sorry, could you say that again?  Could you

13    say the question again?

14         Q.   Yes.  Can we agree that the specific engagement

15    to Liberty related to providing internal support in

16    implementing PowerPlan products?

17         A.   That sounds correct, but I don't have memorized

18    where that particular language appears.

19         Q.   And does implementation of PowerTax at a new

20    company, does that fall within the tax services market

21    or is that something else?

22         A.   My understanding is that it was because of some

23    of the deficiencies and limitations of PowerTax that

24    Liberty required the assistance of Lucasys, which would

25    put it into the tax services.



 1       Q.  So your position is -- and it's your

 2   understanding in this case is that to implement new

 3   software, that's one of the limitations of the PowerPlan

 4   software.  It's limited in its ability to be

 5   implemented?

 6       A.  My understanding is that -- my recollection of

 7   my understanding is that necessity of Liberty to require

 8   or to need the assistance of Lucasys in the

 9   implementation is consistent with the limitations of the

10   PowerTax system.

11       Q.  So do you believe that the PowerTax system

12   should be implementing itself?

13       A.  I don't have an opinion on that.

14       Q.  So when I say -- when I ask you a question

15   about implementation, what's your understanding of what

16   implementation entails?

17       A.  My understanding of implementation is taking

18   the software and making it usable for the customer in

19   whatever ways that the customer requires in that

20   software.

21       Q.  Okay.  How -- in what way -- when you're

22   installing a new software and it's beginning to be used

23   by customers, in what way is Power Tax limited?

24       A.  My understanding is that some of the features

25   and functionality of PowerTax was -- I think it was

1    described by some customers as clunky and required

2    additional steps to be used, and that would be -- could

3    be in the ongoing process or could be in the

4    implementation process.

5        Q.  And I'm asking specifically about in

6    implementation.  What are these -- what are these

7    functions that are absent you were talking about?

8        A.  One that comes to mind is certain reports, to

9    run certain reports.  There's certain cutting and

10   pasting that's needed that's cumbersome.  That would be

11   one example.  I can't recall specifically for the

12   Liberty what the -- what the specific services were in

13   terms of implementation.

14       Q.  And so your view is that reporting

15   functionality is -- is something that comes up in

16   implementation of the software?

17       A.  Again, I'm not a software expert in terms of

18   the technical side of software, so I don't have an

19   opinion on that.

20       Q.  Okay.

21       A.  You asked me for some examples of limitations.

22       Q.  I'm trying to understand.  When you tell me

23   that aspects of implementation are limitations, which is

24   a term you use in your report and it's how you defined

25   your tax services market.  I'm trying to understand what

1    falls into it and what doesn't.  So I think -- is there

2    anything about the software implementation that is also

3    implementation, in your view?  Or if you haven't looked

4    into it, you can say too.  I'm not interested in going

5    into the granular detail if it's not necessary.

6        A.  Again, as I said before, I'm not a technical

7    expert on the software.  So I have a general

8    understanding of the limitations, but not specific as it

9    refers to interaction with implementation.

10       Q.  But you felt like you knew enough about it to

11   be able to define a market around the PowerTax -- the

12   alleged PowerTax limitations?

13       A.  My understanding and observation from Lucasys

14   by way of example and other companies in that space is

15   that there are limitations to the software and that

16   customers will and have spent money in order to obtain

17   consulting services, and for example, approve Lucasys in

18   order to overcome those limitations.

19       Q.  Well, there are lots of other environments in

20   which -- there are lots of other environments where

21   consultants are required to move data within an ERP

22   system, for example, true?

23           MR. CIESLAK:  Objection.  Lacks foundation.

24           THE WITNESS:  Again, I'm not a technical

25   software expert with regards to ERP systems.



1        Q.   (By Mr. Fazio)   So if an accountant comes into

2   -- comes into a company and is accessing the accounting

3   system and needs to do anything in the accounting

4   systems, is that a -- is that a -- it's a service in

5   support of a limitation of the accounting system or is

6   that something didn't?

7        A.   I don't have an opinion on that.

8                 THE VIDEOGRAPHER:   Can I change the tapes?

9                 MR. FAZIO:   Yes.

10                THE VIDEOGRAPHER:   Okay.   Off the record at

11  2:31 p.m., and we can go right back on if you all are

12  ready.

13                MR. CIESLAK:   Yes.

14                THE VIDEOGRAPHER:   This begins media unit

15  number three, and we're back on the record at 2:31 p.m.

16       Q.   (By Mr. Fazio)   All right.   Let's skip down to

17  Suez, your last bullet point.   You note here that

18  PowerPlan raised concerns about Lucasys' access to

19  PowerPlan's software in May or June of 2020?

20       A.   Yes.

21       Q.   Do you know the specific product -- the

22  specific projects that Lucasys was engaged by Suez to

23  provide services for?

24       A.   Not that I can recall.

25       Q.   And so did you do anything to confirm that the

1    services were related to PowerTax?

2        A.  My recollection was that I had an understanding

3    that they were, but not that I can specifically recall.

4        Q.  If the services were not related to PowerTax,

5    would they fall into your tax services market?

6        A.  If they were not related to PowerTax, then they

7    would not, no.

8        Q.  I think we touched on this earlier, but you

9    understand Suez decided to continue working with

10   Lucasys, true?

11       A.  That's my understanding.

12       Q.  You say here -- you quote a project manager.

13   You say, "Suez ultimately decided to continue its

14   engagement with Lucasys, though an extern project

15   manager at Suez noted in internal communications that,

16   quote, "I'm very surprised that he decided on Lucasys

17   because of the legal issue.  I thought all along," and

18   then you have in brackets, "Michael Salas, Suez chief

19   information officer and the person responsibile for

20   deciding how to respond to PowerPlan bracket was going

21   to say we had to work with PP."  What is -- why is

22   that -- why did you include that quote in the bullet?

23       A.  I included that quote because that refers to

24   the risk I was talking about before and the fact that

25   Suez has through this quote indicated that -- that at



1   least Michael Salas, who is his CIO -- well, this

2   individual thought that -- that Suez's CIO was going to

3   indicate that they had to work with PowerPlan because of

4   a legal issue and so indicating -- although they ended

5   up deciding on Lucasys.  So it's the connection between

6   the risks associated with legal issues and choice of

7   supplier.



13        Q.  Now, you talk -- you were talking a moment ago

14   about the risk that -- this quote, unquote, "legal issue

15   presented."  Did you review the -- the deposition,

16   30(b)(6) deposition, the corporate representative

17   deposition of Suez?

18        A.  I don't -- let me just see if I -- I don't know

19   if Mr. Brockway was the corporate representative to

20   which you're referring.

21        Q.  Yes, it was.

22        A.  And whether the specific deposition to which

23   you're referring, but that's the deposition with regard

24   to Suez that I recall.

25        Q.  Did you note when you read that deposition that

1   Suez's cooperate representative testified in response

2   actually to a question from Lucasys' counsel that none

3   of the communications from PowerPlan had resulted in

4   Lucasys losing out on future opportunities with Suez?

5   Do you recall seeing that testimony?

6       A.  Again, I don't have these depositions committed

7   to memory, but I certainly understand that Lucasys

8   continued to work with Suez.

9       Q.  Well, if the cooperate representative, in fact,

10  offered that testimony, doesn't that directly contradict

11  the risk issue that you're highlighting in this bullet

12  point?

13      A.  I disagree.

14      Q.  Okay.  Why?

15      A.  Because risk is a cost to a company.  It's

16  having to incur certain risks because of certain

17  behavior, regardless of whether or not it decided to

18  proceed or not.  In fact, it decided that Lucasys was

19  the better option to proceed despite the risk, but that

20  meant that it -- it was, as a result of that decision,

21  forced to incur that risk.

22      Q.  Okay.

23      A.  Which it otherwise wouldn't have incurred had

24  the competitive behavior had not occurred.

25      Q.  All right.  I think we talked about this

1   specifically with Suez, but just so we can cover it all

2   at once.  Are you aware of any situation in which

3   PowerPlan has brought legal action against any customer

4   over access to its software by Lucasys?

5            MR. CIESLAK:  Objection.  Asked and

6   answered.

7            THE WITNESS:  Again, I answered this

8   earlier in the deposition.  I'm aware of legal action

9   that PowerPlan brought against Lucasys, which certainly

10  could have an impact on customers, directly and

11  indirectly.  I'm not aware of any legal action that

12  PowerPlan has brought against customers.

13       Q.  (By Mr. Fazio)  So --

14       A.  We've been going about an hour.  I don't know

15  when a good time is to take a break.

16       Q.  If you need a break, I'm happy to take one.

17       A.  That would be great.

18       Q.  That's fine.

19            THE VIDEOGRAPHER:  Off the record at

20  2:38 p.m.

21            (Off the record.)

22            THE VIDEOGRAPHER:  All right.  Just a

23  moment.  Back on the report at 2:47 p.m.

24       Q.  (By Mr. Fazio)  All right.  Dr. Meyer, let's

25  talk about your comments beginning at paragraph 93 where

1   you're talking about the 2020 IP protection customer

2   communications.  Do you see that?

3       A.  Yes.

4       Q.  Okay.  Now, you state here that PowerPlan sent

5   out letters to 40 or 50 customers over a period of time,

6   true?

7       A.  That's my understanding, yes.

8       Q.  Did you communicate with any recipient of an IP

9   protection letter?

10      A.  Personally, I did not.

11      Q.  Did anybody from New York communicate with a

12  recipient of an IP protection letter?

13      A.  No, not to the best of my knowledge.

14      Q.  Are you aware of anybody else who communicated

15  with a recipient of an IP protection letter where you've

16  gotten feedback from the recipient on it?

17      A.  Not to the best of my recollection.

18      Q.  Did you do anything to determine whether any

19  recipient of an IP protection letter were considering

20  either the purchase of tax services or tax software at

21  the time you received the letter?

22      A.  Not specifically, no.

23      Q.  Did you do something generally?

24      A.  Certainly the letter and specifically the --

25  the language that I have pulled out talks about Lucasys

1    specifically, so specifically alerting customers or

2    potential customers to Lucasys, but other than that, no.

3        Q.   Did you do anything to determine whether an IP

4    protection letter influenced any recipient's decision to

5    engage with Lucasys?

6        A.   Again, specific to any particular customer, no.

7        Q.   Can you identify any customer that did not do

8    business with Lucasys as a result of receiving an IT

9    protection letter?

10       A.   Specifically, no.

11       Q.   Now, you cite to two paragraph from a letter

12   here, but to be clear, there's another paragraph in that

13   letter that says PowerPlan's consent was not required to

14   engage Lucasys to the extent they was doing things that

15   did not involve access to the PowerPlan software.  Do

16   you remember that?

17       A.   I recall that this is just an excerpt from the

18   letter, yes.

19       Q.   Do you remember the text that I'm talking

20   about?

21       A.   Again, you keep asking me about things --

22   whether I committed things to memory without showing me

23   documents, and no, I have not committed the document to

24   memory.

25       Q.   I'll show you.



```
 1              (Exhibit 2 marked for identification.)

 2        Q.  (By Mr. Fazio)  Here you go, doctor.

 3        A.  (Witness examining document.)

 4        Q.  Now, doctor, I want to direct your attention to

 5   what's been marked as Exhibit 2.  Okay.  And if you look

 6   at your last sentence of paragraph 93, you say, "The

 7   image below is from the document that appears to be the

 8   template from those communications."  Do you see that?

 9        A.  Yes.

10        Q.  And then you have a footnote 237, and footnote

11   237 refers to Exhibit 17 from the deposition of Brett

12   Bertz.  And do you see the Brett Bertz Exhibit 17

13   sticker on --

14        A.  I do.

15        Q.  -- Exhibit 2?

16        A.  Yes.

17        Q.  Now, can you just take a look at Bertz 17, your

18   Exhibit 2, and if you could just compare the two

19   paragraphs that you have excerpted and put into your

20   report with the second and third paragraphs of this

21   letter template.

22        A.  (Witness examining document.)

23        Q.  All set?

24        A.  Yes.

25        Q.  Okay.  And so are these the two -- paragraphs
```

1    two and three from Exhibit 2, are these the paragraphs

2    that you excerpted into your report?

3        A.  Yes.  That's correct.

4        Q.  Okay.  Now, there's a paragraph that follows

5    that paragraph, the fourth paragraph on first

6    Exhibit 17.  Do you see that?

7        A.  I do.

8        Q.  The one that says, "PowerPlan's consent is not

9    required for customers to retain Lucasys for projects

10   that will not involve access to, disclosure of, or

11   working with PowerPlan software, or other confidential

12   information."  Do you see that?

13       A.  Yes.

14       Q.  Okay.  Is there a reason you didn't include

15   this paragraph excerpted into your report?

16       A.  There are also other paragraphs that I did not

17   include either.  I simply included these two paragraphs

18   that talk about -- and it specifically says it's from

19   the document that talk about the limitations and the

20   assertions of intellectual property.

21       Q.  Okay.  Let's talk about that for a second.

22   Where is -- when you say, "insertion of intellectual

23   property," what are you referring to?

24       A.  (Witness examining document.)  I'm referring to

25   the specific use of the term "intellectual property" as



1   used by PowerPlan.

2       Q.  Okay.  And where specifically are you doing

3   that?  Where does that language come up?

4       A.  It comes up in both paragraphs.  It comes up in

5   the first paragraph and including trade secrets, which I

6   understand to be one form of intellectual property, and

7   then it comes up in the second paragraph as well.

8       Q.  And do you think it's relevant that in the same

9   letter in the paragraph immediately following the two

10  that you cite, PowerPlan was making it clear that it had

11  -- did not need -- no PowerPlan customer needed

12  PowerPlan's consent to use Lucasys if they were doing

13  work that did not involve access to PowerPlan's

14  software?

15      A.  (Witness examining document.)

16            No, I don't think that's particularly

17  relevant.

18      Q.  Why is that?

19      A.  Because, as I stated, the communications

20  specifically spoke about the concerns that were -- and

21  the -- the alerting of customers to protect -- to

22  potential risks associated with using Lucasys, and those

23  are indicated in these two particular paragraphs.  There

24  are also other place certainly in the final points.

25  There's again mention of contacting PowerPlan.  So there

1    certainly is additional information throughout the

2    letter, and I -- I cite to the entirety of the letter.

3    These just happen to be two paragraphs that specifically

4    deal with that risk.

5         Q.  Have you made any determination in your work in

6    this case whether the license agreements that PowerPlan

7    has with its customers require consent before someone

8    gives access to the PowerPlan software to a third party?

9         A.  (Witness examining document.)  I certainly

10   recall seeing information.  There's information later on

11   in this letter about confidential information and the --

12   and the license agreement.

13        Q.  So is it your position that when PowerPlant

14   sent these letters -- well, I don't know.  Maybe I don't

15   know if you've formed an opinion.  Have you formed an

16   opinion on this letter as to whether or not it

17   accurately portrays rights and customer obligations

18   under the license?  Is that an opinion you intend to

19   given this case?

20        A.  That is not an opinion.  I'm not a -- I'm not a

21   lawyer or legal expert.  That's not an opinion that I

22   intend to give or that I'm qualified to give in this

23   case.

24        Q.  Now, in paragraph 95, you state that Mr. Bertz

25   testified that he had no evidence that Lucasys had



1  misappropriated PowerPlan's confidential information and

2  trade secrets at the time PowerPlan sent the letter or

3  the correspondence described above.  Do you see that?

4         MR. CIESLAK:  Just to be clear, we're back

5  on Dr. Meyer's report?

6         MR. FAZIO:  Yes.  Sorry.

7         MR. CIESLAK:  Just keeping a clear record.

8         THE WITNESS:  Yes.  I believe you either

9  read or paraphrased that sentence correctly.

10     Q.  (By Mr. Fazio)  Okay.  Do you know whether

11  Mr. Bertz was among the people that were charged with

12  evaluating whether or not in was a risk to PowerPlan's

13  intellectual property as a result of Lucasys' access to

14  PowerPlan's software?

15     A.  Again, I have -- I don't have Mr. Bertz's

16  deposition or the other deposition committed to memory.

17  I don't recall one way or the other.

18     Q.  Well, if Mr. Bertz was in a position to know,

19  would you have cited him here?

20     A.  Well, Mr. Bertz was testifying about the letter

21  itself.  He seemed to be the individual knowledgeable

22  about the contact of customers by PowerPlan.  So to that

23  end, the information that he -- what he knew or didn't

24  know about Lucasys' actions would be relevant with

25  regards to him sending or knowing about sending of the



1   letters.

2        Q.   Flip over to paragraph 96.

3        A.   (Witness complying.)

4        Q.   It's your report.  Page 48.  There you say --

5   you cite Mr. Chang for the proposition that Lucasys has

6   lost a lot of business due to the reputation damage from

7   PowerPlan's alleged interference.  Can you tell me what

8   have you done to corroborate Mr. Chang's testimony?

9        A.   As I stated before, the -- there's evidence

10  obviously from the four particular customers that we

11  spoke earlier that had already engaged or at least been

12  in discussions with Lucasys about an engagement.

13  However, the other customers who never engaged Lucasys,

14  I can observe, as an economist, with regards to a

15  reduction or a change in that level of engagement, but

16  individuals like Mr. Chang in the marketplace would have

17  their opinions, as he did, about the effect of those

18  letters.

19       Q.   So would it be fair to say that you as an

20  economist, you're not offering an opinion in this case

21  that Lucasys' business reputation was, in fact, damaged

22  by PowerPlan's conduct?

23       A.   Again, because of the period of time during

24  which the letters were sent before Lucasys had a chance

25  to really establish itself in the market, it's not



1    possible for me as an economist to -- to observe that

2    reputation damage directly in customers that hadn't yet

3    engaged Lucasys, although we can certainly see it in

4    customers that had, but Mr. Chang being in the market

5    would have a sense of the reputation of Lucasys.

6        Q.   So for this particular point, you're relying on

7    Mr. Chang exclusively; is that fair?

8        A.   For Mr. Chang's testimony, I'm relying on Mr.

9    Chang, yes.

10       Q.   Okay.   In term of this broader point about

11   damage to reputation, is there other evidence that you

12   know of or that you could would cite to at trial about

13   reputational damage to Lucasys' business reputation?

14       A.   Again, the totality of my report speaks to a

15   lot of issues that are relevant to this question,

16   including PowerPlan's own -- I believe there was a quote

17   that, for example, Lucasys' oxygen is gone and other

18   such statements, and additionally, Lucasys' other

19   statements about difficulties in light of this ant

20   competitive conduct, but specifically, I can't recall,

21   as I sit here today, another -- there may be and it may

22   be elsewhere in my report.   I just can't recall, as I

23   sit here today, another instance of the use of the word

24   "reputation damage" specifically.

25       Q.   In terms of your -- you were very clear earlier

1    about the four customers that are identified your

2    report, but I just want to make sure clear on --

3    collaboratively.  Do you agree that there is no record

4    or evidence in this case that any of the 40 to 50

5    customers that received an IP protection letter from

6    PowerPlan elected not to work with Lucasys because of

7    that letter?

8              MR. CIESLAK:  Objection.  Calls for

9    speculation.

10             THE WITNESS:  (Witness examining document.)

11   Again, I can't recall, as I sit here today, a particular

12   -- a customer that would fall into that category, as I

13   sit here today.

14       Q.  (By Mr. Fazio)  So the next section in your

15   report, you talk about -- you say, quote, "PowerPlan has

16   misappropriated confidential and proprietary information

17   and trade secret in PowerPlan."  Section 3 starts at

18   paragraph 97.  Are you with me?

19       A.  Yes.

20       Q.  Now, I wanted to direct your attention to

21   paragraph 101, which is the concluding paragraph of this

22   section.  The last sentence, you say, "Accordingly, it

23   is economically reasonable to assume that prior to their

24   dismissal, the counterclaims of PowerPlan against

25   Lucasys had a dampening effect on competition."  Do you

1    see that?

2         A.  I apologize.  I do not.  I didn't catch where

3    you were starting.

4         Q.  I'm sorry.  Last -- it's paragraph 101, last

5    sentence.

6         A.  (Witness examining document.)  Last sentence,

7    yes.  I'm sorry.

8         Q.  Okay.  Are you with me?

9         A.  I am.

10        Q.  Okay.  I just want to ask you, are you aware of

11   any testimony from any customer or potential customer in

12   the alleged tax software market indicating that it would

13   not work with Lucasys because of PowerPlan's

14   counterclaims?

15        A.  Again, as I have indicated before, we have a

16   number of customers where there's specific information

17   about a change in the business relationship.  In at

18   least one of those cases, legal risk specifically was

19   discussed.  Whether that was specific to the lawsuit

20   itself or the letter, it wasn't clear from that

21   statement, and likewise about the customers who received

22   the letter, but in terms of as a matter of economics,

23   the presence of a lawsuit certainly increases risk of a

24   customer working with -- with Lucasys, which would tend

25   to have a dampening effect on competition.

1      Q.  So my question was simple.  I'm just asking you

2  if you were aware of any testimony from any customer or

3  any potential customer in the alleged tax software

4  market or in the tax software market indicating it would

5  not work at Lucasys because of PowerPlan's

6  counterclaims.  I understand your broader point about

7  risk.  I'm asking you that specific question.  Are you

8  aware of any testimony?

9      A.  Specifically with regards to any particular

10  customer, no.

11      Q.  Can you point me to any document in which any

12  customer, potential customer, in the alleged tax

13  software market indicated it would not work with Lucasys

14  because of PowerPlan's counterclaims?

15      A.  Again, specific to a particular customer and

16  specific to the counterclaims as distinct from the more

17  general combination of anticompetitive behavior, no, I

18  can't isolate that.

19      Q.  Can you point me to any evidence that any

20  customer or potential customer in the alleged tax

21  services market indicated that it would not work with

22  Lucasys because of PowerPlan's counterclaims?

23      A.  And again, as I stated before, we certainly

24  have -- we have a number of customers specifically

25  changing their business relationship with Lucasys and



1   customers receiving several pieces of information, the

2   letter being one, regarding potential risk associated

3   with Lucasys, but if you're asking me specifically to

4   isolate the counterclaims and the effect of that

5   specifically on a specific customer in isolation, no, I

6   can't do that.

7       Q.   Do you understand that Lucasys actually filed

8   suit against PowerPlan in July 2020?

9       A.   My recollection, I don't recall the exact date

10  of the original complaint, but that sounds about with

11  what I recall.

12      Q.   Right.  Well, you're aware -- let's simplify it

13  a little bit.  You're aware that Lucasys originally

14  brought the claim against PowerPlan, fair?

15      A.   That's my understanding, yes.

16      Q.   And in forming your opinions in this case, did

17  you consider what impact Lucasys' filing of the suit

18  against PowerPlan may have had on Lucasys' ability to

19  compete in the tax software market?

20      A.   Not specifically, no.

21      Q.   And you're aware that PowerPlan's answer and

22  counterclaim wasn't filed in 2021, October 2021?

23      A.   Again, I don't have those dates memorized.

24      Q.   Let's again simplify it.  Is it fair to say

25  that prior to the filing of the counterclaims, there



1    couldn't have been any representation damage to Lucasys

2    associated with the counterclaims?

3         A.   I certainly agree that there wouldn't be

4    specific harm associated with the filing of the

5    counterclaims, but again, the letters and any other

6    communication with PowerPlan that either alluded to

7    legal risk or another -- in any other way suggested

8    legal risk.  Whether or not it was the actual filing of

9    the counterclaims or not certainly could have that

10   dampening effect, but in terms of the dampening effect

11   of the counterclaim, other than specific communication

12   about an intention to file a counterclaim, that would

13   come from the filing of the counterclaim.

14        Q.   So I asked you a minute ago about the potential

15   impact of Lucasys filing lawsuit against PowerPlan, and

16   you told me that you didn't specifically look into that.

17   Is the filing of the complaint by Lucasys in which they

18   at least raised a discussion about trade secrets in the

19   complaint, would that have the bearing on the risk that

20   an IOU may face when they're deciding whether or not to

21   use Lucasys?

22             MR. CIESLAK:  Objection.  Misstates

23   testimony.

24             THE WITNESS:  I'm sorry.  Now that I'm

25   trying to answer your question, I just want to make sure



1    that I heard it correctly.  Could you repeat the

2    question?

3                  (Whereupon, the question was read back on

4    the record.)

5                  THE WITNESS:  I'm not quite sure I

6    understand that question.

7                  MY.  FAZIO:  That was the question

8    equivalent to a toddler running downhill.

9        Q.  (By Mr. Fazio)  The filing of the complaint

10   itself, did that have any bearing on the risks that IOUs

11   would have faced in determining whether they wanted to

12   use Lucasys or some other vendor for tax services or tax

13   software?

14       A.  I don't -- I don't believe that that would have

15   increased the risk above and beyond the risk that the

16   companies were facing.

17       Q.  Well, at that point in time prior to the filing

18   of the complaint, what were the risks that the companies

19   were facing?

20       A.  Well, prior to the filing of the complaint,

21   they would have been the risks that were being -- were,

22   in fact, discussed in the complaint, such as the

23   letters.  So those were already -- had already been

24   sent, and my understanding is that -- well, and the

25   filing of the lawsuit would indicate at least an attempt



1   by Lucasys to push back against that risk.

2       Q.  So beyond the 40 or 50 recipients of the IP

3   protection letters, are you aware of any other IOUs that

4   were either -- they received a copy of those letters or

5   knew of those letters by any specific IOUs who was not

6   necessary a recipient, but knew of them?

7       A.  I don't recall seeing information about that

8   one way or the other.

9       Q.  So you said earlier you're not a lawyer.  Great

10  judgment on your part.  So I assume you have no opinion

11  as to whether or not PowerPlan was obligated to file its

12  counterclaim or risk waiving them?

13      A.  Again, I'm not a legal expert.  I don't have an

14  opinion on that knowledge, no.

15      Q.  We're you provided any information concerning

16  the pre-litigation exchange of information where Lucasys

17  disclosed certain proprietary information to PowerPlan's

18  former counsel?

19              MR. CIESLAK:  Objection.  Lacks foundation.

20              THE WITNESS:  I don't recall any such

21  documentation that I reviewed, not as I sit here today.

22      Q.  (By Mr. Fazio)  Are you aware that -- that

23  generally that that process occurred?

24      A.  I don't have a recollection one way or the

25  other.  Nothing comes to mind, as I sit here today.



1      Q.   Now, I'll represent to you that the

2  counterclaims were pending for about seven months, and I

3  think you know they were dismissed.  So you know they

4  were dismissed, true?

5      A.   Yes.

6      Q.   Okay.  And so I'll represent to you that it was

7  about seven months later.  What, if anything, do you do

8  to test your assumption that competition was dampened

9  during the period the counterclaims were pending?

10      A.   Again, given all of the anticompetitive

11  behavior by PowerPlan, it wasn't possible to isolate the

12  specific effect of the counterclaims at a particular

13  point in time.  I just note, as I have noted in my

14  report, the uncertainty and the dampening effect as a

15  matter of economics that the threat of intellectual

16  property litigation would tend to have on customers.

17      Q.   In the year since the counterclaim has been

18  dismissed, has Lucasys sold any software in the tax

19  software market?

