

# Transcript of **Gary Olsen**

### Friday, March 17, 2023

### *Lucasys Inc. v. Powerplan, Inc.*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 126479

1

2                IN THE UNITED STATES DISTRICT COURT

3               FOR THE NORTHERN DISTRICT OF GEORGIA

4                        ATLANTA DIVISION

5

6   LUCASYS INC.,                    )
                                     )
7        PLAINTIFF,                  )
    vs.                              )   CASE NO.  1:20-CV-02987-AT
8                                    )
                                     )   JUDGE AMY TOTENBERG
9   POWERPLAN, INC.,                 )
                                     )
10       DEFENDANT.                  )

11

12                        *******

13       The following deposition of GARY OLSEN, EXPERT WITNESS,

14   was taken pursuant to stipulations contained herein, the

15   reading and signing of the deposition waived before Collette

16   Jackson, Certified Court Reporter in the State of Georgia, on

17   March 17, 2023, at Robbins Alloy Belinfante Littlefield LLC,

18   500 14th Street, N.W., Atlanta, Georgia 30318 at 9:30 a.m.

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S

 2   ON BEHALF OF THE PLAINTIFF:

 3        JOSHUA MAYES, ESQ.

 4        ROBBINS ALLOY BELINFANTE LITTLEFIELD

 5             500 14TH STREET, N.W.

 6             ATLANTA, GEORGIA 30318

 7             jmayes@robbinsfirm.com

 8             404-856-3266

 9   ON BEHALF OF THE DEFENDANT:

10        STEVEN A. FRIEDMAN, ESQ.

11        SQUIRE PATTON BOGGS

12             1000 KEY TOWER

13             127 PUBLIC SQUARE

14             CLEVELAND, OHIO 44114

15             216-479-8327

16             steven.friedman@squirepb.com

17   ALSO PRESENT:

18        JASON S. ALLOY, ESQ.

19        ROBBINS ALLOY BELINFANTE LITTLEFIELD

20             500 14TH STREET, NW

21             ATLANTA, GEORGIA 30318

22             678-701-9374

23             jalloy@robbinsfirm.com

24

25   LUKE STEVENSON (VIDEOGRAPHER)
```

```
 1                    I N D E X

 2   DEPONENT

 3   GARY OLSEN                               PAGE

 4

 5   CROSS-EXAMINATION BY STEVEN A. FRIEDMAN,ESQ.........5-98

 6   DISCLOSURE ........................................99

 7   CERTIFICATE ......................................100

 8

 9                    *  *  *  *  *

10                 E X H I B I T S

11

12   EXHIBIT IDENTIFIED     DESCRIPTION     PAGE MARKED

13   D-OLSEN 1             EXPERT REPORT            5

14   D-OLSEN 2             PLAINTIFF'S OBJECTIONS   19

15                         AND RESPONSES TO

16                         DEFENDANT'S FIRST

17                         CONTINUING INTERROGATORIES

18   D-OLSEN 3             CONTRACT ROUTING SLIP    24

19   D-OLSEN 4             STATEMENT OF WORK        32

20   D-OLSEN 5             EMAIL FROM LANTUKH       50

21   D-OLSEN 6             CHANGE ORDER             50

22   D-OLSEN 7             EMAIL FROM LANTUKH       50

23

24

25
```

```
 1                    P R O C E E D I N G S

 2               VIDEOGRAPHER:  All righty.  Good morning, everybody.

 3   We're now on the record for the video recorded deposition of

 4   Gary Olsen, taken in the matter of Lucasys, Inc., versus

 5   Powerplan, Inc.  Today is Friday, March 17, 2023, and our time

 6   on the record is 09:28 a.m., Eastern standard time.  This

 7   deposition is being conducted at Robbins Alloy, Belinfante

 8   Littlefield, LLC, in Atlanta, Georgia.  My name is Duke

 9   Stevenson.  I'm the videographer.  And our court reporter today

10   is Collette Jackson.  We both represent

11   Trustpoint.One/Alderson.  Will counsel please introduce

12   themselves for the record?  After which, will the court porter

13   please swear in the witness?

14               MR. FRIEDMAN:  Steven Friedman, for Defendant

15   PowerPlan, Inc.

16               MR. MAYES:  Joshua Mayes, for Plaintiff Lucasys, Inc.

17               MR. ALLOY:  Jason Alloy, for Lucasys, Inc.

18               MR. FRIEDMAN:  And then, just for the record, then

19   we've got others just listening in on Zoom counsel?

20               MR. MAYES:  Yeah, Luis Blanquez and Jon Cieslak from

21   Bona Law.

22               COURT REPORTER:  Mr. Olsen, will you raise your right

23   hand.

24               WITNESS:  (Witness complies)

25               COURT REPORTER:  Do you solemnly swear or affirm that
```

1    the testimony that you're about to give, will be the truth, the

2    whole truth, nothing but the truth?  If so, say I do.

3            WITNESS:  I do.

4    Whereupon,

5                        GARY OLSEN

6    was called as a deponent herein and, having first been duly

7    sworn, was examined and deposed as follows:

8              C R O S S - E X A M I N A T I O N

9    BY MR. FRIEDMAN:

10       Q.   Good morning, Mr. Olsen.  I'm Steve Friedman.  We've

11   never met before, correct?

12       A.   Correct.

13       Q.   Okay.  Well, get this for getting started.  I've

14   marked your expert report as Olsen 1.  I'll hand that to you.

15   I got an extra one here.  I represent to you that it's a

16   complete copy of the expert report that you issued in this case

17   on December 16, 2022.  Okay?

18   (Defendant's Exhibit No. Olsen 1 marked and identified.)

19       A.   Okay.

20       Q.   Looking at your CV, it looks like you testified

21   deposition four times in 2022?

22       A.   Just 22.  That sounds right.

23       Q.   Okay.  I think there was also an arbitration hearing

24   in 2022 that you testified at?

25       A.   I don't think in '22.



1        Q.    Okay.  Let me -- if you look at the reports and

2    testimony -- I thought I saw one.  Maybe not.  How about in

3    2023?  Have you testified in 2023?

4        A.    One time last week.

5        Q.    Where was that?

6        A.    It was a Zoom deposition.

7        Q.    What kind of case?

8        A.    It was in the healthcare industry, and it involved

9    data breach damages.

10       Q.    Have you ever worked with the Robbins Firm before?

11       A.    No, this is my first time.

12       Q.    How about the Bona Law Firm?

13       A.    No.

14       Q.    Sir, does this report include all the opinions you

15    were requested to provide in this case?

16       A.    It does.

17       Q.    And does it include all the opinions you intend to

18    offer at trial?

19       A.    It does.

20       Q.    Are there any opinions in this report that have

21    changed since you issued it in December of 2022?

22       A.    No, there hasn't been any changes.

23       Q.    And I understand from the report that you're billing

24    at 575 an hour?

25       A.    That sounds right.



1       Q.   And are there other employees at B. Riley that worked

2   on this engagement?

3       A.   Yes.

4       Q.   And just generally, what do they do?

5       A.   They assisted with the analysis and research, with

6   the review of the documents and deposition testimony.  We

7   discussed as a team our approach to damages.

8       Q.   Okay.  And they all reported to you?

9       A.   Yes.

10      Q.   About how many employees of B. Riley other than

11  yourself worked on this report?

12      A.   There were primarily three or four.  One has since

13  left the firm.

14      Q.   Okay.  And just approximately how much has B. Riley

15  charged Lucasys for this engagement?

16      A.   Actually, I don't know the figure.

17      Q.   Are you responsible for sending out the invoices?

18      A.   Only recently, up until a few months ago it was

19  someone else.

20      Q.   Have you reviewed any of the invoices?

21      A.   Just the last two.

22      Q.   You don't have an estimate, within a half million

23  dollars, more or less?

24      A.   I would say less than a half million.

25      Q.   How about $200,000?



1    A.    Probably more than 200.

2    Q.    Sir, have you ever testified in an antitrust case

3  before?

4    A.    I've worked on antitrust cases, but this is the first

5  time I've been a testifier on an antitrust case.

6    Q.    And you're not an expert in antitrust law, correct?

7    A.    No, I'm not an expert in antitrust law.

8    Q.    And you're not an expert in antitrust injury,

9  correct?

10   A.    From the legal perspective, no.

11   Q.    And you're not an expert in antitrust markets

12  definitions, right?

13   A.    No, I don't claim to be.

14   Q.    And you're not an expert in antitrust causation, the

15  concept of antitrust causation?

16   A.    I'm certainly familiar with the topic of causation,

17  but I wouldn't consider myself an expert in causation.

18   Q.    And if I understand from your report, you're not

19  planning to offer any opinions regarding liability in this

20  case, correct?

21   A.    Correct, I'm assuming liability.

22   Q.    And you also not offering any opinions regarding

23  proximate cause in this case, correct?

24   A.    I do not have any opinions regarding approximate

25  cause.



1       Q.    As a matter of fact, as it states in your report, you

2   assume both liability and proximate cause, correct?

3       A.    Correct.

4       Q.    All right.  If we could look at the report.   In

5   particular, I'd like to start at paragraph 14, please.  And in

6   paragraph 14, you describe four particular software products,

7   correct?

8       A.    Yes.

9       Q.    And those are software products that you understand

10  are offered by the Plaintiff Lucasys to customers?

11      A.    Yes.

12      Q.    And those four software products, in addition to

13  consulting services are the five areas in which you've analyzed

14  lost revenue and lost profits for Lucasys, correct?

15      A.    I would agree.

16      Q.    It's just those five topics, right?  The four

17  software products and consulting services, there's nothing else

18  that you're aware of, correct?

19      A.    Nothing else that I've included in my analysis.

20      Q.    Great.  Have you ever seen a demonstration of these

21  four products?

22      A.    I've heard them described.  I haven't physically seen

23  the software in action.

24      Q.    Okay.  Other than -- you cite to Lucasys' web page as

25  the source for your description of these four software products



1    in paragraph 14.  Other than that, is there any other source

2    for your understanding of what these products are and what they

3    do?

4        A.   Other than the website that I had several discussions

5    with the CEO of Lucasys.

6        Q.   Okay.  Mr. Lantukh, correct?

7        A.   Yes.

8        Q.   And do you have an understanding of how these

9    products compare to software products offered by PowerPlan?

10       A.   As far as the specific technical details, I do not.

11       Q.   What is your general understanding?

12       A.   At the time, my general understanding was that

13   PowerPlan's products were an application based versus Lucasys'

14   products were cloud based.

15       Q.   Okay.  What about functionality?  What is your

16   understanding as to what functionality PowerPlan products have

17   versus these four software products offered by Lucasys?

18       A.   Well, my understanding is PowerPlan doesn't offer a

19   product comparable to either Copilot or Nova, whereas they do

20   offer products comparable to deferred tax and depreciation.

21       Q.   You say comparable that PowerPlan has products that

22   are comparable to Lucasys' deferred tax and tax depreciation.

23   Do you have an understanding of how those products differ in

24   terms of functionality?

25       A.   Specifically, no.



1    Q.    Generally, do you have some general understanding?

2    A.    In terms of how they differ or how they are the same?

3    Q.    How they differ?

4    A.    Other than the cloud based versus not cloud based,

5    that's the main difference that I recall.

6    Q.    Okay.  You understand that PowerPlan has a software

7    offering called PowerTax?

8    A.    Yes, I do understand that.

9    Q.    And do you have an understanding of what PowerTax

10   entails?

11   A.    My understanding is PowerTax is a suite of software

12   products that have multiple different functions.

13   Q.    And there are modules within PowerTax that include

14   the functionality of deferred tax and tax depreciation.  Is

15   that your understanding?

16   A.    That is correct.

17   Q.    And you understand that those are different modules

18   that can be purchased separately?

19   A.    I do understand that depreciation and deferred tax

20   can be purchased separately.

21   Q.    And the same thing with the Lucasys' products,

22   correct?  You understand that they can be purchased separately?

23   A.    Yes.

24   Q.    Do you have an understanding whether the Copilot and

25   the Nova are compatible with PowerTax products?



```
 1        A.    I believe I have read some documents that indicate

 2   that.  I don't know about Nova, but certainly Copilot mentioned

 3   some compatibility.  I believe I've read some documents that

 4   mentioned that.

 5        Q.    Okay.  But that's not of import to your opinion,

 6   though, is it?

 7        A.    No.

 8        Q.    All right.  In addition to the four software

 9   products, as we stated before, you also analyzed lost revenue

10   in consulting services, correct?

11        A.    Correct.

12        Q.    And what is your understanding of what those

13   consulting services entail?

14        A.    My understanding is the consulting services involve

15   providing tax services to assist clients with the various needs

16   they have, due to the regulations involved with investor owned

17   utilities.

18        Q.    How does those -- strike that.  How do those

19   consulting services, if any way, relate to the four software

20   products listed in paragraph 14?

21        A.    Well, I know there can be some overlap between the

22   services.  I know, for example, Nova is a tax based balance

23   sheet software product.  And I know that Lucasys has performed

24   consulting services in the areas of tax based balance sheet.

25        Q.    Do you know, does Lucasys implement Copilot or Nova
```



1    as part of its consulting services to customers?

2        A.    As part of consulting services, my understanding is

3    that they're not implementing software unless that's what the

4    customer is ordering.

5        Q.    So you understand it'd be a separate purchase order

6    or something like that, if there was a software product in

7    addition to consulting services?

8        A.    Whether it's a purchase order agreement I don't know,

9    but I view those as separate.

10        Q.    So you didn't consider there any overlap in your

11    damages analysis between lost revenue for consulting services

12    and lost revenue for any other four software products?

13        A.    Yes, there's a number of different professional fees

14    I considered in my analysis, including implementation fees,

15    data cleansing fees, and then consulting services.  I do

16    understand those all to be separate.

17        Q.    Okay.  So going back to the four products in

18    paragraph 14, you have no understanding as to which product

19    fits into which antitrust market, correct?

20        A.    Can you describe what you mean by antitrust market?

21        Q.    Yeah, antitrust market as analyzed by Dr. Meyer in

22    this case.  Have you read Dr. Meyer's report?

23        A.    No.

24        Q.    Has anyone told you about anything about Dr. Meyer's

25    report?



1        A.    No.

2        Q.    I will tell you, Dr. Meyer is an expert that the

3   Plaintiffs have engaged in this case, and she defines antitrust

4   markets for this case.  Okay.  And she fits different products

5   in different categories.  You don't have any understanding of

6   that though, correct?

7        A.    No.

8        Q.    And you don't tend to offer any opinions as to what

9   antitrust market, any of these particular products fit into,

10  correct?

11       A.    I do not.

12       Q.    Mr. Olsen, have you read Mr. Hilliard's report?

13       A.    No.

14       Q.    Has anyone told you anything about a report from Mr.

15  Brooks Hilliard that was issued in this case?

16       A.    No.

17       Q.    So you don't have any opinions regarding the

18  reasonableness of PowerPlan's license agreements with its

19  customers, correct?

20       A.    I do not.

21       Q.    How about the reasonableness of the terms of the

22  authorized vendor agreements between PowerPlan and third party

23  providers of consulting services?

24       A.    I do not have any opinions on that topic.

25       Q.    Mr. Olsen, have you ever spoken with anyone who is an



1    end user of PowerTax?

2         A.   No.

3         Q.   How about someone who's an end user of one of the

4    four products software products listed in paragraph 14?

5         A.   No.  I have not spoken with any clients of either

6    Lucasys or PowerPlan.

7         Q.   Thanks, you got my next question.  I'll ask it now.

8    Exactly where I was going.

9         A.   All about efficiency.

10        Q.   It's all good.  And so it's an assumption of your

11   damage model that certain customers did not purchase Lucasys'

12   software because of PowerPlan's alleged conduct as described in

13   the amended complaint, correct?

14        A.   That's a component, correct.

15        Q.   I'm sorry?

16        A.   That's a component, correct.

17        Q.   A component.  What do you mean by that?

18        A.   That one of the components of my damages calculation

19   is the causation element.

20        Q.   And my question was, just to make sure the record is

21   clear, that it is an assumption of your damage model that

22   certain customers did not purchase Lucasys' products because of

23   PowerPlan's alleged conduct, correct?

24        A.   Correct.

25        Q.   Mr. Olsen, do you have experience with Enterprise



1    Software?

2         A.    I have experience with software as a service, which I

3    understand this to be.

4         Q.    Do you have an understanding what Enterprise Software

5    is, in that term?

6         A.    Not sure how you might be using that.

7         Q.    Okay.  So I'm using that term as software that is

8    used by businesses for -- large businesses for their business

9    operations.  Oracle and SAP come to mind.

10        A.    Okay.

11        Q.    All right.  Have you testified any cases involving

12   Enterprise Software?

13        A.    I testified in 2021 on a couple of cases that

14   involved software in the telecom industry that sounds like that

15   might fit that description.

16        Q.    Okay.  And was your testimony in that case related to

17   potential lost profits?

18        A.    Yes.

19        Q.    And could you tell us a little more about that

20   opinion?

21        A.    There were two cases, related cases between the same

22   parties.  One was a patent infringement case and one was a

23   trade secrets case.  And I testified on behalf of the Defendant

24   in those cases involving both lost profits and reasonable

25   royalties.



1    Q.   Okay.  Have you ever testified in a matter relating

2    to software for tax accounting?

3    A.   Specifically tax accounting, no.  I did testify in a

4    matter involving software as a service company involving back

5    of the office operations, which included the accounting

6    function.

7    Q.   All right.  If you look at your report on page five

8    in particular, let's take a look at footnote three.  About

9    halfway down, you make a reference to dissatisfied PowerPlan

10   customers.  Do you see that?

11   A.   I do.

12   Q.   And who are those customers?

13   A.   I don't recall names.

14   Q.   Was AEP one of them?

15   A.   I don't know.  I just recall that the summary section

16   from the Stack's report, which mentions many customers were

17   dissatisfied.

18   Q.   Okay.  And you have no opinion on the veracity of

19   those statements in the Stack's report, do you?

20   A.   No, I assume they were accurate.

21   Q.   Okay.  And you have no opinion as to -- strike that.

22   I know you read the depositions of the customers that were

23   deposed in this case.  They're listed in your report.  And

24   those are AEP, NextEra, Liberty and Suez.  Does that sound

25   right?



```
 1      A.   Yes.

 2      Q.   We're not aware of any other customer depositions

 3   that were taken in this case?

 4      A.   Other customers.  No other than the four that you

 5   mentioned.

 6      Q.   And you did not attempt to interview any customers,

 7   correct?

 8      A.   No, I did not interview any customers.

 9      Q.   Why not?

10      A.   In my experience, that would be unusual.

11      Q.   Did you ask counsel to depose any more customers?

12      A.   No.

13      Q.   Why not?

14      A.   Because I felt the information I had available was

15   sufficient for my needs in calculating damage.

16      Q.   Coming back to paragraph 14 and it identifies four

17   software products that were offered by Lucasys, correct?

18      A.   Yes.

19      Q.   Do you know the date of when any of these four

20   products was first offered by Lucasys?

21      A.   I know they were first offered in 2019.

22      Q.   Do you know the date when any of these four products

23   was completed by Lucasys?

24      A.   I know all four by now have been developed and

25   completed, so it would be sometime between 2019 and now.
```



1       Q.    So did you review any interrogatory responses as part

2    of your engagement?

3       A.    I don't recall.

4       Q.    I'm going to go ahead and mark Exhibit 2 for you.

5    And I'll represent to you that this is Plaintiff's objections

6    and responses to Defendant's first set of interrogatories.

7    Okay?

8    (Defendant's Exhibit No. Olsen 2 marked and identified.)

9       A.    Okay.

10      Q.    And in particular, I'd like you to look at the

11   response to interrogatory number 7 and just happens to be on

12   page 7 too.  If you want to read the actual interrogatory,

13   that's at the bottom of page 7.  And then on page 8, it lists

14   on the bullet points.  This is provided by the Plaintiff, for

15   each of the four software products that are referenced in

16   paragraph 14 of your report, correct?

17      A.    Includes the four and two others.

18      Q.    Okay.  And I see that the bullet point for deferred

19   tax says that "Deferred tax development began in 2018 and is

20   ongoing by Steven String and Jonathan Porter".  And I'll tell

21   you that if you look at the very last page, the date of

22   verification is interrogatories is November 16, 2021.  Okay?

23      A.    Okay.

24      Q.    Did you consider the fact that deferred tax was --

25   development was ongoing in 2021?



1        A.    No, my understanding was that the basic product was

2    developed and available, and then they tailor each

3    implementation for each client.

4        Q.    And what's that understanding based on?

5        A.    Discussions with Vadim Lantukh.

6        Q.    That's it?  No others?

7        A.    I believe Steven String I spoke with at some point as

8    well.

9        Q.    Okay.  But you didn't actually see a version of

10   deferred tax that was ready for use prior to 2021, right?

11       A.    I haven't seen (unintelligible) any of the products,

12   no.

13       Q.    And you're not aware of any customer that was using

14   or had used Lucasys' deferred tax product, correct?

15       A.    No.  I understand that because of the actions of

16   PowerPlan -- Lucasys wasn't unable to implement this product.

17       Q.    And you're not aware of any customer that purchased

18   deferred tax software product from Lucasys in 2019, correct?

19       A.    I'm certainly aware of interest in the product, in

20   purchasing the product, but I'm not aware that Lucasys was able

21   to implement it at any --

22       Q.    We'll get to that.  Now let's look at Nova.  It says

23   "Nova development began in 2020 and is ongoing".  Do you see

24   that?

25       A.    I do.



1      Q.    Did you consider that in forming your opinion?  That

2  statement by Lucasys?

3      A.    Yes, that fits with my understanding.

4      Q.    All right.  And so if development began in 2020, how

5  could it have been sold in 2019?

6      A.    Because how these products are sold, the

7  implementation period for these products is quite long.  So an

8  agreement entered into in 2019 could last multiple years.

9      Q.    And that's true for the Nova product, not just the

10  deferred tax and depreciation tax product --

11      A.    Yes.

12      Q.    -- is that your understanding?

13      A.    The timeline I saw for Nova started in 2019 and went

14  into 2021, if memory serves.

15      Q.    So the timeline you saw started in 2019, but this

16  statement says that "Development began in 2020".  Do you see

17  that?  How is that consistent?

18      A.    I believe that's consistent because Lucasys was

19  intending to develop the products as they implemented them.

20      Q.    And what is your source for that information?

21      A.    Again, discussions with Mr. String and Mr. Lantukh.

22      Q.    Anything else other than your discussions with those

23  two individuals?

24      A.    Their deposition testimony, I believe is consistent

25  with that as well.



```
1        Q.    Okay.  And that's an assumption of your model too,

2   correct?  If that's information correct?

3        A.    Yes.

4        Q.    And then see depreciation, the fourth bullet point.

5   It says "Depreciation design and development began in 2021".

6   Did you consider that in issuing your report?

7        A.    Yes.

8        Q.    Mr. Olsen, do you have any opinions as to whether or

9   not there was harm to competition in the antitrust sense, due

10  to PowerPlan's actions?

11       A.    I do not have any opinions on that topic.

12       Q.    I understand that you do not allocate the alleged

13  damages by the claims in this case, correct?

14       A.    Correct.

15       Q.    And you didn't attempt to tie any of the damages to

16  any particular claim that's alleged in the amended complaint,

17  correct?

18       A.    Correct.

19       Q.    And so if PowerPlan were to be found liable for some

20  of the claims and not for other claims, would that affect your

21  damage model?

22       A.    As I sit here, I don't know how it would.

23       Q.    It could affect your damage model, right?

24       A.    I guess that's possible.

25       Q.    Same question for the timing of the alleged improper
```



```
 1    actions by PowerPlan.  If the timing of the alleged improper

 2    actions were determined to have occurred after 2019, for

 3    instance, that would affect your damage model, wouldn't it?

 4         A.    If the actions of PowerPlan were after 2019?

 5         Q.    Correct.

 6         A.    Well, I believe the actions of PowerPlan started in

 7    2019 and have continued beyond 2019.

 8         Q.    My question is, assume that the court determines that

 9    any improper actions by PowerPlan occurred after 2019.  Would

10    that change your damage model?

11         A.    Well, it wouldn't change the model as I provided it.

12         Q.    It would change the results of your model, wouldn't

13    it?

14         A.    I'm not sure that it would.

15         Q.    How could there be damages in 2019 if the alleged

16    proper conduct occurred after 2019, sir?

17         A.    I don't have any damages in 2019.

18         Q.    Okay.  We'll get to that.

19         A.    They start after.

20         Q.    All right.  So let's do the same hypothetical for

21    2020.  If the alleged improper conduct by PowerPlan occurred

22    after 2020, would that affect your damage model?

