

Transcript of **Vadim Lantukh 30(b)(6)**

Wednesday, September 14, 2022

*Lucasys Inc. v. Powerplan, Inc.*

www.TP.One
www.aldersonreporting.com
www.accutrancr.com
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 120888

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3   LUCASYS INC.,            )
                             )
4           Plaintiff,       )
                             )
5      vs.                   )    CIVIL ACTION FILE NO.
                             )    1:20-CV-2987-AT
6   POWERPLAN, INC.,         )
                             )
7           Defendants.      )

8

9                    DEPOSITION OF:

10              LUCASYS, INC. 30(b)(6)

11      DESIGNATED REPRESENTATIVE VADIM LANTUKH

12      Being taken pursuant to stipulations herein:

13          Before Debbie C. Hennings, CCR, RPR

14           Wednesday, September 14, 2022

15             Commencing at 12:59 p.m.

16

17

18

19

20

21          All parties, including the court reporter,

22      appeared remotely.

23

24

25   Job No. 120888
```

1              I N D E X   T O   E X A M I N A T I O N S

2    VADIM LANTUKH
          BY MR. FAZIO . . . . . . . . . . . . . . . . .   5
3

4

5                I N D E X   T O   E X H I B I T S

6                    (No exhibits marked.)

7                           * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    A P P E A R A N C E S

 2    ON BEHALF OF THE PLAINTIFF:

 3         JOSHUA A. MAYES, ESQUIRE
           Robbins Alloy Belinfante Littlefield LLC
 4         500 14th Street, NW
           Atlanta, Georgia 30318
 5         jmayes@robbinsfirm.com
           404-856-3255
 6
      ON BEHALF OF THE DEFENDANT:
 7
           STEPHEN M. FAZIO, ESQUIRE
 8         Squire, Patton, Boggs
           1000 Key Tower 127
 9         Public Square
           Cleveland, Ohio  44114
10         216-479-8403
           Stephen.fazio@squirepb.com
11
      ALSO PRESENT:
12
           Paul Smith, Videographer
13         407-718-7164

14

15                          *  *  *

16         (Pursuant to O.C.G.A. Section 9-11-29(a) and

17    (d) and Section 15-14-37(a), (b) and (c), the court

18    reporter disclosure statement is tendered at the

19    end of the transcript.)

20                          *  *  *

21

22

23

24

25
```

1              THE VIDEOGRAPHER:  We are now on the record in

2       the matter of "Lucasys Inc. v. PowerPlan Inc."

3       Today's date is Wednesday, September 14, 2022, and

4       the time is 12:59 p.m.

5              This is the video recorded deposition of Vadim

6       Lantukh as the 30(b)(6) witness.  This deposition is

7       being taken via Zoom.

8              I am the camera operator.  My name is Paul Smith, in

9       association with TP.One.  The court reporter is Debbie

10      Hennings, also in association with TP.One.

11             Will all attorneys identify themselves and the

12      parties they represent, beginning with the party

13      Noticing the proceeding.

14             MR. FAZIO:  Stephen Fazio with Squire, Patton,

15      Boggs (US) LLP on behalf of the Defendant

16      PowerPlan, Inc.

17             MR. MAYES:  Joshua Mayes with the Robbins Firm

18      representing Lucasys.

19             COURT REPORTER:  And if I could have counsel

20      stipulate on the record that there is no objection to the

21      court reporter swearing in the witness remotely.

22             MR. MAYES:  No objection.

23             MR. FAZIO:  No objection.

24                     VADIM LANTUKH,

25      being first duly sworn, was examined and testified as

1    follows:

2                          EXAMINATION

3    BY MR. FAZIO:

4         Q.   Good afternoon, Mr. Lantukh.

5         A.   Good afternoon.

6         Q.   Sir, we spoke at a previous deposition.  I

7    know you have been through the ground rules before so I

8    won't go through them again exhaustively.

9              I just ask if I ask you a question today that

10   you don't understand, if you please just let me know

11   that you don't understand and I'll do my best to

12   rephrase it; is that fair?

13        A.   Yes.

14        Q.   Sir, you understand that you have been

15   designated to testify on behalf of Lucasys Inc. on the

16   damages that Lucasys is claiming in this proceeding and

17   the basis for those damages?

18        A.   Yes.

19        Q.   Okay.  What have you done to prepare for your

20   deposition today?

21        A.   I met this morning with counsel for about an

22   hour, reviewed the Notice of the deposition.  Yeah.

23        Q.   So aside from your meeting with counsel, did

24   you do anything else to prepare?

25        A.   Again, I went through just my memory of the

1    facts of this case.  I went through and looked at some

2    of the analysis that we had done when we brought the

3    case.

4            I think that's it, pretty straight -- so just

5    a full review of the case and the documents in this

6    case, the complaint before going on today.

7        Q.   So in terms of the documents that you looked

8    at, can you tell me -- you mentioned the Notice of

9    Deposition.  What other documents did you look at in

10   preparation for your deposition today?

11       A.   I looked at some of the forecasts that I think

12   were in the discovery, things like that.  The

13   projections that we had done internally at various times

14   during the course of the business.

15       Q.   You looked at forecasts, and those were all

16   documents that have been produced in discovery?

17       A.   Yes, I believe so.

18       Q.   Aside from the forecasts, what other documents

19   did you look at?

20       A.   I believe that's it.

21       Q.   Okay.  Well, you said -- you said a minute ago

22   that you looked at some analyses that were done I think

23   at the time or before the case was brought.  What were

24   you referring to, sir?

25       A.   I'm sorry, can you repeat that.  It's a little

1   hard to hear.

2       Q.   I said a moment ago I think you said that you

3   had looked at some analyses that were done at or before

4   the time the litigation was brought?

5       A.   Yes, that's correct.  So with our complaint,

6   we had of course requested the damages, so I

7   refamiliarized myself with that request and the analysis

8   that supported that.

9       Q.   That's a written analysis that was done?

10      A.   It is a -- yes, I looked at a printout of a

11  spreadsheet analysis that was done.

12      Q.   Okay.  And do you know if that analysis has

13  been produced in this litigation?

14      A.   I believe that -- my understanding is that

15  that is work product tied to the complaint, but I would

16  have to maybe defer to counsel.

17          MR. FAZIO:  Hey, Joshua, is that something

18          that's been produced or not produced or are you

19          guys asserting privilege over it?

20          MR. MAYES:  That has not been produced.  That

21          was work product.  That was done at our direction.

22          MR. FAZIO:  Well, he's here to testify about

23          it.  He's clearly reviewed it in anticipation of

24          his testimony today, so I think we're entitled to

25          see that.



1          MR. MAYES:  I mean, if he reviewed a memo that

2     we produced to give to him on the legal analysis,

3     you wouldn't get that either.  Your guys wouldn't

4     testify as to things that -- discussions they had

5     with their in-house counsel about the case.

6          We don't think he should have to testify about

7     things he prepared specifically for us at our

8     direction and transmitted us.

9          MR. FAZIO:  You guys said you wanted $47

10     million in your complaint.  Part of the reason for

11     us being here today is to find out the basis for

12     that number.

13          He's reviewed a document that outlines the

14     basis for that number.  I mean, if he's used it to

15     prepare himself for today, I think we are entitled

16     to it.

17          MR. MAYES:  Okay.  Well, I hear your position.

18     We can take it up offline if you'd like.  It has

19     not been produced is the answer to your question.

20          MR. FAZIO:  Okay.  And just to be clear,

21     you're asserting work product protection over it

22     despite the fact that he's here to testify about

23     these very topics and he's reviewed it in

24     preparation for his deposition today; is that the

25     position?

1              MR. MAYES:  He didn't review it independently.

2        The same way that you would not let your witnesses

3        testify as to things you showed them, I'm not going

4        to let him testify about things I showed him during

5        preparation.

6              MR. FAZIO:  So your position is that he's not

7        going to answer even questions concerning what the

8        basis of the $47 million is?

9              MR. MAYES:  No, we'll let him testify about

10       that.  I'm just talking about this specific

11       document that was prepared at our direction for us.

12             We haven't produced it and aren't planning to

13       at this point, but we're happy to discuss that.

14       I'm happy to have you ask him questions about his

15       analysis and what he's done and where that came

16       from.

17             MR. FAZIO:  Okay.  I mean, obviously, we can

18       agree to disagree about it, but let's see where the

19       deposition goes and we'll take it up -- we'll take

20       it up offline if we need to.

21             MR. MAYES:  Okay.  Sounds good.

22   BY MR. FAZIO:

23       Q.  All right.  So, sir, in addition to this

24   analysis that we have been discussing a minute ago and

25   the forecasts that were produced in discovery, have you

1    looked at any other documents in preparation for your

2    deposition today?

3         A.    Not specifically for this deposition, no.

4         Q.    And you said you met with Mr. Mayes.  And you

5    said you met with him today; is that correct?

6         A.    That's correct.

7         Q.    Okay.  Any other meetings in preparation for

8    your deposition today?

9         A.    No.

10        Q.    Okay.  Was anybody else -- did anybody else

11   participate in the meeting that you had with Mr. Mayes?

12        A.    Yes.

13        Q.    Okay.  Who else participated?

14        A.    Mr. Alloy, Mr. Cieslak and Mr. Blanquez --

15        Q.    I'm sorry, what was the last name?

16        A.    Blanquez, Luis Blanquez.

17        Q.    Anybody else?  Sorry I interrupted you.

18        A.    No, that was all.

19        Q.    Now, sir, we -- why don't we jump right into

20   it.  This -- you're aware that Lucasys in its complaint

21   and in its first amended complaint alleges that it's

22   entitled to $47 million in damages?

23        A.    At least 47 million, that's correct.

24        Q.    Okay.  And, sir, I would like you to help me

25   understand, what's the -- do you have an understanding

1    as to the basis of that $47 million?

2         A.   I do.

3         Q.   Okay.  Why did you -- help me understand what

4    the basis of the $47 million is.

5         A.   So the $47 million came from an analysis that

6    was performed I believe in May of 2020 at the request of

7    counsel.

8              It was in and around that time that what's

9    been referred to as the agreed process had come to an

10   end and we became aware that PowerPlan had reached out

11   to and interfered with at least two additional Lucasys

12   customer relationships.

13             And we understood in that period of time that,

14   absent relief from the court or through a judicial

15   process, that we would not survive as a business.

16             And so at that time in preparation for

17   bringing the complaint we put together an analysis based

18   upon the facts that were known at that time related to

19   the contracts and opportunities that were impacted and

20   lost as a result of PowerPlan's direct interference with

21   them.

22        Q.   So let's take this one step at a time.  Who

23   was the author of this analysis?

24        A.   I was the primary author and put it together

25   with coordination from my co-founders at Lucasys, Daniel



1   and Stephen.

2        Q.   And you said this was in May of 2020?

3        A.   I believe that's correct.  May have been June.

4   Sometime in that time frame.

5        Q.   And you say Daniel and Stephen were -- Daniel

6   Chang and Stephen Strang were involved as well?

7        A.   They certainly had a review role, and I

8   believe we had made sure that we were in agreement on

9   that analysis with the approach and of course the

10  numbers in it.

11       Q.   Okay.  And who asked you to do -- who

12  specifically asked you to prepare this analysis?

13            MR. MAYES:  Objection.

14            Do not disclose attorney-client

15       communications.

16            MR. FAZIO:  Well, I'm asking -- I'm not asking

17       for the substance of communications.  I'm asking

18       who --

19  BY MR. FAZIO:

20       Q.   Was it an attorney that instructed you to do

21  this?

22            MR. MAYES:  Again, I object.

23            Do not disclose attorney-client

24       communications.

25            Steve, I think asking him who instructed him

1          to do a particular analysis is asking for the

2          substance of the information.

3                    MR. FAZIO:  I asked him if an attorney asked

4          him to do it or not.

5                    THE WITNESS:  Yes, this analysis was done at

6          the request of our attorney, Robbins Firm, and it

7          was done in support of the complaint that was

8          brought.

9                    So it was part of a larger analysis that went

10         into the preparation for the complaint.

11    BY MR. FAZIO:

12         Q.   Okay.  So there was a financial -- this --

13    there was a financial -- there was a financial analysis

14    or a damages analysis that was part of -- that resulted

15    in the $47 million number and then there was a separate

16    analysis that was done?

17         A.   I mean, during that period we had ongoing

18    discussions about the facts of the case and the --

19         Q.   I'm not asking about the specifics of those

20    communications.  I want to understand specifically

21    the -- tell me -- walk me through how you went about

22    preparing this analysis.

23         A.   Certainly.  So it started with a list of the

24    impacted customers at issue.  So these are the same

25    customers that were named in the complaint that include



1    AEP, NextEra, Suez and Liberty.

2            It included the actual contract value of the

3    business that we had, one of those customers, and

4    included an -- along with our business strategy, the

5    assumption that we would continue to do business with

6    those customers but for PowerPlan's influence.

7        Q.   Sir, so let me make sure I understand.   So

8    you -- it's premised around the work you were doing for

9    AEP, NextEra, Suez and Liberty.   Are those the only four

10   customers that you included in your analysis?

11       A.   So the analysis is brought.   So it's those

12   four customers that come to the $47 million number

13   that's in the complaint.

14            The analysis continues to do a broader

15   analysis of our target markets in the North American

16   utility market.   So there is a subsequent layer to the

17   analysis that includes other customers.

18       Q.   And so let's talk about the 47 million first

19   and then we'll get to your broader -- your broader

20   analysis.   What values were you using for AEP, NextEra,

21   Suez and Liberty in this analysis?   What was the

22   starting point of your analysis?

23       A.   The existing contract value at the time.   So I

24   don't have the analysis in front of me to refer to, but

25   it would have been, you know, a seven-figure number for



1    AEP, seven-figure number for Suez, six-figure number for

2    Liberty and for NextEra.

3        Q.   Now, sir, those values, what -- so you put the

4    contract -- you start with the contract value.  What did

5    you do next?

6        A.   So we recognized that that contract is the

7    initial relationship that we're developing with that

8    customer.

9            Those contracts, or at least two of those

10   four, had proposed software and sold software as part of

11   those contracts.  So there was a -- an annual recurring

12   software subscription added on to that analysis as well.

13       Q.   And how did you make the determination of how

14   much you were going to include in the analysis for the

15   annual -- this annual recurring software subscription?

16       A.   Certainly.  So we understood -- because we had

17   begun to develop relationships with these four

18   customers, we understood the value of the solutions we

19   can bring to them, meaning, you know -- if I take AEP,

20   for example, we understood that AEP's spend on

21   third-party software, consulting kind of contracts, we

22   understood what they were committing to to kind of keep,

23   in particular tax depreciation running or tax fixed

24   asset running.

25           And so we understood that -- that we could



1   bring software to individual customers, that if we could

2   reduce the customer's overall spend, that would be

3   attractive.

4          So we included some aggressive pricing, so

5   bidding probably lower than the value of the solutions

6   that we're bringing so that -- you know, would indicate

7   kind of the foot in the door for the software, you know,

8   with the goal that over time our software program would

9   grow.

10         But the analysis in particular kind of kept

11  up, hey, here's what we would think would be the year

12  one spend on software and let's just assume nothing more

13  than that going forward.

14         So I'll take a step back.  The overall

15  analysis actually is very conservative.  It doesn't

16  include any kind of assumed escalation in our, either

17  software or services of those customers, kind of a

18  steady state analysis for those core customers.

19     Q.   So we're going to get back to the specifics of

20  each of the customers in a minute.  How long -- how far

21  out did you take this analysis in terms of time?

22     A.   Yeah, so we went back and forth a little bit

23  and ended up settling on a period that we thought was

24  reasonable based or our industry and the rate that our

25  industry acquires software.



1           We used a ten-year period of our annual

2    software consulting, kind of took, you know, year one

3    steady state and extrapolated it out ten years.

4        Q.    Okay.  And so the baseline where these

5    contract values for AEP, NextEra, Suez and Liberty, was

6    there anything -- I'm not sure I follow exactly what you

7    were saying.  Was there anything added to the actual

8    existing contractual values?

9        A.    Well, let me clarify.  The baseline that we

10   just talked about, that's a one-time contract, right.

11   So it's the -- it's the -- it's the implementation

12   configuration, so that number is not included in

13   subsequent years.

14           It's the -- it's the recurring component that

15   comes from that contract that then is included.  So, for

16   example, in the AEP case, although it was a seven-figure

17   number, that initial contract, the ongoing years would

18   represent a much smaller AEP commitment to software that

19   would solve the problem in perpetuity and any supporting

20   services around that.

21           So when we said what numbers were added on to

22   the initial contract value, it's a -- it's a steady

23   state number that represents a lower cost to the

24   customer over time, took that number ten years.

25       Q.    Okay.  And so let's start with AEP.  So for



1    the years out from year one in your analysis, what

2    products did you assume AEP would license?

3        A.   My recollection is that the project that was

4    interfered with was the depreciation and deferred tax

5    solutions, so it would have been those two products.

6             And so I believe that the annual subscription

7    assumption there included only those two products.

8        Q.   Those two products.  And what was the amount

9    that you were assuming?

10       A.   I -- I don't have it readily here, but it

11   would have been in the ███████████████████████

12   for recurring software revenue.

13       Q.   Okay.  And so you had the contract -- the

14   services contract only in year one, and then years two

15   through ten, you were including ███████████ in

16   recurring revenue related to software subscriptions?

17       A.   That is correct.

18       Q.   What about NextEra, what products did you

19   assume you would license to NextEra?

20       A.   I believe NextEra's assumption was the Copilot

21   solution that we were implementing in the fall of 2019,

22   at the time that PowerPlan interfered with our

23   relationship.

24       Q.   Well, sir, your -- so -- and what did you

25   assume that you would be able to license Copilot for in



1    years two through nine in the NextEra contract?

2         A.    Just -- I don't recall exactly precisely, but

3    the number would have been less than the AEP number.  It

4    may have been ▮▮▮▮▮▮▮▮▮, in that kind of range.

5    I don't recall specifically a number.

6         Q.    Okay.  How about Suez, what did you assume

7    that Suez would have purchased from Lucasys?

8         A.    So for Suez, the proposal that we had on the

9    table at the time of PowerPlan's interference was a

10   proposal called tax modeling automation and controls.

11            And so that included three Lucasys products,

12   included Lucasys deferred tax product for tax modeling,

13   it included Lucasys Copilot product for automation, and

14   it included Lucasys Nova product for tax basis balance

15   sheet controls.

16        Q.    Okay.  And how much did you assume that each

17   one of those would be worth in years two through ten?

18        A.    I don't recall precisely, but it would have

19   been somewhere in the ▮▮▮▮▮▮▮▮▮.

20        Q.    Would it have been more or less than the AEP

21   numbers?

22        A.    It may have been comparable.  Again, I

23   don't -- I don't know exactly.  ▮▮▮▮▮▮▮▮.

24        Q.    All right.  And tell me about Liberty, what

25   products did you assume Liberty was going to license?



1      A.    I don't recall if the analysis included an

2  ongoing software component.  I think the Liberty

3  relationship was very new.

4            The analysis may have included an ongoing

5  services component for Liberty, consulting services, but

6  I don't recall precisely.  I have to refresh my memory.

7      Q.    And for any of the others that we have

8  discussed, Suez, AEP or NextEra, was there an ongoing

9  services component to your analysis as well?

10      A.    Yes, there would have been.

11      Q.    Okay.  And how did you determine what those

12  ongoing services should be valued at?

13      A.    So we understood -- so I think I mentioned

14  this before.  We understood the value of the

15  problem-solving to our customer.

16

17

18

19

20

21

22            For consulting services, that largely is based

23  on our collective experience providing consulting

24  services to the market.

25            We might focus an on-call type industry,

1    accounting, tax questions, as well as the project-based

2    work that may come up from time to time.

3        Q.   And so can you tell me -- I mean, I want to

4    make sure I understand your answer.  So was it -- was

5    the ongoing consulting work more or less than the

6    recurring revenue from the software licenses that you

7    assumed you included in the assumptions?

8        A.   Sure.  So it may have differed from company to

9    company.  So, for example, for Liberty it may be more

10   given that we hadn't proposed a software solution.

11           For AEP I believe it was less because we had a

12   software solution that we were delivering what was the

13   primary solution, so consulting would have been

14   additional areas where we thought it would provide value

15   software.

