**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

LUCASYS INC.,

    *Plaintiff*,

v.

POWERPLAN, INC.,

    *Defendant*.

Civil Action File

No.: 1:20-cv-2987-AT

## PLAINTIFF LUCASYS INC.'S CONSOLIDATED STATEMENT OF UNDISPUTED MATERIAL FACTS AND REPLY IN SUPPORT OF STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56, Northern District of Georgia Local Rule 56.1, and this Court's August 11, 2022 Standing Order, Plaintiff Lucasys Inc. ("Plaintiff" or "Lucasys") hereby files its Consolidated Statement of Undisputed Material Facts and Reply in Support of Statement of Undisputed Material Facts, showing the Court as follows:

**A.**     **The Tax Software Market**

1.

**Lucasys Statement No. 1:**

From at least 2018 through the present, Defendant PowerPlan, Inc. ("PowerPlan") manufactured and sold a computer software product named PowerTax. (*Income Tax Suite*, PowerPlan, https://powerplan.com/solutions/income-

tax-suite (last visited on April 11, 2023); PowerPlan 10.4 and PowerTax Overview (Depreciation and Deferred Tax Modules) (POWERPLAN01186333) (hereinafter, "PowerTax Overview"), attached hereto as **Exhibit A**.)

**PowerPlan's Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

2.

**Lucasys Statement No. 2:**

PowerTax consists of two separate software modules. (Doc. 126, First Amended Complaint ("Amend. Comp.") ¶ 9; Doc. 129, Answer to a Complaint ("Answer") ¶ 9 (admitting that PowerPlan's "income tax related modules allow its customers to compute tax depreciation and deferred income taxes."); *Income Tax Suite*, PowerPlan, https://powerplan.com/solutions/income-tax-suite (last visited on April 11, 2023); Ex. A, PowerTax Overview; Doc. 160-1, July 14, 2022 Deposition of Vadim Lantukh ("Lantukh Dep."), excerpts attached hereto as **Exhibit B**, at 24:22–25:1, 33:10–11; Doc. 155-1, Apr. 22, 2022 Deposition of Jamie Carr ("Carr Dep."), excerpts attached hereto as **Exhibit C**, at 225:2–15; Doc. 157-1, May 19, 2022 Deposition of Jason Cone ("Cone Dep."), excerpts attached hereto as

**Exhibit D**, at 12:1–16.)

**PowerPlan's Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

3.

**Lucasys Statement No. 3:**

One PowerTax module (the "Depreciation Module") calculates tax depreciation for fixed assets. (Doc. 126, Amend. Comp. ¶ 9; Doc. 129, Answer ¶ 9; *Income Tax Suite*, PowerPlan, https://powerplan.com/solutions/income-tax-suite (last visited on Apr. 6, 2023); Ex. A, PowerTax Overview.)

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

4.

**Lucasys Statement No. 4**

The other PowerTax module (the "Deferred Tax Module") calculates fixed-asset-related deferred tax balances. (Doc. 126, Amend. Comp. ¶ 9; Doc. 129,

Answer ¶ 9; *Income Tax Suite*, PowerPlan, https://powerplan.com/solutions/income-tax-suite (last visited on Apr. 6, 2023); Ex. A, PowerTax Overview; Doc. 160-1, Lantukh Dep. at 24:22–25:1, 33:10–11.)

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

5.

**Lucasys Statement No.**

Rate-regulated, investor-owned utilities ("RRIOUs") have additional, incremental accounting requirements that are industry specific for calculating deferred tax balances related to their fixed assets. (Doc. 157-1, Cone Dep. at 14:2–15:8, 30:9–21; 2021 – 2023 PowerPlan Strategic Plan (Oct. 2020) (hereinafter, "2021 – 2023 Strategic Plan"), attached hereto as **Exhibit E**, at 2–3; 2022 – 2024 PowerPlan Strategic Plan Update (Nov. 2021) (hereinafter, "2022 – 2024 Strategic Plan Update"), attached hereto as **Exhibit F**, at 3–4.)

**PowerPlan's Response:**

Lucasys' citations to Doc. 186-7, Ex. E and Doc. 186-8, Ex. F, do not support Statement No. 5. Those documents state that "energy companies"—including

RRIOUs as well as municipal utilities, utility cooperatives, and oil & gas companies—have "unique financial requirements" that are not "industry specific" to RRIOUS.  The record evidence refutes Statement No. 5 and shows that industries other than RRIOUs have additional requirements for calculating deferred tax balances because they are rate-regulated, and that customers in those industries purchase PowerPlan's Deferred Tax module. *See* Doc. 172-1, Tyler Tr. 182:22–186:19.

**Lucasys Reply**:

As an initial matter, the Response admits that "energy companies"—including RRIOUs—have unique financial requirements for calculating deferred tax balances related to their fixed assets because they are rate regulated. This fact may therefore be considered undisputed.

PowerPlan incorrectly extrapolates that, because "energy companies"—including RRIOUs—have unique financial requirements for calculating deferred tax balances related to their fixed assets because they are rate regulated, RRIOUs cannot have additional requirements that are "industry specific." The two are not mutually exclusive. Energy companies in general can have unique financial requirements for calculating deferred tax balances related to their fixed assets while still having additional and/or "different" requirements within their specific industry, especially

given that RRIOUs are subject to different regulatory bodies than other energy companies. Indeed, the cited evidence confirms this: "Energy companies are different – they face a more challenging regulatory environment and have unique financial requirements than other industries. Our customers have significant tracking and reporting requirements for multiple regulatory bodies (FERC, IRS, SEC, Public Utility Commissions), *many of which have different or even competing rules for the same assets*. (Doc. 186-8, 2022 – 2024 Strategic Plan Update at 3 (emphasis added).) Thus, PowerPlan has offered no record evidence to refute that RRIOUs have additional, incremental accounting requirements that are industry specific for calculating deferred tax balances related to their fixed assets.

Because PowerPlan has failed to respond to or address this material fact by directly refuting it with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

6.

**Lucasys Statement No. 6:**

Calculating and maintaining deferred tax balances is an essential business function for RRIOUs. (Doc. 156-1, May 12, 2022 Deposition of Rob Yankovich ("Yankovich Dep."), excerpts attached hereto as **Exhibit G**, at 17:1–20, 29:7–32:3.)

**PowerPlan Response**:

Undisputed.

**Lucasys Reply**:

Undisputed.

7.

**Lucasys Statement No. 7**:

Calculating and maintaining deferred tax balances is extremely difficult to do manually, particularly for any RRIOU that has a large number of fixed assets. (Doc. 157-1, Cone Dep. at 84:8–85:4; Doc. 156-1, Yankovich Dep. at 19:22–24, 66:5–67:1; *see also* Doc. 163-1, July 27, 2022 Deposition of Jonathan D. Williams 30(b)(6) Witness for Regulated Capital Consultants, LLC ("RCC") ("RCC Dep."), excerpts attached hereto as **Exhibit H**, at 28:21–29:22.)

**PowerPlan Response**:

PowerPlan refutes the portion of Statement No. 7 that "[c]alculating and maintaining deferred tax balances is extremely difficult to do manually," on the grounds that deferred tax balances are easy to calculate under certain circumstances and methodologies. *See, e.g.*, Doc. 163-1, RCC Dep. at 32:15–33:13 ("And then the alternative method that exists according to the IRS is, is a Reverse South Georgia Method . . . . That – that is an alternative method and that method is much less

sophisticated for lack of a better term.  It's easy.  Okay.  You can do that in your Excel file.").  PowerPlan does not dispute the remainder of Statement No. 7.

**Lucasys Reply:**

The Response only contends that calculating and maintaining deferred tax balances is easy to do under the Reverse South Georgia Method ("RSGM"). The RSGM is one of two methods by which rate-regulated utilities can calculate their deferred tax balances; the other method is the Average Rate of Assumption Method ("ARAM"), which is essentially what PowerTax performs. (Doc. 163-1, RCC Dep. at 32:16–33:5, 122:20–123:2; Doc. 156-1, Yankovich Dep. at 122:9–123:3.)

As an initial matter, PowerPlan does not dispute that calculating and maintaining deferred tax balances under the ARAM is extremely difficult to do manually, particularly for any RRIOU that has a large number of fixed assets. This material fact can therefore be deemed undisputed.

As for whether an RRIOU can easily calculate its deferred taxes under the RSGM, this contention is irrelevant and not material. The Internal Revenue Service ("IRS") has issued a Revenue Procedure setting forth that the ARAM is the required method under the TCJA, unless a utility company lacks the requisite vintage account data necessary to conduct the ARAM calculation. *See* Rev. Proc. 2020-39, 2020-36 I.R.B. 546 § 4 (2020) (stating that, "[g]enerally, under section 13001(d)(1) of the

TCJA, taxpayers must use ARAM . . . if the taxpayer's regulatory books . . . are based upon the vintage account data necessary to use ARAM. However, if the taxpayer's regulatory books are not based upon the vintage account data that is necessary for the ARAM, use of the ARAM is not required."). Indeed, other than some gas companies who are subject to FERC guidelines and a few electric companies, the vast majority of RRIOUs must use the ARAM method to calculate and maintain their deferred tax balances. (Doc. 163-1, RCC Dep. at 33:23–34:23, 124:13–125:9; Doc. 156-1, Yankovich Dep. at 122:9–123:5.) As a practical matter, any RRIOU using PowerTax has the requisite vintage data to conduct the ARAM and must therefore use that method. The RSGM is therefore irrelevant and not material.

8.

**Lucasys Statement No. 8:**

As a practical matter, RRIOUs of any significant size must use software (and PowerTax specifically) to calculate deferred tax balances. (Ex. A, PowerTax Overview; Ex. E, 2021 – 2023 Strategic Plan; Ex. F, 2022 – 2024 Strategic Plan Update at 3–4; Doc. 156-1, Yankovich Dep. at 17:15–18:25, 19:1–20:10; Income and Property Tax Market Overview (Feb. 2019) (POWERPLAN00671327) (hereinafter, "Tax Market Overview"), attached hereto as **Exhibit I**, at 3;

Doc. 161-1, July 19, 2022 Deposition of Daniel Chang ("Chang Dep."), excerpts attached hereto as **Exhibit J**, at 34:3–35:11.)