20      A.   Again, I don't think it's been quite a year.  I

21  think it was May.  I think it was May again, but --

22      Q.   Fair --

23      A.   -- but not to my understanding.

24      Q.   So let's assume that the only issue in the case

25  that Lucasys was concerned about were the counterclaims,



1    and there was nothing prior to that.  Would you have

2    been able to measure the dampening effect if that was

3    the only conduct that Lucasys was complaining about?

4              MR. CIESLAK:  Objection.  Incomplete

5    hypothetical.

6              THE WITNESS:  I can't answer that.  That's

7    not what I understood -- that's not what I understand

8    the claims to be or the circumstances to be, so I might

9    or I might not, depending on the circumstances.

10        Q.  (By Mr. Fazio)  So just -- are there

11   circumstances that you would need to understand beyond

12   only the counterclaims -- the only issue that was being

13   complained about were the counterclaims and the other

14   issues had never happened?  I'm trying to understand

15   what your method would be to measure this dampening

16   effect.  How would you go about doing that?  Whether or

17   not you could do it in this case because these were the

18   things -- set that aside for a moment.  What would the

19   method be for you to determine the dampening effect that

20   you refer to in your report?

21        A.  Well, it would be to look at all the evidence

22   in the case, but whether or not that would be possible

23   to ascertain the damning effect, I don't know because we

24   do actually have these other factors that are happening

25   at the same time.



1       Q.   Paragraph 102, you talk about authorized vendor

2  agreement.  Do you see that?

3       A.   Yes.

4       Q.   Okay.  And you say, second sentence there, "I

5  understand that Lucasys' believes that the scope of the

6  AVA is overly restricted of that is in attempting to

7  deny Lucasys' right and information that is not

8  exclusive to PowerPlan and enable PowerPlan to impose

9  burdensome and costly audits on Lucasys."  Do you see

10 that?

11      A.   Yes.

12      Q.   Independent of what Lucasys may have told you,

13 have you done anything to analyze the authorized vendor

14 agreements that PowerPlan has with certain service

15 providers?

16      A.   (Witness examining document.)  Again, I note

17 the specific sources for both in terms of Lucasys itself

18 and also RCC and its opinions about the restrictive

19 nature, but other -- and my economic analysis of the

20 potential for such agreements to raise the cost of

21 becoming -- of being a service provider under such an

22 agreement.  Those were the things I've done in addition

23 obviously to everything this in report as a backdrop.

24      Q.   Have you read the authorized vendor agreement

25 that was proposed to Lucasys?



1      A.  My recollection is I've seen an authorized

2  agreement.  Whether or not it was for Lucasys, I just

3  can sit here and recall, as I sit here today.

4      Q.  Have you done anything independently evaluate

5  the impact that the proposed AVAs had on competition in

6  the tax services market?

7      A.  Again, in isolation, the AVAs are -- in this

8  particular situation, are a part of the entirety of

9  the -- of the set of anticompetitive behaviors.  I

10  haven't sought to isolate their impact separately.

11      Q.  Have you done anything to compare the

12  authorized vendor agreements that PowerPlan entered into

13  with third-party providers to any kind of industry

14  standard or comparable AVAs that existed in other

15  software markets?

16      A.  No.

17      Q.  Do you have understanding as to whether or not

18  the AVAs allowed certain third-party vendors into

19  PowerPlan's cloud environment?  Do you know if that's

20  true or not?

21      A.  I don't recall, as I sit here today.

22      Q.  So with respect to access to the cloud -- to

23  PowerPlan's cloud environment, if prior to the AVA third

24  parties were not permitted access at all to provide

25  services, and after the AVA, they were able to provide



1   services, can we agree that would actually be

2   procompetitive with respect to the tax services market?

3                 MR. CIESLAK:  Objection.  Incomplete

4   hypothetical.

5                 THE WITNESS:  I can't answer that one way

6   or the other.

7        Q.  (By Mr. Fazio)  Well, we certainly increase

8   choose.  Can we agree to that?

9                 MR. CIESLAK:  Objection.  Incomplete

10  hypothetical.

11                THE WITNESS:  Again, that would depend on

12  the totality of the agreement and the implications in

13  the specific way that you're discussing, and I just

14  don't recall that, as I sit here today.

15       Q.  (By Mr. Fazio)  Can you point to any evidence

16  that an AVA actually raised this tax service market

17  participant's cost?

18       A.  Insofar as there's discussion of audits that

19  are burdensome that would increase cost, insofar as it

20  limited a provider's ability to provide a full range of

21  products and services that would raise -- that could

22  raise their costs of operation.

23       Q.  Do you have any -- can you point to any

24  evidence or record in the case of either of those things

25  actually occurring?



1       A.  I can't recall specific evidence of an audit

2  occurring, not to the best of my recollection.

3       Q.  In terms of PowerPlan, is it your view that

4  there are no legitimate restrictions they can impose on

5  customers and the customer's use of third-party

6  consultants?

7       A.  I am not a legal expert.  I don't have an

8  opinion as to that question.

9       Q.  And do you have -- do you degree that

10 protecting a firm's intellectual property is reasonable?

11      A.  I don't understand what you mean by that

12 question.

13      Q.  Well, is it reasonable -- if you have

14 intellectual property, is it reasonable to take steps to

15 protect it?

16      A.  Again, I don't know what you mean by

17 "reasonable" in that context.

18      Q.  Okay.  Well, can we agree that intellectual

19 property protection are procompetitive in the sense that

20 they would provide an incentive for investment?

21              MR. CIESLAK:  Objection.  Incomplete

22 hypothetical.

23              THE WITNESS:  I understand in this case

24 there's a disagreement about whether there is

25 intellectual property to be protected.  As a matter --



1   as a more general matter, even in situations where there

2   is intellectual property to be protected, there's also a

3   balance between the -- any potential procompetitive

4   effects of protecting that intellectual property and

5   anticompetitive effects of an exclusion related to that

6   protection.

7       Q.  (By Mr. Fazio)  Okay.  You mentioned the

8   dispute over trade secrets in this case.  That's not

9   something you're going to offer an opinion on in the

10  trial of this case whether PowerPlan had or didn't have

11  particular trade secrets?

12      A.  I'm not a legal expert.  That's not part of my

13  opinion, no.

14      Q.  You're aware that Lucasys has never actually

15  signed or agreed to the AVA that was proposed to it,

16  correct?

17      A.  That's my understanding.

18      Q.  So in this case, Lucasys was never -- they were

19  never bound by the AVA, true?

20      A.  Again, I'm not a legal expert.  I certainly --

21  I would assume that if you haven't signed something,

22  you're not bound by it, but I'm not a legal expert, so I

23  won't offer an opinion on that.

24      Q.  All right.  So at least with respect to Lucasys

25  as a -- as a firm that did not enter into an AVA, the



1   AVA itself couldn't have impeded Lucasys in any way.  If

2   it's not bound by it, can't impede them; is that fair?

3           MR. CIESLAK:  Objection.  Vague.

4           THE WITNESS:  Well, I would disagree.

5       Q.  (By Mr. Fazio)  Okay.  Tell me why.

6       A.  Well, to the extent that failing to agree to

7   sign an agreement that Lucasys feels is overly

8   burdensome results in Lucasys not being considered an

9   authorization vendor, certainly to the extent --

10  particularly in light of a tax services market linked to

11  the limitations of the PowerTax software would certainly

12  not be beneficial to Lucasys.

13          MR. FAZIO:  Take ten minutes.

14          MR. CIESLAK:  Okay.

15          THE VIDEOGRAPHER:  Off the record at

16  3:30 p.m.

17              (Off the record.)

18          THE VIDEOGRAPHER:  All right.  Just a

19  moment.  Back on the record at 3:41 p.m.

20      Q.  (By Mr. Fazio)  Dr. Meyer, you mentioned

21  earlier that you had reviewed Dr. Tyler's report?

22      A.  Yes.

23      Q.  Okay.  After reviewing his report, was there --

24  are there any opinions or conclusions that you reached

25  in your report that you've changed?



 1      A.  No.

 2      Q.  Do you have any specific criticisms of Dr.

 3  Tyler's report?

 4      A.  I reviewed the portions of his report related

 5  to my -- my report, and I disagree with his critiques of

 6  my report, but I don't have specific criticisms above

 7  and beyond that.

 8      Q.  Well, in what sense do you disagree with his

 9  critiques of your report?

10      A.  Well, I believe that he mischaracterizes my

11  report in a number of different places.  Flatly

12  incorrectly asserts certain statements to me or ascribes

13  them to my report and opinions, which are not true.  He

14  incorrectly characterizes my opinion and things of that

15  nature.

16      Q.  Okay.

17      A.  I don't have a complete list of those

18  disagreements at my fingertips.

19      Q.  Well, can you give me a couple of examples?

20      A.  Again, there were -- there were instances in

21  which I recall him essentially saying that I didn't, you

22  know, look at a certain type of analysis or didn't --

23  something to that nature or came to a certain

24  conclusion.  He claims that I came to a certain

25  conclusion which I didn't come to.  Again, I don't have



1    those committed memory.

2       Q.  Your report, you got -- in your Exhibit 1, you

3    got as a profile/CV, which if you go to page -- it's

4    unnumbered, but it would be Page 52.

5       A.  Yes.

6       Q.  Okay.  Second paragraph of the profile, you

7    were described as somebody who analyzes damages and

8    provide expert testimony concerning issues arising

9    patent trademark, copyright infringement,

10   misappropriation of trade secrets, breach of contract,

11   analyze lost profits, so forth, and so on.  Did you

12   consider offering a damages opinion in this case?

13      A.  I was not asked to provide a damages opinion in

14   this case.

15      Q.  Okay.  And have you -- did you do anything to

16   support Dr. -- or Mr. Olson in preparing his damages

17   opinion in the case?

18      A.  I did not.

19      Q.  In terms of your -- your work at NERA, what

20   percentage of your work is litigation related?

21      A.  That really depends on -- as to the time

22   period.

23      Q.  Yes.

24      A.  I would estimate that over the last several

25   years, that could range from 40 percent or so to about

1  maybe 70, 75 percent, depending on the particular time

2  period involved.

3      Q.  And when you're not working on litigation type

4  engagements, what sort of work do you do?

5      A.  I have a number of different roles at the firm.

6  I'm chair of the intellectual property practice and a

7  member of the board of directors.  So there's -- and a

8  managing director of my own team for human resources

9  purposes.  So there's another of tasks that fall into

10  that category -- all of those categories.  And then

11  additionally, I do consuming work related to economics

12  in a number of different areas, which are not litigation

13  related as well.

14      Q.  Your -- if you flip over to Page 3 of your CV,

15  there's a section that starts "testimony and expert

16  reports," and I'm assuming these are just for the last

17  four years?

18      A.  Yes.  That's correct.

19      Q.  Okay.  And of this list, are there any case you

20  think are particularly similar to this case?

21      A.  (Witness examining document.)  I'm not sure

22  what you mean by "particularly similar."

23      Q.  Any of these involve potential market entrance,

24  coming into a market?

25      A.  Certainly a number of these would involve



1    potential market entrance, coming into a market.

2         Q.  Okay.  Which ones?

3         A.  I probably will not -- I will not be able to

4    give you an exhaustive list --

5         Q.  Sure.

6         A.  -- as we sit here today.  The ones that comes

7    to mind are, at a minimum, the Farmobile case, the

8    Danieli case.  And I'm looking at Page 4.  I would

9    consider the Siemens case to be -- one could

10   characterize that either way as a market entrance case

11   coming into a market.  The Guide Tech case could be

12   characterized in that way.  The FloodBreak case could be

13   characterized in that way.  The PPG case on Page 5 could

14   be characterized in that way.  The IN Venture case could

15   be characterized in that way.

16        Q.  On Page 6?

17        A.  On Page 7.  Those are ones, as I sit here

18   today, that can be characterized that way, but there may

19   be others as well.  I'm not able to bring to mind all of

20   the issues and all of the cases as, I sit here today.

21             MR. FAZIO:  All right.  Dr. Meyer, thank

22   you.  I don't have any further questions.

23             MR. CIESLAK:  Nothing from us.

24             THE VIDEOGRAPHER:  All right.  This

25   concludes the video recorded deposition.  We're off the

1    record at 3:51 p.m.

2                    (Off the record.)

3         (The proceeding were concluded at 3:51 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    -       -       -

 2              CERTIFICATE OF REPORTER

 3

 4      STATE OF GEORGIA)

 5                     )

 6      COUNTY OF DEKALB)

 7

 8              I, TAMIKA M. BURNETTE, hereby certify

 9   that the foregoing proceedings were taken before me at

10   the time and place therein designated; that a review of

11   the transcript was requested, and that the foregoing

12   pages numbered 1 through 177 are a true and correct

13   record of the aforesaid proceedings.

14              I further certify that I am not a relative,

15   employee, attorney or counsel of any of the parties, nor

16   am I a relative or employee of any of the parties'

17   attorneys or counsel connected with the action, nor am I

18   financially interested in the action.

19

20              DATED this 28th day of March, 2023

21

22

23        _____

24              TAMIKA M. BURNETTE

25        CERTIFIED COURT REPORTER, RPR, CSR-2870
```

```
 1                    COURT REPORTER DISCLOSURE

 2              Pursuant to Article 10.B of the Rules and

 3    Regulations of the Board of Court Reporting of the

 4    Judicial Council of Georgia which states:  "Each court

 5    reporter shall tender a disclosure form at the time of

 6    the taking of the deposition stating the arrangements

 7    made for the reporting services of the certified court

 8    reporter, by the court reporter's employer, or the

 9    referral source for the deposition, with any party to

10    the litigation, counsel to the parties or other entity.

11    Such form shall be attached to the deposition

12    transcript."  I make the following disclosure:

13                    I am a Georgia Certified Court Reporter.

14    I am here as a representative of

15    Trustpointe.One/Alderson.  Trustpointe.One/Alderson

16    contacted to provide court reporting services for the

17    deposition.  Trustpointe.One/Alderson will not be taking

18    this deposition under any contract that is prohibited by

19    O.C.G.A. 91128(c).

20                    Trustpointe.One/Alderson as no

21    contract/agreement to provide court reporting services

22    with any party to the case, any counsel in the case, or

23    any reporter or reporting agency from whom a referral

24    might have been made to cover this deposition.

25    Trustpointe.One/Alderson will charge its usual and
```

```
1    customary rates to all parties in the case, and a

2    financial discount will not be given to any party to

3    this litigation.

4                         Tamika M. Burnette, RPR, CCR2870

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Notice Date: 03/28/2023

Deposition Date: 3/15/2023

Deponent: Christine S. Meyer, Ph.D.

Case Name: Lucasys Inc. v. Powerplan, Inc.

Page:Line           Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

**< $ >**
**$2** 77:*12*
**$3** 139:*11, 14*

**< 0 >**
**0159157** 122:*2*
**01595157** 121:*21*

**< 1 >**
**1** 3:*12* 5:*15, 16* 38:*24*
174:*2* 178:*12*
**1,000** 122:*4*
**1:20-CV-02987-AT** 1:*7*
**1:40** 115:*1*
**10.B** 179:*2*
**10:12** 45:*6*
**10:27** 45:*9*
**100** 128:*19*
**1000** 2:*21*
**101** 158:*21* 159:*4*
**102** 167:*1*
**11** 29:*20, 25*
**11:17** 73:*2*
**11:26** 72:*24*
**11:45** 89:*4*
**12:02** 89:*7*
**12:45** 114:*19, 23*
**127** 2:*22*
**13** 4:*1*
**1470** 1:*15*
**14th** 2:*13*
**15** 1:*13* 4:*10* 23:*7*
**151** 3:*13*
**17** 151:*11, 12, 17* 152:*6*
**177** 178:*12*

**< 2 >**
**2** 3:*13* 12:*21* 15:*1* 41:*5*
97:*22* 151:*1, 5, 15, 18*
152:*1*
**2:31** 144:*11, 15*
**2:38** 148:*20*
**2:47** 148:*23*
**20** 29:*25* 77:*8*
**200** 2:*6*
**2000** 137:*9*
**2017** 31:*18, 19, 21* 32:*3,
8* 33:*14*
**2018** 77:*5*
**2019** 62:*25* 78:*2* 137:*10*
**2020** 112:*5* 125:*6* 127:*7*
144:*19* 149:*1* 161:*8*
**2021** 12:*17* 127:*20*
161:*22*
**2022** 7:*9, 10* 12:*14, 17*
33:*10*
**2023** 1:*13* 4:*1, 10* 77:*8*
178:*20*

**21** 29:*25*
**216** 2:*24*
**22** 38:*23* 65:*1*
**226** 139:*3*
**237** 151:*10, 11*
**24** 10:*3*
**27** 29:*17* 30:*3*
**28th** 178:*20*

**< 3 >**
**3** 158:*17* 175:*14*
**3:30** 172:*16*
**3:41** 172:*19*
**3:51** 1:*17* 177:*1, 3*
**30(b)(6** 146:*16*
**30318** 2:*14*
**30339** 1:*16*
**31** 115:*3*
**3100** 1:*14*
**34** 108:*24*
**39** 34:*12* 45:*13* 115:*3*

**< 4 >**
**4** 176:*8*
**40** 34:*18* 37:*7, 19, 23*
45:*21* 46:*24* 149:*5*
158:*4* 164:*2* 174:*25*
**404** 2:*15*
**41** 34:*18* 37:*8* 38:*14, 23*
40:*6* 45:*21* 46:*24*
**42** 49:*10* 50:*8* 64:*25*
**4275** 2:*5*
**44** 39:*7* 132:*16*
**44114** 2:*23*
**479-8403** 2:*24*
**48** 156:*4*

**< 5 >**
**5** 3:*6, 12* 176:*13*
**50** 149:*5* 158:*4* 164:*2*
**500** 2:*13*
**52** 30:*15, 20* 78:*15*
174:*4*
**53** 31:*16, 20*
**56** 31:*16, 20*
**58** 31:*20*

**< 6 >**
**6** 55:*6, 7* 176:*16*
**60** 31:*20*
**61** 31:*20*
**65** 89:*16*

**< 7 >**
**7** 176:*17*
**70** 175:*1*
**700** 122:*14, 23*
**74** 111:*17* 112:*4, 10, 23*
114:*4, 12*
**75** 175:*1*

**< 8 >**
**81** 115:*3, 8*
**82** 121:*18* 124:*13*
**83** 127:*23* 129:*9, 18*
130:*12*
**85** 22:*10* 128:*2, 9, 19*
129:*8, 17, 22* 130:*11*
132:*11*
**850** 11:*13*
**856-3255** 2:*15*
**858** 2:*8*
**87** 73:*4, 5*
**88** 84:*21* 85:*1*
**89** 38:*10*

**< 9 >**
**9** 45:*11*
**9:00** 1:*17* 4:*2*
**9:07** 4:*11*
**90** 38:*11* 132:*19*
**91** 38:*23* 39:*23*
**91128(c** 179:*19*
**92** 133:*3* 134:*13, 20*
135:*6*
**92037** 2:*7*
**93** 148:*25* 151:*6*
**94** 38:*23* 39:*23*
**95** 154:*24*
**96** 156:*2*
**964-4589** 2:*8*
**97** 158:*18*

**< A >**
**a.m** 1:*17* 4:*2, 11* 45:*6, 9*
72:*24* 73:*2* 89:*4*
**ability** 87:*3* 105:*5*
132:*18* 137:*12, 13* 141:*4*
161:*18* 169:*20*
**able** 18:*12* 21:*16* 24:*20*
26:*1, 11* 28:*15* 35:*23*
50:*3* 68:*15* 69:*15, 24*
71:*23* 74:*18* 75:*23* 76:*4*
84:*4* 85:*20, 23* 106:*17*
129:*4* 132:*13* 138:*23*
143:*11* 166:*2* 168:*25*
176:*3, 19*
**absent** 142:*7*
**Accept** 70:*5* 106:*25*
107:*1*
**accepted** 131:*8, 12*
**access** 13:*5, 6, 7* 15:*4*
117:*3* 138:*23* 144:*18*
148:*4* 150:*15* 152:*10*
153:*13* 154:*8* 155:*13*
168:*22, 24*
**accessing** 144:*2*
**account** 35:*23* 43:*25*
96:*12*
**accountant** 144:*1*

**accounting** 12:*1* 17:*20*
20:*1* 82:*18* 90:*15* 144:*2,
3, 5*
**accurate** 32:*5, 17* 33:*25*
38:*5* 115:*18* 118:*8*
136:*20*
**accurately** 154:*17*
**acquire** 137:*6*
**Action** 1:*6* 62:*5, 9, 16*
148:*3, 8, 11* 178:*17, 18*
**actions** 63:*16* 64:*3, 6*
155:*24*
**actual** 39:*7, 15* 40:*20*
162:*8*
**add** 35:*25*
**added** 72:*1*
**addition** 13:*15* 98:*6*
119:*13* 167:*22*
**additional** 10:*23* 15:*7*
32:*9* 41:*15* 72:*18* 76:*25*
119:*3, 6, 9, 15* 125:*2*
131:*24* 132:*10* 137:*25*
142:*2* 154:*1*
**additionally** 41:*3* 157:*18*
175:*11*
**address** 21:*2* 40:*15*
43:*12* 65:*5* 66:*5* 69:*5*
97:*2* 99:*15, 21* 108:*14*
**addressed** 43:*3* 108:*17*
**addresses** 73:*20* 108:*10,
11*
**addressing** 100:*2*
**adjustments** 40:*14*
**advertises** 68:*5, 9*
**advisory** 140:*8*
**AEP** 54:*14, 19, 20, 24*
56:*17* 64:*5* 138:*7, 9, 19*
139:*1, 5, 8, 10, 13, 21, 22,
24*
**affect** 130:*17*
**aforesaid** 178:*13*
**afraid** 98:*14*
**agency** 179:*23*
**aging** 100:*5*
**agnostic** 137:*21*
**ago** 5:*13* 15:*21, 22* 36:*4,
6* 78:*9* 87:*20* 99:*12*
101:*3* 116:*7* 146:*13*
162:*14*
**agree** 23:*10, 14* 28:*17*
34:*2* 38:*1, 7* 39:*3* 41:*10*
49:*11* 50:*15* 51:*1, 14, 18*
52:*10* 54:*1, 5, 11, 13, 18*
59:*10, 12* 60:*14* 74:*1, 2,
5* 77:*10* 81:*15, 20, 21*
82:*12* 83:*2, 12, 13* 90:*2,
6* 93:*5, 15* 99:*17* 103:*18,
24* 109:*1* 114:*3* 116:*10,
19* 120:*4* 124:*13, 16*
125:*14, 16* 127:*16*
129:*25* 133:*10* 134:*9*

135:9 138:14 140:8, 14
158:3 162:3 169:1, 8
170:18 172:6
**agreed** 171:15
**agreement** 154:12 167:2,
22, 24 168:2 169:12
172:7
**agreements** 117:21
120:17 154:6 167:14, 20
168:12
**aid** 72:9
**alerting** 150:1 153:21
**allegations** 28:3, 11
**allege** 103:16
**alleged** 27:22 34:20
37:9 45:21 46:25 51:17
57:13 60:10 61:8 62:21
76:11 93:18 95:18 99:1
135:3, 5 137:9 138:14
143:12 156:7 159:12
160:3, 12, 20
**allegedly** 98:16 107:21
**allowed** 168:18
**allows** 18:10
**ALLOY** 2:10, 12 4:12
5:1
**alluded** 162:6
**alternatives** 91:6
**amended** 25:14 26:4
**America** 73:17
**amount** 77:24 87:14
140:2, 3
**amounting** 120:14
**analysis** 21:8, 21 22:7
26:7 28:1, 10 31:7 34:2,
3, 4 41:6 52:5, 8, 10, 11,
14, 15 53:6, 25 58:7
74:15 76:14, 23 77:3, 4
78:1, 11 82:23 83:10, 15
87:10, 15 88:23 91:1
92:6, 9 95:13 96:11
97:1 103:9, 12 104:2, 23
105:25 106:7 107:4, 7,
12, 18, 19, 20, 24, 25
115:20 116:22 117:2, 14
121:9 125:9 139:18
167:19 173:22
**analyst** 76:17, 18
**analytical** 95:14, 15, 24
**analyze** 17:8, 12 94:17
117:10 167:13 174:11
**analyzed** 28:23 51:12,
16, 19 53:9, 12, 16, 20
79:5 95:22
**analyzes** 174:7
**analyzing** 50:20 107:22
**and/or** 43:8 64:11
**anecdotes** 111:16
**answer** 19:2 20:3, 7
21:22 26:1, 11 33:21
40:23 42:21 43:7 47:7

50:3 59:25 60:5 67:9
69:3, 15, 25 75:13 86:6
93:6 97:12 102:23
106:15, 17 110:14 126:1,
15, 18 161:21 162:25
166:6 169:5
**answered** 21:23 76:20
86:19 148:6, 7
**ant** 157:19
**anticompetitive** 107:21
160:17 165:10 168:9
171:5
**antidote** 123:9
**antidotes** 88:2 123:16
**anybody** 9:24 149:11, 14
**apologize** 56:7 106:18
159:2
**APPEARANCES** 2:1
**appeared** 85:19
**appears** 5:22 6:1, 2
126:22 140:18 151:7
**application** 72:16, 17
75:1
**applications** 75:3 82:6,
11
**apply** 47:12 85:6, 15
128:24
**appointments** 120:24
**appreciate** 100:7
**appropriately** 105:13
**approve** 143:17
**approximately** 7:6, 10
16:4
**area** 20:25 91:3
**areas** 175:12
**arguments** 14:5
**arising** 174:8
**arose** 62:24 78:3
**arrangements** 179:6
**Article** 179:2
**ascertain** 48:6 64:17
166:23
**ascertained** 60:25
**ascribes** 173:12
**aside** 22:21 38:3 39:4
51:24 78:18 114:15
136:18 137:7 166:18
**asked** 6:9 33:17, 22
46:4, 19 76:19 78:9
86:18 107:6, 11 110:18
138:3 142:21 148:5
162:14 174:13
**asking** 8:24, 25 10:1
32:25 33:11 34:1 40:14,
19 43:21 56:8 68:13
69:12, 13 71:25 80:5
82:5 86:2 87:8, 11, 13
103:3 106:25 112:1, 2
116:17 126:25 130:7
135:20 142:5 150:21
160:1, 7 161:3

**aspects** 85:25 86:3 90:5
97:8 107:17 118:14
142:23
**assertions** 152:20
**asserts** 173:12
**assessment** 29:15 33:18
104:5, 7 116:20
**asset** 18:2, 7 125:23
140:8
**asset-intensive** 127:15
**assets** 18:5, 19 69:11
91:22 92:2, 3 93:7, 8
104:10, 14 106:4, 21
**assist** 14:3, 4 66:13
**assistance** 35:14 140:24
141:8
**assisted** 14:18
**associated** 100:21
112:19, 22 140:4 146:6
153:22 161:2 162:2, 4
**assume** 20:14 39:22
43:10 70:2, 6 73:24
76:10 91:21 93:6 106:4,
12, 22 107:11 108:11
158:23 164:10 165:24
171:21
**assuming** 76:10 83:11
91:18 175:16
**assumption** 106:25
107:1 165:8
**ATLANTA** 1:3, 16 2:14
4:13
**attached** 3:9 179:11
**attempt** 29:11 163:25
**attempting** 19:10 105:9
167:6
**attention** 14:23 89:16
151:4 158:20
**attorney** 178:15
**attorneys** 178:17
**attribute** 24:12
**audit** 170:1
**audits** 167:9 169:18
**authored** 6:4 40:4
**authorization** 172:9
**authorized** 167:1, 13, 24
168:1, 12
**automation** 73:16
**AVA** 167:6 168:23, 25
169:16 171:15, 19, 25
172:1
**availability** 83:9
**available** 21:4 23:1
29:14 43:3 82:19 83:4
84:10 105:20, 24 128:13,
21 130:20
**AVAs** 168:5, 7, 14, 18
**average** 112:24 113:7,
11 126:12
**aware** 8:21 9:7, 10, 13,
23 10:20 17:12 18:1