23         A.    The model would still be the same.  Now, whether

24    there would need to be any adjustments to how it's applied,

25    might need to be taken into consideration.
```



1       Q.   Isn't it an important facet of your model that

2  Lucasys lost opportunities to sell software products and

3  consulting services to customers in 2019, due to PowerPlan's

4  alleged improper conduct?

5       A.   Yes, I've assumed that improper conduct started in

6  2019.

7       Q.   Not just that the improper conduct started in 2019,

8  but part of your model assumes that Lucasys lost customer

9  opportunities in 2019, due to PowerPlan's alleged improper

10 conduct, correct?

11      A.   Correct.  Starting in 2019 and continuing and beyond.

12      Q.   If you look at paragraph 20 of your report.  In

13 paragraph 20 discusses at the bottom of the paragraph a

14 contract that Lucasys has had with AEP.  Do you see that?

15      A.   I do.

16      Q.   And you saw that contract?

17      A.   I did.

18      Q.   And that contract was for consulting services, not

19 software, correct?

20      A.   I don't believe I agree with that statement.

21      Q.   I'm going to marked that Olsen, Exhibit 3.  This is

22 the document cited in footnote 24 of your report.  Matches up.

23 (Defendant's Exhibit No. Olsen 3 marked and identified.)

24      A.   Yes, it appears to be.

25      Q.   So this is the contract that you're referring to in



1  paragraph 20, correct?

2      A.   Yes.

3      Q.   And we can look at the "Statement of Work" at the end

4  of this document.  Maybe three pages.  I guess.  The bait stamp

5  of the first page of the "Statement of Work" is Lucasys

6  RPD0002184.  We're on the same page?

7      A.   Yes, I see that.

8      Q.   Okay.  And under "Scope of the Statement of Work",

9  there's a middle paragraph.  It says, "As part of this

10  engagement, contractor and client will evaluate the feasibility

11  of Lucasys' software solutions to meet client's needs".  Do you

12  see that?

13      A.   Yes.

14      Q.   You don't equate that to the sale of software, do

15  you?

16      A.   Well, certainly they were contemplating software

17  solutions.  Yes.

18      Q.   Okay.  Yeah.  Contemplating software solutions.  That

19  statement is not the actual sale of software solutions, is it?

20      A.   As I understand, PowerPlan didn't permit Lucasys to

21  get that far.

22      Q.   Sir, can you just answer my question, please?  I

23  didn't ask that.  Do you want me to ask the question again?

24      A.   Sure.

25      Q.   My question for you is, that that sentence does not

1    entail the sale of a software product by Lucasys to AEP, does

2    it?

3         A.    That one sentence out of this contract by itself, no.

4         Q.    Can you point to anything else in this contract, that

5    this contract states that there is a sale of software product

6    by Lucasys to AEP?

7         A.    Yes.

8         Q.    Point it out to me, please.

9         A.    First page.

10        Q.    So what does that say?

11        A.    "Description of Service Work software and consulting

12   services for tax and financial accounting".

13        Q.    And so what is that software on the first page?  What

14   product is that?

15        A.    The parties were contemplating, as I understand,

16   deferred, tax, Copilot, and depreciation.

17        Q.    Okay.  And you equate contemplating as an actual sale

18   of software?

19        A.    This is certainly the first step of that process,

20   yes.

21        Q.    And you agree that that's just the first step?  There

22   were ultimately other steps that had to be done before there

23   would be a sale of software, correct?

24        A.    Before that -- if you're talking sale in terms of

25   from an accounting perspective and booking the revenue, then



1    yes, there's additional steps that would be the case with any

2    contract.

3         Q.    There's no license agreement for software in this

4    document, right?

5         A.    I believe there is reference to a license.

6         Q.    Let me ask this question.  A license agreement for a

7    specific software product.  Do you see that in this document?

8         A.    Yes.

9         Q.    Elucidate, please.

10        A.    On page 4, under "License Software", where it says,

11   "Provider hereby grants customer a non-exclusive license to

12   reproduce and use the license software".

13        Q.    My question is, what is the specific license

14   software?

15        A.    My understanding that parties were talking about

16   deferred, tax, depreciation, and Copilot.

17        Q.    Where in this document are any of those three tax

18   software products mentioned?

19        A.    There's other documents that discuss those three

20   products.

21        Q.    But you chose not to cite those in your report?

22        A.    Yes, I did.

23        Q.    Have you read the deposition of the AEP corporate

24   representative?

25        A.    Yes.



1    Q.    And based upon your reading that deposition, what is

2    your understanding of the reason why AEP did not purchase a

3    software product from Lucasys in 2019?

4    A.    I haven't formed my conclusion based off that

5    deposition alone.

6    Q.    What else do you base your conclusion on?

7    A.    All the evidence in the record.

8    Q.    What in particular?

9    A.    In particular, all the conduct between AEP and

10   Lucasys and the actions of PowerPlan.  There's several

11   documents that cover all the events that transpired.

12   Q.    Can you recall any of those specific documents as you

13   sit here today?

14   A.    By Bates number, no.

15   Q.    Just describe them to me.

16   A.    There's email communications internally amongst

17   PowerPlan personnel.  There's communications back and forth

18   between PowerPlan and AEP.  There's communications between

19   Power -- sorry, not PowerPlan.  AEP and Lucasys.  There's

20   deposition testimony from a number of parties that all cover

21   this topic.

22   Q.    And it's your testimony that those are more important

23   to you than the direct statement of the corporate

24   representative of AEP in determining why AEP decided not to

25   license software from Lucasys in 2019?



1        A.    I don't have an opinion that certain documents are

2    more important.  I've considered all of them.  It would be

3    inappropriate just to look at one with blinders on and not

4    consider others.

5        Q.    You didn't understand my question.  Can you read the

6    question back, please?

7            (Court Reporter was asked to read back)

8    BY MR. FRIEDMAN:  (Resuming)

9        Q.    Sir, you're not aware of anything in the record from

10   AEP that contradicts the statements of its corporate

11   representative's deposition, correct?

12       A.    I have to think about that.  Are there specific

13   statements you're asking about?

14       Q.    Email, anything you have in the record that you're

15   aware of in the record from altered by AEP that contradicts the

16   statements of its 30(b)(6) witness?

17       A.    Which statements?

18       Q.    Any statement in the 30(b)(6) deposition?

19           MR. MAYES:  Objection.  Lack of foundation.

20   BY MR. FRIEDMAN:  (Resuming)

21       Q.    Yeah.  There isn't such a thing, is there?  You're

22   not aware of anything, correct?

23           MR. MAYES:  Objection.

24           WITNESS:  I'm not sure.

25   BY MR. FRIEDMAN:  (Resuming)



1          Q.   But this is all academic because you assume, for

2     purposes of your report, that PowerPlan's actions is the cause

3     of AEP not purchasing software from Lucasys, correct?

4          A.   Well, it's an informed assumption, yes.

5          Q.   But you don't have an expert opinion on whether it's

6     accurate or not, correct?  That's not part of your expertise,

7     correct?

8          A.   No.  I have no opinions on the accuracy of the

9     underlying documents.

10         Q.   As a matter of fact, why don't we look at schedule 12

11    while we're on this.  I'm sorry, schedule 10.  Should know that

12    by heart.  And if you could look at page 17.  I think it's the

13    third page in schedule 10.  Page 17 of 38 in your schedules?

14         A.   Yeah, I just don't follow you about -- what you mean

15    by the third page of schedule 10.  There's only one page,

16    schedule 10.

17         Q.   Well, I don't know about that.  It looks to me like

18    schedule 10 starts on page 16.  So I guess I'm off one.  It's

19    the second page of schedule 10.  Is that accurate?

20         A.   Okay.  I'm with you now.

21         Q.   Yeah, I'm sorry I said third.  I was off by one.

22    It's two pages to schedule 10, correct?

23         A.   Yes.

24         Q.   And the second page title is "Potential Customer and

25    But-For Customer Analysis", we're on the same page now?



1     A.   Yes.

2     Q.   And in the column for 2019, in this schedule, there

3   are a series of numbers for the four software products we

4   discussed and consulting services.  The five areas we discussed

5   earlier, correct?

6     A.   Yes.

7     Q.   And in particular for the row, "The But-For Lucasys'

8   deferred tax customers".  What does that represent?  That row.

9     A.   The row shade is in pink here?

10    Q.   Row one, "But-For Lucasys' deferred tax customers".

11    A.   Row one, that's the number of customers year by year,

12  that I have calculated as would have purchased deferred tax

13  from Lucasys.

14    Q.   Okay.  And there was a footnote 3, right.

15    A.   I see that.

16    Q.   And it says, "Assuming AEP and Suez would have become

17  deferred tax customers of Lucasys in 2019", right?

18    A.   Yes.  I see that.

19    Q.   And then I see there's two citations.  One of them is

20  the document we just looked at, the AEP document.

21    A.   That looks right.

22    Q.   Okay.  And the other one, why don't I go ahead and

23  mark the other one.  Just make sure I got the right Bates

24  numbers.  It's easy to mix this up, right.  Let's see.  23272,

25  23272.  All right.  I handed you Olsen 4.  And it's Lucasys



1    23272.  And it's the second document that's cited in the

2    footnote 3 on this page of schedule 10, correct?

3    (Defendant's Exhibit No. Olsen 4 marked and identified.)

4        A.   Yes, it appears to be.

5        Q.   And the footnote says, "Assuming AEP and Suez would

6    have become deferred tax customers of Lucasys in 2019".  And

7    that is what's represented by the two in the column for 2019,

8    correct?

9        A.   Yes.

10       Q.   And that's an assumption of your model that AEP and

11   Suez would have become deferred tax customers of Lucasys in

12   2019, but for PowerPlan's, alleged conduct, right?

13       A.   Correct.

14       Q.   And if that assumption was not correct, then your

15   damages model would have to be altered, wouldn't it?

16       A.   If that assumption is not correct yes, I'd have to

17   reconsider.

18       Q.   It would affect the result of your damage model,

19   wouldn't it?

20       A.   A high likelihood.

21       Q.   High likelihood, or it definitely would have?

22       A.   I'd have to consider all the new facts in this

23   scenario you're proposing.

24       Q.   You're seriously stating that your damage model

25   possibly would not be different if neither Suez nor AEP would



1    have become a deferred tax customer of Lucasys in 2019, But-For

2    PowerPlan's conduct.  Is that your testimony?

3            MR. MAYES:  Objection.  Asked and answered.

4    BY MR. FRIEDMAN:  (Resuming)

5        Q.    Can you answer it again, though?

6        A.    My testimony is that I can't give you a definite

7    answer until I know all the facts and circumstances in the

8    hypothetical you're proposing.

9        Q.    Same thing is true for the next footnote.  Footnote

10   4.  Footnote 4.  That's in the second row, correct?  And this

11   one deals with the depreciation software, correct?

12       A.    Correct.

13       Q.    And again, for purposes of the depreciation software,

14   you assume AEP would have become a depreciation customer in

15   2019, But-For PowerPlan's conduct, correct?

16       A.    Yes.

17       Q.    And your citation is, again, to the same document we

18   looked at earlier?

19       A.    It is.

20       Q.    That statement of work and agreement, correct?

21       A.    Yes.

22       Q.    And row 3.  That is But-For Lucasys' Copilot

23   customers.  You lists three of them for that one, right?

24       A.    For Copilot, yes.  AEP, Suez, and Florida Power &

25   Light.



1       Q.    And so, again, you assume, it says right there in

2    footnote 5, your word "Assuming", not mine, right?  It says

3    "Assuming AEP, Suez and FPL would have become Copilot customers

4    in 2019".  And again, it's But-For the behavior of PowerPlan,

5    right?  That's an assumption of your model.

6       A.    Yes, I believe those are reasonable assumptions given

7    the record I've reviewed.

8       Q.    Okay.  Well, let's talk about that a little bit.

9    You're aware that Suez -- that Lucasys was doing consulting

10   work for Suez in 2019 and 2020, correct?

11      A.    They did.

12      Q.    And are you aware of any communication by PowerPlan

13   to Suez in 2019 that concerned Lucasys?

14      A.    I'm not aware of any written communication.

15      Q.    Any verbal communication from in the record from

16   PowerPlan to Suez concerning Lucasys that was made in 2019?

17      A.    I'd have to go back and review all the testimony.

18      Q.    I'll represent to you that there is no evidence in

19   the record of any communication, written or verbal by PowerPlan

20   to Suez concerning Lucasys in 2019.  So just assume that for

21   purposes of my question.  Assuming that's accurate, is it still

22   your position that Suez would have been -- I'm sorry, would

23   have become a customer of Lucasys for deferred tax, Copilot,

24   and Nova in 2019, But-For PowerPlan's behavior?

25            MR. MAYES:  Objection.  Lack of foundation.



1    BY MR. FRIEDMAN:   (Resuming)

2         Q.    Still answer the question.

3         A.    Yes, they actually became a customer in 2019.   The

4    nature of these agreements, again, are very long term.   The

5    implementation of these software products and the consulting

6    services take years.

7         Q.    My question is whether or not they would have become

8    a customer of Lucasys for these products in 2019, But-For

9    PowerPlan's conduct if PowerPlan didn't have any communications

10   with Suez in 2019?

11          MR. MAYES:  Objection.  Lack of foundation.  You can

12   answer if you can.

13          WITNESS:  That's the assumption here, yes.

14   BY MR. FRIEDMAN:   (Resuming)

15        Q.    And I assume that footnote 6, that's a typo

16   depreciation should be Nova, right?  Is that a typographical

17   error in your report?

18        A.    Let's look.  That should be Nova, yes.

19        Q.    Let's also talk about the But-For consulting

20   customers.  There's a reference to schedule 12, that there are

21   four consulting customers that presumably -- I assume you're

22   saying that those four would have been consulting customers

23   But-For PowerPlan's conduct in 2019?

24        A.    No, those are all actual consulting customers.

25        Q.    Why does line 5 say, "But-For Lucasys' consulting



1    customers" and there's a reference in 2019?

2         A.   Well, that's why those in 2019, you see, those are

3    all distinguished by being in red.

4         Q.   Okay.  So there's no lost revenue from consulting

5    customers in 2019 in your damage model, correct?

6         A.   Correct.

7         Q.   And you use those four for the purpose of predicting

8    how many customers Lucasys would have had in future years,

9    But-For PowerPlan's conduct.  Is that correct?

10         A.   Correct.  2019 is the benchmark or baseline.

11              MR. MAYES:  And I know we haven't been going for an

12    hour, but I need a comfort break.

13              MR. FRIEDMAN:  Absolutely.

14    (Brief break taken)

15    BY MR. FRIEDMAN:  (Resuming)

16         Q.   Okay.  Mr. Olsen, here's my understanding of big

17    picture of the damage model and want to make sure I have the

18    right understanding.  So based upon the assumptions that we

19    just went over that are shown in schedule 10 footnotes, you

20    determined the number of But-For sales of the four products and

21    consulting services in 2019.  I'm sorry. Schedule 10.

22              MR. MAYES:  I'm sorry.  Was that a question?

23              MR. FRIEDMAN:  Yeah, just making sure I understand

24    the big picture.

25    BY MR. FRIEDMAN:  (Resuming)



1       Q.    You took on schedule 10, the 2019 column, and those

2    are the assumptions of the number of sales of the different

3    software products in 2019, correct?

4       A.    Yes, 2019 serves as the baseline for the analysis.

5       Q.    Good.  So that's the baseline.  And so then you took

6    that baseline and you compared it against information shown on

7    schedules 13, 14, 15, and 16 for the software products.

8       A.    I took 10 and did what?  Compared to 13 through 16.

9       Q.    You took 10 and then you calculated a win rate, based

10   upon the number of opportunities to sell depreciation and

11   deferred tax products shown in 13, 14, 15, and 16.

12      A.    Well, the win rate would just be based off 13 for the

13   software opportunities.

14      Q.    Well, the win rate for 2019 is based upon the number

15   of But-For sales shown in schedule 10, divided into the

16   opportunities in schedule 13, right?

17      A.    Yes.  Just 13, but not 14, 15, and 16.

18      Q.    Yeah, for 19, the other ones are for different years?

19      A.    Right.

20      Q.    Yeah.  No, I'm sorry, I didn't mean to imply that.

21   Just for 2019, the win rate is schedule 10, divided into

22   schedule 13?

23      A.    For software, yes.  And then for consulting for

24   schedule 17.

25      Q.    Got you.  Those are the futures.  That's why I



1   stopped with 16, because 17, 18, 19, 20 go into consulting

2   opportunities, right?

3       A.   Correct.

4       Q.   Okay.  And that ratio, which you call a win rate is

5   important for your damage model, right?

6       A.   It's one of the elements I use to forecast future

7   sales, yes.

8       Q.   Yeah.  And so, again, the denominator in that win

9   rate is based upon what we just went through in schedule 10.

10  And the numerator is based upon schedule 13, the opportunities?

11      A.   I think you swapped denominator, but yes.

12      Q.   I'm sorry, I'm a lawyer, not an accountant like you.

13  I get it.  Okay.  But those are the two elements of the ratio,

14  right.  The one element is the assumptions that are made in

15  schedule 10 about the lost.  Look at the exact words, "About

16  the inability to become a customer in 2019".

17      A.   With you so far.

18      Q.   Right.  That's one of the elements.  And then the

19  other element is the number of opportunities shown in schedule

20  13, correct?

21      A.   For the baseline rate, I believe that's correct.

22      Q.   Okay.  And you then created by -- use that ratio, and

23  then you applied that ratio to the number of opportunities that

24  are shown in the future year schedules, correct?

25      A.   Yes.



1       Q.    And that's how you came up with the number of lost

2   sales in your model?

3       A.    I said lost customers, yes.

4       Q.    Good clarification, lost customers.  Did you read Dr.

5   Tyler's report in this case?

6       A.    Yes.

7       Q.    Did you read the section in his report about

8   principles of damages analysis?

9       A.    Yes.

10      Q.    You don't describe any particular damages methodology

11  in your report, do you?

12      A.    Well, I describe the general calculation for lost

13  profits, which involves forecasting actual revenues --

14  forecasting But-For revenues subtracting actual revenues to get

15  lost revenues.  Yes, I do.

16      Q.    So that's your methodology, right?

17      A.    Yes.

18      Q.    And you don't cite any treatises for the

19  appropriateness of that methodology in antitrust case, do you?

20      A.    For lost profits, I cite the AICPA manual on

21  calculating lost profits.  I do.

22      Q.    Does that relate to antitrust cases?

23      A.    I'd have to go back and look at it to see if it

24  covers that.  I would assume so.

25      Q.    Okay.  Essentially, you're measuring harm by



1   comparing a But-For world and natural world?

2        A.   Yes.

3        Q.   And again, your actual world is based upon the

4   assumptions in those footnotes in schedule 10, correct?

5        A.   The actual world is based off those footnotes in 10,

6   as well as the actual revenues earned for the customers that

7   Lucasys actually made.

8        Q.   Okay.  But in terms of lost customers, it's based

9   upon the assumptions in those footnotes on schedule 10,

10  correct?

11       A.   Yes, as informed by the rest of the record as well.

12       Q.   So you would agree that assessing damages for startup

13  companies has greater challenges than doing so for established

14  companies, correct?

15       A.   It certainly can.

16       Q.   Would you consider your model a yardstick approach?

17       A.   No, I would consider it more a before after approach.

18       Q.   Would you consider it would be a forecast model?

19       A.   There are certainly elements in forecasting in this

20  model as I'm forecasting revenues for a number of years

21  forward.

22       Q.   But it's primarily a before and after model, right?

23       A.   I believe that's a fair characterization.

24       Q.   And you didn't do a lost enterprise value approach

25  like Mr. Tyler suggested, do you?



1        A.   Well, I don't know that he suggested that was

2   appropriate for this case.  He mentioned that's just one of the

3   possibilities.

4        Q.   Okay.  And you didn't consider that?

5        A.   No.

6        Q.   You didn't interview any of the customers that are

7   referenced in that 2019 column in the footnotes in schedule 10,

8   correct?

9        A.   No, I did not interview any customers.

10       Q.   You're not aware of any affidavits that any of those

11   customers signed, correct?

12       A.   I'm just aware of their deposition testimony from

13   those customers.

14       Q.   You're not aware of any particular emails from those

15   customers to either Lucasys or PowerPlan, are you?

16       A.   I believe there are a number of emails from those

17   customers to Lucasys and PowerPlan in the record, yes.

18       Q.   But none of those were mentioned in your report,

19   correct?

20            MR. MAYES:  Objection.

21            WITNESS:  A number of them are cited -- I've reviewed

22   and are cited in the Appendix B of my report.

23   BY MR. FRIEDMAN:  (Resuming)

24       Q.   Okay.

25       A.   And I should also clarify there a number of those

1   communications are attached as deposition exhibits to many of

2   the depositions.

3       Q.   Other than as you've referenced, reading the

4   materials that are cited in your report, what did you do to

5   investigate the appropriateness of the assumption that you made

6   in footnotes 3, 4, 5, 6 -- 3, 4, 5, and 6 of Schedule 10?

7       A.   Other than my review of the entire record, many of

8   the documents we've just been discussing, as well as

9   discussions with Mr. Lantukh, Mr. String, all of this

10  information is informed.  The reasonable -- it convinced me

11  that those assumptions were reasonable.

12      Q.   You agree that there was risk inherent in Lucasys

13  trying to develop a product in 2019, right?

14      A.   Yes, there's risk.

15      Q.   And to the extent the products were still in

16  development, you don't know how that risk would have played out

17  going forward, right?

18      A.   Specifically, no, thought.  That's informed by my

19  understanding that since that time all those products have been

20  developed.

21      Q.   Have any of those products been implemented by a

22  customer since that time, to your knowledge?

23      A.   To my knowledge, because of the actions of PowerPlan

24  that Lucasys has been unable to implement any of those software

25  solutions.



1      Q.    Did you take the development risk into account in

2    formulating your damages model?

3      A.    Sorry, can I back up one and add to the last

4    question?

5      Q.    Of course.  Yes, please.

6      A.    I understand Copilot - Lucasys has started to

7    implement that at AEP.

8      Q.    Lucasys is implementing Copilot at AEP.  Is the loss

9    of the opportunity to sell Copilot at AEP part of your damages

10    model?

11      A.    Yes.

12      Q.    And so if Lucasys is now implementing Copilot, AEP

13    and presumably being compensated for it, is that double

14    counting in your damages model?

15      A.    No.  Because to whatever extent they are now

16    receiving revenue, that would be backed out in the actual

17    revenue.  That would be including the actual revenue that I'm

18    subtracting from the forecasted revenue in my model.

19      Q.    But you haven't done that yet in your model?

20      A.    Yes, I have.

21      Q.    You've backed out payments to Lucasys going forward

22    for licensing Copilot?

23      A.    I've backed out estimates of future revenue, which

24    would include Copilot from AEP, yes.

25      Q.    Okay.  What if AEP were to implement another one of



1   the software products this year?  Would your damage model have

2   to be adjusted to account for that?

3       A.   No, because again, I'm forecasting whatever revenue

4   Lucasys is expecting in 2023.  Right now, they're not expecting

5   any revenue from -- for deferred tax and depreciation from AEP

6   because AEP chose a different solution and is not currently in

7   the market for those products.

8       Q.   Well, take another customer.  Any of the customers on

9   -- let's take a customer on Schedule 15.  Let's look at

10  Schedule 15.  So, for instance, customer number 11, Tampa

11  Electric, TECO.

12      A.   Okay.

13      Q.   If TECO were to purchase and implement one of the

14  software products, either depreciation or deferred tax product

15  in 2023 from Lucasys, would that affect your damages model?

16      A.   Not necessarily.

17      Q.   Explain why not?

18      A.   For a couple of reasons.  One, I'm not specifically

19  forecasting individual opportunities.  I'm not saying that

20  Tampa Electric would have purchased in the actual or But-For

21  world.  And two, that seems highly unlikely that any of these

22  customers are actually going -- there's no plans right now that

23  I'm aware of from Lucasys that Tampa Electric or any of these

24  companies are currently considering deferred tax or any product

25  in the Lucasys slate because of the stigma that exists in the



1    market right now.

2        Q.   The stigma that exists in the market right now.   What

3    is that stigma?

4        A.   That there is an understanding in the market that

5    Lucasys is off limits because of PowerPlan.

6        Q.   And what do you base that on?

7        A.   My review of the record.

8        Q.   What specifically in the record as you sit here

9    today, can you base that statement on?

10       A.   Deposition testimony from Lucasys' employees,

11   deposition testimony of the customers in this case.

12       Q.   Give me a particular customer deposition in this case

13   that supports that statement?

14       A.   The representative from Liberty?

15       Q.   Representative from Liberty supports the statement

16   that there's a stigma in the marketplace for the purchase of

17   depreciation or deferred tax products from Lucasys.   Is that

18   your testimony?

19       A.   Not in those exact words, but yes.

20       Q.   Okay.   The record will speak for itself.   Okay.

21   Let's look at paragraph 30 of your report.   By the way, is

22   Liberty an opportunity for depreciation of deferred tax

23   products, according to your report?

24       A.   No, they were one of the consulting customers.

25       Q.   Paragraph 30, third sentence says, "In addition, I'm



1    aware of proposals to at least 15 additional IOUs by Lucasys

2    for both software products and consulting services".  Do you

3    see that sentence?

4         A.   I do.

5         Q.   There's no reference, there's no footnotes to that

6    sentence.  Are you referring to verbal written?  What is that

7    in reference to?

8         A.   These are written proposals.

9         Q.   And you don't cite them in your report?

10        A.   They're included in Appendix B.

11        Q.   Okay.  And all 15 of those are written proposals?

12        A.   I reviewed documents, so that I would consider that

13   written, yes.

14        Q.   Okay.  Are you aware of any responses from customers

15   to these 15 written proposals from Lucasys?

16        A.   What I'm aware of is, that none of them were willing

17   to go forward because of fears of PowerPlan.

18        Q.   And that's based upon statements by those customers?

19        A.   That's based off my understanding from discussions

20   with Mr. Lantukh.

21        Q.   Yeah, from Mr. Lantukh.  You're not aware of any

22   written communications or verbal communications from a customer

23   that they were unwilling to go forward with Lucasys because of

24   PowerPlan's behavior, are you?

25        A.   Let's see.  Well, we discussed the Liberty one.  That



1    was a proposal and that was actually an agreement.  There was

2    -- I thought I saw a communication from Suez.  I know I heard

3    of a communication from Suez about whether or not they could

4    continue to -- whether or not they can use Lucasys now or not

5    and thought that they couldn't --

6         Q.   So you're --

7         A.   I can tell you Bates numbers --

8         Q.   I didn't mean to interrupt you.  So you read Suez's

9    30(b)(6) deposition, right?

10        A.   Yes.

11        Q.   And you're aware of the fact that Suez continued to

12   use Lucasys for services after it was contacted by PowerPlan in

13   2020, correct?

14        A.   I'm aware that they finished up some work that was in

15   process at the time and since then that the workflow has

16   stopped.

17        Q.   And are you aware that Suez's corporate

18   representative said that the decision -- strike that.  Are you

19   aware that Suez's corporate representative said that

20   PowerPlan's behavior has not affected Suez's decision to

21   continue to engage Lucasys?

22             MR. MAYES:  Objection.  Mischaracterizes the

23   testimony.

24             WITNESS:  I believe I'm aware of the testimony of

25   which you speak, but that's contradicted by a number of things.



```
 1   Including; the fact that there have been no further

 2   opportunities.  And two, that I understand that a

 3   representative from Suez reached out to Lucasys asking to use

 4   one of Lucasys' contractors because they couldn't use Lucasys

 5   directly.

 6   BY MR. FRIEDMAN:  (Resuming)

 7        Q.   Okay.  All right.  So then you cite two examples of

 8   the 15 (unintelligible).  Are these two examples part of the 15

 9   that you're referring to in paragraph 30?

10        A.   Yes, I believe so.  Okay.

11        Q.   ████████████████████████████████

12        A.   Yes.

13        Q.   Are either of those opportunities on one of your

14   schedules?

15        A.   You mean on schedule 10?

16        Q.   No, schedules from not schedule 10, opportunities

17   from the Salesforce data.  The schedules that we talked about

18   the numbers 13, 14, 15, 16.

19        A.   I'm not sure.  I'd have to go back and look.

20        Q.   Okay.

21        A.   And sometimes the way PowerPlan refers to a company

22   by name -- is not the same way that Lucasys refers to them.