16       Q.   So, sir, you created this analysis.  You've

17   got four companies on it.  You have made assumptions

18   about the initial contract values and you made

19   assumptions about software licenses going out ten years.

20   What did you do with that information?

21       A.   Let me qualify.  We didn't make assumptions

22   about the initial contract value.  We took the actual

23   contract value and then -- and then for the ongoing

24   recurring revenue, that was a case-by-case based on the

25   individual contracts.



1          But yes, then we took that at a year-two

2   number, the steady state number, and looked at that over

3   ten years.  Then we had a simplified model, we just took

4   that number and multiplied by ten.

5          We understand of course that in our contracts

6   we have escalation clauses and things like that.  We

7   understood that this analysis would be refined during

8   the proceeding so we just took a simple, steady state

9   number multiplied by ten.

10     Q.   Okay.  Let's take a step back.  The simple,

11  steady state number that you're talking about multiplied

12  by ten, help me -- you were cutting in and out just a

13  little bit on my end.  What was the basis of that steady

14  state number?

15     A.   It's what we had discussed.  So it's the

16  recurring software and consulting revenues from those

17  four customers based on the contracts and relationship

18  that we had at the time of the interference.

19     Q.   Okay.  And since you -- and so that you take

20  that out over -- so it's -- you just took those -- that

21  number and you multiplied it by ten and that's how you

22  got -- you got to a number and then number was tripled;

23  is that -- is that how the analysis worked?

24     A.   Yes, I believe so.

25     Q.   Okay.  Anything else about the sort of



 1   mechanically how the analysis was put together that we

 2   haven't touched on?

 3       A.   Yes.  So we took -- we took that analysis, we

 4   recognized that it included kind of a sample of the

 5   various subsegments of the utility industries, included

 6   water, electric, gas businesses, and we independently

 7   pulled the North American utility businesses.

 8           So there is three trade organizations that

 9   we have worked with closely over the last four years and

10   we're associate members and sponsors: Edison Electric

11   for utilities; American Gas Association for gas

12   utilities; and NAWC, North American Water Companies, for

13   the privately owned water companies.

14           So we took the utilities that are members of

15   those organizations, removed the ones -- some utilities

16   are members of both organizations, and excluded some

17   utilities that are too small so they would below the

18   threshold of enterprise software.

19           And so we -- if I recall, the final was 130

20   utilities, electric, gas and water.  We recognized that

21   across the Lucasys team, we had developed deep

22   relationships with 40 or 50 utilities.

23           And so we had done an analysis that said, hey,

24   we think that of these 130 utilities that over this

25   ten-year period based on our relationships, based on the



1    market being ready for innovation in this space, we

2    can -- we can penetrate the market.

3              And I think we had assumed over that ten-year

4    horizon a 30 percent penetration in the market.

5              And so that analysis came to kind of a

6    level-two analysis that really, since we had been frozen

7    out of the market by PowerPlan with this dispute, having

8    to bring this litigation, the overall adverse impact

9    that we came to and that we felt at that time came to a

10   number that when trebled was in excess of $450 million

11   once -- once we include the entire target market.

12             So that -- that analysis was a component of

13   the -- of the analysis that we have been describing.

14       Q.   Okay.  So we talked -- we were initially

15   talking about the 47 million and then you -- that's the

16   sort of the step two that you were describing earlier?

17       A.   Correct.

18       Q.   Okay.  Now, sir, I want to ask you a couple

19   more questions about the 47 million, just to make sure I

20   understand it.

21             So you took that -- so we took -- you came up

22   with a number, the number ended up at about 15.6

23   million, and then you trebled it and that's where the 47

24   million came from and that's based on the initial four

25   customers we were talking about?



1      A.    That's correct.

2      Q.    Okay.  And then this -- you did another

3   analysis where you were looking at a broader penetration

4   of the market that you think was possible.

5            Can you tell me, what have you done to

6   determine, if anything, whether or not you would

7   actually be able to reach a 30 percent penetration rate

8   with those utilities over a ten-year period?

9      A.    Certainly.  So, yeah, we looked up the

10  traction that we had as a business in the first 18

11  months of the business prior to the PowerPlan

12  interference, saw that we had -- were able to acquire I

13  think maybe -- I think it was seven customers in that

14  time period.

15           And really -- really, in the 12- or 13-month

16  period that we had revenue, right.  So we start a

17  business, there was some amount of time to develop

18  software, no revenue coming in, we're just building a

19  business.

20           But once -- once we had connected with

21  customers, built relationships in that 12-, 13-month

22  period we had acquired seven customers.  Four of them

23  had signed software NSAs.  There was a lot of traction.

24           We had won software deals that we were either

25  getting started on or in the process of implementing.



1   And so based on that 18-month horizon, we felt very good

2   about our ability to penetrate the market.

3            Outside of that, I think it's no secret -- and

4   I think the discovery has shown this -- that the utility

5   industry has been begging for alternative solutions in

6   this space.

7            This is -- this has been communicated to us

8   since before our time at Lucasys, to me personally when

9   I was at RCC, and really even when I was at PowerPlan,

10  that -- that customers have been just -- just begging

11  for help in this space.

12           They didn't feel like the solutions there were

13  adequate or meeting their needs.  So we really felt that

14  based on our experience, that the 30 percent market

15  penetration in ten years is actually very conservative

16  as well.

17           We wanted to keep it conservative.  We

18  understood that utilities can take a little longer to

19  adopt software.  But that was part of the basis for

20  that -- for that assumption.

21      Q.   Sir, so you describe to me your feelings about

22  it, but have you gone out and actually surveyed any

23  customers in the utility market and asked them

24  specifically whether they were interested in purchasing

25  your product?



1        A.    Well, yes, of course.  So when I say we felt,

2   what I mean is the result of the communication to us

3   gave us the impression, or our understanding of our

4   customers was, so I want to clarify that.

5            But yes, absolutely.  So even before the --

6   before Lucasys brought products to the marketplace,

7   even -- for example, when I was RCC, RCC was asked to

8   build better solutions in this space, right, by

9   customers.  That was a common request all the time.

10           And so with Lucasys, again, we had a very

11  narrow window of opportunity prior to PowerPlan's

12  interference but were able to acquire seven customers in

13  that time, had a very strong pipeline of interested

14  customers that then evaporated and froze almost

15  overnight.

16           And then of course we learned subsequent about

17  PowerPlan's actions in the marketplace outside of --

18       Q.   Sir, what specific customers asked you at RCC

19  to build an alternative software product?

20       A.   So I recall this coming from EEI AGA, like

21  trade, they have a committees.  If I recall the taxation

22  committee for representatives from 40 or 50 of the

23  utilities who have regular polls, and it's an ongoing

24  request to the market to build other solutions.

25  That includes --



```
 1        Q.    I'm sorry to interrupt.  My question is really
 2   simple.  Who asked?  Give me the name of a specific
 3   person or a specific company that made the request.
 4             You're trying -- you're saying -- you're
 5   talking about the industry generally and I'm trying to
 6   understand specifically what companies, what
 7   individuals, what was said, when.
 8             So can you give me the -- let's start with
 9   who.  Who told you this?
10        A.    So this was 15 years of history collectively,
11   right, and it's an ongoing thread of communication.  So
12   I can list a couple, but it's not going to be
13   exhaustive.
14             It's the -- every conversation around tax
15   technology with this industry includes, hey, we need
16   better solutions, we need more options, where can we
17   find solutions to this or that problem?
18             It's the ongoing dialogue.  So specifically
19   with respect to your question, at RCC we, prior to tax
20   reform, had a lot of discussions with customers who were
21   asking us, hey, can you build a product that will
22   support us.
23             So, you know, I know I personally had
24   conversations with individuals on this topic from Con
25   Ed, Consolidated Edison, and Reed Energies is my
```



1    recollection.

2            But again, this was a broad industry request.

3    And my conversations were limited more to like the tax

4    side.  But my understanding from colleagues and -- that

5    the same requests were happening outside, you know, of

6    the tax area.

7        Q.   So it's your impression was that's what the

8    market wanted, those were your feelings, but can you

9    give me any other specific examples where somebody said

10   to you directly, we want you to build a specific

11   product?

12           You said you had conversations with Con Ed and

13   one other.  Any others?

14       A.   The request went like this:  Hey, when are you

15   going to build a product because this market needs

16   product, right.

17           So it's not a company coming and saying, I

18   want to back you for a product.  That's not the

19   impression I'm trying to give.

20           It's an expectation that as additional players

21   came into the services market that one of them, or many

22   of them, would bring technology solutions into the

23   space.  That's what I'm trying to communicate.

24       Q.   So these were not specific comments, these

25   were general comments; is that fair?



1        A.    So, I think, if I want to give you a specific

2    one, we had a request for a proposal from Southern Star

3    Pipeline at Lucasys -- it's in the discovery -- to build

4    a PowerPlan replacement solution.

5              So if we want to get real specific like that,

6    we can go to documents.  But I'm not trying to answer

7    the question with like, here's the two people.  I'm

8    saying that there is a general industry problem that the

9    right solutions don't exist in this space.

10       Q.    Sir, is Southern Star Pipeline a regulated

11   utility?

12       A.    I believe they have regulated pipeline

13   operations, but I don't know -- I don't believe they're

14   an electric company, if that's your question.

15       Q.    I'm sorry, were you finished?

16       A.    Yeah, I think they have regulated pipeline

17   operations.

18       Q.    And did you end up actually building them a

19   solution?

20       A.    They did not -- we gave a proposal; they chose

21   not to move forward with our proposal.

22       Q.    Did they tell you why they chose not to move

23   forward with the proposal?

24       A.    I don't believe so.

25       Q.    And so you don't know if the decision not to

1    go forward with that proposal has anything to do with

2    PowerPlan or not, do you, sir?

3        A.   Well, so I don't recall with regard to that

4    specific proposal the timing.  What I do recall is with

5    that proposal, and even from the early days of Lucasys,

6    myself having conversations with -- so we recognize

7    that -- that the problem was bigger than even what we at

8    Lucasys could solve, right, in some ways.

9            That there was -- that there was a need in the

10   land accounting, property accounting space as well, that

11   with the current team at Lucasys, I should say, you

12   know, we needed to expand the team.

13           So what I do recall is as we got that request

14   and other conversations that we had, recruiting

15   conversations, where I personally did with what I would

16   say like the equivalent person on the property

17   accounting space or utilities or people like that to

18   come in and lead that part of the business, right, so

19   expand into that.

20           And I do know that with the dispute, both the

21   opportunities to move that way, so to build a full

22   PowerPlan solution, disappeared.  And the individuals

23   with which we had those recruiting conversations

24   actually ended up in some cases going to our competitors

25   and leading successful practices there.



1           So we can easily connect the dots that

2    PowerPlan's interference dried up the opportunity and,

3    more than that, the resources that would have been

4    available to us went to competitors.

5           Q.   I'm not asking for your opinion.  I'd like to

6    know the facts.  Let's start with Southern Star

7    Pipeline.  Did somebody at Southern Star ever say to you

8    the reason that they did not hire you to build any form

9    of PowerPlan or replacement was because of something

10   PowerPlan did?

11          To me, that's a yes-or-no question, so can you

12   answer it as a yes-or-no question?

13          A.   I don't recall having that kind of

14   communication with a representative from Southern Star

15   Pipeline.

16          Q.   Are you aware of anybody at Lucasys who has

17   had that kind communication with a representative at

18   Southern Star Pipeline?

19          A.   I'm not aware, no.

20          Q.   Can you give me any example of a customer that

21   said they are not going to do business with Lucasys

22   because of something that PowerPlan did?

23          A.   Yes.

24          Q.   Okay.  Let's make a list.  Give me the list

25   and then we'll go through each one.  What's the -- tell



1    me the -- tell me who the customers are.

2         A.   All right.  So we have of course the four

3    customers in the complaint.  Do we want to go through

4    those?

5         Q.   No, I -- we know those.  Those are well

6    understood.  So any in addition to those four?

7         A.   Yeah, well, I think they -- so I don't want to

8    minimize those, because again, once -- so it's a small

9    industry.  We talked about how we had identified 130,

10   -40 customers.  There is three trade groups that talk to

11   each other.

12             As soon as the first interference happens, the

13   communication spreads, right.  Furthermore, PowerPlan

14   intentionally spread that communication, right.

15             So -- so the fact that outside these four

16   customers there may have been less communications to

17   that effect actually just demonstrates PowerPlan's

18   success at freezing the market --

19        Q.   Sir, with all due respect, you're not

20   answering the questions that I'm asking you.  The

21   question that I asked you was, aside from the four

22   customers that we talked about today and we talked about

23   in your prior deposition that are identified in the

24   compliant, identified in your interrogatories, are there

25   any other customers that you can identify that did not



1   do work with Lucasys because of something that PowerPlan

2   did?

3          I'm just asking you to identify those -- tell

4   me the names of those customers so that we can go

5   through them one at a time.

6      A.   Certainly.  So, I'll -- there may be more than

7   I can recall sitting here today, but I'll -- I'll --

8   I'll list a few where I have had conversations to that

9   effect.

10          Maybe before I do that, just because it's

11   fresh on my mind, we did have a conversation just in the

12   last couple weeks from, actually, Suez.  You will recall

13   Suez is one of the four customers, but they had stopped

14   doing new business with us.

15          Had reached out asking if they could contract

16   with our contractor without going through Lucasys

17   because their understanding was, based on this dispute,

18   they were not able to contract with Lucasys directly.

19          This is a director level employee at Suez who

20   contact --

21      Q.   Before we move on from that -- we'll come back

22   to the list in a minute -- who was the director level

23   employee that you're describing?

24      A.   Sandy Chung, director of property accounting.

25          COURT REPORTER:  I'm sorry, sir.  Say the name



1        one more time.

2            THE WITNESS:  Sandy Chung.

3    BY MR. FAZIO:

4        Q.    Okay.  And when did this conversation happen?

5        A.    My recollection is this was last week.  It may

6    have been the prior week.  In the last couple weeks.

7        Q.    Okay.  And what specifically was said?

8        A.    She had reached out first to Lou and then

9    directly to Daniel and asked if there was any way for

10   Suez to contract with -- with Lou without contracting

11   with Lucasys.

12            So they needed help in the property accounting

13   space and felt like they were precluded -- or she

14   indicated that she was not able to contract with Lucasys

15   and so she wanted to take the Lucasys resource,

16   effectively, outside of Lucasys' umbrella and contract

17   in that manner.

18       Q.    And did she say why she thought she wasn't

19   allowed to use Lucasys?

20       A.    She said because of the dispute, her

21   understanding was that she was not able to work with

22   Lucasys.

23       Q.    And this was -- and when you say "the

24   dispute," what are you talking about?

25       A.    I mean the dispute that came when Lucasys



1   received a cease and desist letter in October of 2019

2   from PowerPlan.

3        Q.   But of course, Suez did do a lot of work with

4   Lucasys after that time, didn't they?

5        A.   So Lucasys -- so Suez was reached out by

6   PowerPlan much later than that, so it would have been

7   summer of 2020, and -- I believe we went through this in

8   some earlier testimony.

9             But we were able only to finish the work that

10  had already been contracted through that time, and any

11  new proposals were not considered after that time.

12       Q.   So you told me that this Sandy Chung

13  conversation.  Let's go back to making the list.  Tell

14  me the -- give me the list of customers or potential

15  customers that said they will not work with you because

16  of something that PowerPlan has done.

17       A.   Yes.   █████████████████████████████

18  These are the three that come to mind offhand at the

19  moment.

20       Q.   All right.  Well, tell, me when did this --

21  when did █████████████ tell you that they wouldn't do

22  work with you?

23       A.   ██████████████████████████████████

24  ███████   ████████████████████████████████████████

25  ████████████████████████████████████









1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



6       Q.   Sir, are there -- have you ever made a

7   proposal for software where the customers just said,

8   this doesn't meet our needs?

9       A.   Have we ever made a proposal for software and

10   the customer says that doesn't meet our needs?

11       Q.   Lucasys, yes.

12       A.   Well, we work with customers to identify their

13   needs and then propose the solutions for that.  We're

14   not -- we're not selling a hundred percent prebuilt

15   software into any need.

16           We're saying, let's understand your needs.  To

17   the extent we have solutions that can meet them, here's

18   what we think.

19           We can expand either our own Solution set or,

20   like we have done with all of our products, actually,

21   yeah, we don't have that right now, but let's work

22   together to build that.  We think there's value not only

23   for you but for the whole market.

24       Q.   So, sir, you gave me -- you gave me these

25   three companies as examples where they said they -- you

1    described them as companies that were reluctant to do

2    business with Lucasys because of PowerPlan.

3            Aside from the four that are identified in

4    complaint and the three that we discussed today, are

5    there any others that you claim where you have been

6    damaged because of the relationship -- because of

7    something that PowerPlan did?

8        A.   Yes, there are more.

9        Q.   Okay.  Who are they?

10       A.   We can keep going down memory lane.  This may

11   take a while.  But, okay, I'll give you another example.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   ███████████████████████████████████

2      ███████████████████████████████████

3   ███████████████████████████████

4   ███████████████████████

5      Q.   ███████████████████████████████   Who

6   else?  I mean, I want to know everybody -- if we're

7   going to hear about this through Lucasys's experts or at

8   some point down the road, I want to know every single

9   person where you're going to claim -- where Lucasys is

10  going to claim that somehow PowerPlan did something to

11  interfere with your commercial relationship such that

12  you were damaged.  That's what we're here for today, so.

13     A.   Certainly.  I understand the question.  I'm

14  doing my best to help with that.  Of course, there are

15  communications that I'm not privy to that are attorney

16  eyes only and there is nobody within Lucasys

17  organization -- we don't have in-house counsel -- that

18  can see those.  So there may be communications that --

19  that I can't tell you about here.

20        And -- and I can tell you what I know from my

21  own experience or memory or what the Lucasys employees

22  have communicated to me.  I would do that.  I don't

23  think that in this setting we would be able to have an

24  exhaustive list for you.

25     Q.   Well, sir, you're here as a corporate

1   representative of Lucasys.  We asked for somebody who is

2   going to testify as to the facts specific to Lucasys's

3   claimed damages.

4            If you are going to claim the damages, we're

5   entitled to know.  So are you not prepared to provide

6   that information to us today?

7       A.   I am prepared to provide the information based

8   on the knowledge that Lucasys employees of the company

9   has.  We -- the Lucasys employees do not have access to

10  all of the discovery materials, particularly the AEO

11  materials.

12           So to the extent there are other

13  communications that are in those communications, of

14  course I wouldn't be able to testify to those here

15  today.

16      Q.   Well, sir, obviously we're not -- I'm not

17  asking you to testify to things that are not known or

18  knowable to Lucasys.

19           I'm just asking you what is known or knowable

20  to Lucasys and what Lucasys intends to claim in terms of

21  damages.

22           So if there are any other specific

23  circumstances in which you think PowerPlan -- or you

24  intend to claim that PowerPlan has interfered somehow in

25  Lucasys's business, I want to know what those are.



1          So are there any others from the ones we have

2     talked about already?

3          A.    So you're asking me to identify specific

4     customers, and I'm trying to tell you that there is a

5     broad -- so PowerPlan, our understanding is, sent

6     letters to dozens of utilities communicating that they

7     ought not to do business with Lucasys.

8          And many of those utilities followed up and --

9     with the affirmative, like, hey, we'll watch out for

10    those -- for those -- for those guys.  These are

11    documents that are in the record that we can see.

12         So -- so I can give you specific instances,

13    but our claims are not limited to those.  They're

14    limited to the actions of PowerPlan or the industry as a

15    whole.

16         And communication to Mr. Kleczynski at Exelon,

17    the VP of tax at there, I want to refer to now as well

18    because that happened the same -- you know, the same day

19    that Mr. Burkes had -- had said, as of that day, there

20    is no evidence that Lucasys misappropriated PowerPlan

21    confidential information.

22         And the same day he's sending an email to the

23    head of the EEI taxation committee, who represents the

24    entire industry, saying, quote, we have strong reason to

25    believe that Lucasys has -- has misappropriated



1    PowerPlan confidential information.

2         Q.    Move to strike.  It's not -- move to strike

3    all this as nonresponsive.  My question is specific to

4    you, sir.  I'm asking you to identify specific people.

5              I understand that Lucasys' position is that

6    there is this general, industrywide, I don't know,

7    perception of this dispute.  That's your view.  I

8    understand.  You have expressed that multiple times now.