**PowerPlan Response:**

PowerPlan refutes the portion of Statement No. 8 that "RRIOUs of any significant size must use software . . . to calculate deferred tax balances," as the evidence is disputed in the record on the grounds that deferred tax balances are easy to calculate under certain circumstances and methodologies. *See, e.g.*, Doc. 163-1, RCC Dep. 32:15–33:13 ("And then the alternative method that exists according to the IRS is, is a Reverse South Georgia Method . . . . That – that is an alternative method and that method is much less sophisticated for lack of a better term. It's easy. Okay. You can do that in your Excel file."). PowerPlan also refutes the portion of Statement No. 8 that "PowerTax [software] specifically" must be used by "RRIOUS of any significant size" because Lucasys sells deferred tax software. *See, e.g.*, Doc. 161-1, Chang Dep. 105:24-106:3 ("Q. I just want to make sure I understand the current state of that particular product. Is the Lucasys deferred tax product available to be licensed by a customer, as we sit here today? A. Yes.").

**Lucasys Reply:**

The Response disputes this statement because certain utility companies can use the RSGM, as opposed to the ARAM, to calculate their deferred tax balances.

As set forth in Lucasys' Reply to Statement No. 7, ARAM, not RSGM, is the required method to be used under the TCJA, unless a utility company lacks the requisite vintage account data necessary to conduct the ARAM. *See* Rev. Proc. 2020-39, 2020-36 I.R.B. 546 § 4 (2020). PowerPlan cites no evidence that RRIOUs of any significant size lack the requisite vintage account data to permit them to use the RSGM, rather than the ARAM. Indeed, it is undisputed that the vast majority of RRIOUs must use the ARAM method to calculate and maintain their deferred tax balances. (Doc. 163-1, RCC Dep. at 33:23–34:23, 124:13–125:9; Doc. 156-1, Yankovich Dep. at 122:9–123:5.) RRIOUs therefore must use the ARAM, which PowerPlan does not dispute is extremely difficult to do manually and requires a software product. (*See* Response and Reply to Statement No. 7.) Thus, the Court can deem this portion of the statement undisputed.

PowerPlan also refutes that RRIOUs of any significant size must use PowerTax specifically to calculate deferred tax balances by pointing to the fact that RRIOUs could Lucasys' Deferred Tax product. PowerPlan, therefore, does not dispute that prior to Lucasys developing its Deferred Tax product, there was no alternative to PowerTax, and RRIOUs of any significant size had to use PowerTax to calculate deferred tax balances.

9.

**Lucasys Statement No. 9:**

Between 2019 and December 2022, there were no software products (aside from potentially the one developed by Lucasys) capable of being used as a substitute for PowerTax to calculate deferred tax balances for RRIOUs. (Doc. 155-1, Carr Dep. at 51:22–53:1; Doc. 157-1, Cone Dep. at 32:16–34:16, 42:7–43:7, 45:7–46:1; Ex. E, 2021 – 2023 Strategic Plan at 3; Ex. F, 2022 – 2024 Strategic Plan Update at 4; Doc. 156-1, Yankovich Dep. at 16:19–25, 17:22–18:25; Ex. I, Tax Market Overview at 16–17; Doc. 159-1, June 10, 2022 Deposition of James (Jim) Duffy ("Duffy Dep."), excerpts attached hereto as **Exhibit K**, at 126:16–127:4; Doc. 165-1, Aug. 9, 2022 Deposition of Luisa Read 30(b)(6) Witness for Liberty Utilities Service Corp. ("Read Dep."), excerpts attached hereto as **Exhibit L**, at 41:8–14, 42:4–43:20; Doc. 166-1, Aug. 9, 2022 Deposition of Laura Eustace 30(b)(6) Witness for Liberty Utilities Service Corp. ("Eustace Dep."), excerpts attached hereto as **Exhibit M**, at 34:1–5.)

**PowerPlan Response:**

PowerPlan disputes that "between 2019 and December 2022, there were no software products (aside from potentially the one developed by Lucasys) capable of being used as a substitute for PowerTax to calculate deferred tax balances for

RRIOUs", as the evidence is disputed in the record. *See, e.g.*, Doc. 159-1, Duffy Dep. 84:15–18 ("Q. If a regulated utility wanted to use a different piece of software to calculate deferred taxes using ARAM methodology, are you aware of any products that they could use aside from PowerTax? A. Just Excel.").

**Lucasys Reply**:

The evidence cited in the Response does not actually dispute the statement. As a threshold matter, the testimony quoted by PowerPlan is nowhere in Mr. Duffy's deposition testimony. Rather, Mr. Duffy testified that, "Excel is a competition [sic] to PowerTax." (Doc. 159-1, Duffy Dep. at 84:15–17.) And, while Lucasys disputes that Excel is competitive with PowerTax, even if it is, being competitive does not mean that Excel is a "substitute for PowerTax" for RRIOUs to use to calculate their deferred tax balances. In fact, Mr. Duffy testified shortly thereafter that all of his IOU customers used PowerTax. (*Id.* at 85:24–86:17.)

The quoted language actually comes from Mr. Williams' deposition. Mr. Williams testified that, aside from PowerTax, the only product an RRIOU could use to calculate its deferred taxes using the ARAM was Excel. (Doc. 163-1, RCC Dep. at 125:10–14.) Again, that an RRIOU can use Excel to calculate deferred taxes using the ARAM does not make Excel a "substitute for PowerTax." In fact, Mr. Williams testified that of RCC's regulated utilities customers that use the

ARAM, all of them use PowerTax. (*Id.* at 125:3–9.) Moreover, PowerPlan does not dispute that calculating and maintaining deferred tax balances under the ARAM is extremely difficult to do manually, particularly for any RRIOU that has a large number of fixed assets. (*See* Response and Reply to Statement No. 7.) And, the undisputed record evidence shows that calculating and maintaining deferred tax balances using only Excel would not be easy. (Doc. 156-1, Yankovich Dep. at 19:11–24.)

Because PowerPlan has failed to respond to or address this material fact by directly refuting it with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

10.

**Lucasys Statement No. 10:**

PowerPlan's RRIOU customers were unable to identify any software products that could calculate deferred tax balances for RRIOUs other than PowerTax. (Doc. 165-1, Read Dep. at 41:8–14, 42:4–43:20; Doc. 166-1, Eustace Dep. at 34:1– 5; Doc. 168-1, Aug. 15, 2022 Deposition of James X. Llende 30(b)(6) Witness for American Electric Power ("AEP Dep."), excerpts attached hereto as **Exhibit N**, at 24:14–25:14; Doc. 168-1 at 91 (Pl.'s Ex. 259) ("There are no known competitors

who could cover all functionality of PowerPlan."); Doc. 170-1, Aug. 22, 2022
Deposition of Keenan Aaron Roylance ("Roylance Dep."), excerpts attached hereto
as **Exhibit O**, at 8:15–18.)

**PowerPlan Response:**

PowerPlan disputes Statement No. 10 on the grounds that the cited evidence
does not support the factual assertion. None of these customers were asked to
identify software products that could calculate deferred tax balances for RRIOUs
other than PowerTax. Doc. 165-1, Liberty (Read) Tr. 41:8-11, ("Q. Are you aware
of any other software provided to regulated utilities that does similar – has similar
functionality to PowerPlan software?"); Doc. 166-1, Liberty (Eustace) Tr. 34:1-3
("Q. Are you aware of any other software that you can use to perform the functions
that PowerTax performs?"); Doc. 168-1, AEP Tr. 24:14-16 ("Q. Do you have an
understanding as to whether there is software that could replace PowerPlan and
cover all of its functionality?"); Doc. 170-1, Roylance Tr. 8:15-16 ("Q. Are there
other competitors who can do what you need PowerPlan to do for PGE?").
Moreover, a purported sample of three or four people is not statistically
representative of PowerPlan's many customers.

**Lucasys Reply:**

As an initial matter, the Response does not dispute that, prior to Lucasys

developing its Deferred Tax product, there were no other software products other than PowerTax that can calculate deferred tax balances for RRIOUs. (*See also* Response and Reply to Statement No. 8 (admitting that RRIOUs of any significant size could only use PowerTax to calculate deferred tax balances).) Rather, the Response only disputes whether PowerPlan's RRIOU customers were able to *identify* such other software products. The Response does not provide any evidence showing that customers were able to identify alternatives to PowerTax but rather argues that the statement is not supported by the cited evidence.

Contrary to the Response, the cited evidence does support this statement. First, although the customer testimony cited above broadly referred to "PowerPlan software," "functions that PowerTax performs," and "PowerPlan and [ ] all of its functionality," implicit in that is PowerPlan's software that can perform more specific functions, including calculating deferred tax balances for RRIOUs. In other words, because PowerPlan software and PowerPlan functionality indisputably include PowerTax and the ability to calculate deferred tax balances for RRIOUs, the customers' inability to identify any alternative to the broader suite of products intrinsically shows that they could not identify any alternative to the narrower tax products.

This is confirmed by the customers' testimony. For example, Ms. Read further testified that Liberty selected PowerPlan's "asset accounting" and "tax module" and that she was unaware of any other products to choose from in that area. (Doc. 165-1, Read Dep. at 41:18–21, 42:4–7.) In fact, Ms. Read even testified that she is "[n]ot aware of any other software or systems that do the PowerTax and Tax Provision" and that she is unaware of any other software that handles deferred taxes and tax depreciation. (*Id.* at 43:14–20.) Ms. Eustace was unable to identify any software that can perform the functions of PowerTax, which PowerPlan does not dispute includes deferred taxes. (*See* Statements Nos. 2–4.) As for Mr. Roylance's testimony, he testified that he was not aware of any competitors who "can do what [he] need[ed] PowerPlan to do for PGE," which moments earlier he explained was "tax provisions and . . . the PowerTax which deals with [PGE's] deferred taxes and tax depreciation." (Doc. 170-1, Roylance Dep. at 7:19–21, 8:15–18.) The Response's contention is therefore without merit.

Lastly, while the Response states that these customers are not representative of PowerPlan's other many customers, it cites no record evidence to refute the above statement and is therefore insufficient to refute the statement. L.R. 56.1(B)(2)(a)(2).

In short, the statement is supported by the cited evidence, and PowerPlan has failed to directly refute it with specific citations to evidence. Accordingly, the Court

may consider this fact admitted and undisputed for the purposes of Lucasys' Partial

Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

11.