19:21 41:18 62:5 77:11
88:15, 17 104:16 131:4
139:7, 10 148:2, 8, 11
149:14 159:10 160:2, 8
161:12, 13, 21 164:3, 22
171:14

**< B >**
**back** 6:1 12:20 17:18
20:18 22:6 32:10, 15, 19
37:7 38:9 39:1 45:8, 11
49:25 50:3 52:23 56:5
59:21, 22 61:3 62:3
64:25 68:12, 14 69:14,
23 70:1 73:2 78:2 81:4
89:6 98:13 101:25
104:13 106:21 109:9, 15
110:15, 21 114:25 115:3
123:3 125:25 126:14, 19
127:2 130:13 135:24
136:3, 8 144:11, 15
148:23 155:4 163:3
164:1 172:19
**backdrop** 167:23
**backwards** 131:10
**balance** 73:15 171:3
**bank** 88:14, 16
**barriers** 80:14
**base** 24:2 27:24
**based** 28:3 31:7 81:11
122:21 130:24 136:16
**basic** 33:19
**basing** 103:25
**basis** 6:12 24:16 86:10
107:12 122:4
**Bates** 30:18
**bear** 44:21
**bearing** 162:19 163:10
**becoming** 81:12 167:21
**began** 56:11 103:15
**beginning** 141:22 148:25
**begins** 73:1 144:14
**begun** 21:15
**behalf** 4:19, 22, 24 5:1
**behavior** 147:17, 24
160:17 165:11
**behaviors** 107:21 168:9
**belabor** 132:24
**believe** 14:9 16:7 30:15
37:3 50:7 53:15 62:12
67:4 81:24 82:2 112:19
113:22 119:16 141:11
155:8 157:16 163:14
173:10
**believed** 124:20
**believes** 167:5
**BELINFANTE** 2:10
4:13
**beneficial** 172:12
**Bertz** 151:12, 17 154:24



155:11, 18, 20
**Bertz's** 155:15
**best** 5:25 7:7, 8, 12 8:4, 20, 23 9:17 10:4 12:8, 15, 19 15:6 25:7, 20 51:10 58:2, 3 62:7 81:1 86:6 92:1, 14 117:8, 11 126:13 132:2, 3 133:23 134:6, 10 136:7 149:13, 17 170:2
**better** 15:24 60:4, 19 147:19
**beyond** 94:24 96:10 134:12 163:15 164:2 166:11 173:7
**billed** 11:20
**billings** 139:12
**bills** 11:23 12:2, 12
**bit** 29:18 31:7 49:11 86:5 132:23 161:13
**board** 175:7 179:3
**BOGGS** 2:18
**BONALAW** 2:3
**Boulevard** 1:14
**bound** 171:19, 22 172:2
**boundary** 46:23
**bracket** 145:20
**brackets** 145:18
**brand** 75:2
**breach** 174:10
**break** 45:2 88:24 114:20 148:15, 16
**Brett** 151:11, 12
**bring** 77:19 79:1 103:6 176:19
**bringing** 14:22 56:20
**broad** 58:22, 23 98:3
**broader** 56:8 75:6 111:18 123:11 157:10 160:6
**broadly** 57:17
**Brockway** 146:19
**brought** 148:3, 9, 12 161:14
**bucket** 65:17, 18 100:25 101:1
**bullet** 30:9 39:7 55:7 112:3, 7, 9, 23 113:5 114:4 124:12, 13 125:13, 14 127:11, 12 135:11 138:7 140:6 144:17 145:22 147:11
**burdensome** 167:9 169:19 172:8
**BURNETTE** 1:21 4:16 178:8, 24 180:4
**business** 70:7 73:8 77:1, 2, 9 87:19 150:8 156:6, 21 157:13 159:17 160:25

**but-for** 76:16, 22 78:5, 10 103:8, 9, 12

**< C >**
**calculate** 112:21
**calculated** 140:1
**calculation** 69:11
**calculations** 24:20 83:25 113:1, 3
**California** 2:7
**call** 8:21 12:15 14:19 67:11
**called** 46:12 80:25
**Calls** 158:8
**Camonie** 13:21
**capabilities** 43:25
**capable** 19:16 20:22 49:3 70:8 106:4
**Capital** 49:16 78:13, 19 79:12, 16 80:1 83:3, 9, 12 86:16, 17, 22, 25 87:8, 9, 16, 23, 25 88:3, 6, 8, 12, 18
**care** 43:13
**careful** 75:4 89:10 100:1 131:18
**case** 5:23 6:3, 4 7:3, 11 8:7, 13 9:18, 22 10:8, 17 11:1, 4, 16, 21 13:6, 9, 11, 14, 18 15:5, 8 16:10 17:9 18:6 22:7 25:8, 12, 15 27:20 28:22 29:1, 10 30:24 36:6 41:1 42:3, 9 47:9 49:10 50:19 59:16 67:4, 25 68:16 76:15 77:17 78:1 79:7 86:13 90:21 92:5 94:15, 21 96:2 97:9, 17 102:3 103:10, 13 104:19 105:17 117:9, 13 118:13 121:10 122:19, 20 124:25 134:1 138:3 141:2 154:6, 19, 23 156:20 158:4 161:16 165:24 166:17, 22 169:24 170:23 171:8, 10, 18 174:12, 14, 17 175:19, 20 176:7, 8, 9, 10, 11, 12, 13, 14 179:22 180:1
**case-by-case** 86:9
**cases** 159:18 176:20
**catch** 159:2
**categories** 95:11 175:10
**category** 37:3 47:18, 20, 21, 23 166:6 100:19 133:22 158:12 175:10
**caused** 135:5
**CCR2870** 180:4
**cents** 57:14
**certain** 10:22 33:12 56:18 61:7 63:9 65:11

66:5, 13 69:12, 13 96:8 98:6 119:4 137:5, 24 142:8, 9 147:16 164:17 167:14 168:18 173:12, 22, 23, 24
**Certainly** 6:7 10:21 17:12 18:9 20:13 26:10 28:10, 17 31:1, 22 38:11 39:2 41:18 42:10 44:24 49:24 50:11 51:21 52:8 53:22 54:23 60:12 62:11 63:8 64:15 66:21 69:6, 9 70:14 71:5 81:5 82:22 87:3, 24 92:9, 10 96:14 97:20 99:6 103:21 104:4, 6 105:3, 6 109:21 111:21 116:3, 25 118:19 119:2 125:22 128:16 131:4 134:17 139:20 147:7 148:9 149:24 153:24 154:1, 9 157:3 159:23 160:23 162:3, 9 169:7 171:20 172:9, 11 175:25
**CERTIFICATE** 178:2
**CERTIFIED** 178:25 179:7, 13
**certify** 178:8, 14
**cetera** 44:2
**CHAIN** 3:13
**chair** 175:6
**chance** 100:8 156:24
**Chang** 8:17 74:2 156:5, 16 157:4, 7, 9
**change** 12:16 39:14 40:4, 10, 19 59:16 63:1 72:20 144:8 156:15 159:17
**changed** 41:17 172:25
**changing** 160:25
**Chang's** 156:8 157:8
**characterizations** 29:14
**characterize** 21:17 28:7 34:24 52:13 94:25 103:11 176:10
**characterized** 71:15 94:3 102:12 109:10 176:12, 13, 14, 15, 18
**characterizes** 173:14
**charge** 52:1 179:25
**charged** 51:16 155:11
**charges** 11:13
**charted** 93:2
**check** 33:1, 23
**checking** 14:25 32:20
**chief** 145:18
**choice** 58:1 146:6
**choose** 43:5, 17 51:7 79:17 84:5 88:13, 16 169:8

**chose** 88:12
**chosen** 84:7, 8, 12
**CHRISTINE** 1:12 3:4 4:7 5:4 13:2
**Cieslak** 2:4 4:22 17:10 18:25 23:2 26:5 28:5 34:23 39:17 40:8, 22 43:19 44:10 45:4 49:5 52:17 59:17 60:17 61:15 62:19 70:11 71:1, 12 76:19 83:5, 14, 22 86:18 88:20 95:20 100:14 101:23 103:20 104:25 107:13 108:12 114:21 121:13 122:5, 16, 25 123:20 129:12 134:5, 8 143:23 144:13 148:5 155:4, 7 158:8 162:22 164:19 166:4 169:3, 9 170:21 172:3, 14 176:23
**CIO** 146:1, 2
**circle** 98:13
**circular** 86:6
**circumstance** 47:14 95:16
**circumstances** 166:8, 9, 11
**circumstantial** 35:5
**cite** 11:10 37:20, 21 38:18 95:10 121:20 122:13 150:11 153:10 154:2 156:5 157:12
**cited** 10:13 11:3 38:10 39:13, 23 97:4 126:21 155:19
**citing** 32:2, 16 121:17
**Civil** 1:6
**claim** 54:7 74:5 161:14
**claims** 74:11 166:8 173:24
**clarification** 56:12 133:21
**clarify** 34:6 62:20
**clear** 8:24 10:4 19:24 25:2 45:12 81:17 104:8 123:22 150:12 153:10 155:4, 7 157:25 158:2 159:20
**Cleveland** 2:23
**client** 100:24
**close** 21:9, 20 22:25 23:6 30:4, 9, 23 32:25 33:20, 24 34:9 74:15 134:9
**cloud** 168:19, 22, 23
**cloud-based** 119:23 120:24
**clunky** 100:5 142:1
**code** 46:11 65:11 71:16, 20, 21 72:1

coding 65:*18*
collaboratively 158:*3*
combination 63:*21*
96:22 160:17
come 10:25 17:*18* 22:6
30:*13* 54:9 64:8, *19*
82:*1, 24* 87:9 102:3, *15*
103:22 111:*18* 153:*3*
162:*13* 173:25
comes 15:*12, 17* 38:*11*
39:*2* 42:*11* 48:*24* 79:8
81:*23* 91:7 95:*11* 142:8,
*15* 144:*1, 2* 153:4, 7
164:25 176:6
comfortable 68:*2*
coming 55:*4* 80:*24*
105:6 175:*24* 176:*1, 11*
comment 111:6, *8*
112:*17, 23* 113:*15*
124:*14* 126:*11*
commentary 124:*3*
126:22
commented 98:*20*
111:22
comments 96:*12, 16, 25*
97:5 98:*7, 23, 24* 110:*24*
111:9 112:*20* 113:*19, 20*
114:*3, 13* 118:6, *7, 10, 21*
122:*10, 20, 23* 123:6
126:*23* 148:25
committed 50:*12* 77:14
109:*16* 110:3, *11, 20*
122:*7* 124:*7* 125:*1, 8*
132:9 138:6 147:6
150:*22, 23* 155:*16* 174:*1*
communicate 149:*8, 11*
communicated 114:*16*
149:*14*
communication 9:*19*
138:20 162:6, *11*
communications 7:*17*
8:*14, 17* 9:5, *9, 12, 15, 25*
10:*9, 10, 11* 14:*15*
145:*15* 147:*3* 149:*2*
151:8 153:*19*
companies 31:*4* 32:*14*
66:*13* 82:*22* 83:*2, 8*
88:*11, 13, 16* 95:5
143:*14* 163:*16, 18*
company 18:*10* 30:*17*
80:*23, 25* 88:*2, 9* 97:*14*
112:*14* 113:*12* 128:*1*
129:*23* 140:*20* 144:*2*
147:*15*
comparable 67:*21*
168:*14*
compare 112:*21* 121:6
129:*9, 16, 22* 151:*18*
168:*11*
comparison 68:*4* 92:*15,
19* 129:*21*

compete 71:5 132:*18*
161:*19*
competing 50:*25*
competition 27:*22* 28:9
57:*17* 58:*4* 89:*22* 102:*4,
14* 103:*2* 105:*21* 137:*18*
138:*25* 158:*25* 159:*25*
165:*8* 168:5
competitive 31:*8* 32:*2, 4,
5, 20* 101:*22* 102:*23*
115:*21* 116:*2, 8, 13, 18*
130:*1, 3* 137:*16* 147:*24*
157:*20*
competitor 41:*10, 11*
competitors 33:*19* 65:*4*
71:*9*
complained 166:*13*
complaining 166:*3*
complaint 25:*12, 14, 19*
26:*3, 4, 9* 28:*3, 11*
161:*10* 162:*17, 19* 163:*9,
18, 20, 22*
complete 5:*24* 8:5
64:*17* 69:*24* 107:*13*
119:*7* 125:*25* 126:*18*
173:*17*
completed 61:*24*
completely 43:*22* 61:*4*
62:*2*
completeness 60:*4*
completion 135:*16*
136:*14*
compliment 23:*18*
complying 12:*22* 65:*2*
89:*17* 156:*3*
comprehensive 31:*7*
computer 65:*18* 68:*1*
71:*23* 72:*4*
concern 43:*4* 124:*4*
concerned 50:*5* 61:*5*
165:*25*
concerning 97:*18* 108:*8*
116:*16* 120:*18* 130:*18*
164:*15* 174:*8*
concerns 144:*18* 153:*20*
conclude 115:*17*
concluded 60:*6* 177:*3*
concludes 176:*25*
concluding 158:*21*
conclusion 33:*3, 20* 54:9
95:*17* 102:*4, 7* 108:*8*
123:*18* 129:*8* 173:*24, 25*
conclusions 29:*24* 57:*23*
134:*18* 172:*24*
conduct 53:*4* 60:*11*
136:*23* 137:9 156:*22*
157:*20* 166:*3*
conducted 4:*12* 6:*21*
110:*19* 125:*6* 132:*18*
confidential 152:*11*

154:*11* 155:*1* 158:*16*
confirm 37:9 144:*25*
confirmed 39:*6*
connected 178:*17*
connection 146:*5*
consent 150:*13* 152:*8*
153:*12* 154:*7*
consequences 61:*13*
consider 18:*7* 21:9 22:*7*
25:*8* 70:*17* 76:*7, 12, 17,
22, 24* 77:*4* 80:*17* 90:*3,
14, 17, 23* 95:*24* 105:*15*
111:*23* 118:*25* 119:*22*
137:*17* 161:*17* 174:*12*
176:*9*
consideration 50:*21*
considerations 44:*25*
considered 18:*9* 21:*20*
41:*16* 81:*7* 104:*18*
136:*2* 172:*8*
considering 41:*15* 111:*7*
119:*21* 149:*19*
consist 46:*9, 10* 65:*25*
67:*1* 68:*18* 69:*19*
consistency 118:*21*
123:*5, 8* 128:*22* 132:*14*
consistent 16:*18* 33:*19*
109:*6* 115:9 122:*20*
123:*10, 14, 25* 127:*16*
128:*8, 10, 16* 141:*9*
consistently 130:*23*
consult 56:*6*
consultant 46:*15* 126:*4*
Consultants 49:*16*
143:*21* 170:*6*
Consulting 9:*16* 30:*17*
31:*15* 46:*11* 49:*22* 52:*1,
2, 9* 54:*12, 15* 56:*6*
63:*20* 67:*17* 70:*7* 126:*8,
10* 138:*9, 23* 143:*17*
146:*9*
consumers 55:*8, 10, 13*
consumes 63:*5*
consuming 175:*11*
contact 155:*22*
contacted 179:*16*
contacting 153:*25*
contain 6:*5*
contains 6:*7*
context 20:*10* 53:*5*
94:*14* 111:*10* 116:*5*
123:*7* 170:*17*
continuation 56:*2, 3*
continue 61:9 137:*1*
145:*9, 13*
continued 56:*10* 59:*10*
62:*1* 147:*8*
continues 121:*22*
continuing 56:*6*

contract 55:*17* 133:*14*
135:*16* 136:*14* 139:*18*
174:*10* 179:*18*
contract/agreement
179:*21*
contradict 147:*10*
conversation 7:*21, 22*
73:*6*
conversations 7:*5*
cooperate 147:*1, 9*
cooperation 73:*17*
Coopers 49:*21*
copilot 66:*1, 9, 11, 16, 22*
67:*2, 10, 21* 70:*4* 135:*15,
18* 136:*13*
copy 5:*17, 24* 164:*4*
copyright 174:*9*
core 13:*19*
corporate 138:*2* 146:*16,
19*
correct 6:*24* 7:*24, 25*
10:*15, 16* 11:*14* 12:*14*
16:*11, 14, 16, 17, 24* 17:*6,
21* 23:*13* 30:*21* 34:*19*
38:*8* 41:*25* 49:*17* 60:*7*
64:*23* 74:*17* 77:*6* 91:*19,
20, 23* 93:*11, 14, 24* 94:9
107:*5* 108:*6* 112:*18*
113:9 114:*18* 127:*10, 22*
139:*14* 140:*17* 152:*3*
171:*16* 175:*18* 178:*12*
correctly 155:9 163:*1*
correspondence 155:*3*
corroborate 32:*24* 33:*3*
156:*8*
corroboration 34:*8*
cost 52:*22* 55:9 56:*24*
57:*2, 3, 4, 6, 9, 13* 58:*22,
23* 118:*25* 119:*6, 9*
147:*15* 167:*20* 169:*17,
19*
costly 167:*9*
costs 56:*25* 169:*22*
Council 179:*4*
counsel 4:*17* 10:*19, 22,
25* 11:*7* 14:*12, 15* 15:*15,
19, 20* 16:*2* 134:*3* 147:*2*
164:*18* 178:*15, 17*
179:*10, 22*
counted 98:*2*
counterclaim 161:*22*
162:*11, 12, 13* 164:*12*
165:*17*
counterclaims 62:*12*
158:*24* 159:*14* 160:6, *14,
16, 22* 161:*4, 25* 162:*2, 5,
9* 165:*2, 9, 12, 25* 166:*12,
13*
counting 113:*5*
COUNTY 178:*6*

couple 6:*19* 59:*1*
138:*15* 173:*19*
course 43:*23* 95:*12*
COURT 1:*1* 4:*15* 36:*13*
178:*25* 179:*1, 3, 4, 7, 8,
13, 16, 21*
cover 148:*1* 179:*24*
created 93:*3*
criticism 96:*2, 4* 97:*10,
13* 99:*2*
criticisms 41:*9* 96:*6, 10*
97:*25* 173:*2, 6*
critiques 173:*5, 9*
CSR-2870 1:*21* 178:*25*
Cumberland 1:*14*
cumbersome 142:*10*
curious 79:*14* 98:*1*
current 62:*25* 106:*24*
currently 19:*22* 22:*8*
54:*14, 19* 83:*19* 133:*13*
139:*7*
custom 35:*12* 36:*3*
customary 180:*1*
customer 21:*13* 24:*2, 8,
11, 16* 27:*5, 10, 14* 28:*16,
18* 35:*12* 36:*2, 9, 24*
42:*6, 17, 24* 43:*1, 4, 5, 12,
16* 44:*1, 5, 14, 16, 23*
47:*17* 48:*18, 22, 25* 49:*1*
58:*16* 62:*14, 15, 16*
63:*15* 64:*2, 11* 65:*20, 21*
67:*13, 17* 72:*15* 73:*17*
84:*22* 86:*14* 91:*12* 96:*2,
4, 6, 10, 12, 25* 97:*24*
101:*8, 10, 14, 16* 104:*1*
109:*2, 25* 111:*6* 113:*16*
114:*6* 117:*23* 118:*5, 21*
119:*12* 122:*19* 133:*8, 14*
134:*2* 137:*7, 11, 13, 19*
141:*18, 19* 146:*11* 148:*3*
149:*1* 150:*6, 7* 153:*11*
154:*17* 158:*12* 159:*11,
24* 160:*2, 3, 10, 12, 15, 20*
161:*5*
customers 9:*9, 12* 24:*5*
28:*13, 20, 21, 25* 29:*5, 7*
30:*16* 32:*24* 33:*4, 17*
35:*3* 36:*8* 40:*14* 41:*24*
42:*14, 18, 19, 23* 48:*4, 6,
13, 16* 50:*16, 19, 23* 51:*2,
6* 52:*20* 54:*25* 55:*3, 22*
56:*9, 20, 23* 57:*1, 7, 25*
58:*14, 20, 25* 62:*8* 63:*9*
64:*8, 13, 16, 18, 20, 23*
65:*20* 73:*8* 74:*6* 75:*21*
79:*22* 82:*3, 9* 93:*18, 24*
94:*2, 6* 95:*7, 11* 96:*7, 20*
98:*4, 10, 15, 20* 101:*5*
102:*18* 103:*23* 104:*3, 6*
105:*9, 20* 106:*5, 6, 24*
108:*18* 109:*12* 114:*9*
116:*6* 117:*4* 118:*2, 4, 11*
119:*2, 6, 19* 120:*2, 10, 18,
23* 122:*24* 123:*5, 13*
132:*25* 133:*1, 2, 6, 15, 17,
25* 134:*4, 12, 23* 141:*23*
142:*1* 143:*16* 148:*10, 12*
149:*5* 150:*1, 2* 152:*9*
153:*21* 154:*7* 155:*22*
156:*10, 13* 157:*2, 4*
158:*1, 5* 159:*16, 21*
160:*24* 161:*1* 165:*16*
170:*5*
customer's 43:*23* 44:*14*
170:*5*
cutting 142:*9*
CV 12:*23* 175:*14*

< D >

damage 156:*6* 157:*2, 11,
13, 24* 162:*1*
damaged 156:*21*
damages 174:*7, 12, 13, 16*
damning 166:*23*
dampened 165:*8*
dampening 158:*25*
159:*25* 162:*10* 165:*14*
166:*2, 15, 19*
Danieli 176:*8*
data 117:*5, 10* 143:*21*
database 13:*7, 8*
DATE 1:*13* 7:*9* 15:*21*
31:*21, 23* 32:*8* 33:*16*
76:*16, 22* 161:*9*
dated 31:*18* 32:*2*
178:*20*
dates 31:*19* 32:*10*
41:*18* 161:*23*
day 10:*3* 15:*25* 178:*20*
days 8:*22*
deal 41:*5* 154:*4*
dealings 64:*15*
decade 117:*17*
December 31:*18, 19, 21*
25:*3, 8*
decided 56:*4* 145:*9, 13,
16* 147:*17, 18*
deciding 145:*20* 146:*5*
162:*20*
decision 44:*22* 91:*15*
100:*23* 147:*20* 150:*4*
decisions 90:*25*
decline 103:*15*
Defendant 1:*9* 2:*17*
defer 68:*10*
deferred 16:*13, 15* 17:*4,
19* 18:*13* 19:*5, 20* 20:*1,
12* 23:*11, 14* 24:*7, 17, 20,
24* 25:*6* 26:*15* 27:*9, 23*
28:*18* 29:*5* 36:*24* 45:*14*
49:*13, 23* 50:*18, 20*
57:*17* 58:*22, 24* 65:*9*
66:*14* 68:*6, 9* 69:*9*
74:*23, 25* 82:*18, 25*
83:*24* 87:*5* 90:*15* 91:*15*
92:*17*
deficiencies 140:*23*
deficient 49:*3*
define 16:*9, 12* 34:*21*
35:*7* 45:*22* 48:*5, 7*
143:*11*
defined 45:*15* 74:*16*
100:*2* 130:*17* 142:*24*
defining 28:*2*
definition 26:*13, 18, 24*
27:*7, 17* 41:*16* 45:*19*
46:*16, 23* 47:*15*
definitions 25:*9, 18, 23*
26:*3*
degree 52:*21* 170:*9*
DEKALB 178:*6*
delivered 126:*12*
Deloitte 49:*21*
demand 27:*18* 28:*12*
47:*15* 48:*2* 138:*10*
demanding 28:*13, 14*
47:*17* 119:*8*
demands 48:*22, 24*
84:*16* 117:*23* 137:*5*
demonstrated 93:*24*
demonstration 91:*24*
92:*3* 94:*3*
denote 11:*7*
deny 167:*7*
department 12:*1*
depend 169:*11*
depending 166:*9* 175:*1*
depends 20:*10* 174:*21*
deploy 43:*5, 17, 18*
deployed 72:*1* 95:*16*
depo 15:*23*
deposed 134:*1*
DEPOSITION 1:*12* 4:*7,
12* 15:*14, 25* 20:*15*
32:*23* 33:*3* 79:*7* 136:*25*
139:*4* 146:*15, 16, 17, 22,
23, 25* 148:*8* 151:*11*
155:*16* 176:*25* 179:*6, 9,
11, 17, 18, 24*
depositions 31:*11*
133:*25* 134:*2, 4* 138:*6*
147:*6*
depreciation 16:*12, 15*
17:*3, 20* 18:*4, 5* 20:*1, 12*
23:*11, 15* 24:*6, 21* 25:*6*
28:*18* 45:*14* 68:*25*
69:*10, 14* 74:*25* 90:*15*
91:*15* 92:*17*
depth 82:*20*
describe 37:*16* 59:*6*
63:*5*
described 37:*6* 48:*10, 16*
58:*15* 61:*13* 72:*5* 116:*6*
135:*4, 7* 142:*1* 155:*3*
174:*7*
describing 101:*7*
DESCRIPTION 3:*11*
66:*21* 135:*3*
descriptions 32:*16*
design 46:*4* 78:*14, 20*
designated 178:*10*
designed 34:*13* 47:*23*
despite 147:*19*
detail 143:*5*
detailed 66:*11, 17* 84:*8*
details 88:*5*
determination 85:*13*
101:*20* 103:*14* 128:*11*
138:*19* 154:*5*
determine 30:*22* 32:*15*
38:*4* 47:*25* 57:*16* 68:*15*
69:*8* 70:*22* 71:*9* 78:*17,
18* 79:*15* 85:*7, 15, 19, 22*
93:*16* 94:*18* 111:*15*
114:*5, 8* 115:*21* 116:*13*
118:*7* 124:*23* 127:*6, 19*
128:*24* 130:*22* 137:*20*
149:*18* 150:*3* 166:*19*
determined 17:*14* 33:*8*
51:*9* 116:*8*
determining 17:*17*
110:*24* 116:*18* 163:*11*
develop 19:*11* 21:*15*
87:*23*
developed 10:*21* 24:*19*
66:*13* 73:*14, 15* 74:*11*
developing 19:*11* 21:*25*
77:*21* 79:*21* 87:*5*
development 21:*6, 11, 13*
22:*1, 5* 36:*3* 73:*9* 74:*25*
75:*19, 20* 77:*13* 79:*23*
82:*13* 84:*23* 86:*13* 94:*1*
95:*5* 105:*14*
difference 102:*24*
differences 23:*23* 24:*2,
15* 119:*22*
different 17:*6* 23:*12*
25:*24* 34:*5, 6* 36:*21*
41:*24, 25* 42:*4, 14, 20*
48:*10* 53:*10* 60:*3* 74:*9*
86:*20* 97:*5* 100:*21*
101:*19, 21* 102:*22*
107:*17* 109:*23* 117:*1*
118:*3, 4* 122:*9* 173:*11*
175:*5, 12*
differentiate 72:*11* 99:*18*
differentiated 65:*4*
66:*25* 70:*8*
differentiates 67:*7*
differentiation 71:*18*
72:*12*
difficulties 157:*19*
direct 73:*7* 89:*15* 98:*24*