23        Q.   But you could figure that out by looking at the

24   source document.  Right.  The big spreadsheet that's a

25   PowerPlan cited as footnote 1 in schedule -- I guess it's all
```



1    their schedules.  It would be schedule 13.

2         A.   I could, just not as I sit here, for example --

3         Q.   You just don't know off the top of your head?

4         A.   Off the top of my head, for example; and the --

5    Lucasys refers to Suez as Suez versus PowerPlan refers to it as

6    Viola Water.  So theres --

7         Q.   But Viola (unintelligible)

8         A.   Right.

9         Q.   So back in 2019, it was Suez.  Now a new company owns

10   it, right.  But we could figure that out by looking at that

11   document, right?

12        A.   Right.  But there might be an additional step of

13   trying to figure out if there's different subdivisions for

14   subsidiaries.

15        Q.   And you would agree the document speaks for itself.

16   If ████████████████████ and none of its parents or

17   subsidiaries is on that document, then it wouldn't be in your

18   schedule, correct?

19        A.   It wouldn't be in the opportunities based off of the

20   Salesforce database.  That could be correct.

21        Q.   Yeah.  Well, that's exactly what I was getting at.

22   Thank you.  I see you have two footnotes 36, and 37.  Why don't

23   we go ahead and take a quick look at those documents?

24             MR. MAYES:  Which one's, which?

25             MR. FRIEDMAN:  5 is 1, 4, 9, 3, 4, 5.



```
 1              MR. MAYES:  Thank you.

 2              MR. FRIEDMAN:  And 6 is the other one.  Give me a

 3     second, get my page organized.

 4     BY MR. FRIEDMAN:  (Resuming)

 5        Q.    So footnote 36 relates to ███████████, correct?

 6        A.    Yes, I believe so.

 7        Q.    And are you aware of any follow up to this email from

 8     Mr. Lantukh?

 9     (Defendant's Exhibit No. Olsen 5 marked and identified)

10        A.    I don't recall as we sit here.

11        Q.    Okay.  You don't recall any response from ████████?

12        A.    I don't.

13        Q.    All right.  Now let's take a look at Exhibit 6.  The

14     same thing for ████████████.  Do you have any response from

15     ████████████ to Lucasys?

16     (Defendant's Exhibit No. Olsen 6 marked and identified.)

17        A.    No.

18        Q.    Did Mr. Lantukh tell you anything about either one of

19     these customers response to his emails?  As you can best of

20     your recollection?

21     (Defendant's Exhibit No. Olsen 7 marked and identified)

22        A.    He may have.  I just don't recall specifically.

23        Q.    And you didn't attempt to interview either one of

24     these customers, did you?

25        A.    No.
```



1    Q.   Mr. Olsen, let's go back to paragraph 14.  Something

2    I missed.

3           MR. MAYES:  You said paragraph 14?

4           MR. FRIEDMAN:  Yeah, paragraph 14 of your report.

5    BY MR. FRIEDMAN:  (Resuming)

6    Q.   Sorry.  We had talked about this paragraph before and

7    I missed the issue that I wanted to follow up on.  In the

8    second sentence, in a statement "To service these customers,

9    Lucasys offers consulting services to address gaps existing

10   between the needs of the IOUs and currently available fixed

11   asset tax offer".  Do you see that sentence?

12   A.   I do.

13   Q.   What gaps are you referring to?

14   A.   As I understand that the state of the PowerTax

15   software suite wasn't addressing all the needs of customers and

16   that's the reason why entire sub industry has arisen of

17   consulting for tax based consulting for IOUs by companies like

18   RCC and others.

19   Q.   Does Lucasys deferred tax product address every gap

20   that's described in paragraph 14?

21   A.   I have no opinion on whether the Lucasys product

22   addresses gaps or not.

23   Q.   Okay.  So you don't know if there's any difference

24   between PowerTax's products and Lucasys' products with regard

25   to the gaps existing that you're referring to in paragraph 14,



1   right?

2       A.   Right, I am not.  Although, I do understand that

3   Copilot has one of the -- Lucasys' selling points for Copilot

4   is that it will reduce the need for future consulting services.

5       Q.   But Copilot is compatible with PowerTax, right?

6       A.   That's my general understanding.

7       Q.   It's not a substitute, unlike deferred tax and

8   depreciation, right?

9       A.   For certain modules of PowerTax, right.

10      Q.   Yeah, deferred tax and depreciation.  I'm sorry.  Tax

11  depreciation.  Got the words about backwards, as described in

12  paragraph 14.  You're understanding that those are substitute

13  for certain modules provided by PowerTax, right?

14      A.   Generally, yes.

15      Q.   But that Copilot and Nova are (unintelligible),

16  correct?

17      A.   That might be fair.  I know they each address certain

18  issues.  Whether how neatly those pieces fit into the overall

19  puzzle that I couldn't offer an opinion on.

20      Q.   You mentioned customer Liberty before.  And Liberty

21  terminated a consulting agreement with Lucasys, correct?

22      A.   Yes.

23      Q.   And do you know who performed those consulting

24  services for Liberty?

25      A.   I do not.



1    Q.    Do you know of any other customer that terminated

2    consulting services with Lucasys, due to PowerPlan's alleged

3    behavior?

4    A.    I believe part of the services canceled by NextEra or

5    Florida Power & Light also included -- I think one was Copilot

6    that was also including consulting services that were later

7    done by PowerPlan.

8    Q.    Okay.  So Liberty and FPL are the two examples that

9    you're aware of of customers that terminated consulting

10   services with Lucasys allegedly based upon PowerPlan's conduct,

11   correct?

12   A.    Those are two specific examples I'm aware of, yes.

13   Q.    So you're not aware of any others, right?

14   A.    That went from actual contracts, canceled, It's just

15   those two that I'm aware of.  I know AEP and Suez had

16   consulting services as well, that were restructured rather than

17   canceled.

18   Q.    Mr. Olsen, what is your definition of the win rate as

19   portrayed in your report?

20   A.    It's the ratio of the number of customers converted

21   by Lucasys compared to the number of opportunities generally

22   available in any given year.

23   Q.    And again, make sure I get this right.  The

24   denominator for the win rate is the opportunity shown in

25   Schedule 13 for 2019?



1      A.    For the baseline rate, yes.

2      Q.    Yeah.  And the numerator is the assumed lost sales

3   shown in schedule 10 for 2019?

4      A.    Yeah.  The number of customers indicated in 2019 on

5   schedule 10, category by category.

6      Q.    And it's just three customers AEP, Suez, and FPL,

7   correct?

8      A.    For software?

9      Q.    I'm sorry.

10     A.    Yes.

11     Q.    You got me, 100 percent.  I need to be more specific

12   for software.  Thank you, sir.  Because I was thinking

13   software, and I didn't make the differentiation.  For software

14   only, it's just the three customers AEP, Suez, and FPL.  And

15   then you can look at Schedule 10.  Let's make sure we're all on

16   the same page.  Footnotes schedule 10.

17     A.    That is correct.

18     Q.    And then, I mean, to be fair, for consulting

19   customers, it's not any assumption, it's the actual customers?

20     A.    Right.

21     Q.    Yeah.  Okay, so make sure again, that's the numerator

22   and the denominator is the information you've got on Schedule

23   13 that you pulled from the Salesforce, right?

24     A.    Yes.

25     Q.    And the three customers in the numerator, AEP, Suez,

1    and FPL, only AEP is also shown on Schedule 13, correct?

2          A.   Of those three, yes.

3          Q.   Okay.  Let's talk a little bit about how -- let's

4    talk a little bit about how you compiled Schedule 13, okay?

5          A.   Sure.

6          Q.   And I'm not going to bring it up because it's an

7    unwieldy document, but I will give you a -- hopefully, I'll

8    give you a Bate stamp number.  Well, you've got it on there.

9    You took as the source, since footnote 1 on Schedule 13.  A

10   PowerPlan document.  And it's PowerPlan 01945177, correct?

11         A.   Yes.

12         Q.   That's a (unintelligible) spreadsheet, right?

13         A.   Yes.

14         Q.   And what is your understanding of what that

15   spreadsheet entails?  What does it show?

16         A.   My understanding is that it's an export from a

17   Salesforce database used by PowerPlan in the normal course of

18   business.

19         Q.   And did you interview anyone who compiled that

20   information?

21         A.   At PowerPlan?

22         Q.   I assume you agree with me that that information was

23   compiled only by PowerPlan, right?

24         A.   I do agree.

25         Q.   And did you interview anybody at PowerPlan to



1    understand how they compiled that data?

2        A.    No.    I reviewed deposition testimony of

3    representatives from PowerPlan who were knowledgeable about

4    that database.

5        Q.    And who are those witnesses?  Mr. Cry is one of them,

6    right?

7        A.    One of them.  But there's also another lady that her

8    name escapes me.

9            MR. MAYES:  It was either Jennifer Butts or Allison

10   McGuffy.

11           MR. FRIEDMAN:  It's Allison McGuffy.

12           WITNESS:  That's the one.

13   BY MR. FRIEDMAN:  (Resuming)

14       Q.    Okay.  But Ms. McGuffy, she didn't actually input any

15   data into that, did she?

16       A.    I don't recall.  I believe she testified on how that

17   database was used by PowerPlan.

18       Q.    Okay.  And Mr. Cry (ph) was the vice president of

19   sales back in 2019, correct?

20       A.    I don't recall his title.

21       Q.    You have no reason to question the proposition that

22   Mr. Cry would have been the individual at PowerPlan during this

23   time period who is most familiar with those documents in the

24   Salesforce?

25       A.    I have no reason to disagree with that.



1    Q.    And you read Mr. Cry's deposition?

2    A.    I don't recall that I personally did, someone from my

3    staff probably did.

4    Q.    Are you aware of what PowerPlan describes as a phase

5    two opportunity in the Salesforce data?

6    A.    I am familiar with the phase two concept based off of

7    the Tyler report.

8    Q.    Okay.  He didn't go back and meet Mr. Cry's

9    deposition to see how he describes what a phase two opportunity

10   is?

11   A.    No, I accepted Tyler's definition of that phase two.

12   Q.    Other than those depositions, what did you do to

13   understand how PowerPlan compiles the data in the Salesforce

14   data?

15   A.    Other than the depositions, nothing.

16   Q.    Okay.

17   A.    I assumed the information was accurate and that was a

18   reasonable assumption based on that, PowerPlan uses the

19   database to conduct its business.

20   Q.    And so how did you pick from the Salesforce database

21   this document that's referenced in footnote 1, how did you pick

22   for 2019 these 20 customers?

23   A.    Well, these are every customer identified by

24   PowerPlan as having either an opportunity for PowerTax --

25   deferred tax, or PowerTax depreciation within the year of 2019.



1      Q.   What do you mean when you say "An opportunity for

2   deferred tax or depreciation"?  The licensing of new software,

3   Is that what you mean by that?

4      A.   What I mean is that within the Salesforce database,

5   the PowerPlan is identifying which products are the perceived

6   opportunity for the customer.  And PowerPlan specifically

7   listed whether PowerTax depreciation or PowerTax deferred tax

8   was one of the products that could be sold to that customer.

9      Q.   Okay.  So your understanding is that these 20

10  customers are customers who have been designated by PowerPlan

11  in 2019 as customers that either tax depreciation or deferred

12  tax products could be sold to in that year?

13     A.   According to their database, yes.

14     Q.   But that's your understanding of what you pulled out,

15  right?

16     A.   Yes.

17     Q.   Okay.  And so what did you do to test that?  What did

18  you do to test that assumption that the customers that you were

19  pulling out were actually customers that PowerPlan believed

20  were an opportunity to purchase depreciation or deferred tax,

21  products in 2019?

22     A.   I assumed the document was accurate.  I didn't see a

23  need to test it.

24     Q.   Okay.  So the document doesn't say that these are

25  customers that the sale or licensing of software is an



1   opportunity in 2019, does it?  Does it actually say that?

2       A.   I'd have to see the document to be sure.  But my

3   understanding of it, is PowerPlan is identifying different

4   customers to which it could sell its products and included,

5   product by product, which products it thinks it could sell.

6   And I'm just simply summarizing that.

7       Q.   Okay.  So for instance, if a particular customer that

8   you have on Schedule 13 has a reference in the Salesforce data

9   to a PPE uplift for one of these products.  Do you consider

10  that to be an opportunity to sell new software to that

11  customer?

12      A.   Only if PowerPlan included as a product PowerTax --

13  deferred tax or PowerTax depreciation.

14      Q.   Got you.  So if there's a reference to one of those

15  two products, even if it doesn't say it's a sale of a new

16  software, you put it in that schedule?

17      A.   Correct.

18      Q.   Okay.  And so, again, do you know what a PPE uplift

19  is in the Salesforce data?  What that's a reference to?

20      A.   Specifically, no.  There is a number of products

21  beyond just deferred tax and depreciation listed for these

22  customers.

23      Q.   So what if it's a PPE uplift for depreciation

24  software?  You took that to be a reference of a new sale of

25  depreciation software, right?



1        A.    I didn't necessarily consider that a new sale.    I

2    considered that an opportunity for that customer is interested

3    in that software product.

4        Q.    So if a customer is interested in a software product,

5    even if it's -- strike that.    If a customer is interested in a

6    software product because it wanted -- we don't need to --

7    that's fine.    Okay.    Strike that.    We'll go on.    How about a

8    standard maintenance renewal for depreciation tax software?    Is

9    that an opportunity in your mind?

10        A.    Potentially.    So, again, I'm just summarizing,

11    anytime that PowerPlan saw an opportunity related to those two

12    software products.

13        Q.    Got you.    Even if it's not related to the purchase of

14    new software, correct?

15        A.    The purchase of new software is not a prerequisite

16    for my consideration of the opportunities.

17        Q.    Got you.    So an opportunity for a standard

18    maintenance renewal, to you, that's an opportunity to sell new

19    software?

20        A.    That could be.

21        Q.    Okay.    And what did you do to test that assumption?

22        A.    That -- again, the document speaks for itself.    I saw

23    no need to test beyond assuming the document was accurate.

24        Q.    No, that's not my question, sir.    You're avoiding the

25    question.    Let me ask it again.    If there's an entry in the



1   Salesforce database for deferred tax product.  And the entry is

2   standard maintenance renewal.  You took that to be a software

3   opportunity that includes depreciation on tax deferred

4   products, right?

5        A.   That would be included as an opportunity in my

6   analysis, yes.

7        Q.   Okay.  And the purpose of schedule 13, is customers

8   that there's an opportunity to sell new tax depreciation or

9   deferred tax products to, correct?

10       A.   Yes.

11       Q.   Lucasys wasn't selling standard maintenance renewal

12   for PowerTax, was it?

13       A.   Lucasys was not, no.

14       Q.   No, they're selling new tax software as listed in

15   paragraph 14 of your report, right?

16       A.   Paragraph 14 does list the four different software

17   products that I'm concerned that would be sold by Lucasys.

18       Q.   That's right.  And so you took the Salesforce

19   database, and anytime there's a mention of depreciation or

20   deferred tax products in a line in that database, you took it

21   to be an opportunity for Lucasys to sell new product to,

22   correct?

23       A.   Yes.

24       Q.   And that's true even if the opportunity mentions one

25   of those softwares, but it has nothing to do with the purchase



```
 1   of new software, correct?
 2       A.   Correct.  It could be a renewal.
 3       Q.   Yeah.  You didn't test well, not just a renewal
 4   software renewal, just maintenance agreement for the software.
 5   You didn't do anything to test whether or not the reference to
 6   one of these products in the Salesforce database was an
 7   opportunity that PowerPlan saw to sell any new tax software,
 8   correct?
 9       A.   Correct.  I didn't see the reason to test that.
10       Q.   You don't think that would be important to
11   determining whether or not it truly is an opportunity that
12   includes depreciation or deferred tax products?  An opportunity
13   for Lucasys we're talking about, right?
14       A.   Correct.
15       Q.   Great.  What about a reference in the Salesforce
16   database to a customer who is divesting itself of assets and
17   needs consulting services to separate the data in its deferred
18   tax or depreciation software?  Is that an opportunity for
19   Lucasys to sell new software to?
20       A.   If the customer needed consulting services.  My
21   understanding is that would show up in the database as a PS
22   PowerTax product and I would have included it as a consulting
23   opportunity.
24       Q.   You're able to determine on the Salesforce database
25   from reading the lines whether it's consulting or new software?
```



1      A.    Whether it's a software or consultant, yes.

2      Q.    So if I told you, assume that there is a line that

3   one of your customers in one of your schedules was divesting

4   assets and needed consulting services to do so for either

5   deferred tax or tax depreciation, but is in the schedule, would

6   that be a mistake?  Shouldn't be in the schedule then?

7            MR. MAYES:  Objection.  Lack of foundation.  If you

8   understand, you can answer.

9            WITNESS:  As I understand it, if the customer need

10  consulting opportunities, then PowerPlan would have identified

11  it as such and I would have included it as such.

12  BY MR. FRIEDMAN:  (Resuming)

13     Q.    Okay.  And so if there's a line that -- I'm not going

14  to pull up the whole thing.  But one of your customers in

15  schedule for Schedule 15 is Dominion.  And if there's a line in

16  that entry that says "Dominion approach PowerPlan to provide

17  services to SWG at no cost".  And the services relate to either

18  depreciation deferred tax, should that have been included in

19  Schedule 15?

20     A.    If PowerPlan identified it as a software opportunity,

21  then yes.

22     Q.    How did you determine that it's a software

23  opportunity that's being identified by PowerPlan?

24            MR. MAYES:  Objection.  Asked and answered.

25            WITNESS:  The way it was identified in the database



```
1    to be a software opportunity versus a consulting opportunity

2    was the designation of PS before PowerTax, which I understood

3    PS to stand for Professional Services.

4    BY MR. FRIEDMAN:  (Resuming)

5        Q.   Okay.  But you did nothing to test of any one of

6    these -- your interpretation of any one of these customers

7    listed on your schedules, in fact, was thought of by PowerPlan

8    as an opportunity to sell software either depreciation or

9    deferred tax software to that customer, did you?

10           MR. MAYES:  Objection.  Mischaracterizes testimony.

11   You can answer if you understand.

12           WITNESS:  No.  I didn't see that a reason to do so.

13   BY MR. FRIEDMAN:  (Resuming)

14       Q.   Okay.  You'd agree with me that the individuals at

15   PowerPlan that inputted the data would know better than anyone

16   else as to whether or not they were referring to an opportunity

17   to sell new software, correct?

18       A.   That might be accurate.  That's not necessarily how I

19   used it, but okay.

20       Q.   Well, it's not necessarily how you used it.  Let's

21   back up then.  Because my understanding is, and we went over

22   this, that you compiled schedule 13, 14, 15, and 16 with the

23   understanding, based upon your review of the Salesforce data,

24   that the customers listed were thought of by PowerPlan as

25   opportunities to sell new software -- depreciation deferred tax
```



1    software products in that year.

2          MR. MAYES:  Objection.  Mischaracterizes his

3    testimony.

4          WITNESS:  No.

5    BY MR. FRIEDMAN:  (Resuming)

6      Q.    Explain to me what I just said that's not correct?

7      A.    I haven't assumed that these are opportunities for

8    PowerPlan to sell new software.

9      Q.    What is your assumption then?

10     A.    My assumption is these are customers that are

11   interested in the two specific software products that Lucasys

12   is selling.

13     Q.    So they have some level of interest.  You don't know

14   what that level is though, do you?

15     A.    That PowerPlan knows the level of that interest.

16   PowerPlan identified these opportunities, not me.

17     Q.    Right, so you don't know.  You just assume that then,

18   right?  That's an assumption of your model, isn't it?  What you

19   just said.

20     A.    I'm assuming their Salesforce database is accurate.

21   I've used it in a way I've explained.  And I know PowerPlan

22   uses it in the normal course of business, therefore I felt it

23   was reasonable to use.

24     Q.    Do you know if any of the customers listed in these

25   schedules actually purchased software from PowerPlan, in the



1    years in question?

2         A.   I believe the Salesforce database does have some

3    indication of follow up on these opportunities.  I'd have to go

4    back and look to see to what extent.

5         Q.   Would it affect your opinion at all if fewer than 5

6    percent of the customers listed in your schedules actually

7    purchase software from anybody in these time periods?

8         A.   No.

9         Q.   Why not?

10        A.   I don't see how it would.

11        Q.   Well, doesn't that tell you that they weren't really

12   opportunities for the purchase of new software if they didn't

13   buy it from anybody?  Isn't that logical, sir?

14        A.   No.

15        Q.   Explain to me why -- what's the fallacy of that -- my

16   last statement?

17        A.   A number of things.  One, most of these customers had

18   already purchased many of these software products.  Two, there

19   is no other available software product on the market.  So it's

20   not as if they weren't purchasing from PowerPlan, they had some

21   other option.  There were no other options.

22        Q.   So your assumption is that if there's some mention in

23   the Salesforce data about these customers, then they were

24   opportunities for Lucasys to sell and replace PowerPlan.  Is

25   that the assumption?



1      A.    For certain aspects of PowerTax that modules were

2   discussing and the other software products that Lucasys offers,

3   yes.

4      Q.    Okay.  And you did nothing to verify whether any of

5   these customers, in fact, were interested in purchasing new

6   software?

7      A.    Well, I know many of the customers were dissatisfied

8   with PowerPlan's software according to the Stack's report.

9      Q.    Did you compare a single one of these customers to a

10   comment on the Stack's report?

11     A.    No, I didn't see a reason to do so.

12     Q.    You don't know of a single customer listed on one of

13   your schedules that there is an entry in any of the Stack's

14   reports, do you?

15     A.    Can I get that question again?

16     Q.    You cannot identify a single customer listed on

17   Schedule 13, 14, 15, or 16 that had a negative comment about

18   PowerTax or tax depreciation in the Stack's report, can you?

19     A.    A specific customer, no.  But the fact that there's

20   only so many of these customers in the IOU market and the fact

21   that many of them were identified by Stack's as being

22   dissatisfied, it's reasonable to assume that some of those

23   were.

24     Q.    Can you even refer to a single entry in the Stack's

25   reports that specifically relates to these two products as



1    opposed to PowerPlan's overall suite of services and tax

2    software?  You can't, can you?

3         A.    I just mentioned that I am unable to go through any

4    specific customer, but logically they must be.

5         Q.    The Stack's report will speak for itself.  So we can

6    look at that and see if there's any specific reference.  Okay.

7    If I go back to Schedule 13, there's a column for whether or

8    not the customer received a letter.  Do you see that?

9         A.    I do.

10        Q.    Okay.  Now, for the 2019 analysis, is it your

11   testimony that the customers where there's a yes in that column

12   received a letter from PowerPlan in 2019?

13        A.    In 2019?  No, that's not (unintelligible) .

14        Q.    What is that reference then?  What is that a

15   reference to then?  Why is this column in 2019 schedule?

16        A.    Because at some point they received a letter.  I'm

17   not giving an opinion that they received a letter in 2019.

18        Q.    Okay.  I'll tell you.  The letters went out in 2020?

19        A.    Correct.

20        Q.    And so some of these customers are identified as

21   having received a letter from PowerPlan and some as not having

22   received a letter from PowerPlan, right?

23        A.    Yes.

24        Q.    And it's about 25 percent in Schedule 13 and 58

25   percent in Schedule 14 and 48 percent in Schedule 15.  And my



1  eyes aren't so good.  I think it's 48 percent in Schedule 16.

2  But the print is small --

3       A.    Right.

4       Q.    Is that accurate?

5       A.    Looks like it.

6       Q.    So basically half give or take, right?

7       A.    Right.

8       Q.    And so for the customers that did not receive a

9  letter, do you know whether or not those customers even knew

10  about PowerPlan's allegations that Lucasys -- sorry, strike

11  that.  For the entities that did not receive a letter, do you

12  have any evidence that they even knew about any controversy

13  between PowerPlan and Lucasys?

14       A.    My understanding is the market is very small.  These

15  companies talked to each other, and even companies that did not

16  receive a letter were aware of the issues between PowerPlan and

17  Lucasys.

18       Q.    And that's another assumption on your part, right?

19       A.    That's my understanding based off conversations with

20  Mr. Lantukh.

21       Q.    Okay.  Just Mr. Lantukh.  There's no other source for

22  that, correct?

23       A.    I'm trying to recall.  I believe there's testimony in

24  the record on that as well.  Deposition testimony.

25       Q.    You're not aware of a statement in the record from



1    any of these customers other than AEP in the case of Schedule

2    13, regarding their knowledge of any controversy between

3    PowerPlan and Lucasys, correct?

4        A.    Any statements from customers other than AEP?

5        Q.    Yeah.

6        A.    I'm not aware of any specific statements.

7        Q.    And again, you assumed that all of these customers

8    had knowledge of the controversy between Lucasys and PowerPlan.

9    And you also assume that none of them purchased software from

10   Lucasys because of PowerPlan's conduct, correct?

11            MR. MAYES:  Objection.  Compound.

12            WITNESS:  I'm assuming that the dispute between

13   PowerPlan and Lucasys is generally known in the industry.

14   BY MR. FRIEDMAN:  (Resuming)

15       Q.    And you also are assuming that some percentage of

16   these customers, I understand, supplied by the win rate, not an

17   individual customer.  But some percentage of these customers

18   did not do business with Lucasys because of the alleged conduct

19   of PowerPlan, correct?

20       A.    Correct.  That's my model.

21       Q.    Yeah.  That's an assumption of the model.  Yeah.

22   Now, for Copilot and Nova, there's nothing in the Salesforce

23   data about those products, right?

24       A.    Correct.

25       Q.    And so another assumption of your model is that the



1    customers on Schedules 13, 14, 15,16 would have purchased that

2    product from Lucasys at the same rate at which they purchased

3    the other two products?

4         A.    Not exactly.

5         Q.    I'm not sure I got that.  Explain that to me, please.

6    Yeah.

7         A.    So the win rates for Nova and Copilot are calculated

8    as a derivative of the win rates for deferred tax and

9    depreciation.

10        Q.    Got you.  So the denominator is the same, but the

11   numerator is different?

12        A.    Both are different.

13        Q.    How's the denominator different?  Didn't you just

14   take the same schedule -- the same customers off the schedule?

15        A.    That's the denominator for deferred tax and for

16   depreciation.  The denominator then becomes the number of

17   instances of deferred tax and depreciation in 2019, and the

18   numerator becomes the number of instances of Copilot and Nova.

19        Q.    So the numerator is different.  But I missed -- why

20   is the denominator different between the win rates for the

21   deferred and depreciation on one hand, and the Nova and the

22   Copilot on the other hand?

23        A.    Because what I'm assuming is that the Lucasys is

24   experienced with selling Nova and Copilot to customers that

25   were also buying either deferred tax or depreciation or both



1    would be the same going forward.  And so, for example, if we

2    just use an example, Nova, there was one instance of Nova in

3    2019, and --

4         Q.   And that's Suez, right?

5         A.   That's Suez.  And combined, there were, I believe,

6    three instances of deferred tax and depreciation total.  And so

7    the win rates then calculated, one divided by three going

8    forward.  And so I look at 2020, I'm forecasting two customers

9    for deferred tax and one customer for depreciation, which

10   happens to be the same as 2019.  And I forecast one instance of

11   Nova based on the same ratio of Nova to deferred tax and

12   depreciation in 2019.

13        Q.   Got it.  So it does follow the same potential

14   customers, but the success rate is lower because it's based

15   upon the success rate of the combined products?

16        A.   Well, actually, the success rate looks like it's

17   higher because it's one divided by three, which is 33 percent,

18   but I think you got I got it the gist of it.

19        Q.   So that's another assumption of the model, right?

20        A.   That Nova and Copilot would be sold to the same

21   customers as deferred, tax and depreciation, yes.

22        Q.   Yeah.  You didn't interview any customers to ask them

23   about their purchasing preferences and the combination or

24   anything like that?  That's an assumption that based upon what

25   Mr. Lantukh has told you.



1      A.    Well, not just what he told me, but based on what --

2   based on the proposal history of the company.

3      Q.    Okay.  So those are the proposals back in 2019.  But

4   those weren't actual sales of Copilot or Nova, right?  Those

5   are just proposals, right?  We talked about that before.

6      A.    Those were based off the proposals after Lucasys had

7   entered into agreements with these companies, yes.

8      Q.    Yeah, but the agreements were not specifically for

9   the sale of Copilot or Nova.  They were services agreements

10   that could lead to the sale of those products, right.  Is that

11   my understanding, correct for 2019?

12      A.    My understanding at the time they entered the master

13   services agreements with Suez and AEP, for example, that they

14   were certainly contemplating the sale of all those products,

15   yes.

16      Q.    But again, contemplating is not closing a sale,

17   right?  When you use the word "contemplating", you don't mean

18   to actually close the sale for that license?

19      A.    I would say the sale was in process.

20      Q.    And that's based upon Mr. Lantukh's testimony?  It's

21   not based upon the depositions, right?  Of the customers?

22      A.    It's based off the entire record.

23           MR. FRIEDMAN:  Actually, I want to take another

24   break.

25   (Brief break taken.)