9              I'm asking you to identify for me the specific

10   individuals, the specific opportunities that Lucasys is

11   claiming it was foreclosed from as a result of

12   PowerPlan's conduct.  That's the question.

13             MR. MAYES:  Object to the form of the

14        question.

15             MR. FAZIO:  I'm sorry.

16             MR. MAYES:  I objected to the form of the

17        question.

18             But you can answer.

19             THE WITNESS:  Could the repeat the question.

20        I'm sorry.

21   BY MR. FAZIO:

22        Q.    The specific question to you is, who are the

23   specific customers that Lucasys is claiming that

24   PowerPlan interfered with such that Lucasys was damaged?

25   That's my question to you.



1          Setting aside the ones we have already talked

2     about, I'm not talking about those.  I'm talking about

3     the specific customers you can identify.

4          A.   So each customer who has received a letter

5     from PowerPlan stating that they ought not to work with

6     Lucasys is a customer that, because of our inability to

7     sell to that customer, has caused damage to Lucasys.

8          Q.   Sorry, apologies.  Sorry, we've got multiple

9     videoconferencing conflicting here.  I'm sorry.  Sir, if

10    you could start over, I would appreciate it.  You were

11    saying that -- you were talking about the letters,

12    customers had received the letters?

13         A.   Yeah.  So you asked me which customers

14    specifically is Lucasys alleging that they were damaged

15    because of PowerPlan's communications.

16          And I'm saying each customer that received a

17    letter from PowerPlan requiring that customer to not do

18    business with Lucasys, to not -- let me put it a

19    different way.

20          To use this threat of a legal dispute or a

21    legal issue to misconstrue Lucasys' activities to

22    prevent that customer from doing business is, was, has

23    caused damage to Lucasys.

24          So I think there are dozens of those and

25    they're in the discovery material.



1        Q.    Sir, have you read those letters?

2        A.    I believe that I have seen a -- documents that

3    are available to me.  I understand it's a form letter

4    and I believe I have seen examples of that and what's

5    available to me in terms of the list of customers that

6    received it.

7        Q.    Isn't it true that those letters specifically

8    say that PowerPlan has no objection to customers working

9    with Lucasys provided that they're not given access to

10   PowerPlan's software?  Do you know if that's true or

11   not?

12       A.    Well, I think we have to understand how -- how

13   the receiving party receives that letter, right.  So

14   this is -- this is a company that provides the only

15   deferred tax software to utilities --

16       Q.    Sir, I'm sorry to interrupt but you're not

17   answering the questions that I'm asking you.  I asked

18   you if you had seen the letter and did -- was that your

19   understanding was the contents of the letter.

20           I'm not asking you to speculate how third

21   parties who received it may have interpreted it.

22       A.    I don't recall the contents of the letter.

23       Q.    And sir, and it's true that certain customers

24   have received that letter have been doing business with

25   Lucasys nonetheless; is that true?



1     A.   We have customers that, having received some

2  communication from PowerPlan, gave us the ability to

3  have a conversation with them where we could demonstrate

4  what actually is going on in this business relationship.

5          And when we were afforded that opportunity,

6  customers had to make an assessment for themselves, and

7  we are privileged that we had at least one that intended

8  to do business with us, so otherwise we wouldn't be here

9  today.

10     Q.   Sir, let me ask you this, I mean, AEP is one

11  of the companies that received -- received one of those

12  letters; true?

13     A.   Well, my understanding is that the AEP

14  communications followed a different fact pattern.  They

15  started earlier.  They started with phone calls.  To the

16  extent there were letters, they may or may not have been

17  part of the broad campaign.  I don't know.

18          But I do understand that they were verbal and

19  written communications to AEP, that's correct.

20     Q.   And so today, AEP is a customer of Lucasys;

21  true?

22     A.   We're very grateful that we have one utility

23  that has continued to work with us despite PowerPlan's

24  allegations.

25     Q.   Sir, Con Ed is a customer of yours, too,



1    correct?

2         A.   We do some limited services work with Con Ed,

3    that is correct.

4         Q.   Do you know if they received one of those

5    letters or not?

6         A.   I don't know that.

7         Q.   Sir, let's go back to AEP.  AEP is -- you have

8    a ████████████████████████████████████████████████

9    ████████████████████████████████

10        A.   I think that's accurate.

11        Q.   Part of that involves licensing with software;

12   true?

13        A.   I believe that we have jut recently -- again,

14   this is three years since the initial interference --

15   but we had already sold software.

16             We have just recently been able to propose and

17   sell a much more limited software offering to AEP,

18   that's correct.

19        Q.   And that -- that's Copilot, right; you're

20   licensing Copilot to them?

21        A.   That is correct.

22        Q.   And what is the license fee that Lucasys is

23   charging AEP for using Copilot?

24        A.   So, in order to make this sale in light of the

25   dispute, we had to very aggressively price the Copilot

```
1    solution.  ████████████████████████████████

2    █████

3         Q.   And so, in fairness, sir, when you were

4    pricing it for AEP, you were doing something similar;

5    isn't that true?

6         A.   I'm sorry?  Can you repeat that.

7         Q.   Strike that question.  It's a rabbit hole we

8    need not go down.  ██████████████████████████████

9    ████████████████

10        A.   Again, it's the plan for the current scope of

11   the Copilot solution.

12        Q.   And was that different from the Copilot

13   solution that you originally proposed at AEP?

14        A.   So we had originally proposed a depreciation

15   and deferred tax solution to AEP.

16        Q.   Sir, is it possible in your mind -- let me

17   strike that.

18             Is it possible that AEP simply came to the

19   conclusion that it preferred PowerPlan's product to

20   Lucasys's product and that's why you didn't get -- they

21   didn't license software from you?

22        A.   Is it possible that they preferred PowerPlan's

23   product?

24        Q.   Yes.

25        A.   I think it's possible that they weighed the
```

1   risks of moving forward in light of this dispute and

2   chose to continue using PowerPlan's products.

3          Now, had they not already been using

4   PowerPlan's products, I don't believe they would have

5   made that choice.  I believe it's a -- it's -- it's

6   really the issue of this case, that the utilities are

7   locked in to this product.

8          And even though they want to do otherwise,

9   whether it's PowerPlan's bad behavior in the market or

10  the other market conditions that are barriers to entry

11  for other solution providers caused utilities to have to

12  continue using the PowerPlan product.  I think that's

13  what we saw at AEP as well.

14     Q.   Sir, let me ask you a question.  Have there

15  been any situations at Lucasys where their inability to

16  sell software or their ability to close a consulting

17  deal was related to anything that Lucasys did or is

18  everything related to PowerPlan's conduct?

19     A.   Our inability to sell software or inability to

20  propose a consulting deal; is --

21     Q.   Let me break it down.  That's compounded in

22  multiple ways.  Let me clean it up.  Sir, has there been

23  any situation in which Lucasys was unable to sell a

24  piece of software, license a piece of software that

25  had reasons -- that were for reasons other than



1    PowerPlan's conduct, in Lucasys's view?

2         A.    So prior to PowerPlan's interference, we did

3    not attempt to sell software where we couldn't have,

4    right, where we couldn't deliver on that.

5               After PowerPlan's interference, the -- the

6    market is frozen, right.  So our ability or inability is

7    all dictated on the market's perceptiveness to do

8    business with us.

9               So if your question is after PowerPlan's

10   interference, we're not aware after PowerPlan's

11   interference of a single instance where an opportunity

12   was lost for any reason other than PowerPlan's

13   interference.

14              Moreover, we're -- we're -- we're aware that

15   our ability to even generate leads dried up in the same

16   period of time as PowerPlan's interference and

17   communication campaign to the market.

18        Q.    Sir, what about the people who never received

19   the letter; are those -- do you consider those people,

20   those are folks that you are unable to reach out to to

21   try and do work for?

22        A.    Yeah, so I think we touched on the

23   communication from PowerPlan to the head of the EEI

24   taxation committee.  Of course, he represents the entire

25   electric utility industry, not just the individuals who



1  received the letter.

2          Outside of that, this is a -- this is a small

3  industry.  This is tight-knit.  It's very focused.

4  We're really talking about an industry within an

5  industry, right.

6          We're talking about regulated utilities in the

7  U.S. and we're talking about primarily tax.  So it's --

8  we're down to dozens of individuals or less, really, who

9  are decision-makers in this process.

10          One item that did come to my attention is that

11  at some point the dispute was forwarded or passed along

12  to members of the industry kind of trade group, who then

13  forwarded it on to their staff and associates.

14          And eventually I got that communication.  I

15  believe it was -- I believe it was an EEI email.  So we

16  do see evidence that -- that simply PowerPlan making the

17  allegations, that that information has spread just based

18  on the nature and the tightness of the market that we're

19  talking about.

20     Q.   Sir, I want to just shift gears a little bit.

21  You understand that in the amended complaint you have

22  asked for -- or Lucasys has asked for an injunction?  Do

23  you understand what an injunction is?

24     A.   I have some understanding of an injunction,

25  yes.



1        Q.    Well, I'll represent to you that an injunction

2   is essentially an order of the court requiring -- or

3   prohibiting a party -- either requiring a party to do

4   something or prohibiting a party from doing something;

5   do you understand that?

6        A.    Yes.

7        Q.    Okay.  And so Lucasys -- what is it that

8   Lucasys is asking -- going to ask for from the court in

9   terms of an injunction in this case?  What is it that

10  you think you need from the court to remedy the issues

11  that you feel you have with PowerPlan?

12       A.    Outside of the various categories of damages?

13       Q.    This is a separate category.

14       A.    Right.  So -- so certainly the types of

15  communications that PowerPlan has made where allegations

16  were made based on some proof of position of

17  confidential information that hasn't been kept

18  confidential, so an order from the court to help

19  PowerPlan refrain from communications like that, that

20  lack merit.

21             In fact, a step further, some kind of remedy

22  communication to the -- to kind of unring the bell to

23  the extent that even can be done would be helpful in

24  this case.

25       Q.    Anything else?



1        A.    In terms of injunctive relief?

2        Q.    Yeah.

3        A.    Well, I guess I'm not intimately familiar with

4    the legal process, but I think we leave -- we leave some

5    things up to I think the court's discretion as well.

6             But from my standpoint running the business, I

7    understand that those communications impact our

8    customers or potential customers and that needs to be

9    stopped and remedied, at a minimum, for us to continue

10   doing our business.  But I don't know what all is

11   involved in --

12       Q.    Is there any -- just to be clear, I'm not

13   asking you for a legal response.  I'm asking you from

14   the perspective as the CEO of the company what it is

15   that you feel is necessary.

16            So you said an order preventing any future

17   communications and potentially some sort of remedial

18   communication.  Is there anything else as you're sitting

19   here today that you think is necessary?

20       A.    Yes, I do.  So I think even -- even those two,

21   although they would go a long way, in many ways the -- I

22   think I used this analogy -- so the damage has been

23   done, so it really takes -- I think the corrective

24   action on PowerPlan's side needs to really reflect that

25   and it needs to be not just a never mind but -- but I



1    think there needs to be something more than that.

2              I think it may take a conversation.  It may --

3    I think it needs to be more than just a disregard the

4    previous letter.

5        Q.   Sir, is there anything that you have learned

6    during discovery that alters your $47 million analysis?

7    I'm talking about the original analysis.  I understand

8    you have this broader analysis, but I'm talking

9    specifically about the $47 million analysis.

10              Have you learned anything in discovery that if

11   you were to redo the analysis today it would look

12   different?

13       A.   So if we -- if Lucasys were to redo the

14   analysis, certainly would incorporate things that we

15   learned.  We also of course have retained experts to do

16   that for us.

17              But yes, we have learned of course of the

18   letter campaign through the discovery process.  We have

19   learned that the communications to EEI industry leaders

20   making allegations of misappropriation, strong reason to

21   believe, things like that.

22              We've subsequently, or in the same vein

23   learned that actually people making those statement had

24   no reason to believe and testify to that.

25              And so, yes, we have additional information



1   that if we were to do an analysis today we could list

2   more utilities in the analysis and definitely do that

3   more refined.  But again, we also rely on experts to do

4   that for us.

5        Q.   So, sir, we have talked about -- I want to

6   just make sure the record is clear.  We have talked

7   about all of the customers that you think -- that you

8   can recall specifically that you think in some way

9   PowerPlan interfered with Lucasys on; is that fair?

10       A.   I think we talked about specific conversations

11  that -- that I as CEO of Lucasys have had with potential

12  utilities related to their inability to work with us

13  based on PowerPlan's communications.

14            I do not believe that we have gone through the

15  list of all utilities with which Lucasys has been

16  interfered with based on PowerPlan's communications.

17            Again, I'll refer you to the communication

18  campaign, the letter campaign, communication to EEI

19  leaders, and even the bringing of counterclaims in this

20  case, which is a signal to the entire market that, you

21  know, the counterclaims don't state that Lucasys might

22  misappropriate.  They state that Lucasys did.

23            And so those counterclaims of course are

24  passed along and passed around in the industry the same

25  way this information is as well.



1              So I think we touched on specific

2     conversations, but I don't think we have an exhaustive

3     list of utilities that are impacted by PowerPlan's

4     conduct.

5          Q.   So let's set aside the companies that received

6     the letters.  Those are -- those are known and knowable.

7     And we talked about -- we know about the companies that

8     are identified in the complaint and in the interrogatory

9     responses, and you have given me other specific

10    examples.

11             Aside from the ones we have already talked

12    about, the folks who received letters, folks that have

13    been identified through, you know, the litigation

14    process and the ones you described today, are there any

15    other specific ones you intend to raise in terms of

16    claiming damages in this case?

17         A.   I would have to rely on the expert analysis

18    who have access to more communications than I do.

19         Q.   I'm asking what's known and knowable to

20    Lucasys as you sit here today.  I understand that there

21    is discovery that's gone on that you're not necessarily

22    privy.

23             I just want to know from Lucasys, based on

24    what you know as you sit here today, understanding that

25    you're limited because of the protective order for



1    certain things, are there any others that are going --

2    that somebody from Lucasys is going to testify to or

3    have been provided to your experts?  That's what I'm

4    asking you.

5              I just want to have a complete list, sir.

6    That's all I'm asking.

7         A.   I understand.  I understand that.  So, I think

8    I have shared with you the specific conversations that

9    I've had recently.  There are a number of proposals and

10   leads that dried up at the same time as the letter

11   campaign came out.

12             Although some of those may not have come to me

13   and said, hey, we can't pursue this because of this

14   dispute, we understood that that -- the time line was

15   connected.  So I can get into those and maybe we

16   could --

17        Q.   My question, if you're going to claim them as

18   damages, I would like to know which ones specifically

19   you're talking about, so --

20             MR. MAYES:  Steve, let me just -- if we're

21        going to launch into the topic of the leads that

22        dried up, we have been going for about an hour and

23        a half; can we take like maybe five minutes, just a

24        comfort break?

25             MR. FAZIO:  Yeah, that's fine.



```
 1              MR. MAYES:  Okay.  I don't want to interrupt

 2        if a question was hanging?  Was there any question

 3        hanging?  I don't think there was.

 4              MR. FAZIO:  No, I just want to know what we're

 5        dealing with.  We can take a break, that's fine.

 6              THE VIDEOGRAPHER:  Going off record at

 7        2:23 p.m.

 8              (A break was taken at 2:23 p.m., and the

 9        deposition resumed at 2:35 p.m.)

10              THE VIDEOGRAPHER:  Back on record at 2:35 p.m.

11  BY MR. FAZIO:

12      Q.   Mr. Lantukh, right before the break we were

13  talking -- or about to start talking about other

14  specific examples where Lucasys is alleging that

15  something that PowerPlan did that caused the damages,

16  and so I would like to know these -- who these other

17  customers are.

18              And so if you could just maybe start with a

19  list and then we can go through them as necessary.  And

20  again, I'm talking about the ones we haven't already

21  talked about and I'm not talking about customers that

22  allegedly received a letter from PowerPlan.

23      A.   Okay, I'll try not to repeat.  If I do, I

24  apologize.  ████████████████████████████████████████

25  ████████████    ██████████████████████████████████
```

1  ███████████  ████████████████████████

2  ████████████████████████████████████████

3  ████

4          ███████████████████

5  ██████████████████████████  ████████

6  ███████████  ███████████████  There may have

7  been more, but this is what I'm remembering at the

8  moment.  If I recall additional ones, I will let you

9  know.

10      Q.   Sir -- and so to be clear, these are ones that

11  you're saying that Lucasys has had an opportunity to do

12  business with these customers and somehow PowerPlan

13  interfered with that opportunity?

14      A.   That's correct.  These are customers where

15  Lucasys had an opportunity to do business, whether it's

16  a proposal, sometimes a contract, subsequent to

17  PowerPlan's communications that that business was lost.

18      Q.   Okay.  And so to be clear, I want to make sure

19  that we're clear about what we're about to get into

20  here.  So these are -- these are customers where there

21  was a proposal after the time that certain letters

22  were -- or certain information was communicated from

23  PowerPlan, but you're saying these are not necessarily

24  ones where they received a letter, or do you know one

25  way one another?

1       A.   These were customers that we had built

2   relationships with prior to PowerPlan's interference.   I

3   don't know which of these received letters.

4            I do know that the industry as a whole is

5   aware of the dispute and of course the counterclaims and

6   that these are relationships, opportunities that we had

7   sometimes -- most of these were developed before

8   PowerPlan's interference and disappeared as of the time

9   of PowerPlan's communication to market.

10      Q.   So now let me see if we can narrow this list

11  down little bit.  Of the list that you just gave me, are

12  there any where the customer came back to you and gave

13  you an indication that it was not willing to do business

14  with Lucasys because of something that PowerPlan had

15  done?

16      A.   I think we talked about those instances I

17  think before the break, where we had those specific

18  conversations.  And then what these list of customers,

19  these are customers where after PowerPlan's interference

20  in the market the relationship that we had built up to

21  that point, the opportunity did not come to pass.

22      Q.   And so for the ones that you just listed for

23  me, these are not -- to be clear, these are not ones

24  where the customer came back to you and said anything

25  akin to, PowerPlan said that you can't have access to



1   our software; is that correct?

2       A.   I think many of these customers may have

3   received that letter that we had talked about, but I

4   don't have a recollection from these customers

5   in particular -- there may be an exception or two, but

6   largely, the opportunity grew cold at the time of

7   PowerPlan's interference and as this dispute arose.

8       Q.   Now, sir, not all of the companies you have

9   listed are regulated utilities; true?  And, for example,

10  Arizona Water, Southwest Water, those aren't regulated

11  utility companies, are they?

12      A.   I believe they are.

13      Q.   They are?

14      A.   I think that's correct, yeah.  They're members

15  of the NAWC.  That's how we actually built the

16  relationships is through our association with that trade

17  group.

18      Q.   And so Lucasys when it's considering potential

19  customers, it looks at any -- any rate-regulated

20  utility?

21      A.   I don't -- correct, within the United States.

22  We have been looking primarily with U.S. operations.

23      Q.   And in terms of -- and are there any other

24  customers that Lucasys has or intends to target outside

25  of that regulated utility industry?



1        A.    So I think we have discussed broadly a

2   long-term strategy to take solutions outside of the

3   rate-regulated utility industry.

4              We recognize that that strategy requires

5   significant capital investment and the hiring of

6   expensive experienced resources basically to replicate

7   the Lucasys model for utilities for the next industry.

8              So while we have discussed that strategy, we

9   have not been able to execute on it based on our capital

10  commitments to this litigation.

11       Q.    Sir, are there any -- are any of the existing

12  products that Lucasys has developed, are any of them

13  suitable for use outside of the investor owned rate-

14  regulated utilities?

15       A.    They are, and they are actually designed and

16  developed for that purpose.  So if I expand on that, in

17  each of our products the requirements for rate-regulated

18  utilities specifically are incremental functionality.

19             So an example would be within the deferred tax

20  solution, we actually perform a three-stage computation

21  and only the third step is required for regulating

22  industries and the first two are the non-regulated

23  space.

24             So when we have had the opportunity to demo

25  our software to utilities that have regulated and



1  non-regulated business, they see the value in having a

2  comprehensive solution like that.

3      Q.   Sir, how much has Lucasys paid to date for

4  this litigation?

5      A.   So the last -- through June of this year it

6  was in excess of ██████████   Based on the monthly

7  expenses for July, August, we're probably close to █

8  ████████  as I sit here today.