**Lucasys Statement No. 11:**

PowerPlan employees and former employees were unable to identify any

software products that could calculate deferred tax balances for RRIOUs other than

PowerTax. (Doc. 155-1, Carr Dep. at 51:17–53:1; Ex. E, 2021 – 2023 Strategic Plan;

Ex. F, 2022 – 2024 Strategic Plan Update at 4; Ex. I, Tax Market Overview at 16–

17; Doc. 159-1, Duffy Dep. at 126:16–127:4; Doc. 154-1, Dec. 2, 2021 Deposition

of Brett Bertz ("Bertz Dep."), excerpts attached hereto as **Exhibit P**, at 212:12–18;

Doc. 158-1, May 17, 2022 Deposition of Joost Rutten ("Rutten Deposition"),

excerpts attached hereto as **Exhibit Q**, at 173:25–174:7; *see also* Doc. 164-1, Aug.

5, 2022 Deposition of Jim Dahlby ("Dahlby Dep."), excerpts attached hereto as

**Exhibit R**, at 207:2–208:10.)

**PowerPlan's Response:**

PowerPlan refutes Statement No. 11 as the purported evidence is disputed in

the record. *See, e.g.*, Doc. 159-1, Duffy Dep. 84:15–18 ("Q. If a regulated utility

wanted to use a different piece of software to calculate deferred taxes using ARAM

methodology, are you aware of any products that they could use aside from

PowerTax? A. Just Excel.")

**Lucasys Reply**:

The Response disputes this statement and cites only the deposition testimony of Mr. Duffy. Contrary to PowerPlan's contention, the quoted text does not appear anywhere in Mr. Duffy's deposition testimony. (*See generally* Doc. 159-1, Duffy Dep.) Rather, Mr. Duffy was unable to identify a different software and testified only that "Excel is a competition [sic] to PowerTax. ***You don't have to buy a software***, you can do it – try to do it in spreadsheets." (*Id.* at 84:15–18 (emphasis added).) Because PowerPlan has failed to respond to or address this material fact by directly refuting it with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

12.

**Lucasys Statement No. 12**:

Some very small RRIOUs (meaning those with relatively few fixed assets) are able to calculate deferred tax balances using home-grown solutions, such as spreadsheets created in Microsoft Excel or a similar software application. (Doc. 163-1, RCC Dep. at 32:15–34:12, 124:13–23; Doc. 159-1, Duffy Dep. at 84:15–18.)

**PowerPlan's Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

13.

**Lucasys Statement No. 13:**

Home-grown solutions are not practical for RRIOUs of any significant size, including the vast majority of electrical and gas utilities. (Doc. 157-1, Cone Dep. at 84:8–85:4; Doc. 156-1, Yankovich Dep. at 19:22–20:10, 66:5–67:1; Doc. 163-1, RCC Dep. at 34:19–35:23.)

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

B.    **The Tax Services Market**

14.

**Lucasys Statement No. 14:**

In addition to software, many RRIOUs require tax consulting and technical services ("Tax Services") in order to calculate accurately their tax depreciation and

deferred tax balances. (Doc. 157-1, Cone Dep. at 19:13–22:2, 30:9–25; Doc. 163-1, RCC Dep. at 144:18–147:24; Doc. 159-1, Duffy Dep. at 79:21–80:10; Doc. 158-1, Rutten Dep. at 86:23–87:21.)

**PowerPlan Response:**

Undisputed that many RRIOUs use tax consulting and technical services. To the extent that Statement No. 14 asserts that an antitrust market for "Tax Services" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**Lucasys Reply:**

As an initial matter, the Response does not dispute that, in addition to software, many RRIOUs require tax consulting and technical services ("Tax Services") in order to calculate accurately their tax depreciation and deferred tax balances. The Response only disputes that "Lucasys has adequately defined a valid antitrust market for 'Tax Services'" and states that "Tax Services" is allegedly

defined differently in Dr. Christine S. Meyer's expert report. Because PowerPlan has failed to respond to or address this material fact by directly refuting it with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the **Tax Software Market**—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally* Docs. 186, 186-1, Pl.'s Partial Motion for Summary Judgment and Brief in Support of Pl.'s Partial Motion for Summary Judgment (collectively, "Pl.'s MSJ"). For purposes of its negative tying claim, Lucasys only has to show that Tax Software and Tax Services are distinct products. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts."). Whether Lucasys has adequately defined

a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Moreover, the Response's statement regarding any difference between the above referenced definition of Tax Services and Dr. Meyer's definition is equally irrelevant and not material.

15.

**Lucasys Statement No. 15:**

Tax Services are something different than Tax Software. (Doc. 159-1, Duffy Dep. at 232:24–25, 350:19–20.)

**PowerPlan Response:**

The phrase "Tax Services" is vague, and the phrase "Tax Software" is undefined in this Statement of Undisputed Material Facts. Statement No. 15 is therefore ambiguous and therefore disputed. Moreover, PowerPlan disputes that "Tax Services" as defined by Lucasys' liability expert are something different than "Tax Software," as the evidence in the record is that they are substitutes. *See, e.g.*, Doc. 177-1, Meyer Tr. 35:4-36:1 ("Q  How do I define the tax services market? A. So as I stated in my report, my understanding is that PowerTax has some limitations. Some of them are enumerated here, but they could – my understanding is that they could also be specific for a particular customer . . . ."); Doc. 185-23, Ex. 48, Tyler Report ¶ 77 ("This means of market definition would seem to force

any differentiated software product out of the 'Tax Software' market and into the 'Tax Services' market, or at least operate in both."); *id.* ¶ 79 ("[C]ertain functions performed by PowerTax for one customer in the 'Tax Software' market might be considered in the 'Tax Services' market for another customer.").

To the extent that Statement No. 15 asserts that an antitrust market for "Tax Services" or "Tax Software" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services" or "Tax Software." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**Lucasys Reply:**

The Response disputes this statement arguing that the phrase Tax Services is vague and because "Tax Software" is undefined. First, Tax Services is not vague. It is defined herein to mean tax consulting and technical services, services which PowerPlan admits RRIOUs require. (*See* Response and Reply to Statement No. 14.) Second, regardless of how defined herein, PowerPlan has sufficient understanding of what Tax Software and Tax Services include. Indeed, Mr. Duffy, PowerPlan's

former Vice President of Sales, who's deposition testimony is cited above, testified to the difference between Tax Services and Tax Software: "[S]oftware and consulting are two different things. (Doc. 159-1, Duffy Dep. at 232:18–25, 350:19–20.)  Indeed, PowerPlan's own expert has stated that Tax Services "do not appear to be a reasonable substitute for solutions provided by PowerTax for depreciation and deferred taxes, and vice versa." (Doc. 186-21, Tyler Report ¶ 78.) Both arguments are therefore without merit.

As for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the **Tax Software Market**—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally* Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only has to show that Tax Software and Tax Services are distinct products. *See Eastman Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Likewise, the Response's statement regarding any difference between the

above-referenced definition of Tax Services and Dr. Meyer's definition is equally irrelevant and not material.

While Lucasys disputes whether it has adequately defined a "valid antitrust market" for Tax Software, this is not a fact asserted in the instant statement, and the Response's attempt to dispute this statement on that basis is thus irrelevant.

Because PowerPlan's disputes are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

16.

**Lucasys Statement No. 16:**

Tax Services and Tax Software are not substitutes for one another. (Expert Report of Cleve Tyler, Ph.D. ("Tyler Report"), attached hereto as **Exhibit S**, ¶ 78.)

**PowerPlan Response:**

The phrase "Tax Services" is vague, and the phrase "Tax Software" is undefined in this Statement of Undisputed Material Facts. Statement No. 16 is therefore ambiguous and therefore disputed. Moreover, PowerPlan disputes that "Tax Services" as defined by Lucasys' expert Meyer and "Tax Software" are not substitutes for one another, as the evidence in the record is that they are substitutes.

*See, e.g.*, Doc. 177-1, Meyer Tr. 35:4-36:1 ("Q  How do I define the tax services market? A. So as I stated in my report, my understanding is that PowerTax has some limitations. Some of them are enumerated here, but they could – my understanding is that they could also be specific for a particular customer"); Doc. 185-23, Ex. 48, Tyler Report ¶ 77 ("This means of market definition would seem to force any differentiated software product out of the 'Tax Software' market and into the 'Tax Services' market, or at least operate in both."); *id.* ¶ 79 ("[C]ertain functions performed by PowerTax for one customer in the 'Tax Software' market might be considered in the 'Tax Services' market for another customer.").

To the extent that Statement No. 16 asserts that an antitrust market for "Tax Services" or "Tax Software" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services" or "Tax Software." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**Lucasys Reply**:

The Response again disputes this statement arguing that the phrase Tax

Services is vague and because "Tax Software" is undefined. As set forth above, Tax Services is not vague and is defined herein to mean tax consulting and technical services—services which PowerPlan admits RRIOUs require. (*See* Response and Reply to Statement No. 14.) As for Tax Software, regardless of how defined herein, PowerPlan has sufficient understanding of what it includes. Dr. Tyler's report, which is cited above, states that "[c]onsulting services do not appear to be a reasonable substitute for solutions provided by PowerTax for depreciation and deferred taxes, and vice versa." (Doc. 186-21, Expert Report of Cleve S. Tyler, Ph.D. ("Tyler Report") ¶ 78.) PowerPlan cites no evidence to refute the statement. Both arguments are therefore without merit.

As for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the **Tax Software Market**—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally* Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only has to show that Tax Software and Tax Services are distinct products. *See Eastman*

*Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Likewise, PowerPlan's statement regarding any difference between the above-referenced definition of Tax Services and Dr. Meyer's definition is equally irrelevant and not material.

While Lucasys disputes whether it has adequately defined a "valid antitrust market" for Tax Software, this is not a fact asserted in the instant statement, and the Response's attempt to dispute this statement on that basis is thus irrelevant.

Because PowerPlan's disputes are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

17.

**Lucasys Statement No. 17:**

Lucasys and other third-party vendors, such as Regulated Capital Consultants ("RCC") and Arc-Two Consulting, offer Tax Services to RRIOUs. (Doc. 157-1, Cone Dep. at 31:16–32:1; Doc. 156-1, Yankovich Dep. at 41:1–42:9; Doc. 159-1, Duffy Dep. at 81:6–16; Doc. 154-1, Bertz Dep. at 227:17–228:1; Doc. 158-1, Rutten Dep. at 86:23–87:21.)