151:*4* 158:*20*
**directed** 98:*25* 109:*25*
**direction** 101:*19*
**directly** 73:*9* 133:*8*
147:*10* 148:*10* 157:*2*
**director** 175:*8*
**directors** 175:*7*
**disagree** 36:*5* 53:*11*
82:*16* 129:*14* 130:*2*
147:*13* 172:*4* 173:*5, 8*
**disagreement** 170:*24*
**disagreements** 173:*18*
**disclosed** 164:*17*
**disclosure** 152:*10* 179:*1,
5, 12*
**discount** 180:*2*
**discovery** 14:*11*
**discuss** 31:*5* 48:*12*
**discussed** 31:*2* 65:*12, 15*
79:*18* 82:*2* 96:*15*
159:*19* 163:*22*
**discussing** 105:*19* 169:*13*
**discussion** 29:*19* 52:*19*
73:*25* 78:*22* 91:*12*
92:*21* 111:*14* 162:*18*
169:*18*
**discussions** 53:*17*
122:*21* 156:*12*
**dismissal** 158:*24*
**dismissed** 165:*3, 4, 18*
**dispute** 62:*24* 63:*6* 78:*3*
122:*4* 171:*8*
**distinct** 160:*16*
**distinction** 46:*20* 58:*13*
80:*7* 100:*10* 101:*18*
**DISTRICT** 1:*1, 2*
**dive** 6:*20* 90:*22*
**DIVISION** 1:*3* 65:*5*
**Doctor** 35:*4* 89:*15, 25*
105:*12* 151:*2, 4*
**document** 5:*21* 26:*20*
31:*22* 32:*7* 33:*2, 13*
34:*19* 38:*1, 10, 17, 20*
39:*1, 2, 4, 12, 14, 23* 40:*3*
55:*15* 66:*10* 78:*16*
84:*25* 85:*4* 121:*20*
122:*7* 123:*3* 125:*1, 3, 7*
126:*14, 19* 127:*3, 13*
130:*14* 132:*7, 13* 135:*7,
23* 150:*23* 151:*3, 7, 22*
152:*19, 24* 153:*15* 154:*9*
158:*10* 159:*6* 160:*11*
167:*16* 175:*21*
**documentation** 164:*21*
**documents** 14:*12, 22*
15:*4, 7, 10* 16:*6* 31:*9*
37:*21* 42:*11* 50:*13* 52:*9,
23* 61:*3* 79:*6* 81:*3*
84:*10* 92:*24* 96:*17, 18,
19* 97:*3* 109:*9, 15* 122:*7*
124:*7* 125:*24* 126:*17*

127:*1, 4, 24, 25* 132:*3, 9*
136:*19* 150:*23*
**doing** 32:*6* 34:*1* 54:*20*
59:*7, 9* 105:*10* 113:*17*
117:*14* 125:*8* 150:*14*
153:*2, 12* 166:*16*
**dollar** 79:*2* 87:*13*
139:*17* 140:*1, 3*
**dollars** 12:*7, 9* 57:*14*
77:*24* 99:*14, 19, 20*
**dominance** 115:*24*
**dominant** 45:*16* 102:*13*
**Donahue** 124:*18*
**Double** 9:*16*
**double-check** 136:*4, 8*
**downhill** 163:*8*
**Dr** 5:*10, 14, 19* 13:*21,
23* 14:*2, 3, 23* 16:*9*
23:*10* 26:*12* 40:*17*
45:*10* 47:*20* 50:*15*
51:*11* 73:*3* 100:*25*
115:*2* 148:*24* 155:*5*
172:*20, 21* 173:*2* 174:*16*
176:*21*
**draw** 101:*18* 129:*5, 6*
**drawing** 100:*17*
**drawn** 100:*13*
**drop/add** 11:*12*
**due** 131:*17* 156:*6*
**Duke** 4:*14*
**duly** 5:*5*
**duration** 116:*12* 138:*17,
18, 21*

**< E >**
**earlier** 7:*5* 12:*13* 25:*1*
42:*21* 58:*15* 65:*15*
70:*14* 71:*3* 74:*14* 90:*10*
107:*2* 110:*10* 113:*18*
114:*14* 120:*11, 13*
122:*18* 132:*24* 133:*5*
135:*21* 145:*8* 148:*8*
156:*11* 157:*25* 164:*9*
172:*21*
**early** 7:*3, 9, 10* 12:*17*
77:*8*
**earn** 130:*6*
**earned** 146:*8, 11*
**easier** 32:*12*
**Eastern** 4:*11*
**economic** 27:*16* 44:*6*
84:*13, 15, 18, 19* 131:*1, 4*
167:*19*
**economically** 158:*23*
**economics** 57:*3* 84:*6*
159:*22* 165:*15* 175:*11*
**economist** 28:*2* 75:*22*
84:*11* 90:*1* 94:*10* 95:*15*
123:*15* 128:*24* 156:*14,
20* 157:*1*
**economists** 131:*8, 12*

**effect** 58:*14, 16* 62:*15*
63:*8* 105:*8* 107:*21*
108:*17* 156:*17* 158:*25*
159:*25* 161:*4* 162:*10*
165:*12, 14* 166:*2, 16, 19,
23*
**effected** 58:*5, 25* 63:*15*
64:*2, 5, 11, 15, 18*
**effective** 102:*14*
**effectively** 76:*9*
**effects** 171:*4, 5*
**either** 28:*24* 43:*5, 17*
50:*12* 59:*13* 82:*4* 95:*2*
101:*9* 106:*23* 133:*13, 18*
149:*20* 152:*17* 155:*8*
162:*6* 164:*4* 169:*24*
176:*10*
**elected** 61:*9* 158:*6*
**electric** 26:*25* 27:*2*
**element** 116:*20*
**elements** 76:*3* 116:*15*
118:*25*
**E-MAIL** 3:*13*
**empirical** 52:*4, 7, 10, 11,
14*
**employee** 97:*10, 14, 24*
178:*15, 16*
**employees** 8:*19* 9:*6*
**employer** 179:*8*
**enable** 167:*8*
**ended** 146:*4*
**engage** 51:*7* 150:*5, 14*
**engaged** 54:*14, 19* 56:*2*
133:*18* 139:*7, 10* 140:*7*
144:*22* 156:*11, 13* 157:*3*
**engagement** 140:*9, 14*
145:*14* 146:*9* 156:*12, 15*
**engagements** 175:*4*
**engaging** 61:*1, 6*
**ensure** 98:*2*
**entails** 141:*16*
**enter** 19:*19* 21:*16*
75:*14, 23* 76:*4* 77:*1, 22*
79:*11, 17, 20* 80:*11, 19*
81:*8* 84:*4, 24* 85:*8, 14,
20, 23* 86:*22* 105:*5, 10*
171:*25*
**entered** 76:*13* 84:*20*
112:*17* 168:*12*
**entering** 76:*9* 80:*24*
86:*1* 93:*21*
**enterprise** 81:*17*
**entire** 50:*14*
**entirety** 154:*2* 168:*8*
**entity** 179:*10*
**entrance** 80:*13* 175:*23*
176:*1, 10*
**entrant** 77:*19* 81:*13*
**entry** 78:*12, 22* 80:*14*
102:*13*

**enumerated** 35:*10* 52:*22*
**enumeration** 69:*13*
**environment** 71:*16*
101:*22* 168:*19, 23*
**environments** 143:*19, 20*
**equality** 102:*22*
**equity** 88:*1, 9*
**equivalent** 163:*8*
**Ernst** 49:*21*
**ERP** 81:*8, 11, 15, 19, 21,
25* 83:*18* 84:*3* 143:*21,
25*
**especially** 84:*22*
**Esquire** 2:*4, 11, 12, 19, 20*
**essence** 48:*24*
**essentially** 173:*21*
**establish** 156:*25*
**estimate** 11:*18* 12:*4, 8*
174:*24*
**et** 44:*1*
**evaluate** 29:*11* 85:*11, 18*
86:*21* 168:*4*
**evaluating** 79:*10* 118:*7,
10, 12* 155:*12*
**evaluation** 85:*13*
**event** 120:*5*
**eventually** 138:*11*
**everybody** 4:*6* 10:*3*
**evidence** 80:*23* 85:*18,
24* 86:*3* 94:*14, 16, 17*
95:*23* 96:*5, 23* 97:*15, 18*
102:*8* 123:*25* 133:*15*
134:*17* 154:*25* 156:*9*
157:*11* 158:*4* 160:*19*
166:*21* 169:*15, 24* 170:*1*
**exact** 7:*9* 15:*21* 109:*4*
110:*21* 161:*9*
**exactly** 12:*18* 16:*1*
20:*10* 37:*6* 45:*25* 53:*5*
69:*7* 104:*13* 109:*10*
112:*2* 116:*18* 118:*1*
138:*16*
**EXAMINATION** 3:*6*
5:*8*
**examined** 5:*6*
**examining** 5:*21* 26:*20*
31:*22* 32:*7* 34:*19* 38:*20*
55:*15* 66:*10* 78:*16*
84:*25* 85:*4* 127:*13*
135:*7, 23* 151:*3, 22*
152:*24* 153:*15* 154:*9*
158:*10* 159:*6* 167:*16*
175:*21*
**example** 10:*24* 11:*6*
14:*13, 21* 15:*1* 22:*18*
31:*11* 32:*21, 22, 24*
35:*22* 36:*18* 37:*2* 41:*7*
42:*17* 51:*8* 55:*16* 56:*23*
57:*25* 58:*21* 63:*14*
67:*10* 70:*17, 18, 19*
73:*14* 80:*15* 86:*8, 10*

88:2  91:5, *10*  93:2
96:*15*  112:*3, 24*  142:*11*
143:*14, 17, 22*  157:*17*
**examples**  35:*1, 16, 18*
133:*7*  134:*19, 21*  135:*8*
142:*21*  173:*19*
**excerpt**  150:*17*
**excerpted**  151:*19*  152:*2,*
*15*
**excess**  139:*11*
**exchange**  164:*16*
**excluded**  46:*16*  130:*16*
**excluding**  27:*16*
**exclusion**  27:*21*  116:*16*
171:*5*
**exclusionary**  58:*3*  60:*10*
**exclusions**  130:*18*
**exclusive**  167:*8*
**exclusively**  10:*18*  157:*7*
**Excuse**  31:*12*
**Executive**  2:*5*
**exercise**  27:*18, 19*  47:*15,*
*16*  48:*3*  93:*8, 9*  94:*12*
95:*25*  128:*5*
**exhaustive**  83:*10*  176:*4*
**EXHIBIT**  3:*11, 12, 13*
5:*15, 16*  12:*21*  15:*1*
38:*24*  41:*5*  97:*22*  151:*1,*
*5, 11, 12, 15, 18*  152:*1, 6*
174:*2*
**EXHIBITS**  3:*8, 9*
**exist**  37:*10*  72:*2*  107:*11*
129:*25*  130:*3*
**existed**  168:*14*
**existence**  107:*10*
**existing**  73:*16*  135:*16*
**exists**  83:*19*
**expectation**  103:*23*  104:*1*
**expects**  49:*2*
**expensive**  124:*9*
**experience**  82:*13*  84:*23*
86:*15*  109:*3*
**EXPERT**  3:*12*  5:*22*
7:*14*  15:*11*  68:*2*  75:*5*
90:*3, 14, 17, 23*  91:*2*
142:*17*  143:*7, 25*  154:*21*
164:*13*  170:*7*  171:*12, 20,*
*22*  174:*8*  175:*15*
**expertise**  90:*21*
**explain**  17:*16*  98:*14*
118:*6*
**explained**  76:*2*  101:*2*
**extended**  116:*12*
**extensively**  53:*16*
**extent**  11:*1*  27:*10*  28:*19,*
*24*  33:*14*  60:*2*  83:*18*
87:*1*  105:*5*  117:*2*  119:*5*
125:*2*  150:*14*  172:*6, 9*
**extern**  145:*14*
**extracted**  111:*10*

**extracting**  110:*25*
**extremely**  124:*20*

**< F >**
**face**  33:*13*  55:*9*  162:*20*
**faced**  56:*24*  57:*1*  163:*11*
**facilitate**  70:*10, 24*
71:*10, 23*
**facing**  60:*22, 25*  163:*16,*
*19*
**fact**  44:*2*  60:*2*  84:*12*
98:*9*  108:*8*  138:*22*
145:*24*  147:*9, 18*  156:*21*
163:*22*
**factfinder**  36:*13*  47:*8*
72:*7*
**factors**  44:*20*  166:*24*
**factually**  38:*4*
**failing**  172:*6*
**fair**  20:*16*  21:*10*  34:*20*
37:*22*  51:*11, 15*  52:*5*
53:*8, 19*  54:*2, 6, 15*
69:*22*  88:*10*  111:*13, 19*
113:*8*  118:*8*  124:*15*
131:*9*  156:*19*  157:*7*
161:*14, 24*  165:*22*  172:*2*
**fall**  37:*3*  47:*3*  49:*12*
133:*21*  140:*20*  145:*5*
158:*12*  175:*9*
**fallen**  137:*8*
**falls**  27:*10*  47:*10, 18*
59:*3*  143:*1*
**familiar**  50:*1*  81:*6*
104:*10*
**far**  6:*20*  7:*14*  11:*21*
60:*16*
**Farmobile**  176:*7*
**Fazio**  2:*19*  3:*6*  4:*19*
5:*9, 12, 17, 19*  17:*16*
19:*8*  23:*7*  26:*12*  28:*14*
35:*4*  39:*22*  40:*17, 25*
44:*6*  45:*10*  49:*9*  52:*25*
59:*21*  60:*6, 18*  61:*20*
62:*20*  70:*21*  71:*2, 19*
72:*22*  73:*3*  76:*24*  83:*11,*
*17*  84:*2*  86:*20*  89:*1, 10*
96:*1*  100:*18*  102:*6*
103:*25*  105:*12*  108:*2, 19*
110:*17*  114:*19*  115:*2*
121:*16*  122:*9, 22*  123:*8*
124:*2*  129:*16*  134:*9, 10*
144:*1, 9, 16*  148:*13, 24*
151:*2*  155:*6, 10*  158:*14*
163:*7, 9*  164:*22*  166:*10*
169:*7, 15*  171:*7*  172:*5,*
*13, 20*  176:*21*
**feasibility**  88:*5*
**features**  19:*3, 24*  92:*16,*
*19*  93:*2*  141:*24*
**fee**  118:*18*
**feedback**  94:*7*  149:*16*

**Feel**  26:*21*  102:*19*
131:*24*
**feels**  86:*5*  172:*7*
**fees**  118:*19*  120:*6*  146:*9,*
*11*
**felt**  58:*2*  143:*10*
**figure**  79:*3*  100:*22*
130:*11*
**file**  38:*11*  162:*12*  164:*11*
**filed**  5:*23*  57:*5*  64:*14*
161:*7, 22*
**files**  39:*3, 5*
**filing**  161:*17, 25*  162:*4,*
*8, 13, 15, 17*  163:*9, 17, 20,*
*25*
**final**  153:*24*
**financial**  52:*8*  117:*5*
127:*24, 25*  180:*2*
**financially**  178:*18*
**financials**  129:*11*
**find**  124:*19*
**fine**  134:*8*  148:*18*
**fingertips**  26:*11*  32:*11*
173:*18*
**finished**  62:*2*
**firm**  85:*7, 13*  88:*9*
171:*25*  175:*5*
**firms**  40:*12*  50:*25*  51:*7*
52:*1, 3, 10*  71:*4*  79:*11,*
*15*  80:*18*  81:*22*  82:*12*
**firm's**  170:*10*
**first**  5:*5*  13:*23*  14:*21*
19:*19*  20:*25*  25:*14*  26:*4*
30:*12*  55:*13, 20*  57:*2*
73:*18*  79:*1*  80:*6*  112:*3,*
*5, 7, 9, 23*  113:*5*  115:*11*
124:*13*  125:*6*  127:*20*
135:*11, 18*  152:*5*  153:*5*
**fits**  104:*14*
**fixed**  18:*5*  69:*11*  91:*22*
104:*14*  125:*23*  140:*7*
**Flatly**  173:*11*
**Flip**  156:*2*  175:*14*
**FloodBreak**  176:*12*
**Florida**  112:*13*  113:*12*
**focus**  24:*17*  29:*1, 2*
**focused**  104:*11*  109:*19*
**folks**  9:*2, 16*  114:*2, 17*
122:*14*
**follow**  134:*23*
**following**  12:*23*  153:*9*
179:*12*
**follows**  5:*7*  152:*4*
**footnote**  11:*11*  30:*15, 19,*
*20*  31:*16, 20*  38:*23*
121:*21*  139:*3*  151:*10*
**footnotes**  11:*12*  13:*18*
14:*24*  31:*13*  38:*10, 15,*
*21, 22*  39:*23*  41:*4*  97:*21*
**forced**  147:*21*

**foreclosed**  139:*19*
**foregoing**  178:*9, 11*
**form**  6:*9*  39:*7*  153:*6*
179:*5, 11*
**formed**  154:*15*
**former**  164:*18*
**forming**  6:*16*  8:*13*  10:*7,*
*17*  40:*25*  42:*9*  76:*14*
77:*17*  104:*18*  105:*12, 16*
124:*24*  134:*13*  161:*16*
**formulating**  14:*5*  54:*3*
**forth**  134:*19*  174:*11*
**forward**  61:*20, 22*
106:*10, 16*  107:*6, 10, 23*
**foundation**  26:*5*  83:*5,*
*14, 22*  103:*20*  122:*5, 16,*
*25*  143:*23*  164:*19*
**founded**  77:*5*
**four**  13:*16, 19*  38:*16*
64:*22*  77:*9*  123:*9*
132:*25*  133:*6, 21*  134:*12,*
*23*  156:*10*  158:*1*  175:*17*
**fourth**  152:*5*
**frame**  12:*18*
**framing**  116:*5*
**free**  26:*21*
**Friedman**  2:*20*  4:*21*
**front**  12:*24*  44:*19*
**fulfill**  36:*23*
**fulfills**  43:*23*
**full**  24:*19*  169:*20*
**fully**  21:*16*  59:*25*  62:*4*
64:*17*  102:*16*  106:*5*
**functionalities**  23:*19*
**functionality**  17:*24*
18:*10, 18*  19:*4, 5, 20*
21:*2*  22:*19*  23:*4*  24:*6, 7,*
*19, 24*  25:*6*  26:*16*  27:*9*
48:*22*  50:*23*  66:*15, 18,*
*20*  69:*10*  70:*4*  72:*19*
92:*7, 16, 20, 25*  119:*4, 7*
141:*25*  142:*15*
**functionally**  18:*13*
**functions**  23:*12*  33:*9, 24*
93:*2*  142:*7*
**fund**  88:*18*
**funds**  87:*4*
**further**  32:*22*  70:*17*
79:*23*  176:*22*  178:*14*
**furthermore**  107:*24*
**future**  6:*9*  105:*6*
107:*20*  108:*16*  147:*4*

**< G >**
**gas**  26:*25*  27:*2*
**gears**  34:*10*  132:*16*
**Geiser**  113:*5*
**general**  20:*6*  34:*8*
41:*18*  49:*8*  50:*22*  62:*1*
66:*12*  69:*4*  70:*13, 19*
71:*5*  80:*12*  82:*15, 17*

83:7 87:24 88:11, 15
95:9, 11 100:4 102:2
109:6 126:16 130:2, 7, 8
131:15, 16 143:7 160:17
171:1
**Generally** 11:5 20:4
24:25 29:4 51:22 54:16,
23 68:8 79:25 80:3, 5, 6,
8, 13, 15 88:7 120:1
121:4 131:8, 12 149:23
164:23
**generate** 87:19
**generates** 119:10
**GEORGIA** 1:2, 16 2:14
4:13 178:4 179:4, 13
**getting** 41:2 80:16 87:2
**give** 6:5 12:4 35:18
69:24 78:7 125:25
126:18 154:22 173:19
176:4
**given** 6:12 85:7 115:24
116:12 127:8 154:19
165:10 180:2
**gives** 154:8
**giving** 10:8
**glasses** 89:9
**glean** 131:19
**go** 6:1 10:21 29:22
31:17 32:3, 9, 15 33:6,
22 34:17 38:9 39:1
49:10, 25 50:3 52:23
58:1, 2 61:3 62:3 64:25
68:12, 13 69:23 70:1
72:22 73:12 78:2 81:4
89:1, 13 94:18 104:12
106:21 109:9, 15 110:21
113:17 122:11 123:2
125:4, 25 126:14, 19
127:2, 5 130:13 134:8
135:10, 24 136:3, 8
144:11 151:2 166:16
174:3
**goes** 29:25 37:7 96:10
100:25 113:22
**go-forward** 107:12
**going** 5:14 10:7, 8
14:21 20:18 32:19, 22
39:14 45:1 49:18 63:19
80:4 85:12 90:22
106:10, 15 107:6, 9, 23
122:17 143:4 145:20
146:2 148:14 171:9
**Good** 4:5 5:10, 11, 18
148:15
**gotten** 149:16
**granular** 143:5
**great** 41:5 88:24
148:17 164:9
**greater** 83:12
**Grid** 124:19, 20, 24

125:5, 11 127:5
**gross** 128:2 129:9
**group** 31:15 60:9
100:21
**guess** 20:8 84:2 99:11
108:1
**Guide** 176:11

**< H >**
**half** 12:7, 8 16:4 112:5
125:6 127:7, 20
**hand** 5:14 77:23 87:4
**happen** 7:6 108:15
154:3
**happened** 107:19 166:14
**happening** 28:4 166:24
**happy** 148:16
**hardware** 44:1, 15
**harm** 135:5 137:3, 8, 16
138:25 139:1, 24, 25
140:3, 4, 5 162:4
**harmed** 55:8 60:10, 13
136:22 138:4, 19
**harms** 137:4
**hate** 98:13
**head** 42:7 122:3
**heading** 30:3
**health** 37:4
**hear** 39:21 59:20
**heard** 80:25 163:1
**help** 35:4, 18 45:22
46:8 56:22 75:7 99:11
106:14
**helpful** 134:11, 16
**hereto** 3:9
**high** 80:22 84:16
115:17 116:1, 2 118:21
123:19, 25 124:21
128:19 129:25 130:3, 6
**higher** 22:11 53:2
102:5 126:5
**highlighting** 147:11
**hindering** 27:22
**hired** 36:19 40:12 61:25
**hit** 49:19
**holistic** 111:23
**homegrown** 22:17
**honest** 106:20
**hour** 11:13 16:4 45:1
126:4 148:14
**hours** 10:3 11:15
**human** 175:8
**hypothetical** 39:18
43:20 44:11 49:6 59:18
60:5 70:6, 12 100:15
105:1 106:3 107:14
121:14 123:1 166:5
169:4, 10 170:22
**hypothetically** 70:6

**< I >**
**id** 138:3
**idea** 42:4
**identification** 5:16 151:1
**identified** 6:12, 15 16:22
30:7 40:5 80:19 114:3
122:10 132:25 158:1
**identify** 5:19 34:17
64:23 100:11 114:10
133:7 150:7
**identifying** 113:15
**image** 151:7
**immediately** 12:23
81:23 153:9
**impact** 58:20 104:23
148:10 161:17 162:15
168:5, 10
**impacted** 57:18 58:7, 22
94:12, 19
**impede** 87:3 172:2
**impeded** 87:5 132:18
172:1
**implement** 43:6 78:14,
20 141:2
**implementation** 119:23
140:19 141:9, 15, 16, 17
142:4, 6, 13, 16, 23 143:2,
3, 9
**implemented** 141:5
**implementing** 71:22
140:11, 16 141:12
**implicated** 36:15 128:6
**implicates** 46:15 47:2
**implication** 129:6
**implications** 111:24
113:23 129:4 169:12
**imply** 44:17
**import** 96:19 113:18
**important** 36:7 43:24
77:16, 25 85:25 86:1, 3,
24 110:23
**impose** 167:8 170:4
**impression** 125:19
**improve** 72:18
**improved** 103:6, 19
**improvement** 103:23
**improvements** 36:22
**inaccurate** 136:20
**incentive** 41:11 170:20
**include** 26:23 42:24
67:18 69:5 74:16 81:22
95:3 97:4 124:3 145:22
152:14, 17
**included** 19:9 25:18
45:23 46:1 49:20 50:8
130:10 145:23 152:17
**includes** 27:2 34:13
46:4 126:11
**including** 26:24 31:3, 11
40:11 44:1 50:9 51:7, 8

65:25 67:2 69:4 95:10
98:21 153:5 157:16
**income** 122:14
**Incomplete** 39:17 43:19
44:10 49:5 59:17 70:11
100:14 104:25 121:13
123:1 166:4 169:3, 9
170:21
**inconsistent** 108:7
**incorporated** 96:25
**incorrectly** 135:25
173:12, 14
**increase** 55:9 57:13
169:7, 19
**increased** 56:24, 25 57:6,
9 163:15
**increases** 159:23
**incur** 119:6 147:16, 21
**incurred** 147:23
**independent** 37:12 92:6,
9 167:12
**independently** 29:11
30:22, 25 37:9 168:4
**INDEX** 3:1
**indicate** 84:16 91:4
124:4, 10 132:14, 17
133:16 146:3 163:25
**indicated** 11:12 22:14
41:4 67:8 70:14 75:1
91:2 97:21 100:3 119:3
120:13 121:21 128:12
132:6 145:25 153:23
159:15 160:13, 21
**indicates** 67:9 128:25
138:25 139:23
**indicating** 22:11 70:18
84:12 137:25 146:4
159:12 160:4
**indication** 108:5
**indicative** 96:3 97:11
118:22 132:1
**indicator** 131:9, 13
**indicators** 102:17
**indirectly** 148:11
**individual** 41:8 54:3
65:20 139:4 146:2
155:21
**individuals** 13:16, 17, 19,
20 14:17, 19 156:16
**industrial-owned** 19:17
91:16
**industries** 127:6
**industry** 33:16 34:6
37:16 74:3, 6 84:23
86:14 118:17 168:13
**Industry-Agnostic** 30:4
**infirmities** 41:12
**influenced** 150:4
**information** 10:18 29:13
32:22 33:4 37:25 40:21
41:2, 3, 6 51:21, 24