```
 1    BY MR. FRIEDMAN:  (Resuming)

 2        Q.   Mr. Olsen, we had earlier talked about the idea of

 3    the phase two opportunity, remember that?

 4        A.   I recall.

 5        Q.   And I don't think I asked you, had you heard of that

 6    phrase before you wrote your report?  Was that just something

 7    you identified when you read Mr. Tyler's report?

 8        A.   I don't think I had heard of it until I saw the Tyler

 9    report.

10        Q.   Okay.  Did you make any adjustments to your win rate

11    based upon the number of products that a particular customer

12    might have been interested in any given year?

13        A.   No.

14        Q.   Because on the Salesforce data, as a customer,

15    there's often a list of a lot of different products, right?

16        A.   Correct.

17        Q.   And so if a customer do you look see if a customer

18    might have been interested in both the deferred and the

19    depreciation products, did they get double listed or is that

20    just a single entry?

21        A.   That would just be a single entry on my schedules.

22        Q.   Okay.  And you understand that some of those

23    opportunities rolled over from year to year, correct?

24        A.   I did see some of the same companies in more than one

25    year, yes.
```



1      Q.    Okay.  Did you do anything to account for that as

2    part of your analysis?

3      A.    No, those just go into the total pool of potential

4    opportunities year by year.

5      Q.    We can agree, though, if Lucasys had sold software to

6    a particular customer on a schedule in 2021, that same customer

7    would not have been an opportunity in 2022, right?  For that

8    product?

9      A.    Yes, for that product.

10     Q.    But you didn't do anything to account for that as

11   part of your analysis?

12     A.    No.  I'm not forecasting any specific customer sale.

13   It's a much more general approach.

14     Q.    Well, it may not be a specific customer, but it is a

15   subset.  You are projecting a subset of the customers listed on

16   the schedule would have purchased software from Lucasys,

17   correct?

18     A.    Yes, but not necessarily those customers.  These are

19   serving as a proxy for the number of opportunities that might

20   be available to Lucasys.

21     Q.    Got you.  So this is just a proxy for you to assume

22   what the overall market could have been?

23     A.    It was the best available evidence that I found for

24   an estimate of how many customers might be interested in those

25   types of products in any given year.



1    Q.   Okay.  And I may have asked this already, but what

2  did you do to test that assumption?

3    A.   Other than looking at how PowerPlan used the

4  Salesforce database in the normal course of business, according

5  to the deposition testimony.  I also looked at the number of

6  relationships Lucasys had with the IOUs in the industry.  And I

7  looked at the past relationships that some of the key members

8  of Lucasys had with these types of customers and no significant

9  overlap.

10   Q.   Right.  And all those relationships were

11  relationships for consulting services, right.

12   A.   From the --

13   Q.   Previous -- I'm sorry.  That was a bad question

14  because I assumed that we were still talking about what your

15  answer was.  Let me restate the question.  The relationships

16  you refer to that Lucasys had with customers, those were

17  relationships through providing consulting services, right?

18   A.   Not necessarily.  Because some of those relationships

19  likely stem from past work that members of Lucasys performed

20  while at PowerPlan.

21   Q.   And they were performing consulting services for

22  those customers while at PowerPlan, right?

23   A.   Partially, yes.  I know they also worked on -- at

24  PowerPlan on customers who were software customers.

25   Q.   Are you aware of any employee of Lucasys that was in



1    sales while at PowerPlan at any time?

2        A.    I don't recall specifically.

3        Q.    Okay.  So you have no reason to disagree with my

4    statement that all of the employees of Lucasys that worked at

5    PowerPlan were on the consulting services side not on the sales

6    side, correct?

7        A.    I don't have a specific reason to disagree with you.

8        Q.    Okay.  Did you investigate how PowerPlan tracks its

9    win rate based upon Salesforce data?

10       A.    No, I didn't track PowerPlan's win rate.

11       Q.    In fact, they don't -- I'll say -- do you have any

12   evidence that they calculate such a win rate based upon their

13   Salesforce data?

14       A.    I would actually be surprised if they did, because

15   that's more of a damages concept than a normal operating

16   concept.

17       Q.    Do you even know -- let's strike that.  Other than

18   the deposition testimony that we mentioned earlier of the

19   PowerPlan's employees.  You have no other knowledge about how.

20   PowerPlan uses the Salesforce data, correct?

21       A.    Outside of their deposition testimony, yeah, I would

22   have no basis other than the deposition testimony.

23       Q.    Lucasys' employees had no input into that, right?

24       A.    Not that I'm aware of.

25       Q.    And you didn't see any documents in the record



 1   describing how the Salesforce data is used, just the deposition

 2   testimony, right?

 3        A.   No documents other than the data itself?

 4        Q.   Yeah.  And the data itself doesn't describe how it's

 5   used, correct?  The database itself doesn't describe how

 6   PowerPlan uses it, correct?

 7        A.   No, it just describes the contents of the data

 8   itself.

 9        Q.   Yeah.  Although there is an anecdotal line in there,

10   right?  Not line, column.  There's an anecdotal column in the

11   data that whoever put inputs, the salesperson inputs some

12   narrative about what they're thinking, right?

13        A.   I recall seeing a notes column.

14        Q.   Yeah, I think it's column AM.  Just not that I'm not

15   going to test you on that.

16        A.   I'm not going to remember that.

17        Q.   But there was some narrative.  It wasn't just single

18   sentences filling in, I mean, single words filling in columns,

19   right?

20        A.   There was narrative, yes.

21        Q.   Did you review that narrative for the customers that

22   are listed on the schedules?

23        A.   I skimmed through some of that.  Whether I looked at

24   narratives for the specific customers on my schedules, I don't

25   recall.



1       Q.   Okay.  Now you also assumed -- made certain

2    assumptions that the customers that Lucasys would have sold

3    software to would be a mix of small, medium, and large

4    customers, right?

5       A.   Correct.

6       Q.   And to do this, you also use the data from the

7    Salesforce database, correct?

8       A.   Only in part because, as far as their names go, yes.

9       Q.   And then you also use the size of the customer,

10    though, from the names in the Salesforce data, right?

11       A.   Well, the Salesforce data did not indicate the size

12    of the customer.  I looked up external sources.

13       Q.   Exactly.  So you got the names from the Salesforce

14    data and then external sources you use to categorize them in

15    one of those three categories?

16       A.   Correct.

17       Q.   Did you do any investigation as to whether the mix of

18    customers that you were analyzing was similar to the mix that

19    PowerPlan actually sells to?

20       A.   No.

21       Q.   Did you, as part of your analysis, look at whether a

22    company was a subsidiary or a parent?

23       A.   That was necessary to determine the overall size.

24    Because I think we discussed this a little bit earlier that

25    PowerPlan might list a subsidiary, that we had to go then and



1    look up the parent company to determine how large.

2        Q.    Yeah.  So the Salesforce data may have a name and it

3    may not exactly be the parent or the subsidiary, and you have

4    to then figure that who the actual customer is for purposes of

5    the size?

6        A.    Correct.  It took some matching.

7        Q.    Yeah.  And you did that as part of your analysis,

8    right?

9        A.    Yes.

10       Q.    You also have certain growth assumptions in your

11   model, right?

12       A.    Yes.

13       Q.    And those growth assumptions were based upon

14   interviews with Mr. Lantukh?

15       A.    In part.

16       Q.    What else?

17       A.    His deposition, testimony, as well as some early

18   company forecasts.

19       Q.    You didn't do any analysis of software markets in

20   general for that, though, did you?

21       A.    Software markets in general, no, just the IOU market

22   at issue here.

23       Q.    The IOU market issue.  You did an analysis of the

24   market for enterprise software to be sold to IOUs?

25       A.    I didn't do an analysis.  I looked at the history of



1    the market and how PowerPlan took over for -- I'm forgetting

2    the name of the company that was around before PowerPlan and

3    how PowerPlan's software was adopted in the '90s.

4         Q.   Did you look at growth rates for revenue for

5    PowerPlan?

6         A.   Only generally, I looked at the history of -- based

7    on publicly available financial statements.

8         Q.   Okay.  You didn't do an analysis of actual growth of

9    revenue for these -- well, two of the four products is only

10   deferred tax and tax depreciation are offered by PowerPlan,

11   right?  You didn't do an analysis of their growth rates for

12   those two products as part of your report?

13        A.   Correct.  PowerPlan doesn't sell those products.

14        Q.   No.  You didn't do an analysis of the two products of

15   the growth rates of the two products that PowerPlan, in fact,

16   sells deferred tax and tax depreciation as part of your

17   analysis of the growth rate fors Lucasys, correct?

18        A.   Specifically those who products.  Correct.

19        Q.   Okay.  And you didn't do an analysis of anticipated

20   growth rates for PowerPlan on the consulting side in your

21   analysis of the potential growth rates for Lucasys on the

22   consulting side, correct?

23        A.   Specific to consulting.  Correct.

24        Q.   You didn't do analysis of PowerPlan's business

25   anticipated growth rates at all, correct?



1    A.    What period are you talking about?

2    Q.    For your analysis of the growth rates in your report?

3    A.    Not other than what we've already discussed.

4    Correct.

5    Q.    I know I went through this with you before, but I was

6    a little confused.  The example of, we used AEP where your

7    model assumes that they would have become a customer for

8    Copilot in 2019.  And I think we established that they in fact

9    have recently become a customer for Copilot, right?  We talked

10   about that earlier?

11   A.    Yes.

12   Q.    And follow up, so if AEP were to become a customer

13   for one of these software products now, then wouldn't that

14   affect your model?

15   A.    In that unlikely scenario, that would be something I

16   would need to consider because I include forecasts of future

17   Lucasys' actual revenue to subtract from the But-For revenue

18   and the actual revenue -- forecasted, actual revenue for 2023

19   would include Copilot.

20   Q.    Well, what about deferred tax?  Why do you say that

21   that would be unexpected?  Because AEP is a current customer,

22   right?  Of Lucasys.

23   A.    Right, but they've already made the decision to spend

24   a significant amount of money on renewing the PowerTax

25   solution.  So they're not currently in the market for deferred



1    tax and depreciation.

2         Q.    That's the point I was going to say I got.  So that's

3    why you don't anticipate AEP becoming a customer for deferred

4    tax or tax depreciation, right?

5         A.    Correct.

6         Q.    And you have no opinion on whether or not another

7    customer may or may not become a customer of Lucasys in the

8    future after this lawsuit is over, right?

9         A.    Certainly not in the near term.  I don't understand

10   there's any potential deferred tax or depreciation customers in

11   the works at the moment.

12        Q.    But you project license fees out for ten years,

13   right?

14        A.    The license fee component, yes.

15        Q.    And so if a customer were to become a licensee of

16   Lucasys in 2025, that could affect your damage model, right?

17        A.    It shouldn't, no.

18        Q.    Well, there's no revenue component being taken out of

19   your model for license fees starting in 2025, is there?

20        A.    There's no actual revenue being subtracted.  Correct.

21        Q.    Okay.  And so if an opportunity became a licensee in

22   2025, wouldn't that affect the damage model?

23        A.    No.

24        Q.    Why not?

25        A.    Because the only revenues being forecasted beyond

1    2024 are license fee revenues of existing customers.

2         Q.   But the same customer could purchase product in 2025

3    that could have purchased the product in 2022 or 2021, right?

4    It would just be a delayed purchase.

5         A.   Again, unlikely, because once that opportunity is

6    lost, the customer is unlikely to go and reconsider a new

7    software package once it already has made a decision on its tax

8    software for quite some time.

9         Q.   Well, all of these customers have had PowerTax for

10   quite some time, correct?

11        A.   Yeah, 90 percent of the market, yes.

12        Q.   There's no new entries that you know of, are there?

13        A.   No.

14        Q.   Whether it's 2019 or 2025, customer has to convince

15   Lucasys to switch from PowerTax to Lucasys, correct?

16        A.   Correct.

17        Q.   Now, when does your model assume that the

18   anticompetitive conduct by PowerPlan ceases?

19        A.   I don't have an assumption on that conduct ceasing.

20        Q.   Okay.  So you didn't conduct any scenarios where the

21   anticompetitive conduct ceased in 2020, for instance?

22        A.   No.  I understand the conduct has been ongoing.

23        Q.   Okay.  And the same you have a scenario in which the

24   anticompetitive conduct ceases in 2023?

25        A.   Well, not other than the conclusion of the



1   anticipated trial in 2023.

2        Q.   Okay.  Why is that relevant for the damage model?

3        A.   That's relevant because, as I believe I mentioned in

4   the report, once the trial happens, if there's a decision at

5   the trial, then the market has the opportunity to be educated

6   on the outcome of the trial, and Lucasys presumably could move

7   forward at that point.

8        Q.   Okay.  There's no counterclaim pending now, you

9   understand that, right?

10       A.   Correct.

11       Q.   And are you aware of any letters that have been sent

12  by PowerPlan to any customer since 2020?

13       A.   I'm not aware of any specific letters beyond 2020,

14  no.

15       Q.   Okay.  For Lucasys' pricing, you primarily relied

16  upon Mr. Lantukh's interview?

17       A.   No.

18       Q.   What did you do for pricing?

19       A.   I looked at numerous documents in the record

20  regarding pricing.

21       Q.   Okay.  Can you give me a specific?

22       A.   We had been talking about -- well, yeah, I can give

23  you a specific, Olsen Exhibit 6, Olsen Exhibit 5 would be two

24  of them.

25       Q.   Those don't have actual pricing for software



1    licenses, do they?

2         A.   Yes.

3         Q.   Help me out.  Exhibit 6, where do you see a price for

4    software licensing?

5

6

7

8         Q.   I'm sorry, I'm on 6.  You're on 5.

9         A.   I'm sorry.

10        Q.   No, that's my fault.  Let's just do 6 first because I

11   pulled that one out first.  Okay.  Let's look at 6.  This is

12   ⬛⬛⬛⬛⬛⬛⬛⬛, right?

13   (Defendant's Exhibit No. Olsen 6 marked and identified.)

14        A.   Right.

15        Q.   And where does this have any information on software

16   licensing?

17

18

19

20

21             MR. MAYES:  You have a different Exhibit 6 than the

22   one that I was handed.

23             MR. FRIEDMAN:  My mistake.  That I don't know how

24   that happened.  Let's get that figured out.

25             MR. MAYES:  That's what I have as Exhibit 6.  That's

1    what you have in front of you.  He has a change order.

2             MR. FRIEDMAN:  That's Viola?

3             MR. MAYES:  I don't see the customer listed.  I'm

4    looking for that.

5             MR. FRIEDMAN:  Let's go off the record for a few

6    minutes.  Let me get my documents right.  I'm sorry.

7    (Brief break taken.

8    BY MR. FRIEDMAN:  (Resuming)

9        Q.   I apologize for the mix up of the documents.  So let

10   me just get these straight for everybody, for the record, okay?

11   What is marked as Exhibit 5 is the document referenced at

12   footnote 36 of your report.

13            MR. MAYES:  What page is 36?

14            MR. FRIEDMAN:  On page eleven.  This is the ████████

15   order that we discussed briefly.

16   BY MR. FRIEDMAN:  (Resuming)

17       Q.   Is that right, Mr. Olsen?

18       A.   For Exhibit 5, yes.

19       Q.   Correct.  Okay.  And then Exhibit 6 is referenced in

20   schedule 10.  It is the Florida Power document in footnote 5

21   relating to Copilot.

22       A.   Okay.

23       Q.   Right?

24       A.   That makes more sense.

25       Q.   Yeah.  We went through these, and I didn't add that

1    when we were looking at those footnotes.  And then Exhibit 7,

2    we go back to footnote 37 on page 11.  It is the ████████

3    order email, correct?

4         A.    Correct.

5         Q.    And I asked you questions earlier today about

6    Exhibits 5 and 7.  And these were both emails from Mr. Lantukh

7    to customers, correct?

8         A.    They are.

9         Q.    And I asked you if you were aware of any responses

10   from the customers.  And are you aware of any responses from

11   either of the customers for the emails in Exhibit 5 and 7?

12        A.    Not that I recall.

13        Q.    Consistent with what you said before.  But make sure

14   our record is clear.

15        A.    That's good.

16        Q.    I did not ask you about Exhibit 6 earlier.  And

17   again, putting it back in context, this is something that's

18   referenced in schedule 10 under footnotes 5, right?

19        A.    Yes.

20        Q.    And we looked at the AEP and Suez documents, but we

21   didn't look at the FPL document in that footnote earlier,

22   correct?

23        A.    Correct.

24        Q.    And that's what this is a reference to?

25        A.    That's my understanding of the document.



1     Q.    Okay.  And the Copilot is not a recurring license

2  fee?

3     A.    Once installed, it likely would lead to that, yes.

4     Q.    Where is that in this document?

5     A.    It's not in the document.

6     Q.    This document just simply says it's a ███0 change

7  order for installation, right?

8     A.    That describes the implementation of Copilot.

9  There'd be other charges in the future likely had this moved

10  forward.

11     Q.    So likely.  What do you base that on?

12     A.    The evidence in the record.

13     Q.    You're aware of something in the record between

14  Florida Power & Light and Lucasys for a licensing fee for

15  Copilot?

16     A.    Not specifically for Florida Power & Light, but other

17  proposals I've seen for Copilot which do involve implementation

18  fees as well as license fees.

19     Q.    Okay.  We agree that Exhibit 6 at least has no

20  pricing for license fee for Copilot?

21     A.    Correct.

22     Q.    How about Exhibit 5?  The ███████ document.

23     A.    How about it?  It doesn't reference Copilot at all.

24     Q.    Well, how about any license fee for any product?

25     A.    Again, this is just referencing the implementation





1  fee.

2      Q.   Okay.  Thank you.  And the same with Exhibit 7, the

3  email from Mr. Lantukh to the representatives at ▮▮▮▮▮▮

4  ▮▮▮▮?

5      A.   Again, I was just discussing implementation fee.

6      Q.   Did you conduct any analysis to determine whether or

7  not the pricing in your model is reasonable?

8      A.   The pricing is in line with all the proposals and all

9  the documents I saw.  Which made me conclude it was reasonable.

10     Q.   Did you compare it to PowerTax fees?

11     A.   No, that would not be appropriate.

12     Q.   Okay.  Why would that not be appropriate?

13     A.   Because I'm not forecasting PowerTax's fees.  I'm

14  forecasting the Lucasys' products.

15     Q.   These products, the Lucasys' products in particular,

16  deferred tax and tax depreciation are substitutes for PowerTax

17  modules, correct?

18     A.   Correct.

19     Q.   Isn't it important to the customer, as part of the

20  decision making process, the price of their substitute?

21     A.   That might be important to the customer, but again,

22  I'm not forecasting PowerTax's products, I'm forecasting

23  Lucasys' products.

24     Q.   The reasonableness of Lucasys' prices depend on what

25  the customer is willing to pay, right?



1      A.    That could be a factor, yes.

2      Q.    Notice that you price both the deferred tax and the

3    tax depreciation products the same, correct?

4      A.    Well, I don't, Lucasys does.

5      Q.    And did you do any analysis of whether that was

6    appropriate?

7      A.    It was in line with their proposal, so yes.

8      Q.    Okay.  Are you aware of the fact that PowerPlan does

9    not price its modules -- deferred tax module and tax

10   depreciation module the same?

11     A.    I've heard that, yes.

12     Q.    We talked a little bit about the growth scenarios

13   earlier, right?

14     A.    Yes.

15     Q.    You have two scenarios of 20 percent and 30 percent

16   correct?

17     A.    Correct.

18     Q.    Did you choose those numbers?

19     A.    Yes.

20     Q.    And that was based upon discussions with Mr. Lantukh?

21     A.    And review of the deposition testimony and the

22   documents in the record, yes.

23     Q.    Okay.  You also -- paragraph 71, you've got

24   percentages of the market that you assume Lucasys would

25   achieve, correct?



1    A.    Correct.

2    Q.    And how did you calculate those numbers?

3    A.    Based on the total -- I believe it's the total

4  deferred tax sales divided by the IOU market.

5    Q.    And how did you determine what the number of -- is it

6  number of customers in IOU market?  Is that what we're talking

7  about?

8    A.    Yeah, I believe the denominator there was 131.

9    Q.    Right.  But it's not by value, it's just by number of

10  IOUs, right?

11    A.    By number, yes.

12    Q.    Okay.  So again, the assumption is that that

13  percentage of the market would switch from PowerTax to Lucasys'

14  products in the relevant time frame in your report, right?

15    A.    Yeah, there's a couple of different timeframes, but

16  yes.

17    Q.    Yeah.  And that that would have happened But-For

18  PowerPlan's alleged conduct, correct?

19    A.    According to the model I've come up with, yes.

20    Q.    Yeah.  And so you claim that the growth scenarios --

21  paragraph 73, I want to make sure we're on the same page.  The

22  growth scenario appears realistic and reasonable, right?

23    A.    In paragraph 73.  That's what it says, yes.

24    Q.    Do you have some expertise engaging the

25  dissatisfaction of customers with PowerPlan more than anyone



 1    else?

 2         A.   No.

 3         Q.   And do you have some expertise in determining whether

 4    the Lucasys team is qualified more than anybody else?

 5         A.   I've reviewed the background of the Lucasys' team,

 6    which they all have quite a few years of experience in this

 7    area.  The main players have an experience specifically with

 8    PowerPlan.

 9         Q.   My question is, do you have particular expertise to

10    judge that more than Josh does?

11         A.   Well --

12              MR. MAYES:  I'm very knowledgeable about many things,

13    Steve.

14              WITNESS:  I'm in no position to judge my expertise

15    versus Josh's expertise.

16    BY MR. FRIEDMAN:  (Resuming)

17         Q.   You don't consider yourself an expert in the

18    qualifications of the Lucasys' team, but that is tough, isn't

19    it?

20         A.   No, that's not an area I claim to be an expert in.

21         Q.   Okay.  And the same with the magnitude of the concern

22    exhibited by PowerPlan.  You're not an expert to determine

23    whether that's more meaningful than anyone else can, correct?

24         A.   No, I'm not considering myself an expert in that

25    area.



1        Q.    Okay.  And you're not an expert in determining

2    whether or not PowerPlan's actions in this case were dramatic

3    or not dramatic, correct?

4        A.    I certainly have no opinions on how dramatic

5    PowerPlan's conduct was.

6            MR. FRIEDMAN:  Okay.  Thank you.  Give me 10 minutes.

7    We're getting really close.  Let me organize some notes.  Okay,

8    let's go off the record.

9    (Brief break taken.)

10   BY MR. FRIEDMAN:  (Resuming)

11       Q.    Mr. Olsen, the customers on schedule 10 in the

12   footnotes, AEP, Suez, and Florida Power & Light, right?

13       A.    Well, with respect to the software customers, yes.

14       Q.    Yeah.  You understood that Lucasys' representatives

15   had existing relationships with these customers from when they

16   worked at PowerPlan, right?

17       A.    I don't specifically recall if that was only from

18   PowerPlan, because I know some of them worked like Vadim worked

19   at RCC, Mr. Chang worked at Deloitte.  I don't know if they had

20   connection with those same customers -- employers.

21       Q.    But they had existing relationships with those

22   customers from being in the business before Lucasys was found,

23   correct?

24       A.    That's my understanding.

25       Q.    Okay.  Do you do any analysis of whether Lucasys had



1   relationships with any of the other IOUs in the marketplace?

2       A.   I've seen lists of customers for which -- at least

3   the top three people at Lucasys had done business with in the

4   past as part of the AEP proposal.  There were dozens of

5   customers listed.

6       Q.   Dozens of customers listed that they had actually

7   done work for in the past or just that they had proposed

8   services to?

9       A.   If memory serves, that's dozens of customers that

10  they had experience with.

11      Q.   Okay.  Do you do any analysis of the depth of any

12  relationships that Lucasys had with IOUs other than the three

13  we just mentioned that are shown on schedule 10?

14      A.   Not beyond -- I understand there's deposition

15  testimony from Mr Lantukh saying they had deep relationships

16  with, I want to say, 40 to 50 of the IOUs.

17      Q.   Okay.  And you rely on his deposition for that and

18  there's no other source of information that you're aware of?

19      A.   That seems corroborated by the lists that were

20  attached to the AEP proposal for example.

21      Q.   Okay.  But the lists that were attached to AEP

22  proposal didn't go into any detail as to the depth of any

23  relationships, right?  Just was a list of entities.

24      A.   Correct.

25      Q.   Okay.  Let's talk just a few minutes about the



1    variable cost.  So based upon your projected number of

2    customers, Lucasys would have had to increase its staff, right?

3         A.   At some point, yes.

4         Q.   Okay.  And they would have to engage new technical

5    expertise to fulfill the obligations to those customers, right?

6         A.   Yes.  I mean, that could be by increasing its staff.

7         Q.   Well, particularly for consulting services, someone

8    has to be on site, right?

9         A.   Not just for consulting service, but the

10   implementation of the software too.

11        Q.   Yeah, implementation of the software, too.  And how

12   many employees were there of Lucasys?

13        A.   I know of at least five, and I think they're up to

14   seven.

15        Q.   And how many of them had the technical expertise to

16   implement software?

17        A.   As far as the technical side, I don't recall how many

18   of those had the technical.

19        Q.   Okay.  You didn't do any study of the availability of

20   additional talent or the costs associated of recruiting new

21   talent, right?

22        A.   No.  I do know that Lucasys has had offers out to

23   some additional employees back in the 2019, '20 timeframe.

24        Q.   And how about the increased overhead costs associated

25   with it being a larger employer.  Was that part of your



1   analysis and the variable cost?

2        A.   Yes.

3        Q.   You did a straight line regression analysis based

4   upon their prior cost?

5        A.   It could be characterized that way, yes.

6        Q.   Okay.  Mr. Olsen, I know you said that you had

7   reviewed Dr. Tyler's report, correct?

8        A.   Yes.

9        Q.   I'm not going to put a copy in front of you.  But as

10  you sit here today, is there anything that jumps to mind that

11  you think was incorrect in Dr. Tyler's report?

12       A.   Well, on the topic of a variable cost, yes.

13       Q.   What was that?

14       A.   He claimed my variable cost of reproach the

15  regression is, he called it, doesn't work because of a lack of

16  statistical significance in the coefficients.

17       Q.   Okay.  You disagree with that analysis?

18       A.   Right, statistical significance isn't necessary for

19  how I'm using the slopes of the coefficients in my analysis.

20       Q.   Okay.  Anything else that comes to mind in Dr.

21  Tyler's report?

22       A.   Well, as you can imagine, he disagrees with most of

23  my report, so obviously I disagree with most of his.

24       Q.   Well, I mean, a lot of it's about assumptions, what

25  about a particular opinion as opposed to an assumption in the



1    report?  Is there any particular opinion in the report that

2    jumps out that you think he misunderstands?

3         A.   Again, on the topic of variable costs, I know he

4    claims that I should have included the consulting and

5    professional fees expense.  And that's just simply wrong

6    because the consulting and professional expense related

7    entirely to non-tax consulting revenues.  And I'm not

8    forecasting non-tax consulting revenue.  So it's not

9    appropriate to include that.

10        Q.   You don't expect those to continue to occur, right?

11        A.   Correct.

12        Q.   That's a reasonable assumption, right?

13        A.   And the data (unintelligible) of that out, yes.

14             MR. FRIEDMAN:  Okay.  I think that's all I've got for

15   you.

16             MR. MAYES:  Yes.  No questions for us.

17             (The proceedings were thereby concluded at

18   12:56 p.m.)

19

20

21

22

23

24

25

1               D I S C L O S U R E

2

3   STATE OF GEORGIA          DEPOSITION OF GARY OLSEN

4   COUNTY OF HENRY           MARCH 17, 2023

5

6   Pursuant to Article 8.B of the rules and regulations of the

7   Board of Court Reporting of the Judicial Council of Georgia, I

8   make the following disclosure:

9

10   I, Collette Jackson, am a Georgia Certified Court Reporter.  I

11   am here as an independent contractor for Trustpoint.One.

12

13   Trustpoint.One, was contacted by STEVEN A. FRIEDMAN, ESQ., to

14   provide court reporting services for this deposition.  The firm

15   will not be taking this deposition under any contract that is

16   prohibited by O.G.G.A. 15-14-37 (a) and (b).

17   This, March 17, 2023

18

19

20

                    COLLETTE JACKSON, CCR
21                  No. 5741-5233-4639-1040
                    CERTIFIED COURT REPORTER

22

23

24

25