9      Q.   And those are dollars that have been paid?

10     A.   I don't know if we have gotten all of last

11 month's invoices.  I may have included a month of

12 activity that either hasn't been invoiced or hasn't been

13 paid, but those are the dollars that would have been

14 incurred sitting here today.

15     Q.   And your understanding is that with the

16 exception of possibly last month, everything that's been

17 incurred has been paid?

18     A.   Certainly has, yes.  We're current on all the

19 received invoices.

20     Q.   So for -- as it stands today, is Lucasys cash

21 flow positive?

22     A.   ████████████████████████████████

23 ████████████████████████

24     Q.   ████████████████████████████████

25     A.   ████████████████████████████████



22      Q.   So, sir, we have talked about lost

23   opportunities with specific customers.   We have talked

24   about the model or the damages estimate that you

25   included in the complaint.

1           Aside from the loss of software licensing

2    revenue or the loss of consulting revenue, are there any

3    other categories of damages that Lucasys is claiming in

4    this case?

5           A.    Yes, there are.

6           Q.    What are those?

7           A.    So I think one category is the loss of our

8    ability to demonstrate a proof of concept.  So it's --

9    yeah, it's the loss of the ability to kind of penetrate

10   in the utility with a proof of concept model.

11          That's a very important one because that lines

12   up with our business strategy to gain new customers.

13          Q.    Sir, when you were making your recent proposal

14   to AEP that resulted in the Copilot product being

15   licensed, did you demonstrate for them Lucasys's other

16   software products?

17          A.    In the context of a Copilot proposal?

18          Q.    Well, during that process when you were -- the

19   process that ultimately resulted in you getting the

20   consulting contract and licensing Copilot, did you have

21   the opportunity to also demonstrate your other software

22   products?

23          A.    So the AEP relationship includes the software

24   work that was demonstrated and that opportunity that was

25   lost, right.



1            So -- but in the context of the current

2    engagement, which is services only, the Copilot solution

3    was presented to meet some very specific requirements in

4    AEP's processes, so that was the only solution that was

5    presented to meet those specific requirements.

6        Q.   And did you ask AEP -- have you asked AEP in

7    the last 18 months for the opportunity to demonstrate

8    your current state of Lucasys's software products?

9        A.   So our business model is to provide value,

10   provide the demonstration of where there is a need.  And

11   so that's true with AEP.

12           We understand that AEP made a business

13   decision to stay with the PowerPlan solution, invested

14   into that, went through an upgrade, and so we understand

15   that AEP is not ready to evaluate another solution.

16           In the same way we would do any of our

17   customer demos during the initial discovery call, we

18   identify the pinpoints and only demo the solutions and

19   address those, don't come in and demo every solution

20   that we have hoping one sticks.

21       Q.   Sir, let me ask you this question.  It's

22   Lucasys's position that you had -- that you had won the

23   bid to build software for AEP in 2019; true?

24       A.   Lucasys had won the bid to deploy and

25   implement new software at AEP in 2019.  And AEP



1    understood that some of that software would continue to

2    be built out during that project to meet AEP's

3    requirements.

4        Q.    And so do you have an understanding as to why

5    AEP was interested in licensing your software in 2019

6    but not in 2021?

7        A.    So I believe in 2019, AEP had to make a

8    decision, had come to a place where the maintenance of

9    its existing software, particular tax software had

10    become so poor that it created a risk to AEP and they

11    had to decide whether to invest in new technology or

12    continue to pay for their existing technology.

13            I believe that they had been at a point where

14    PowerPlan had communicated to them that their current

15    version would be not supported and so there was this

16    window of opportunity for them to invite -- to invite

17    other vendors to bring solutions.

18            And of course we weren't the only ones.  There

19    were several vendors that came and proposed solutions

20    for that -- for that RFP.  Having -- having -- AEP

21    having decided that as a business they were going to

22    continue to PowerPlan tax solutions, they have invested

23    as a company back into those solutions and so it's a

24    different conversation today.

25            AEP -- the conversation that I -- that comes



1    to mind with AEP individuals -- I think this may have

2    been with Jimmy -- was that the industry needs new

3    technology in this case and AEP wants to be a leader in

4    that space.

5              And so there is a door open for AEP to

6    evaluate other Lucasys products in the future, and we're

7    hopeful that that comes sooner rather than later, but we

8    understand this dispute continues to be one of the

9    factors.

10        Q.   Have you had the opportunity to read

11   Mr. Lindsey's deposition?

12        A.   I don't believe so.

13        Q.   Have you read Mr. May's deposition at NextEra?

14        A.   I don't believe so.

15        Q.   Have you read any of the depositions that were

16   taken of the Liberty corporate representatives?

17        A.   I don't think we have access to those.

18        Q.   And same question for Suez.  Have you read the

19   30(b)(6) deposition of Suez in this case?

20        A.   I have not.

21        Q.   And so to the extent that if any of the folks

22   at those companies took a position that was contrary to

23   what you're saying, would you defer to their views on

24   why they made the decisions they made?

25        A.   So I think the decisions at enterprise



1    companies are -- a lot of factors go into them and it's

2    a lot of people that don't have a voice in it.

3          So I think -- I don't know how to answer that

4    question without maybe seeing what was said.

5      Q.   You wouldn't necessarily defer to -- well,

6    strike that.

7          All right, sir.  Are there any other

8    categories of damages that Lucasys intends to claim in

9    this case that we haven't discussed today?

10     A.   Yes, there are.

11     Q.   What are they?

12     A.   So another way that we have been damaged is we

13   have been unable to grow and expand our team here at

14   Lucasys.  So I think I touched on the recruiting efforts

15   around the property accounting space.

16         Even more than that, we had to rescind a

17   couple of offers in light of this dispute.  One of those

18   rescinded offers went to work with one of our

19   competitors in the services space with RCC.

20         Actually, now that I think about it, we've got

21   two people that we weren't able to recruit that now work

22   at RCC, are leaders in that business.

23         So yes, we have absolutely been harmed by our

24   inability to grow team.  And actually when those

25   individuals are available, although they want to come



1    work with us, they go to work for competitors instead.

2    So that's one example.

3         Q.   Okay.  What others?  What others are there?  I

4    mean, I want to know what we're going to hear about from

5    your experts and from you, so if there are other

6    categories of damages, I'd like to know what they are.

7         A.   Sure.  So our inability to expand outside of

8    core businesses, we touched on this a little bit.  But

9    outside of tax and outside of utilities, from the very

10   founding of the company and our earliest document that

11   we had laid out our approach, we -- our goal and vision

12   to expand outside of tax and property accounting, our

13   inability to do that as a result of PowerPlan's

14   interference.  That's a very important one.

15        I think also just the harm to the reputation

16   of both Lucasys as a company, as well as the founders

17   and even employees of Lucasys.

18        We -- in the same document that I was thinking

19   about, talking about our strategy and approach, from the

20   founding of the company our sales strategy was to

21   leverage relationships for sales.

22        And actually that's been our whole hiring

23   strategy.  Of course, we have only hired individuals

24   with the expertise and relationships in the utility

25   industry.



1          And so the reputational harm, it's not a side

2     thing.  It comes at the core of our business model and

3     our sales pipeline.  So reputational harm is a huge one.

4          Of course, litigation expenses.  I think we're

5     going to -- I would love for us to seek punitive

6     damages.  I think that the actions by PowerPlan

7     individual executives has been willful and without

8     regard to the impact to Lucasys.  So I think that will

9     be a category that I would like to see included.

10         And then of course with the technology

11    business, we think about not just the lost profits

12    revenue, but there is a value to the business for

13    outside investment, for an eventual sale of the

14    business, our inability to grow or even delay growth has

15    enormous impact on -- on the value -- the valuation of

16    the business and where it is today versus where it could

17    be based on the projections that we had.

18    Q.   Sir, when are you planning on selling your

19    business?

20    A.   So I think in the initial -- in the earliest

21    projection I have I think there was a five-year window.

22    So I guess that would be next year, year 2023 -- I'm

23    sorry, that would have been -- yeah, I guess 2023,

24    absent the interference in this dispute which has gone

25    on for three years now.



1      Q.   So your intention was to sell the business

2  after five years?

3      A.   Well, the intention was to build value in the

4  business such that after five years it would be

5  attractive to a broke investor or somebody that could

6  help come in and take the business to the next level.

7      Q.   Sir, I understand you have -- I want to focus

8  on damages that you say you have incurred.  So you

9  talked to me broadly about damages associated with the

10  sort of inhibited growth of the company, what specific

11  customers.

12           Any other reputational damage or -- they're

13  all sort of tied together.  But tell me, are there any

14  other categories of damages that we haven't talked

15  about?

16      A.   Yeah, I think we touched on the reputational

17  harm, right.  And we've got counterclaims.  And I know

18  that they didn't move forward, but this is counterclaims

19  in the public record that Lucasys -- that name us

20  individually within the counterclaims.

21           This is a -- this is a perpetual thing.  Those

22  damages are real and, you know, I think it's -- it's

23  unfortunate what PowerPlan decided to do in this dispute

24  and the allegations that they have made.

25           It's of course harm to company, but I'm



1    thinking about my own employees, co-founders,

2    individuals who now their careers are at stake, their

3    families at risk because of PowerPlan's actions.

4         Q.   Sir, I would like to ask to, with respect to

5    the allegations that Lucasys made in the original

6    complaint, are there any allegations that are contained

7    in that complaint that you think are incorrect as you

8    sit here today?

9         A.   In the original complaint?  There was an

10   amended complaint.  Clarify the question.

11        Q.   Either.  In the original complaint or the

12   amended complaint, are there any allegations contained

13   in either of those documents that Lucasys has made about

14   PowerPlan that Lucasys understands today are incorrect?

15        A.   I don't believe so.

16        Q.   All right.  That's all I have, sir.

17             MR. MAYES:  Thank you.  Nothing from us.

18             THE VIDEOGRAPHER:  Going off record at

19   3:01 p.m.

20             COURT REPORTER:  Are we going to read and

21   sign, Mr. Mayes?

22             MR. MAYES:  Yes.

23             COURT REPORTER:  And so would you like just an

24   electronic copy?

25             MR. MAYES:  Yeah, that's fine.



1              COURT REPORTER:  And, Mr. Fazio, you as well?

2              MR. FAZIO:  Yeah, that's fine.

3              (Deposition concluded at 3:01 p.m.)

4                          * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        DISCLOSURE

 2    STATE OF GEORGIA:

 3    COBB COUNTY:
                    DEPOSITION OF:  VADIM LANTUCKH

 4
                  Pursuant to Article 10.B. of the Rules and
 5
      Regulations of the Board of Court Reporting of Judicial
 6
      Council of Georgia, I make the following disclosure:
 7
                  I am a Georgia Certified Court Reporter acting
 8
      as an agent of Trustpoint.One, who was contacted by the
 9
      offices of Squire, Patton, Boggs, to provide court
10
      reporting services for this deposition.  I will not be
11
      taking this deposition under any contract that is
12
      prohibited by O.C.G.A. 15-14-37 (a) and (b).
13
                  Trustpoint.One has no contract to provide
14
      reporting services with any party to the case, and
15
      counsel in the case, or any reporter or reporting agency
16
      from whom a referral might have been made to cover this
17
      deposition.  Trustpoint.One will charge its usual and
18
      customary rates to all parties in the case, and a
19
      financial discount will not be given to any party to
20
      this litigation.
21