**PowerPlan Response:**

Undisputed that numerous independent third-parties supply tax consulting and technical services to RRIOUs. To the extent that Statement No. 17 asserts that an antitrust market for "Tax Services" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**Lucasys Reply:**

The Response does not dispute that numerous third parties, including Lucasys, provide tax consulting and technical services, which are herein defined as Tax Services, to RRIOUs. (*See* Response and Reply to Statement No. 14.) Accordingly, the Court can deem this statement undisputed for purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant

motion. Lucasys has moved for summary judgment on its negative tying claim under

15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C.

§ 2 pertaining to the **Tax Software Market**—not the Tax Services Market—and

PowerPlan's first affirmative defense regarding antitrust standing. (*See generally*

Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only

has to show that Tax Software and Tax Services are distinct products. *See Eastman*

*Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid

antitrust market for Tax Services is thus irrelevant and not material to the instant

motion. Likewise, PowerPlan's statement regarding any difference between the

above-referenced definition of Tax Services and Dr. Meyer's definition is equally

irrelevant and not material.

18.

**Lucasys Statement No. 18:**

PowerPlan also offers Tax Services to RRIOUs. (Ex. E, 2021 – 2023 Strategic

Plan at 11; Doc. 156-1, Yankovich Dep. at 41:1–10.)

**PowerPlan Response:**

Undisputed that PowerPlan provides tax consulting and technical services

to RRIOUs. To the extent that Statement No. 17 asserts that an antitrust market for

"Tax Services" exists, PowerPlan disputes that Lucasys has adequately defined a

valid antitrust market for "Tax Services." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**Lucasys Reply**:

The Response does not dispute that PowerPlan provides tax consulting and technical services, which are herein defined as Tax Services, to RRIOUs. (*See* Response and Reply to Statement No. 14.) Accordingly, the Court can deem this statement undisputed. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the ***Tax Software Market***—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally* Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only

has to show that Tax Software and Tax Services are distinct products. *See Eastman Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Likewise, PowerPlan's statement regarding any difference between the above-referenced definition of Tax Services and Dr. Meyer's definition is equally irrelevant and not material.

19.

**Lucasys Statement No. 19:**

As a practical matter, in order to provide Tax Services to RRIOUs, a service provider must be able to access PowerPlan's PowerTax database to retrieve and modify customer data. (Doc. 157-1, Cone Dep. at 34:17–22, 40:12–16, 136:14–19; *see also* Doc. 156-1, Yankovich Dep. at 56:12–18.)

**PowerPlan Response:**

PowerPlan disputes that "in order to provide Tax Services to RRIOUs, a service provider must be able to access PowerPlan's PowerTax database to retrieve and modify customer data," as the statement is not supported by the record evidence. Tax Services, to the extent PowerPlan understands that phrase, are broad and varied, and do <u>not</u> necessarily involve operations with PowerPlan's software. Ex. 50, May 12, 2023 Declaration of Jim Dahlby ("Dahlby Decl.") ¶ 6;

Doc. 158-1, Rutten Tr. 47:5-14. Moreover, in all cases, a customer controls its own data and can provide that data to a service provider outside of PowerPlan software so long as it does so in compliance with its license agreement. Ex. 50, Dahlby Decl. ¶ 7; Doc. 159-1, Duffy Tr. 195:13–24 ("The client has access to their data at all times to my knowledge . . . . The data itself is theirs."); Doc. 184-1, Ex. 1 (June 2020 form letter from PowerPlan to customer) ("PowerPlan consent is not required for customers to provide their data, in raw form, to Lucasys"); Doc. 182-2 ¶¶ 15–17. In addition, no customer has testified that they were ever prevented from supplying the customer's own data to Lucasys.

To the extent that Statement No. 19 asserts that an antitrust market for "Tax Services" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**Lucasys Reply**:

The Response disputes this statement, arguing that "Tax Services . . . are broad and varied, and do not necessarily involve operations with PowerPlan's

-34-

software." (Emphasis omitted). In support of this dispute, the Response cites the Declaration of Jim Dahlby (Doc. 190-5). Mr. Dahlby, however, did not make any statement regarding *Tax Services*—which are defined herein to mean tax consulting and technical services—but rather made statements regarding general "services related to the business processes that PowerPlan's software supports." (Doc. 190-5, Dahlby Dec. ¶ 6.) While some of these generalized services may not require access to PowerPlan's databases, Mr. Dahlby did not state that a provider of Tax Services to RRIOUs would not need to be able to access PowerPlan's PowerTax database to retrieve and modify customer data. As such, the Response has provided no evidence to dispute this fact.

As for whether a customer controls its own data and can provide that data to a service provider outside of PowerPlan software, even if true (which Lucasys has disputed), Mr. Dahlby's generalized statement is irrelevant and not material to the instant statement because it does not address whether the provision of Tax Services, specifically, to RRIOUs requires a provider to access PowerPlan's PowerTax database to retrieve and modify customer data.

Because PowerPlan's purported disputes do not directly refute this fact and it has provided no other specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary

Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

With regard to whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the **Tax Software Market**—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally* Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only has to show that Tax Software and Tax Services are distinct products. *Eastman Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Likewise, PowerPlan's statement regarding any difference between the above-referenced definition of Tax Services and Dr. Meyer's definition is equally irrelevant and not material.

## C.   PowerPlan's Market Power

20.

## Lucasys Statement No. 20:

Lucasys's expert witness, Dr. Christine Meyer, has opined that PowerPlan has

market power in the market for Tax Software. (Expert Report of Christine S. Meyer, Ph.D. ("Meyer Report"), attached hereto as **Exhibit T,** ¶ 8 ("PowerPlan's high market share combined with high barriers to entry in the market for Tax Software indicate that PowerPlan has market power in the market for Tax Software."); *id.* § V.)

**PowerPlan Response:**

Undisputed. For clarity, however, to the extent that Statement No. 20 asserts that an antitrust market for "Tax Software" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Software." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76.

**Lucasys Reply:**

The Response does not dispute that Lucasys' expert witness, Dr. Christine Meyer, has opined that PowerPlan has market power in the market for Tax Software. The Court can therefore deem this fact undisputed for purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

While Lucasys disputes whether it has adequately defined a "valid antitrust market" for Tax Software, this is not a fact asserted in the instant statement, and the Response's attempt to dispute this statement on that basis is thus irrelevant.

21.

**Lucasys Statement No. 21:**

PowerPlan's expert witness, Dr. Cleve Tyler, does not dispute that PowerPlan has market power in the market for Tax Software. (Doc. 172-1, Mar. 23, 2023 Deposition of Cleve B. Tyler, Ph.D. ("Tyler Dep."), excerpts attached hereto as **Exhibit U**, at 206:14-207:4.)

**PowerPlan Response:**

Undisputed. For clarity, however, to the extent that Statement No. 21 asserts that an antitrust market for "Tax Software" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Software." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76.

**Lucasys Reply:**

The Response admits that PowerPlan's expert witness, Dr. Cleve Tyler, does not dispute that PowerPlan has market power in the market for Tax Software. The Court can therefore deem this fact undisputed. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

While Lucasys disputes whether it has adequately defined a "valid antitrust market" for Tax Software, this is not a fact asserted in the instant statement, and the Response's attempt to dispute this statement on that basis is thus irrelevant.

22.

**Lucasys Statement No. 22:**

PowerPlan has reported, both internally and externally, that PowerTax enjoys market shares between 80% and 100% among RRIOUs. (*About Us*, PowerPlan, https://powerplan.com/about-us (last visited on Apr. 9, 2023) ("That's why 9 out of 10 North American IOUs run on PowerPlan."); Doc. 155-1, Carr Dep. at 86:18–22, 88:3–21, 92:6–16; Doc. 155-1 at 296 (Pl.'s Ex. 53) (stating that "99% of [IOUs] utilize PowerTax"); Ex. E, 2021 – 2023 Strategic Plan (reporting 81% penetration for PowerTax within core IOU market); Doc. 154-1, Bertz Dep. at 11:19–21; Doc. 154-1 at 255 (Pl.'s Ex. 1); Doc. 158-1, Rutten Dep. at 170:4–23; Doc. 167-1, Aug. 11, 2022 Deposition of Matt Crye ("Crye Dep."), excerpts attached hereto as **Exhibit V**, at 57:3–11, 61:23–62:1, 92:11–24; PowerPlan Response for Dominion Energy Services, Inc. Request for Information (Jan. 10, 2019) (hereinafter, "Dominion RFP"), attached hereto as **Exhibit W**, at 5 ("PowerPlan possesses a dominant position with US Investor Owned Utilities, Railroads and Midstream organizations with roughly 90% market share."); Carr, Jamie, *National Grid PowerTax Deferred Tax Implementation* (Apr. 16, 2018), attached hereto as **Exhibit X**, at 6 (representing that the "client base that has adopted the PowerTax Depreciation and PowerTax Deferred Tax Accounting module includes nearly 100%

of the investor-owned utilities in the United States"); *see also* Thoma Bravo, "*Project TORQUE: Investment Committee Presentation*" (Jan. 2015), attached hereto as **Exhibit Y**, at 5 (describing PowerPlan as the "[g]old standard w/ 90% market share in Utilities").)

**PowerPlan's Response:**

PowerPlan objects to Statement No. 22 because it is inadmissible under Federal Rule of Evidence 402 (irrelevance). PowerPlan further objects that the statement is not material, as Lucasys does not assert the market(s) in which PowerPlan has purportedly reported "market shares between 80% and 100% among RRIOUs." PowerPlan also disputes any implication that Lucasys has adequately defined a valid antitrust market. *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76.

**Lucasys Reply:**

The Response first objects to this statement arguing that it is inadmissible under Federal Rule of Evidence 402 because it is irrelevant. This is incorrect. "Evidence is 'relevant' under Rule 401 of the Federal Rules of Evidence if 'it has any tendency to make a fact more or less probable than it would be without the evidence' and 'the fact is of consequence in determining the action.'" *United States v. McGregor*, 960 F.3d 1319, 1323 (11th Cir. 2020) (quoting Fed. R. Evid. 401).

Here, Lucasys has moved for summary judgment on, *inter alia*, its negative tying claim under 15 U.S.C. § 1 (Count III) and on the monopoly and market power elements of its other antitrust claims pertaining to the Tax Software Market. (*See generally* Docs. 186, 186-1, Pl.'s MSJ.) In order to establish its *per se* negative tying claim, Lucasys must show that, *inter alia*, PowerPlan "possesses sufficient economic power" in the Tax Software market. *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1414 (11th Cir. 1987). Likewise, Lucasys must establish PowerPlan's market power for the monopoly power element of its other Section 2 claims (Counts I, II, XI, XII) and the market power element of its concerted refusal to deal and exclusive dealing claims under Section 1. The fact that PowerPlan has reported, both internally and externally, that PowerTax enjoys market shares between 80% and 100% among RRIOUs is highly relevant to these elements and claim, as it tends to make PowerPlan's market power more probable and is of consequence in determining the action. Thus, this objection is without merit.