53:23  55:4  125:3
128:13, 15  130:20, 22, 24
131:19, 20, 21, 23, 24
132:14  139:12, 21
145:19  146:11  152:12
154:1, 10, 11  155:1, 23
158:16  159:16  161:1
164:7, 15, 16, 17  167:7
**infringement** 174:9
**inherent** 107:23
**input** 69:11
**inputs** 132:11
**insertion** 152:22
**inside** 47:10
**Insofar** 8:8, 11  17:22
72:14, 15  90:5  105:4
169:18, 19
**insolation** 113:25
**installing** 141:22
**instance** 157:23
**instances** 57:24  173:20
**instant** 54:22
**instrument** 110:21
**intellectual** 61:8  62:13
152:20, 22, 25  153:6
155:13  165:15  170:10,
14, 18, 25  171:2, 4  175:6
**intend** 6:5  8:9  134:22
154:18, 22
**intended** 109:2
**intention** 162:12
**interaction** 136:16  143:9
**interconnectedness** 24:22
**interdependencies** 25:3
**interest** 17:15, 24  84:13,
15, 18
**interested** 143:4  178:18
**interface** 14:12
**interfered** 133:1  134:14
**interference** 76:11
133:16  134:21  135:3, 5,
9  137:2, 6, 14  156:7
**interfering** 133:8
**internal** 40:2, 3  50:16
140:10, 15  145:15
**interrupt** 31:12
**interview** 6:21  7:1, 18,
23  8:1, 11  10:13  14:14
37:22  38:2  41:7
**interviewed** 9:2
**introduce** 4:17
**invest** 77:1
**invested** 77:12
**investigate** 23:23  24:1, 4
131:1, 25
**investigating** 24:15  25:2
**investing** 105:14  108:9
**investment** 78:14, 19, 25
170:20
**investor-owned** 18:11
19:4  20:23  22:15  23:4

26:13, 16, 19, 23  27:1, 11,
24  37:14, 15  39:10  75:9
83:19, 21  90:16, 24
**involve** 150:15  152:10
153:13  175:23, 25
**involved** 65:18  91:14
135:13  136:6  175:2
**involves** 65:10
**IOU** 18:11  29:12  45:16
63:5  90:10  162:20
**IOUs** 22:19  24:23  29:9
63:2  114:11  163:10
164:3, 5
**IP** 149:1, 8, 12, 15, 19
150:3  158:5  164:2
**IRS** 37:20
**isolate** 160:18  161:4
165:11  168:10
**isolation** 97:14  161:5
168:7
**issue** 18:4  27:20  38:14
43:11, 14  72:13  80:6
99:20  100:24  101:10, 11,
13, 14, 15  105:3  106:9
108:3  139:5  145:17
146:4, 14  147:11  165:24
166:12
**issued** 33:10
**issues** 27:19  38:13
48:12  78:24  91:7  92:25
98:12, 19  99:7, 8  100:4,
19, 21  101:5, 6  108:11,
18  146:6  157:15  166:14
174:8  176:20
**issuing** 15:8
**items** 39:6  40:5
**its** 33:13  36:24  47:15
51:22  65:4  70:9, 10
73:15  77:1  87:3, 19
88:18  93:24  95:3, 4, 18
97:16  98:9  105:5
117:20  120:9, 10, 18
121:2, 10, 11  128:1, 2
129:10  133:2  141:4
145:13  148:4  154:7
164:11  167:18  179:25

**< J >**
**Jalloy@robbinsfirm.com**
2:16
**James** 8:18
**Jason** 2:12  5:1
**Jolla** 2:7
**Jon** 2:4  4:22
**Jon.cieslak@bonalawpc.com** 2:9
**Josh** 4:24
**Joshua** 2:11
**judge** 47:8  72:7
**judgment** 164:10

**Judicial** 179:4
**July** 161:8
**jump** 73:4
**jumping** 138:8
**June** 144:19

**< K >**
**keep** 10:2  36:10  40:18
150:21
**keeping** 155:7
**Key** 2:21  69:9, 11
**kind** 52:4  71:21  78:19
80:2  93:8  113:1, 2
121:22  168:13
**kinds** 9:25  10:9, 10
118:1
**knew** 143:10  155:23
164:5, 6
**know** 6:9  7:13, 14, 15
9:4  10:2  11:17, 20
12:12  18:16, 18, 22
19:15  20:19  21:16  32:8
33:1, 11  35:14  36:12, 13
38:19  40:14  43:7, 25
44:2, 4, 14  46:11  54:17
56:12  60:16  61:9, 12
62:8, 17, 20  63:17, 19
67:20  68:24  78:25
79:25  81:2, 22  82:3
85:6  86:2  87:11, 12, 14
92:8  98:24  99:1  100:16
103:3  105:5, 8  106:17
108:16  109:4, 11  110:1
111:1  113:4, 6, 10
117:15  118:6  119:10
120:9  129:3  130:10
131:17  133:18  135:19
138:2  139:2  144:21
146:18  148:14  154:14,
15  155:10, 18, 24  157:12
165:3  166:23  168:19
170:16  173:22
**knowing** 155:25
**knowledge** 8:4  9:17
10:4  15:3, 6  17:3  62:7
79:13, 16, 20  83:20, 24,
25  88:4  149:13  164:14
**knowledgeable** 155:21
**KPMG** 49:21

**< L >**
**La** 2:7
**lack** 32:24  34:8  96:9
108:14  137:13
**Lacks** 26:5  83:5, 14, 22
103:20  122:5, 16, 25
143:23  164:19
**laid** 35:21  57:21  103:1
**landed** 25:10

**language** 25:25  32:20
109:4  140:18  149:25
153:3
**Lantukh** 6:22  7:1, 2, 23
8:6  13:21  14:11  37:22
73:7  74:2  135:14
136:24
**Lantukh's** 136:12, 18
**large** 64:12  81:24  83:8
**larger** 67:12, 14, 16
**late** 12:17  62:25
**law** 104:21
**lawsuit** 57:5  64:14
159:19, 23  162:15
163:25
**lawyer** 154:21  164:9
**leader** 9:1  10:4
**leading** 81:21
**learned** 10:18
**learning** 29:4
**leave** 108:1
**led** 135:14  136:12
**legal** 10:24  11:6  60:25
61:2, 6, 13  62:5, 9, 16
145:17  146:4, 6, 14
148:3, 8, 11  154:21
159:18  162:7, 8  164:13
170:7  171:12, 20, 22
**legitimate** 170:4
**letter** 37:20  149:9, 12,
15, 19, 21, 24  150:4, 9, 11,
13, 18  151:21  153:9
154:2, 11, 16  155:2, 20
158:5, 7  159:20, 22
161:2
**letters** 57:4  60:13, 22
64:12  133:15  149:5
154:14  156:1, 18, 24
162:5  163:23  164:3, 4, 5
**level** 21:3  80:11  88:4
100:6  115:21  116:2, 8,
14, 19  128:5  132:7
156:15
**leveraging** 73:16
**Liberty** 55:16, 19  56:11
63:14, 24  140:6, 7, 9, 10,
15, 24  141:7  142:12
**license** 75:9  117:21
118:2, 3, 18, 19  120:5, 7,
17  154:6, 12, 18
**licensed** 23:21  125:11
127:7, 20
**licenses** 119:11  120:10
124:24  125:5
**licensing** 119:13  120:5,
15  135:15  136:13
**Light** 112:14  113:12
131:20  157:19  172:10
**likewise** 55:24  159:21
**limit** 36:13

**limitation** 34:*14* 36:*11, 14, 20* 40:*18* 48:*1, 4, 6, 20, 21* 73:*20* 98:*11* 99:*19* 100:*12, 25* 101:*9* 144:*5*

**limitations** 34:*18, 21, 25* 35:*2, 9, 13, 19, 21, 24* 36:*7* 37:*9, 17, 18* 39:*8, 15* 40:*6, 16, 20* 43:*8* 45:*15, 20, 21* 46:*5, 13, 25* 47:*24* 48:*9, 11, 14* 65:*6, 11, 19* 66:*5, 7* 67:*18* 69:*6* 71:*24* 72:*15* 95:*6, 8* 96:*8, 9, 22* 98:*12, 15, 18, 22* 99:*1, 3, 5, 7, 8, 16, 22* 100:*3, 6, 19* 101:*4, 6* 119:*4* 140:*23* 141:*3, 9* 142:*21, 23* 143:*8, 12, 15, 18* 152:*19* 172:*11*

**limited** 26:*13, 18* 128:*14, 15* 129:*2, 4* 130:*20* 131:*17, 20, 21, 23* 141:*4, 23* 169:*20*

**line** 99:*24* 100:*13, 17* 101:*7* 129:*18, 19*

**linked** 172:*10*

**list** 13:*3* 30:*13* 37:*10* 49:*15, 18* 50:*8, 9* 56:*13* 69:*7, 9* 93:*3* 173:*17* 175:*19* 176:*4*

**listed** 32:*14* 39:*6* 46:*24* 114:*12, 17* 134:*13*

**listing** 41:*22*

**lists** 49:*15*

**literally** 54:*17*

**literature** 131:*2, 5, 21*

**litigation** 77:*12* 165:*16* 174:*20* 175:*3, 12* 179:*10* 180:*3*

**little** 29:*18* 32:*12* 49:*10* 77:*9* 86:*5* 109:*23* 132:*23* 161:*13*

**LITTLEFIELD** 2:*10* 4:*13*

**live** 91:*24* 92:*3*

**LLC** 2:*10* 4:*13*

**LLP** 2:*18*

**loan** 88:*13*

**loans** 88:*16*

**LOCATION** 1:*14*

**locations** 48:*10*

**long** 15:*22* 16:*1, 3* 76:*10* 78:*4*

**look** 12:*20* 16:*5* 25:*4* 26:*21* 30:*1* 31:*13, 16* 38:*9, 15* 39:*1* 52:*23* 67:*24* 69:*7, 14* 79:*24, 25* 85:*24* 86:*7, 11* 91:*10* 94:*21* 97:*7, 12* 105:*3* 106:*2* 111:*23* 124:*12* 125:*4, 10, 13* 127:*2*

136:*19* 151:*5, 17* 162:*16* 166:*21* 173:*22*

**looked** 16:*7* 29:*13* 31:*1* 33:*7* 41:*4* 42:*8* 51:*25* 58:*24* 66:*21* 80:*5, 6* 86:*7, 8* 92:*10* 94:*16* 96:*5, 10, 14, 17, 18* 97:*3, 15, 18, 20* 98:*6, 7* 121:*1* 123:*7* 128:*21* 130:*21* 132:*2* 139:*21* 143:*3*

**looking** 12:*12* 19:*19* 21:*1, 6, 7, 14* 27:*12, 23* 29:*8* 34:*6* 50:*1* 69:*8* 71:*17* 79:*22* 80:*10* 85:*20* 86:*4, 8* 96:*22* 107:*18* 116:*4* 119:*25* 120:*1, 11* 122:*19* 176:*8*

**looks** 94:*14*

**losing** 116:*4* 147:*4*

**lost** 106:*18* 156:*6* 174:*11*

**lot** 44:*13* 81:*3* 132:*10* 156:*6* 157:*15*

**lots** 143:*19, 20*

**low** 96:*3* 97:*11* 99:*13* 102:*17*

**lower** 53:*2* 89:*22* 99:*13*

**LUCASYS** 1:*5* 4:*8, 23, 25* 5:*2* 8:*18* 9:*12* 15:*4* 19:*8, 10, 16, 19, 21* 20:*18, 21, 24, 25* 21:*9, 14, 20, 24* 27:*23* 29:*8* 35:*15* 36:*18* 37:*21, 24* 38:*1, 8, 11, 17* 39:*13, 24* 40:*4, 11, 21* 41:*2, 8, 10* 48:*9, 15* 51:*7, 21, 25* 52:*9, 11, 16, 20* 53:*1, 23* 54:*11* 55:*1, 3, 10, 14, 16, 21, 22, 25* 56:*2, 9, 14, 17* 57:*8, 9, 25* 58:*8, 13, 15, 19* 59:*7* 61:*1, 6, 10, 21, 23* 62:*10, 11, 18, 22, 24* 63:*7* 64:*9, 14, 19* 65:*3, 9, 22* 66:*1, 13, 24* 67:*2, 7* 68:*5, 25* 71:*5* 73:*7, 13, 14* 74:*11, 16* 75:*8, 23* 76:*1, 5, 7, 25* 77:*5, 9, 11, 21* 78:*3, 17* 79:*19* 80:*3, 4, 10* 83:*13* 84:*21* 85:*12* 86:*8, 10, 21* 87:*9, 18, 22* 88:*5, 18* 92:*12, 17* 93:*17, 20, 23* 94:*6* 95:*4* 102:*15* 103:*6* 104:*5* 105:*4, 9* 132:*18* 133:*2, 13, 18, 19* 134:*3, 15* 137:*1, 6, 21, 24* 138:*1, 9, 11, 23* 139:*7, 10, 19, 22* 140:*7, 24* 141:*8* 143:*13, 17* 144:*18, 22* 145:*10, 14, 16* 146:*5, 8* 147:*2, 4, 7, 18* 148:*4, 9* 149:*25* 150:*2, 5, 8, 14* 152:*9*

153:*12, 22* 154:*25* 155:*13, 24* 156:*5, 12, 13, 21, 24* 157:*3, 5, 13, 17, 18* 158:*6, 25* 159:*13, 24* 160:*5, 13, 22, 25* 161:*3, 7, 13, 17, 18* 162:*1, 15, 17, 21* 163:*12* 164:*1, 16* 165:*18, 25* 166:*3* 167:*5, 7, 9, 12, 17, 25* 168:*2* 171:*14, 18, 24* 172:*1, 7, 8, 12*

**Lucasys's** 38:*18* 39:*2, 5*

**lunch** 114:*20*

**< M >**

**majority** 29:*6* 59:*14*

**making** 58:*14* 68:*3, 19* 100:*10* 141:*18* 153:*10*

**management** 125:*23*

**manager** 127:*15* 145:*12, 15*

**managing** 175:*8*

**March** 1:*13* 4:*1, 10* 178:*20*

**margin** 128:*2, 5, 10, 14, 18, 20, 25* 129:*8, 17* 130:*21* 131:*2, 25* 132:*5*

**margins** 115:*9* 127:*23* 128:*20* 129:*2, 25* 130:*3, 6, 18* 131:*5, 13, 18*

**mark** 5:*15*

**marked** 5:*16* 151:*1, 5*

**market** 16:*13, 16, 20* 17:*13, 15, 25* 18:*8, 23* 19:*9, 22* 21:*8, 16, 18, 21* 22:*8, 11* 23:*1, 8* 25:*9, 18* 26:*13, 18, 24* 27:*5, 6, 7, 13, 17, 18* 28:*3, 8, 9, 16* 29:*12, 14, 15, 22* 33:*18* 34:*11, 13, 22, 25* 35:*6, 7* 39:*11* 40:*10* 41:*16* 42:*13* 44:*8* 45:*13, 14, 20, 23, 24* 46:*17, 23* 47:*3, 4, 10, 11, 15* 48:*2, 7* 49:*13, 23* 50:*18, 21* 51:*12, 13, 17, 23* 52:*6, 12, 14, 16* 53:*3, 10, 14, 16, 17, 21, 24* 54:*4, 7, 8* 55:*8* 57:*18* 58:*8, 12, 18, 22, 24* 59:*4* 62:*18, 21* 65:*9* 67:*5, 7* 68:*11, 20, 22, 23* 69:*2, 7* 70:*16, 20, 25* 71:*6, 11* 72:*9, 10* 74:*12, 16* 75:*15, 23* 76:*4, 6, 8, 9, 13* 77:*19, 20, 22* 78:*6, 13* 79:*1, 11, 17, 20* 80:*11, 13, 16, 20, 21, 22, 24* 81:*9, 14* 84:*4, 20, 24* 85:*8, 15, 20, 21, 23* 86:*1, 23* 89:*19, 20, 23* 93:*19, 21* 94:*12, 19, 22* 95:*2, 19, 23* 99:*15* 100:*2*

101:*22* 102:*5, 12, 15, 17, 18, 23* 103:*16* 104:*7* 105:*10* 107:*3* 108:*5, 8* 115:*4, 10, 15, 22, 24* 116:*9, 12* 118:*22* 122:*21* 123:*6, 14, 18* 124:*1* 126:*5, 6, 7, 9* 128:*6, 10, 16, 22, 25* 129:*7* 130:*5* 131:*3, 5, 7, 8, 13, 14* 132:*1, 15* 134:*15* 135:*19* 136:*3* 139:*19* 140:*20* 142:*25* 143:*11* 145:*5* 156:*25* 157:*4* 159:*12* 160:*4, 13, 21* 161:*19* 165:*19* 168:*6* 169:*2, 16* 172:*10* 175:*23, 24* 176:*1, 10, 11*

**marketed** 22:*3, 4*

**marketing** 31:*15* 39:*13* 40:*3*

**marketplace** 156:*16*

**markets** 16:*10* 17:*21* 26:*7* 29:*21* 130:*1, 4* 136:*1* 168:*15*

**materialized** 60:*15* 61:*14, 17*

**materials** 6:*15* 7:*3* 13:*1, 3, 5, 7, 8, 11* 16:*1* 32:*16* 97:*22*

**matter** 4:*8* 6:*6* 27:*13* 50:*22* 57:*2* 70:*13* 71:*5* 72:*13* 82:*15, 18* 83:*7* 84:*6* 87:*24* 88:*11, 15* 102:*3* 108:*15* 109:*6* 130:*2* 131:*15, 16* 159:*22* 165:*15* 170:*25* 171:*1*

**Mayes** 2:*11* 4:*24*

**mean** 7:*20* 8:*8* 9:*21* 10:*1, 11* 11:*11* 17:*11* 20:*9* 27:*15* 30:*25* 31:*12* 34:*4* 37:*12* 38:*14* 42:*1, 15* 47:*13* 52:*7* 54:*16, 18, 21* 58:*6, 20, 23* 60:*7* 61:*16* 80:*13* 85:*10, 21* 86:*9* 92:*8* 94:*13* 95:*9* 100:*16* 101:*13* 111:*20* 134:*16* 137:*12* 138:*22* 140:*2, 4* 170:*11, 16* 175:*22*

**means** 88:*19*

**meant** 53:*18, 19* 147:*20*

**measure** 94:*11* 109:*2* 166:*2, 15*

**media** 73:*1* 144:*14*

**meet** 15:*19* 16:*3*

**meeting** 16:*5*

**member** 175:*7*

**members** 15:*17*

**memo** 7:*16*

**memorandum** 7:*19* 8:*2, 5*

**memorized** 125:*24*
126:*18* 127:*1, 4* 139:*5,
13, 15* 140:*17* 146:*12*
161:*23*
**memory** 38:*12, 25* 50:*14*
77:*14* 109:*16* 110:*3, 11,
20* 122:*8* 124:*7* 125:*2, 8*
132:*9* 138:*6* 147:*7*
150:*22, 24* 155:*16* 174:*1*
**mention** 30:*17* 31:*6*
49:*24, 25* 56:*11* 57:*24*
71:*13* 109:*22* 110:*4, 7,
12* 153:*25*
**mentioned** 14:*7, 9* 15:*1*
17:*2* 19:*7* 21:*12* 22:*10*
26:*9* 30:*16* 31:*2, 5, 8*
35:*17* 36:*2* 44:*21* 56:*11*
57:*22* 64:*1, 22* 87:*18*
92:*23* 104:*12* 114:*14*
119:*15* 122:*18* 124:*8, 10,
17* 171:*7* 172:*20*
**mere** 96:*10*
**met** 5:*12* 15:*15, 20, 22*
**method** 166:*15, 19*
**metric** 131:*2*
**MEYER** 1:*12* 3:*4* 4:*7*
5:*4, 10, 14, 19* 16:*9*
23:*10* 26:*12* 40:*17*
45:*10* 47:*20* 50:*15*
51:*11* 73:*3* 115:*2*
148:*24* 172:*20* 176:*21*
**Meyer's** 100:*25* 155:*5*
**mic** 89:*11*
**Michael** 145:*18* 146:*1*
**middle** 73:*5*
**mid-paragraph** 65:*3*
**million** 12:*7, 9, 10* 77:*12*
139:*11, 14*
**millions** 146:*8*
**mind** 15:*12, 18* 37:*2*
41:*23* 42:*11* 55:*5* 56:*21*
64:*9* 72:*20* 79:*8* 81:*23*
82:*1* 91:*7* 95:*12* 103:*8*
118:*20* 142:*8* 164:*25*
176:*7, 19*
**Mine** 107:*19*
**minimum** 176:*7*
**minute** 5:*13* 34:*10* 36:*4,
6* 116:*7* 122:*11* 162:*14*
**minutes** 78:*9* 101:*2*
172:*13*
**misappropriated** 155:*1*
158:*16*
**misappropriation** 174:*10*
**mischaracterizes** 173:*10*
**misspeak** 75:*4*
**misspoken** 53:*18*
**Misstates** 18:*25* 28:*5*
95:*21* 123:*20* 129:*12*
162:*22*

**mistaken** 136:*10*
**model** 87:*19* 124:*10*
**module** 17:*4* 20:*1, 2*
23:*14, 15* 24:*18, 22*
36:*19, 20, 23*
**modules** 17:*6, 23* 18:*14,
19* 19:*6* 20:*16* 23:*11, 20,
24* 24:*2, 16, 23, 25* 25:*3,
4* 27:*15* 28:*19* 29:*8*
117:*23* 121:*2, 7, 12*
**moment** 74:*19* 78:*18*
87:*20* 99:*12* 146:*13*
148:*23* 166:*18* 172:*19*
**Monday** 4:*1*
**money** 96:*7* 98:*16*
143:*16*
**months** 138:*15* 165:*2, 7*
**morning** 4:*6* 5:*10, 11*
**move** 143:*21*
**moved** 61:*20, 22*
**Mt** 2:*20*
**multimillion** 139:*17*
**Myer** 13:*2*

**< N >**
**name** 4:*14* 5:*12* 18:*3*
65:*14* 113:*23*
**names** 50:*1* 55:*2* 75:*3*
82:*1*
**narrative** 14:*20*
**National** 124:*19, 20, 24*
125:*5, 10* 127:*5*
**nature** 15:*2* 47:*15* 59:*9*
117:*6* 167:*19* 173:*15, 23*
**necessarily** 11:*10, 11*
105:*7*
**necessary** 18:*10* 24:*21*
25:*5* 76:*3* 79:*17* 84:*24*
143:*5* 164:*6*
**necessity** 141:*7*
**need** 24:*6* 35:*12* 36:*3*
42:*20* 43:*4* 69:*14* 75:*14*
106:*16* 108:*17* 119:*7*
126:*19* 141:*8* 148:*16*
153:*11* 166:*11*
**needed** 36:*22* 58:*2*
67:*17* 131:*25* 142:*10*
153:*11*
**needs** 42:*25* 44:*15*
48:*24* 65:*21* 66:*14* 73:*9*
91:*12* 117:*23* 144:*3*
**negotiation** 126:*5*
**neither** 39:*5*
**NERA** 9:*1* 13:*14* 174:*19*
**net** 108:*20* 109:*1, 12, 18*
112:*4* 121:*17* 122:*13*
123:*16*
**neutral** 96:*12, 25*
**never** 91:*18, 21* 93:*1, 7*
94:*5* 124:*18* 156:*13*
166:*14* 171:*14, 18, 19*

**new** 81:*12, 13* 104:*22*
108:*10* 140:*19* 141:*2, 22*
149:*11*
**newer** 43:*13*
**newest** 42:*19*
**NextEra** 55:*24* 56:*11*
64:*1* 135:*11, 15* 136:*5,
13, 17, 22, 25* 137:*3, 4, 8,
21* 138:*3*
**next-gen** 104:*22* 105:*16*
108:*10*
**Nodding** 8:*3* 63:*12*
132:*20*
**non-investor-owned** 27:*4*
**non-IOU** 28:*14, 20*
**non-IOUs** 28:*24* 29:*6*
**non-premise** 119:*23*
**North** 73:*17*
**NORTHERN** 1:*2*
**notation** 82:*16*
**note** 30:*15* 31:*17* 32:*7,
21* 33:*15* 48:*11* 50:*8*
78:*21* 81:*11* 82:*22*
127:*13* 144:*17* 146:*25*
165:*13* 167:*16*
**noted** 82:*23* 92:*11*
139:*3* 145:*15* 165:*13*
**notes** 8:*1*
**Nova** 73:*13, 15, 19*
**November** 137:*10*
**number** 28:*21* 29:*5, 23*
30:*8* 31:*14, 19* 48:*10*
49:*12* 51:*6* 64:*12, 17*
65:*25* 67:*1* 68:*19* 69:*19*
73:*2* 77:*14* 82:*10* 87:*25*
98:*6* 107:*16, 18* 114:*14*
121:*17* 144:*15* 159:*16*
160:*24* 173:*11* 175:*5, 12,
25*
**numbered** 178:*12*
**numbers** 30:*18*
**numeration** 93:*9*
**numerous** 29:*14*

**< O >**
**O.C.G.A** 179:*19*
**O1177753-755** 39:*25*
**Objection** 17:*10* 18:*25*
23:*2* 26:*5* 28:*5* 34:*23*
39:*17* 40:*8, 22* 43:*19*
44:*10* 49:*5* 52:*17* 59:*17*
60:*17* 61:*15* 62:*19*
70:*11* 71:*1, 12* 76:*19*
83:*5, 14, 22* 86:*18* 88:*20*
95:*20* 100:*14* 103:*20*
104:*25* 107:*13* 108:*12*
121:*13* 122:*5, 16, 25*
123:*20* 129:*12* 134:*5*
143:*23* 148:*5* 158:*8*
162:*22* 164:*19* 166:*4*

169:*3, 9* 170:*21* 172:*3*
**obligated** 164:*11*
**obligations** 154:*17*
**observation** 143:*13*
**observations** 118:*8*
**observe** 64:*21* 84:*6, 19*
129:*4* 156:*14* 157:*1*
**observed** 80:*21*
**obtain** 87:*22* 143:*16*
**obtaining** 87:*1*
**obviously** 6:*1* 8:*22*
62:*14* 105:*2* 108:*16*
156:*10* 167:*23*
**occasion** 7:*2*
**occurred** 76:*12* 139:*2*
147:*24* 164:*23*
**occurring** 9:*25* 169:*25*
170:*2*
**occurs** 117:*2*
**O'Cotection** 14:*23*
**October** 78:*2* 137:*9, 10*
161:*22*
**offer** 45:*16* 106:*3* 171:*9,
23*
**offered** 67:*4* 69:*1*
147:*10*
**offering** 19:*13* 70:*8*
90:*7* 156:*20* 174:*12*
**offerings** 21:*1* 33:*8*
70:*24* 71:*10* 87:*20*
**offers** 65:*9* 67:*20*
**officer** 145:*19*
**Ohio** 2:*23*
**Okay** 7:*5* 9:*1, 18* 11:*9*
12:*13* 14:*10* 16:*12*
17:*16* 18:*1, 16* 20:*5*
25:*17, 22* 30:*2* 31:*24*
33:*21* 34:*17* 35:*4* 36:*2*
39:*12* 40:*2* 43:*10* 45:*4*
46:*6* 47:*8* 48:*5* 49:*9*
50:*20* 51:*20, 24* 53:*12*
55:*6* 56:*16, 22* 57:*10, 20*
58:*10, 17* 59:*6* 60:*15*
63:*10, 11* 64:*4* 65:*8, 13*
67:*14, 20, 24* 68:*10, 17*
69:*16* 70:*1* 74:*5, 14*
75:*6* 76:*5, 10, 24* 77:*5*
79:*24* 80:*9* 81:*2, 7*
82:*12* 83:*11* 85:*5* 86:*12*
88:*13, 17* 89:*15, 25*
90:*12* 91:*9* 92:*12* 94:*24*
96:*1, 24* 100:*7* 101:*8*
102:*21* 105:*24* 107:*2*
108:*7* 109:*23* 113:*1, 4*
114:*2, 11* 115:*20, 25*
116:*7, 11* 117:*7* 122:*1,
22* 124:*12, 18* 125:*18*
128:*8* 129:*16, 22* 133:*5,
11, 20, 24* 134:*11* 135:*1*
141:*21* 142:*20* 144:*10*
147:*14, 22* 149:*4* 151:*5,*