```
 1                      C E R T I F I C A T E

 2

 3    STATE OF GEORGIA

 4    COUNTY OF HENRY

 5

 6         I COLLETTE JACKSON, Certified Court Reporter for the

 7    County of Henry and for the State of Georgia, do hereby

 8    certify:

 9         That the foregoing transcript is a true and accurate

10    account of evidence and testimony taken by me in the matter of

11    LUCASYS INC., versus POWERPLAN, INC.,(GARY OLSEN, EXPERT

12    WITNESS) to the best of my ability.

13         I further certify that the foregoing pages 5 through 98 of

14    testimony represent a true and correct record of the evidence

15    given upon said plea;

16         And I further certify that I am not a relative by blood or

17    marriage, or an employee of attorney or counsel of any of the

18    parties in the case, nor am I financially or in any way

19    interested in the outcome of the action.

20    This, March 21, 2023

21

22

23

24         COLLETTE JACKSON, CCR
           No. 5741-5233-4639-1040
           CERTIFIED COURT REPORTER

25
```



Notice Date: 03/22/2023

Deposition Date: 3/17/2023

Deponent: Gary Olsen

Case Name: Lucasys Inc. v. Powerplan, Inc.

Page:Line              Now Reads                    Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20___, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

**< $ >**
**$200,000** 7:25
**$40,000** 86:17 89:6

**< 0 >**
**01945177** 55:10
**09:28** 4:6

**< 1 >**
**1** 3:13  5:14, 18  48:25  49:25  55:9  57:21
**1:20-CV-02987-AT** 1:7
**10** 30:11, 13, 15, 16, 18, 19, 22  32:2  36:19, 21  37:1, 8, 9, 15, 21  38:9, 15  40:4, 5, 9  41:7  42:6  48:15, 16  54:3, 5, 15, 16  87:20  88:18  94:6, 11  95:13
**100** 3:7  54:11
**1000** 2:12
**11** 44:10  88:2
**12** 30:10  35:20
**12:56** 98:18
**127** 2:13
**13** 37:7, 8, 11, 12, 16, 17, 22  38:10, 20  48:18  49:1  53:25  54:23  55:1, 4, 9  59:8  61:7  64:22  67:17  68:7, 24  70:2  71:1
**131** 92:8
**14** 9:5, 6  10:1  12:20  13:18  15:4  18:16  19:16  37:7, 11, 17  48:18  51:1, 3, 4, 20, 25  52:12  61:15, 16  64:22  67:17  68:25  71:1
**14th** 1:18  2:5, 20
**15** 37:7, 11, 17  44:9, 10  46:1, 11, 15  48:8, 18  63:15, 19  64:22  67:17  68:25
**15,16** 71:1
**15-14-37** 99:16
**16** 5:17  19:22  30:18  37:7, 8, 11, 17  38:1  48:18  64:22  67:17  69:1
**17** 1:17  4:5  30:12, 13  37:24  38:1  99:4, 17
**18** 38:1
**19** 3:14  37:18  38:1

**< 2 >**
**2** 3:14  19:4, 8
**20** 24:12, 13  25:1  38:1  57:22  58:9  91:15  96:23
**200** 8:1
**200,000** 86:6
**2018** 19:19

**2019** 18:21, 25  20:18  21:5, 8, 13, 15  23:2, 4, 7, 9, 15, 16, 17  24:3, 6, 7, 9, 11  28:3, 25  31:2, 17  32:6, 7, 12  33:1, 15  34:4, 10, 13, 16, 20, 24  35:3, 8, 10, 23  36:1, 2, 5, 10, 21  37:1, 3, 4, 14, 21  38:16  41:7  42:13  49:9  53:25  54:3, 4  56:19  57:22, 25  58:11, 21  59:1  68:10, 12, 13, 15, 17  71:17  72:3, 10, 12  73:3, 11  82:8  84:14  96:23
**2020** 20:23  21:4, 16  23:21, 22  34:10  47:13  68:18  72:8  84:21  85:12, 13
**2021** 16:13  19:22, 25  20:10  21:14  22:5  75:6  84:3
**2022** 5:17, 21, 24  6:21  75:7  84:3
**2023** 1:17  4:5  6:3  44:4, 15  82:18  84:24  85:1  99:4, 17  100:20
**2024** 84:1
**2025** 83:16, 19, 22  84:2, 14
**21** 100:20
**216-479-8327** 2:15
**22** 5:22, 25
**23272** 31:24, 25  32:1
**24** 3:18  24:22
**25** 68:24

**< 3 >**
**3** 3:18  24:21, 23  31:14  32:2  33:22  42:6  49:25
**30** 45:21, 25  48:9  91:15
**30(b)(6** 29:16, 18  47:9
**300,000** 86:6
**30318** 1:18  2:6, 21
**32** 3:19
**33** 72:17
**36** 49:22  50:5  87:12, 13
**37** 49:22  88:2
**38** 30:13

**< 4 >**
**4** 3:19  27:10  31:25  32:3  33:10  42:6  49:25
**40** 95:16
**40,000** 86:19
**404-856-3266** 2:8
**44114** 2:14
**48** 68:25  69:1

**< 5 >**
**5** 3:13, 20  34:2  35:25  42:6  49:25  50:9  66:5

**85:23  86:8  87:11, 18, 20  88:6, 11, 18  89:22  100:13
**50** 3:20, 21, 22  95:16
**500** 1:18  2:5, 20
**5741-5233-4639-1040** 99:20  100:24
**575** 6:24
**58** 68:24

**< 6 >**
**6** 3:21  35:15  42:6  50:2, 13, 16  85:23  86:3, 8, 10, 11, 13, 21, 25  87:19  88:16  89:19
**678-701-9374** 2:22

**< 7 >**
**7** 3:22  19:11, 12, 13  50:21  88:1, 6, 11  90:2
**71** 91:23
**73** 92:21, 23

**< 8 >**
**8** 19:13
**8.B** 99:6

**< 9 >**
**9** 49:25
**9:30** 1:18
**90** 84:11
**90s** 81:3
**98** 100:13
**99** 3:6

**< A >**
**a.m** 1:18  4:6
**ability** 100:12
**able** 20:20  62:24
**Absolutely** 36:13
**academic** 30:1
**accepted** 57:11
**account** 43:1  44:2  75:1, 10  100:10
**accountant** 38:12
**accounting** 17:2, 3, 5  26:12, 25
**accuracy** 30:8
**accurate** 17:20  30:6, 19  34:21  57:17  58:22  60:23  64:18  65:20  69:4  100:9
**achieve** 91:25
**action** 9:23  100:19
**actions** 20:15  22:10  23:1, 2, 4, 6, 9  28:10  30:2  42:23  94:2
**actual** 19:12  25:19  26:17  35:24  39:13, 14  40:3, 5, 6  43:16, 17  44:20  53:14  54:19  73:4

**80:4  81:8  82:17, 18  83:20  85:25
**add** 43:3  87:25
**addition** 9:12  12:8  13:7  45:25
**additional** 27:1  46:1  49:12  96:20, 23
**address** 51:9, 19  52:17
**addresses** 51:22
**addressing** 51:15
**adjusted** 44:2
**adjustments** 23:24  74:10
**adopted** 81:3
**AEP** 17:14, 24  24:14  26:1, 6  27:23  28:2, 9, 18, 19, 24  29:10, 15  30:3  31:16, 20  32:5, 10, 25  33:14, 24  34:3  43:7, 8, 9, 12, 24, 25  44:5, 6  53:15  54:6, 14, 25  55:1  70:1, 4  73:13  82:6, 12, 21  83:3  88:20  94:12  95:4, 20, 21
**affect** 22:20, 23  23:3, 22  32:18  44:15  66:5  82:14  83:16, 22
**affidavits** 41:10
**affirm** 4:25
**ago** 7:18
**agree** 9:15  24:20  26:21  40:12  42:12  49:15  55:22, 24  64:14  75:5  89:19
**agreement** 13:8  21:8  27:3, 6  33:20  47:1  52:21  62:4
**agreements** 14:18, 22  35:4  73:7, 8, 9, 13
**ahead** 19:4  31:22  49:23
**AICPA** 39:20
**allegations** 69:10
**alleged** 15:12, 23  22:12, 16, 25  23:1, 15, 21  24:4, 9  32:12  53:2  70:18  92:18
**allegedly** 53:10
**Allison** 56:9, 11
**allocate** 22:12
**Alloy** 1:17  2:4, 18, 19  4:7, 17
**altered** 29:15  32:15
**amended** 15:13  22:16
**amount** 82:24
**AMY** 1:8
**analysis** 7:5  9:19  13:11, 14  30:25  37:4  39:8  61:6  68:10  75:2, 11  79:21  80:7, 19, 23, 25  81:8, 11, 14, 17, 19, 21, 24  82:2  90:6  91:5  94:25  95:11  97:1, 3, 17, 19

**analyzed** 9:*13* 12:*9* 13:*21*

**analyzing** 79:*18*

**anecdotal** 78:*9, 10*

**answer** 25:*22* 33:*5, 7* 35:*2, 12* 63:*8* 64:*11* 76:*15*

**answered** 33:*3* 63:*24*

**anticipate** 83:*3*

**anticipated** 81:*19, 25* 85:*1*

**anticompetitive** 84:*18, 21, 24*

**antitrust** 8:*2, 4, 5, 6, 7, 8, 11, 14, 15* 13:*19, 20, 21* 14:*3, 9* 22:*9* 39:*19, 22*

**anybody** 55:*25* 66:*7, 13* 93:*4*

**anytime** 60:*11* 61:*19*

**apologize** 87:*9*

**appears** 24:*24* 32:*4* 92:*22*

**Appendix** 41:*22* 46:*10*

**application** 10:*13*

**applied** 23:*24* 38:*23*

**approach** 7:*7* 40:*16, 17, 24* 63:*16* 75:*13*

**appropriate** 41:*2* 90:*11, 12* 91:*6* 98:*9*

**appropriateness** 39:*19* 42:*5*

**approximate** 8:*24*

**approximately** 7:*14*

**arbitration** 5:*23*

**area** 93:*7, 20, 25*

**areas** 9:*13* 12:*24* 31:*4*

**arisen** 51:*16*

**Article** 99:*6*

**asked** 29:*7* 33:*3* 63:*24* 74:*5* 76:*1* 88:*5, 9*

**asking** 29:*13* 48:*3*

**aspects** 67:*1*

**assessing** 40:*12*

**asset** 51:*11*

**assets** 62:*16* 63:*4*

**assist** 12:*15*

**assisted** 7:*5*

**associated** 96:*20, 24*

**assume** 9:*2* 17:*20* 23:*8* 30:*1* 33:*14* 34:*1, 20* 35:*15, 21* 39:*24* 55:*22* 63:*2* 65:*17* 67:*22* 70:*9* 75:*21* 84:*17* 91:*24*

**assumed** 24:*5* 54:*2* 57:*17* 58:*22* 65:*7* 70:*7* 76:*14* 79:*1*

**assumes** 24:*8* 82:*7*

**assuming** 8:*21* 31:*16* 32:*5* 34:*2, 3, 21* 60:*23* 65:*20* 70:*12, 15* 71:*23*

**assumption** 15:*10, 21* 22:*1* 30:*4* 32:*10, 14, 16* 34:*5* 35:*13* 42:*5* 54:*19* 57:*18* 58:*18* 60:*21* 65:*9, 10, 18* 66:*22, 25* 69:*18* 70:*21, 25* 72:*19, 24* 76:*2* 84:*19* 92:*12* 97:*25* 98:*12*

**assumptions** 34:*6* 36:*18* 37:*2* 38:*14* 40:*4, 9* 42:*11* 79:*2* 80:*10, 13* 97:*24*

**ATLANTA** 1:*4, 18* 2:*6, 21* 4:*8*

**attached** 42:*1* 95:*20, 21*

**attempt** 18:*6* 22:*15* 50:*23*

**attorney** 100:*17*

**authorized** 14:*22*

**availability** 96:*19*

**available** 18:*14* 20:*2* 51:*10* 53:*22* 66:*19* 75:*20, 23* 81:*7*

**avoiding** 60:*24*

**aware** 9:*18* 18:*2* 20:*13, 17, 19, 20* 29:*9, 15, 22* 34:*9, 12, 14* 41:*10, 12, 14* 44:*23* 46:*1, 14, 16, 21* 47:*11, 14, 17, 19, 24* 50:*7* 53:*9, 12, 13, 15* 57:*4* 69:*16, 25* 70:*6* 76:*25* 77:*24* 85:*11, 13* 88:*9, 10* 89:*13* 91:*8* 95:*18*

**< B >**

**back** 13:*17* 17:*4* 18:*16* 28:*17* 29:*6, 7* 34:*17* 39:*23* 43:*3* 48:*19* 49:*9* 51:*1* 56:*19* 57:*8* 64:*21* 66:*4* 68:*7* 73:*3* 88:*2, 17* 96:*23*

**backed** 43:*16, 21, 23*

**background** 93:*5*

**backwards** 52:*11*

**bad** 76:*13*

**bait** 25:*4*

**balance** 12:*22, 24*

**base** 28:*6* 45:*6, 9* 89:*11*

**based** 10:*13, 14* 11:*4* 12:*22, 24* 20:*4* 28:*1, 4* 36:*18* 37:*9, 12, 14* 38:*9, 10* 40:*3, 5, 8* 46:*18, 19* 49:*19* 51:*17* 53:*10* 57:*6, 18* 64:*23* 69:*19* 72:*11, 14, 24* 73:*1, 2, 6, 20, 21, 22* 74:*11* 77:*9, 12* 80:*13* 81:*6* 91:*20* 92:*3* 96:*1* 97:*3*

**baseline** 36:*10* 37:*4, 5, 6* 38:*21* 54:*1*

**basic** 20:*1*

**basically** 69:*6*

**basis** 77:*22*

**Bate** 55:*8*

**Bates** 28:*14* 31:*23* 47:*7*

**becoming** 83:*3*

**began** 19:*19* 20:*23* 21:*4, 16* 22:*5*

**BEHALF** 2:*2, 9* 16:*23*

**behavior** 34:*4, 24* 46:*24* 47:*20* 53:*3*

**believe** 12:*1, 3* 20:*7* 21:*18, 24* 23:*6* 24:*20* 27:*5* 34:*6* 38:*21* 40:*23* 41:*16* 47:*24* 48:*10* 50:*6* 53:*4* 56:*16* 66:*2* 69:*23* 72:*5* 85:*3* 92:*3, 8*

**believed** 58:*19*

**Belinfante** 1:*17* 2:*4, 19* 4:*7*

**benchmark** 36:*10*

**best** 50:*19* 75:*23* 100:*12*

**better** 64:*15*

**beyond** 23:*7* 24:*11* 59:*21* 60:*23* 83:*25* 85:*13* 95:*14*

**big** 36:*16, 24* 48:*24*

**billing** 6:*23*

**bit** 34:*8* 55:*3, 4* 79:*24* 91:*12*

**Blanquez** 4:*20*

**blinders** 29:*3*

**blood** 100:*16*

**Board** 99:*7*

**BOGGS** 2:*11*

**Bona** 4:*21* 6:*12*

**booking** 26:*25*

**bottom** 19:*13* 24:*13*

**breach** 6:*9*

**break** 36:*12, 14* 73:*24, 25* 87:*7* 94:*9*

**Brief** 36:*14* 73:*25* 87:*7* 94:*9*

**briefly** 87:*15*

**bring** 55:*6*

**Brooks** 14:*15*

**bullet** 19:*14, 18* 22:*4*

**business** 16:*8* 55:*18* 57:*19* 65:*22* 70:*18* 76:*4* 81:*24* 94:*22* 95:*3*

**businesses** 16:*8*

**But-For** 30:*25* 31:*7, 10* 33:*1, 15, 22* 34:*4, 24* 35:*8, 19, 23, 25* 36:*9, 20* 37:*15* 39:*14* 40:*1* 44:*20* 82:*17* 92:*17*

**Butts** 56:*9*

**buy** 66:*13*

**buying** 71:*25*

**< C >**

**calculate** 77:*12* 92:*2*

**calculated** 31:*12* 37:*9* 71:*7* 72:*7*

**calculating** 18:*15* 39:*21*

**calculation** 15:*18* 39:*12*

**call** 38:*4*

**called** 5:*6* 11:*7* 97:*15*

**canceled** 53:*4, 14, 17*

**CASE** 1:*7* 5:*16* 6:*7, 15* 8:*2, 5, 20, 23* 13:*22* 14:*3, 4, 15* 16:*16, 22, 23* 17:*23* 18:*3* 22:*13* 27:*1* 39:*5, 19* 41:*2* 45:*11, 12* 70:*1* 94:*2* 100:*18*

**cases** 8:*4* 16:*11, 13, 21, 24* 39:*22*

**categories** 14:*5* 79:*15*

**categorize** 79:*14*

**category** 54:*5*

**causation** 8:*14, 15, 16, 17* 15:*19*

**cause** 8:*23, 25* 9:*2* 30:*2*

**CCR** 99:*20* 100:*24*

**ceased** 84:*21*

**ceases** 84:*18, 24*

**ceasing** 84:*19*

**CEO** 10:*5*

**certain** 15:*11, 22* 29:*1* 52:*9, 13, 17* 67:*1* 79:*1* 80:*10*

**certainly** 8:*16* 12:*2* 20:*19* 25:*16* 26:*19* 40:*15, 19* 73:*14* 83:*9* 94:*4*

**CERTIFICATE** 3:*7*

**Certified** 1:*16* 99:*10, 21* 100:*6, 25*

**certify** 100:*8, 13, 16*

**challenges** 40:*13*

**Chang** 94:*19*

**CHANGE** 3:*21* 23:*10, 11, 12* 86:*18* 87:*1* 89:*6*

**changed** 6:*21*

**changes** 6:*22*

**characterization** 40:*23*

**characterized** 97:*5*

**charged** 7:*15*

**charges** 89:*9*

**choose** 91:*18*

**chose** 27:*21* 44:*6*

**Cieslak** 4:*20*

**circumstances** 33:*7*

**citation** 33:*17*

**citations** 31:*19*

**cite** 9:*24* 27:*21* 39:*18, 20* 46:*9* 48:*7*

**cited** 24:*22* 32:*1* 41:*21, 22* 42:*4* 48:*25*

**claim** 8:*13* 22:*16* 92:*20*

93:20
claimed 97:14
claims 22:13, 20 98:4
clarification 39:4
clarify 41:25
cleansing 13:15
clear 15:21 88:14
CLEVELAND 2:14
client 20:3 25:10
clients 12:15 15:5
client's 25:11
close 73:18 94:7
closing 73:16
cloud 10:14 11:4
coefficients 97:16, 19
Collette 1:15 4:10
99:10, 20 100:6, 24
column 31:2 32:7 37:1
41:7 68:7, 11, 15 78:10,
13, 14
columns 78:18
combination 72:23
combined 72:5, 15
come 16:9 92:19
comes 97:20
comfort 36:12
Coming 18:16
comment 67:10, 17
communication 34:12, 14,
15, 19 47:2, 3
communications 28:16,
17, 18 35:9 42:1 46:22
companies 40:13, 14
44:24 51:17 69:15 73:7
74:24
company 17:4 48:11, 21
49:9, 16 73:2 79:22
80:1, 18 81:2
comparable 10:19, 20, 21,
22
compare 10:9 67:9
90:10
compared 37:6, 8 53:21
comparing 40:1
compatibility 12:3
compatible 11:25 52:5
compensated 43:13
competition 22:9
compiled 55:4, 19, 23
56:1 64:22
compiles 57:13
complaint 15:13 22:16
complete 5:16
completed 18:23, 25
complies 4:24
component 15:14, 16, 17
83:14, 18
components 15:18
Compound 70:11
concept 8:15 57:6

77:15, 16
concern 93:21
concerned 34:13 61:17
concerning 34:16, 20
conclude 90:9
concluded 98:17
conclusion 28:4, 6 84:25
conduct 15:12, 23 23:16,
21 24:4, 5, 7, 10 28:9
32:12 33:2, 15 35:9, 23
36:9 53:10 57:19 70:10,
18 84:18, 19, 20, 21, 22,
24 90:6 92:18 94:5
conducted 4:7
confused 82:6
connection 94:20
consider 8:17 13:10
19:24 21:1 22:6 29:4
32:22 40:16, 17, 18 41:4
46:12 59:9 60:1 82:16
93:17
consideration 23:25
60:16
considered 13:14 29:2
60:2
considering 44:24 93:24
consistent 21:17, 18, 24
88:13
consultant 63:1
consulting 9:13, 17
12:10, 13, 14, 19, 24 13:1,
2, 7, 11, 15 14:23 24:3,
18 26:11 31:4 34:9
35:5, 19, 21, 22, 24, 25
36:4, 21 37:23 38:1
45:24 46:2 51:9, 17
52:4, 21, 23 53:2, 6, 9, 16
54:18 62:17, 20, 22, 25
63:4, 10 64:1 76:11, 17,
21 77:5 81:20, 22, 23
96:7, 9 98:4, 6, 7, 8
contacted 47:12 99:13
contained 1:14
contemplating 25:16, 18
26:15, 17 73:14, 16, 17
contents 78:7
context 88:17
continue 47:4, 21 98:10
continued 23:7 47:11
CONTINUING 3:17
24:11
CONTRACT 3:18
24:14, 16, 18, 25 26:3, 4,
5 27:2 99:15
contractor 25:10 99:11
contractors 48:4
contracts 53:14
contradicted 47:25
contradicts 29:10, 15
controversy 69:12 70:2,

8
conversations 69:19
converted 53:20
convince 84:14
convinced 42:10
Copilot 10:19 11:24
12:2, 25 26:16 27:16
33:22, 24 34:3, 23 43:6,
8, 9, 12, 22, 24 52:3, 5, 15
53:5 70:22 71:7, 18, 22,
24 72:20 73:4, 9 82:8, 9,
19 86:17 87:21 89:1, 8,
15, 17, 20, 23
copy 5:16 97:9
corporate 27:23 28:23
29:10 47:17, 19
correct 5:11, 12 8:6, 9,
20, 21, 23 9:2, 3, 7, 14, 18
10:6 11:16, 22 12:10, 11
13:19 14:6, 10, 19 15:13,
14, 16, 23, 24 18:7, 17
19:16 20:14, 18 22:2, 13,
14, 17, 18 23:5 24:10, 11,
19 25:1 26:23 29:11, 22
30:3, 6, 7, 22 31:5 32:2,
8, 13, 14, 16 33:10, 11, 12,
15, 20 34:10 36:5, 6, 9,
10 37:3 38:3, 20, 21, 24
40:4, 10, 14 41:8, 11, 19
47:13 49:18, 20 50:5
52:16, 21 53:11 54:7, 17
55:1, 10 56:19 59:17
60:14 61:9, 22 62:1, 2, 8,
9, 14 64:17 65:6 68:19
69:22 70:3, 10, 19, 20, 24
73:11 74:16, 23 75:17
77:6, 20 78:5, 6 79:5, 7,
16 80:6 81:13, 17, 18, 22,
23, 25 82:4 83:5, 20
84:10, 15, 16 85:10
87:19 88:3, 4, 7, 22, 23
89:21 90:17, 18 91:3, 16,
17, 25 92:1, 18 93:23
94:3, 23 95:24 97:7
98:11 100:14
correctly 86:20
corroborated 95:19
cost 63:17 96:1 97:1, 4,
12, 14
costs 96:20, 24 98:3
Council 99:7
counsel 4:11, 19 18:11
100:17
counterclaim 85:8
counting 43:14
COUNTY 99:4 100:4, 7
couple 16:13 44:18
92:15
course 43:5 55:17
65:22 76:4

COURT 1:2, 16 4:9, 12,
22, 25 23:8 29:7 99:7,
10, 14, 21 100:6, 25
cover 28:11, 20
covers 39:24
created 38:22
CROSS-EXAMINATION
3:5
Cry 56:5, 18, 22
Cry's 57:1, 8
current 82:21
currently 44:6, 24 51:10
82:25
customer 13:4 18:2
20:13, 17 24:8 27:11
30:24, 25 33:1, 14 34:23
35:3, 8 38:16 42:22