22

23
                       CCR# B-2007 DATE: 9 - 21 - 2022
24    Debbie C. Hennings

25
```

1                        CERTIFICATE

2

3    STATE OF GEORGIA:

4    COBB COUNTY:

5

6            I hereby certify that the foregoing transcript

     was taken down, as stated in the caption, and the

7

     questions and answers thereto were reduced to

8

     typewriting under my direction; that the foregoing pages

9

     1 through 82 represent a true and correct transcript of

10

     the evidence given upon said hearing.

11

             The witness did reserve the right to read and

12

     sign the transcript.

13

             This, the 21st day of September 2022.

14

15

16

17

18

19

20

21

22

23

24           DEBBIE C. HENNINGS, CCR-B-2007
             My commission expires the
25           1st day of April 2023

Notice Date: 09/21/2022

Deposition Date: 9/14/2022

Deponent: Vadim Lantukh 30(b)(6)

Case Name: Lucasys Inc. v. Powerplan, Inc.

| Page:Line | Now Reads | Should Read |
|-----------|-----------|-------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

## WORD INDEX

**< $ >**
**$30,000** 52:*1, 8*
**$3-plus** 51:*8*
**$450** 24:*10*
**$47** 8:*9* 9:*8* 10:22 11:*1, 4, 5* 13:*15* 14:*12* 58:*6, 9*

**< 1 >**
**1** 80:*4*
**1.5** 67:*6*
**1:20-CV-2987-AT** 1:*5*
**10.B** 79:*3*
**100** 18:*15* 19:*23*
**100,000** 18:*11* 19:*4* 68:*16*
**1000** 3:*8*
**12** 25:*15, 21*
**12:59** 1:*15* 4:*4*
**120888** 1:*25*
**127** 3:*8*
**130** 23:*19, 24* 33:*9*
**13-month** 25:*15, 21*
**14** 1:*14* 4:*3*
**14th** 3:*4*
**15** 28:*10*
**15.6** 24:*22*
**15-14-37** 79:*3*
**15-14-37(a** 3:*17*
**18** 25:*10* 70:*7*
**18-month** 26:*1*
**1st** 80:*25*

**< 2 >**
**2** 67:*7*
**2:23** 62:*7, 8*
**2:35** 62:*9, 10*
**200,000** 18:*11, 15* 19:*23*
**2019** 18:*21* 36:*1* 37:*20* 38:*9, 17, 18* 70:*23, 25* 71:*5, 7*
**2020** 11:*6* 12:*2* 36:*7*
**2021** 71:*6*
**2022** 1:*14* 4:*3* 80:*4*
**2023** 75:*22, 23* 80:*25*
**216-479-8403** 3:*10*
**21st** 80:*4*

**< 3 >**
**3:01** 77:*19* 78:*3*
**30** 24:*4* 25:*7* 26:*14*
**30(b)(6** 1:*10* 4:*6* 72:*19*
**30318** 3:*4*

**< 4 >**
**40** 23:*22* 27:*22* 33:*10*
**404-856-3255** 3:*5*
**407-718-7164** 3:*13*
**44114** 3:*9*

**47** 10:*23* 14:*18* 24:*15, 19, 23*

**< 5 >**
**5** 2:*2*
**50** 23:*22* 27:*22*
**50,000** 19:*4* 68:*16*
**500** 3:*4*
**500,000** 20:*16*

**< 8 >**
**82** 80:*4*

**< 9 >**
**9-11-29(a** 3:*16*

**< A >**
**ability** 26:*2* 41:*5* 42:*4* 50:*2* 53:*16* 54:*6, 15* 69:*8, 9*
**able** 18:*25* 25:*7, 12* 27:*12* 34:*18* 35:*14, 21* 36:*9* 41:*22* 44:*23* 45:*14* 51:*16* 66:*9* 73:*21*
**absent** 11:*14* 75:*24*
**absolutely** 27:*5* 73:*23*
**access** 45:*9* 49:*9* 60:*18* 64:*25* 72:*17*
**accounting** 21:*1* 31:*10, 17* 34:*24* 35:*12* 73:*15* 74:*12*
**accurate** 51:*10*
**acquire** 25:*12* 27:*12*
**acquired** 25:*22*
**acquires** 16:*25*
**acting** 79:*3*
**ACTION** 1:*5* 57:*24*
**actions** 27:*17* 46:*14* 75:*6* 77:*3*
**activities** 48:*21*
**activity** 67:*12*
**actual** 14:*2* 17:*7* 21:*22*
**added** 15:*12* 17:*7, 21*
**addition** 9:*23* 33:*6*
**additional** 11:*11* 21:*14* 29:*20* 58:*25* 63:*8*
**address** 70:*19*
**adequate** 26:*13*
**adopt** 20:*20* 26:*19*
**adverse** 24:*8*
**AEO** 45:*10*
**AEP** 14:*1, 9, 20* 15:*1, 19* 17:*5, 16, 18, 25* 18:*2* 19:*3, 20* 20:*8* 21:*11* 50:*10, 13, 19, 20* 51:*7, 9, 17, 23* 52:*4, 9, 13, 15, 18* 53:*13* 69:*14, 23* 70:*6, 11, 12, 15, 23, 25* 71:*5, 7, 10, 20, 25* 72:*1, 3, 5*
**AEP's** 15:*20* 70:*4* 71:*2*

**affirmative** 46:*9*
**afforded** 50:*5*
**afternoon** 5:*4, 5*
**AGA** 27:*20*
**agency** 79:*3*
**agent** 79:*3*
**aggressive** 16:*4*
**aggressively** 51:*25*
**ago** 6:*21* 7:*2* 9:*24*
**agree** 9:*18*
**agreed** 11:*9*
**agreement** 12:*8*
**akin** 64:*25*
**allegations** 50:*24* 55:*17* 56:*15* 58:*20* 76:*24* 77:*5, 6, 12*
**allegedly** 62:*22*
**alleges** 10:*21*
**alleging** 48:*14* 62:*14*
**allowed** 35:*19* 40:*3*
**Alloy** 3:*3* 10:*14*
**alternative** 26:*5* 27:*19*
**alters** 58:*6*
**amended** 10:*21* 55:*21* 77:*10, 12*
**Ameren** 36:*17* 41:*2, 3, 5, 7* 42:*4*
**American** 14:*15* 23:*7, 11, 12* 36:*17, 21, 24* 37:*1, 6, 8* 38:*2, 22* 39:*17*
**amount** 18:*8* 25:*17*
**analogy** 57:*22*
**analyses** 6:*22* 7:*3*
**analysis** 6:*2* 7:*7, 9, 11, 12* 8:*2* 9:*15, 24* 11:*5, 17, 23* 12:*9, 13* 13:*1, 5, 9, 13, 14, 16, 22* 14:*10, 11, 14, 15, 17, 20, 21, 22, 24* 15:*12, 14* 16:*10, 15, 18, 21* 18:*1* 20:*1, 4, 9* 21:*16* 22:*7, 23* 23:*1, 3, 23* 24:*5, 6, 12, 13* 25:*3* 58:*6, 7, 8, 9, 11, 14* 59:*1, 2* 60:*17*
**annual** 15:*11, 15* 17:*1* 18:*6*
**answer** 8:*19* 9:*7* 21:*4* 30:*6* 32:*12* 47:*18* 67:*23* 73:*3*
**answering** 33:*20* 49:*17*
**answers** 80:*4*
**anticipation** 7:*23*
**anybody** 10:*10, 17* 32:*16* 39:*17*
**apologies** 48:*8*
**apologize** 62:*24*
**appeared** 1:*22*
**appreciate** 48:*10*
**approach** 12:*9* 74:*11, 19*
**April** 80:*25*
**area** 29:*6*

**areas** 21:*14*
**Arizona** 63:*1* 65:*10*
**arose** 65:*7*
**Article** 79:*3*
**ascribe** 67:*24*
**aside** 5:*23* 6:*18* 33:*21* 43:*3* 48:*1* 60:*5, 11* 69:*1*
**asked** 12:*11, 12* 13:*3* 26:*23* 27:*7, 18* 28:*2* 33:*21* 35:*9* 40:*10* 45:*1* 48:*13* 49:*17* 55:*22* 70:*6*
**asking** 12:*16, 17, 25* 13:*1, 19* 28:*21* 32:*5* 33:*20* 34:*3, 15* 38:*15* 45:*17, 19* 46:*3* 47:*4, 9* 49:*17, 20* 56:*8* 57:*13* 60:*19* 61:*4, 6*
**asserting** 7:*19* 8:*21*
**assessment** 50:*6*
**asset** 15:*24*
**assistance** 37:*9*
**associate** 23:*10*
**associated** 76:*9*
**associates** 55:*13*
**association** 4:*9, 10* 23:*11* 65:*16*
**assume** 16:*12* 18:*2, 19, 25* 19:*6, 16, 25*
**assumed** 16:*16* 21:*7* 24:*3*
**assuming** 18:*9*
**assumption** 14:*5* 18:*7, 20* 26:*20*
**assumptions** 21:*7, 17, 19, 21*
**ATLANTA** 1:*2* 3:*4*
**attempt** 54:*3*
**attention** 55:*10*
**attorney** 12:*20* 13:*3, 6* 44:*15*
**attorney-client** 12:*14, 23*
**attorneys** 4:*11*
**attractive** 16:*3* 76:*5*
**August** 67:*7*
**author** 11:*23, 24*
**automation** 19:*10, 13*
**available** 32:*4* 40:*12, 14* 49:*3, 5* 73:*25*
**aware** 10:*20* 11:*10* 32:*16, 19* 40:*13* 54:*10, 14* 64:*5*

**< B >**
**B-2007** 79:*3*
**back** 16:*14, 19, 22* 22:*10* 29:*18* 34:*21* 36:*13* 42:*4* 51:*7* 62:*10* 64:*12, 24* 71:*23*
**bad** 53:*9*
**balance** 19:*14*
**barriers** 53:*10*



**based** 11:*17* 16:*24*
20:*22* 21:*24* 22:*17*
23:*25* 24:*24* 26:*1, 14*
34:*17* 38:*23* 40:*14*
43:*24* 45:*7* 55:*17* 56:*16*
59:*13, 16* 60:*23* 66:*9*
67:*6* 75:*17*
**baseline** 17:*4, 9*
**basically** 66:*6*
**basis** 5:*17* 8:*11, 14* 9:*8*
11:*1, 4* 19:*14* 22:*13*
26:*19* 68:*15*
**began** 44:*4*
**begging** 26:*5, 10*
**beginning** 4:*12*
**begun** 15:*17*
**BEHALF** 3:*2, 5* 4:*15*
5:*15*
**behavior** 53:*9*
**believe** 6:*17, 20* 7:*14*
11:*6* 12:*3, 8* 18:*6, 20*
21:*11* 22:*24* 30:*12, 13,
24* 36:*7* 37:*2* 39:*2* 40:*7*
41:*1* 43:*21* 46:*25* 49:*2,
4* 51:*13* 52:*1* 53:*4, 5*
55:*15* 58:*21, 24* 59:*14*
65:*12* 71:*7, 13* 72:*12, 14*
77:*15*
**Belinfante** 3:*3*
**bell** 56:*22*
**best** 5:*11* 44:*14*
**better** 27:*8* 28:*16*
**bid** 70:*23, 24*
**bidding** 16:*5*
**bigger** 31:*7*
**bit** 16:*22* 22:*13* 55:*20*
64:*11* 74:*8*
**Black** 36:*17* 39:*20, 21,
22, 23* 41:*8*
**Blanquez** 10:*14, 16*
**Board** 79:*3*
**Boggs** 3:*8* 4:*15* 79:*3*
**break** 53:*21* 61:*24* 62:*5,
8, 12* 64:*17*
**bring** 15:*19* 16:*1* 20:*17*
24:*8* 29:*22* 71:*17*
**bringing** 11:*17* 16:*6*
59:*19*
**broad** 29:*2* 46:*5* 50:*17*
**broader** 14:*14, 19* 25:*3*
58:*8*
**broadly** 66:*1* 68:*1* 76:*9*
**broke** 68:*13* 76:*5*
**brought** 6:*2, 23* 7:*4*
13:*8* 14:*11* 27:*6*
**Bryan** 37:*5*
**build** 27:*8, 19, 24* 28:*21*
29:*10, 15* 30:*3* 31:*21*
32:*8* 42:*22* 70:*23* 76:*3*
**building** 25:*18* 30:*18*

**built** 25:*21* 64:*1, 20*
65:*15* 71:*2*
**Burkes** 46:*19*
**business** 6:*14* 11:*15*
14:*3, 4, 5* 25:*10, 11, 17,
19* 31:*18* 32:*21* 34:*14*
43:*2* 45:*25* 46:*7* 48:*18,
22* 49:*24* 50:*4, 8* 54:*8*
57:*6, 10* 63:*12, 15, 17*
64:*13* 67:*1* 69:*12* 70:*9,
12* 71:*21* 73:*22* 75:*2, 11,
12, 14, 16, 19* 76:*1, 4, 6*
**businesses** 23:*6, 7* 74:*8*

**< C >**
**call** 40:*4* 70:*17*
**called** 19:*10*
**calls** 50:*15*
**camera** 4:*8*
**campaign** 50:*17* 54:*17*
58:*18* 59:*18* 61:*11*
**capital** 66:*5, 9*
**caption** 80:*4*
**careers** 77:*2*
**case** 6:*1, 3, 5, 6, 23* 8:*5*
13:*18* 17:*16* 40:*13* 53:*6*
56:*9, 24* 59:*20* 60:*16*
69:*4* 72:*3, 19* 73:*9* 79:*3*
**case-by-case** 21:*24*
**cases** 31:*24*
**cash** 67:*20*
**categories** 56:*12* 69:*3*
73:*8* 74:*6* 76:*14*
**category** 56:*13* 69:*7*
75:*9*
**caused** 48:*7, 23* 53:*11*
62:*15*
**causing** 68:*8*
**CCR** 1:*13* 79:*3*
**CCR-B-2007** 80:*24*
**cease** 36:*1*
**Central** 63:*4*
**CEO** 57:*14* 59:*11*
**certain** 49:*23* 61:*1*
63:*21, 22*
**certainly** 12:*7* 13:*23*
15:*16* 25:*9* 34:*6* 44:*13*
56:*14* 58:*14* 67:*18, 25*
**CERTIFICATE** 80:*1*
**Certified** 79:*3*
**certify** 80:*4*
**Chang** 12:*6*
**change** 42:*3*
**changed** 37:*2*
**charge** 79:*3*
**charging** 51:*23* 52:*8*
**check** 41:*13*
**choice** 53:*5*
**chose** 30:*20, 22* 53:*2*
**Chung** 34:*24* 35:*2*

36:*12*
**Cieslak** 10:*14*
**circumstances** 45:*23*
**Ciullo** 38:*8*
**C-I-U-L-L-O** 38:*8*
**CIVIL** 1:*5*
**claim** 43:*5* 44:*9, 10*
45:*4, 20, 24* 61:*17* 73:*8*
**claimed** 45:*3*
**claiming** 5:*16* 47:*11, 23*
60:*16* 69:*3*
**claims** 46:*13*
**clarify** 17:*9* 27:*4* 77:*10*
**clauses** 22:*6*
**clean** 53:*22*
**clear** 8:*20* 57:*12* 59:*6*
63:*10, 18, 19* 64:*23*
**clearly** 7:*23*
**CLECO** 63:*5*
**Cleveland** 3:*9*
**close** 53:*16* 67:*7*
**closely** 23:*9*
**COBB** 79:*3* 80:*4*
**co-founders** 11:*25* 77:*1*
**cold** 43:*17* 65:*6*
**colleagues** 29:*4*
**collective** 20:*23*
**collectively** 28:*10*
**come** 11:*9* 14:*12* 21:*2*
31:*18* 34:*21* 36:*18*
39:*25* 55:*10* 61:*12*
64:*21* 70:*19* 71:*8* 73:*25*
76:*6*
**comes** 17:*15* 43:*12*
71:*25* 72:*7* 75:*2*
**comfort** 61:*24*
**coming** 25:*18* 27:*20*
29:*17*
**Commencing** 1:*15*
**comments** 29:*24, 25*
**commercial** 44:*11*
**commission** 80:*24*
**commitment** 17:*18*
**commitments** 66:*10*
**committee** 27:*22* 44:*1*
46:*23* 54:*24*
**committees** 27:*21*
**committing** 15:*22*
**common** 27:*9*
**communicate** 29:*23*
**communicated** 26:*7*
44:*22* 63:*22* 71:*14*
**communicating** 46:*6*
**communication** 27:*2*
28:*11* 32:*14, 17* 33:*13,
14* 41:*22* 43:*24* 46:*16*
50:*2* 54:*17, 23* 55:*14*
56:*22* 57:*18* 59:*17, 18*
64:*9*
**communications** 12:*15,
17, 24* 13:*20* 33:*16*

39:*16, 21* 41:*4* 43:*19*
44:*2, 15, 18* 45:*13* 48:*15*
50:*14, 19* 56:*15, 19* 57:*7,
17* 58:*19* 59:*13, 16*
60:*18* 63:*17*
**companies** 21:*17* 23:*12,
13* 28:*6* 42:*25* 43:*1*
50:*11* 60:*5, 7* 62:*25*
65:*8, 11* 72:*22* 73:*1*
**company** 21:*8, 9* 28:*3*
29:*17* 30:*14* 37:*11* 45:*8*
49:*14* 57:*14* 63:*5* 71:*23*
74:*10, 16, 20* 76:*10, 25*
**comparable** 77:*6*
**competitors** 31:*24* 32:*4*
73:*19* 74:*1*
**complaint** 6:*6* 7:*5, 15*
8:*10* 10:*20, 21* 11:*17*
13:*7, 10, 25* 14:*13* 33:*3*
43:*4* 55:*21* 60:*8* 68:*25*
77:*6, 7, 9, 10, 11, 12*
**complete** 61:*5*
**compliant** 33:*24*
**component** 17:*14* 20:*2,
5, 9* 24:*12*
**compounded** 53:*21*
**comprehensive** 67:*2*
**computation** 66:*20*
**Con** 28:*24* 29:*12* 50:*25*
51:*2*
**concept** 69:*8, 10*
**concerning** 9:*7* 41:*5*
**concluded** 78:*3*
**conclusion** 52:*19*
**conditions** 53:*10*
**conduct** 47:*12* 53:*18*
54:*1* 60:*4*
**conference** 37:*23* 38:*25*
39:*1* 40:*1, 8*
**conferences** 41:*20, 21*
**confidential** 46:*21* 47:*1*
56:*17, 18*
**configuration** 17:*12*
**conflicting** 48:*9*
**connect** 32:*1*
**connected** 25:*20* 61:*15*
**conservative** 16:*15*
26:*15, 17*
**consider** 54:*19*
**considered** 36:*11*
**considering** 65:*18*
**Consolidated** 28:*25*
**consulting** 15:*21* 17:*2*
20:*5, 22, 23* 21:*5, 13*
22:*16* 53:*16, 20* 69:*2, 20*
**contact** 34:*20*
**contacted** 79:*3*
**contained** 77:*6, 12*
**contents** 49:*19, 22*
**context** 69:*17* 70:*1*

**continue** 14:5 38:17 41:19 53:2, 12 57:9 71:1, 12, 22
**continued** 50:23
**continues** 14:14 72:8
**contract** 14:2, 23 15:4, 6 17:5, 10, 15, 17, 22 18:13, 14 19:1 21:18, 22, 23 34:15, 18 35:10, 14, 16 63:16 69:20 79:3
**contracted** 36:10
**contracting** 35:10
**contractor** 34:16
**contracts** 11:19 15:9, 11, 21 21:25 22:5, 17
**contractual** 17:8
**contrary** 72:22
**contribute** 67:25
**controls** 19:10, 15
**conversation** 28:14 34:11 35:4 36:13 38:1, 10, 14, 16 39:9, 14 40:15, 19 41:24 42:1, 5 50:3 58:2 71:24, 25
**conversations** 28:24 29:3, 12 31:6, 14, 15, 23 34:8 37:1 38:9 59:10 60:2 61:8 64:18
**coordination** 11:25
**Copilot** 18:20, 25 19:13 51:19, 20, 23, 25 52:9, 11, 12 69:14, 17, 20 70:2
**copy** 77:24
**core** 16:18 74:8 75:2
**corporate** 44:25 72:16
**correct** 7:5 10:5, 6, 23 12:3 18:17 24:17 25:1 41:3 50:19 51:1, 3, 18, 21 63:14 65:1, 14, 21 80:4
**corrective** 57:23
**cost** 17:23
**costs** 20:16
**Council** 79:3
**counsel** 4:19 5:21, 23 7:16 8:5 11:7 44:17 79:3
**counterclaims** 59:19, 21, 23 64:5 76:17, 18, 20
**COUNTY** 79:3 80:4
**couple** 24:18 28:12 34:12 35:6 39:24 40:16 73:17
**course** 6:14 7:6 12:9 22:5 27:1, 16 33:2 36:3 40:22 43:18 44:14 45:14 54:24 58:15, 17 59:23 64:5 71:18 74:23 75:4, 10 76:25
**COURT** 1:1, 21 3:17 4:9, 19, 21 11:14 34:25

56:2, 8, 10, 18 77:20, 23 78:1 79:3