The Response next objects that the statement is not material because Lucasys purportedly did not assert the market in which PowerPlan has reported market shares between 80% and 100%. Again, this objection is without merit. The cited evidence shows that PowerPlan's Tax Software, including specifically PowerTax, enjoys market penetration with RRIOUs between 80% and 100%. (*See, e.g.*, Doc. 155-1,

Carr Dep. at 296 (Pl.'s Ex. 53) ("Managing complex deferred tax calculations is the 'special sauce' of PowerPlan's tax solutions, PowerTax and Provision, and is one the reasons ***99% of investor owned utilities utilize the PowerTax system***." (emphasis added)); *see also* Doc. 186-7, 2021 – 2023 Strategic Plan (reporting that PowerTax had an 81% market penetration within the total addressable market ("TAM") among IOUs). This objection is meritless.

Because PowerPlan's objections are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

23.

**Lucasys Statement No. 23**:

PowerPlan RRIOU customers have reported similar market shares for PowerTax to regulatory authorities. (Doc. 170-1, Roylance Dep. at 34:2–35:2; Doc. 170-1 at 69–70 (Ex. 4 at 6:15–7:2) ("This industry-standard software is employed by over 95% percent of investor-owned utilities in the United States.").)

**PowerPlan Response**:

PowerPlan objects to Statement No. 23 pursuant to Federal Rule of Evidence 402 (irrelevance), Federal Rule of Evidence 602 (need for personal knowledge) and

802 (hearsay). PowerPlan further objects that the statement is not material, as PowerPlan's RRIOU customers' reports to regulatory authorities regarding PowerPlan's market share for PowerTax are not probative as to determining whether PowerPlan has market power. Moreover, the referenced deposition is of an employee at a PowerPlan customer, Portland General Electric Company, who lacks the requisite foundation to offer evidence on PowerPlan's market share for PowerTax. PowerPlan also disputes any implication that Lucasys has adequately defined a valid antitrust market. *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76.

**Lucasys Reply**:

The Response objects to the statement based on Federal Rules of Evidence 402 (irrelevance), 602 (need for personal knowledge), and 802 (hearsay). None of these objections have merit.

First, the statement is certainly relevant. "Evidence is 'relevant' under Rule 401 of the Federal Rules of Evidence if 'it has any tendency to make a fact more or less probable than it would be without the evidence' and 'the fact is of consequence in determining the action.'" *McGregor*, 960 F.3d at 1323 (quoting Fed. R. Evid. 401). Here, Lucasys has moved for summary judgment on, *inter alia*, its negative tying claim under 15 U.S.C. § 1 (Count III) and on the monopoly and market power

elements of its other antitrust claims pertaining to the Tax Software Market. (*See generally* Docs. 186, 186-1, Pl.'s MSJ.) In order to establish its *per se* negative tying claim, Lucasys must show that, *inter alia*, PowerPlan "possesses sufficient economic power" in the Tax Software market. *Tic-X-Press*, 815 F.2d at 1414. Likewise, Lucasys must establish PowerPlan's market power for the monopoly power element of its other Section 2 claims (Counts I, II, XI, XII) and the market power element of its concerted refusal to deal and exclusive dealing claims under Section 1. That PowerPlan's RRIOU customers have reported that PowerPlan enjoys market shares between 80% and 100% to regulatory authorities is highly relevant to these elements and claim, as it tends to make PowerPlan's market power more probable and is of consequence in determining the action. Thus, this objection is without merit.

Second, Mr. Roylance has sufficient personal knowledge. Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." "[P]ersonal knowledge can include 'inferences and opinions, as long as they are grounded in personal observations and experience.'" *United States v. Wirtz*, 357 F. Supp. 2d 1164, 1169 (D. Minn. 2005) (quoting *United States v. Rodriguez*, 162 F.3d 135, 144 (1st Cir. 1998)). Here, the cited evidence comes from Mr. Roylance's testimony before the Public Utility Commission of the State of Oregon on behalf of

Portland General Electric Company ("PGE"). (*See* 170-1, Roylance Dep. at 69–70 (Ex. 4 at 6:15–7:2).) At the time of his testimony, Mr. Roylance was the Principal Tax Analyst for PGE's Corporate Tax Department and had spent nearly thirty years in different utility accounting roles, including twelve in various tax roles. (*Id.* at 84.) In short, Mr. Roylance has ample personal knowledge of the utility tax industry, including on the industry standard tax software used by those utilities.

Third, the Response's hearsay objection is baseless. Setting aside whether the statement is based on hearsay, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial." *Lewis v. Residential Mortg. Sols.*, 800 F. App'x 830, 834 (11th Cir. 2020). "The most obvious way to reduce hearsay to admissible form is to call the declarant to testify at trial." *Id.* Here, both Mr. Roylance and Mr. Carr, who is also credited with providing this statistic, can provide testimony at trial. Accordingly, the Court may consider this statement regardless of whether it is hearsay or not. Finally, the statement of Mr. Roylance would fall under multiple exceptions to the hearsay rule, including Federal Rules of Evidence 803(6) and 803(8), and statements of Mr. Carr are not hearsay, because they are admissions of a party opponent under Federal Rule of Evidence 801(2).

Finally, PowerPlan further objects that the statement is not material, arguing that PowerPlan's RRIOU customers' reports to regulatory authorities regarding PowerPlan's market share for PowerTax are not probative of whether PowerPlan has market power. Again, this is incorrect. Such statements are, at a minimum, circumstantial proof of PowerPlan's market power and therefore material to the issues in the instant motion. *See United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) ("Because such direct proof is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power."); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997) ("Market power can be proven by either direct or circumstantial evidence."); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1071 (10th Cir. 2013) ("Plaintiffs usually seek to prove market power indirectly or circumstantially . . . ."). Accordingly, at a minimum, the statement is circumstantial evidence of PowerPlan's market power, and PowerPlan's objection is without merit.

Because PowerPlan's objections are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

24.

**Lucasys Statement No. 24:**

PowerPlan's ordinary course business documents call its software the "stickiest and most differentiated product solution, with currently 81% penetration for the PowerTax module within [its] core IOU market." (Ex. E, 2021 – 2023 Strategic Plan at 6–7).

**PowerPlan Response:**

Undisputed that the words quoted appear in the cited document, which references PowerPlan's core IOU market at a given point in time. PowerPlan disputes any implication that Lucasys has adequately defined a valid antitrust market. *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76.

**Lucasys Reply:**

The Response does not dispute that PowerPlan's ordinary course business documents call its software the "stickiest and most differentiated product solution, with currently 81% penetration for the PowerTax module within [its] core IOU market." This statement can therefore be deemed admitted and undisputed for purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for PowerPlan's argument that Lucasys has not adequately defined a "valid antitrust market" for Tax Software (Lucasys disputes this argument), this is not a fact asserted in the instant statement, and the Response's attempt to dispute this statement on that basis is thus irrelevant.

25.

**Lucasys Statement No. 25:**

According to a May 2017 PowerPlan internal email concerning communications to RRIOU tax departments: "Managing complex deferred tax calculations is the 'special sauce' of PowerPlan's tax solutions, PowerTax and Provision, and is one of the reasons 99% of investor owned utilities utilize the PowerTax system." (Doc. 155-1 at 296 (Pl.'s Ex. 53).)

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

26.

**Lucasys Statement No. 26:**

According to a 2018 PowerPlan proposal for PowerTax Deferred Tax implementation for National Grid, "[t]he client base that has adopted the PowerTax

Depreciation and PowerTax Deferred Tax Accounting module includes nearly 100% of the investor owned utilities in the United States." (Ex. X, Carr, Jamie, *National Grid PowerTax Deferred Tax Implementation* (Apr. 16, 2018).)

**PowerPlan Response**:

Undisputed.

**Lucasys Reply**:

Undisputed.

27.

**Lucasys Statement No. 27**:

PowerPlan customers have described PowerPlan as a "monopoly." (Doc. 168-1, AEP Dep. at 32:10–25; Doc. 168-1 at 93 (Pl.'s Ex. 260) ("PowerPlan enjoys *monopoly* in this space because any new solution which anyone develops will end up being as expensive as PowerPlan so there is no viable business case for anyone else to get into this area." (emphasis added)); Doc. 170-1 at 55 (Ex. 1) ("I'm concerned that PowerPlan has become complacent because they have had a *monopoly* for so long. There has been no other solution from which to choose. You have been the best of the only." (emphasis added)); Doc. 167-1, Crye Dep. at 59:8–60:11; Doc. 167-1 at 342 (Pl.'s Ex. 235) (containing statement from PowerPlan customer describing PowerPlan as having "a *monopoly* in the Utilities space"

(emphasis added)).)

**PowerPlan Response**:

PowerPlan objects to Statement No. 27 because it is inadmissible under Federal Rules of Evidence 602 (need for personal knowledge) and 802 (hearsay). PowerPlan's customers lack the requisite foundation to offer evidence as to PowerPlan's purported monopoly position.

**Lucasys Reply**:

The Response objects to the statement on the grounds that the customers cited lack personal knowledge of PowerPlan's market position and because the statement is allegedly based on hearsay. Both objections are without merit.

First, PowerPlan's customers have personal knowledge regarding PowerPlan's market position. Under Federal Rule of Evidence 602, "personal knowledge can include 'inferences and opinions, as long as they are grounded in personal observations and experience.'" *Wirtz*, 357 F. Supp. 2d at 1169. Here, the subject communications contain PowerPlan's customers' inferences, observations, and opinion based on their personal observations and experiences in the market. Indeed, as explained above, Mr. Roylance, who is cited above, has sufficient personal knowledge to testify as to PowerPlan's dominant market position given his extensive experience working in utility tax departments. (*See also* Reply to

Statement No. 23.)