*25* 152:*4, 14, 21* 153:*2*
155:*10* 157:*10* 159:*8, 10*
165:*6* 167:*4* 170:*18*
171:*7* 172:*5, 14, 23*
173:*16* 174:*6, 15* 175:*19*
176:*2*
**older** 42:*18*
**Olson** 174:*16*
**once** 148:*2*
**one-product** 22:*8*
**ones** 32:*1* 50:*5* 55:*21*
64:*22* 98:*25* 176:*2, 6, 17*
**one-time** 120:*5*
**one-to-one** 68:*4*
**ongoing** 22:*1, 5* 56:*1*
64:*10* 75:*20* 142:*3*
**on-premise** 120:*23*
**operates** 83:*20*
**operation** 169:*22*
**opinion** 22:*23* 39:*14*
40:*4, 19* 41:*13* 49:*7*
54:*3* 59:*16* 67:*4, 25*
96:*1* 97:*9* 136:*16, 18, 20*
141:*13* 142:*19* 144:*7*
154:*15, 16, 18, 20, 21*
156:*20* 164:*10, 14* 170:*8*
171:*9, 13, 23* 173:*14*
174:*12, 13, 17*
**opinions** 6:*5, 7, 10, 12, 13,
16* 8:*13* 10:*7, 17* 13:*4*
41:*1* 42:*9* 50:*14* 55:*6*
76:*14* 77:*17* 90:*7*
104:*19* 105:*13, 17*
118:*12* 124:*24* 134:*14*
156:*17* 161:*16* 167:*18*
172:*24* 173:*13*
**opportunities** 73:*8* 147:*4*
**opposed** 58:*8, 13*
**optimize** 73:*9*
**option** 22:*20* 51:*10*
147:*19*
**Oracle** 81:*22* 82:*4, 6, 10,
12, 16* 83:*3* 84:*11, 17*
**oral** 83:*12*
**order** 24:*19* 35:*13*
36:*23* 119:*6* 126:*18*
143:*16, 18*
**organizations** 127:*15*
**orient** 29:*18* 30:*2* 34:*12*
**oriented** 89:*18* 107:*9*
**original** 161:*10*
**originally** 161:*13*
**outer** 46:*23*
**outside** 27:*10* 36:*15*
47:*10* 51:*7* 88:*20*
119:*20*
**overall** 33:*3* 52:*22* 58:*8,
12, 19* 62:*17* 66:*5, 7*
109:*2* 122:*12, 24* 126:*11,
12* 128:*20*

**overcome** 34:*14* 35:*13*
46:*4* 47:*23* 65:*11, 19*
71:*24* 72:*14* 95:*6, 8*
96:*7, 21* 98:*11* 143:*18*
**overcoming** 46:*12* 67:*18*
**overly** 167:*6* 172:*7*
**overseeing** 14:*16*
**oxygen** 157:*17*

**< P >**

**p.m** 1:*17* 89:*7* 114:*23*
115:*1* 144:*11, 15* 148:*20,
23* 172:*16, 19* 177:*1, 3*
**PAGE** 3:*3, 11* 6:*2*
29:*20, 25* 38:*23* 55:*6, 7*
65:*1* 77:*6* 108:*24* 112:*8*
115:*3* 132:*16* 156:*4*
174:*3, 4* 175:*14* 176:*8,
13, 16, 17*
**pages** 85:*2* 178:*12*
**paid** 117:*4* 119:*19*
120:*6* 127:*21*
**paragraph** 29:*17* 30:*3*
34:*12* 37:*19, 23* 38:*14,
23* 39:*7* 40:*6* 45:*11, 13*
49:*10* 50:*2, 8, 24* 64:*25*
70:*15* 73:*4, 5* 76:*1*
78:*15, 21* 84:*21* 85:*1*
89:*16* 111:*17* 112:*4, 10,
23* 114:*4, 12* 115:*3*
121:*18* 124:*13* 127:*23*
128:*12* 129:*6, 18* 130:*12*
132:*19* 133:*3* 134:*13, 20*
135:*6* 148:*25* 150:*11, 12*
151:*6* 152:*4, 5, 15* 153:*5,
7, 9* 154:*24* 156:*2*
158:*18, 21* 159:*4* 167:*1*
174:*6*
**paragraphs** 34:*18* 37:*7*
45:*21* 151:*19, 20, 25*
152:*1, 16, 17* 153:*4, 23*
154:*3*
**paraphrase** 93:*12*
**paraphrased** 155:*9*
**parent** 128:*1*
**parse** 52:*21*
**part** 15:*24* 17:*8, 14*
60:*1* 65:*18* 67:*4, 10*
69:*1, 6* 71:*20* 76:*14, 17,
23* 77:*3, 4* 78:*10* 86:*24*
90:*20* 91:*1* 107:*24, 25*
136:*1, 2* 164:*10* 168:*8*
171:*12*
**participant** 53:*3* 54:*4*
131:*14*
**participants** 33:*16* 34:*7*
37:*16* 39:*11* 40:*11*
51:*13* 94:*20, 22* 95:*2, 24*
130:*5*
**participant's** 169:*17*

**participates** 70:*15, 20*
**participating** 102:*16*
**particular** 17:*14* 18:*3,
11* 19:*13* 24:*12* 27:*13,
25* 33:*1, 7* 34:*2, 3* 35:*11,
24* 36:*2, 8* 37:*2* 38:*2, 6*
41:*13* 42:*22, 23, 25* 43:*8*
44:*5, 22* 47:*9, 17* 48:*8*
49:*9* 50:*2, 24* 51:*5* 53:*4*
57:*22, 24* 58:*16* 61:*17*
62:*13* 64:*20* 67:*13*
68:*13, 14* 69:*9* 70:*16, 18*
72:*8* 73:*6, 22* 74:*3* 75:*3*
76:*22* 78:*10* 79:*19, 21*
80:*12* 81:*11* 82:*19* 83:*9,
21* 88:*23* 97:*13, 14*
98:*19* 100:*23, 24* 102:*3,
10* 105:*22* 112:*22* 114:*6,
9, 10* 116:*20* 117:*23*
118:*13* 120:*2* 122:*7, 19*
123:*18, 23, 24* 132:*7*
136:*1* 140:*4, 18* 150:*6*
153:*23* 156:*10* 157:*6*
158:*11* 160:*9, 15* 165:*12*
168:*8* 171:*11* 175:*1*
**particularly** 33:*17* 77:*25*
118:*14* 153:*16* 172:*10*
175:*20, 22*
**parties** 168:*24* 178:*15,
16* 179:*10* 180:*1*
**parts** 13:*18* 102:*11*
**party** 154:*8* 179:*9, 22*
180:*2*
**pasting** 142:*10*
**patent** 174:*9*
**PATTON** 2:*18*
**pause** 138:*14, 17, 18, 21*
139:*2, 23, 25*
**paused** 138:*9*
**pay** 95:*8*
**paying** 96:*7, 21* 98:*10,
16* 125:*11* 127:*8*
**PC** 2:*3*
**pending** 165:*2, 9*
**people** 13:*13* 60:*9* 88:*8*
155:*11*
**perceive** 48:*6*
**perceived** 61:*18* 138:*4*
**perceives** 101:*9*
**percent** 22:*10* 23:*7*
128:*2, 9, 19* 129:*17, 22*
130:*11* 132:*11* 174:*25*
175:*1*
**percentage** 62:*17, 21*
82:*4* 174:*20*
**perception** 93:*17* 94:*7*
98:*4* 120:*1* 123:*13*
**perform** 23:*11* 40:*15*
**performance** 25:*5*
**period** 71:*14* 105:*4, 8,
18* 106:*8* 107:*3* 149:*5*

156:*23* 165:*9* 174:*22*
175:*2*
**periods** 105:*3*
**permitted** 168:*24*
**perpetual** 120:*4*
**person** 8:*21* 112:*16*
145:*19*
**personal** 8:*14*
**personally** 11:*15* 90:*8,
11* 149:*10*
**perspective** 28:*12* 44:*7*
72:*6* 75:*22* 111:*16*
**Ph.D** 1:*12* 3:*4* 5:*4*
**PhD** 4:*7* 13:*2*
**phone** 8:*21*
**photographic** 38:*12, 25*
**phrase** 127:*17*
**picked** 122:*22*
**piece** 34:*3* 49:*2* 66:*2*
72:*8* 93:*4* 97:*13* 111:*12*
**pieces** 33:*23* 161:*1*
**place** 57:*22* 91:*7*
102:*19* 132:*4* 153:*24*
178:*10*
**places** 75:*25* 76:*2* 78:*23*
80:*15* 91:*5, 13* 173:*11*
**Plaintiff** 1:*6*
**PLAINTIFFS** 2:*2*
**planning** 81:*18* 127:*15*
133:*18*
**platform** 100:*5* 120:*3*
**player** 102:*13, 14*
**please** 4:*17* 20:*14* 43:*10*
**point** 6:*8* 11:*16* 33:*17*
34:*8* 39:*7* 55:*7* 68:*20*
78:*5* 82:*19* 86:*16* 88:*24*
105:*22* 112:*3, 7, 9* 123:*4*
124:*13* 125:*13, 14*
135:*11* 137:*8* 138:*7*
140:*6* 144:*17* 147:*12*
157:*6, 10* 160:*6, 11, 19*
163:*17* 165:*13* 169:*15,
23*
**points** 30:*10* 34:*7* 114:*4*
117:*1* 124:*12* 153:*24*
**portion** 104:*4* 106:*6*
**portions** 106:*23* 173:*4*
**portrays** 154:*17*
**posed** 109:*12, 24* 110:*9,
11* 111:*2* 126:*15*
**position** 40:*13* 97:*17*
141:*1* 154:*13* 155:*18*
**positioned** 84:*22*
**positive** 96:*12, 25*
**possibility** 79:*10*
**possible** 43:*8* 44:*2, 4*
64:*16* 115:*23* 116:*10, 21*
157:*1* 165:*11* 166:*22*
**potential** 25:*9* 27:*21*
28:*15, 17, 25* 29:*23*
30:*13, 16* 31:*1, 8* 41:*10*

64:*15, 17*  74:*6*  77:*18*
92:*22*  93:*18*  150:*2*
153:*22*  159:*11*  160:*3, 12,*
*20*  161:*2*  162:*14*  167:*20*
171:*3*  175:*23*  176:*1*
**power**  54:*4, 7*  89:*19*
94:*12, 19*  95:*19*  103:*16*
108:*5, 8*  112:*13*  113:*12*
115:*5, 10, 15*  116:*13*
118:*22*  120:*22*  122:*21*
123:*6, 14*  124:*1*  128:*6,*
*11, 16, 22, 25*  129:*7*
131:*3, 6, 7, 9, 14*  132:*1,*
*15*  141:*23*
**POWERPLAN**  1:*8*  4:*8,*
*20*  9:*5, 9*  17:*5, 22*  18:*2*
19:*12*  23:*18*  25:*4*  29:*7*
30:*17*  31:*3, 16*  41:*9, 11*
49:*22*  54:*7*  60:*23*  61:*6*
62:*6, 9, 25*  63:*6*  64:*12*
67:*20*  70:*3, 15, 19*  71:*6*
72:*1*  78:*3*  85:*11*  92:*23*
95:*3*  96:*19*  98:*8, 21*
103:*22*  104:*15, 22*
105:*13*  108:*9*  109:*3*
111:*22, 24*  113:*20, 21, 24*
114:*9, 10*  115:*9*  116:*13*
117:*4, 20*  119:*10, 14, 19*
120:*9, 18*  121:*1, 7, 21*
122:*2*  125:*5, 22*  127:*19,*
*24, 25*  128:*1*  129:*7, 10,*
*18, 19*  130:*20, 24, 25*
133:*1, 8*  134:*14*  138:*20*
140:*11, 16*  141:*3*  144:*18*
145:*20*  146:*3*  147:*3*
148:*3, 9, 12*  149:*4*
150:*15*  152:*11*  153:*1, 10,*
*11, 25*  154:*6, 8*  155:*2, 22*
158:*6, 15, 17, 24*  161:*8,*
*14, 18*  162:*6, 15*  164:*11*
165:*11*  167:*8, 14*  168:*12*
170:*3*  171:*10*
**PowerPlan/PowerTax**
17:*19*
**PowerPlan's**  18:*7, 16, 18*
19:*6*  23:*10, 15*  29:*12*
60:*10*  63:*16*  64:*2, 6*
70:*7*  89:*21*  91:*21*  95:*18*
96:*8*  103:*5, 16*  104:*4, 14*
111:*11*  114:*1*  115:*5, 8,*
*24, 25*  116:*22*  117:*16*
120:*23*  121:*10*  132:*17*
136:*23*  138:*10*  144:*19*
150:*13*  152:*8*  153:*12, 13*
155:*1, 12, 14*  156:*7, 22*
157:*16*  159:*13*  160:*5, 14,*
*22*  161:*21*  164:*17*
168:*19, 23*
**PowerPlant**  89:*19*
103:*18*  154:*13*
**powers**  130:*5*

**PowerTax**  16:*22, 25*
17:*20*  19:*17, 18, 23, 25*
20:*4, 6, 15, 22*  21:*10*
22:*4, 9, 20, 22, 25*  23:*6*
27:*5, 15*  28:*15, 25*  29:*12*
30:*14, 23*  31:*2*  33:*9, 20,*
*25*  34:*14*  35:*9, 19, 23*
36:*16, 19, 20, 23*  37:*10,*
*14*  39:*16*  40:*6, 16*  41:*12,*
*17, 19, 25*  42:*5*  45:*15*
46:*5, 15*  47:*2, 24*  48:*1, 4,*
*7, 13, 23*  54:*12*  59:*15*
60:*2*  65:*6, 12*  67:*19, 22*
69:*6*  70:*4*  72:*15, 16, 17*
73:*20*  75:*10*  79:*1*  80:*22*
82:*3, 6, 9, 17*  84:*15*
89:*21*  90:*9, 11*  91:*6, 19,*
*25*  92:*7, 16, 20, 21*  93:*3*
95:*17*  96:*2, 13*  97:*10, 19*
98:*12, 15, 18, 24, 25*  99:*2*
100:*19, 22*  101:*11, 15, 16,*
*21*  102:*22*  103:*15, 19*
104:*9, 15, 24*  105:*14*
106:*5, 7, 23, 24*  108:*3*
109:*20, 22*  110:*1, 4, 7, 13*
114:*5*  115:*13, 16*  116:*23*
117:*4, 20, 24*  118:*9, 25*
119:*5, 8, 12, 18, 20, 21, 24*
120:*10, 15, 19, 23*  121:*6,*
*10*  124:*14, 16*  125:*15, 16,*
*20*  126:*6, 9*  127:*12, 16,*
*17*  130:*16*  140:*19, 23*
141:*10, 11, 25*  143:*11, 12*
145:*1, 4, 6*  172:*11*
**PowerTax-related**  54:*15*
111:*7*
**PowerTax's**  78:*22*  103:*4*
104:*21*
**PP**  145:*21*
**PPG**  176:*13*
**practice**  175:*6*
**practices**  90:*15*
**practicing**  94:*10*  123:*15*
128:*23*
**precluded**  87:*2*
**predict**  6:*8*
**preference**  22:*21*  137:*7,*
*12, 25*
**preferred**  22:*20*  55:*10,*
*14, 17, 21, 23, 25*  56:*9, 15,*
*18*  62:*18, 22*  87:*18*
**preferring**  20:*16*
**preliminary**  6:*19*
**pre-litigation**  164:*16*
**premise**  129:*15*
**prepare**  15:*13*
**prepared**  31:*14*  85:*7, 14,*
*16*
**preparing**  15:*23, 25*
32:*17*  174:*16*

**prerequisites**  80:*19*
**presence**  159:*23*
**presented**  146:*15*
**pretax**  91:*15*
**previous**  19:*3*  20:*7*
53:*15*  67:*8*  69:*4*
**Price**  49:*21*  115:*21*
116:*8, 14, 18*  123:*10*
**prices**  51:*8, 16*  52:*12*
84:*16*  117:*3, 20, 24*
118:*17*  121:*1*  125:*10*
127:*8, 20*
**pricing**  23:*24*  43:*24*
44:*16*  52:*2, 5, 16, 22*
53:*2*  63:*1*  115:*6, 9, 11,*
*12, 13, 17*  116:*1, 6, 16, 23*
117:*1, 16, 22*  118:*3, 9, 12,*
*15, 16, 20, 22*  119:*21, 25*
120:*2*  121:*7, 10*  122:*21*
123:*7, 14, 18, 25*  124:*5, 8,*
*9, 20*
**primarily**  14:*3, 11, 15*
**primary**  13:*15*
**prior**  60:*8*  81:*15*
111:*14*  158:*23*  161:*25*
163:*17, 20*  166:*1*  168:*23*
**private**  37:*20*
**probably**  60:*19*  176:*3*
**problem**  43:*11*
**proceed**  147:*18, 19*
**proceeding**  177:*3*
**proceedings**  178:*9, 13*
**process**  21:*12*  22:*1, 2*
79:*21*  94:*17*  142:*3, 4*
164:*23*
**procompetitive**  169:*2*
170:*19*  171:*3*
**produced**  7:*16*  13:*8, 11*
15:*5*
**produces**  129:*19*
**product**  19:*8, 13, 16*
20:*22*  21:*3, 18, 20*  22:*3,*
*4*  27:*7, 8*  29:*20*  40:*16*
41:*19*  67:*19*  68:*6, 10, 25*
70:*3*  71:*15*  73:*13, 15, 19*
77:*19*  78:*6*  82:*25*  86:*13*
94:*8, 18, 23*  95:*1*  97:*6*
102:*25*  104:*23, 24*  105:*6,*
*14, 19*  108:*10*  114:*9*
115:*14, 16*  123:*19*
129:*18*  135:*15*  136:*5, 13*
137:*5, 14*  144:*23*
**products**  17:*22*  18:*2, 7,*
*9*  19:*6, 11, 21*  21:*9, 25*
22:*12, 13, 16, 17, 22, 24*
24:*13*  27:*15*  28:*20*  31:*8,*
*13*  33:*9*  41:*12*  65:*25*
67:*2, 3, 6, 21*  68:*13, 19,*
*21*  69:*20, 21*  71:*4*  74:*12,*
*17*  75:*8, 14*  77:*13*  92:*13,*
*17, 22*  93:*24*  94:*6*

**103:***24*  104:*11*  107:*10*
114:*11, 15*  117:*20, 22*
119:*20*  124:*23*  125:*5, 11,*
*22*  127:*6, 9, 19, 21*  128:*3,*
*10*  129:*3, 10*  130:*10*
132:*6*  140:*11, 16*  169:*21*
**product's**  94:*11*
**profile**  174:*6*
**profile/CV**  174:*3*
**profiles**  31:*4, 14*  32:*2, 5,*
*21*
**profit**  128:*2, 14, 18, 19,*
*20, 24*  129:*9, 17*  130:*3,*
*18*  131:*2, 5, 12, 18*  132:*5*
**profits**  174:*11*
**prohibited**  179:*18*
**project**  55:*25*  56:*2, 3*
83:*9*  135:*13, 14*  136:*12,*
*13*  139:*11*  140:*8*  145:*12,*
*14*
**projects**  144:*22*  152:*9*
**promoter**  108:*20*  109:*1,*
*12, 18*  112:*4*  121:*17*
122:*13*  123:*17*
**prompted**  111:*7*
**properly**  94:*3*
**property**  61:*8*  62:*13*
152:*20, 23, 25*  153:*6*
155:*13*  165:*16*  170:*10,*
*14, 19, 25*  171:*2, 4*  175:*6*
**proposed**  9:*34:11*
47:*3*  49:*13, 23*  167:*25*
168:*5*  171:*15*
**proposition**  156:*5*
**proprietary**  158:*16*
164:*17*
**protect**  153:*21*  170:*15*
**protected**  170:*25*  171:*2*
**protecting**  170:*10*  171:*4*
**protection**  149:*1, 9, 12,*
*15, 19*  150:*4, 9*  158:*5*
164:*3*  170:*19*  171:*6*
**provide**  22:*18*  24:*20*
35:*2, 16*  40:*13*  50:*16*
51:*2*  54:*14*  140:*7, 10*
144:*23*  168:*24, 25*
169:*20*  170:*20*  174:*8, 13*
179:*16, 21*
**provided**  46:*15*  47:*2*
50:*17*  51:*9*  53:*9, 13, 21*
59:*15*  71:*20*  118:*10*
127:*24, 25*  164:*15*
**provider**  9:*20*  48:*15*
55:*11, 14, 17, 23, 25*  56:*9,*
*15, 18*  58:*1*  62:*18, 22*
81:*11*  83:*18*  84:*3*
137:*22*  167:*21*
**providers**  9:*15*  30:*8*
35:*2, 15*  49:*12, 22*  53:*10*
70:*22*  80:*18*  81:*8, 18, 21,*

*24* 92:23 98:*10* 167:*15*
168:*13*
**provider's** 169:*20*
**provides** 17:*23* 18:*19*
66:*25* 86:*10* 119:*14*
**providing** 23:*4* 49:*3*
50:*23* 54:*11* 55:*1* 63:*17*
71:*16* 88:*19* 123:*24*
139:*8* 140:*15*
**provision** 52:*19* 70:*25*
71:*10* 95:*5*
**provisions** 66:*2*
**Public** 2:*22* 29:*5* 84:*10*
**publicly** 84:*9*
**pulled** 149:*25*
**purchase** 28:*20* 137:*13*,
*15* 149:*20*
**purchasing** 27:*14* 90:*24*
91:*14*
**purposes** 20:*14* 21:*21*
27:*12* 73:*24* 83:*1* 175:*9*
**Pursuant** 179:*2*
**push** 164:*1*
**put** 108:*9* 140:*25*
151:*19*
**puts** 65:*17*
**putting** 14:*25* 119:*1*

**< Q >**
**qualified** 154:*22*
**qualities** 95:*1*
**quality** 53:*9*, *13*, *17*, *20*,
*25* 89:*22* 90:*8* 91:*11*
93:*17* 94:*11*, *18*, *22* 95:*4*,
*18* 96:*3*, *9* 97:*6*, *11*, *16*,
*19* 98:*11*, *12*, *15*, *19* 99:*5*,
*7*, *13*, *14*, *20* 100:*4*, *11*, *20*
101:*1*, *5*, *6*, *10*, *21* 102:*5*,
*17* 103:*2*, *6*, *10*, *14*
104:*21*, *23* 105:*18*, *22*
106:*7*, *8* 107:*4*, *7*, *12*, *23*
108:*3*, *10*, *11*, *14*, *18*
126:*12*
**quantification** 140:*2*
**quantify** 29:*11* 57:*12*
63:*1*, *4* 139:*25*
**quantitative** 111:*15*, *18*,
*21* 115:*20* 116:*15*, *19*
**quantity** 58:*21*
**question** 20:*3*, *7*, *8*, *18*
21:*19*, *22*, *23* 28:*11*, *23*
32:*12* 33:*21*, *22* 36:*17*
37:*1* 39:*20* 42:*16*, *22*
43:*7* 46:*3*, *19* 47:*6*, *16*
48:*3* 49:*8* 50:*3* 53:*15*,
*19* 56:*8* 59:*20*, *22* 60:*5*,
*19* 69:*4*, *15* 70:*2* 71:*7*
73:*22* 75:*6*, *13* 78:*6*, *7*, *8*
79:*24* 85:*18* 86:*6* 87:*7*
88:*23* 93:*13* 99:*5* 101:*3*,
*24*, *25* 102:*21*, *23* 106:*15*,

*17*, *19* 107:*8*, *17* 109:*11*,
*24* 110:*9*, *15*, *18* 111:*1*,
*12* 112:*16* 124:*2* 125:*3*
126:*15* 129:*15*, *20*
130:*21* 131:*16* 134:*24*
139:*20* 140:*13* 141:*14*
147:*2* 157:*15* 160:*1*, *7*
162:*25* 163:*2*, *3*, *6*, *7*
170:*8*, *12*
**questioning** 85:*5*
**questions** 19:*3* 27:*19*, *20*
72:*13* 100:*9* 108:*16*, *22*
110:*3*, *11* 122:*18* 126:*25*
176:*22*
**question's** 109:*23*
**quick** 88:*24*
**quickly** 135:*11*
**quite** 163:*5* 165:*20*
**quote** 124:*17* 145:*12*, *16*,
*22*, *23*, *25* 146:*14* 157:*16*
158:*15*
**quoted** 126:*3*
**quotes** 111:*10* 116:*25*
**quoting** 112:*13* 126:*23*

**< R >**
**R2** 9:*16* 49:*22*
**raise** 88:*2*, *8*, *12* 108:*2*
167:*20* 169:*21*, *22*
**raised** 144:*18* 162:*18*
169:*16*
**raising** 87:*25* 88:*6*
108:*3*
**range** 87:*16* 169:*20*
174:*25*
**rates** 126:*4* 180:*1*
**rational** 27:*16*
**RCC** 9:*16* 49:*15* 51:*8*
70:*23* 167:*18*
**reach** 29:*23* 95:*16*
102:*6* 123:*17* 134:*18*
**reached** 94:*5* 124:*18*
172:*24*
**reaction** 96:*6* 98:*9*
111:*11* 113:*20*
**reactions** 91:*12* 104:*3*, *5*
**read** 25:*12* 59:*21*, *22*
101:*25* 110:*15* 146:*25*
155:*9* 163:*3* 167:*24*
**reading** 46:*1* 118:*5*
136:*25*
**Ready** 89:*13* 144:*12*
**reality** 84:*19*
**really** 93:*21* 107:*16*, *20*
118:*20* 126:*22* 156:*25*
174:*21*
**realm** 128:*20*
**re-answer** 107:*9*
**re-ask** 107:*8*
**reason** 9:*24* 40:*24* 44:*3*
84:*3* 88:*17* 152:*14*