44:8, 9, 10 45:12 46:22
52:20 53:1 57:23 58:6,
8 59:7, 11 60:2, 4, 5
62:16, 20 63:9 64:9
67:12, 16, 19 68:4, 8
70:17 72:9 74:11, 14, 17
75:6, 12, 14 79:9, 12
80:4 82:7, 9, 12, 21 83:3,
7, 15 84:2, 6, 14 85:12
87:3 90:19, 21, 25
customers 9:10 13:1
14:19 15:11, 22 17:10,
12, 16, 22 18:4, 6, 8, 11
24:3 31:8, 10, 11, 17
32:6, 11 33:23 34:3
35:20, 21, 22, 24 36:1, 5,
8 39:3, 4 40:6, 8 41:6, 9,
11, 13, 15, 17 44:8, 22
45:11, 24 46:14, 18
50:19, 24 51:8, 15 53:9,
20 54:4, 6, 14, 19, 25
57:22 58:10, 11, 18, 19,
25 59:4, 22 61:7 63:3,
14 64:6, 24 65:10, 24
66:6, 17, 23 67:5, 7, 9, 20
68:11, 20 69:8, 9 70:1, 4,
7, 16, 17 71:1, 14, 24
72:8, 14, 21, 22 73:21
75:15, 18, 24 76:8, 16, 22,
24 78:21, 24 79:2, 4, 18
83:10 84:1, 9 88:7, 10,
11 92:6, 25 94:11, 13, 15,
20, 22 95:2, 5, 6, 9 96:2,
5
CV 5:20

< D >
damage 15:11, 21 18:15
22:21, 23 23:3, 10, 22
32:18, 24 36:5, 17 38:5
44:1 83:16, 22 85:2
damages 6:9 7:7 13:11
15:18 22:13, 15 23:15,



*17* 32:15 39:8, *10* 40:12
43:2, *9, 14* 44:15 77:15
**data** 6:9 13:15 48:17
56:1, *15* 57:5, *13, 14*
59:8, *19* 62:17 64:15, *23*
66:23 70:23 74:14 77:9,
*13, 20* 78:1, *3, 4, 7, 11*
79:6, *10, 11, 14* 80:2
98:13
**database** 49:20 55:17
56:4, *17* 57:19, *20* 58:4,
*13* 61:1, *19, 20* 62:6, *16,*
*21, 24* 63:25 65:20 66:2
76:4 78:5 79:7
**date** 18:19, *22* 19:21
**deals** 33:11
**December** 5:17 6:21
**decided** 28:24
**decision** 47:18, *20* 82:23
84:7 85:4 90:20
**deep** 95:15
**DEFENDANT** 1:10 2:9
4:14 16:23
**DEFENDANT'S** 3:16
5:18 19:6, *8* 24:23 32:3
50:9, *16, 21* 86:13
**deferred** 10:20, *22*
11:14, *19* 19:18, *19, 24*
20:10, *14, 18* 21:10
26:16 27:16 31:8, *10, 12,*
*17* 32:6, *11* 33:1 34:23
37:11 44:5, *14, 24* 45:17,
*22* 51:19 52:7, *10* 57:25
58:2, *7, 11, 20* 59:13, *21*
61:1, *3, 9, 20* 62:12, *17*
63:5, *18* 64:9, *25* 71:8,
*15, 17, 21, 25* 72:6, *9, 11,*
*21* 74:18 81:10, *16*
82:20, *25* 83:3, *10* 86:5
90:16 91:2, *9* 92:4
**defines** 14:3
**definite** 33:6
**definitely** 32:21
**definition** 53:18 57:11
**definitions** 8:12
**delayed** 84:4
**Deloitte** 94:19
**demonstration** 9:20
**denominator** 38:8, *11*
53:24 54:22 71:10, *13,*
*15, 16, 20* 92:8
**depend** 90:24
**DEPONENT** 3:2 5:6
**depose** 18:11
**deposed** 5:7 17:23
**deposition** 1:13, *15* 4:3,
*7* 5:21 6:6 7:6 21:24
27:23 28:1, *5, 20* 29:11,
*18* 41:12 42:1 45:10, *11,*
*12* 47:9 56:2 57:1, *9*
69:24 76:5 77:18, *21, 22*

78:1 80:17 91:21 95:14,
*17* 99:3, *14, 15*
**depositions** 17:22 18:2
42:2 57:12, *15* 73:21
**depreciation** 10:20, *22*
11:14, *19* 21:10 22:4, *5*
26:16 27:16 33:11, *13,*
*14* 35:16 37:10 44:5, *14*
45:17, *22* 52:8, *10, 11*
57:25 58:2, *7, 11, 20*
59:13, *21, 23, 25* 60:8
61:3, *8, 19* 62:12, *18*
63:5, *18* 64:8, *25* 67:18
71:9, *16, 17, 21, 25* 72:6,
*9, 12, 21* 74:19 81:10, *16*
83:1, *4, 10* 90:16 91:3,
*10*
**depth** 95:11, *22*
**derivative** 71:8
**describe** 9:6 13:20
28:15 39:10, *12* 78:4, *5*
**described** 9:22 15:12
51:20 52:11
**describes** 57:4, *9* 78:7
89:8
**describing** 78:1
**DESCRIPTION** 3:12
9:25 16:15 26:11
**design** 22:5
**designated** 58:10
**designation** 64:2
**detail** 95:22
**details** 10:10
**determine** 62:24 63:22
79:23 80:1 90:6 92:5
93:22
**determined** 23:2 36:20
**determines** 23:8
**determining** 28:24
62:11 93:3 94:1
**develop** 21:19 42:13
**developed** 18:24 20:2
42:20
**development** 19:19, *25*
20:23 21:4, *16* 22:5
42:16 43:1
**differ** 10:23 11:2, *3*
**difference** 11:5 51:23
**different** 11:12, *17*
13:13 14:4, *5* 32:25
37:2, *18* 44:6 49:13
59:3 61:16 71:11, *12, 13,*
*19, 20* 74:15 86:21
92:15
**differentiation** 54:13
**direct** 28:23
**directly** 48:5
**disagree** 56:25 77:3, *7*
97:17, *23*
**disagrees** 97:22

**DISCLOSURE** 3:6 99:8
**discuss** 27:19
**discussed** 7:7 31:4
46:25 79:24 82:3 87:15
**discusses** 24:13
**discussing** 42:8 67:2
90:5
**discussions** 10:4 20:5
21:21, *22* 42:9 46:19
91:20
**dispute** 70:12
**dissatisfaction** 92:25
**dissatisfied** 17:9, *17*
67:7, *22*
**distinguished** 36:3
**DISTRICT** 1:2, *3*
**divesting** 62:16 63:3
**divided** 37:15, *21* 72:7,
*17* 92:4
**DIVISION** 1:4
**document** 24:22 25:4
27:4, *7, 17* 31:20 32:1
33:17 48:24 49:11, *15,*
*17* 55:7, *10* 57:21 58:22,
*24* 59:2 60:22, *23* 86:19
87:11, *20* 88:21, *25* 89:4,
*5, 6, 22*
**documents** 7:6 12:1, *3*
27:19 28:11, *12* 29:1
30:9 42:8 46:12 49:23
56:23 77:25 78:3 85:19
87:6, *9* 88:20 90:9
91:22
**doing** 34:9 40:13
**dollars** 7:23
**D-OLSEN** 3:13, *14, 18,*
*19, 20, 21, 22*
**Dominion** 63:15, *16*
**double** 43:13 74:19
**dozens** 95:4, *6, 9*
**Dr** 13:21, *22, 24* 14:2
39:4 97:7, *11, 20*
**dramatic** 94:2, *3, 4*
**due** 12:16 22:9 24:3, *9*
53:2
**Duke** 4:8
**duly** 5:6

**< E >**
**earlier** 31:5 33:18 74:2
77:18 79:24 82:10 88:5,
*16, 21* 91:13
**early** 80:17
**earned** 40:6
**Eastern** 4:6
**easy** 31:24
**educated** 85:5
**efficiency** 15:9
**either** 10:19 15:5 41:15
44:14 48:13 50:18, *23*

56:9 57:24 58:11 63:4,
*17* 64:8 71:25 88:11
**Electric** 44:11, *20, 23*
**element** 15:19 38:14, *19*
**elements** 38:6, *13, 18*
40:19
**eleven** 87:14
**Elucidate** 27:9
**EMAIL** 3:20, *22* 28:16
29:14 50:7 88:3 90:3
**emails** 41:14, *16* 50:19
88:6, *11*
**employee** 76:25 100:17
**employees** 7:1, *10* 45:10
77:4, *19, 23* 96:12, *23*
**employer** 96:25
**employers** 94:20
**engage** 47:21 96:4
**engaged** 14:3
**engagement** 7:2, *15* 19:2
25:10
**engaging** 92:24
**entail** 12:13 26:1
**entails** 11:10 55:15
**entered** 21:8 73:7, *12*
**Enterprise** 15:25 16:4,
*12* 40:24 80:24
**entire** 42:7 51:16 73:22
**entirely** 98:7
**entities** 69:11 95:23
**entries** 84:12
**entry** 60:25 61:1 63:16
67:13, *24* 74:20, *21*
**equate** 25:14 26:17
**error** 35:17
**escapes** 56:8
**ESQ** 2:3, *10, 18* 99:13
**Essentially** 39:25
**established** 40:13 82:8
**estimate** 7:22 75:24
**estimates** 43:23
**evaluate** 25:10
**events** 28:11
**everybody** 4:2 87:10
**evidence** 28:7 34:18
69:12 75:23 77:10
89:12 100:10, *14*
**exact** 38:15 45:19
**Exactly** 15:8 49:21
71:4 79:13 80:3
**examined** 5:7
**example** 12:22 49:2, *4*
72:1, *2* 73:13 82:6
95:20
**examples** 48:7, *8* 53:8,
*12*
**EXHIBIT** 3:12 5:18
19:4, *8* 24:21, *23* 32:3
50:9, *13, 16, 21* 85:23
86:3, *13, 21, 25* 87:11, *18,*

*19* 88:*1, 11, 16* 89:*19, 22* 90:*2*
**exhibited** 93:*22*
**exhibits** 42:*1* 88:*6*
**existing** 51:*9, 25* 84:*1* 94:*15, 21*
**exists** 44:*25* 45:*2*
**expect** 98:*10*
**expecting** 44:*4*
**expense** 98:*5, 6*
**experience** 15:*25* 16:*2* 18:*10* 93:*6, 7* 95:*10*
**experienced** 71:*24*
**EXPERT** 1:*13* 3:*13* 5:*14, 16* 8:*6, 7, 8, 11, 14, 17* 14:*2* 30:*5* 93:*17, 20, 22, 24* 94:*1* 100:*11*
**expertise** 30:*6* 92:*24* 93:*3, 9, 14, 15* 96:*5, 15*
**Explain** 44:*17* 65:*6* 66:*15* 71:*5*
**explained** 65:*21*
**export** 55:*16*
**extent** 42:*15* 43:*15* 66:*4*
**external** 79:*12, 14*
**extra** 5:*15*
**eyes** 69:*1*

**< F >**
**facet** 24:*1*
**fact** 9:*1* 19:*24* 30:*10* 47:*11* 48:*1* 64:*7* 67:*5, 19, 20* 77:*11* 81:*15* 82:*8* 91:*8*
**factor** 91:*1*
**facts** 32:*22* 33:*7*
**fair** 40:*23* 52:*17* 54:*18*
**fallacy** 66:*15*
**familiar** 8:*16* 56:*23* 57:*6*
**far** 10:*10* 25:*21* 38:*17* 79:*8* 96:*17*
**fault** 86:*10*
**fears** 46:*17*
**feasibility** 25:*10*
**fee** 83:*14* 84:*1* 89:*2, 14, 20, 24* 90:*1, 5*
**fees** 13:*13, 14, 15* 83:*12, 19* 89:*18* 90:*10, 13* 98:*5*
**felt** 18:*14* 65:*22*
**fewer** 66:*5*
**figure** 7:*16* 48:*23* 49:*10, 13* 80:*4*
**figured** 86:*24*
**filling** 78:*18*
**financial** 26:*12* 81:*7*
**financially** 100:*18*
**fine** 60:*7*
**finished** 47:*14*
**Firm** 6:*10, 12* 7:*13* 99:*14*

**FIRST** 3:*16* 5:*6* 6:*11* 8:*4* 18:*20, 21* 19:*6* 25:*5* 26:*9, 13, 19, 21* 86:*10, 11*
**fit** 14:*9* 16:*15* 52:*18*
**fits** 13:*19* 14:*4* 21:*3*
**five** 9:*13, 16* 17:*7* 31:*4* 96:*13*
**fixed** 51:*10*
**Florida** 33:*24* 53:*5* 87:*20* 89:*14, 16* 94:*12*
**follow** 30:*14* 50:*7* 51:*7* 66:*3* 72:*13* 82:*12*
**following** 1:*13* 99:*8*
**follows** 5:*7*
**footnote** 17:*8* 24:*22* 31:*14* 32:*2, 5* 33:*9, 10* 34:*2* 35:*15* 48:*25* 50:*5* 55:*9* 57:*21* 87:*12, 20* 88:*2, 21*
**footnotes** 36:*19* 40:*4, 5, 9* 41:*7* 42:*6* 46:*5* 49:*22* 54:*16* 88:*1, 18* 94:*12*
**forecast** 38:*6* 40:*18* 72:*10*
**forecasted** 43:*18* 82:*18* 83:*25*
**forecasting** 39:*13, 14* 40:*19, 20* 44:*3, 19* 72:*8* 75:*12* 90:*13, 14, 22* 98:*8*
**forecasts** 80:*18* 82:*16*
**foregoing** 100:*9, 13*
**forgetting** 81:*1*
**formed** 28:*4*
**forming** 21:*1*
**formulating** 43:*2*
**fors** 81:*17*
**forth** 28:*17*
**forward** 40:*21* 42:*17* 43:*21* 46:*17, 23* 72:*1, 8* 85:*7* 89:*10*
**found** 22:*19* 75:*23* 94:*22*
**foundation** 29:*19* 34:*25* 35:*11* 63:*7*
**four** 5:*21* 7:*12* 9:*6, 12, 16, 21, 25* 10:*17* 12:*8, 19* 13:*12, 17* 15:*4* 18:*4, 16, 19, 22, 24* 19:*15, 17* 31:*3* 35:*21, 22* 36:*7, 20* 61:*16* 81:*9*
**fourth** 22:*4*
**FPL** 34:*3* 53:*8* 54:*6, 14* 55:*1* 88:*21*
**frame** 92:*14*
**Friday** 4:*5*
**FRIEDMAN** 2:*10* 4:*14, 18* 5:*9, 10* 29:*8, 20, 25* 33:*4* 35:*1, 14* 36:*13, 15, 23, 25* 41:*23* 48:*6* 49:*25* 50:*2, 4* 51:*4, 5* 56:*11, 13* 63:*12* 64:*4, 13* 65:*5*

70:*14* 73:*23* 74:*1* 86:*23* 87:*2, 5, 8, 14, 16* 93:*16* 94:*6, 10* 98:*14* 99:*13*
**FRIEDMAN, ESQ.........5-98** 3:*5*
**front** 87:*1* 97:*9*
**fulfill** 96:*5*
**function** 17:*6*
**functionality** 10:*15, 16, 24* 11:*14*
**functions** 11:*12*
**further** 48:*1* 100:*13, 16*
**future** 36:*8* 38:*6, 24* 43:*23* 52:*4* 82:*16* 83:*8* 89:*9*
**futures** 37:*25*

**< G >**
**gap** 51:*19*
**gaps** 51:*9, 13, 22, 25*
**GARY** 1:*13* 3:*3* 4:*4* 5:*5* 99:*3*
**general** 10:*11, 12* 11:*1* 39:*12* 52:*6* 75:*13* 80:*20, 21*
**generally** 7:*4* 11:*1* 52:*14* 53:*21* 70:*13* 81:*6*
**GEORGIA** 1:*3, 16, 18* 2:*6, 21* 4:*8* 99:*3, 7, 10* 100:*3, 7*
**getting** 5:*13* 49:*21* 94:*7*
**gist** 72:*18*
**give** 5:*1* 33:*6* 45:*12* 50:*2* 55:*7, 8* 69:*6* 85:*21, 22* 94:*6*
**given** 34:*6* 53:*22* 74:*12* 75:*25* 100:*15*
**giving** 68:*17*
**go** 19:*4* 31:*22* 34:*17* 38:*1* 39:*23* 46:*17, 23* 48:*19* 49:*23* 51:*1* 57:*8* 60:*7* 66:*3* 68:*3, 7* 75:*3* 79:*8, 25* 84:*6* 87:*5* 88:*2* 94:*8* 95:*22*
**going** 13:*17* 15:*8* 19:*4* 24:*21* 36:*11* 42:*17* 43:*21* 44:*22* 55:*6* 63:*13* 72:*1, 7* 78:*15, 16* 83:*2* 97:*9*
**Good** 4:*2* 5:*10* 15:*10* 37:*5* 39:*4* 69:*1* 88:*15*
**grants** 27:*11*
**Great** 9:*20* 62:*15*
**greater** 40:*13*
**growth** 80:*10, 13* 81:*4, 8, 11, 15, 17, 20, 21, 25* 82:*2* 91:*12* 92:*20, 22*
**guess** 22:*24* 25:*4* 30:*18* 48:*25*

**< H >**
**half** 7:*22, 24* 69:*6*
**halfway** 17:*9*
**hand** 4:*23* 5:*14* 71:*21, 22*
**handed** 31:*25* 86:*22*
**happened** 86:*24* 92:*17*
**happens** 19:*11* 72:*10* 85:*4*
**harm** 22:*9* 39:*25*
**head** 49:*3, 4*
**healthcare** 6:*8*
**heard** 9:*22* 47:*2* 74:*5, 8* 91:*11*
**hearing** 5:*23*
**heart** 30:*12*
**Help** 86:*3*
**HENRY** 99:*4* 100:*4, 7*
**high** 32:*20, 21*
**higher** 72:*17*
**highly** 44:*21*
**Hilliard** 14:*15*
**Hilliard's** 14:*12*
**history** 73:*2* 80:*25* 81:*6*
**hopefully** 55:*7*
**hour** 6:*24* 36:*12*
**How's** 71:*13*
**hypothetical** 23:*20* 33:*8*

**< I >**
**idea** 74:*2*
**IDENTIFIED** 3:*12* 5:*18* 19:*8* 24:*23* 32:*3* 50:*9, 16, 21* 57:*23* 63:*10, 20, 23, 25* 65:*16* 67:*21* 68:*20* 74:*7* 86:*13*
**identifies** 18:*16*
**identify** 67:*16*
**identifying** 58:*5* 59:*3*
**imagine** 97:*22*
**implement** 12:*25* 20:*16, 21* 42:*24* 43:*7, 25* 44:*13* 96:*16*
**implementation** 13:*14* 20:*3* 21:*7* 35:*5* 86:*6* 89:*8, 17, 25* 90:*5* 96:*10, 11*
**implemented** 21:*19* 42:*21*
**implementing** 13:*3* 43:*8, 12*
**imply** 37:*20*
**import** 12:*5*
**important** 24:*1* 28:*22* 29:*2* 38:*5* 62:*10* 90:*19, 21*
**improper** 22:*25* 23:*1, 9, 21* 24:*4, 5, 7, 9*
**inability** 38:*16*
**inappropriate** 29:*3*
**INC.,(GARY** 100:*11*



include 6:*14, 17* 11:*13*
43:*24* 82:*16, 19* 98:*9*
included 9:*19* 17:*5*
46:*10* 53:*5* 59:*4, 12*
61:*5* 62:*22* 63:*11, 18*
98:*4*
Includes 19:*17* 61:*3*
62:*12*
including 13:*14* 43:*17*
48:*1* 53:*6*
incorrect 97:*11*
increase 96:*2*
increased 96:*24*
increasing 96:*6*
independent 99:*11*
indicate 12:*1* 79:*11*
indicated 54:*4*
indication 66:*3*
individual 44:*19* 56:*22*
70:*17*
individuals 21:*23* 64:*14*
industry 6:*8* 16:*14*
51:*16* 70:*13* 76:*6*
information 18:*14* 21:*20*
22:*2* 37:*6* 42:*10* 54:*22*
55:*20, 22* 57:*17* 86:*15*
95:*18*
informed 30:*4* 40:*11*
42:*10, 18*
infringement 16:*22*
inherent 42:*12*
injury 8:*8*
input 56:*14* 77:*23*
inputs 78:*11*
inputted 64:*15*
installation 89:*7*
installed 89:*3*
instance 23:*3* 44:*10*
59:*7* 72:*2, 10* 84:*21*
instances 71:*17, 18* 72:*6*
intend 6:*17*
intending 21:*19*
interest 20:*19* 65:*13, 15*
interested 60:*2, 4, 5*
65:*11* 67:*5* 74:*12, 18*
75:*24* 100:*19*
internally 28:*16*
interpretation 64:*6*
interpreting 86:*19*
INTERROGATORIES
3:*17* 19:*6, 22*
interrogatory 19:*1, 11, 12*
interrupt 47:*8*
interview 18:*6, 8* 41:*6, 9*
50:*23* 55:*19, 25* 72:*22*
85:*16*
interviews 80:*14*
introduce 4:*11*
investigate 42:*5* 77:*8*
investigation 79:*17*

investor 12:*16*
invoices 7:*17, 20*
involve 12:*14* 89:*17*
involved 6:*8* 12:*16*
16:*14*
involves 39:*13*
involving 16:*11, 24* 17:*4*
IOU 67:*20* 80:*21, 23*
92:*4, 6*
IOUs 46:*1* 51:*10, 17*
76:*6* 80:*24* 92:*10* 95:*1,*
*12, 16*
issue 51:*7* 80:*22, 23*
86:*18*
issued 5:*16* 6:*21* 14:*15*
issues 52:*18* 69:*16*
issuing 22:*6*
it'd 13:*5* 86:*18*
its 13:*1* 14:*18* 29:*10, 16*
49:*16* 57:*19* 59:*4* 62:*17*
77:*8* 84:*7* 91:*9* 96:*2, 6*

< J >
Jackson 1:*16* 4:*10*
99:*10, 20* 100:*6, 24*
jalloy@robbinsfirm.com
2:*23*
JASON 2:*18* 4:*17*
Jennifer 56:*9*
jmayes@robbinsfirm.com
2:*7*
Jon 4:*20*
Jonathan 19:*20*
Josh 93:*10*
Josh's 93:*15*
JOSHUA 2:*3* 4:*16*
JUDGE 1:*8* 93:*10, 14*
Judicial 99:*7*
jumps 97:*10* 98:*2*

< K >
KEY 2:*12* 76:*7*
kind 6:*7*
knew 69:*9, 12*
know 7:*16* 12:*2, 21, 22,*
*23, 25* 13:*8* 17:*15, 22*
18:*19, 21, 22, 24* 22:*22*
30:*11, 17* 33:*7* 36:*11*
41:*1* 42:*16* 47:*2* 49:*3*
51:*23* 52:*17, 23* 53:*1, 15*
59:*18* 64:*15* 65:*13, 17,*
*21, 24* 67:*7, 12* 69:*9*
76:*23* 77:*17* 82:*5* 84:*12*
86:*23* 94:*18, 19* 96:*13,*
*22* 97:*6* 98:*3*
knowledge 42:*22, 23*
70:*2, 8* 77:*19*
knowledgeable 56:*3*
93:*12*
known 70:*13*

knows 65:*15*

< L >
Lack 29:*19* 34:*25*
35:*11* 63:*7* 97:*15*
lady 56:*7*
LANTUKH 3:*20, 22*
10:*6* 20:*5* 21:*21* 42:*9*
46:*20, 21* 50:*8, 18* 69:*20,*
*21* 72:*25* 80:*14* 88:*6*
90:*3* 91:*20* 95:*15*
Lantukh's 73:*20* 85:*16*
large 16:*8* 79:*3* 80:*1*
larger 96:*25*
Law 4:*21* 6:*12* 8:*6, 7*
lawsuit 83:*8*
lawyer 38:*12*
lead 73:*10* 89:*3*
left 7:*13*
legal 8:*10*
letter 68:*8, 12, 16, 17, 21,*
*22* 69:*9, 11, 16*
letters 68:*18* 85:*11, 13*
level 65:*13, 14, 15*
liability 8:*19, 21* 9:*2*
liable 22:*19*
Liberty 17:*24* 45:*14, 15,*
*22* 46:*25* 52:*20, 24* 53:*8*
license 14:*18* 27:*3, 5, 6,*
*10, 11, 12, 13* 28:*25*
73:*18* 83:*12, 14, 19* 84:*1*
89:*1, 18, 20, 24*
licensee 83:*15, 21*
licenses 86:*1*
licensing 43:*22* 58:*2, 25*
86:*4, 16* 89:*14*
Light 33:*25* 53:*5* 89:*14,*
*16* 94:*12*
likelihood 32:*20, 21*
limits 45:*5*
line 35:*25* 61:*20* 63:*2,*
*13, 15* 78:*9, 10* 86:*5*
90:*8* 91:*7* 97:*3*
lines 62:*25*
list 61:*16* 74:*15* 79:*25*
95:*23*
listed 12:*20* 15:*4* 17:*23*
58:*7* 59:*21* 61:*14* 64:*7,*
*24* 65:*24* 66:*6* 67:*12, 16*
74:*19* 75:*15* 78:*22* 87:*3*
95:*5, 6*
listening 4:*19*
lists 19:*13* 33:*23* 95:*2,*
*19, 21*
little 16:*19* 34:*8* 55:*3, 4*
79:*24* 82:*6* 91:*12*
Littlefield 1:*17* 2:*4, 19*
4:*8*
LLC 1:*17* 4:*8*
logical 66:*13*

logically 68:*4*
long 21:*7* 35:*4*
look 6:*1* 9:*4* 17:*7, 8*
19:*10, 21* 20:*22* 24:*12*
25:*3* 29:*3* 30:*10, 12*
35:*18* 38:*15* 39:*23* 44:*9*
45:*21* 48:*19* 49:*23*