**court's** 57:5
**cover** 79:3
**created** 21:16 71:10
**current** 31:11 52:10 67:18 68:6 70:1, 8 71:14
**currently** 68:10
**customary** 79:3
**customer** 11:12 15:8 17:24 20:15, 20 32:20 37:7 42:10 48:4, 6, 7, 16, 17, 22 50:20, 25 64:12, 24 70:17
**customers** 13:24, 25 14:3, 6, 10, 12, 17 15:18 16:1, 17, 18, 20 22:17 24:25 25:13, 21, 22 26:10, 23 27:4, 9, 12, 14, 18 28:20 33:1, 3, 10, 16, 22, 25 34:4, 13 36:14, 15 42:7, 12 46:4 47:23 48:3, 12, 13 49:5, 8, 23 50:1, 6 57:8 59:7 62:17, 21 63:12, 14, 20 64:1, 18, 19 65:2, 4, 19, 24 68:23 69:12 76:11
**customer's** 16:2
**cutting** 22:12

**< D >**
**damage** 48:7, 23 57:22 76:12
**damaged** 43:6 44:12 47:24 48:14 73:12
**damages** 5:16, 17 7:6 10:22 13:14 45:3, 4, 21 56:12 60:16 61:18 62:15 68:24 69:3 73:8 74:6 75:6 76:8, 9, 14, 22
**Daniel** 11:25 12:5 35:9 37:5
**date** 4:3 67:3 68:17, 20 79:3
**day** 46:18, 19, 22 80:4, 25
**days** 31:5
**deal** 53:17, 20
**dealing** 62:5
**deals** 25:24
**Debbie** 1:13 4:9 79:24 80:24
**decide** 71:11
**decided** 71:21 76:23
**decision** 30:25 70:13 71:8
**decision-makers** 55:9
**decisions** 72:24, 25
**deep** 23:21 36:24

**DEFENDANT** 3:5 4:15
**Defendants** 1:7
**defer** 7:16 72:23 73:5
**deferred** 18:4 19:12 49:15 52:15 66:19
**definitely** 59:2
**delay** 75:14
**deliver** 54:4
**delivering** 21:12
**demo** 39:23 41:7, 8, 9, 25 43:12 66:24 70:18, 19
**demonstrate** 50:3 69:8, 15, 21 70:7
**demonstrated** 69:24
**demonstrates** 33:17
**demonstration** 40:4 70:10
**demos** 70:17
**deploy** 70:24
**DEPOSITION** 1:9 4:5, 6 5:6, 20, 22 6:9, 10 8:24 9:19 10:2, 3, 8 33:23 62:9 72:11, 13, 19 78:3 79:3
**depositions** 72:15
**depreciation** 15:23 18:4 52:14
**describe** 26:21
**described** 39:17 43:1 60:14
**describing** 24:13, 16 34:23
**DESIGNATED** 1:11 5:15
**designed** 66:15
**desist** 36:1
**despite** 8:22 50:23
**determination** 15:13
**determine** 20:11 25:6
**develop** 15:17 25:17
**developed** 23:21 64:7 66:12, 16
**developing** 15:7
**dialogue** 28:18
**dictated** 54:7
**Diego** 63:2
**differed** 21:8
**different** 48:19 50:14 52:12 58:12 71:24
**dinner** 40:8
**direct** 11:20
**direction** 7:21 8:8 9:11 80:4
**directly** 29:10 34:18 35:9
**director** 34:19, 22, 24 41:24 42:1
**disagree** 9:18
**disappear** 44:4

**disappeared** 31:22 64:8
**disclose** 12:14, 23
**disclosure** 3:18 79:1, 3
**discount** 79:3
**discovery** 6:12, 16 9:25 26:4 30:3 43:18 45:10 48:25 58:6, 10, 18 60:21 70:17
**discretion** 57:5
**discuss** 9:13
**discussed** 20:8 22:15 43:4 66:1, 8 73:9
**discussing** 9:24
**discussions** 8:4 13:18 28:20
**dispute** 24:7 31:20 34:17 35:20, 24, 25 37:16, 25 38:3, 15 39:6 40:21, 22 41:12, 14 47:7 48:20 51:25 53:1 55:11 61:14 64:5 65:7 72:8 73:17 75:24 76:23
**disregard** 58:3
**DISTRICT** 1:1
**DIVISION** 1:2
**document** 8:13 9:11 74:10, 18
**documents** 6:5, 7, 9, 16, 18 10:1 30:6 46:11 49:2 77:13
**doing** 14:8 34:14 44:14 48:22 49:24 52:4 56:4 57:10
**dollars** 67:9, 13
**Donna** 40:6
**Donna's** 40:23
**door** 16:7 72:5
**dots** 32:1
**dozens** 46:6 48:24 55:8
**dried** 32:2 54:15 61:10, 22
**due** 33:19
**duly** 4:25

**< E >**
**earlier** 24:16 36:8 50:15
**earliest** 74:10 75:20
**early** 31:5 37:21 41:14 42:5
**easily** 32:1
**Ed** 28:25 29:12 50:25 51:2
**Edison** 23:10 28:25
**EEI** 27:20 39:3 43:25 46:23 54:23 55:15 58:19 59:18
**effect** 33:17 34:9 37:24 40:16
**effectively** 35:16
**efforts** 73:14

**either** 8:*3* 16:*16* 25:*24*
42:*19* 56:*3* 67:*12* 77:*11*,
*13*
**electric** 23:*6*, *10*, *20*
30:*14* 54:*25* 63:*5*, *6*
**electronic** 77:*24*
**email** 46:*22* 55:*15*
**employee** 34:*19*, *23*
36:*23*
**employees** 37:*5*, *17*, *18*
38:*21*, *22* 44:*21* 45:*8*, *9*
74:*17* 77:*1*
**ended** 16:*23* 24:*22*
31:*24*
**Energies** 28:*25*
**Energy** 63:*5*
**engage** 37:*6* 38:*4*
**engagement** 38:*19*, *21*
51:*8*, *9* 70:*2*
**enormous** 75:*15*
**enterprise** 23:*18* 72:*25*
**entire** 24:*11* 46:*24*
54:*24* 59:*20*
**entitled** 7:*24* 8:*15*
10:*22* 45:*5*
**entry** 53:*10*
**equivalent** 31:*16*
**escalation** 16:*16* 22:*6*
**ESQUIRE** 3:*3*, *5*
**essentially** 56:*2*
**estimate** 68:*24*
**evaluate** 70:*15* 72:*6*
**evaporated** 27:*14*
**eventual** 75:*13*
**eventually** 55:*14*
**everybody** 44:*6*
**evidence** 46:*20* 55:*16*
80:*4*
**exact** 37:*15*
**exactly** 17:*6* 19:*2*, *23*
38:*14*
**EXAMINATION** 5:*2*
**examined** 4:*25*
**example** 15:*20* 17:*16*
21:*9* 27:*7* 32:*20* 43:*11*
65:*9* 66:*19* 74:*2*
**examples** 29:*9* 42:*25*
49:*4* 60:*10* 62:*14*
**exception** 65:*5* 67:*16*
**excess** 24:*10* 67:*6*
**excluded** 23:*16*
**execute** 66:*9*
**executives** 43:*19* 75:*7*
**Exelon** 43:*12*, *13*, *20*, *23*,
*25* 44:*5* 46:*16*
**Exelon's** 43:*24*
**exhaustive** 28:*13* 44:*24*
60:*2*
**exhaustively** 5:*8*
**exhibits** 2:*6*
**exist** 30:*9*

**existing** 14:*23* 17:*8*
66:*11* 71:*9*, *12*
**expand** 31:*12*, *19* 42:*19*
66:*16* 73:*13* 74:*7*, *12*
**expectation** 29:*20*
**expenses** 67:*7*, *25* 68:*4*
75:*4*
**expensive** 66:*6*
**experience** 20:*23* 26:*14*
44:*21*
**experienced** 66:*6*
**expert** 60:*17*
**expertise** 74:*24*
**experts** 44:*7* 58:*15* 59:*3*
61:*3* 74:*5*
**expires** 80:*24*
**expressed** 47:*8*
**extent** 41:*22* 42:*17*
45:*12* 50:*16* 56:*23*
72:*21*
**extrapolated** 17:*3*
**eyes** 44:*16*

**< F >**
**fact** 8:*22* 33:*15* 50:*14*
56:*21*
**factor** 68:*3*
**factors** 72:*9* 73:*1*
**facts** 6:*1* 11:*18* 13:*18*
32:*6* 40:*13* 45:*2*
**fair** 5:*12* 29:*25* 59:*9*
**fairness** 52:*3*
**fall** 18:*21*
**familiar** 57:*3*
**families** 77:*3*
**far** 16:*20*
**FAZIO** 2:*2* 3:*5* 4:*14*,
*23* 5:*3* 7:*17*, *22* 8:*9*, *20*
9:*6*, *17*, *22* 12:*16*, *19*
13:*3*, *11* 35:*3* 47:*15*, *21*
61:*25* 62:*4*, *11* 78:*1*, *2*
**fee** 51:*22*
**feedback** 43:*15*
**feel** 26:*12* 56:*11* 57:*15*
68:*5*
**feelings** 26:*21* 29:*8*
**feet** 43:*17*
**felt** 24:*9* 26:*1*, *13* 27:*1*
35:*13*
**FILE** 1:*5*
**filing** 40:*12*
**final** 23:*19*
**financial** 13:*12*, *13* 79:*3*
**find** 8:*11* 28:*17*
**fine** 61:*25* 62:*5* 77:*25*
78:*2*
**finish** 36:*9*
**finished** 30:*15*
**Firm** 4:*17* 13:*6*

**first** 4:*25* 10:*21* 14:*18*
25:*10* 33:*12* 35:*8* 63:*5*
66:*22*
**five** 61:*23* 76:*2*, *4*
**five-year** 75:*21*
**fixed** 15:*23*
**flow** 67:*21*
**focus** 20:*25* 76:*7*
**focused** 55:*3*
**folks** 54:*20* 60:*12* 72:*21*
**follow** 17:*6*
**followed** 46:*8* 50:*14*
**following** 79:*3*
**follows** 5:*1*
**follow-up** 41:*9*, *16*
**follow-ups** 43:*16*
**foot** 16:*7*
**forecasts** 6:*11*, *15*, *18*
9:*25*
**foreclosed** 47:*11*
**foregoing** 80:*4*
**forever** 39:*12*
**form** 32:*8* 47:*13*, *16*
49:*3*
**formal** 37:*11*
**formalize** 37:*13* 38:*23*
**forth** 16:*22*
**forward** 16:*13* 30:*21*, *23*
31:*1* 53:*1* 76:*18*
**forwarded** 55:*11*, *13*
**founders** 74:*16*
**founding** 74:*10*, *20*
**four** 14:*9*, *12* 15:*10*, *17*
21:*17* 22:*17* 23:*9* 24:*24*
25:*22* 33:*2*, *6*, *15*, *21*
34:*13* 43:*3*
**frame** 12:*4*
**freezing** 33:*18*
**fresh** 34:*11*
**front** 14:*24* 68:*21*
**froze** 27:*14*
**frozen** 24:*6* 54:*6*
**full** 6:*5* 31:*21*
**functionality** 66:*18*
**further** 56:*21*
**Furthermore** 33:*13*
43:*25*
**future** 57:*16* 72:*6*

**< G >**
**Gabriel** 36:*24* 37:*9*, *10*,
*20*
**gain** 69:*12*
**gas** 23:*6*, *11*, *20*
**gears** 55:*20*
**general** 29:*25* 30:*8* 47:*6*
**generally** 28:*5*
**generate** 54:*15*
**Genora** 40:*24*
**G-E-N-O-R-A** 41:*1*

**GEORGIA** 1:*1* 3:*4*
79:*2*, *3* 80:*3*
**getting** 25:*25* 38:*22*
69:*19*
**give** 8:*2* 28:*2*, *8* 29:*9*,
*19* 30:*1* 32:*20*, *24* 36:*14*
43:*11* 46:*12*
**given** 21:*10* 49:*9* 60:*9*
79:*3* 80:*4*
**go** 5:*8* 30:*6* 31:*1* 32:*25*
33:*3* 34:*4* 36:*13* 39:*12*
51:*7* 52:*8* 57:*21* 62:*19*
73:*1* 74:*1*
**goal** 16:*8* 74:*11*
**goes** 9:*19*
**going** 6:*6* 9:*3*, *7* 15:*14*
16:*13*, *19* 19:*25* 21:*19*
28:*12* 29:*15* 31:*24*
32:*21* 34:*16* 43:*10* 44:*7*,
*9*, *10* 45:*2*, *4* 50:*4* 56:*8*
61:*1*, *2*, *17*, *21*, *22* 62:*6*
71:*21* 74:*4* 75:*5* 77:*18*,
*20*
**Good** 5:*4*, *5* 9:*21* 26:*1*
43:*15*
**gotten** 67:*10*
**grateful** 50:*22*
**grew** 65:*6*
**ground** 5:*7*
**group** 55:*12* 65:*17*
**groups** 33:*10*
**grow** 16:*9* 73:*13*, *24*
75:*14*
**growth** 68:*5* 75:*14*
76:*10*
**guess** 57:*3* 75:*22*, *23*
**guys** 7:*19* 8:*3*, *9* 46:*10*

**< H >**
**half** 61:*23*
**hanging** 62:*2*, *3*
**happen** 35:*4*
**happened** 38:*9* 40:*9*
46:*18*
**happening** 29:*5* 38:*21*
**happens** 33:*12*
**happy** 9:*13*, *14*
**hard** 7:*1*
**harm** 74:*15* 75:*1*, *3*
76:*17*, *25*
**harmed** 73:*23*
**head** 37:*2* 43:*19*, *25*
46:*23* 54:*23*
**hear** 7:*1* 8:*17* 44:*7*
74:*4*
**hearing** 80:*4*
**help** 10:*24* 11:*3* 22:*12*
26:*11* 35:*12* 37:*10*
44:*14* 56:*18* 76:*6*
**helpful** 56:*23*

**Hennings** 1:*13* 4:*10*
79:*24* 80:*24*
**Hey** 7:*17* 16:*11* 23:*23*
28:*15, 21* 29:*14* 46:*9*
61:*13*
**Hills** 36:*17* 39:*20, 21, 22,
23* 41:*8*
**hire** 32:*8*
**hired** 36:*23, 25* 37:*20*
74:*23*
**hiring** 66:*5* 74:*22*
**history** 28:*10*
**hole** 52:*7*
**hopeful** 39:*11* 72:*7*
**hoping** 70:*20*
**horizon** 24:*4* 26:*1*
**hour** 5:*22* 61:*22*
**huge** 75:*3*
**hundred** 42:*14*

**< I >**
**identified** 33:*9, 23, 24*
43:*3* 60:*8, 13*
**identify** 4:*11* 33:*25*
34:*3* 42:*12* 46:*3* 47:*4, 9*
48:*3* 70:*18*
**impact** 24:*8* 57:*7* 75:*8,
15*
**impacted** 11:*19* 13:*24*
60:*3*
**impacting** 68:*8*
**impacts** 42:*4*
**implement** 70:*25*
**implementation** 17:*11*
**implementing** 18:*21*
25:*25*
**important** 68:*6* 69:*11*
74:*14*
**impression** 27:*3* 29:*7, 19*
**inability** 41:*5* 48:*6*
53:*15, 19* 54:*6* 59:*12*
68:*1* 73:*24* 74:*7, 13*
75:*14*
**incentivize** 20:*20*
**include** 13:*25* 15:*14*
16:*16* 24:*11*
**included** 14:*2, 4, 10*
16:*4* 17:*12, 15* 18:*7*
19:*11, 12, 13, 14* 20:*1, 4*
21:*7* 23:*4, 5* 67:*11*
68:*25* 75:*9*
**includes** 14:*17* 27:*25*
28:*15* 69:*23*
**including** 1:*21* 18:*15*
**incorporate** 58:*14*
**incorporates** 40:*22*
**incorrect** 77:*7, 14*
**increase** 68:*2*
**incremental** 66:*18*
**incurred** 67:*14, 17* 76:*8*

**independently** 9:*1* 23:*6*
**indicate** 16:*6*
**indicated** 35:*14*
**indication** 64:*13*
**individual** 16:*1* 21:*25*
75:*7*
**individually** 76:*20*
**individuals** 28:*7, 24*
31:*22* 37:*8* 42:*3* 47:*10*
54:*25* 55:*8* 72:*1* 73:*25*
74:*23* 77:*2*
**industries** 23:*5* 66:*22*
**industry** 16:*24, 25* 20:*25*
26:*5* 28:*5, 15* 29:*2* 30:*8*
33:*9* 37:*22* 46:*14, 24*
54:*25* 55:*3, 4, 5, 12*
58:*19* 59:*24* 64:*4* 65:*25*
66:*3, 7* 72:*2* 74:*25*
**industrywide** 47:*6*
**influence** 14:*6*
**information** 13:2 21:*20*
45:6, 7 46:*21* 47:*1*
55:*17* 56:*17* 58:*25*
59:*25* 63:*22*
**inhibited** 76:*10*
**in-house** 8:*5* 44:*17*
**initial** 15:*7* 17:*17, 22*
21:*18, 22* 24:*24* 41:*25*
51:*14* 70:*17* 75:*20*
**initially** 24:*14*
**initiated** 37:*1*
**injunction** 55:*22, 23, 24*
56:*1, 9*
**injunctive** 57:*1*
**innovation** 24:*1*
**instance** 54:*11*
**instances** 46:*12* 64:*16*
**instructed** 12:*20, 25*
**intend** 45:*24* 60:*15*
**intended** 50:*7*
**intends** 45:*20* 65:*24*
73:*8*
**intention** 76:*1, 3*
**intentionally** 33:*14*
**interested** 26:*24* 27:*13*
71:*5*
**interfere** 44:*11*
**interfered** 11:*11* 18:*4,
22* 45:*24* 47:*24* 59:*9, 16*
63:*13*
**interference** 11:*20* 19:*9*
22:*18* 25:*12* 27:*12* 32:*2*
33:*12* 51:*14* 54:*2, 5, 10,
11, 13, 16* 64:*2, 8, 19*
65:*7* 74:*14* 75:*24*
**internally** 6:*13*
**interpreted** 49:*21*
**interrogatories** 33:*24*
**interrogatory** 60:*8*
**interrupt** 28:*1* 49:*16*

62:*1*
**interrupted** 10:*17*
**intimately** 57:*3*
**invest** 71:*11*
**invested** 70:*13* 71:*22*
**investment** 66:*5* 75:*13*
**investor** 66:*13* 76:*5*
**invite** 71:*16*
**invoiced** 67:*12*
**invoices** 67:*11, 19*
**involved** 12:*6* 57:*11*
**involves** 51:*11*
**issue** 13:*24* 48:*21* 53:*6*
**issues** 56:*10*
**item** 55:*10*
**items** 68:*7*
**its** 10:*20, 21* 71:*9* 79:*3*

**< J >**
**Jersey** 63:*4*
**Jimmy** 72:*2*
**jmayes@robbinsfirm.com**
3:*5*
**Job** 1:*25*
**JOSHUA** 3:*3* 4:*17* 7:*17*
**judicial** 11:*14* 79:*3*
**July** 67:*7*
**jump** 10:*19* 42:*4*
**June** 12:*3* 37:*22* 38:*10,
14, 25* 67:*5*
**jut** 51:*13*

**< K >**
**keep** 15:*22* 26:*17* 43:*10*
**kept** 16:*10* 37:*8* 56:*17*
**Key** 3:*8*
**kind** 15:*21, 22* 16:*7, 10,
16, 17* 17:*12* 19:*4* 23:*4*
24:*5* 32:*13, 17* 38:*2*
43:*17* 55:*12* 56:*21, 22*
69:*9*
**Kleczynski** 46:*16*
**knew** 40:*12*
**know** 5:*7, 10* 7:*12*
14:*25* 15:*19* 16:*6, 7*
17:*2* 19:*23* 28:*23* 29:*5*
30:*13, 25* 31:*12, 20* 32:*6*
33:*5* 38:*15* 39:*11* 40:*11*
44:*6, 8, 20* 45:*5, 25*
46:*18* 47:*6* 49:*10* 50:*17*
51:*4, 6* 57:*10* 59:*21*
60:*7, 13, 23, 24* 61:*18*
62:*4, 16* 63:*9, 24* 64:*3, 4*
67:*10* 73:*3* 74:*4, 6*
76:*17, 22*
**knowable** 45:*18, 19* 60:*6,
19*
**knowledge** 45:*8*
**known** 11:*18* 45:*17, 19*
60:*6, 19*

**< L >**
**lack** 56:*20*
**laid** 74:*11*
**land** 31:*10*
**lane** 43:*10*
**LANTUCKH** 79:*3*
**LANTUKH** 1:*11* 2:*2*
4:6, *24* 5:4 62:*12*
**largely** 20:*22* 65:*6*
**larger** 13:*9*
**launch** 61:*21*
**layer** 14:*16*
**lead** 31:*18*
**leader** 72:*3*
**leaders** 58:*19* 59:*19*
73:*22*
**leadership** 44:*1*
**leading** 31:*25*
**leads** 44:*3* 54:*15* 61:*10,
21*
**learned** 27:*16* 58:*5, 10,
15, 17, 19, 23*
**leave** 57:*4*
**left** 38:*17*
**legal** 8:2 48:*20, 21* 57:*4,
13*
**letter** 36:*1* 48:*4, 17*
49:*3, 13, 18, 19, 22, 24*
54:*19* 55:*1* 58:*4, 18*
59:*18* 61:*10* 62:*22*
63:*24* 65:*3*
**letters** 46:*6* 48:*11, 12*
49:*1, 7* 50:*12, 16* 51:*5*
60:*6, 12* 63:*21* 64:*3*
**level** 34:*19, 22* 76:*6*
**level-two** 24:*6*
**leverage** 74:*21*
**Liberty** 14:*1, 9, 21* 15:2
17:*5* 19:*24, 25* 20:2, *5*
21:*9* 72:*16*
**license** 18:2, *19, 25*
19:*25* 51:*22* 52:*21*
53:*24*
**licensed** 69:*15*
**licenses** 21:*6, 19*
**licensing** 51:*11, 20* 69:*1,
20* 71:*5*
**light** 51:*24* 53:*1* 73:*17*
**limited** 29:*3* 46:*13, 14*
51:2, *17* 60:*25*
**Lindsey's** 72:*11*
**line** 41:*14* 61:*14*
**lines** 69:*11*
**list** 13:*23* 28:*12* 32:*24*
34:*8, 22* 36:*13, 14* 44:*24*
49:*5* 59:*1, 15* 60:*3* 61:*5*
62:*19* 64:*10, 11, 18*
**listed** 64:*22* 65:*9*

litigation 7:*4*, *13* 24:8 40:*10* 60:*13* 66:*10* 67:*4*, *25* 68:*4* 75:*4* 79:*3*
little 6:*25* 16:22 22:*13* 26:*18* 55:20 64:*11* 74:8
Littlefield 3:*3*
LLC 3:*3*