Second, the statements are not hearsay because they are not being offered exclusively for the truth of the matter asserted. *See* Fed. R. Civ. P. 801(c)(2) (defining hearsay). The statements show the customer's perception of PowerPlan's market position and the availability of alternative Tax Software products. In any event, even if hearsay, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial." *Lewis*, 800 F. App'x at 834. "The most obvious way to reduce hearsay to admissible form is to call the declarant to testify at trial." *Id.* Because Mr. Roylance and Ms. Hanni of AEP can provide testimony at trial, the Court may consider this statement regardless of whether it is hearsay or not. Moreover, the email communications produced by PowerPlan fall within the hearsay exception found in Federal Rule of Evidence 803(6), and the responses thereto by PowerPlan employees are not hearsay because they are admissions of a party opponent under Federal Rule of Evidence 801(2).

Finally, as for PowerPlan's argument that its customers "lack the requisite foundation to offer evidence as to PowerPlan's purported monopoly position," this is unfounded. Federal Rule of Evidence 701 permits a lay witness to offer opinion testimony that is "rationally based on the witness's perception." The evidence here

is based on the customers' perception of alternative market options and therefore perfectly proper.

Because PowerPlan's objections are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

28.

**Lucasys Statement No. 28:**

PowerPlan employees have internally described PowerPlan as enjoying a "dominant position," as having "a stranglehold on the industry" and as having "no direct competitors." (Ex. W, Dominion RFP at 5; Email from Jim Duffy to Mark Bortniker (Mar. 25, 2021) (POWERPLAN00124831), attached hereto as **Exhibit Z**; FAQs, PowerPlan (POWERPLAN00647436), attached hereto as **Exhibit AA**.)

**PowerPlan Response:**

Statement No. 28 is not material because, even if true, the claim about *PowerPlan's* market position for a combination of multiple product verticals is not relevant to PowerPlan's market position or competition in the claimed market for Tax Depreciation & Deferred Tax Software where *PowerTax* is sold. Lucasys' citation to Doc. 186-29, Ex. AA, does not support Statement No. 28 and reinforce

that PowerTax faces competition in the claimed markets. *See* Doc.186-29, Ex. AA ¶ 14 ("While we have no director competition with [us] across the full suite of solutions[,] ***there are several point solutions in tax*** such as Thomson Reuters, or Duff[] & Phelps. (emphasis supplied)). Lucasys' cited documents of Doc. 186-25, Ex. W and Doc. 186-29, Ex. AA and are also inadmissible hearsay being offered for the truth of the matter asserted.

**Lucasys Reply:**

The Response contends that the statement is not material because the cited evidence pertains to "a combination of multiple product verticals" that are not "relevant to PowerPlan's market position or competition in the claimed market for Tax Depreciation & Deferred Tax Software where *PowerTax* is sold." Again, PowerPlan's argument is misplaced. First, much of the cited evidence concerns PowerTax specifically. Mr. Duffy's email describing PowerPlan as the "best of the one" was in response to and quoting a complaint from a PowerPlan utility customer, PGE, who had complained about PowerTax and PowerPlan's failure to address customer needs. (*See* Doc. 186-28; Doc. 170-1, Roylance Dep. at 56.) Second, even if not addressing PowerPlan's market position for Tax Software specifically, the other cited evidence is material because it shows PowerPlan's internal perception of its market power among utility companies at large. And that perception is certainly

additional circumstantial evidence of PowerPlan's market power in the tax software market.

Contrary to PowerPlan's claim, Doc. 186-29, Ex. AA, does not support its contention that PowerTax faces competition in the claimed markets. That document only provides that there are some limited "point solutions in tax" that address a single use case for certain customer's tax needs. Rather, the undisputed evidence is that, prior to Lucasys developing its Deferred Tax product, RRIOUs of any significant size had to use PowerTax to calculate deferred tax balances, and there were no substitutes. (*See* Statements Nos. 8–9.)

With regard to PowerPlan's final argument that Doc. 186-25, Ex. W, and Doc. 186-29, Ex. AA, are inadmissible hearsay, the objection is without merit. Both documents are excepted as records of a regularly conducted activity under Federal Rule of Evidence 803(6), and they are admissions of a party opponent that are not hearsay under Federal Rule of Evidence 801(2). This objection is meritless.

Because PowerPlan's objections are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

29.

**Lucasys Statement No. 29:**

In a 2020 PowerPlan Employee Engagement Survey, multiple employees identified PowerPlan's monopoly position as amongst its "Greatest Strengths" with comments like "benefit of holding monopoly in our market;" "Monopolized offerings in regulated utilities;" "Monopoly to keep the business going;" "Our pseudo-monopoly position in the market;" and "Our almost monopoly on Plant Accounting and Tax with Utilities." (PowerPlan 2020 Employee Engagement Results (Oct. 2020) (POWERPLAN00121797), attached hereto as **Exhibit BB**.)

**PowerPlan Response:**

PowerPlan objects to Statement No. 29 because it is inadmissible under Federal Rules of Evidence 602 (need for personal knowledge) and 802 (hearsay). The PowerPlan 2020 Employee Engagement Results do not even identify the individual(s) that submitted those statements. These unidentified persons lack the requisite foundation to offer evidence as to PowerPlan's purported monopoly position.

**Lucasys Reply:**

PowerPlan objects to this statement based on Federal Rules of Evidence 602 (need for personal knowledge) and 802 (hearsay). Neither objection has merit. First,

PowerPlan employees undeniably have sufficient personal knowledge to comment on what they believe PowerPlan's "greatest strengths" are and their perception of the company's market position. Second, the statements of PowerPlan employees made during the course of their employment are admissions of a party opponent that are not hearsay under Federal Rule of Evidence 801(2)(D).

Because PowerPlan's objections are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

30.

**Lucasys Statement No. 30:**

Tax Software takes a significant capital investment to develop. (Doc. 160-1, Lantukh Dep. at 123:24–124:15, 125:4–9, 141:20–142:10, 143:20–144:8, 156:13–157:5; Doc. 171-1, Sept. 14, 2022 Deposition of Vadim Lantukh 30(b)(6) Witness for Lucasys (hereinafter, "Lucasys Dep."), excerpts attached hereto as **Exhibit CC**, at 66:1–10; Doc. 162-1, July 22, 2022 Deposition of Stephen Strang ("Strang Dep."), excerpts attached hereto as **Exhibit DD**, at 91:6–92:21, 95:18–97:3, 164:2–7; Doc. 169-1, Aug. 19, 2022 Deposition of Joe Gomes ("Gomes Dep."), excerpts attached hereto as **Exhibit EE**, at 142:21–143:2; *see also* Doc. 167-1, Crye Dep. at 211:15–

212:20, 262:1–3, 262:21–23, 264:22–265:11.)

**PowerPlan Response**:

Undisputed that tax depreciation and deferred tax software takes significant capital investment to develop. To the extent that Statement No. 30 asserts that an antitrust market for "Tax Software" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Software." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76.

**Lucasys Reply**:

The Response does not dispute that Tax Software—tax depreciation and deferred tax—takes significant capital investment to develop. Accordingly, the Court may deem this fact undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for PowerPlan's argument that Lucasys has not adequately defined a "valid antitrust market" for Tax Software (Lucasys disputes this argument), this is not a fact asserted in the instant statement, and the Response's attempt to dispute this statement on that basis is thus irrelevant.

31.

**Lucasys Statement No. 31**:

Creating Tax Software requires specialized knowledge of RRIOU business

requirements. (Doc. 169-1, Gomes Dep. at 29:16–30:20; Doc. 169-1 at 354 (Pl.'s Ex. 265); *see also* Doc. 162-1, Strang Dep. at 77:3–79:4.)

**PowerPlan Response:**

Undisputed that tax depreciation and deferred tax software is best developed by persons with specialized knowledge. To the extent that Statement No. 31 asserts that an antitrust market for "Tax Software" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Software." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76.

**Lucasys Reply:**

The Response does not dispute that Tax Software—tax depreciation and deferred tax—requires specialized knowledge of RRIOU business requirements. Accordingly, the Court may deem this fact undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for PowerPlan's argument that Lucasys has not adequately defined a "valid antitrust market" for Tax Software (Lucasys disputes this argument), this is not a fact asserted in the instant statement, and the Response's attempt to dispute this statement on that basis is thus irrelevant.

32.

**Lucasys Statement No. 32:**

It is expensive for an RRIOU to switch from one Tax Software product to another. (Email from Nathan Shurtleff to Skip Fowler (Feb. 14, 2019) (POWERPLAN01695482), attached hereto as **Exhibit FF**; Doc. 160-1, Lantukh Dep. at 185:15–187:23.)

**PowerPlan Response:**

Undisputed that it can be expensive to switch from one tax software product to using another tax software product. To the extent that Statement No. 32 asserts that an antitrust market for "Tax Software" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Software." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 48–76.

**Lucasys Reply:**

The Response does not dispute that it can be expensive for an RRIOU to switch from one Tax Software product to another. Accordingly, the Court may deem this fact undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for PowerPlan's argument that Lucasys has not adequately defined a "valid antitrust market" for Tax Software (Lucasys disputes this argument), this is not a

fact asserted in the instant statement, and the Response's attempt to dispute this statement on that basis is thus irrelevant.

**D.    PowerPlan's Licensing Agreements Are Negative Tying Arrangements**

33.

**Lucasys Statement No. 33:**

PowerPlan licenses PowerTax to RRIOUs pursuant to written agreements ("License Agreements"). (Doc. 159-1, Duffy Dep. at 78:14–79:11; Doc. 158-1, Rutten Dep. at 30:18–32:1; Doc. 167-1, Crye Dep. at 50:24–51:1.)

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

34.

**Lucasys Statement No. 34:**

PowerPlan's License Agreements state that PowerPlan's consent is necessary before a customer can provide anyone with access to PowerPlan's "confidential information." (Doc. 159-1, Duffy Dep. at 172:10–173:23, 284:1–3; Doc. 159-1 at 579 (Pl.'s Ex. 127); Doc. 154-1 at 360 (Pl.'s Ex. 26).)

**PowerPlan Response**:

Undisputed.

**Lucasys Reply**:

Undisputed.

35.

**Lucasys Statement No. 35**:

PowerPlan has interpreted that provision in the License Agreements to require PowerPlan consent for any third party to be provided "front-end user access to PowerPlan's software" and "access to your PowerPlan database," among other things. (Doc. 154-1, Bertz Dep. at 104:9–23, 142:23–143:4, 176:5–15, 180:16–181:6, 240:5–22; Doc. 154-1 at 280, 302–03, 306, 360–61 (Pl.'s Exs. 14, 19, 21, 26); Doc. 159-1, Duffy Dep. at 172:10–173:23, 284:1–3; Doc. 159-1 at 579 (Pl.'s Ex. 127).)