**reasonable** 118:*8* 123:*16*
158:*23* 170:*10*, *13*, *14*, *17*
**reasons** 99:*12*
**recall** 9:*3* 16:*1*, *8* 18:*3*
23:*25* 24:*10*, *12* 25:*11*,
*25* 26:*2* 29:*4* 32:*19*
55:*2*, *3* 59:*8* 62:*15* 68:*3*
71:*17* 74:*18*, *23*, *24* 75:*2*,
*11* 79:*2* 80:*23* 82:*9*
94:*4* 97:*23* 104:*20*
109:*5*, *14*, *21* 110:*3*, *6*, *12*
117:*14* 120:*16*, *20* 121:*5*,
*8* 124:*6*, *8* 125:*8* 126:*20*
130:*14* 132:*7*, *9*, *12*
136:*21* 138:*16* 139:*12*,
*16*, *21* 142:*11* 144:*24*
145:*3* 146:*11*, *24* 147:*5*
150:*17* 154:*10* 155:*17*
157:*20*, *22* 158:*11* 161:*9*,
*11* 164:*7*, *20* 168:*3*, *21*
169:*14* 170:*1* 173:*21*
**received** 11:*6* 14:*22*
41:*7* 60:*13* 138:*20*
139:*22* 149:*21* 158:*5*
159:*21* 164:*4*
**receiving** 150:*8* 161:*1*
**recipient** 149:*8*, *12*, *15*,
*16*, *19* 164:*6*
**recipients** 164:*2*
**recipient's** 150:*4*
**recognized** 111:*25*
**recognizing** 98:*21*
**recollect** 134:*7*
**recollection** 7:*7*, *8* 8:*5*,
*20*, *23* 12:*15*, *19* 15:*24*
25:*7*, *20* 26:*8* 52:*18*, *24*
55:*24* 56:*19* 60:*24* 61:*4*
74:*22* 75:*17* 81:*1*, *4*
91:*11* 92:*1*, *4*, *14* 104:*13*
109:*7* 110:*22* 117:*8*, *11*
120:*12* 123:*4* 126:*16*, *24*
132:*2*, *4* 133:*23* 134:*11*
135:*22* 136:*1*, *7*, *9*, *24*
141:*6* 145:*2* 149:*17*
161:*9* 164:*24* 168:*1*
170:*2*
**recollections** 7:*12*
**record** 4:*6*, *11*, *18* 5:*12*,
*20* 45:*5*, *7*, *8* 59:*23*
72:*22*, *23*, *25* 73:*2* 81:*17*
89:*2*, *3*, *5*, *6* 102:*1*
110:*16* 114:*22*, *24*, *25*
144:*10*, *15* 148:*19*, *21*
155:*7* 158:*3* 163:*4*
169:*24* 172:*15*, *17*, *19*
177:*1*, *2* 178:*13*
**recorded** 4:*7* 176:*25*
**reduction** 156:*15*
**refer** 16:*19* 18:*14* 20:*12*
31:*20* 38:*17* 65:*24*
115:*12* 125:*14* 166:*20*

**reference** 45:*15* 99:*2*
125:*19* 126:*6* 127:*12*
**referral** 179:*9*, *23*
**referred** 11:*2* 108:*19*
**referring** 17:*1*, *3* 30:*19*
31:*14* 35:*20* 38:*21* 53:*5*
63:*13* 69:*21* 112:*4*
117:*24*, *25* 118:*1* 146:*20*,
*23* 152:*23*, *24*
**refers** 27:*7* 39:*24* 68:*6*
125:*21* 137:*12* 143:*9*
145:*23* 151:*11*
**reflect** 117:*1*
**reflected** 7:*18* 122:*2*
**reflective** 122:*12*, *24*
**refresh** 52:*23* 61:*4* 81:*4*
104:*13* 110:*22* 120:*12*
123:*3* 135:*21*
**refreshes** 75:*17*
**refreshing** 74:*22*
**regard** 36:*24* 74:*21*
94:*2* 146:*23*
**regarding** 48:*10* 130:*21*
161:*2*
**regardless** 56:*10* 111:*6*
120:*2* 147:*17*
**regards** 32:*20* 38:*6*
40:*15* 61:*7* 62:*12* 65:*20*
67:*19* 74:*23* 75:*18*
81:*10* 85:*25* 94:*25* 95:*1*,
*23* 96:*5* 97:*16* 118:*15*
123:*6* 133:*17* 143:*25*
155:*25* 156:*14* 160:*9*
**Regulated** 49:*15*
**Regulations** 179:*3*
**rejecting** 26:*2*
**relate** 38:*22* 99:*7*
**related** 27:*24* 54:*12*
59:*15* 60:*2* 100:*11*, *12*
132:*5* 140:*15* 145:*1*, *4*, *6*
171:*5* 173:*4* 174:*20*
175:*11*, *13*
**relates** 66:*2* 135:*11*
**relating** 62:*9*
**relationship** 64:*10* 73:*16*
75:*3*, *18* 133:*2*, *9* 159:*17*
160:*25*
**relationships** 73:*7* 74:*6*
79:*23* 80:*2* 84:*22* 86:*14*
**relative** 51:*12* 53:*9*, *20*,
*25* 103:*23* 116:*1*, *2*
178:*14*, *16*
**relatively** 28:*21* 128:*19*
**relevant** 6:*10* 9:*22*
17:*13*, *15* 26:*7* 27:*13*, *18*
28:*1*, *8*, *9*, *10*, *13* 47:*14*
48:*2* 72:*12* 83:*24*
105:*15*, *21*, *25* 106:*6*, *9*,
*10* 107:*4*, *7*, *11*, *17*
111:*12* 121:*9* 125:*2*
126:*9*, *25* 129:*2* 138:*18*,

*22* 139:*18* 153:*8, 17*
155:*24* 157:*15*
**reliable** 131:*13*
**reliance** 50:*13*
**relied** 6:*16* 7:*3* 8:*12*
10:*18* 13:*1* 37:*16* 38:*7*
97:*22*
**rely** 7:*22* 39:*10* 109:*19*
123:*17*
**relying** 6:*21* 8:*6, 8, 14*
10:*9* 11:*2* 13:*4* 37:*24*
38:*1* 109:*13* 157:*6, 8*
**remainder** 57:*23* 78:*21*
**remedy** 119:*4*
**remember** 12:*18* 15:*21*
117:*5* 150:*16, 19*
**remind** 135:*24*
**repeat** 39:*20* 59:*19*
101:*23* 110:*14* 163:*1*
**replace** 19:*22* 75:*10*
**replacement** 105:*16*
106:*22*
**replacing** 7:*13* 19:*16, 18*
20:*22* 104:*22* 106:*5*
**replicate** 70:*3*
**REPORT** 3:*12* 5:*18, 22,
24* 6:*3, 11, 13, 17, 20* 7:*4,
16, 23* 8:*2* 10:*14* 11:*3*
12:*21* 14:*4, 5, 18, 25*
15:*8, 11, 15* 16:*7, 9* 17:*2*
21:*13* 22:*10, 14* 25:*24*
29:*19* 31:*6* 32:*6, 18, 23*
33:*5, 10* 35:*8* 41:*5*
45:*11* 47:*22* 48:*12, 14*
50:*4, 14* 53:*23* 57:*21, 22,
24* 60:*7, 8* 66:*24* 68:*18*
73:*4* 75:*25* 78:*12, 23*
79:*19* 81:*20* 84:*16*
89:*16* 91:*2, 4* 92:*11, 24*
95:*13* 97:*4, 21* 98:*3, 17*
99:*9* 102:*11* 108:*4, 20*
109:*13, 19* 110:*25* 115:*4*
117:*13* 118:*17* 119:*1, 16*
123:*13* 124:*14* 126:*3*
130:*11* 132:*17* 142:*24*
148:*23* 151:*20* 152:*2, 15*
155:*5* 156:*4* 157:*14, 22*
158:*2, 15* 165:*14* 166:*20*
167:*23* 172:*21, 23, 25*
173:*3, 4, 5, 6, 9, 11, 13*
174:*2*
**REPORTED** 1:*21* 19:*12*
117:*13* 123:*9* 128:*2*
129:*9*
**reporter** 4:*15* 178:*2, 25*
179:*1, 5, 8, 13, 23*
**reporter's** 179:*8*
**reporting** 16:*18* 111:*17*
129:*3, 17* 142:*14* 179:*3,
7, 16, 21, 23*

**reports** 11:*5* 102:*9*
129:*10* 142:*8, 9* 175:*16*
**represent** 4:*16* 57:*5*
165:*1, 6*
**representation** 70:*5*
162:*1*
**representative** 98:*3*
110:*25* 111:*17* 113:*16*
138:*2* 146:*16, 19* 147:*1,
9* 179:*14*
**represents** 104:*15*
**reputation** 156:*6, 21*
157:*2, 5, 11, 13, 24*
**reputational** 157:*13*
**requested** 178:*11*
**require** 23:*5* 35:*14*
78:*13* 119:*3, 5* 141:*7*
154:*7*
**required** 19:*4* 24:*23*
42:*23* 77:*18* 78:*19, 25*
80:*1, 2* 86:*17* 87:*8, 9*
140:*24* 142:*1* 143:*21*
150:*13* 152:*9*
**requirements** 19:*5*
36:*24, 25* 79:*12, 16*
80:*16* 87:*16* 88:*18*
**requires** 18:*13* 36:*15*
72:*18* 78:*13* 99:*19, 20*
141:*19*
**research** 31:*15*
**researchers** 14:*16*
**reservers** 14:*20*
**resides** 19:*6*
**resource** 81:*18*
**resources** 43:*17, 18*
50:*16* 76:*25* 77:*18, 23*
82:*14, 17, 18* 83:*3, 13*
175:*8*
**respect** 6:*11* 32:*1, 13*
37:*23* 41:*9* 59:*2* 60:*16*
67:*21* 68:*20* 70:*4, 16*
80:*3* 93:*7, 8* 97:*24*
103:*10* 108:*3* 134:*20, 23*
168:*22* 169:*2* 171:*24*
**respond** 145:*20*
**respondents** 123:*9* 124:*9*
**response** 113:*11* 123:*11*
127:*8* 138:*10* 147:*1*
**responses** 110:*8, 12*
112:*24* 113:*8, 12* 121:*18*
122:*2, 14, 23* 124:*4, 10*
**responsibile** 145:*19*
**responsible** 11:*23* 14:*11,
16, 20, 24*
**rest** 68:*23*
**restricted** 167:*6*
**restrictions** 170:*4*
**restrictive** 167:*18*
**result** 57:*4* 58:*3* 60:*22,
25* 63:*6* 103:*15* 111:*25*
121:*17* 137:*1, 5, 9, 14*

138:*4, 20* 147:*20* 150:*8*
155:*13*
**resulted** 147:*3*
**results** 172:*8*
**resumed** 138:*11*
**retain** 152:*9*
**retained** 7:*8, 11* 12:*14*
40:*12* 54:*24*
**revenue** 86:*25* 87:*3, 19*
119:*11, 13* 120:*13*
139:*22*
**review** 52:*15* 146:*15*
178:*10*
**reviewed** 15:*7, 10, 11, 15,
16* 26:*10* 42:*11* 50:*13*
53:*23* 79:*6* 120:*17*
134:*17* 164:*21* 172:*21*
173:*4*
**reviewing** 12:*2* 15:*25*
98:*23* 172:*23*
**right** 9:*4* 11:*25* 12:*23*
31:*21* 38:*14* 47:*19*
54:*20, 21* 60:*11* 71:*7*
79:*12* 83:*2* 88:*1* 89:*15*
99:*16* 100:*18* 106:*21*
113:*10* 115:*2* 126:*4*
144:*11, 16* 147:*25*
148:*22, 24* 161:*12* 167:*7*
171:*24* 172:*18* 176:*21,
24*
**rights** 154:*17*
**rise** 100:*6*
**rises** 21:*3*
**risk** 55:*9* 56:*25* 57:*3, 4,
6* 60:*12, 15, 22, 25* 61:*2,
6, 17, 19* 63:*4, 8* 64:*19*
145:*24* 146:*14* 147:*11,
15, 19, 21* 154:*4* 155:*12*
159:*18, 23* 160:*7* 161:*2*
162:*7, 8, 19* 163:*15*
164:*1, 12*
**risks** 146:*6* 147:*16*
153:*22* 163:*10, 18, 21*
**ROBBINS** 2:*10*
**Robin** 4:*12*
**role** 8:*25* 14:*2, 3*
**roles** 14:*8* 175:*5*
**room** 126:*5*
**Roper** 128:*1*
**roughly** 139:*2*
**RPD** 39:*24*
**RPR** 1:*21* 178:*25* 180:*4*
**rule** 50:*11* 51:*4*
**Rules** 179:*2*
**ruling** 37:*20*
**run** 49:*18* 142:*9*
**running** 72:*16* 163:*8*

**< S >**
**Saint** 8:*18*

**Salas** 145:*18* 146:*1*
**sales** 120:*12*
**SAP** 22:*18* 81:*22* 82:*4,
5, 10, 13, 16* 83:*3, 12*
84:*11, 17*
**sat** 93:*1*
**saw** 31:*8* 130:*25* 132:*4*
**saying** 34:*7* 40:*18*
101:*12* 108:*4* 128:*9*
173:*21*
**says** 13:*1* 45:*13* 46:*3*
48:*18* 50:*9* 80:*4* 118:*3*
126:*11* 150:*13* 152:*8, 18*
**Scalf** 13:*21, 24*
**S-C-A-L-F** 13:*25*
**Scalf's** 14:*2, 3, 23*
**scenario** 43:*16* 44:*7, 19*
**schedule** 138:*24*
**scope** 34:*21* 42:*13* 62:*2*
88:*21* 167:*5*
**scopes** 61:*24*
**score** 108:*20* 109:*1, 12,
18* 112:*5, 17, 22* 113:*4, 6*
121:*17* 122:*13* 123:*17*
**scores** 112:*19* 113:*2*
**se** 62:*16*
**second** 34:*11* 37:*8*
39:*22* 43:*10* 45:*13*
54:*21* 55:*7* 58:*2, 3* 70:*2*
72:*22* 98:*1* 125:*13, 14*
126:*3, 4* 127:*7* 151:*20*
152:*21* 153:*7* 167:*4*
174:*6*
**secret** 158:*17*
**secrets** 153:*5* 155:*2*
162:*18* 171:*8, 11* 174:*10*
**section** 29:*19, 21* 32:*23*
35:*17* 36:*1* 48:*8* 75:*17,
24* 76:*2* 80:*14* 89:*19, 21*
91:*11* 92:*24* 98:*17, 19*
115:*4, 12* 116:*16* 119:*25*
123:*12, 24* 132:*17, 23*
158:*14, 17, 22* 175:*15*
**sections** 48:*12* 76:*3*
**see** 25:*2, 4* 29:*24* 30:*1,
5, 10* 31:*18, 19, 23* 33:*23*
34:*14* 39:*25* 40:*9* 45:*12,
17* 55:*11* 65:*3, 6* 73:*10*
84:*3, 11, 24* 85:*4* 99:*5*
101:*6* 102:*17* 105:*8*
109:*10* 112:*6, 12* 115:*6*
121:*18, 22, 25* 125:*4, 10*
127:*2, 11* 128:*3, 21*
129:*7* 133:*2* 135:*16*
138:*12* 146:*18* 149:*2*
151:*8, 12* 152:*6, 12*
155:*3* 157:*3* 159:*1*
167:*2, 9*
**seeing** 55:*4* 117:*5*
139:*12, 21* 146:*11* 147:*5*

154:*10*  164:*7*
**seek** 134:*3*
**seen** 25:*14*  51:*21, 25*
52:*8*  63:*8*  65:*22*  79:*2*
80:*23*  81:*3, 5, 13*  84:*9*
91:*24*  92:*2, 12*  94:*6*
133:*24*  134:*2*  168:*1*
**sees** 48:*15*
**sell** 88:*1, 9*
**sending** 11:*23*  155:*25*
**sense** 20:*7*  54:*25*  101:*3*
111:*19*  120:*22*  122:*1*
126:*8*  157:*5*  170:*19*
173:*8*
**sent** 57:*5*  60:*23*  64:*12*
133:*15*  149:*4*  154:*14*
155:*2*  156:*24*  163:*24*
**sentence** 45:*13, 25*  46:*2*
55:*7*  69:*19*  115:*8*  126:*4*
135:*12*  138:*8*  151:*6*
155:*9*  158:*22*  159:*5, 6*
167:*4*
**sentences** 37:*23*  38:*2, 6*
**sentiment** 113:*16*
122:*12, 24*
**separate** 16:*10*  29:*15*
**separately** 23:*21*  52:*22*
168:*10*
**served** 6:*3, 4*  8:*2*  117:*13*
**service** 46:*14*  47:*1, 10,
17*  49:*12, 22*  53:*9*  55:*10*
70:*22*  99:*15, 19, 20*
100:*11*  137:*5, 14*  144:*4*
167:*14, 21*  169:*16*
**serviced** 23:*8*
**Services** 9:*16*  16:*16, 20*
34:*11, 13, 21, 25*  35:*2, 6,
7, 13*  36:*15*  37:*4*  40:*13,
15*  41:*16*  42:*13, 20, 23*
43:*5, 17*  44:*8, 16*  45:*14*
46:*1, 4, 7, 9, 10, 11, 17*
47:*3, 4, 10, 11, 23*  48:*15*
49:*13, 23*  50:*17, 18, 21*
51:*2, 9, 13, 17, 22*  52:*1, 5,
12, 14, 16, 19*  53:*2, 13, 20,
21, 24*  54:*4, 7, 12*  55:*1, 8,
23*  56:*15, 18*  57:*18*
58:*22, 24*  59:*4, 14*  62:*21*
63:*2, 5, 17, 20, 23*  65:*5, 9,
17*  66:*3, 6, 7, 25*  67:*5, 7,
18*  68:*11, 20*  69:*1, 4*
70:*9, 10, 16, 25*  71:*6, 11,
16, 20*  72:*9, 14, 18*  86:*25*
87:*2, 20*  88:*19*  95:*5, 6, 8*
96:*21*  98:*10*  100:*1*
104:*7*  119:*3, 15, 20*
120:*13*  126:*7, 9, 12, 13*
127:*19*  135:*13, 18*  136:*3,
6*  137:*24, 25*  138:*10, 11,
23*  139:*8, 17, 19*  140:*8,
20, 25*  142:*12, 25*  143:*17*

144:*23*  145:*1, 4, 5*
149:*20*  160:*21*  163:*12*
168:*6, 25*  169:*1, 2, 21*
172:*10*  179:*7, 16, 21*
**set** 8:*1*  35:*12*  78:*17*
117:*22*  129:*3*  134:*19*
151:*23*  166:*18*  168:*9*
**setting** 14:*13*  22:*21*
136:*18*
**seven** 165:*2, 7*
**Seventy-four** 112:*11*
**share** 22:*11*  29:*12, 15*
80:*22*
**shares** 51:*12*
**sheet** 73:*16*
**shorthand** 16:*19*
**shortly** 7:*7*
**show** 150:*25*
**showing** 123:*24*  150:*22*
**side** 27:*19*  28:*12*  29:*6*
47:*16*  48:*3*  120:*13*
142:*18*
**Siemens** 176:*9*
**sign** 172:*7*
**signed** 171:*15, 21*
**significant** 78:*13*  82:*13*
83:*3*
**similar** 46:*19*  78:*8*  93:*3*
175:*20, 22*
**simple** 160:*1*
**simpler** 87:*7*
**simplify** 161:*12, 24*
**simply** 71:*16*  123:*5*
128:*21*  129:*3*  130:*21*
152:*17*
**simultaneously** 105:*16*
**sit** 5:*25*  9:*3, 10, 13*
10:*20*  11:*17*  12:*9, 19*
15:*12, 18*  19:*15*  20:*19,
21*  21:*4*  26:*9*  36:*25*
41:*23*  42:*12*  44:*3, 18*
47:*7*  50:*11*  51:*4*  52:*20,
25*  55:*2, 5*  56:*21*  59:*25*
62:*16*  64:*9*  66:*22*  69:*18*
74:*24*  79:*3, 9*  81:*6*  91:*8*
94:*4*  95:*12*  97:*23*
104:*17*  106:*11*  109:*14*
110:*2*  117:*18*  120:*16, 20*
124:*6*  130:*14*  132:*8, 12*
136:*7, 9*  138:*16*  139:*6,
16*  146:*12*  157:*21, 23*
158:*11, 13*  164:*21, 25*
168:*3, 21*  169:*14*  176:*6,
17, 20*
**sitting** 8:*4*  18:*22*  24:*10*
37:*4*  75:*1*  99:*10*
**situation** 55:*19*  102:*11*
131:*17*  136:*23*  148:*2*
168:*8*
**situations** 51:*1, 6*  88:*8*

171:*1*
**skip** 144:*16*
**small** 28:*21*  29:*5*
**smaller** 13:*18*
**software** 9:*19*  16:*13, 22*
17:*6, 21*  18:*8, 23, 24*
19:*8, 9*  20:*13*  21:*20*
22:*7, 16, 22, 24*  24:*18*
25:*9*  26:*12*  28:*19*  29:*22*
30:*5, 8, 14, 23*  33:*8, 23*
36:*14*  37:*11, 15, 17, 18*
39:*8, 16*  40:*7*  41:*17*
42:*5, 18, 19, 25*  43:*3, 13*
44:*7, 15, 23*  48:*21*  49:*2,
3*  53:*10, 16, 17*  65:*5, 8,
10, 13, 16, 17, 25*  66:*1, 2,
12, 25*  67:*2, 6, 10*  68:*2,
19, 21*  69:*5, 20, 21*  70:*3,
9, 24*  71:*10, 15*  72:*2, 8,
10*  73:*9*  74:*12, 15*  75:*15,
19, 23*  76:*5, 8, 13*  77:*1,
13, 19, 22*  78:*14, 20*
79:*11, 21*  80:*17*  81:*18,
25*  82:*13*  83:*18*  84:*4, 23,
24*  85:*8, 15*  87:*6, 10, 23*
89:*20*  90:*4, 5, 9, 11, 24*
91:*13, 15, 19, 22, 25*  92:*7,
13, 16, 20*  93:*4, 17, 18*
94:*6*  95:*17*  96:*3, 13*
97:*10*  99:*13, 19*  100:*3,
20, 22*  101:*11*  102:*12, 22*
103:*4, 5, 6, 15, 19, 24*
114:*11*  115:*10, 22*
120:*12*  121:*2, 7, 11*
126:*13*  129:*19, 23*
135:*19*  141:*3, 4, 18, 20,
22*  142:*16, 17, 18*  143:*2,
7, 15, 25*  144:*19*  148:*4*
149:*20*  150:*15*  152:*11*
153:*14*  154:*8*  155:*14*
159:*12*  160:*3, 4, 13*
161:*19*  163:*13*  165:*18,
19*  168:*15*  172:*11*
**sold** 17:*5, 22*  165:*18*
**solely** 113:*19*
**solution** 58:*2, 3*  67:*12,
14, 16*  74:*23*
**solutions** 46:*12*  65:*8, 14,
16, 24*  67:*1*  68:*18*  69:*5,
19*  70:*9*  71:*23*  73:*10*
79:*22*  136:*2*
**somebody** 10:*2*  174:*7*
**sorry** 7:*20*  13:*23*  18:*17*
38:*10, 20*  39:*20*  71:*4*
84:*25*  85:*3*  98:*25*
101:*23*  103:*5*  110:*14*
114:*9*  116:*4, 23*  127:*25*
132:*21*  140:*12*  155:*6*
159:*4, 7*  162:*24*
**sort** 42:*2*  43:*22*  46:*2*
48:*23*  54:*18*  66:*15*  68:*3*

71:*14*  80:*15*  93:*9*  100:*5*
111:*23*  130:*7*  132:*6*
175:*4*
**sorts** 66:*15*  91:*6*  119:*19*
**sought** 73:*7*  168:*10*
**sound** 81:*6*  139:*14*
**sounds** 69:*13*  109:*6*
140:*17*  161:*10*
**source** 10:*24*  40:*21*
69:*24*  130:*13*  179:*9*
**sources** 31:*9*  32:*8, 9*
33:*15*  167:*17*
**space** 19:*12, 14, 20*
21:*12, 14, 25*  27:*11, 12,
25*  29:*12*  45:*16*  63:*20,
23*  143:*14*
**speak** 78:*24*
**speaking** 11:*5*  54:*17, 24*
74:*14*  104:*6*
**speaks** 33:*2*  48:*14*
139:*5*  157:*14*
**specialized** 79:*13, 15, 20*
**specific** 17:*13*  18:*20*
19:*13*  20:*16*  22:*3*  26:*16*
27:*8*  30:*18*  32:*20*  34:*17*
35:*11*  36:*8*  41:*22*  42:*24*
43:*11*  44:*19*  47:*6*  48:*9,
11*  53:*6, 25*  58:*24*  59:*9*
64:*8, 10, 23*  65:*13, 16, 19,
21*  67:*13, 23*  73:*21*
74:*24*  75:*11, 13*  76:*16*
80:*12*  82:*17*  87:*13*  88:*4*
90:*21*  98:*18*  103:*7*
105:*9*  108:*22*  109:*11, 21*
111:*16*  113:*3*  114:*15*
122:*10*  123:*13*  124:*14*
127:*6, 12*  128:*24*  129:*1,
20*  130:*10*  131:*16*
132:*25*  133:*6, 7, 17*
134:*21*  138:*21*  140:*9, 14*
142:*12*  143:*8*  144:*21, 22*
146:*22*  150:*6*  152:*25*
159:*16, 19*  160:*7, 15, 16*
161:*5*  162:*4, 11*  164:*5*
165:*12*  167:*17*  169:*13*
170:*1*  173:*2, 6*
**specifically** 16:*25*  17:*2*
20:*2*  24:*11*  27:*9, 19, 22,
24*  32:*19*  33:*1*  46:*3*
50:*2, 24*  52:*2, 21*  57:*14*
58:*5*  64:*21*  68:*3*  69:*17*
71:*17, 25*  74:*21, 22*
75:*11*  77:*23*  79:*4*  80:*8,
24*  81:*10*  82:*8, 24*  83:*8*
91:*2*  95:*1*  96:*20*  97:*1*
98:*1*  100:*2*  102:*9*  103:*3*
107:*20*  109:*19*  110:*1, 13*
111:*11, 25*  115:*13*
116:*17*  117:*25*  120:*14*
121:*3*  124:*16*  125:*8, 15,
20*  126:*15*  127:*14, 17*

132:5  133:*12, 17, 19*
138:*22*  140:*1*  142:*5, 11*
145:*3*  148:*1*  149:*22, 24*
150:*1, 10*  152:*18*  153:*2,
20*  154:*3*  157:*20, 24*
159:*18*  160:*9, 24*  161:*3,
5, 20*  162:*16*
**specification**  75:*2*
**specificity**  26:*1, 8*  59:*8*
109:*5, 14*  132:*8, 10*
**specifics**  120:*15*  123:*4*
135:*8*
**speculation**  158:*9*
**spend**  15:*23*  99:*15*
**spent**  11:*15*  15:*24*
77:*24*  143:*16*
**spoke**  7:*2*  15:*17*  153:*20*
156:*11*
**spoken**  50:*22*
**spreadsheet**  126:*20, 21*
**Square**  2:*5, 22*
**SQUIRE**  2:*18*
**stable**  117:*16*
**Stacks**  113:*23*
**Stand**  4:*5*  35:*22*
**Standard**  4:*11*  168:*14*
**standpoint**  29:*7*  48:*20*
60:*12*  103:*4, 7*
**started**  100:*20*
**starting**  24:*17*  133:*3*
159:*3*
**starts**  29:*20, 24*  108:*23*
158:*17*  175:*15*
**startup**  88:*8*
**state**  53:*22*  76:*1*  78:*12*
87:*5*  102:*18*  149:*4*
154:*24*  178:*4*
**stated**  35:*8*  40:*24*  42:*21*
44:*12*  45:*25*  46:*7*  47:*22*
48:*8*  64:*13*  69:*3*  71:*3*
75:*16, 24*  77:*11*  90:*10*
97:*7*  98:*5, 8*  110:*10*
113:*18*  114:*14*  120:*11*
130:*19*  136:*15*  153:*19*
156:*9*  160:*23*
**statement**  36:*6*  126:*17*
136:*12*  159:*21*
**statements**  38:*4*  61:*7*
95:*3, 10*  96:*8*  157:*18, 19*
173:*12*
**STATES**  1:*1*  63:*2*  179:*4*
**stating**  179:*6*
**stayed**  117:*16*
**Stephen**  2:*19*  4:*19*
**Stephen.fazio@squirepb.c
om**  2:*25*
**Stephens**  4:*14*
**steps**  142:*2*  170:*14*
**Steve**  5:*12*
**Steven**  2:*20*  4:*21*