50:*13* 54:*15* 66:*4* 68:*6*
72:*8* 74:*17* 79:*21* 80:*1*
81:*4* 86:*11* 88:*21*
looked 31:*20* 33:*18*
76:*5, 7* 78:*3* 79:*12*
80:*25* 81:*6* 85:*19* 88:*20*
Looking 5:*20* 48:*23*
49:*10* 76:*3* 87:*4* 88:*1*
looks 5:*20* 30:*17* 31:*21*
69:*5* 72:*16*
loss 43:*8*
lost 9:*14* 12:*9* 13:*11, 12*
16:*17, 24* 24:*2, 8* 36:*4*
38:*15* 39:*1, 3, 4, 12, 15,*
*20, 21* 40:*8, 24* 54:*2*
84:*6*
lot 74:*15* 97:*24*
lower 72:*14*
LUCASYS 1:*6* 4:*4, 16,*
*17* 7:*15* 9:*10, 14, 24*
10:*5, 13, 17, 22* 11:*21*
12:*23, 25* 15:*6, 11, 22*
18:*17, 20, 23* 20:*14, 16,*
*18, 20* 21:*2, 18* 24:*2, 8,*
*14* 25:*5, 11, 20* 26:*1, 6*
28:*3, 10, 19, 25* 30:*3*
31:*7, 10, 13, 17, 25* 32:*6,*
*11* 33:*1, 22* 34:*9, 13, 16,*
*20, 23* 35:*8, 25* 36:*8*
40:*7* 41:*15, 17* 42:*12, 24*
43:*6, 8, 12, 21* 44:*4, 15,*
*23, 25* 45:*5, 10, 17* 46:*1,*
*15, 23* 47:*4, 12, 21* 48:*3,*
*4, 22* 49:*5* 50:*15* 51:*9,*
*19, 21, 24* 52:*3, 21* 53:*2,*
*10, 21* 61:*11, 13, 17, 21*
62:*13, 19* 65:*11* 66:*8*
67:*2* 69:*10, 13, 17* 70:*3,*
*8, 10, 13, 18* 71:*2, 23*
73:*6* 75:*5, 16, 20* 76:*6, 8,*
*16, 19, 25* 77:*4, 23* 79:*2*
81:*17, 21* 82:*17, 22* 83:*7,*
*16* 84:*15* 85:*6, 15* 89:*14*
90:*14, 15, 23, 24* 91:*4, 24*
92:*13* 93:*4, 5, 18* 94:*14,*
*22, 25* 95:*3, 12* 96:*2, 12,*
*22* 100:*11*
Luis 4:*20*
LUKE 2:*25*

< M >
magnitude 93:*21*
main 11:*5* 93:*7*

maintenance  60:*8, 18*
61:*2, 11*  62:*4*
making  36:*23*  90:*20*
manual  39:*20*
March  1:*17*  4:*5*  99:*4,
17*  100:*20*
mark  19:*4*  31:*23*
MARKED  3:*12*  5:*14, 18*
19:*8*  24:*21, 23*  32:*3*
50:*9, 16, 21*  86:*13*  87:*11*
market  13:*19, 20, 21*
14:*9*  44:*7*  45:*1, 2, 4*
66:*19*  67:*20*  69:*14*
75:*22*  80:*21, 23, 24*  81:*1*
82:*25*  84:*11*  85:*5*  91:*24*
92:*4, 6, 13*
marketplace  45:*16*  95:*1*
markets  8:*11*  14:*4*
80:*19, 21*
marriage  100:*17*
master  73:*12*
Matches  24:*22*
matching  80:*6*
materials  42:*4*
matter  4:*4*  9:*1*  17:*1, 4*
30:*10*  100:*10*
MAYES  2:*3*  4:*16, 20*
29:*19, 23*  33:*3*  34:*25*
35:*11*  36:*11, 22*  41:*20*
47:*22*  49:*24*  50:*1*  51:*3*
56:*9*  63:*7, 24*  64:*10*
65:*2*  70:*11*  86:*21, 25*
87:*3, 13*  93:*12*  98:*16*
McGuffy  56:*10, 11, 14*
mean  13:*20*  15:*17*
30:*14*  37:*20*  47:*8*  48:*15*
54:*18*  58:*1, 3, 4*  73:*17*
78:*18*  96:*6*  97:*24*
meaningful  93:*23*
measuring  39:*25*
medium  79:*3*
meet  25:*11*  57:*8*
members  76:*7, 19*
memory  21:*14*  86:*17*
95:*9*
mention  61:*19*  66:*22*
mentioned  12:*2, 4*  18:*5*
27:*18*  41:*2, 18*  52:*20*
68:*3*  77:*18*  85:*3*  95:*13*
mentions  17:*16*  61:*24*
met  5:*11*
methodology  39:*10, 16,
19*
Meyer  13:*21*  14:*2*
Meyer's  13:*22, 24*
middle  25:*9*
Middlesex  48:*11*  49:*16*
50:*5, 11*  87:*14*  89:*22*
million  7:*22, 24*
mind  16:*9*  60:*9*  97:*10,

*20*
mine  34:*2*
minutes  87:*6*  94:*6*
95:*25*
Mischaracterizes  47:*22*
64:*10*  65:*2*
missed  51:*2, 7*  71:*19*
mistake  63:*6*  86:*23*
misunderstands  98:*2*
mix  31:*24*  79:*3, 17, 18*
87:*9*
model  15:*11, 21*  22:*1, 21,
23*  23:*3, 10, 11, 12, 22, 23*
24:*1, 8*  32:*10, 15, 18, 24*
34:*5*  36:*5, 17*  38:*5*  39:*2*
40:*16, 18, 20, 22*  43:*2, 10,
14, 18, 19*  44:*1, 15*  65:*18*
70:*20, 21, 25*  72:*19*
80:*11*  82:*7, 14*  83:*16, 19,
22*  84:*17*  85:*2*  90:*7*
92:*19*
module  91:*9, 10*
modules  11:*13, 17*  52:*9,
13*  67:*1*  90:*17*  91:*9*
moment  83:*11*
money  82:*24*
months  7:*18*
morning  4:*2*  5:*10*
move  85:*6*
moved  89:*9*
multiple  11:*12*  21:*8*

< N >
N.W  1:*18*  2:*5*
name  4:*8*  48:*22*  56:*8*
80:*2*  81:*2*
names  17:*13*  79:*8, 10, 13*
narrative  78:*12, 17, 20,
21*
narratives  78:*24*
natural  40:*1*
nature  35:*4*
near  83:*9*
neatly  52:*18*
necessarily  44:*16*  60:*1*
64:*18, 20*  75:*18*  76:*18*
necessary  79:*23*  97:*18*
need  23:*24, 25*  36:*12*
52:*4*  54:*11*  58:*23*  60:*6,
23*  63:*9*  82:*16*
needed  62:*20*  63:*4*
needs  12:*15*  18:*15*
25:*11*  51:*10, 15*  62:*17*
negative  67:*17*
neither  32:*25*
never  5:*11*
new  32:*22*  49:*9*  58:*2*
59:*10, 15, 24*  60:*1, 14, 15,
18*  61:*8, 14, 21*  62:*1, 7,
19, 25*  64:*17, 25*  65:*8*

66:*12*  67:*5*  84:*6, 12*
96:*4, 20*
NextEra  17:*24*  53:*4*
non-exclusive  27:*11*
non-tax  98:*7, 8*
normal  55:*17*  65:*22*
76:*4*  77:*15*
NORTHERN  1:*3*
notes  78:*13*  94:*7*
Notice  91:*2*
Nova  10:*19*  11:*25*  12:*2,
22, 25*  20:*22, 23*  21:*9, 13*
34:*24*  35:*16, 18*  52:*15*
70:*22*  71:*7, 18, 21, 24*
72:*2, 11, 20*  73:*4, 9*
November  19:*22*
number  13:*13*  19:*11*
28:*14, 20*  31:*11*  36:*20*
37:*2, 10, 14*  38:*19, 23*
39:*1*  40:*20*  41:*16, 21, 25*
44:*10*  47:*25*  53:*20, 21*
54:*4*  55:*8*  59:*20*  66:*17*
71:*16, 18*  74:*11*  75:*19*
76:*5*  86:*19*  92:*5, 6, 9, 11*
96:*1*
numbers  31:*3, 24*  47:*7*
48:*18*  91:*18*  92:*2*
numerator  38:*10*  54:*2,
21, 25*  71:*11, 18, 19*
numerous  85:*19*
NW  2:*20*

< O >
O.G.G.A  99:*16*
Objection  29:*19, 23*
33:*3*  34:*25*  35:*11*  41:*20*
47:*22*  63:*7, 24*  64:*10*
65:*2*  70:*11*
OBJECTIONS  3:*14*
19:*5*
obligations  96:*5*
obviously  97:*23*
occur  98:*10*
occurred  23:*2, 9, 16, 21*
offer  6:*18*  8:*19*  10:*18,
20*  14:*8*  51:*11*  52:*19*
offered  9:*10*  10:*9, 17*
18:*17, 20, 21*  81:*10*
offering  8:*22*  11:*7*
offers  51:*9*  67:*2*  96:*22*
office  17:*5*
OHIO  2:*14*
Okay  5:*13, 17, 19, 23*
6:*1*  7:*8, 14*  9:*24*  10:*6,
15*  11:*6*  12:*5*  13:*17*
14:*4*  16:*7, 10, 16*  17:*1,
18, 21*  19:*7, 9, 18, 22, 23*
20:*9*  22:*1*  23:*18*  25:*8,
18*  26:*17*  30:*20*  31:*14,
22*  34:*8*  36:*4, 16*  38:*4,
13, 22*  39:*25*  40:*8*  41:*4,

24*  43:*25*  44:*12*  45:*20*
46:*11, 14*  48:*7, 10, 20*
50:*11*  51:*23*  53:*8*  54:*21*
55:*3, 4*  56:*14, 18*  57:*8,
16*  58:*9, 17, 24*  59:*7, 18*
60:*7, 21*  61:*7*  63:*13*
64:*5, 14, 19*  67:*4*  68:*6,
10, 18*  69:*21*  73:*3*  74:*10,
22*  75:*1*  76:*1*  77:*3, 8*
79:*1*  81:*8, 19*  83:*21*
84:*20, 23*  85:*2, 8, 15, 21*
86:*11*  87:*10, 19, 22*  89:*1,
19*  90:*2, 12*  91:*8, 23*
92:*12*  93:*21*  94:*1, 6, 7,
25*  95:*11, 17, 21, 25*  96:*4,
19*  97:*6, 17, 20*  98:*14*
OLSEN  1:*13*  3:*3*  4:*4,
22*  5:*5, 10, 14, 18*  14:*12,
25*  15:*25*  19:*8*  22:*8*
24:*21, 23*  31:*25*  32:*3*
36:*16*  50:*9, 16, 21*  51:*1*
53:*18*  74:*2*  85:*23*  86:*13*
87:*17*  94:*11*  97:*6*  99:*3*
100:*11*
once  84:*5, 7*  85:*4*  89:*3*
ones  37:*18*
one's  49:*24*
ongoing  19:*20, 25*  20:*23*
84:*22*
operating  77:*15*
operations  16:*9*  17:*5*
opinion  12:*5*  16:*20*
17:*18, 21*  21:*1*  29:*1*
30:*5*  51:*21*  52:*19*  66:*5*
68:*17*  83:*6*  97:*25*  98:*1*
opinions  6:*14, 17, 20*
8:*19, 22, 24*  14:*8, 17, 24*
22:*8, 11*  30:*8*  94:*4*
opportunities  24:*2, 9*
37:*10, 13, 16*  38:*2, 10, 19,
23*  44:*19*  48:*2, 13, 16*
49:*19*  53:*21*  60:*16*
63:*10*  64:*25*  65:*7, 16*
66:*3, 12, 24*  74:*23*  75:*4,
19*
opportunity  43:*9*  45:*22*
53:*24*  57:*5, 9, 24*  58:*1, 6,
20*  59:*1, 10*  60:*2, 9, 11,
17, 18*  61:*3, 5, 8, 21, 24*
62:*7, 11, 12, 18, 23*  63:*20,
23*  64:*1, 8, 16*  74:*3*  75:*7*
83:*21*  84:*5*  85:*5*
opposed  68:*1*  97:*25*
option  66:*21*
options  66:*21*
Oracle  16:*9*
ORDER  3:*21*  13:*5, 8*
86:*18*  87:*1, 15*  88:*3*
89:*7*
ordering  13:*4*

**organize** 94:7
**organized** 50:*3*
**outcome** 85:*6* 100:*19*
**Outside** 77:*21*
**overall** 52:*18* 68:*1*
75:*22* 79:*23*
**overhead** 96:*24*
**overlap** 12:*21* 13:*10*
76:*9*
**owned** 12:*16*
**owns** 49:*9*

**< P >**
**p.m** 98:*18*
**package** 84:7
**PAGE** 3:*3, 12* 9:*24*
17:*7* 19:*12, 13, 21* 25:*5,
6* 26:*9, 13* 27:*10* 30:*12,
13, 15, 18, 19, 24, 25* 32:*2*
50:*3* 54:*16* 87:*13, 14*
88:*2* 92:*21*
**pages** 25:*4* 30:*22*
100:*13*
**paragraph** 9:*5, 6* 10:*1*
12:*20* 13:*18* 15:*4* 18:*16*
19:*16* 24:*12, 13* 25:*1, 9*
45:*21, 25* 48:*9* 51:*1, 3, 4,
6, 20, 25* 52:*12* 61:*15, 16*
91:*23* 92:*21, 23*
**parent** 79:*22* 80:*1, 3*
**parents** 49:*16*
**part** 13:*1, 2* 19:*1* 24:*8*
25:*9* 30:*6* 43:*9* 48:*8*
53:*4* 69:*18* 75:*2, 11*
79:*8, 21* 80:*7, 15* 81:*12,
16* 90:*19* 95:*4* 96:*25*
**Partially** 76:*23*
**particular** 9:*5, 6* 14:*9*
17:*8* 19:*10* 22:*16* 28:*8,
9* 31:*7* 39:*10* 41:*14*
45:*12* 59:*7* 74:*11* 75:*6*
90:*15* 93:*9* 97:*25* 98:*1*
**particularly** 96:*7*
**parties** 16:*22* 26:*15*
27:*15* 28:*20* 100:*18*
**party** 14:*22*
**patent** 16:*22*
**PATTON** 2:*11*
**pay** 90:*25*
**payments** 43:*21*
**pending** 85:*8*
**people** 95:*3*
**perceived** 58:*5*
**percent** 54:*11* 66:*6*
68:*24, 25* 69:*1* 72:*17*
84:*11* 91:*15*
**percentage** 70:*15, 17*
92:*13*
**percentages** 91:*24*
**performed** 12:*23* 52:*23*

76:*19*
**performing** 76:*21*
**period** 21:*7* 56:*23* 82:*1*
**periods** 66:*7*
**permit** 25:*20*
**personally** 57:*2*
**personnel** 28:*17*
**perspective** 8:*10* 26:*25*
**ph** 56:*18*
**phase** 57:*4, 6, 9, 11* 74:*3*
86:*5*
**phrase** 74:*6*
**physically** 9:*22*
**pick** 57:*20, 21*
**picture** 36:*17, 24*
**pieces** 10:*8*
**pink** 31:*9*
**PLAINTIFF** 1:*7* 2:*2*
4:*16* 9:*10* 19:*14*
**Plaintiffs** 14:*3*
**PLAINTIFF'S** 3:*14* 19:*5*
**planning** 8:*19*
**plans** 44:*22*
**played** 42:*16*
**players** 93:*7*
**plea** 100:*15*
**please** 4:*11, 13* 9:*5*
25:*22* 26:*8* 27:*9* 29:*6*
43:*5* 71:*5*
**point** 19:*18* 20:*7* 22:*4*
26:*4, 8* 68:*16* 83:*2* 85:*7*
96:*3*
**points** 19:*14* 52:*3*
**pool** 75:*3*
**porter** 4:*12* 19:*20*
**portrayed** 53:*19*
**position** 34:*22* 93:*14*
**possibilities** 41:*3*
**possible** 22:*24*
**possibly** 32:*25*
**potential** 11:*7* 30:*24*
72:*13* 75:*3* 81:*21* 83:*10*
**Potentially** 60:*10*
**Power** 28:*19* 33:*24*
53:*5* 87:*20* 89:*14, 16*
94:*12*
**POWERPLAN** 1:*9* 4:*5,
15* 10:*9, 16, 18, 21* 11:*6*
14:*22* 15:*6* 17:*9* 20:*16*
22:*19* 23:*1, 4, 6, 9, 21*
25:*20* 28:*10, 17, 18, 19*
34:*4, 12, 16, 19* 35:*9*
41:*15, 17* 42:*23* 45:*5*
46:*17* 47:*12* 48:*21, 25*
49:*5* 53:*7* 55:*10, 17, 21,
23, 25* 56:*3, 17, 22* 57:*4,
13, 18, 24* 58:*5, 6, 10, 19*
59:*3, 12* 60:*11* 62:*7*
63:*10, 16, 20, 23* 64:*7, 15,
24* 65:*8, 15, 16, 21, 25*
66:*20, 24* 68:*12, 21, 22*

69:*13, 16* 70:*3, 8, 13, 19*
76:*3, 20, 22, 24* 77:*1, 5, 8,
20* 78:*6* 79:*19, 25* 81:*1,
2, 5, 10, 13, 15, 20* 84:*18*
85:*12* 91:*8* 92:*25* 93:*8,
22* 94:*16, 18* 100:*11*
**PowerPlan's** 10:*13*
14:*18* 15:*12, 23* 22:*10*
24:*3, 9* 30:*2* 32:*12* 33:*2,
15* 34:*24* 35:*9, 23* 36:*9*
46:*24* 47:*20* 53:*2, 10*
67:*8* 68:*1* 69:*10* 70:*10*
77:*10, 19* 81:*3, 24* 92:*18*
94:*2, 5*
**PowerTax** 11:*7, 9, 11, 13,
25* 15:*1* 51:*14* 52:*5, 9,
13* 57:*24, 25* 58:*7* 59:*12,
13* 61:*12* 62:*22* 64:*2*
67:*1, 18* 82:*24* 84:*9, 15*
90:*10, 16* 92:*13*
**PowerTax's** 51:*24* 90:*13,
22*
**PPE** 59:*9, 18, 23*
**predicting** 36:*7*
**preferences** 72:*23*
**prerequisite** 60:*15*
**PRESENT** 2:*17*
**president** 56:*18*
**presumably** 35:*21* 43:*13*
85:*6*
**Previous** 76:*13*
**price** 86:*3* 90:*20* 91:*2, 9*
**prices** 90:*24*
**pricing** 85:*15, 18, 20, 25*
89:*20* 90:*7, 8*
**primarily** 7:*12* 40:*22*
85:*15*
**principles** 39:*8*
**print** 69:*2*
**prior** 20:*10* 97:*4*
**Probably** 8:*1* 57:*3*
**proceedings** 98:*17*
**process** 26:*19* 47:*15*
73:*19* 90:*20*
**product** 10:*19* 12:*23*
13:*6, 18* 20:*1, 14, 16, 18,
19, 20* 21:*9, 10* 26:*1, 5,
14* 27:*7* 28:*3* 42:*13*
44:*14, 24* 51:*19, 21* 59:*5,
12* 60:*3, 4, 6* 61:*1, 21*
62:*22* 66:*19* 71:*2* 75:*8,
9* 84:*2, 3* 89:*24*
**products** 9:*6, 9, 12, 17,
21, 25* 10:*2, 9, 13, 14, 16,
17, 20, 21, 23* 11:*12, 21,
25* 12:*9, 20* 13:*12, 17*
14:*4, 9* 15:*4, 22* 18:*17,
20, 22* 19:*15* 20:*11* 21:*6,
7, 19* 24:*2* 27:*18, 20*
31:*3* 35:*5, 8* 36:*20* 37:*3,
7, 11* 42:*15, 19, 21* 44:*1,*

7, 14 45:*17, 23* 46:*2*
51:*24* 58:*5, 8, 12, 21*
59:*4, 5, 9, 15, 20* 60:*12*
61:*4, 9, 17, 20* 62:*6, 12*
65:*1, 11* 66:*18* 67:*2, 25*
70:*23* 71:*3* 72:*15* 73:*10,
14* 74:*11, 15, 19* 75:*25*
81:*9, 12, 13, 14, 15, 18*
82:*13* 90:*14, 15, 22, 23*
91:*3* 92:*14*
**professional** 13:*13* 64:*3*
98:*5, 6*
**profits** 9:*14* 16:*17, 24*
39:*13, 20, 21*
**prohibited** 99:*16*
**project** 83:*12*
**projected** 96:*1*
**projecting** 75:*15*
**proper** 23:*16*
**proposal** 47:*1* 73:*2*
91:*7* 95:*4, 20, 22*
**proposals** 46:*1, 8, 11, 15*
73:*3, 5, 6* 89:*17* 90:*8*
**proposed** 95:*7*
**proposing** 32:*23* 33:*8*
**proposition** 56:*21*
**provide** 6:*15* 63:*16*
99:*14*
**provided** 19:*14* 23:*11*
52:*13*
**Provider** 27:*11*
**providers** 14:*23*
**providing** 12:*15* 76:*17*
**proximate** 8:*23* 9:*2*
**proxy** 75:*19, 21*
**PS** 62:*21* 64:*2, 3*
**PUBLIC** 2:*13*
**publicly** 81:*7*
**pull** 63:*14*
**pulled** 54:*23* 58:*14*
86:*11*
**pulling** 58:*19*
**purchase** 13:*5, 8* 15:*11,
22* 28:*2* 44:*13* 45:*16*
58:*20* 60:*13, 15* 61:*25*
66:*7, 12* 84:*2, 4*
**purchased** 11:*18, 20, 22*
20:*17* 31:*12* 44:*20*
65:*25* 66:*18* 70:*9* 71:*1,
2* 75:*16* 84:*3*
**purchasing** 20:*20* 30:*3*
66:*20* 67:*5* 72:*23*
**purpose** 36:*7* 61:*7*
**purposes** 30:*2* 33:*13*
34:*21* 80:*4*
**pursuant** 1:*14* 99:*6*
**put** 59:*16* 78:*11* 97:*9*
**putting** 88:*17*
**puzzle** 52:*19*

**< Q >**
**qualifications** 93:*18*
**qualified** 93:*4*
**question** 15:*7, 20* 22:*25*
23:*8* 25:*22, 23, 25* 27:*6,*
*13* 29:*5, 6* 34:*21* 35:*2, 7*
36:*22* 43:*4* 56:*21* 60:*24,*
*25* 66:*1* 67:*15* 76:*13, 15*
93:*9*
**questions** 88:*5* 98:*16*
**quick** 49:*23*
**quite** 21:*7* 84:*8, 10* 93:*6*

**< R >**
**raise** 4:*22*
**range** 86:*6*
**rate** 37:*9, 12, 14, 21*
38:*4, 9, 21* 53:*18, 24*
54:*1* 70:*16* 71:*2* 72:*14,*
*15, 16* 74:*16* 77:*9, 10, 12*
81:*17*
**rates** 71:*7, 8, 20* 72:*7*
81:*4, 11, 15, 20, 21, 25*
82:*2*
**ratio** 38:*4, 13, 22, 23*
53:*20* 72:*11*
**RCC** 51:*18* 94:*19*
**reached** 48:*3*
**read** 12:*1, 3* 13:*22*
14:*12* 17:*22* 19:*12*
27:*23* 29:*5, 7* 39:*4, 7*
47:*8* 57:*1* 74:*7*
**reading** 1:*15* 28:*1* 42:*3*
62:*25*
**ready** 20:*10*
**realistic** 92:*22*
**really** 66:*11* 94:*7*
**reason** 28:*2* 51:*16*
56:*21, 25* 62:*9* 64:*12*
67:*11* 77:*3, 7*
**reasonable** 16:*24* 34:*6*
42:*10, 11* 57:*18* 65:*23*
67:*22* 90:*7, 9* 92:*22*
98:*12*
**reasonableness** 14:*18, 21*
90:*24*
**reasons** 44:*18*
**recall** 11:*5* 17:*13, 15*
19:*3* 28:*12* 50:*10, 11, 22*
56:*16, 20* 57:*2* 69:*23*
74:*4* 77:*2* 78:*13, 25*
88:*12* 94:*17* 96:*17*
**receive** 69:*8, 11, 16*
**received** 68:*8, 12, 16, 17,*
*21, 22*
**receiving** 43:*16*
**recollection** 50:*20*
**reconsider** 32:*17* 84:*6*
**record** 4:*3, 6, 12, 18*
15:*20* 28:*7* 29:*9, 14, 15*
34:*7, 15, 19* 40:*11* 41:*17*

42:*7* 45:*7, 8, 20* 69:*24,*
*25* 73:*22* 77:*25* 85:*19*
87:*5, 10* 88:*14* 89:*12, 13*
91:*22* 94:*8* 100:*14*
**recorded** 4:*3*
**recruiting** 96:*20*
**recurring** 89:*1*
**red** 36:*3*
**reduce** 52:*4*
**refer** 67:*24* 76:*16*
**reference** 17:*9* 27:*5*
35:*20* 36:*1* 46:*5, 7* 59:*8,*
*14, 19, 24* 62:*5, 15* 68:*6,*
*14, 15* 88:*24* 89:*23*
**referenced** 19:*15* 41:*7*
42:*3* 57:*21* 87:*11, 19*
88:*18*
**referencing** 89:*25*
**referring** 24:*25* 46:*6*
48:*9* 51:*13, 25* 64:*16*
**refers** 48:*21, 22* 49:*5*
86:*17*
**regard** 51:*24*
**regarding** 8:*19, 22, 24*
14:*17* 70:*2* 85:*20*
**regression** 97:*3, 15*
**regulations** 12:*16* 99:*6*
**relate** 12:*19* 39:*22*
63:*17*
**related** 16:*16, 21* 60:*11,*
*13* 98:*6*
**relates** 50:*5* 67:*25*
**relating** 17:*1* 87:*21*
**relationships** 76:*6, 7, 10,*
*11, 15, 17, 18* 94:*15, 21*
95:*1, 12, 15, 23*
**relative** 100:*16*
**relevant** 85:*2, 3* 92:*14*
**relied** 85:*15*
**rely** 95:*17*
**remember** 74:*3* 78:*16*
**renewal** 60:*8, 18* 61:*2,*
*11* 62:*2, 3, 4*
**renewing** 82:*24*
**replace** 66:*24*
**REPORT** 3:*13* 5:*14, 16*
6:*14, 20, 23* 7:*11* 8:*18*
9:*1, 4* 13:*22, 25* 14:*12,*
*14* 17:*7, 16, 19, 23* 19:*16*
22:*6* 24:*12, 22* 27:*21*
30:*2* 35:*17* 39:*5, 7, 11*
41:*18, 22* 42:*4* 45:*21, 23*