LLP 4:*15*
locked 53:7
long 16:*20* 57:*21*
longer 26:*18*
long-term 66:2
look 6:*9*, *19* 58:*11*
looked 6:*1*, 7, *11*, *15*, 22 7:*3*, *10* 10:*1* 22:2 25:9 68:*13*
looking 25:*3* 65:22
looks 65:*19*
loss 67:22, 24 68:*6*, 8, *10*, *12* 69:*1*, 2, 7, 9
losses 68:*15*
lost 11:*20* 42:5 54:*12* 63:*17* 68:22 69:*25* 75:*11*
lot 25:*23* 28:*20* 36:*3* 73:*1*, 2
Lou 35:8, *10*
Louisiana 63:*5*
love 75:*5*
lower 16:*5* 17:*23*
LUCASYS 1:*3*, *10* 4:2, *18* 5:*15*, *16* 10:20 11:*11*, *25* 19:*7*, *11*, *12*, *13*, *14* 23:*21* 26:8 27:6, *10* 30:*3* 31:5, 8, *11* 32:*16*, *21* 34:*1*, *16*, *18* 35:*11*, *14*, *15*, *16*, *19*, 22, *25* 36:*4*, 5, *25* 37:*5* 42:*11* 43:2, *12* 44:9, *16*, *21* 45:*1*, 8, 9, *18*, *20* 46:*7*, *20*, *25* 47:*5*, *10*, 23, *24* 48:*6*, 7, *14*, *18*, *21*, *23* 49:*9*, *25* 50:*20* 51:*8*, *22* 53:*15*, *17*, *23* 55:22 56:*7*, 8 58:*13* 59:*9*, *11*, *15*, *21*, 22 60:*20*, *23* 61:2 62:*14* 63:*11*, *15* 64:*14* 65:*18*, *24* 66:*7*, *12* 67:*3*, *20* 69:*3* 70:24 72:6 73:*8*, *14* 74:*16*, *17* 75:8 76:*19* 77:*5*, *13*, *14*
Lucasys's 44:*7* 45:2, *25* 52:*20* 54:*1* 69:*15* 70:*8*, 22
Luis 10:*16*

< M >
magnitude 68:*9*
maintained 41:22
maintenance 71:8
making 36:*13* 55:*16*

58:20, *23* 69:*13*
managers 40:2
manner 35:*17*
marked 2:6
market 14:*16* 20:24 24:*1*, 2, 4, 7, *11* 25:4 26:*2*, *14*, *23* 27:24 29:8, *15*, *21* 33:*18* 42:*23* 53:*9*, *10* 54:*6*, *17* 55:*18* 59:20 64:*9*, *20*
marketplace 27:6, *17*
markets 14:*15*
market's 54:*7*
material 48:*25*
materialized 43:*16*
materials 45:*10*, *11*
matter 4:2
MAYES 3:*3* 4:*17*, 22 7:20 8:*1*, *17* 9:*1*, 9, *21* 10:*4*, *11* 12:*13*, 22 47:*13*, *16* 61:*20* 62:*1* 77:*17*, *21*, 22, 25
May's 72:*13*
mean 8:*1*, *14* 9:*17* 13:*17* 21:*3* 27:2 35:25 44:6 50:*10* 74:4
meaning 15:*19* 37:*16*, 25 41:*12*
mechanically 23:*1*
meet 42:*8*, *10*, *17* 70:*3*, 5 71:2
meeting 5:*23* 10:*11* 26:*13* 39:*3* 40:*3*
meetings 10:7
Melissa 37:*4*, *12*, *13*, *23* 38:25
Melissa's 38:*5*, 7
members 23:*10*, *14*, *16* 55:*12* 65:*14*
memo 8:*1*
memory 5:25 20:6 43:*10* 44:*21*
mentioned 6:8 20:*13* 41:2
merit 56:*20*
met 5:*21* 10:*4*, 5 40:*1*
million 8:*10* 9:8 10:22, 23 11:*1*, 4, 5 13:*15* 14:*12*, *18* 24:*10*, *15*, *19*, 23, 24 51:*8*, 9 58:*6*, 9 67:*6*, 8
mind 34:*11* 36:*18* 43:*12* 52:*16* 57:*25* 72:*1*
minimize 33:8
minimum 57:9
minute 6:*21* 9:24 16:*20* 34:22
minutes 61:*23*
misappropriate 59:22
misappropriated 43:*21*

46:*20*, 25
misappropriation 58:*20*
misconstrue 48:*21*
model 22:*3* 66:*7* 68:24 69:*10* 70:9 75:2
modeling 19:*10*, 12
moment 7:2 36:*19* 39:*19* 63:8
month 67:*11*, *16* 68:*12*, *13*, *16*
monthly 67:6 68:*15*
months 25:*11* 70:7
month's 67:*11*
morning 5:*21*
move 30:2*1*, 22 31:2*1* 34:2*1* 47:2 76:*18*
moving 53:*1*
multiple 47:8 48:8 53:22
multiplied 22:*4*, 9, *11*, 21

< N >
name 4:*8* 10:*15* 28:2 34:*25* 36:*23* 38:5, 7 40:6, *23* 76:*19*
named 13:*25*
names 34:*4*
name's 37:*3*
narrow 27:*11* 64:*10*
Nashville 39:*2*, *3* 40:8
nature 55:*18*
NAWC 23:*12* 65:*15*
necessarily 60:*21* 63:*23* 73:5
necessary 57:*15*, *19* 62:*19*
need 9:*20* 28:*15*, *16* 31:9 37:*13* 41:*11*, *14* 42:*15* 52:8 56:*10* 70:*10*
needed 31:*12* 35:*12*
needs 26:*13* 29:*15* 42:*8*, *10*, *13*, *16* 57:*8*, 24, *25* 58:*1*, *3* 72:2
net 67:22, 24 68:*6*, 8, *10*, *12*
never 38:*20* 54:*18* 57:25
new 20:*3* 34:*14* 36:*11* 37:7 39:24 63:4 69:*12* 70:25 71:*11* 72:2
NextEra 14:*1*, 9, *20* 15:2 17:5 18:*18*, *19* 19:*1* 20:8 72:*13*
NextEra's 18:*20*
nine 19:*1*
no-go 43:*24*
non-regulated 66:22 67:*1*
nonresponsive 47:*3*
North 14:*15* 23:7, *12*

NORTHERN 1:*1*
Notice 5:22 6:8
Noticing 4:*13*
Nova 19:*14* 43:*12*
NSAs 25:*23*
number 8:*12*, *14* 13:*15* 14:*12*, *25* 15:*1* 17:*12*, *17*, *23*, *24* 19:*3*, 5 22:*2*, 4, 9, *11*, *14*, *21*, 22 24:*10*, 22 61:9 68:*11*, *17*, *20*
numbers 12:*10* 17:2*1* 19:2*1*
NW 3:*4*

< O >
O.C.G.A 3:*16* 79:*3*
object 12:22 47:*13*
objected 47:*16*
objection 4:*20*, 22, *23* 12:*13* 49:8
obviously 9:*17* 45:*16*
October 36:*1*
offering 51:*17*
offers 73:*17*, *18*
offhand 36:*18*
offices 79:*3*
offline 8:*18* 9:20
Ohio 3:*9*
Okay 5:*19* 6:*21* 7:*12* 8:*17*, *20* 9:*17*, *21* 10:7, *10*, *13*, 24 11:*3* 12:*11* 13:*12* 17:*4*, *25* 18:*13* 19:*6*, *16* 20:*11* 22:*10*, *19*, *25* 24:*14*, *18* 25:2 32:24 35:*4*, 7 37:*12* 41:*10* 43:9, *11* 44:5 56:*7* 62:*1*, *23* 63:*18* 74:*3*
on-call 20:*25*
once 24:*11* 25:*20* 33:8
ones 23:*15* 46:*1* 48:*1* 60:*11*, *14*, *15* 61:*18* 62:*20* 63:*8*, *10*, 24 64:22, *23* 71:*18*
one-time 17:*10*
ongoing 13:*17* 17:*17* 20:*2*, *4*, 8, *12* 21:*5*, *23* 27:*23* 28:*11*, *18*
open 44:*3* 72:*5*
operating 67:22
operations 30:*13*, *17* 65:22
operator 4:*8*
opinion 32:*5*
opportunities 11:*19* 31:2*1* 44:*4* 47:*10* 64:*6* 68:*23*
opportunity 20:*17* 27:*11* 32:*2* 37:*6* 38:*20* 43:*23* 50:*5* 54:*11* 63:*11*, *13*, *15* 64:*21* 65:*6* 66:*24* 69:*21*,

*24* 70:*7* 71:*16* 72:*10*
**options** 28:*16*
**order** 51:*24* 56:2, *18*
57:*16* 60:*25*
**organization** 44:*17*
**organizations** 23:8, *15, 16*
**original** 58:*7* 77:*5, 9, 11*
**originally** 52:*13, 14*
**ought** 46:*7* 48:*5*
**outlines** 8:*13*
**Outside** 26:*3* 27:*17*
29:*5* 33:*15* 35:*16* 55:2
56:*12* 65:*24* 66:2, *13*
74:*7, 9, 12* 75:*13*
**overall** 16:2, *14* 24:8
**overnight** 27:*15*
**owned** 23:*13* 66:*13*

< P >
**p m** 1:*15* 4:*4* 62:*7, 8, 9,
10* 77:*19* 78:*3*
**package** 20:*18*
**pages** 80:*4*
**paid** 67:*3, 9, 13, 17*
**Part** 8:*10* 13:*9, 14*
15:*10* 26:*19* 31:*18*
50:*17* 51:*11*
**participate** 10:*11*
**participated** 10:*13*
**particular** 13:*1* 15:*23*
16:*10* 65:*5* 68:*16* 71:*9*
**particularly** 45:*10*
**parties** 1:*21* 4:*12* 49:*21*
79:*3*
**party** 4:*12* 49:*13* 56:*3,
4* 79:*3*
**pass** 64:*21*
**passed** 55:*11* 59:*24*
**pattern** 50:*14*
**Patton** 3:*8* 4:*14* 79:*3*
**Paul** 3:*10* 4:*8*
**pay** 71:*12*
**penetrate** 24:*2* 26:*2*
69:*9*
**penetration** 24:*4* 25:*3, 7*
26:*15*
**people** 30:*7* 31:*17* 47:*4*
54:*18, 19* 58:*23* 73:*2, 21*
**percent** 24:*4* 25:*7*
26:*14* 42:*14*
**perception** 47:*7*
**perceptiveness** 54:*7*
**perform** 66:*20*
**performed** 11:*6*
**period** 11:*13* 13:*17*
16:*23* 17:*1* 23:*25* 25:*8,
14, 16, 22* 54:*16*
**perpetual** 76:*21*
**perpetuity** 17:*19*
**person** 28:*3* 31:*16* 44:*9*

**personally** 26:*8* 28:*23*
31:*15*
**perspective** 57:*14*
**PG&E** 62:*25*
**phone** 50:*15*
**piece** 53:*24*
**pinpoints** 70:*18*
**pipeline** 27:*13* 30:*3, 10,
12, 16* 32:*7, 15, 18* 75:*3*
**place** 71:*8*
**Plaintiff** 1:*4* 3:*2*
**plan** 52:*10*
**planning** 9:*12* 75:*18*
**players** 29:*20*
**plays** 41:*12, 15*
**please** 5:*10*
**point** 9:*13* 14:*22* 44:*8*
55:*11* 64:*21* 71:*13*
**polls** 27:*23*
**poor** 71:*10*
**position** 8:*17, 25* 9:*6*
47:*5* 56:*16* 68:*8* 70:*22*
72:*22*
**positive** 67:*21*
**possible** 25:*4* 52:*16, 18,
22, 25*
**possibly** 67:*16*
**potential** 36:*14* 37:*7*
57:*8* 59:*11* 65:*18*
**potentially** 57:*17*
**Power** 63:*6*
**POWERPLAN** 1:*6* 4:2,
*16* 11:*10* 18:*22* 24:*7*
25:*11* 26:*9* 30:*4* 31:*2,
22* 32:*9, 10, 22* 33:*13*
34:*1* 36:2, *6, 16* 39:*7*
40:*20, 22* 43:*2, 7, 19, 20*
44:*10* 45:*23, 24* 46:*5, 14,
20* 47:*1, 24* 48:*5, 17*
49:*8* 50:*2* 53:*12* 54:*23*
55:*16* 56:*11, 15, 19* 59:*9*
62:*15, 22* 63:*12, 23*
64:*14, 25* 70:*13* 71:*14,
22* 75:*6* 76:*23* 77:*14*
**PowerPlan's** 11:*20* 14:*6*
19:*9* 27:*11, 17* 32:*2*
33:*17* 47:*12* 48:*15*
49:*10* 50:*23* 52:*19, 22*
53:*2, 4, 9, 18* 54:*1, 2, 5, 9,
10, 12, 16* 57:*24* 59:*13,
16* 60:*3* 63:*17* 64:*2, 8, 9,
19* 65:*7* 74:*13* 77:*3*
**practices** 31:*25*
**prebuilt** 42:*14*
**precisely** 19:*2, 18* 20:*6*
**precluded** 35:*13*
**preferred** 52:*19, 22*
**premised** 14:*8*
**preparation** 6:*10* 8:*24*
9:*5* 10:*1, 7* 11:*16* 13:*10*

**prepare** 5:*19, 24* 8:*15*
12:*12*
**prepared** 8:*7* 9:*11* 45:*5,
7*
**preparing** 13:*22*
**PRESENT** 3:*10*
**presented** 70:*3, 5*
**pretty** 6:*4*
**prevent** 48:*22*
**preventing** 57:*16*
**previous** 5:*6* 40:*2* 58:*4*
**price** 51:*25*
**priced** 20:*18* 52:*1*
**pricing** 16:*4* 52:*4*
**primarily** 55:*7* 65:*22*
**primary** 11:*24* 21:*13*
68:*2*
**printout** 7:*10*
**prior** 25:*11* 27:*11*
28:*19* 33:*23* 35:*6* 40:*16*
54:*2* 64:*2*
**privately** 23:*13*
**privilege** 7:*19*
**privileged** 50:*7*
**privy** 44:*15* 60:*22*
**probably** 16:*5* 67:*7*
68:*16*
**problem** 17:*19* 20:*16*
28:*17* 30:*8* 31:*7*
**problem-solving** 20:*15*
**proceeding** 4:*13* 5:*16*
22:*8*
**process** 11:*9, 15* 25:*25*
43:*18* 55:*9* 57:*4* 58:*18*
60:*14* 69:*18, 19*
**processes** 70:*4*
**produced** 6:*16* 7:*13, 18,
20* 8:*2, 19* 9:*12, 25*
**product** 7:*15, 21* 8:*21*
19:*12, 13, 14* 26:*25*
27:*19* 28:*21* 29:*11, 15,
16, 18* 52:*19, 20, 23* 53:*7,
12* 69:*14*
**products** 18:2, *5, 7, 8, 18*
19:*11, 25* 27:*6* 42:*20*
53:2, *4* 66:*12, 17* 69:*16,
22* 70:*8* 72:*6*
**profits** 75:*11*
**program** 16:*8*
**prohibited** 79:*3*
**prohibiting** 56:*3, 4*
**project** 18:*3* 71:*2*
**project-based** 21:*1*
**projection** 75:*21*
**projections** 6:*13* 75:*17*
**proof** 56:*16* 69:*8, 10*
**property** 31:*10, 16*
34:*24* 35:*12* 73:*15*
74:*12*

**proposal** 19:*8, 10* 30:2,
*20, 21, 23* 31:*1, 4, 5* 42:*7,
9* 63:*16, 21* 69:*13, 17*
**proposals** 36:*11* 61:*9*
**propose** 38:*20* 42:*13*
51:*16* 53:*20*
**proposed** 15:*10* 21:*10*
52:*13, 14* 71:*19*
**protection** 8:*21*
**protective** 60:*25*
**provide** 21:*14* 41:*6*
45:*5, 7* 70:*9, 10* 79:*3*
**provided** 39:*22* 49:*9*
61:*3*
**providers** 53:*11*
**provides** 49:*14*
**providing** 20:*23*
**Public** 3:*9* 76:*19*
**publicly** 40:*12, 14*
**pulled** 23:*7*
**punitive** 75:*5*
**purchased** 19:*7*
**purchasing** 26:*24*
**purpose** 66:*16*
**pursuant** 1:*12* 3:*16*
79:*3*
**pursue** 61:*13*
**put** 11:*17, 24* 15:*3* 23:*1*
48:*18*

< Q >
**qualify** 21:*21*
**question** 5:*9* 8:*19* 28:*1,
19* 30:*7, 14* 32:*11, 12*
33:*21* 44:*13* 47:*3, 12, 14,
17, 19, 22, 25* 52:*7* 53:*14*
54:*9* 61:*17* 62:*2* 67:*23*
70:*21* 72:*18* 73:*4* 77:*10*
**questions** 9:*7, 14* 21:*1*
24:*19* 33:*20* 49:*17* 80:*4*
**quote** 46:*24*

< R >
**rabbit** 52:*7*
**raise** 60:*15*
**range** 18:*11* 19:*4, 19*
20:*20*
**ranged** 68:*15*
**rate** 16:*24* 25:*7* 66:*13*
**rate-regulated** 65:*19*
66:*3, 17*
**rates** 79:*3*
**RCC** 26:*9* 27:*7, 18*
28:*19* 73:*19, 22*
**reach** 25:*7* 37:*12, 18*
41:*18* 54:*20*
**reached** 11:*10* 34:*15*
35:*8* 36:*5* 38:*22*
**reaching** 37:*8* 38:*24*
**read** 49:*1* 72:*10, 13, 15,*



*18* 77:20  80:*4*
**readily** 18:*10*
**ready** 24:*1* 70:*15*
**real** 30:*5* 76:22
**really** 24:*6* 25:*15* 26:*9*, *13* 28:*1* 43:*15* 53:*6* 55:*4*, *8* 57:*23*, *24* 68:2
**reason** 6:*10* 32:*8* 43:*21* 44:*3* 46:*24* 54:*12* 58:20, *24*
**reasonable** 16:*24*
**reasons** 53:*25*
**recall** 19:2, *5*, *18* 20:*1*, *6* 23:*19* 27:*20*, *21* 31:*3*, *4*, *13* 32:*13* 34:*7*, *12* 37:*15* 39:*19*, *24* 49:22 59:*8* 63:*8*
**recalled** 40:*15*
**recalling** 41:*9*
**received** 36:*1* 48:*4*, *12*, *16* 49:*6*, *21*, *24* 50:*1*, *11* 51:*4* 54:*18* 55:*12* 60:*5*, *12* 62:22 63:*24* 64:*3* 65:*3* 67:*19*
**receives** 49:*13*
**receiving** 49:*13*
**recognize** 31:*6* 66:*4*
**recognized** 15:*6* 23:*4*, *20* 66:*17*
**recollection** 18:*3* 29:*1* 35:*5* 40:*18* 41:*10* 65:*4*
**reconsider** 39:*14*
**record** 4:*1*, *20* 46:*11* 59:*6* 62:*6*, *10* 76:*19* 77:*18*
**recorded** 4:*5*
**recruit** 73:*21*
**recruiting** 31:*14*, *23* 73:*14*
**recurring** 15:*11*, *15* 17:*14* 18:*12*, *16* 20:*19* 21:*6*, *24* 22:*16*
**redo** 58:*11*, *13*
**reduce** 16:2
**reduced** 80:*4*
**Reed** 28:*25*
**refamiliarized** 7:*7*
**refer** 14:*24* 46:*17* 59:*17*
**referral** 79:*3*
**referred** 11:*9* 41:*25*
**referring** 6:*24*
**refined** 22:*7* 59:*3*
**reflect** 57:*24*
**reform** 28:*20*
**refrain** 56:*19*
**refresh** 20:*6*
**regard** 31:*3* 75:*8*
**regular** 27:*23*
**regulated** 30:*10*, *12*, *16* 55:*6* 65:*9*, *10*, *25* 66:*14*, *25*

**regulating** 66:*21*
**Regulations** 79:*3*
**related** 11:*18* 18:*16* 53:*17*, *18* 59:*12*
**relationship** 15:*7* 18:*23* 20:*3* 22:*17* 36:*24* 37:*4*, *11* 38:*23* 40:2 43:*6* 44:*11* 50:*4* 64:*20* 69:*23*
**relationships** 11:*12* 15:*17* 23:22, *25* 25:*21* 64:*2*, *6* 65:*16* 74:*21*, *24*
**relief** 11:*14* 57:*1*
**reluctant** 43:*1*
**rely** 59:*3* 60:*17*
**remedial** 57:*17*
**remedied** 57:*9*
**remedy** 56:*10*, *21*
**remember** 39:*5* 44:*5*
**remembering** 63:*7*
**remotely** 1:22  4:*21*
**removed** 23:*15*
**repeat** 6:*25* 47:*19* 52:*6* 62:23  68:*18*
**rephrase** 5:*12*
**replacement** 30:*4* 32:*9*
**replicate** 66:*6*
**reporter** 1:*21* 3:*18* 4:*9*, *19*, *21* 34:25 77:20, *23* 78:*1* 79:*3*
**Reporting** 79:*3*
**represent** 4:*12* 17:*18* 56:*1* 80:*4*
**REPRESENTATIVE** 1:*11* 32:*14*, *17* 45:*1*
**representatives** 27:22 41:*21* 72:*16*
**representing** 4:*18*
**represents** 17:*23* 46:*23* 54:*24*
**reputation** 74:*15*
**reputational** 75:*1*, *3* 76:*12*, *16*
**request** 7:*7* 11:*6* 13:*6* 27:*9*, *24* 28:*3* 29:*2*, *14* 30:*2* 31:*13*
**requested** 7:*6*
**requests** 29:*5* 38:*23*
**required** 66:*21*
**requirements** 66:*17* 70:*3*, *5* 71:*3*
**requires** 66:*4*
**requiring** 48:*17* 56:2, *3*
**rescind** 73:*16*
**rescinded** 73:*18*
**reserve** 80:*4*
**resolve** 38:*4*, *16*
**resolved** 39:*7*
**resource** 35:*15*
**resources** 32:*3* 63:*4* 66:*6*

**respect** 28:*19* 33:*19* 77:*4*
**response** 57:*13*
**responses** 60:*9*
**result** 11:20 27:2 47:*11* 74:*13*
**resulted** 13:*14* 69:*14*, *19*
**resumed** 62:*9*
**retained** 58:*15*
**retired** 42:*1*, *2*
**revenue** 18:*12*, *16* 20:*19* 21:*6*, *24* 25:*16*, *18* 68:*2*, *5* 69:*2* 75:*12*
**revenues** 22:*16*
**review** 6:*5* 9:*1* 12:*7*
**reviewed** 5:*22* 7:*23* 8:*1*, *13*, *23*
**RFP** 71:*20*
**right** 9:*23* 10:*19* 17:*10* 19:*24* 25:*16* 27:*8* 28:*11* 29:*16* 30:*9* 31:*8*, *18* 33:*2*, *13*, *14* 36:20 39:*16* 41:2 42:*21* 49:*13* 51:*19* 54:*4*, *6* 55:*5* 56:*14* 62:*12* 69:*25* 73:*7* 76:*17* 77:*16* 80:*4*
**risk** 71:*10* 77:*3*
**risks** 53:*1*
**road** 44:*8*
**Robbins** 3:*3* 4:*17* 13:*6*
**role** 12:*7*
**rotate** 44:*1*
**RPR** 1:*13*
**rules** 5:*7* 79:*3*
**running** 15:*23*, *24* 57:*6*

**< S >**
**sale** 51:*24* 75:*13*
**sales** 74:*20*, *21* 75:*3*
**sample** 23:*4*
**San** 63:*1*
**Sandy** 34:*24* 35:*2* 36:*12*
**saw** 25:*12* 38:*25* 40:*7* 43:*19* 53:*13*
**saying** 17:*7* 28:*4* 29:*17* 30:*8* 42:*16* 46:*24* 48:*11*, *16* 63:*11*, *23* 72:*23*
**says** 42:*10*
**scenario** 38:*2*
**scope** 52:*10*
**secret** 26:*3*
**secrets** 43:*2*
**Section** 3:*16*, *17*
**see** 7:*25* 9:*18* 41:*11*, *15*, *20* 44:*18* 46:*11* 55:*16* 64:*10* 67:*1* 75:*9*
**seeing** 73:*4*
**seek** 75:*5*
**seen** 49:*2*, *4*, *18*
**sell** 48:*7* 51:*17* 53:*16*,

*19*, *23* 54:*3* 76:*1*