**PowerPlan Response**:

Undisputed.

**Lucasys Reply**:

Undisputed.

**E.**   **PowerPlan Used Its Licensing Agreements to Keep Buyers From Engaging Lucasys**

36.

**Lucasys Statement No. 36:**

In the summer of 2019, Florida Power & Light, also known as NextEra Energy ("FPL") issued a request for proposals to provide Tax Services to FPL. (Doc. 167-1 at 394 (Pl.'s Ex. 249).)

**PowerPlan Response:**

Undisputed that NextEra requested proposals to provide tax consulting and technical services. To the extent that Statement No. 36 asserts that an antitrust market for "Tax Services" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**Lucasys Reply:**

The Response does not dispute that FPL/NextEra issued a request for proposals to provide tax consulting and technical services, defined herein as Tax

Services, to FPL. Accordingly, the Court may deem this fact undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the ***Tax Software Market***—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally* Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only has to show that Tax Software and Tax Services are distinct products. *Eastman Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Moreover, the Response's statement regarding any difference between the above referenced definition of Tax Services and Dr. Meyer's definition is equally irrelevant and not material.

37.

**Lucasys Statement No. 37:**

PowerPlan and Lucasys both submitted bids to FPL to provide those services. (Doc. 155-1, Carr Dep. at 126:1–4; Doc. 155-1 at 308 (Pl.'s Ex. 58).)

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

38.

**Lucasys Statement No. 38:**

FPL awarded the contract to Lucasys. (Doc. 155-1, Carr Dep. at 124:23–125:10; Doc. 155-1 at 308 (Pl.'s Ex. 58).)

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

39.

**Lucasys Statement No. 39:**

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

**PowerPlan Response**:

Undisputed.

**Lucasys Reply**:

Undisputed.

40.

**Lucasys Statement No. 40**:

FPL communicated to PowerPlan that FPL "selected the lowest price bidder." (Doc. 164-1, Dahlby Dep., at 291 (Pl.'s Ex. 195).)

**PowerPlan Response**:

PowerPlan objects to Statement No. 40 because the cited portion of Doc. 164-1 is inadmissible under Federal Rule of Evidence 602 (need for personal knowledge) and 802 (hearsay). Lucasys cannot use this statement to prove the truth of the matter asserted, *i.e.*, that FPL selected the lowest price bidder. Lucasys has not established the that the FPL employee quoted had any qualification to opine on FPL's bid selection process. Lucasys took the deposition of the 30(b)(6) representative for NextEra (parent of FPL) and did not try to establish this fact.

**<u>Lucasys Reply</u>:**

The Response objects to this statement based on Federal Rules of Evidence 602 (need for personal knowledge) and 802 (hearsay). First, Rule 602 does not apply, as that rule only pertains to the personal knowledge of a testifying witness. The evidence cited here is an email communication between Phillip Roger at FPL and PowerPlan's Jamie Carr. Moreover, when FPL's corporate representative, James May, was asked about the email communication, he testified that he had no reason to think that Mr. Roger's statement was inaccurate. (Doc. 175-1, NextEra Dep. at 19:22–25.) Second, the email is admissible for the purpose that PowerPlan was *told* by FPL that Lucasys was the lowest bidder, even if that were somehow not true, so it is relevant aside from the truth of the matter asserted. Finally, the communication is a record of regularly conducted business activity that is admissible under Federal Rule of Evidence 803(6).

Because PowerPlan's objections are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

41.

**Lucasys Statement No. 41**:

On July 22, 2019, Jim Dahlby, PowerPlan's Vice President of Growth Strategy, communicated to Brett Bertz, PowerPlan's Chief Customer Officer, that the lost FPL Tax Services bid was one that "the Lucasys letter to FPL could impact." (Doc. 164-1, Dahlby Dep. at 10:18–11:3; Doc. 164-1 at 291 (Pl.'s Ex. 195); Doc. 154-1, Bertz Dep. at 8:5–9.)

**PowerPlan Response**:

Undisputed.

**Lucasys Reply**:

Undisputed.

42.

**Lucasys Statement No. 42**:

In late October 2019, PowerPlan contacted FPL and communicated that PowerPlan would not consent to Lucasys having access to PowerPlan software or databases. (Doc. 154-1, Bertz Dep. at 304 (Pl.'s Ex. 20).)

**PowerPlan Response**:

Undisputed.

**Lucasys Reply**:

Undisputed.

43.

**Lucasys Statement No. 43:**

On November 8, 2019, FPL terminated its engagement with Lucasys as a result of PowerPlan's communication. (Email from Steven Williams to Vadim Lantukh (Nov. 8, 2019) (Pl.'s Exs. 283–84), attached hereto as **Exhibit HH**; Doc. 154-1, Bertz Dep. at 365 (Pl.'s Ex. 30) ("I want to highlight a recent discussion that the FPL team had with Brett Bertz, during which we were advised of the underlying potential IP infringement issue that prompted the termination of our existing agreement for the subject services.").)

**PowerPlan Response:**

PowerPlan objects to Statement No. 43 because Doc. 154-1 is inadmissible under Federal Rules of Evidence 602 (need for personal knowledge) and 802 (hearsay). Additionally, Doc. 186-36, Ex. HH, does not support the fact asserted that FPL/NextEra terminated its engagement with Lucasys "as a result of PowerPlan's communications." PowerPlan refutes Statement No. 43 because the record evidence contradicts that statement. *See, e.g.*, Doc. 175-1, NextEra Tr. 18:17-19 ("Q. Did the phone call from Mr. Bertz result in NextEra terminating its

relationship with Lucasys.  A.  No, it did not.").

**Lucasys Reply:**

The Response objects to this statement arguing that a portion of the cited evidence is inadmissible under Federal Rules of Evidence 602 (need for personal knowledge) and 802 (hearsay). First, Rule 602 does not apply, as that rule only pertains to the personal knowledge of a testifying witness. The challenged evidence here is an email from Steven Williams at FPL to Jamie Carr. Second, even if hearsay, the Court may consider the evidence, as Mr. Williams and Mr. Carr can provide testimony at trial. *See Lewis*, 800 F. App'x at 834 ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial . . . . The most obvious way to reduce hearsay to admissible form is to call the declarant to testify at trial."). Finally, the email is a record of a regularly conducted business activity that is admissible under Federal Rule of Evidence 803(6). These objections are therefore without merit.

As for PowerPlan's second argument—that the record evidence disputes the statement—PowerPlan has not provided any evidence to directly refute that FPL terminated its engagement with Lucasys as a result of PowerPlan's communications. NextEra's representative, James May, only testified that the initial call with Mr. Bertz did not result in NextEra terminating its relationship with Lucasys.

-69-

(Doc. 175-1, NextEra Dep. at 16:4–18:19.) After refreshing Mr. May's recollection, however, he refused to state why NextEra terminated Lucasys based on an assertion of attorney-client privilege and advice of counsel. (*Id.* at 31:20–33:8.) Indeed, Mr. May refused to answer any question pertaining to the reasons for terminating Lucasys based on the advice of counsel and under a purported claim a privilege. (*See, e.g.*, *id.* at 33:9–34:8.) However, the record evidence shows that Lucasys was terminated just four days after Mr. Bertz's communication and that during those four days Mr. Bertz continued to assure NextEra that it would not be worse off by ending its engagement with Lucasys. (*Id.* at 39:15–17, 43:17–46:19, 61:2–25, Pl.'s Exs. 278, 280–82.) Accordingly, PowerPlan has not cited any evidence directly refuting this statement.

Because PowerPlan's objections are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

44.

**<u>Lucasys Statement No. 44</u>:**

In December 2019, Laura Naclerio (now Laura Eustace) of Liberty Utilities reached out to Lucasys to secure Tax Services related to the implementation of

PowerTax. (Doc. 161-1, Chang Dep. at 123:2–124:18; Doc. 166-1, Eustace Dep. at 10:23–11:24; Doc. 166-1 at 52 (Ex. 1).)

**<u>PowerPlan Response</u>:**

Undisputed that Liberty contacted Lucasys about tax consulting and technical services. To the extent that Statement No. 44 asserts that an antitrust market for "Tax Services" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**<u>Lucasys Reply</u>:**

The Response does not dispute that, in December 2019, Laura Naclerio (now Laura Eustace) of Liberty Utilities reached out to Lucasys to secure tax consulting and technical services, defined herein as Tax Services, related to the implementation of PowerTax. Accordingly, the Court may deem this fact undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought

partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the **Tax Software Market**—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally* Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only has to show that Tax Software and Tax Services are distinct products. *Eastman Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Moreover, the Response's statement regarding any difference between the above referenced definition of Tax Services and Dr. Meyer's definition is equally irrelevant and not material.

45.

**Lucasys Statement No. 45:**

On February 20, 2020, Liberty Utilities contracted with Lucasys to provide Tax Services. (Doc. 161-1, Chang Dep. at 128:5–1; Doc. 161-1 at 345 (Def.'s Ex. 31); Doc. 166-1, Eustace Dep. at 66 (Ex. 6).)

**PowerPlan Response:**

Undisputed that Liberty hired Lucasys for tax consulting and technical

services. To the extent that Statement No. 45 asserts that an antitrust market for "Tax Services" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**Lucasys Reply**:

The Response does not dispute that, on February 20, 2020, Liberty Utilities contracted with Lucasys to provide tax consulting and technical services, defined herein as Tax Services. Accordingly, the Court may deem this fact undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

As for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the ***Tax Software Market***—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally*

Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only has to show that Tax Software and Tax Services are distinct products. *Eastman Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Moreover, the Response's statement regarding any difference between the above referenced definition of Tax Services and Dr. Meyer's definition is equally irrelevant and not material.

46.

**Lucasys Statement No. 46:**

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

47.

**Lucasys Statement No. 47:**

On April 21, 2020, PowerPlan contacted Liberty Utilities and communicated

that PowerPlan would not consent to Lucasys having access to PowerPlan software or databases. (Doc. 165-1, Read Dep. at 24:12–25:16; Doc. 166-1, Eustace Dep. at 66 (Ex. 6); Doc. 159-1, Duffy Dep. at 186:4–19; Doc. 159-1 at 579 (Pl.'s Ex. 127).)

**PowerPlan Response:**

Undisputed.

**Lucasys Reply:**

Undisputed.

48.