**sticker**  151:*13*
**stop**  49:*20*
**stopped**  56:*10*
**Strang**  8:*18*
**Street**  2:*13*
**strike**  17:*18*  18:*17*
20:*20*  23:*8*  60:*18*  63:*18*
74:*1*  106:*13*  131:*9*
**structural**  84:*3*
**structure**  121:*10*
**structured**  120:*7*
**structures**  120:*9*
**struggling**  36:*11*  100:*9*
107:*15*
**studied**  82:*20, 21*  83:*7*
90:*20*
**study**  84:*17*
**subject**  62:*12*
**subjected**  62:*9*
**subsection**  108:*23*
**substantial**  59:*14*  106:*5,
23*
**substantially**  113:*6, 7, 11*
**substitute**  21:*9, 21*
23:*18*  30:*23*  33:*25*  44:*8*
**substitutes**  22:*25*  23:*6,
16*  29:*23*  30:*4, 9, 13*
31:*1*  32:*25*  33:*20*  34:*9*
74:*15*
**Suez**  56:*4, 6, 11, 14*  59:*2,
3, 7, 9, 11, 15*  60:*9, 12, 16,
22, 24*  61:*9, 14, 18, 20, 22*
62:*6*  63:*10, 25*  73:*17*
144:*17, 22*  145:*9, 13, 15,
18, 25*  146:*9, 17, 24*
147:*4, 8*  148:*1*
**Suez's**  146:*2*  147:*1*
**sufficient**  86:*21, 22*
134:*18*
**suggest**  41:*11*
**suggested**  162:*7*
**suit**  161:*8, 17*
**Suite**  1:*15*  2:*6*  122:*15*
**summaries**  32:*4*
**summarize**  48:*18*
**summary**  55:*6*  57:*23*
**supplier**  146:*7*
**supply**  51:*22*  53:*23*
**support**  140:*10, 15*
144:*5*  174:*16*
**sure**  9:*21*  12:*9*  17:*11*
30:*25*  36:*17*  37:*12*  45:*3,
11*  47:*13*  52:*7*  53:*4*
58:*23*  59:*20*  61:*16*
81:*16*  101:*13, 17*  111:*20*
112:*1*  134:*16*  137:*11*
158:*2*  162:*25*  163:*5*
175:*21*  176:*5*
**surprised**  82:*10*  145:*16*
**survey**  110:*3, 8, 9, 21*
111:*12*  112:*5*  113:*13, 22*

118:*14*  122:*1, 13*  123:*11,
17*  124:*4, 9*  125:*6*
126:*22*
**surveys**  96:*15, 16*  98:*7,
8*  108:*20*  109:*2, 12, 18,
25*  110:*18*  111:*18, 22, 24,
25*  113:*21, 24, 25*  114:*1*
**sweep**  14:*21*
**Switch**  34:*10*  132:*16*
**sworn**  5:*3, 5*
**synonyms**  99:*9*
**system**  83:*20*  97:*19*
101:*15, 16*  141:*10, 11*
143:*22*  144:*3, 5*
**Systems**  30:*4*  143:*25*
144:*4*
**system's**  101:*21*

**< T >**
**tabs**  10:*2*
**take**  10:*11*  11:*11*  43:*13*
45:*2, 10*  50:*21*  56:*5*
58:*13*  68:*23*  75:*9*  88:*24*
95:*14*  101:*19*  114:*16, 19*
115:*10*  123:*16*  125:*23*
148:*15, 16*  151:*17*
170:*14*  172:*13*
**takeaways**  114:*1*
**taken**  4:*8*  6:*5*  62:*6*
78:*5*  85:*16*  178:*9*
**talk**  14:*14*  30:*8*  34:*10*
38:*13*  49:*10, 20*  71:*19*
73:*12*  79:*13*  80:*14*  88:*7*
91:*5*  92:*24*  98:*17, 19*
102:*9, 10*  112:*7*  115:*11*
118:*13, 16*  123:*10*  126:*2*
127:*23*  146:*13*  148:*25*
152:*18, 19, 21*  158:*15*
167:*1*
**talked**  45:*20*  46:*24*
53:*15*  56:*23*  63:*10*
70:*23*  95:*7*  100:*18*
132:*23*  146:*10*  147:*25*
**talking**  14:*17*  19:*25*
20:*2*  23:*20*  37:*19*  42:*2*
45:*23*  50:*24*  71:*21, 22*
72:*3*  81:*16, 17*  82:*8*
97:*25*  104:*9*  110:*8*
115:*5, 13, 15*  118:*2, 17*
125:*22*  127:*14*  136:*24*
142:*7*  145:*24*  146:*13*
149:*1*  150:*19*
**talks**  29:*20, 21*  100:*5*
123:*12*  131:*5*  149:*25*
**TAMIKA**  1:*21*  4:*15*
178:*8, 24*  180:*4*
**tapes**  72:*21*  144:*8*
**tasks**  46:*25*  175:*9*
**Tax**  9:*15*  16:*12, 13, 15,
19, 20*  17:*3, 4, 13, 20, 21*
18:*2, 7, 8, 12, 16, 23*  19:*5,

9, 20*  20:*1, 12*  22:*7*
23:*11, 14, 15*  24:*6, 7, 17,
20, 24*  25:*5, 6*  26:*12, 15*
27:*9, 24*  28:*18*  29:*5, 22*
30:*4, 5*  34:*13, 25*  35:*2, 6,
7*  36:*25*  37:*3*  41:*16*
42:*13*  45:*14, 16*  46:*16*
47:*3, 4, 10, 11*  49:*13, 23*
50:*18, 20*  51:*13, 17*  52:*5,
12, 14, 16*  53:*10, 13, 16,
17, 21, 24*  54:*4, 7*  55:*1, 8,
23*  57:*17*  58:*22, 24*  59:*4*
62:*21*  63:*1, 5, 20, 22*
65:*9*  66:*2, 6, 7, 14*  67:*5,
7*  68:*6, 9, 10, 11, 25*  69:*1,
9*  70:*16, 25*  71:*6, 11*
72:*9, 10, 13*  74:*12, 15, 23,
25*  75:*15, 23*  76:*5, 7, 13*
77:*1, 19, 22*  78:*14, 20*
79:*11*  82:*17, 25*  83:*24*
84:*4, 24*  85:*8, 14*  87:*5,
10*  89:*20*  90:*14, 15*
91:*15, 21*  92:*17*  93:*18*
96:*21*  99:*15*  100:*1*
102:*12*  104:*7*  115:*10, 22*
122:*14*  126:*6*  127:*14*
128:*3, 10*  132:*5*  139:*8,
17*  140:*7, 20, 25*  141:*23*
142:*25*  145:*5*  149:*20*
159:*12*  160:*3, 4, 12, 20*
161:*19*  163:*12*  165:*18*
168:*6*  169:*2, 16*  172:*10*
**tax-based**  73:*15*
**tax-fixed**  18:*17, 19*  92:*2,
3*  93:*7, 8*  104:*10*  106:*4,
21*
**TCJA**  35:*22*
**team**  9:*1, 2, 5, 8, 11, 14*
10:*5*  13:*7, 13, 15, 19*
14:*2*  15:*3, 17*  32:*15*
33:*6*  71:*8*  92:*5*  93:*1*
175:*8*
**Tech**  176:*11*
**technical**  44:*3*  68:*2*
72:*4, 5*  75:*5*  90:*5*  103:*3,
7*  142:*18*  143:*6, 24*
**Technologies**  128:*1*
**tell**  5:*5, 25*  35:*5*  40:*19*
41:*20*  55:*13, 20*  58:*10*
66:*8, 9*  67:*5*  68:*24*
69:*18, 20*  87:*11*  102:*24*
106:*11*  117:*19*  127:*11*
136:*22*  142:*22*  156:*7*
172:*5*
**telling**  100:*20*
**template**  151:*8, 21*
**ten**  172:*13*
**tend**  159:*24*  165:*16*
**tender**  179:*5*
**ten-minute**  45:*2*

**term** 20:*4, 6, 9, 11, 15*
36:*10* 51:*18* 68:*14*
125:*16* 142:*24* 152:*25*
157:*10*
**terminated** 55:*18* 56:*1*
135:*13*
**terms** 6:*11* 7:*3, 5* 8:*11*
14:*12* 17:*12* 23:*3* 27:*1*
52:*9* 53:*24* 57:*14* 60:*13*
62:*13* 67:*17* 74:*18*
76:*16, 21* 77:*23, 24* 78:*1,
9* 79:*10* 80:*12, 21* 81:*12*
83:*23* 84:*10* 88:*5* 90:*21*
96:*4, 7, 21* 97:*22* 99:*22,
25* 102:*12* 103:*22*
105:*18* 106:*8, 21* 107:*2,
22* 109:*24* 111:*20*
113:*15* 116:*17* 118:*2, 3,
20* 120:*5* 123:*23* 131:*19,
23* 132:*10* 142:*13, 17*
157:*25* 159:*22* 162:*10*
167:*17* 170:*3* 174:*19*
**test** 47:*11, 13* 78:*14, 20*
85:*6, 15, 17, 21* 94:*10, 13*
95:*15, 16* 128:*23* 129:*1*
165:*8*
**tested** 90:*8*
**testified** 5:*6* 135:*14*
138:*3* 147:*1* 154:*25*
**testify** 10:*5* 134:*22*
135:*25*
**testifying** 155:*20*
**testimony** 19:*1* 28:*6*
32:*23* 33:*4* 60:*8* 79:*8*
95:*21* 123:*21* 129:*13*
134:*12* 147:*5, 10* 156:*8*
157:*8* 159:*11* 160:*2, 8*
162:*23* 174:*8* 175:*15*
**text** 150:*19*
**TFA** 107:*3, 10*
**Thank** 74:*22* 89:*12*
176:*21*
**thing** 36:*15*
**things** 6:*19* 13:*3* 15:*2*
35:*15* 37:*20* 39:*15*
43:*24* 44:*20, 21* 72:*11*
86:*7* 95:*10* 100:*4, 13, 17*
101:*4* 118:*1, 23* 130:*16*
150:*14, 21, 22* 166:*18*
167:*22* 169:*24* 173:*14*
**think** 10:*23* 12:*13*
20:*10* 21:*23* 36:*11* 37:*1,
2, 5* 44:*21* 46:*2, 18* 47:*5*
49:*19* 65:*15* 98:*5* 99:*4,
10, 13, 23, 24* 100:*1, 7*
101:*2* 103:*14* 107:*7*
111:*13* 122:*12, 23*
123:*15* 125:*18* 133:*5*
135:*5, 20* 141:*25* 143:*1*
145:*8* 147:*25* 153:*8, 16*

165:*3, 20, 21* 175:*20*
**thinking** 57:*3*
**third** 85:*12, 13* 140:*6*
151:*20* 154:*8* 168:*23*
**third-party** 168:*13, 18*
170:*5*
**thought** 24:*14* 74:*8*
145:*17* 146:*2*
**threat** 165:*15*
**three** 14:*9, 10* 37:*20*
38:*16* 118:*23* 121:*24*
122:*10, 13, 23* 123:*9, 16*
144:*15* 152:*1*
**thwarted** 21:*15* 22:*2*
76:*9* 93:*20* 102:*16*
105:*4, 10*
**thwarting** 27:*21*
**ticking** 33:*12*
**tie** 6:*1*
**TIME** 1:*17* 4:*10, 11*
6:*8* 11:*13* 12:*16, 18*
32:*6, 17* 33:*12, 18* 34:*7*
41:*17* 42:*2* 49:*1* 54:*18*
71:*1, 14* 82:*19* 101:*10*
103:*2* 105:*3, 4, 8, 19, 20,
23* 106:*8* 107:*3* 111:*2*
114:*12* 115:*11* 116:*23,
24* 117:*1, 2* 148:*15*
149:*5, 21* 155:*2* 156:*23*
163:*17* 165:*13* 166:*25*
174:*21* 175:*1* 178:*10*
179:*5*
**times** 12:*11* 98:*6*
118:*13* 130:*19*
**Today** 4:*10, 15* 5:*25*
8:*5* 9:*3, 10, 13* 10:*20*
11:*17* 12:*19* 15:*12, 18*
16:*19* 18:*22* 19:*15*
20:*15, 19, 21* 21:*5* 23:*1*
24:*10* 26:*9* 32:*5* 36:*25*
37:*4* 41:*23* 42:*6, 12*
44:*3, 18* 47:*7* 50:*12*
51:*5* 52:*20, 25* 54:*12, 16,
17* 55:*2, 5* 56:*21* 59:*25*
62:*16* 64:*9* 69:*18* 74:*24*
75:*2, 7, 23* 76:*6, 8* 79:*3,
9* 81:*6* 91:*8* 94:*4* 95:*12*
97:*23* 99:*10* 102:*16*
104:*17* 105:*24* 106:*11,
15* 109:*15* 110:*2* 117:*18*
120:*16, 21* 124:*6* 130:*15,
17* 132:*8, 12* 136:*2, 8, 9*
138:*16* 139:*6, 16* 146:*12*
157:*21, 23* 158:*11, 13*
164:*21, 25* 168:*3, 21*
169:*14* 176:*6, 18, 20*
**today's** 15:*13*
**toddler** 163:*8*
**told** 46:*25* 63:*24* 116:*7*
133:*5* 162:*16* 167:*12*
**top** 29:*25* 42:*7* 122:*3*

**totality** 43:*22* 48:*13*
95:*13* 96:*5, 17* 97:*3, 16*
98:*9* 101:*17* 111:*21*
157:*14* 169:*12*
**totally** 102:*8* 106:*20*
**touch** 91:*6*
**touched** 25:*1* 145:*8*
**touchtone** 104:*1*
**Tower** 2:*21*
**track** 106:*18*
**trade** 153:*5* 155:*2*
158:*17* 162:*18* 171:*8, 11*
174:*10*
**trademark** 174:*9*
**transcript** 8:*9* 178:*11*
179:*12*
**trends** 117:*10*
**trial** 6:*6, 10* 10:*8*
134:*22* 157:*12* 171:*10*
**tried** 102:*15*
**true** 16:*10, 23* 23:*16*
28:*16* 43:*6, 18* 49:*13, 16,
23* 59:*11* 61:*10, 21, 25*
70:*7* 75:*15* 77:*15* 83:*21*
87:*20, 23* 88:*14* 90:*1, 4*
104:*10* 107:*4* 108:*5*
113:*13* 115:*13* 116:*9*
117:*4* 130:*6, 8, 9* 143:*22*
145:*10* 146:*8* 149:*6*
165:*4* 168:*20* 171:*19*
173:*13* 178:*12*
**Trustpointe** 4:*16*

**Trustpointe.One/Alderson**
179:*15, 17, 20, 25*
**truth** 5:*6*
**try** 127:*6* 132:*24*
**trying** 36:*12* 40:*17*
45:*19* 46:*20, 22* 47:*1, 9,
19* 67:*3* 68:*17, 21* 80:*8*
86:*6* 100:*10, 22* 101:*18*
129:*7* 142:*22, 25* 162:*25*
166:*14*
**turn** 29:*17* 102:*20*
**turning** 85:*2*
**turns** 39:*12* 40:*2* 59:*13*
**two** 14:*7, 17, 19* 15:*21,
22* 16:*9* 18:*14* 19:*6*
20:*16* 23:*20* 24:*16, 23,
25* 37:*21, 23* 38:*6* 49:*24*
50:*7* 63:*21* 72:*11* 73:*2*
78:*7* 81:*23* 100:*13, 17*
108:*23* 150:*11* 151:*18,
25* 152:*1, 17* 153:*9, 23*
154:*3*
**Tyler** 15:*11, 16*
**Tyler's** 172:*21* 173:*3*
**type** 9:*19* 24:*8, 11*
67:*14* 173:*22* 175:*3*
**types** 26:*23* 27:*1* 35:*1*

48:*14* 86:*7* 97:*5*

**< U >**
**U.S** 17:*20* 19:*25*
**ultimately** 145:*13*
**unable** 137:*6*
**unaware** 9:*25*
**uncertainty** 165:*14*
**uncontroversial** 74:*9*
**underlying** 69:*24* 123:*3*
**understand** 6:*20* 7:*20*
11:*8* 13:*2, 8* 16:*20* 17:*5*
18:*4* 23:*17, 21* 24:*5, 25*
28:*19* 35:*19, 22* 36:*12,
17* 39:*19* 40:*18* 41:*24*
42:*1, 3, 15* 45:*19* 46:*8,
18, 20, 22* 47:*1, 9, 19*
54:*23* 56:*5, 14, 17, 22*
59:*7* 60:*8* 62:*1, 11*
63:*15* 64:*2, 5, 11* 67:*3,
11* 68:*5, 17, 21, 22* 70:*15,
19* 72:*8* 73:*6, 8, 13, 14*
74:*13* 75:*16* 80:*7* 81:*19*
82:*25* 83:*7, 17* 85:*9, 17,
21* 86:*1* 93:*23* 94:*13*
99:*11* 100:*10* 103:*21*
106:*14* 111:*13* 117:*21*
120:*7* 128:*7* 136:*5*
138:*9* 139:*20* 142:*22, 25*
145:*9* 147:*7* 153:*6*
160:*6* 161:*7* 163:*6*
166:*7, 11, 14* 167:*5*
170:*11, 23*
**understanding** 13:*10, 12*
18:*14, 20* 19:*3, 10, 19*
20:*24* 21:*4, 5, 11, 24*
22:*3, 9, 15* 23:*5, 13, 22*
24:*18* 25:*17, 22* 26:*15*
27:*8* 28:*9* 35:*8, 10*
40:*10* 42:*22* 44:*13*
45:*12* 46:*10* 48:*21* 51:*5*
53:*1* 55:*16* 56:*3* 59:*2, 5,
12* 60:*1, 3, 4, 21* 61:*5, 11,
18, 22* 63:*22* 65:*10, 16*
66:*4, 11, 12, 17, 19, 22*
67:*9, 16, 23* 68:*7, 8*
69:*10* 71:*3* 72:*4* 73:*19,
21* 74:*4, 7, 10* 75:*7, 12,
18, 25* 76:*8* 77:*7, 21*
78:*4* 79:*18* 80:*10* 81:*12*
84:*8* 85:*9* 86:*24* 93:*20,
25* 95:*2, 4* 109:*17*
110:*17* 117:*19* 119:*14,
18* 125:*21* 126:*16*
131:*11* 136:*15* 137:*23*
139:*9* 140:*22* 141:*2, 6, 7,
15, 17, 24* 143:*8, 13*
145:*2, 11* 149:*7* 161:*15*
163:*24* 165:*23* 168:*17*
171:*17*

understandings 10:*22, 24*
11:*7*
understood 166:*7*
undertake 21:*7*
undertaken 92:*6*
unfortunately 100:*8*
unhappy 101:*11, 14*
unit 73:*1* 144:*14*
UNITED 1:*1* 63:*2*
unnumbered 174:*4*
unquote 146:*14*
updates 103:*22*
upgrade 36:*19* 43:*2, 6, 9,
12, 18, 22* 44:*7, 17, 23*
upgraded 43:*2*
upgrades 42:*2*
usable 141:*18*
usage 99:*25*
use 20:*8, 11, 15* 22:*16*
25:*23* 37:*14* 41:*24* 42:*5*
46:*15* 51:*18* 67:*11*
68:*14* 82:*4, 5* 85:*17*
116:*25* 131:*2* 132:*13*
133:*19* 137:*24* 142:*24*
152:*25* 153:*12* 157:*23*
162:*21* 163:*12* 170:*5*
uses 94:*11*
usual 179:*25*
usually 39:*10*
Utegration 80:*25* 81:*2*
utilities 19:*4* 22:*15*
23:*5* 26:*14, 16, 19, 24*
27:*1, 11, 25* 90:*16, 24*
utility 18:*11* 19:*17*
20:*23* 27:*4* 37:*14, 15*
39:*10* 75:*9, 10* 83:*19, 21*
91:*16*
utilized 90:*11*

< V >
Vague 17:*10* 23:*2*
34:*23* 52:*17* 60:*17*
61:*15* 62:*19* 70:*12* 71:*1*
95:*20* 108:*12* 172:*3*
valued 139:*11*
variety 96:*16* 97:*5*
various 14:*13* 30:*9*
31:*4, 9* 48:*14* 52:*20*
92:*23* 93:*24* 95:*23*
114:*4* 117:*22* 133:*25*
vendor 163:*12* 167:*1, 13,
24* 168:*12* 172:*9*
vendors 168:*18*
Venture 176:*14*
verification 37:*13*
verify 32:*4* 41:*3* 136:*11,
19*
version 42:*19, 25* 43:*13*
79:*1* 91:*19* 114:*5*
versions 41:*25* 42:*1, 3, 5,
18*

Versus 4:*8* 36:*14* 44:*16*
71:*15* 120:*24*
video 4:*7* 176:*25*
VIDEOGRAPHER 4:*5,
15* 45:*5, 8* 72:*20, 23*
73:*1* 89:*3, 6* 114:*22, 25*
144:*8, 10, 14* 148:*19, 22*
172:*15, 18* 176:*24*
view 35:*1* 36:*21* 48:*4,
19* 49:*1* 101:*5* 131:*7, 11*
142:*14* 143:*3* 170:*3*
vis-a-vis 75:*20* 106:*7*
visibility 129:*2* 131:*17*

< W >
waiving 164:*12*
want 5:*17* 10:*3* 13:*2*
30:*2* 37:*5* 45:*10, 11*
56:*12* 59:*20* 75:*4* 81:*16*
89:*25* 93:*12* 99:*23, 25*
100:*7* 109:*9* 135:*25*
136:*8* 151:*4* 158:*2*
159:*10* 162:*25*
wanted 24:*24* 25:*1*
30:*12* 34:*5* 73:*18* 80:*4*
108:*22* 136:*25* 137:*24*
138:*24* 158:*20* 163:*11*
wants 43:*12* 72:*7* 137:*4,
15*
water 26:*25* 27:*2*
Waterhouse 49:*21*
way 11:*6* 21:*17* 22:*4*
28:*8* 34:*2, 4, 5* 35:*22*
37:*6* 41:*14* 44:*4, 18*
49:*4* 53:*7, 12* 54:*9* 57:*3*
63:*14* 67:*11* 68:*15*
73:*21* 83:*25* 86:*21* 88:*2,
8, 12* 101:*7* 116:*5* 120:*8,
20* 121:*15* 122:*9* 125:*18*
128:*17* 130:*7* 136:*22*
141:*21, 23* 143:*14*
155:*17* 162:*7* 164:*8, 24*
169:*5, 13* 172:*1* 176:*10,
12, 13, 14, 15, 18*
ways 58:*4* 87:*22, 25*
141:*19*
website 38:*18* 65:*22*
Wednesday 1:*13*
weeks 15:*21, 22*
Well 12:*1, 4* 15:*16*
17:*17* 20:*20* 22:*12* 23:*8*
27:*14* 32:*1, 9, 12* 35:*18*
37:*7, 19* 40:*17* 43:*10*
44:*6* 46:*2, 22* 48:*11*
49:*9* 55:*20* 56:*4, 17, 20*
58:*6, 10, 12* 60:*6, 18*
62:*15* 63:*10* 64:*16* 66:*8,
24* 68:*1, 17* 69:*12* 70:*20*
75:*6, 14, 17* 78:*23* 79:*10*
80:*7* 81:*15* 82:*2* 83:*11*
85:*22* 86:*20* 88:*7* 89:*1*

90:*22* 91:*13* 94:*16*
95:*10* 96:*11* 99:*11*
100:*7* 101:*13, 19* 102:*8,
10* 104:*7, 15* 105:*2*
106:*12* 107:*25* 118:*5*
119:*2, 15* 122:*18* 124:*12*
125:*4* 126:*2* 129:*6, 16*
143:*19* 146:*1* 147:*9*
153:*7* 154:*14* 155:*18, 20*
161:*12* 163:*17, 20, 24*
166:*21* 169:*7* 170:*13, 18*
172:*4, 6* 173:*8, 10, 19*
175:*13* 176:*19*
went 30:*7* 33:*7* 97:*7*
129:*8* 131:*10*
we're 19:*24* 23:*20* 73:*2*
81:*16, 17* 89:*1, 18* 90:*22*
115:*4* 144:*15* 155:*4*
164:*15* 176:*25*
We've 45:*1* 70:*23*
97:*25* 104:*8* 148:*14*
willingness 95:*7*
wishes 43:*23*
WITNESS 3:*3* 5:*3, 21*
12:*22* 17:*11* 19:*2* 23:*3*
26:*6, 20* 28:*7* 31:*22*
32:*7* 34:*19, 24* 38:*20*
39:*19* 40:*9, 23* 43:*21*
44:*12* 49:*7* 52:*18* 55:*15*
59:*19, 24* 61:*16* 65:*2*
66:*10* 70:*13* 71:*13*
76:*21* 78:*16* 83:*6, 15, 23*
84:*25* 85:*4* 88:*22* 89:*8,
17* 95:*22* 100:*16* 102:*2*
103:*21* 105:*2* 107:*15*
108:*13* 121:*15* 122:*6, 17*
123:*2, 22* 127:*13* 129:*14*
134:*6* 135:*7, 23* 143:*24*
148:*7* 151:*3, 22* 152:*24*
153:*15* 154:*9* 155:*8*
156:*3* 158:*10* 159:*6*
162:*24* 163:*5* 164:*20*
166:*6* 167:*16* 169:*5, 11*
170:*23* 172:*4* 175:*21*
Wonvel 13:*22*
word 8:*9* 85:*17* 116:*4*
157:*23*
wording 33:*1, 12*
words 35:*5* 126:*2*
work 9:*18* 14:*16* 17:*9*
18:*6* 25:*8* 26:*4* 28:*22*
29:*10* 30:*24* 41:*5* 54:*20*
59:*3, 9, 10* 61:*24* 62:*2*
90:*20* 92:*5* 94:*25*
103:*13* 117:*9* 133:*14*
137:*1* 145:*21* 146:*3*
147:*8* 153:*13* 154:*5*
158:*6* 159:*13* 160:*5, 13,
21* 174:*19, 20* 175:*4, 11*
worked 13:*17, 18*

working 11:*16* 13:*13*
23:*18* 67:*25* 94:*1* 104:*6*
105:*16* 133:*13* 145:*9*
152:*11* 159:*24* 175:*3*
world 76:*17* 78:*5, 10*
103:*8*
worse 60:*19*
worthy 24:*15*
writing 14:*4, 5, 18, 24*
46:*11* 65:*11* 71:*19*
written 35:*25*
wrong 60:*7* 89:*9* 132:*12*
wrote 69:*19*

< Y >
year 12:*16* 165:*17, 20*
years 74:*3* 77:*9* 102:*14*
103:*18* 117:*15* 174:*25*
175:*17*
Yende 139:*4*
yesterday 15:*20* 16:*3, 5*
York 149:*11*
Young 49:*21*

< Z >
zero 128:*18*
Zoom 8:*22*