46:*9* 51:*4* 53:*19* 57:*7*
61:*15* 67:*8, 10, 18* 68:*5*
74:*6, 7, 9* 81:*12* 82:*2*
85:*4* 87:*12* 92:*14* 97:*7,*
*11, 21, 23* 98:*1*
**reported** 7:*8*
**Reporter** 1:*16* 4:*9, 22,*
*25* 29:*7* 99:*10, 21* 100:*6,*

*25*
**Reporting** 99:*7, 14*
**reports** 6:*1* 67:*14, 25*
**represent** 4:*10* 5:*15*
19:*5* 31:*8* 34:*18* 100:*14*
**representative** 27:*24*
28:*24* 45:*14, 15* 47:*18,*
*19* 48:*3*
**representatives** 56:*3*
90:*3* 94:*14*
**representative's** 29:*11*
**represented** 32:*7*
**reproach** 97:*14*
**reproduce** 27:*12*
**requested** 6:*15*
**research** 7:*5*
**respect** 94:*13*
**response** 19:*11* 50:*11,*
*14, 19*
**RESPONSES** 3:*15* 19:*1,*
*6* 46:*14* 88:*9, 10*
**responsible** 7:*17*
**rest** 40:*11*
**restate** 76:*15*
**restructured** 53:*16*
**result** 32:*18*
**results** 23:*12*
**Resuming** 29:*8, 20, 25*
33:*4* 35:*1, 14* 36:*15, 25*
41:*23* 48:*6* 50:*4* 51:*5*
56:*13* 63:*12* 64:*4, 13*
65:*5* 70:*14* 74:*1* 87:*8,*
*16* 93:*16* 94:*10*
**revenue** 9:*14* 12:*9*
13:*11, 12* 26:*25* 36:*4*
43:*16, 17, 18, 23* 44:*3, 5*
81:*4, 9* 82:*17, 18* 83:*18,*
*20* 98:*8*
**revenues** 39:*13, 14, 15*
40:*6, 20* 83:*25* 84:*1*
98:*7*
**review** 7:*6* 19:*1* 34:*17*
42:*7* 45:*7* 64:*23* 78:*21*
91:*21*
**reviewed** 7:*20* 34:*7*
41:*21* 46:*12* 56:*2* 93:*5*
97:*7*
**right** 4:*22* 5:*22* 6:*25*
8:*12* 9:*4, 16* 12:*8* 16:*11*
17:*7, 25* 20:*10* 21:*4*
22:*23* 23:*20* 27:*4* 31:*14,*
*17, 21, 23, 24, 25* 32:*12*
33:*23* 34:*1, 2, 5* 35:*16*
36:*18* 37:*16, 19* 38:*2, 5,*
*14, 18* 39:*16* 40:*22*
42:*13, 17* 44:*4, 22* 45:*1,*
*2* 47:*9* 48:*7, 24* 49:*8, 10,*
*11, 12* 50:*13* 52:*1, 2, 5, 8,*
*9, 13* 53:*13, 23* 54:*20, 23*
55:*12, 23* 56:*6* 58:*15*
59:*25* 61:*4, 15, 18* 62:*13*

65:*17, 18* 68:*22* 69:*3, 6,*
*7, 18* 70:*23* 72:*4, 19*
73:*4, 5, 10, 17, 21* 74:*15*
75:*7* 76:*10, 11, 17, 22*
77:*23* 78:*2, 10, 12, 19*
79:*4, 10* 80:*8, 11* 81:*11*
82:*9, 22, 23* 83:*4, 8, 13,*
*16* 84:*3* 85:*9* 86:*12, 14*
87:*6, 17, 23* 88:*18* 89:*7*
90:*25* 91:*13* 92:*9, 10, 14,*
*22* 94:*12, 16* 95:*23* 96:*2,*
*5, 8, 21* 97:*18* 98:*10, 12*
**righty** 4:*2*
**Riley** 7:*1, 10, 14*
**risk** 42:*12, 14, 16* 43:*1*
**Robbins** 1:*17* 2:*4, 19*
4:*7* 6:*10*
**rolled** 74:*23*
**ROUTING** 3:*18*
**row** 31:*7, 8, 9, 10, 11*
33:*10, 22*
**royalties** 16:*25*
**RPD0002184** 25:*6*
**rules** 99:*6*

**< S >**
**sale** 25:*14, 19* 26:*1, 5, 17,*
*23, 24* 58:*25* 59:*15, 24*
60:*1* 73:*9, 10, 14, 16, 18,*
*19* 75:*12*
**sales** 36:*20* 37:*2, 15*
38:*7* 39:*2* 54:*2* 56:*19*
73:*4* 77:*1, 5* 92:*4*
**Salesforce** 48:*17* 49:*20*
54:*23* 55:*17* 56:*24* 57:*5,*
*13, 20* 58:*4* 59:*18, 19*
61:*1, 18* 62:*6, 15, 24*
64:*23* 65:*20* 66:*2, 23*
70:*22* 74:*14* 76:*4* 77:*9,*
*13, 20* 78:*1* 79:*7, 10, 11,*
*13* 80:*2*
**salesperson** 78:*11*
**SAP** 16:*9*
**saw** 6:*2* 21:*13, 15* 24:*16*
47:*2* 60:*11, 22* 62:*7*
74:*8* 90:*9*
**saying** 35:*22* 44:*19*
95:*15*
**says** 19:*19* 20:*22* 21:*16*
22:*5* 25:*9* 27:*10* 31:*16*
32:*5* 34:*1, 2* 45:*25*
63:*16* 89:*6* 92:*23*
**scenario** 32:*23* 82:*15*
84:*23* 92:*22*
**scenarios** 84:*20* 91:*12,*
*15* 92:*20*
**schedule** 30:*10, 11, 13, 15,*
*16, 18, 19, 22* 31:*2* 32:*2*
35:*20* 36:*19, 21* 37:*1, 15,*
*16, 21, 22, 24* 38:*9, 10, 15,*
*19* 40:*4, 9* 41:*7* 42:*6*

44:9, *10* 48:*15*, *16*, *25*
49:*1*, *18* 53:*25* 54:*3*, *5*,
*15*, *16*, *22* 55:*1*, *4*, *9* 59:*8*,
*16* 61:*7* 63:*5*, *6*, *15*, *19*
64:*22* 67:*17* 68:*7*, *15*, *24*,
*25* 69:*1* 70:*1* 71:*14*
75:*6*, *16* 87:*20* 88:*18*
94:*11* 95:*13*
**schedules** 30:*13* 37:*7*
38:*24* 48:*14*, *16*, *17* 49:*1*
63:*3* 64:*7* 65:*25* 66:*6*
67:*13* 71:*1* 74:*21* 78:*22*,
*24*
**Scope** 25:*8*
**second** 30:*19*, *24* 32:*1*
33:*10* 50:*3* 51:*8*
**secrets** 16:*23*
**section** 17:*15* 39:*7*
**see** 17:*10* 19:*18* 20:*9*,
*23* 21:*16* 22:*4* 24:*14*
25:*7*, *12* 27:*7* 31:*15*, *18*,
*19*, *24* 36:*2* 39:*23* 46:*3*,
*25* 49:*22* 51:*11* 57:*9*
58:*22* 59:*2* 62:*9* 64:*12*
66:*4*, *10* 67:*11* 68:*6*, *8*
74:*17*, *24* 77:*25* 86:*3*
87:*3*
**seeing** 78:*13*
**seen** 9:*20*, *22* 20:*11*
89:*17* 95:*2*
**sell** 24:*2* 37:*10* 43:*9*
59:*4*, *5*, *10* 60:*18* 61:*8*,
*21* 62:*7*, *19* 64:*8*, *17*, *25*
65:*8* 66:*24* 81:*13*
**selling** 52:*3* 61:*11*, *14*
65:*12* 71:*24*
**sells** 79:*19* 81:*16*
**sending** 7:*17*
**sense** 22:*9* 87:*24*
**sent** 85:*11*
**sentence** 25:*25* 26:*3*
45:*25* 46:*3*, *6* 51:*8*, *11*
**sentences** 78:*18*
**separate** 13:*5*, *9*, *16*
62:*17*
**separately** 11:*18*, *20*, *22*
**series** 31:*3*
**seriously** 32:*24*
**serves** 21:*14* 37:*4* 86:*17*
95:*9*
**service** 16:*2* 17:*4* 26:*11*
51:*8* 96:*9*
**services** 9:*13*, *17* 12:*10*,
*13*, *14*, *15*, *19*, *22*, *24* 13:*1*,
*2*, *7*, *11*, *15* 14:*23* 24:*3*,
*18* 26:*12* 31:*4* 35:*6*
36:*21* 46:*2* 47:*12* 51:*9*
52:*4*, *24* 53:*2*, *4*, *6*, *10*, *16*
62:*17*, *20* 63:*4*, *17* 64:*3*
68:*1* 73:*9*, *13* 76:*11*, *17*,

*21* 77:*5* 95:*8* 96:*7*
99:*14*
**serving** 75:*19*
**set** 19:*6*
**seven** 96:*14*
**shade** 31:*9*
**sheet** 12:*23*, *24*
**show** 55:*15* 62:*21*
**shown** 36:*19* 37:*6*, *11*,
*15* 38:*19*, *24* 53:*24* 54:*3*
55:*1* 95:*13*
**side** 77:*5*, *6* 81:*20*, *22*
96:*17*
**signed** 41:*11*
**significance** 97:*16*, *18*
**significant** 76:*8* 82:*24*
**signing** 1:*15*
**similar** 79:*18*
**simply** 59:*6* 89:*6* 98:*5*
**single** 67:*9*, *12*, *16*, *24*
74:*20*, *21* 78:*17*, *18*
**Sir** 6:*14* 8:*2* 23:*16*
25:*22* 29:*9* 54:*12* 60:*24*
66:*13*
**sit** 22:*22* 28:*13* 45:*8*
49:*2* 50:*10* 97:*10*
**site** 96:*8*
**size** 79:*9*, *11*, *23* 80:*5*
**skimmed** 78:*23*
**slate** 44:*25*
**SLIP** 3:*18*
**slopes** 97:*19*
**small** 69:*2*, *14* 79:*3*
**software** 9:*6*, *9*, *12*, *17*, *23*,
*25* 10:*9*, *17* 11:*6*, *11*
12:*8*, *19*, *23* 13:*3*, *6*, *12*
15:*4*, *12* 16:*1*, *2*, *4*, *7*, *12*,
*14* 17:*2*, *4* 18:*17* 19:*15*
20:*18* 24:*2*, *19* 25:*11*, *14*,
*16*, *18*, *19* 26:*1*, *5*, *11*, *13*,
*18*, *23* 27:*3*, *7*, *10*, *12*, *14*,
*18* 28:*3*, *25* 30:*3* 31:*3*
33:*11*, *13* 35:*5* 37:*3*, *7*,
*13*, *23* 42:*24* 44:*1*, *14*
46:*2* 51:*15* 54:*8*, *12*, *13*
58:*2*, *25* 59:*10*, *16*, *24*, *25*
60:*3*, *4*, *6*, *8*, *12*, *14*, *15*, *19*
61:*2*, *14*, *16* 62:*1*, *4*, *7*, *18*,
*19*, *25* 63:*1*, *20*, *22* 64:*1*,
*8*, *9*, *17*, *25* 65:*1*, *8*, *11*, *25*
66:*7*, *12*, *18*, *19* 67:*2*, *6*, *8*
68:*2* 70:*9* 75:*5*, *16*
76:*24* 79:*3* 80:*19*, *21*, *24*
81:*3* 82:*13* 84:*7*, *8*
85:*25* 86:*4*, *5*, *15* 94:*13*
96:*10*, *11*, *16*
**softwares** 61:*25*
**sold** 21:*5*, *6* 58:*8*, *12*
61:*17* 72:*20* 75:*5* 79:*2*
80:*24*

**solemnly** 4:*25*
**solution** 44:*6* 82:*25*
**solutions** 25:*11*, *17*, *18*,
*19* 42:*25*
**sorry** 15:*15* 28:*19*
30:*11*, *21* 34:*22* 36:*21*,
*22* 37:*20* 38:*12* 43:*3*
51:*6* 52:*10* 54:*9* 69:*10*
76:*13* 86:*8*, *9* 87:*6*
**sound** 17:*24*
**sounds** 5:*22* 6:*25* 16:*14*
**source** 9:*25* 10:*1* 21:*20*
48:*24* 55:*9* 69:*21* 95:*18*
**sources** 79:*12*, *14*
**Southwest** 48:*11* 50:*14*,
*15* 86:*12* 88:*2* 90:*3*
**speak** 45:*20* 47:*25* 68:*5*
**speaks** 49:*15* 60:*22*
**specific** 10:*10* 27:*7*, *13*
28:*12* 29:*12* 53:*12*
54:*11* 65:*11* 67:*19* 68:*4*,
*6* 70:*6* 75:*12*, *14* 77:*7*
78:*24* 81:*23* 85:*13*, *21*,
*23*
**Specifically** 10:*25* 17:*3*
42:*18* 44:*18* 45:*8* 50:*22*
58:*6* 59:*20* 67:*25* 73:*8*
77:*2* 81:*18* 89:*16* 93:*7*
94:*17*
**spend** 82:*23*
**spoke** 20:*7*
**spoken** 14:*25* 15:*5*
**spreadsheet** 48:*24* 55:*12*,
*15*
**SQUARE** 2:*13*
**SQUIRE** 2:*11*
**Stack's** 17:*16*, *19* 67:*8*,
*10*, *13*, *18*, *21*, *24* 68:*5*
**staff** 57:*3* 96:*2*, *6*
**stamp** 25:*4* 55:*8*
**stand** 64:*3*
**standard** 4:*6* 60:*8*, *17*
61:*2*, *11*
**start** 9:*5* 23:*19*
**started** 5:*13* 21:*13*, *15*
23:*6* 24:*5*, *7* 43:*6*
**Starting** 24:*11* 83:*19*
**starts** 30:*18*
**startup** 40:*12*
**State** 1:*16* 51:*14* 99:*3*
100:*3*, *7*
**stated** 12:*9*
**STATEMENT** 3:*19*
21:*2*, *16* 24:*20* 25:*3*, *5*, *8*,
*19* 28:*23* 29:*18* 33:*20*
45:*9*, *13*, *15* 51:*8* 66:*16*
69:*25* 77:*4*
**statements** 17:*19* 29:*10*,
*13*, *16*, *17* 46:*18* 70:*4*, *6*
81:*7*

**STATES** 1:*2* 9:*1* 26:*5*
**stating** 32:*24*
**statistical** 97:*16*, *18*
**stem** 76:*19*
**step** 26:*19*, *21* 49:*12*
**steps** 26:*22* 27:*1*
**Steve** 5:*10* 93:*13*
**STEVEN** 2:*10* 3:*5* 4:*14*
19:*20* 20:*7* 99:*13*
**steven.friedman@squirep**
**b.com** 2:*16*
**STEVENSON** 2:*25* 4:*9*
**stigma** 44:*25* 45:*2*, *3*, *16*
**stipulations** 1:*14*
**stopped** 38:*1* 47:*16*
**straight** 87:*10* 97:*3*
**Street** 1:*18* 2:*5*, *20*
**strike** 12:*18* 17:*21*
47:*18* 60:*5*, *7* 69:*10*
77:*17*
**String** 19:*20* 20:*7*
21:*21* 42:*9*
**study** 96:*19*
**sub** 51:*16*
**subdivisions** 49:*13*
**subset** 75:*15*
**subsidiaries** 49:*14*, *17*
**subsidiary** 79:*22*, *25*
80:*3*
**substitute** 52:*7*, *12* 90:*20*
**substitutes** 90:*16*
**subtract** 82:*17*
**subtracted** 83:*20*
**subtracting** 39:*14* 43:*18*
**success** 72:*14*, *15*, *16*
**Suez** 17:*24* 31:*16* 32:*5*,
*11*, *25* 33:*24* 34:*3*, *9*, *10*,
*13*, *16*, *20*, *22* 35:*10* 47:*2*,
*3*, *11* 48:*3* 49:*5*, *9* 53:*15*
54:*6*, *14*, *25* 72:*4*, *5*
73:*13* 88:*20* 94:*12*
**Suez's** 47:*8*, *17*, *19*, *20*
**sufficient** 18:*15*
**suggested** 40:*25* 41:*1*
**suite** 11:*11* 51:*15* 68:*1*
**summarizing** 59:*6* 60:*10*
**summary** 17:*15*
**supplied** 70:*16*
**supports** 45:*13*, *15*
**sure** 15:*20* 16:*6* 23:*14*
25:*24* 29:*24* 31:*23*
36:*17*, *23* 48:*19* 53:*23*
54:*15*, *21* 55:*5* 59:*2*
71:*5* 88:*13* 92:*21*
**surprised** 77:*14*
**swapped** 38:*11*
**swear** 4:*13*, *25*
**SWG** 63:*17*
**switch** 84:*15* 92:*13*
**sworn** 5:*7*

< T >
**tailor** 20:2
**take** 17:8 35:6 43:1
44:8, 9 49:23 50:13
69:6 71:14 73:23
**taken** 1:14 4:4 18:3
23:25 36:14 73:25
83:18 87:7 94:9 100:10
**talent** 96:20, 21
**talk** 34:8 35:19 55:3, 4
95:25
**talked** 48:17 51:6
69:15 73:5 74:2 82:9
91:12
**talking** 26:24 27:15
62:13 76:14 82:1 85:22
92:6
**Tampa** 44:10, 20, 23
**tax** 10:20, 22 11:14, 19
12:15, 22, 24 17:2, 3
19:19, 24 20:10, 14, 18
21:10 26:12, 16 27:16,
17 31:8, 10, 12, 17 32:6,
11 33:1 34:23 37:11
44:5, 14, 24 45:17, 22
51:11, 17, 19 52:7, 10
57:25 58:2, 7, 11, 12, 20
59:13, 21 60:8 61:1, 3, 8,
9, 14, 20 62:7, 12, 18
63:5, 18 64:9, 25 67:18
68:1 71:8, 15, 17, 25
72:6, 9, 11, 21 81:10, 16
82:20 83:1, 4, 10 84:7
86:5 90:16 91:2, 3, 9
92:4
**team** 7:7 93:4, 5, 18
**technical** 10:10 96:4, 15,
17, 18
**TECO** 44:11, 13
**telecom** 16:14
**tell** 14:2 16:19 19:20
47:7 50:18 66:11 68:18
**ten** 83:12
**tend** 14:8
**term** 16:5, 7 35:4 83:9
**terminated** 52:21 53:1, 9
**terms** 10:24 11:2 14:21
26:24 40:8
**test** 58:17, 18, 23 60:21,
23 62:3, 5, 9 64:5 76:2
78:15
**testified** 5:20, 24 6:3
8:2 16:11, 13, 23 17:1
56:16
**testifier** 8:5
**testify** 17:3
**testimony** 5:1 6:2 7:6
16:16 21:24 28:20, 22
33:2, 6 34:17 41:12
45:10, 11, 18 47:23, 24

56:2 64:10 65:3 68:11
69:23, 24 73:20 76:5
77:18, 21, 22 78:2 80:17
91:21 95:15 100:10, 14
**Thank** 49:22 50:1
54:12 90:2 94:6
**Thanks** 15:7
**theres** 49:6
**thing** 11:21 29:21 33:9
50:14 63:14
**things** 47:25 66:17
93:12
**think** 5:23, 25 29:12
30:12 38:11 53:5 62:10
69:1 72:18 74:5, 8
78:14 79:24 82:8 96:13
97:11 98:2, 14
**thinking** 54:12 78:12
**thinks** 59:5
**third** 14:22 30:13, 15,
21 45:25 86:5
**thought** 6:2 42:18 47:2,
5 64:7, 24
**three** 7:12 17:8 25:4
27:17, 19 33:23 54:6, 14,
25 55:2 72:6, 7, 17
79:15 95:3, 12
**tie** 22:15
**time** 4:5, 6 6:4, 11 8:5
10:12 42:19, 22 47:15
56:23 66:7 73:12 77:1
84:8, 10 92:14
**timeframe** 96:23
**timeframes** 92:15
**timeline** 21:13, 15
**times** 5:21
**timing** 22:25 23:1
**title** 30:24 56:20
**Today** 4:5, 9 28:13
45:9 88:5 97:10
**told** 13:24 14:14 63:2
72:25 73:1
**top** 49:3, 4 95:3
**topic** 8:16 14:24 22:11
28:21 97:12 98:3
**topics** 9:16
**total** 72:6 75:3 92:3
**TOTENBERG** 1:8
**tough** 93:18
**TOWER** 2:12
**track** 77:10
**tracks** 77:8
**trade** 16:23
**transcript** 100:9
**transpired** 28:11
**treatises** 39:18
**trial** 6:18 85:1, 4, 5, 6
**true** 21:9 33:9 61:24
100:9, 14
**truly** 62:11
**Trustpoint.One** 99:11, 13

**Trustpoint.One/Alderson**
4:11
**truth** 5:1, 2
**trying** 42:13 49:13
69:23
**two** 7:21 16:21 19:17
21:23 30:22 31:19 32:7
38:13 44:21 48:2, 7, 8
49:22 53:8, 12, 15 57:5,
6, 9, 11 59:15 60:11
65:11 66:18 67:25 71:3
72:8 74:3 81:9, 12, 14,
15 85:23 91:15
**Tyler** 40:25 57:7 74:8
**Tyler's** 39:5 57:11 74:7
97:7, 11, 21
**types** 75:25 76:8
**typo** 35:15
**typographical** 35:16

< U >
**ultimately** 26:22
**unable** 20:16 42:24
68:3
**underlying** 30:9
**understand** 6:23 8:18
9:9 11:6, 8, 17, 19, 22
13:5, 16 16:3 20:15
22:12 25:20 26:15 29:5
36:23 43:6 48:2 51:14
52:2 56:1 57:13 63:8, 9
64:11 70:16 74:22 83:9
84:22 85:9 95:14
**understanding** 10:2, 8,
11, 12, 16, 18, 23 11:1, 9,
11, 15, 24 12:12, 14 13:2,
18 14:5 16:4 20:1, 4
21:3, 12 27:15 28:2
36:16, 18 42:19 45:4
46:19 52:6, 12 55:14, 16
58:9, 14 59:3 62:21
64:21, 23 69:14, 19
73:11, 12 88:25 94:24
**understood** 64:2 94:14
**unexpected** 82:21
**unintelligible** 20:11 48:8
49:7 52:15 55:12 68:13
98:13
**UNITED** 1:2
**unusual** 18:10
**unwieldy** 55:7
**unwilling** 46:23
**uplift** 59:9, 18, 23
**use** 20:10 27:12 36:7
38:6, 22 47:4, 12 48:3, 4
65:23 72:2 73:17 79:6,
9, 14
**user** 15:1, 3
**uses** 57:18 65:22 77:20
78:6

**utilities** 12:17

< V >
**Vadim** 20:5 94:18
**value** 40:24 92:9
**variable** 96:1 97:1, 12,
14 98:3
**various** 12:15
**vendor** 14:22
**veracity** 17:18
**verbal** 34:15, 19 46:6, 22
**verification** 19:22
**verify** 67:4
**version** 20:9
**versus** 4:4 10:13, 17
11:4 49:5 64:1 93:15
100:11
**vice** 56:18
**video** 4:3
**VIDEOGRAPHER** 2:25
4:2, 9
**view** 13:9
**Viola** 49:6, 7 87:2
**vs** 1:7

< W >
**waived** 1:15
**want** 19:12 25:23 36:17
73:23 92:21 95:16
**wanted** 51:7 60:6
**Water** 48:11 49:6, 16
50:5, 14, 15 86:12 90:4
**way** 12:19 45:21 48:21,
22 63:25 65:21 97:5
100:18
**web** 9:24
**website** 10:4
**week** 6:4
**Well** 5:13 10:18 12:21
20:8 21:25 23:6, 11
25:16 30:4, 17 34:8
36:2 37:12, 14 39:12
40:6, 11 41:1 42:8 44:8
46:25 49:21 53:16 55:8
57:23 62:3 64:20 66:11
67:7 69:24 72:16 73:1
75:14 79:11 80:17 81:9
82:20 83:18 84:9, 25
85:22 89:18, 24 91:4
93:11 94:13 96:7 97:12,
22, 24
**went** 21:13 36:19 38:9
53:14 64:21 68:18 82:5
87:25
**We're** 4:3 18:2 25:6
30:11, 25 54:15 62:13
92:6, 21 94:7
**we've** 4:19 5:10 42:8
82:3
**willing** 46:16 90:25

**win**  37:*9, 12, 14, 21*  38:*4, 8*  53:*18, 24*  70:*16*  71:*7, 8, 20*  72:*7*  74:*10*  77:*9, 10, 12*
**WITNESS**  1:*13*  4:*13, 24*  5:*3*  29:*16, 24*  35:*13*  41:*21*  47:*24*  56:*12*  63:*9, 25*  64:*12*  65:*4*  70:*12*  93:*14*  100:*12*
**witnesses**  56:*5*
**word**  34:*2*  73:*17*
**words**  38:*15*  45:*19*  52:*11*  78:*18*
**WORK**  3:*19*  25:*3, 5, 8*  26:*11*  33:*20*  34:*10*  47:*14*  76:*19*  95:*7*  97:*15*
**worked**  6:*10*  7:*1, 11*  8:*4*  76:*23*  77:*4*  94:*16, 18, 19*
**workflow**  47:*15*
**works**  83:*11*
**world**  40:*1, 3, 5*  44:*21*
**written**  34:*14, 19*  46:*6, 8, 11, 13, 15, 22*
**wrong**  98:*5*
**wrote**  74:*6*

**< Y >**
**yardstick**  40:*16*
**Yeah**  4:*20*  13:*21*  25:*18*  29:*21*  30:*14, 21*  36:*23*  37:*18, 20*  38:*8*  46:*21*  49:*21*  51:*4*  52:*10*  54:*2, 4, 21*  62:*3*  70:*5, 21*  71:*6*  72:*22*  73:*8*  77:*21*  78:*4, 9, 14*  80:*2, 7*  84:*11*  85:*22*  87:*25*  92:*8, 15, 17, 20*  94:*14*  96:*11*
**year**  31:*11*  38:*24*  44:*1*  53:*22*  57:*25*  58:*12*  65:*1*  74:*12, 23, 25*  75:*4, 25*
**years**  21:*8*  35:*6*  36:*8*  37:*18*  40:*20*  66:*1*  83:*12*  93:*6*

**< Z >**
**Zoom**  4:*19*  6:*6*



Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)