**selling** 42:*14* 75:*18*
**sending** 46:22
**sent** 46:*5*
**separate** 13:*15* 56:*13*
**September** 1:*14* 4:*3* 80:*4*
**services** 16:*17* 17:20 18:*14* 20:*5*, *9*, *12*, *19*, 22, *24* 29:*21* 38:*19* 41:*6* 51:*2* 70:*2* 73:*19* 79:*3*
**set** 42:*19* 60:*5*
**setting** 44:*23* 48:*1*
**settling** 16:*23*
**seven** 25:*13*, 22 27:*12*
**seven-figure** 14:*25* 15:*1* 17:*16*
**shared** 61:*8*
**sheet** 19:*15*
**shift** 55:20
**showed** 9:*3*, *4* 40:*18*
**shown** 26:*4*
**side** 29:*4* 57:*24* 75:*1*
**sign** 77:*21* 80:*4*
**signal** 59:20
**signed** 25:*23*
**significant** 66:*5*
**similar** 52:*4*
**simple** 22:*8*, *10* 28:2
**simplified** 22:*3*
**simply** 52:*18* 55:*16*
**single** 44:*8* 54:*11*
**Sir** 5:*6*, *14* 6:24  9:*23* 10:*19*, *24* 14:7  15:*3* 18:*24* 21:*16* 24:*18* 26:*21* 27:*18* 30:*10* 31:2 33:*19* 34:*25* 38:*5* 40:*23* 42:*6*, *24* 44:*5*, 25 45:*16* 47:*4* 48:*9* 49:*1*, *16*, *23* 50:*10*, *25* 51:*7* 52:*3*, *16* 53:*14*, 22 54:*18* 55:20 58:*5* 59:*5* 61:*5* 63:*10* 65:*8* 66:*11* 67:*3* 68:*19*, 22 69:*13* 70:*21* 73:*7* 75:*18* 76:*7* 77:*4*, *16*
**sit** 60:*20*, *24* 67:*8* 77:*8*
**sitting** 34:*7* 40:*9* 57:*18* 67:*14*
**situation** 53:*23* 68:*6*
**situations** 53:*15*
**six-figure** 15:*1* 19:*19* 68:*17*, 20
**small** 23:*17* 33:*8* 55:2
**smaller** 17:*18*
**Smith** 3:*10* 4:*8*
**software** 15:*10*, *12*, *15*, *21* 16:*1*, *7*, *8*, *12*, *17*, 25 17:2, *18* 18:*12*, *16* 20:2, *19* 21:*6*, *10*, *12*, *15*, *19* 22:*16* 23:*18* 25:*18*, *23*, *24* 26:*19* 27:*19* 39:*23* 40:*5*

41:6  42:7, *9, 15*  49:*10, 15*  51:*11, 15, 17*  52:*21*  53:*16, 19, 24*  54:*3*  65:*1*  66:*25*  69:*1, 16, 21, 23*  70:*8, 23, 25*  71:*1, 5, 9*
**sold**  15:*10*  51:*15*
**solution**  18:*21*  20:*18*  21:*10, 12, 13*  30:*4, 19*  31:*22*  42:*19*  43:*13*  52:*1, 11, 13, 15*  53:*11*  66:*20*  67:*2*  70:*2, 4, 13, 15, 19*
**solutions**  15:*18*  16:*5*  18:*5*  20:*21*  26:*5, 12*  27:*8, 24*  28:*16, 17*  29:*22*  30:*9*  40:*17*  42:*13, 17*  66:*2*  70:*18*  71:*17, 19, 22, 23*
**solve**  17:*19*  31:*8*
**somebody**  29:*9*  32:*7*  45:*1*  61:*2*  76:*5*
**soon**  33:*12*
**sooner**  39:*15*  72:*7*
**sorry**  6:*25*  10:*15, 17*  28:*1*  30:*15*  34:*25*  38:*6*  47:*15, 20*  48:*8, 9*  49:*16*  52:*6*  68:*18*  75:*23*
**sort**  22:*25*  24:*16*  57:*17*  76:*10, 13*
**Sounds**  9:*21*
**Southern**  30:*2, 10*  32:*6, 7, 14, 18*
**Southwest**  62:*24*  63:*1, 2*  65:*10*
**space**  24:*1*  26:*6, 11*  27:*8*  29:*23*  30:*9*  31:*10, 17*  35:*13*  66:*23*  72:*4*  73:*15, 19*
**specific**  9:*10*  27:*18*  28:*2, 3*  29:*9, 10, 24*  30:*1, 5*  31:*4*  39:*5*  45:*2, 22*  46:*3, 12*  47:*3, 4, 9, 10, 22, 23*  48:*3*  59:*10*  60:*1, 9, 15*  61:*8*  62:*14*  64:*17*  68:*23*  70:*3, 5*  76:*10*
**specifically**  8:*7*  10:*3*  12:*12*  13:*20*  19:*5*  26:*24*  28:*6, 18*  35:*7*  39:*4*  48:*14*  49:*7*  58:*9*  59:*8*  61:*18*  66:*18*
**specifics**  13:*19*  16:*19*
**speculate**  49:*20*
**spell**  40:*25*
**spelled**  38:*8*
**spend**  15:*20*  16:*2, 12*
**spoke**  5:*6*
**sponsor**  41:*20*
**sponsors**  23:*10*
**spread**  33:*14*  55:*17*
**spreads**  33:*13*
**spreadsheet**  7:*11*

**Square**  3:*9*
**Squire**  3:*8*  4:*14*  79:*3*
**staff**  55:*13*
**stake**  77:*2*
**standpoint**  57:*6*
**stands**  67:*20*
**Star**  30:*2, 10*  32:*6, 7, 14, 18*
**start**  15:*4*  17:*25*  25:*16*  28:*8*  32:*6*  48:*10*  62:*13, 18*
**started**  13:*23*  25:*25*  41:*13*  50:*15*
**starting**  14:*22*
**state**  16:*18*  17:*3, 23*  22:*2, 8, 11, 14*  59:*21, 22*  70:*8*  79:*2*  80:*3*
**stated**  80:*4*
**statement**  3:*18*  58:*23*
**STATES**  1:*1*  65:*21*
**stating**  43:*20*  48:*5*
**stay**  70:*13*
**steady**  16:*18*  17:*3, 22*  22:*2, 8, 11, 13*
**step**  11:*22*  16:*14*  22:*10*  24:*16*  56:*21*  66:*21*
**STEPHEN**  3:*5*  4:*14*  12:*1, 5, 6*
**Stephen fazio@squirepb.com**  3:*10*
**steps**  39:*8*  41:*10*
**Steve**  12:*25*  61:*20*
**sticks**  70:*20*
**stipulate**  4:*20*
**stipulations**  1:*12*
**stopped**  34:*13*  57:*9*
**straight**  6:*4*
**Strang**  12:*6*
**strategy**  14:*4*  66:*2, 4, 8*  69:*12*  74:*19, 20, 23*
**Street**  3:*4*
**strike**  47:*2*  52:*7, 17*  73:*6*
**strong**  27:*13*  46:*24*  58:*20*
**subscription**  15:*12, 15*  18:*6*
**subscriptions**  18:*16*
**subsegments**  23:*5*
**subsequent**  14:*16*  17:*13*  27:*16*  37:*19, 20*  40:*4*  63:*16*
**subsequently**  58:*22*
**substance**  12:*17*  13:*2*  39:*6*
**success**  33:*18*
**successful**  31:*25*
**Suez**  14:*1, 9, 21*  15:*1*  17:*5*  19:*6, 7, 8*  20:*8*  34:*12, 13, 19*  35:*10*  36:*3,

5*  72:*18, 19*
**suitable**  66:*13*
**summer**  36:*7*
**support**  13:*7*  28:*22*
**supported**  7:*8*  71:*15*
**supporting**  17:*19*
**sure**  12:*8*  14:*7*  17:*6*  21:*4, 8*  24:*19*  59:*6*  63:*18*  74:*7*
**surveyed**  26:*22*
**survive**  11:*15*
**swearing**  4:*21*
**sworn**  4:*25*

**< T >**
**table**  19:*9*
**take**  8:*18*  9:*19*  11:*22*  15:*19*  16:*14, 21*  22:*10, 19*  26:*18*  35:*15*  39:*8*  41:*10*  43:*11*  58:*2*  61:*23*  62:*5*  66:*2*  76:*6*
**taken**  1:*12*  4:*7*  62:*8*  72:*16*  80:*4*
**takes**  57:*23*
**talk**  14:*18*  33:*10*  37:*17*  40:*11*
**talked**  17:*10*  24:*14*  33:*9, 22*  37:*23*  46:*2*  48:*1*  59:*5, 6, 10*  60:*7, 11*  62:*21*  64:*16*  65:*3*  68:*22, 23*  76:*9, 14*
**talking**  9:*10*  22:*11*  24:*15, 25*  28:*5*  35:*24*  38:*18*  40:*21*  48:*2, 11*  55:*4, 6, 7, 19*  58:*7, 8*  61:*19*  62:*13, 20, 21*  74:*19*
**target**  14:*15*  24:*11*  65:*24*
**tax**  15:*23*  18:*4*  19:*10, 12, 14*  21:*1*  28:*14, 19*  29:*3, 6*  37:*2*  39:*24*  40:*7*  41:*24*  42:*1*  43:*20, 24, 25*  46:*17*  49:*15*  52:*15*  55:*7*  66:*19*  71:*9, 22*  74:*9, 12*
**taxation**  27:*21*  39:*3*  44:*1*  46:*23*  54:*24*
**team**  23:*21*  31:*11, 12*  73:*13, 24*
**technology**  28:*15*  29:*22*  71:*11, 12*  72:*3*  75:*10*
**tell**  6:*8*  13:*21*  19:*24*  21:*3*  25:*5*  30:*22*  32:*25*  33:*1*  34:*3*  36:*13, 20, 21*  39:*20*  41:*4*  44:*19, 20*  46:*4*  76:*13*
**ten**  17:*3, 24*  18:*15*  19:*17*  21:*19*  22:*3, 4, 9, 12, 21*  26:*15*
**tendered**  3:*18*

**ten-year**  17:*1*  23:*25*  24:*3*  25:*8*
**terms**  6:*7*  16:*21*  45:*20*  49:*5*  56:*9*  57:*1*  60:*15*  65:*23*  68:*9*
**testified**  4:*25*
**testify**  5:*15*  7:*22*  8:*4, 6, 22*  9:*3, 4, 9*  45:*2, 14, 17*  58:*24*  61:*2*
**testimony**  7:*24*  36:*8*
**Thank**  77:*17*
**thereto**  80:*4*
**thing**  75:*2*  76:*21*
**things**  6:*12*  8:*4, 7*  9:*3, 4*  22:*6*  45:*17*  57:*5*  58:*14, 21*  61:*1*
**think**  6:*4, 11, 22*  7:*2, 24*  8:*6, 15*  12:*25*  16:*11*  20:*2, 13*  23:*24*  24:*3*  25:*4, 13*  26:*3, 4*  30:*1, 16*  33:*7*  37:*21*  38:*8*  40:*1*  41:*13, 23*  42:*18, 22*  43:*13*  44:*23*  45:*23*  48:*24*  49:*12*  51:*10*  52:*25*  53:*12*  54:*22*  56:*10*  57:*4, 5, 19, 20, 22, 23*  58:*1, 2, 3*  59:*7, 8, 10*  60:*1, 2*  61:*7*  62:*3*  63:*2*  64:*16, 17*  65:*2, 14*  66:*1*  68:*1, 7, 12*  69:*7*  72:*1, 17, 25*  73:*3, 14, 20*  74:*15*  75:*4, 6, 8, 11, 20, 21*  76:*16, 22*  77:*7*
**thinking**  74:*18*  77:*1*
**third**  49:*20*  66:*21*
**third-party**  15:*21*
**thought**  16:*23*  21:*14*  35:*18*
**thread**  28:*11*
**threat**  48:*20*
**three**  19:*11*  23:*8*  33:*10*  36:*18*  42:*25*  43:*4*  51:*14*  75:*25*
**three-stage**  66:*20*
**threshold**  23:*18*
**tied**  7:*15*  76:*13*
**tight-knit**  55:*3*
**tightness**  55:*18*
**time**  4:*4*  6:*23*  7:*4*  11:*8, 13, 16, 18, 22*  12:*4*  14:*23*  16:*8, 21*  17:*24*  18:*22*  19:*9*  21:*2*  22:*18*  24:*9*  25:*14, 17*  26:*8*  27:*9, 13*  34:*5*  35:*1*  36:*4, 10, 11, 25*  37:*3, 16*  41:*8, 14, 17, 23*  54:*16*  61:*10, 14*  63:*21*  64:*8*  65:*6*
**times**  6:*13*  47:*8*
**timing**  31:*4*
**today**  5:*9, 20*  6:*6, 10*  7:*24*  8:*11, 15, 24*  10:*2, 5,

*8* 33:22 34:7 40:*18*
43:*4* 44:*12* 45:*6, 15*
50:*9, 20* 57:*19* 58:*11*
59:*1* 60:*14, 20, 24* 67:*8,*
*14, 20* 71:*24* 73:*9* 75:*16*
77:*8, 14*
**Today's** 4:*3*
**told** 28:*9* 36:*12* 39:*11,*
*12* 40:*10*
**topic** 28:*24* 61:*21*
**topics** 8:*23*
**top-line** 68:*2, 5*
**total** 20:*17*
**touched** 23:*2* 54:*22*
60:*1* 73:*14* 74:*8* 76:*16*
**Tower** 3:*8*
**TP.One** 4:*9, 10*
**traction** 25:*10, 23*
**trade** 23:*8* 27:*21* 33:*10*
43:*21* 55:*12* 65:*16*
**transcript** 3:*19* 80:*4*
**transmitted** 8:*8*
**trebled** 24:*10, 23*
**tried** 38:*23*
**tripled** 22:*22*
**true** 49:*7, 10, 23, 25*
50:*12, 21* 51:*9, 12* 52:*5*
65:*9* 70:*11, 23* 80:*4*
**Trustpoint.One** 79:*3*
**try** 54:*21* 62:*23*
**trying** 28:*4, 5* 29:*19, 23*
30:*6* 37:*10* 46:*4*
**Tucson** 63:*6*
**two** 11:*11* 15:*9* 18:*5, 7,*
*8, 14* 19:*1, 17* 24:*16*
30:*7* 57:*20* 65:*5* 66:*22*
68:*7* 73:*21*
**type** 20:*25*
**types** 56:*14*
**typewriting** 80:*4*

**< U >**
**U.S** 55:*7* 65:*22*
**ultimately** 69:*19*
**umbrella** 35:*16*
**unable** 53:*23* 54:*20*
73:*13*
**understand** 5:*10, 11, 14*
10:*25* 11:*3* 13:*20* 14:*7*
21:*4* 22:*5* 24:*20* 28:*6*
42:*16* 44:*13* 47:*5, 8*
49:*3, 12* 50:*18* 55:*21, 23*
56:*5* 57:*7* 58:*7* 60:*20*
61:*7* 70:*12, 14* 72:*8*
76:*7*
**understanding** 7:*14*
10:*25* 27:*3* 29:*4* 34:*17*
35:*21* 46:*5* 49:*19* 50:*13*
55:*24* 60:*24* 67:*15* 71:*4*
**understands** 77:*14*

**understood** 11:*13* 15:*16,*
*18, 20, 22, 25* 20:*13, 14,*
*17* 22:*7* 26:*18* 33:*6*
43:*23* 44:*2* 61:*14* 71:*1*
**unfortunate** 76:*23*
**UNITED** 1:*1* 65:*21*
**unring** 56:*22*
**upgrade** 70:*14*
**USCG** 62:*24*
**use** 35:*19* 40:*18* 48:*20*
66:*13*
**usual** 79:*3*
**utilities** 23:*11, 12, 14, 15,*
*17, 20, 22, 24* 25:*8* 26:*18*
27:*23* 31:*17* 39:*13* 46:*6,*
*8* 49:*15* 53:*6, 11* 55:*6*
59:*2, 12, 15* 60:*3* 65:*9*
66:*7, 14, 18, 25* 74:*9*
**utility** 14:*16* 23:*5, 7*
26:*4, 23* 30:*11* 37:*22*
41:*20* 50:*22* 54:*25*
65:*11, 20, 25* 66:*3* 69:*10*
74:*24*

**< V >**
**VADIM** 1:*11* 2:*2* 4:*5,*
*24* 79:*3*
**Valley** 63:*2*
**valuation** 75:*15*
**value** 14:*2, 23* 15:*4, 18*
16:*5* 17:*22* 20:*14* 21:*14,*
*22, 23* 42:*22* 67:*1* 70:*9*
75:*12, 15* 76:*3*
**valued** 20:*12*
**values** 14:*20* 15:*3* 17:*5,*
*8* 21:*18*
**various** 6:*13* 23:*5* 56:*12*
**vein** 58:*22*
**vendors** 71:*17, 19*
**verbal** 50:*18*
**version** 71:*15*
**versus** 75:*16*
**video** 4:*5*
**videoconferencing** 48:*9*
**Videographer** 3:*10* 4:*1*
62:*6, 10* 77:*18*
**view** 47:*7* 54:*1*
**views** 72:*23*
**virtual** 40:*4*
**vision** 74:*11*
**voice** 73:*2*
**VP** 39:*24* 40:*7* 41:*24*
42:*1, 2* 43:*24, 25* 46:*17*
**vs** 1:*5*

**< W >**
**wait** 41:*11*
**waiting** 38:*3* 41:*15*
**walk** 13:*21*
**want** 13:*20* 21:*3* 24:*18*
27:*4* 29:*10, 18* 30:*1, 5*

33:*3, 7* 44:*6, 8* 45:*25*
46:*17* 53:*8* 55:*20* 59:*5*
60:*23* 61:*5* 62:*1, 4*
63:*18* 73:*25* 74:*4* 76:*7*
**wanted** 8:*9* 26:*17* 29:*8*
35:*15*
**wants** 72:*3*
**watch** 46:*9*
**water** 23:*6, 12, 13, 20*
36:*17, 21, 24* 37:*1, 6, 8*
38:*3, 22* 39:*17* 62:*24, 25*
63:*1, 2* 65:*10*
**way** 9:*2* 31:*21* 35:*9*
39:*13* 48:*19* 57:*21* 59:*8,*
*25* 63:*25* 70:*16* 73:*12*
**ways** 31:*8* 53:*22* 57:*21*
**Wednesday** 1:*14* 4:*3*
**week** 35:*5, 6*
**weeks** 34:*23* 35:*6*
**weighed** 52:*25*
**Well** 6:*21* 7:*22* 8:*17*
12:*6, 16* 15:*12* 17:*9*
18:*24* 20:*9* 21:*1* 26:*16*
27:*1* 31:*3, 10* 33:*5, 7*
36:*20* 39:*25* 40:*13*
41:*11* 42:*2, 12* 44:*25*
45:*16* 46:*17* 49:*12*
50:*13* 53:*13* 56:*1* 57:*3,*
*5* 59:*25* 69:*18* 73:*5*
74:*16* 76:*3* 78:*1*
**went** 5:*25* 6:*1* 13:*9, 21*
16:*22* 29:*14* 32:*4* 36:*7*
70:*14* 73:*18*
**we're** 7:*24* 9:*13* 15:*7*
16:*6, 19* 23:*10* 25:*18*
38:*3* 41:*22* 42:*13, 14, 16*
44:*6, 12* 45:*4, 16* 50:*22*
54:*10, 14* 55:*4, 6, 7, 8, 18*
61:*20* 62:*4* 63:*19* 67:*7,*
*18* 72:*6* 74:*4* 75:*4*
**we've** 44:*8* 58:*22* 73:*20*
76:*17*
**WGL** 62:*24*
**willful** 75:*7*
**willing** 64:*13*
**window** 27:*11* 71:*16*
75:*21*
**wish** 40:*17*
**witness** 4:*6, 21* 13:*5*
35:*2* 47:*19* 80:*4*
**witnesses** 9:*2*
**woman** 37:*3*
**won** 25:*24* 70:*22, 24*
**words** 37:*15* 39:*5*
**work** 7:*15, 21* 8:*21*
14:*8* 21:*2, 5* 34:*1* 35:*21*
36:*3, 9, 15, 22* 42:*12, 21*
48:*5* 50:*23* 51:*2* 54:*21*
59:*12* 69:*24* 73:*18, 21*
74:*1*

**worked** 22:*23* 23:*9* 40:*3*
**working** 39:*13* 49:*8*
**worth** 19:*17*
**wrapped** 37:*24*
**written** 7:*9* 50:*19*

**< Y >**
**Yeah** 5:*22* 16:*22* 25:*9*
30:*16* 33:*7* 42:*21* 48:*13*
54:*22* 57:*2* 61:*25* 65:*14*
69:*9* 75:*23* 76:*16* 77:*25*
78:*2*
**year** 16:*11* 17:*2* 18:*1,*
*11, 14* 20:*16* 37:*21, 22*
38:*11* 43:*13, 14* 52:*2, 8*
67:*5, 23* 68:*17, 20* 75:*22*
**years** 17:*3, 13, 17, 24*
18:*1, 14* 19:*1, 17* 21:*19*
22:*3* 23:*9* 26:*15* 28:*10*
39:*24* 40:*16* 51:*14*
75:*25* 76:*2, 4*
**year-to-date** 68:*11*
**year-two** 22:*1*
**yes-or-no** 32:*11, 12*

**< Z >**
**Zoom** 4:*7*