**Lucasys Statement No. 48:**

FPL and Liberty Utilities terminated their Tax Services engagements with Lucasys as a result of PowerPlan's communications to those customers. (Doc. 160-1, Lantukh Dep. at 56:25–57:4, 104:13–16, 107:24–108:12; Doc. 165-1, Read Dep. at 14:24–15:8; Doc. 166-1, Eustace Dep. at 18:2–15; Ex. HH, Email from Steven Williams to Vadim Lantukh (Nov. 8, 2019) (Pl.'s Exs. 283–84); Doc. 154-1, Bertz Dep. at 365 (Pl.'s Ex. 30) ("I want to highlight a recent discussion that the FPL team had with Brett Bertz, during which we were advised of the underlying potential IP infringement issue that prompted the termination of our existing agreement for the subject services.").)

**PowerPlan Response**:

PowerPlan objects to Statement No. 48 because the cited portions of Doc. 160-1 and Doc. 154-1 are inadmissible under Federal Rules of Evidence 602 (need for personal knowledge) and 802 (hearsay). Doc. 186-36, Ex. HH, does not support the fact asserted that FPL/NextEra terminated its engagement "as a result of PowerPlan's communications." PowerPlan disputes that "FPL . . . terminated its Tax Services engagement[] with Lucasys as a result of PowerPlan's communications to th[at] customer[]" as the statement is not supported by the record evidence, and as the record evidence instead contradicts that statement. *See, e.g.,* Doc. 175-1, NextEra 30(b)(6) Tr. 18:17-19 ("Q. Did the phone call from Mr. Bertz result in NextEra terminating its relationship with Lucasys. A. No, it did not.").

To the extent that Statement No. 48 asserts that an antitrust market for "Tax Services" exists, PowerPlan disputes that Lucasys has adequately defined a valid antitrust market for "Tax Services." *See, e.g.*, Doc. 185-23, Ex. 48, Tyler Report ¶¶ 15, 77–81. Additionally, Lucasys' definition of "Tax Services" as "tax consulting and technical services" in its Statement of Undisputed Material Facts differs from its expert's market definition of "Tax Services" as "services designed and used to overcome the limitations of PowerTax." Doc. 184-5, Ex. 5, Meyer Report ¶ 39.

**<u>Lucasys Reply</u>:**

As an initial matter, the Response does not provide any evidence refuting that Liberty terminated their Tax Services engagement with Lucasys as a result of PowerPlan's communications to it. Nor does the Response object to the deposition testimony of Ms. Read or Ms. Eustace who testified that Liberty terminated its engagement with Lucasys as a result of PowerPlan's communications. Accordingly, the Court may deem this fact admitted and undisputed for purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

The Response, however, does object to the statement based on Federal Rules of Evidence 602 (need for personal knowledge) and 802 (hearsay) as it relates to the deposition testimony of Mr. Lantukh and Pl.'s Ex. 30. As for Mr. Lantukh's personal knowledge, he undeniably has personal knowledge regarding Liberty's and NextEra's termination of Lucasys. And, as Mr. Lantukh can provide testimony at trial, the Court can also consider his testimony. *See Lewis*, 800 F. App'x at 834 ("[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial . . . . The most obvious way to reduce hearsay to admissible form is to call the declarant to testify at trial.").

As for Plaintiff's Exhibit 30, PowerPlan's arguments are without merit. As explained above, Rule 602 does not apply to the exhibit because that rule only pertains to the personal knowledge of a testifying witness. Exhibit 30 is an email from Steven Williams at FPL to Jamie Carr. As for whether the document is inadmissible hearsay, even if so, the Court may consider the evidence, as Mr. Williams and Mr. Carr can provide testimony at trial. *See Lewis*, 800 F. App'x at 834. Finally, the email is the record of a regularly conducted business activity and admissible under Federal Rule of Evidence 803(6). These objections are therefore without merit. (*See* Statement No. 43.)

As for PowerPlan's other argument—that the record evidence disputes the statement that NextEra/FPL terminated its engagement with Lucasys because of PowerPlan's communication—PowerPlan has not provided any evidence to directly refute this statement. NextEra's representative, James May, only testified that the initial call with Mr. Bertz did not result in NextEra terminating its relationship with Lucasys. (Doc. 175-1, NextEra Dep. at 16:4–18:19.) After refreshing Mr. May's recollection, however, he refused to state why NextEra terminated Lucasys based on an assertion of attorney-client privilege and advice of counsel. (*Id.* at 31:20–33:8.) Indeed, Mr. May refused to answer any question pertaining to the reasons for terminating Lucasys based on the advice of counsel and under a purported claim a

privilege. (*See, e.g.*, *id.* at 33:9–34:8.) However, the record evidence shows that Lucasys was terminated just four days after Mr. Bertz's communication and that during those four days Mr. Bertz continued to assure NextEra that it would not be worse off by ending its engagement with Lucasys. (*Id.* at 39:15–17, 43:17–46:19, 61:2–25, Pl.'s Exs. 278, 280–82.) Accordingly, PowerPlan has not cited any evidence directly refuting this statement.

Finally, as for whether Lucasys has adequately defined a "valid antitrust market" for Tax Services, this is not an element of any claim for which Lucasys has sought partial summary judgment and is therefore irrelevant and not material to the instant motion. Lucasys has moved for summary judgment on its negative tying claim under 15 U.S.C. § 1 (Count III), on the market power element of its claims under 15 U.S.C. § 2 pertaining to the ***Tax Software Market***—not the Tax Services Market—and PowerPlan's first affirmative defense regarding antitrust standing. (*See generally* Docs. 186, 186-1, Pl.'s MSJ). For purposes of its negative tying claim, Lucasys only has to show that Tax Software and Tax Services are distinct products. *Eastman Kodak Co.*, 504 U.S. at 462. Whether Lucasys has adequately defined a valid antitrust market for Tax Services is thus irrelevant and not material to the instant motion. Moreover, the Response's statement regarding any difference between the above referenced definition of Tax Services and Dr. Meyer's definition

is equally irrelevant and not material.

Because PowerPlan's objections are without merit and it has otherwise failed to directly refute this fact with specific citations to evidence, the Court may consider this fact admitted and undisputed for the purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

49.

**Lucasys Statement No. 49**:

Between 2019 and the filing of this case in July 2020, PowerPlan notified more than 50 RRIOUs orally or in writing that, pursuant to the License Agreement, it did not consent to Lucasys accessing any PowerPlan software or databases. (Doc. 154-1, Bertz Dep. at 85:1–86:5, 87:18–25; Doc. 154-1 at 280–300, 302–03, 306 (Pl.'s Ex. 14–17, 19, 21).)

**PowerPlan Response**:

Statement No. 49 is not material because the vast majority of the emails were not even opened, and there is no admissible evidence that those emails caused any company to not do business with Lucasys. *See* Doc. 185-12, Ex. 37 (12 unique opens out of 67 recipients); Doc. 177-1, Meyer Tr. 150:7–10 ("Q. Can you identify any customer that did not do business with Lucasys as a result of receiving an [IP] protection letter? A. Specifically, no.").

**Lucasys Reply**:

As an initial matter, the Response does not dispute that, between 2019 and the filing of this case in July 2020, PowerPlan notified more than 50 RRIOUs orally or in writing that, pursuant to the License Agreement, it did not consent to Lucasys accessing any PowerPlan software or databases. Accordingly, the Court may deem this fact admitted and undisputed for purposes of Lucasys' Partial Motion for Summary Judgment. *See* Fed. R. Civ. P. 56(e)(2); L.R. 56.1(B)(2)(a)(2).

Instead, the Response only argues that the statement is immaterial because a subset of the emails allegedly "were not even opened, and there is no admissible evidence that those emails caused any company to not do business with Lucasys." This is incorrect. The statement is material to Plaintiff's negative tying claim as it shows, *inter alia*, that PowerPlan interpreted its license agreement to require its consent for customers to share their data and that it would not provide that consent for customers seeking to use Lucasys. This argument is meritless.

50.

**Lucasys Statement No. 50**:

To date, PowerPlan has not made any communications to those RRIOUs notifying them of a change in that position since the filing of this lawsuit. (PowerPlan, Inc.'s Responses to Lucasys, Inc.'s Third Set of Continuing

Interrogatories, Response Number 21, attached hereto as **Exhibit II**.)

**PowerPlan Response:**

    Undisputed.

**Lucasys Reply:**

    Undisputed.

    This 26th day of May, 2023.

> _/s/ Joshua A. Mayes_
> Richard L. Robbins
> Georgia Bar No. 608030
> rrobbins@robbinsfirm.com
> Jason S. Alloy
> Georgia Bar No. 013188
> jalloy@robbinsfirm.com
> Joshua A. Mayes
> Georgia Bar No. 143107
> jmayes@robbinsfirm.com
> Rachel F. Gage
> Georgia Bar No. 547982
> rgage@robbinsfirm.com
> Evan C. Dunn
> Georgia Bar No. 535202
> edunn@robbinsfirm.com
> Robbins Alloy Belinfante Littlefield LLC
> 500 14th Street, N.W.
> Atlanta, Georgia 30318
> Telephone:  (678) 701-9381
> Facsimile:   (404) 856-3255
>
> Aaron Gott (admitted _pro hac vice_)
> aaron.gott@bonalawpc.com
> BONA LAW PC
> 15 South 9th Street, Suite 239

Minneapolis, Minnesota 55402
(612) 284-5001
Jarod Bona (admitted *pro hac vice*)
jarod.bona@bonalawpc.com
Jon Cieslak (admitted *pro hac vice*)
jon.cieslak@bonalawpc.com
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, California 92037
(858) 964-4589
(858) 964-2301 (fax)

*Counsel for Plaintiff Lucasys Inc.*

## **L.R. 7.1(D) CERTIFICATION**

I certify that the foregoing filing has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C). Specifically, this filing has been prepared using 14-pt Times New Roman Font.

*/s/ Joshua A. Mayes*
Joshua A. Mayes

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the within and foregoing **PLAINTIFF LUCASYS INC.'S CONSOLIDATED STATEMENT OF UNDISPUTED MATERIAL FACTS AND REPLY IN SUPPORT OF STATEMENT OF UNDISPUTED MATERIAL FACTS** with the Clerk of Court using the CM/ECF electronic filing system which will automatically send counsel of record e-mail notification of such filing.

This 26th day of May, 2023.

*/s/ Joshua A. Mayes*
Joshua A. Mayes
